No. 22-1018

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ADVANCED ENERGY ECONOMY, *ET AL.*,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

*Respondent.*

_____

**BRIEF FOR AMICUS CURIAE
THE R STREET INSTITUTE**
_____

On Petition for Review of a Final Order of the United States Federal Energy
Regulatory Commission

Josiah Neeley
The R Street Institute
1212 New York Ave. N.W.
Suite 900
Washington, D.C. 20005
*Counsel for Amicus Curiae*

\* Admitted to practice in Texas

# DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, the R Street Institute makes the following disclosures:

R Street Institute is a nonprofit, nonpartisan, public policy research organization. Our mission is to engage in policy research and outreach to promote free markets and limited, effective government. R Street has no parent companies, subsidiaries, or affiliates and has not issued shares or other securities to the public. No publicly held corporation owns any stock in R Street.

# STATEMENT REGARDING CONSENT TO FILE
# AND SEPARATE BRIEFING

All parties have consented to the filing of this brief. Subsequent to receiving consent to file an amicus brief in support of petitioners, R Street learned that a separate amicus brief in support of petitioners was being prepared by the Harvard Electricity Law Initiative. Pursuant to Circuit Rule 29(d), R Street consulted with counsel for the Harvard Electricity Law Initiative about the possibility of doing a joint amicus, but were unable to reach agreement about the content of a joint brief, and ultimately concluded a single brief was impractical.

# TABLE OF CONTENTS

Disclosure Statement ........................................................................................ ii

Statement Regarding Consent to File and Separate Briefing ................................. ii

Table of Contents ............................................................................................. iii

Table of Authorities ......................................................................................... iv

Statement of Interest ......................................................................................... 1

Argument .......................................................................................................... 1

Conclusion ........................................................................................................ 8

Certificate of Compliance ............................................................................... 10

Certificate of Service ...................................................................................... 11

# TABLE OF AUTHORITIES

**CASES**

*Blumenthal v. FERC,* 552 F.3d 875 (D.C. Cir. 2009). ................................................6

**STATUTES**

16 U.S.C § 824d ........................................................................................... 1-2, 5

16 U.S.C. §§ 824j. ...............................................................................................2

**OTHER AUTHORITIES**

Promoting Wholesale Competition Through Open Access Nondiscriminatory

    Transmission Services by Public Utilities; Recovery of Stranded Costs by Public

    Utilities and Transmitting Utilities, Order No. 888, FERC Stats. & Regs. p

    31,036, 61 Fed. Reg. 21,540 (1996) ..................................................1, 2, 3, 5, 6, 7

Jennifer Chen, "Evaluating Options for Enhancing Wholesale Competition

and Implications for the Southeastern United States," Nicholas Institute for

    Environmental Policy Solutions, March 2020 ....................................................8

Jennifer Chen and Michael Bardee, "How Voluntary Electricity Trading

Can Help Efficiency in the Southeast," R Street Policy Study, No. 201, August

2020……………………………………………………………………………..8

## STATEMENT OF INTEREST OF AMICI CURIAE

The R Street Institute is a nonprofit, nonpartisan, public-policy research organization with a mission to engage in policy research and outreach to promote free markets and limited, effective government. R Street has a long history of writing, research, and advocacy on electricity law and policy issues, and has written extensively about the importance of competition in wholesale electricity markets. No one other than the amicus curiae or its counsel paid for the preparation of this amicus curiae brief or authored this brief, in whole or in part.

## ARGUMENT

In 1996 the Federal Energy Regulatory Commission (Commission or FERC) enacted Order 888, which sought to remove discriminatory barriers to competition from electric transmission. Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, Order No. 888, FERC Stats. & Regs. p 31,036, 61 Fed. Reg. 21,540 (1996). Order 888 was grounded in two legislative enactments that provide the underlying foundation for electricity regulation in the United States. First, Section 205 of the Federal Power Act of 1934 prescribes that "[n]o public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or

1

grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." 16 U.S.C. § 824d(b). Second, in the Energy Policy Act of 1992, Congress gave FERC new powers to order utilities to transmit power from third party generators over the utility's transmission lines in order to promote competition. 16 U.S.C. §§ 824j.

In Order 888, FERC recognized that new generation entrants were being discouraged by a lack of access to transmission services. FERC found that potential consumer benefits could be derived from more efficient generating plants obtaining access to regional transmission grids. The problem, however, was that "many traditional vertically integrated utilities still did not provide open access to third parties and still favored their own generation if and when they provided transmission access to third parties, barriers continued to exist to cheaper, more efficient generation sources." 61 Fed. Reg. at 21,546. In an area with a vertically integrated utility, the utility is at once a competitor with any independent generators and also the sole provider of transmission services within their service area. The utility thus has a financial incentive to deny transmission access to other generators or provide them inferior service in order to hobble their competition in the generation market.

2

To remedy this, Order No. 888 specifically required all public utilities that own, control or operate interstate transmission facilities to file open access non-discriminatory transmission tariffs that include minimum terms and conditions of non-discriminatory service. *Id.* at 21540. Further, Order 888 makes clear that simply filing an open access tariff by itself will not cure undue discrimination in transmission if utilities can "continue to trade with a selective group… that discriminatorily excludes others from becoming a member." *Id.* at 21593.

The Southeast Energy Exchange Market (SEEM) is a new, multilateral wholesale energy trading platform proposed by a select number of transmission-owning utilities located in the Southeast United States. It was filed before FERC on February 12, 2021. On Oct. 12, 2021, SEEM became effective by operation of law resulting from a 2-2 deadlock at the Commission. On Nov. 8, 2021, the Commission issued a related order approving the utilities' proposed revisions to their Open Access Transmission Tariffs (OATT), resulting in restricted access to a new transmission service to entities participating in SEEM.

SEEM has several features that are relevant to its compatibility with Order 888. First, membership in SEEM is limited to utilities operating within the SEEM territory. According to the SEEM Agreement, to be a member of SEEM, an entity must be:

> (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in

the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory.

Southeast Energy Exchange Market Agreement, III.2.1 (JA__).

SEEM is governed by a Membership Board which is made up of one representative from each Member. *Id.* at IV.1.2. The Membership Board holds substantial authority over the operation of the SEEM market, overseeing and approving budgets, approving manuals developed by the Operating Committee, and directing the functions of the Market Auditor. *Id.* at IV. There is little to no requirement for transparency in the operation of SEEM. The SEEM Agreement provides no requirement that its materials, minutes, or actions taken during a Membership Board meeting be made public, with the exception of a once a year "Stakeholders Meeting" held with only seven days' notice. *Id.* at IV.4.

SEEM's membership restrictions and governance structure are unduly discriminatory. By requiring participants to own or control a resource in the territory or be contractually obligated to directly serve customers in the territory, the agreement forbids resources outside the territory with the physical capability of providing electricity to the territory from participating and it restricts the ability of non-physical market actors, such as traders, to participate. Many independent power producers, who do not directly serve end-use consumers, are ineligible for

4

membership, and thus cannot access the benefits of SEEM. This unequivocally thwarts competition and blocks transmission access for physical and financial third-party suppliers and eliminates market options for consumers to contract with independent suppliers. SEEM's closed membership model directly contradicts the open membership model required by Order 888, which states that "membership provision[s] must allow any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location." *Id.* at 21594.

SEEM denies "open access" to electric transmission facilities, which is the bedrock of just and reasonable rates under the Federal Power Act. SEEM erodes the foundational principles of open access transmission service and establishes a system that is a market in name only, where incumbent transmission utilities have the motive and ability to discriminate against third party suppliers and exercise market power in a manner that raises costs to consumers, resulting in unjust and unreasonable rates under the Federal Power Act. 16 U.S.C. § 824d(b).

In his official statement explaining his vote to approve SEEM, Commissioner James Danly argues that SEEM is not inconsistent with the Federal Power Act because it is "no more than an enhancement to an existing bilateral regime which is obviously permissible under the FPA." Statement of James P. Danly, p. 17 (JA at _). This is incorrect. SEEM imposes certain modifications to the existing market structures in the southeast United States that would restrict

market access compared to the status quo, rendering the market unduly discriminatory and preferential to predetermined incumbent utilities. Specifically, SEEM's membership restrictions, preferential market rules and lack of independent governance are unduly discriminatory. Before FERC can approve a market-based tariff, it must be satisfied that approval would not allow sellers to exercise anticompetitive market power. *Blumenthal v. FERC*, 552 F.3d 875, 882 (D.C. Cir. 2009). In this case, the combination of preferential rule and lack of oversight exposes consumers to exercises of market power by incumbent utilities that increase rates above what a competitive marketplace would provide.

Under the status quo in the Southeast region, rules governing bilateral transactions are not dictated by one party or a consortium of parties. However, SEEM would impose rules that highly restrict membership and grant preferences to its members over other parties. This is in direct violation of Order 888's requirement for open, non-discriminatory membership provisions for such arrangements. Order 888 at 21,593 (undue discrimination occurs where utilities can "continue to trade with a selective group… that discriminatorily excludes others from becoming a member.")

SEEM establishes a select group of members with exclusive transmission-related rights. These preferential rights include SEEM members' ability to effectively control the SEEM agent, administrator, auditor and governance

6

structure. SEEM permits a small sub-class of market participants to conduct operational control and oversight for administering service across a footprint comprised of many different transmission owners. The complexity of the operational platform, in addition to the ability of SEEM members to determine the auditor's actions, would accommodate anticompetitive conduct by members. This discriminatory structure is why open access for multilateral energy exchanges elsewhere in the country have always been implemented by an independent agent, administrator and auditor or market monitor.

Incumbent SEEM members have unmitigated authority over who is permitted to enter enabling agreements to become a SEEM participant. Given the financial motives of incumbent members to deter competition from third parties, expected economic behavior of SEEM participants under this structure would be to provide favorable transmission services to members while inhibiting their non-SEEM member competitors in the generation market by providing them with inferior transmission service. In this regard, SEEM structurally emulates a sanctioned cartel, which directly violates Order 888 requirements. *Id.*

There are various market structures consistent with Order 888 that are upgrades to the bilateral-only status quo in the Southeast. For example, independent administration of a voluntary energy exchange with open membership and nondiscriminatory transmission services rendered in a transparent governance

7

framework would be an upgrade to the current bilateral market that would be perfectly consistent with Order 888. See Jennifer Chen, "Evaluating Options for Enhancing Wholesale Competition and Implications for the Southeastern United States," Nicholas Institute for Environmental Policy Solutions, March 2020. Such initiatives to incrementally upgrade form the bilateral-only model are underway in many western states. Jennifer Chen and Michael Bardee, "How Voluntary Electricity Trading Can Help Efficiency in the Southeast," R Street Policy Study, No. 201, August 2020. SEEM does not resemble these productive, nondiscriminatory structures. There is thus a danger that allowing SEEM to go forward will not only lead to excessive and discriminatory rates in the southeast, but established a roadmap for incumbent utilities to pursue a downgrade in competition in other regions of the country. For this reason, the Commission's approval of SEEM was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, amicus curiae asks this Court to grant the Petition for Review, set aside FERC's orders, and remand to FERC.

                    Respectfully submitted,

                    <u>/s/ Josiah Neeley</u>
                    Josiah Neeley
                    The R Street Institute

                                    1212 New York Ave., N.W.
                                    Suite 900
                                    Washington, D.C. 20005
                                    Telephone: 512.415.2012

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this filing complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) & 32(a)(7)(B) because this document contains 1,733 words, excluding the parts exempted by Fed. R. App. P. 32(f). I further certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared using a proportionally spaced typeface in Microsoft Word using Times New Roman 14-point.

>/s/ Josiah Neeley
>Josiah Neeley
>The R Street Institute
>1212 New York Ave., N.W.
>Suite 900
>Washington, D.C. 20005
>Telephone: 512.415.2012

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2022, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy of the on all registered users.

/s/ Josiah Neeley
Josiah Neeley
The R Street Institute
1212 New York Ave., N.W.
Suite 900
Washington, D.C. 20005
Telephone: 512.415.2012
