IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 22-1018

ADVANCED ENERGY ECONOMY., ET AL.
Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
Respondent

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**BRIEF OF AMICUS CURIAE
HARVARD ELECTRICITY LAW INITIATIVE
IN SUPPORT OF PETITIONERS**

Ari Peskoe
Harvard Law School
Electricity Law Initiative
6 Everett Street, Suite 4119
Cambridge, MA 02138
617.495.4425
apeskoe@law.harvard.edu

*Counsel for Amicus Curiae*

## Certificate as to Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing in this court are listed in the Brief for Petitioner.

Amici curiae are the Harvard Electricity Law Initiative and the R Street Institute in support of Petitioners.

### B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Petitioners.

### C.    Related Cases.

Counsel is not aware of any related cases.

## Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1: The Harvard Electricity Law Initiative is a research program at Harvard Law School. The Initiative is supported by Harvard University, a 501(c)(3) corporation based in Cambridge, Massachusetts, and is funded by private philanthropic foundations.

i

The Initiative aims to produce research that informs regulatory and judicial proceedings. The Initiative also updates policymakers about regulatory about judicial developments and files comments in Federal Energy Regulatory Commission proceedings.

# TABLE OF CONTENTS

Interest of Amicus Curiae ............................................................... 1

Rule 29 Statements ......................................................................... 2

Summary of the Argument.............................................................. 3

I.    Prior to FERC's Open Access Rules, Investor-Owned
      Utilities' Control of Transmission Allowed Them to
      Blatantly Wield Market Power in Interstate Markets .......... 8

II.   FERC's Open Access Transmission Rules Aim to Mitigate
      IOU Market Power and Are Necessary for Enabling Non-
      Utility Investment .............................................................. 16

III.  FERC's Approval of SEEM Disregards Open Access
      Standards and Inexplicably Sanctions IOU Control
      over the Regional Market ..................................................... 21

Conclusion ...................................................................... 26

# TABLE OF AUTHORITIES

**Federal Cases**

Ashwander v. TVA, 297 U.S. 288 (1936) .................................................. 10

Central Iowa v. FERC, 606 F.2d 1156 (D.C. Cir. 1979) ......................... 15

FPC v. Southern Cal. Edison. Co., 376 U.S. 205 (1964) ......................... 14

Gulf States Utilities Co. v. FPC, 411 U.S. 747 (1973) ............................ 11

Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of
   Snohomish Cty., 554 U. S. 527 (2008) .................................................. 21

National Ass'n of Regulatory Utility Comm'rs. v. FERC, 475 F.3d 1277
   (D.C. Cir. 2007) ..................................................................................... 20

New York v. FERC, 535 U.S. 1 (2002) ..................................................... 5

North Am. Co. v. SEC, 327 U.S. 686 (1946) ............................................ 9

Otter Tail Power v. U.S., 410 U.S. 366 (1973) ........................................ 11

Salt River Project v. FPC, 391 F.2d 470 (D.C. Cir. 1968) ...................... 10

Tennessee Elec. Power v. TVA, 306 U.S. 118 (1939) ............................... 10

Transmission Access Policy Group v. FERC, 225 F.3d 667 (D.C. Cir.
   2000) ................................................................................................... 5, 6

United Distribution Cos. v. FERC, 88 F.3d 1105 (D.C. Cir. 1996) ........ 20

**FERC Orders**

New England Power Pool Agreement, 48 FPC 1477 (1972) .................... 12

New England Power Pool Agreement, 56 FPC 1562 (1976) .................... 13

Order No. 1000, 136 FERC ¶ 61,051 (2011) .............................. 19, 20, 25

Order No. 2000, 89 FERC ¶ 61,285 (1999) ............................................ 17

Order No. 2003, 104 FERC ¶ 61,103 (2003) .......................................... 19

Order No. 888 Notice of Proposed Rulemaking, 60 Fed. Reg. 17,662
  (1995)..............................................................................................16, 25

Order No. 888, 61 Fed. Reg. 21,540 (1996) .......................5, 13, 16, 18, 20

Order No. 888-A, 62 Fed. Reg. 12,274 (1997) ............................16, 18, 24

Order No. 889, 61 Fed. Reg. 21,737 (1996) .............................................18

Order No. 890, 118 FERC ¶ 61,119 (2007) ................................19, 20, 25

Re Florida Power & Light Co., 8 FERC ¶ 61,121 (1979).........................15

Southern Co. Services, 125 FERC ¶ 61,316 (2008) ................................23

## FERC Commissioner Statements

Statement of Comm'r Clements (Oct. 20, 2021) .....................................23

## State Cases

Birmingham Ry., Light & Power Co. v. Littleton, 201 Ala. 141 (1917) ...8

## State Statutes

Alabama Acts of 1915 ..................................................................................8

## Other Authorities

Ari Peskoe, *Is the Utility Transmission Syndicate Forever?* 42 Energy
  L.J. 1 (2021) ........................................................................................12

Federal Power Commission, National Power Survey (1964).................15

In the Matter of Alabama Power Company, 13 NRC 1027 (1981).........11

In the Matter of Consumers Power Co., 6 N.R.C. 892 (1977) ...............11

# GLOSSARY

| | |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| IOU | Investor-Owned Utility |
| NRC | Nuclear Regulatory Commission |
| SEEM | Southeast Energy Exchange Market |

## INTEREST OF AMICUS CURIAE

The Harvard Electricity Law Initiative seeks to align the electricity sector's century-old legal foundations with modern clean energy technologies and business models. FERC's Open Access transmission rules are foundational for these efforts.

The power sector is in the midst of two profound transformations. First, additions of emission-free electricity generation technologies are outpacing new fossil-fuel based generation. This trend is likely to accelerate. Second, power delivery is now increasingly a two-way street, as consumers can both generate their own clean energy and react to real-time system conditions by storing energy or curtailing usage.

FERC's Open Access rules are essential for realizing the potential of both transformations. Already, Open Access has unleashed hundreds of billions of dollars in private investment and facilitated new business models, products, and services. Open Access has also linked consumers to markets, allowing them to shop for energy supply and sell energy services. The Electricity Law Initiative is concerned that FERC's approval of the Southeast Energy Exchange Market (SEEM) conflicts with Open Access principles, threatening progress on clean energy.

## RULE 29 STATEMENTS OF AUTHORSHIP, FINANCIAL CONTRIBUTIONS, CONSENT, AND SEPARATE BRIEF

Counsel has not been compensated for this brief. No party funded this brief. The undersigned counsel authored this brief. This brief does not represent the views of Harvard University or Harvard Law School.

Petitioners and Respondent FERC consented to the filing of this brief. Intervenors consented on the condition that the total word count of this brief and the amicus brief of the R Street Institute does not exceed the length of a single amicus brief. Counsel believes that this condition has been met.

Pursuant to Rule 29(d) of this Court, Counsel conferred with counsel for R Street Institute about a joint amicus brief and opted for complementary briefs. This brief provides historical context for FERC's Open Access rules and shows that FERC's approval of SEEM is at odds with the principles and premises underlying Open Access.

## SUMMARY OF THE ARGUMENT

The Petitioners explain that tariffs filed by investor-owned utilities (IOUs) based in the Southeast are inconsistent with the Federal Energy Regulatory Commission's (FERC) Open Access transmission rules. This brief provides context by explaining why FERC's regulation of interstate transmission service is necessary to counteract IOU market power, highlighting the key principles underlying FERC's Open Access transmission rules, and outlining how FERC's approval of the Southeast Energy Exchange Market (SEEM) violates Open Access principles.

Interstate transmission is the nervous system of the nation's electric power systems. Transmission lines connect large-scale power plants that generate nearly all electricity to ubiquitous local distribution systems that deliver power to homes and businesses. Transmission is the medium for coordinating supply and demand that enables the industry and consumers to unlock short-run and long-term efficiencies through trading and planning. Prior to Open Access, transmission's strategic importance allowed transmission-owning IOUs to restrict competition in infrastructure development, dominate

3

wholesale power markets, and dictate terms of service to their captive wholesale customers, such as municipally and cooperatively owned utilities. FERC's Open Access rules, first promulgated in 1996 and since strengthened several times, eliminated unfettered IOU control over transmission by setting standards for non-discriminatory service.

FERC's Open Access rules are necessary to counteract an unintended consequence of early twentieth century state public utility laws. By sanctioning local monopolies and funding IOU growth through state-set consumer rates, states enabled IOUs to dominate transmission development. Although they had initially focused on providing local service, IOUs leveraged their local monopolies into regional dominance. Through corporate consolidation and agreements with each other to exchange energy and coordinate infrastructure development, IOUs obtained dominant control of the nation's power sector. Their ownership of interstate transmission made this dominance possible.

In 1935, Congress responded by empowering FERC[1] to review IOU tariffs for interstate service. For decades, FERC focused on

---

[1] Until 1977, FERC was called the Federal Power Commission (FPC). For simplicity, we refer to the Commission as FERC.

4

ensuring that rates for wholesale power sales met the Federal Power Act's (FPA) "just and reasonable" standard and largely overlooked the terms and conditions of transmission service. Meanwhile, FERC, other federal agencies, and federal courts adjudicated a steady stream of complaints from non-profit municipal and cooperatively owned utilities alleging anti-competitive IOU conduct. For its part, FERC generally approved agreements among IOUs to coordinate operations and planning, even where non-profit utilities alleged they were discriminatorily excluded from those "power pools." As FERC later explained, prior to Open Access it favored IOU coordination even where it led to anti-competitive behavior because it believed that "competition generally was not meaningfully available as a means to discipline prices." *Order No. 888*, 61 Fed. Reg. 21,540, at p. 21,568 (May 10, 1996).

Following numerous technological advancements and regulatory changes, FERC issued Order No. 888 to mitigate IOUs' "systemic anticompetitive behavior." *Transmission Access Policy Group v. FERC*, 225 F.3d 667, 684 (D.C. Cir. 2000) (upholding Order No. 888), *aff'd New York v. FERC*, 535 U.S. 1 (2002). In Order No. 888, FERC recognized that competition was feasible and beneficial and found that IOU control

5

over transmission was impeding the development of competitive power markets. By setting minimum standards for IOU transmission service, FERC hoped to abolish unduly discriminatory transmission service and harness competitive wholesale electricity markets to improve industry performance and benefit consumers.

Starting with Order No. 888 and continuing through subsequent orders, FERC's Open Access rules have been guided by two key requirements: comparability and transparency. FERC requires IOUs to provide their customers and their own power wholesale market operations with comparable transmission service. To support new entry and fair markets, FERC has attempted to liberate transmission information from utility control by compelling IOUs to share operational and planning data.

Over the past twenty-six years, FERC has repeatedly strengthened its comparability and transparency requirements. FERC's Open Access revisions rest on its "general findings of systemic monopoly conditions and the resulting potential for anti-competitive behavior." *Transmission Access Policy Group v. FERC*, 225 F.3d at 688. FERC's approach has erred on the side of protecting against IOU market power.

6

FERC's approval of SEEM discards Open Access principles. SEEM provides the Southeast region with two tiers of transmission service and allows IOUs to arbitrarily deny preferential access, even to block competitors. FERC attempts to justify this deliberately discriminatory scheme by presuming that IOUs will not take advantage of SEEM's easy opportunities to act anti-competitively. This trust betrays FERC's firmly established presumption that monopolist IOUs will act in their own self-interest in absence of regulatory safeguards.

Retreating from Open Access could have grave consequences. The power sector is the midst of transformational changes. Open Access has unleashed innovation and entrepreneurship within the confines of monopolist ownership of transmission. FERC's Open Access rules have led to the creation of new business models, products, and services, and enabled hundreds of billions of dollars of non-utility investment. Technological advances in clean energy generation, storage, and delivery have boundless potential. The speed and costs of deployment, however, are in doubt. FERC's Open Access rules are necessary to limit the potential for IOU market power to impede the adoption of new technologies and services, thereby ensuring just and reasonable rates.

7

I.   **PRIOR TO FERC'S OPEN ACCESS RULES, INVESTOR-OWNED UTILITIES' CONTROL OF TRANSMISSION ALLOWED THEM TO BLATANTLY WIELD MARKET POWER IN INTERSTATE MARKETS**

Early twentieth century state public utility laws enabled IOUs, including the SEEM IOUs, to exercise market power in interstate power markets. These laws empowered state regulators to control entry into the nascent electricity industry. *See, e.g.,* Alabama Acts of 1915, pp. 865–67.  In general, regulators provided the dominant local provider with monopoly privileges. By preventing non-utility investment, regulators sanctioned exclusive service territories that allowed the then-largest IOUs to dominate the rapidly growing power industry.

To meet their "obligation to serve the public," *Birmingham Ry., Light & Power Co. v. Littleton*, 201 Ala. 141, 145 (1917), IOUs financed system expansion through state-regulated rates that tied their profits to the amount of money they invested in physical assets, such as power plants and transmission lines. The combination of exclusive service territories and state-set ratemaking minimized investment risks, allowing IOUs to cheaply finance new infrastructure. The states' regulatory model was designed to maximize local service: a locally

8

based IOU with a local service territory revenue from local ratepayers to build local infrastructure needed to meet growing local demand.

But state laws had the unintended effect of enabling IOUs to dominate interstate wholesale power markets. Backed by the unearned advantages provided by states — cost-of-service rates and exclusive local service territories — and fueled by utility holding companies whose investors were motivated by "by a desire for size and the power inherent in size," *North Am. Co. v. SEC*, 327 U.S. 686, 703 n.13 (1946), IOUs expanded quickly. Transmission construction tracked power plant expansion, as IOUs built new lines to connect new generation while also connecting to each other and to other nearby utility systems.

Connecting to neighboring utility systems via transmission links served two primary purposes. First, connections between IOUs tended to enhance system reliability and efficiency, lowering system costs. IOUs provided each other with backup power and traded energy when it was mutually beneficial. Second, transmission served IOUs' long-term strategic and financial goals. Connections to small, non-profit utilities provided IOUs with captive wholesale customers, and links among IOUs facilitated their regional dominance.

9

In the Southeast, two types of non-profit electric utilities were
prevalent by the middle of the twentieth century. *Tennessee Elec. Power
v. TVA*, 306 U.S. 118, 141–142 (1939) (describing states' enabling laws).
Since the electric power industry's founding, many municipalities
eschewed private utilities and instead built infrastructure needed to
deliver power to their residents and businesses. Beginning in the 1930s,
the federal government provided financial support to rural communities
"which the investor-owned utilities had not found [ ] profitable to
service." *Salt River Project v. FPC*, 391 F.2d 470, 473 (D.C. Cir. 1968).

Many municipal and rural cooperative utilities could not afford to
build their own power plants and therefore relied on wholesale power
purchases to meet consumer demand. Even where non-profit utilities
could access non-IOU suppliers, they often needed IOU transmission to
deliver that power. The Roosevelt Administration launched a
transmission construction campaign and an initiative to purchase
transmission facilities from IOUs in order to reduce non-profit utilities'
dependency on IOU transmission. *Ashwander v. TVA*, 297 U.S. 288
(1936) (describing a contract between TVA and Alabama Power to
purchase transmission facilities). But these short-lived efforts did not

10

change the fundamentals. For instance, by the 1970s SEEM IOU member Alabama Power had "dominance, particularly over the transmission facilities in south and central Alabama, [which] placed [it] in a unique position to control access to the market." *In the Matter of Alabama Power Company*, 13 NRC 1027, 1070 (1981).

IOU transmission dominance was by no means limited to the Southeast. For instance, in response to a complaint by Minnesota municipalities, a federal district court found that the IOU had "strategic dominance in the transmission of power in most of its service area, and that it used this dominance to foreclose [its competitors] from obtaining electric power from outside sources of supply." *Otter Tail Power v. U.S.*, 410 U.S. 366, 370 (1973) (quoting the lower court's findings). Federal courts and agencies heard similar complaints from non-profit utilities who were captive to their local IOU for transmission service. *See Gulf States Utilities Co. v. FPC*, 411 U.S. 747 (1973) (non-profit utilities alleging that the local IOU would only provide transmission service if they agreed to anti-competitive restrictions); *In the Matter of Consumers Power Co.*, 6 N.R.C. 892, 997–1044 (1977) (NRC finding that the Michigan IOU had "strategic dominance over high voltage

11

transmission," which allows it to "control the terms by which the small utilities can obtain . . . services," and that "small utilities were uniformly of the impression that it would be a useless gesture to request wheeling [transmission of power produced by the IOU's competitor] . . . and thus refrained from proposing transactions dependent on access to [the IOU's] transmission network").

Non-profit utilities also protested IOU alliances, typically referred to as power pools, as exclusionary and anti-competitive.[2] For instance, New England municipal utilities alleged that a proposed pool permitted "all the large utilities, legal competitors of each other, to combine all of the generation and all of the transmission in [the region] . . . without protecting the rights and opportunities of the small municipal and cooperative systems." *New England Power Pool Agreement*, 48 FPC 1477, 1478 (1972). FERC nonetheless approved the IOUs' power pool, noting that although the agreement "might narrow the basis for wholesale competition . . . reduction in cost of service resulting from this

---

[2] This discussion about power pools draws heavily from Counsel's previous work. *See* Ari Peskoe, *Is the Utility Transmission Syndicate Forever?* 42 Energy L.J. 1, 11–19 (2021).

new-found coordination is most certainly in the public interest and

outweighs any possible reduction in wholesale competition." *New*

*England Power Pool Agreement*, 56 FPC 1562, 1587 (1976).

In general, FERC followed this approach, tolerating exclusionary

and anti-competitive IOU power pools because it believed that efficiency

gains from IOU coordination were impossible to achieve with

competition. As FERC later summarized, "competition generally was

not meaningfully available as a means to discipline prices." Order No.

888 at p. 21,568 (1996). Nonetheless, IOU-run pools disadvantaged

non-profit utilities in numerous ways.

To facilitate joint operations, many pool agreements offered free

transmission service for members only. Pools required a constant flow of

information among IOUs about generation and transmission

availability, consumer demand, and other factors. Shared information,

along with IOU-written pool rules for dispatching plants and allocating

costs, determined the cost of power. Non-profit IOUs were often left in

the dark about operations and planning and assigned higher cost power.

Pool dispatch prioritized member plants over non-members'

generators. An IOU-run pool could effectively monopolize regional

13

wholesale power transactions by refusing to transport power from competing generators or blocking non-members from accessing particular sources of power. By emphasizing cooperation and shared savings, pools suppressed competition among IOU members.

Long-term planning procedures outlined in pool agreements were premised on IOUs cartelizing regional infrastructure development. Planning arrangements allowed IOUs to co-own facilities or take turns building new generators, furthering their regional dominance. As modern power plants became larger and pricier, more non-profit utilities were unable to support construction by themselves and became increasingly dependent on IOUs to generate and deliver power.

IOU-run pools were also mechanisms for evading regulatory scrutiny. Pool agreements were beyond the jurisdiction of state regulators. Only FERC could directly regulate their terms, although in practice many IOUs did not file agreements with FERC until the mid-1960s following a relevant Supreme Court decision, *FPC v. Southern Cal. Edison. Co.*, 376 U.S. 205 (1964). FERC then prioritized encouraging voluntary coordination over aggressive enforcement of the FPA's anti-discrimination mandate. *See Central Iowa v. FERC*, 606

F.2d 1156, 1162–63 (D.C. Cir. 1979); Federal Power Commission, National Power Survey, at p. 1 (1964) (stating that its two-volume report was "the most effective means of carrying out the provisions of [FPA] section 202(a)," which encourages industrywide coordination).

By the late 1970s, following a series of Supreme Court cases about the relationship between antitrust law and the FPA, as well as a Congressional mandate for limited wholesale competition, FERC began to change its tune. Its response to anti-competitive IOU transmission service proceeded on a tariff-by-tariff basis. Where there was specific evidence about a particular IOU agreement, FERC considered whether the relevant tariff provision was "the least anticompetitive method of obtaining legitimate . . . objectives." *Re Florida Power & Light Co.*, 8 FERC ¶ 61,121 (1979).

15

## II.    FERC'S OPEN ACCESS TRANSMISSION RULES AIM TO MITIGATE IOU MARKET POWER AND ARE NECESSARY FOR ENABLING NON-UTILITY INVESTMENT

In Order No. 888, FERC reversed its tariff-by-tariff approach to remedying anti-competitive IOU transmission service and imposed, for the first time, industrywide standards. While non-utility-owned power plants had made significant inroads, FERC recognized that "the single greatest impediment to competition" remained IOUs' "market power through control of transmission." O*rder No. 888 Notice of Proposed Rulemaking*, 60 Fed. Reg. 17,662, 17,664 (Apr. 7, 1995); Order No. 888 at p. 21,546 ("The most likely route to market power in today's electric utility industry lies through ownership or control of transmission.").

To unleash the potential of competition for wholesale power sales, FERC determined that it had to review "discriminatory practices that once did not constitute undue discrimination" under FPA section 206. *Order No. 888* at p. 21,568. Having done so, FERC concluded that it could not "allow what have become unduly discriminatory practices to erect barriers between customers and the rapidly emerging competitive electricity marketplace." *Order No. 888-A*, 62 Fed. Reg. 12,274, at p. 12,296 (Mar. 14, 1997).

16

Order No. 888 includes three related components aimed at facilitating competition in wholesale power. First, FERC ordered each IOU to file a transmission tariff that provides all customers with transmission service that is comparable to the service that the IOU provides for its own wholesale marketing business. Second, to support this comparability goal, FERC required each IOU to "unbundle" wholesale energy sales from transmission service by charging separate rates for each and taking transmission service for its own wholesale marketing activities under its own tariff. Third, FERC also required IOUs to separate their power marketing and transmission personnel pursuant to codes of conduct that would prohibit employees operating the transmission network from providing non-public information to the utility's power marketing personnel.

In a subsequent order, FERC explained that its "primary focus, both in terms of access and pricing was comparability; that is, all transmission users should receive access under rates, terms and conditions comparable to those the transmitting utility applies to itself to serve its own customers." *Order No. 2000*, 89 FERC ¶ 61,285, at p. 210 (1999). By "open[ing] up the 'black box' of [] transmission system

17

information," and separating IOU employees by function, FERC aimed to "ensure that the utility does not use its access to information about transmission to unfairly benefit its own or its affiliates' sales." *Order No. 889*, 61 Fed. Reg. 21,737, at p. 21,740 (May 10, 1996).

FERC's sweeping reforms specifically targeted IOU-run power pools. FERC acknowledged that it had previously tolerated pool agreements "that provided third parties with transmission services that were distinctly inferior to the utility's own uses of the transmission system," *Order No. 888-A* at p. 12,296. However, FERC's "primary goal" was now "to ensure comparability regarding transmission services that are offered on a pool-wide basis." *Id.* at p. 12,313. FERC concluded that its comparability and transparency requirements were "not enough to cure undue discrimination in transmission if those public utilities can continue to trade with a selective group within a power pool that discriminatorily excludes others from becoming a member and that provides preferential intra-pool transmission rights and rates." *Order No. 888* at p. 21,593. It therefore ordered IOUs to file new power pool agreements that were consistent with Open Access rules.

18

FERC has consistently and repeatedly strengthened the comparability and transparency requirements. In 2003, FERC required IOUs to standardize agreements for generators seeking to connect to IOU-owned transmission because it found that "interconnection is a critical component of open access transmission service and thus is subject to the requirement that utilities offer comparable service." *Order No. 2003*, 104 FERC ¶ 61,103 at P 9 (2003). In 2007, FERC found its Open Access rules still had "inadequate transparency requirements," and it ordered reforms aimed at "ensuring comparability in the manner in which a transmission provider operates and plans its system." *Order No. 890*, 118 FERC ¶ 61,119 at PP 51, 292 (2007). In 2011, FERC required IOUs to participate in regional transmission planning processes that provide non-IOU developers with "an opportunity comparable to that of an incumbent" IOU to have their projects selected for construction. *Order No. 1000*, 136 FERC ¶ 61,051 at P 332 (2011).

Each of these revisions was premised on the nature of monopolist IOUs. "The inherent characteristics of monopolists make it inevitable that they will act in their own self-interest to the detriment of others by . . . providing inferior transmission to competitors in the bulk power

markets." *Order No. 888* at 21,567. With each revision, FERC aims to address IOUs' "incentive[s] and abilit[ies] to discriminate against third parties, particularly in areas where [Open Access rules] leave the transmission provider with significant discretion." *Order No. 890* at P 26. FERC's goal is to "eliminate opportunities for undue discrimination in the provision of transmission service." *Order No. 1000* at P 17.

This Court has emphasized that FERC's "authority generally rests on the public interest in constraining exercises of market power," *National Ass'n of Regulatory Utility Comm'rs. v. FERC*, 475 F.3d 1277, 1280 (D.C. Cir. 2007) (citation omitted) and has "consistently required the Commission to protect consumers against [transmission owners'] monopoly power." *United Distribution Cos. v. FERC*, 88 F.3d 1105, 1127 (D.C. Cir. 1996). With its Open Access rules, FERC is meeting this Court's mandate.

However, FERC's approval of the SEEM marks an unexplained departure from the Commission's commitment to mitigating opportunities for undue discrimination, and SEEM approval is inconsistent with foundational Open Access principles.

### III.   FERC'S APPROVAL OF SEEM DISREGARDS OPEN ACCESS STANDARDS AND INEXPLICABLY SANCTIONS IOU CONTROL OVER THE REGIONAL MARKET

Although Open Access transmission has led to different wholesale market outcomes around the country, Open Access rules apply equally to all IOUs. In some regions, particularly where state laws now prohibit IOU power plant ownership, Open Access has facilitated robust new entry and transparent wholesale prices. Elsewhere, including the Southeast, new entry is largely dependent on state-regulated utility procurement decisions. Nevertheless, FERC's duty is the same — it must "break down regulatory and economic barriers that hinder a free market in wholesale electricity." *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U. S. 527, 536 (2008). FERC's approval of SEEM falls short. SEEM flouts key Open Access principles and resembles an anti-competitive pre-Open Access power pool that is designed to further IOUs' regional dominance.

SEEM is inconsistent with Open Access rules because it does not offer comparable transmission service. Petitioners summarize that SEEM includes "free transmission service and exclusive trading opportunities to a select group of power market participants." Pet. Br. 3.

21

Non-utility power plant owners are limited to second-class participation and could be excluded entirely by IOUs, even for anti-competitive reasons. *Id.* at 14–16. Once denied entry into SEEM, a market participant will receive inferior transmission service. *Id.* at 52 (listing benefits of SEEM transmission). This two-tiered transmission service is unduly discriminatory because it preferences the IOUs' favored market participants with superior service.

SEEM provides less transparent service than the status quo. Under existing FERC-approved tariffs in the Southeast, IOUs allocate transmission serviced based on the terms and conditions published in the filed tariff. But, as just mentioned, non-SEEM members can be arbitrarily denied preferential SEEM transmission service for any reason. The SEEM rules are unduly discriminatory because they allow IOUs to deny transmission service without any FERC-approved limits.

Moreover, SEEM allocates transmission service through wholesale prices that are less transparent than existing pricing mechanisms. For instance, Southern Company (parent to three SEEM IOU members) runs auctions for short-term power that are overseen by an independent monitor and publicly discloses bids and offers into the auctions.

22

*Southern Co. Services*, 125 FERC ¶ 61,316 (2008); Supplemental Affidavit of Paul M. Sotkiewicz, FERC Docket No. ER21-1111, Jun. 28, 2021, at PP 48–52. SEEM has neither protection, thus "limit[ing] transparency . . . [and] making it more difficult for interested parties to analyze the market" and understand how SEEM IOUs are allocating preferential transmission service. Sotkiewicz Affidavit at PP 51–52.

The lack of comparability and transparency is exacerbated by SEEM's exclusionary governance. FERC Commissioner Clements summarized in her dissenting statement that "[m]ember control over operations is provided via their exclusive ability to participate in both the [SEEM] Membership Board and Operating Committee, which are vested with near total control over the structure and operation of the market." Statement of Comm'r Clements (Oct. 20, 2021). In particular, SEEM rules allows the region's two largest IOUs — Southern Company and Duke Energy — to block changes to market rules. Protest of Public Interest Organizations, FERC Docket No. ER21-1111, Mar. 24, 2021, at pp. 28–29 (citing SEEM Agreement Articles 4, 4.1.5). Allowing two IOUs to jointly control the regional market invites the sort of anti-competitive conduct that Open Access is supposed to address.

23

It is no defense that SEEM includes some government and cooperatively owned utility members. Petitioners show that SEEM explicitly excludes many existing independent power producers and allows IOUs to arbitrarily exclude other sellers in the future. Pet. Br. 14–16, 23, 54. Thanks to Open Access, such non-utility power plant developers now compete with IOUs, and they will be disadvantaged by SEEM's unduly discriminatory service. SEEM IOUs resist labelling SEEM a "pool" because FERC's Open Access rules are crystal clear: pools must "allow open membership and [ ] make the transmission service in the [ ] pool agreement available to others." *Order No. 888-A* at p. 12,313. SEEM IOUs seek to revive pre-Open Access era pools, which enabled members to allocate the benefits to themselves and exclude competitors. Open Access ended such undue discrimination.

Finally, as Petitioners explain, FERC's approval is arbitrary and capricious because it rests on the "fallacy that monopoly utilities have no incentive to extend their monopolies by limiting their competitors' access to free transmission service and trading opportunities." Pet. Br. 4, 46–49. Open Access is premised on the self-evident truth that "utilities owning or controlling transmission facilities possess

24

substantial market power [and] that, as profit maximizing firms, they have and will continue to exercise that market power in order to maintain and increase market share." *Order No. 888 Notice of Proposed Rulemaking* at p. 17,665. FERC's amendments to its Open Access rules are built on that foundational assumption. *Order No. 890* at P 422 (imposing transmission planning rules because FERC cannot "rely on the self-interest of transmission providers to expand the grid in a nondiscriminatory manner"); *Order No. 1000* at P 256 (mandating competitive transmission development processes because "[i]t is not in the economic self-interest of incumbent transmission providers to permit new entrants to develop transmission facilities."). FERC fails to justify any departure from this longstanding premise.

25

## CONCLUSION

FERC's Open Access transmission rules constrain IOUs' abilities to exercise market power through their transmission service. FERC's approval of SEEM is irreconcilable with Open Access rules. We respectfully request that this Court set aside FERC's orders.

September 28, 2022

Respectfully submitted,

/s Ari Peskoe
Ari Peskoe
Harvard Law School
Electricity Law Initiative
6 Everett Street, Suite 4119
Cambridge, MA 02138
617.495.4425
apeskoe@law.harvard.edu

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,411 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14 point Century Schoolbook font.

Dated: September 28, 2022

/s/ Ari Peskoe
Ari Peskoe

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2022, I electronically re-filed this corrected brief with the Clerk of the Court of the United States Court of Appeals for the District of Columba Circuit by using the appellate CM/ECF system, which constitutes service under this Court's rules.

/s/ Ari Peskoe
Ari Peskoe

28