**ORAL ARGUMENT SCHEDULED MARCH 15, 2023**

**No. 22-1018**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ADVANCED ENERGY ECONOMY, *ET AL.*,
*Petitioners*,
*v.*
FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

---

Petition for Review of a Final Order of the
United States Federal Energy Regulatory Commission

---

**JOINT APPENDIX**

---

**<u>Attorneys for Petitioners</u>:**

Maia Hutt
Alexandra Farrell
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
(919) 967-1450
mhutt@selcnc.org
afarrell@selcnc.org
*Counsel for Energy Alabama,*
*Georgia Interfaith Power and Light,*

John N. Moore
Natural Resources Defense Council
20 North Wacker Street, Suite 1600
Chicago, Illinois 60201
(312) 651-7927
jmoore@nrdc.org

(cont'd below)

January 26, 2023

*Additional Attorneys and Parties Listed on Inside Cover Pages*

*(cont'd) North Carolina Sustainable Energy Association, Partnership for Southern Equity, Sierra Club, Southern Alliance for Clean Energy, South Carolina Coastal Conservation League, Southface Institute, Vote Solar*

Ben Norris
Solar Energy Industries Association
1425 K Street, NW Suite 1000
Washington, DC 20005
(202) 682-0556
bnorris@seia.org
*Counsel for Solar Energy Industries Association*

Todd G. Glass
Wilson Sonsini Goodrich
& Rosati, PC
501 Fifth Avenue, Suite 5100
Seattle, WA 98104
(206) 883-2571
tglass@wsgr.com
*Counsel for Advanced Energy Economy*

Robert H. Solomon
Solicitor
Robert M. Kennedy
Senior Attorney
Federal Energy Regulatory Commission
Washington, DC 20426
(202) 502-8904
robert.kennedy@ferc.gov
*Counsel for Respondent Federal Energy Regulatory Commission*

Caroline Reiser
Natural Resources Defense Council
1152 15th Street, NW, #300
Washington, DC 20005
(202) 717-8341
creiser@nrdc.org

Danielle C. Fidler
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
dfidler@earthjustice.org

Aaron Stemplewicz
Earthjustice
1617 John F. Kennedy Boulevard, Suite 1130
Philadelphia, PA 19103
(917) 628-7411
astemplewicz@earthjustice.org

Alexander L. Tom
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
(415) 217-2111
atom@earthjustice.org
*Counsel for Natural Resources Defense Council*

Adrienne Mouton-Henderson
Clean Energy Buyers Association
1425 K Street, Suite 1110
Washington, DC 20005
(888) 458-2322
amouton-henderson@cebuyers.org
*Counsel for Clean Energy Buyers Association*

Matthew A. Fitzgerald
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-4716
mfitzgerald@mcguirewoods.com
*Counsel for Intervenors-*
*Respondents SEEM Members*

## TABLE OF CONTENTS

| Tab | Description | Record Item | JA |
|---|---|---|---|
| **FERC Issuances** | | | |
| 1 | Letter informing Alabama Power Company et al. that the 02/12/2021 filing is deficient and requesting additional information within 45 days under ER21-1118 et al. | R.182 | **JA0001** |
| 2 | Letter informing Alabama Power Company that the 06/07/2021 filing is deficient and requesting additional information within 10 days under ER21-1111 et al. | R.202 | **JA0016** |
| 3 | *Alabama Power Co.*, Notice of Filing Taking Effect By Operation of Law, FERC Docket Nos. ER21-1111, et al. (Oct. 13, 2021) | R.226 | **JA0022** |
| 4 | Statement of Chairman Richard Glick in FERC Docket Nos. ER21-1111, et al. (Oct. 20, 2021) | R.227 | **JA0025** |
| 5 | Statement of Commissioner Allison Clements in FERC Docket Nos. ER21-1111, et al. (Oct. 20, 2021) | R.228 | **JA0035** |
| 6 | Statement of Commissioner Mark C. Christie in FERC Docket Nos. ER21-1111, et al. (Oct. 20, 2021) | R.229 | **JA0060** |
| 7 | Statement of Commissioner James P. Danly in FERC Docket Nos. ER21-1111, et al. (Oct. 20, 2021) | R.230 | **JA0076** |
| 8 | *Duke Energy Progress, LLC*, Order Accepting Tariff Revisions, 177 FERC ¶ 61,080 (Nov. 8, 2021) | R.232 | **JA0117** |
| 9 | *Alabama Power Co.*, Order Rejecting Rehearing Requests as Timely, 177 FERC ¶ 61,178 (Dec. 10, 2021) | R.247 | **JA0194** |
| 10 | *Alabama Power Co.*, Order Accepting Tariff Revisions, 178 FERC ¶ 61,048 (Jan. 21, 2022) | R.274 | **JA0203** |
| 11 | *Duke Energy Progress, LLC*, Order Addressing Arguments Raised on Rehearing, 178 FERC ¶ 61,195 (Mar. 24, 2022) | R.284 | **JA0226** |

i

| Tab | Description | Record Item | JA |
|---|---|---|---|
| 12 | *Alabama Power Co.*, Order Addressing Arguments Raised on Rehearing, 178 FERC ¶ 61,196 (Mar. 24, 2022) | R.285 | **JA0257** |
| 13 | *Alabama Power Co.*, Order Addressing Arguments Raised on Rehearing, 179 FERC ¶ 61,128 (May 19, 2022) | R.286 | **JA0276** |
| **Comments and Party Filings** | | | |
| 14 | Alabama Power Company submits tariff filing per 35.13(a)(2)(iii): Southeast EEM Agreement Filing to be effective 5/13/2021 under ER21-1111 Filing Type: 10 | R.4 | **JA0286** |
| 15 | Motion to Intervene and Comments of Tennessee Valley Authority under ER21-1112 | R.132 | **JA0649** |
| 16 | Advanced Energy Economy, et al. submits Comments under ERGs under ER21-1111, et al. | R.142 | **JA0655** |
| 17 | Errata to the March 15, 2021, Motion to Intervene and Limited Protest and Comments of Public Interest Organizations under ER21-1111, et al. | R.174 | **JA0714** |
| 18 | Motion for Leave to Answer and Answer of the Southeast EEM Members under ER21-1111, et al. | R.177 | **JA0844** |
| 19 | Alabama Power Company submits tariff filing per 35.17(b): Response to Deficiency Letter regarding Southeast EEM Agreement to be effective 8/6/2021 under ER21-1111 Type:180 (Excerpt Transmittal Letter pp. 12-42 and Attach A pp. 48-66) | R.183 | **JA0908** |
| 20 | Protest of Sustainable FERC Project, et al. under ER21-1111 | R.196 | **JA0959** |
| 21 | Motion for Leave to Respond and Respond of Public Interest Organizations under ER21-1111, et al. (Excerpt pp. 10-13) | R.201 | **JA1025** |

| Tab | Description | Record Item | JA |
|-----|-------------|-------------|-----|
| 22 | Alabama Power Company submits tariff filing per 35.17(b): Response to Second Deficiency Letter regarding Southeast EEM Agreement to be effective 10/12/2021 under ER21-1111 Filing Type: 180 (Excerpt Transmittal Letter pp. 1-2 and Attachment A (SEEM Agreement)) | R.212 | **JA1030** |
| 23 | Protest of Public Interest Organizations et al. under ER21-1111, et al. (Excerpt pp. 1-5) | R.216 | **JA1095** |
| 24 | Request for Rehearing of Public Interest Organizations under ER21-1111, et al. | R.234 | **JA1100** |
| 25 | Request for Rehearing of Clean Energy Coalition for the October 13, 2021 Deadlock Notice under ER21-1111, et al. (Excerpt pp. 8-26) | R.235 | **JA1118** |
| 26 | Alabama Power Company submits tariff filing per 35.13(a)(2)(iii): Revisions to Southeast EEM Agreement to be effective 11/25/2021 under ER22-476 Filing Type: 10 (Excerpt Transmittal Letter and Revised Tariff - Clean) | R.237 | **JA1138** |
| 27 | Motion for Leave to Answer and Answer of the Southeast EEM Members to Requests for Rehearing under ER21-1111, et al. (Excerpt pp. 1-16) | R.239 | **JA1246** |
| 28 | Request for Rehearing of the Commission's November 8, 2021 Order Accepting Tariff Revisions of Public Interest Organizations under ER21-1115, et al. (Excerpt pp. 5-27) | R.246 | **JA1262** |
| 29 | Request for Rehearing of Energy Alabama et al. for the Commission's January 21, 2022 Order Accepting Tariff Revisions under ER22-476 (Excerpt pp. 8-14) | R.280 | **JA1286** |
| 30 | SEEM Agreement Amendment Filing, FERC Dkt. No. ER23-588-000 (Dec. 9, 2022) | N/A | **JA1294** |

**CERTIFICATE OF SERVICE**

I hereby certify that, pursuant to D.C. Cir. R. 25(a), service of the foregoing will be made electronically via the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system. Dated this 26th day of January 2023.

*/s/ Danielle C. Fidler*
Danielle C. Fidler

Date: January 26, 2023

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, DC 20426

OFFICE OF ENERGY MARKET REGULATION

In Reply Refer To:
Alabama Power Company
Georgia Power Company
Mississippi Power Company
Duke Energy Carolinas, LLC
Duke Energy Progress, LLC
Louisville Gas and Electric Company
Kentucky Utilities Company
Dominion Energy South Carolina, Inc.
Docket Nos.  ER21-1111-000
                      ER21-1112-000
                      ER21-1114-000
                      ER21-1115-000
                      ER21-1116-000
                      ER21-1117-000
                      ER21-1118-000
                      ER21-1119-000
                      ER21-1120-000
                      ER21-1121-000
                      ER21-1125-000
                      ER21-1128-000
                      (not consolidated)

Issued: 5/4/2021

McGuireWoods LLP
2001 K Street, NW
Suite 400
Washington, DC 20006

Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, AL 35203

Duke Energy Corporation
1301 Pennsylvania Avenue, NW
Washington, DC 20011

JA0001

Document Accession #: 20210504-3015          Filed Date: 05/04/2021

LG&E and KU Energy LLC
220 West Main Street
Louisville, KY 40202

Dominion Energy, Inc.
Mail Code C222
220 Operation Way
Cayce, SC 29033

Attention:      Noel Symons, Esq.
                 Counsel for Southern Company Services, Inc. and the other Members of the
                 Southeast Energy Exchange Market

                 Andrew W. Tunnell, Esq.
                 Attorney for Southern Company Services, Inc.

                 Christopher H. Demko, Esq.
                 Counsel for Southern Company Services, Inc.

                 Molly Suda, Esq.
                 Associate General Counsel for Duke Energy Corporation

                 Jennifer Keisling, Esq.
                 Senior Counsel for LG&E and KU Energy, LLC

                 Sara C. Weinberg, Esq.
                 Senior Counsel for Dominion Energy, Inc.

Reference:     Southeast Energy Exchange Market Proposal and Related Open Access
                 Transmission Tariff Revisions

      On February 12, 2021, in Docket No. ER21-1111-000, Southern Company
Services, Inc., as agent for Alabama Power Company (Alabama Power), acting on behalf
of Alabama Power and the other Members of the Southeast Energy Exchange Market
(Southeast EEM) (collectively, Filing Parties), submitted the Southeast Energy Exchange
Market Agreement (Southeast EEM Agreement). In conjunction with the Southeast EEM
Agreement filing, each Member of the Southeast EEM that is a transmission service
provider with an open access transmission tariff (OATT) on file with the Commission,
including Southern Companies,[1] submitted amendments to its respective OATT to offer

---

      [1] Southern Companies refers, collectively, to Alabama Power, Georgia Power
Company (Georgia Power), and Mississippi Power Company (Mississippi Power).

JA0002

zero-charge transmission service for Energy Exchange transactions facilitated by the Southeast EEM (called Non-Firm Energy Exchange Transmission Service or NFEETS).[2] Also, each of the other Commission-jurisdictional Members of the Southeast EEM, in conjunction with the Southeast EEM Agreement filing, submitted a Certificate of Concurrence (together, the Concurrence Filings).[3]

Please be advised that your submittals are deficient and that additional information is required in order to process the filings. Please provide the information requested below. To the extent that some of the required information may contain confidential material, please submit a non-public version in addition to the public version for Commission review.

1. Filing Parties state that Southern Companies anticipate submitting a maximum energy exchange price that will be no more than the mitigated price cap that is set forth in their Market-Based Rate (MBR) Tariff (MBR Tariff). Filing Parties explain that "[i]f the match price is above the 'maximum Energy Exchange Price' for buyers in mitigated [balancing authority areas], the match price will be adjusted down to the 'Energy Exchange Price.'"[4]

   a. When Filing Parties state that the match price will be adjusted down to the "Energy Exchange Price," do they mean adjusted down to the "maximum Energy Exchange Price"?

      i. If the answer is no, when the final match price is above the maximum Energy Exchange Price, what will the final price be?

      ii. If the Energy Exchange Price is below the maximum Energy

---

[2] Southern Companies, Filing, Docket No. ER21-1125-000 (filed Feb. 12, 2021); Duke Energy Carolinas, LLC (DEC), Filing, Docket No. ER21-1115-000 (filed Feb. 12, 2021); Dominion Energy South Carolina, Inc. (Dominion Energy SC), Filing, Docket No. ER21-1128-000 (filed Feb. 12, 2021); Louisville Gas & Electric Company (LG&E), Filing, Docket No. ER21-1118-000 (filed Feb. 12, 2021).

[3] Georgia Power, Filing, Docket No. ER21-1119-000 (filed Feb. 12, 2021); Mississippi Power, Filing, Docket No. ER21-1121-000 (filed Feb. 12, 2021); Dominion Energy SC, Filing, Docket No. ER21-1112-000 (filed Feb. 12, 2021); DEC, Filing, Docket No. ER21-1116-000 (filed Feb. 12, 2021); DEC, Filing, Docket No. ER21-1117-000 (filed Feb. 12, 2021); Kentucky Utilities, Filing, Docket No. ER21-1120-000 (filed Feb. 12, 2021); LG&E, Filing, Docket No. ER21-1114-000 (filed Feb. 12, 2021).

[4] Alabama Power, Filing, Docket No. ER21-1111-000, at 40 (filed Feb. 12, 2021) (Southeast EEM Transmittal).

Exchange Price, will the final price be the maximum Energy
Exchange Price or the Energy Exchange Price?

b. To help explain the mechanics of how the Southeast EEM, including the
Energy Exchange Price, will interact with existing market power
mitigation in certain balancing authority areas and for specific
participants, please address the following:

  i. Please provide further explanation, with examples, on how the
  "maximum Energy Exchange Price," "match price," and "Energy
  Exchange Price" will be used in the bidding process.

  ii. Please explain what the mitigated price cap is, how it works, and
  provide examples. Please also explain whether the mitigated
  price cap refers to the cost-based cap associated with the average
  variable cost, or to the incremental variable cost, within the
  Southern Companies' Energy Auction in mitigated balancing
  authority areas.[5]

  iii. Please explain why it is just and reasonable to use the mitigated
  price cap for non-intra hour trading as a cap for real-time, 15-
  minute energy trading.

2. Under Southern Companies' MBR Tariff, Southern Companies are required to
offer all available and uncommitted thermal generating capacity[6] (the must

---

[5] In December 2008, the Commission accepted Southern Companies' proposal to
establish a day-ahead and hour-ahead auction for energy to mitigate prospectively any
ability that Southern Companies' may have to exercise market power in the Southern
Balancing Authority Area. The Commission found that the Energy Auction, as
implemented under the conditions imposed by the Commission, would sufficiently
mitigate any potential that Southern Companies may have to exercise market power in
the Southern BAA. *See Southern Co. Servs., Inc.*, 125 FERC ¶ 61,316 (2008); *see also
Ala. Power Co.*, 158 FERC ¶ 61,131 (2017).

[6] Southern Companies' available capacity is calculated by first determining their
total generating capacity, including owned generating units and third-party purchases.
From this total generating capacity, Southern Companies subtract (1) the portion of their
total generating capacity that is unavailable due to planned or existing outages, derates, or
operational constraints, and (2) the amount of capacity that is already committed. The
remaining amount constitutes Southern Companies' "available capacity." All available
capacity is offered into the Energy Auction. *See* Alabama Power, Filing, Docket No.
ER10-2881-014, attach. A, at P 46 (filed June 14, 2014).

Document Accession #: 20210504-3015          Filed Date: 05/04/2021

offer requirement) into the Energy Auction in (1) firm Energy that is subject to liquidated damages and recallable in 50-megawatt (MW) blocks of day-ahead energy and (2) in non-firm 1 MW blocks of hour-ahead energy.

   a. Southern Companies' existing MBR Tariff states that all "available capacity" is offered into the Energy Auction.[7]  Please explain how the Energy Auction and the Southeast EEM will work together.  As part of your explanation, please address whether "available capacity" would be offered first to the Energy Auction and then to the Southeast EEM, or whether "available capacity" would be offered to the Southeast EEM before the Energy Auction in the mitigated balancing authority areas.

   b. Please confirm that the Southeast EEM proposal would not change the definition of available capacity in Southern Companies' MBR Tariff.[8]

3. Filing Parties assert that the Southeast EEM will enhance bilateral, intra-hour (15-minute increment) trading of a non-firm energy product.  Please clarify how the Southeast EEM will interact with or replace transactions that would occur under other bilateral agreements or any other aspects of existing markets by addressing the following:

   a. Please identify what product(s) currently available in the bilateral wholesale energy market could reasonably be a substitute for the 15-minute residual energy Southeast EEM product.

   b. What is the supply in MWs of 15-minute residual energy expected to be offered, in terms of the number of companies offering to sell energy and the size of their offers, in a typical peak and off-peak period?  What is the expected demand, in terms of the number of companies offering to purchase energy and their size, in a typical peak and off-peak period?

   c. Do you expect trades for 15-minute residual energy will expand across the whole Southeast EEM Territory?  Do you expect to have areas where some sellers are unlikely to find a match?

   d. Do you expect congestion, as in frequently binding constraints, would affect how trades are distributed across the Southeast EEM Territory in any time period?  Do you expect that there will be frequent times when

---

[7] *Id.*

[8] Alabama Power, Market Based Rate Tariff, Record F, Appendix DA-1 to Participation Rules (1.0.0).

one area may not be able to trade with another because of congestion? If so, how would you expect to measure congestion in the Southeast EEM?

4. Filing Parties state that the Southeast EEM will not create new opportunities for market manipulation, such that the Commission's existing auditing and monitoring tools for bilateral markets will remain sufficient.[9]  Specifically, Filing Parties explain that the Commission will have access to individual trades via the Electronic Quarterly Reports (EQR) that 13 of the Southeast EEM Members are required to submit, representing approximately 98% of the total net energy for load of the Members.  Filing Parties further explain that the Commission will continue to have access to e-Tag data submitted pursuant to Order No. 771.[10]  Filing Parties assert that Southeast EEM transactions will be easily identifiable in EQR and e-Tag data given the 15-minute duration of the schedule and use of NFEETS.[11]  Filing Parties also note that the Commission will have access to the aggregated Southeast EEM data in the informational reports that the Southeast EEM Administrator (Administrator) will post publicly.  Lastly, Filing Parties state that the "three-eligible-counterparty rule," i.e., the requirement that all Participants have "toggled on" at least three unaffiliated potential counterparties each time they bid or offer, will protect against opportunities for market manipulation.[12]

   a. Please explain what, if any, information will routinely be available to the Commission to detect and address potential market manipulation in a near real-time manner (e.g., less than 30 days) in the Southeast EEM.

   b. Please explain whether the Administrator, Southeast EEM Market Auditor, or Membership Board will have the authority to respond to requests from the Commission for the following information for any and all Participants: specific parameter data for all 15-minute intervals, including toggled counterparty choices; Enabling Agreement counterparties; toggled balancing authority area choices; Available Transfer Capability made available to the Southeast EEM; bid/offer

---

[9] Southeast EEM Transmittal at 40.

[10] *Availability of E-Tag Information to Comm'n Staff*, Order No. 771, 141 FERC ¶ 61,235 (2012), *order on reh'g & clarification*, Order No. 771-A, 142 FERC ¶ 61,181 (2013).

[11] Southeast EEM Transmittal at 40-42.

[12] *Id.* at 40-41.

curves with price and quantity information; price caps; and/or matched bids with their associated price information.

   c. Please explain whether the Administrator, Southeast EEM Market Auditor, or Membership Board will be required to inform the Commission of potential violations of the Southeast EEM Market Rules or the Commission's statutes, regulations, or orders when and if they are identified.

5. To become a Participant in the Southeast EEM, a prospective Participant must, among other requirements, have or enter into an Enabling Agreement with at least three or more Participants.  The Southeast EEM Agreement defines an Enabling Agreement as "a bilateral agreement for the purchase and sale of Energy that provides for Energy Exchanges between a Seller and a Buyer and that, for Sellers that are Public Utilities and require authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under Section 205 of the FPA, has been entered into pursuant to such Seller's market-based rate authority."[13]  Filing Parties state that all transactions in the Southeast EEM will be consummated under Enabling Agreements instead of being consummated within the Southeast EEM itself.[14]

   a. Are there any limitations on a Participant's ability to refuse to enter into an Enabling Agreement with a prospective or current Participant?

   b. Are Participants required to provide any reason for refusing to sign an Enabling Agreement with a prospective or current Participant?

   c. What are the options for prospective or current Participants to challenge refusals by Participants to enter into an Enabling Agreement?

6. Filing Parties propose that the Administrator will create and maintain informational reports, including a monthly report of the weighted average match prices and daily reports containing the weighted average exchange price.[15]  According to Filing Parties' affiant, manipulation of the average exchange price is unlikely because the weighted average Southeast EEM prices

---

[13] Alabama Power, Filing, Docket No. ER21-1111-000, attach. A, art. 1 (filed Feb. 12, 2021) (Southeast EEM Agreement).

[14] Southeast EEM Transmittal at 14.

[15] Alabama Power, Filing, Docket No. ER21-1111-000, attach. C, Operations Aff. ¶ 53 (filed Feb. 12, 2021) (Operations Aff.).

Document Accession #: 20210504-3015    Filed Date: 05/04/2021

are not well-suited for settling related contracts that would be susceptible to manipulation and, further, it would be difficult for participants to materially change the weighted-average prices.[16]   Additionally, Filing Parties' affiants clarify that any party that does not consummate its Southeast EEM transactions—either by dispatching up its cleared supply or dispatching down its current supplies to reflect its cleared demand—will face imbalance charges.[17]

    a.   Please explain how access to e-Tag data, EQRs, and any other data provided by the Administrator or Southeast EEM Market Auditor (Auditor) could be used to detect potential exchanges that are cleared by the Southeast EEM but not physically consummated.

    b.   Please explain the reasoning for including unconsummated transactions in the calculation of the weighted average exchange price.

    c.   Please describe what, if any, data or information on unconsummated Southeast EEM transactions will be made available to the Commission, either in reports provided by the Southeast EEM Administrator or elsewhere.

7.   The Southeast EEM Agreement states that the Administrator will be responsible for, among other things, (1) the on-going functions of the Southeast EEM System and overseeing and/or performing the operation and maintenance services necessary to allow the Southeast EEM System to operate in a reliable manner, and (2) maintaining open communications by and among the Southeast EEM Administrator, Participants and the Southeast EEM Agent.[18]   The proposed Southeast EEM Market Rules state that the Auditor will perform its functions at the direction of the Membership Board.[19]   The Auditor will report its conclusions and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis.[20]   The Membership Board will maintain sole responsibility for

---

[16] Alabama Power, Filing, Docket No. ER21-1111-000, attach. D, Econ. Aff. ¶ 24 (filed Feb. 12, 2021) (Econ. Aff.).

[17] Operations Aff. ¶ 47.

[18] Southeast EEM Agreement § 2.3.

[19] Southeast EEM Agreement, app. B, § VI.D (Southeast EEM Market Rules).

[20] *Id.*

determining whether to share the information any further.[21]

    a.  What authority does the Administrator have to report concerns with the functionality, correct operations, and accordance with Market Rules of the Southeast EEM, or to recommend improvements to the Southeast EEM, to the Membership Board or to any other entities?  Must the Administrator wait for an auditing interval to report such concerns to the Auditor, or does the Administrator have other means of sharing concerns with the Membership Board or other parties?

    b.  The proposed Southeast EEM Market Rules describe one of the Auditor's auditing functions as to "[p]rovide evaluation regarding the proper function of the Southeast EEM System, and the effectiveness of any Southeast EEM System specific controls in place related to the operation of the Southeast EEM System."[22]

        i.  Please explain the process that the Auditor will use to ensure that the Southeast EEM system is functioning properly.

        ii.  Please describe what is meant by "any Southeast EEM System specific controls in place related to the operation of the Southeast EEM System."

    c.  The proposed Southeast EEM Market Rules describe one of the Auditor's auditing functions as to "[r]efer any complaints received to the Membership Board, and investigate further at the Membership Board's direction."[23]

        i.  Please explain whether the Membership Board is required to respond to the Auditor's reports and referred complaints.

        ii.  Please explain the criteria that the Membership Board will use to evaluate the Auditor's reports and referred complaints and to determine whether further action is necessary.

    d.  Filing Parties' affiants state that the Auditor will be responsible for responding to questions from Participants and/or regulators regarding

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

the integrity of the matching process.[24]

    i.  Please clarify to which regulators the Auditor will be required to respond.  Please also clarify on what timeline the Auditor will respond to questions from regulators or Participants.

    ii.  Please clarify whether the Auditor will be required to send its response to a question from a regulator or Participant to the Membership Board for review, prior to responding.

    iii.  Please explain what information the Auditor will have access to on its own to answer questions about the integrity of the matching process, or whether it will need to rely upon the Administrator to provide such information.

8.  The Southeast EEM Territory shares borders with the Midcontinent Independent System Operator, Inc. (MISO), PJM Interconnection, L.L.C. (PJM), and Southwest Power Pool, Inc. (SPP).  Filing Parties state that the Southeast EEM proposes to observe all physical and contractual limits on the transmission system of the Southeast EEM Members.[25]  Filing Parties explain that an Energy Exchange transaction under the Southeast EEM would not be matched if that transaction needed to rely on a neighboring transmission system.[26]

    a.  Please explain how the Southeast EEM will interact at the seams with MISO, PJM, and SPP.  Please explain how SEEM will manage loop flow, including an explanation of whether such loop flow would require additional interregional coordination, beyond that which exists today and how such coordination would work to respect contractual circumstances such as the MISO Settlement.

    b.  Filing Parties state that the Southeast EEM does not alter how transmission availability is calculated for bilateral transactions today and will not adversely affect the MISO Settlement, which provides for the contractual rights to transfer up to 1,000 MWs of energy between

---

[24] Operations Aff. ¶ 52.

[25] Southeast EEM Members Answer, Docket No. ER21-1111-000, at 51-55 (filed Mar. 30, 2021) (Southeast EEM Members Answer).

[26] *Id.* at 51.

MISO South and MISO Midwest via transmission facilities operated by MISO.[27]

    i. Please explain how the operation of the Southeast EEM (i.e., matching bids and offers and consummation of Energy Exchange transactions) and the Southeast EEM's preclusion against transactions occurring over neighboring transmission systems will respect the 1,000 MWs of contractual rights under the MISO Settlement.

    ii. Please explain which service—NFEETS or non-firm service under the MISO Settlement—would get priority on the systems of Southeast EEM Participating Transmission Providers.

9. Filing Parties state that since the Southeast EEM "will only use transmission that is not otherwise being used, [NFEETS] will not result in underfunding of transmission."[28] At the same time, Filing Parties indicate that availability of NFEETS may result in "some slight decrease in Point-to-Point revenues, which in turn would lessen revenue credits used to offset" charges to network service transmission customers.[29] According to Filing Parties, any increase in network transmission service rates would be "roughly balanced" by expected benefits from decreased energy costs resulting from the Southeast EEM.[30]

    a. Please explain how the statement that NFEETS will only use transmission that would not otherwise be used is consistent with the potential for a reduction in point-to-point transmission service reservations as a result of NFEETS. To the extent the increase in network service transmission rates due to an erosion of point-to-point transmission service reservations exceeds benefits to network service

---

[27] *Id.* at 55 n.185 (citing *Sw. Power Pool, Inc.*, 154 FERC ¶ 61,021 (2016) (MISO Settlement)). The MISO Settlement reflects the 2011 Amended and Restated Interchange Agreement between Entergy Arkansas, Inc., Associated Electric Cooperative, Inc., and Union Electric Company d/b/a as Ameren Missouri.

[28] Alabama Power, Filing, Docket No. ER21-1111-000, attach. B, Overview Aff. ¶ 23 (filed Feb. 12, 2021) (Overview Aff.).

[29] *Id.* ¶ 23.

[30] Econ. Aff. ¶ 67.

transmission customers resulting from the Southeast EEM, please explain how the zero-rate for NFEETS is consistent with cost causation.

b. Please explain how the availability of NFEETS may impact rates for firm point-to-point transmission charged by each prospective Southeast EEM Member that is a transmission service provider.

c. Please explain how the information Filing Parties propose to have posted regarding NFEETS meets the Commission's OASIS requirements.

10. Filing Parties state that the Southeast EEM Market Rules present the mathematical equation for how Energy Exchange prices will be calculated.[31] Filing Parties also state that certain other implementation details are the type of information that the Commission regularly finds are best left to unfiled business practice manuals.[32] Further, Filing Parties explain that the Southeast EEM Members commit to posting any applicable business practice manuals and meeting minutes on the Southeast EEM Website.[33]

a. Please clarify what implementation details related to the functioning of the Southeast EEM Algorithm—such the conditional logic, iterations, or other computational processes that will be used by the Southeast EEM Algorithm—you propose to include in the business practice manuals.

b. Please clarify whether the Southeast EEM business practice manuals will be posted to a publicly viewable portion of the Southeast EEM website, i.e., whether the manuals will be publicly accessible. If not, please clarify which entities will be able to access the manuals.

c. In addition to the posting of the business practice manuals on the Southeast EEM website, please describe any data about the Southeast EEM Algorithm's operation that will be posted to the Southeast EEM website, aside from the data that will be published in hourly, daily, and

---

[31] Southeast EEM Members Answer at 49 (citing Southeast EEM Market Rules § IV.C.5.a ("Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.")).

[32] *Id.*

[33] *Id.* at 41 n.140.

monthly ex-post reporting.

11. Filing Parties state that prior to being permitted to provide NFEETS, Participating Transmission Providers shall provide sufficient information to permit the Administrator to create a Network Map of the Southeast EEM Territory for the purpose of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges.[34] Filing Parties define "Network Map" as the computer-based representation of all Participating Transmission Provider service territories, Balancing Authorities, valid transmission paths (Point of Receipt – Point of Delivery combinations), Sources, and Sinks.[35]

   a. Please describe what information will be sufficient to permit the Administrator to create a Network Map, including how that information would be updated to reflect the 15-minute intervals.

   b. Please explain how the Southeast EEM Algorithm will ensure that transmission capacity submitted by Participants as available for NFEETS is consistent with Available Transfer Capacity on the relevant transmission lines.

12. The Southeast EEM Agreement states that the standard of review for any changes to the Agreement proposed by a non-party or by the Commission shall be no lower than the "public interest" standard of review set forth in *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).[36]

   a. Please provide further justification for the application of the *Mobile-Sierra* "public interest" standard of review to any changes to the Southeast EEM Agreement proposed by a non-party or the Commission.

   b. Please explain why the Southeast EEM Agreement establishes contract rates that qualify for the *Mobile-Sierra* presumption. Alternatively, please explain why the Commission should apply *Mobile-Sierra* to the

---

[34] Southeast EEM Market Rules § IV.A.2.

[35] *Id.* § II.

[36] Southeast EEM Agreement § 16.9.

Southeast EEM Agreement if it is not classified as a contract rate.

    c.   What standard of review will apply to amendments to the Southeast EEM Agreement proposed by the Members?

This letter is issued pursuant to 18 C.F.R. § 375.307 and is interlocutory.  This letter is not subject to rehearing under 18 C.F.R. § 385.713.  A response to this letter must be filed with the Secretary of the Commission within 45 days of the date of this letter by making a deficiency filing in accordance with the Commission's electronic tariff requirements.  For your response, use Type of Filing Code 170 if your company is registered under program code "M" (Electric Market Based Rate Public Utilities) or Type of Filing Code 180 if your company is registered under program code "E" (Electric Traditional Cost of Service and Market Based Rates Public Utilities).[37]  In addition, submit an electronic version of your response to Cecelia Coffey at cecelia.coffey@ferc.gov.  The information requested in this letter order will constitute an amendment to your filing and a new filing date will be established.[38]  A notice will be issued upon receipt of your filing.

Pending receipt of the above information, a filing date will not be assigned to your filing.  Failure to respond to this letter order within the time period specified may result in a further order rejecting your filing.

Issued by: Kurt M. Longo, Director, Division of Electric Power Regulation – East

---

[37] The filing must include at least one tariff record to restart the statutory timeframe for Commission action even though a tariff revision might not otherwise be needed.  *See generally Electronic Tariff Filings*, 130 FERC ¶ 61,047, at PP 3-8 (2010) (explaining that the Commission uses the data elements resulting from the tariff filing process to establish statutory filing and other procedural dates).

[38] *See Duke Power Co.*, 57 FERC ¶ 61,215, at 61,713 (1991) ("the Commission will consider any amendment or supplemental filing filed after a utility's initial filing . . . to establish a new filing date for the filing in question").

Document Content(s)
Southeast EEM Deficiency Letter - For Issuance.DOCX ......................1

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, DC  20426

OFFICE OF ENERGY MARKET REGULATION

In Reply Refer To:
Alabama Power Company
Georgia Power Company
Mississippi Power Company
Duke Energy Carolinas, LLC
Duke Energy Progress, LLC
Louisville Gas and Electric Company
Kentucky Utilities Company
Dominion Energy South Carolina, Inc.
Docket Nos.  ER21-1111-001
                        ER21-1112-001
                        ER21-1114-001
                        ER21-1115-000
                        ER21-1115-001
                        ER21-1116-001
                        ER21-1117-001
                        ER21-1118-001
                        ER21-1119-001
                        ER21-1120-001
                        ER21-1121-001
                        ER21-1125-000
                        ER21-1125-001
                        ER21-1128-000
                        ER21-1128-001
                        (not consolidated)

Issued: August 6, 2021

McGuireWoods LLP
2001 K Street, NW
Suite 400
Washington, DC 20006

Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, AL 35203

JA0016

Docket Nos. ER21-1111-001, et al.                                    - 2 -

Duke Energy Corporation
1301 Pennsylvania Avenue, NW
Washington, DC 20011

LG&E and KU Energy LLC
220 West Main Street
Louisville, KY 40202

Dominion Energy, Inc.
Mail Code C222
220 Operation Way
Cayce, SC 29033

Attention:     Noel Symons, Esq.
               Counsel for Southern Company Services, Inc. and the other Members of the
               Southeast Energy Exchange Market

               Andrew W. Tunnell, Esq.
               Attorney for Southern Company Services, Inc.

               Christopher H. Demko, Esq.
               Counsel for Southern Company Services, Inc.

               Molly Suda, Esq.
               Associate General Counsel for Duke Energy Corporation

               Jennifer Keisling, Esq.
               Senior Counsel for LG&E and KU Energy, LLC

               Sara C. Weinberg, Esq.
               Senior Counsel for Dominion Energy, Inc.

Reference:     Southeast Energy Exchange Market Proposal and Related Open Access
               Transmission Tariff Revisions

       On June 7, 2021, in Docket No. ER21-1111-001, Southern Company Services,
Inc., as agent for Alabama Power Company (Alabama Power), acting on behalf of
Alabama Power and the other Members of the Southeast Energy Exchange Market
(Southeast EEM) (collectively, Filing Parties), submitted its response to Commission
staff's May 14, 2021 deficiency letter (Deficiency Response), which included proposed
revisions to the Southeast Energy Exchange Market Agreement (Southeast EEM
Agreement).  In conjunction with the Deficiency Response, each Member of the
Southeast EEM that is a transmission service provider with an open access transmission

JA0017

tariff (OATT) on file with the Commission, including Southern Companies,[1] re-submitted proposed amendments to its respective OATT to offer zero-charge transmission service for Energy Exchange transactions facilitated by the Southeast EEM.[2] Also, each of the other Commission-jurisdictional Members of the Southeast EEM, in conjunction with the Deficiency Response, re-submitted a Certificate of Concurrence.[3]

Please be advised that your submittals are deficient and that additional information is required in order to process the filings. Please provide the information requested below. To the extent that some of the required information may contain confidential material, please submit a non-public version in addition to the public version for Commission review.

1. Filing Parties state in their proposal that Members who are subject to restrictions under the Commission's Standards of Conduct and affiliate restrictions will remain subject to those rules and, for avoidance of doubt, the Southeast EEM Agreement contains prohibitions on sharing transmission function and market information.[4] Please explain how proposed provisions in the Southeast EEM Agreement ensure that Members cannot access competitors' transmission function or commercially sensitive information via reports or information provided by the Administrator or Auditor in the execution of their respective functions.[5]

2. Filing Parties state in their Deficiency Response that confidential information

---

[1] Southern Companies refers, collectively, to Alabama Power, Georgia Power Company (Georgia Power), and Mississippi Power Company (Mississippi Power).

[2] Southern Companies, Filing, Docket No. ER21-1125-001 (filed June 7, 2021); Duke Energy Carolinas, LLC (DEC), Filing, Docket No. ER21-1115-001 (filed June 7, 2021); Dominion Energy South Carolina, Inc. (Dominion Energy SC), Filing, Docket No. ER21-1128-001 (filed June 7, 2021); Louisville Gas & Electric Company (LG&E), Filing, Docket No. ER21-1118-001 (filed June 7, 2021).

[3] Georgia Power, Filing, Docket No. ER21-1119-001 (filed June 7, 2021); Mississippi Power, Filing, Docket No. ER21-1121-001 (filed June 7, 2021); Dominion Energy SC, Filing, Docket No. ER21-1112-001 (filed June 7, 2021); DEC, Filing, Docket No. ER21-1116-001 (filed June 7, 2021); DEC, Filing, Docket No. ER21-1117-001 (filed June 7, 2021); Kentucky Utilities, Filing, Docket No. ER21-1120-001 (filed June 7, 2021); LG&E, Filing, Docket No. ER21-1114-001 (filed June 7, 2021).

[4] Filing Parties February 12 Filing, Transmittal at 31.

[5] *See, e.g.*, PIOs March 15 Limited Protest and Comment at 41.

JA0018

Docket Nos. ER21-1111-001, et al.                                        - 4 -

will be posted to a dedicated confidential portion of the Southeast EEM website.[6]  Filing Parties also propose amending the Southeast EEM Agreement to require each Participant to designate employees who will have access to this portion of the Southeast EEM website.  Please explain, using examples as appropriate, whether the availability of redacted documents posted to the confidential portion of the Southeast EEM website will vary depending on the identity of the Participant accessing those documents (e.g., to avoid divulging commercially sensitive information to a Participant's competitors).

3.  Filing Parties state that the Administrator and the Auditor will be third-party independent entities.[7]  Filing Parties explain further that the Auditor will not be a Member, Participant, Agent, or the Administrator, nor an affiliate of those entities.[8]  Please clarify whether the Administrator similarly will not be a Member, Participant, Agent, or affiliate of those entities.

This letter is issued pursuant to 18 C.F.R. § 375.307 and is interlocutory.  This letter is not subject to rehearing under 18 C.F.R. § 385.713.  A response to this letter must be filed with the Secretary of the Commission within 10 days of the date of this letter by making a deficiency filing in accordance with the Commission's electronic tariff requirements.  For your response, use Type of Filing Code 170 if your company is registered under program code "M" (Electric Market Based Rate Public Utilities) or Type of Filing Code 180 if your company is registered under program code "E" (Electric Traditional Cost of Service and Market Based Rates Public Utilities).[9]  In addition, submit an electronic version of your response to John Miller at john.miller@ferc.gov. The information requested in this letter order will constitute an amendment to your filing and a new filing date will be established.[10]  A notice will be issued upon receipt of your

---

[6] Deficiency Response at 27-32.

[7] Filing Parties February 12 Filing, Transmittal at 16-18.

[8] Filing Parties July 14 Answer at 14-15.

[9] The filing must include at least one tariff record to restart the statutory timeframe for Commission action even though a tariff revision might not otherwise be needed.  *See generally Electronic Tariff Filings*, 130 FERC ¶ 61,047, at PP 3-8 (2010) (explaining that the Commission uses the data elements resulting from the tariff filing process to establish statutory filing and other procedural dates).

[10] *See Duke Power Co.*, 57 FERC ¶ 61,215, at 61,713 (1991) ("the Commission will consider any amendment or supplemental filing filed after a utility's initial filing . . . to establish a new filing date for the filing in question").

filing.

Pending receipt of the above information, a filing date will not be assigned to your filing.  Failure to respond to this letter order within the time period specified may result in a further order rejecting your filing.

Issued by: Kurt M. Longo, Director, Division of Electric Power Regulation – East

JA0020

Document Content(s)
Southeast EEM Second Deficiency Letter - For Issuance.DOCX ...............1

JA0021

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-002 |
| Louisville Gas and Electric Company | | ER21-1114-002 |
| Duke Energy Carolinas, LLC | | ER21-1116-002 |
| Duke Energy Progress, LLC | | ER21-1117-002 |
| Georgia Power Company | | ER21-1119-002 |
| Kentucky Utilities Company | | ER21-1120-002 |
| Mississippi Power Company | | ER21-1121-002 |

(Not Consolidated)

NOTICE OF FILING TAKING EFFECT BY OPERATION OF LAW

(October 13, 2021)

On February 12, 2021, as amended on June 7, 2021, and August 11, 2021, Southern Company Services, Inc., as agent for Alabama Power Company, filed, pursuant to section 205 of the Federal Power Act (FPA)[1] and section 35.12 of the Commission's regulations,[2] the Southeast Energy Exchange Market (Southeast EEM) Agreement on behalf of itself and the other prospective Members (collectively, Filing Parties) of the Southeast EEM.[3] Additionally, on February 12, 2021, as amended on June 7, 2021, and

---

[1] 16 U.S.C. § 824d (2018).

[2] 18 C.F.R. § 35.12 (2020).

[3] According to Filing Parties, the following entities constitute the prospective Members of the Southeast EEM: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, Southern Companies); Associated Electric Cooperative, Inc.; Dalton Utilities; Dominion Energy South Carolina, Inc. (Dominion Energy SC); Duke Energy Carolinas, LLC (DEC) and Duke Energy Progress, LLC

JA0022

August 11, 2021, seven prospective Southeast EEM Members submitted certificates of concurrence to the Southeast EEM Agreement.[4]

Pursuant to section 205 of the FPA, in the absence of Commission action on or before October 11, 2021, the proposed Southeast EEM Agreement and concurrences thereto became effective by operation of law. Accordingly, the effective date of the proposed tariff sheets is October 12, 2021, as reflected in these tariff sheets.

The Commission did not act on the proposed Southeast EEM Agreement and concurrences thereto because the Commissioners are divided two against two as to the lawfulness of the change. Consistent with section 205(g)(1)(B) of the FPA, any written statement explaining the views of a Commissioner with respect to Filing Parties' proposal will be added to the record of the Commission in the captioned proceedings.

Kimberly D. Bose,
Secretary.

---

(DEP); Louisville Gas and Electric Company (LG&E) and Kentucky Utilities Company (KU); North Carolina Municipal Power Agency Number 1; PowerSouth Energy Cooperative; North Carolina Electric Membership Corporation; and Tennessee Valley Authority (each a Member and collectively, the Members).

[4] *See* Dominion Energy SC, Tariff Filing, Docket No. ER21-1112-002 (filed Aug. 11, 2021); LG&E, Tariff Filing, Docket No. ER21-1114-002 (filed Aug. 11, 2021); DEC, Tariff Filing, Docket No. ER21-1116-002 (filed Aug. 11, 2021); DEP, Tariff Filing, Docket No. ER21-1117-002 (filed Aug. 11, 2021); Georgia Power Company, Tariff Filing, Docket No. ER21-1119-002 (filed Aug. 11, 2021); KU, Tariff Filing, Docket No. ER21-1120-002 (filed Aug. 11, 2021); Mississippi Power Company, Tariff Filing, Docket No. ER21-1121-002 (filed Aug. 11, 2021). Where two or more public utilities are parties to the same rate schedule or tariff, the Commission permits one public utility to file such rate schedule or tariff and all other parties obligated to file such rate schedule or tariff to file a certificate of concurrence adopting the filed rate schedule or tariff in lieu of filing a duplicative rate schedule or tariff. 18 C.F.R. § 35.1(a) (2020).

Document Content(s)

ER21-1111-002FR.docx.....................................................1

JA0024

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-002 |
| Louisville Gas and Electric Company | | ER21-1114-002 |
| Duke Energy Carolinas, LLC | | ER21-1116-002 |
| Duke Energy Progress, LLC | | ER21-1117-002 |
| Georgia Power Company | | ER21-1119-002 |
| Kentucky Utilities Company | | ER21-1120-002 |
| Mississippi Power Company | | ER21-1121-002 |

STATEMENT OF CHAIRMAN GLICK

(Issued October 20, 2021)

1.      Expanding regional electricity markets is one of the single most important steps that the Commission can take to save customers money, enhance reliability, and integrate intermittent resources most efficiently.  I believe regional transmission organizations (RTOs) and independent system operators (ISOs) are, by far, the best way to achieve these benefits.  That is also true for the Southeastern United States.  From my perspective, utilities and other stakeholders in this region should be working to establish an RTO/ISO in the Southeast for the benefit of consumers and to promote grid reliability. But that is not the proposal presented to us in this docket.  Instead, the parties submitted a filing pursuant to section 205 of the Federal Power Act (FPA) proposing to establish the Southeast Energy Exchange Market (Southeast EEM) to facilitate bilateral trading in the Southeast.  And we were called upon to determine whether this proposal is just and reasonable and not unduly discriminatory or preferential, not whether there is a better option for the region—in my opinion, there clearly is.

2.      I believe that much of the Southeast EEM proposal arguably satisfies the Section 205 standard.  However, I voted no in large part because the filing parties' proposal to apply the *Mobile-Sierra* public interest presumption to the Southeast EEM Agreement violates well-established Commission precedent.  When *Mobile-Sierra* applies, the

1

JA0025

Commission must presume that the relevant agreement meets the statutory just-and-reasonable standard, so the agreement can only be changed if it seriously harms the "public interest," a significantly higher evidentiary hurdle.[1]

3.      That is important here because I share some of Commissioner Clements's concerns over transparency and the potential for the exercise of market power and manipulation in the Southeast EEM.  But I believe that the Commission's monitoring capabilities, enforcement authority, and ability to institute an FPA section 206 action provide adequate protections should any Southeast EEM members or participants engage in any conduct that may transgress the FPA or Commission regulations.

4.      That is true, however, only if the Commission's section 206 authority is not hamstrung, for instance, by the improper application of the *Mobile-Sierra* presumption. And because the Southeast EEM proposal would apply *Mobile-Sierra* in a manner inconsistent with our precedent—I voted no.  In the balance of this statement, I lay out my "views . . . with respect to the change" submitted by the Southeast EEM parties in the above-captioned dockets, as section 205(g) of the FPA requires when a filing goes into effect by operation of law after a 2-2 vote of the Commission.[2]

*      *      *

5.      Currently, the Southeast region operates as a traditional wholesale electricity market.  Trading occurs bilaterally under wholesale power sales contracts.  Trades generally occur on an hourly basis as the shortest increment, and usually only amongst entities in the same or directly interconnected balancing authority areas.  Parties must use phone or electronic communication tools to negotiate terms of sale, arrange for transmission service, and schedule delivery.

6.      The Southeast EEM represents a step toward modernizing this antiquated approach.  The proposal will establish a new automated electronic trading platform designed to facilitate bilateral trading in the Southeast region.  The platform will use an algorithm to match willing buyers and sellers for 15-minute transactions, facilitated by a

---

[1] *See NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 174 (2010) ("In unmistakably plain language, *Morgan Stanley* restated *Mobile–Sierra*'s instruction to the Commission: FERC 'must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law. The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest.'") (quoting *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008)).

[2] 16 U.S.C. § 824d(g); Alabama Power Co., *et al.*, Notice, Docket Nos. ER21-1111, *et al.* (issued Oct. 13, 2021) (taking effect by operation of law).

JA0026

zero-charge transmission service (Non-Firm Energy Exchange Transmission Service or NFEETS) offered by participating transmission providers. Under the Agreement, NFEETS will be available to all participants on the same terms. The Agreement covers a substantial geographic footprint spanning ten states. The founding entities of the Southeast EEM collectively own 160,000 MW of generating capacity and serve approximately 640 TWh of load across ten balancing authority areas and two time zones.[3] According to the filing parties, their proposal will produce approximately $40 million in market-wide savings each year relative to the existing bilateral market; and, assuming increased penetration of renewable resources, those savings are projected at $100 million per year.

7.     To buy or sell energy through the Southeast EEM, an entity must join as a participant. To become a participant, an entity must execute a participant agreement, arrange to take NFEETS from each participating transmission provider, and enter into "Enabling Agreements" with at least three other participants. The 14 entities that executed the Southeast EEM Agreement are designated as members. To become a member, an entity must be a load serving entity located in the Southeast EEM territory or an association or governmental utility created for the purpose of providing energy to a cooperative or governmental load serving entity in the territory. Under the Agreement, members share the costs of developing and operating the Southeast EEM system. Each member will have a seat on the membership board, responsible for all significant decisions, while a revolving group of members will sit on the operating committee, responsible for day-to-day operations.

8.     Considering the history of entrenched resistance to organized markets in the Southeast, the Southeast EEM represents at least a positive step forward. Currently, several large incumbent utilities serve most of the consumers in the Southeast as bundled retail customers. Delivering power across multiple balancing authority areas in the region requires multiple transmission reservations and payment of pancaked transmission rates. A centralized and competitive wholesale market in the Southeast, or at least something closer to that model, is a step in the right direction.

9.     But finding a proposal just and reasonable and not unduly discriminatory or preferential under Section 205 of the FPA requires that it be more than just a step in the right direction. The filing parties initially proposed to apply *Mobile-Sierra* to the entire Southeast EEM Agreement and later narrowed that to a smaller subset of "enumerated provisions." I cannot support this part of the proposal because I believe that application of the *Mobile-Sierra* presumption here violates Commission precedent. Under that well-

---

[3] Alabama Power Company, Tariff Filing, Docket No. ER21-1111-000, at 4 (filed Feb. 12, 2021) (Southeast EEM Transmittal).

JA0027

settled precedent, the *Mobile-Sierra* presumption applies to a contract "only if the contract has certain characteristics that justify the presumption."[4]

10.     The Southeast EEM Agreement fails this test.  We have consistently held that *Mobile-Sierra* does not apply to "generally applicable" contractual provisions, including those that bind not just the parties to the contract but also would apply to any potential future signatories with limited, if any, room for negotiation.[5]  The filing parties have already conceded that the *Mobile-Sierra* presumption should not apply to the entire Agreement:  when they narrowed their proposal to apply *Mobile-Sierra* to just the enumerated provisions, they acknowledged that "certain portions of the Southeast EEM Agreement . . . may be perceived as being generally applicable in nature."[6]  Our prior holdings require that we reject the imposition of *Mobile-Sierra* on even the enumerated provisions of the Southeast EEM Agreement.  Entities that may later seek to join the Southeast EEM would need to accept the enumerated provisions "as is," with limited room for negotiation.  New signatories thus would be placed in a position "that differs fundamentally from that of parties who are able to negotiate freely like buyers and sellers entering into a typical power sales contract that would be entitled to a *Mobile-Sierra* presumption."[7]  And the Southeast EEM filing parties have not shown "extraordinary" or "compelling" circumstances that, under Commission precedent, would merit application of *Mobile-Sierra* here as a matter of agency discretion.[8]  For these reasons, applying the

---

[4] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 182 (2013).

[5] *See, e.g.*, *Arizona Pub. Serv. Co.*, 148 FERC ¶ 61,012, at P 4 (2014) (contrasting settlement rates that apply only to parties to the settlement with another settlement involving generally applicable rate schedules that apply to any entity for open access service); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 187 (2013) (stating that the Commission's conclusion that right of first refusal provisions at issue created generally applicable requirements was "bolstered by the fact that any new PJM Transmission Owner would have to accept these provisions as-is, with limited room for negotiation"); *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185 (2015); *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,137, at P 9 (2013).  Commissioner Danly concedes that my position "has the weight of Commission precedent" on my side.  Comm'r Danly Statement at P 25.  And while he cites broad statements in Supreme Court cases on *Mobile-Sierra* extolling the public policy benefits of contractual stability *as a general matter*, he offers no case—indeed, there is none—that contradicts either my position against applying *Mobile-Sierra* under the circumstances of this proceeding or the extensive Commission precedent on which I rely.

[6] *See* June 7 Deficiency Response at 40.

[7] *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185.

[8] *See, e.g.*, *High Island Offshore Sys., LLC*, 135 FERC ¶ 61,105, at PP 23-25

4

*Mobile-Sierra* public interest presumption to at least the enumerated provisions of the Southeast EEM Agreement departs from our precedent without justification.[9]  I am disappointed that a majority of the Commission did not reach this conclusion.

11.     We must always tread cautiously when determining whether a *presumption* that an agreement satisfies the statutory "just and reasonable" standard is applicable.  Had the Commission been able to reach agreement on the *Mobile-Sierra* issue discussed above, I believe that our existing statutory protections against undue discrimination would have been sufficient to address protestors' concerns about the Southeast EEM and to protect consumers and market participants in the region.  Applying the *Mobile-Sierra* presumption in these circumstances will make it more difficult for third parties or even the Commission to mount legitimate challenges in the future to the justness and reasonableness of the Southeast EEM.  Put simply, there is no need (and no basis) to apply the *Mobile-Sierra* presumption here—and there is considerable risk to the public in doing so.

12.     Aside from my disagreement on the *Mobile-Sierra* issue, I was willing to support the Southeast EEM proposal—as modified by the filing parties' June 7 and August 11 responses[10] to Commission deficiency letters—because I believe the modified proposal otherwise meets the "just and reasonable" standard of section 205 of the Federal Power Act.  Our role here is to decide only whether the proposal before us meets that standard— not whether the filing parties have chosen the best available option, which in my view is to establish an RTO.[11]  The Southeast EEM filing parties have proposed essentially a

---

(2011); *Devon Power,* 137 FERC ¶ 61,073, at P 37 (2011).

[9] The *Mobile-Sierra* question is not "weeds of legal minutiae."  Comm'r Christie Statement at P 20.  The doctrine, which has been repeatedly addressed by the U.S. Supreme Court, establishes the standard for Commission modifications to the agreements at issue here, implicating both our statutory authority and our duty to protect consumers. *See NRG Power Mktg.*, 558 U.S. at 172 (noting origins of the doctrine in Supreme Court decisions from 1956).

[10] *See, e.g.*, June 7 Deficiency Response at 17-18 (committing to providing additional transaction data in response to concerns about opportunities for market manipulation under the Southeast EEM Agreement); August 11 Deficiency Response at 3-4 (committing to additional restrictions on sharing of non-public market information received through the Southeast EEM).

[11] *See, e.g.*, *PJM Interconnection, L.L.C.*, 170 FERC ¶ 61,243, at P 57 (2020) (citing *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007); *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984); *Cal. Indep. Sys. Operator Corp.*, 128 FERC ¶ 61,282, at P 31 (2009)).

JA0029

matching platform for bilateral transactions. The intent of this platform, as these parties have stated, is to augment the existing bilateral nature of energy transactions in the region. And the stated benefits of this platform, though unverified, appear to be meaningful: The filing parties project over $100 million per year in market-wide savings by 2037 assuming higher renewable and energy storage penetration across the region, or $40 million per year relative to the current bilateral market under a more conservative estimate.

13.     For customers to realize such benefits, however, market outcomes must be the product of genuine competition, not market manipulation. For this reason, I share the concern of many that the Southeast EEM Agreement may present opportunities for the participants to engage in manipulation.[12] The Southeast EEM parties made commitments, in their responses to deficiency letters, to provide additional transparency safeguards.[13] While the original filings, not those subsequent responses, go into effect by operation of law, I urge the parties to stand by their additional commitments on transparency.

14.     Indeed, without those commitments embodied in the filing parties' responses to the deficiency letters, the Southeast EEM may be unjust and unreasonable under section 206 of the Federal Power Act. These added safeguards are necessary to protect consumers and market participants from anticompetitive conduct. For example, the filing parties' commitment to providing extensive transaction data on a weekly basis will enable the Commission to be aware of any abusive conduct. The filing parties also offered critical transparency measures to protect market participants and consumers: by publicly posting, with appropriate confidentiality limitations, any information requests from regulators and the Southeast EEM Auditor's responses to such requests. Beyond what the parties have offered, the Commission has the tools—and stands ready—to investigate any potential fraudulent or manipulative conduct and take any corrective action as needed, including imposing civil penalties. As I have often stated, guarding against market manipulation remains one of the core obligations vested in this agency by Congress. I intend for the Commission to continue to remain vigilant on this front.

15.     I believe the parties' Southeast EEM proposal, while admittedly not perfect, is a positive first step on the road to regionalization. The better outcome here, in my view, is for markets like the Southeast to move toward organized wholesale electricity markets. RTOs and ISOs have led to significant benefits for consumers across the country, including more efficient coordination and dispatch of generation, enhanced reliability,

---

[12] *See, e.g.*, Comments of Advanced Energy Economy, *et al.*, at 23-24 (Mar. 15, 2021); Protest of Public Interest Organizations, at 24-26 (Mar. 15, 2021).

[13] June 7 Deficiency Response at 17-19; Filing Parties July 14 Answer at 8-15.

JA0030

and more effective integration of renewable resources.[14]  As the generation mix transforms rapidly before our eyes,[15] the benefits of organized wholesale markets will continue to accrue in the future—particularly when it comes to both meeting our nation's critical need to rapidly integrate massive amounts of new renewable resources at relatively low costs and minimizing disruptions to energy markets from extreme weather events.

16.    Finally, both Commissioners Danly and Christie raise objections to the omission of the parties' open access transmission tariff filings from the Secretary's October 13, 2021 notice of the filings that went into effect by operation of law effective October 12, 2021.  In their view, all twelve dockets related to the Southeast EEM proposal should have gone into effect by operation of law, rather than only the eight that were included in the notice.  Their preferred result would unsettle established Commission precedent and introduce significant uncertainty into Commission proceedings.[16]

17.    In enacting the FPA, "Congress did not set forth any filing procedures.  Rather, it expressly authorized the FERC to prescribe rules and regulations pertaining to rate filings and to designate the form of such filings."[17]  Under that authority, the Commission has

---

[14] *See, e.g.*, *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 (2019) (Glick, Comm'r, concurring at P 4); *Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285, 1999 WL 33505505, at *37-38 (2000).

[15] *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 176 FERC ¶ 61,024 (2021) (Glick, Chairman, and Clements, Comm'r, concurring at P 4).

[16] Separately, Commissioner Danly calls for a remand based on his suggestion that the Commission has "accept[ed]" only "half of a proposed rate" in violation of the D.C. Circuit's *NRG Power Marketing* decision.  Comm'r Danly Statement at P 31 & n.76.  But *NRG* is inapt.  *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 115 (D.C. Cir. 2017).  There, the court held that the Commission could not "suggest *modifications* that result in an 'entirely different rate design' than the utility's original proposal or the utility's prior rate scheme." *Id.* (emphasis added).  Here, the Commission, as a result of a 2-2 split, has merely let filings go into effect on their proposed effective date, as required by section 205 of the FPA.  It has not "modified" a rate in any respect.  Moreover, Commissioner Danly's theory is undercut by the filing parties themselves, who expressly asked the Commission not to consolidate their filings, foreclosing the possibility that these filings are part of a single rate for the purposes of *NRG*.  Southeast EEM Members, Answer, Docket Nos. ER21-1111, at 54 (filed Mar. 30, 2021) ("Notwithstanding the common nexus of facts, the filings are by different entities who retain their individual Section 205 rights.").

[17] *Ala. Power Co. v. FERC*, 22 F.3d 270, 272-73 (11th Cir. 1994) (citing 16 U.S.C.

adopted regulations, by notice-and-comment rulemaking, regarding the electronic filing of tariffs, including the rules governing the use of proposed effective dates. Pursuant to these regulations, only filings with statutory action dates become effective in the absence of Commission action.[18] And it is longstanding Commission practice even before the emergence of electronic tariff filing—again, codified through notice-and-comment rulemaking—to determine the effective dates of section 205 filings based on the effective dates proposed by the filing parties in their tariff sheets.[19] Since the advent of the Commission's eTariff filing system in 2010, parties have relied on those rules when filing nearly 1,200 statutory filings with open-ended effective dates.[20]

18. Here, four of the relevant 12 filings incorporated open-ended proposed effective dates.[21] As a result, these four filings did not become effective on October 12, 2021,

---

§ 824d(c)).

[18] 18 C.F.R. § 35.7(d) ("Only filings filed and designated as filings with statutory action dates in accordance with these electronic filing requirements and formats will be considered to have statutory action dates."); *see also* 18 C.F.R. § 385.205(b) (filings without statutory action dates "will not become effective should the Commission not act by the requested action date"); Electronic Tariff Filings, Order No. 714-A, 147 FERC ¶ 61,115, at P 4 (2014) ("The regulations now will provide explicitly that only tariff filings properly filed as and designated as statutory filings according to the Commission's eTariff requirements will be considered to have statutory action dates, and that tariff filings not properly filed and designated as statutory filings will not become effective in the absence of Commission action."); *Pioneer Transmission, LLC*, 169 FERC ¶ 61,265, at P 20 (2019) ("Any filer who desires to have its section 205 filing subject to the statutory clock must follow the prescribed eTariff filing format.").

[19] *See Designation of Electric Rate Schedule Sheets*, Order No. 614, FERC Stats. & Regs. ¶ 31,096, at 31,504 (2000) ("It is thus incumbent upon utilities to unambiguously identify their proposed changes in a manner conforming to the Commission's regulations including properly formatting and designating their proposed tariff sheets. . . . It is not the function of this Commission to speculate on the nature of an applicant's filing (for example, what a utility intends as the effective date) nor is it our function to, on our own, perfect a utility's application.").

[20] Statutory filings are filings made pursuant to section 205 of the FPA, section 4 of the Natural Gas Act, and section 6 of the Interstate Commerce Act.

[21] *See* Alabama Power Co., Transmittal, Docket No. ER21-1125, at 12 & n.36 (filed Feb. 12, 2021) ("While the Southeast EEM Commencement Date is anticipated to occur sometime in the first quarter of 2022, *the exact date is unknown at this time*. The Southeast EEM Commencement Date will be determined by the Members in accordance with the provisions of Section 4.1.9(a)(v) of the Southeast EEM Agreement.

JA0032

when the Commission failed to act within 61 days of the filing date. Despite Commissioner Christie's statements to the contrary, the record shows that the applicants understood these rules,[22] expressly sought an open-ended effective date,[23] and opposed consolidation.[24] As the filing parties also recognized, their use of an open-ended effective date requires action by the Commission in the form of a waiver of agency regulations.[25] The Secretary's October 13 notice fully complies with the statute as well as with the Commission's regulations and precedent, and is consistent with the filing

_____

*Accordingly, Southern Companies are using an open-ended effective date (12/31/9998), consistent with Commission guidelines.*") (emphases added).

[22] Commissioner Christie implies that the applicants might have been confused by the Commission's eTariff rules, but he also concedes that the applicants intended that "the transmission revisions should only go into effect *at a later date* when the service was established under the market structure approved by the Commission," and he cites applicants' own statement that they used a 12/31/9998 effective date for that reason. Comm'r Christie Statement at P 24 (emphasis added). The applicants therefore followed the Commission's eTariff rules exactly as expected, given their own request that the OATT revisions take effect at an unknown point after, not coincident with, the Southeast EEM Agreement. Commissioner Christie's criticism of Commission staff for not raising such eTariff issues in the deficiency letters is unfounded. Those letters sought additional information in light of deficiencies in the filings—but the open-ended proposed effective date for their OATT filings, chosen by the filing parties at their discretion, was not a deficiency.

[23] Alabama Power Co., Transmittal, Docket No. ER21-1125, at 12 (filed Feb. 12, 2021) ("An effective date prior to the Southeast EEM Commencement Date would be inconsistent with current non-Southeast EEM operations and illogical because NFEETS can be taken only in conjunction with Energy Exchanges. . . . Southern Companies respectfully *request* that the Commission act on this filing within 90 days of filing.") (emphasis added); Duke Energy Carolinas, LLC and Duke Energy Progress, LLC, Transmittal, Docket No. ER21-1115, at 12-13 (filed Feb. 12, 2021) (same); Dominion Energy South Carolina, Inc., Transmittal, Docket No. ER21-1128, at 11-12 (filed Feb. 12, 2021) (same); Louisville Gas & Elec. Co., Transmittal Letter, Docket No. ER21-1118, at 12-13 (filed Feb. 12, 2021) (same).

[24] Southeast EEM Members, Answer, Docket Nos. ER21-1111, at 54 (filed Mar. 30, 2021).

[25] *See, e.g.,* Alabama Power Co., Transmittal, Docket No. ER21-1125, at 12 (filed Feb. 12, 2021) ("In addition, because the requested effective date may be more than 120 days after the date these OATT revisions are filed with the Commission, Southern Companies seek waiver of Section 35.3(a)(1) of the Commission's regulations.").

JA0033

parties' discretionary choice to include effective dates on some—but not all—of their submissions.

19.     Still, there remains an easy solution for the filing parties:  In the event that the Commission has not acted on their filings, when they know the implementation date for the Southeast EEM, they can establish an effective date by submitting an amended filing with the proposed date on which their OATTs will become effective; in the absence of Commission action, this filing will go into effect on the later of their proposed effective date or 61 days from the date of filing.[26]

*        *        *

20.     Under FPA section 205, our role is to evaluate whether the proposal before us is just and reasonable and not unduly discriminatory or preferential.  As described above, while on balance I believe the proposal comes close to meeting that standard, I cannot support application of the *Mobile-Sierra* presumption in these circumstances.  To do so would run contrary to Commission precedent and undermine our ability to protect consumers under the Southeast EEM.

_____

Richard Glick
Chairman

---

[26] *Notice of Procedures for Making Statutory Filings when Authorization for New or Revised Tariff Provisions is Not Required*, Docket No. RM01-5, at 5 (June 3, 2020) (the effective date on which a public utility filing goes into effect in the absence of Commission action is "the later of either the 61st day after the date of filing or the earliest of the proposed tariff record effective dates that is after the 61st day").

JA0034

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Alabama Power Company | Docket Nos. ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | ER21-1112-002 |
| Louisville Gas and Electric Company | ER21-1114-002 |
| Duke Energy Carolinas, LLC | ER21-1116-002 |
| Duke Energy Progress, LLC | ER21-1117-002 |
| Georgia Power Company | ER21-1119-002 |
| Kentucky Utilities Company | ER21-1120-002 |
| Mississippi Power Company | ER21-1121-002 |

STATEMENT OF COMMISSIONER CLEMENTS

(Issued October 20, 2021)

1.      The proposed Southeast Energy Exchange Market (Southeast EEM) Agreement, filed in this proceeding pursuant to section 205 of the Federal Power Act (FPA),[1] by Southern Company Services, Inc. as agent for Alabama Power Company, and on behalf of itself and the other prospective Members, went into effect by operation of law because the Commissioners are divided two against two as to the lawfulness of the market.  That means that the Commission did not determine whether the proposed market is just and reasonable and not unduly discriminatory or preferential.  When this happens, section 205(g) of the FPA[2] requires each Commissioner to issue a "written statement explaining the views of the Commissioner with respect to the change[s]."[3]

2.      While I am an ardent supporter of market formation across the electricity sector as a means of harnessing competition to ensure better outcomes for customers, market formation cannot be blessed at the expense of compromising the Commission's bedrock principles of ensuring open access to non-discriminatory rates and service, and applying adequate protections to markets to ensure just and reasonable rates.  The cost and reliability benefits that all sorts of organized market structures have provided to customers, utilities, and regions—whether from tight power pools, RTOs, the more recent Western imbalance markets, or other constructs—are clear and compelling.  While I appreciate the efforts of the Filing Parties in this proceeding toward increasing the

---

[1] 16 U.S.C. § 824(d).

[2] *Id.* § 824d(g).

[3] *Id.*

JA0035

Docket No. ER21-1111-002, *et al.*                                                    - 2 -

efficiency of the existing Southeastern bilateral markets, I would have voted against the
Southeast EEM as proposed by the Filing Parties.  I believe the Southeast EEM, as
proposed by the Filing Parties, fails to abide by the bedrock principles of open access and
non-discrimination that were crystallized in the Commission's landmark Order No. 888,
and fails to ensure just and reasonable rates.

3.      To be very clear, my lack of support for the instant proposal is not because I
would prefer a different market structure or that I fail to appreciate the parameters of the
legal inquiry that Section 205 prescribes.  I am cognizant of Section 205's requirements
that we not let perfect be the enemy of the good and that we can only review the proposal
in front of us.[4]  But legal insufficiency must foreclose Commission approval.  In my
view, the Southeast EEM, as proposed, contains infirmities that compel the Commission
to find that the Filing Parties have not satisfied their legal burden.  That is not to say that
the Southeast EEM, or a similar market structure, has no path to legal sufficiency.
Rather, as I discuss below, my concerns with this market could be addressed with some
discrete changes to the membership and governance provisions, as well as a superior
approach to market power and manipulation concerns.[5]

4.      The Filing Parties' proposal rests on two legally and factually flawed contentions:
first, that the Southeast EEM is nothing more than an enhancement to the existing
bilateral markets that currently exist in the Southeastern United States; and second, that
no new evidence, analysis, or safeguards are required to reach the conclusion that there
exists no opportunity for market power or manipulation across the proposal's exchange
platform.

5.      As I describe in more detail below, the proposed Southeast EEM is far from the
existing bilateral market regime.  The Southeast EEM is a multilateral market, with a
unique (and large) footprint, designed to allocate limited rights to a new, desirable

---

[4] *See, e.g., PJM Interconnection, L.L.C.*, Docket No. ER21-2582-000, Statement
of Chairman Glick and Comm'r Clements, Oct. 19, 2021, at P 32 ("Under section 205, a
utility does not need to show that the existing tariff is unjust and unreasonable, nor must
it demonstrate that its proposal is the best option.  Rather it must show only that its
proposed tariff is just and reasonable [and not unduly discriminatory].")  (citing *Emera
Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017); *PJM Interconnection, L.L.C.*, 170
FERC ¶ 61,243, at P 57 (2020); *City of Winfield v. FERC*, 744 F.2d 871, 874-75 (D.C.
Cir. 1984)).

[5] In past similar circumstances, the Commission has taken the approach of
rejecting initial proposals for new market constructs that fail to meet the requirements of
section 205, and later approving revised proposals when those shortcomings were later
addressed.  *See, e.g., Pub. Serv. Co. of Colorado*, 151 FERC ¶ 61,248 (2015); *Sw. Power
Pool, Inc.*, 172 FERC ¶ 61,115 (2020).

transmission product and match electric power supply and demand offers across a suite of potential exchange matches using a complex "black box" algorithm.[6] The transmission product and matching service are accessible only to Southeast EEM market Participants that sign and obtain countersigned participation agreements and acquiesce to the platform's governing rules, which are controlled by a coterie of preferred Members. None of these characteristics are features of a bilateral market.

6.     I am concerned that the Southeast EEM may expose Participants to unjust and unreasonable rates. The Filing Parties proposed the Southeast EEM with neither any quantitative analysis demonstrating an inability by Participants to exercise market power or manipulate the market, nor adequate safeguards to protect against these abuses on a going-forward basis. It is insufficient to rely on Participants' existing market-based rate authorities given the new market structure and new market footprint of the Southeast EEM. Yet the Filing Parties suggest that despite these clear differences, the Commission should rely on analysis conducted for the existing bilateral market, and safeguards put in place for a bilateral, not multi-lateral market structure.

7.     I also agree with Chairman Glick's conclusion that applying the *Mobile-Sierra* standard to the generally applicable Southeast EEM Agreement provisions, even the "enumerated provisions" identified in the response to the First Deficiency Letter, would violate Commission precedent. As he ably explains, the Southeast EEM provisions are tariff rates for which *Mobile-Sierra* protection does not lie.[7] Applying the *Mobile-Sierra* standard would therefore inappropriately make any future challenge to the justness and reasonableness of the Southeast EEM Agreement more difficult. This is particularly problematic here given the concerns with undue discrimination, governance, market power, and manipulation that the proposal presents.

8.     While Filing Parties made some relevant additional commitments to provide data in response to the Commission's May 4, 2021 deficiency letter,[8] they still wave off most

---

[6] The Territory will span 10 states, feature 160,000 MW of generating capacity, and serve about 640 TWh of load. Transmittal Letter at 4.

[7] Chairman Glick Statement at PP 9-10.

[8] Among other things, the Filing Parties committed to: provide Order No. 760-style data to the Commission; require the Administrator, Auditor, and Participants to respond to inquiries from the Commission and other regulators; post reports, analysis, and Participant complaints on the Southeast EEM website; post the network map and information on binding transmission paths and the marginal value of transmission constraints; and make transparency improvements (*e.g.* making Membership Board meeting minutes public and allowing non-Members to observe Membership Board meetings). While this would have provided more transparency than the tariff provisions that have gone into effect by operation of law, these concessions do not eliminate the

of protestors' concerns about the Southeast EEM's barriers to participation, restrictions on membership, preferential structure for load-serving entity Members, lack of transparency or oversight, and potential for the exercises of market power and manipulation. These concerns, however, constitute legal grounds on which the Commission should have rejected the current proposal. To be clear, there is no insurmountable barrier to the formation of a market like the Southeast EEM. In fact, straightforward revisions to the platform's participation and membership rules, and common approaches to protection against the exercise of market power and manipulation would cure most, if not all, of the statutory violations that impair the current proposal.

9.      By failing to reject the Southeast EEM as proposed, despite its demonstrable flaws, the Commission compromises its fundamental principles of transparency, oversight and fair and open market access. Failing to apply these principles to this market is dangerous not only because of the discriminatory and unjust rate impacts it may impart in the region, but because it may inhibit the Commission's ability to ensure that other organized markets, existing or forthcoming, are just and reasonable and not unduly discriminatory. Failing to reject the instant proposal is likely to invite future attacks on the Commission's fundamental market design safeguards in existing and future markets across the country.

## I.      The Southeast EEM is a multi-lateral market construct

10.     First, it is necessary to understand what the Southeast EEM is and is not. The Filing Parties take the position that the Southeast EEM is merely an enhancement of the bilateral markets that currently exist in the Southeastern United States. They argue that the introduction of the Southeast EEM algorithm, which will automatically match buyers and sellers for Energy Exchanges, and NFEETS, a zero-cost transmission product, are merely improvements on the existing bilateral structure.[9] This position requires an insurmountable strain on logic that lacks any compelling rationale.

11.     Bilateral electric power supply transactions involve two known parties engaging in a negotiated exchange of electricity and related services. They involve the parties participating in a back-and-forth regarding terms of the sale including the price, quantity, transmission path, tenor, performance expectations, and other terms and conditions. While market data may influence agreed-upon prices or other terms, any given bilateral transaction is defined by the four corners of the deal struck by the engaging parties.

---

impermissible barriers to access, cure the unduly discriminatory membership and participation structure, or remedy the failure to carry out market power analysis or provide for an independent market monitor whose institutional role is to independently protect the Southeast EEM from manipulation or the exercise of market power.

[9] Transmittal Letter at 9-11.

Docket No. ER21-1111-002, *et al.*                                      - 5 -

Bilateral transaction prices are not influenced in real-time by various other bid and buy offer levels, nor are they optimized across a set of various buyer and seller matches. Bilateral electric power supply transactions are not automatically combined with transmission service and do not require access to a participant-only transmission product. Bilateral transactions do not involve a members committee, an administrator, an auditor, or satisfaction of a set of participation requirements as a condition to execution.

12.    While the Southeast EEM relies on bilaterally arranged enabling agreements, the structure hinges upon a complex multi-lateral optimization engine that replaces the bilateral negotiation of key terms, including price and quantity.  This engine, operated by the Southeast EEM Administrator, is responsible for (1) selecting which transactions should be consummated from among many potential buy and sell offers from many participants in order to optimize dispatch over the Southeast EEM footprint, and (2) allocating the NFEETS, which is an exclusive transmission service reserved for participants in the Southeast EEM, in order to consummate those transactions.[10]  The multi-lateral engine is so complex that the Filing Parties assert that simply providing a "mathematical statement of the optimization problem solved by the Algorithm (*i.e.*, the software platform implementing the Southeast EEM)" would be a "significant undertaking and possibly an additional material Southeast EEM Member expense in addition to the planned cost of hiring a software vendor."[11]  Necessarily, the Southeast EEM also has its own set of rules, a governance structure, and participation requirements, each of which further distinguish it from traditional bilateral markets.

13.    My colleagues disagree with this assessment, but offer no rationale whatsoever regarding how these plainly multi-lateral market features represent a mere immaterial "enhancement" to the bilateral market and do not transform it into a multi-lateral construct.  Rather than engage with these arguments on the merits, their positions amount to credulously accepting the Filing Parties' assertions that the market will be bilateral in nature without examining the ample evidence to the contrary.[12]

---

[10] The existence of NFEETS is in itself an important distinction between the Southeast EEM and traditional bilateral markets.  In true bilateral transactions arranging and paying for transmission is a part of effectuating any trade.  NFEETS, which is only obtainable by joining the Southeast EEM, is factored into the market's optimization.

[11] Response to First Deficiency Letter at 38.

[12] *See* Comm'r Danly Statement at P 20 ("The filing parties clearly state that, 'the Southeast EEM is not—and was never intended to be—a top-to-bottom reimagining of the Southeast energy market; rather it reflects incremental improvement to the existing bilateral market.'") (quoting Transmittal Letter at 9); Comm'r Christie Statement at PP 6, 8 (stating in conclusory fashion that the proposal enhances rather than modifies the existing bilateral market).  While Commissioner Danly observes that "[t]his market does

14.     But closing our eyes, clicking our heels three times, and wishing "the Southeast will remain a purely bilateral market" will not make that so.  Given its features, the Southeast EEM is clearly more than an enhancement of the status quo.  It is an entirely new market construct, with its own set of rules and a unique footprint.  As such, it is the Commission's obligation to go beyond taking the Filing Parties' word for it and to review the Southeast EEM proposal to ensure that it meets basic principles of non-discrimination and protects against the exercise of market power and manipulation.

## II.     Access to the Southeast EEM is not open, violating Order No. 888

15.     Order No. 888 compels open "access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce,"[13] and requires public utilities to "remove preferential transmission access and pricing provisions from agreements governing their transactions."[14]  The Southeast EEM contravenes these bedrock requirements by restricting access to NFEETS.

16.     In order to join and obtain the ability to access NFEETS, a prospective Participant is required: (1) to obtain the countersignature of the Southeast EEM Agent at the direction of the Operating Committee, a body controlled entirely by Members,[15] and (2) to execute Enabling Agreements with at least three other Participants.  These provisions give Southeast EEM Members and existing Participants leverage they may use to block market access to transmission service.[16]  In addition, to participate, an entity must be registered as a Source or Sink within the Southeast EEM footprint.

---

not offer joint dispatch, joint operation, or joint planning," these are arguments that the Southeast EEM is an RTO, not a rebuttal to any of the logic I have set forth regarding why the Southeast EEM platform is multi-lateral, not bilateral.  Comm'r Danly Statement at P 20.

[13] Order No. 888, 61 Fed. Reg. 21,540, 21,541 (1996).

[14] *Id.*

[15] *See* Southeast EEM Agreement § 5.1 (describing Operating Committee membership).

[16] Southeast EEM Market Rules § III.B.3.  A prospective Participant must also (3) own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink; and (4) arrange to take NFEETS from each Participating Transmission Provider, either through execution of a service agreement under the Participating Transmission Provider's tariff or by otherwise making arrangements for such service.

Docket No. ER21-1111-002, *et al.*                                                          - 7 -

17.     While the Filing Parties argue that Members and Participants have economic incentives to execute participation and enabling agreements, they neglect that Members and Participants also have economic incentives to block access, and the reality is that the proposal erects substantial barriers to participation.  Although the Filing Parties observe that "enabling agreements are used today in the Southeast bilateral market "to facilitate regular bilateral energy transactions"[17] this fact is beside the point.  While transmission service is not governed by enabling agreements in the existing bilateral market, the question the Commission must ask here is whether these requirements serve as an unduly discriminatory barrier to entry to Southeast EEM and the NFEETS *transmission service* it provides.  Order No. 888 establishes a firm requirement of open access, not a demonstration that economic incentives *might* create conditions where utilities choose of their own accord to permit open competition.[18]

18.     As protestors persuasively argue, the Three Counterparty Rule and Participant Agreement requirements may prevent a prospective Participant from accessing the market because current Participants may "collude to exclude prospective Participants by refusing to enter into Enabling Agreements," or the Operating Committee could direct the Agent to block access by declining to sign the Participant Agreement with a given counterparty.[19]  The Filing Parties contend that the Commission need not worry about such abuse of the Three Counterparty Rule and Participant Agreement because the benefits of the Southeast EEM "will be at their greatest with eligible counterparties maximized," arguing that if they had incentive to block market access for any individual prospective participant they would not have proposed the Southeast EEM at all.[20]  To accept this simplistic logic is naïve.

19.     While it is true that retail customer benefits would be maximized if Participants entered into as many matches as possible, incentives for load serving entity shareholder

---

[17] Response to First Deficiency Letter at 19-20.

[18] *See* Order No. 888, 61 Fed. Reg. at 21,541 ("The legal and policy cornerstone of these rules is to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce.").  Order No. 888 targets denials of open access "whether they are blatant or subtle," and also targets "the *potential* for future denials of access."  *Id.* at 21,550 (emphasis added).

[19] The proposal appears not to contain any provision requiring the Agent to not unreasonably withhold its signature, in contrast to other market arrangements. *See, e.g.*, Public Service Company of Colorado, Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43.

[20] Filing Parties March 30 Answer at 37.

profits do not neatly align with retail customer benefits in the Southeast EEM as proposed. Indeed, while some Members may indirectly have an incentive to lower costs, many of the Filing Parties earn more return on equity by spending more capital. Shareholder profits for Southeast EEM Members may go up if they retain a larger market share by blocking access for competitors and thereby increase the megawatt-hours served by generation owned by Members.[21]

20.     Even if it does not choose to block access outright, the Southeast EEM Operating Committee could seek to use Participant Agreements as an opportunity to exercise leverage over prospective Participants.[22] The Commission's regulations require that a market-based rate seller demonstrate that "the seller cannot erect any barriers to entry against potential competitors."[23] It is hard to imagine a more direct and problematic barrier than granting a subset of market participants veto power over whether others may access transmission service, as the Participant Agreement requirement does.[24] While it is common for organized markets to require some sort of participation agreement, such

---

[21] Monopoly regulation of vertically integrated, investor-owned utilities exists because of the structural misalignment of economic incentives that fail to ensure the maximization of consumer benefits. Here, protections are necessary not as a speculative assumption of bad faith on the part of Filing Parties, but as part of the Commission's statutory obligation. In no situation can one simply assume that monopoly entities will work to adequately protect customers without regulation to require it.

[22] Contrary to the Filing Parties' response, such abuse is perfectly consistent with a broader desire by the Filing Parties to utilize the Southeast EEM construct. While seeking to deliver consumer savings facilitated by the Southeast EEM, the Filing Parties may nevertheless seek to administer the platform in a manner that locks out certain competitors who they determine might pose a threat to their market positions, or who they can secure concessions from in other market contexts by exerting leverage in agreeing to permit access to SEEM. *See* March 30 Answer at 36 ("If utilities in the Southeast were driven, when it came to consideration of the Southeast EEM, by the idea that 'competition and the availability of lower cost suppliers erodes the potential profits that come from a monopoly's main source of revenue: building additional generation,' . . . there would be no Southeast EEM proposal.").

[23] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3 (D.C. Cir. Aug. 6, 2021) (citing 18 C.F.R. § 35.37 (2020)).

[24] *See* PIOs March 24 Protest at 13 ("[B]y exercising unmitigated authority over who is permitted to execute Enabling Agreements and become a SEEM Participant, the Applicants cement their control over the transmission system and all but guarantee that competitors will be provided inferior transmission service.").

agreements should have clear application procedures and must not allow for other participants to reject the agreement without cause.[25]

21.    Further, by failing to act, the Commission approves a market construct by which prospective Participants do not have adequate means of detecting or seeking redress regarding abuse in restricting market access.  Prospective Participants appear not to have a right to bring complaints to the Auditor (with such complaints limited to Participants).[26] And while prospective Participants could in theory bring a complaint directly to the Commission, the absence of market transparency provides them with scant ability to gather the evidence that would be necessary to support such a complaint.  Further, several Southeast EEM Members are unregulated transmitting utilities, over whom the Commission likely would not have jurisdiction for such a complaint.  The upshot is that to the extent that abuse occurs, the Commission may never find out.  Something as fundamental as open access to transmission services must not rely on speculation.  Rather, a basic tenet of Order No. 888 is that transmission providers must file tariff terms that provide open access without giving themselves an opportunity to exercise discretion to block access.[27]

---

[25] Such barriers to transmission access were the express focus of Order 888.  Order No. 888, 61 Fed. Reg. at 21,541-42.  *See, e.g.*, Public Service Company of Colorado, Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43 (an example of an agreement with clearer application features that do not permit unjustified rejection).

[26] Transmittal Letter at 31 ("The Auditor may also receive complaints from Participants, which it will refer to the Membership Board and investigate at the Membership Board's discretion.").  Further, even if prospective Participants did have a right to bring complaints to the Auditor, complaints to the Auditor about undue discrimination via the Enabling Agreements are submitted to the Membership Board, which can choose not to act and to not submit such complaints to the Commission.

[27] Order No. 888, 61 Fed. Reg. at 21, 552 ("We conclude that functional unbundling of wholesale services is necessary to implement non-discriminatory open access transmission and that corporate unbundling should not now be required.  As we explained in the NOPR, functional unbundling means three things:  (1) a public utility must take transmission services (including ancillary services) for all of its new wholesale sales and purchases of energy under the same tariff of general applicability as do others; (2) a public utility must state separate rates for wholesale generation, transmission, and ancillary services; (3) a public utility must rely on the same electronic information network that its transmission customers rely on to obtain information about its transmission system when buying or selling power.").

22.     The proposal further restricts participation by requiring Participants to own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory.[28]  Public Interest Organizations (PIOs) assert that this restriction will exclude "an estimated 65 trading partners that border the SEEM territory . . . because they do not have resources located in the territory."[29]  Excluding these trading partners from the Southeast EEM closes their access to a valuable transmission service offered by each Transmission Owner, and is demonstrably more restrictive than the required Open Access Transmission Tariffs (OATTs) of the participating jurisdictional Transmission Owners.  As PIOs explain, the Commission's "open access rules require that transmission service is offered under each public utility's OATT to all transmission customers in a comparable, non-discriminatory manner, including existing trading partners."[30]

23.     The Filing Parties rationalize the proposed geographic restriction as permissible because it "is not currently technically feasible to allow entities outside the Territory to participate in the Southeast SEEM because 'transactions involving the use of transmission outside of the Territory . . . would require the coordination of e-Tags with non-NFEETS providers in the less-than-20 minute timeframe required, which is not possible at this time.'"[31]

24.     This reasoning is circular: open access is not technically feasible because the Filing Parties have not designed the market in a manner that facilitates a workable solution, and have not invested in the software or other analytical capabilities necessary to facilitate access under their chosen design.  Permitting transmission providers to evade open access requirements via their own market design choices and investment decisions would fundamentally undermine open access.  Filing Parties have done nothing to demonstrate why, in the abstract, e-Tags for external resources could not be coordinated on the timeframe necessary, or why another solution, such as requiring external resources to secure firm service to the border of the Southeast EEM Territory, is not feasible.  Rather, they have designed the market and chosen a scope of work for the relevant vendors that accomplishes coordination for their own purposes without facilitating access for competitors outside the Territory.  Such undue exclusion is not permitted by Order No. 888.[32]

---

[28] Transmittal Letter at 16.

[29] PIOs July 29 Answer at 10-11.

[30] *Id.* at 11.

[31] Filing Parties March 30 Answer at 44.

[32] Order No. 888, 61 Fed. Reg. at 21,594 ("[M]embership provision[s] must allow

25.     The basic unavoidable fact is that NFEETS is transmission service, and thus must be provided by each of the Southeast EEM Members on an open and non-discriminatory basis.  That NFEETS is last priority service does not change this analysis,[33] nor does it make a whit of difference that NFEETS will technically be accessed via the relevant Southeast EEM Member's OATT.  While the service will technically be administered via the OATT, it can only be accessed by Southeast EEM participants, pursuant to the discriminatory terms set forth in the Southeast EEM Agreement and other relevant documents.  None of my colleagues reckons with how the proposal's blatant barriers to open access—manifested by the participation agreement provisions, Three Counterparty Rule, and source/sink requirements—pass muster under Order No. 888.[34]

## III.     Southeast EEM's membership structure, market rules and governance are unduly discriminatory

26.     Beyond violating Order No. 888 by providing for unlawful barriers to accessing NFEETS, the Southeast EEM proposal also unlawfully limits access to transmission service via its restrictive membership provisions, and by forcing prospective non-Member Participants into a choice between either (i) agreeing to a set of discriminatory rules that may only be amended or otherwise influenced by a small cohort of Members in

---

any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location.").

[33] Were it material that "NFEETS service is available *only if* the existing transmission system is not fully employed," as Commissioner Danly suggests, then non-firm service could likewise skirt the basic requirements of Order No. 888.  Comm'r Danly Statement at P 23 (emphasis in original).  Nothing in that order suggests or has been understood to apply only to firm service.

[34] For example, Commissioner Christie asserts that the Three Counterparty Rule and source/sink requirements are "necessary to ensure technical feasibility," and repeats his conclusion that "this proposal represents an enhancement to a bilateral system in which enabling agreements are not unusual," but does not address the obvious distinction that, unlike in this existing bilateral market, such requirements *in this context* inhibit open access to transmission service.  Comm'r Christie Statement at P 13.  The Filing Parties suggest that open membership requirements do not apply because the Southeast EEM will not establish a loose power pool.  *See* Filing Parties March 30 Answer at 9.  While I disagree with this conclusion, it is irrelevant with regard to the barriers to *participation* imposed by the participation agreement provisions, Three Counterparty Rule, and source/sink requirements.  Such barriers implicate Order No. 888's requirement that transmission providers provide open access to transmission service; requirements for loose power pools are layered on top of this floor set for all jurisdictional transmission providers.

Docket No. ER21-1111-002, *et al.*                                   - 12 -

order to access NFEETS and the Southeast EEM's matching service, or (ii) forgoing service altogether.

27.     A key defect of the Southeast EEM is that, except for one narrow exception, an entity must be an LSE in the Southeast EEM footprint to be a Member.[35]  This restrictive provision, standing alone, violates the express terms of Order No. 888.  But even if such Membership restrictions were permissible, as discussed below, they constitute an impermissible barrier to transmission service when considered together with the combination of features in the proposal that discriminate in favor of Members.

### A.     The proposal's membership restrictions violate Order No. 888

28.     The proposed restrictions on membership for the Southeast EEM violate Order No. 888, which requires open, non-discriminatory membership for "'loose' power pools" or "other coordination arrangements."[36]  Contrary to the conclusion of my colleagues, the proposed arrangement constitutes a loose power pool, for which Order No. 888 requires "open, non-discriminatory membership provisions" and mandates modification of "any provisions that are unduly discriminatory or preferential."[37]  Order No. 888 specifically requires open membership for loose power pools to extend beyond transmission owning utilities: "membership provision[s] must allow any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location."[38]

29.     The Southeast EEM fits comfortably within Order No. 888-A's definition for loose power pools, which is "(1) any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that (2) explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[39]  NFEETS is a "discounted and/or special transmission arrangement" because it provides a service not otherwise available under relevant Participants' OATTs: $0/MWh transmission service with no associated Schedule 1 or Schedule 2 ancillary service charges, and financial losses only.  While Filing Parties contend that NFEETS is

---

[35] A Member must either be "(1) an LSE located in the Territory; (2) an association, Cooperative, or Governmental Entity that is an LSE located in the Territory; or (3) an association, Cooperative, or Governmental Utility created for the purpose of providing Energy to a Cooperative or Governmental LSEs."  Transmittal Letter at 13.

[36] Order No. 888, 61 Fed. Reg. at 21, 593.

[37] *Id.* at 21,594.

[38] *Id.*

[39] Order No. 888-A, 62 Fed. Reg. 12,274, 12,313 (1997).

not a discounted service because it relies on otherwise unused capacity, providing service at zero cost is not something typically done by the relevant transmission providers, who generally charge for non-firm service.[40]

30.    The Commission's recent decision in *PSCo* fails to support a finding that the Southeast EEM will not establish a loose power pool. *PSCO* merely stated in conclusory fashion that the arrangement at issue was not a loose power pool, without justifying that conclusion.[41] Further, *PSCo*'s conclusion ran counter to Order No. 888's express terms, despite the fact that *PSCo* was an order on a proceeding contested by a single party, not a rulemaking that would be required to reverse Order No. 888. In addition, *PSCo* addressed circumstances that entailed a far simpler arrangement across only a single balancing authority, and was inconsistent with the Commission's prior conclusion in *Wolverine Power Supply*, where the Commission explained that Order No. 888, "in seeking to eliminate undue discrimination in pooling arrangements, . . . defined pooling arrangements in the broadest terms possible."[42]

31.    While NFEETS schedules transmission on infrastructure that would otherwise go unused, *PSCo* fails to address the fact that the service is discounted insofar as NFEETS does not include any ancillary service charges and does not entail any charges for operating the platform to arrange service. Moreover, *PSCo* never considered whether such service was "special."[43] Here, in addition to the special terms described above, the elimination of rate pancaking across the broad Southeastern EEM service territory is a demonstrably special service delivered by NFEETS, sparing Participants from the multiplicity of charges that could otherwise be incurred in the existing bilateral markets. Further, in a significant distinction from *PSCo*, this case entails a complex multi-lateral optimization engine that *coordinates* the apportionment of the zero-cost transmission service among a wide array of participating entities across at least several balancing authority areas.

32.    Even if the Southeast EEM were not classified as a loose power pool, the same need for non-discriminatory membership provisions applies in order to avoid triggering

---

[40] *See* PIOs April 12 Answer at 3-5 (citing Filing Parties March 30 Answer at 8-9).

[41] *PSCo*, 154 FERC ¶ 61,107, at P 85 (2016) ("PSCo is not proposing the establishment of a loose power pool and as such the requirements cited to are not required of the arrangement proposed by PSCo.").

[42] *Wolverine Power Supply*, 85 FERC ¶ 61,099, 61,355 (1998).

[43] *PSCo*, 154 FERC ¶ 61,107, at P 84 (2016) ("Therefore, Joint Dispatch Transmission Service does not represent a discount of non-firm transmission service, and does not serve as a substitute for that service.").

the FPA's bar on undue discrimination.  Indeed, in speaking more broadly about "power pools *or other coordination arrangements*," or "certain bilateral arrangements that allow preferential transmission pricing or access," Order No. 888 states that "[t]he filing of open access tariffs by the public utility members . . . is not enough to cure undue discrimination in transmission if those public utilities can continue to trade with a selective group within a power pool that discriminatorily excludes others from becoming a member and that provides preferential intra-pool transmission rights and rates."[44]  The Filing Parties' proposal violates this requirement because it establishes a select group of Members with exclusive transmission-related rights: namely, the ability to participate in controlling and overseeing the platform for administering service across a footprint comprised of many different transmission owners.[45]  The heart of the proposal's deficiency in this regard stems from the Southeast EEM's exclusion of non-LSEs from the opportunity to fund the platform in exchange for Membership rights.

## B.    Further, the proposal's membership restrictions act in conjunction with its asymmetric market and governance structure to provide discriminatory access to transmission service

33.    Beyond directly violating Order No. 888's requirements for loose power pools or other coordination arrangements, the Southeast EEM's restrictive membership provisions act in concert with other aspects of the Southeast EEM proposal to violate the FPA's prohibition on undue discrimination by creating two unequal classes of market participants.  The proposal gives preferential treatment to the small coterie of Members, granting them operational control of the complex and important market platform that allocates transmission service, as well as unique auditing and oversight abilities not shared with other Participants, and exclusive control over all meaningful governance decisions.[46]  Non-Member Participants, on the other hand, face a Hobson's choice: agree to participate in a market that is controlled in all substantive respects by preferred Members and risk exposure to market flaws, potential exercises of market power, or other abuses that may not be detected due to skewed and inadequate oversight, transparency and fair governance; or forgo access to a valuable transmission service altogether.  Taken, together, these provisions amount to an impermissible barrier to transmission access and thereby violate "the legal and policy cornerstone" of Order No. 888.[47]

---

[44] Order No. 888, 61 Fed. Reg. at 21,594 (emphasis added).

[45] These preferential rights include Members' ability to effectively control the Southeast EEM Agent, Administrator, and Auditor, and to dictate the Southeast EEM's governance.

[46] Transmittal Letter at 21-23.

[47] Order No. 888, 61 Fed. Reg. at 21,541.

Document Accession #: 20211020-4003          Filed Date: 10/20/2021

Prospective Participants confirm that these discriminatory features may cause them to choose not to participate in the Southeast EEM.[48]

34.     Member control over operations is provided via their exclusive ability to participate in both the Southeast EEM Membership Board and Operating Committee, which are vested with near total control over the structure and operation of the market. The Membership Board will have sole responsibility and input into the operation and oversight of the Southeast EEM platform, including the hiring and firing of the Administrator, who operates the platform.[49]  The Membership Board also chooses the Auditor, who oversees the platform, and determines how often, if ever, the Auditor performs its function.[50]  Together, the Auditor and Administrator are responsible for ensuring that the Southeast EEM's multi-lateral optimization platform functions as intended.

35.     Allowing operational control and oversight to be conducted by a small sub-class of Participants is particularly troubling in the context of the Southeast EEM proposal because of the extreme complexity of the optimization platform.  Given the platform's complexity, it is unsurprising that Members provided a mechanism for themselves to ensure that it functions as intended.  The Auditor is to "monitor the functionality of the Southeast EEM System to ensure that it is operating correctly and in accordance with the Market Rules outlined in the Southeast EEM Agreement."[51]  But in providing the

---

[48] *See* Clean Energy Coalition March 15 Comments at 22 ("Without more transparency that offers some assurance of fairness and proper market function, independent sellers and buyers of power may severely limit their participation in SEEM.").  While Order No. 888's open access requirement does not speak directly to terms and conditions by which transmission service is accessed, it stands to reason that conditioning access on acceding to undesirable terms and conditions must at some point constitute an impermissible bar to access.  A large monetary fee imposed only on non-Members, for example, would clearly constitute undue discrimination.  Here, as confirmed by the Clean Energy Coalition's declaration that its members are hesitant to participate in the Southeast EEM, the discriminatory administration, oversight, and governance provisions acting in concert rise to the level of a clear barrier to participation that can reasonably be expected to inhibit non-Members' access to transmission services.

[49] The Administrator will oversee and operating the Southeast EEM System and submit e-Tags to reserve and schedule NFEETS.  Transmittal Letter at 17.

[50] Transmittal Letter at 17; Operations Affidavit at P 52.

[51] Transmittal Letter at 17.

Members alone with control over the Auditor's actions, the proposal gives non-Member Participants no such assurance.

36.     The proposal also vests Members alone with power to meaningfully weigh in on any potential changes to the Market Rules, providing no meaningful opportunity for non-Members, including other Southeast EEM market participants, states, or customers, to have a voice.  While the Filing Parties propose to provide limited opportunities for non-Member engagement, such as an "Annual Meeting of Participants and Stakeholders,"[52] these opportunities equate to no more than a chance to provide a perspective.  The proposal does not include any requirements for or process by which these perspectives will be incorporated or acted upon.  These opportunities fail to provide non-Member Participants with any real ability or leverage to shape decisions, or to participate in market administration and oversight.

37.     The Filing Parties rationalize this blatantly preferential treatment with a theory that superior rights for Members are appropriate because the Members financed the Southeast EEM platform.[53]  This argument neglects the fact that non-LSE Participants are not offered the opportunity to become Members or otherwise participate in the funding of the platform.  The exclusive opportunity to fund a market platform that organizes market activity and allocates transmission service across several utilities' footprints, and enjoy special rights granted in exchange for that funding, is unduly discriminatory because no reason has been given why LSEs alone should enjoy this right in exchange for preferential terms and conditions.  Although the Filing Parties reference the recently accepted governance structure of SPP WEIS' market as support,[54] such reliance is inappropriate for three reasons: (1) although representation on WEIS' WMEC is similarly exclusive to WEIS Participants, there are no restrictions on who can become a WEIS Participant; (2) there are meaningful avenues for non-WEIS Participants to provide input on WEIS decisions (*i.e.*, through the WEIS Revision Request Process); and (3) the WMEC is overseen by the independent SPP Board of Directors, with any decisions by WMEC appealable up to the SPP Board of Directors.

38.     The Commission has on prior occasions disapproved of transmission service arrangements that give preference to a certain class of Members, even where that preference is less marked than the combination of factors present here.  For example, in evaluating the "governance rules for the Management Committee and the Regional Reliability Committee" of the Mid-Continent Area Power Pool, the Commission determined that the rules "do not satisfy Order No. 888" because they provided for

---

[52] Southeast EEM Agreement § 4.4.

[53] Filing Parties March 30 Answer at 37.

[54] *Id.*

"voting on the basis of Electric Revenues, which . . . gives too much influence to the vertically integrated utility members that own the transmission system."[55]  Similarly, the D.C. Circuit upheld a Commission order rejecting the membership criteria of a loose power pooling arrangement that provided for two classes of Participants, with one class enjoying substantially better rights to govern the pool's market rules and control operation of the pool.[56]  In that case, the relevant filing parties had proposed an arrangement that included "Participants," who enjoyed full membership rights, and "Associate Participants," who were entitled only to "representation on certain pool committees and participation in pool planning functions."[57]  The Commission found this distinction "discriminatory on its face under sections 205 and 206 of [the Federal Power Act]", and its determination was specifically approved by the D.C. Circuit.[58]  While the names of the two classes diverge, the difference between Participants and Associate Participants in many respects mirrors the Southeast EEM proposal's distinction of rights between Member Participants and non-Member Participants.

39.     Commissioners Danly and Christie dismiss these discriminatory features of the Southeast EEM, suggesting that they would only be problematic if the Southeast EEM were an RTO.  In doing so, they ignore the fact that, together, the preference for Members built into the Southeast EEM agreement, these features are a clear barrier to access for prospective non-Member Participants.  My colleagues fail to set forth any theory for why forcing potential Participants to choose between accepting these discriminatory market rules or forgoing access to this valuable transmission service is not a violation of Order No. 888 and the underlying requirement of the FPA that service not be unduly discriminatory.

40.     Allowing the Southeast EEM to go into effect with the existing governance structure and market participation requirements may have a significant effect on the Southeast energy market.  For one, it will decrease volume and liquidity of non-firm point-to-point service within or across the Southeast EEM territory,[59] making it more difficult and expensive for anyone who continues to engage bilaterally in the Southeast

---

[55] *Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075 at 61,317 (1999), *petitions for review denied*, *Alliant Energy Corp. v. FERC*, 253 F.3d 748 (D.C. Cir. 2001).

[56] *See Central Iowa Power Cooperative v. FERC*, 606 F.2d 1156, 1170 (D.C. Cir. 1979).

[57] *Id.*

[58] *Id.* at 1170, 1171.

[59] Filing Parties predict this effect, citing it in their benefits analysis.  *See* Transmittal Letter at 36-37 (citing Benefits Analysis at 8, 19).

EEM footprint.  The Filing Parties acknowledge this potential cost impact on non-Participants.[60]  The FPA does not permit requiring non-Participants to subsidize benefits for Participants, especially for Participants with valid concerns that joining the Southeast EEM may subject them to discriminatory treatment.

41.     There are clear and straightforward solutions here, which would not derail the Filing Parties goal of an efficient Southeast EEM platform.  For example, the Filing Parties could remedy these infirmities by: (1) creating the option for non-LSE Participants to become Members if they make the necessary financial commitment, like in the WEIS; and (2) creating a process for non-Member Participants, states and other stakeholders, such as consumer groups, to provide complaints and concerns on Southeast EEM proposals, also like in the WEIS.

## IV.    Southeast EEM's lack of adequate market protections may result in unjust and unreasonable rates

42.     I am also concerned that the Southeast EEM, as proposed, could result in unjust and unreasonable rates.  The Filing Parties failed to provide sufficient analysis demonstrating a lack of potential by Southeast EEM Participants for the exercise of market power or manipulation of the market, or adequate safeguards to protect against these potential abuses on a going forward basis.

43.     The Filing Parties dismiss market power concerns raised by protestors and argue that no market power analysis or other market power protection is needed for the Southeast EEM because the core functioning of the Southeast bilateral market is not being changed by the Southeast EEM and the market presents no new opportunities for the exercise of market power.[61]  In other words, the Filing Parties propose to rely on the jurisdictional Southeast EEM Participants' existing market-based rate authorities as proof that Participants in the Southeast EEM will not be able to exercise market power.  This reliance depends on the false premise that the Southeast EEM is nothing more than an enhancement on the existing bilateral markets in the Southeast.[62]  Such cursory analysis

---

[60] See Pope Aff. ¶ 67.  The Filing Parties justify the potential increase in transmission service costs to native load customers as permissible because native load customers may receive greater benefits via the relevant utilities' participation in the Southeast EEM.  *Id.*  But this argument neglects that *non*-native load customers can likewise expect increased transmission service costs and will receive *no* corresponding benefits where they are not Participants in the Southeast EEM.

[61] *See* Filing Parties March 30 Answer at 29; Response to First Deficiency Letter at 2.

[62] *See supra* at PP 10-12.

violates the Commission's duty to ensure that participants in the Southeast EEM "either lack, or have adequately mitigated, any horizontal or vertical market power."[63]

44.    First, as discussed above, the Southeast EEM is a new market footprint.  To the extent that the Commission has granted jurisdictional Southeast EEM Participants the authority to transact in the Southeast, it has done so based on the results of market power analyses of each Participant's ability to exercise market power in the balancing authority areas in which they own generation and transmission assets.  Those analyses assume that each balancing authority is essentially its own unique market, and require a number of inputs that are specific to the market being studied.[64]  Given its expanded footprint, voluntary nature, and introduction of NFEETS, all of these inputs would necessarily be different for the Southeast EEM.

45.    Furthermore, traditional market power analyses assume that all uncommitted capacity located within the market footprint is available to compete.  However, given the participation requirements, and the voluntary nature of the market, it is unclear who will participate in the market and how many resources they will make available.  The Filing Parties admit that they do not know the level of participation in the Southeast EEM.[65]  If participation levels are lower than the Filing Parties anticipate, it is very possible that Participants the Commission found to not have market power as studied in individual balancing authority areas could have the ability to exercise market power in the Southeast EEM.

46.    The failure to provide market-specific market power analyses contradicts the Commission's decisions in the Western EIM.  In *PacifiCorp*, the Commission found that the EIM will be a new relevant geographic market for market power purposes, and required PacifiCorp (and all subsequent market members) to study the EIM when joining, as well as study it as part of their triennial market power updates.[66]  This helped ensure

---

[63] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3.

[64] For example, the amount of generation located in the balancing authority area, the average amount of load, the number of potential competitors, and the amount of potential competing transfers that can be imported from neighboring balancing authority areas.

[65] In the first Deficiency Letter, Commission staff inquired about the number of companies that are expected to participate in the Southeast EEM, as well as their expected supply and demand offers.  The Filing Parties declined to offer any specifics, instead arguing that "forward looking estimates . . . are difficult to make with any precision or certainty" and they expect "that the market will attract robust participation." *See* Response to First Deficiency Letter at 13-14.

[66] *PacifiCorp*, 147 FERC ¶ 61,227, at P 206 (2014) ("[B]ecause the EIM will be a

that PacifiCorp, which had market-based rate authority in all balancing areas that comprised the EIM at the time it joined the market, would not be able to exercise market power.

47.     Without a market power analysis that looks specifically at the Southeast EEM, the Commission is flying blind.  The risk of market power abuse created by the Southeast EEM going into effect without adequate market power analysis is exacerbated by the fact that the market has no independent market monitor.  Other organized market proposals recently approved by the Commission, like the WEIS and EIM, include independent market monitors that work to prevent the exercise of market power, by constantly analyzing the market and enforcing market power mitigation measures when they detect that conditions are such that a market participant will be able to exercise market power – even when those participants have received authorization to transact at market-based rates.  The Commission relied on the presence of the market monitors in approving the design of the Western EIM and SPP's WEIS.[67]  While the Commission is equipped to

---

new relevant geographic market for market power purposes, PacifiCorp is required to make a market-based rate change of status filing within nine months of the launch of the EIM market so that the Commission can assess whether PacifiCorp has market power in the EIM.").

[67] *See e.g.*, *Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,231, at P 226 (2014) ("With regard to Neighboring Systems' request that market power analyses be performed on an ongoing basis and that the Department of Market Monitoring publish quarterly reports on the performance of the EIM, we note that CAISO has proposed that the Department of Market Monitoring will monitor markets administered by CAISO, which include the EIM.  In addition, CAISO's tariff requires the Department of Market Monitoring to report on wholesale market trends on a quarterly basis."); *Sw. Power Pool, Inc.,* 173 FERC ¶ 61,267, at P 81 (2020) ("Instead, SPP and the SPP MMU will evaluate the mitigation thresholds over time, and SPP will file with the Commission to implement changes as needed.  We find that this approach is just and reasonable and addresses the Commission's concern in the July Order regarding automatic increases of mitigation thresholds."); *id.* at P 83 ("Furthermore, the SPP MMU is obligated to recommend frequently constrained areas prior to the start of the WEIS Market"); *id.* at P 99 ("In addition, to the extent that market participants are consistently short due to physical withholding, they face potential referral to the Commission's Office of Enforcement if the SPP MMU suspects physical withholding behavior based on credible evidence."). SPP's market monitor also completed a Market Power Study several months prior to Commission approval of the proposed WEIS market, found that a single supplier could possess structural market power at the system level, and recommended that the SPP develop a system-wide market power mitigation measure.  *Id.* at P 69.

provide some *ex post* monitoring of the Southeast EEM, that is not a replacement for active monitoring that will prevent the exercise of market power.

48.    I am also concerned that the Southeast EEM's design will create avenues for manipulation.  The Southeast EEM permits Participants to "select Counterparty Specific Constraints for any reason."[68]  Given this lack of any need for justification,[69] as well as the absence of market monitoring, such "toggling" presents a risk of abuse.  The Filing Parties argue that such toggling "is just a manifestation of a decision that any market participant can make today."[70]  This argument neglects the fact that that the risk is materially different in the Southeast EEM context.  Under the proposal, actions by one participant not only impact that participant and its counterparties, but also automatically flow through the multi-lateral algorithm, impacting other potential buyers and sellers at the same time.  Prices of various transactions that emerge from the algorithm depend upon the multi-lateral landscape of bids, not just on that party's own conduct.  Further, the Filing Parties glaze over the fact that the Southeast EEM is a mechanism to allocate finite transmission rights.  The ability to toggle off competitors, or entire balancing authority areas, creates the opportunity for participating Southeast EEM Members to secure NFEETS transmission rights for themselves while denying their competitors access.[71]  The bilateral market, by contrast, subjects all bilateral transactions to equal transmission opportunities.

49.    Using the Three Eligible Counterparty Rule[72] as a safeguard against collusive schemes is a recognition that such schemes may occur.  There has been no demonstration

---

[68] Transmittal Letter at 25.

[69] While Filing Parties explain that Counterparty Specific Constraints can be used to allow Participants to comply with limits on their market-based rate authority ("toggling off" in regions where they are not permitted to market-based sales), nothing obligates them to use Counterparty Specific Constraints only for this purpose, and they need not give any justification for imposing constraints.  *Id.*

[70] Filing Parties March 30 Answer at 33.

[71] The Filing Parties list 180 counterparties to existing enabling agreements as evidence that they are widely used in the Southeast.  However, these agreements have never been used as a gating mechanism for participation in a multilateral market construct.  Prospective Southeast EEM Participants must enter into enabling agreements with existing Southeast EEM Participants to gain entry into the market.

[72] The Three Eligible Counterparty Rule is "the requirement that all Participants have 'toggled on' at least three unaffiliated potential counterparties each time they bid or offer."  Transmittal Letter at 40.

that this requirement will act as an effective safeguard to prevent such schemes. The Filing Parties state that the number of required counterparties renders it difficult for Participants to engage in anticompetitive conduct,[73] but do not provide any analysis, evidence, or rationale why three is the right number to protect the integrity of the market. This amounts to acknowledgment that anticompetitive conduct is a valid concern, without any demonstration that such concern has been properly mitigated.

50.     The Southeast EEM algorithm's complexity and lack of transparency expose the market to manipulation, particularly in the absence of a market monitor to observe its operation and investigate anomalies. The Commission's enforcement docket is full of examples of market participants using superior knowledge of, and experience with, vulnerabilities in optimization algorithms or other features of complex markets to manipulate prices or collect unjustified payments.[74] That the algorithm is too complex for Filing Parties even to describe in a mathematical formula evinces a high risk of design flaws for manipulators to exploit.

51.     The lack of analysis specific to Southeast EEM's unique characteristics, demonstrating that Participants will not be able to exercise market power, as well as the unchecked potential avenues for manipulation, means that Filing Parties have failed to demonstrate that rates in the Southeast EEM will be just and reasonable. Like earlier concerns about undue discrimination, these issues are not insurmountable. The Filing Parties could easily address these deficiencies by submitting a Southeast EEM-specific market power analysis and by closing some of these potential avenues for manipulation (e.g. instituting protections to avoid toggling off abuse). Of course, adding an independent market monitor would also go a long way to address both the market power and market manipulation concerns. These are legitimate issues with straightforward solutions that the Commission could have provided as guidance to Filing Parties in a rejection order.

---

[73] Transmittal Letter at 41.

[74] *See, e.g., Vitol Inc. and Federico Corteggiano*, 169 FERC ¶ 61,0170 (2019) (order assessing penalties for market manipulation where knowledgeable market participants used feature of CAISO's marginal cost of congestion formula to manipulate physical energy prices for benefit of participants' related financial positions); *Coaltrain Energy, L.P.,* 155 FERC ¶ 61,204 (2016) (market participants manipulate market by placing economically meaningless 'Up to Congestion' bids at nodes with small or no price spreads for sole purpose of collecting unjustified marginal loss surplus allocation credits, rather than for legitimate arbitrage purposes); *City Power Marketing, LLC,* 152 FERC ¶ 61,012 (2015) (manipulative 'Up to Congestion' bids); *Houlian Chen,* 151 FERC ¶ 61,179 (2015) (manipulative 'Up to Congestion' bids).

Docket No. ER21-1111-002, *et al.*                                    - 23 -

### V.    **Conclusion:  Creation of this market puts non-Members at a permanent disadvantage in the Southeast**

52.     The Commission's responsibility under section 205 of the FPA is to evaluate proposals to determine whether they will result in just and reasonable rates that are not unduly discriminatory or preferential.  As my colleagues have emphasized, the Filing Parties have not put forth an RTO proposal, so in the context of this proceeding it is not the Commission's role to evaluate whether an RTO would deliver greater benefits than the proposal before us.  By the same token, we cannot dismiss a failure of this proposal to abide by the Commission's bedrock principles necessary to guarantee just and reasonable and non-discriminatory rates simply because opponents of the proposal may prefer an RTO.  We have an obligation under the Administrative Procedure Act to articulate a "rational connection between the facts found and the choice made."[75]  (Here, the choice being to allow the tariff to go into effect by operation of law via split vote.)  My colleagues' failure to explain why they would have rejected protestors' detailed arguments that the proposal imposes unduly discriminatory barriers to transmission access and fails to safeguard the market against just and reasonable rates violates this obligation.[76]

53.     Engaging on the merits of the actual filing under consideration, it is clear that the Southeast EEM proposal, whether accepted by operation of law or with the commitments offered in the response to the first deficiency letter, fails to meet the standard set forth in section 205.  I therefore cannot support the market platform as proposed.

54.     A well-designed Southeast EEM has the potential to provide valuable benefits to the Southeast energy markets.  An order rejecting the proposal could easily have set the stage for a future proposal complying with the FPA's requirements, thereby providing a pathway for the promise of benefits to bear fruit.  It is disappointing that, perhaps in search of near-term incremental cost savings, the Commission has compromised its fundamental responsibilities to guarantee non-discriminatory service and safeguard the market from abuse.  Allowing this tariff to go into effect by operation of law puts at risk the Commission's long-running and largely unified commitment to steadily expanding

---

[75] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)).

[76] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) ("It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'") (quoting *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)).

Document Accession #: 20211020-4003          Filed Date: 10/20/2021

non-discriminatory open access, a legal tradition exemplified by one of the Commission's proudest actions, Order No. 888.


_____

Allison Clements
Commissioner

Document Content(s)
Southeast EEM Fair Rates Act Statement - Clements.docx....................1

JA0059

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | Docket No. | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-002 |
| Louisville Gas and Electric Company | | ER21-1114-002 |
| Duke Energy Progress, LLC<br>Duke Energy Carolinas, LLC | | ER21-1115-000<br>ER21-1115-001<br>ER21-1115-002 |
| Duke Energy Carolinas, LLC | | ER21-1116-002 |
| Duke Energy Progress, LLC | | ER21-1117-002 |
| Louisville Gas and Electric Company | | ER21-1118-002 |
| Georgia Power Company | | ER21-1119-002 |
| Kentucky Utilities Company | | ER21-1120-002 |
| Mississippi Power Company | | ER21-1121-002 |
| Alabama Power Company | | ER21-1125-000<br>ER21-1125-001<br>ER21-1125-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1128-002 |

STATEMENT OF COMMISSIONER CHRISTIE

(Issued October 20, 2021)

1.     The Southeast Energy Exchange Market (Southeast EEM or SEEM) proposal meets the standard for approval under section 205 of the Federal Power Act (FPA).[1]  The

---

[1] 16 U.S.C. § 824d (2018).

JA0060

opposition to this proposal stems from one core issue: the goal of many interest groups to force the Southeastern states into a Regional Transmission Organization (RTO) or at least into a halfway-house to an RTO now, with full submission later.[2] The decision whether these states should join an RTO, however, is for their own elected policy-makers to make, not this Commission. All that we are asked to do in this case is determine whether the SEEM proposal meets the section 205 standard. For the reasons set forth below, it does and I would have voted to approve.

2.      On February 12, 2021, as amended on June 7, 2021[3] and August 11, 2021,[4] Southern Company Services, Inc., as agent for Alabama Power Company, filed the

---

[2] Chairman Glick shares the goal of creating a Southeastern RTO: "From my perspective, utilities and other stakeholders in this region should be working to establish an RTO/ISO in the Southeast for the benefit of consumers and to promote grid reliability." Statement of Chairman Glick regarding Southeast EEM at P 1. Nonetheless, he acknowledges that "I believe that much of the Southeast EEM proposal arguably satisfies the Section 205 standard." *Id.* at P 2. Chairman Glick would have voted against the Southeast EEM proposal based on the *Mobile-Sierra* issue. *Id.* at P 2; *contra infra* at P 20. Commissioner Clements would use this proceeding to impose RTO-type governance structures on the Southeast EEM. Statement of Comm'r Clements regarding Southeast EEM at P 41 ("For example, the Filing Parties could remedy these infirmities by: (1) creating the option for non-LSE Participants to become Members if they make the necessary financial commitment, like in the WEIS; and (2) creating a process for non-Member Participants and other *stakeholders, such as states* or consumer groups, to provide complaints and concerns on Southeast EEM proposals, also like in the WEIS." (emphasis added)). I note that states are not just "stakeholders" but are sovereign authorities which have long exercised regulatory power over the utilities in the Southeast and would be stripped of much of their regulatory authority if the Southeastern states were forced into a federally-regulated RTO. Being allowed to attend stakeholder meetings and make complaints to RTO management is small consolation to the states for losing much of their regulatory ability to ensure their consumers receive reliable power at the lowest practical cost. As noted below, *not a single* state utility commission filed in opposition to the SEEM proposal. *See infra* at P 19.

[3] On May 4, 2021, Commission staff issued a deficiency letter to Filing Parties informing them that the February 12, 2021 Filings were deficient and requesting additional information (May 4 Deficiency Letter). On June 7, 2021, Filing Parties submitted a response to that letter (June 7 Deficiency Response), amending the February 12, 2021 Filings.

[4] On August 6, 2021, Commission staff issued a deficiency letter to Filing Parties informing them that the February 12, 2021 Filings, as amended in the June 7 Deficiency

Southeast EEM Agreement on behalf of itself and the other prospective Members (collectively, Filing Parties) of the Southeast EEM,[5] pursuant to section 205 of the FPA and section 35.12 of the Commission's regulations.[6]  Also on February 12, 2021, as amended on June 7, 2021 and August 11, 2021, seven prospective Southeast EEM Members submitted certificates of concurrence to the Southeast EEM Agreement and four prospective Participating Transmission Providers in the Southeast EEM filed revisions to their respective open access transmission tariffs (OATTs) to incorporate Non-Firm Energy Exchange Transmission Service (NFEETS).[7]

---

Response, were deficient and requesting further information (August 6 Deficiency Letter).  On August 11, 2021, Filing Parties submitted a response to the August 6 Deficiency Letter (August 11 Deficiency Response), further amending the February 12, 2021 Filings.

[5] As of February 12, 2021, the following entities constitute the prospective Members of the Southeast EEM:  Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, Southern Companies); Associated Electric Cooperative, Inc.; Dalton Utilities; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC (collectively, Duke Energy); Louisville Gas and Electric Company and Kentucky Utilities Company (collectively, LG&E/KU); North Carolina Municipal Power Agency Number 1; PowerSouth Energy Cooperative; North Carolina Electric Membership Corporation; and Tennessee Valley Authority  (each a Member and collectively, the Members).  *See, e.g.*, Southern Companies, Docket No. ER21-1111, February 12, 2021 Transmittal (Southeast EEM Transmittal) at 1 and n.1.  In addition, the following entities participated in the creation of the Southeast EEM and, as of February 12, 2021, are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members:  Georgia System Operations Corporation; Georgia Transmission Corporation; Municipal Electric Authority of Georgia; Oglethorpe Power Corporation; and South Carolina Public Service Authority.  *See, e.g.*, *id.*

[6] 18 C.F.R. § 35.12 (2020).

[7] *See* Duke Energy, Tariff Filing, Docket Nos. ER21-1115-000 (filed Feb. 12, 2021), ER21-1115-001 (filed June 7, 2021), and ER21-1115-002 (filed Aug. 11, 2021); LG&E/KU, Tariff Filing, Docket Nos. ER21-1118-000 (filed Feb. 12, 2021), ER21-1118-001 (filed June 8, 2021); ER21-1118-002 (filed Aug. 11, 2021); Southern Companies, Tariff Filing, Docket Nos. ER21-1125-000 (filed Feb. 12, 2021), ER21-1125-001 (filed June 7, 2021), and ER21-1115-002 (filed Aug. 11, 2021); Dominion Energy SC, Tariff Filing, Docket Nos. ER21-1128-000 (file Feb. 12, 2021), ER21-1128-

Docket No. ER21-1111-001, et al.                                    - 4 -

3.      In the event the Commission does not act on a filing made pursuant to FPA section 205 within the 60-day period established therein "because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum," FPA section 205(g)(1)(B) requires each Commissioner to "add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change."[8] This statement complies with the statute.[9]

4.      In sum, I would have voted to accept the Southeast EEM proposal as a package. As I set forth in greater detail below, the filings unquestionably meet the statutory criteria for acceptance under section 205 and should have been approved by majority vote of this Commission.  In fact, I would have voted to approve the Southeast EEM proposal as a package within the deadline of August 6, 2021 created by the May 4 Deficiency Letter.[10]

* * *

5.      The Southeast EEM proposal facilitates and enhances interaction among entities in the purchase and sale of energy across a 10-state footprint involving 160,000 MW of generating capacity and approximately 640 TWh of load.[11]  The algorithm proposed by the Southeast EEM to be run by an independent administrator, will match 15-minute "split-the-savings" energy exchanges, subject to available transmission.  Moreover, the proposal for the NFEETS transmission service will, subject to availability, provide zero-cost, non-firm transmission by using *otherwise unused* transmission capacity.  NFEETS will also encourage transactions between geographically distant trading partners that may otherwise have been uneconomic.[12]

_____

001 (filed June 8, 2021), ER21-1128-002 (filed Aug. 11, 2021).

   [8] 16 U.S.C. § 824d.

   [9] *Id.*

   [10] The Commission does not vote on whether to issue a deficiency letter. Accordingly, no vote of the Commission was taken on whether to issue the August 6 Deficiency Letter – issued on the deadline for an order to be issued for the Southeast EEM proposal or for the proposal to go into effect by operation of law – and which, in my view, sought information that was already in the record or unnecessary to making a decision on the proposal.

   [11] *See, e.g.*, Southeast EEM Transmittal at 4.

   [12] *See generally* Southeast EEM Transmittal, attach. D, Pope Aff. ¶ 22 (explaining

JA0063

6.      The proposal acts to enhance the existing bilateral market in the Southeast and benefits the participants.  It will increase efficiency, liquidity, transparency, and competition in the Southeast bilateral market and better utilize existing transmission capacity in the region.  The filing estimates that the benefit will be approximately $40 million in market-wide savings per year relative to the status quo bilateral market.[13] Importantly, benefits of the proposal will flow to consumers.  I would have found that the proposal package meets the standards for the Commission's acceptance of them under FPA section 205 as they are just and reasonable and not unduly discriminatory or preferential.

7.      In reaching this conclusion, I have considered the various protests and comments in these dockets.  Specifically, I have considered that certain protestors and commenters criticize and express concern with different elements and aspects of the Southeast EEM proposal.  I do not agree with them.  Indeed, as set forth below, it is obvious that many of the criticisms and complaints are direct or veiled attacks on this Southeast EEM proposal not because of what it is, but because of what it is not:  an RTO or a halfway-house to an RTO, which is what many of the critics clearly want.[14]

8.      For purposes of this statement, I touch generally on certain of the briefed criticisms.  For example, certain protestors argue that the Southeast EEM will unjustly exclude entities like public interest organizations, independent power producers, and large-scale commercial and industrial customers from becoming Members and engaging in governance[15] and assert that the Southeast EEM's management authority will be

---

that the Southeast EEM matching tool will lead to lower transaction costs by arranging 15-minute trades across a broad geographic area).

[13] *See, e.g.*, Southeast EEM Transmittal at 11 (citing Southeast EEM Transmittal, attach. E-1); *id.* at 32-33.

[14] *See infra* at PP 17-18 and n.32.

[15] *See, e.g.*, Advanced Energy Economy, Advanced Energy Buyers Group, Renewable Energy Buyers Alliance, and Solar Energy Industries Association (collectively "Clean Energy Coalition") March 15, 2021 Comments (Clean Energy Coalition March 15 Comments) at 15-24; Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council (collectively "PIOs") March 15, 2021 Limited Protest and Comments at 30-32 (PIO's March 15 Limited Protest); Public Citizen March 15, 2021 Protest (Public Citizen March

concentrated only among load serving entities (LSEs) creating a lack of independent governance, imbalanced decision-making and uncompetitive outcomes.[16]  They further allege that the decision-making authority will be in the hands of the three largest utilities and that together these allegations create a lack of independence in governance from the proposed market participants that is unjust, unreasonable, and unduly discriminatory.[17]  I would have found that Southeast EEM is designed to *enhance, not modify*, the existing bilateral nature of energy transactions in the Southeast.  Much of the criticism raised here appears to reflect disappointment that this proposal does not create an RTO.  As I set forth herein, such criticism is misplaced and any expectation that RTO or RTO-esque structures can or should be forced on this region through FERC action has no basis in law or policy.  I therefore would have found these aspects of the Southeast EEM meet section 205 standards and I would have accepted them.

9.      The arguments that the Southeast EEM should be required to have an independent market monitor suffer from the same infirmity.[18]  While I certainly agree that an independent market monitor is essential to oversee more complex and multi-faceted RTO markets, once again, this is *not* a proposal to create a new RTO market nor should FERC force these applicants into an RTO or RTO-type construct.  Thus, the lack of a market monitor in the Southeast EEM not only does not make this proposal unjust and unreasonable, but the request for the imposition of a market monitor in the Southeast EEM again reflects an agenda of forcing these states into an RTO or RTO-type construct, despite the obvious benefits to consumers of the enhancement of the bilateral trading construct that is proposed in the Southeast EEM.  Moreover, the monitoring and auditing

---

15 Protest)at 2-3; Southern Renewable Energy Association (SREA) March 15, 2021 Comments (SREA March 15 Comments) at 3-5; Voltus, Inc. March 15, 2021 Protest (Voltus March 15 Protest) at 3-4.

[16] *See, e.g.*, PIOs March 15 Limited Protest at 31-32; Public Citizen March 15 Protest at 2-3.

[17] *See, e.g.*, Carolinas Clean Energy Business Association (CCEBA) March 15, 2021 Comments (CCEBA March 15 Comments) at 2; Clean Energy Coalition March 15 Comments at 17-20; PIOs March 15 Limited Protest at 28-32, 39; Advanced Energy Economy, Advanced Energy Buyers Group, and the Solar Energy Industries Association (collectively, "Clean Energy Coalition II") June 28, 2021 Response to June 2021 Response to Delinquency Letter (Clean Energy Coalition II June 28 Response to Delinquency Letter) at 5-6.

[18] *See, e.g.*, SREA March 15 Comments at 5; PIOs March 15 Limited Protest at 32-34; Clean Energy Coalition March 15 Comments at 7-8.

proposed in these filings and the combined roles of the Auditor and the Administrator make for a just and reasonable proposal under section 205 that facilitates bilateral trading which already can and does occur in the current market.

10.     Again, related to the same agenda of imposing an RTO on the Southeast, protestors argue that the benefits of the Southeast EEM have been misstated, overstated or unproven.[19]  First, any claim in this record that an RTO would provide "more" benefits than those offered by the Southeast EEM is purely speculative and unpersuasive.  The issue of RTO benefits versus costs and disadvantages, in terms of both reliability and consumer protection, are complex and multi-faceted.  Second, the only proposal before the Commission is the Southeast EEM and under section 205 the Commission's analysis is limited to whether this proposal is just and reasonable and not whether some other proposal is more just or more reasonable.[20]  That said, I would have voted that the proposal meets section 205 standards.

11.     There is also disagreement over the application of the *Mobile-Sierra*[21] public interest presumption as the standard of review.[22]  In response to the May 4 Deficiency Letter, the Filing Parties suggested that they would limit application of the *Mobile-Sierra* presumption to provisions, including:  membership criteria; governance; roles, responsibilities, and scope of the Agent; budgeting and cost allocation; severability; withdrawal; release and liability; equitable relief; reliability obligations; dispute resolution; defaults; confidentiality; public utility status of Members; no reliance on NFEETS; no dedication of facilities; amendments; and the agreement for new Members

---

[19] *See, e.g.*, PIOs March 15 Limited Protest at 42; Clean Energy Coalition March 15 Comments at 8, 27-34; American Forest & Paper Association March 15, 2021 Comments at 13-14.

[20] *See, e.g.*, *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (finding that, when determining whether a proposed rate was "just and reasonable," as required by the FPA, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than the alternative rate designs").

[21] *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

[22] *See, e.g.*, Clean Energy Coalition June 28 Delinquency Letter Response at 7-9; Solar Energy Industries Association August 23, 2021 Protest at 3-6.

to join.[23] As set forth more fully below, I would have found application of the *Mobile-Sierra* standard appropriate under the standard itself.

12.      Several protestors raise concerns regarding the (i) public availability and quality of data related to the energy exchange as it relates to the ability to monitor the Southeast EEM for exercises of market power and market manipulation[24] and (ii) the independence and transparency of the Administrator and Auditor roles and the Membership Board's control over those roles.[25] I would have found, however, that the Southeast EEM proposal strikes a balance between (i) providing the Commission with appropriate information to monitor the Southeast EEM for the exercise of market power and market manipulation and providing the public with sufficient information to understand the Southeast EEM's performance and (ii) protecting confidential and commercially sensitive information. In addition, under the proposal, the roles and responsibilities of the Administrator and Auditor are set forth clearly and, as I noted above, their combined roles add to a just and reasonable proposal. As a result, I again would have found the proposal to be just and reasonable and not unduly discriminatory or preferential on these points as well.

13.      A number of protestors claim that a high barrier is created to participation in Southeast EEM by its participation requirements and that those barriers may limit the services Participants can offer or access to NFEETS.[26] Among the concerns expressed in this regard are the limitation of participation to entities within the territory defined by the Southeast EEM and the three-counterparty rule regarding enabling agreements. Once again, I would have found the proposal to be just and reasonable and not unduly discriminatory and preferential as to these issues. For example, as the Filing Parties explain, these requirements are necessary to ensure the technical feasibility of the Southeast EEM. The Filing Parties note that it is not technically feasible at this time to

---

[23] June 7 Deficiency Response at 40-41.

[24] *See, e.g.*, Voltus March 15 Protest at 5; CCEBA March 15 Comments at 2 (citing Clean Energy Coalition March 15 Comments at 18-22); PIOs March 15 Limited Protest at 36-37.

[25] *See, e.g.*, PIOs March 15 Limited Protest at 37-38, 40-41; Public Citizen March 15 Protest at 3; Clean Energy Coalition March 15 Comments at 24-25; R Street Institute March 15, 2021 Comments at 5.

[26] *See, e.g.*, Voltus March 15 Protest at 4-5; SREA March 15 Comments at 4; Environmental Defense Fund March 15, 2021 Comments at 7-8; PIOs March 15 Limited Protest at 50.

allow entities outside the territory to participate in the Southeast EEM, for example, because "transactions involving the use of transmission outside of the Territory. . . would require the coordination of e-Tags with non-NFEETS providers in the less-than-20 minute timeframe required, which is not possible at this time."[27]  Moreover, as I have noted, this proposal represents an enhancement to a bilateral system in which enabling agreements are not unusual and therefore represent the continued use of an existing mechanism.

14.    Some commenters claim that a lack of a market power analysis of the Southeast EEM is a concern and, for example, makes the Southeast EEM proposal incomplete.[28]  I similarly would have found the proposal just and reasonable as to this point because there is no new product introduced which would require a new market power analysis.

15.    In addition, concerns are expressed over NFEETS, including the potential of undue discrimination to entities with firm transmission rights and that NFEETS acts as a discount to transmission.  Further, some protestors argue that the Southeast EEM creates a loose power pool and therefore must allow open membership to comply with the Commission's open access requirements established in Order Nos. 888 and 888-A.[29]  Again, I would have found the proposal just and reasonable and not unduly discriminatory or preferential.  First, there is no discount to transmission; otherwise unused non-firm transmission is to be used in NFEETS and it is made available only after all other transmission customers make their transmission reservations.[30]  Second, the proposal does not meet the requirements for creating a loose power pool established by Order No. 888-A.[31]

16.    The Commission is obligated to rule on *only the proposal before it*, not some hypothetical version that some may claim would have been better in some ways, in effect, more just and reasonable.  It is a truism that to meet the 205 standard, a proposal does not have to be the best of all conceivable proposals, only good enough to meet the 205

---

[27] Filing Parties March 30 Answer at 44.

[28] *See, e.g.*, Clean Energy Coalition March 15 Comment at 27.

[29] *See, e.g.*, *id.* at 9-14; PIOs March 15 Limited Protest at 6-13; CCEBA March 15 Comments at 2; *see also* Advanced Energy Economy, Advanced Energy Buyers Group, Renewable Energy Buyers Alliance (collectively, Clean Energy Customers) August 23, 2021 Comments at 4-5.

[30] Southeast EEM Transmittal at 24-25.

[31] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 31,235.

standard; the Southeast EEM proposal clearly is and I would have accepted that proposal under section 205 as it meets the applicable legal standard.

17.     As I noted above, much of the opposition to and criticism of the Southeast EEM Agreement follows a common theme:  that the Southeast EEM Agreement falls short of creating a new Southeastern RTO or falls short of laying the foundation that would lead to such a new Southeastern RTO.[32]  Many of the comments or protests to this proposal seek to force RTO-type governance structures and procedures on the SEEM proposal.

---

[32] *See, e.g.*, PIOs March 15 Limited Protest at 63-64 (encouraging the Commission to engage in a technical conference to determine, *inter alia*, the benefits of RTOs and ISOs over the Southeast EEM and whether instituting the Southeast EEM would "impede or delay" market reform in the Southeast and concluding "The Commission has an opportunity to exercise its authority to establish a foundation for wholesale market reform in the Southeast.  This foundation, instead of being fashioned by the self-interest of the long-time monopoly utilities in the region, would enable the competitive procurement of clean energy and hold down costs for customers in a manner that reflects the views of the many public and private entities that have so much at stake in how the Southeast's electricity system evolves."); Voltus Protest March 15 at 6 ("Part of the question is whether utilities can set up a bilateral trading structure that largely benefits themselves – with only pass through consumer benefits – without even discussing an RTO structure. Given this – and the CLEAN Future Act's proposal that all public utilities place their transmission under the control of an RTO or ISO – Voltus proposes FERC convene a joint conference with the relevant electric retail regulatory authorities (RERRAs) in the involved states to explore the benefits and costs of establishing an RTO/ISO in the Southeastern U.S." (footnote omitted)); SREA March 15 Comments at 2 (SREA "supports the development of an independent organized energy market in the South. While the Southeastern Energy Exchange Market. . .is a step towards better market efficiency, we are concerned that this step will become a stumbling block on the longer journey towards true market reform"); Clean Energy Coalition March 15 Comments at 32-33 ("If only one state in the SEEM footprint were to participate in an RTO, that decision alone is projected to have greater customer benefit than all of the utilities' participation in SEEM is claimed to have.  If the Southeast were to band together to create a new RTO, the potential benefits could total in the hundreds of billions by 2040. The Clean Energy Coalition encourages the SEEM Filing Entities and the Commission to think more ambitiously than the proposal offered in these proceedings, given the tremendous upside to true regional market integration." (footnotes omitted)); Clean Energy Coalition II June 28 Response Delinquency Letter at 4-5 ("Evidence is mounting that a robust and economically efficient competitive regional wholesale market in the Southeast would provide significant benefits to the region, well above the benefits projected by the SEEM Members to be realized through the SEEM Proposal.  In addition

Docket No. ER21-1111-001, et al.                                      - 11 -

18.     The advocacy by various intervening interest groups for FERC to use this proceeding to impose an RTO or proto-RTO structures misses a key point:  the decision whether to form a new RTO in the states covered by this proposal is a policy decision that is ultimately for the *elected policy-makers in those states* to make, *not* for FERC to impose.  If some want to claim that consumers would do better in an RTO than in the state-regulated models prevalent in these Southeastern states – an open question, to say the least – we can certainly have that debate, but it is for another forum.  This proceeding is about one question only:  whether the Southeast EEM proposal meets the section 205 standard.  Answer, as set forth above:  *it does.*

19.     Claims that the Southeast EEM proposal will actually harm consumers are specious – part of the campaign to force these states into an RTO-type structure – particularly in view of data indicating that consumers in the states represented in the Southeast EEM footprint[33] already enjoy average retail rates lower than the national average retail rate under their existing state regulatory frameworks.[34]  Notably, *not a single* state utility commission expressed opposition to this proposal.

---

to the joint section 209 hearing proposed above, the Commission should convene a technical conference amongst itself, its staff, SEEM members, and stakeholders to facilitate a moderate discussion regarding comprehensive market reform in the Southeast. The Clean Energy Coalition is confident that such a technical conference would reveal that the benefits associated with establishing a true electricity market in the Southeast (be they economic, reliability-based, or environmental) far outweigh the costs.  The Commission should not let this be the end of the matter." (footnotes omitted)); Clean Energy Customers Comments August 23 at 5-6 ("[T]he Commission can, and should, do more to encourage an inclusive conversation about the future of wholesale markets developments in the Southeast.  Now is the time to convene a forum by which stakeholders, including state regulators and policy makers, can begin establishing a collaborative process to consider the costs and benefits of more robust competitive markets in the Southeast.  By broadly soliciting input from stakeholders and establishing a technical conference separate and apart from this docket the Commission can allow consideration of all relevant facts and circumstances, including by stakeholders most impacted.  The Commission has an important role to play in ensuring that this conversation moves forward and can use its convening tools to ensure that the views of states and consumers on the future of the region's wholesale market are heard and considered.").

[33] Southeast EEM Transmittal at 5.

[34] *See* https://www.eia.gov/electricity/state/ .  Information compiled by the Energy Information Administration (EIA), the statistical and analytical agency within the U.S.

20.    The *Mobile-Sierra* issue provides no basis to vote against the Southeast EEM.  A grant of *Mobile-Sierra* status to the provisions remaining after the Filing Parties voluntarily withdrew their request for such status from the *majority* of the Agreement's provisions, as was proffered in response to the May 4 Deficiency Letter,[35] should have been approved.  So, all the provisions, including those withdrawn in the Response to the May 4 Deficiency Letter, will now receive *Mobile-Sierra* protection as requested in the original filings.  While I was prepared to vote on August 6 to approve the filings with the proffered *Mobile-Sierra* withdrawals, I see no reason or basis to differentiate among them at this point.  The real issue here, however, is not hidden in the weeds of legal minutiae over how to interpret our past precedent concerning application of *Mobile-Sierra*, which is muddled at best even before considering the question of how those precedents line up with judicial opinions.  The *Mobile-Sierra* issue does not exist in a hermetically sealed vacuum in this case, and it is unrealistic to pretend that it does.  Refusal to grant any *Mobile-Sierra* protection even to the remaining provisions after the proffered withdrawal – when we could have – empowers those interests opposing the Southeast EEM by making it easier for these opponents to attack and undermine the Southeast EEM in a later section 206 proceeding at this Commission.[36]  The Filing Parties' request for

_____

Department of Energy, exists concerning average retail rates in the various states.  I consulted EIA's figures for 2019, the last full year before the pandemic may have had some impact on data.  While I understand that adjustments can be made to the average retail rates published in EIA's reports, I accept the data for what they are, averages both national and state-specific.  The average retail rate for the United States in 2019 was 10.54 cents/kWh.  *Id.*  The 2019 average retail rate for each of the states reflected in the Southeast EEM proposal's footprint is lower.  *See id.*; *see also*, Southeast EEM Transmittal at 5.

[35] *See, e.g.*, June 7 Deficiency Response at 41 (noting that "[m]ost of the Southeast EEM Agreement" would not have been subject to the *Mobile-Sierra* presumption under the June 7 Deficiency Letter Response, including the Market Rules).

[36] Commissioner Clements foresees future section 206 complaints against SEEM, and lists the potential allegations: "Applying the *Mobile-Sierra* standard would therefore *inappropriately make any future challenge* to the justness and reasonableness of the Southeast EEM Agreement *more difficult*.  This is particularly problematic here *given the concerns with undue discrimination, governance, market power, and manipulation that the proposal presents*." Comm'r Clements Southeast EEM Statement at P 7 (emphasis added).  Chairman Glick also raises the prospect of just such future attacks: "Applying the *Mobile-Sierra* presumption in these circumstances will *make it more difficult for third parties* or even the Commission to *mount legitimate challenges* in the future to the justness and reasonableness of the Southeast EEM." Chairman Glick Southeast EEM

*Mobile-Sierra* protection against such future attacks on the contractual provisions should have been granted because – once again – this is *not* an RTO, *not* a halfway-house to an RTO, but simply a contractual arrangement for utilities in the Southeast to engage in bilateral trading.

21.    In sum, the Southeast EEM application clearly meets the standard to be approved under section 205 and I would have voted to approve.  It is sad that this proposal, which offers undeniable benefits to consumers both in terms of reliability and lower costs, could not command at least three votes.

22.    Now to turn to a procedural issue.  On October 13, 2021, a Notice was issued in eight of the above-referenced dockets as the Commission could not issue an order due to a 2-to-2 division among the Commissioners.  In that Notice, the filings related directly to Southeast EEM Agreement – but *not* those four related to the OATT revisions which were always part of the Southeast EEM proposal package – were confirmed to have gone into effect by operation of law.

23.    Regardless of legal arguments related to the Notice's exclusion of the four OATT filings from approval by operation of law, as a matter of procedural fairness the OATT revisions could and should have been accepted with a simple order issued by this Commission.  I would have voted for such an order, which I strongly believe would have been appropriate given the way the Southeast EEM proposal has been managed and handled by the Commission.[37]

24.    The Filing Parties stated that the filings across these dockets were made *as a package*.[38]  After changes in the effective date necessitated by two deficiency letters, the Filing Parties selected October 12, 2021 as an effective date for all of the filings.[39]  The

---

Statement at P 11 (emphasis added).

[37] *See, e.g.*, *supra* at n.10.

[38] *See* Southern Companies, Docket No. ER21-1125, February 12, 2021 Transmittal at 3 ("The Southeast EEM filings are a package.  Commission action on all filings is necessary so that Southern Companies and other Southeast EEM Members can have the regulatory certainty they need to move forward with any significant additional Southeast EEM financial commitments to bring this enhanced market to fruition for the benefit of customers as quickly as possible."); *see, e.g.,*  Dominion South Carolina, Docket No. ER21-1128, February 12, 2021 Transmittal at 3; Duke Progress & Duke Carolinas, Docket No. ER21-1115, February 12, 2021 Transmittal at 3; LG&E/KU, Docket No. ER21-1118, February 12, 2021 Transmittal at 3.

[39] Southern Companies, Docket No. ER21-1111, August 11 Deficiency Response

Secretary issued a Combined Notice that reflected that each of the filings was made under section 205(d) and again confirming a 60 day clock.[40]  Southern Companies noted that they followed guidance that the filings needed to be made in multiple dockets[41] and that the OATT revisions should bear a date in eTariff of 12/31/9998 as the transmission revisions should only go into effect at a later date when the service was established under the market structure approved by the Commission.[42]  In sum, the Filing Parties spoke clearly through their filings about their intentions, the reasons the filings were made through multiple dockets, what sources they relied on to make their filings and that these multiple filings were all related and part of the *same* package.

25.     There can be no credible argument that the Filing Parties did not at all times act in good faith as they navigated the Commission rules, protocols and technical requirements for making all of these filings.  This is especially true since neither of the two deficiency letters noted any issue or potential concern with respect to the manner in which the OATT filings were made and given that they were all part of the same package.  It follows that inaction by the Commission on these filings due to a lack of a majority should have resulted in *all* dockets being treated as a *package* by publishing a Notice that the entire package was effective by operation of law or, and preferably, simply issuing the necessary order accepting the OATT filings as of October 12, 2021, the date the rest of the filings went into effect by operation of law.

---

at 9.

[40] February 12, 2021 Combined Notice of Filing #1 and February 12, 2021 Combined Notice of Filing #2 describing each docket as filed under 205(d).

[41] *See* Southeast EEM Transmittal at 3 (defining the Tariff Filings, Concurrence Filings and the Agreement Filings collectively as the Southeast EEM Filings and stating that "eTariff requirements mandate that each of the Southeast EEM Filings have its own docket. . . .")

[42] *See, e.g.*, Southern Companies, Docket No. ER21-1125, February 12, 2021 Transmittal at 12, n.39 (citing Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings at 10 (last updated on Nov. 14, 2016) ("If the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., the date of 12/31/9998 must be used.")).

26.     As I stated, regardless of the arguments both legal and equitable, however, there is a readily available cure.  We can and should issue the appropriate technical order accepting the OATT revision filings, and we should do so promptly.  I would have voted for such an order.

_____

Mark C. Christie
Commissioner

Document Content(s)
FINAL 10-20-21 CHRISTIE SEEM STATEMENT.docx...............................1

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-002 |
| Louisville Gas and Electric Company | | ER21-1114-002 |
| Duke Energy Progress, LLC | | ER21-1115-000 |
| Duke Energy Carolinas, LLC | | ER21-1115-001 |
| | | ER21-1115-002 |
| Duke Energy Carolinas, LLC | | ER21-1116-002 |
| Duke Energy Progress, LLC | | ER21-1117-002 |
| Louisville Gas and Electric Company | | ER21-1118-002 |
| Georgia Power Company | | ER21-1119-002 |
| Kentucky Utilities Company | | ER21-1120-002 |
| Mississippi Power Company | | ER21-1121-002 |
| Alabama Power Company | | ER21-1125-000 |
| | | ER21-1125-001 |
| | | ER21-1125-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1128-002 |

(Issued October 20, 2021)

STATEMENT OF JAMES P. DANLY

1.      I submit this statement in accordance with section 205(g)(1)(B) of the Federal
Power Act (FPA).[1]  I voted to approve the proposal.

---

[1] 16 U.S.C. § 824d(g)(1)(B).  In October 2018, the America's Water Infrastructure
Act became law.  America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, 132
Stat. 3765 (2018).  That Act included provisions from the Fair Ratepayer Accountability,

2.     I provide this statement to explain why the entire Southeast Energy Exchange Market (Southeast EEM) proposal[2] in all twelve root dockets went into effect by operation of law and not merely the subset of dockets included in the Commission's October 13, 2021 Notice.[3]  Excluding those dockets from the notice may create the false impression that the proposed tariff revisions in those dockets did not also go into effect by operation of law.  To the contrary, every filing, in every related docket has now been accepted.[4]  As discussed below, the Commission's deficient notice is just one more in a

---

Transparency, and Efficiency Standards Act (the Fair RATES Act) amending FPA section 205 to treat inaction by the Commission that allows a rate change to take effect as an order for purposes of rehearing and judicial review.  America's Water Infrastructure Act § 3006.

[2] Members of the Southeast EEM are: Alabama Power Company (Alabama Power), Georgia Power Company (Georgia Power), and Mississippi Power Company (Mississippi Power) (collectively, Southern Companies); Associated Electric Cooperative, Inc. (AECI); Dalton Utilities (Dalton); Dominion Energy South Carolina, Inc. (Dominion Energy SC); Duke Energy Carolinas, LLC (DEC) and Duke Energy Progress, LLC (DEP) (together with DEC, Duke); Louisville Gas & Electric Company (LG&E) and Kentucky Utilities Company (KU) (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, LG&E/KU); North Carolina Municipal Power Agency Number 1 (NCMPA Number 1); Power South Energy Cooperative (PowerSouth); North Carolina Electric Membership Corporation (NCEMC); and Tennessee Valley Authority (TVA) (each a Member and collectively, the Members).  Other entities that have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members: Georgia System Operations Corporation (GSOC); Georgia Transmission Corporation (GTC); Municipal Electric Authority of Georgia (MEAG Power); Oglethorpe Power Corporation (An Electric Membership Corporation) (Oglethorpe); and South Carolina Public Service Authority (Santee Cooper).

[3] October 13, 2021 Notice.  Dockets included were *Ala. Power*, Docket No. ER21-1111-002; *Dominion Energy SC*, Docket No. ER21-1112-002; *LG&E*, Docket No. ER21-1114-002; *DEC*, Docket No. ER21-1116-002; *DEP*, Docket No. ER21-1117-002; *Ga. Power*, Docket No. ER21-1119-002; *KU*, Docket No. ER21-1120-002; *Miss. Power*, Docket No. ER21-1121-002.  Dockets excluded were *Ala. Power*, Docket No. ER21-1125-002, et al.; *Dominion Energy SC*, Docket No. ER21-1128-002, et al.; *Duke*, Docket No. ER21-1115-002, et al.; *LG&E*, Docket No. ER21-1118-002, et al.

[4] *See, e.g.*, *Pub. Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d 757, 776 (D.C. Cir. 1974) (recognizing that an agency's authority runs to it as "an entity apart from its members, and it is its institutional decision—none other—that bear legal

- 2 -

JA0077

line of improper procedural maneuvers that have unjustifiably delayed the establishment of this market and delayed the issuance of a merits order by half a year.

3.     I also explain why the Southeast EEM proposal is just and reasonable and not unduly discriminatory or preferential and should have been approved in full by the Commission in an order on the merits.

## I.     <u>Southeast EEM Proposal</u>

4.     On February 12, 2021, Southern Company, as agent for Alabama Power, on behalf of itself and other Members of the Southeast EEM, submitted the Southeast EEM Agreement, part of a unified package of proposals to establish a new, voluntary electronic trading platform designed to facilitate bilateral trading in the Southeast, provide access to unused transmission capacity and increase liquidity and competition.[5]  The Southeast EEM Agreement and related filings, including concurrences thereto[6] and related open access transmission tariff (OATT) revisions to establish Non-Firm Energy Exchange Transmission Service,[7] were submitted in twelve related dockets.  As the Southeast EEM Members explained: "The Southeast EEM filings are a package.  Commission action on all filings is necessary so that Southern Companies and other Southeast EEM Members can have the regulatory certainty they need to move forward with any significant additional Southeast EEM financial commitments to bring this enhanced market to fruition for the benefit of customers as quickly as possible."[8]  The Southeast EEM

---

significance."); *see also Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) ("[A]ctions of the Commission shall be determined by a majority vote of the members present." (quoting 42 U.S.C. § 7171(e))).

[5] *See, e.g.*, *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 2.

[6] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal; *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal; *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal; *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal; *Ga. Power*, Docket No. ER21-1119-000 Transmittal; *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal; *Miss. Power*, Docket No. ER21-1121-000 Transmittal.

[7] The four OATT dockets are: *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal; *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal.

[8] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3;

Agreement requires all Members that are transmission service providers amend their tariffs to provide Non-Firm Energy Exchange Transmission Service (NFEETS).[9]  The Members of the Southeast EEM submitted their OATT revisions, in the four dockets excluded from the October 13 Notice, because they signed the Southeast EEM Agreement.[10]  As they noted, the "eTariff requirements mandate that each of the Southeast EEM Filings have its own docket[.]"[11]  The Commission's notices of filing

_Dominion Energy SC_, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 3; _Duke_, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3; _LG&E_, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3.  These are the four OATT dockets.  _See Ala. Power_, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5 ("In addition to Southern Companies, Dominion Energy South Carolina, DEC, and LG&E are each filing amendments to their transmission tariffs, some of which are joint OATTs, to add [Non-Firm Energy Exchange Transmission Service] ("Tariff Filings," together with the Agreement Filing and the Concurrence Filings, the "Southeast EEM Filings")."); _see also Ala. Power_, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3 (defining the Tariff Filings, Concurrence Filings and the Agreement Filings as the Southeast EEM Filings).

[9] _See_ Southeast EEM Agreement, § 3.2.1 ("To be a Member of the Southeast EEM, an entity must be: (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory. _The Tariff of any Member who provides transmission service must contain Non-Firm Energy Exchange Transmission Service provisions for those Energy Exchanges that seek to utilize such Member's transmission system_.") (emphasis added); _see also id._ § 3.1 ("Each Member shall comply with all applicable rules, policies, guidelines, or other standards or requirements set forth in this Agreement and as may otherwise be required by the Membership Board or applicable Law.").

[10] _Ala. Power_, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2; _Dominion Energy SC_, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 2; _Duke_, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2; _LG&E_, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2.

[11] _See, e.g._, _Ala. Power_, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3 ("eTariff requirements mandate that each of the Southeast EEM Filings have its own docket"); _Ala. Power_, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 ("eTariff requirements mandate that each of the Southeast EEM Filings

- 4 -

properly designated all twelve filings as FPA section 205(d) rate filings in accordance with FPA section 205(d) and the related filing codes that were used.[12]  They used the effective date of 12/31/9998[13] as required.[14]  The Southeast EEM proposal was submitted

---

have its own docket").

[12] Filing Code 10 was used for the February 12, 2021 filings, and Filing Code 180 was used for the deficiency responses.  The eTariff Rules Table (as published on April 20, 2018) denotes filings under these codes as having a 60-day statutory deadline with a date range of April 2010 to an inactive date of 12/31/9998.  ETariff Filing Rules Listing (Apr. 20, 2018), available at https://www.ferc.gov/sites/default/files/2020-05/Type%20of%20Filing%20Rules%20Table.pdf.  The Commission routinely accepts filings with a filing party's commitment to submit an informational filing once the commencement of service date is known.

[13] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3, 11-12, 12 n.36, 14 (requesting acceptance of the proposed OATT changes on May 13, 2021 to be effective as of commencement of service and using 12/31/9998 in accordance with the implementation guide); *Dominion Energy SC*, Docket No. ER21-1128-000 February 12, 2021 Transmittal at 3, 11-12, 11 n.36, 14; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3, 12-13, 12 n.39, 15; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3, 12-13, 12 n.38, 15.

[14] *Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings* at 10 (last updated on Nov. 14, 2016), available at https://www.ferc. gov/sites/default/files/2020-05/implementation-guide.pdf ("If the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., *the date of 12/31/9998 must be used*.") (emphasis added).  *See N. Y. Indep. Sys. Operator, Inc.*, Docket No. ER21-892-000 (Mar. 10, 2021) (delegated letter order) (accepting tariff revisions 54 days after filing on January 15, 2021; requesting acceptance within the 60-day statutory period, a waiver of the Commission's 120 days prior notice requirement, and a flexible effective date with tariff sheets filed as effective 12/31/9998); *see also Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,160 (2021) (accepting tariff revisions 60 days after filing on March 26, 2021, which requested the Commission issue an order by May 25, 2021 and included an effective date of 12/31/9998 as part of the tariff records; accepting the proposed tariff revisions to be effective no later than June 15, 2021 as requested); *Tri-State Generation & Transmission Ass'n, Inc.*, 171 FERC ¶ 61,202 (2020) (accepting protested rate filing 60 days after it was filed with 12/31/9998 for its eTariff effective date); *Gulf Power Co.*, Docket No. ER21-240-000 (Dec. 17, 2020) (delegated letter order) (accepting the Service Agreement for Network Integration Transmission Service under Gulf Power's OATT 49 days after filing on October 29, 2020 requesting an effective date of 12/31/9998).

- 5 -

by the filing parties on February 12, 2021, with a requested acceptance date 90 days after filing, or May 13, 2021, to allow 30 days for comments and 60 days for Commission action.[15]

## II.    **Procedural Issues**

### A.    **Deficiency Letters**

5.      Rather than issue an order on the merits, Commission staff embarked upon a series of procedural maneuvers that significantly delayed approval of the Southeast EEM proposal.  These began with the issuance of a first (and arguably justifiable) deficiency letter.[16]  The original last day for Commission action (LDA)[17] was May 12, 2021.  The First Deficiency Letter was issued on May 4, 2021, just over a week in advance of the deadline.[18]  The filing parties' response to the First Deficiency Letter was filed on June 7, 2021.[19]  That submission reset 60-day statutory clock to August 6, 2021.  In their first deficiency letter response, the filing parties requested "that the Commission accept the

---

[15] *See, e.g., Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3-4 ("The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement to become effective May 13, 2021, 90 days after this filing  . . . .  [W]e respectfully request that the Commission establish a comment period of thirty days . . .  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received.").  See attachment A for similar statements in other dockets.

[16] The first deficiency letter issued on May 4, 2021 requested information related to market power, market manipulation, and market oversight.  May 4, 2021 Deficiency Letter, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (delegated order) (First Deficiency Letter).

[17] The Commission's LDA is an internal control to identify the last date upon which the Commission must act on a filing with a statutory deadline before the filing goes into effect by operation of law.

[18] *See* First Deficiency Letter.

[19] *See Ala. Power*, Docket Nos. ER21-1111-001, et al., First Deficiency Response (June 7-8, 2021).  The deficiency response was filed in certain of the dockets after the 5 p.m. deadline on June 7, 2021, so it is dated June 8, 2021 in those dockets.

Southeast EEM Agreement, *and the related filings in these unconsolidated* dockets . . . to become effective on August 6, 2021."[20]

6.      That deficiency letter was then followed by a second, indisputably frivolous deficiency letter which Commission staff issued on August 6, 2021.[21]  That would have again reset the 60-day statutory clock, this time to October 11, 2021, a federal holiday.  In their second deficiency letter response, the filing parties requested that the "Commission accept the Southeast EEM Agreement, *and the related filings in these unconsolidated dockets . . . to become effective on October 12, 2021.*"[22]

7.      Altogether, those deficiency letters extended by five months the acceptance by operation of law on October 12, 2021 of a filing that was originally submitted on February 12, 2021 with  a requested acceptance date of May 13, 2021.

8.      I am concerned that the Commission staff, who work under the supervision of the Chairman, improperly employed deficiency letters issued under delegated authority to unlawfully toll the time for Commission action.  The First Deficiency Letter requested information related to market power, market manipulation and market oversight.  I concede that this first deficiency letter could be argued to have been a legitimate request for more information, though I do not consider any of the information requested or received to have been necessary to rule on whether the submission satisfied the requirements of FPA section 205.  But even if the first deficiency letter were a legitimate exercise of staff's delegated authority, deficiency letters should not be issued lightly because they work a circumvention of the FPA's clear direction that rate proposals go into effect (or must be affirmatively accepted or rejected) in 60 days.

9.      The Second Deficiency Letter is another matter entirely.  It failed to identify any deficiency or solicit any information that any Commissioner could have required to determine whether the proposal before us is just and reasonable.  As detailed below,

---

[20] First Deficiency Response at 43 (emphasis added).

[21] The second deficiency letter, issued on August 6, 2021, requested information related to Standards of Conduct and affiliate restrictions, access to redacted and confidential information, the Administrator, including information already in the record. August 6, 2021 Deficiency Letter, Docket Nos. ER21-1111-001, ER21-1112-001, ER21-1114-001, ER21-1115-000, ER21-1115-001, ER21-1116-001, ER21-1117-001, ER21-1118-001, ER21-1119-001, ER21-1120-001, ER21-1121-001, ER21-1125-000, ER21-1125-001, ER21-1128-000, ER21-1128-001 (delegated order) (Second Deficiency Letter).

[22] *Ala. Power*, Docket Nos. ER21-1111-002, et al., Second Deficiency Response, at 9 (Aug. 11, 2021) (emphasis added).

review of the record demonstrates—beyond dispute—that the Second Deficiency Letter requested information that *was already in the record*. In reply, the filing parties swiftly submitted responses to the Second Deficiency Letter's three questions three business day after its issuance, on August 11, 2021, five days earlier than the established due date of August 16, 2021. In their response, the filing parties again requested expedited Commission action on or before September 10, 2021; no Commission order issued. The last LDA was October 11, 2021, roughly *five months* later than the original requested effective date.

10.     Requiring filing parties to restate information already in the record can hardly constitute the identification of a deficiency in the parties' filing and if the filing is not deficient, then it must be ruled upon within the statutorily-imposed 60-day time limit. We *know* that the requested information was already available to the Commission. For two of the three questions in the Second Deficiency Letter, the filing parties' response consisted of little more than citations to their original filing and to their First Deficiency Response.[23] As to the third question, while the filing parties did not simply cite to their earlier submissions (perhaps to avoid the appearance of insolence?), the information sought there was also already in the record. The third question asked that the filing parties "[p]lease clarify whether the Administrator similarly *will not be a Member, Participant, Agent*, or affiliate of those entities."[24] All[25] of this was already known to the Commission—it was included in the original February 12, 2021 filing in which the filing parties describe the various entities' roles, stating that the "Southeast EEM Administrator" "[w]ill be an independent third party contracted to operate the Southeast EEM; *will not be a Member, Participant, Agent*, or Auditor."[26] Worst of all, the

---

[23] *See* Second Deficiency Response at 3-7 & nn.4-9 (regarding the response to the first question) (citing First Deficiency Response, Attach. A, Proposed Revisions to Southeast EEM Agreement, Market Rules, §§ VI.D.6, VI.A, VI.D, 2.5, III; *id.* at 7-8 & n.10 (regarding the response to the second question) (citing First Deficiency Response, Attach. A, Proposed Revisions to Southeast EEM Agreement, Participant Agreement, § 6.0).

[24] Second Deficiency Letter at 4 (emphasis added).

[25] While the term "affiliate" was not specifically included in the initial filing, the words "*independent third party*" do appear in describing the Administrator. *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 18 (reflecting that the Southeast EEM Administrator "[w]ill be an independent third party contracted to operate the Southeast EEM; will not be a Member, Participant, Agent, or Auditor.") A deficiency letter question on this point was not warranted given the lack of ambiguity in the filing parties' initial submission.

[26] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 18

inclusion of this question could not have been an oversight—the Second Deficiency Letter actually *cited the page* at which the filing parties included this information in their transmittal letter.[27]

11.     To the extent to which there was any deficiency at all in this case, it is entirely the Commission's, in particular, its failure to timely act on a complete and well-pleaded section 205 filing.  The issuance of deficiency letters is a practice employed for many years at the direction of many different Chairmen.  I have sparingly directed the issuance of deficiency letters myself.[28]  But the fact that a practice has been employed for years does not make it legal and its abuse can never be acceptable.  As in the case of the Commission's past practice of granting rehearing for the purposes of further consideration (AKA tolling orders) to delay the consideration of section 205 filings, the use of deficiency letters as a tolling mechanism violates the Federal Power Act's clear statutory timeline.  Given the court's sharp rebuke in *Allegheny Defense Project v. FERC* (*Allegheny*), should this new tolling practice ever be challenged, it cannot be expected to withstand judicial scrutiny.  As the court in *Allegheny*[29] noted, "Commissioner Glick has called the process enabled by the Commission's tolling orders 'fundamentally unfair' . . . ."[30]  I agree.

---

(emphasis added).

[27] Second Deficiency Letter at 4 n.7 (citing Filing Parties February 12 Filing, Transmittal at 16-18).

[28] *See, e.g.*, *PJM Interconnection, L.L.C.*, Docket No. ER21-278-000, Deficiency Letter (2020) (deficiency letter issued on Dec. 22, 2020 regarding an Oct. 30, 2020 filing submitted pursuant to section 205 of the FPA noting that, pending receipt of the information requested to be provided 30 days from the date of the letter, a filing date will to be assigned to the filing).

[29] *Allegheny*, 964 F.3d 1, 9 (D.C. Cir. 2020) (en banc).

[30] *Id.* at 10 (citing *Spire STL Pipeline LLC*, 169 FERC ¶ 61,134 (2019) (*Spire*) (Glick, Comm'r, dissenting at PP 29-30)); *see also Spire*, 169 FERC ¶ 61,134 (Glick, Comm'r, dissenting at P 33) (criticizing "fundamental[] unfair[ness]," recognizing "good government is about more than meeting the absolute minimum of constitutional due process," noting that a "regulatory construct . . . [that] ensures that irreparable harm will occur before any party has access to judicial relief . . . ought to keep every member of [the] Commission up at night," and criticizing "bureaucratic indifference that I find hard to stomach."); *id.* (Glick, Comm'r, dissenting at P 34) ("Alternatively, the Commission could have taken 'the easiest path of all' by simply . . . not issuing its standard tolling

JA0084

### B.    FPA Section 205(g) Notice

12.    And now, the latest procedural maneuver: the October 13, 2021 Secretary's Notice.  This notice, issued again by staff under the Chairman's supervision, implies that, following Commission inaction by the statutory deadline of October 11, 2021, only eight of the twelve related dockets had been accepted by operation of law.  The notice simply fails to mention four additional dockets, each of which relate to the tariff changes necessary for the individual utilities to implement the accepted Southeast EEM proposal and provide NFEETs.

13.    Because the Commission *did not issue an order* accepting or denying the Southeast EEM proposal, under FPA section 205(g)(1)(A), such inaction is "considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a)."[31]  The notice is not an order, and has no legal effect on whether a filing has been accepted by operation of law.  Individual Commissioner's statements are no more than opinions and do not have the force of law.  Statements are not institutional decisions and do not reflect a majority vote.  The Commission only speaks through its orders.[32]  Because the entire filing constitutes an integrated package, all twelve dockets went into effect by operation of law.  The Commission's notice is deficient, unlawful, and of no effect because it is the Commission's inaction that triggers parties' rights under the FPA, not the notice.  Since the entire set of twelve dockets has now gone into effect, the filing parties are free to immediately begin implementation of the Southeast EEM proposal.

14.    Chairman Glick acknowledges that "[s]tatutory filings are filings made pursuant to section 205 of the FPA."[33]  Chairman Glick claims that these rate proposals should not be treated like a normal FPA section 205 rate change[34] because the filing parties used an

---

order.") (citation omitted).

[31] 16 U.S.C. § 824d(g)(1)(A).

[32] *See, e.g.*, *Pub. Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d at 776; *see also Pub. Citizen, Inc. v. FERC*, 839 F.3d at 1169.

[33] Glick Statement at P 17 n.20 ("Statutory filings are filings made pursuant to section 205 of the FPA, section 4 of the Natural Gas Act, and section 6 of the Interstate Commerce Act.").

[34] Glick Statement at P 18 ("Here, four of the relevant 12 filings incorporated open-ended proposed effective dates.  As a result, these four filings did not become effective on October 12, 2021, when the Commission failed to act within 61 days of the filing date.").

effective date of 12/31/9998[35] and thus are excluded from the FPA 60-day clock.  The effect of this exclusion, if it were lawful, would be to block the tariff revisions required to effectuate the Southeast EEM proposal and thus to prevent the now-accepted proposal from going into effect.

15.     The argument goes as follows: the four dockets at issue, all of which update individual utilities' tariffs in order to establish provisions effectuating the Southeast EEM proposal, were not, in fact, FPA section 205 filings because a Commission staff Implementation Guide required them to use the 12/31/9998 effective date.  The staff Implementation Guide provides that "[i]f the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., *the date of 12/31/9998 must be used*."[36]  Therefore, the filing parties do not enjoy the benefit of the 60-day time limit for Commission action.  This, despite the fact that the filing parties have repeatedly stated that every one of the unconsolidated dockets are part of a single, unified filing and despite the fact that, upon inspection, it is evident that the tariff revisions contemplated in the four excluded dockets are  necessary for the Southeast EEM proposal to function.  The reason?  Because the filing parties entered an effective date of 12/31/9998 on eTariff and despite the fact that this is the *exact entry* that the Commission staff Implementation Guide required them to use.[37]

---

[35] *Cf.* Glick Statement at P 18 ("[F]our of the relevant 12 filings incorporated open-ended proposed effective dates."); Glick Statement at P 18 n.22 ("[T]he open-ended proposed effective date for their OATT filings [was] chosen by the filing parties at their discretion"); *id.* ("The applicants therefore followed the Commission's eTariff rules exactly as expected, given their own request that the OATT revisions take effect at an unknown point after, not coincident with, the Southeast EEM Agreement.").  While it is correct to say the filing parties asked for a future effective date for the OATT filings, their transmittal letters clearly evidenced a requested acceptance date of their filings within the statutory 60-day period in both deficiency letter responses.

[36] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12 n.36 (quoting *Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings* at 10 (last updated on Nov. 14, 2016) (emphasis added).

[37] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12 n.36 ("*See Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings* at p. 10 (last updated on Nov. 14, 2016) ('If the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., *the date of 12/31/9998 must be used*.').") (emphasis added).

16.     This cannot be correct.  No precedent is, or to my knowledge can be, cited in support of this theory and that which[38] is cited is inapposite.[39]  Regardless, the FPA governs, not a staff Implementation Guide.  The FPA requires the Commission to act

---

[38] "In order for the Commission and the public to obtain a complete picture of a company's tariff, these various provisions need to be integrated into a single system that will provide information as to the status of tariff provisions, permit the assembly of a complete tariff, and permit tariff related research.  Indeed, for tariffs filed on paper, the Commission has managed these tariffs as a database by keeping tariff books . . . .  The standards we are adopting in this Final Rule merely replace this paper system with a very similar electronic database that will similarly track the tariff submissions and tariff history, but in a form that will make tariff information more widely available over the Internet."  *Electronic Tariff Filings*, Order No. 714, 124 FERC ¶ 61,270, at P 10 (2008), *clarified*, Order No. 714-A, 147 FERC ¶ 61,115 (2014).

Step-by-step instructions explain how one must download and populate the .xml file with the tariff record and use the eTariff Filing Codes for inclusion of metadata.  Then one must zip the .xml file but not the documents.  One submits the .xml file to the FERC Sandbox Electronic Test Site in order to correct any errors received before resubmitting it to the sandbox and "[c]ontinue correcting any errors and resubmitting until no errors are reported."  Fed. Energy Regul. Comm'n, *Electric and MBR Step-by-Step Filing*, https://www.ferc.gov/industries-data/electric/overview/electric-market-based-rates/initial-applications/step-step-guide-filing-your-application-etariff-system (last updated Nov. 19, 2020).  Then, one logs into FERC Online to submit the eFiling including the zip file that contains the .xml file.  Two emails are sent by FERC verifying receipt of the filing.  If errors are identified then one must amend the .xml file and resubmit it.  If one receives warnings, this signals the filing was received but one must double-check that the correct information was submitted as warnings may indicate that what was submitted is different than what FERC normally receives.  *See id.*

[39] Glick Statement at P 17 & nn.18-19.  The cited regulations, 18 C.F.R. §§ 35.7(d) and 385.205(b), and cited orders, *Designation of Electric Rate Schedule Sheets*, Order No. 614, FERC Stats. & Regs. ¶ 31,096, at 31,504 (2000) (cross-referenced at 90 FERC ¶ 61,352); *Electronic Tariff Filings*, Order No. 714, 124 FERC ¶ 61,270 (2008), *clarified*, Order No. 714-A, 147 FERC ¶ 61,115, at P 4 (2014); and, *Pioneer Transmission, LLC*, 169 FERC ¶ 61,265, at P 20 (2019).  Neither the eTariff program nor a staff Implementation Guide can trump the FPA; to do so is unlawful.  The cited case *Ala. Power Co. v. FERC*, 22 F.3d 270, 272-73 (11th Cir. 1994) is inapposite as the sole issue on appeal was whether the FERC may properly decide that when several utilities jointly file their respective rates in a single contract, the 60-day review period begins only when the filing is complete for every utility.  Here, the filings were individually submitted and complete within the last 60-day statutory period.

within 60 days.  We did not, for reasons I have already highlighted.  The staff Implementation Guide, on the other hand, is nothing more than staff's ministerial effort to provide "guidance" (that is why it is called a "Guide") when rate proponents have an unknown future effective date.  The 12/31/9998 date imposed (but really "guided") *by the Commission* via a staff Implementation Guide in such cases obviously is a placeholder date and does not reflect the parties' actual intended effective date.  A good faith reading of neither the Implementation Guide nor the FPA would seriously contemplate empowering the Commission to provide itself up to 7,977 years to act on such a filing.[40] And such a reading of the FPA lacks majority support in any event.

17.     Apart from having no basis in law, this approach gives no effect to filing parties' repeatedly expressed, unambiguous intent for Commission acceptance within the statutory period.[41]  And to the extent to which any proposed solution relies upon a further submission and yet another 60 days to elapse before those filings must be accepted, that would deny the filing parties the very regulatory certainty they require to begin implementation.  Refiling is unnecessary under the FPA, and—given the history of delay

---

[40] Under Chairman Glick's logic, the only way the rate proposal at issue in these four dockets could go into effect by operation of law today would be if the Filing Parties' Neolithic ancestors had filed it circa 6,000 B.C.

[41] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3-4, 12-13, 42, 44; *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2 & n.6, 6-7, 8; *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2 & n.6; 6-7, 8; *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2 & n.6, 6-7; *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2 & n.6, 6-7,8; *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2 & n.6, 6-7, 8; *Ga. Power*, Docket No. ER21-1119-000, February 12, 2021 Transmittal at 3; *Miss. Power*, Docket No. ER21-1121-000, February 12, 2021 Transmittal at 3.

"The Southeast EEM filings are a package." *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3; *see also Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 3 (same); *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3 (same);  *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3 (same).  *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5, 3, 12, 14; *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 2-3, 12, 14; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2-3, 2 n.7, 13, 15; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2-3, 2 n.5, 13, 15.

in this proceeding—would be difficult to view as anything but a further cynical attempt to stall the establishment of the Southeast EEM.

18.     All of which is to say, the entire filing package, including every associated docket, has been accepted.  And, since the original version of the proposal that was filed with the Commission has not been superseded, the *Mobile-Sierra* public interest standard of review applies to the *entire* agreement, as requested in the initial submission.[42]  Due to the Commission's failure to issue an order, no compliance filing is triggered as a result of the October 13, 2021 Notice.  Rehearing rights as to the original filing are now perfected, paving the way for judicial review under FPA section 205(g).

## III.     <u>Substantive Matters</u>

19.     As to the merits of the case, I would have voted to approve the Southeast EEM proposal in full.

20.     We must first understand what the Southeast EEM proposal is and what it is not. The filing parties clearly state that, "the Southeast EEM is not—and was never intended to be—a top-to-bottom reimagining of the Southeast energy market; rather, it reflects incremental improvement to the existing bilateral market."[43]  This market does not offer joint dispatch, joint operation, or joint planning.  And it is not an energy imbalance market.

21.     While some may have preferred that the utilities in the Southeast create a regional independent system operator (ISO) or regional transmission organization (RTO), that is not the filing the parties submitted.  My colleagues detail a litany of objections[44] to the

---

[42] Second Deficiency Response at 9 ("If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Southeast EEM Members commit to subsequently submit a compliance filing to effectuate the proposed revisions within 30 days of acceptance.").

[43] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 9.

[44] Examples of these include: membership (Clements Statement at PP 3, 8 & n.8, Section III); governance (Clements Statement at PP 3, 7, 33-41); oversight and preference for independent market monitor to address market power and manipulation (Clements Statement at PP 3, 8 & n.8, 33, 42-51; Glick Statement at PP 3, 13, 14); "'black box' algorithm" (Clements Statement at P 5); participation and access requirements (Clements Statement at PP 5, 8 & n.8, 9, 11-12, 16, 17, 19, 21, 40, 48); transparency (Clements Statement at PP 8, 9, 21, 33, 50); undue discrimination (Clements Statement at P 7).  *Cf.* Glick Statement at P 3 ("I believe that the Commission's monitoring capabilities, enforcement authority, and ability to institute an FPA section 206 action provide adequate protections should any Southeast EEM members or participants engage in any

- 14 -

Southeast EEM proposal that, I presume, stem from just such a preference[45] since the establishment of an ISO or RTO would bring with it open access throughout the

---

conduct that may transgress the FPA or Commission regulations.").

[45] Glick Statement at P 1 ("I believe . . . [RTOs and ISOs] are, by far, the best way to achieve these benefits [i.e., save customers money, enhance reliability, and integrate intermittent resources most efficiently.]. That is also true for the Southeastern United States. From my perspective, utilities and other stakeholders in this region should be working to establish an RTO/ISO in the Southeast for the benefit of consumers and to promote grid reliability. But that is not the proposal presented to us in this docket."); *id.* ("in my opinion there clearly is" a "better option for the region"); *id.* at P 8 ("A centralized and competitive wholesale market in the Southeast, or at least something closer to that model, is a step in the right direction."); *id.* at P 12 ("the best available option . . . in my view is to establish an RTO"); Clements Statement at P 2 (the proposal "fails to abide by the bedrock principles of open access and non-discrimination that were crystallized in the Commission's landmark Order No. 888"); Clements Statement, Section II, at PP 15-25 ("Access to the Southeast EEM is not open, violating Order No. 888"); Clements Statement, Section III.A, at PP 28-32 ("The proposal's membership restrictions violate Order No. 888); Clements Statement, Section III.B, at PP 33-41 (the membership provisions unduly discriminate by creating two unequal classes of market participants (Members and Non-Members) that create an impermissible barrier to transmission access and violate 'the legal and policy cornerstone' of Order No. 888).

JA0090

Southeast in accordance with Order Nos. 888,[46] 719[47] or 2000.[48] But that decision is not ours to make.[49] That choice is reserved wholly to the States and their utilities.[50]

22.     All we need decide here is whether the proposal meets the requirements of FPA section 205. Whether there might be a better arrangement that could have been requested, is absolutely irrelevant to our analysis.[51] Arguments that the proposal

---

[46] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,738 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[47] *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719, 125 FERC ¶ 61,071 (2008), *order on reh'g*, Order No. 719-A, 128 FERC ¶ 61,059 (2009), *order on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009).

[48] *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999) (cross-referenced at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)).

[49] *N.C. Waste Awareness & Reduction Network, Inc. v. Duke Energy Carolinas, LLC*, 151 FERC ¶ 61,079, at P 64 (2015) (noting that "[t]he Commission's longstanding policy is that RTO participation is voluntary") (citations omitted)).

[50] *See* Order No. 2000, FERC Stats. & Regs. at 31,213 ("[M]ost states must approve a utility joining an RTO, and several states have required their utilities to turn over their transmission facilities to an independent transmission operator. Also, states must approve the siting of transmission facilities that are called for in an RTO expansion plan.").

[51] *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 943 (8th Cir. 2020) (recognizing that the Commission "restricts itself to evaluating the confined proposal" and therefore "need only find the *proposed* rates to be just and reasonable." (citations omitted) (emphasis in original)); *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (stating "[w]hen acting on a public utility's rate filing under section 205, the Commission undertakes 'an essentially passive and reactive role' and restricts itself to

establishes a multilateral construct in violation of the principles of Order No. 888 fail to persuade—this proposal, by its own terms, purports to be no more than an enhancement to an existing bilateral regime which is obviously permissible under the FPA.[52]  While recognizing that market-based rate authorities and safeguards are already in place for the existing bilateral market,[53] my colleague argues that these are insufficient given the new market structure and footprint and argues a need for "quantitative analysis" about the ability "to exercise market power or manipulate the market" and for "safeguards to protect against these abuses."[54]  I disagree.  The filing parties have amply demonstrated how existing and new, additional mechanisms will guard against such concerns, including the establishment of an Administrator and Auditor.

23.     While occupied with cataloguing deficiencies, real or perceived, in the Southeast EEM proposal, we should not lose sight of the fact that Non-Firm Energy Exchange Transmission Service is available *only if* the existing transmission system is not fully employed.  Entities may continue to use the existing transmission system in accordance with the Commission-approved OATTs in place today and may continue to engage in bilateral transactions under Commission-approved market-based tariffs that already

---

evaluating the confined proposal." (quoting *City of Winnfield v. FERC*, 774 F.2d 871, 875-76 (D.C. Cir. 1984)); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (finding that the Commission did not adopt an incorrect legal standard when it did not determine "whether [one] method is more appropriate than a [another] method, but rather whether the [proposed] method is reasonable and adequate.").

[52] The Commission has described the electric power market in the Southeast as follows:  "The Southeast electricity market is a bilateral market . . . and virtually all the physical sales in the Southeast are done bilaterally."  Fed. Energy Regul. Comm'n, *Electric Power Markets*, https://www.ferc.gov/electric-power-markets (last updated July 20, 2021); *see also* Fed. Energy. Regul. Comm'n, Staff Report, Energy Primer: A Handbook of Energy Market Basics 61 (April 2020), https://www.ferc.gov/sites/default/files/2020-06/energy-primer-2020.pdf (explaining that in traditional wholesale electricity markets, which "exist primarily in the Southeast[,] . . . . [u]tilities . . . are frequently vertically integrated . . . [and] [w]holesale physical power trading typically occurs through bilateral transactions.").  Bilateral market wholesale sales of electric energy in interstate commerce and the transmission of electric energy in interstate commerce are subject to the Commission's FPA section 205 authority.  16 U.S.C. §§ 824(a), 824d; *Ala. Power Co.* Docket No. ER17-514-001 (May 17, 2017) (delegated letter order) (accepting Southern Companies' revised market-based rate tariff).

[53] Clements Statement at P 6.

[54] *See, e.g.*, *id.*

- 17 -

impose market power mitigation restrictions. These same OATTs, as revised to provide the Non-Firm Energy Exchange Transmission Service, and the utilities' market-based rate tariffs, will effectuate the Non-Firm Energy Exchange Transmission Service transactions *only* when there is unused transmission capacity.

24.     While some of the opposition may stem from the preference to see RTOs and open access established as widely as possible, one of my colleagues voted against the proposal because he disagrees with the application of the *Mobile-Sierra* standard to protect the Southeast EEM agreements. That is an insufficient basis upon which to cast a vote to reject. The Commission's recent precedent restricting *Mobile-Sierra* protections to only those contracts that bear particular hallmarks is in error. It violates the principles animating the *Mobile-Sierra* doctrine and deviates from the plain terms of the judicial precedent establishing and reinforcing it.

25.     While recognizing that "much of the Southeast EEM proposal arguably satisfies the Section 205 standard"[55] Chairman Glick stated that he "voted no in large part because the filing parties' proposal to apply the *Mobile-Sierra* public interest presumption to the Southeast EEM Agreement violates well-established Commission precedent."[56] In fact, Chairman Glick objects not only to the application of the presumption to the entire agreement, which was what the originally-filed proposal called for, but he objects even to the presumption's application to the smaller subset of enumerated provisions to which the filing parties conditionally agreed in their response to the First Deficiency Letter.[57] In addition to stating that application of the *Mobile-Sierra* presumption would cause

---

[55] Glick Statement at P 2.

[56] *Id.*

[57] First Deficiency Response at 43. Chairman Glick's claim that the filing parties conceded that certain provisions of their agreement did not qualify for the *Mobile-Sierra* presumption is inaccurate. Glick Statement at 10. The parties did not concede that they could not have *Mobile-Sierra* protection for the entire agreement. They agreed under the duress attendant to the delay caused by the first deficiency letter to reduce the scope of the *Mobile-Sierra* protection *if* the Commission were to accept the rest of the proposal in full. They agreed to do so *after* the Commission accepted the proposal. Because the Commission has discretion to apply *Mobile-Sierra* protection, the filing parties could not have conceded the entire agreement was ineligible for *Mobile-Sierra* protection in any event. *See New Eng. Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 370-71 (D.C. Cir. 2013) (holding Commission has considerable discretion to apply *Mobile-Sierra* to non-contract rates).

"considerable risk to the public,"[58] he states that "the *Mobile-Sierra* presumption applies to a contract 'only if the contract has certain characteristics that justify the presumption.'"[59] He explains that it does not apply to generally applicable contractual provisions that bind any potential future signatories and no extraordinary or compelling circumstances apply that warrant application of *Mobile-Sierra* as a matter of agency discretion.[60] I freely acknowledge that Chairman Glick has the weight of Commission precedent on his side. But the Commission's excursion outside the bounds of *Mobile-Sierra* has yet to be addressed squarely by the courts and is based upon an incorrect reading of the case law.

26.     The Commission has repeatedly held that the presumption of *Mobile-Sierra* protection applies only to those contracts that have certain characteristics. The Commission's belief flows from the Supreme Court's statement in *Morgan Stanley*,[61] and quoted in *NRG*,[62] that "[u]nder the *Mobile-Sierra* doctrine, the Federal Energy Regulatory Commission (FERC or Commission) must presume that the rate set out *in a freely negotiated wholesale-energy contract* meets the 'just and reasonable' requirement imposed by law."[63] The Court further held that "[t]he presumption may be overcome only if FERC concludes that the contract seriously harms the public interest."[64]

---

[58] Glick Statement at 11; *see also* Clements Statement at P 7.

[59] Glick Statement at P 9 & n.4 (citing *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 182 (2013)).

[60] Glick Statement at PP 10-11.

[61] *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527 (2008) (*Morgan Stanley*).

[62] *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n*, 558 U.S. 165, 167 (2010) (*NRG*).

[63] *Morgan Stanley*, 554 U.S. at 530 (emphasis added); *accord NRG*, 558 U.S. at 167 (quoting, in part, *Morgan Stanley*, 554 U.S. at 530) (emphasis added).

[64] *Morgan Stanley*, 554 U.S. at 530. *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214; *cf. N.Y. Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,038 (2021) (granting petition for declaratory order that New York Transmission Owners have a federal right of first refusal under New York Independent System Operator, Inc.'s foundational agreements and OATT).

27.     I cannot accept the Commission's apparent reliance on the "freely negotiated" language in *Morgan Stanley* and *NRG*[65] to hold that the presumption applies only to contracts with individualized rates, terms, or conditions, and not to contracts with standard rates, terms, or conditions entered into by multiple counterparties.[66] The Commission has placed more weight on this one statement in *Morgan Stanley* than it can reasonably bear and, in inventing this requirement out of whole cloth, it has abandoned its obligations under the *Mobile-Sierra* doctrine.[67]

---

[65] Glick Statement at P 2 & n.1 (citing *NRG*, 558 U.S. at 174 (quoting *Morgan Stanley*, 554 U.S. at 530)).

[66] In ruling on whether the characteristics necessary to justify a *Mobile-Sierra* presumption are present, the Commission must determine whether the agreement at issue embodies either (1) individualized rates, terms, or conditions that apply only to sophisticated parties who negotiated them freely at arm's length; or (2) rates, terms, or conditions that are generally applicable or that arose in circumstances that do not provide the assurance of justness and reasonableness associated with arm's-length negotiations. Unlike the latter, the former constitute contract rates, terms, or conditions that necessarily qualify for a *Mobile-Sierra* presumption. *See ISO New Eng. Inc.*, 150 FERC ¶ 61,209, at P 183 (2015) (declining to apply the *Mobile-Sierra* presumption but recognizing that the D.C. Circuit "has determined that the Commission is legally authorized to impose a more rigorous application of the statutory 'just and reasonable' standard of review on future changes to agreements that do not present contract rates."); *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,048, at P 94 (2014) (same); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 185 (permitting the Consolidated Transmission Owner Agreement to be subject to differing standards of review because it could not "be classified in its entirety as containing contract rates or tariff rates" and noting that the differing standards would "recognize the distinctions among its provisions."); *cf N.Y. Indep. Sys. Operator, Inc.*, 162 FERC ¶ 61,107, at PP 143-145 (2018) (approving public interest standard provisions in Non-Incumbent Transmission Owner Agreement in NYISO tariff to conform to NYISO-Transmission Owner Agreement); *ISO New Eng. Inc.* v. *New Eng. Power Pool*, 106 FERC ¶ 61,280, at PP 126-131, *reh'g granted in part, denied in part*, 109 FERC ¶ 61,147, at P 84 (2004) ("We agree that the issues addressed by [section 9.01 (indemnification requirements) and section 9.06 (assumption of liability)] affect primarily the rights and interests of the Filing Parties alone.  Accordingly, we will accept the Filing Parties' proposed Mobile-Sierra provision as it relates to these provisions.").

[67] The D.C. Circuit described the Commission's approach in *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 78-80 (D.C. Cir. 2016).  However, although the court went on to uphold the Commission's determination that the *Mobile-Sierra* presumption does not apply to the right of first refusal provision in the Southwest Power Pool Membership Agreement, the court did not rule on the Commission's approach.  Instead, the court's

28.     It is worth taking a moment to explain why the case law does not reasonably allow the liberties the Commission has taken.  In *Morgan Stanley*, the Court reversed the Ninth Circuit's holding that the *Mobile-Sierra* presumption does not apply to market-based rate contracts not initially approved by the Commission.  In so doing, the Court explained the important public policy benefits of this doctrine:

> The Ninth Circuit's standard would give short shrift to the important role of contracts in the FPA, as reflected in our decision in *Sierra*, and *would threaten to inject more volatility into the electricity market by undermining a key source of stability*.  The FPA recognizes that contract stability ultimately benefits consumers, even if short-term rates for a subset of the public might be high by historical standards—which is why it permits rates to be set by contract and not just by tariff.  As the Commission has recently put it, its "first and foremost duty is to protect consumers from unjust and unreasonable rates; however, . . . *uncertainties regarding rate stability and contract sanctity can have a chilling effect on investments and a seller's willingness to enter into long-term contracts and this, in turn, can harm customers in the long run*."**[68]**

Similarly, in *NRG*, the Court referenced "*the essential role of contracts* as a key factor fostering stability in the electricity market, to the long-run benefit of consumers."**[69]**

29.     These benefits are conferred by *all* contracts, and I see no justification for depriving the parties of *Mobile-Sierra* here.  In addition, fixation upon the phrase "freely negotiated" is unwarranted.  Every contract entered into freely is, to one degree or another, negotiated.  This is true even if the negotiation amounts to no more than an offer and a rejection, implicit or explicit.  This Commission-created doctrine simply has no support in the case law.  We cannot subject the Southeast EEM Agreement to scrutiny on matters not contemplated by the holdings that established the Supreme Court's *Mobile-Sierra* doctrine, and thereby defeat the very purpose of the doctrine: to ensure that—

---

ruling was based on its conclusion that "FERC did not err in determining that the doctrine does not extend to anti-competitive measures that were not arrived at through arms-length bargaining."  *Id*. at 79.

**[68]** *Morgan Stanley*, 554 U.S. at 551 (quoting *Market–Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities*, Order No. 697, 72 Fed. Reg. 39,904, 119 FERC ¶ 61,295, at P 6 (2007)) (emphasis added).

**[69]** *NRG*, 558 U.S. at 174 (citing *Morgan Stanley*, 554 U.S. at 547-48, 551) (emphasis added).

- 21 -

absent extraordinary circumstances that would justify a public interest finding—contracts can be relied upon.

30.     My colleague asserts that to support *Mobile-Sierra* would be to "undermine our ability to protect consumers under the Southeast EEM."[70]   As I see it, denial of the Southeast EEM proposal would be to allow unused transmission capacity go unused, thereby denying consumers the "meaningful" benefits of the filing parties' projection of "over $100 million per year in market-wide savings by 2037, assuming higher renewable and energy storage penetration, or $40 million per year compared to the current bilateral market under a more conservative estimate."[71]   And to deny the filing parties the protection of the *Mobile-Sierra* presumption would be to make every aspect of this market construct more expensive and less certain.  Neither of these results can be said to be in the public interest.

31.     My colleagues' objections are not properly within the narrow scope of our analysis under FPA section 205.[72]   There is only one question before us: whether the proposed tariff amendments are just and reasonable and not unduly discriminatory or preferential.[73] In reviewing a section 205 filing, the Commission makes a limited determination

---

[70] Glick Statement at P 20.

[71] *Id.* at P 12.

[72] In addition, Commissioner Clements contends that "In past similar circumstances, the Commission has taken the approach of rejecting initial proposals for new market constructs that fail to meet the requirements of section 205, and later approving revised proposals when those shortcomings were later addressed."  Clements Statement at P 3 n.5 (citing *Pub. Serv. Co. of Colo.*, 151 FERC ¶ 61,248 (2015) (*PSCo*); *Sw. Power Pool, Inc.*, 172 FERC ¶ 61,115 (2020) (*SPP*)).  In *PSCo*, the filing entity did not have and was not seeking market-based rate authority, unlike the circumstances here; additionally, the Commission noted that it had accepted other joint dispatch agreements with varying payment structures, including those that split the savings equally among participants, which is the structure presented in the Southeast EEM filing.  *PSCo*, 151 FERC ¶ 61,248 at P 99.  Unlike in *PSCo*, access to non-public information will be restricted.  *Id.* at P 100.  *PSCo* is inapposite.  With respect to *SPP*, the Commission determined the filing was not clear regarding the "use of transmission and the role of the reliability coordinator" and provided guidance on "supply adequacy, marginal losses, and market power."  *SPP*, 172 FERC ¶ 61,115 at P 19.  Here, it is clear that the purpose of the filing is to enhance the existing bilateral mechanism to use *unused* transmission, and existing approvals and safeguards, with enhancements thereto, will apply.

[73] 16 U.S.C. § 824d.

"whether the rates proposed by a utility are reasonable—and [the analysis does not] extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs."[74]  The Commission has authority to accept, reject, or make only "minor deviations" from the filed provisions with the filer's consent.[75]  The Commission is prohibited from requiring an "entirely different rate design" than the one submitted, and it cannot accept "only half of a proposed rate."[76]  According to Chairman Glick, acceptance of only certain of the filings is not a prohibited modification under *NRG*, and he maintains that by expressly requesting that the Commission not consolidate their dockets they "foreclose[ed] the possibility that these filings are part of a single rate for purposes of *NRG*."[77]  I disagree.

32.    Chairman Glick's reading of the Southeast EEM filings ignores other statements in the filings that the Southeast EEM proposal was a package and that regulatory certainty was required to proceed,[78] the explanation of the filing parties that mandatory

---

[74] *Cities of Bethany*, 727 F.2d at 1136 (finding that, when determining whether a proposed rate was "just and reasonable," as required by the FPA, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than the alternative rate designs").

[75] *See W. Res., Inc. v. FERC*, 9 F.3d 1568, 1579 (D.C. Cir. 1993) (*W. Res.*); *City of Winnfield v. FERC*, 744 F.2d. 871, 876.

[76] *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 115 (D.C. Cir. 2017) (quoting *W. Res.*, 9 F.3d at 1578-79).

[77] Glick Statement at P 16 & n.16.

[78] *See, e.g.*, "The Southeast EEM filings are a package.  Commission action on all filings is necessary so that Southern Companies and other Southeast EEM Members can have the regulatory certainty they need to move forward with any significant additional Southeast EEM financial commitments to bring this enhanced market to fruition for the benefit of customers as quickly as possible." *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3; *Dominion Energy SC*, ER21-1128-000, February 12, 2021 Transmittal at 3; *Duke*, ER21-1115-000, February 12, 2021 Transmittal at 3; *LG&E*, ER21-1118-000, February 12, 2021 Transmittal at 3.  These are the four OATT dockets.  *See, e.g.*, *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5 ("In addition to Southern Companies, Dominion Energy South Carolina, DEC, and LG&E are each filing amendments to their transmission tariffs, some of which are joint OATTs, to add Non-Firm Energy Exchange Transmission Service ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filings, the 'Southeast EEM Filings').")); *see also, e.g.*, *Ala. Power*, Docket No., ER21-1111-000, February 12, 2021 Transmittal at 3 (defining the Tariff Filings, Concurrence Filings, and

- 23 -

eTariff procedures required each of the filings to have its own docket but "the issues in the dockets are related . . . [and] use of a single pleading across all dockets will allow all concerned to focus on substance,"[79] and it ignores the Commission's own designation of the dockets as having been filed under FPA section 205(d).[80]  It also cannot be squared with *NRG*.

33.     This submission is just and reasonable.  The Southeast EEM would enhance the existing bilateral market by creating an automated, region-wide platform that facilitates sub-hourly bilateral transactions using otherwise unused transmission capacity to achieve cost savings throughout the region.  It facilitates trades and more efficiently uses the transmission system in the existing market.  It does so in reliance upon Commission approvals already granted to the filing parties and is designed in accordance with existing precedent.  The provision that prices Non-Firm Energy Exchange Transmission Service at $0/MWh is just and reasonable because the Southeast EEM would make unused transmission capacity available only after all other transmission customers make their transmission reservations.[81]  This represents transmission capacity that would otherwise be left fallow.  As such, there are no opportunity costs associated with Non-Firm Energy Exchange Transmission Service.[82]  In the face of all of the potential benefits that could be

---

the Agreement Filings as the Southeast EEM Filings); *id.* at 4 ("the requested effective date, and the requested date for Commission action . . . will still provide the Commission 60 days to act upon the Southeast EEM Filings").

[79] *See, e.g.*, *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3.

[80] *See, e.g.*, 86 Fed. Reg. 10,264, 10,264-10,265 (Feb. 19, 2021); 86 Fed. Reg. 31,492, 31,493 (June 14, 2021); 86 Fed. Reg. 45,980, 45,980-45,981 (Aug. 17, 2021). *Pioneer*, 169 FERC ¶ 61,265 at P 24 ("Pioneer also had notice that its filing was not a statutory filing made pursuant to section 205(d), as the Commission's Notice of Filing did not indicate that Pioneer made its filing pursuant to section 205(d) or that it had a proposed effective date."); *see also id.* P 24 n.45 ("*Compare* Pioneer's Notice of Filing, at 3 *with* Pacific Gas and Electric Company's Notice of Filing, at 3 in Combined Notice of Filings #1, Docket No. ER18-2119-000, (August 1, 2018), . . . .  (Pacific Gas and Electric Company's Notice states that it is a § 205(d) Rate Filing with a proposed effective date while Pioneer's does not).  *The Commission adds the § 205(d) Rate Filing and the proposed effective date to those filings with statutory action dates that are properly made through eTariff*." (emphasis added)).

[81] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 24-25.

[82] *See Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107, at P 84 (2016) (finding that the

realized by the creation of the Southeast EEM, and the fact that there is virtually no downside to its implementation, there is simply no lawful basis upon which to reject this submission.

34.    While protestors raise concerns with various aspects of the Southeast EEM proposal, we should have found that the filing parties have satisfied their burden under FPA section 205, and we should have ruled on the proposal before us and not upon protestors' alternatives.[83]

## IV.    **Conclusion**

35.    I voted to accept the Southeast EEM proposal and would have done so on August 6, 2021, as just and reasonable.

36.    The Commission will get a second chance to issue a merits order in response to requests for rehearing.  I sincerely hope that wisdom prevails, and that the Southeast EEM proposal is ultimately accepted.

37.    However, should this matter eventually come to the court under FPA section 205(g), the court should remand it back to FERC for an order in the first instance. Failing that, if the court chooses to issue a decision on the merits, it should deny the petitions for review and remand with instructions that every aspect of the filers' submission—in all related dockets—be accepted.

_____

James P. Danly
Commissioner

_____

zero-rate transmission service at issue would otherwise be unused and, therefore, there would be no associated opportunity costs).

[83] *See, e.g.*, *Cities of Bethany*, 727 F.2d at 1136 (finding that, when determining whether a proposed rate was "just and reasonable," as required by the FPA, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than the alternative rate designs").

- 25 -

# ATTACHMENT A

## I.     Second Deficiency Response[84]

1.      "Given the limited nature of the second Deficiency Letter and response, the Southeast EEM Members request a shortened comment period of 10 days, or August 23, 2021, and action within 30 days, or September 10. Additionally, the Members request an effective date (as to the Southeast EEM Agreement and concurrence filings) of October 12, 2021, sixty days from the filing of this Response."[85]

2.      "The Southeast EEM Members also respectfully request expedited Commission action on or before September 10, 2021—30 days after the filing date."[86]

3.      "The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement, and the related filings in these unconsolidated dockets, subject to the modifications proposed by the Members in previous filings, to become effective on October 12, 2021. If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Southeast EEM Members commit to subsequently submit a compliance filing to effectuate the proposed revisions within 30 days of acceptance."[87]

## II.     First Deficiency Response[88]

4.      "Because the evidence demonstrates that the Southeast EEM, as proposed to be modified here, will benefit customers, the Southeast EEM Members request that the Commission approve the Southeast EEM as soon as reasonably possible, but no later than August 6, 2021."[89]

5.      "The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement, and the related filings in these unconsolidated dockets,

---

[84] *Ala. Power*, Docket Nos. ER21-1111-002, et al., Second Deficiency Response (Aug. 11, 2021).

[85] Second Deficiency Response at 2

[86] Second Deficiency Response at 8.

[87] Second Deficiency Response at 9.

[88] *Ala. Power*, Docket Nos. ER21-1111-001, et al., First Deficiency Response (June 6, 2021).

[89] First Deficiency Response at 7.

subject to the modifications proposed herein, to become effective on August 6, 2021. If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Southeast EEM Members commit to subsequently submit a compliance filing to effectuate the proposed revisions within 30 days of acceptance."[90]

## III.    Initial Filings

### A.    *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal

6.    "Concurrently with this filing, each of the other Commission-jurisdictional Members (together with Southern Companies, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings'). Additionally, each Member that is a transmission service provider with an open access transmission tariff ('transmission tariff' or OATT') on file with the Commission, including Southern Companies, is filing amendments to its transmission tariff to offer zero-charge transmission service for Southeast Energy Exchange transactions (known as 'Non-Firm Energy Exchange Transmission Service' or 'NFEETS') (collectively, the 'Tariff Filings,' together with the Concurrence Filings and this filing, the 'Southeast EEM Filings')."[91]

7.    "[T]he requested effective date, and the requested date for Commission action . . .  will still provide the Commission 60 days to act upon the Southeast EEM Filings . . . ."[92]

8.    "The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement to become effective May 13, 2021, 90 days after this filing."[93]

9.    "In order to provide ample time to potential commenters who may wish to provide comments, we respectfully request that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021. As noted, the requested effective date, and the requested date for Commission action, is in 90 days. Accordingly, a 30-day period for comments will still provide the

---

[90] First Deficiency Response at 43.

[91] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3.

[92] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 4.

[93] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3.

Commission 60 days to act upon the Southeast EEM Filings after comments are received."[94]

10.     "If the Commission accepts the Southeast EEM Filings without material modification or condition within the requested 90 days, the Members anticipate the following schedule to implement the Southeast EEM: May 13, 2021: Proposed effective date of the Southeast EEM Agreement."[95]

11.     "Southern Company and the other Southeast EEM Members respectfully request that the Southeast EEM Agreement become effective on May 13, 2021, 90 days after filing.  This requested effective date is consistent with 18 C.F.R. §§ 35.2(f) and 35.3(a)(1)."[96]

12.     "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[97]

13.     "Southern Company and the Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[98]

---

[94] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3-4.

[95] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 12-13.

[96] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 42.

[97] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 42.

[98] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 44.

JA0103

B.    ***Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal**

14.    "[Dominion Energy SC] respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Southern Company in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[99]

15.    "Each of the other Commission-jurisdictional Members (together with [Dominion Energy SC], the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings').  Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket. There are a total of twelve Southeast EEM Filings."[100]

16.    "In addition, consistent with the request made regarding the Southeast EEM Agreement filing, [Dominion Energy SC] requests a 30-day comment period for this filing, such that comments would be due on March 15, 2021."[101]

17.    ["Dominion Energy SC] respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[102]

18.    "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[103]

---

[99] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2

[100] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2 n.6.

[101] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2.

[102] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 6.

[103] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021

19.    "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[104]

20.    "[Dominion Energy SC] respectfully requests that the Commission establish a 30-day comment period for this filing and accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[105]

### C.    *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal

21.    "LG&E respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Southern Companies in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[106]

22.    Each of the other Commission-jurisdictional Members (together with LG&E, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings').  Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket.  There are a total of twelve Southeast EEM Filings."[107]

23.    "In order to provide ample time to potential commenters who may wish to provide comments, LG&E respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still

---

Transmittal at 6.

[104] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 7.

[105] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 8.

[106] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2.

[107] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2 n.6.

provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[108]

24.     "LG&E respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[109]

25.     "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[110]

26.     "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[111]

27.     "LG&E respectfully requests that the Commission accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[112]

## D.     *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal

28.     "DEC respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Alabama Power Company in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[113]

29.     "Each of the other Commission-jurisdictional Members (together with DEC, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to

---

[108] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2.

[109] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 6.

[110] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 7.

[111] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 7.

[112] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 8.

[113] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2.

its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings'). Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket. There are a total of twelve Southeast EEM Filings."[114]

30.    "In order to provide ample time to potential commenters who may wish to provide comments, DEC respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021. As noted, the requested effective date, and the requested date for Commission action, is in 90 days. Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[115]

31.    "DEC respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[116]

32.    "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[117]

33.    "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[118]

34.    "DEC respectfully request[s] that the Commission accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[119]

---

[114] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2 n.6.

[115] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2.

[116] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 6.

[117] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 7.

[118] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 7.

[119] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 8.

### E. *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal

35.    "DEP respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Alabama Power Company in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[120]

36.    "Each of the other Commission-jurisdictional Members (together with DEP, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings').  Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket.  There are a total of twelve Southeast EEM Filings."[121]

37.    "In order to provide ample time to potential commenters who may wish to provide comments, DEP respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[122]

38.    "DEP respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[123]

39.    "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[124]

---

[120] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2.

[121] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2 n.6.

[122] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2.

[123] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 6.

[124] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 6-7.

40.     "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[125]

41.     "DEP respectfully request[s] that the Commission accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[126]

### F.     *Ga. Power*, Docket No. ER21-1119-000 February 12, 2021 Transmittal

42.     "SCS respectfully requests the Commission make the attached tariff record effective as of May 13, 2021, consistent with the effective date requested in Alabama Power's filing of the Southeast EEM Agreement."[127]

### G.     *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal

43.     "KU respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Southern Companies in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[128]

44.     "Each of the other Commission-jurisdictional Members (together with KU, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings'). Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings'). Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket. There are a total of twelve Southeast EEM Filings."[129]

---

[125] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 7.

[126] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 8.

[127] *Ga. Power*, Docket No. ER21-1119-000, February 12, 2021 Transmittal at 2.

[128] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2.

[129] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2 n.6.

JA0109

45.    "In order to provide ample time to potential commenters who may wish to provide comments, KU respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[130]

46.    "KU respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[131]

47.    "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[132]

48.    "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[133]

### H.    *Miss. Power*, Docket No. ER21-1121-000 February 12, 2021 Transmittal

49.    "SCS respectfully requests the Commission make the attached tariff record effective as of May 13, 2021, consistent with the effective date requested in Alabama Power's filing of the Southeast EEM Agreement."[134]

---

[130] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2.

[131] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 6.

[132] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 7.

[133] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 7.

[134] *Miss. Power*, Docket No. ER21-1121-000, February 12, 2021 Transmittal at 2.

## I.     *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal

50.     "eTariff requirements mandate that each of the Southeast EEM Filings have its own docket . . . the issues in the dockets are related . . . ."[135]

51.     "In addition to Southern Companies, Dominion Energy South Carolina, DEC, and LG&E are each filing amendments to their transmission tariffs, some of which are joint OATTs, to add NFEETS ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filings, the 'Southeast EEM Filings')."[136]

52.     "Southern Companies request that the Commission issue an order within 90 days, by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Agreement Filing.  Also consistent with that filing, Southern Companies request that the Commission establish a comment period of 30 days in this docket, or March 15, 2021.  The Southeast EEM filings are a package."[137]

53.     "Accordingly, Southern Companies are using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[138]

54.     "Although Southern Companies are requesting a 12/31/9998 effective date, to be updated once the Southeast EEM Commencement Date is known, Southern Companies respectfully request that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast EEM Agreement.  As explained in the Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that include this filing and the Agreement Filing before making significant additional investment in the Southeast EEM."[139]

---

[135] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2-3.

[136] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5

[137] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3.

[138] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12.

[139] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12.

55.    "Southern Companies ask the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section III above."[140]

### J.    *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal

56.    "eTariff requirements mandate that each of the twelve Southeast EEM Filings have its own docket . . . . the issues in the dockets are related . . . ."[141]

57.    "The Company requests that the Commission issue an order within 90 days, by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Southeast EEM Agreement Filing.  Also consistent with that filing, the Company requests that the Commission establish a comment period of 30 days in this docket, or March 15, 2021.  The Southeast EEM filings are a package."[142]

58.    "Accordingly, the Company is using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[143]

59.    "Although the Company is requesting a 12/31/9998 effective date, the Company respectfully requests that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast EEM Agreement.  As explained in the Southeast EEM Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that include this filing and the Southeast EEM Agreement Filing before making additional investment in the Southeast EEM."[144]

---

[140] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 14.

[141] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 2.

[142] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 3.

[143] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 11.

[144] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 12.

60.     "[T]he Company asks the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section IV above."[145]


### K.     *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal

61.     "eTariff requirements mandate that each of the twelve Southeast EEM Filings have its own docket . . . the issues in the dockets are related . . . ."[146]

62.     "Those twelve filings are Southern Companies' filing of the Southeast EEM Agreement, the seven Concurrence Filings, and the four OATT filings to implement NFEETS, including this one ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filing, the 'Southeast EEM Filings')."[147]

63.     "The Filing Parties request that the Commission issue an order within 90 days of this filing, i.e., by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Agreement Filing.  Also consistent with that filing, the Filing Parties request that the Commission establish a comment period of 30 days in this docket, i.e., March 15, 2021.  The Southeast EEM filings are a package."[148]

64.     "Accordingly, the Filing Parties are using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[149]

65.     "Although the Filing Parties are requesting a 12/31/9998 effective date, to be updated once the Southeast EEM Commencement Date is known, the Filing Parties respectfully request that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast EEM Agreement.  As explained in the Southeast EEM Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that

---

[145] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 14.

[146] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2-3.

[147] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2 n.7.

[148] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3.

[149] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 12.

include this filing and the Southeast EEM Agreement Filing before making significant additional investment in the Southeast EEM."[150]

66.    "[T]he Filing Parties ask the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section IV above."[151]

## L.    *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal

67.    "eTariff requirements mandate that each of the twelve Southeast EEM Filings have its own docket . . . the issues in the dockets are related."[152]

68.    "In addition to LG&E/KU, Southern Companies, Dominion Energy South Carolina, DEC are each filing amendments to their transmission tariffs, some of which are joint OATTs to add NFEETS ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filings, the 'Southeast EEM Filings')."[153]

69.    "LG&E/KU request that the Commission issue an order within 90 days, by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Southeast EEM Agreement Filing.  Also consistent with that filing, LG&E/KU request that the Commission establish a comment period of 30 days in this docket, or March 15, 2021.  The Southeast EEM filings are a package."[154]

70.    "Accordingly, the LG&E/KU are using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[155]

71.    "Although the LG&E/KU are requesting a 12/31/9998 effective date, to be updated once the Southeast EEM Commencement Date is known, the LG&E/KU respectfully request that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast

---

[150] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 13.

[151] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 15.

[152] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2-3.

[153] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2 n.5.

[154] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3.

[155] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 12.

EEM Agreement.  As explained in the Southeast EEM Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that include this filing and the Southeast EEM Agreement Filing before making significant additional investment in the Southeast EEM."[156]

72.     "LG&E/KU ask the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section IV above."[157]

---

[156] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 13.

[157] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 15.

JA0115

Document Content(s)
10202021 FINAL -- SEEM -- Danly Fair RATES Act Statement.docx ............1

177 FERC ¶ 61,080
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                        James P. Danly, Allison Clements,
                        and Mark C. Christie.

| | |
|---|---|
| Duke Energy Progress, LLC | Docket Nos.  ER21-1115-000 |
| Duke Energy Carolinas, LLC | ER21-1115-001 |
| | ER21-1115-002 |
| | |
| Louisville Gas and Electric Company | ER21-1118-002 |
| | |
| Alabama Power Company | ER21-1125-000 |
| | ER21-1125-001 |
| | ER21-1125-002 |
| | |
| Dominion Energy South Carolina, Inc. | ER21-1128-002 |

(Not consolidated)

ORDER ACCEPTING TARIFF REVISIONS

(Issued November 8, 2021)

1.      On February 12, 2021, as amended on June 7, 2021, and August 11, 2021, the following four prospective Participating Transmission Providers (collectively, Filing Parties) in the Southeast Energy Exchange Market (Southeast EEM) filed, pursuant to section 205 of the Federal Power Act (FPA)[1] and section 35.12 of the Commission's regulations,[2] revisions to their respective open access transmission tariffs (OATT) to incorporate Non-Firm Energy Exchange Transmission Service (NFEETS):[3]

---

[1] 16 U.S.C. § 824d.

[2] 18 C.F.R. § 35.12 (2020).

[3] NFEETS is a zero-charge transmission service used to facilitate 15-minute transactions (Energy Exchanges) matched by an algorithm via the Southeast EEM electronic trading platform.  Duke Energy OATT Transmittal at 4; LG&E/KU OATT Transmittal at 3-6; Southern Companies OATT Transmittal at 4; Dominion Energy SC

JA0117

Docket No. ER21-1115-000, et al.                                      - 2 -

Duke Energy Carolinas, LLC (DEC) and Duke Energy Progress, LLC (DEP) (collectively, Duke Energy);[4] Louisville Gas and Electric Company (LG&E) and Kentucky Utilities Company (KU) (collectively, LG&E/KU);[5] Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, Southern Companies);[6] and Dominion Energy South Carolina, Inc. (Dominion Energy SC).[7]  As discussed below, we accept the OATT revisions effective December 31, 9998, as requested, and direct Filing Parties to submit:  (1) a compliance filing within 30 days of the date of this order implementing ministerial revisions; and (2) an informational filing submitted at least 30 days prior to the Southeast EEM Commencement Date,[8] to update the effective date for the OATT revisions.

---

OATT Transmittal at 3-4.

   [4] *See* Duke Energy, Tariff Filing, Docket Nos. ER21-1115-000 (filed Feb. 12, 2021), ER21-1115-001 (filed June 7, 2021), and ER21-1115-002 (filed Aug. 11, 2021).

   [5] *See* LG&E/KU, Tariff Filing, Docket Nos. ER21-1118-000 (filed Feb. 12, 2021), ER21-1118-001 (filed June 7, 2021), and ER21-1118-002 (filed Aug. 11, 2021).

   [6] *See* Southern Companies, Tariff Filing, Docket Nos. ER21-1125-000 (filed Feb. 12, 2021), ER21-1125-001 (filed June 7, 2021), and ER21-1125-002 (filed Aug. 11, 2021).

   [7] *See* Dominion Energy SC, Tariff Filing, Docket Nos. ER21-1128-000 (filed Feb. 12, 2021), ER21-1128-001 (filed June 7, 2021), and ER21-1128-002 (filed Aug. 11, 2021).

   [8] The Southeast EEM Commencement Date refers to the date that Southeast EEM platform begins operation.  Duke Energy OATT Transmittal at 12; Dominion Energy SC OATT Transmittal at 11; LG&E/KU OATT Transmittal at 12; Southern Companies OATT Transmittal at 11-12.

Docket No. ER21-1115-000, et al.                                                    - 3 -

## I.   **Background**

2.     The Southeast EEM Agreement[9] and associated certificates of concurrence, filed by the Members[10] of the Southeast EEM, became effective as of October 12, 2021.[11]  The Southeast EEM Agreement establishes a voluntary electronic trading platform to facilitate bilateral trading in the Southeast,[12] which has historically been a traditional wholesale electricity market where electric service providers are responsible for system operations and providing service to retail customers.[13]  To engage in bilateral power purchases and sales, electric service providers have had to use phone or electronic communication tools to discover each other, negotiate terms of sale, arrange for transmission service, and schedule delivery.  Thus, as a practical matter, trades in the Southeast bilateral market generally have occurred on an hourly basis as the shortest increment, and usually only with entities in the same or directly interconnected balancing authority area (BAA).[14]  However, when implemented, the Southeast EEM will provide an automated, region-wide platform to facilitate voluntary, sub-hourly bilateral

---

[9] Alabama Power Company, Tariff Filing, Docket No. ER21-1111-000, Ex. A, Southeast EEM Agreement (filed Feb. 12, 2021) (Southeast EEM Agreement).

[10] Members of the Southeast EEM include:  Southern Companies; Associated Electric Cooperative, Inc. (AECI); Dalton Utilities (Dalton); Dominion Energy SC; Duke Energy; LG&E/KU; North Carolina Municipal Power Agency Number 1 (NCMPA); PowerSouth Energy Cooperative (PowerSouth); North Carolina Electric Membership Corporation (NCEMC); and Tennessee Valley Authority (TVA) (each a Member and collectively, the Members).

[11] *Ala. Power Co.*, Notice, Docket No. ER21-1111-002, et al. (issued Oct. 13, 2021) (taking effect by operation of law; explaining that the Commissioners were divided two against two as to the lawfulness of the change).  The Members do not expect trading to occur until the first quarter of 2022.  Duke Energy OATT Transmittal at 3; Dominion Energy SC OATT Transmittal at 3; LG&E/KU OATT Transmittal at 3; Southern Companies OATT Transmittal at 3.

[12] Alabama Power Company, Tariff Filing, Docket No. ER21-1111-000, Transmittal, at 5-6 (filed Feb. 12, 2021) (Southeast EEM Agreement Transmittal).

[13] *Id.* at 4.

[14] *Id.* at 4, 6.

Docket No. ER21-1115-000, et al.                                      - 4 -

transactions, occurring every 15 minutes starting at the top of the hour, utilizing unused transmission capacity to achieve cost savings throughout the region.[15]

3.      Participation in the Southeast EEM will be open to all entities that "own or otherwise control a Source within the Territory and/or is contractually obligated to serve a Sink within the Territory[.]"[16]  Entities that submit bids and offers into the Southeast EEM will be "Participants," and to become a Participant, an entity must execute a Participant Agreement;[17] arrange to take NFEETS, a zero-cost transmission service using unused transmission capacity for 15-minute Energy Exchanges,[18] from each Participating Transmission Provider; and have or execute Enabling Agreements with at least three other Participants (three-eligible-counterparty rule).  Participation is free.  Members who wish to engage in Energy Exchanges must do so as a Participant, on the same terms and conditions as non-Member Participants.

4.      Each hour, Participating Transmission Providers will provide data about their available capacity for NFEETS.  Energy Exchanges matched through the Southeast EEM will be consummated under Enabling Agreements,[19] the same way bilateral transactions

---

[15] *Id.*

[16] Southeast EEM Agreement, app. B, Southeast EEM Market Rules § II (Market Rules).  The Southeast EEM Market Rules define a "Source" as a pre-approved and validated OATI webRegistry source point.  Market Rules § II.  Generally, a source point is where a generation resource capable of generating electricity (source) is located.  OATI webRegistry is the North American Electric Reliability Corporation (NERC) Transmission Site Information Network (TSIN) registry selected by The North American Energy Standards Board (NAESB).  The Southeast EEM Market Rules define a "Sink" as a pre-approved and validated OATI webRegistry sink point.  *Id.*  Generally, a sink point is where a load resource capable of consuming electricity (sink) is located.  OATI webRegistry is the NERC TSIN registry selected by NAESB.

[17] The Southeast EEM Agreement defines Participant Agreement as the agreement set forth in Section 3.3.  Southeast EEM Agreement § 1.1.

[18] The Southeast EEM Agreement defines "Energy Exchange" as a transaction for the purchase and sale of non-firm energy using the matching, reservation, and tagging functions of the Southeast EEM between Participants pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Market Rules.  *Id.*

[19] The Southeast EEM Agreement defines "Enabling Agreement" as a bilateral agreement for the purchase and sale of energy that provides for Energy Exchanges between a seller and a buyer and that, for sellers that are public utilities and require authorization to engage in sales for resale of electric energy, capacity, or ancillary services at market-based rates under section 205 of the FPA, has been entered into

are consummated today, and NFEETS will be provided under the individual OATTs of each Participating Transmission Provider[20] within the Southeast EEM.[21]

5.      At issue in the proceedings here, the Filing Parties, which constitute the Commission-jurisdictional Southeast EEM Members that are also Participating Transmission Providers, submitted revisions to their individual OATTs to establish NFEETS on their systems.[22]  We address the specific OATT revisions and relevant comments and protests below.

## II.     Notice of Filings and Responsive Pleadings

6.      Notices of Filing Parties' OATT revision filings were published in the *Federal Register*, 86 Fed. Reg. 10,264 (Feb. 12, 2021), with interventions and protests due on or before March 5, 2021.  On February 12, 2021, the Commission issued an errata notice extending the comment deadline to March 15, 2021.  Unless otherwise noted, the interventions and responsive pleadings were filed in all four of the above-captioned proceedings.

7.      Notices of intervention were filed by:  Georgia Public Service Commission (Docket Nos. ER21-1115 and ER21-1118); Kentucky Public Service Commission; Mississippi Public Service Commission (Docket No. ER21-1125); and North Carolina Utilities Commission.  Letters were filed by South Carolina Senator Tom Davis and South Carolina Representative Nathan Ballentine.

8.      Timely motions to intervene were filed by:  Alabama Municipal Electric Authority; American Clean Power Association; American Municipal Power, Inc. (Docket No. ER21-1118); Carolinas Industrial Group for Fair Utility Rates; City of Orangeburg, South Carolina (Docket No. ER21-1128); Cooperative Energy (Docket No. ER21-1125); Dalton; Dominion Energy SC (Docket Nos. ER21-1115, ER21-1118, and ER21-1125); Duke Energy (Docket Nos. ER21-1118, ER21-1125, and ER21-1128); East Kentucky Power Cooperative, Inc. (Docket No. ER21-1118); EDP Renewables North America LLC; Florida Municipal Power Agency; Georgia Transmission Corporation; Georgia System Operations Corporation; Kentucky Municipal Energy Agency; LG&E/KU (Docket Nos. ER21-1115, ER21-1125, and ER21-1128); Municipal Electric Authority of

---

pursuant to such seller's market-based rate authority.  *Id.*

[20] The Southeast EEM Agreement defines "Participating Transmission Provider" as a transmission provider that is providing NFEETS.  *Id.*

[21] Southeast EEM Agreement Transmittal at 14.

[22] *See* app. A and app. B to this order for a list of filed tariff records.

Georgia; NCEMC (Docket No. ER21-1125); NCMPA; North Carolina Department of Justice; North Carolina Utilities Commission Public Staff; Oglethorpe Power Corporation; Orlando Utilities Commission; Pine Gate Renewables, LLC (Docket Nos. ER21-1115 and ER21-1128); PowerSouth Energy Cooperative; Renew Missouri Advocates; South Carolina Public Service Authority (Santee Cooper); South Carolina Office of Regulatory Staff (Docket Nos. ER21-1115 and ER21-1128); Southern Companies (Docket Nos. ER21-1115, ER21-1118, and ER21-1128); Tennessee Valley Public Power Association (Tennessee Valley PPA); and The Energy Authority, Inc.

9.      Timely motions to intervene and comments were filed by:  AECI; American Forest & Paper Association (AF&PA); Carolinas Clean Energy Business Association (CCEBA); Clean Energy Coalition;[23] Environmental Defense Fund (EDF); Georgia Association of Manufacturers; Midcontinent Independent System Operator, Inc. (MISO); PJM Interconnection, L.L.C. (PJM); R Street Institute; Southern Renewable Energy Association (SREA); and TVA.

10.     Timely motions to intervene and protests were filed by:  Entergy Services, LLC, Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, and Entergy Texas, Inc. (collectively, Entergy); Public Citizen, Inc. (Public Citizen); Public Interest Organizations (PIOs);[24] and Voltus, Inc. (Voltus).

11.     Motions to intervene out of time were filed by:  American Electric Power Service Corporation; Athens Utilities Board; FirstEnergy Companies; Gibson Electric Membership Corporation; Independent Market Monitor for PJM; Joe Wheeler Electric Membership Corporation; Kentucky Attorney General; Missouri Joint Municipal Electric Utility Commission; Morgan Stanley Capital Group, Inc.; and Volunteer Energy Cooperative.

---

[23] Clean Energy Coalition filed comments without a motion to intervene; however, the entities that constitute the Clean Energy Coalition filed timely motions to intervene: Advanced Energy Economy; Advanced Energy Buyers Group; Renewable Energy Buyers Alliance; and Solar Energy Industries Association (SEIA).

[24] PIOs filed a protest without a motion to intervene; however, the entities that constitute PIOs filed timely motions to intervene: Energy Alabama; Sierra Club; South Carolina Coastal Conservation League; GASP Coalition; Southern Alliance for Clean Energy; Southface Energy Institute, Inc.; Vote Solar; Georgia Interfaith Power and Light; Georgia Conservation Voters; Partnership for Southern Equity; North Carolina Sustainable Energy Association; Sustainable FERC Project; and Natural Resources Defense Council.

12.    On March 24, 2021, EDF filed a motion for leave to answer and answer.  On March 30, 2021, Filing Parties filed a motion for leave to answer and answer.  On April 12, 2021, PIOs submitted a motion for leave to answer and answer.  On April 14, 2021, Clean Energy Coalition filed a motion for leave to answer and answer.

13.    On May 4, 2021, Commission staff issued a letter informing Filing Parties that the February 12, 2021 Filings were deficient and requesting additional information (May 4 Deficiency Letter).  On June 7, 2021, Filing Parties submitted a response to the May 4 Deficiency Letter (June 7 Deficiency Response), amending the February 12, 2021 Filings.

14.    Notice of the June 7 Deficiency Response was published in the *Federal Register*, 86 Fed. Reg. 31,492 (June 8, 2021), with comments due on or before June 28, 2021. Comments on the June 7 Deficiency Response were filed by Clean Energy Coalition; R Street Institute; and SREA.  PIOs filed a protest to the June 7 Deficiency Response.

15.    On July 14, 2021, Filing Parties filed a motion for leave to answer and answer. On July 29, 2021, PIOs filed a motion for leave to answer and answer.

16.    On August 6, 2021, Commission staff issued a letter informing Filing Parties that the February 12, 2021 Filings, as amended in the June 7 Deficiency Response, were deficient and requesting further information (August 6 Deficiency Letter).  On August 11, 2021, Filing Parties submitted a response to the August 6 Deficiency Letter (August 11 Deficiency Response), further amending the February 12, 2021 Filings.

17.    Notice of the August 11 Deficiency Response was published in the *Federal Register*, 86 Fed. Reg. 45,980 (Aug. 11, 2021), with comments due on or before August 23, 2021.  Comments on the August 11 Deficiency Response were filed by R Street Institute; and Advanced Energy Economy, Advanced Energy Buyers Group, and Renewable Energy Buyers Alliance (collectively, Clean Energy Customers).  PIOs and SEIA filed protests to the August 11 Deficiency Response.

### III.    Discussion

####    A.    Procedural Matters

18.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure,[25] the timely, unopposed motions to intervene serve to make the entities that filed them parties to the proceedings in which they filed them.

---

[25] 18 C.F.R. § 385.214 (2020).

19.     Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure,[26] we will grant American Electric Power Service Corporation's, Athens Utilities Board's, FirstEnergy Companies', Gibson Electric Membership Corporation's, Independent Market Monitor for PJM's, Joe Wheeler Electric Membership Corporation's, Kentucky Attorney General's, Missouri Joint Municipal Electric Utility Commission's, Morgan Stanley Capital Group, Inc.'s, and Volunteer Energy Cooperative's late-filed motions to intervene given their interest in these proceedings, the early stage of these proceedings, and the absence of undue prejudice or delay.

20.     Rule 213(a)(2) of the Commission's Rules of Practice and Procedure prohibits an answer to a protest or answer unless otherwise ordered by the decisional authority.[27] We will accept the answers filed by EDF, Filing Parties, PIOs, and Clean Energy Coalition because they have provided information that assisted us in our decision-making process.

### B.    **Substantive Matters**

21.     As further discussed below, we find the OATT revisions filed in the above-captioned dockets to be just and reasonable and not unduly discriminatory or preferential, and therefore accept them,[28] subject to:  (1) a compliance filing to be submitted within 30 days of the date of this order to implement ministerial revisions and (2) an informational filing at least 30 days prior to the Southeast EEM Commencement Date updating the effective date for the OATT revisions.[29]

---

[26] *Id.* § 385.214(d).

[27] *Id.* § 385.213(a)(2).

[28] As noted above, the Southeast EEM Agreement and associated certificates of concurrence from the Southeast EEM Members became effective by operation of law with an effective date of October 12, 2021.  This order addresses the remaining pending dockets related to the Southeast EEM—the OATT revisions filings from Duke Energy, LG&E/KU, Southern Companies, and Dominion Energy SC.

[29] Filing Parties submitted the OATT revisions addressed in this order in eTariff with a requested effective date of 12/31/9998, to allow the Commission to act on the proposed OATT revisions while maintaining flexibility to establish an effective date at a later time.  Filing Parties propose to establish the effective date in an informational filing no later than 30 days prior to the Southeast EEM Commencement Date.  Duke Energy OATT Transmittal at 12-13 (committing to make an informational filing with the Commission no later than 30 days before the Southeast EEM Commencement Date); LG&E/KU OATT Transmittal at 12-13 (same); Southern Companies OATT Transmittal

Docket No. ER21-1115-000, et al.                                        - 9 -

## 1.   **NFEETS**

### a.   **Proposal**

22.     Filing Parties explain that NFEETS is the only transmission product that will be available in the Southeast EEM.[30]  Filing Parties state that the Southeast EEM Agreement establishes minimum characteristics of NFEETS and requires that all Participants arrange to take NFEETS from all Participating Transmission Providers.  Filing Parties characterize NFEETS as:  non-firm transmission; only available on an as-available basis (i.e., only available after all other uses have been considered); provided solely for 15-minute Energy Exchanges; the lowest curtailment priority; the rate for service is $0/MWh; and there are no Schedule 1 or Schedule 2 ancillary service charges.  Because it is a non-firm, as-available product, Filing Parties state that no transmission studies are necessary to obtain NFEETS.  Additionally, Filing Parties propose that NFEETS will be documented by e-Tags to schedule deliveries of energy with the applicable Participating Transmission Provider and/or Participants.[31]

23.     Filing Parties propose certain caveats on the use of NFEETS.[32]  First, Filing Parties state that losses for NFEETS will be financial in that losses will be supplied by the applicable Participating Transmission Provider and paid for by the matched bidder and offeror in each Energy Exchange.  Filing Parties explain that these financial losses will be assessed based on the loss factor and rate in each of the Participating Transmission Providers' tariffs and equally shared between the matched bidder and offeror.  In support of the Southeast EEM's use of financial losses, Filing Parties state that in developing the Southeast EEM, they determined that financial losses were the best option rather than providing physical, in-kind losses since the use of financial losses will permit losses to be considered upfront when the Southeast EEM algorithm matches bids and offers.[33]  Second, Filing Parties propose that NFEETS will only be available through

---

at 11-12 (same); Dominion Energy SC OATT Transmittal at 11-12 (same).

[30] Duke Energy OATT Transmittal at 4-6; LG&E/KU OATT Transmittal at 3-6; Southern Companies OATT Transmittal at 3-6; Dominion Energy SC OATT Transmittal at 3-6.

[31] Duke Energy OATT Transmittal at 4-6; LG&E/KU OATT Transmittal at 3-6; Southern Companies OATT Transmittal at 3-6; Dominion Energy SC OATT Transmittal at 3-6; *see also* Southeast EEM Agreement Transmittal at 31.

[32] Duke Energy OATT Transmittal at 5-6; LG&E/KU OATT Transmittal at 5-6; Southern Companies OATT Transmittal at 5; Dominion Energy SC OATT Transmittal at 5-6.

[33] Southeast EEM Agreement Transmittal, attach. C, McGeeney and Sellers Aff. ¶

Docket No. ER21-1115-000, et al.                                                     - 10 -

the reservation, scheduling, and tagging functions of the Southeast EEM platform rather than the Participating Transmission Providers' open-access same time information systems (OASIS).[34]  Third, Filing Parties propose to limit NFEETS so that it cannot be reassigned, resold, or redirected.  Fourth, Filing Parties state that NFEETS can only be provided by a Participating Transmission Provider whose system, if added to the other Participating Transmission Providers' systems, creates a continuous contract path for the Energy Exchange.  Finally, the Participating Transmission Provider must provide all information required by the Southeast EEM Market Rules.

24.     In addition, transmission owners whose facilities are made available by a Participating Transmission Provider are not obligated to plan, construct, or maintain their transmission systems for the benefit of any Southeast EEM Participant.[35]  Further, Filing Parties propose that Participating Transmission Providers' participation in the Southeast EEM is voluntary and may be terminated in accordance with the requirements of the Southeast EEM Agreement.

25.     In support of NFEETS, Filing Parties argue that the implementation of the Southeast EEM will not impact reliability or existing operations, including serving native load.[36]  Filing Parties state that since NFEETS is an as-available transmission service that uses Available Transfer Capability (ATC)[37] after all other reliability obligations have

---

33 (McGeeney and Sellers Aff.).

[34] Duke Energy OATT Transmittal at 5; LG&E/KU OATT Transmittal at 5; Southern Companies OATT Transmittal at 5; Dominion Energy SC OATT Transmittal at 5.

[35] DEC, Tariffs, Rate Schedules and Serv. Agreements, attach. X, Non-Firm Energy Exch. Transmission Serv. (0.0.1), § 3.7.2; Dominion Energy SC, OATT and Serv. Agreements, attach. P, Non-Firm Energy Exchange Transmission Serv. (2.0.0), § 3.7.2; Alabama Power Co., OATT and Associated Serv. Agreements, attach. W, Non-Firm Energy Exch. Transmission Serv. (0.0.0), § 3.7.2; LG&E, Transmission, Part V, attach. S, Non-Firm Energy Exch Transmission Serv. (1.0.2), § 3.7.2.

[36] Duke Energy OATT Transmittal at 11; LG&E/KU OATT Transmittal at 11; Southern Companies OATT Transmittal at 10-11; Dominion Energy SC OATT Transmittal at 10-11.

[37] NERC defines Available Transfer Capability as a "measure of the transfer capability remaining in the physical transmission network for further commercial activity over and above already committed uses.  It is defined as Total Transfer Capability less Existing Transmission Commitments (including retail customer service), less a Capacity Benefit Margin, less a Transmission Reliability Margin, plus Postbacks, plus counterflows."  North American Electric Reliability Corporation, *Glossary of Terms*

been satisfied, each Participating Transmission Providers' other transmission services will not be impacted. Moreover, Filing Parties state that participation in the Southeast EEM will not relieve any Participant of its resource adequacy responsibilities since NFEETS is the lowest-priority transmission service. Finally, Filing Parties note that should a Participant fail to consummate a transaction committed by the Southeast EEM algorithm, that Participant will be responsible for imbalance charges as it would for other transmission transactions.

26.     Finally, Filing Parties state that providing NFEETS with no charge is just and reasonable and consistent with other models the Commission has approved previously.[38] As an example, Filing Parties note that in accepting the California Independent System Operator Corp.'s (CAISO) Western Energy Imbalance Market (Western EIM), the Commission accepted CAISO's proposal to waive all wheeling charges that would have been charged to exports.[39] Filing Parties state, akin to the Commission's findings in the Western EIM Order, that NFEETS is fundamentally different than other transmission services since NFEETS uses as-available lowest priority transmission that would otherwise not be used and can only be reserved through the Southeast EEM platform. Filing Parties state that since all network customers are expected to benefit from reduced costs, the Southeast EEM is consistent with cost causation. Filing Parties explain that it has been long-standing Commission policy that network customers pay for the system, but that any point-to-point uses provide revenues that act as credits to reduce the revenue requirements paid by network load. Filing Parties acknowledge that the availability of NFEETS may lead to a small reduction in credits to offset payments by network load.[40] While there may be a small reduction in credits to offset payments by network load, Filing Parties contend that this is consistent with cost causation since those costs will be

---

*Used in NERC Reliability Standards*, https://www.nerc.com/files/glossary_of_terms.pdf.

[38] Duke Energy OATT Transmittal at 8-9; LG&E/KU OATT Transmittal at 8-9; Southern Companies OATT Transmittal at 7-9; Dominion Energy SC OATT Transmittal at 8-9.

[39] Duke Energy OATT Transmittal at 8 (citing *Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,231, at P 125 (2014) (Western EIM Order)); LG&E/KU OATT Transmittal at 8 (same); Southern Companies OATT Transmittal at 8 (same); Dominion Energy SC OATT Transmittal at 8 (same).

[40] Duke Energy OATT Transmittal at 8 (citing Southeast EEM Agreement Transmittal, attach. E-1, Benefits Analysis at 8); LG&E/KU OATT Transmittal at 8 (same); Southern Companies OATT Transmittal at 8 (same); Dominion Energy SC OATT Transmittal at 8 (same).

Docket No. ER21-1115-000, et al.                                                    - 12 -

borne by those who directly benefit from the Southeast EEM.[41]  Filing Parties add that
the Commission relied on similar logic in the Western EIM Order.[42]  Taken together,
Filing Parties state, while the Southeast EEM differs from the Western EIM, the same
logic applies here.  Filing Parties state that since network load will receive the benefits of
the Southeast EEM, it is fair and consistent with cost causation to ask network load
customers to shoulder any incremental transmission system revenue requirements
network load is exposed to as a result of any erosion of point-to-point revenues.

### b.    Comments and Protests

27.    AECI supports the NFEETS proposal and believes that it will facilitate efficiency
gains when applied to a large geographic region through the Southeast EEM platform.[43]
Tennessee Valley PPA asserts that the Southeast EEM Agreement's ability to provide
modest levels of economic benefit appears to depend on the provision by each
Southeast EEM Member of NFEETS at a price of $0/MWh.[44]

28.    Clean Energy Coalition argues that the OATT revisions have not been shown to be
consistent with or superior to the Commission's *pro forma* OATT.[45]  Clean Energy
Coalition argues that the Southeast EEM departs from Commission precedent since it
does not require NFEETS reservations to be made through OASIS.[46]  Clean Energy
Coalition asserts that all Commission-jurisdictional Participating Transmission Providers
are required by Commission regulation to post transfer capability and accept transmission
service requests through OASIS.  Here, Clean Energy Coalition contends, there is
insufficient information on whether the non-OASIS reservation system is just and
reasonable and not unduly discriminatory.

---

[41] Southeast EEM Agreement Transmittal, attach. D, Pope Aff. ¶ 67 (Pope Aff.)
(stating that "the Southeast EEM is expected to reduce energy costs for native load
customers, so any increase in network service transmission rates would be roughly
balanced by expected benefits from decreases in their energy costs").

[42] Duke Energy OATT Transmittal at 8 (citing Western EIM Order, 147 FERC ¶
61,231 at P 156); LG&E/KU OATT Transmittal at 8 (same); Southern Companies OATT
Transmittal at 8 (same); Dominion Energy SC OATT Transmittal at 8 (same).

[43] AECI March 15 Comments at 4.

[44] Tennessee Valley PPA March 15 Comments at 5.

[45] Clean Energy Coalition March 15 Comments at 8.

[46] *Id.* at 35 (citing 18 C.F.R. §§ 37.1, 37.5(a), 37.6 (2020)).

29.    Clean Energy Coalition contends that the Southeast EEM proposal lacks critical details on how imbalance charges will be applied.[47]  Specifically, Clean Energy Coalition asserts that it is unclear whether the load or generator will be the transmission customer in the Energy Exchange transaction, so it is impossible to determine whether Participating Transmission Providers will properly apply imbalance penalties. Clean Energy Coalition adds that because there is a single contract path for each Energy Exchange transaction, the imbalances should be treated as if they are in a single BAA.  Clean Energy Coalition also argues that it is unclear how 15-minute transactions will be handled when imbalance penalties are typically applied hourly.  Clean Energy Coalition further notes that NFEETS is the most likely to be curtailed, which shifts unreasonable risk of imbalance penalties onto Participants.  Finally, Clean Energy Coalition adds that Filing Parties have not explained whether imbalance penalties will apply to buyers or sellers located in non-public utility BAAs.  Therefore, Clean Energy Coalition argues that Filing Parties should provide more information on imbalance charges because without these details, it is impossible for the Commission to determine whether these tariff provisions are consistent with or superior to the *pro forma* OATT.

30.    Clean Energy Coalition raises concerns with the OATT revisions regarding financial impacts for existing, firm transmission customers.[48]  Specifically, Clean Energy Coalition notes that Filing Parties acknowledge that, if accepted, the Southeast EEM may decrease the quantity of non-firm, point-to-point transactions.  Clean Energy Coalition contends that Filing Parties have made no attempt to quantify the potential increase in network service costs or the resulting consequences for network customers.  PIOs express similar concerns that the availability of NFEETS could incent firm and non-firm transmission customers with pancaked rates to satisfy those needs through the Southeast EEM, which would lead to a spiraling effect that reduces transmission revenues.[49] Furthermore, Clean Energy Coalition asserts, Filing Parties have not pledged to hold customers harmless from cost increases as a result of the Southeast EEM.[50]  Therefore, Clean Energy Coalition asks that the Commission require more information on whether the $0/MWh NFEETS would adversely impact or unduly discriminate against holders of firm transmission rights.

31.    Clean Energy Coalition also argues that Filing Parties' dismissal of concerns of potential cost increases for network customers relies on a flawed understanding of native

---

[47] *Id.* at 36-39.

[48] *Id.* at 39-40.

[49] PIOs March 15 Protest at 24-25.

[50] Clean Energy Coalition March 15 Comments at 40.

load and network load.[51]  Clean Energy Coalition states that the benefits created by the Southeast EEM will apply to native load customers, not network load.  Clean Energy Coalition asserts that Filing Parties rely on precedent that finds native load and network load "largely" the same, but they are not in this instance.  Finally, Clean Energy Coalition asserts that there is a possibility that the Southeast EEM will lead to cost shifts among Members since some Members may have higher revenues from point-to-point transmission service.  Clean Energy Coalition postulates that should point-to-point revenues decline, the effects may be worse for transmission customers of a Member with formerly high point-to-point revenues.  Accordingly, Clean Energy Coalition requests that the Commission require a supplemental filing detailing the lost point-to-point revenues and the resulting cost shifts.

32.    Clean Energy Coalition argues that Filing Parties have not supported changes to their transmission losses in each of their respective OATTs.[52]  Clean Energy Coalition argues that Filing Parties have not explained why NFEETS customers cannot physically settle losses like other non-firm or firm transmission transactions.  Additionally, Clean Energy Coalition argues that by requiring financial settlements of losses, the Southeast EEM may disadvantage Participants and unduly restrict a transmission customer's ability to determine the most appropriate commercial arrangements to address real power losses associated with its transactions in the most cost-effective manner.

33.    Similarly, Voltus asserts that NFEETS requires Members to provide their own ancillary services or pay the transmission provider for ancillary services, but it does not allow independent third parties to provide ancillary services.[53]

### c.    **Filing Parties' Answer**

34.    Filing Parties reiterate that the small increase in network service charges will be offset by reductions in overall customer costs.[54]  Filing Parties note that no contrary evidence has been offered.  Filing Parties further state that all customers will have the same opportunities to obtain the same benefits on the same terms and conditions.

35.    Regarding financial losses, Filing Parties contend that there is no substantive reason why Filing Parties' explanations to support financial losses are insufficient and protestors fail to distinguish the cases to which Filing Parties cite in support of the use of

---

[51] *Id.* at 40-41.

[52] *Id.* at 45-47.

[53] Voltus March 15 Protest at 5.

[54] Filing Parties March 30 Answer at 45-46.

financial losses.[55]  On imbalance charges, Filing Parties reiterate that imbalances are integrated across the hour, and state that this will continue with imbalances resulting from Energy Exchanges.[56]  Filing Parties further state that transmission across multiple systems today must pay for imbalance on both the Source and Sink systems; eliminating some of those charges would require transmission owners to subsidize imbalances.

36.     Regarding OASIS, Filing Parties note that the Southeast EEM proposal makes clear that NFEETS for Energy Exchanges will be scheduled through OASIS on all impacted transmission systems, which will be done by the Southeast EEM System, rather than directly by individual counterparties.[57]

### d.     June 7 Deficiency Response

37.     In the May 4 Deficiency Letter, Commission staff requested more information regarding Filing Parties' claims about how NFEETS may lead to reductions in point-to-point revenue credits.[58]  Specifically, Commission staff asked, to the extent that an increase in network service transmission rates due to an erosion of point-to-point transmission service reservations exceeds benefits to network service transmission customers resulting from the Southeast EEM, how the Southeast EEM's $0/MWh rate for NFEETS is consistent with cost causation.  Further, Commission staff asked how NFEETS meets the Commission's OASIS requirements.

38.     In response, Filing Parties reiterate that their statement that NFEETS will only use transmission that would not otherwise be used is consistent with their statements regarding the potential effect on point-to-point transmission revenues because NFEETS will only be scheduled after scheduling deadlines for other types of transmission service have passed.[59]  Filing Parties acknowledge that there could be an erosion of non-firm point-to-point revenues; however, Filing Parties explain that NFEETS is not a substitute for firm transactions.  Filing Parties postulate that a slight reduction in point-to-point revenues resulting from customers voluntarily opting to transact via the Southeast EEM

---

[55] *Id.* at 46-47 (citing, *e.g.,* LG&E/KU OATT Transmittal at 10 (citing *Ariz. Pub. Serv. Co.*, 143 FERC ¶ 61,280, at P 28 (2013); *Ariz. Pub. Serv. Co.*, 155 FERC ¶ 61,112, at P 125 (2016))).

[56] *Id.*

[57] *Id.*

[58] May 4 Deficiency Letter at 11-12.

[59] June 7 Deficiency Response at 36.

Docket No. ER21-1115-000, et al.                                                                 - 16 -

may occur, but this interaction will still be consistent with cost causation. Filing Parties note that "the Southeast EEM is expected to reduce energy costs for native load customers, so any increase in network service transmission rates would be roughly balanced by expected benefits from decreases in their energy costs."[60] In other words, Filing Parties explain, network load and firm point-to-point load will receive the benefits of the Southeast EEM, so it is fair and consistent with cost causation to ask such load to shoulder any incremental transmission system revenue requirements. Additionally, Filing Parties clarify that, consistent with existing bilateral transactions, the Southeast EEM simply automates the process of providing information to OASIS.[61]

### e. **Comments and Protests on June 7 Deficiency Response and Answers**

39.     PIOs argue that Filing Parties fail to answer Commission staff's questions.[62] PIOs contend that independent power producers (IPP) wheeling out of the Southeast EEM region to sell energy to neighboring RTOs/ISOs will be forced to pay higher firm point-to-point transmission rates and will not get any of the benefits because they do not serve load in the Southeast EEM region. PIOs assert that the erosion of firm point-to-point revenues will lead to higher charges for other firm point-to-point and network service. According to PIOs, this burden will fall on holders of firm point-to-point service looking to access other markets and not participate in the Southeast EEM, and thus those who will not be beneficiaries of the Southeast EEM. PIOs aver that this would not be consistent with cost causation.[63] PIOs explain that Filing Parties' assertion that firm point-to-point load will receive the benefits of the Southeast EEM, and therefore should bear the cost of any erosion of non-firm point-to-point revenues, assumes that all transmission customers are LSEs, which is not the case. Accordingly, PIOs argue, the vertically integrated monopoly utilities serving load in the Southeast EEM will receive most, if not all, of the benefits of the Southeast EEM and IPPs selling into RTOs/ISOs will pay the cost. PIOs claim that the "Commission must apply 'rigorous scrutiny of the rates charged for transmission service'—including the zero rate NFEETS—because it will raise firm transmission rates relied on by competitors of SEEM Members without any offsetting benefit for their ultimate end-use consumers."[64]

---

[60] *Id.* (citing Pope Aff. ¶ 67).

[61] *Id.* at 37.

[62] PIOs June 28 Protest at 23-24.

[63] PIOs June 28 Protest, attach. A, Suppl. Aff. of Paul Sotkiewicz ¶¶ 75–77.

[64] PIOs July 29 Answer at 12-13 (citing *Entergy Ark., Inc.*, 175 FERC ¶ 61,136

Docket No. ER21-1115-000, et al.                                                    - 17 -

f.     **Commission Determination**

40.     We find the OATT revisions to be just and reasonable and not unduly discriminatory or preferential, and therefore accept them, subject to: (1) a compliance filing to be submitted within 30 days of the date of this order to implement ministerial revisions and (2) an informational filing at least 30 days prior to the Southeast EEM Commencement Date establishing an effective date for the OATT revisions. We believe that NFEETS, a new, non-firm, as-available transmission product that will utilize otherwise unused transmission capacity, will promote more efficient operation of Participating Transmission Providers' systems, while at the same time reducing the transactional friction normally associated with bilateral transactions. In addition, we believe that the proposal to price NFEETS at $0/MWh is appropriate since the Southeast EEM will make available to Participants the transmission capacity that is available only after all other transmission customers make their transmission reservations.[65] This is transmission capacity that would otherwise be unused and as such, there are no opportunity costs associated with NFEETS.[66]

41.     Regarding Clean Energy Coalition's arguments related to OASIS requirements, we find that Filing Parties have sufficiently addressed Clean Energy Coalition's concerns. As discussed above, in Filing Parties' March 30 Answer and the June 7 Deficiency Response, Filing Parties state that the Southeast EEM will merely automate the process of providing information to OASIS consistent with existing practices for bilateral transactions.[67] In other words, any information regarding ATC—including ATC made available by Participating Transmission Providers for Energy Exchanges—will be posted to Participating Transmission Providers' respective OASIS websites, as required by their respective OATTs and Commission regulations.

42.     Regarding Clean Energy Coalition's arguments related to imbalance charges, we find that Filing Parties have sufficiently addressed Clean Energy Coalition's concerns. As Filing Parties explain, akin to any other non-firm transaction, imbalance charges

---

(2021) (Clements, Comm'r, dissenting at P 8)).

[65] Duke Energy OATT Transmittal at 9; LG&E/KU OATT Transmittal at 9; Southern Companies OATT Transmittal at 8-9; Dominion Energy SC OATT Transmittal at 8-9.

[66] *See Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107, at P 84 (2016) (*PSCo*) (finding that the zero-rate transmission service at issue would otherwise be unused and, therefore, there would be no associated opportunity costs).

[67] *See, e.g.*, Market Rules § IV.C.8.iv (requiring that information be submitted through OASIS).

would apply to NFEETS as provided for in each of the Participating Transmission Providers' OATTs. Given that the Participating Transmission Providers' OATTs are compliant with Order No. 890, we find that Filing Parties' proposal to apply existing imbalance charge provisions to NFEETS is just and reasonable.[68]

43.    As for Clean Energy Coalition's and PIOs' concerns with financial impacts for existing, firm transmission customers from NFEETS, Filing Parties acknowledge that there are few sub-hourly, non-firm energy transactions taking place today in the Southeast. Filing Parties explain that with the introduction of the Southeast EEM, and NFEETS, these existing sub-hourly, non-firm energy transactions will likely migrate to the Southeast EEM and use NFEETS and thus may cause a reduction in point-to-point transactions. However, we agree with Filing Parties that the anticipated impact of such decisions is likely to be minimal. On the other hand, the Southeast EEM, by providing a new avenue for sub-hourly, non-firm transactions to occur, will provide benefits to Participants and others throughout the Southeast, including IPPs that choose to participate. These benefits are derived from lower production costs. Accordingly, we find that since native load customers taking network service will likely see decreases in future energy costs, it is just and reasonable that these customers bear the costs of any decreased point-to-point transactions.[69] We decline to require a supplemental filing on any lost point-to-point revenues and alleged cost shifts, as Clean Energy Coalition requests, as we do not believe any such information is needed to render the OATT filings just and reasonable and not unduly discriminatory or preferential, nor do we think that such information would do anything more than confirm the minimal impact, if any, of NFEETS on existing, firm transmission customers.

44.    Regarding PIOs' allegation that potential cost shifts would violate cost causation, PIOs' argument is speculative and unsupported. Assuming, *arguendo*, that an erosion of revenue credits from non-firm point-to-point transmission service may occur, we disagree that resulting increases in firm point-to-point transmission rates would necessarily violate cost causation. At bottom, PIOs suggest that there is an issue with existing rate designs for transmission service (i.e., a misalignment between the costs charged and the cost

---

[68] *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, at P 663, *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[69] *See* Western EIM Order, 147 FERC ¶ 61,231 at P 156 (finding that "elimination of pancaked transmission rates . . . enhances competitive electricity markets . . . resulting in lower energy costs overall and thus benefitting native load customers . . . who largely bear transmission costs").

causers) such that *any* reduction in non-firm point-to-point transmission service revenues—and thus revenue credits to network and firm point-to-point transmission customers—would result in unjust and unreasonable rates. We are unable to reach such a conclusion based on the record. We also note that no transmission customer (including IPPs) filed comments or protests expressing concerns about possible cost shifts or higher firm point-to-point transmission rates.

45.     Regarding Clean Energy Coalition's arguments related to transmission losses, we find that Filing Parties' proposal to use financial losses is just and reasonable given the use of financial losses will permit losses to be considered upfront when the Southeast EEM algorithm matches bids and offers.[70] Moreover, the Commission has found that Order Nos. 888[71] and 890 do not preclude the use of financial settlement of losses to the exclusion of in-kind replacement of losses.[72] In addition, the Commission has stated that the specific means of accounting for losses is left to the transmission provider to propose.[73]

46.     Similarly, regarding Voltus' arguments related to ancillary services and the ability of a third-party to provide those services, we note that in Order No. 890 the Commission permitted transmission customers to purchase ancillary services from third-party providers with the exception of scheduling, system control and dispatch service, and reactive supply and voltage control service.[74] Here, the only ancillary services related to

---

[70] Duke Energy OATT Transmittal at 9-10; LG&E/KU OATT Transmittal at 10; Southern Companies OATT Transmittal at 9; Dominion Energy SC OATT Transmittal at 9.

[71] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[72] *See Ariz. Pub. Serv. Co.*, 143 FERC ¶ 61,280 at P 28 (citing Order No. 888, FERC Stats. & Regs. ¶ 31,036 at PP 217-218); *see also* Order No. 890, 118 FERC ¶ 61,119 at P 703.

[73] *Ariz. Pub. Serv. Co.*, 143 FERC ¶ 61,280 at P 28.

[74] Order No. 890, 118 FERC ¶ 61,119 at P 888.

Docket No. ER21-1115-000, et al.                                                     - 20 -

NFEETS are the ancillary services that are not eligible for third parties to provide and, therefore, Filing Parties' proposal on this matter is just and reasonable.

### 2.  **Open Access Requirements**

### a.  **Comments and Protests**

47.    Clean Energy Coalition, PIOs, and CCEBA argue that the Southeast EEM constitutes a loose power pool and that the OATT revision filings establishing NFEETS in the individual Participating Transmission Providers' OATTs do not comply with the requirements established in Order No. 888 and its progeny for loose power pools.[75] Clean Energy Coalition and PIOs state that Order No. 888-A defines a loose power pool as: "[(1)] any multilateral arrangement, other than a tight power pool or a holding company arrangement, [(2)] that explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[76] They argue that the Southeast EEM Agreement meets the first prong because it is an agreement among several utilities to pool the unused portion of each Member's transmission system.  They also assert that the Southeast EEM Agreement meets the second prong because NFEETS contains discounts and special terms and conditions compared to other transmission services offered by the Participating Transmission Providers.  In particular, they argue that NFEETS is:  non-firm, as available, lowest priority service, provided solely for 15-minute Energy Exchanges, at a $0/MWh rate, with no associated Schedule 1 or Schedule 2 ancillary service charges, and financial losses only.  Clean Energy Coalition claims that it is irrelevant that:  (1) there are multiple BAAs, (2) only NFEETS, and not all transmission facilities of each Participating Transmission Provider, are turned over for pool operations, and (3) the Southeast EEM Agreement does not provide for joint dispatch, planning, or operation of transmission facilities.[77]

48.    Clean Energy Coalition and PIOs argue that because the Southeast EEM Agreement establishes a loose power pool, it must have a pool-wide OATT—rather than the individual OATT filings at issue here—and allow open membership to comply with the Commission's open access requirements established in Order Nos. 888 and 888-A.[78]

_____

[75] Clean Energy Coalition March 15 Comments at 9-12; PIOs March 15 Protest at 6-10; CCEBA March 15 Comments at 2.

[76] PIOs March 15 Protest at 6-10 (quoting Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 31,241); Clean Energy Coalition March 15 Comments at 9-12.

[77] Clean Energy Coalition March 15 Comments at 12-13.

[78] *Id.* at 15; PIOs March 15 Protest at 11; *see also* Clean Energy Customers August 23 Comments at 4-5.

Docket No. ER21-1115-000, et al.                                              - 21 -

According to PIOs, the pool-wide OATT requirement allows members of a power pool to be held accountable for unduly discriminatory or anti-competitive conduct.[79]  PIOs contend that to ensure comparability, the Southeast EEM must offer to third parties the same transmission service that Members provide themselves; PIOs argue that it is problematic that NFEETS will be available to only Members and Participants of the Southeast EEM.  PIOs state that utilities within a loose power pool must take service under the pool-wide OATT for all pool transactions.  However, Clean Energy Coalition acknowledges that as long as there is a Commission-approved pool-wide OATT, participants in a loose power pool may take service under the individual OATTs of transmission providers that participate in the pool.[80]  CCEBA adds that, in addition to requiring a pool-wide OATT, the Commission's open access requirements mandate that the Southeast EEM also have unrestricted membership, fair and transparent governance, and stakeholder processes.[81]

49.     Several protestors similarly express concern about limiting access to NFEETS to only Participants in the Southeast EEM.  Voltus argues that the participation requirements, especially the Source/Sink requirement, three-eligible-counterparty rule, and the requirement that Participants must arrange to take NFEETS from each Participating Transmission Provider, effectively exclude non-LSEs, distributed energy, and virtual offerings and are not justified by the record.[82]  Similarly, SREA contends that it is unclear whether the Source/Sink requirement will allow IPPs that have secured power purchase agreements or commercial and industrial customers to become Southeast EEM Participants, which is necessary to access NFEETS.[83]  PIOs protest that Southeast EEM Members may use the Southeast EEM's participation requirements to block access to NFEETS by either refusing to execute Enabling Agreements with prospective Participants or by directing the Agent, through the Operating Committee's discretion, to refuse to countersign a Participant Agreement.[84]  PIOs also argue that the Source/Sink requirement could prevent IPPs, particularly solar and wind generators, from accessing NFEETS.

---

[79] PIOs March 15 Protest at 11-12.

[80] Clean Energy Coalition March 15 Comments at 13.

[81] CCEBA March 15 Comments at 2.

[82] Voltus March 15 Protest at 4.

[83] SREA March 15 Comments at 4.

[84] PIOs March 15 Protest at 12-13, 50.

JA0137

Docket No. ER21-1115-000, et al.                                        - 22 -

## b.     Filing Parties' Answer and Answers Thereto

50.     Filing Parties argue that the Southeast EEM is not a loose power pool.[85]  Filing Parties contend that whether the Southeast EEM is a loose power pool hinges on whether NFEETS is a discounted transmission service, which Filing Parties argue it is not. In support, Filing Parties point to *PSCo*, in which the Commission found that a zero-rate transmission product that relied on otherwise unused transmission capacity was not discounted because there was no opportunity cost associated with the transmission.[86] Filing Parties also state that the Commission noted in *PSCo* that the parties there did not have discretion as to how the transmission service was used, and the transmission service did not serve as a replacement of other non-firm transmission service.  Filing Parties argue that, like the transmission service at issue in *PSCo*, NFEETS is based on otherwise unused transmission capacity so there is no opportunity cost associated with NFEETS; therefore, they contend, NFEETS is not discounted.  Additionally, Filing Parties note that, like in *PSCo*, Southeast EEM Members and Participants will have no discretion as to whether and how NFEETS is used.  Finally, Filing Parties claim that NFEETS will not serve as a replacement to any existing transmission service since Southeast EEM Participants will need alternative arrangements in place to ensure that they remain resource adequate.[87]

51.     Moreover, Filing Parties argue that the Southeast EEM structure prevents undue discrimination in the provision of NFEETS, thereby addressing the Commission's concerns in issuing the open access requirements applicable to loose power pools in Orders Nos. 888 and 888-A.[88]  Filing Parties note that the Commission requires joint OATTs to ensure that public utilities cannot offer preferential transmission rights and rates to a select group that discriminatorily excludes others.  Filing Parties explain that while a pool-wide OATT can cure undue discrimination concerns, it is not the only way to address undue discrimination concerns.  Filing Parties assert that an equally effective measure to address  undue discrimination is for each Participating Transmission Provider to embed in its OATT (or equivalent) the same exact terms and conditions for providing a new form of transmission service to all transmission customers, which is what the OATT

---

[85] Filing Parties March 30 Answer at 8-9.

[86] *Id.* at 9-10 (citing *PSCo*, 154 FERC ¶ 61,107 at PP 84-85).

[87] *Id.* at 10-11.

[88] *Id.* at 11-12.

Docket No. ER21-1115-000, et al.                                    - 23 -

filings do.  Filing Parties argue that NFEETS will be available to all Participants on non-discriminatory terms, not just to Southeast EEM Members.[89]

52.    Filing Parties argue that a pool-wide OATT for the Southeast EEM would be impractical and unnecessary.[90]  Filing Parties explain that since the Southeast EEM relies on residual transmission capacity, there is no reason for a pool-wide OATT for all transmission service.  Filing Parties reiterate that the Southeast EEM Agreement is the appropriate vehicle for preventing undue discrimination since it dictates a uniform approach to the provision of NFEETS by each Participating Transmission Provider. Filing Parties argue that requests for two tariffs (i.e., a pool-wide OATT for NFEETS and individual OATTs for other transmission service) would not provide any increase in functionality or benefits and would be unnecessarily costly and perhaps impossibly complicated.

53.    Filing Parties also respond to arguments that the Southeast EEM's participation requirements may unreasonably limit access to NFEETS.  Filing Parties argue that the participation requirements are as inclusive as possible and conform to the requirements for entities transacting in the bilateral market today, which is a physical market.[91]  Filing Parties state that the participation requirements are the bare minimum necessary to ensure the proper functioning of the Southeast EEM.  Filing Parties argue that the Participant Agreement terms and conditions are standard and do not require any start-up or operating costs.  In addition, Filing Parties claim that it is necessary for the Southeast EEM algorithm to function for Participants to have service agreements in place with each of the Participating Transmission Providers to take NFEETS.  Filing Parties also explain that the three-eligible-counterparty rule is intended to balance the desire to allow maximum participation in the Southeast EEM while addressing a potential avenue of market manipulation.[92]  Furthermore, Filing Parties contend that the Source/Sink requirement is necessary because that information is needed to complete the e-Tags to effectuate Energy Exchanges.

54.    PIOs respond that Filing Parties' reliance on *PSCo* to claim that NFEETS is not discounted is misplaced for several reasons.[93]  First, PIOs argue that NFEETS, unlike the transmission service at issue in *PSCo*, will reduce non-firm transmission revenues.

---

[89] *Id.*

[90] *Id.* at 12-13.

[91] Filing Parties March 30 Answer at 41-44.

[92] *Id.* at 42.

[93] PIOs April 12 Answer at 5-7.

Docket No. ER21-1115-000, et al.                                    - 24 -

Second, PIOs point out that the zero-dollar transmission in *PSCo* only applied within a single BAA, whereas NFEETS eliminates rate pancaking between BAAs.  Third, PIOs argue that the Southeast EEM membership and participation requirements are more stringent than those contained in the *PSCo* agreement because the Southeast EEM requires several agreements, including a Participant Agreement, Enabling Agreements, and NFEETS agreements, whereas the *PSCo* agreement provided a less burdensome "one-stop shopping" approach for resources seeking to participate.[94]  Finally, PIOs note that the *PSCo* agreement provided least cost dispatch, whereas the proposed Southeast EEM would not.

55.    Moreover, PIOs argue that, even if NFEETS is not discounted, the Southeast EEM is still a loose power pool because it is a multilateral agreement with *special* transmission terms and conditions.[95]  PIOs contend that NFEETS is special because:  (1) the only qualified use of NFEETS is for 15-minute Energy Exchanges; (2) NFEETS has the lowest curtailment priority of any transmission service; (3) NFEETS is provided on an as-available basis; (4) losses will be "financial" in that they will be supplied by the applicable Participating Transmission Provider and paid for by the matched bidder and offeror in each Energy Exchange; and (5) NFEETS can only be used by resources in the Southeast EEM to serve load in the Territory.

56.    PIOs also contest Filing Parties' argument that the proposed OATT revisions provide comparability and address opportunities for undue discrimination, thereby complying with the Commission's open access requirements in Order Nos. 888 and 888-A.[96]  PIOs argue that to comply with Order No. 888's open access requirements, Filing Parties must make NFEETS available to any qualified transmission customer, without requiring it to be reserved and scheduled through the Southeast EEM and without the requirement for load and resources to be located in the Territory.  PIOs also contend that the Commission's regulations and precedent require a pool-wide OATT even if some transmission services are still provided under individual OATTs.  Clean Energy Coalition acknowledges that a pool-wide OATT is not the only vehicle that could ensure appropriate mitigation and governance procedures, but contends that it is still an efficient approach grounded in Commission precedent.[97]

---

[94] *Id.* at 6-7.

[95] *Id.* at 3-5.

[96] PIOs April 12 Answer at 7-9.

[97] Clean Energy Coalition April 15 Answer at 9-10.

### c.     June 7 Deficiency Response

57.     In the June 7 Deficiency Response, Filing Parties argue that the Southeast EEM's participation requirements will not serve as a significant barrier to accessing NFEETS. Filing Parties note that Enabling Agreements are not unique to Southeast EEM participation; many are already in place to facilitate bilateral transactions today.[98]  Filing Parties clarify that the Southeast EEM does not change the existing framework for entering into an Enabling Agreement, which requires negotiation and mutual agreement between two or more parties.  Filing Parties provide a list of 180 counterparties to existing Enabling Agreements with Southeast EEM Members in the current bilateral market.[99]  Filing Parties argue that the expanded reach of the Southeast EEM will only increase diversity of existing trading arrangements as every Participant has the incentive to enter into Enabling Agreements to maximize the number of potential matches and thus potential benefits from the Southeast EEM.[100]

### d.     Comments and Protests on June 7 Deficiency Response

58.     PIOs argue that Enabling Agreements facilitate discriminatory access to NFEETS because Southeast EEM Members can selectively enter into Enabling Agreements (with the intention of blocking access to NFEETS) or negotiate terms and conditions of Enabling Agreements in an unduly discriminatory manner.[101]  PIOs assert that Enabling Agreements are not standardized and Participants are permitted to individually negotiate terms and conditions without limitation.  PIOs argue that the use of Enabling Agreements to access NFEETS gives the Southeast EEM Members the ability to exercise market power over transmission service, and that Southeast EEM Members already have incentive to exercise such market power over potential Participants that are competitors to serve load.  PIOs recommend the establishment of a *pro forma* Enabling Agreement for Southeast EEM participation that would be available to all Participants and filed with the Commission, claiming that this is a standard practice for other organized markets and a requirement for non-discriminatory access.[102]

59.     Although Filing Parties did not directly address this issue in the June 7 Deficiency Response, PIOs argue that the Commission intentionally defined pooling arrangements in

---

[98] June 7 Deficiency Response at 19-20.

[99] *Id.*, attach. C.

[100] *Id.* at 20-22.

[101] PIOs June 28 Protest at 6-8.

[102] *Id.* at 8 (citing *Sw. Power Pool, Inc.*, 114 FERC ¶ 61,289, at P 209 (2006)).

the broadest terms possible, and that the Commission's power pool regulations are not only aimed at pools that coordinate operations or planning.[103]  PIOs add that, under the Commission's regulations, a pool-wide or system-wide OATT is required for all public utility members of a "multi-lateral trading arrangement or agreement" that "contains transmission rates, terms, or conditions," not just for loose power pools.[104]  According to PIOs, the Southeast EEM fits squarely within this definition regardless of its status as a loose power pool; therefore, a pool-wide or system-wide OATT is required before any transactions occur in the Southeast EEM.  Additionally, PIOs argue that the Southeast EEM proposal violates the Commission's open access rules because entities located outside the Territory will be unable to become Participants.[105]

### e.    Filing Parties' Answer to Comments and Protests on June 7 Deficiency Response and Answers Thereto

60.     Filing Parties dispute PIOs' argument that the Southeast EEM Members have the incentive and ability to exercise market power by foreclosing competitors from accessing NFEETS.[106]  Filing Parties state that the foundational principle of the Southeast EEM is to maximize benefits for customers by enabling more mutually beneficial transactions.  Moreover, Filing Parties reiterate that they have designed and proposed the Southeast EEM to ensure market access for all entities that may feasibly participate, including IPPs.

61.     PIOs argue that the list of existing counterparties to Enabling Agreements does not establish that any party wishing to access NFEETS will be able to obtain an Enabling Agreement or that the terms of the Enabling Agreements are the same.[107]  PIOs also note that the list shows that approximately 65 existing bilateral trading partners border the Territory and that these entities would be excluded from accessing NFEETS.

### f.    Commission Determination

62.     Protestors make several arguments related to the Commission's open access requirements:  (1) that the Southeast EEM is a loose power pool and, therefore, that a joint pool-wide OATT is required rather than establishing NFEETS for each Participating Transmission Provider's system in their individual OATTs; (2) that limiting access to

---

[103] *Id.* at 4-5.

[104] *Id.* (citing 18 C.F.R. § 35.28(c)(3) (2020)).

[105] PIOs July 29 Answer at 11-12.

[106] Filing Parties July 14 Answer at 16.

[107] PIOs July 29 Answer at 10-12.

Docket No. ER21-1115-000, et al.                                    - 27 -

NFEETS to Participants in the Southeast EEM, as is done in the individual OATT revisions, is unduly discriminatory; and (3) even if the Southeast EEM is not a loose power pool, that 18 C.F.R. § 35.28(c)(3) broadly applies to multi-lateral trading arrangements like the Southeast EEM Agreement, such that a joint system-wide OATT is required rather than establishing NFEETS for each Participating Transmission Provider's system in their individual OATTs. We disagree that the Southeast EEM is a loose power pool and that limiting access to NFEETS to Participants in the Southeast EEM is unduly discriminatory. As for 18 C.F.R. § 35.28(c)(3), we find that good cause exists to waive that regulation.

63.     In Order No. 888, the Commission applied the general requirement for non-discriminatory transmission access and pricing by public utilities, and the specific requirement that public utilities unbundle their transmission rates and take transmission service under their own tariffs, to all public utilities' wholesale sales and purchases of electric energy, including coordination transactions such as through power pools. The Commission promulgated 18 C.F.R. § 35.28(c)(3), which requires that "every public utility . . . that is a member of a . . . multi-lateral trading arrangement or agreement that contains transmission rates, terms, or conditions, must have on file a joint pool-wide or system-wide" OATT.

64.     We find that the Southeast EEM is not a loose power pool. In Order No. 888-A, the Commission defined a "loose" power pool as: "(1) any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that (2) explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[108] Subsequently in *PSCo*, the Commission found that a zero-dollar non-firm transmission to facilitate intra-hour transactions did not constitute a loose power pool.[109] Just like in *PSCo*, the Southeast EEM Agreement allows for zero-dollar, non-firm service for unused transmission capacity, and thus entails no opportunity costs. As previously noted, NFEETS is the lowest-priority transmission service, cannot be used

---

[108] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 31,235.

[109] Protestors' attempts to distinguish *PSCo* are unavailing. There is no basis in the record to conclude that the Southeast EEM will result in more of a reduction in non-firm transmission revenues than the agreement at issue in *PSCo*. In addition, we disagree that the participation requirements of the Southeast EEM are more stringent than those of the agreement at issue in *PSCo*; if anything, the requirements in *PSCo* were more stringent than those of the Southeast EEM, since an entity seeking to participate in the Southeast EEM need only execute Participant and Enabling Agreements, whereas an entity seeking to participate in the agreement at issue in *PSCo* would have to convince its home transmission provider to provide access to available transmission at a zero-rate. We therefore do not agree that *PSCo* is distinguishable.

to satisfy reliability obligations of Southeast EEM Participants, and does not replace existing transmission service.[110]  And the Southeast EEM Members, like the parties to the agreement in *PSCo*, will have no discretion as to how NFEETS is used to facilitate transactions matched by the Southeast EEM algorithm because this matching process is automated.  Further, like the agreement in *PSCo*, the Southeast EEM does not provide for joint planning or coordination and allows Participants to determine how much or how little energy to buy and/or sell in each interval.[111]

65.     Nor does limiting NFEETS to Southeast EEM Participants and providing NFEETS via individual Participating Transmission Providers' OATTs transgress Order No. 888's "primary goal" for requirements on pooling arrangements—ensuring "comparability regarding transmission services that are offered on a pool-wide basis."[112]  Under the Southeast EEM Agreement, NFEETS will be available to all Participants on non-discriminatory terms.  We do not view the Southeast EEM's participation requirements as erecting an unduly discriminatory barrier to accessing NFEETS.  On the contrary, the participation requirements set forth requirements that are consistent with the need to ensure the technical feasibility of the Southeast EEM and that seek to address

---

[110] Indeed, because NFEETS does not serve as a substitute for other non-firm services, it cannot be a discount of any non-firm transmission service.  Not only is NFEETS non-firm, it is the lowest-priority transmission service (i.e., the first to be curtailed before other non-firm transactions).  Therefore, NFEETS cannot be used to satisfy reliability obligations and so Southeast EEM Participants still need to purchase other firm or non-firm transmission services for their resources and load.  The introduction of NFEETS as the transmission product to be used in the Southeast EEM does not change the reliability obligations of Southeast EEM Participants.

[111] *See PSCo*, 154 FERC ¶ 61,107 at PP 7-8, 84-85 (noting that the three-party joint dispatch agreement did not involve joint resource planning or commitment); *see also Wolverine Power Supply*, 81 FERC ¶ 61,369, at 62,756 (1997), *order on reh'g*, 85 FERC ¶ 61,099, at 61,355-56 (1998) (finding that a coordination agreement, which provided for coordination of reserve capacity and operations, planning and construction of new generation and transmission, and capacity and energy interchange services, as well as a transmission rate available only to members, constituted a loose power pool); *Inquiry Concerning Alternative Power Pooling Institutions under the Fed. Power Act*, FERC Stats. & Regs. ¶ 35,529 (1994) (cross-referenced at 69 FERC ¶ 61,090) (explaining that members of loose power pools "work together to establish principles and practices for interconnected operation, review area power supply problems and establish criteria for power supply adequacy, exchange generation and transmission construction plans, and plan coordinated efforts to attain optimal economy and reliability").

[112] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,241.

concerns regarding the potential for market manipulation within the Southeast EEM unrelated to the provision of NFEETS.

66.     In particular, the Source/Sink requirement incorporates a preexisting requirement in the Southeast bilateral market that both a registered Source and a registered Sink are necessary for the creation of an e-Tag, which allows for both the assignment and tracking of transmission service on the Participating Transmission Providers' systems.[113] Similarly, Filing Parties note that it is not currently technically feasible to allow entities outside the Territory to be participate in the Southeast EEM because "transactions involving the use of transmission outside of the Territory . . . would require coordination of e-Tags with non-NFEETS providers in the less-than-20 minute timeframe required, which is not possible at this time."[114]  We find no merit or evidence to support the claim that this technical requirement presents an unreasonable barrier to accessing NFEETS.[115]

67.     The incorporation of a requirement to enter into Enabling Agreements—widely used in the electric industry, including the Southeast, to define standard contract terms that parties use to enter into bilateral transactions—to participate in the Southeast EEM (and thus access NFEETS) simply incorporates an aspect of the existing bilateral market construct in the Southeast.  Given these circumstances, we do not agree with PIOs that a *pro forma* Enabling Agreement is required to render the proposal just and reasonable and not unduly discriminatory or preferential.[116]  We also note the practical reality that, for physical energy transactions that are scheduled between five and fifteen minutes prior to

---

[113] Filing Parties March 30 Answer at 43.

[114] *Id.* at 44.

[115] Any registered Source within the Territory may offer energy into the Southeast EEM—and access NFEETS for matched transactions—and entities that control a registered Sink can similarly access NFEETS provided they satisfy the other participation requirements.

[116] We are unpersuaded by PIOs' reliance on *Sw. Power Pool, Inc.* in support of their recommendation to require a *pro forma* Enabling Agreement, as the agreement referenced in that case was a "market participant service agreement," which is more analogous to the Southeast EEM Participant Agreement, for which the Southeast EEM has a *pro forma* agreement.  *See Sw. Power Pool, Inc.*, 114 FERC ¶ 61,289 at P 209. Moreover, the *pro forma* market participant service agreement in that case was proposed by the filer, not independently required by the Commission; the Commission required the filer to submit the agreement because it was inadvertently omitted from the original filing.  *Id.* P 16 n.13.

delivery,[117] it is likely necessary to have the general terms in place under which parties will consummate those transactions.

68.     We also disagree with protestors' assertions that certain Participants are likely to collude to exclude prospective Participants by refusing to enter into Enabling Agreements.  Such claims are unsupported and speculative.  The Southeast EEM is designed to create an incentive for Participants to enter into Enabling Agreements with as many potential counterparties as possible in order to maximize the number of potential bilateral transactions and thus the benefits that may be derived by participating in Energy Exchanges matched by the Southeast EEM algorithm.[118]  We are unpersuaded that requiring three Enabling Agreements will present an unreasonable barrier to Southeast EEM participation and to accessing NFEETS because, given the number of potential counterparties, no prospective Participant should need to depend on any single counterparty nor any three particular counterparties to access NFEETS.[119]

69.     As for the Participant Agreement requirement, we similarly find protestors' argument that Filing Parties may unreasonably restrict access to NFEETS by directing the Agent to refuse to countersign a Participant Agreement to be speculative and unsupported.  The Agent will countersign Participant Agreements at the direction of the Operating Committee,[120] which will be comprised of representatives from each sector of the Southeast EEM membership.[121]  No evidence in the record suggests the Operating Committee will prevent the Agent from countersigning a given Participant Agreement.  Moreover, it is not uncommon to require execution of an agreement like the Participant

---

[117] McGeeney and Sellers Aff. ¶ 35.

[118] Filing Parties March 30 Answer at 36-37 ( "[T]he Southeast EEM Members created the Southeast EEM because they do intend to use it, and benefit from it, and benefits will be at their greatest with eligible counterparties maximized"); *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 65-68 (D.C. Cir. 2014) (explaining that the Commission is permitted to rely on reasonable economic propositions).

[119] *See* June 7 Deficiency Response, attach. C (listing approximately 180 counterparties to Filing Parties' existing Enabling Agreements).  While we acknowledge PIOs' assertion that some of these counterparties are duplicates or located outside the Territory, there is still a multitude of possible counterparties for a Participant such that the three-eligible-counterparty rule is not an unduly discriminatory barrier to participation in the Southeast EEM.

[120] Market Rules § III.B.3.

[121] Southeast EEM Agreement Transmittal at 22.

JA0146

Agreement for voluntary structures like the Southeast EEM[122] and the provision of a standard form protects against undue discrimination.[123]

70.     The requirement to arrange to take NFEETS from each jurisdictional Participating Transmission Provider by executing service agreements—the standard forms for which are included in each Participating Transmission Providers' OATTs on file with the Commission—likewise does not present an unduly discriminatory barrier to accessing NFEETS.  A Participant will not be able to consummate an Energy Exchange if it has not made arrangements to take NFEETS from the relevant Participating Transmission Provider(s) whose facilities form the contract path for the transaction.  Because of the limited period in which to make such arrangements after a match is made by the Southeast EEM algorithm, it is not unreasonable to require a Participant to arrange for such service in advance.  Accordingly, it is necessary to make such arrangements in advance and it is appropriate and not burdensome for Participants to make the arrangements to take NFEETS by executing service agreements under each Participating Transmission Provider's OATT.[124]

71.     For all of these reasons, we conclude that the Southeast EEM is not a loose power pool and that limiting access to NFEETS to Southeast EEM Participants is not unduly discriminatory.

72.     Nevertheless, PIOs point out that 18 C.F.R. § 35.28(c)(3) broadly applies to public utilities who enter into "multi-lateral trading arrangement or agreement that contains transmission rates, terms, or conditions"[125] even if there is no loose power pool.  We find

---

[122] *See PSCo*, 154 FERC ¶ 61,107 at P 85 (noting that prospective participants "only need[] to sign the Joint Dispatch Agreement" to participate in the JDA); Western EIM-Order, 147 FERC ¶ 61,231 at P 6 (noting that CAISO proposed a *pro forma* agreement for use by participants in the EIM).

[123] *See, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 149 FERC ¶ 61,224, at P 23 (2014) ("We note that using a *pro forma* agreement minimizes opportunities for undue discrimination.").

[124] *See* Market Rules § III.B.4 (describing the service agreements requirement).

[125] 18 C.F.R. § 35.28(c)(3); *see Wolverine Power Supply Coop., Inc.*, 81 FERC at 62,756 & n.18, *order on reh'g*, 85 FERC at 61,355 (finding that agreements between even just two parties can qualify as multi-lateral); Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 31,242 (stating that 18 C.F.R. § 35.28(c)(3) applies where the transmission rates, terms, or conditions are explicit or implicit); *Sw. Reserve Sharing Grp.*, 83 FERC ¶ 61,314 at 62,285-86 (1998) (rejecting arguments that an agreement does not contain transmission rates, terms, or conditions just because parties would reserve transmission

Docket No. ER21-1115-000, et al.                                             - 32 -

that good cause exists here to waive that regulation.  Indeed, the Commission has previously granted such waiver where "it would not be practical" to establish a joint system-wide OATT.[126]

73.    We agree with Filing Parties that requiring a joint system-wide OATT for the Southeast EEM would carry certain challenges.  Perhaps most importantly, it appears there would be no practical difference between a joint system-wide OATT and the identical NFEETS provisions that each Participating Transmission Provider has filed.[127] In addition, the joint-system wide OATT requirement applies to only the public utility Members of the Southeast EEM; it does not apply to non-jurisdictional entities like TVA. However, without TVA, a joint *system-wide* OATT would not cover the entire Southeast EEM System.  It is not clear how a joint system-wide OATT could allow the Southeast EEM to function as proposed without TVA.  As Filing Parties explain, "if TVA cannot participate in a redesigned market, then others (LG&E/KU and AECI) would not have a contiguous connection to the rest of the market."[128]  Therefore, requiring a joint system-wide OATT could jeopardize the expected benefits of the Southeast EEM without providing any clear "increase in functionality or benefits," but at the same time would impose unnecessary costs and "administrative and operational complications" on the

---

under individual tariffs).

[126] *See Bangor Hydro Elec. Co.*, 144 FERC ¶ 61,031, at PP 15-17 (2013) (finding good cause to grant waiver following consummation of merger where merged utility would operate two separate transmission systems that were not directly interconnected, one of which would be under functional control of an ISO); *Wolverine Power Supply Coop., Inc.*, 87 FERC ¶ 61,047, at 61,203 (1999) (waiving joint OATT requirement because Wolverine was the only pool member with an integrated transmission grid, and Wolverine already offered transmission service in its individual OATT).

[127] Filing Parties March 30 Answer at 8-9 (stating that "the Southeast EEM Agreement binds each signatory to implement the same . . . rules for zero-charge NFEETS for all transmission customers [of the Southeast EEM] and thereby permits region-wide transactions on uniform, non-discriminatory terms"); *id.* at 12 (explaining that the Southeast EEM Agreement provides that NFEETS "will be made available to all Participants on non-discriminatory terms, not just the Southeast EEM Members who are parties to the Southeast EEM Agreement").

[128] Southeast EEM Agreement Transmittal, attach. B, Melda and Bellar Aff. ¶ 17 (noting that "creating a market design that recognizes and gives effect to the TVA fence has been an important goal of the design effort, and it is an important component of the delicate balance struck by the final Southeast EEM design").

Southeast EEM Members.[129]  The transmission service provided by Commission jurisdictional entities for Energy Exchanges will be provided under OATTs on file with the Commission.  We find the OATT revisions proposed to implement NFEETS to be just and reasonable.  Additionally, each Participating Transmission Provider's OATT will continue to be subject to the FPA.  Requiring the submission of another tariff by these entities, particularly given the concerns Filing Parties raise to doing so, would place form over substance.

74.     Consistent with Filing Parties' request for waiver of any other filing requirement in Part 35 of the Commission's regulations as may be necessary,[130] we conclude it is appropriate to grant waiver of the joint system-wide OATT requirement in 18 C.F.R. § 35.28(c)(3) and find good cause to do so.

### 3.     **Miscellaneous**

75.     We direct Duke Energy, LG&E/KU, and Dominion Energy SC to submit compliance filings within 30 days of the date of this order to correct ministerial errors in their respective OATTs.  Specifically, all three companies must correct numbering in their respective NFEETS attachments[131] so that section 4.1.1.1 in each attachment accurately reflects its subordination to section 4.1.2.  Duke Energy must also correct section 4.1.1.1(ii) to insert omitted language.  Section 4.1.1.1(ii) should read:  "A statement that the entity requesting service is, or will be upon commencement of service, an Eligible Customer."

76.     Finally, we reject as moot certain tariff records filed by Duke Energy and Southern Companies[132] because those records are superseded by tariff records filed in subsequent deficiency responses.[133]

---

[129] Filing Parties March 30 Answer at 13.

[130] Duke Energy OATT Transmittal at 13; LG&E/KU OATT Transmittal at 13; Southern Companies OATT Transmittal at 12; Dominion Energy SC OATT Transmittal at 12.

[131] DEC, Tariffs, Rate Schedules and Serv. Agreements, attach. X, Non-Firm Energy Exchange Transmission Serv. (0.0.1); Dominion Energy SC, OATT and Serv. Agreements, attach. P, Non-Firm Energy Exch. Transmission Serv. (2.0.0); LG&E, Transmission, pt. V, attach. S, Non-Firm Energy Exch. Transmission Serv. (1.0.2).

[132] *See* app. B for a list of tariff records that we reject as moot.

[133] In the future, Duke Energy and Southern Companies should use Associated Filing and Record Identifiers at the record level when amending a tariff record in a

The Commission orders:

(A)     The OATT revisions identified in Appendix A are hereby accepted for filing, subject to condition, as discussed in the body of this order.

(B)     The OATT revisions identified in Appendix B are hereby rejected as moot, as discussed in the body of this order.

(C)     Duke Energy, LG&E/KU, and Dominion Energy SC are hereby directed to submit compliance filings within 30 days of the date of this order making ministerial revisions to their respective OATTs, as discussed in the body of this order.

(D)     Filing Parties are hereby directed to submit an informational filing at least 30 days prior to the Southeast EEM Commencement Date updating the effective date for the OATT revisions, as discussed in the body of this order.

By the Commission.  Chairman Glick is concurring with a separate statement attached.
                              Commissioner Danly is concurring with a separate statement attached.
                              Commissioner Clements is dissenting with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

.

---

pending proceeding. *See FERC Staff's Responses to Discussion Questions from eTariff@FERC.gov*, Tariff Record Related Codes, Question 17 at 31, https://www.ferc.gov/sites/default/files/2020-06/Frequently-Asked-Questions-eTariff.pdf (discussing the need to target an underlying tariff record when submitting an amendment to a tariff filing); and *Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings*, at 23, https://www.ferc.gov/sites/default/files/2020-05/OSEC%20Implementation%20Guide.pdf (containing definitions of the associated record data elements).

## Appendix A: Tariff Records Accepted for Filing

Duke Energy Carolinas, LLC, Tariffs, Rate Schedules and Serv. Agreements, Tariff Volume No. 4, OATT (10.0.2); 1, Definitions (10.0.1); 14, Nature of Non-Firm Point-To-Point Transmission Serv. (7.0.1); 15, Service Availability (35.0.1); 28, Nature of Network Integration Transmission Serv. (38.0.1); 42, Load Shedding and Curtailments (3.0.1); Schedule 9, Loss Compensation Service (15.0.0); attach. X, Non-Firm Energy Exch. Transmission Serv. (0.0.1); and attach. X-1, Form of Service Agreement for NFEETS (0.0.1).

Louisville Gas and Elec. Co., Transmission, OATT Table of Contents, OATT Table of Contents (11.0.2); pt. 1_01, Definitions (11.0.2); pt. II_14, Nature of NF PTP Transmission Serv. (11.0.2); pt. V_ATTACH S, Non-Firm Energy Exch. Transmission Serv. (1.0.2); and attach. S-1, Non-Firm Energy Exch. Serv. Agreement (1.0.2).

Alabama Power Company, OATT and Associated Service Agreements, TABLE OF CONTENTS, (6.0.2); § 1, Definitions (1.0.0); § 14, Nature of Non-Firm Point-To-Point Transmission Serv. (2.0.0); § 18, Procedures - Arranging Non-Firm PTP Transmission Service (1.0.0); § 23, Sale or Assignment of Transmission Service (2.0.0); Schedule 1, Scheduling, System Control and Dispatch Serv. (3.0.0); Schedule 2, Reactive Supply/Voltage Control from Gen/Other Sources Serv. (3.0.0); Schedule 8, Non-Firm Point-To-Point Transmission Serv. (3.0.0); attach. C, Methodology to Assess Available Transfer Capability (4.0.0); attach. M, Formula Rate Manual (7.0.0); attach. W, Non-Firm Energy Exchange Transmission Service (0.0.0); and attach. W-1, Form of Service Agreement-Non-Firm Energy Exchange Service (0.0.0).

Dominion Energy South Carolina, Inc., OATT and Service Agreements, TABLE OF CONTENTS, TABLE OF CONTENTS (2.5.0); pt. I.01 Definitions (3.0.0); pt. II.14 Nature of NON-Firm Pt. to Pt (3.0.0); attach. P Non-Firm Energy Exchange Transmission Serv. (2.0.0); and NFEETS Service Agreement, attach. P-1 (2.0.0).

Docket No. ER21-1115-000, et al.                                    - 2 -

## Appendix B: Tariff Records Rejected as Moot

Duke Energy Carolinas, LLC, Tariffs, Rate Schedules and Service Agreements, 15, Service Availability (35.0.0) and 28, Nature of Network Integration Transmission Service (38.0.0).

Alabama Power Company, OATT and Associated Service Agreements, TABLE OF CONTENTS, (6.0.0) and TABLE OF CONTENTS, (6.0.1).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Duke Energy Progress, LLC | Docket Nos.  ER21-1115-000 |
| Duke Energy Carolinas, LLC | ER21-1115-001 |
| | ER21-1115-002 |
| | |
| Louisville Gas and Electric Company | ER21-1118-002 |
| | |
| Alabama Power Company | ER21-1125-000 |
| | ER21-1125-001 |
| | ER21-1125-002 |
| | |
| Dominion Energy South Carolina, Inc. | ER21-1128-002 |
| | |
| | (Not consolidated) |

(Issued November 8, 2021)

GLICK, Chairman, *concurring*:

1.      I support today's order accepting the filing parties' revisions to their open access transmission tariffs to incorporate Non-Firm Energy Exchange Transmission Service (NFEETS) as part of their participation in the Southeast Energy Exchange Market (Southeast EEM).  The reason I support this order is because the parties' OATT filings—unlike their Southeast EEM Agreement that was the subject of my October 20, 2021 statement under the Fair RATES Act—do not propose to apply the *Mobile-Sierra* public interest presumption.

2.      As I emphasized in my October 20 statement, applying *Mobile-Sierra* to the Southeast EEM Agreement would violate Commission precedent.  And it would pose a serious obstacle to legitimate challenges in the future to the justness and reasonableness of the Southeast EEM and would undermine our ability to protect consumers.  But I am comfortable with the revisions to the OATT filings because they do not include the *Mobile-Sierra* presumption, and I concur with the Commission's finding that they are just and reasonable under section 205 of the Federal Power Act.

3.      We must tread cautiously, and scrutinize carefully, whenever we are presented with a proposal to apply a *presumption* that an agreement satisfies the statutory "just and reasonable" standard.  Happily, such a proposal is not before us today.

JA0153

Docket No. ER21-1115-000, et al.                                                        - 2 -

4.      With today's acceptance of the parties' OATT filings and because the filings on the Southeast EEM Agreement went into effect by operation of law, the Southeast EEM will soon become a live marketplace.  I will again take this opportunity to remind the parties of their commitments to provide extensive transaction data on a weekly basis to the Commission and to publicly post, with appropriate confidentiality limitations, any information requests from regulators along with the Southeast EEM Auditor's responses to such requests.[1]  As I explained in my October 20 statement, the added safeguards embodied in these commitments are necessary to protect consumers and market participants from anticompetitive conduct—and the Southeast EEM may be unjust and unreasonable under section 206 of the Federal Power Act without those commitments.[2]  I again urge the parties to stand by these commitments.  Regardless of whether the parties do so, however, I intend for the Commission to remain vigilant against any potential exercise of market manipulation.


        For these reasons, I respectfully concur.



_____
Richard Glick
Chairman

---

        [1] *See* Response to Deficiency Letter, Docket Nos. ER21-1111, *et al.*, at 17-19 (filed June 7, 2021); Southeast EEM Members, Answer, Docket Nos. ER21-1111, *et al.*, at 8-15 (filed July 14, 2021).

        [2] Statement of Chairman Glick, Docket Nos. ER21-1111, *et al.*, at P 14 (Oct. 20, 2021).

JA0154

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Duke Energy Progress, LLC | Docket Nos. ER21-1115-000 |
| Duke Energy Carolinas, LLC | ER21-1115-001 |
| | ER21-1115-002 |
| | |
| Louisville Gas and Electric Company | ER21-1118-002 |
| | |
| Alabama Power Company | ER21-1125-000 |
| | ER21-1125-001 |
| | ER21-1125-002 |
| | |
| Dominion Energy South Carolina, Inc. | ER21-1128-002 |

(Not consolidated)

(Issued November 8, 2021)

DANLY, Commissioner, *concurring*:

1.     I concur in today's order because it finds the open access transmission tariffs (OATTs) submitted in the captioned dockets to be just and reasonable for the reasons stated in the order.[1]  I nevertheless write separately to state that this order is absolutely unnecessary because these OATTs have already taken effect by operation of law as I have previously explained.[2]

For these reasons, I respectfully concur.

_____
James P. Danly
Commissioner

_____

[1] *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080, at PP 40-46 (2021).  These four dockets include updates to individual utilities' OATTs in order to effectuate the Southeast Energy Exchange Market (Southeast EEM) and the provision of Non-Firm Energy Exchange Transmission Service.

[2] *See Ala. Power Co.*, Statement of Commissioner James P. Danly, Docket Nos. ER21-1111-002, et al. (issued Oct. 20, 2021); *see also* 16 U.S.C. § 824d(g)(1)(B).

JA0155

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Duke Energy Progress, LLC | Docket Nos.  ER21-1115-000 |
| Duke Energy Carolinas, LLC | ER21-1115-001 |
| | ER21-1115-002 |
| | |
| Louisville Gas and Electric Company | ER21-1118-002 |
| | |
| Alabama Power Company | ER21-1125-000 |
| | ER21-1125-001 |
| | ER21-1125-002 |
| | |
| Dominion Energy South Carolina, Inc. | ER21-1128-002 |

(not consolidated)

(Issued November 8, 2021)

CLEMENTS, Commissioner, *dissenting*:

1.     Today's Majority Order represents the next step in implementation of a market exchange platform that fails to satisfy Order No. 888's open access requirements and the Filing Parties' obligations under Section 205 of the Federal Power Act.  Today's order approves the Filing Parties' revisions to their respective open access transmission tariffs (OATTs) to incorporate the Non-Firm Energy Exchange Transmission Service (NFEETS) that is an integral part of the Southeast Energy Exchange Market (Southeast EEM).  I dissent from this order because the Filing Parties' OATTs fail to provide for open access to the Southeast EEM and provide for rates that have not been shown to be just and reasonable.  In my Fair Rates Act (FRA) Statement concerning the Southeast EEM proposal, I discuss at length why the Southeast EEM Agreement is unduly discriminatory and has not been demonstrated to be just and reasonable.[138]  My FRA Statement also discusses the straightforward modifications the Commission could have recommended to the Filing Parties in a rejection with guidance to illustrate a potential path to accessing the promised benefits of the Southeast EEM while alleviating the current proposal's legal infirmities.  The same infirmities that render the broader Southeast EEM proposal unduly discriminatory and not just and reasonable also mean that it cannot lawfully be incorporated into the relevant utilities' OATTs in this

---

[138] *Alabama Power Company*, Docket No. ER21-1111-002, Statement of Comm'r Clements, October 20, 2021 (FRA Statement), attached hereto as Appendix A.

Docket No. ER21-1115-000, et al.                                    - 2 -

proceeding. Incorporating NFEETS into OATTs integrates the Southeast EEM proposal's flaws into the relevant utilities' transmission service offerings.

2.     As I explained in my FRA Statement, allowing the Southeast EEM Agreement and related certificates of concurrence to go into effect by operation of law on October 12, 2021 was arbitrary and capricious because none of the Commissioners who supported the filing provided any reasoning as to why protestors' concerns should be dismissed.[139] My colleagues largely focused on tilting at a straw man of RTO preference,[140] and did not engage with the substance of the numerous concerns I set forth. Today's order cannot cure that failure of agency process with respect to the Southeast EEM Agreement that went into effect via Commission inaction. It does, however, provide a belated, but not compelling, defense of certain aspects of the proposal. My FRA Statement largely rebuts these proffered defenses. Rather than repeat the full content of my FRA Statement here, I incorporate all of its contents by reference.

3.     In light of the Majority Order's newly presented arguments on a subset of the issues, however, I take this opportunity to clarify some of my concerns and address some of the faulty reasoning that is central both to this Majority Order, and the Southeast EEM more broadly.[141]

---

[139] FRA Statement at P 52.

[140] Although my statement was crystal clear that my objections stemmed from the proposal's failure to meet the requirements of FPA section 205, not from a view that an RTO would yield greater benefits, Commissioners Danly and Christie's Fair Rates Acts Statements focused primarily on arguing that the proposal could not be rejected on the basis that an RTO would be preferable. *See Alabama Power Company*, Docket No. ER21-1111-002, Statement of Comm'r Danly, October 20, 2021, at P 21 ("While some may have preferred that the utilities in the Southeast create a regional independent system operator (ISO) or regional transmission organization (RTO), that is not the filing the parties submitted. My colleagues detail a litany of objections that, I presume, stem from just such a preference. . . .") (Danly Statement); *Alabama Power Company*, Docket No. ER21-1111-002, Statement of Comm'r Christie, October 20, 2021, at P 7 ("Indeed, as set forth below, it is obvious that many of the criticisms and complaints are direct or veiled attacks on this Southeast EEM proposal not because of what it is, but because of what it is not: an RTO or a halfway-house to an RTO, which is what many of the critics clearly want.") (Christie Statement). *See also* Danly Statement at PP 21 & n. 45, 24, 49, 50; Christie Statement at PP 1,  8, 9, 10, 17, 18, 19, 20 & n. 2, 32.

[141] To be clear, given the overlap of this dissent and my FRA Statement, I incorporate all arguments from that statement in their entirety, even though herein I delve into only certain matters in greater detail.

Docket No. ER21-1115-000, et al.                                      - 3 -

## I.     Access to NFEETS is not open

### A.     Limiting availability of NFEETS to Participants violates Order No. 888's core requirements

4.   Most critically, the Majority Order reaches a concerning conclusion that the various participation requirements for the Southeast EEM do not impose any unduly discriminatory barriers to accessing NFEETS.  The order reaches this conclusion despite the OATTs' incorporation of the Southeast EEM Agreement's provisions that grant Southeast EEM Members discretionary control over who may participate in the market and access NFEETS, a transmission service.  As I said in my FRA Statement, it is difficult to surmise a more direct and problematic barrier to open access than granting a subset of market participants veto power over whether others may access a market platform that allocates transmission service.

5.     Access to NFEETS is dependent upon a prospective participant having executed enabling agreements with three counterparties who participate in the Southeast EEM (the Three Counterparty Rule), and upon obtaining the countersignature of the Participant Agreement by the Southeast EEM Agent, who is controlled by an Operating Committee composed of Southeast EEM Members.[142]  These requirements impose unlawful barriers to prospective Participants seeking access to the market because current Participants may collude to exclude prospective Participants by refusing to enter into enabling agreements, or the Operating Committee could direct the Agent to block access by declining to sign the Participant Agreement with a given counterparty.[143]  The Filing Parties contend that the Commission need not worry about such abuse of the Three Counterparty Rule and Participant Agreement because the benefits of the Southeast EEM "will be at their greatest with eligible counterparties maximized," arguing that if they had incentive to block market access for any individual prospective participant they would not have proposed the Southeast EEM at all.[144]  This simplistic logic defies the fundamental purpose of utility regulation, which is premised in large part upon the basic proposition

---

[142] Southeast EEM Market Rules § III.B.3; *see* Southeast EEM Agreement § 5.1 (describing Operating Committee membership).

[143] *See* Public Interest Organizations (PIOs) March 15 Protest at 12-13, 50 (setting forth concerns regarding the potential anti-competitive leveraging of the Three Counterparty Rule and/or Participant Agreement).  The proposal appears not to contain any provision requiring the Agent to not unreasonably withhold its signature, in contrast to other market arrangements.  *See, e.g.*, Public Service Company of Colorado, Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43.

[144] Filing Parties March 30 Answer at 37.

that one cannot simply assume that monopoly utilities will act in the best interest of their retail customers.[145]

6.      While it is true that retail customer benefits would be maximized if Participants entered into as many matches as possible, incentives for Southeast EEM Member shareholder profits do not neatly align with retail customer benefits in the Southeast EEM as proposed.  Indeed, while some Members may indirectly have an incentive to lower costs, many of the Filing Parties earn more return on equity by spending more capital.  Shareholder profits for Southeast EEM Members may go up if they retain a larger market share by blocking access for competitors and thereby increase the megawatt-hours served by generation owned by Members.  Contrary to the Majority Order's suggestion, there is nothing inconsistent about taking an incremental step toward open markets while still exerting discriminatory leverage over individual competitors.[146]  Such actions would be perfectly consistent with a complex mix of incentives where, for example, a utility's retail regulator expresses a desire for accessing the benefits of markets, but the utility's shareholders are threatened by certain competitors.

7.      Even if they do not choose to block access outright, the Southeast EEM Operating Committee could seek to use Participant Agreements as an opportunity to exercise leverage over prospective Participants.  The Commission's regulations require a market-based rate seller to demonstrate that "the seller cannot erect any barriers to entry against potential competitors."[147]  While it is common for organized markets to require some sort of participation agreement, such agreements should have clear application procedures and must not allow for other participants to reject the agreement without cause.[148]  This

_____

[145] Monopoly regulation of vertically integrated, investor-owned utilities exists because of the structural misalignment of economic incentives that fail to ensure the maximization of consumer benefits.  Here, protections are necessary not as a speculative assumption of bad faith on the part of the Filing Parties, but as part of the Commission's statutory obligation.

[146] *Cf.* Majority Order at n. 117 (quoting Filing Parties March 30 Answer at 36-37 ("[T]he Southeast EEM Members created the Southeast EEM because they do intend to use it, and benefit from it, and benefits will be at their greatest with eligible counterparties maximized")).

[147] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3 (D.C. Cir. Aug. 6, 2021) (citing 18 C.F.R. § 35.37 (2020)).

[148] Such barriers to transmission access were the express focus of Order No. 888.  Order No. 888, 61 Fed. Reg. 21,540, 21,541-42 (1996).  *See, e.g.*, Public Service Company of Colorado, Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43 (an example of an agreement with clearer application features that

omission is particularly troublesome, as neither the Majority Order nor the Filing Parties provide any justification as to why a provision requiring consent to be withheld only for cause would be infeasible to enact.

8.      The Majority Order dismisses concerns that Southeast EEM Members may exploit the Three Counterparty Rule or Participant Agreement requirements to block access for competitors as "speculative."[149] Such logic is akin to a teacher leaving an exam's answer key in plain sight, then insisting that any concerns that cheating might occur are "speculative" because the exam hasn't been administered yet.  By insisting that protestors meet an impossible evidentiary standard to demonstrate their concerns, despite the presence of mechanisms in the Southeast EEM Agreement by which the Southeast EEM Members can deny access if they so choose, the Majority Order inappropriately puts the burden of proof on the protestors.  Pursuant to Order No. 888 and section 205 of the Federal Power Act, the Filing Parties are the ones who must demonstrate that their OATTs ensure open transmission access.  Yet the Majority Order's only justification is that the Southeast EEM Members can be trusted to never take advantage of the express barriers to access they provided for in the Southeast EEM Agreement, because the benefits for retail customers will be highest with maximum participation in the Southeast EEM.[150] This falls far short of the section 205 burden the Filing Parties carry.

9.      With respect to the Three Counterparty Rule, the Majority Order also suggests that the OATTs "simply incorporate[] an aspect of the existing bilateral market construct in the Southeast."[151] Enabling agreements are a feature of bilateral energy transactions; however, they are *not* a requirement to access transmission service, as the OATTs require.  Nor does the bilateral market require entry into *three* enabling agreements to engage in any other individual contract negotiation within the market.  The Majority Order further "note[s] the practical reality that, for physical energy transactions that are scheduled between five and fifteen minutes prior to delivery, it is likely necessary to have the general terms in place under which parties will consummate those transactions."[152] But this general observation provides no support for using the Three Counterparty Rule as a condition to access transmission service (as opposed to something that might be required for an individual transaction), nor does it offer any rebuttal to the suggestion that

---

do not permit unjustified rejection).

[149] Majority Order at PP 68, 69.

[150] *Id.* P 68.

[151] *Id.* P 67.

[152] *Id.*

a *pro forma* should be used to prevent misuse of enabling agreements to lock out or exert leverage over competitors.

10.     Further, prospective Participants do not have adequate means of detecting or seeking redress regarding abuse in restricting market access if such abuse were to occur. Prospective Participants appear not to have a right to bring complaints to the Auditor (with such complaints limited to Participants).[153]  And while prospective Participants could in theory bring a complaint directly to the Commission, the absence of market transparency provides them with scant ability to gather the evidence that would be necessary to support such a complaint.  The upshot is that, to the extent that abuse occurs, the Commission may never find out.  Further, reliance on the potential for section 206 actions to justify accepting the Filing Parties' OATTs under section 205, in the face of the Filing Parties' express ability to block transmission access, creates a rather grave concern that the Commission's view on the appropriate level of review under section 205 is withering to the point that nearly any OATT filing would pass muster.  Section 206 action will *always* be available, so using it to excuse plainly discriminatory terms renders section 205 review perfunctory.  Something as fundamental as open access to transmission services must not rely on speculation that the relevant utilities will choose to provide it.  Rather, a basic tenet of Order No. 888 is that transmission providers must file tariff terms that affirmatively ensure non-discriminatory open access.[154]

11.     The proposal further restricts participation by requiring Participants to own or otherwise control a Source within the Territory and/or be contractually obligated to serve

---

[153] Transmittal Letter at 31 ("The Auditor may also receive complaints from Participants, which it will refer to the Membership Board and investigate at the Membership Board's discretion.").  Further, even if prospective Participants did have a right to bring complaints to the Auditor, complaints to the Auditor about undue discrimination via the enabling agreements are submitted to the Membership Board, which can choose not to act and to not submit such complaints to the Commission.

[154] Order No. 888, 61 Fed. Reg. at 21, 552 ("We conclude that functional unbundling of wholesale services is necessary to implement non-discriminatory open access transmission and that corporate unbundling should not now be required.  As we explained in the NOPR, functional unbundling means three things:  (1) a public utility must take transmission services (including ancillary services) for all of its new wholesale sales and purchases of energy under the same tariff of general applicability as do others; (2) a public utility must state separate rates for wholesale generation, transmission, and ancillary services; (3) a public utility must rely on the same electronic information network that its transmission customers rely on to obtain information about its transmission system when buying or selling power.").

a Sink within the Territory.[155]  Public Interest Organizations (PIOs) assert that this restriction will exclude "an estimated 65 trading partners that border the [Southeast EEM] territory. . . because they do not have resources located in the territory."[156]  Excluding these trading partners from the Southeast EEM forecloses their access to a valuable transmission service offered by each Transmission Owner, and is demonstrably more restrictive than the required OATTs of the participating jurisdictional Transmission Owners.  As PIOs explain, the Commission's "open access rules require that transmission service is offered under each public utility's OATT to all transmission customers in a comparable, non-discriminatory manner, including existing trading partners."[157]

12.    On this point, the Majority Order again fails to engage in sufficient consideration, stating that the source/sink requirement merely "incorporates a preexisting requirement in the Southeast bilateral market that both a registered Source and a registered Sink are necessary for the creation of an e-Tag, which allows for both the assignment and tracking of transmission service."[158]  The primary concern here, however, is not that to participate an entity must be a source or sink, it is that the sink must *be in the Southeast EEM territory*.  That requirement is what blocks access for external trading partners.  It is *not* a pre-existing condition of the Southeast bilateral market, as the Southeast EEM territory did not exist prior to the filing of the Southeast EEM Agreement and the associated OATTs that incorporate NFEETS.

13.    The Filing Parties rationalize the proposed geographic restriction as permissible because it "is not currently technically feasible to allow entities outside the Territory to participate in the Southeast EEM because 'transactions involving the use of transmission outside of the Territory . . . would require the coordination of e-Tags with non-NFEETS providers in the less-than-20 minute timeframe required, which is not possible at this time.'"[159]

14.    This reasoning is circular: open access is not technically feasible because the Filing Parties have not designed the market in a manner that facilitates a workable solution, and have not invested in the software or other analytical capabilities necessary to facilitate access under their chosen design.  Permitting transmission providers to evade open access requirements via their own market design choices and investment decisions

---

[155] Transmittal Letter at 16.

[156] PIOs July 29 Answer at 10-11.

[157] *Id.* at 11.

[158] Majority Order at P 66.

[159] Filing Parties March 30 Answer at 44.

fundamentally undermines open access. The Filing Parties have done nothing to demonstrate why, in the abstract, e-Tags for external resources could not be coordinated on the timeframe necessary, or why another solution, such as requiring external resources to secure firm service to the border of the Southeast EEM territory, is not feasible. Rather, they have designed the market and chosen a scope of work for the relevant vendors that accomplishes coordination for their own purposes without facilitating access for competitors outside the Territory. Such undue exclusion is not permitted by Order No. 888.[160]

## B.    The Southeast EEM is a loose power pool

15.    The Majority Order also erroneously concludes that the Southeast EEM is not a loose power pool. As my FRA Statement on the broader Southeast EEM proposal explains, the filings are legally deficient whether or not this conclusion is reached.[161] But the fact that the Southeast EEM qualifies as a loose power pool under Order No. 888-A provides further predicate for rejection because the Southeast EEM proposal fails to meet the minimum requirements for power pools, including that such pools' "membership provision[s] must allow any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location."[162]

16.    The Southeast EEM fits comfortably within Order No. 888-A's definition for loose power pools, which is "(1) any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that (2) explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[163] NFEETS is a "special transmission arrangement" because it provides a service not otherwise available under relevant Participants' OATTs: $0/MWh transmission service with no associated Schedule 1 or Schedule 2 ancillary service charges, and financial losses only.

17.    To reach the contrary conclusion that the Southeast EEM is not a loose power pool, the Majority Order hangs its hat on *PSCo*.[164] But *PSCo* fails to look to the text of

---

[160] Order No. 888, 61 Fed. Reg. at 21,594 ("[M]embership provision[s] must allow any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location.").

[161] FRA Statement at PP 28-32.

[162] *Id.*

[163] Order No. 888-A, 62 Fed. Reg. 12,274, 12,313 (1997).

[164] Majority Order at P 64 (citing *Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107

Order No. 888-A to examine whether the arrangement at issue constituted a loose pool. Instead, it simply states in conclusory fashion that "PSCo is not proposing the establishment of a loose power pool and as such [loose pool requirements] are not required of the arrangement proposed by PSCo."[165] While *PSCo* does separately reason that the $0/MWh transmission service at issue in that case was not a "discount" because it was distinct from the non-firm service already offered to others,[166] nowhere does it analyze whether the service offered was a "special transmission arrangement." Yet the text of Order No. 888-A, which uses "special" and "discounted" to describe separate categories of beneficial service that may be available to loose pool members, indicates that "special transmission arrangement" describes precisely the circumstance at issue here: service not otherwise offered outside of the arrangement established by the pool members.[167]

18.    Here, NFEETS is a special transmission arrangement principally because outside the context of the Southeast EEM loose pooling arrangement, transmission customers cannot obtain $0/MWh last priority transmission service. Beyond this, protestors detail several ways that NFEETS service is a "special transmission arrangement."[168] For example, NFEETS "can be used only by resources in the [Southeast EEM service]

_____

(2016) (*PSCO*)).

[165] *PSCo*, 154 FERC ¶ 61,107 at P 85.

[166] *See id.* P 84.

[167] If one takes a restrictive view of discounted service, as the Majority Order does, that discounts are only service identical to or that replace service offered elsewhere but at a reduced price in the pool context, then the conclusion that "special transmission arrangement" must describe service not offered elsewhere becomes even more unescapable. *See* Majority Order at P 64 n. 109 ("because NFEETS does not serve as a substitute for other non-firm services, it cannot be a discount of any non-firm service"). A more reasonable interpretation of "discounted" service is more expansive, incorporating arrangements that involve service components that are priced lower than a transmission provider's normal charges. Under either interpretation, the arrangement is a loose power pool. Under the more expansive interpretation of "discounted," NFEETS would clearly qualify as discounted transmission service because it does not charge for the administrative and other expenses associated with providing NFEETS, and waives various fees such as ancillary service charges that would otherwise apply. *See* PIOs April 12 Answer at 5 (detailing the ways in which NFEETS provides discounted service, such as "by waiving Schedule 1 and Schedule 2 ancillary service charges").

[168] *See, e.g.*, PIOs April 12 Answer at 4.

Docket No. ER21-1115-000, et al.                                      - 10 -

Territory to serve load in the Territory,"[169] and eliminates rate pancaking which would otherwise apply, sparing Participants from a multiplicity of charges that could otherwise be incurred in the existing bilateral markets.

19.     The Majority Order does not even attempt to set forth an alternative interpretation of "special transmission arrangement" that explains why NFEETS does not qualify as such.  Because it thereby fails to articulate a "rational connection between the facts found and the choice made," the Majority Order is therefore arbitrary and capricious.[170]

20.     The Majority Order also contains a fabricated distinction, not found in the text of Order No. 888-A, between arrangements that involve "joint planning or coordination" and those that do not.[171]  It pieces this together by juxtaposing the facts of two cases, *PSCo* and *Wolverine Power Supply*,[172] despite the fact that neither incorporates joint planning or coordination into its reasoning.[173]  Further, *Wolverine Power Supply* explicitly states on rehearing that Order No. 888, "in seeking to eliminate undue discrimination in pooling arrangements, . . . defined pooling arrangements in the broadest terms possible."[174]  It goes on to explain that in practice, this means that the Commission

---

[169] *Id.*

[170] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)).

[171] Majority Order at P 64 n. 110.

[172] *Id.* (citing *Wolverine Power Supply*, 81 FERC ¶ 61,369, at 62,756 (1997), *order on reh'g*, 85 FERC ¶ 61,099, at 61,355-56 (1998)).

[173] While *Wolverine Power Supply* discusses the joint coordination arrangement after setting forth the broad standard that a loose power pool is any "multilateral trading arrangement or agreement containing preferential transmission rates, terms or conditions," it does so to emphasize the "collective," multi-lateral aspects of that arrangement, not to discuss the substantive responsibilities of joint coordination.  *See* 85 FERC ¶ 61,099, at 61,356 (italicizing "*MPPA Power Pool*," "*collectively*," and "*each of the MPPA Power Pool Participants*") (emphasis in original).  As discussed *supra* P 17, *PSCo* is a conclusory order that contains no substantive reasoning with regard to why the arrangement at issue was not deemed to be a loose power pool.

[174] *Wolverine Power Supply*, 85 FERC ¶ 61,099, 61,355 (1998).  While *Wolverine Power Supply* involved a more extensive coordination arrangement, the fact that the Commission reasoned that this arrangement easily cleared the bar set forth in Order No. 888-A for loose pool arrangements in no way implies that such features constitute minimum requirements for any arrangement to constitute a loose power pool.

Docket No. ER21-1115-000, et al.                                                    - 11 -

has required a "joint pool-wide open access transmission tariff" for every "agreement containing preferential transmission rates, terms or conditions."[175] And even if Order No. 888 included such a distinction, the OATTs *do* jointly coordinate transmission services across the loose pool members, via the algorithm that controls the provision of NFEETS service. By signing onto the Southeast EEM Agreement and integrating it into their OATTs, the relevant transmission providers have arranged for a common set of principles to coordinate the allocation of the last remaining available capacity on their transmission systems.

### C. Waiver of the requirement to file a joint OATT under 18 C.F.R. § 35.28(c)(3) is not warranted

21.     The Majority Order appears to concede that regardless of whether the Southeast EEM constitutes a loose power pool, 18 C.F.R. § 35.28(c)(3) requires the filing of a joint OATT, because the Southeast EEM is plainly a "multi-lateral trading arrangement or agreement that contains transmission rates, terms, or conditions."[176] Yet the Majority Order finds "good cause" to grant waiver, because "there would be no practical difference between a joint system-wide OATT and the identical NFEETS provisions that each Participating Transmission Provider has filed," such that requiring a joint OATT "would place form over substance."[177]

22.     This reasoning is flawed. A joint OATT *would* provide for substantive differences from the individual OATTs that the relevant transmission providers have each filed. One clear difference, as the Majority Order itself suggests, is that a joint OATT would have to either include or not include Tennessee Valley Authority (TVA), requiring TVA to choose whether to voluntarily join into an OATT that they are not required to file themselves, or else refrain from joining the Southeast EEM and experiencing its benefits. This choice, like the Commission's reciprocity provision, does not mandate filing of an OATT by an unregulated transmitting utility, but induces voluntary assumption of comparable responsibilities by regulated entities in exchange for benefits of integration.[178] Either outcome (i.e., TVA's participation or lack thereof) would be substantively quite different from the result dictated here.

---

[175] *Id.*

[176] 18 C.F.R. § 35.28(c)(3).

[177] Majority Order at P 73.

[178] In Order No. 888, the Commission proposed a reciprocity provision "so that public utilities offering transmission access to others would be able to receive service from transmitting utilities that are not public utilities." Order No. 888, 61 Fed. Reg. at 21,610. It concludes that such a provision is appropriate because "[a]ny public utility that

JA0166

Docket No. ER21-1115-000, et al.                                          - 12 -

23.     Furthermore, the joint OATT regulations require access to be made available to parties that have not explicitly joined the multi-lateral trading arrangement at issue. These regulations ensure that Order No. 888's "primary goal" for pooling arrangements is met—ensuring "comparability regarding transmission services that are offered on a pool-wide basis."[179]   Yet Order No. 888-A states that "comparability . . . can be achieved" via satisfaction of two requirements: (1) "allow[ing] open membership" for the pool; and (2) making the transmission service in the loose pool agreement available to others.[180]   The Filing Parties have met neither prong of this test.

24.     The first prong is not met because, as explained in my FRA Statement, the Southeast EEM Agreement restricts membership to a select group that is nearly exclusively limited to load serving entities.  It also provides explicit barriers to participation (even short of Member status) by granting Southeast EEM Members discretionary control over the provision of NFEETS rather than ensuring open access.[181] The second prong of comparability is not met because, unlike a joint OATT that "make[s] the transmission service in the loose pool agreement available to others," the Southeast EEM Agreement restricts service to those who participate in the Southeast EEM.  To the extent that the Majority Order implicitly argues that the ability to participate in the Southeast EEM alone satisfies both requirements, that is belied by the text of Order No. 888-A, which separately requires both open membership *and* access for "others" who do not directly participate in the arrangement.[182]

25.     The application of 18 C.F.R. § 35.23(c)(3) is therefore not merely ministerial. Given that waiver of 18 C.F.R. § 35.23(c)(3) substantively undermines open access, yields different outcomes, and harms entities who are disadvantaged by the lack of a joint

---

offers non-discriminatory open access transmission for the benefit of customers should be able to obtain the same non-discriminatory access in return." *Id.*  The Commission expressly provides that where "a non-public utility is a member of . . . a power pool, it . . . would have to provide service to the other members of the . . . power pool." *Id.*

[179] Order No. 888-A, 62 Fed. Reg. 12,274, 12,313; *see also* Majority Order at P 65 (quoting the same).

[180] Order No. 888-A, 62 Fed. Reg. 12,274, 12,313.

[181] *See supra* PP 4-14.

[182] This separate enumeration also provides evidence that the Commission did not envision mere participation when it referred to "open membership," but instead meant what it said: *membership* should be open.

Docket No. ER21-1115-000, et al.                                              - 2 -

OATT that makes NFEETS available to those who have not joined the Southeast EEM, I disagree that "good cause" for a waiver is present.


        For these reasons, I respectfully dissent.


_____
Allison Clements
Commissioner

**Appendix A**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Alabama Power Company | Docket Nos.  ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | ER21-1112-002 |
| Louisville Gas and Electric Company | ER21-1114-002 |
| Duke Energy Carolinas, LLC | ER21-1116-002 |
| Duke Energy Progress, LLC | ER21-1117-002 |
| Georgia Power Company | ER21-1119-002 |
| Kentucky Utilities Company | ER21-1120-002 |
| Mississippi Power Company | ER21-1121-002 |

STATEMENT OF COMMISSIONER CLEMENTS

(Issued October 20, 2021)

1.     The proposed Southeast Energy Exchange Market (Southeast EEM) Agreement, filed in this proceeding pursuant to section 205 of the Federal Power Act (FPA),[1] by Southern Company Services, Inc. as agent for Alabama Power Company, and on behalf of itself and the other prospective Members, went into effect by operation of law because the Commissioners are divided two against two as to the lawfulness of the market.  That means that the Commission did not determine whether the proposed market is just and reasonable and not unduly discriminatory or preferential.  When this happens, section 205(g) of the FPA[2] requires each Commissioner to issue a "written statement explaining the views of the Commissioner with respect to the change[s]."[3]

2.     While I am an ardent supporter of market formation across the electricity sector as a means of harnessing competition to ensure better outcomes for customers, market formation cannot be blessed at the expense of compromising the Commission's bedrock principles of ensuring open access to non-discriminatory rates and service, and applying adequate protections to markets to ensure just and reasonable rates.  The cost and reliability benefits that all sorts of organized market structures have provided to customers, utilities, and regions—whether from tight power pools, RTOs, the more recent Western imbalance markets, or other constructs—are clear and compelling.  While I

---

[1] 16 U.S.C. § 824(d).

[2] *Id.* § 824d(g).

[3] *Id.*

JA0169

appreciate the efforts of the Filing Parties in this proceeding toward increasing the efficiency of the existing Southeastern bilateral markets, I would have voted against the Southeast EEM as proposed by the Filing Parties. I believe the Southeast EEM, as proposed by the Filing Parties, fails to abide by the bedrock principles of open access and non-discrimination that were crystallized in the Commission's landmark Order No. 888, and fails to ensure just and reasonable rates.

3.        To be very clear, my lack of support for the instant proposal is not because I would prefer a different market structure or that I fail to appreciate the parameters of the legal inquiry that Section 205 prescribes. I am cognizant of Section 205's requirements that we not let perfect be the enemy of the good and that we can only review the proposal in front of us.[4] But legal insufficiency must foreclose Commission approval. In my view, the Southeast EEM, as proposed, contains infirmities that compel the Commission to find that the Filing Parties have not satisfied their legal burden. That is not to say that the Southeast EEM, or a similar market structure, has no path to legal sufficiency. Rather, as I discuss below, my concerns with this market could be addressed with some discrete changes to the membership and governance provisions, as well as a superior approach to market power and manipulation concerns.[5]

4.        The Filing Parties' proposal rests on two legally and factually flawed contentions: first, that the Southeast EEM is nothing more than an enhancement to the existing bilateral markets that currently exist in the Southeastern United States; and second, that no new evidence, analysis, or safeguards are required to reach the conclusion that there exists no opportunity for market power or manipulation across the proposal's exchange platform.

5.        As I describe in more detail below, the proposed Southeast EEM is far from the existing bilateral market regime. The Southeast EEM is a multilateral market, with a

---

[4] See, e.g., PJM Interconnection, L.L.C., Docket No. ER21-2582-000, Statement of Chairman Glick and Comm'r Clements, Oct. 19, 2021, at P 32 ("Under section 205, a utility does not need to show that the existing tariff is unjust and unreasonable, nor must it demonstrate that its proposal is the best option. Rather it must show only that its proposed tariff is just and reasonable [and not unduly discriminatory].") (citing *Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017); *PJM Interconnection, L.L.C.*, 170 FERC ¶ 61,243, at P 57 (2020); *City of Winfield v. FERC*, 744 F.2d 871, 874-75 (D.C. Cir. 1984)).

[5] In past similar circumstances, the Commission has taken the approach of rejecting initial proposals for new market constructs that fail to meet the requirements of section 205, and later approving revised proposals when those shortcomings were later addressed. *See, e.g., Pub. Serv. Co. of Colorado*, 151 FERC ¶ 61,248 (2015); *Sw. Power Pool, Inc.*, 172 FERC ¶ 61,115 (2020).

unique (and large) footprint, designed to allocate limited rights to a new, desirable transmission product and match electric power supply and demand offers across a suite of potential exchange matches using a complex "black box" algorithm.[6]  The transmission product and matching service are accessible only to Southeast EEM market Participants that sign and obtain countersigned participation agreements and acquiesce to the platform's governing rules, which are controlled by a coterie of preferred Members.  None of these characteristics are features of a bilateral market.

6.      I am concerned that the Southeast EEM may expose Participants to unjust and unreasonable rates.  The Filing Parties proposed the Southeast EEM with neither any quantitative analysis demonstrating an inability by Participants to exercise market power or manipulate the market, nor adequate safeguards to protect against these abuses on a going-forward basis.  It is insufficient to rely on Participants' existing market-based rate authorities given the new market structure and new market footprint of the Southeast EEM.  Yet the Filing Parties suggest that despite these clear differences, the Commission should rely on analysis conducted for the existing bilateral market, and safeguards put in place for a bilateral, not multi-lateral market structure.

7.      I also agree with Chairman Glick's conclusion that applying the *Mobile-Sierra* standard to the generally applicable Southeast EEM Agreement provisions, even the "enumerated provisions" identified in the response to the First Deficiency Letter, would violate Commission precedent.  As he ably explains, the Southeast EEM provisions are tariff rates for which *Mobile-Sierra* protection does not lie.[7]  Applying the *Mobile-Sierra* standard would therefore inappropriately make any future challenge to the justness and reasonableness of the Southeast EEM Agreement more difficult.  This is particularly problematic here given the concerns with undue discrimination, governance, market power, and manipulation that the proposal presents.

8.      While Filing Parties made some relevant additional commitments to provide data in response to the Commission's May 4, 2021 deficiency letter,[8] they still wave off most

---

[6] The Territory will span 10 states, feature 160,000 MW of generating capacity, and serve about 640 TWh of load.  Transmittal Letter at 4.

[7] Chairman Glick Statement at PP 9-10.

[8] Among other things, the Filing Parties committed to: provide Order No. 760-style data to the Commission; require the Administrator, Auditor, and Participants to respond to inquiries from the Commission and other regulators; post reports, analysis, and Participant complaints on the Southeast EEM website; post the network map and information on binding transmission paths and the marginal value of transmission constraints; and make transparency improvements (*e.g.* making Membership Board meeting minutes public and allowing non-Members to observe Membership Board meetings).  While this would have provided more transparency than the tariff provisions

of protestors' concerns about the Southeast EEM's barriers to participation, restrictions on membership, preferential structure for load-serving entity Members, lack of transparency or oversight, and potential for the exercises of market power and manipulation. These concerns, however, constitute legal grounds on which the Commission should have rejected the current proposal. To be clear, there is no insurmountable barrier to the formation of a market like the Southeast EEM. In fact, straightforward revisions to the platform's participation and membership rules, and common approaches to protection against the exercise of market power and manipulation would cure most, if not all, of the statutory violations that impair the current proposal.

9.     By failing to reject the Southeast EEM as proposed, despite its demonstrable flaws, the Commission compromises its fundamental principles of transparency, oversight and fair and open market access. Failing to apply these principles to this market is dangerous not only because of the discriminatory and unjust rate impacts it may impart in the region, but because it may inhibit the Commission's ability to ensure that other organized markets, existing or forthcoming, are just and reasonable and not unduly discriminatory. Failing to reject the instant proposal is likely to invite future attacks on the Commission's fundamental market design safeguards in existing and future markets across the country.

## I.     The Southeast EEM is a multi-lateral market construct

10.     First, it is necessary to understand what the Southeast EEM is and is not. The Filing Parties take the position that the Southeast EEM is merely an enhancement of the bilateral markets that currently exist in the Southeastern United States. They argue that the introduction of the Southeast EEM algorithm, which will automatically match buyers and sellers for Energy Exchanges, and NFEETS, a zero-cost transmission product, are merely improvements on the existing bilateral structure.[9] This position requires an insurmountable strain on logic that lacks any compelling rationale.

11.     Bilateral electric power supply transactions involve two known parties engaging in a negotiated exchange of electricity and related services. They involve the parties participating in a back-and-forth regarding terms of the sale including the price, quantity, transmission path, tenor, performance expectations, and other terms and conditions. While market data may influence agreed-upon prices or other terms, any given bilateral

---

that have gone into effect by operation of law, these concessions do not eliminate the impermissible barriers to access, cure the unduly discriminatory membership and participation structure, or remedy the failure to carry out market power analysis or provide for an independent market monitor whose institutional role is to independently protect the Southeast EEM from manipulation or the exercise of market power.

[9] Transmittal Letter at 9-11.

transaction is defined by the four corners of the deal struck by the engaging parties. Bilateral transaction prices are not influenced in real-time by various other bid and buy offer levels, nor are they optimized across a set of various buyer and seller matches. Bilateral electric power supply transactions are not automatically combined with transmission service and do not require access to a participant-only transmission product. Bilateral transactions do not involve a members committee, an administrator, an auditor, or satisfaction of a set of participation requirements as a condition to execution.

12.     While the Southeast EEM relies on bilaterally arranged enabling agreements, the structure hinges upon a complex multi-lateral optimization engine that replaces the bilateral negotiation of key terms, including price and quantity.  This engine, operated by the Southeast EEM Administrator, is responsible for (1) selecting which transactions should be consummated from among many potential buy and sell offers from many participants in order to optimize dispatch over the Southeast EEM footprint, and (2) allocating the NFEETS, which is an exclusive transmission service reserved for participants in the Southeast EEM, in order to consummate those transactions.[10]  The multi-lateral engine is so complex that the Filing Parties assert that simply providing a "mathematical statement of the optimization problem solved by the Algorithm (*i.e.*, the software platform implementing the Southeast EEM)" would be a "significant undertaking and possibly an additional material Southeast EEM Member expense in addition to the planned cost of hiring a software vendor."[11]  Necessarily, the Southeast EEM also has its own set of rules, a governance structure, and participation requirements, each of which further distinguish it from traditional bilateral markets.

13.     My colleagues disagree with this assessment, but offer no rationale whatsoever regarding how these plainly multi-lateral market features represent a mere immaterial "enhancement" to the bilateral market and do not transform it into a multi-lateral construct.  Rather than engage with these arguments on the merits, their positions amount to credulously accepting the Filing Parties' assertions that the market will be bilateral in nature without examining the ample evidence to the contrary.[12]

---

[10] The existence of NFEETS is in itself an important distinction between the Southeast EEM and traditional bilateral markets.  In true bilateral transactions arranging and paying for transmission is a part of effectuating any trade.  NFEETS, which is only obtainable by joining the Southeast EEM, is factored into the market's optimization.

[11] Response to First Deficiency Letter at 38.

[12] *See* Comm'r Danly Statement at P 20 ("The filing parties clearly state that, 'the Southeast EEM is not—and was never intended to be—a top-to-bottom reimagining of the Southeast energy market; rather it reflects incremental improvement to the existing bilateral market.'") (quoting Transmittal Letter at 9); Comm'r Christie Statement at PP 6, 8 (stating in conclusory fashion that the proposal enhances rather than modifies the

14.    But closing our eyes, clicking our heels three times, and wishing "the Southeast will remain a purely bilateral market" will not make that so.  Given its features, the Southeast EEM is clearly more than an enhancement of the status quo.  It is an entirely new market construct, with its own set of rules and a unique footprint.  As such, it is the Commission's obligation to go beyond taking the Filing Parties' word for it and to review the Southeast EEM proposal to ensure that it meets basic principles of non-discrimination and protects against the exercise of market power and manipulation.

## II.    Access to the Southeast EEM is not open, violating Order No. 888

15.    Order No. 888 compels open "access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce,"[13] and requires public utilities to "remove preferential transmission access and pricing provisions from agreements governing their transactions."[14]  The Southeast EEM contravenes these bedrock requirements by restricting access to NFEETS.

16.    In order to join and obtain the ability to access NFEETS, a prospective Participant is required: (1) to obtain the countersignature of the Southeast EEM Agent at the direction of the Operating Committee, a body controlled entirely by Members,[15] and (2) to execute Enabling Agreements with at least three other Participants.  These provisions give Southeast EEM Members and existing Participants leverage they may use to block market access to transmission service.[16]  In addition, to participate, an entity must be registered as a Source or Sink within the Southeast EEM footprint.

---

existing bilateral market).  While Commissioner Danly observes that "[t]his market does not offer joint dispatch, joint operation, or joint planning," these are arguments that the Southeast EEM is an RTO, not a rebuttal to any of the logic I have set forth regarding why the Southeast EEM platform is multi-lateral, not bilateral.  Comm'r Danly Statement at P 20.

[13] Order No. 888, 61 Fed. Reg. 21,540, 21,541 (1996).

[14] *Id.*

[15] *See* Southeast EEM Agreement § 5.1 (describing Operating Committee membership).

[16] Southeast EEM Market Rules § III.B.3.  A prospective Participant must also (3) own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink; and (4) arrange to take NFEETS from each Participating Transmission Provider, either through execution of a service agreement under the Participating Transmission Provider's tariff or by otherwise making arrangements for such service.

17.     While the Filing Parties argue that Members and Participants have economic incentives to execute participation and enabling agreements, they neglect that Members and Participants also have economic incentives to block access, and the reality is that the proposal erects substantial barriers to participation.  Although the Filing Parties observe that "enabling agreements are used today in the Southeast bilateral market "to facilitate regular bilateral energy transactions"[17] this fact is beside the point.  While transmission service is not governed by enabling agreements in the existing bilateral market, the question the Commission must ask here is whether these requirements serve as an unduly discriminatory barrier to entry to Southeast EEM and the NFEETS *transmission service* it provides.  Order No. 888 establishes a firm requirement of open access, not a demonstration that economic incentives *might* create conditions where utilities choose of their own accord to permit open competition.[18]

18.     As protestors persuasively argue, the Three Counterparty Rule and Participant Agreement requirements may prevent a prospective Participant from accessing the market because current Participants may "collude to exclude prospective Participants by refusing to enter into Enabling Agreements," or the Operating Committee could direct the Agent to block access by declining to sign the Participant Agreement with a given counterparty.[19]  The Filing Parties contend that the Commission need not worry about such abuse of the Three Counterparty Rule and Participant Agreement because the benefits of the Southeast EEM "will be at their greatest with eligible counterparties maximized," arguing that if they had incentive to block market access for any individual prospective participant they would not have proposed the Southeast EEM at all.[20]  To accept this simplistic logic is naïve.

19.     While it is true that retail customer benefits would be maximized if Participants entered into as many matches as possible, incentives for load serving entity shareholder

---

[17] Response to First Deficiency Letter at 19-20.

[18] *See* Order No. 888, 61 Fed. Reg. at 21,541 ("The legal and policy cornerstone of these rules is to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce.").  Order No. 888 targets denials of open access "whether they are blatant or subtle," and also targets "the *potential* for future denials of access."  *Id.* at 21,550 (emphasis added).

[19] The proposal appears not to contain any provision requiring the Agent to not unreasonably withhold its signature, in contrast to other market arrangements. *See, e.g.*, Public Service Company of Colorado, Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43.

[20] Filing Parties March 30 Answer at 37.

profits do not neatly align with retail customer benefits in the Southeast EEM as
proposed.  Indeed, while some Members may indirectly have an incentive to lower costs,
many of the Filing Parties earn more return on equity by spending more capital.
Shareholder profits for Southeast EEM Members may go up if they retain a larger market
share by blocking access for competitors and thereby increase the megawatt-hours served
by generation owned by Members.[21]

20.     Even if it does not choose to block access outright, the Southeast EEM Operating
Committee could seek to use Participant Agreements as an opportunity to exercise
leverage over prospective Participants.[22]  The Commission's regulations require that a
market-based rate seller demonstrate that "the seller cannot erect any barriers to entry
against potential competitors."[23]  It is hard to imagine a more direct and problematic
barrier than granting a subset of market participants veto power over whether others may
access transmission service, as the Participant Agreement requirement does.[24]  While it is
common for organized markets to require some sort of participation agreement, such

---

[21] Monopoly regulation of vertically integrated, investor-owned utilities exists
because of the structural misalignment of economic incentives that fail to ensure the
maximization of consumer benefits.  Here, protections are necessary not as a speculative
assumption of bad faith on the part of Filing Parties, but as part of the Commission's
statutory obligation.  In no situation can one simply assume that monopoly entities will
work to adequately protect customers without regulation to require it.

[22] Contrary to the Filing Parties' response, such abuse is perfectly consistent with a
broader desire by the Filing Parties to utilize the Southeast EEM construct.  While
seeking to deliver consumer savings facilitated by the Southeast EEM, the Filing Parties
may nevertheless seek to administer the platform in a manner that locks out certain
competitors who they determine might pose a threat to their market positions, or who
they can secure concessions from in other market contexts by exerting leverage in
agreeing to permit access to SEEM.  *See* March 30 Answer at 36 ("If utilities in the
Southeast were driven, when it came to consideration of the Southeast EEM, by the idea
that 'competition and the availability of lower cost suppliers erodes the potential profits
that come from a monopoly's main source of revenue: building additional generation,' . .
. there would be no Southeast EEM proposal.").

[23] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3 (D.C. Cir. Aug.
6, 2021) (citing 18 C.F.R. § 35.37 (2020)).

[24] *See* PIOs March 24 Protest at 13 ("[B]y exercising unmitigated authority over
who is permitted to execute Enabling Agreements and become a SEEM Participant, the
Applicants cement their control over the transmission system and all but guarantee that
competitors will be provided inferior transmission service.").

Docket No. ER21-1111-002, et al.                                         - 9 -

agreements should have clear application procedures and must not allow for other
participants to reject the agreement without cause.[25]

21.     Further, by failing to act, the Commission approves a market construct by which
prospective Participants do not have adequate means of detecting or seeking redress
regarding abuse in restricting market access. Prospective Participants appear not to have
a right to bring complaints to the Auditor (with such complaints limited to Participants).[26]
And while prospective Participants could in theory bring a complaint directly to the
Commission, the absence of market transparency provides them with scant ability to
gather the evidence that would be necessary to support such a complaint. Further, several
Southeast EEM Members are unregulated transmitting utilities, over whom the
Commission likely would not have jurisdiction for such a complaint. The upshot is that
to the extent that abuse occurs, the Commission may never find out. Something as
fundamental as open access to transmission services must not rely on speculation.
Rather, a basic tenet of Order No. 888 is that transmission providers must file tariff terms
that provide open access without giving themselves an opportunity to exercise discretion
to block access.[27]

---

[25] Such barriers to transmission access were the express focus of Order 888. Order
No. 888, 61 Fed. Reg. at 21,541-42. *See, e.g.*, Public Service Company of Colorado,
Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43 (an
example of an agreement with clearer application features that do not permit unjustified
rejection).

[26] Transmittal Letter at 31 ("The Auditor may also receive complaints from
Participants, which it will refer to the Membership Board and investigate at the
Membership Board's discretion."). Further, even if prospective Participants did have a
right to bring complaints to the Auditor, complaints to the Auditor about undue
discrimination via the Enabling Agreements are submitted to the Membership Board,
which can choose not to act and to not submit such complaints to the Commission.

[27] Order No. 888, 61 Fed. Reg. at 21, 552 ("We conclude that functional
unbundling of wholesale services is necessary to implement non-discriminatory open
access transmission and that corporate unbundling should not now be required. As we
explained in the NOPR, functional unbundling means three things:  (1) a public utility
must take transmission services (including ancillary services) for all of its new wholesale
sales and purchases of energy under the same tariff of general applicability as do others;
(2) a public utility must state separate rates for wholesale generation, transmission, and
ancillary services; (3) a public utility must rely on the same electronic information
network that its transmission customers rely on to obtain information about its
transmission system when buying or selling power.").

22.    The proposal further restricts participation by requiring Participants to own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory.[28]  Public Interest Organizations (PIOs) assert that this restriction will exclude "an estimated 65 trading partners that border the SEEM territory . . . because they do not have resources located in the territory."[29]  Excluding these trading partners from the Southeast EEM closes their access to a valuable transmission service offered by each Transmission Owner, and is demonstrably more restrictive than the required Open Access Transmission Tariffs (OATTs) of the participating jurisdictional Transmission Owners.  As PIOs explain, the Commission's "open access rules require that transmission service is offered under each public utility's OATT to all transmission customers in a comparable, non-discriminatory manner, including existing trading partners."[30]

23.    The Filing Parties rationalize the proposed geographic restriction as permissible because it "is not currently technically feasible to allow entities outside the Territory to participate in the Southeast SEEM because 'transactions involving the use of transmission outside of the Territory . . . would require the coordination of e-Tags with non-NFEETS providers in the less-than-20 minute timeframe required, which is not possible at this time.'"[31]

24.    This reasoning is circular: open access is not technically feasible because the Filing Parties have not designed the market in a manner that facilitates a workable solution, and have not invested in the software or other analytical capabilities necessary to facilitate access under their chosen design.  Permitting transmission providers to evade open access requirements via their own market design choices and investment decisions would fundamentally undermine open access.  Filing Parties have done nothing to demonstrate why, in the abstract, e-Tags for external resources could not be coordinated on the timeframe necessary, or why another solution, such as requiring external resources to secure firm service to the border of the Southeast EEM Territory, is not feasible.  Rather, they have designed the market and chosen a scope of work for the relevant vendors that accomplishes coordination for their own purposes without facilitating access for competitors outside the Territory.  Such undue exclusion is not permitted by Order No. 888.[32]

---

[28] Transmittal Letter at 16.

[29] PIOs July 29 Answer at 10-11.

[30] *Id.* at 11.

[31] Filing Parties March 30 Answer at 44.

[32] Order No. 888, 61 Fed. Reg. at 21,594 ("[M]embership provision[s] must allow

25.    The basic unavoidable fact is that NFEETS is transmission service, and thus must be provided by each of the Southeast EEM Members on an open and non-discriminatory basis.  That NFEETS is last priority service does not change this analysis,[33] nor does it make a whit of difference that NFEETS will technically be accessed via the relevant Southeast EEM Member's OATT.  While the service will technically be administered via the OATT, it can only be accessed by Southeast EEM participants, pursuant to the discriminatory terms set forth in the Southeast EEM Agreement and other relevant documents.  None of my colleagues reckons with how the proposal's blatant barriers to open access—manifested by the participation agreement provisions, Three Counterparty Rule, and source/sink requirements—pass muster under Order No. 888.[34]

## III.    Southeast EEM's membership structure, market rules and governance are unduly discriminatory

26.    Beyond violating Order No. 888 by providing for unlawful barriers to accessing NFEETS, the Southeast EEM proposal also unlawfully limits access to transmission service via its restrictive membership provisions, and by forcing prospective non-Member Participants into a choice between either (i) agreeing to a set of discriminatory rules that may only be amended or otherwise influenced by a small cohort of Members in

---

any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location.").

[33] Were it material that "NFEETS service is available *only if* the existing transmission system is not fully employed," as Commissioner Danly suggests, then non-firm service could likewise skirt the basic requirements of Order No. 888.  Comm'r Danly Statement at P 23 (emphasis in original).  Nothing in that order suggests or has been understood to apply only to firm service.

[34] For example, Commissioner Christie asserts that the Three Counterparty Rule and source/sink requirements are "necessary to ensure technical feasibility," and repeats his conclusion that "this proposal represents an enhancement to a bilateral system in which enabling agreements are not unusual," but does not address the obvious distinction that, unlike in this existing bilateral market, such requirements *in this context* inhibit open access to transmission service.  Comm'r Christie Statement at P 13.  The Filing Parties suggest that open membership requirements do not apply because the Southeast EEM will not establish a loose power pool.  *See* Filing Parties March 30 Answer at 9.  While I disagree with this conclusion, it is irrelevant with regard to the barriers to *participation* imposed by the participation agreement provisions, Three Counterparty Rule, and source/sink requirements.  Such barriers implicate Order No. 888's requirement that transmission providers provide open access to transmission service; requirements for loose power pools are layered on top of this floor set for all jurisdictional transmission providers.

order to access NFEETS and the Southeast EEM's matching service, or (ii) forgoing service altogether.

27.    A key defect of the Southeast EEM is that, except for one narrow exception, an entity must be an LSE in the Southeast EEM footprint to be a Member.[35]  This restrictive provision, standing alone, violates the express terms of Order No. 888.  But even if such Membership restrictions were permissible, as discussed below, they constitute an impermissible barrier to transmission service when considered together with the combination of features in the proposal that discriminate in favor of Members.

### D.    The proposal's membership restrictions violate Order No. 888

28.    The proposed restrictions on membership for the Southeast EEM violate Order No. 888, which requires open, non-discriminatory membership for "'loose' power pools" or "other coordination arrangements."[36]  Contrary to the conclusion of my colleagues, the proposed arrangement constitutes a loose power pool, for which Order No. 888 requires "open, non-discriminatory membership provisions" and mandates modification of "any provisions that are unduly discriminatory or preferential."[37]  Order No. 888 specifically requires open membership for loose power pools to extend beyond transmission owning utilities: "membership provision[s] must allow any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location."[38]

29.    The Southeast EEM fits comfortably within Order No. 888-A's definition for loose power pools, which is "(1) any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that (2) explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[39]  NFEETS is a "discounted and/or special transmission arrangement" because it provides a service not otherwise available under relevant Participants' OATTs: $0/MWh transmission service with no associated Schedule 1 or Schedule 2 ancillary service charges, and financial losses only.  While Filing Parties contend that NFEETS is

---

[35] A Member must either be "(1) an LSE located in the Territory; (2) an association, Cooperative, or Governmental Entity that is an LSE located in the Territory; or (3) an association, Cooperative, or Governmental Utility created for the purpose of providing Energy to a Cooperative or Governmental LSEs."  Transmittal Letter at 13.

[36] Order No. 888, 61 Fed. Reg. at 21, 593.

[37] *Id.* at 21,594.

[38] *Id.*

[39] Order No. 888-A, 62 Fed. Reg. 12,274, 12,313 (1997).

not a discounted service because it relies on otherwise unused capacity, providing service at zero cost is not something typically done by the relevant transmission providers, who generally charge for non-firm service.[40]

30.     The Commission's recent decision in *PSCo* fails to support a finding that the Southeast EEM will not establish a loose power pool. *PSCO* merely stated in conclusory fashion that the arrangement at issue was not a loose power pool, without justifying that conclusion.[41] Further, *PSCo*'s conclusion ran counter to Order No. 888's express terms, despite the fact that *PSCo* was an order on a proceeding contested by a single party, not a rulemaking that would be required to reverse Order No. 888. In addition, *PSCo* addressed circumstances that entailed a far simpler arrangement across only a single balancing authority, and was inconsistent with the Commission's prior conclusion in *Wolverine Power Supply*, where the Commission explained that Order No. 888, "in seeking to eliminate undue discrimination in pooling arrangements, . . . defined pooling arrangements in the broadest terms possible."[42]

31.     While NFEETS schedules transmission on infrastructure that would otherwise go unused, *PSCo* fails to address the fact that the service is discounted insofar as NFEETS does not include any ancillary service charges and does not entail any charges for operating the platform to arrange service. Moreover, *PSCo* never considered whether such service was "special."[43] Here, in addition to the special terms described above, the elimination of rate pancaking across the broad Southeastern EEM service territory is a demonstrably special service delivered by NFEETS, sparing Participants from the multiplicity of charges that could otherwise be incurred in the existing bilateral markets. Further, in a significant distinction from *PSCo*, this case entails a complex multi-lateral optimization engine that *coordinates* the apportionment of the zero-cost transmission service among a wide array of participating entities across at least several balancing authority areas.

32.     Even if the Southeast EEM were not classified as a loose power pool, the same need for non-discriminatory membership provisions applies in order to avoid triggering

---

[40] *See* PIOs April 12 Answer at 3-5 (citing Filing Parties March 30 Answer at 8-9).

[41] *PSCo*, 154 FERC ¶ 61,107, at P 85 (2016) ("PSCo is not proposing the establishment of a loose power pool and as such the requirements cited to are not required of the arrangement proposed by PSCo.").

[42] *Wolverine Power Supply*, 85 FERC ¶ 61,099, 61,355 (1998).

[43] *PSCo*, 154 FERC ¶ 61,107, at P 84 (2016) ("Therefore, Joint Dispatch Transmission Service does not represent a discount of non-firm transmission service, and does not serve as a substitute for that service.").

the FPA's bar on undue discrimination.  Indeed, in speaking more broadly about "power pools *or other coordination arrangements*," or "certain bilateral arrangements that allow preferential transmission pricing or access," Order No. 888 states that "[t]he filing of open access tariffs by the public utility members . . . is not enough to cure undue discrimination in transmission if those public utilities can continue to trade with a selective group within a power pool that discriminatorily excludes others from becoming a member and that provides preferential intra-pool transmission rights and rates."[44]  The Filing Parties' proposal violates this requirement because it establishes a select group of Members with exclusive transmission-related rights: namely, the ability to participate in controlling and overseeing the platform for administering service across a footprint comprised of many different transmission owners.[45]  The heart of the proposal's deficiency in this regard stems from the Southeast EEM's exclusion of non-LSEs from the opportunity to fund the platform in exchange for Membership rights.

> ### E.  Further, the proposal's membership restrictions act in conjunction with its asymmetric market and governance structure to provide discriminatory access to transmission service

33.     Beyond directly violating Order No. 888's requirements for loose power pools or other coordination arrangements, the Southeast EEM's restrictive membership provisions act in concert with other aspects of the Southeast EEM proposal to violate the FPA's prohibition on undue discrimination by creating two unequal classes of market participants.  The proposal gives preferential treatment to the small coterie of Members, granting them operational control of the complex and important market platform that allocates transmission service, as well as unique auditing and oversight abilities not shared with other Participants, and exclusive control over all meaningful governance decisions.[46]  Non-Member Participants, on the other hand, face a Hobson's choice: agree to participate in a market that is controlled in all substantive respects by preferred Members and risk exposure to market flaws, potential exercises of market power, or other abuses that may not be detected due to skewed and inadequate oversight, transparency and fair governance; or forgo access to a valuable transmission service altogether.  Taken, together, these provisions amount to an impermissible barrier to transmission access and thereby violate "the legal and policy cornerstone" of Order No. 888.[47]

---

[44] Order No. 888, 61 Fed. Reg. at 21,594 (emphasis added).

[45] These preferential rights include Members' ability to effectively control the Southeast EEM Agent, Administrator, and Auditor, and to dictate the Southeast EEM's governance.

[46] Transmittal Letter at 21-23.

[47] Order No. 888, 61 Fed. Reg. at 21,541.

Prospective Participants confirm that these discriminatory features may cause them to choose not to participate in the Southeast EEM.[48]

34.     Member control over operations is provided via their exclusive ability to participate in both the Southeast EEM Membership Board and Operating Committee, which are vested with near total control over the structure and operation of the market. The Membership Board will have sole responsibility and input into the operation and oversight of the Southeast EEM platform, including the hiring and firing of the Administrator, who operates the platform.[49]   The Membership Board also chooses the Auditor, who oversees the platform, and determines how often, if ever, the Auditor performs its function.[50]   Together, the Auditor and Administrator are responsible for ensuring that the Southeast EEM's multi-lateral optimization platform functions as intended.

35.     Allowing operational control and oversight to be conducted by a small sub-class of Participants is particularly troubling in the context of the Southeast EEM proposal because of the extreme complexity of the optimization platform.  Given the platform's complexity, it is unsurprising that Members provided a mechanism for themselves to ensure that it functions as intended.  The Auditor is to "monitor the functionality of the Southeast EEM System to ensure that it is operating correctly and in accordance with the Market Rules outlined in the Southeast EEM Agreement."[51]   But in providing the

---

[48] *See* Clean Energy Coalition March 15 Comments at 22 ("Without more transparency that offers some assurance of fairness and proper market function, independent sellers and buyers of power may severely limit their participation in SEEM.").  While Order No. 888's open access requirement does not speak directly to terms and conditions by which transmission service is accessed, it stands to reason that conditioning access on acceding to undesirable terms and conditions must at some point constitute an impermissible bar to access.  A large monetary fee imposed only on non-Members, for example, would clearly constitute undue discrimination.  Here, as confirmed by the Clean Energy Coalition's declaration that its members are hesitant to participate in the Southeast EEM, the discriminatory administration, oversight, and governance provisions acting in concert rise to the level of a clear barrier to participation that can reasonably be expected to inhibit non-Members' access to transmission services.

[49] The Administrator will oversee and operating the Southeast EEM System and submit e-Tags to reserve and schedule NFEETS.  Transmittal Letter at 17.

[50] Transmittal Letter at 17; Operations Affidavit at P 52.

[51] Transmittal Letter at 17.

Members alone with control over the Auditor's actions, the proposal gives non-Member Participants no such assurance.

36.     The proposal also vests Members alone with power to meaningfully weigh in on any potential changes to the Market Rules, providing no meaningful opportunity for non-Members, including other Southeast EEM market participants, states, or customers, to have a voice.  While the Filing Parties propose to provide limited opportunities for non-Member engagement, such as an "Annual Meeting of Participants and Stakeholders,"[52] these opportunities equate to no more than a chance to provide a perspective.  The proposal does not include any requirements for or process by which these perspectives will be incorporated or acted upon.  These opportunities fail to provide non-Member Participants with any real ability or leverage to shape decisions, or to participate in market administration and oversight.

37.     The Filing Parties rationalize this blatantly preferential treatment with a theory that superior rights for Members are appropriate because the Members financed the Southeast EEM platform.[53]  This argument neglects the fact that non-LSE Participants are not offered the opportunity to become Members or otherwise participate in the funding of the platform.  The exclusive opportunity to fund a market platform that organizes market activity and allocates transmission service across several utilities' footprints, and enjoy special rights granted in exchange for that funding, is unduly discriminatory because no reason has been given why LSEs alone should enjoy this right in exchange for preferential terms and conditions.  Although the Filing Parties reference the recently accepted governance structure of SPP WEIS' market as support,[54] such reliance is inappropriate for three reasons: (1) although representation on WEIS' WMEC is similarly exclusive to WEIS Participants, there are no restrictions on who can become a WEIS Participant; (2) there are meaningful avenues for non-WEIS Participants to provide input on WEIS decisions (*i.e.*, through the WEIS Revision Request Process); and (3) the WMEC is overseen by the independent SPP Board of Directors, with any decisions by WMEC appealable up to the SPP Board of Directors.

38.     The Commission has on prior occasions disapproved of transmission service arrangements that give preference to a certain class of Members, even where that preference is less marked than the combination of factors present here.  For example, in evaluating the "governance rules for the Management Committee and the Regional Reliability Committee" of the Mid-Continent Area Power Pool, the Commission determined that the rules "do not satisfy Order No. 888" because they provided for

---

[52] Southeast EEM Agreement § 4.4.

[53] Filing Parties March 30 Answer at 37.

[54] *Id.*

"voting on the basis of Electric Revenues, which . . . gives too much influence to the vertically integrated utility members that own the transmission system."[55]  Similarly, the D.C. Circuit upheld a Commission order rejecting the membership criteria of a loose power pooling arrangement that provided for two classes of Participants, with one class enjoying substantially better rights to govern the pool's market rules and control operation of the pool.[56]  In that case, the relevant filing parties had proposed an arrangement that included "Participants," who enjoyed full membership rights, and "Associate Participants," who were entitled only to "representation on certain pool committees and participation in pool planning functions."[57]  The Commission found this distinction "discriminatory on its face under sections 205 and 206 of [the Federal Power Act]", and its determination was specifically approved by the D.C. Circuit.[58]  While the names of the two classes diverge, the difference between Participants and Associate Participants in many respects mirrors the Southeast EEM proposal's distinction of rights between Member Participants and non-Member Participants.

39.    Commissioners Danly and Christie dismiss these discriminatory features of the Southeast EEM, suggesting that they would only be problematic if the Southeast EEM were an RTO.  In doing so, they ignore the fact that, together, the preference for Members built into the Southeast EEM agreement, these features are a clear barrier to access for prospective non-Member Participants.  My colleagues fail to set forth any theory for why forcing potential Participants to choose between accepting these discriminatory market rules or forgoing access to this valuable transmission service is not a violation of Order No. 888 and the underlying requirement of the FPA that service not be unduly discriminatory.

40.    Allowing the Southeast EEM to go into effect with the existing governance structure and market participation requirements may have a significant effect on the Southeast energy market.  For one, it will decrease volume and liquidity of non-firm point-to-point service within or across the Southeast EEM territory,[59] making it more difficult and expensive for anyone who continues to engage bilaterally in the Southeast

---

[55] *Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075 at 61,317 (1999), *petitions for review denied*, *Alliant Energy Corp. v. FERC*, 253 F.3d 748 (D.C. Cir. 2001).

[56] *See Central Iowa Power Cooperative v. FERC*, 606 F.2d 1156, 1170 (D.C. Cir. 1979).

[57] *Id.*

[58] *Id.* at 1170, 1171.

[59] Filing Parties predict this effect, citing it in their benefits analysis.  *See* Transmittal Letter at 36-37 (citing Benefits Analysis at 8, 19).

EEM footprint.  The Filing Parties acknowledge this potential cost impact on non-Participants.[60]  The FPA does not permit requiring non-Participants to subsidize benefits for Participants, especially for Participants with valid concerns that joining the Southeast EEM may subject them to discriminatory treatment.

41.    There are clear and straightforward solutions here, which would not derail the Filing Parties goal of an efficient Southeast EEM platform.  For example, the Filing Parties could remedy these infirmities by: (1) creating the option for non-LSE Participants to become Members if they make the necessary financial commitment, like in the WEIS; and (2) creating a process for non-Member Participants, states and other stakeholders, such as consumer groups, to provide complaints and concerns on Southeast EEM proposals, also like in the WEIS.

## IV.    Southeast EEM's lack of adequate market protections may result in unjust and unreasonable rates

42.    I am also concerned that the Southeast EEM, as proposed, could result in unjust and unreasonable rates.  The Filing Parties failed to provide sufficient analysis demonstrating a lack of potential by Southeast EEM Participants for the exercise of market power or manipulation of the market, or adequate safeguards to protect against these potential abuses on a going forward basis.

43.    The Filing Parties dismiss market power concerns raised by protestors and argue that no market power analysis or other market power protection is needed for the Southeast EEM because the core functioning of the Southeast bilateral market is not being changed by the Southeast EEM and the market presents no new opportunities for the exercise of market power.[61]  In other words, the Filing Parties propose to rely on the jurisdictional Southeast EEM Participants' existing market-based rate authorities as proof that Participants in the Southeast EEM will not be able to exercise market power.  This reliance depends on the false premise that the Southeast EEM is nothing more than an enhancement on the existing bilateral markets in the Southeast.[62]  Such cursory analysis

---

[60] See Pope Aff. ¶ 67.  The Filing Parties justify the potential increase in transmission service costs to native load customers as permissible because native load customers may receive greater benefits via the relevant utilities' participation in the Southeast EEM.  *Id.*  But this argument neglects that *non*-native load customers can likewise expect increased transmission service costs and will receive *no* corresponding benefits where they are not Participants in the Southeast EEM.

[61] *See* Filing Parties March 30 Answer at 29; Response to First Deficiency Letter at 2.

[62] *See supra* at PP 10-12.

violates the Commission's duty to ensure that participants in the Southeast EEM "either lack, or have adequately mitigated, any horizontal or vertical market power."[63]

44.     First, as discussed above, the Southeast EEM is a new market footprint.  To the extent that the Commission has granted jurisdictional Southeast EEM Participants the authority to transact in the Southeast, it has done so based on the results of market power analyses of each Participant's ability to exercise market power in the balancing authority areas in which they own generation and transmission assets.  Those analyses assume that each balancing authority is essentially its own unique market, and require a number of inputs that are specific to the market being studied.[64]  Given its expanded footprint, voluntary nature, and introduction of NFEETS, all of these inputs would necessarily be different for the Southeast EEM.

45.     Furthermore, traditional market power analyses assume that all uncommitted capacity located within the market footprint is available to compete.  However, given the participation requirements, and the voluntary nature of the market, it is unclear who will participate in the market and how many resources they will make available.  The Filing Parties admit that they do not know the level of participation in the Southeast EEM.[65]  If participation levels are lower than the Filing Parties anticipate, it is very possible that Participants the Commission found to not have market power as studied in individual balancing authority areas could have the ability to exercise market power in the Southeast EEM.

46.     The failure to provide market-specific market power analyses contradicts the Commission's decisions in the Western EIM.  In *PacifiCorp*, the Commission found that the EIM will be a new relevant geographic market for market power purposes, and required PacifiCorp (and all subsequent market members) to study the EIM when joining, as well as study it as part of their triennial market power updates.[66]  This helped ensure

_____

[63] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3.

[64] For example, the amount of generation located in the balancing authority area, the average amount of load, the number of potential competitors, and the amount of potential competing transfers that can be imported from neighboring balancing authority areas.

[65] In the first Deficiency Letter, Commission staff inquired about the number of companies that are expected to participate in the Southeast EEM, as well as their expected supply and demand offers.  The Filing Parties declined to offer any specifics, instead arguing that "forward looking estimates . . . are difficult to make with any precision or certainty" and they expect "that the market will attract robust participation." *See* Response to First Deficiency Letter at 13-14.

[66] *PacifiCorp*, 147 FERC ¶ 61,227, at P 206 (2014) ("[B]ecause the EIM will be a

that PacifiCorp, which had market-based rate authority in all balancing areas that comprised the EIM at the time it joined the market, would not be able to exercise market power.

47.     Without a market power analysis that looks specifically at the Southeast EEM, the Commission is flying blind.  The risk of market power abuse created by the Southeast EEM going into effect without adequate market power analysis is exacerbated by the fact that the market has no independent market monitor.  Other organized market proposals recently approved by the Commission, like the WEIS and EIM, include independent market monitors that work to prevent the exercise of market power, by constantly analyzing the market and enforcing market power mitigation measures when they detect that conditions are such that a market participant will be able to exercise market power – even when those participants have received authorization to transact at market-based rates.  The Commission relied on the presence of the market monitors in approving the design of the Western EIM and SPP's WEIS.[67]  While the Commission is equipped to

_____

new relevant geographic market for market power purposes, PacifiCorp is required to make a market-based rate change of status filing within nine months of the launch of the EIM market so that the Commission can assess whether PacifiCorp has market power in the EIM.").

[67] *See e.g.*, *Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,231, at P 226 (2014) ("With regard to Neighboring Systems' request that market power analyses be performed on an ongoing basis and that the Department of Market Monitoring publish quarterly reports on the performance of the EIM, we note that CAISO has proposed that the Department of Market Monitoring will monitor markets administered by CAISO, which include the EIM.  In addition, CAISO's tariff requires the Department of Market Monitoring to report on wholesale market trends on a quarterly basis."); *Sw. Power Pool, Inc.,* 173 FERC ¶ 61,267, at P 81 (2020) ("Instead, SPP and the SPP MMU will evaluate the mitigation thresholds over time, and SPP will file with the Commission to implement changes as needed.  We find that this approach is just and reasonable and addresses the Commission's concern in the July Order regarding automatic increases of mitigation thresholds."); *id*. at P 83 ("Furthermore, the SPP MMU is obligated to recommend frequently constrained areas prior to the start of the WEIS Market"); *id.* at P 99 ("In addition, to the extent that market participants are consistently short due to physical withholding, they face potential referral to the Commission's Office of Enforcement if the SPP MMU suspects physical withholding behavior based on credible evidence."). SPP's market monitor also completed a Market Power Study several months prior to Commission approval of the proposed WEIS market, found that a single supplier could possess structural market power at the system level, and recommended that the SPP develop a system-wide market power mitigation measure.  *Id.* at P 69.

provide some *ex post* monitoring of the Southeast EEM, that is not a replacement for active monitoring that will prevent the exercise of market power.

48.     I am also concerned that the Southeast EEM's design will create avenues for manipulation. The Southeast EEM permits Participants to "select Counterparty Specific Constraints for any reason."[68] Given this lack of any need for justification,[69] as well as the absence of market monitoring, such "toggling" presents a risk of abuse. The Filing Parties argue that such toggling "is just a manifestation of a decision that any market participant can make today."[70] This argument neglects the fact that that the risk is materially different in the Southeast EEM context. Under the proposal, actions by one participant not only impact that participant and its counterparties, but also automatically flow through the multi-lateral algorithm, impacting other potential buyers and sellers at the same time. Prices of various transactions that emerge from the algorithm depend upon the multi-lateral landscape of bids, not just on that party's own conduct. Further, the Filing Parties glaze over the fact that the Southeast EEM is a mechanism to allocate finite transmission rights. The ability to toggle off competitors, or entire balancing authority areas, creates the opportunity for participating Southeast EEM Members to secure NFEETS transmission rights for themselves while denying their competitors access.[71] The bilateral market, by contrast, subjects all bilateral transactions to equal transmission opportunities.

49.     Using the Three Eligible Counterparty Rule[72] as a safeguard against collusive schemes is a recognition that such schemes may occur. There has been no demonstration

---

[68] Transmittal Letter at 25.

[69] While Filing Parties explain that Counterparty Specific Constraints can be used to allow Participants to comply with limits on their market-based rate authority ("toggling off" in regions where they are not permitted to market-based sales), nothing obligates them to use Counterparty Specific Constraints only for this purpose, and they need not give any justification for imposing constraints. *Id.*

[70] Filing Parties March 30 Answer at 33.

[71] The Filing Parties list 180 counterparties to existing enabling agreements as evidence that they are widely used in the Southeast. However, these agreements have never been used as a gating mechanism for participation in a multilateral market construct. Prospective Southeast EEM Participants must enter into enabling agreements with existing Southeast EEM Participants to gain entry into the market.

[72] The Three Eligible Counterparty Rule is "the requirement that all Participants have 'toggled on' at least three unaffiliated potential counterparties each time they bid or offer." Transmittal Letter at 40.

that this requirement will act as an effective safeguard to prevent such schemes. The Filing Parties state that the number of required counterparties renders it difficult for Participants to engage in anticompetitive conduct,[73] but do not provide any analysis, evidence, or rationale why three is the right number to protect the integrity of the market. This amounts to acknowledgment that anticompetitive conduct is a valid concern, without any demonstration that such concern has been properly mitigated.

50.     The Southeast EEM algorithm's complexity and lack of transparency expose the market to manipulation, particularly in the absence of a market monitor to observe its operation and investigate anomalies. The Commission's enforcement docket is full of examples of market participants using superior knowledge of, and experience with, vulnerabilities in optimization algorithms or other features of complex markets to manipulate prices or collect unjustified payments.[74] That the algorithm is too complex for Filing Parties even to describe in a mathematical formula evinces a high risk of design flaws for manipulators to exploit.

51.     The lack of analysis specific to Southeast EEM's unique characteristics, demonstrating that Participants will not be able to exercise market power, as well as the unchecked potential avenues for manipulation, means that Filing Parties have failed to demonstrate that rates in the Southeast EEM will be just and reasonable. Like earlier concerns about undue discrimination, these issues are not insurmountable. The Filing Parties could easily address these deficiencies by submitting a Southeast EEM-specific market power analysis and by closing some of these potential avenues for manipulation (e.g. instituting protections to avoid toggling off abuse). Of course, adding an independent market monitor would also go a long way to address both the market power and market manipulation concerns. These are legitimate issues with straightforward solutions that the Commission could have provided as guidance to Filing Parties in a rejection order.

---

[73] Transmittal Letter at 41.

[74] *See, e.g., Vitol Inc. and Federico Corteggiano*, 169 FERC ¶ 61,0170 (2019) (order assessing penalties for market manipulation where knowledgeable market participants used feature of CAISO's marginal cost of congestion formula to manipulate physical energy prices for benefit of participants' related financial positions); *Coaltrain Energy, L.P.,* 155 FERC ¶ 61,204 (2016) (market participants manipulate market by placing economically meaningless 'Up to Congestion' bids at nodes with small or no price spreads for sole purpose of collecting unjustified marginal loss surplus allocation credits, rather than for legitimate arbitrage purposes); *City Power Marketing, LLC,* 152 FERC ¶ 61,012 (2015) (manipulative 'Up to Congestion' bids); *Houlian Chen,* 151 FERC ¶ 61,179 (2015) (manipulative 'Up to Congestion' bids).

## V.  **Conclusion:  Creation of this market puts non-Members at a permanent disadvantage in the Southeast**

52.    The Commission's responsibility under section 205 of the FPA is to evaluate proposals to determine whether they will result in just and reasonable rates that are not unduly discriminatory or preferential.  As my colleagues have emphasized, the Filing Parties have not put forth an RTO proposal, so in the context of this proceeding it is not the Commission's role to evaluate whether an RTO would deliver greater benefits than the proposal before us.  By the same token, we cannot dismiss a failure of this proposal to abide by the Commission's bedrock principles necessary to guarantee just and reasonable and non-discriminatory rates simply because opponents of the proposal may prefer an RTO.  We have an obligation under the Administrative Procedure Act to articulate a "rational connection between the facts found and the choice made."[75]  (Here, the choice being to allow the tariff to go into effect by operation of law via split vote.)  My colleagues' failure to explain why they would have rejected protestors' detailed arguments that the proposal imposes unduly discriminatory barriers to transmission access and fails to safeguard the market against just and reasonable rates violates this obligation.[76]

53.    Engaging on the merits of the actual filing under consideration, it is clear that the Southeast EEM proposal, whether accepted by operation of law or with the commitments offered in the response to the first deficiency letter, fails to meet the standard set forth in section 205.  I therefore cannot support the market platform as proposed.

54.    A well-designed Southeast EEM has the potential to provide valuable benefits to the Southeast energy markets.  An order rejecting the proposal could easily have set the stage for a future proposal complying with the FPA's requirements, thereby providing a pathway for the promise of benefits to bear fruit.  It is disappointing that, perhaps in search of near-term incremental cost savings, the Commission has compromised its fundamental responsibilities to guarantee non-discriminatory service and safeguard the market from abuse.  Allowing this tariff to go into effect by operation of law puts at risk the Commission's long-running and largely unified commitment to steadily expanding

---

[75] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)).

[76] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) ("It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'") (quoting *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)).

non-discriminatory open access, a legal tradition exemplified by one of the Commission's proudest actions, Order No. 888.


_____
Allison Clements
Commissioner

Document Content(s)

ER21-1115-000 .docx.......................................................1

JA0193

177 FERC ¶ 61,178
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-003 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-003 |
| Louisville Gas and Electric Company | | ER21-1114-003 |
| Duke Energy Carolinas, LLC | | ER21-1116-003 |
| Duke Energy Progress, LLC | | ER21-1117-003 |
| Georgia Power Company | | ER21-1119-003 |
| Kentucky Utilities Company | | ER21-1120-003 |
| Mississippi Power Company | | ER21-1121-003 |
| | | (Not Consolidated) |

ORDER REJECTING REHEARING REQUESTS AS UNTIMELY

(Issued December 10, 2021)

1.      On February 12, 2021, as amended on June 7, 2021, and August 11, 2021, Southern Company Services, Inc., as agent for Alabama Power Company, filed, pursuant to section 205 of the Federal Power Act (FPA)[1] and section 35.12 of the Commission's regulations,[2] the Southeast Energy Exchange Market (Southeast EEM) Agreement on behalf of itself and the other prospective members (collectively, Filing Parties) of the Southeast EEM.  Additionally, on February 12, 2021, as amended on June 7, 2021, and August 11, 2021, seven prospective Southeast EEM members submitted certificates of

---

[1] 16 U.S.C. § 824d.

[2] 18 C.F.R. § 35.12 (2021).

JA0194

Docket No. ER21-1111-003, et al.                                                   - 2 -

concurrence to the Southeast EEM Agreement.  Pursuant to section 205 of the FPA, in the absence of Commission action on or before October 11, 2021, the proposed Southeast EEM Agreement and concurrences became effective by operation of law.[3]  On November 12, 2021, Clean Energy Coalition[4] and Public Interest Organizations (PIOs)[5] (jointly, Rehearing Parties) each filed requests for rehearing pursuant to sections 205(g) and 313(a) of the FPA.[6]  As explained below, we reject the rehearing requests as untimely.

I.     **Background**

2.     On February 12, 2021, Filing Parties filed, pursuant to section 205 of the FPA, the Southeast EEM Agreement and seven prospective Southeast EEM members submitted certificates of concurrence to the Southeast EEM Agreement (collectively, the Filings).  Filing Parties requested an effective date of May 13, 2021, 90 days after they submitted the Filings to the Commission.

3.     On May 4, 2021, Commission staff issued a letter informing Filing Parties that the Filings were deficient and requesting additional information (May 4 Deficiency Letter).  On June 7, 2021, Filing Parties submitted a response to the May 4 Deficiency Letter (June 7 Deficiency Response), amending the Filings.  Filing Parties requested an effective date of August 6, 2021, 60 days after they submitted the June 7 Deficiency Response to the Commission.

4.     On August 6, 2021, Commission staff issued a letter informing Filing Parties that the Filings, as amended in the June 7 Deficiency Response, were deficient and requesting further information (August 6 Deficiency Letter).  On August 11, 2021, Filing Parties submitted a response to the August 6 Deficiency Letter (August 11 Deficiency Response), further amending the Filings.  Filing Parties requested an effective date of

---

[3] *See* Alabama Power Co., Notice, Docket No. ER21-1111-002, et al. (issued Oct. 13, 2021) (Notice) (became effective by operation of law).

[4] Clean Energy Coalition consists of:  Advanced Energy Economy; the Advanced Energy Buyers Group; Renewable Energy Buyers Alliance; and the Solar Energy Industries Association.

[5] PIOs consist of:  Energy Alabama; Sierra Club; South Carolina Coastal Conservation League; GASP; Southern Alliance for Clean Energy; Southface Energy Institute, Inc.; Vote Solar; Georgia Interfaith Power and Light; Georgia Conservation Voters; Partnership for Southern Equity; North Carolina Sustainable Energy Association; Sustainable FERC Project; and Natural Resources Defense Council.

[6] 16 U.S.C. §§ 824d(g), 825*l*(a).

October 12, 2021, 62 days after they submitted the August 11 Deficiency Response to the Commission.[7]

5.      On October 13, 2021, the Secretary of the Commission issued the Notice, stating: "[p]ursuant to section 205 of the FPA, in the absence of Commission action on or before October 11, 2021, the proposed Southeast EEM Agreement and concurrences thereto became effective by operation of law."[8]  The Notice further stated "the effective date of the proposed tariff sheets is October 12, 2021, as reflected in these tariff sheets."[9]  The Notice explained that "[t]he Commission did not act on the proposed Southeast EEM Agreement and concurrences thereto because the Commissioners [were] divided two against two as to the lawfulness of the change."[10]

## II.     **Rehearing Requests and Alternatives**

6.      On November 12, 2021, Rehearing Parties each filed requests for rehearing. Clean Energy Coalition requests rehearing, or in the alternative clarification, of "the Notice" and states that the 60-day prior notice period under FPA section 205(d)[11] "expired on or before October 12, 2021."[12]  Clean Energy Coalition specifically alleges that the Notice is arbitrary and capricious and lacks reasoned decision-making.[13]  Similarly, referring to the Notice as "the Order,"[14] PIOs request rehearing on the basis that "the Order" violates Commission policy and precedent and is arbitrary and capricious.[15]

---

[7] Although Filing Parties stated that the requested effective date was 60 days after the August 11 Deficiency Response, it was actually 62 days thereafter.

[8] Notice at 2.

[9] *Id.*

[10] *Id.*

[11] 16 U.S.C. § 824d(d).

[12] Clean Energy Coalition Request for Rehearing at 1-3.

[13] *Id.* at 8, 14, 20, 22.

[14] PIOs Request for Rehearing at 2 n.3.

[15] *Id.* at 4, 14-15.

7.     Clean Energy Coalition requests that, in the event the Commission does not grant rehearing, the Commission provide certain clarifications related to the role and function of the Southeast EEM.[16]  PIOs request that, in the alternative to rehearing, the Commission set the issues raised in PIOs' request for rehearing and those to be raised in subsequent, planned requests for rehearing on the Commission's November 8, 2021 order accepting filings related to the Southeast EEM proposal[17] for a paper hearing with a technical conference before briefing.[18]

## III.   **Discussion**

8.     For the reasons explained below, we reject the rehearing requests as untimely, decline to address Clean Energy Coalition's alternative motion for clarification, and reject PIOs' alternative request for a paper hearing with a technical conference.[19]

9.     Given that the Commission has not previously explained in an order the proper calculation of the deadline for rehearing requests following the failure of the Commission to act within the time period prescribed by section 205(d) of the FPA, we take this opportunity to do so.  Applying that calculation to these circumstances and as identified in the October 13, 2021 Notice, we find that the Commission had until the end of the day on October 11, 2021, to issue an order pursuant to section 205(d) in this proceeding.  Because rehearing requests therefore were due no later than November 10, 2021—30 days after October 11, 2021—and because both rehearing requests were filed on November 12, 2021, we must reject both rehearing requests as untimely.

10.     Pursuant to section 205(g)(1), it is the Commission's "failure to issue an order accepting or denying the change" prior to the expiration of the statutory period established in section 205(d) that is deemed to be an "order" for which parties may seek rehearing under section 313(a).[20]  Thus, the "failure to issue an order accepting or

---

[16] Clean Energy Coalition Request for Rehearing at 23-25.

[17] *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (November 2021 OATT Order).

[18] PIOs Request for Rehearing at 15.

[19] We note that Filing Parties submitted a motion for leave to answer and answer on November 29, 2021.  We do not address that pleading given that it responds to the rehearing requests that are being rejected as untimely.  We similarly do not address Rehearing Parties' December 3, 2021 joint answer to Filing Parties' November 29, 2021 motion for leave to answer and answer.

[20] Section 205(g)(1) of the FPA provides: "[I]f the Commission permits the 60-day period established [in section 205(d) of the FPA] to expire without issuing an order

Docket No. ER21-1111-003, et al.                                          - 5 -

denying the change" under FPA section 205(g)(1) is the day that the statutory period established in section 205(d) expires.

11.      Section 205(d) allows filings to take effect by operation of law "after 60 days' notice," meaning filings may take effect on the 61st day after filing.  Applicants may also propose that a filing take effect on a date certain that is more or less than the requisite 60 days' notice, consistent with the Commission's regulations implementing section 205(d).[21]  If the Commission does not issue an order accepting or denying the filing by the *later* of the day prior to the effective date or the 60th day after the filing is made, the requested tariff changes go into effect by operation of law.  Therefore, the statutory period for Commission action established in section 205(d) expires on the later of the day prior to the effective date or the 60th day after the filing is made.

12.      After the filing has taken effect by operation of law, the utility's proposal becomes the filed rate.  In this case, that occurred in the first moments of October 12, 2021 as requested by Filing Parties.  For that reason, the Commission can no longer issue an order pursuant to section 205(d) accepting or denying the filing, as there is no longer a section 205(d) filing pending before the Commission.  The Commission under section 205(d) cannot retroactively invalidate the rate that was already on file as of the first moments of October 12, 2021, as such action would violate the bar on retroactive ratemaking.[22]  Nor could the Commission issue an order under section 205(d) that applied only prospectively.  After the point at which a rate goes into effect, the Commission may change the filed rate in response to a timely request for rehearing, as discussed below, pursuant to FPA section 206 or a new section 205 filing in a new proceeding, but its

---

accepting or denying [a rate] change because the Commissioners are divided two against two as to the lawfulness of the change . . . or if the Commission lacks a quorum . . . the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of [section 313(a) of the FPA] . . . ."  16 U.S.C. § 824d(g)(1).

[21] *See id.* § 824d(d); 18 C.F.R. § 35.3; *Electronic Tariff Filings*, 130 FERC ¶ 61,047, at P 6 & n.9 (2010).

[22] *See Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1226 (D.C. Cir. 2018) ("The [FPA] also empowers the Commission to fix or change rates and charges, but only prospectively.  When a utility wishes to alter the rates it charges, it must provide sixty-days' notice to the Commission . . . .  The Commission may waive the sixty-day notice requirement for good cause, but the Commission has no authority under the Act to allow retroactive change in the rates charged to consumers.") (citing 16 U.S.C. §§ 824d(d), 824e(a)); *see also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (finding that "the Commission itself has no power to alter a rate retroactively").

*opportunity to act* in this proceeding pursuant to section 205(d) has passed. The time calculation rules established in 18 C.F.R. § 385.2007(a)(2) cannot and do not operate to extend the statutory deadline for Commission action pursuant to section 205(d).[23]

13.     This interpretation is consistent with how the Commission "acts" on section 205 filings for which there is both a quorum and a majority:  Under those circumstances, the Commission issues any order "accepting or denying" the filing by the later of the day prior to the effective date or the 60th day after the filing is made.[24]

14.     Under section 313(a) of the FPA, any party "aggrieved by an order issued by the Commission . . . may apply for a rehearing within thirty days after the issuance of such order."[25]  Accordingly, where a filing takes effect under the circumstances described in

---

[23] As the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has explained, the statutory notice period (then 30 days, and now 60 days) "is the maximum a utility can be compelled to wait from the time it files its rate changes until the date the changes take effect unless the Commission properly exercises its suspension power." *Ind. & Mich. Elec. Co. v. FPC*, 502 F.2d 336, 341 (D.C. Cir. 1974).  In that case, the court found that a Commission regulation requiring "a *de facto* rate filing 60 days in advance of the effective date" "unlawfully extend[ed] the statutory waiting period for utilities by 30 days." *Id*.  Accordingly, the court vacated a Commission order, issued pursuant to that regulation, purporting to suspend a rate filing after the close of the statutory notice period. *Id.*

[24] If the FPA section 205(d) statutory deadline falls on a weekend or holiday, the Commission's general practice is to issue the order by the preceding business day. *E.g.*, *PJM Interconnection, L.L.C.*, 176 FERC ¶ 61,056 (2021) (issuing order on Friday, July 30 accepting tariff revisions with an effective date of Sunday, August 1); *Cal. Indep. Sys. Operator Corp.*, 157 FERC ¶ 61,252 (2016) (issuing order on Friday, December 30 accepting tariff revisions with an effective date of Sunday, January 1).  This is the Commission's general practice because a filing can go into effect on a weekend or holiday if the statutory period established in section 205(d) expires on a weekend or holiday.  Although the Commission is not open on weekends or holidays, 18 C.F.R. § 375.101(c), there is no prohibition on the Commission acting on a day that it is typically closed, *see, e.g.*, *City of Hastings, Minn.*, 125 FERC ¶ 61,287 (2008) (on Saturday, December 13, 2008, granting applicants' license to install two hydrokinetic turbines).

[25] 16 U.S.C. § 825*l*(a); *see Granholm ex rel. Mich. Dep't of Nat. Res. v. FERC*, 180 F.3d 278, 280-81 (D.C. Cir. 1999) (stating that neither the court nor the Commission retains "any form of jurisdictional discretion" to ignore the mandatory "petition-for-rehearing requirement") (internal citations omitted); *New England Power Generators Ass'n, Inc. v. FERC*, 879 F.3d 1192, 1197-98 (D.C. Cir. 2018) (finding the court lacked

FPA section 205(g)(1), the 30-day time period for seeking rehearing starts running on the day after the last day that the Commission could have taken action by "issuing an order accepting or denying the change."[26]

15.     In this case, Filing Parties requested a specific effective date of October 12, 2021, meaning that the statutory period established in section 205(d) expired on October 11, 2021.  As explained above, a filing goes into effect by operation of law if the Commission does not issue an order accepting or denying the filing within the statutory period.[27]  Again, as it applies to this matter, this means that the Commission had until the end of the day on October 11, 2021, to issue an order and could not have waited to act on October 12, 2021, as the Filings had already taken effect as of the first moments of October 12, 2021.[28]  The October 13, 2021 Notice plainly states:  "in the absence of Commission action on or before October 11, 2021," the day immediately preceding Filing Parties' proposed effective date, the Filings became effective by operation of law.[29]  Thus, the Commission's "failure to issue an order" on October 11, 2021, which under section 205(g)(1)(A) is "an order" subject to rehearing, occurred on October 11, 2021.

16.     Per the above discussion, the rehearing requests were due no later than November 10, 2021—30 days after the "order" in question, which is deemed to have been issued on October 11, 2021 per section 205(g)(1)(A).  Both rehearing requests were

---

jurisdiction to consider a party's objections to a Commission order because the party had not sought rehearing of that order in accordance with section 313(a) of the FPA).

[26] 16 U.S.C. § 824d(g)(1).

[27] *See Fla. Power & Light Co. v. FERC*, 617 F.2d 809, 817 (D.C. Cir. 1980) (explaining that the statutory deadline for Commission action under FPA section 205(d) falls "within" the statutory notice period and holding that the Commission acted within the statutory "limit" notwithstanding clerical error).

[28] *See supra* P 12.

[29] Notice at 2.

Docket No. ER21-1111-003, et al.                                    - 8 -

filed November 12, 2021.[30]  As a result, we must reject both rehearing requests as untimely.[31]

17.     Clean Energy Coalition requests that, in the event the Commission does not grant rehearing, the Commission provide certain affirmative clarifications.  In the absence of an order acting on the Filings, we find there is nothing to be clarified.

18.     As for PIOs' alternative request for a paper hearing with a technical conference, because we reject PIOs' rehearing request as untimely, we cannot set the issues PIOs raise therein for paper hearing.  Issues to be raised in subsequent requests for rehearing of the November 2021 OATT Order are outside the scope of this proceeding, which is limited to the Southeast EEM Agreement and concurrences thereto.  We therefore reject PIOs' alternative request.

The Commission orders:

Clean Energy Coalition's and PIOs' requests for rehearing, including any alternatives, are rejected, as discussed in the body of this order.

By the Commission.  Commissioner Phillips is not participating.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

---

[30] While both rehearing requests state that they seek rehearing of the Notice, the Notice is not a Commission "order" for which rehearing is available.  *See Public Citizen v. FERC*, 839 F.3d 1165, 1170 (D.C. Cir. 2016) (stating "the Notices describing the effects of [the Commission's] deadlock are not reviewable orders under the FPA").

[31] The D.C. Circuit has stated that the 30-day deadline for seeking rehearing is "as much a part of the jurisdictional threshold as the mandate to file for a rehearing," and cannot be waived by the courts or the Commission.  *See, e.g.*, *Cities of Campbell v. FERC*, 770 F.2d 1180, 1183 (D.C. Cir. 1985) (citing *Boston Gas Co. v. FERC*, 575 F.2d 975 (1st Cir. 1978)); *see also Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1114 (D.C. Cir. 2001) (noting the court's "independent obligation" to raise this issue *sua sponte* even if the Commission did not).

Document Content(s)

ER21-1111-003.docx.......................................................1

178 FERC ¶ 61,048
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
James P. Danly, Allison Clements,
Mark C. Christie, and Willie L. Phillips.

| | | |
|---|---|---|
| Alabama Power Company | Docket No. | ER22-476-000 |

ORDER ACCEPTING TARIFF REVISIONS

(Issued January 21, 2022)

1.      On November 24, 2021, Alabama Power Company, on behalf of the Members[1] of the Southeast Energy Exchange Market (SEEM), submitted revisions to the SEEM Agreement under section 205 of the Federal Power Act (FPA)[2] and Part 35 of the Commission's regulations[3] to "stand by the commitments" they previously made in the proceeding to establish SEEM.[4]  As discussed below, we accept the proposed revisions, effective November 25, 2021, as requested.

I.      **Background**

2.      On February 12, 2021, the Members filed the SEEM Agreement (and certificates of concurrence thereto), which sets forth the framework for a new voluntary electronic trading platform designed to facilitate bilateral trading in the Southeast and market access

---

[1] For purposes of this order, each of the following are a Member and, collectively, are the Members:  Alabama Power Company, Georgia Power Company, and Mississippi Power Company; Associated Electric Cooperative, Inc. (AECI); Dalton Utilities; Dominion Energy South Carolina, Inc. (Dominion Energy SC); Duke Energy Carolinas, LLC and Duke Energy Progress, LLC (together, Duke); Louisville Gas & Electric Company (LG&E) and Kentucky Utilities Company (KU) (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, LG&E/KU); North Carolina Municipal Power Agency Number 1 (NCMPA Number 1); PowerSouth Energy Cooperative (PowerSouth); North Carolina Electric Membership Corporation (NCEMC); and Tennessee Valley Authority (TVA).

[2] 16 U.S.C. § 824d.

[3] 18 C.F.R. pt. 35 (2021).

[4] Transmittal at 2.

JA0203

to currently unused transmission capacity.[5]  On October 12, 2021, due to Commission inaction, the SEEM Agreement and associated certificates of concurrence became effective by operation of law.[6]  Each Member that is also a transmission service provider filed revisions to its transmission tariff to offer zero-charge transmission service to accommodate SEEM transactions (Non-Firm Energy Exchange Transmission Service or NFEETS), which the Commission accepted in an order issued on November 8, 2021.[7]

## II.    **Filing**

3.      The Members state that they submit the proposed revisions to "stand by the commitments" they made in the proceeding to establish SEEM that were not previously included in the tariff records, and therefore did not go into effect by operation of law.[8]  In particular, the Members made commitments in response to two Commission staff deficiency letters, which they now propose to effectuate through the proposed revisions to the SEEM Agreement.  The Members also submit several additional ministerial and administrative revisions to the SEEM Agreement both to reflect the use of defined terms, and to provide for administrative efficiency during the initial implementation period of SEEM prior to market launch and operations.  According to the Members, these revisions either have been previously identified and supported by the Members in their previous submissions or are ministerial in nature and are necessary to facilitate the initial implementation of SEEM.  The Members state that these amendments are proposed as a package, and as such, are not severable from each other.[9]

4.      Specifically, the Members propose to revise the SEEM Agreement to effectuate the weekly submission of confidential market data to the Commission via a new Appendix D.[10]  The Members explain that this information is comparable to the information that independent system operators and regional transmission organizations (ISOs/RTOs) provide under Order No. 760, but adjusted for the different market design

---

[5] *Id.*; *see also id.*, attach. B, Revised SEEM Agreement, at 1.

[6] *Ala. Power Co.*, Notice, Docket No. ER21-1111-002, et al. (issued Oct. 13, 2021) (October 13 Notice).

[7] *Duke Energy Progress LLC*, 177 FERC ¶ 61,080 (2021).

[8] Transmittal at 6.

[9] *Id.*

[10] *Id.* at 6-7.

of SEEM.[11]  The Members propose to provide this information with respect to all transactions within SEEM, regardless of whether the parties to the transaction are jurisdictional.  However, the Members note that submission of data related to non-jurisdictional entities is voluntary in conjunction only with the participation of such entities in SEEM.  As such, the Members request the Commission expressly confirm that submission and receipt of such data does not and will not affect the jurisdictional status of non-jurisdictional Members in any way.  Additionally, the Members request the Commission affirm that, akin to the information submitted by ISOs/RTOs in response to Order No. 760, the data submitted by the SEEM Administrator to the Commission will remain non-public, and subject to FOIA Exemption 4.[12]

5.     The Members also propose revisions to the SEEM Agreement to clarify and increase the transparency surrounding the Market Auditor's functions and roles.[13]  Specifically, the Members propose to require the Market Auditor to respond to information requests from SEEM participants, the Commission, the North American Electric Reliability Corporation, state commissions in the SEEM region, TVA's Inspector General, and other applicable regulators within 30 days of receipt of any such request, where reasonable, and to simultaneously post any such responses to the SEEM website.  The Members note that participant-specific information and Critical Energy Infrastructure Information will not be posted to the SEEM website.[14]  The Members explain that such information will be redacted from any document or information that is posted and unredacted copies will be confidentially available to the Commission upon request.  The Members also propose revisions to avoid conflicts with this new requirement and to ensure that other documents, such as participant complaints and reports, are also posted to the SEEM website.[15]  The Members further propose to revise the participant agreement to clarify that SEEM participants will not provide information posted in the confidential section of the SEEM website to any marketing function employee.[16]

---

[11] *Id.* at 7 (citing *Enhancement of Elec. Mkt. Surveillance & Analysis through Ongoing Elec. Delivery of Data from Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 760, 139 FERC ¶ 61,053, at PP 34-36 (2012)).

[12] *Id.*

[13] *Id.* at 8.

[14] *Id.* at 9.

[15] *Id.* at 9-10.

[16] *Id.* at 10.

Document Accession #: 20220121-3122          Filed Date: 01/21/2022

6.      Additionally, the Members propose to modify the SEEM Agreement to address any remaining concerns over unauthorized use of neighboring transmission systems.[17] The Members explain that each Participating Transmission Provider already posts its methodology for calculating Available Transfer Capability (ATC) on its open-access same-time information system (OASIS).  To clarify that there must be sufficient ATC along each of the relevant Participating Transmission Provider's systems for any match to occur, the Members propose to revise the SEEM Agreement to require that each Participating Transmission Provider commit to following its posted methodology in making its reports of ATC to the SEEM system.  The Members explain that this revision will ensure that there is no match that exceeds the most limiting element along the contract path.  The Members also propose corresponding revisions to clarify the timing of ATC information submitted by Participating Transmission Providers and to more clearly require the SEEM Algorithm to honor ATC limits.

7.      With regard to the standard of review provision in the SEEM Agreement, the Members explain that, currently, changes to any portion of the SEEM Agreement are subject to the *Mobile-Sierra*[18] public interest standard of review.[19]  The Members propose to revise the standard of review provision in the SEEM Agreement to apply the ordinary just and reasonable standard of review rather than the currently effective *Mobile-Sierra* public interest standard to the "more public-facing features of the S[EEM] Agreement, such as the Market Rules[,]" while retaining the *Mobile-Sierra* "public interest standard for a limited set of provisions that provide Members with regulatory certainty about the extent of their commitments under [the] agreement."[20]  The provisions to which the *Mobile-Sierra* public interest standard of review will no longer apply include:  87 of the 102 defined terms; section 1.2 (Rules of Construction); Article 2 (Establishment of SEEM and Administration); section 3.1 (Member compliance); section 3.3 (Participant Criteria); section 3.4 (Participating Transmission Providers); section 3.5 (Member Standard of Conduct); Article 5 (Operating Committee); section 6.3 (SEEM Agent resignation and removal); section 6.4 (SEEM Agent and vendor contracts); section 6.5 (SEEM Agent liability and indemnity); section 8.1 (Governmental Entity jurisdiction); section 8.2 (Filing With and Approval or Acceptance by Governmental Entities); section 8.3 (Participating Transmission Provider tariff amendments); section 8.4 (Effective Date and SEEM Commencement Date); section 8.5 (Withdrawal of proposed membership); section 10.1 (Transparency; Confidentiality); section 10.2 (Auditing); section 11.1

---

[17] *Id.* at 12-14.

[18] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (*Mobile-Sierra*).

[19] *Id.* at 14-16.

[20] *Id.* at 14.

(Referencing Market Rules); section 11.3 (Auditing SEEM System); Article 13 (Representations and Warranties); section 16.2 (Transfer of Interest in Agreement); section 16.3 (Relationship of Parties); section 16.4 (Third Party Beneficiaries) (except section 16.4.1); section 16.6 (Other Agreements); section 16.7 (Further Assurances); section 16.8 (Notices); section 16.10 (Headings); section 16.11 (Applicable Law); section 16.12 (Entire Agreement); section 16.13 (Counterparts); section 16.14 (Waiver of Jury Trial); section 16.15 (Special Provisions Related to Implementation of the Agreement); Exhibit A (Names and Addresses of the Members); Appendix A (Form of Participant Agreement); Appendix B (SEEM Market Rules); and Appendix D (Information Provided to FERC and Market Auditor).[21]  Under the proposal here, any changes to the remaining provisions will continue to be subject to the *Mobile-Sierra* public interest standard of review, as is the case under the currently effective SEEM Agreement.[22]

8.      Moreover, the Members propose revisions to the SEEM Agreement to clarify that the Market Auditor will verify that the SEEM system complies with the participant-specific constraints and generally applicable constraints.[23]  The Members also propose revisions to the Market Rules to state that, when running the algorithm, randomization will be used if a heuristic is required to resolve ties or ambiguities.[24]  The Members further propose revisions to the Market Rules to correct a scrivener's error that resulted in the omission of an important limitation on a SEEM participant's ability to run and review reports available in SEEM.[25]  Specifically, SEEM participants will be able to run reports that are redacted to only show information related to that participant.

9.      The Members also propose to revise the Market Rules to clarify the Administrator's authority to maintain configuration parameters and to avoid confusion about whether the Administrator is permitted to change those parameters (it is not).[26]

---

[21] *Id.* at 15; *see also id.*, attach. B, Revised SEEM Agreement.

[22] These include 15 defined terms, Member criteria, governance, appointment of the SEEM Agent, budgeting and cost responsibility, inter-related and inter-dependent provisions and withdrawal, release of liability, no fiduciary duties, equitable relief, reliability obligations, dispute resolution, defaults, confidentiality, public utility status of Members, no reliance interest on NFEETS, no dedication of facilities, amendments, form of joinder agreement to add new Members, and SEEM Agent scope.  Transmittal at 15.

[23] *Id.* at 16-17.

[24] *Id.*

[25] *Id.*

[26] *Id.*

Document Accession #: 20220121-3122    Filed Date: 01/21/2022

The Members additionally propose to revise the Market Rules to add certain information to the monthly informational report that will be posted by the SEEM Administrator.[27] The Members state that the information proposed for inclusion in the monthly report is similar to what is provided in the newly proposed Appendix D submissions (described above), except that some of the information will be subject to a four-month time lag and masking to remove the identities of specific SEEM participants.[28]  The Members believe that providing this information publicly, masked and subject to a time lag as appropriate, will strike the appropriate balance between transparency into SEEM operations and protecting participant identities and other commercially sensitive information.

10.    The Members propose to add a new section to the participant agreement appended to the SEEM Agreement, which states that SEEM participants with Market-Based Rate authority granted by this Commission acknowledge that they must provide complete, accurate, and not misleading information in any communication with the SEEM Administrator or the Market Auditor relating to participation in SEEM.[29]  The Members also propose to revise the definitions of Market Auditor and SEEM Administrator to state that neither the Market Auditor, nor the SEEM Administrator may be, or be affiliated with, a Member, participant, the SEEM Agent, or the SEEM Administrator.[30]

11.    With regard to complaints with the Market Auditor, the Members propose two clarifications that ensure that all participants will have notice of when the SEEM Membership Board chooses not to act on a complaint, allowing an entity that files a complaint with the Market Auditor to be assured of the timeline the Board will apply in deciding whether to investigate the complaint, and if not satisfied, to be able to file a complaint with the Commission under FPA section 206.[31]  The Members propose revisions to the SEEM Agreement to clarify that, within 60 days of receiving a complaint from the Market Auditor, the Board must post to the SEEM website either:  (1) a determination as to whether an investigation into the complaint will be opened; or (2) a notice that the Board requires more time to determine whether to investigate the complaint.

12.    In addition to the above commitments that the Members previously made in the proceeding to establish SEEM, the Members state that they determined that additional

---

[27] *Id.* at 18.

[28] *Id.* at 19.

[29] *Id.* at 20.

[30] *Id.* at 21.

[31] *Id.* at 22-23.

specific revisions are necessary to be in effect prior to SEEM launch and operations and during the initial implementation period only.[32]  First, the Members propose to revise the definition of "Member(s)" to more clearly define the timeline under which entities that are included in Appendix A to the SEEM Agreement but have not yet joined as Members may join under expedited procedures following the implementation of these revisions.  Second, the Members propose revisions to deal specifically with the implementation period, defined as the period between October 12, 2021, through January 30, 2022.[33]  The Members explain that these revisions will allow for:  (1) initial budgeting outside the normal budgeting process (which would have been on a compressed timeline given the October 13 Notice and the SEEM Agreement's October 30th timeline); (2) a Member to request an Alternate Member's Net Energy for Load Value for the initial budget (in parallel with section 7.3.1(a) applicable to all subsequent budgets); and (3) a modified timeline for the Annual Meeting of Members for 2021.  The Members state these revisions will allow a Member who joins under the expedited procedures to be included in the Net Energy for Load Vote and be appropriately accounted for in the voting process.  Additionally, the Members explain that these revisions permit the SEEM Secretary to serve the limited informational receipt and delivery responsibilities of the SEEM Administrator until a SEEM Administrator is chosen.[34]  The Members note that, with the exception of the revision to allow the SEEM Secretary to receive notices on behalf of the SEEM Administrator until they are selected, these provisions sunset by January 30, 2022.[35]  Further the Members state that several clarifying edits were identified while preparing the filing and therefore they propose to:  make ministerial revisions to sections 4.1.5(d), 7.2.2, and 10.1; provide a definition of the term "Southeast EEM Website;" and incorporate defined terms throughout the SEEM Agreement.[36]

13.     The Members request waiver of the Commission's prior notice requirements to allow the amendments to the SEEM Agreement to become effective November 25, 2021, one day after the date of filing.[37]  The Members state that good cause exists to grant waiver because doing so would allow the new revisions, and in particular the revisions to

---

[32] *Id.* at 23.

[33] *Id.* at 23-24.

[34] *Id.* at 24-25.

[35] *Id.* at 26.

[36] *Id.* at 26-27.

[37] *Id.* at 27; *see also* 18 C.F.R. §§ 35.2(f), 35.3(a)(1).

cost allocation provisions, to become effective prior to the incurrence of vendor costs, which are expected to start being incurred as early as December 2021.

## III.   Notice of Filing and Responsive Pleadings

14.   Notice of the filing was published in the *Federal Register*, 86 Fed. Reg. 68,246 (Dec. 1, 2021), with interventions and protests due on or before December 15, 2021.

15.   Timely motions to intervene were filed by:  Cooperative Energy; Missouri Joint Municipal Electric Utility Commission; Duke; American Municipal Power, Inc.; Alabama Municipal Electric Authority; NCEMC; AECI; the City of Orangeburg, South Carolina; Dominion Energy SC; NCMPA Number 1; LG&E/KU; PowerSouth; MEAG Power; Georgia Power Company and Mississippi Power Company; North Carolina Sustainable Energy Association; Sustainable FERC Project and Natural Resources Defense Council; Southeast Public Interest Groups;[38] Solar Energy Industries Association; Advanced Energy Economy; Advanced Energy Buyers Group; and Clean Energy Buyers Association.

16.   Comments were filed by Clean Energy Coalition.[39]  On January 13, 2022, out-of-time comments were filed by Public Interest Organizations (PIOs).[40]

17.   On December 21, 2021, the Members filed an answer to Clean Energy Coalition's comments.

### A.   Comments

18.   Clean Energy Coalition argues that the SEEM Agreement presents risks that the Members will have market power and does not prevent any Member from withholding

---

[38] Southeast Public Interest Groups include:  Energy Alabama; GASP, Inc.; Sierra Club; Vote Solar; Georgia Interfaith Power and Light; South Carolina Coastal Conservation League; Southface Energy Institute, Inc.; and Partnership for Southern Equity.

[39] Clean Energy Coalition includes:  Solar Energy Industries Association; Advanced Energy Economy; Advanced Energy Buyers Group; and Clean Energy Buyers Association.

[40] PIOs include:  Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council.

the newly created NFEETS to specific SEEM participants with virtually no Commission oversight.[41]  Further, Clean Energy Coalition asserts that the SEEM Agreement authorizes the Members to exclude competitors for a significant period of time by delaying, or refusing the execution of an Enabling Agreement, which is a precondition for entering into transactions in SEEM.[42]

19.     Clean Energy Coalition contends that the proposed revisions to the SEEM Agreement can only rehabilitate the SEEM Agreement if the revisions include a pool-wide Open Access Transmission Tariff (OATT), demonstrate a lack of market power, or propose measures sufficient to mitigate the market power of the Members.[43]  Clean Energy Coalition explains that the Commission's regulations require members of a loose power pool—like SEEM—to have a joint OATT on file "to remedy undue discrimination and mitigate market power."[44]  Clean Energy Coalition notes that the Members have not adopted a pool-wide OATT and the proposed revisions neither demonstrate a lack of market power nor provide any measures to mitigate the Members' market power and discipline their ability to set the prevailing price.  Clean Energy Coalition argues that the SEEM Agreement relies on the prevailing price in the marketplace as the final measure of just and reasonable rates and the revisions do not remedy this alleged fatal flaw.[45]

20.     Clean Energy Coalition asserts that the SEEM Agreement's lack of protections against the potential exercise of market power combined with the lack of enforceable transaction reporting seriously harms the public interest and the proposed revisions do not cure the identified deficiencies or render the SEEM Agreement just and reasonable.[46]

---

[41] Clean Energy Coalition Comments at 4.

[42] *Id.* at 5.

[43] *Id.*

[44] *Id.* (quoting *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,655 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002)).

[45] *Id.* at 5-6.

[46] *Id.* at 12.

According to Clean Energy Coalition, the U.S. Court of Appeals for the Ninth Circuit (Ninth Circuit) has explained that if the Commission's "ability to monitor the market or gauge the 'just and reasonable' nature of the rate is eliminated," then effective regulation is removed.[47] Clean Energy Coalition notes that the Ninth Circuit went on to explain that "[w]ithout the required filings, neither [the Commission] nor any affected party may challenge the rate. Pragmatically, under such circumstances, there is no filed tariff in place at all."[48] Clean Energy Coalition argues that the court's rationale is directly applicable to SEEM because the Commission has not issued a merits order with respect to the SEEM Agreement and the imposition of the *Mobile-Sierra* public interest standard of review severely limits the Commission's ability to engage in a meaningful way with the SEEM Agreement in the future. Clean Energy Coalition further argues that because the SEEM Agreement does not provide a means to gauge the just and reasonable nature of rates produced by the SEEM Algorithm, "[p]ragmatically, under such circumstances, there is no fi[l]ed tariff in place at all."[49]

21.     Clean Energy Coalition claims that, while the Commission's normal "monitoring capabilities, enforcement authority, and ability to institute an FPA section 206 action" could allow for sufficient post-approval monitoring, here, the Commission is hamstrung by the SEEM Agreement's application of the *Mobile-Sierra* public interest standard of review to future changes; in addition, Clean Energy Coalition argues that the existing statutory provisions against undue discrimination are insufficient to protect customers and market participants.[50] According to Clean Energy Coalition, the proposed revisions to the SEEM Agreement do not alter this and do not otherwise provide the Commission with a means to satisfy its oversight duties or enable the Commission to order the Members to revise the SEEM Agreement if abuses of market power are detected. Clean Energy Coalition acknowledges that the Members commit to provide the Commission with data outlined in Appendix D to the SEEM Agreement, but Clean Energy Coalition states that it is not clear whether the Commission will review or assess the data it receives.[51] Therefore, according to Clean Energy Coalition, the proposed revisions do

---

[47] *Id.* at 13 (quoting *Cal. ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1016 (9th Cir. 2004) (*Lockyer*)).

[48] *Id.* (quoting *Lockyer*, 383 F.3d at 1016).

[49] *Id.* (quoting *Lockyer*, 383 F.3d at 1016; *Cal. ex rel. Harris v. FERC*, 784 F.3d 1267, 1273 (9th Cir. 2015) (*Harris*)).

[50] *Id.* at 7 (quoting Chairman Glick Statement at P 11).

[51] *Id.* at 7-8.

not provide for enforceable transaction reporting and are not sufficient to establish the SEEM Agreement as a lawful filed rate.[52]

22.     Additionally, Clean Energy Coalition argues that the Commission is not prohibited from remedying the alleged deficiencies in the SEEM Agreement, including ordering the Members to adopt a pool-wide OATT.[53]  Clean Energy Coalition contends that the SEEM Agreement does not meet the standards of a lawful filed rate and failing to correct a "set of discriminatory rules that may only be amended or otherwise influenced by a small cohort of Members" is contrary to the Commission's statutory duty.[54]

23.     Turning to the standard of review, Clean Energy Coalition argues that the proposed revisions do not cure the unlawful application of the *Mobile-Sierra* public interest standard to future changes to the SEEM Agreement.[55]  According to Clean Energy Coalition, while narrowing the application of the *Mobile-Sierra* public interest standard from changes to any provision of the SEEM Agreement to the specific enumerated provisions, as proposed, is directionally positive, the proposed revision to the standard of review provision does not fully rehabilitate the alleged unlawful *Mobile-Sierra* application in the SEEM Agreement.[56]  Clean Energy Coalition asserts that the narrowed application of the *Mobile-Sierra* public interest standard continues to "make it more difficult for third parties or even the Commission to mount legitimate challenges in the future to the justness and reasonableness" of the SEEM Agreement.[57]  Clean Energy Coalition also states that the provisions in the SEEM Agreement that are subject to the *Mobile-Sierra* public interest standard include terms that were "arrived at by horizontal competitors with a common interest to exclude future competition."[58]  Clean Energy Coalition explains that the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has made clear this circumstance "will remove a provision from the ambit

---

[52] *Id.* at 8.

[53] *Id.*

[54] *Id.* (quoting Commissioner Clements Statement at P 26).

[55] *Id.*

[56] *Id.* at 8-9.

[57] *Id.* at 9 (quoting Chairman Glick Statement at P 11).

[58] *Id.*

of *Mobile-Sierra*."[59]  According to Clean Energy Coalition, any claim that the proposed revisions will remove the Members' exclusive control over the SEEM platform or the Market Rules is false, and therefore the proposed revisions do not correct the unlawful application of the *Mobile-Sierra* public interest standard.[60]

24.     Clean Energy Coalition further argues that the proposed revisions to the standard of review provision fail to establish that the *Mobile-Sierra* presumption can be lawfully invoked because the SEEM Agreement is a tariff that is generally applicable to all Members and participants, was not negotiated on an individualized basis,[61] and was not "the product of adversarial negotiations between sophisticated parties pursuing independent interests."[62]  Clean Energy Coalition claims that the Commission recently held that "if negotiating parties have a common economic interest in the outcome of the negotiations, their bargaining is not arm's length."[63]  According to Clean Energy Coalition, neither the participants nor the potential future Members of SEEM were allowed to negotiate the SEEM Agreement's terms and both participants and potential future Members will be required to accept the SEEM Agreement "as-is" without the benefit of any negotiations regarding its content.  As such, Clean Energy Coalition continues, because the SEEM Agreement will extend to Members, potential future Members, and participants, it is undoubtedly a document containing terms of general applicability that "do not provide the assurance of justness and reasonableness associated with arm's-length negotiations" and the proposed revisions do not save the allegedly unlawful application of the *Mobile-Sierra* public interest standard.[64]

25.     PIOs state that, while they appreciate the modest improvements to transparency and narrowed application of *Mobile-Sierra* protection in the revised SEEM Agreement, the revisions do not address PIOs' concerns about market power, governance, non-discriminatory access, lack of an independent market monitor, and impacts on

---

[59] *Id.* (quoting *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 80 (D.C. Cir. 2016) (*Oklahoma Gas*)).

[60] *Id.* at 10.

[61] *Id.* at 11 (citing *Basin Elec. Power Coop.*, 172 FERC ¶ 61,221 (2020)).

[62] *Id.* (quoting *Oklahoma Gas*, 827 F.3d at 80).

[63] *Id.* (quoting *Tri State Generation & Transmission Ass'n, Inc.*, 171 FERC ¶ 61,202, at P 47 (2020) (*Tri State*)).

[64] *Id.* at 11-12 (quoting *Tri State*, 171 FERC ¶ 61,202 at P 47).

consumers.[65]  PIOs argue that their protest in the proceeding to establish SEEM raised fundamental flaws with the SEEM Agreement that remain unaddressed by the revisions to the SEEM Agreement that the Members propose here.[66]  PIOs argue that application of the *Mobile-Sierra* public interest standard to even a subset of provisions in the SEEM Agreement, as proposed, fails to safeguard the interests of future SEEM participants. Further, according to PIOs, the Members "failed to 'carr[y] their burden in showing that their proposal . . . strikes the necessary balance of interests'" because the Members did not justify the application of the *Mobile-Sierra* public interest standard to each enumerated provision.[67]  PIOs also contend that the revised SEEM Agreement violates Order No. 888's open access mandate and Order No. 888-A's requirements for loose power pools.[68]  PIOs further allege that the SEEM Agreement—even with the proposed revisions—continues to create opportunities for SEEM Members and participants to unduly restrict their competitors' access to transmission.[69]  Additionally, PIOs argue that, while the Members claim that SEEM will produce substantial benefits, the benefits analysis relied upon has serious methodological flaws and lacks sufficient modeling detail.[70]  Moreover, PIOs assert that it is uncontested that NFEETS will erode non-firm point-to-point revenues resulting from customers switching from non-firm transmission service to NFEETS and will therefore shift costs to firm point-to-point and network transmission customers.[71]  According to PIOs, shifting costs from the Members and participants to non-participants violates cost causation.  Finally, PIOs claim that NFEETS is not "consistent with or superior to" the *pro forma* OATT for many reasons.[72]

---

[65] PIOs Comments at 1-2.

[66] *Id.* at 2.

[67] *Id.* (quoting *ISO New Eng. Inc. v. New Eng. Power Pool*, 106 FERC ¶ 61,280, at P 131 (2004)).

[68] *Id.* at 2-3.

[69] *Id.* at 3.

[70] *Id.* at 3-4.

[71] *Id.* at 4.

[72] *Id.* (citing *Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282, at P 3 (2006); Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,734 n.434; 18 C.F.R. § 35.28(c)(1)).

### B.    Answer

26.    The Members argue that the scope of review of this proceeding is limited to determining whether the proposed revisions to the SEEM Agreement are just and reasonable, and, therefore, Clean Energy Coalition's continued attempts to relitigate settled matters must be rejected.[73]  The Members state that there is no option here to revisit the unchanged portions of the SEEM Agreement, which is a filed rate subject to the protection of the filed rate doctrine.[74]  The Members explain that, after admitting that the proposed revisions improve the SEEM Agreement, Clean Energy Coalition focuses almost exclusively on undisguised collateral attacks on the SEEM Agreement. According to the Members, Clean Energy Coalition's arguments that the proposed revisions fail to make the SEEM Agreement just and reasonable is not the standard for proposed revisions to a filed rate and the cases to which Clean Energy Coalition cites to attempt to broaden the Commission's review are inapposite.[75]  The Members argue that under longstanding Commission precedent applicable to proposals by utilities to amend their own filed rates under FPA section 205, attacks against unchanged portions of the filed rate are beyond the scope of the proceeding.[76]

## IV.   Discussion

### A.    Procedural Matters

27.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure,[77] the notices of intervention and the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

28.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure prohibits an answer to a protest unless otherwise ordered by the decisional authority.[78]  We will

---

[73] Members Answer at 1-2.

[74] *Id.* at 2.

[75] *Id.* at 2-3 (citing *Upper Missouri G. & T. Elec. Coop.*, 174 FERC ¶ 61,019 (2021); *Basin Elec. Power Coop.*, 172 FERC ¶ 61,221; *Oklahoma Gas*, 827 F.3d 75; *Lockyer*, 383 F.3d 1006; *Harris*, 784 F.3d 1267).

[76] *Id.* at 3 (citing *PJM Interconnection, L.L.C.*, 114 FERC ¶ 61,201, at P 40 (2006)).

[77] 18 C.F.R. § 385.214 (2021).

[78] *Id.* § 385.213(a)(2) (2021).

accept the Members' answer because it has provided information that assisted us in our decision-making process.

### B.    **Substantive Matters**

29.    For the reasons discussed below, we accept the Members' proposed revisions to the SEEM Agreement, effective November 25, 2021,[79] as we find them to be just and reasonable and not unduly discriminatory or preferential.

30.    As a threshold matter, Clean Energy Coalition and PIOs raise concerns that pertain almost entirely to the filed rate and not to the proposed revisions before us in this proceeding.  Although the Commission did not issue an order accepting the SEEM Agreement, the SEEM Agreement went into effect by operation of law[80] and is, therefore, the rate on file.[81]  What is pending before us in this proceeding are certain proposed revisions to that currently effective rate, filed pursuant to FPA section 205.[82]  The justness and reasonableness of the existing provisions of the SEEM Agreement to which the Members do not propose revisions in this proceeding is not pending before us.  Thus, arguments that alleged deficiencies in the SEEM Agreement are not remedied by the proposed revisions[83] are beyond the scope of this proceeding.

---

[79] We grant the Members' request for waiver of the Commission's 60-day prior notice requirement.  *See* 18 C.F.R. § 35.11; *Cent. Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106, *reh'g denied*, 61 FERC ¶ 61,089 (1992).

[80] *See* October 13 Notice.

[81] The Commission issued an order accepting each SEEM transmission service provider's proposed revisions to its transmission tariff to offer NFEETS, in which the Commission addressed several of the arguments PIOs repeat in their comments in this proceeding.  *See Duke Energy Progress LLC*, 177 FERC ¶ 61,080 at PP 40-46, 62-74.

[82] *See Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 943 (8th Cir. 2020) (recognizing that "courts have made it clear that [the Commission] 'restricts itself to evaluating the confined proposal'" and "[t]herefore, [the Commission] 'need only find the *proposed* rates to be just and reasonable.'" (citations omitted)); *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) ("When acting on a public utility's rate filing under section 205, the Commission undertakes 'an essentially passive and reactive role' and restricts itself to evaluating the confined proposal.") (quoting *City of Winnfield v. FERC*, 744 F.2d 871, 875-76 (D.C. Cir. 1984)).

[83] *See, e.g.*, Clean Energy Coalition Comments at 2-3, 8; PIOs Comments at 1-5.

31.     Turning to the merits, we find that the proposed revisions to the SEEM Agreement are just and reasonable and not unduly discriminatory or preferential.  The proposed revisions are intended to improve the transparency of SEEM to the public and to the Commission, and to establish safeguards to ensure SEEM operates as intended.  In this manner, the revisions reasonably balance providing the Commission and the public with increased transparency regarding the market, against the need to safeguard transmission information and commercially sensitive information.  The additional data to be made available under the proposed revisions will give the Commission greater visibility into market behavior in SEEM than that afforded by the original proposal.

32.     While Clean Energy Coalition argues that "[t]he SEEM Revisions do not render the SEEM Agreement a lawful filed rate,"[84] this argument misunderstands the scope of the Commission's review in this proceeding.  Contrary to Clean Energy Coalition's position, we need not find that the proposed revisions provide for "mitigation measures, enforceable transaction reporting, and other features"[85] that would ensure the other portions of the SEEM Agreement, not before us here, are just and reasonable.  Rather, our task is only to assess whether the filed amendments, including the provision of data, are just and reasonable.  We find that they are.  We agree with the filing parties that the data provided by the Members to the Commission, including the public posting of reports, responses to market regulator inquiries and complaints to the Market Auditor, will increase transparency.[86]  Further, in response to Clean Energy Coalition's contention that "it is not clear whether [the Commission] will review or assess the data it receives"[87] we confirm that the Commission plans to review and assess this data, as part of its ongoing monitoring and surveillance of market transactions and market participant activity, to monitor wholesale electricity market transactions executed through SEEM.  We also confirm that the weekly data submission will not affect the status of non-jurisdictional entities, and that the Commission will treat the information as non-public, subject to FOIA Exemption 4.[88]

33.     We further disagree with Clean Energy Coalition that the Ninth Circuit's decisions in *Lockyer* and *Harris* are directly applicable to SEEM.  To the extent that Clean Energy Coalition points to these cases to challenge the justness and reasonableness of the

---

[84] Clean Energy Coalition Comments at 13.

[85] *Id.*

[86] Transmittal at 8-9, 22.

[87] Clean Energy Coalition Comments at 8.

[88] 5 U.S.C. § 552(b)(4) (FOIA exemption for "trade secrets and commercial or financial information").

existing provisions of the SEEM Agreement to which the Members do not propose revisions in this proceeding, those arguments are beyond the scope of this proceeding.[89] Those cases are also inapposite. In those cases, the Commission found that certain utilities violated reporting requirements associated with their market-based rate authority, but the Commission declined to impose refunds.[90] The filing here is unrelated to reporting requirements associated with market-based rate authority. Instead, the Members now voluntarily propose to provide additional information and transparency surrounding SEEM, which will increase the Commission's ability to monitor SEEM.

34.     We find that the proposed clarifying revisions regarding the SEEM Administrator and Market Auditor, the protection of neighboring systems, and the restrictions placed on Market-Based Rate holders are just and reasonable as they provide additional information to SEEM participants. We find the remaining ministerial revisions appropriate.

35.     We also find just and reasonable the Members' proposal to change the standard of review applicable to certain provisions of the SEEM Agreement from the *Mobile-Sierra* public interest standard to the ordinary just and reasonable standard. As noted above, our review is limited to the proposed changes to the filed rate. We are not reviewing anew the application of the *Mobile-Sierra* public interest standard to the provisions of the SEEM Agreement to which it will continue to apply. Accordingly, arguments about the portion of the standard of review provision that the Members do not propose to change are beyond the scope of this proceeding.

36.     Here, the Members propose to change the standard of review applicable to certain provisions from the *Mobile-Sierra* public interest application of the just and reasonable standard to the ordinary just and reasonable standard.[91] We find that it is appropriate to accept application of the ordinary just and reasonable standard of review to changes to certain provisions, as proposed here. Indeed, no party argues otherwise. We find that applying the just and reasonable standard to the proffered provisions will permit the Commission to revise those provisions without meeting the public interest standard, also facilitating the Commission's ability to ensure that rates remain just and reasonable and not unduly discriminatory or preferential.

---

[89] *E.g.*, Clean Energy Coalition Comments at 13.

[90] *Lockyer*, 383 F.3d at 1010; *see also Harris*, 784 F.3d at 1273 (reviewing the Commission's decision on remand and finding that "predicating the 'just and reasonable' inquiry required under [section] 205 on accumulation of market power under the hub-and-spoke test, [the Commission] insulated sellers from liability for reporting violations and thereby ran afoul of the FPA").

[91] Transmittal at 14-15.

<u>The Commission orders</u>:

The proposed revisions are hereby accepted for filing, effective November 25, 2021, as requested, as discussed in the body of this order.

By the Commission.  Chairman Glick is concurring with a separate statement attached.
Commissioner Clements is concurring with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Alabama Power Company                                    Docket No.      ER22-476-000

(Issued January 21, 2022)

GLICK, Chairman, *concurring*:

1.      I concur in today's order.  This proposal narrows the application of the *Mobile-Sierra* public interest standard to only certain provisions of the Southeast Energy Exchange Market (Southeast EEM) Agreement.  In so doing, it will help ensure that the Commission can fulfill its responsibility to protect customers and market participants in the Southeast by allowing the Commission to remedy any unjust and unreasonable or unduly preferential or discriminatory conditions, should they arise in the Southeast EEM.[1]

2.      I write separately to reiterate my view that applying the *Mobile-Sierra* public interest presumption to *any* provisions of the Southeast EEM Agreement is contrary to well-established Commission precedent.[2]  That precedent dictates that, absent extraordinary circumstances not present here, the *Mobile-Sierra* presumption applies to a contract "*only* if the contract has certain characteristics that justify the presumption."[3]  By contrast, *Mobile-Sierra* does not apply to "generally applicable" contractual provisions, such as those contained in the Southeast EEM agreements.  These provisions bind not only the parties to the contract, but also any prospective future signatories, who would be stuck with these provisions with limited, if any, room for negotiation.[4]  This "take it or

---

[1] Statement of Chairman Glick, Docket Nos. ER21-1111, *et al.*, at P 11 (Oct. 20, 2021).

[2] *Id.* at PP 2, 10.

[3] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 182 (2013) (emphasis added); *see also Devon Power,* 137 FERC ¶ 61,073, at P 37 (2011) ("The Commission will accept a more stringent application of the statutory 'just and reasonable' standard only when the applicant can demonstrate compelling circumstances, such as those found in this proceeding, that merit such protection from challenges.").

[4] *See, e.g.*, *Arizona Pub. Serv. Co.*, 148 FERC ¶ 61,012, at P 4 (2014) (contrasting settlement rates that apply only to parties to the settlement with another settlement involving generally applicable rate schedules that apply to any entity for open access service); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 187 (stating that the Commission's conclusion that right of first refusal provisions at issue created generally

JA0221

leave it" dynamic places future participants in a position "that differs fundamentally from that of parties who are able to negotiate freely like buyers and sellers entering into a typical power sales contract that would be entitled to a *Mobile-Sierra* presumption."[5]  As such, application of the *Mobile-Sierra* presumption is inappropriate and inconsistent with our precedent.

3.      Aside from the *Mobile-Sierra* issue, I also agree that the proposed revisions to the Agreement to regularly provide transaction data to the Commission and to increase transparency are just and reasonable and not unduly discriminatory or preferential.  I applaud the filing parties for standing by their previous commitments on transparency.[6]  Shining the light of transparency on the Southeast EEM will help protect market participants and consumers in the region, and will enhance the Commission's ongoing vigilance against potential fraudulent or manipulative conduct.  Guarding against market manipulation remains one of the core obligations vested in the Commission by Congress.


        For these reasons, I respectfully concur.


_____

Richard Glick
Chairman


---

applicable requirements was "bolstered by the fact that any new PJM Transmission Owner would have to accept these provisions as-is, with limited room for negotiation"); *ISO New England Inc*., 150 FERC ¶ 61,209, at P 185 (2015); *Sw. Power Pool, Inc*., 145 FERC ¶ 61,137, at P 9 (2013).

     [5] *ISO New England Inc*., 150 FERC ¶ 61,209, at P 185.

     [6] Statement of Chairman Glick, Docket Nos. ER21-1111, *et al*., at P 13 (Oct. 20, 2021).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Alabama Power Company                    Docket No.  ER22-476-000

(Issued January 21, 2022)

CLEMENTS, Commissioner, *concurring*:

1.     I agree with the decision to accept the proposed Tariff changes because, as explained in the Commission's decision, the scope of our review is limited to the amendments proposed in this proceeding.  When considering these changes alone and not the broader lawfulness of the SEEM Agreement and Open Access Transmission Tariffs into which they are integrated, they are just and reasonable.[1]  I concur, however, to clarify that the proposed amendments do not cure the underlying fundamental flaws with the Southeast Energy Exchange Market (SEEM) Agreement, as incorporated into the relevant SEEM Members' Open Access Transmission Tariffs (OATT).

2.     As I expressed in my Fair Rates Act Statement on the Commission's inaction on the SEEM Agreement,[2] and in my dissent to the Commission's order accepting the OATT revisions incorporating the SEEM Agreement,[3] the SEEM Agreement and the OATTs incorporating it are unduly discriminatory, unjust and unreasonable. Most critically, the SEEM Agreement violates Order No. 888's core requirements by imposing unduly discriminatory barriers to accessing a new transmission product offered by the SEEM Members.  Among other infirmities, SEEM was also proposed without adequate analysis or mitigation mechanisms to ensure that market power will not be exercised and manipulation will not occur.[4]  Also, as highlighted by Chairman Glick, the SEEM

---

[1] I note that it would be a different circumstance if the Filing Parties were putting forth these revisions in place of existing Tariff provisions designed to enable the Commission to adequately carry out its oversight duties.  If that were the case, and if the proposed deletions eliminated tariff provisions that were necessary to ensure the original rate was just and reasonable, then the Commission would have to assess the newly proposed provisions in light of whether they adequately replaced the deleted provisions. Today's order does not address that future potential circumstance.

[2] *Alabama Power Company*, Docket No. ER21-1111-002, Statement of Comm'r Clements, October 20, 2021 (FRA Statement).

[3] *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (Clements, Comm'r, dissenting).

[4] FRA Statement at PP 42-51.

Agreement inappropriately provides the *Mobile-Sierra* standard of review for broadly applicable provisions, contrary to well-established Commission precedent.[5]  Further, the *Mobile-Sierra* public interest standard is not appropriate for provisions that protect a common interest of the Filing Parties, such as provisions granting them preferential rights over non-Members.[6]

3.    None of the amendments accepted herein cure any of these underlying infirmities with SEEM,[7] nor does my concurrence with today's order indicate my approval of that broader market construct.

For these reasons, I respectfully concur.

_____
Allison Clements
Commissioner

---

[5] Chairman Glick Concurrence at PP 2-3.

[6] *See ISO New England Inc.* 143 FERC ¶ 61,150 at PP 168-69 (2013) (finding that the *Mobile-Sierra* presumption did not apply to right of first refusal provisions, which "arose in a negotiation aimed at protecting a common interest among competing Participating Transmission Owners," in contrast to "circumstances in which the Commission can presume that the resulting rate is the product of negotiations between parties with competing interests").

[7] I acknowledge that today's order accepts the SEEM Members' proposal to change the standard of review applicable to certain provisions of the SEEM Agreement to the ordinary just and reasonable standard.  This is an improvement.  However, the filed rate continues to inappropriately provide for application of the *Mobile-Sierra* standard to a number of generally applicable provisions within the SEEM Agreement.

Document Content(s)

ER22-476-000.docx.....................................................1

JA0225

178 FERC ¶ 61,195
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Richard Glick, Chairman;
James P. Danly, Allison Clements,
Mark C. Christie, and Willie L. Phillips.

| | |
|---|---|
| Duke Energy Progress, LLC<br>Duke Energy Carolinas, LLC | Docket Nos.  ER21-1115-003 |
| Louisville Gas and Electric Company | ER21-1118-003 |
| Alabama Power Company | ER21-1125-003 |
| Dominion Energy South Carolina, Inc. | ER21-1128-003 |

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued March 24, 2022)

1.      On November 8, 2021, the Commission issued an order accepting four filings, submitted pursuant to section 205 of the Federal Power Act (FPA)[1] and section 35.12 of the Commission's regulations,[2] by the four above-captioned entities (Filing Parties) in accordance with their role as Participating Transmission Providers in the Southeast Energy Exchange Market (Southeast EEM).[3]  The filings incorporated Non-Firm Energy Exchange Transmission Service (NFEETS),[4] a new transmission service established to facilitate Southeast EEM transactions, into their respective open access transmission

---

[1] 16 U.S.C. § 824d.

[2] 18 C.F.R. § 35.12 (2021).

[3] *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (November 2021 Order).

[4] NFEETS is a zero-charge transmission service used to facilitate 15-minute transactions (Energy Exchanges) matched by an algorithm via the Southeast EEM electronic trading platform.  *See id.* P 1, n.3.

tariffs (OATT).  Clean Energy Coalition[5] and Public Interest Organizations (PIOs)[6] (collectively, Petitioners) seek rehearing of the November 2021 Order.

2.      Pursuant to *Allegheny Defense Project v. FERC*,[7] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the FPA,[8] we are modifying the discussion in the November 2021 Order and continue to reach the same result in this proceeding, as discussed below.[9]

---

[5] Clean Energy Coalition consists of: Advanced Energy Economy, the Advanced Energy Buyers Group, Clean Energy Buyers Association, and Solar Energy Industries Association.

[6] PIOs consist of:  Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute Inc., Vote Solar, Georgia Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council.

[7] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[8] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[9] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the November 2021 Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

## I.   **Background**

3.      The Southeast EEM Agreement[10] and associated certificates of concurrence, filed by the Members[11] of the Southeast EEM, became effective as of October 12, 2021.[12] The Southeast EEM Agreement establishes a voluntary electronic trading platform to facilitate bilateral trading in the Southeast.  Participation in the Southeast EEM is voluntary, free, and open to all entities that own or otherwise control a source or are contractually obligated to serve a sink within the region.  To be eligible to participate, entities must enter into Enabling Agreements—standardized agreements similar to those that parties in the Southeast currently use to facilitate bilateral energy transactions—with at least three counterparties in the Southeast EEM footprint (three-eligible-counterparty rule).  Participants will submit bids and offers into the Southeast EEM and arrange to take NFEETS, a zero-cost transmission service using unused transmission capacity for 15-minute Energy Exchanges,[13] from each Participating Transmission Provider.[14]

---

[10] Alabama Power Company, Market Based Rate Tariff, Rate Schedule No. 1011, Southeast EEM Agreement (0.0.3).

[11] The Members of the Southeast EEM include:  Southern Companies; Associated Electric Cooperative, Inc.; Dalton Utilities; Dominion Energy SC;  Duke Energy Carolinas, LLC and Duke Energy Progress, LLC (collectively, Duke Energy); Louisville Gas and Electric Company (LG&E) and Kentucky Utilities Company (collectively, LG&E/KU); North Carolina Municipal Power Agency Number 1; PowerSouth Energy Cooperative; North Carolina Electric Membership Corporation; and Tennessee Valley Authority (TVA) (each a Member and collectively, the Members).

[12] *Ala. Power Co.*, Notice, Docket No. ER21-1111-002, et al. (issued Oct. 13, 2021) (taking effect by operation of law).  The Members do not expect trading to occur until the first quarter of 2022.  Duke Energy OATT Transmittal at 3; Dominion Energy SC OATT Transmittal at 3; LG&E/KU OATT Transmittal at 3; Southern Companies OATT Transmittal at 3.

[13] The Southeast EEM Agreement defines "Energy Exchange" as a transaction for the purchase and sale of non-firm energy using the matching, reservation, and tagging functions of the Southeast EEM between Participants pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Market Rules.  Alabama Power Company, Market Based Rate Tariff, Rate Schedule No. 1011, Southeast EEM Agreement § 1.1 (0.0.3).

[14] November 2021 Order, 177 FERC ¶ 61,080 at P 3.

4.     On February 12, 2021, as amended on June 7, 2021, and August 11, 2021, Duke Energy, [15] LG&E/KU;[16] Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, Southern Companies);[17] and Dominion Energy South Carolina, Inc. (Dominion Energy SC)[18] submitted revisions to their respective OATTs to incorporate NFEETS (OATT amendments).  In the November 2021 Order, the Commission accepted the OATT amendments effective December 31, 9998, as requested.  The Commission also concluded that it was appropriate to grant waiver of the joint system-wide OATT requirement in 18 C.F.R. § 35.28(c)(3).[19]

5.     In their respective rehearing requests, Petitioners allege that the Commission erred in the November 2021 Order by departing from Commission precedent requiring open access to transmission service when the Commission accepted the filings and granted waiver of 18 C.F.R. § 35.28(c)(3).  Petitioners also raise objections to the underlying Southeast EEM Agreement, including to the membership requirements and application of the *Mobile-Sierra* public interest presumption to that Agreement.[20]  On December 21, 2021, the Members filed a motion for leave to answer and answer in response to Petitioners' rehearing requests.

---

[15] *See* Duke Energy, Tariff Filing, Docket Nos. ER21-1115-000 (filed Feb. 12, 2021), ER21-1115-001 (filed June 7, 2021), and ER21-1115-002 (filed Aug. 11, 2021).

[16] *See* LG&E/KU, Tariff Filing, Docket Nos. ER21-1118-000 (filed Feb. 12, 2021), ER21-1118-001 (filed June 7, 2021), and ER21-1118-002 (filed Aug. 11, 2021).

[17] *See* Southern Companies, Tariff Filing, Docket Nos. ER21-1125-000 (filed Feb. 12, 2021), ER21-1125-001 (filed June 7, 2021), and ER21-1125-002 (filed Aug. 11, 2021).

[18] *See* Dominion Energy SC, Tariff Filing, Docket Nos. ER21-1128-000 (filed Feb. 12, 2021), ER21-1128-001 (filed June 7, 2021), and ER21-1128-002 (filed Aug. 11, 2021).

[19] November 2021 Order, 177 FERC ¶ 61,080 at P 74.

[20] *See* PIOs Rehearing Request at 13 (alleging unduly preferential and discriminatory membership provisions); Clean Energy Coalition Rehearing Request at 5-7 (alleging unlawful application of *Mobile-Sierra*).

## II.     **Rehearing Requests**

6.      Petitioners contend that the Commission's November 2021 Order violates Order No. 888[21] and its progeny and section 205 of the FPA by approving revisions to Filing Parties' OATTs that unlawfully restrict transmission access.[22]  PIOs argue that the OATT amendments create a number of opportunities for Filing Parties to restrict access to transmission service to the disadvantage of potential competitors.  For example, they contend that the requirement to execute Enabling Agreements under the three-eligible-counterparty rule creates opportunities for existing Southeast EEM participants, and especially the Members, to block prospective participants, including their competitors, from accessing NFEETS.[23]  Similarly, Clean Energy Coalition argues that the Southeast EEM membership structure, particularly the requirement that only load serving entities can be Members, creates "two unequal classes of market participants" in a manner that thwarts open access to transmission service and results in undue discrimination in violation of the FPA.[24]  Clean Energy Coalition alleges that the governance structure of the Southeast EEM Agreement is flawed and does not provide for reasonable representation because it excludes whole classes of interested parties.[25]

7.      PIOs challenge the Commission's conclusion in the November 2021 Order that the Members and Southeast EEM participants lack the incentive to exclude potential competitors from access to NFEETS, arguing instead that "monopoly utilities . . . have a well-understood incentive to protect their monopoly franchise by blocking transmission

---

[21] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[22] PIOs Rehearing Request at 3; Clean Energy Coalition Rehearing Request at 12-15.

[23] PIOs Rehearing Request at 6-7; *see also* Clean Energy Coalition Rehearing Request at 13 (objecting to the requirement to execute Enabling Agreements with three counterparties).

[24] Clean Energy Coalition Rehearing Request at 13.

[25] *Id.* at 14.

access for [their] competitors."[26] PIOs maintain that they cannot and should not be required to provide evidence of a denial of transmission access *before it happens*, as that would: (1) set an impossibly high standard; (2) abandon the principle that the burden under section 205 of the FPA lies with the filing utility; and (3) violate the basic tenet of Order No. 888, which explicitly targets "the *potential* for future denials of access."[27]

8.      PIOs also argue that the Commission erred in accepting the OATT amendments because, in PIOs' view, they are not "consistent with or superior to" the *pro forma* OATT, as required under Order No. 888. They allege that the Commission did not adequately address evidence from protesters indicating that at least 65 existing bilateral trading partners would be excluded from access to NFEETS. PIOs also object to the requirement that transmission customers be "in good financial standing with the Transmission Provider." PIOs argue that this creditworthiness requirement is vague, undefined, and not required for point-to-point transmission service in the *pro forma* OATT.[28] In addition, PIOs argue that the OATT amendments are inconsistent with the *pro forma* OATT in that they do not specify the rates, terms, and conditions under which transmission providers are allowed to make energy sales to third parties using NFEETS. PIOs state that, while the *pro forma* OATT provides that transmission providers are subject to the rates, terms, and conditions of Part II of the *pro forma* OATT when making third-party sales, Part II of the OATT amendments does not contain the rates, terms, and conditions for NFEETS. PIOs argue that, because NFEETS is not a Part II transmission service, the transmission providers were required to show why their proposal to make third-party sales using their own transmission system for free under a service that is not available to all potential users of the transmission system is consistent with or superior to the *pro forma* OATT.[29]

9.      PIOs point out that the *pro forma* OATT requires transmission providers to use point-to-point transmission service for third-party sales whereas the OATT amendments contemplate third-party sales using NFEETS. PIOs state that it is either the case that (1) NFEETS is a substitute for point-to-point transmission service and therefore can be used to make third-party sales or (2) NFEETS is not a substitute for point-to-point transmission service, such that third-party sales using NFEETS would not be consistent

---

[26] PIOs Rehearing Request at 8.

[27] *Id.* at 10 (quoting Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,652 (emphasis in pleading)).

[28] *Id.* at 11.

[29] *Id.* at 12.

with the *pro forma* OATT and would not meet Order No. 888's comparability requirements.  According to PIOs, the Commission cannot have it both ways.[30]

10.     Both Clean Energy Coalition and PIOs allege that the Commission erred in concluding that the Southeast EEM does not establish a loose power pool.[31]  They maintain that the Southeast EEM fits squarely within the definition of loose power pool set forth in Order No. 888-A and contains membership provisions that are unduly discriminatory and preferential.[32]  Petitioners allege that the Commission erred in relying exclusively on *Public Service Company of Colorado*[33] to support its determination that the Southeast EEM does not establish a loose power pool.  In particular, they note that *PSCo* never discusses the definition of loose power pool as defined in Order Nos. 888 and 888-A, or whether the arrangement at issue in that proceeding satisfied that definition.[34]  PIOs add that the joint dispatch agreement at issue in *PSCo* is distinguishable from the Southeast EEM Agreement because, under the joint dispatch agreement, the system is dispatched on a least-cost basis for all imbalances, whereas under the Southeast EEM Agreement, the Members have "absolute discretion" as to whether NFEETS is used.[35]  Clean Energy Coalition also argues that the Commission failed to consider other precedent regarding loose power pools, including a case involving the Mid-Atlantic Power Pool (MAPP), in which the Commission rejected a two-class membership system that Clean Energy Coalition claims is similar to the two-part requirement that prospective Southeast EEM participants must: (1) obtain the countersignature of the Southeast EEM Agent at the direction of the Operating Committee; and (2) execute enabling agreements with at least three other participants.[36]

11.     Petitioners also allege that the Commission failed to consider whether NFEETS is a "special transmission arrangement" under the definition of a loose power pool set forth in Order No. 888-A and how this special arrangement bears on whether the Southeast

---

[30] *Id.* at 16.

[31] *Id.* at 13-17; Clean Energy Coalition Rehearing Request at 8-10.

[32] PIOs Rehearing Request at 13; Clean Energy Coalition Rehearing Request at 8.

[33] 154 FERC ¶ 61,107, at P 84 (2016) (*PSCo*).

[34] PIOs Rehearing Request at 14; Clean Energy Coalition Rehearing Request at 9.

[35] PIOs Rehearing Request at 14-15.

[36] Clean Energy Coalition Rehearing Request at 8-9 (citing *MAPP*, 58 FPC 2662 (1977)).

EEM establishes a loose power pool.[37]  According to PIOs, NFEETS is "special" insofar as it: (1) is exclusively for 15-minute Energy Exchanges matched in the Southeast EEM; (2) has the lowest curtailment priority of any transmission service; (3) is available on an "as-available basis;" (4) incurs financial losses that are paid for by the matched bidder and offeror in each Energy Exchange; and (5) eliminates rate pancaking for Southeast EEM participants.[38]

12.     PIOs disagree with the Commission's determination that NFEETS is not a substitute or replacement for other non-firm transmission services and therefore cannot be a "discount" of non-firm transmission service.  They insist that the record shows that NFEETS is a substitute for non-firm transmission service because, by its name, it is non-firm transmission service and, as Filing Parties acknowledged and the Commission recognized, "there could be an erosion of point-to-point revenues" resulting from customers switching from non-firm transmission service to NFEETS.[39]  PIOs maintain that NFEETS is a discounted transmission service insofar as it provides an alternative for non-firm point-to-point transmission service that does not include any ancillary services charges, does not entail any charges for operating the Southeast EEM platform, and does not charge for the fixed costs of providing transmission service.[40]

13.     Petitioners argue that the Commission's determination to grant waiver of the joint system-wide OATT requirement in 18 C.F.R. § 35.28(c)(3) is unjustified and undermines the open access requirements adopted in Order No. 888.[41]  PIOs allege that the Commission "fabricat[ed] a distinction between multilateral arrangements that involve 'joint planning or coordination' and those that do not," which does not justify waiver.[42]  Petitioners also disagree with the Commission's claim that there is no practical difference between a joint system-wide OATT and the individual OATT amendments that Filing

---

[37] PIOs Rehearing Request at 16; Clean Energy Coalition Rehearing Request at 8-9.

[38] PIOs Rehearing Request at 17; *see also* Clean Energy Coalition Rehearing Request at 9 (claiming that NFEETS eliminates rate pancaking which would otherwise apply in the absence of NFEETS).

[39] PIOs Rehearing Request at 15 (quoting November 2021 Order, 177 FERC ¶ 61,080 at P 38).

[40] *Id.* at 15-16.

[41] *Id.* at 18; Clean Energy Coalition Rehearing Request at 10-12.

[42] PIOs Rehearing Request at 19.

Parties submitted.[43] PIOs maintain that application of 18 C.F.R. § 35.28(c)(3) to the Southeast EEM would: (1) facilitate open access to NFEETS; (2) provide for one-stop shopping for potential customers that are not members of the Southeast EEM to access NFEETS; and (3) ensure that important protections offered by the FPA would apply to transmission service over the systems of non-jurisdictional utilities.[44] Clean Energy Coalition adds that another clear difference is that a joint system-wide OATT may or may not include service over TVA's transmission facilities; in other words, TVA—a non-jurisdictional utility that plans to be a Participating Transmission Provider in the Southeast EEM—would have to choose whether to voluntarily join a FERC-jurisdictional joint system-wide OATT, or else refrain from being a Participating Transmission Provider in the Southeast EEM.[45]

14. Petitioners argue that the facts at issue in *Bangor Hydro Electric Co.*[46] and *Wolverine Power Supply Cooperative Inc.*,[47] to which the Commission cited in granting waiver of 18 C.F.R. § 35.28(c)(3) in the November 2021 Order, are distinguishable from the facts here. For example, Petitioners point out that the *Bangor Hydro* proceeding involved a merged utility that would operate two separate transmission systems that were not directly interconnected, one of which would be under the control of a regional transmission organization (RTO). In contrast, they argue that none of the Southeast EEM Members have given operational control of their transmission systems over to an RTO and three of the four utilities are contiguous.[48] PIOs add that *Wolverine* is distinguishable because pool-wide transmission service was not contemplated in that case and the parties had committed to file a joint pool-wide tariff within 60 days of receiving a request, in contrast to the pool-wide NFEETS at issue here and the refusal to file a joint system-wide OATT.[49]

---

[43] *Id.* at 19-20; Clean Energy Coalition Rehearing Request at 11-12.

[44] PIOs Rehearing Request at 19-20; *see also* Clean Energy Coalition Rehearing Request at 10 (arguing that individual OATTs are insufficient to cure undue discrimination in transmission because Southeast EEM Members can continue to trade with a select group while excluding others).

[45] Clean Energy Coalition Rehearing Request at 12.

[46] 144 FERC ¶ 61,031 (2013) (*Bangor Hydro*).

[47] 87 FERC ¶ 61,047 (1999) (*Wolverine*).

[48] PIOs Rehearing Request at 21; Clean Energy Coalition Rehearing Request at 11.

[49] PIOs Rehearing Request at 21; *see also* Clean Energy Coalition Rehearing Request at 11 (distinguishing *Wolverine* as involving only one pool member with an

15.     PIOs claim that the November 2021 Order "appears to be premised on the assumption" that the Southeast EEM will provide net benefits throughout the Southeast EEM territory, with which PIOs disagree.[50]  PIOs allege that the Commission failed to respond to evidence showing that the benefits analysis on which Filing Parties relied to support the Southeast EEM proposal is flawed because (1) it does not have the ability to model dispatch on the 15-minute intervals that will be used for Southeast EEM transactions (i.e., Energy Exchanges) and (2) the underlying methodology lacks sufficient detail for the results to be verified for reasonableness.[51]  PIOs argue that, due to the alleged shortcomings of the benefits analysis, Filing Parties failed to demonstrate that the OATT amendments will result in just and reasonable rates.

16.     PIOs allege that the November 2021 Order results in an impermissible cost shift by reducing point-to-point transmission service revenues for existing market participants, such as independent power producers that are not permitted or do not wish to participate in the Southeast EEM.  PIOs maintain that independent power producers that are not Members or participants in the Southeast EEM will receive no corresponding benefits from it and, yet, will see higher costs, which PIOs contend violates cost causation.[52]

17.     Clean Energy Coalition argues that the Commission erred by accepting the OATT amendments in isolation without addressing the alleged infirmities of the Southeast EEM Agreement.  Clean Energy Coalition maintains that the OATT amendments are inextricably linked to the Southeast EEM Agreement because the sole purpose of NFEETS is to facilitate Southeast EEM transactions and because the rules governing use of NFEETS are embedded in and governed by the SEEM Agreement.[53]  In particular, Clean Energy Coalition asserts that the Commission failed to address the allegedly unlawful application of the *Mobile-Sierra* public interest presumption to the Southeast EEM Agreement.[54]

---

integrated grid whereas most, if not all, of the Southeast EEM Participating Transmission Providers have integrated transmission grids).

[50] PIOs Rehearing Request at 21-22.

[51] PIOs Rehearing Request at 22 (citing SEEM Agreement Transmittal Letter, Attach. E-1, Benefits Analysis at Docket No. ER21-1111-000 (Feb. 12, 2021)).

[52] *Id.* at 24-26.

[53] Clean Energy Coalition Rehearing Request at 4-7.

[54] *Id.* at 5.

## III. Discussion

### A. Procedural Matters

18.     Rule 713(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.713(d)(1) (2021), prohibits an answer to a request for rehearing. Accordingly, we deny the Members' motion to answer and reject their answer.

### B. Substantive Matters

19.     We are unpersuaded by Petitioners' arguments on rehearing. We continue to find that the OATT amendments are just and reasonable and not unduly discriminatory or preferential, as discussed below.[55] As an initial matter, Petitioners' arguments concerning whether the Southeast EEM Agreement establishes a loose power pool are nearly identical to those Petitioners raised earlier in this proceeding and were thoroughly addressed in the November 2021 Order.[56] PIOs' attempt to distinguish *PSCo* is also unavailing because they are incorrect in asserting that the Members have "absolute discretion" as to whether NFEETS is used.[57] To the contrary, the Southeast EEM Market Rules require that Participating Transmission Providers provide the Southeast EEM administrator with their available transfer capability, as calculated by each Participating Transmission Providers' posted methodology.[58] Each hour, that available transfer capability is used as an input to the Southeast EEM Algorithm.[59] The Southeast EEM

---

[55] Contrary to the dissent, we address undue discrimination concerns (*see infra* PP 23, 25, 27, 31), arguments related to the membership and governance provisions in the Southeast EEM Agreement (*see infra* PP 22, 23), and *MAPP* precedent (*see infra* P 22 and n.68). While the dissent claims the Commission has not rebutted arguments that the OATTs at issue erect impermissible barriers, those too are addressed. *See infra* P 23; *see also* November 2021 Order, 177 FERC ¶ 61,080 at PP 65-67.

[56] *Compare* Clean Energy Coalition March 15, 2021 Comments, Docket No. ER21-1111-000 et al., at 9-12 and PIOs March 15, 2021 Protest, Docket No. ER21-1111-000 et al., at 6-10 *with* Clean Energy Coalition Rehearing Request at 8-10 and PIOs Rehearing Request at 13-17. *See* November 2021 Order, 177 FERC ¶ 61,080 at PP 47-48, 64, n.109 (noting and addressing argument).

[57] PIOs Rehearing Request at 14-15.

[58] Alabama Power Company, Market Based Rate Tariff, Rate Schedule No. 1011, Southeast EEM Agreement (0.0.3), Rate Schedule No. 1011, app. B (Southeast EEM Market Rules) (0.0.3) § IV.A.2.

[59] *Id.* § IV.B.2.a.

Algorithm uses that information as a constraint such that no match will exceed the available transfer capability of any Participating Transmission Provider, thereby removing discretion from Members as to whether NFEETS is used.[60]

20.     We also disagree that the *PSCo* decision fails to consider the definition of a loose power pool from Order No. 888-A.[61]  In Order No. 888-A, the Commission defined a "loose" power pool as:  "any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[62]  Although the *PSCo* decision did not explicitly discuss that definition, the Commission necessarily found that PSCo's arrangement did not meet that definition when it found that PSCo's proposed Joint Dispatch Transmission Service did not represent a "discount" of non-firm transmission service and that PSCo's Joint Dispatch Agreement did not constitute a loose power pool.[63]  Here, the Commission considered the "discounted" nature of the PSCo arrangement by emphasizing the zero-dollar non-firm transmission to facilitate intra-hour transactions and by explaining that this was similar to the zero-dollar, non-firm service for unused transmission capacity available under the Southeast EEM Agreement.[64]

21.     Similarly, the Commission's finding that PSCo's Joint Dispatch Agreement did not constitute a loose power pool necessarily found that the Joint Dispatch Agreement was not "special transmission arrangement."  Here, too, we find that NFEETS does not constitute a "special transmission arrangement" under the Order No. 888-A definition of a loose power pool.  As the Commission explained in the November 2021 Order, NFEETS, as "the lowest-priority transmission service, cannot be used to satisfy reliability obligations of Southeast EEM Participants, and does not replace existing transmission service."[65]  We disagree with the dissent's conclusion that these characteristics render the

---

[60] *Id.* § IV.C.6.b.

[61] PIOs Rehearing Request at 14.

[62] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,241.

[63] *See PSCo*, 154 FERC ¶ 61,107 at PP 84-85; *id.* P 85 (Rejecting Tri-State's arguments regarding a violation of Order No. 888's requirements for loose power pools, the Commission stated "PSCo is not proposing the establishment of a loose power pool and as such the requirements cited to are not required of the arrangement proposed by PSCo.") (citation omitted).

[64] November 2021 Order, 177 FERC ¶ 61,080 at P 64.

[65] *Id.*

service "special" by the "natural meaning" [66] of that word.  To the contrary, as used in Order No. 888-A's definition of loose power pool, the word "special" is reasonably read to connote something favorable, in a manner similar to the word "discounts" referenced in the same definition.[67]  Indeed, the Commission recognized as much in Order No. 888-A when it stated that it would consider "any rates, terms or conditions of transmission service that *favor* members over non-members to be unduly discriminatory or preferential."[68]

22.     In light of the Commission's finding in the November 2021 Order that the Southeast EEM does not establish a loose power pool, the particular membership and governance structure of the Southeast EEM is not subject to the requirements of Order No. 888, such that Clean Energy Coalition's discussion of precedent concerning *MAPP* is inapposite.[69]  Moreover, Clean Energy Coalition's arguments challenging the membership and governance structure contained in the Southeast EEM Agreement are outside the scope of this proceeding, which is limited to the OATT amendments, which incorporated NFEETS, approved in the November 2021 Order.[70]  Clean Energy Coalition's challenge to the application of the *Mobile-Sierra* public interest presumption to changes to the Southeast EEM Agreement are likewise outside the scope of this proceeding and, in any event, the Commission addressed those arguments in a separate docket.[71]

23.     We continue to find that Filing Parties have satisfied their burden under section 205 of the FPA to demonstrate that the OATT amendments are just and reasonable and not unduly discriminatory or preferential, including that NFEETS will be offered on a

---

[66] Clements, Comm'r, dissenting at P 8.

[67] *See* Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,241.  Filing Parties themselves described NFEETS as having "the lowest priority of all available services" and as such it does not meet the definition of "special" as that term is used in reference to a loose power pool.  *See, e.g.*, Southeast EEM Transmittal at 24. SEEM Agreement Transmittal Letter, Docket No. ER21-1111-000 (Feb. 12, 2021)).

[68] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,242 (emphasis added).

[69] While the MAPP arrangement did not satisfy the minimum criteria for membership in a pooling agreement, the instant case involves no such pooling agreement.

[70] Rehearing arguments concerning the Southeast EEM Agreement, which took effect by operation of law, were rejected as untimely.  *Ala. Power Co.*, 177 FERC ¶ 61,178 (2021).

[71] *Ala. Power Co.*, 178 FERC ¶ 61,048, at PP 35-36 (2022).

non-discriminatory basis, such that the OATT amendments are consistent with or superior to the *pro forma* OATT. Notably, all participants in the Southeast EEM—including Members and non-Members alike—will be able to access NFEETS on the same terms and conditions through the individual OATT provisions that the Commission accepted in this proceeding. Accordingly, we are unpersuaded by claims that the membership and governance structure of the Southeast EEM unduly restrict access to NFEETS. The Commission also detailed in the November 2021 Order why it does not view the Southeast EEM's participation requirements, including the requirement that participants own or otherwise control a source or sink within the Southeast EEM territory and the three-eligible-counterparty rule, as erecting unduly discriminatory barriers to accessing NFEETS.[72] The Commission explained that these requirements incorporate preexisting requirements in the Southeast bilateral market, are widely-used, and are also necessary from an operational perspective.[73] We agree with Filing Parties that the proposed participation requirements balance enabling the greatest number of entities to participate in the Southeast EEM against addressing concerns regarding the potential for market manipulation within the Southeast EEM through participants deciding to only trade with one or two potential counterparties.[74] We continue to believe that arguments that Filing Parties may unreasonably restrict access to NFEETS by refusing to enter into Enabling Agreements or by directing the Southeast EEM Agent to refuse to countersign a Participant Agreement are speculative and unsupported.[75]

24.     As for the creditworthiness requirements, contrary to PIOs' claim on rehearing, we do not find it unreasonable to require a transmission customer to be in good financial standing to access NFEETS. PIOs acknowledge that "creditworthiness requirements are spelled out in the *pro forma* OATT."[76] Yet PIOs do not demonstrate that the general creditworthiness requirement of being in "good financial standing" as contained in the OATT amendments is any more restrictive than those requirements contained in the *pro*

---

[72] November 2021 Order, 177 FERC ¶ 61,080 at PP 65-70.

[73] *Id.*

[74] Filing Parties' March 30, 2021 Answer, Docket No. ER21-1111-000 et al., at 42 (noting that the three-eligible-counterparty rule is "intended to balance the desire to allow maximum participation while addressing a potential avenue for market manipulation").

[75] November 2021 Order, 177 FERC ¶ 61,080 at PP 68-69 & n.118 (citing Filing Parties March 30 Answer at 36-37 (stating that "the Southeast EEM Members created the Southeast EEM because they do intend to use it, and benefit from it, and benefits will be at their greatest with eligible counterparties maximized.")).

[76] PIOs Rehearing Request at 11.

*forma* OATT.  Accordingly, we disagree with PIOs' argument that the OATT amendments are not consistent with or superior to the *pro forma* OATT.

25.    PIOs' argument with respect to third-party sales[77] is not entirely clear.  PIOs allege that Filing Parties have not shown "why their proposal to make Third-Party Sales using their own transmission system for free under a service that is not available to all potential users of the transmission system is consistent with or superior to the *pro forma* OATT."[78]  Given our finding that the Southeast EEM participation requirements are not unduly restrictive and that NFEETS will be offered on a non-discriminatory basis, we fail to see why the use of NFEETS for third-party sales would present any comparability concerns with the *pro forma* OATT and are therefore unpersuaded by PIOs' argument on this point.

26.    We disagree that there is "unrebutted" evidence suggesting that the Members and expected participants in the Southeast EEM have "a well-understood incentive to protect their monopoly franchise by blocking transmission access for its competitors."[79]  Filing Parties directly rebutted this allegation by explaining that the public service companies, electric cooperatives, and municipal electric companies that comprise the Members of the Southeast EEM currently trade in the bilateral market in the Southeast with numerous counterparties and have come together for the express purpose of maximizing the number of potential bilateral transactions.[80]  We agree with Filing Parties that there are increased incentives to trade with counterparties for the purposes of maximizing these potential joint benefits.  As Filing Parties explained, automated matching by the Southeast EEM Algorithm will make it easier for trading partners to find each other and engage in economic transactions that otherwise may not occur.[81]  They also explained that

---

[77] *See supra* PP. 8-9.

[78] PIOs Rehearing Request at 12.

[79] *Id.* at 9.

[80] Filing Parties July 14, 2021 Answer, Docket No. ER21-1111-001 et al., at 18; *see also* November 2021 Order, 177 FERC ¶ 61,080 at P 68 (dismissing claims that certain Participants are likely to collude to exclude prospective Participants).

[81] February 12, 2021 Southeast EEM Transmittal, Docket No. ER21-1111-000, attach. D, Pope Aff. ¶ 32 ("The automated system will have a substantial advantage in searching for transmission paths with available transmission to complete beneficial trades, overcoming transaction costs and information barriers.  Further, the algorithm will exhaustively seek out all possible beneficial trades across the Territory, as measured by voluntary bids and offers, capturing the additional benefits made available by scheduling otherwise unused available transmission with zero-cost transmission service.").

automation would increase market efficiency by making certain 15-minute transactions economic when they may not be economic under the existing bilateral market.[82]  In addition, we note that the Southeast EEM construct and the availability of NFEETS does not change the market-based rate authorizations or obligations of any Member or participant.

27.     Contrary to PIOs' rehearing argument, our dismissal of PIOs' allegations as speculative and unsupported by the record in this proceeding does not create an "impossibly high standard," nor does it shift the burden of proof from Filing Parties to protesters.  Having considered the arguments raised in the protests and on rehearing, we continue to find that those arguments are not adequately supported by the record in this proceeding.  For the reasons discussed above and in the November 2021 Order, we conclude that Filing Parties have demonstrated, as required under section 205 of the FPA, that the OATT amendments are, on their face, just and reasonable and not unduly discriminatory or preferential.

28.     We also sustain the Commission's determination in the November 2021 Order that there is good cause to grant waiver of 18 C.F.R. § 35.28(c)(3).[83]  The requirement to file a joint system-wide OATT contained in that regulation originated from the Commission's concern in Order No. 888 that individual OATTs could not cure undue discrimination "if those public utilities can continue to trade with a selective group within a power pool that discriminatorily excludes others from becoming a member and that provides preferential intra-pool transmission rights and rates."[84]  Here, there is no such concern regarding preferential intra-pool transmission rights and rates because the Southeast EEM does not establish a loose power pool.  Moreover, we find that an equally effective measure to protect against any remaining potential for undue discrimination is to ensure that each individual OATT contains the same rates, terms, and conditions for providing NFEETS, which is the case here, and which we find to be just and reasonable.[85]

---

[82] *Id.* ¶ 13 ("The Southeast EEM's combination of zero-cost, non-pancaked transmission service and automated 15-minute trading reduce the costs of competition making it more likely that willing buyers and sellers will be able to enter into cost-reducing 15-minute trades.").

[83] November 2021 Order, 177 FERC ¶ 61,080 at P 62.

[84] Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,726.

[85] Contrary to the suggestion in the dissent, this determination is consistent with the Commission's finding in the November 2021 Order that "there would be no practical difference between a joint system wide OATT and the identical NFEETS provisions that

29.     We also continue to believe that waiver of 18 C.F.R. § 35.28(c)(3) is appropriate due to the impracticalities associated with the filing of a joint system-wide OATT in this case.  As Filing Parties explained, the Southeast EEM affects only residual transmission, such that a joint system-wide OATT for all transmission service would be unnecessarily cumbersome and result in the opposite of the "one-stop shopping" approach for which PIOs advocate on rehearing.[86]

30.     We are also unpersuaded by Petitioners' arguments[87] raising factual differences between the instant case and the *Bangor Hydro* and *Wolverine* cases to which the Commission cited in the November 2021 Order as examples of where the Commission had previously granted waiver of 18 C.F.R. § 35.28(c)(3).  The Commission's waiver determinations are specific to the facts in each proceeding.[88]  As in *Bangor Hydro* and *Wolverine*, the Commission supported its waiver determination in the November 2021 Order given the particular facts at issue here notwithstanding factual differences from cited precedent.

31.     As to PIOs' arguments questioning the extent of potential benefits resulting from the Southeast EEM, we disagree that the Commission's acceptance of the OATT amendments in the November 2021 Order was "premised on the assumption" of benefits.  The Commission appropriately focused its analysis on whether the proposed OATT amendments were just and reasonable and not unduly discriminatory or preferential, and

---

each Participating Transmission Provider has filed."  Clements, Comm'r, dissenting at n.19 (citing November 2021 Order, 177 FERC ¶ 61,080 at P 73).

[86] *Compare* Filing Parties' March 30, 2021 Answer, Docket No. ER21-1111-000 et al. (explaining that, under the individual OATT approach, Southeast EEM participants "will be able to enter into a single NFEETS transaction that will be scheduled through each Participating Transmission Provider's OASIS" whereas the requirement to have a joint system-wide OATT would "seeming[ly] call for there to be *two* tariffs and *two* transmission providers for each transmission system (i.e., a joint OATT for NFEETS and individual [Tariffs] for  other services)" (emphasis in pleading)); *with* PIOs Rehearing Request at 20 (arguing that a joint system-wide OATT would allow non-Member participants in the Southeast EEM a "one-stop shop" for NFEETS).

[87] *See* PIOs Rehearing Request at 21; Clean Energy Coalition Rehearing Request at 11.

[88] *See* Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,854 ("Because the possible scenarios under which small entities may seek waivers from the Final Rule are diverse, they are not susceptible to resolution on a generic basis and we will require applications and fact-specific determinations in each instance.").

we continue to find them to be so.[89]  Nevertheless, the qualitative and quantitative benefits are relevant insofar as they balance any potential costs of decreased point-to-point transactions with the potential benefits expected to accrue from the new automated bilateral trading platform.[90]  We are also unpersuaded by PIOs' argument that the benefits analysis does not sufficiently demonstrate and quantify the costs and benefits of the Southeast EEM, including arguments that the costs are understated and that the benefits are overstated.  The Commission does not require a quantified cost-benefit analysis to determine whether a proposal is just and reasonable and not unduly discriminatory or preferential.[91]

32.      In formulating their allegation that the November 2021 Order is inconsistent with cost causation, PIOs also reiterate arguments that the Southeast EEM will result in a cost shift by reducing point-to-point transmission revenues for existing market participants, such as independent power producers, that cannot or do not wish to participate in the Southeast EEM.[92]  We disagree.  PIOs continue to suggest that there is an issue with the existing rate designs for transmission service.[93]  As discussed in the November 2021 Order, we are unable to reach such a conclusion based on the record.[94]  Not only are these concerns speculative and unsupported, but we also note that these issues are not before us (as no party has proposed to change the existing rate designs).[95]

---

[89] *See* November 2021 Order, 177 FERC ¶ 61,080 at PP 40, 62-71.

[90] *See id.* P 43 (discussing benefits).

[91] *See, e.g.*, *Sw. Power Pool, Inc.*, 173 FERC ¶ 61,267, at P 30 (2020) (finding that Southwest Power Pool's Western Energy Imbalance Service market would deliver significant benefits while rejecting arguments that Southwest Power Pool must quantify those benefits).

[92] PIOs Rehearing Request at 24-26.

[93] *See* November 2021 Order, 177 FERC ¶ 61,080 at P 44.

[94] *Id.*

[95] *See ANR Pipeline Co. v. FERC*, 771 F.2d 507, 514 (D.C. Cir. 1985) (finding that the Commission cannot revise an "unchanged part" of a rate under section 4 of the Natural Gas Act, the counterpart to section 205 of the FPA); *Midcontinent Indep. Sys. Operator, Inc.,* 164 FERC ¶ 61,069, at P 48 (2018), *order on reh'g*, 169 FERC ¶ 61,038, at P 13 (2019) (finding that requiring further revisions in addition to what was proposed in the filing is beyond the scope of the Commission's review under section 205 of the FPA).

<u>The Commission orders</u>:

      In response to the requests for rehearing, the November 2021 Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.  Commissioner Danly is concurring with a separate statement
                          attached.
                      Commissioner Clements is dissenting with a separate statement
                          attached.

( S E A L )

Kimberly D. Bose,
Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Duke Energy Progress, LLC<br>Duke Energy Carolinas, LLC | Docket Nos.  ER21-1115-003 |
| Louisville Gas and Electric Company | ER21-1118-003 |
| Alabama Power Company | ER21-1125-003 |
| Dominion Energy South Carolina, Inc. | ER21-1128-003 |

(Issued March 24, 2022)

DANLY, Commissioner, *concurring*:

I concur in today's order[1] because it continues to find that the open access transmission tariffs (OATTs) submitted in the captioned dockets are just and reasonable.[2] I write separately to reiterate that, because these OATTs took effect by operation of law, no further orders should have issued.[3]

For these reasons, I respectfully concur.

_____
James P. Danly
Commissioner

---

[1] *See Duke Energy Progress, LLC*, 178 FERC ¶ 61,195 (2022).

[2] *Id.* PP 2, 22.  These four dockets include updates to individual utilities' OATTs in order to effectuate the Southeast Energy Exchange Market and the provision of Non-Firm Energy Exchange Transmission Service.

[3] *See Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (Danly, Comm'r, concurring); *Ala. Power Co.*, Statement of Commissioner James P. Danly, Docket Nos. ER21-1111-002, et al. (issued Oct. 20, 2021); *see also* 16 U.S.C. § 824d(g)(1)(A).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Duke Energy Progress, LLC | Docket Nos.  ER21-1115-003 |
| Duke Energy Carolinas, LLC | |
| | |
| Louisville Gas and Electric Company | ER21-1118-003 |
| | |
| Alabama Power Company | ER21-1125-003 |
| | |
| Dominion Energy South Carolina, Inc. | ER21-1128-003 |

(Issued March 24, 2022)

CLEMENTS, Commissioner, *dissenting*:

1.     At its heart, this case is about a simple question.  May a group of transmission owners join together as a member group to render transmission service to each other on preferential terms, while only providing that same service to non-members if (1) the member group approves the non-member's access, and (2) the non-member agrees to a set of rules that offer it inferior rights and protections?  The clear answer is no.  The Federal Power Act (FPA) does not permit services to be rendered in this discriminatory manner, nor does it permit such a barrier to open access.  The transmission service at issue here, known as Non-Firm Energy Exchange Transmission Service (NFEETS), must be openly offered, without unduly discriminatory terms, conditions, and rights available only to preferred customers.

2.     To justify their conclusion that a group of transmission providers *may* restrict their service and offer it on discriminatory terms, the majority engages in a confusing path of circuitous logic—first finding, based on no discernible principle, that the service arrangement at issue is not a loose power pool, and next finding that because it is not a loose power pool, the Members' decision to provide themselves with preferential rights is not directly prohibited by existing regulations.  Yet nothing in the order confronts the basic question at the heart of the dispute:  Are the terms of service for NFEETS set forth in the proposed Open Access Transmission Tariffs (OATTs) unduly discriminatory?  And if not, why not?

3.     The majority avoids this question because the answer is inescapable.  As I explained at length in my dissent to the underlying order in this case and my Fair Rates Act (FRA) Statement concerning the Southeast Energy Exchange Market (Southeast

EEM or SEEM) proposal,[1] the SEEM arrangement discriminates against non-Members and therefore erects an unlawful barrier to open access. Each OATT at issue in this order enshrines the Southeast EEM agreement and provides SEEM Members with preferential rights concerning the provision of NFEETS.

4.      There are numerous flaws in the majority's reasoning that render the Commission's approval of the OATTs at issue deficient, and this dissent does not attempt to detail them all. Rather, I emphasize two points: First, the majority's characterization that NFEETS is not provided via a loose power pool is arbitrary and capricious, contrary to Order Nos. 888 and 888-A, and at odds with the FPA's bar on undue discrimination. The majority's suggestion that transmission owners may discriminate in offering lowest priority service has no basis in Order Nos. 888 and 888-A, or in the FPA. Second, the rehearing requests' persuasive arguments that the OATTs at issue erect impermissible barriers to open access stand largely unrebutted. The majority principally contends that barriers to accessing NFEETS are necessary to the operational provision of the service. But this logic presumes that the filing parties are entitled to provide NFEETS, even if they do so in a manner contrary to open access. They hold no such entitlement. Order No. 888's insistence on open access is a basic floor that all transmission service must meet.

## I.    <u>NFEETS is provided through a loose power pool. The majority's determination to the contrary is arbitrary and capricious, and inconsistent with Order Nos. 888 and 888-A, and the FPA.</u>

5.      As the majority acknowledges, Order No. 888-A defines a "loose power pool" as: "any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[2] Loose power pools must "allow open membership," "make the transmission service in the loose pool agreement available to others[,]" and must not establish "rates, terms or conditions of transmission service that

---

[1]  *See Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (November 2021 Order) (Clements, Comm'r, dissenting) (Clements Dissent November 2021 Order) (attaching and incorporating by reference as Appendix A Clements dissent in *Alabama Power Co.*, Docket No. ER21-1111-002, Statement of Comm'r Clements, October 20, 2021 (Clements Dissent November 2021 Order, 177 FERC ¶ 61,080 at App. A (FRA Statement)).

[2]  Majority Order at P 20 (quoting *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, at 30,241 (1997) (cross-referenced at 78 FERC ¶ 61,220).

favor members over non-members ....”[3]  Through this definition and requirements, Order Nos. 888 and 888-A ensure that “a selective group” of public utilities cannot “discriminatorily exclude[] others from becoming a member” so as to provide each other with “preferential intra-pool transmission rights and rates.”[4]

6.     The structure of Order No. 888’s definition of loose power pools ensures that it captures all efforts by public utilities to join together to provide one another access to preferential transmission service, and thereby ensures that membership and governance for such service is not unduly discriminatory.  “Discounted” service suggests cases where the members have access to service priced lower than the same or similar service available elsewhere.  “Special” service, on the other hand, suggests service that is distinctive or unique.  Common sense thus leads to the conclusion that “special transmission arrangements” are agreements to provide a distinctive service unique to the pool.  Here, NFEETS is a “special transmission arrangement” because it is only offered to SEEM participants and is a distinct service that is not otherwise available.[5]

7.     The common-sense conclusion that NFEETS is a special transmission arrangement is also consistent with the broader structure and purpose of Order No. 888.  By requiring arrangements for either “discounted” or “special” services to conform to certain rules, Order No. 888 ensures that member groups cannot provide themselves with preferential rights over transmission service.[6]  If the service at issue is not unique or distinct (i.e., is otherwise available outside the pool) and is not discounted, then preferential terms and conditions for membership in a pool that provides that service would not pose a problem because non-members could obtain the same service outside of the pool at the same price.[7]

---

[3] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,241-42.

[4] Majority Order at P 28 (quoting *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,726 (1996) (cross-referenced at 75 FERC ¶ 61,080).

[5] To the extent that NFEETS is interpreted as *not* providing a distinct, special transmission service because it is similar to other non-firm service, then it would qualify under the “discounted” prong of the loose power pool definition because it is offered for free.

[6] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,241-42 (discussing primary goal of Order No. 888).

[7] That Order No. 888 intended to broadly address all cases of utilities entering into agreements to provide each other with preferential service is further supported by the

8.     In a sharp divergence from the natural meaning of "special," the majority states that NFEETS is not a "special transmission service arrangement" because it provides "the lowest-priority transmission service, cannot be used to satisfy reliability obligations of Southeast EEM Participants, and does not replace existing transmission service."[8] The majority provides no reasonable explanation for why these criteria render the service arrangement at issue non-special or otherwise disqualify it from being a loose power pool, much less a reasonable explanation of how Order No. 888-A could possibly define "special transmission arrangements" in a manner that is the very opposite of the words' natural meanings and that runs contrary to the order's purpose of preventing undue discrimination.[9] Ironically, the characteristics the majority cites are some of the very features that make NFEETS distinctive (i.e., special). Indeed, the Commission's underlying order asserts that because NFEETS does not replace "other non-firm services, it cannot be a discount of any non-firm transmission service[,]"[10] thereby suggesting that NFEETS *is* distinctive and unique (i.e. special). The closest the majority comes to providing a reason for its determination is its suggestion that special "connote[s]

---

regulations issued via Order No. 888, which require a "joint pool-wide or system-wide" OATT for every "arrangement or agreement that contains transmission rates, terms or conditions." 18 C.F.R. § 35.28(c)(3), *enacted by* Order No. 888, FERC Stats. & Regs. ¶ 31,036). The majority acknowledges that this regulation requires a joint system-wide OATT in this circumstance but waives the requirement. Majority Order at P 28.

     [8] Majority Order at P 21.

     [9] While the majority theorizes that the *Public Service Company of Colorado* decision it relies upon "necessarily found that the Joint Dispatch Agreement [at issue] was not a 'special transmission arrangement[,]'" that decision includes no discussion whatsoever regarding what constitute "special transmission arrangements." Majority Order at P 21; *see Public Service Company of Colorado*, 154 FERC ¶ 61,107, at PP 84-85 (2016) (never once even mentioning the term "special transmission arrangements," and simply assuming that the Joint Dispatch Agreement at issue did not constitute a loose power pool). Doubling down on this lack of reasoning, as the majority does, is arbitrary and capricious. *See Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (A "fundamental requirement of administrative law is that an agency set forth its reasons for decision . . . . [C]onclusory statements will not do; an agency's statement must be one of *reasoning*.") (citations omitted; emphasis in original).

     [10] November 2021 Order, 177 FERC ¶ 61,080 at P 64 n.110. Today's order creatively reinterprets the underlying order as suggesting that the fact that NFEETS service does not substitute for non-firm service is instead (or also) relevant to whether the service is "special," but does not provide any rational explanation for this conclusion.

something favorable."[11]  Yet this only proves the point further that NFEETS *is* special. While NFEETS is lowest priority service, it is provided at *zero cost*.  Having access to such a service is clearly favorable.

9.      Nor does the majority offer any reasons why concerns of undue discrimination would not apply to transmission service simply because it is "the lowest-priority transmission service, cannot be used to satisfy reliability obligations of Southeast EEM Participants, and does not replace existing transmission service."[12]  Order No. 888's requirements for loose power pools ultimately flow from the FPA's requirement that rates and terms of service must be just and reasonable and not unduly discriminatory.

10.     Even if, for some unexplainable reason, NFEETS does not constitute a "special transmission arrangement," the majority offers no reason why the underlying logic of the membership and governance requirements of Order No. 888 would not equally apply to the case at hand.  The majority has not cited anything in Order No. 888 suggesting that the characteristics of NFEETS should provide a free pass for discrimination and control by a preferential member group.  Nothing in Order No. 888 or the FPA suggests that transmission providers may discriminate in mutually arranging for lowest priority service, services that are not used to satisfy reliability obligations, or services that do not replace other existing transmission services.

11.     Today's order uses its interpretation of "special transmission arrangement" as the basis to conclude that Commission and judicial precedent concerning the Mid-Atlantic Power Pool (MAPP) "is inapposite."[13]  Yet nothing about the MAPP decisions suggests that their precedential value should be limited to pooling arrangements,[14] and Order No. 888 was concerned with *expanding* the Commission's open access principles, not narrowing them.[15]  Further, the majority fails to provide an affirmative reason as to how

---

[11] Majority Order at P 21.

[12] *Id.* (quoting November 2021 Order, 177 FERC ¶ 61,080 at P 64).

[13] *Id*. P 22.

[14] *See, e.g. MAPP*, 58 FPC 2622 (1977) (rejecting proposed restrictive membership criteria and ordering them to be modified, where membership criteria conferred advantages and negatively impacted parties denied membership), *petition for rev. den*. *Cent. Iowa Power Coop.*, 606 F.2d 1156, 1171 (1979) ("We are satisfied that the Commission, in modifying the membership provisions, reached a reasoned decision based on substantial evidence.").

[15] Order No. 888, FERC Stats. & Regs. ¶ 31,036.

discriminatory membership and governance provisions are permitted by the FPA and do not constitute undue discrimination.[16] The burden is on the filers to demonstrate that what they have put forward is just and reasonable and not unduly discriminatory, meaning that such an affirmative showing is compulsory. Simply stating that the filing is not directly precluded by existing precedent is not sufficient to meet this burden.

12. Section 205 of the FPA places a burden on filing parties to not only demonstrate that "rates and charges made" are "just and reasonable and not unduly discriminatory," but also to demonstrate that "rules and regulations affecting or pertaining to such rates or charges" are likewise just and reasonable and not unduly discriminatory.[17] The order states that "all participants in the Southeast EEM—including Members and non-Members alike—will be able to access NFEETS on the same terms and conditions…."[18] But this simply is not true. As the Clean Energy Coalition identifies, SEEM Members alone have "operational control of the complex and important market platform that allocates [NFEETS]," and have "unique auditing and oversight abilities not shared with other Participants."[19] The majority gives no explanation as to how these plainly discriminatory

---

[16] The majority concludes that several challenges are out of scope, including challenges to membership and governance structure, as well as challenges to the application of the *Mobile-Sierra* public interest presumptions, reasoning that this case is limited to the "OATT amendments, which incorporated NFEETS[.]" Majority Order at P 22. But these OATT amendments incorporate NFEETS, which provides service only for transactions carried out and governed by the Southeast EEM Agreement. In these dockets, for the first time, these utilities (Duke Energy Progress LLC, Duke Energy Carolinas LLC, Louisville Gas and Electric Company, Alabama Power Company, Georgia Power Company, Mississippi Power Company, and Dominion Energy South Carolina, Inc.) now include these discriminatory governance provisions in their respective OATTs. To approve them, the Commission must conclude that they are just and reasonable and not unduly discriminatory, which in turn requires determinations on governance and *Mobile-Sierra*. That the rehearing arguments concerning the Southeast EEM Agreement itself were rejected as untimely does not absolve the Commission of the duty to consider the justness and reasonableness of the OATT amendments in this case. *Id.* P 21 n.65 (citing *Ala. Power Co.*, 177 FERC ¶ 61,178 (2021)). In particular, the governance issues remain squarely within the scope of this order given Order No. 888's requirements for loose power pools. Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,241-42.

[17] *See* 16 U.S.C. § 824d.

[18] Majority Order at P 23.

[19] Clean Energy Coalition Request for Rehearing at 14 (quoting Clements Dissent November 2021 Order, 177 FERC ¶ 61,080 at App. A (FRA Statement) P 33). SEEM

differences in the terms on which NFEETS is provided do not constitute "terms and conditions" of service, or otherwise constitute "rules and regulations affecting or pertaining to" NFEETS rates and charges.[20] Because filing parties have failed to affirmatively demonstrate how these terms and conditions are just and reasonable and not unduly discriminatory, they have failed to carry their burden under section 205 of the FPA.

---

Members' preferential rights include the exclusive ability to sit on the SEEM Membership Board, which has sole authority to address "all Significant Matters", including the hiring and firing of the SEEM Agent, Administrator, and Auditor; to appoint the Operating Committee that supervises the day-to-day operation of the SEEM system; and to direct the Auditor to perform auditing function, including whether to investigate further any complaints received from a Participant. As Order No. 888-A explains, the Commission "consider[s] any rates, terms or conditions of transmission service that favor members over non-members to be unduly discriminatory and preferential, whether embodied explicitly or implicitly in a loose pooling agreement." Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 30,242.

[20] In contending that waiver of 18 C.F.R. § 35.28(c)(3) is appropriate, the majority suggests that individual OATTs are permissible because the Commission can employ "an equally effective measure to protect against . . . undue discrimination," by insisting that "each individual OATT contains the same rates, terms, and conditions for providing NFEETS …." Majority Order at P 28. But as the majority appears to concede, a joint OATT would bar preferential rights and rates that discriminate in favor of the parties signing onto the joint OATT. This concern is not addressed by "each individual OATT contain[ing] the same rates, terms, and conditions for providing NFEETS" where those conditions are unduly discriminatory. The majority's conclusion that "there would be no practical difference between a joint system wide OATT and the identical NFEETS provisions that each Participating Transmission Provider has filed" is also flawed. Majority Order at P 28 n. 85 (citing November 2021 Order, 177 FERC ¶ 61,080 at P 73). As the Clean Energy Coalition echoes from my dissent to that order, "one clear difference" between individual OATT filings at issue here and a joint OATT is that "a joint OATT would have to either include or not include Tennessee Valley Authority (TVA), requiring TVA to choose whether to voluntarily join into an OATT that they are not required to file themselves, or else refrain from joining the SEEM and experiencing its benefits." Clean Energy Coalition Request for Rehearing at 11-12 (quoting Clements Dissent November 2021 Order, 177 FERC ¶ 61,080 at P 22.

## II.   The OATTs at issue erect barriers to open access in violation of Order No. 888

13.     Whether or not SEEM is in fact a loose power pool, the terms enshrined in the OATTs at issue here violate Order No. 888's requirement for open access.[21]  The majority dismisses the concerns articulated in the rehearing requests that the OATTs impose impermissible barriers to accessing NFEETS, namely: (1) participants must control a source or be contractually obligated to serve a sink within the relevant service territories; (2) execute a Participation Agreement with the SEEM Agent at the direction of the Operating Committee comprised of SEEM Members, and (3) execute Enabling Agreements with at least three eligible counterparties in the SEEM footprint.[22]  But as I previously stated, "it is difficult to surmise a more direct and problematic barrier to open access than granting a subset of market participants veto power over whether others may access a market platform that allocates transmission service."[23]

14.     The principal thrust of the majority's rebuttal to these concerns appears to be that the SEEM participation requirements are "necessary from an operational perspective," or necessary to "address[] concerns regarding the potential for market manipulation …."[24] These justifications ring hollow.  Nothing in Order No. 888 or the FPA permits open access to be denied because the filing utility has designed a new transmission service for which barriers to its competitors are necessary from an operational perspective.  Further, while the majority appears to suggest that such restrictions are the only means by which the proposed Tariff could facilitate participation while addressing the potential for market manipulation, it ignores that other markets are able to operate with far more participants without these sorts of discriminatory measures.[25]  The barriers to participation, and failure to develop non-discriminatory means of addressing the issues they intend to solve,

---

[21] Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,635, 31,651-53.

[22] Public Interest Organizations Request for Rehearing at 6-10; Clean Energy Coalition Request for Rehearing at 13, 14 (Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,635, 31,651-53).

[23] Clements Dissent November 2021 Order, 177 FERC ¶ 61,080 at P 4.

[24] Majority Order at P 23.  Notably, while the operational and market manipulation concerns are responses to the source/sink and Enabling Agreement requirements, respectively, the majority does not appear to cite *any* justification for the Participation Agreement requirement.

[25] *See, e.g. Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,231 (2014); *Sw. Power Pool, Inc.*, 173 FERC ¶ 61,267 (2020).

are market design decisions made by the filing parties.[26]  Such design choices are prohibited by the FPA.

15.     And while operational and manipulation concerns are the majority's inadequate justification for the source/sink and Enabling Agreement requirements, it has offered no justification for the barrier to open access posed by the Participation Agreement requirement.[27]  Under the proposed tariffs, NFEETS is only granted to prospective participants that obtain a countersigned Participation Agreement from the SEEM Agent, who reports to SEEM Operating Committee which is selected exclusively by the SEEM Members.[28]  The majority declares in conclusory fashion that they have not "shift[ed] the burden of proof from Filing Parties to protestors."[29]  In the face of this express barrier to open access, however, it is difficult to describe in any other way their insistence on smoking gun evidence that the SEEM Members have express plans to block market access for a competitor or otherwise utilize the leverage they have expressly chosen to give themselves over all prospective SEEM participants.

16.     The majority also states in conclusory fashion that their dismissal of Public Interest Organizations (PIOs)' well-founded concerns "does not create an 'impossibly high standard,'" but they offer no explanation for how PIOs could possibly demonstrate, before the provision of NFEETS even commences, that the SEEM Members have in fact utilized their leverage in directing the SEEM Agent to sign (or refrain from signing) a Participation Agreement, thereby denying NFEETS under the proposed OATTs.[30]  In evaluating MAPP participation criteria, the Commission previously stated "[a] finding of

---

[26] *See* FRA Statement at P 24 ("Permitting transmission providers to evade open access requirements via their own market design choices . . . would fundamentally undermine open access.").

[27] The underlying order states that "it is not uncommon to require execution of an agreement like the Participant Agreement for voluntary structures like the Southeast EEM," without examining whether previously-approved structures allow the filing utilities to grant themselves total discretion over whether to sign such agreements, or whether such discretion is permissible under the FPA.  November 2021 Order, 177 FERC ¶ 61,080 at P 69.

[28] *See* Alabama Power Company/Market Based Rate Tariff, Rate Schedule No. 1011, Southeast EEM Agreement, § 5 Operating Committee membership (0.0.3).  Furthermore, except for one narrow exception, Southeast EEM Membership is exclusive to load serving entities.  *See Id.* § 3.2.1.

[29] Majority Order at P 27.

[30] *Id.*

discrimination in the terms of an agreement without its actual implementation has not previously nor will it now prevent the Commission from remedying such discrimination."[31]  Those same words apply equally today to the barrier to open access enshrined in the OATTs at issue here: a finding that discriminatory terms for the provision of NFEETS have in fact been implemented is not a necessary predicate to deny the relevant OATTs' proposals for restricted service pursuant to FPA section 205.

17.     The majority also continues to suggest that the Participant Agreement requirement's blatant barrier to access is permissible because the Commission can simply trust that SEEM Members will refrain from either denying market access or exercising their leverage over prospective market participants.[32]  Contrary to the majority order, the evidence regarding Members' economic incentives to block competitors from accessing NFEETS remains unrebutted.  While the majority notes that Filing Parties currently trade with counterparties and have asserted that their purpose in developing SEEM is to "maximiz[e] the number of potential bilateral transactions[,]"[33] this amounts to a description of a counter-incentive, not a rebuttal of the core concern that exercising leverage over competitors stands to increase SEEM Member shareholder profits.[34]  Nothing has been offered to suggest that those economic incentives are not present.  As explained previously in my dissent, there is nothing inconsistent about Members having both an economic incentive to execute certain participation and enabling agreements while simultaneously having an economic incentive to use access decisions as leverage, or to block access to key competitors.[35]

18.     Regulations such as Order No. 888's express prohibition on barriers to open access are necessary because "one cannot simply assume that monopoly utilities will act in the best interest of their retail customers."[36]  Whatever one might speculate about whether or how the Filing Parties may or may not exercise the leverage they have given

---

[31] *MAPP*, 58 FPC 2622, 2623 (1977).

[32] Majority Order at P 23.

[33] *Id.*

[34] Further, a statement by the Filing Parties about their own intentions in forming SEEM is extremely thin evidence of this counterincentive, considering the many reasons that may have caused the Filing Parties to create SEEM, and their express choice to give themselves discretion to allow or deny market access for competitors.

[35] Clements Dissent November 2021 Order, 177 FERC ¶ 61,080 at App. A (FRA Statement) P 17.

[36] *Id.* P 5.

themselves in the relevant OATTs, the OATTs' barriers to accessing NFEETS violate this prohibition.

## III.  Conclusion

19.  As I explained in my FRA Statement, I am an ardent supporter of electric markets when they are used to meaningfully harness competition and ensure better outcomes for customers, including through reduced costs and reliability benefits.[37]  Nevertheless, I deeply disagree with the majority's decision, which I fear puts a camel's nose of discrimination under FERC's tent, threatening to despoil the principles this Commission has long held dear.  Whatever the potential market benefits of SEEM, the means by which utilities transition towards such a market cannot be permitted to undermine the bedrock principle of ensuring open access to non-discriminatory rates and service.

20.  Today's order blesses an arrangement that runs contrary to fundamental principles enshrined in Order No. 888 and which flow from the FPA:  transmission services must be open, accessible, and provided without undue discrimination.

For these reasons, I respectfully dissent.

_____
Allison Clements
Commissioner

---

[37] *Id.* App. A (FRA Statement) P 2.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
James P. Danly, Allison Clements,
Mark C. Christie, and Willie L. Phillips.

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-005 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-005 |
| Louisville Gas and Electric Company | | ER21-1114-005 |
| Duke Energy Carolinas, LLC | | ER21-1116-005 |
| Duke Energy Progress, LLC | | ER21-1117-005 |
| Georgia Power Company | | ER21-1119-005 |
| Kentucky Utilities Company | | ER21-1120-005 |
| Mississippi Power Company | | ER21-1121-005 |
| | | (Not Consolidated) |

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued March 24, 2022)

1.     On November 12, 2021, Clean Energy Coalition[1] and Public Interest Organizations[2] (jointly, Rehearing Parties) each filed rehearing requests challenging the Southeast Energy

---

[1] Clean Energy Coalition consists of:  Advanced Energy Economy; the Advanced Energy Buyers Group; Renewable Energy Buyers Alliance; and the Solar Energy Industries Association.

[2] PIOs consist of:  Energy Alabama; Sierra Club; South Carolina Coastal Conservation League; GASP; Southern Alliance for Clean Energy; Southface Energy Institute, Inc.; Vote Solar; Georgia Interfaith Power and Light; Georgia Conservation

Exchange Market (Southeast EEM) Agreement and certificates of concurrence becoming effective by operation of law in the absence of Commission action prior to the statutory effective date of the proposed rate.  On December 10, 2021, the Commission issued an order rejecting the rehearing requests as untimely.[3]  The Rehearing Parties filed a joint request for rehearing of the Rejection Order.

2.      Pursuant to *Allegheny Defense Project v. FERC*,[4] the rehearing request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the Federal Power Act (FPA),[5] we are modifying the discussion in the Rejection Order and continue to reach the same result in this proceeding, as discussed below.[6]

## I.      **Background**

3.      On February 12, 2021, as amended on June 7, 2021, and August 11, 2021, Southern Company Services, Inc., as agent for Alabama Power Company, filed the Southeast EEM Agreement on behalf of itself and the other prospective members of the Southeast EEM (collectively, Filing Parties) pursuant to section 205 of the FPA[7] and section 35.12 of the Commission's regulations.[8]  Additionally, on February 12, 2021, as amended on June 7, 2021, and August 11, 2021, seven prospective Southeast EEM members submitted certificates of concurrence to the Southeast EEM Agreement.

---

Voters; Partnership for Southern Equity; North Carolina Sustainable Energy Association; Sustainable FERC Project; and Natural Resources Defense Council.

[3] *Ala. Power Co.*, 177 FERC ¶ 61,178 (2021) (Rejection Order).

[4] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[5] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[6] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Rejection Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[7] 16 U.S.C. § 824d.

[8] 18 C.F.R. § 35.12 (2021).

4.      On October 13, 2021, the Secretary of the Commission issued a notice, stating:
"[p]ursuant to section 205 of the FPA, in the absence of Commission action on or before
October 11, 2021, the proposed Southeast EEM Agreement and concurrences thereto
became effective by operation of law."[9]  The Notice further stated "the effective date
of the proposed tariff sheets is October 12, 2021, as reflected in these tariff sheets."[10]
The Notice explained that "[t]he Commission did not act on the proposed Southeast EEM
Agreement and concurrences thereto because the Commissioners [were] divided two
against two as to the lawfulness of the change."[11]

5.      On November 12, 2021, Rehearing Parties each filed requests for rehearing.
Clean Energy Coalition requested rehearing, or in the alternative clarification, of "the
Notice" and stated that the 60-day prior notice period under FPA section 205(d)[12]
"expired on or before October 12, 2021."[13]  Similarly, referring to the Notice as "the
Order,"[14] PIOs requested rehearing on the basis that "the Order" violated Commission
policy and precedent and was arbitrary and capricious.[15]

6.      On December 10, 2021, the Commission issued an order rejecting the rehearing
requests as untimely and addressed the issue of how to properly calculate the deadline for
rehearing requests when the Commission fails to act under sections 205(d) and 205(g)[16]
of the FPA.  The Commission explained that, in the context of section 205(g)(1), because
the failure to issue an order accepting or denying the change prior to the expiration of the
statutory period established in section 205(d) is "considered to be an order" for purposes
of an application for rehearing as provided in section 313(a),[17] failure by the Commission

---

[9] Alabama Power Co., Notice of Filing Taking Effect By Operation of Law,
Docket No. ER21-1111-002, et al., at 2 (issued Oct. 13, 2021) (Notice).

[10] *Id.*

[11] *Id.*

[12] 16 U.S.C. § 824d(d).

[13] Rejection Order, 177 FERC ¶ 61,178 at P 7 (citing Clean Energy Coalition
November 10, 2021 Request for Rehearing at 1-3).

[14] *Id.* (citing PIOs November 10, 2021 Request for Rehearing at 2 n.3).

[15] *Id.* (citing PIOs November 10, 2021 Request for Rehearing at 4, 14-15).

[16] 16 U.S.C. § 824d(g).

[17] *Id.* § 825*l*(a).

to act by that date is the day that the statutory period established in section 205(d) expires.[18]  The Commission further explained that the expiration of the statutory period under section 205(d) occurred on October 11, 2021, such that rehearing requests were due no later than November 10, 2021—30 days after the "order," as set forth in section 205(g)(1)(A).[19]  Because both rehearing requests were filed on November 12, 2021, the Commission rejected each as untimely.

## II.    <u>Rehearing Request</u>

7.    Rehearing Parties argue that the Commission ignored the fact that October 11, 2021, was a legal public holiday and that, in their view, the governing procedures for time computation in 18 C.F.R. § 385.2007 (Rule 2007) prohibit the expiration of a statutory time period on Saturday, Sunday, or legal public holidays.[20]  Rehearing Parties maintain that the Rejection Order effectively altered or rescinded Rule 2007 without notice-and-comment rulemaking.[21]  Rehearing Parties also cite precedent indicating that, where the last day of the time period prescribed for seeking rehearing in FPA section 313(a) (30 days) falls on a weekend or legal public holiday, the period does not end until the end of the next business day, allowing parties to file their requests for rehearing on the first business day *after* the 30th day.[22]  Rehearing Parties further argue that the Commission's "new approach to time tabulations" frustrated their reasonable reliance on past Commission practice, thereby depriving Rehearing Parties of the opportunity to seek rehearing and limiting their ability to petition for judicial review.[23]

---

[18] *Id.* P 10.

[19] *Id.* PP 15-16.

[20] Rehearing Request at 6.

[21] *Id*. at 12.

[22] *Id.* at 11 (citing *Dayton Power & Light Co. v. FPC*, 251 F.2d 875, 877, (D.C. Cir. 1957); *Cities of Batavia*, 672 F.2d 64, 72-73 (D.C. Cir. 1982); *Nat'l Fuel Gas Supply Corp.*, 154 FERC ¶ 61,098, at n.5 (2016) ("Pursuant to Rule 2007 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2007(a)(2) (2015), when a deadline falls on a weekend or legal public holiday, the deadline is extended to the close of the next business day.")).

[23] *Id*. at 12.

## III.   **Discussion**

### A.   **Procedural Matters**

8.      On January 25, 2022, Filing Parties submitted a motion for leave to answer and answer to Rehearing Parties' rehearing request. Rule 713(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.713(d)(1) (2021), prohibits an answer to a request for rehearing. Accordingly, we deny Filing Parties' motion to answer and reject the answer.

### B.   **Substantive Matters**

9.      As discussed below, we continue to find that the time calculation rules established in Rule 2007 of the Commission's regulations cannot and do not operate to extend the statutory deadline for Commission action pursuant to section 205(d) of the FPA.[24]

10.     Section 205(g)(1) of the FPA provides:

> [I]f the Commission permits the 60-day period established [in section 205(d) of the FPA] to expire without issuing an order accepting or denying [a rate] change because the Commissioners are divided two against two as to the lawfulness of the change . . . the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of [section 313(a) of the FPA] . . . .[25]

As such, we continue to find that the expiration of the statutory notice period for the initial FPA section 205 filing in this case occurred on October 11, 2021, and that the 30-day rehearing period under section 313(a) of the FPA began to run as of October 11, 2021, with October 12, 2021, constituting the first day and November 10, 2021, constituting the last day, thereby rendering the rehearing requests filed on November 12, 2021, untimely.

11.     Under section 205(d) of the FPA, when a utility wishes to alter the rates it charges, it must provide 60-days' notice to the Commission and file new rate schedule(s) "stating plainly the change or changes to be made in the schedule or schedules then in force and

---

[24] Rejection Order, 177 FERC ¶ 61,178 at P 12. While we note that courts have not directly addressed the validity of Rule 2007 in the context of extending Commission action deadlines under section 205(d) of the FPA, as set forth below, an interpretation extending the deadline would be in contravention of section 205(d).

[25] 16 U.S.C. § 824d(g)(1).

the time when the change or changes will go into effect."[26]  Courts have repeatedly confirmed that when a utility provides 60-days' notice under section 205(d), absent Commission action on a section 205 rate filing within the 60-day statutory notice period, the filing automatically takes effect immediately upon the expiration of this notice period (i.e., on the 61st day).[27]  Applicants may also propose a specific effective date, consistent with the Commission's regulations implementing section 205(d).[28]  If the Commission does not issue an order accepting or denying the filing by the *later* of the day prior to the effective date or the 60th day after the filing is made, the requested tariff changes go into effect by operation of law.  Therefore, the statutory period for Commission action established in section 205(d) expires on the later of the day prior to the effective date or the 60th day after the filing is made.[29]  In the instant case, the later date was the day prior to the October 12, 2021 requested effective date, i.e., October 11, 2021.[30]

12.     Rehearing Parties nonetheless point out that October 11, 2021, was a legal public holiday and proceed to argue that "the period set by FPA [s]ection 205(d) may not expire

---

[26] 16 U.S.C. § 824d(d).

[27] *See, e.g., Pub. Citizen v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016) (holding that the court lacked jurisdiction to review a Commission notice providing that rates had, consistent with FPA section 205(d), gone into effect by operation of law); *City of Bethany v. FERC*, 727 F.2d 1131, 1143 (D.C. Cir. 1984) (stating "[u]nder section 205, a utility may unilaterally file a rate change with FERC, which rate takes effect immediately after a sixty day's notice requirement has been satisfied"); *City of Campbell v. FERC*, 770 F.2d 1180, 1184-85 (D.C. Cir. 1985) (explaining that "under the § 205 process, a proposed rate becomes effective 60 days after it is filed"); *City of Girard v. FERC*, 790 F.2d 919, 920 (D.C. Cir. 1986) (stating unless the Commission otherwise orders, "[a]fter sixty day's notice to the Commission and the public, the new rate may become effective.").

[28] *See* 16 U.S.C. § 824d(d); 18 C.F.R. § 35.3; *Electronic Tariff Filings*, 130 FERC ¶ 61,047, at P 6 & n.9 (2010).

[29] Rejection Order, 177 FERC ¶ 61,178 at P 11.

[30] *See* Notice at 2 ("in the absence of Commission action on or before October 11, 2021, the proposed Southeast EEM Agreement and concurrences thereto became effective by operation of law").

on a legal public holiday."[31]  In support, they cite Rule 2007, which states, in relevant part:

> The last day of any time period is included in the time period, unless it is a Saturday; Sunday; a day on which the Commission closes due to adverse conditions and does not reopen prior to its official close of business . . . ; part-day holiday that affects the Commission; or legal public holiday as designated in section 6103 of title 5, U.S. Code.  In each case the period does not end until the close of the Commission business of the next day which is not a Saturday; Sunday; a day on which the Commission closes due to adverse conditions and does not reopen prior to its official close of business . . . part-day holiday that affects the Commission; or legal public holiday.

Rehearing Parties allege that the Commission "depart[ed] from its standard practice of applying Rule 2007 to time periods established by FPA [s]ection 205(d)."[32]

13.    We disagree.  Contrary to Rehearing Parties' arguments, no such "standard practice" exists.  Rehearing Parties cite no instance of the Commission applying Rule 2007 to justify the issuance of an order after the statutory notice period in FPA section 205(d) has run.[33]  Similarly, Rehearing Parties cite no example where the 60th day has fallen on a weekend or legal public holiday and where the Commission has

---

[31] Rehearing Request at 6.

[32] *Id.* at 4.

[33] We have identified one outlier proceeding where, due to limited circumstances not present here and without reference to Rule 2007, the Commission published an order one day after the statutory period had expired.  *See Fla. Power & Light Co. v. FERC*, 617 F.2d 809, 818 (D.C. Cir. 1980).  The U.S. Court of Appeals of the District of Columbia Circuit (D.C. Circuit) nonetheless held that the Commission acted "within" the statutory notice period, even though the order expressing that action was, due to clerical oversight, published one day late.  *Id.*  A dissenting judge disagreed with this application of the "clerical error doctrine," and emphasized that "at the end of the [statutory period], the Commission, by operation of law, loses its power to take action pursuant to [section 205(d)].  Any action after that time is ultra vires and beyond the scope of the statutory authority granted by Congress."  *Id.* at 818 n.1 (Tamm, J., dissenting).

waited until the next business day to issue its order.[34]  As such, we are unpersuaded by the argument that the Rejection Order has "frustrate[d] the Rehearing Parties' reasonable reliance on the Commission's past precedent."[35]

14.     The D.C. Circuit precedent cited above[36] confirms that the statutory deadline under section 205(d) is a strict requirement, and were the Commission to take initial action on the same filing under section 205(d) after the statutory period, such action would be deemed beyond the Commission's statutory authority.[37]  As the Commission explained in the Rejection Order, to the extent such action retroactively modified the filed rate for the period it was already in effect, such action would also violate the bar on retroactive ratemaking.[38]  Under the filed rate doctrine, a regulated seller of power is prohibited from collecting a rate other than the one filed with the Commission, and the Commission itself cannot retroactively impose a rate increase for power already sold.[39]  In a similar vein, the rule against retroactive ratemaking "prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods."[40]  Rehearing Parties do not contend that an exception to the filed rate doctrine

---

[34] To the contrary, Rehearing Parties acknowledge the Commission's "general practice" of issuing orders early when a statutory deadline falls on a weekend or holiday but contend that such practice is "irrelevant."  Rehearing Request at 10.

[35] *Id.* at 4-5.

[36] *See supra* notes 27 & 33.

[37] By contrast, after the point at which a rate goes into effect, the Commission *may* change the filed rate in response to a timely request for rehearing, pursuant to FPA section 206, or a new section 205 filing in a new proceeding.  *See* Rejection Order, 177 FERC ¶ 61,178 at P 12.

[38] *Id.* (citing *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1226 (D.C. Cir. 2018) ("The [FPA] also empowers the Commission to fix or change rates and charges, but only prospectively.  When a utility wishes to alter the rates it charges, it must provide sixty-days' notice to the Commission . . . .  The Commission may waive the sixty-day notice requirement for good cause, but the Commission has no authority under the Act to allow retroactive change in the rates charged to consumers.") (citing 16 U.S.C. §§ 824d(d), 824e(a)); *see also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (finding that "the Commission itself has no power to alter a rate retroactively")).

[39] *Old Dominion Elec. Coop.*, 892 F.3d at 1227.

[40] *Id.* (citing *Town of Concord v. FERC*, 955 F.2d 67, 71 n.2 (D.C. Cir 1992)).

applies here or otherwise explain why their interpretation would not violate the rule against retroactive ratemaking, without depriving Filing Parties of their requested effective date.[41]

15.     We do not dispute Rehearing Parties' assertion that the Commission and the courts have interpreted Rule 2007 as effectively extending the statutory deadlines for *filers* seeking rehearing under section 313(a) of the FPA.[42]   However, we find that while Rule 2007 has been applied to effectively extend deadlines for filers, it cannot extend the statutory period in which, absent Commission action, a rate becomes effective by operation of law.  Our determination on this point gives effect to the statutory scheme underlying the FPA allowing the public utility, in the first instance, to select an effective date for its proposed rate.[43]   In *Indiana & Michigan Electric Co.*,[44] the D.C. Circuit found that a Commission regulation constituting a *de facto* 30-day extension of the statutory deadline for Commission action under section 205(d) "unlawfully extend[ed] the statutory waiting period for utilities."[45]   The court explained that the statutory notice period (then 30 days, now 60 days) is "the maximum a utility can be *compelled* to wait from the time it

---

[41] While there are some recognized exceptions to the filed rate doctrine, none is applicable here.  *See, e.g., NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 801 (D.C. Cir. 2007) (citing *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 797 (D.C. Cir. 1990)).

[42] *Scott's Mill Hydro, LLC*, 177 FERC ¶ 61,102 (2021) (stating "[b]ecause the 30-day *filing deadline* for requests for rehearing of the August 2021 Letter fell on a Saturday (i.e., September 4, 2021) and Monday was a holiday, the *filing deadline* became the close of business on Tuesday, September 7, 2021.") (emphasis added); *Cities of Batavia*, 672 F.2d at72-73; *Dayton Power & Light Co.*, 251 F.2d at 877.  While the Filing Parties rely on *Nat'l Fuel Gas Supply Corp.*, 154 FERC ¶ 61,098, at n.5, that case also involves a filing deadline for a request for rehearing.  Rehearing Request at 11.

[43] *See, e.g.*, *NRG Power Mktg. LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 171 (2010) ("The [FPA] allows regulated utilities to set rates unilaterally by tariff . . . ."); *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 531 (2008) ("[T]he FPA requires regulated utilities to file compilations of their rate schedules, or 'tariffs,' with the Commission, and to provide service to electricity purchasers on the terms and prices there set forth.  Utilities wishing to change their tariffs must notify the Commission 60 days before the change is to go into effect.").

[44] Rejection Order, 177 FERC ¶ 61,178 at P 12 n.23 (citing *Ind. & Mich. Elec. Co. v. FPC*, 502 F.2d 336 (D.C. Cir. 1974)).

[45] *Ind. & Mich. Elec. Co.*, 502 F.2d at 339.

files its rate changes until the date the changes take effect unless the Commission properly exercises its suspension power."[46] The Supreme Court has also recognized that the statutory scheme under the virtually identical Natural Gas Act provides for the "earliest effectuation of contractually authorized or otherwise permissible rate changes consistent with appropriate Commission review."[47] If, as Rehearing Parties posit, the section 205(d) statutory notice period cannot expire on a weekend or, as here, a federal holiday, a utility impermissibly may be forced to wait one or more additional days beyond the 60-day notice period before its rate takes effect, if the Commission fails to take action before the notice period expires. Indeed, applying Rule 2007 as Rehearing Parties urge would lead to the result that utilities would not be entitled to receive a statutory effective date that fell on a Sunday, Monday, or the day after a federal holiday.[48] Accordingly, we find that Rehearing Parties' interpretation of Rule 2007 in these circumstances is unreasonable because it would unlawfully deprive the Filing Parties of the ability in the first instance to determine their own rates and the dates those rates are to be effective, subject to appropriate Commission oversight.

16. Rehearing Parties point to the Commission's past practice of issuing tolling orders as an example of the Commission acting after expiration of a statutory time period. This argument fails because the D.C. Circuit invalidated the Commission's practice and held that tolling orders do not extend the time for Commission action on rehearing under

---

[46] *Id.* (emphasis added). If a utility requests an effective date that is longer than 60 days from the date of filing, the utility does so of its own volition and consequently is not compelled – but has chosen – to wait beyond 60 days for its rate to take effect. The utility is then not entitled to an order accepting its filing within the 60-day statutory notice period. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 899 F.2d 1244, 1248 (D.C. Cir. 1990) (interpreting notice requirement under section 4(d) of the Natural Gas Act, 15 U.S.C. § 717c(d), to require only that the Commission act prior to the proposed effective date).

[47] *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 114 (1958).

[48] Rehearing Parties' preferred interpretation of Rule 2007 would have barred Filing Parties from obtaining the October 12, 2021 effective date that they had requested. To achieve Filing Parties' October 12, 2021 requested effective date, an order would have needed to be issued on or before October 11, 2021, which, as discussed above, is precisely why Rehearing Parties' rehearing requests were deemed untimely. We add that utilities, typically to simplify billing, often seek effective dates for their rates that coincide with the first day of the month (regardless of the day of the week that the first happens to fall on), or the first day of the year even though it is a federal holiday (again, regardless of the day of the week that January 1st happens to fall on).

either the Natural Gas Act or the identical statutory language in FPA section 313(a).[49]  As the court explained in *Allegheny*, "once thirty days pass without an enumerated action by the Commission" under section 313(a) of the FPA, the applicant may "deem its rehearing denied."[50]

17.    Finally, we acknowledge Rehearing Parties' argument that certain statements in the Commission's 2003 and 2019 orders amending Rule 2007 appear to be inconsistent with our determination that Rule 2007 cannot be interpreted to extend the time for Commission action in these circumstances.[51]  The existence of such statements, however, does not and cannot change the fundamental principle of administrative law that an agency's power to promulgate regulations is limited to the authority delegated by Congress.[52]  Although "a regulation must be interpreted so as to harmonize with and further not to conflict with the objective of the statute it implements,"[53] to the extent a regulation conflicts with a statute, the statute controls.[54]  Our finding that the Commission cannot extend the time for Commission action under section 205(d) of the FPA in these circumstances is supported by court precedent that suggests utilities are entitled to receive an effective date no later

---

[49] *Allegheny Def. Project v. FERC*, 964 F.3d at 19; *see Ark. La. Gas Co v. Hall*, 453 U.S. 571, 579, n.7 (1981) (noting that relevant provisions of the Natural Gas Act and FPA are substantively identical).

[50] *See id.* at 13.

[51] Rehearing Request at 7-8 (citing *Emergency Closures*, 69 Fed. Reg. 2503 (Jan. 16, 2004) (adding a provision covering temporary closures due to weather or adverse conditions and explaining that the "absence of such a provision could result in *unintended action by the Commission* or otherwise cause hardship to participants in Commission proceedings who face filing deadlines") (emphasis added); *Computation of Time During Emergencies*, 84 Fed. Reg. 3982, 3982 (Feb. 14, 2019) (including section 205 of the FPA as one of the statutes covered by Rule 2007 and reiterating that the purpose of the rule is to "*prevent unintended Commission action by operation of law* and . . . provide clarity as to filing deadlines *and deadlines for action by the Commission*") (emphasis added)).  We also note that these orders were intended to address emergency situations that are not present in this case.

[52] *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[53] *Sec'y of Labor, Mine Safety & Health Admin. v. W. Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990).

[54] *See, e.g.*, *United States v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004).

than 60 days of filing if they so request, assuming the rate is accepted.[55]  Courts have repeatedly stated that when a utility provides 60-days' notice under section 205(d), absent Commission action on a section 205 rate filing within the 60 statutory notice period, the filing would automatically take effect immediately upon the expiration of this notice period (i.e., on the 61st day).[56]  As such, insofar as Rehearing Parties raise equitable considerations based on their reliance upon language in those orders, we are confined by the statutory strictures that limit our authority.

The Commission orders:

        In response to the request for rehearing, the Rejection Order is hereby modified and the result sustained, as discussed in the body of this order.


By the Commission.  Commissioner Danly is concurring with a separate statement attached.
                    Commissioner Clements is concurring with a separate statement attached.
                    Commissioner Christie is concurring with a separate statement attached.

( S E A L )


                            Debbie-Anne A. Reese,
                            Deputy Secretary.

---

[55] *See Ind. & Mich. Elec. Co.*, 502 F.2d at 339.

[56] *See* cases cited *supra* note 27.

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-005 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-005 |
| Louisville Gas and Electric Company | | ER21-1114-005 |
| Duke Energy Carolinas, LLC | | ER21-1116-005 |
| Duke Energy Progress, LLC | | ER21-1117-005 |
| Georgia Power Company | | ER21-1119-005 |
| Kentucky Utilities Company | | ER21-1120-005 |
| Mississippi Power Company | | ER21-1121-005 |
| | | (Not Consolidated) |

(Issued March 24, 2022)

DANLY, Commissioner, *concurring*:

1.     I concur in today's order.[1]  I write to reiterate that both the filed rate doctrine and the rule against retroactive ratemaking also apply to non-rate terms and conditions in filed tariffs.[2]

---

[1] *See Ala. Power Co.*, 178 FERC ¶ 61,196 (2022).

[2] *See Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 830 & n.3 (D.C. Cir. 2021); *id.* at 830 ("[N]on-rate terms . . . are part of the filed rate.  The statute provides no grounds for distinguishing rate and non-rate terms, but rather binds parties to the terms in the filed tariff."); *id.* ("Non-rate terms within the tariff may not be changed retroactively . . . .").

2.      I also write separately to state that no credible reading of my Fair RATES Act Statement,[3] which issued on October 20, 2021,[4] could lead one to believe that I suggested that the Commission's last date to act occurred on any date other than October 11, 2021. The Commission's failure to act by October 11, 2021 resulted in acceptance of the filing, including the requested October 12, 2021 effective date, by operation of law.[5]  Any reading of my Fair RATES Act Statement that implies otherwise is baseless[6] and should be soundly rejected by any reviewing court.


        For these reasons, I respectfully concur.


_____
James P. Danly
Commissioner

_____

[3] *See* 16 U.S.C. § 824d(g)(1)(B).  In October 2018, the America's Water Infrastructure Act became law.  America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, 132 Stat. 3765 (2018).  That Act included provisions from the Fair Ratepayer Accountability, Transparency, and Efficiency Standards Act (the Fair RATES Act) amending Federal Power Act section 205 to treat inaction by the Commission that allows a rate change to take effect as an order for purposes of rehearing and judicial review. America's Water Infrastructure Act § 3006.

[4] *See Ala. Power Co.*, Commissioner James P. Danly, Fair RATES Act Statement on Southeast Energy Exchange Market, Docket Nos. ER21-1111-002, et al. (Oct. 20, 2021) (Fair RATES Act Statement).

[5] *See id.* P 6 ("reset the 60-day statutory clock, this time to October 11, 2021"); *id.* P 9 ("The . . . [last day to act] was October 11, 2021"); *id.* P 12 ("Commission inaction by the statutory deadline of October 11, 2021").  The requested effective date for the filings was October 12, 2021.  *See id.* PP 6-7 (referencing requested effective date of October 12, 2021 and five month extension for such date from May 13, 2021 to October 12, 2021) & Attach. A at PP 1, 3; *see also* 16 U.S.C. § 824d(g)(1)(A).

[6] The Commission's statutory action date was not extended from October 11 to October 12 as the rehearing parties contend by intentionally quoting excerpts of unrelated sentences out of context.  *See* Rehearing Parties January 7, 2022 Request for Rehearing, at 14-15.  The requested effective date was extended by five months from May 13, 2021 to October 12, 2021 due to the Commission's deficiency letters, a key point they improperly omit.  Fair RATES Act Statement at P 7.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Alabama Power Company | Docket Nos. ER21-1111-005 |
| Dominion Energy South Carolina, Inc. | ER21-1112-005 |
| Louisville Gas and Electric Company | ER21-1114-005 |
| Duke Energy Carolinas, LLC | ER21-1116-005 |
| Duke Energy Progress, LLC | ER21-1117-005 |
| Georgia Power Company | ER21-1119-005 |
| Kentucky Utilities Company | ER21-1120-005 |
| Mississippi Power Company | ER21-1121-005 |
| | (Not Consolidated) |

(Issued March 24, 2022)

CLEMENTS, Commissioner, *concurring*:

1.     I concur with the judgment of the Commission in this order because, absent further direction or clarification from the courts, I believe it is appropriate for the Commission to read *Indiana & Michigan Electric Company v. Federal Power Commission*[1] as constraining our authority to modify the 60-day minimum notice period set forth in section 205(d) of the Federal Power Act.

2.     I write to highlight that this is a close case. Rule 2007's time computation formula is arguably quite distinguishable from the order at issue in *Indiana & Michigan Electric Company*.[2] In that case, the United States Court of Appeals for the DC Circuit invalidated an order by the Commission that created a de-facto 60-day notice period for utilities seeking to increase their rates under section 205, doubling the then-effective 30-

---

[1] 502 F.2d 336 (D.C. Cir. 1974).

[2] *Id.*

day statutory period.[3]  In contrast, Rule 2007 merely sets forth a time computation method for how the days in the 60-day period should be counted in the event the Commission is closed.  This case turns on the applicability of *Indiana & Michigan Electric Company*[4] because, should that case's finding that the Commission lacked authority to modify the deadline not extend to these circumstances, Rehearing Parties' interpretation of Rule 2007 would not trigger a violation of the filed rate doctrine.[5]

3.      The Commission was correct in noting its practice of issuing orders prior to weekends and holidays on which a filing party's intended effective date occurs.[6]  However, it is also true that Rule 2007 can be interpreted as consistent with this practice, insofar as the Commission need not act at the last possible statutory moment.  It would be proper for the Commission to seek to effectuate filing parties' intended effective dates where appropriate even were this result not compelled by statute.

4.      The result in the instant case is lamentable insofar as it deprives the Rehearing Parties a chance to be heard on the merits of their claims.[7]  Further, while today's order suggests that the Commission may not have authority to extend a filing deadline should the Commission close due to an emergency,[8] it does not formally modify Rule 2007,

---

[3] *Id.* at 340-42.

[4] *Id.*

[5] This is because if the agency had authority in promulgating Rule 2007 in determining how 60 days should be counted after a utility makes a section 205 filing, applying it to these circumstances would modify the date at which the proposed tariff goes into effect, rather than modifying the tariff after it goes into effect.  (I.e., Rule 2007 would dictate that the proposed rate did not go into effect until October 12, not that it went into effect on October 11 but should be retroactively modified on October 12.)

[6] *Alabama Power Company*, 177 FERC ¶ 61,178, at P 13, n.24 (2021).

[7] I have previously expressed my serious concerns with the Southeast EEM proposal.  For example, in my Fair RATES Act statement issued at the time the proposed tariff went into effect, I stated that the Commission's failure to reject the SEEM proposal "puts at risk the Commission's long-running and largely unified commitment to steadily expanding non-discriminatory open access, a legal tradition exemplified by one of the Commission's proudest actions, Order No. 888."  Commissioner Clements Fair RATES Act Statement on Southeast Energy Exchange Market, Docket Nos. ER21-1111-002, et al. (Oct. 20, 2021).

[8] The order is not clear with regard to whether Order 2007 remains valid in emergency conditions, as it deliberately notes that an emergency situation is

leaving uncertain the Commission's authority to issue an order on a section 205 filing upon recommencing operation after an emergency should the requested effective date have elapsed while it was closed.  I am confident that in such circumstances the Commission will endeavor to act rapidly and appropriately, as required, but the lack of certainty regarding the scope of the Commission's authority is nevertheless cause for concern.  An emergency that may cause the Commission to close, such as a cyber-attack, physical terrorist attack, or extreme weather event, would be a time at which certainty and clarity are particularly important.

5.      In the absence of directly applicable precedent, the Commission must muddle through with our best effort to determine what is compelled by the Federal Power Act and the cases that have thus far interpreted it.  I hope that the United States Court of Appeals for the DC Circuit provides us with clarity in this difficult matter, so that we can in turn expeditiously work to achieve clarity regarding how the Commission will process tariff filings in the event of an emergency.

        For these reasons, I respectfully concur.


_____
Allison Clements
Commissioner

---

distinguishable from the present case.  Majority Order at P 16, n. 51 ("We also note that these orders were intended to address emergency situations that are not present in this case.").

| Alabama Power Company | Docket Nos. | ER21-1111-005 |
|---|---|---|
| Dominion Energy South Carolina, Inc. | | ER21-1112-005 |
| Louisville Gas and Electric Company | | ER21-1114-005 |
| Duke Energy Carolinas, LLC | | ER21-1116-005 |
| Duke Energy Progress, LLC | | ER21-1117-005 |
| Georgia Power Company | | ER21-1119-005 |
| Kentucky Utilities Company | | ER21-1120-005 |
| Mississippi Power Company | | ER21-1121-005 |
| | | (Not Consolidated) |

(Issued March 24, 2022)

CHRISTIE, Commissioner, *concurring*:

1.    I support today's order.  I write separately to address an inaccurate characterization[1] of my October 20, 2021 Fair RATES Act Statement.[2]  In addressing the SEEM OATT revisions,[3] I stated my view that those OATT revisions should have been accepted as effective "*as of October 12, 2021*," as the SEEM Agreement dockets were.  The "as of" language indicates that the OATT revisions would have been accepted as if

---

[1] Rehearing Parties January 7, 2022 Request for Rehearing at 14.

[2] *See* Commissioner Mark C. Christie, Fair RATES Act Statement on Southeast Energy Exchange Market, Docket Nos. ER21-1111-002, et al. (Oct. 20, 2021) (Statement).

[3] The OATT revisions were not part of the October 13, 2021 Notice issued in the dockets referenced in today's order, and it is that fact that I addressed in the portion of my Statement to which the Rehearing Parties refer.

part of the package of SEEM Agreement filings whose tariff sheets were effective on that date.[4] Any suggestion by the Rehearing Parties that my Statement is inconsistent with this is incorrect and any reviewing court is now so apprised by the Statement's author.

For these reasons, I respectfully concur.

_____
Mark C. Christie
Commissioner

---

[4] Moreover, the Notice issued by the Commission's Secretary in this matter seven days before each of the four Commissioner Fair RATES Act Statements were filed – including mine – made this abundantly clear. *Ala. Power Co.*, Notice, Docket No. ER21-1111-002, et al. (issued Oct. 13, 2021) at 2 ("Pursuant to section 205 of the FPA, in the absence of Commission action on or before October 11, 2021, the proposed Southeast EEM Agreement and concurrences thereto became effective by operation of law. Accordingly, the effective date of the proposed tariff sheets is October 12, 2021, as reflected in these tariff sheets.").

179 FERC ¶ 61,128
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
James P. Danly, Allison Clements,
Mark C. Christie, and Willie L. Phillips.

| Alabama Power Company | Docket No.  ER22-476-001 |
|---|---|

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued May 19, 2022)

1.     On November 24, 2021, Alabama Power Company, on behalf of the Members[1] of the Southeast Energy Exchange Market (SEEM), submitted revisions to the SEEM Agreement under section 205 of the Federal Power Act (FPA)[2] and Part 35 of the Commission's regulations.[3]  On January 21, 2022, the Commission issued an order accepting the proposed revisions as just and reasonable and not unduly discriminatory or

---

[1] For purposes of this order, each of the following is a Member and, collectively, are the Members:  Alabama Power Company, Georgia Power Company, and Mississippi Power Company; Associated Electric Cooperative, Inc.; Dalton Utilities; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC; Louisville Gas & Electric Company (LG&E) and Kentucky Utilities Company (KU) (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU); North Carolina Municipal Power Agency Number 1; PowerSouth Energy Cooperative; North Carolina Electric Membership Corporation; and Tennessee Valley Authority.

[2] 16 U.S.C. § 824d.

[3] 18 C.F.R. pt. 35 (2021).

preferential.[4]  Clean Energy Coalition[5] and Public Interest Organizations[6] (Rehearing Parties) jointly sought rehearing of the January 2022 Order.

2.      Pursuant to *Allegheny Defense Project v. FERC*,[7] the rehearing request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 313(a) of the FPA,[8] we are modifying the discussion in the January 2022 Order and continue to reach the same result in this proceeding, as discussed below.[9]

## I.      **Background**

3.      On February 12, 2021, as amended on June 7, 2021, and August 11, 2021, Southern Company Services, Inc., as agent for Alabama Power Company, filed the SEEM Agreement on behalf of itself and the other prospective members of the SEEM. The SEEM Agreement sets forth the framework for a new voluntary electronic trading platform designed to facilitate bilateral trading in the Southeast and market access to currently unused transmission capacity.[10]  Due to Commission inaction, the SEEM Agreement and associated certificates of concurrence became effective by operation of

---

[4] *Ala. Power Co.*, 178 FERC ¶ 61,048 (2022) (January 2022 Order).

[5] Clean Energy Coalition is composed of Advanced Energy Economy, the Advanced Energy Buyer's Group, Clean Energy Buyer's Association, and the Solar Energy Industries Association.

[6] Public Interest Organizations comprise Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council.

[7] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[8] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[9] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the January 2022 Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[10] Alabama Power Company November 24, 2021 Filing at 2.

law on October 12, 2021.[11]  Each Member that is also a transmission service provider filed revisions to its transmission tariff to offer Non-Firm Energy Exchange Transmission Service or NFEETS,[12] which the Commission accepted in an order issued on November 8, 2021.[13]

4.      On November 24, 2021, Alabama Power Company, on behalf of the Members of SEEM, submitted revisions to the SEEM Agreement.  Among other changes, the Members proposed to revise the SEEM Agreement to effectuate the weekly submission of confidential market data to the Commission, to clarify and increase the transparency surrounding internal audits, and to address any remaining concerns over unauthorized use of neighboring transmission systems.[14]

5.      Particularly relevant on rehearing, the Members also proposed to revise the standard of review set forth in the SEEM Agreement.  Under section 16.9 of the originally effective SEEM Agreement, changes to any portion of the SEEM Agreement proposed by third parties or the Commission would be subject to the *Mobile-Sierra*[15] public interest standard of review.[16]  The Members proposed to revise the standard of review provision in the SEEM Agreement to remove application of the *Mobile-Sierra* public interest standard of review from the "more public-facing features of the S[EEM] Agreement, such as the Market Rules[,]" while retaining the *Mobile-Sierra* public interest standard of review "for a limited set of provisions that provide Members with regulatory

---

[11] *Ala. Power Co.*, Notice, Docket No. ER21-1111-002 et al. (issued Oct. 13, 2021) (October 13 Notice); *see also Ala. Power Co.*, 177 FERC ¶ 61,178 (2021) (rejecting requests for rehearing as untimely), *order on reh'g*, 178 FERC ¶ 61,196 (2022), *appeal pending sub nom. Adv. Energy Economy v. FERC*, No. 22-1018 (D.C. Cir. filed Feb. 8, 2022).

[12] NFEETS is a zero-charge transmission service used to facilitate 15-minute transactions matched by an algorithm via the SEEM electronic trading platform.  *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080, at PP 22-23 (2021).

[13] *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021), *order on reh'g*, 178 FERC ¶ 61,195 (2022), *appeal pending sub nom. Adv. Energy Economy v. FERC*, No. 22-1018 (D.C. Cir. filed Feb. 8, 2022).

[14] The proposed revisions were described in the January 2022 Order, 178 FERC ¶ 61,048 at PP 3-12.

[15] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (*Mobile-Sierra*).

[16] Alabama Power Company November 24, 2021 Filing at 14-16.

certainty about the extent of their commitments under [the] agreement."[17]  To accomplish this, the Members proposed to revise section 16.9 of the SEEM Agreement to specify the provisions to which the *Mobile-Sierra* public interest standard of review continues to apply, with all other provisions subject to the ordinary just and reasonable standard of review.[18]

6.      Clean Energy Coalition and Public Interest Organizations generally supported the proposed revisions themselves[19] but objected that the revisions would not cure alleged deficiencies in the existing SEEM Agreement to render the revised SEEM Agreement just and reasonable.[20]

7.      In the January 2022 Order, the Commission noted that Clean Energy Coalition and Public Interest Organizations raised concerns that "pertain almost entirely to the filed rate and not to the proposed revisions before [the Commission] in this proceeding."[21]  The Commission explained that the justness and reasonableness of the unchanged provisions of the SEEM Agreement, including the continued application of the *Mobile-Sierra* public interest standard of review to changes to certain provisions of the SEEM Agreement, was

---

[17] *Id.* at 14; Alabama Power Company et al., Response to Deficiency Letter, Docket No. ER21-1111-002 et al., at 3-4 (filed June 7, 2021) (committing to modify the standard of review provision in the SEEM Agreement in a future filing).

[18] Alabama Power Company November 24, 2021 Filing at 14-16.

[19] Clean Energy Coalition December 15, 2021 Comments at 2 (stating "Clean Energy Coalition appreciates the modest improvements in transparency and small narrowing of the restrictions on future Commission review contained in the SEEM Revisions"); Public Interest Organizations January 13, 2022 Comments at 1 (stating Public Interest Organizations "appreciate the modest improvements to transparency and narrowed application of *Mobile-Sierra* protection in the revised SEEM Agreement").

[20] Clean Energy Coalition December 15, 2021 Comments at 2, 3, 5, 6, 9, 10, 11, 12 (reiterating arguments made in the proceeding in which the SEEM Agreement went into effect by operation of law as to why Clean Energy Coalition believes that the Agreement is unjust and unreasonable and unduly discriminatory and preferential); Public Interest Organizations January 13, 2022 Comments at 5 (arguing that legal deficiencies identified in the proceeding in which the SEEM Agreement went into effect by operation of law "have not been remedied and therefore the Revised SEEM Agreement must be rejected").

[21] January 2022 Order, 178 FERC ¶ 61,048 at P 30.

not pending before the Commission.[22]  The Commission added that commenters' arguments that alleged deficiencies in the SEEM Agreement are not remedied by the proposed revisions are beyond the scope of this proceeding.[23]  Rather, the Commission stated that its task was only to assess whether the proposed revisions are just and reasonable.[24]  The Commission concluded that the proposed revisions were indeed just and reasonable and not unduly discriminatory or preferential.[25]

## II.   **Request for Rehearing**

8.     Rehearing Parties claim that the Commission improperly evaluated the proposed revisions in isolation despite the Commission's authority and obligation under FPA section 205, as interpreted by the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) in *Cities of Batavia v. FERC*,[26] to review a revised rate "completely to assure that its parts—old and new—operate in tandem to ensure a 'just and reasonable' result."[27]

9.     Rehearing Parties also claim that the unchanged provisions of the SEEM Agreement are not shielded from such a holistic review by the filed rate doctrine because interested parties were on notice that the SEEM Agreement would be revised[28] and because the Agreement lacked the characteristics of an "on file" rate.[29]

10.    Rehearing Parties also claim that the Commission failed to satisfy its obligation to consider whether the proposed revisions to section 16.9 of the SEEM Agreement—the standard of review provision—were lawful.[30]  Rehearing Parties claim that no matter

---

[22] *Id*. PP 30, 35.

[23] *Id.* P 30.

[24] *Id.* P 32.

[25] *Id.* P 31.

[26] 672 F.2d 64 (D.C. Cir. 1982) (*Batavia*).

[27] Rehearing Request at 6-7 (quoting *Batavia*, 672 F.2d at 77).

[28] *Id.* at 7 (citing *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 801 (D.C. Cir. 2007)).

[29] *Id.* (citing *Cal ex. rel. Lockyer v. FERC*, 383 F.3d 1006, 1011 (9th Cir. 2004) and *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231-32 (1994)).

[30] *Id.* at 8-14.

whether the revisions limit or expand the application of the *Mobile-Sierra* public interest standard of review, the Commission was obligated to determine whether application of the *Mobile-Sierra* public interest standard of review is appropriate for the specific enumerated provisions to which that standard will continue to apply.[31]  They claim that in a proper review, the Commission should have rejected the proposed revisions to section 16.9 of the SEEM Agreement based on precedent where the Commission did not allow application of the *Mobile-Sierra* public interest standard of review to changes to similar contract provisions.[32]

## III.  **Discussion**

11.     Having considered Rehearing Parties' arguments, we conclude that the Commission appropriately reviewed and accepted the proposed revisions before it in issuing the January 2022 Order.

12.     In the decades since *Batavia* in 1982, the D.C. Circuit has spoken more directly to the scope of the Commission's authority to act upon a revised rate filed under section 205 of the FPA.[33]  Consistent with this precedent, the Commission appropriately explained that "[t]he justness and reasonableness of the existing provisions of the SEEM Agreement to which the Members do not propose revisions in this proceeding is not pending before us."[34]

---

[31] *Id.*

[32] *Id.* at 10-11, 13-14 (citing *Ariz. Pub. Serv. Co.*, 148 FERC ¶ 61,012 (2014); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 187 (2013); *ISO New England Inc.*, 150 FERC ¶ 61,209 (2015); *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,137 (2013); *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 175 (2010); *Ne. Utils. Serv. Co. v. FERC*, 993 F.2d 937 (1st Cir. 1993); *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 76-77 (D.C. Cir. 2016); *Am. Transmission Sys. Inc. v. FERC*, 2016 WL 3615443 (D.C. Cir. 2016) (unpublished); *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017); *MISO Transmission Owners. v. FERC*, 819 F.3d 329, 335 (7th Cir. 2016)).

[33] *E.g.*, *Adv. Energy Mgmt. Alliance v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (finding "[w]hen acting on a public utility's rate filing under section 205, the Commission undertakes an essentially passive and reactive role and restricts itself to evaluating the confined proposal") (internal quotation omitted); *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 115 (D.C. Cir. 2017) ("Section 205 does not allow FERC to suggest modifications that result in an entirely different rate design than the utility's original proposal or the utility's prior rate scheme.") (internal quotation omitted).

[34] January 2022 Order, 178 FERC ¶ 61,048 at P 30.  For the same reason, and as further explained in the January 2022 Order, *Lockyer*, 383 F.3d at 1011, is inapplicable

13.     Even assuming for purposes of argument that *Batavia* requires the Commission to consider the interaction between the changed and unchanged portions of the SEEM Agreement, the Commission did not err in its review of the section 205 filing.  Rehearing Parties neglect to recognize that the D.C. Circuit narrowed *Batavia* in *East Tennessee Natural Gas Co. v. FERC*.[35]  There, the court interpreted the Commission's analogous authority under section 4 of the Natural Gas Act[36] as allowing the Commission to consider and act upon unchanged portions of the filed rate "only where the interaction [between proposed changes and the existing rate] will *create* results that are unjust or unreasonable."[37]  Rehearing Parties explain neither in their comments on the filing nor in their request for rehearing how the proposed revisions to the SEEM Agreement, including to the standard of review provision, interact with the remaining, unchanged provisions of the SEEM Agreement to create results that are unjust and unreasonable.[38]  We similarly cannot identify such an interaction or result.[39]  Therefore, the proposed revisions did "not open the door to any and all retroactive changes" to the existing SEEM

---

here.  *Id.* P 33 (discussing *Lockyer*).  Moreover, unlike both *Lockyer* and *MCI*, 512 U.S. at 231-32, this case does not involve non-compliance with or elimination of reporting requirements associated with market-based rate authority.  *Id.*

[35] 863 F.2d 932 (D.C. Cir. 1988) (*East Tennessee*).

[36] 15 U.S.C. § 717c.  Parallel provisions of the FPA and the Natural Gas Act typically are read *in pari materia*, that is, in the same way when they involve similar language.  *See, e.g.*, *Sierra*, 350 U.S. at 353; *Ark.-La. Gas Co. v. Hall*, 453 U.S. 571, 578 n.7 (1981).

[37] *East Tennessee*, 863 F.2d at 943 (emphasis in original).

[38] *Cf. New Eng. Conf. of Pub. Util. Comm'rs, Inc.*, 124 FERC ¶ 61,291, at P 46 (2008) (The Commission and the courts have long recognized that a protester has a burden to do more than make mere unsubstantiated allegations.); *Sw. Pub. Serv. Co.*, 152 FERC ¶ 61,126, at P 11 (2015) (denying rehearing because protestor alleged only that the proposed revisions were incomplete); *id.* P 13 (finding that "there is nothing in the interaction between these rate components that creates an unjust and unreasonable result, and [the protestor] has provided no basis for the Commission to include these unchanged rate components in its review under section 205 of the FPA").

[39] As the Commission explained in the January 2022 Order, the proposed revisions will "improve the transparency of SEEM to the public and to the Commission, and . . . establish safeguards to ensure SEEM operates as intended," such that rather than rendering the filed rate unjust and unreasonable, "the proposed revisions will give the Commission greater visibility into market behavior in SEEM than that afforded by the original proposal."  January 2022 Order, 178 FERC ¶ 61,048 at P 31.

Agreement, nor did the SEEM Members forego their "reliance interest" in the filed rate simply because they proposed changes under section 205 of the FPA.[40]

14.    By contrast, we note that where Clean Energy Coalition directed its comments to the proposed revisions themselves, the Commission addressed the comments. Clean Energy Coalition contended that "it is not clear whether [the Commission] will review or assess the data it receives" as a result of the revisions.[41] The Commission confirmed that it plans to review and assess this data, as part of its ongoing monitoring and surveillance of market transactions and market participant activity, to monitor wholesale electricity market transactions executed through SEEM.[42] The Commission also confirmed that the weekly data submission will not affect the status of non-jurisdictional entities, and that the Commission will treat the information as non-public, subject to FOIA Exemption 4.[43]

15.    As to Rehearing Parties' filed rate doctrine arguments, we note at the outset that the "Commission looks with disfavor on parties raising new issues on rehearing."[44] Matters that have not previously been raised by any participant in the proceeding may be raised in a rehearing request only when based on matters not available for consideration by the Commission at the time of the final decision or final order.[45] Neither Clean Energy Coalition nor any other participant raised these arguments in their responses to the initial filing from the SEEM Members. Further, the initial filing from the SEEM Members specifically raised the issue of the applicability and scope of the filed rate

---

[40] *East Tennessee*, 863 F.2d at 943.

[41] Clean Energy Coalition December 15, 2021 Comments at 7-8.

[42] January 2022 Order, 178 FERC ¶ 61,048 at P 32.

[43] *Id.*

[44] *Calpine Oneta Power v. Am. Elec. Power Serv. Corp.*, 114 FERC ¶ 61,030, at P 7 (2006) ("Such behavior is disruptive to the administrative process because it has the effect of moving the target for parties seeking a final administrative decision.").

[45] We typically reject such new arguments raised on rehearing, unless we find that the argument could not have been previously presented, e.g., claims based on information that only recently became available or concerns prompted by a change in material circumstances. *KEI (Maine) Power Mgmt. (III) LLC*, 173 FERC ¶ 61,069, at P 38 n.77 (2020). Rule 713(c)(3) of our Rules of Practice and Procedure states that any request for rehearing must "[s]et forth the matters relied upon by the party requesting rehearing, if rehearing is sought based on matters not available for consideration by the Commission at the time of the final decision or final order." 18 C.F.R. § 385.713(c)(3) (2021).

doctrine.[46]  Clean Energy Coalition specifically commented about the status of the SEEM Agreement as a filed rate, but did not present the argument now raised on rehearing.[47] We thus reject Rehearing Parties' filed rate doctrine argument as procedurally barred because it could have been presented earlier in this proceeding.

16.     In any event, Rehearing Parties' filed rate doctrine argument is not persuasive.  In *NSTAR Elec. & Gas Corp. v. FERC*, cited by Rehearing Parties, the court explained that the filed rate doctrine and the bar on retroactive ratemaking are not implicated "when parties have notice that a rate is tentative and may be later adjusted."[48]  Here, there is no such notice.  In the SEEM Agreement proceeding, the SEEM Members contemplated a future filing with the Commission under section 205 of the FPA to revise the market structure rather than a rate to be paid by a customer.[49]  But such statements in a pleading in earlier litigation as to potential future filings do not undermine the fact that the SEEM Agreement is the rate on file.

17.     Regarding the proposed revisions to section 16.9 of the SEEM Agreement—the standard of review provision—Rehearing Parties improperly focus on the form of the revisions rather than their substance.  Although in form, the proposed revisions to section 16.9 served to specify the provisions of the SEEM Agreement for which changes will be subject to the *Mobile-Sierra* public interest standard of review, the proposed revisions did not change the standard of review for the listed provisions.  Rather, the listed provisions remain subject to the *Mobile-Sierra* public interest standard of review, as was the case before the Members filed the proposed revisions.  The substantive changes from the rate on file were the omissions to section 16.9  for which SEEM Agreement changes will now be subject to the ordinary just and reasonable standard of review.[50]  The question before

---

[46] Alabama Power Company November 24, 2021 Filing at 2.

[47] *E.g.*, Clean Energy Coalition December 15, 2021 Comments at 6 ("The SEEM Revisions are not sufficient to establish the SEEM Agreement as a lawful filed rate.").

[48] Rehearing Request at 7 (quoting *NSTAR*, 481 F.3d at 801 (internal citation omitted)).

[49] *See* Alabama Power Company, et al., Response to Deficiency Letter, Docket No. ER21-1111-002, et al., at 3-4 (filed June 7, 2021) (committing to modify certain provisions in a future filing).

[50] January 2022 Order, 178 FERC ¶ 61,048 at P 7 (explaining the proposed narrowing of the application of the *Mobile-Sierra* public interest standard of review); Alabama Power Company November 24, 2021 Filing at 15 (stating the SEEM "Agreement has been revised to establish a general 'just and reasonable' standard of review and lists those provisions that will remain subject to the 'public interest' standard").

the Commission was whether it is just and reasonable to remove the application of the *Mobile-Sierra* public interest standard of review from changes to the remaining, unspecified provisions. The application of the *Mobile-Sierra* public interest standard of review to changes to the other specified provisions was not before the Commission.[51] Clean Energy Coalition even acknowledged and approved of the substantive change, commenting that "this narrowing of the application of *Mobile-Sierra* provisions originally proposed by the SEEM Members is directionally positive."[52]

18.     Therefore, we are unpersuaded by the arguments on rehearing that the Commission erred in its review of the proposed revisions, and we sustain the Commission's findings in the January 2022 Order.

The Commission orders:

In response to Rehearing Parties' request for rehearing, the January 2022 Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.

( S E A L )

Kimberly D. Bose,
Secretary.

---

[51] Although Rehearing Parties claim that neither the Commission nor the Members attempted to distinguish the SEEM Agreement from other contracts negotiated among transmission-owning utilities that have been found ineligible for *Mobile-Sierra* protection, we need not reach this question given the scope of the Commission's review in this proceeding, as discussed above. The remaining provisions applying the *Mobile-Sierra* protection are already accepted by operation of law, as noted in the October 13 Notice.

[52] Clean Energy Coalition December 15, 2021 Comments at 9.

**McGuireWoods LLP**
2001 K Street N.W.
Suite 400
Washington, DC 20006-1040
Phone: 202.857.1700
Fax: 202.857.1737
www.mcguirewoods.com

Noel Symons
Direct: 202.857.2929.

# McGuireWoods

nsymons@mcguirewoods.com
Fax: 202.828.2992.

February 12, 2021

Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street N.E.
Washington, D.C. 20426

**RE:**   ***Southern Company Services, Inc.***
          **Southeast Energy Exchange Market Agreement**
          **Docket No. ER21-____-000**

Dear Secretary Bose:

Southern Company Services, Inc, ("Southern Company"), as agent for Alabama Power Company ("Alabama Power"), on behalf of itself and the other Members of the Southeast Energy Exchange Market ("Southeast EEM"),[1] submits the Southeast Energy Exchange Market Agreement ("Southeast EEM Agreement")[2] for Federal Energy Regulatory Commission ("Commission" or "FERC") acceptance under Section 205(c) of the Federal Power Act ("FPA")

---

[1]      While e-Tariff rules require separate filings, and non-jurisdictional Southeast EEM Members do not require Commission approval to participate in the Southeast EEM, Southern Company is authorized to state that each of the Southeast EEM Members, as well as those listed below that are exploring membership, supports this filing and Commission acceptance of the Southeast EEM Agreement without modification.  As of the date of filing, the following entities are Members of the Southeast EEM: Alabama Power, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion Energy SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP" (together with DEC, "Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, "LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); Power South Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA") (each a "Member" and collectively, the "Members").  In addition, the following entities have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members:  Georgia System Operations Corporation ("GSOC"); Georgia Transmission Corporation ("GTC"); Municipal Electric Authority of Georgia ("MEAG Power"); Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and South Carolina Public Service Authority ("Santee Cooper").

[2]      The Southeast EEM Agreement is being filed as Alabama Power's Rate Schedule No. 1011 in its Market-Based Rate Tariff eTariff database.

Ms. Kimberly D. Bose
February 12, 2021
Page 2

and Part 35 of the Commission's regulations.[3]  The Southeast EEM Agreement sets forth the framework and rules for establishing and maintaining a new voluntary electronic trading platform designed to enhance the existing bilateral market in the Southeast utilizing zero-charge transmission service (the "Southeast EEM System").  That transmission service, in turn, will be voluntarily provided by participating transmission service providers ("Participating Transmission Providers").

The Southeast EEM proposal submitted here ("Southeast EEM Proposal") will materially benefit customers throughout the Southeast.  It will add a new, voluntary, and consensus-driven layer to the existing bilateral market that will comprehensively cover the region, and will facilitate market access to currently unused transmission capacity across the region.  Moreover, it will aid in the reduction of transmission rate pancaking, which has been an object of Commission pricing policy for many years.[4]

The Southeast EEM Agreement is not, in and of itself, a contractual vehicle for the sale or transmission of electric energy at wholesale.  Rather, it reflects the agreement among a wide-ranging group of entities within the Southeast region to create a framework to reduce transactional friction in the Southeast and increase the efficiency of the existing bilateral market by matching willing bidders and offerors for transactions that will occur under other bilateral agreements.

The Southeast EEM Proposal is just and reasonable and should be accepted for filing without modification.  Included in support of this filing are:  1) the Southeast EEM Agreement, including the Names and Addresses of the Members (Exhibit A), Form of Joinder Agreement (Exhibit B), Form of Participation Agreement (Appendix A), the Southeast EEM Market Rules (Appendix B, the "Market Rules"), and Southeast EEM Agent Scope (Appendix C), appended thereto; 2) the Affidavit of Mr. Aaron Melda of TVA and Mr. Lonnie Bellar of LG&E/KU, who provide an overview of the Southeast EEM Proposal and how it was developed ("Overview Affidavit"); 3) the Affidavit of Mr. Chris McGeeney of AECI and Mr. Corey Sellers of Southern Company, who describe the functioning of the Southeast EEM in more detail ("Operations Affidavit"); 4) the Affidavit of Dr. Susan Pope of FTI Consulting, who explains why the Southeast EEM will provide economic benefits, why it does not provide new opportunities for the exercise of market power, and how it has been designed to thwart new avenues for market manipulation ("Economic Affidavit"); and 5) the Affidavit of Andrew Rea of Guidehouse, who

---

[3]     16 U.S.C. § 824d(c) (2016); 18 C.F.R. pt. 35.

[4]     *See, e.g.*, *Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,213 at P 156 (2014) ("*Western EIM Order*") ("[T]he elimination of the seam between [California Independent System Operator, Corp. ("CAISO")] and the [Energy Imbalance Market ("EIM")] Entity BAAs promotes more efficient and competitive electricity markets, provides customers in the EIM and in CAISO access to additional energy supplies, decreases the number of transactions that must pay pancaked rates, and therefore enhances competitive electricity markets in the region.").

Ms. Kimberly D. Bose
February 12, 2021
Page 3

sponsors a benefits analysis performed by Guidehouse and Charles River Associates ("Benefits Analysis") appended thereto.

The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement to become effective May 13, 2021, 90 days after this filing.  The Southeast EEM Members wish to have the regulatory certainty provided by a Commission order before proceeding with further significant investment.  The effective date will not be the market "go live" date, which is currently expected to occur in the first quarter of 2022 and is referred to in the Southeast EEM Agreement as the "Commencement Date."[5]  To ensure that the Commission and potential Participants know when the Commencement Date will occur, the Members commit to make a notice filing in this docket, and the other proceedings discussed next, 30 days before the Commencement Date.

Concurrently with this filing, each of the other Commission-jurisdictional Members (together with Southern Companies, the "FERC Jurisdictional Members"), is filing a Certificate of Concurrence (together, the "Concurrence Filings").[6]  Additionally, each Member that is a transmission service provider with an open access transmission tariff ("transmission tariff" or "OATT") on file with the Commission, including Southern Companies, is filing amendments to its transmission tariff to offer zero-charge transmission service for Southeast Energy Exchange transactions (known as "Non-Firm Energy Exchange Transmission Service" or "NFEETS") (collectively, the "Tariff Filings," together with the Concurrence Filings and this filing, the "Southeast EEM Filings").[7]

While eTariff requirements mandate that each of the Southeast EEM Filings have its own docket, and entities interested in more than one docket should intervene in each docket to which they wish to become a party, that does not mean it is necessary to file duplicate sets of comments in more than one docket.  Rather, the Southeast EEM Members recommend submitting a single pleading with a caption identifying the dockets it is being submitted in, and an indication in the caption that the dockets are "unconsolidated."  While the consolidation of dockets is not appropriate because the dockets involve different filings by different parties, the issues in the dockets are related, such that use of a single pleading across all dockets will allow all concerned to focus on substance, rather than the process of preparing multiple documents in parallel.

In order to provide ample time to potential commenters who may wish to provide comments, we respectfully request that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.

---

[5]     As discussed below in Section IV, rather than specify a date in the Southeast EEM Agreement on which the Southeast EEM will become operational, the Members are leaving the Commencement Date flexible to accommodate any unforeseen implementation or readiness issues that might arise.

[6]     Specifically, Georgia Power, Mississippi Power, Dominion Energy SC, DEC, DEP, KU, and LG&E are each filing a Certificate of Concurrence.

[7]     Specifically, the Southern Companies, Dominion Energy SC, DEC, and LG&E are each filing amendments to their transmission tariffs, some of which are joint OATTs.

Ms. Kimberly D. Bose
February 12, 2021
Page 4

As noted, the requested effective date, and the requested date for Commission action, is in 90 days. Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received.

## I.     Executive summary

The Southeast EEM is an innovative market enhancement that will make the existing bilateral market in the Southeast more efficient, resulting in material customer benefits. "The design of the Southeast EEM leverages automation and zero-cost transmission to facilitate beneficial sub-hourly bilateral transactions."[8] The foundation of the Southeast EEM will be the Southeast EEM System. It will be a region-wide, automated, intra-hour market platform to facilitate bilateral trading between voluntary market participants ("Participants") that will utilize unused transmission capacity to achieve cost savings throughout the region.

The Southeast EEM System will be a secure software system that will rely on Participant inputs (including bids and offers) applied to an algorithm (the "Algorithm"). The Algorithm will match bids and offers voluntarily submitted by Participants for 15-minute intervals and price matched transactions on a "split-the-savings" basis. For purposes of the Southeast EEM, "split-the-savings" pricing means that the transaction price will reflect the midpoint between the seller's offer price and the buyer's bid price, with an adjustment for losses. These matches are referred to in the Southeast EEM Agreement and this filing as "Energy Exchanges." Energy Exchanges will rely on the zero-charge NFEETS provided by the Participating Transmission Providers.

The combination of an automated system for matching trading partners and zero charge transmission over a wide region will allow more buyers and sellers to beneficially transact with one another, thereby increasing efficiency and lowering customer costs. The new trading platform is expected to result in substantial benefits of more than $40 million per year by covering a large footprint over parts of 10 states, and including initial membership commitments from fourteen founding electric service providers in the region, and five additional entities that are actively pursuing membership.[9] These founding entities collectively own approximately 160,000 MW of generating capacity, and serve about 640 TWh of energy for load across 10 Balancing Authority Areas ("BAAs") and two time zones:[10]

---

[8]     Economic Aff. at P 33.

[9]     *See supra* note 1.

[10]    *See* Overview Aff. at P 8.

JA0289

Ms. Kimberly D. Bose
February 12, 2021
Page 5



The Commission should accept the Southeast EEM Agreement for filing because it is a just and reasonable and not unduly discriminatory improvement to the existing bilateral market. Today's trading mechanisms in the bilateral market (chiefly market-based rate ("MBR") sales) have already been found to be just and reasonable, and the Southeast EEM is built on that existing just and reasonable framework. The Southeast EEM will achieve customer savings by facilitating more efficient use of existing, and unused, transmission capacity over a large footprint and ultimately increasing the number of cost-reducing transactions between buyers and sellers. This will be accomplished without any compromise to existing measures to preserve reliability and serve load – rather, it is a just and reasonable means to continue to reliably serve load while achieving new cost savings.

## II.    Background

### A.    In the Southeast today, trading is bilateral, with the shortest transaction period typically being hourly

Today, the Southeast region functions as what the Commission refers to as a "traditional wholesale electricity market."[11] That means that electric service providers generally remain responsible for system operations and management, and are load serving entities ("LSEs") that provide service to retail customers within their service territory.[12] There is great diversity in the types of electric service providers in the Southeast region. These electric service providers include federal government-owned providers such as TVA, state-owned providers, electric

---

[11]    *See* Fed. Energy Regulatory Comm'n, Energy Primer: A Handbook for Energy Market Basics at 61 (Apr. 2020), https://www.ferc.gov/sites/default/files/2020-06/energy-primer-2020.pdf.

[12]    *Id.* Not every entity follows this model. For example, TVA sells power primarily at wholesale to local power companies within its service area.

Ms. Kimberly D. Bose
February 12, 2021
Page 6

cooperatives, municipalities, and Commission jurisdictional investor-owned utilities ("IOUs"). There is also great diversity in the types of technologies and fuels used to meet customer needs.

Energy transactions in the Southeast are best understood against the backdrop of generation planning mechanisms employed by the electric service providers in the region. These entities are responsible for maintaining resource adequacy through Integrated Resource Planning ("IRP") processes.[13] As explained by Mr. Melda and Mr. Bellar, each load serving entity "has an obligation and responsibility to plan to serve its load through its own generation, or long-term power purchase arrangements, or both. Such entities can use bilateral power purchases and sales to reduce customers' cost of energy closer to real time, such as in the hourly market."[14] As Mr. Melda and Mr. Bellar further explain:

> Generally, a short-term power purchase will be sought if more expensive generation can be backed down. An entity will typically engage in a power sale when there is an opportunity to provide power bilaterally to a counterparty at a price greater than the seller's own cost to produce and deliver the power, after satisfying any obligations it may have to its own load. In other words, short-term purchases are generally made for economic purposes to displace more expensive generation. Therefore, these purchases typically reduce customer costs. When sales are made, a significant portion or all of the margin from the sale will be credited to customers, which helps to achieve net cost savings. Most utilities use a mechanism such as a fuel adjustment clause to pass back credits to customers for purchases and sales. Other utilities, such as TVA, pass back the savings from sales by lowering base revenue requirements instead.[15]

Today, trading occurs bilaterally under wholesale power sales contracts. Commission-jurisdictional entities' contracts are often entered into pursuant to the sellers' MBR authority. To effectuate any particular transaction, the parties must discover one another, negotiate the terms of the sale, arrange and pay for transmission service across all utilized transmission systems, and schedule the delivery of energy. All of this is done with "traditional" methods of communication, by phone and electronically, thus creating transactional friction. To determine whether any given energy transaction is economic, the bilateral market participants must consider the cost of transmission service, as well as charges for Real Power Losses ("Losses") and ancillary services. Trades generally occur on an hourly basis as the shortest increment, and most often occur only with entities in the same or directly interconnected balancing authorities. While intra-hour trading and trading with more distant entities is possible, neither is common.[16]

---

[13]     For IOUs, IRP processes typically are overseen by state regulators.

[14]     Overview Aff. at P 9.

[15]     *Id.* This trading construct, under which an entity pursues opportunities for short term purchases and sales based on the marginal cost of producing power from its generation portfolio, is sometimes referred to in this letter, in short hand, as "trading around" the utility's assets.

[16]     *See* Overview Aff. at P 9.

JA0291

Ms. Kimberly D. Bose
February 12, 2021
Page 7

Commission-jurisdictional entities transacting under their MBR authority do not file resulting bilateral agreements with the Commission.  Instead, MBR sellers conduct the transactions in accordance with the terms and conditions of their MBR tariff, and report MBR contracts in their Electric Quarterly Reports ("EQRs") along with transaction information for all associated transactions in the relevant reporting period.  Through its MBR authorization process, the Commission evaluates the market power of each MBR seller and may impose mitigation measures on sellers for a particular market.[17]  Indeed, each of the FERC Jurisdictional Members has conditions in its MBR tariff that limit certain sales and mitigate the potential to exercise market power in bilateral trades.[18]

Participation in the Southeast EEM will not alter the applicability of each entity's MBR authority requirements.  The Commission has numerous tools available to monitor MBR sellers.  All MBR sellers that own or are affiliated with more than 500 MW of generation must update their market power analyses every three years to show that they continue to meet the requirements (including any necessary mitigation) for MBR authority.[19]  MBR sellers must submit EQRs, and must file notices of change in status for any material changes in facts.[20]  Furthermore, the Commission has ongoing audit rights for all jurisdictional sellers.  The implementation of the Southeast EEM will not affect these existing tools for monitoring bilateral transactions.

## B.    Development of mutually agreed-upon core principles led to this proposal for two small but significant beneficial changes to the existing bilateral market

As discussed above, electric service providers in the Southeast seek bilateral transactions that can either save costs directly (purchases) or earn a margin to offset costs (sales).  Transaction economics can be diminished both by "friction" involved in identifying trading

---

[17]    18 C.F.R. §§ 35.37(a)-(b).

[18]    *See S.C. Elec. & Gas Co.*, 121 FERC ¶ 61,263 at P 6 (2007) (finding that Dominion Energy SC's (f/k/a South Carolina Electric and Gas Company) "proposal not to make sales within its balancing authority area under its market-based rate tariff adequately addressed [Dominion Energy SC's] failure of the market share screen in its balancing authority area"); *LG&E Energy Mktg., Inc.*, Docket Nos. ER06-1046-000, *et al.* (letter order issued July 6, 2006) (accepting "revised market-based rate tariff sheets that would, among other things, restrict the LG&E Parties' authority to make sales at market-based rates in the LG&E/KU control area" upon LG&E/KU's exit from the Midwest Independent System Operator, Inc.); *Ala. Power Co.*, 163 FERC ¶ 61,090 at P 32 (2018) (finding that the price cap and auction process established in each of the Southern Companies' MBR tariffs "serve as adequate mitigation for the Southern, SCEG, Tallahassee, and Santee Cooper balancing authority areas"); *Duke Power*, 111 FERC ¶ 61,506 at P 61 (2005) (Commission prohibiting Duke sales within the DEC balancing authority to "mitigate the potential for the exercise of generation market power"); *Fla. Power Corp.*, 113 FERC ¶ 61,131 (2016) (prohibiting Duke sales in the DEP BA).

[19]    18 C.F.R. § 35.37(a)(1).

[20]    18 C.F.R. § 35.42.

partners and added costs of transmitting power to distant potential counterparties. As Mr. Melda and Mr. Bellar explain, "[t]hese factors result in some economic energy going unpurchased and some available transmission going unutilized. A central objective of the Members' efforts to identify potential regional improvements, which has led to the development of the Southeast EEM, is finding ways to increase the use of available transmission and increase opportunities for economic energy purchases and sales."[21]

The effort to identify potential regional improvement led to development of a set of core principles – commonly shared convictions that make today's Southeast EEM Proposal possible. Identifying a common list of core principles shared by all of the very diverse Southeast EEM Members – and thus being able to blanket the region – was an important step, without which there would be no Southeast EEM. These critical core principles are:

- Each electric service provider/state maintains control of generation and transmission investment decisions;

- Each transmission provider remains independent with its own transmission tariff (or equivalent[22]);

- Each Balancing Authority ("BA") remains independent;

- Bureaucracy is minimized while benefits to customers are maximized;

- Participation is voluntary;

- Market benefits exceed costs, collectively and for each market participant;

- Transparency in governance and operations is ensured while Member confidentiality is maintained.[23]

Applying the core principles above, the Members proceeded to develop a proposal to enhance the Southeast's bilateral market, which culminates in today's filing. Mr. Melda and Mr. Bellar describe the simple yet significant nature of the two key design features of the Southeast EEM Proposal as follows:

The Southeast EEM has two simple design features that work together to create matches of buyers and sellers for more mutually beneficial bilateral transactions to produce customer savings.

First, if Southeast EEM Participating Transmission Providers' transmission capacity is not being used for other transactions, it will be made available on an intra-hour basis at no cost (other than financial losses and any applicable imbalance charges) for 15-minute Southeast EEM Energy Exchanges under the Participating Transmission Providers' tariffs . . . Since Southeast EEM will only

---

[21]    See Overview Aff. at P 13.

[22]    TVA has transmission service guidelines that are equivalent to a tariff.

[23]    See Overview Aff. at P 19.

Ms. Kimberly D. Bose
February 12, 2021
Page 9

use transmission that is not otherwise being used, it will not result in underfunding of transmission, which will still be paid for through current rate constructs, *i.e.*, through revenues received from customers of Network Service and Point-to-Point Service, or their equivalent. It is possible that availability of the new free service will lead to some slight decrease in Point-to-Point revenues, which in turn would lessen revenue credits used to offset Network Service charges. However, today, Participating Transmission Providers' revenues from short-term wheeling transactions of the type that could be replaced by Southeast EEM transactions are minimal. In general, we expect that any small increase in Network Service charges will be more than offset by reductions in overall customers' costs attained through the Southeast EEM.

Second, the Southeast EEM will use load bids and generation offers to match buyers and sellers for transactions on a split-the-savings basis that benefits both the buyer and the seller. In today's short-term bilateral market, transactions between buyers and sellers are typically done on an hourly basis. The Southeast EEM will allow for shorter-term, intra-hour, transactions and greater flexibility through an automated matching system. The Southeast EEM will provide a platform that enhances efficiency by using the information input by buyers and sellers to expand the universe of potential trading matchups and to automatically find counterparties.[24]

In other words, the Southeast EEM is not – and was never intended to be – a top-to-bottom reimagining of the Southeast energy market; rather, it reflects incremental improvement to the existing bilateral market.[25] The table below reflects that, other than the two principle changes described above, the bilateral market structure in the Southeast will remain relatively unchanged:[26]

| | Existing Market | Addition of Southeast EEM |
|---|---|---|
| **Nature of market** | • Bilateral: long-term, seasonal, day-ahead, hourly (limited intra-hour)<br>• Products traded: Capacity, firm energy, non-firm energy, and other products | • Significantly enhances bilateral, intra-hour (15-minute increments)<br>• Products traded: Facilitates non-firm energy transactions only |

---

[24]    Overview Aff. at PP 22-24.

[25]    *See id.* at P 6.

[26]    This table is provided in the Overview Aff. at P 28.

JA0294

| | Existing Market | Addition of Southeast EEM |
|---|---|---|
| **Transmission Service** | • Point-to-Point Service or Network Integration Transmission Service ("NITS") required for any transmission system used<br>• Rate based on transmission tariff Schedules plus Losses and ancillary services<br>• e-Tags submitted by parties to transaction | • Adds Non-firm Energy Exchange Transmission Service priced at $0/MWh plus Losses (which must be financial)<br>• e-Tags submitted by Southeast EEM System (for both intra-BA and inter-BA Energy Exchange transactions) |
| **Transactional Friction** | • Buyers and sellers locate one another, negotiate with each other, obtain transmission service, and schedule delivery of energy with e-Tags (using phones, fax, and electronic communications) | • Buyers and sellers self-identify to Southeast EEM System, which matches them according to the Algorithm; Southeast EEM System submits transmission service reservations and e-Tags to schedule delivery of energy with applicable BA(s)/Transmission Service Provider(s)/Participants |
| **Pricing and Settlements** | • Market-based or cost-based, as appropriate<br>• Negotiated between counterparties subject to any limitations imposed by market power mitigation or other restrictions, such as TVA fence or counterparty credit limits<br>• Settlements occur bilaterally | • Market-based, but subject to cost capping where applicable for MBR mitigation<br>• Determined by matching Algorithm on a split-the-savings basis, including [Losses], with matching subject to identified constraints (*e.g.*, to respect TVA fence or counterparty credit limits)<br>• Settlements occur bilaterally |
| **Transparency** | • EQRs, notices of change in status & triennial market power updates<br>• FERC audit rights<br>• e-Tags collected by FERC pursuant to Order No. 771 | • EQRs, notices of change in status & triennial market power updates<br>• FERC audit rights<br>• Southeast EEM transaction e-Tags collected by FERC pursuant to Order No. 771 will be identifiable |

Ms. Kimberly D. Bose
February 12, 2021
Page 11

| | Existing Market | Addition of Southeast EEM |
|---|---|---|
| | | • Additional, publicly posted aggregate information about Southeast EEM transactions and an Annual Meeting |
| **Resource Adequacy** | • Per individual entity and/or state oversight | • No change |
| **Reliability** | • BAs, Transmission Providers, generators and LSEs have roles assigned by North American Electric Reliability Corporation ("NERC") | • No change |
| **State Jurisdictional Issues** | • Any retail access or demand response issues are under state or non-jurisdictional authority | • No change |

While the experience of the Members suggested that these improvements to the existing bilateral market would bring benefits, the Members sought to validate their expected outcomes with analysis from an unbiased third party.  Accordingly, the Members hired independent experts to evaluate the potential benefits of region-wide, intra-hour trading with no-cost transmission. The Benefits Analysis also evaluated potential internal company costs of the Southeast EEM Proposal.

As expected, the results verified that the operation of the Southeast EEM would produce significant quantifiable customer benefits.  The Benefits Analysis, attached as Attachment E-1 to this Filing, conservatively estimated approximately $40 million in market-wide benefits per year, largely from fuel cost savings, in comparison with low individual internal company start-up and ongoing costs (totaling about $3.1 million per year on a levelized basis).[27]  While the study did not quantify vendor costs associated with developing, operating and auditing the Southeast EEM System (because the selection process for that work has not been completed),[28] those incremental costs also are expected to be small, relative to benefits.[29]  As described in the Overview Affidavit, initial vendor price estimates to develop the Platform ranged from $1 million to $5 million, with ongoing annual costs estimated below $1 million.[30]

---

[27]     Benefits Analysis at 4.

[28]     *Id.* (footnote 2).

[29]     Overview Aff. at P 31.

[30]     *Id.*

JA0296

Ms. Kimberly D. Bose
February 12, 2021
Page 12

In addition, the "Southeast EEM will allow for better integration of diverse generation resources, including rapidly growing renewables and will reduce renewable curtailments."[31]  The Benefits Analysis confirmed that benefits will scale with the addition of more solar and wind resources in the region.  Specifically, the Benefits Analysis looked at a "carbon constrained scenario" that assumed increased penetration of renewables over time, consistent with trends in the region.  Under this scenario, benefits are projected to rise to about $100 million per year.[32]

Finally, the relative simplicity of the Southeast EEM also means it can be implemented quickly.  This means expected benefits will flow to Members and their customers as soon as possible.

In short, the Members designed the Southeast EEM to implement incremental improvements to the efficiency of the existing bilateral wholesale market in the Southeast that will yield substantial benefits, relative to costs.  Members based the design on explicit core principles, in particular the principle that market benefits must exceed costs, collectively and for each market participant.  These principles were developed through concerted consensus building, enabling a diverse group of entities to come together to agree upon enhancements to the Southeastern market structure.

### C.    Development efforts and stakeholder engagement have been robust

Over the past year, the Southeast EEM Members have pursued the core principles set out above, developed and refined their proposal, and engaged experts to further review and refine their proposal, all while engaging in extensive stakeholder discussions.  The effort has involved hundreds of individuals and thousands of hours of work from Members' employees.  Stakeholder outreach has included "governmental entities and non-governmental entities such as environmental groups, trade associations, and individual customers.  In many cases, there were multiple discussions with the same entity.  The resulting exchanges of ideas were robust and welcome."[33]  All told, the Members estimate there were hundreds of conversations of this nature.  The result of this combined effort is the Southeast EEM Proposal submitted to the Commission today.  The Southeast EEM Proposal is a significant achievement.

### D.    Commission action is a prerequisite to further significant development

Before making significant commitments of monetary and human capital to develop the Southeast EEM, the Members need regulatory certainty.  If the Commission accepts the Southeast EEM Filings without material modification or condition within the requested 90 days, the Members anticipate the following schedule to implement the Southeast EEM:

---

[31]     *Id.* at P 26.

[32]     Benefits Analysis at 4.

[33]     Overview Aff. at P 20.

JA0297

Ms. Kimberly D. Bose
February 12, 2021
Page 13

- May 13, 2021:  Proposed effective date of the Southeast EEM Agreement.

- First Quarter 2021:  Selection of vendor to build the Southeast EEM System.[34]

- Second and Third Quarter 2021:  Build out of Southeast EEM System.

- First Quarter 2022:  Southeast EEM Commencement Date (customer savings begin).

Commission acceptance of the Southeast EEM Proposal is thus an integral step toward implementing the Southeast EEM.

## III.    The Commission should accept the Southeast EEM Agreement

The Southeast EEM, as structured under the terms of the Southeast EEM Agreement, is a just, reasonable and not unduly discriminatory expansion to the existing just and reasonable bilateral market in the Southeast.  It will provide substantial incremental benefits to customers, driven by the two incremental changes enabled by the Southeast EEM Agreement – zero-dollar transmission service and automated matching at split-the-savings pricing for Energy Exchanges.  Accordingly, the Southeast EEM Agreement should be accepted without modification.

Additionally, it is important to note that the proposal before the Commission is a carefully negotiated series of compromises, negotiated at arm's length between fourteen very different founding Members, encompassing ten BAAs, and comprehensively blanketing the Southeast Region ("Territory").[35]  Further, it is a narrow proposal, from a review perspective, since the Southeast EEM Agreement is not, by itself, a new vehicle for the sale or transmission of electric energy at wholesale.  Rather, transactions that occur through the Southeast EEM System would be consummated under existing authority.  Features of bilateral markets in the

---

[34]     The Members note that, while they may endeavor to select a vendor before obtaining FERC approval, they plan to condition the commencement of performance of any vendor agreement on FERC acceptance.

[35]     As part of that agreement, the Members selected the *Mobile-Sierra* public interest standard of review for the Southeast EEM Agreement.  Under that standard, "where parties have negotiated a . . . contract that sets firm prices . . . and that denies either party the right to change such prices or charges unilaterally, [the Commission] may abrogate or modify the contract only if the public interest so requires." *Texaco Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998).  Such a standard is justified here where the Southeast EEM Agreement was freely negotiated by sophisticated parties and does not contain terms that are generally applicable to non-signatories.  *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 184 (2013) ("On one hand, all such provisions in bilateral power sales contracts freely negotiated at arm's length between sophisticated parties generally would establish contract rates and would come within the [*Mobile-Sierra*] presumption [of justness and reasonableness].  On the other hand, where the terms of an agreement would, if approved, be incorporated into the service agreements of all present and future customers, those terms are properly classified as tariff rates and the *Mobile-Sierra* presumption would not apply.").

JA0298

Ms. Kimberly D. Bose
February 12, 2021
Page 14

Southeast that are not changing are beyond the scope of this filing.[36]  The changes proposed to implement the Southeast EEM Agreement improve on an already just and reasonable bilateral paradigm, and are themselves just and reasonable.

## A.    Commission jurisdiction

The Southeast EEM Agreement provides for the creation of a new trading platform that will match willing buyers and sellers across an expanded region created through de-pancaking of transmission rates for Southeast EEM transactions.  However, neither the sale of power nor the sale of transmission service will be effectuated through the Southeast EEM System or under the Southeast EEM Agreement.  Instead, all Energy Exchanges will be consummated under enabling agreements in the same manner that bilateral sales are consummated today, with transmission service provided under Participating Transmission Providers' transmission tariffs.

The Southeast EEM Agreement does, however, commit Members that are Participating Transmission Providers to amend their transmission tariffs to provide NFEETS.  Thus, even though the NFEETS will be provided under those transmission tariffs, the Southeast EEM Agreement is related to that service within the meaning of Section 205(c).[37]  We note that the Southeast EEM Agreement is also related to the provision of wholesale power sales that are subject to the Commission's jurisdiction.  However, only sales that are pre-authorized under market-based rate authority will be "matched" through the Southeast EEM.  The agreements for those sales are not filed with the Commission, so the Southeast EEM Agreement is not required to be reviewed by the Commission by virtue of its relationship to those unfiled agreements.

In short, it is the relationship of the Southeast EEM Agreement to transmission service, rather than its relationship to power sales, that most clearly implicates filing and review of the Southeast EEM Agreement under Section 205(c).

---

[36]    *See, e.g.*, *Duke Energy Ohio, Inc.*, 163 FERC ¶ 61,173 at P 25 (2018) (rejecting American Municipal Power's challenges to Duke Energy Ohio's return on equity, Section 30.9 credits and unfunded reserves as outside the scope of the proceeding where the utility "proposed narrow and discrete changes to its Template and Protocols" and such challenges were not "integral to [its] proposed changes"); *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,157 at P 195 (2016) (rejecting commenters' requests to institute an alternative Minimum Offer Price Rule ("MOPR") as outside the scope of the proceeding where PJM was not proposing to change its MOPR rules).

[37]    While Southern Company is filing the entire Southeast EEM Agreement, the Commission's authority to review it remains limited by its statutory authority.  *See, e.g.*, *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004) (finding that the Commission exceeded its statutory authority to examine practices "related to" rates when it attempted to replace CAISO's governing board based on its own method of selection).

**B.     Key elements of the Southeast EEM Agreement**

**1.     Southeast EEM roles and responsibilities**

**a.     Southeast EEM roles**

There are several distinct roles with the Southeast EEM.  Members are those entities that, to date, have developed the Southeast EEM, executed the Southeast EEM Agreement, and agreed to fund the upfront and ongoing costs of the Southeast EEM as set forth in the Southeast EEM Agreement.  To be a Member, an entity must be one of the following: (i) a Load Serving Entity located in the Territory; (ii) an Association, Cooperative or Governmental Entity that is a Load Serving Entity located in the Territory; or (iii) an Association, Cooperative or Governmental Utility created for the purpose of providing Energy to a Cooperative or Governmental Load Serving Entities (or the Load Serving Entities being served by an Association, Cooperative or Governmental Entity) located in the Territory.[38]  As explained by Mr. Melda and Mr. Bellar:

> Because the goal of the Southeast EEM is to bring benefits to customers through reduced costs gained by more efficient transactions that would not otherwise occur, the eligibility criteria for membership was tied to load-serving responsibilities, ensuring that the entities with decision-making authority over the design, goals, and objectives of the Southeast EEM will share a common purpose of achieving benefits for customers.[39]

As of the date of this filing, there are fourteen Members, and several other entities have been involved in the development of the Southeast EEM and are working to obtain the necessary approvals to become Members.[40]  In addition, in the future, any entity that meets the definition of "Member" and agrees to the Membership conditions contained in the Southeast EEM Agreement can become a Member.

The Members will govern the Southeast EEM and each will have a seat on a Membership Board that will be responsible for all significant decisions for the Southeast EEM.  In addition, a revolving subset of Members will sit on the Operating Committee, which will be comprised of four representatives overseeing the day-to-day operations of the Southeast EEM.  Finally, the Members will appoint one of the Members as their "Agent" for certain discrete Southeast EEM matters, as an administrative convenience.  The Agent will have limited authority to enter into

---

[38]     Southeast EEM Agreement Section 3.2.

[39]     *See* Overview Aff. at P 33.

[40]     As noted above in note 1, the following entities have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members:  GSOC; GTC; MEAG, Oglethorpe; and Santee Cooper.

Ms. Kimberly D. Bose
February 12, 2021
Page 16

related agreements and take other actions on behalf of the Members that the Membership Board specifically approves.[41]

Entities that submit bids and offers into the Southeast EEM System are called "Participants" under the Southeast EEM Agreement. Participation is open to all entities that can physically transact in bilateral markets in the Southeast today, *i.e.*, any entity that "own[s] or otherwise control[s] a Source within the Territory and/or is contractually obligated to serve a Sink within the Southeast EEM footprint," as well as any entities that can physically transact in the future.[42] Because most transactions in the Southeast today are physical, this approach is consistent with the Members' intent to enhance the existing bilateral market. Within this framework, the Members defined "Participant" to enable maximum participation. In addition to the Source/Sink requirement, Participants must: 1) execute a Participation Agreement, the form of which is attached to the Southeast EEM Agreement as Appendix A; 2) arrange to take Non-Firm Energy Exchange Transmission Service from each Participating Transmission Provider, either through execution of a service agreement under the transmission provider's tariff or otherwise making arrangements for such service; and 3) have or enter into an enabling power sales agreement with at least three or more other Participants.[43] There is no cost to Participants for participating in the Southeast EEM.

Only Participants can use the Southeast EEM System to be matched for Energy Exchanges. A Member that wishes to engage in Energy Exchanges must do so as a Participant, and on exactly the same terms and conditions as non-Member Participants. Members who are subject to information sharing and other restrictions under the Commission's Standards of Conduct[44] and Affiliate Restrictions[45] remain subject to those rules. In any event, for avoidance of doubt, the Southeast EEM Agreement contains prohibitions on sharing transmission function information or market information.[46]

Two third-party independent entities will implement, manage, and oversee operation of the Southeast EEM System. In addition to issuing a request for proposals ("RFP") to identify

---

[41]     *See* Southeast EEM Agreement, Appendix C (describing limited Agent functions).

[42]     *See* Market Rules at Part III (listing Participant requirements). For example, as noted in the Operations Affidavit, demand response and distributed energy resources cannot be a registered source or sink today, but could at some point be able to participate in the market under revised state laws. *See* Operations Aff. at n.6.

[43]     *Id.*

[44]     18 C.F.R. pt. 358.

[45]     18 C.F.R § 35.39. Participants will have access to their own information, but will not be able to access any information regarding other Participants, other than settlement information related to the parties they are matched with, and the transactions for which they are matched – the same information they would have if they entered into a bilateral transaction without the matchmaking provided by the Southeast EEM System.

[46]     Southeast EEM Agreement Section 3.5.

JA0301

Ms. Kimberly D. Bose
February 12, 2021
Page 17

entities capable of developing the Southeast EEM, the Members will subsequently issue an RFP to identify an entity capable of administering the Southeast EEM System in accordance with the Market Rules (the "Southeast EEM Administrator"). The Southeast EEM Administrator selected to manage and oversee operation of the Southeast EEM System may be the same entity that the Members select through the RFP process to develop and build the Southeast EEM System or may be a different qualified entity.[47]

In addition, the Membership Board will hire an auditor, who will monitor the functionality of the Southeast EEM System to ensure that it is operating correctly and in accordance with the Market Rules outlined in the Southeast EEM Agreement ("Auditor").[48] The Auditor will not be a market monitor; it will not monitor Participant behavior, nor will it be tasked with suggesting improvements to the Southeast EEM. The scope of the Auditor's responsibilities aligns with the Members' objectives of transparent operation with minimal bureaucracy to maximize benefits to customers. As described below and in the Economic Affidavit, the Southeast EEM does not create new opportunities for exercise of market power and has been designed to thwart potential avenues for market manipulation.[49] Without any new opportunities for the exercise of market power and with strong safeguards regarding potential market manipulation, there is no need for a market monitoring function, just as there is no such need today. Any additional market monitoring functions beyond the Auditor's responsibilities would be superfluous, creating additional administrative costs that are not justified. For these reasons, Members are unwilling to fund the costs of a market monitor and believe the traditional means of Commission oversight of MBR transactions will continue to provide adequate opportunities for review and regulatory protection.

---

[47]     Operations Aff. at P 31. The Administrator will not be Commission-jurisdictional as its role will be purely ministerial. *See, e.g.*, *1 Bechtel Power Corp.*, 60 FERC ¶ 61,156, 61,572 (1992) (finding that a company was not "operating" a facility where it "merely perform[ed] specific services that are ordered and directed by another party"). Transmission service will continue to be provided by Participating Transmission Providers under their respective tariffs, with the Southeast EEM Administrator only overseeing and operating the Southeast EEM System and submitting e-Tags to reserve and schedule such service. In addition, and as noted above, the Southeast EEM Administrator will not be a party to any transactions consummated as the result of Energy Exchanges or otherwise itself engage in power sales.

[48]     Market Rules at Section IV.D; Operations Aff. at P 52.

[49]     *See* Economic Aff. at PP 72, 83-89.

Document Accession #: 20210212-5033    Filed Date: 02/12/2021

The chart below, also included in the Operations Affidavit, summarizes these roles:[50]

| | |
|---|---|
| **Members** | Will be the parties to the Southeast EEM Agreement; will fund initial development of Southeast EEM System and on-going costs; will have voting rights; may also be Participants. |
| **Participants** | Will not be parties to the Southeast EEM Agreement unless are also Members; must sign a Market Participant Agreement; will be able to participate in the market; Participants that are not also Members will not have funding obligations or voting rights. |
| **Membership Board** | Will be the governing body comprised of a representative from each of the Members. |
| **Operating Committee** | Will handle day-to-day operations, comprised of four representatives from the Members. |
| **Agent** | Will perform a purely administrative role (*e.g.*, will act as signatory to the agreement with Southeast EEM Administrator); will be one of the Members. |
| **Southeast EEM Administrator** | Will be an independent third party contracted to operate the Southeast EEM; will not be a Member, Participant, Agent, or Auditor. |
| **Auditor** | Will be an independent third party that reports to Membership Board; tasked with ensuring that the Southeast EEM System functions properly (*e.g.*, that it adheres to the Market Rules); will not be a Member, Participant, Agent, or Southeast EEM Administrator. |
| **Participating Transmission Providers** | Will provide [NFEETS] to Participants under their respective transmission service tariffs or guidelines; may also be Members or Participants; are not parties to the Southeast EEM Agreement or the Market Participant Agreement in their capacity as a Participating Transmission Provider.[51] |

### b. Cost allocation to Members

Members will share the costs of developing the Southeast EEM System and of ongoing operations (including paying for the Administrator and Auditor). Each Member's allocated costs will have two components: 1) 25% of costs will be allocated equally based on the number of Member Representatives; and 2) the remaining 75% of costs will be allocated based on the breakdown of each Member's net energy for load ("NEL"), with Members paying an amount proportionate to their individual Member NEL ("MNEL") versus total NEL of all Members

---

[50]     Operations Aff. at P 13.

[51]     To the extent the Participating Transmission Provider is also a Member, it will be a party to the Southeast EEM Agreement, and to the extent a Participating Transmission Provider is also a Participant, it will be a party to a Market Participant Agreement.

Ms. Kimberly D. Bose
February 12, 2021
Page 19

("ANEL").[52]  The MNEL for each Member will be updated each year for purposes of cost allocation and voting rights.[53]  Costs will be allocated to Members at the beginning of every year, based on their then-current MNEL and the annual Southeast EEM budget for that year ("Annual Budget").  However, amounts will be payable when the costs are actually incurred.

New Members will be able to join during an "Enrollment Period" that will run from July 1 through September 30 of each year.[54]  The Enrollment Period will give Members certainty about cost allocation and voting rights when the NEL values are updated each October.  There is no minimum Membership term and there is no "exit fee" for withdrawal.  Withdrawing Members will remain responsible for any costs previously allocated to them prior to the date of their withdrawal, but will not be responsible for any additional fees assessed during that year.[55]  A Withdrawing Member's cost allocation would include any initial start-up fees allocated to it as of the date of its notice of withdrawal.[56]  The Members do not view this as a barrier to exit or an exit fee, because the start-up costs will be low (relative to other models) and are expected to be paid out within the first year of market operations by each of the Members.  Similarly, annual budgeted costs are expected to be low, again relative to other models.

As Mr. McGeeney and Mr. Sellers explain, the "hybrid cost allocation methodology is intended to reflect the reality that some costs of the Southeast EEM will be incurred no matter the number or size of Members, and therefore, should be allocated equally among Members; while other costs will be incurred because of the added scale, use, and benefit of Members with more generation or load and, therefore, should be allocated based on size."[57]  The Members selected NEL as the basis for cost allocation because "Members have also sought to ensure that those Members which are expected to make more use and receive more benefits from the Southeast EEM based on their larger generation portfolio and load responsibilities will not only have a larger voting interest, but will also bear more cost responsibility."[58]  In addition, NEL is an objective measure that is verifiable (based on NERC submissions each year) and will remain relatively stable over time, thus providing greater certainty about costs associated with the market, compared to transaction- or trading volume-based measures.  Cost stability is particularly desirable in the early days of a market.

---

[52]     Southeast EEM Agreement Section 7.2.  For purposes of the 25% allocation, affiliated Members will be counted as a single Member, and for purposes of the 75% allocation, the NELs of all affiliated Members will be aggregated.  The Operations Affidavit provides a breakdown of the current Members' load.  *See also* Operations Aff. at P 29.

[53]     Southeast EEM Agreement Section 7.2.

[54]     *Id.* at Section 3.2.3.

[55]     *Id.* at Section 4.2.

[56]     *Id.*

[57]     Operations Aff. at P 28.

[58]     *Id.*

Ms. Kimberly D. Bose
February 12, 2021
Page 20

Finally, similar metrics will be used to allocate voting rights, as described below.  Thus, payment responsibility will align with voting rights.

### c.   Withdrawal

A core principle of the Southeast EEM is that it must be completely voluntary.  To that end, the Southeast EEM Agreement does not require or mandate a minimum participation term for Members.  Members may withdraw at any time after either 30 or 90 days written notice (with Balancing Authority/Participating Transmission Provider Members having a longer notice period), while remaining responsible for all costs previously allocated to them.[59]  In addition, to respect the non-jurisdictional status of many of the founding Members, the Southeast EEM Agreement contains a special provision allowing such Members to withdraw immediately if their non-jurisdictional status is threatened.[60]  Again, such Member would remain responsible for its previously allocated annual costs.

A FERC notice of termination filing will be required to terminate the participation of any Jurisdictional Member in the Southeast EEM Agreement.[61]  However, no such filing will be required for withdrawal of Non-Jurisdictional Members.  As to the Non-Jurisdictional Members, the Southeast EEM Agreement is not a rate schedule, tariff or service agreement "required to be on file" within the meaning of 18 C.F.R. § 35.15.  The non-jurisdictional Members are not providing jurisdictional service, and so are not filing the Southeast EEM Agreement.  They also are not receiving service under the Southeast EEM Agreement (as noted, the Southeast EEM Agreement is related to such service, but does not provide it).  Accordingly, Non-Jurisdictional Members do not require, and will not seek, authorization of this Commission to withdraw from the Southeast EEM and terminate their participation in the Southeast EEM Agreement.[62]

---

[59]     Southeast EEM Agreement Sections 4.2.1, 8.7.

[60]     *Id.* at Section 4.2.1; Operations Aff. at P 19.

[61]     *See* 18 C.F.R. § 35.15.  The exact nature of the filing or (filings) associated with withdrawal will depend on whether the Member filed a certificate of concurrence or, as Southern Company has, the entire Southeast EEM Agreement.  *See* Overview Aff. at P 35 & n.6.  Additionally, if a Participating Transmission Provider withdraws, it would need to file with the Commission to remove the provisions for NFEETS from its OATT.  Such a filing would be presumptively just and reasonable, to the extent that it was returning the Tariff to conformance with the *pro forma* tariff.  *See, e.g., Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282 at P 27 (2006) (articulating a withdrawal standard requiring, among other things, that a company prove its replacement tariff, including any deviations from the pro forma OATT, is "consistent with or superior to" the pro forma OATT, and accepting the company's replacement tariff where it incorporated the *pro forma* OATT).  In addition, as discussed more fully in the Tariff Filings, the tariff amendments for NFEETS specify that a transmission owner providing NFEETS will not plan its system to provide such service, and that the transmission provider's membership in the Southeast EEM, and provision of NFEETS, is voluntary, such that no Participant can or should rely on continued provision of such service.

[62]     *See* Southeast EEM Agreement Section 8.7 ("A Non-Jurisdictional Member, in its sole discretion, may immediately withdraw from this Agreement if it becomes apparent that the Non-Jurisdictional Member's engagement in activities under this Agreement or FERC's approval of this Agreement would

JA0305

Ms. Kimberly D. Bose
February 12, 2021
Page 21

### 2.     Governance

#### a.     Governing bodies

The Members of the Southeast EEM will make all decisions through a Membership Board that is responsible for all significant issues and an Operating Committee that is responsible for day-to-day functioning of the Southeast EEM System.  "When developing the governance structure for the Southeast EEM, the Members had two primary goals:  1) fairly allocating voting rights to ensure that higher paying Members have higher voting rights while respecting smaller entities; and 2) respecting and recognizing the diverse Member interests."[63]  Thus, the composition of these governing bodies and their respective voting rights were designed to give entities representing more load (and taking on a higher share of costs) commensurate voting rights, while also ensuring that entities representing a smaller share of load have a fair say.  Further, the Operating Committee is comprised of representatives of each of the Membership sectors.  As described below, the governance structure of this multilateral arrangement fairly balances payment responsibility with the desire for every Member to have a voice.  Ultimately, continued fairness will be dictated by the voluntary nature of participation in the Southeast EEM.  Decisions that are not consensual will risk the loss of Members.  That means that the governance structure is a structure for consensus-driven administration.

#### i.     The Membership Board

Article 4 of the Southeast EEM Agreement establishes the rules of the Membership Board.  Each Member, including Members with multiple participating affiliates in the Southeast EEM, will have one representative on the Membership Board.  Each Representative will have two votes:  1) a single vote ("Popular Vote"); and 2) a weighted vote based on the Member's MNEL ("NEL Vote").  To ensure that no entity can control the vote, the Southeast EEM Agreement requires that, for any vote, the combined NEL Vote must represent at least three entities.  For "Significant Matters," defined in the Southeast EEM Agreement to include the most critical issues (*e.g.*, amendments to the Southeast EEM Agreement),[64] an action will pass with a majority of the Popular Vote but requires a supermajority NEL Vote.  For all other matters, an action will pass with a majority of the Popular Vote and NEL Vote.  In summary, for any action

---

(i) jeopardize the tax-exempt status of interest paid by the Non-Jurisdictional Member on outstanding debt obligations, (ii) render the Non-Jurisdictional Member a Public Utility subject to FERC's jurisdiction, or (iii) if the Non-Jurisdictional Member determines that any conflict exists between provisions of this Agreement and applicable Laws and regulations of the state of its creation, or rate schedules adopted by its governing body under state Law, in which case such state Laws, regulations, or rate schedules shall govern with respect to such Non-Jurisdictional Member.  The withdrawing Non-Jurisdictional Member may withdraw from this Agreement on this basis by providing written notice to all other Members and the Southeast EEM Administrator."); Operations Aff. at P 19.

[63]     Operations Aff. at P 14.

[64]     Southeast EEM Agreement Section 1.1 (defining "Significant Matters").

JA0306

Ms. Kimberly D. Bose
February 12, 2021
Page 22

to pass the Membership Board, the following voting rules will be followed, with the percentages based on the present Members (who must represent a quorum):[65]

| | Popular Vote | NEL Vote | Minimum Members in Support |
|---|---|---|---|
| **General Matters** | >50% | >50% | 3 |
| **Significant Matters** | >50% | >67% | 3 |

As Mr. McGeeney and Mr. Sellers explain, these voting rights were carefully negotiated among the parties, and are intended to ensure that all Members have a voice in governance.[66]

### ii. The Operating Committee

The Operating Committee will handle all day-to-day activities of the Membership, including interfacing with the Southeast EEM Administrator, and can act on any matter not specifically reserved to the Membership Board.[67]  Like voting rights and cost allocation, the composition of the Operating Committee is in part driven by load and has built-in protections to ensure that each sector has a fair say.  The Operating Committee will have four Committee Members, each with a single, equal vote:[68]  two from the "IOU Sector," one from the "Cooperative Sector," and one from the "Governmental Utility Sector." [69]  The Members agreed to this composition because the IOU Sector makes up about half of the total NEL, with the Cooperative Sector and Governmental Utility Sector making up the other half.[70]  Committee Members will be selected by their sectors, and will have year-long terms.  Each sector also has the authority to remove Committee Members.[71]  To ensure, again, that one subset of Members cannot unduly control the Southeast EEM, votes by the Operating Committee must be unanimous, with any issues that cannot be resolved taken up to the Membership Board.  To encourage transparency among the Members, all Members have a right to attend, observe, and participate in Operating Committee meetings, but cannot vote if they are not an Operating Committee member.[72]

---

[65]     Operations Aff. at P 23.

[66]     *Id.* at P 24.

[67]     Southeast EEM Agreement Section 5.1.

[68]     *Id.* at Sections 5.2, 5.7.

[69]     *Id.* at Sections 5.2, 5.7.

[70]     *See* Operations Aff. at P 25.

[71]     Southeast EEM Agreement Section 5.4.

[72]     *Id.* at Section 5.9(a).

Ms. Kimberly D. Bose
February 12, 2021
Page 23

### b.    Participant and external stakeholder involvement

The Members have engaged in extensive stakeholder outreach, which will not end with this filing; Members will continue to actively encourage stakeholders to communicate their questions and concerns.  As discussed above, the Members, individually or collectively, have spoken to a wide variety of government entities, trade groups, non-governmental entities, and individual customers.  In many cases, they have met multiple times with the same entities, and the discussions have been free-flowing and robust, with good communication and idea exchanges on all sides.  Comments have been overwhelmingly supportive, but a common request was that the Members take the Southeast EEM construct further, to have more ambitious aims entailing far greater complexity.  As described in the Overview Affidavit, the current proposal is the one that struck a delicate balance among the Members, and thereby enables, for the first time, a region-wide market enhancement in the Southeast.[73]

Stakeholders, and indeed the general public, will have access through the Southeast EEM website to all data described below in Section III.B.5.  To facilitate continued engagement with all stakeholders, the Members will hold annual meetings open to all interested parties.[74]  These meetings will be an open forum for stakeholders to address any issues they may have with the Southeast EEM.  Stakeholders will also have opportunities to comment on the Southeast EEM proposal in this proceeding and, for any future amendments to the Southeast EEM Agreement, in any subsequent proceedings at the Commission.  Finally, because the Market Rules are part of the filed rate, any changes to the Market Rules will need to be filed at FERC.  As such, stakeholders will be able to submit comments on any such amendments to the Market Rules.

### c.    Dispute resolution

Article 12 of the Southeast EEM Agreement establishes dispute resolution procedures for the Members.  It is based on the dispute resolution procedures in the FERC *pro forma* OATT and applies equally to all Members, including non FERC-jurisdictional Members.[75]  Because NFEETS will be provided under Participating Transmission Providers' existing tariffs, any dispute between a Participant, as a transmission customer, and a Participating Transmission Provider will be resolved under the dispute resolution provisions of the Participating Transmission Provider's tariff.  Any dispute between two Participants over an Energy Exchange would be resolved under the contract between those Participants under which the Energy Exchange is consummated and settled.[76]

---

[73]     Overview Aff. at P 4.

[74]     Southeast EEM Agreement Section 4.4.

[75]     *See Pro Forma* OATT, Section 12 (Dispute Resolution Procedures), https://www.ferc.gov/sites/default/files/2020-05/pro-forma-OATT.pdf.

[76]     Participants also can submit complaints to the Southeast EEM Auditor, which will be referred to the Membership Board.  Southeast EEM Agreement, Appendix B at VI.D.5.

### 3.  Non-Firm Energy Exchange Transmission Service

The Southeast EEM Agreement and Market Rules provide that, to utilize the Southeast EEM, Participants must have separate arrangements in place with each of the Participating Transmission Providers to take NFEETS.  Further, all Members that own and operate transmission need to amend their tariff or comparable documentation to provide NFEETS.[77]  The current FERC Jurisdictional Members are implementing these requirements through the Tariff Filings being made contemporaneously with this Filing.  Acceptance of the NFEETS tariff amendments is being sought in those dockets.

NFEETS is a new type of transmission service.  It is a non-firm product, provided on an as-available basis for the sole purpose of facilitating Energy Exchanges, and it has the lowest priority of all available services.  The Southeast EEM Agreement establishes the minimum characteristics of NFEETS and requires Participants to obtain it from all Participating Transmission Providers within the Southeast EEM Footprint.  However, the service itself will be obtained by each Participant from individual Participating Transmission Providers, and it will be the responsibility of Participants to execute the necessary service agreements enabling them to receive NFEETS.  The Southeast EEM Agreement and Market Rules provide that NFEETS must have the following characteristics:

- It is non-firm transmission;

- It is available on an as-available basis (*i.e.*, it is only available after all other uses have been taken into account);

- It is provided solely for 15-minute Energy Exchanges;

- It has the lowest curtailment priority;

- The rate for service is $0/MWh;

- There are no associated Schedule 1 or Schedule 2 ancillary service charges;

- Losses will be "financial" in that they will be supplied by the applicable Participating Transmission Provider and paid for by the matched bidder and offeror in each Energy Exchange.  Such financial Losses will be assessed based on the loss factor and loss rate in the Participating Transmission Provider's tariff and equally shared between the matched bidder and offeror;

- It may be obtained only using the reservation, scheduling and tagging functions of the Southeast EEM System (rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by the Participating Transmission Provider);

---

[77]    Southeast EEM Agreement at 3.2.1; Southeast EEM Agreement, Appendix B at III.B.4.

JA0309

Ms. Kimberly D. Bose
February 12, 2021
Page 25

- It may not be reassigned, sold, or redirected;

- It can only be provided by a Participating Transmission Provider whose system, if added to the other participating transmission systems, creates a continuous Contract Path; and

- The Participating Transmission Provider must provide the information required by the Southeast EEM Market Rules (*e.g.*, available transmission).[78]

Because it is a non-firm, as-available product, no transmission studies are necessary to obtain NFEETS. Participants need only execute a transmission service agreement for NFEETS (or otherwise have access to NFEETS)[79] on each Participating Transmission Provider's transmission system.

### 4.    Market Rules

The Southeast EEM Market Rules establish the terms for: 1) market timing; 2) how Bids and Offers will be submitted, matched and how associated e-Tags will be submitted; 3) what the Algorithm will solve for; 4) what information about the Southeast EEM will be publicly available and 5) how the Auditor will function.[80] The Market Rules are included as Appendix B to the Southeast EEM Agreement and are incorporated by reference in the Participation Agreement. All Participants will be required to sign the Participation Agreement, the form of which is included as Appendix A to the Southeast EEM Agreement, through which the Participants will agree to be bound by the Market Rules, as they may be changed from time to time.

### a.    Market timing

Besides eliminating transmission costs, the most significant enhancement to the bilateral market that the Southeast EEM provides is the ability to transact on a compressed timeframe,

---

[78]    Southeast EEM Agreement at 1.1; Operations Aff. at P 32.

[79]    Some of the non-jurisdictional entities will not require service agreements to make NFEETS available.

[80]    In addition to the Market Rules, the Southeast EEM will also utilize a business practice manual containing more detail on procedures surrounding market implementation. Transmission Providers often use manuals containing "implementation details" of their tariffs, consistent with the Commission's "rule of reason" policy under Section 205(c) of the FPA. *See, e.g.*, *Puget Sound Energy, Inc.*, 155 FERC ¶ 61,111 at P 97 (2016) (accepting Puget's proposal to clarify in its EIM Business Manual the fact that it would not charge loads and resources telemetered out of Puget's BAA for EIM administrative charges and it would not sub-allocate any EIM resources to those loads telemetered out of Puget's BAA because "it would not be reasonable to require Puget to set forth in its OATT a list of all parties who are not subject to each specific provision" and therefore "Puget's EIM Business Practice Manual is an appropriate place for Puget to include [that] information."). The manuals here would perform the same function; to provide further details regarding the implementation of processes found in the Southeast EEM Agreement.

JA0310

Ms. Kimberly D. Bose
February 12, 2021
Page 26

made possible by the Southeast EEM System technology to be funded by Members.  The graphic below demonstrates the Southeast EEM anticipated market timing for the first Delivery Interval[81] as an example, which is described in more detail in the Operations Affidavit.[82]  There are four, fifteen-minute "Delivery Intervals" per hour:



### b.    Inputs to Southeast EEM Algorithm

The Algorithm will run based on information provided to it by Participating Transmission Providers and Participants.  The Algorithm must have Participating Transmission Providers' data related to available transmission on their system for the upcoming hour[83] and the applicable transmission loss factor and transmission loss rates no later than 15 minutes before the start of the next Clock Hour.  The transmission loss factor and rate will be based on each Participating Transmission Provider's tariff and must be provided so that financial Losses can be calculated when matching Energy Exchanges.  Participants will be required to submit two sets of information:  1) general "profile" information about counterparties with whom it will not accept a match or geographic areas where it will not trade ("Counterparty Specific Constraints"); and 2)

---

[81]     A "Delivery Interval" is defined under the Market Rules as "a fifteen (15) minute period in which Non-Firm Energy is intended to be delivered by a Seller to its matched Buyer(s)."  Market Rules at Article II.

[82]     *See* Operations Aff. at P 35.

[83]     Some Participating Transmission Service Providers have the availability to provide updated intra-hour available transmission information, and will be permitted to do so as long as the Southeast EEM System has the information at least 15 minutes prior to the applicable Delivery Interval.  *See* Operations Aff. at P 35.  The plans of Dominion Energy SC, Duke Energy, LG&E/KU and the Southern Companies are described *infra* at 40.

Ms. Kimberly D. Bose
February 12, 2021
Page 27

for each Delivery Interval, information about its Bid or Offer ("Bid Information" or "Offer Information").[84]

Counterparty Specific Constraints can be selected for any reason and will be one mechanism by which Commission-jurisdictional entities can ensure compliance with their MBR authority. Like today, the burden of ensuring compliance with MBR limitations will be on the Participants (not on the Southeast EEM System). For example, if a Participant has market-power mitigation and cannot make sales at market-based rates in its BAA, it is able to designate its BAA as a locational constraint so that the Algorithm would not permit it to match for any sales with a Point of Delivery within that BAA.[85] Similarly, a Participant can toggle off its ability to trade with a particular counterparty, so as to, for example, prevent violation of the Commission's affiliate restrictions,[86] avoid exceeding counterparty credit limits, or avoid trading with a Participant without an enabling agreement with that Participant. Participants can update their Counterparty Specific Constraints at any time up to 15 minutes prior to the start of the next Delivery Interval, and do not have to identify a reason for their selection.[87] The Market Rules require that Participants toggle on at least three potential counterparties for each transaction.[88] These constraints will be constant inputs into the Algorithm until changed by the Participant – the Participant need not submit the information with each new Bid or Offer.

Moreover, while the Southeast EEM will not set or police individual restrictions, the default start for all geographic and counterparty toggles will be "off." That means that to trade in a particular BAA, or with a particular counterparty, a Participant will have to make a conscious decision to toggle that capability to "on." That will provide Participants the opportunity to set toggles to reflect, for example, on any market power mitigation or affiliate transaction requirements.

Bid and Offer Information must be submitted no later than 15 minutes before the start of the next Delivery Interval and must include:

- Participant name.

- Whether the submission is a Bid or an Offer.

- A MW volume for the Bid or Offer in increments of 4 MW.

---

[84]     Southeast EEM Agreement, Appendix B at IV.B.3.

[85]     Dominion Energy SC, Duke, LG&E/KU, and the Southern Companies each have market power mitigation within their BAAs. *See* supra note 18. Dominion Energy SC, Duke, LG&E/KU each intend to use this Counterparty Specific Constraint mechanism to comply with the limitations in their respective MBR tariffs.

[86]     18 C.F.R. § 35.39.

[87]     Southeast EEM Agreement, Appendix C at IV.A.2.

[88]     *See* Market Rules at Article IV.A.3. *See also* Operations Aff. at P 39.

Ms. Kimberly D. Bose
February 12, 2021
Page 28

- For all Offers, an Offer Price and for all Bids, a Bid Price.

- For all Offers, a Source and for all Bids, a Sink.

- The specific Delivery Interval to which the Bid or Offer applies.

- Whether the submission: 1) must be matched in full or not at all or 2) can be matched at any volume below the Bid or Offer volume (subject to the 4 MW increment rule).

- Any other components as may be required for the Southeast EEM System to perform actions set forth in Section IV.C of the Market Rules or to generate the reports described in Section V of the Market Rules.[89]

In addition, an Offer may include (as applicable) the maximum Energy Exchange Price an offeror is willing to accept.[90] The "maximum Energy Exchange Price" function is another mechanism by which Participants can ensure compliance with MBR mitigation, as discussed below in Section III.C.6.

### c.     Matching through the Southeast EEM Algorithm

The Algorithm will run for the 15-minute Delivery Intervals starting at the top of each hour and will produce a set of Energy Exchanges that maximizes overall market benefit in light of the submitted Bids and Offers, financial Losses, and all constraints. An Energy Exchange will not be made if there is a constraint (*e.g.*, if there is insufficient transmission along the contract path, or if a match would be contrary to a Counterparty Specific Constraint entered by a Participant). Further, the Algorithm will only produce Energy Exchanges that, on their own, provide a benefit to both the bidder and offeror after accounting for charges for transmission losses.

Prices for Energy Exchanges will be set on a split-the-savings basis, *i.e.*, the price will be halfway between the Bid Price and Offer Price, adjusted for any Losses (which must be financial and will also be split evenly between the matched Participants).[91] Dr. Pope provides the following formulaic representation of the Energy Exchange Price for any particular Energy Exchange:[92]

---

[89]     Southeast EEM Agreement, Appendix B at IV.B.3.

[90]     *Id.*

[91]     *Id.* at IV.C.5.

[92]     Economic Aff. at P 39.

Ms. Kimberly D. Bose
February 12, 2021
Page 29

(1) **Energy Exchange Price** ($/MWh) =

$$\frac{\frac{1}{2}(Bid\ Price + Offer\ Price)(MWh) + \frac{1}{2}(Seller\ Losses - Buyer\ Losses)}{MWh}$$

Where *Bid Price* and *Offer Price* refer to prices in $/MWh and *Seller Losses* and *Buyer Losses* refer to total cost of losses.

The Members selected the split-the-savings methodology because it comports with the core principle of maximizing and sharing benefits. An offer-based methodology or bid-based methodology would stack those benefits towards load or generators, respectively.[93] The split-the-savings methodology instead is a "win-win" for all Participants. Moreover, as explained by Mr. Melda and Mr. Bellar, split-the-savings pricing compliments the existing IRP-based structure of the Southeast market:

> The decision to use split-the-savings pricing is a natural outgrowth of the goal of achieving customer benefits for everyone participating in the Southeast EEM. As we described earlier, electric providers in the Southeast use bilateral trades in conjunction with systems designed through integrated resource planning (or equivalent) procedures to enhance customer savings. They do this by using bilateral transactions to trade around the assets developed through their planning processes. Purchases of power produce savings when they allow a generator with higher marginal costs to be backed down, and sales of power produce savings by allowing crediting of margins from sales against customer costs. Split-the-savings, as the name rightfully suggests, splits the benefit among the buyer and the seller, and so enhances the benefits that Participants already obtain by trading around their planned resources.[94]

Matching through the Southeast EEM System is intended to be binding on the Participants. By submitting a Bid or Offer, the Participant is committing to consummate the sale under the appropriate enabling agreement if matched, and as discussed, may face imbalance charges if it fails to do so.[95] The Southeast EEM System will submit e-Tags to the appropriate BA(s) and Participating Transmission Provider(s) and applicable Participant(s) and will provide sufficient information for the selling Participant to ramp up or down and dispatch its generation as needed.[96] The Southeast EEM System will also send matched Participants a notification of the basic information regarding the match such as the price and volume. It will be up to

---

[93]     Operations Aff. at P 49.

[94]     Overview Aff. at P 25.

[95]     *See* Operations Aff. at P 47.

[96]     *See id.* at P 48.

JA0314

Ms. Kimberly D. Bose
February 12, 2021
Page 30

Participants to dispatch their generation in accordance with the e-Tag,[97] and subsequently to settle the transactions pursuant to the applicable enabling agreement, as they would for any other transaction in the bilateral market. The Southeast EEM will not establish any independent, third party entity for settlement purposes or to otherwise take part in the transaction and, thus, aside from the matched buyer and seller, there is no other party to any transaction matched through the Southeast EEM.

If for some reason an Energy Exchange is made, an e-Tag created, and one or both Participants to the transaction do not operate in accordance with the e-Tag schedule (*i.e.*, generator does not ramp up to serve schedule), the offending Participant(s) may be subject to imbalance charges through the applicable transmission tariffs.[98] This is an important feature of the Southeast EEM design and is consistent with operations in the bilateral market today. The potential to pay imbalance charges creates what amounts to a penalty for anyone who does not live up to their delivery or purchase commitment, thereby creating a substantial incentive to submit only physically realistic Bids and Offers.

###### 5. Transparency and auditing

The Southeast EEM Agreement and the Market Rules enhance transparency in the Southeast markets. Section V of the Market Rules provides that the Southeast EEM Administrator will publish robust public information and specifies what the information will be.[99] This list is intended to strike a balance to provide Participants, customers, and the public with confidence that the Southeast EEM is working properly and providing benefits, while at the same time protecting commercially sensitive information and avoiding potentially anti-competitive price discovery.[100] To achieve this balance, all reported pricing information will be aggregated and will not be provided until at least the day after the trading day.[101] As Dr. Pope explains, the information proposed to be provided will neither enable a Participant to predict future pricing or collude with others.[102] In addition to the Southeast EEM's publicly provided data, all sales made by entities that submit EQRs today[103] will continue to be reflected in EQRs

---

[97]    Note that in addition to the seller dispatching generation up, *i.e.*, increasing generator output, the buyer likely will need to dispatch generation down. The Southeast EEM is not a substitute for resource adequacy requirements. *See* Overview Aff. at P 27.

[98]    *See* Operations Aff. at P 47.

[99]    Southeast EEM Agreement, Appendix B at V.

[100]    *See* Operations Aff. at P 53.

[101]    *See* Market Rules Section V.

[102]    *See* Economic Aff. at PP 49-50 & n.32.

[103]    The following Members currently file EQRs and will continue to do so upon operation of the Southeast EEM: Southern Companies, AECI, Dominion Energy SC, DEC, DEP, LG&E, KU, NCMPA Number 1, PowerSouth, NCEMC and TVA. Additionally, of the entities listed in note 1, *supra*, that are pursuing Membership, Oglethorpe Power Corporation files EQRs.

Ms. Kimberly D. Bose
February 12, 2021
Page 31

for the appropriate enabling agreements.  Because transactions matched as Energy Exchanges will be 15-minute transactions, they generally will be easily identifiable in the EQRs of FERC-jurisdictional sellers.[104]  Additionally, FERC will continue to have access to e-Tags submitted pursuant to Order No. 771.[105]  Southeast EEM transactions will be easily identifiable in e-Tag data available to FERC due to the 15-minute duration of the schedule and use of NFEETS.

The Southeast EEM Members will hire a third-party Auditor to review and analyze Southeast EEM market data to ensure that the Southeast EEM System is properly functioning. The Auditor will "[v]erify that the Southeast EEM System operates in accordance with the Market Rules, including the determination and application of Bids, Offers, constraints, matched settlements, OASIS reservations, and e-Tags"[106] and will report any concerns to the Membership Board.  The Auditor may also receive complaints from Participants, which it will refer to the Membership Board and investigate at the Membership Board's discretion.[107]  A full list of Auditor functions is listed in Section VI.D. of the Market Rules.

As discussed above, the Southeast EEM will not create new concerns related to the Commission's information sharing restrictions in the Standards of Conduct[108] or Affiliate Restrictions.[109]  All Members subject to those rules are obligated to ensure their own compliance, and for avoidance of doubt, the Southeast EEM Agreement contains safeguards regarding disclosure of transmission function information and market information.[110]

### C.    The Southeast EEM Agreement is just and reasonable and not unduly discriminatory and should be accepted

The Southeast EEM Agreement is just and reasonable and not unduly discriminatory, and thus it should be accepted for filing without modification.  When reviewing a proposal under FPA Section 205, the Commission's inquiry is limited to determining "whether the rates proposed by a utility are reasonable - and [does not] extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs."[111]  Further, the Commission's authority to change aspects of a proposal filed under FPA Section 205 is limited

---

[104]    Some limited 15-minute transactions may occur outside of the Southeast EEM, but the Members expect those to be limited, as they are today.  *See* Operations Aff. at P 41.

[105]    *See generally*, *Availability of E-Tag Information to Comm'n Staff*, Order No. 771, 141 FERC ¶ 61,235 (2012) ("Order No. 771").

[106]    Southeast EEM Agreement, Appendix B at VI.D.

[107]    *Id.*

[108]    18 C.F.R. pt. 358.

[109]    18 C.F.R. § 35.39.

[110]    Southeast EEM Agreement Section 3.5.

[111]    *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984).

Ms. Kimberly D. Bose
February 12, 2021
Page 32

to "minor deviations" from the filed provision to which the filer consents.[112]  The Commission may not require changes that would result in an "entirely different rate design" than that proposed, nor can the Commission accept "only half of a proposed rate."[113]  The existence of these statutory safeguards is part of the reason the Southeast EEM Members were able to achieve regional consensus on the delicate balance reflected in the proposal submitted today.

**1.   The Southeast EEM will create material benefits at a low cost**

A key reason for the Members' participation in the Southeast EEM is that it can bring significant benefits to customers at low costs, relative to other market constructs, which was confirmed in the Benefits Analysis conducted by Charles Rivers Associates and Guidehouse.  As Dr. Pope explains:

> The Southeast EEM's combination of zero-cost, non-pancaked transmission service and automated 15-minute trading enable willing buyers and sellers to arrange beneficial trades that use available transmission remaining after deliveries have been scheduled under existing OATT service.  The [Southeast EEM] Proposal will yield benefits by arranging bilateral trades using the available transmission of multiple Participating Transmission Providers in ways that are unlikely to occur today.  The automated system will have a substantial advantage in searching for transmission paths with available transmission to complete beneficial trades, overcoming transaction costs and information barriers.  Further, the Algorithm will exhaustively seek out all possible beneficial trades across the Territory, as measured by voluntary bids and offers, capturing the additional benefits made available by scheduling otherwise unused available transmission with zero-cost transmission service.[114]

Dr. Pope's qualitative assessment is corroborated by the Benefits Analysis assessment of economic benefits.  The Benefits Analysis used a production cost model to compare a "status quo" situation to two different scenarios with intra-hour trading and no cost transmission over a twenty-year period.  The first scenario was an "IRP Baseline Outlook" and was based on Guidehouse's Reference Case outlook on North America, supplemented with information from each of the Member's most recent integrated resource plan (or equivalent Member data where an integrated resource plan did not exist).  The second scenario was a "Carbon Constrained Outlook," which also factored in a potential future outlook where aggressive carbon reduction goals are met.  The Benefits Analysis estimates approximately $40 million in benefits per year in the IRP Baseline Outlook (in 2020 USD).  Benefits under the IRP Baseline Outlook are

---

[112]    *See W. Res., Inc. v. FERC*, 9 F.3d 1568, 1578 (D.C. Cir. 1993) ("*W. Res.*"); *City of Winnfield v. FERC*, 744 F.2d. 871, 876 (D.C. Cir. 1984).

[113]    *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017) (quoting *W. Res.*, 9 F.3d at 1579).

[114]    Economic Aff. at P 32.

Ms. Kimberly D. Bose
February 12, 2021
Page 33

estimated to remain fairly constant over the 20-year study period.[115]  These benefits are fairly
conservative when considering the Carbon Constrained Outlook estimated benefits.  Under the
Carbon Constrained Outlook, benefits were estimated to increase significantly over time, with
benefits reaching more than $100 million per year by 2037.[116]

The study also evaluated the internal costs anticipated for each of the prospective
Members and estimated that individual internal company start-up and ongoing costs would total
about $3.1 million per year on a levelized basis.[117]  The study did not quantify external costs,
such as vendor costs associated with developing, operating and auditing the Southeast EEM
System or Auditing services (because the RFPs for that work have not been completed).
However, based on exploratory outreach to prospective vendors, the Members expect those
incremental costs will also be small relative to benefits.[118]  Compared to the estimated $3.1
million total internal costs estimated for all Members, and even considering external costs not
quantified in the Benefits Analysis, the Members anticipate that benefits will far exceed
anticipated costs.

In addition, as noted above, the Southeast EEM is expected to support increased
renewables integration in the Southeast.  As Mr. Melda and Mr. Bellar explain:

> It is generally recognized that facilitating greater liquidity in sub-hourly
> transactions can help support greater integration of renewable resources.
> Transmission service providers are required under their OATTs to provide
> imbalance service to generators and to loads.  Greater levels of renewable
> resource penetration can require transmission service providers to carry additional
> flexible capacity in reserve in order to be able to balance the variable output of
> renewable resources against their schedules.  If there is little or no sub-hourly
> market liquidity, this generally means the transmission provider must be prepared
> to balance all variation in renewable output across the full hour.  By creating
> greater liquidity in sub-hourly wholesale transactions, especially across a broad
> geographic area encompassing possibly different weather conditions and
> renewable policies, the Southeast EEM can provide additional opportunities for
> transmission service providers to either procure additional energy or to dispose of
> excess energy, rather than having to rely exclusively on increasing or decreasing
> the output from their own generation resources that provide imbalance service.
> Furthermore, renewable resources that elect to participate directly in the Southeast
> EEM will have an opportunity to avoid or reduce their imbalances by entering

---

[115]     Benefits Analysis at 4.

[116]     *Id.*

[117]     *Id.*

[118]     Overview Aff. at P 31.

JA0318

Ms. Kimberly D. Bose
February 12, 2021
Page 34

into sub-hourly sales when the output of their resources trends higher than the hourly quantities forecasted and scheduled farther in advance.[119]

Thus, the Members expect and believe that Southeast EEM benefits will significantly exceed the costs of developing and operating the Southeast EEM.

> ## 2. The Algorithm reasonably uses a split-the-savings rule to calculate the match price for buyers and sellers

The Members evaluated three different types of bilateral pricing mechanisms – bid based, offer based, and split-the-savings. The Members agreed to the split-the-savings method because it would share benefits equally between generators and load.[120]  In addition, split-the-savings matching is complementary to the way that utilities in the Southeast plan their systems and ensure resource adequacy. As Mr. Melda and Mr. Bellar note, Southeastern entities "seek bilateral transactions that can either save costs directly (purchases) or earn a margin to offset costs (sales)."[121]  The Southeast EEM, and the use of split-the-savings pricing, will help entities use bilateral trades to trade around the resources that result from their planning processes.[122]

Southeast EEM Members are able to use their market-based rate authority today to enter into split-the-savings transactions, and with certain exceptions discussed below, will be able to continue to do so under the Southeast EEM. Split-the-savings pricing is a time-honored concept.[123]  As the Commission has said, "split-savings rates are reasonable since they share the pool of benefits equally between buyer and seller," and "equal sharing is deemed to be reasonable and an equitable result."[124]  Additionally, the Commission has found that "[s]plit-savings provide benefits to both the buyer and seller and assure the efficient use of generating resources . . . The transactions are wholly voluntary and only if both parties can benefit will an economy sale take place."[125]  The use of split-the-savings proposed here is likewise just and reasonable.

---

[119]    *Id.* at P 32.

[120]    *See* Operations Aff. at P 49.

[121]    Overview Aff. at P 13.

[122]    In this regard, it is also worth noting that the design of the Algorithm will incentivize buyers and sellers to bid and offer in a manner that reflects their underlying costs. *See* Economic Aff. at PP 45-48.

[123]    *See, e.g., Alabama Power Co.*, 12 FERC ¶ 61,210, 61,512 (1980) (accepting economy interchange rate "predicated on a split-savings approach, consistent with the industry standard").

[124]    *S. Co. Servs., Inc.*, 37 FERC ¶ 61,190, 61,451-52 (1986) (accepting an arrangement with a three-way split-the-savings rate). *See also Am. Elec. Power Serv. Corp.*, 8 FERC ¶ 61,068, 61,233 (1979), *aff'd, Ohio Power Co. v. FERC*, 668 F.2d 880 (6th Cir. 1982) (approving a modification to a split-savings arrangement that would eliminate a previous price ceiling and allow economy energy to be priced on a wholly split-savings basis).

[125]    *Commonwealth Edison Co.*, 23 FERC ¶ 61,219, 61,472 (1983).

Ms. Kimberly D. Bose
February 12, 2021
Page 35

### 3.    Cost allocation to Members based on NEL is just and reasonable

The proposal to allocate upfront and ongoing costs to Members based primarily on NEL is just and reasonable.  As described above, the Members selected NEL as the basis because it would provide rate predictability and stability.  Further, the Members estimate that while some baseline costs would be incurred no matter the number or size of the Members, others will be "incurred because of the added scale, use, and benefit of Members with more generation or load."[126]

Additionally, the Benefits Analysis predicts that a significant amount of savings will accrue to Members, which can be passed to load.  Accordingly, the proposal to allocate to Members (all of whom are LSEs, or have obligations to LSEs) based on load size follows both the Commission's cost causation and beneficiary pays principles of cost allocation.[127]  Cost allocation need not be made with "exacting precision,"[128] but must be at least "roughly commensurate" with the anticipated benefit.[129]  Furthermore, the Commission accepted a similar cost allocation proposal in the bilateral agreements that the CAISO filed when new members joined its Western EIM.[130]  A supporting declaration to CAISO's filing explained that CAISO determined PacifiCorp's cost by first establishing a rate based on dividing the total anticipated implementation cost by the total "MWh of non-ISO new energy for load in the WECC" and then applying that rate "to PacifiCorp's most recently reported net energy for load."[131]  When accepting this proposal, the Commission explained that "[t]he implementation fee allocates a portion of that projected overall cost to PacifiCorp in an amount proportionate to PacifiCorp's benefits from the energy imbalance market, as measured by usage."[132]  In any event, the proposed payment structure is 100% voluntary; nobody is being allocated costs they have not already agreed to pay.[133]

---

[126]    Operations Aff. at P 28.

[127]    *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); ("[A]ll approved rates [must] reflect to some degree the costs actually caused by the customer who must pay them.") *Ill. Comm. Comm'n v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009) (to the extent an entity benefits from a cost, "it may be said to have 'caused' a part of those costs to be incurred") ("*ICC v. FERC*").

[128]    *Sithe/Indep. Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002).

[129]    *See ICC v. FERC*, 576 F.3d at 477.

[130]    *See Cal. Indep. Sys. Operator Corp.*, 143 FERC ¶ 61,298 at PP 31-32 (2013) ("*PacifiCorp Western EIM Implementation Agreement Order*").

[131]    *Cal. Indep. Sys. Operator, Inc.*, Filing of ISO Rate Schedule No. 73, Attachment B, Declaration of Michael K. Epstein at PP 21-22, Docket No. ER13-1372-000 (filed Apr. 30, 2013).

[132]    *PacifiCorp Western EIM Implementation Agreement Order*, 143 FERC ¶ 61,298 at P 32.

[133]    The Southeast EEM Agreement does not allocate any costs to Participants.  Allocating costs to Members as opposed to Participants is reasonable because the Members have decided to create the Southeast EEM and so have caused the costs incurred.  Additionally, any charge to Participants would be speculative at this point, because there is no baseline to evaluate, for example, how many transactions will

Ms. Kimberly D. Bose
February 12, 2021
Page 36

**4.   Providing NFEETS at no charge is not unduly discriminatory and is consistent with rules of cost causation**

Providing NFEETS with no charge for the service is just and reasonable and consistent with other models that the Commission has approved in the Western United States.[134]  In CAISO's Western EIM, for example, CAISO proposed to waive all wheeling charges that otherwise would be charged to exports.[135]  In response to protesters, the Commission found that even though "EIM transfer[s] use[] the same transmission facilities as other CAISO exports," it was nonetheless "just and reasonable that CAISO charges differently for [those] transactions because there are underlying differences in transmission service that allow for different rate treatment."[136]  Here too, NFEETS is fundamentally different than other transmission services – indeed, each of the Participating Transmission Providers must revise its tariff to add the new class of service.  The service uses as-available lowest priority transmission that otherwise would not be used and cannot be reserved by the Transmission Customer directly, but rather can only be reserved through the Southeast EEM System to facilitate Energy Exchanges.

Further, all network service customers are expected to benefit from the reduced costs, making the proposal consistent with cost causation principles.  As the Commission knows, transmission systems are built in the first instance to serve the load connected to them.  Thus, it has long been Commission policy that network customers pay for the system, but that any Point-to-Point uses provide revenues that act as credits to reduce the revenue requirements paid by network load.[137]  The Benefits Analysis predicts that availability of NFEETS service may result in some small decrease in Point-to-Point reservations, and hence in some small reduction in

---

be made market-wide or some other usage-based indication.  Finally, although Participants will not pay any fees to transact over the Southeast EEM System, the Members anticipate that higher levels of participation will increase competition and provide more trading opportunities, thus benefitting the Members and their customers, as well as Participants.

[134]    *See Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107 at PP 84-86 (2016) (accepting CO JDA proposal to provide no-cost transmission service); *Western EIM Order*, 147 FERC ¶ 61,231 at P 153 (accepting CAISO proposal to waive wheeling charges for Western Energy Imbalance Market transactions).

[135]    *Western EIM Order*, 147 FERC ¶ 61,231 at P 125.

[136]    *Id.* at P 154.

[137]    *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at p.304 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (1997), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002) ("In order to prevent over-recovery of costs for those who [consider a firm reservation as the equivalent of a load for cost allocation and planning purposes], we will require transmission providers to include firm point-to-point capacity reservations in the derivation of their load ratio calculations for billings under network service.  In addition, revenue from non-firm services should continue to be reflected as a revenue credit in the derivation of firm transmission tariff rates.").

Ms. Kimberly D. Bose
February 12, 2021
Page 37

credits to offset payments by network load.[138]  But this is entirely consistent with principles of cost causation, because the costs will be borne by those who benefit from the Southeast EEM. As Dr. Pope explains, "the Southeast EEM is expected to reduce energy costs for native load customers, so any increase in network service transmission rates would be roughly balanced by expected benefits from decreases in their energy costs."[139]  The Commission relied on similar logic when approving the Western EIM, concluding that it would "result[] in lower energy costs overall and thus benefit[] native load customers in CAISO and in an EIM Entity BAA who largely bear transmission costs."[140]

While the Southeast EEM differs from CAISO's Western EIM, the same logic applies. Network load will receive the benefits of the Southeast EEM, so it is fair and consistent with principles of cost causation to ask network load to shoulder any incremental transmission system revenue requirements network load is exposed to as a result of any erosion of Point-to-Point revenues.  If, against expectation, the level of erosion somehow exceeds benefits, a Member or Participating Transmission Provider can leave the Southeast EEM at any time, for any reason.[141] Every Member is engaged in the Southeast EEM effort to reduce costs to its customers.

> **5.     Implementation of the Southeast EEM will not negatively impact reliability or existing operations, including service to native load**

The Southeast EEM will not have any negative impact on reliability because it will not change any current reliability roles or responsibilities and will rely on unused transmission given the lowest curtailment priority.  It will be purely an energy market – capacity will not be sold through the Southeast EEM.  As Mr. McGeeney and Mr. Sellers explain, the Southeast EEM was designed so that it would not impact reliability roles.[142]  To that end, the reliability obligations that BAs and transmission providers have today are unchanged under the Southeast EEM.

Further, each LSE must maintain adequate firm NITS and Point-to-Point Service on the transmission system where it is located in the amount of its entire wholesale and retail native load.  The transmission service used for Southeast EEM Energy Exchanges, NFEETS, is based on Participating Transmission Providers' reporting of available transmission after all other scheduled uses have been taken into account.  The Administrator will submit e-Tags so that any Participating Transmission Provider whose system is used for an Energy Exchange will be notified and can take that transaction into account.

Southeast EEM participation does not relieve any Participant of its resource adequacy responsibilities.  Southeast EEM Energy Exchanges do not and are not intended to provide resource adequacy, because they are the lowest priority transactions that can be displaced by

---

[138]     Benefits Analysis at 8, 19.

[139]     Economic Aff. at P 67.

[140]     *Western EIM Order*, 147 FERC ¶ 61,231 at P 156.

[141]     *See* Southeast EEM Agreement Section 4.2.1.

[142]     Operations Aff. at PP 55-57.

Ms. Kimberly D. Bose
February 12, 2021
Page 38

higher priority transactions, and would be the first to be cut in a transmission loading relief ("TLR") situation. Additionally, generators serving native load will never be redispatched to accommodate intra-hour Southeast EEM transactions – Southeast EEM transactions would be curtailed instead.

This means that every load-serving entity participating in the market needs a plan to serve its own load outside and independent of the Southeast EEM. For this reason, Southeast EEM transactions should not drive unit commitment. A Participant would back down owned or contracted generation when it makes a Southeast EEM purchase, but would still likely plan to have ramping capability to cover for a curtailed Southeast EEM transaction. If the Participant does not have that ramping capability, it would fall to the applicable BA or Participating Transmission Provider to provide imbalance, just as occurs today. Under the Southeast EEM, there will be no changes to a BA's responsibility for NERC Resource and Demand Balancing standards or other standards. The potential for imbalance charges is a powerful motivation for the party making a Southeast EEM transaction to maintain the ramping capability needed to make up for a displaced or cut transaction. This is the same way that LSEs need to think today about relying on any transaction using non-firm transmission to back down higher-cost owned or contracted generation. The Southeast EEM's NFEETS is just another form of non-firm service from the perspective of staying resource adequate.

At bottom, Southeast EEM transactions should not result in a reliability concern for native load, or anyone. In essence, the LSE is able to realize energy savings for its customers through the Southeast EEM, yet not affect reliability since its owned or purchased generator(s) should still be available to ramp back up in the event needed. And all of this will occur against a backdrop where each BA's and each Participating Transmission Provider's responsibilities for maintaining reliability, including providing imbalance service, remain unchanged.

### 6. Existing market power mitigation will remain in place, and Southeast EEM will tend to have a deconcentrating effect on market power

There is no need for a market power analysis to support the Southeast EEM proposal because the Southeast EEM will not create market power. As discussed above, the Southeast EEM brings two fundamental changes to the bilateral market in the Southeast. Both changes are inherently pro-competitive. First, for the Southeast EEM intra-hour transactions, it will eliminate rate pancakes across a vast region encompassing ten BAAs. Second, the Southeast EEM will reduce transactional friction by adding another option for finding transactional counterparties with a computer algorithm that matches bids and offers. Together, these changes will enhance efficiencies and reduce opportunities to exercise market power by allowing more buyers to transact with more sellers over a much bigger region.[143]

Further, the fact that the Southeast EEM is a voluntary, residual market "in effect rul[es] out the possibility of one or more Participants exercising horizontal market power as defined by

---

[143]     *See* Economic Aff. at PP 20-31.

Ms. Kimberly D. Bose
February 12, 2021
Page 39

the Commission."[144]  Each LSE has a responsibility to remain resource adequate, and because NFEETS is as-available, lowest priority transmission service, it cannot be relied upon to maintain resource adequacy.  Rather, as described above and by Mr. McGeeney and Mr. Sellers, LSEs must have owned or purchased generation sufficient to meet their needs – Southeast EEM purchases only permit such generation to be backed down.[145]  That means that no load should be in a position of needing to purchase power in the Southeast EEM at an amount above its avoidable cost of generation.  Thus, per Dr. Pope, "[n]o Participant could exercise market power in the Southeast EEM unless it already could exercise market power in today's hourly bilateral market."[146]

Fortunately, the Commission has already evaluated the potential for each jurisdictional seller of power to exercise market power in all markets where the entity has MBR authority and sells energy.  The Commission has imposed mitigation where needed to assure that there can be no such exercise of market power, and has done so for each of the FERC Jurisdictional Members.[147]  The Southeast EEM transactions are bilateral energy transactions under existing MBR authority that will be subject to such existing mitigation.  These measures, together with the pro-competitive effects of the Southeast EEM, will ensure that the Southeast EEM does not create any ability to exercise market power.[148]  And each FERC Jurisdictional Member will remain responsible to file triennial market power updates that will provide the Commission the basis to determine whether existing mitigation measures remain appropriate.  Accordingly, there is no need for a new, Southeast EEM-specific market power analysis, and there is also no need for a notice of change in status.[149]

---

[144]     *Id.* at P 72.

[145]     Operations Aff. at P 56.

[146]     Economic Aff. at P 69.

[147]     *See S.C. Elec. & Gas Co.*, 121 FERC ¶ 61,263 at P 6 (2007) (finding that Dominion Energy SC's (f/k/a South Carolina Electric and Gas Company) "proposal not to make sales within its balancing authority area under its market-based rate tariff adequately addressed [Dominion Energy SC's] failure of the market share screen in its balancing authority area"); *LG&E Energy Mktg., Inc.*, Docket Nos. ER06-1046-000, *et al.* (letter order issued July 6, 2006) (accepting "revised market-based rate tariff sheets that would, among other things, restrict the LG&E Parties' authority to make sales at market-based rates in the LG&E/KU control area" upon LG&E/KU's exit from the Midwest Independent System Operator, Inc.); *Ala. Power Co.*, 163 FERC ¶ 61,090 at P 27 (2018) (finding that the price cap and auction process established in each of the Southern Companies' MBR tariffs  "serve as adequate mitigation for the Southern, SCEG, Tallahassee, and Santee Cooper balancing authority areas"); *Duke Power*, 111 FERC ¶ 61,506 at P 61 (2005) (Commission prohibiting Duke sales within the DEC balancing authority to "mitigate the potential for the exercise of generation market power"); *Fla. Power Corp.*, 113 FERC ¶ 61,131 (2016) (prohibiting Duke sales in the DEP BA).

[148]     Economic Aff. at PP 13, 72.

[149]     Because there is no change in the ability of the Members to exercise market power, there is no need for entities with Market Based Rates to file a notice of change in status by virtue of their participation in the Southeast EEM.  This distinguishes the Southeast EEM from *PacifiCorp*, 147 FERC ¶

Ms. Kimberly D. Bose
February 12, 2021
Page 40

The Southeast EEM will not be responsible for ensuring that its Members comply with mitigation requirements imposed by the Commission, but it will provide the tools for them to do so. Each mitigated company will be able to put constraints into the Algorithm to ensure that the mitigation is observed. Dominion Energy SC, Duke and LG&E/KU anticipate complying with their mitigation requirements by toggling "off" their home BAAs, thus ensuring that they are not matched with any bidder in their home BAAs, and more than meeting the market power mitigation requirement. The Southern Companies anticipate submitting a "maximum Energy Exchange Price" that will be no more than the mitigated price cap that is incorporated into their MBR authority. If the match price is above the "maximum Energy Exchange Price" for buyers in mitigated BAAs, the match price will be adjusted down to the "Energy Exchange Price." This adjustment will occur after the optimization function of the Algorithm is performed to ensure that there are no unintended impacts on optimization.[150] The Market Rules establish both tools as a means for Participants to comply with their applicable mitigation requirements.[151]

### 7. The Southeast EEM does not create new opportunities for market manipulation

There is no need for a market monitor because the Southeast EEM will not create new opportunities for market manipulation, as shown in the Economic Affidavit, such that the Commission's existing tools for bilateral markets will remain sufficient. In evaluating the potential for market manipulation Dr. Pope began with the fact that the Southeast EEM's changes to the existing bilateral market will be minimal. There are two things that differentiate the Southeast EEM from the existing bilateral market when it comes to consideration of the potential for market manipulation. Specifically, Dr. Pope explains that it would be problematic if:

- A Participant could unfairly obtain zero-cost NFEETS and thereby profit at the potential expense of the efficiency benefits realized by the Southeast EEM, the benefits realized by other Participants, or the transmission costs paid by electricity customers; or

---

61,227 at P 206 (2014) and *Nevada Power Co.*, 155 FERC ¶ 61,186, PP 22-25 (2016), which address market power studies in the CAISO EIM. As Dr. Pope explains, "[t]he voluntary aspect of the Southeast EEM is a distinguishing feature in comparison with the CAISO EIM in regard to the potential for the exercise of market power. All transmission service providers that have joined the CAISO EIM have modified their OATTs to pass through the EIM clearing prices as charges for customer imbalances. The fact that transmission customers have no alternative to paying EIM prices for imbalances supports non-discriminatory open access in the EIM, but is also one of the reasons why the EIM has had to consider the potential for the exercise of market power and includes a process for offer mitigation." Economic Aff. at n.49. In short, the market power concerns that could trigger a notice of change in status filing are not present here – nor are there any other changes in material facts germane to the Commission's MBR analysis that could trigger such a requirement. *See* 18 C.F.R § 35.42(a).

[150]   Operations Aff. at P 40.

[151]   Market Rules at IV.A.1.b and IV.B.3; Operations Aff. at P 41.

Document Accession #: 20210212-5033          Filed Date: 02/12/2021

- A Participant could profit from manipulation of the average hourly Energy Exchange Prices published daily and monthly.[152]

As discussed below, and in the Economic Affidavit, the design of the Southeast EEM deters both potential manipulative schemes.

First, Dr. Pope explains that the "three-eligible-counterparty rule," *i.e.*, the requirement that all Participants have "toggled on" at least three unaffiliated potential counterparties each time they bid or offer, protects against collusive schemes to create false benefits in order to trick the Algorithm into moving the schemers to the front of the line for zero-cost transmission.[153] The number of counterparties renders it difficult and risky for parties to coordinate to implement such a scheme, particularly in light of the small benefit to be obtained (*i.e.*, a greater probability of obtaining zero-cost NFEETS). Further, the design of the algorithm itself, which factors in multiple pieces of information (such as transmission availability and the bids of other Participants) that will be unknown to Participants, renders it difficult to guarantee the preferred match when multiple potential counterparties are involved.

Second, Dr. Pope explains that it is unlikely that Participants would be able to engage in a cross-market manipulative scheme based on the reported average Energy Exchange Price.[154] In such a scheme, a Participant would attempt to impact the average reported price for the purpose of benefitting a different contract based on that price as a reference point (essentially a related position scheme). Dr. Pope notes at the outset that it is "very unlikely" that Participants or financial traders would choose to enter into any contract based on the average Energy Exchange price because it is an average weighted price calculated across the entire Southeast EEM footprint.[155] In other words, it does not reflect the "actual market price for energy at any location."[156] Even if a Participant did enter into such a contract, it would be "extremely difficult" for a Participant to attempt to impact the published price.[157]

According to Dr. Pope, "[o]ther possibilities for conduct that might be considered to be market manipulation seem to be even more unlikely," such that "[n]o other new avenues for possible market manipulation are apparent to [Dr. Pope] at this time."[158] In any event, the Commission will retain its existing auditing and monitoring tools and will have, in addition, access to the publicly-posted Southeast EEM data discussed above in Section III.B.5. This additional transparency is intended to give the Commission, as well as Participants, confidence

---

[152]   Economic Aff. at P 75.

[153]   Economic Aff. at PP 83-85.

[154]   *Id.* at P 86.

[155]   *Id.*

[156]   *Id.*

[157]   *Id.* at P 87.

[158]   *Id.* at PP 88-89.

Ms. Kimberly D. Bose
February 12, 2021
Page 42

in the Southeast EEM. While the publicly-posted information will not contain information on individual trades, that information will be included in Participants' EQR reports. Of the current Members, thirteen entities submit EQRs. This includes eight IOUs and five non-jurisdictional entities that are defined as having more than a de minimis impact on wholesale markets. All told, this represents approximately 98% of total NEL of the Members.[159] Additionally, FERC will continue to have access to e-Tags submitted pursuant to Order No. 771. Southeast EEM transactions will be easily identifiable in e-Tag data available to FERC due to the 15-minute duration of the schedule and use of NFEETS.

## IV.    Requested effective date and commitment to notice filing for Commencement Date

Southern Company and the other Southeast EEM Members respectfully request that the Southeast EEM Agreement become effective on May 13, 2021, 90 days after filing. This requested effective date is consistent with 18 C.F.R. §§ 35.2(f) and 35.3(a)(1). Although the Southeast EEM is not anticipated to go live until the first quarter of 2022, an earlier effective date for the Southeast EEM Agreement is necessary to provide Members with regulatory certainty before spending significant additional capital and time to develop the Southeast EEM System. The Southeast EEM Agreement must be binding on the Members before further significant financial commitments are made, meaning, under the terms of the Southeast EEM Agreement, that it must be accepted and effective.

To avoid any potential need for an amendment filing if there are unanticipated readiness issues that delay a market Commencement Date, the Southeast EEM Agreement does not have such a date hardwired. Rather, that date will be determined through the governance process described above. The Members commit to make a notice filing with the Commission no later than 30 days before the Commencement Date in this docket and the other dockets that together comprise the Southeast EEM Filings.

## V.    Request for waivers

Southern Company respectfully requests that the Commission grant such waivers of the Commission's regulations as may be necessary. This request is made out of an abundance of caution; Southern Company and the Members are unaware of any need for a waiver. However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date.

---

[159]    Operations Aff. at P 41. Because the sales will be consummated under the applicable enabling agreement, the Southeast EEM sales will not be identifiable in the EQR reports by "contract." However, because all transactions will be in 15-minute increments (which is a rare occurrence today), the Commission will be able to discern with some certainty which transactions were matched through the Southeast EEM.

Ms. Kimberly D. Bose
February 12, 2021
Page 43

**VI.    Communications**

Southern Company respectfully requests that the following persons be added to the official service list in this proceeding:[160]

Christopher H. Demko                Noel Symons
Associate General Counsel          Julia Dryden English
– Energy Regulation                Katlyn A. Farrell
Southern Company Services, Inc.    Carrie A. Mobley
30 Ivan Allen Jr, Blvd NW          McGuireWoods, LLP
Atlanta, GA 30308                  2001 K Street, N.W., Suite 400
(404) 506-0241                     Washington, D.C.  20006
chdemko@southernco.com             202-857-2929
                                   nsymons@mcguirewoods.com
                                   jenglish@mcguirewoods.com
                                   kfarrell@mguirewoods.com
                                   cmobley@mcguirewoods.com


**VII.    Filing contents**

In addition to this transmittal letter, Southern Company and the Southeast EEM Members are submitting the following documents in support of this filing:

- **Attachment A:**  Southeast EEM Agreement;

- **Attachment B:**  Affidavit of Mr. Aaron Melda and Mr. Lonnie Bellar;

- **Attachment C:**  Affidavit of Mr. Christopher McGeeney and Mr. Corey Sellers;

- **Attachments D and D-1:**  Affidavit of Dr. Susan Pope and attached Curriculum Vitae;

- **Attachments E and E-1:** Affidavit of Andrew Rea and attached Benefits Analysis.

- An .rtf version of the Southeast EEM Agreement, for filing through the Commission's eTariff software.

---

[160]    Southern Company respectfully requests waiver of 18 C.F.R. § 385.203(b)(3) to permit more than two persons to be added to the official service list in this proceeding.

Ms. Kimberly D. Bose
February 12, 2021
Page 44

## VIII.    Conclusion

Southern Company and the Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement, without modification, to become effective on May 13, 2021.

Respectfully submitted,

/s/  *Christopher H. Demko*                     /s/  *Noel Symons*

Christopher H. Demko                            Noel Symons
                                                Julia Dryden English
                                                Katlyn A. Farrell
                                                Carrie A. Mobley


*Counsel for Southern Company Services,*        *Counsel for Southern Company Services,*
*Inc.*                                          *Inc. and the other Members of the*
                                                *Southeast Energy Exchange Market*

JA0329

Attachment A

Southeast Energy Exchange Market Agreement

**SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT**

JA0331

ARTICLE 1 DEFINITIONS AND RULES OF INTERPRETATION ......................................... 1

ARTICLE 2 ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION............. 9

ARTICLE 3 MEMBERSHIP AND PARTICIPATION.............................................................. 9

ARTICLE 4 GOVERNANCE ................................................................................................ 11

ARTICLE 5 OPERATING COMMITTEE ............................................................................ 17

ARTICLE 6 APPOINTMENT OF SOUTHEAST EEM AGENT ........................................... 20

ARTICLE 7 BUDGETING AND COST RESPONSIBILITY ................................................. 21

ARTICLE 8 FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE .................. 24

ARTICLE 9 RELEASE AND LIABILITY; NO FIDUCIARY DUTIES .................................. 26

ARTICLE 10 TRANSPARENCY; CONFIDENTIALITY; AUDITING ................................. 28

ARTICLE 11 SOUTHEAST EEM MARKET RULES ........................................................... 29

ARTICLE 12 DISPUTE RESOLUTION .............................................................................. 29

ARTICLE 13 REPRESENTATIONS AND WARRANTIES .................................................. 31

ARTICLE 14 DEFAULTS .................................................................................................... 31

ARTICLE 15 CONFIDENTIALITY...................................................................................... 32

ARTICLE 16 MISCELLANEOUS ....................................................................................... 33

**EXHIBITS**

EXHIBIT A          Names and Addresses of the Members

EXHIBIT B          Form of Joinder Agreement

**APPENDICES**

APPENDIX A          Form of Participant Agreement

APPENDIX B          Southeast EEM Market Rules

APPENDIX C          Southeast EEM Agent Scope

JA0332

**SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT**

This SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT (as the same may be amended from time to time in accordance with the terms hereof, the "Agreement"), by and among each of the entities listed on Exhibit A hereto (each entity, a "Party," and collectively, the "Parties"), as that exhibit may be amended from time to time in accordance with the terms hereof, is made, entered into and effective this 28th day of December, 2020. Hereinafter, Parties to this Agreement may be referred to individually as a "Member" and collectively as the "Members."

**W I T N E S S E T H**

WHEREAS, there is presently no centrally operated electricity market in the southeastern United States and, accordingly, inter-utility electricity transactions presently occur through bilateral transactions;

WHEREAS, Members believe that a voluntary, region-wide, bilateral, automated, intra-hour electric exchange utilizing unreserved transmission capacity of Participating Transmission Providers at a zero-dollar transmission rate will provide value to their customers by creating efficiencies, transparency, and market liquidity;

WHEREAS, Members desire to participate and to permit other entities to participate as Participants in the exchange; and

WHEREAS, the Members believe that the foregoing objectives can be achieved through a joint effort to sponsor and create a common trading platform that facilitates bilateral electricity transactions between and within their respective service territories.

NOW, THEREFORE, the Members, for good and valuable consideration, enter into this Agreement that sets forth their mutual covenants, rights, and obligations for establishing, funding, and participating in the Southeast Energy Exchange Market (defined below).

**ARTICLE 1**

**DEFINITIONS AND RULES OF INTERPRETATION**

1.1     Definitions.  The following terms shall have the meaning hereinafter specified:

"Additional Member" has the meaning provided to it in Section 3.2.3.

"Affiliate" has the meaning set forth in 18 C.F.R. § 35.36(9), as amended.

"Affirmative Majority Vote" has the meaning set forth in Section 4.1.5(b).

"Affirmative Supermajority Vote" has the meaning set forth in Section 4.1.5(c).

"Alternate Committee Member" has the meaning set forth in Section 5.9(b).

"Alternate MNEL Value" has the meaning set forth in Section 7.3.1(a).

"<u>Alternate Representative</u>" has the meaning set forth in <u>Section 4.1.7(b)</u>.

"<u>Annual Budget</u>" has the meaning set forth in <u>Section 7.2.2</u>.

"<u>Annual Budget Determination Date</u>" has the meaning set forth in <u>Section 7.2.2</u>.

"<u>Annual Meeting</u>" has the meaning set forth in <u>Section 4.4</u>.

"<u>Annual Member Meeting</u>" has the meaning set forth in <u>Section 4.5</u>.

"<u>Authorized Action</u>" has the meaning set forth in <u>Section 6.1</u>.

"<u>Balancing Authority</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Balancing Authority Area</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bid</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bid Information</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bidder</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Business Day</u>" means each weekday, Monday through Friday, excluding NERC holidays.

"<u>Buyer</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Chair of the Membership Board</u>" has the meaning set forth in <u>Section 4.3.2</u>.

"<u>Change in Law</u>" has the meaning set forth in <u>Section 8.6</u>.

"<u>Committee Member</u>" has the meaning set forth in <u>Section 5.1</u>.

"<u>Cooperatives</u>" means those electric membership cooperative Members that serve load, and cooperatives that provide generation, transmission and/or system operations services to electric membership cooperatives that serve load, in each case in the Territory.

"<u>Deadlock Issue</u>" has the meaning set forth in <u>Section 5.7.2</u>.

"<u>Delivery Interval</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Disaggregated Utility</u>" means multiple entities of a disaggregated generation/transmission/system operations utility system.

"<u>Effective Date</u>" has the meaning set forth in <u>Section 8.4.1</u>.

JA0334

"Enabling Agreement" means a bilateral agreement for the purchase and sale of Energy that provides for Energy Exchanges between a Seller and a Buyer and that, for Sellers that are Public Utilities and require authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under Section 205 of the FPA, has been entered into pursuant to such Seller's market-based rate authority.

"Energy" means electric energy delivered as three-phase alternating current.

"Energy Exchange" means a transaction for the purchase and sale of Non-Firm Energy using the transaction matching, reservation and tagging functions of the Southeast EEM between Participants pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Market Rules.

"Enrollment Period" has the meaning set forth in Section 3.2.3.

"FERC" means the Federal Energy Regulatory Commission or any successor to its rights and obligations under Part II of the FPA.

"FPA" means the Federal Power Act, as amended.

"Good Utility Practice" shall have the meaning set forth in the Southeast EEM Market Rules.

"Governmental Action Withdrawal Date" has the meaning set forth in Section 8.6.

"Governmental Entity" means any federal, state, county, municipal, local or foreign government or entity or any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, arbitrator, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or any enforcement authority or other similar recognized organization or body exercising similar powers or authority, including FERC, any public utility commission or public service commission or similar authority, but excluding in each case, any Member acting in its capacity as a Member hereunder and not otherwise in a governmental capacity.

"Governmental Utility" means any electric utility located in the Territory that is owned, operated or controlled by the United States, or any state or commonwealth included in the Territory, any political subdivision of a state or commonwealth included in the Territory, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing.

"Interest Rate" means the lesser of (i) the per annum rate of interest announced from time to time by Citibank, N.A. (or a suitable replacement specified by the Operating Committee) as its "prime rate" for commercial loans effective on the date payment is due as established from time to time by such bank, plus two percent (2%), or (ii) the maximum lawful rate permitted by applicable Law.

"Investor Owned Utilities" means those investor owned utility Members that serve load in the Territory.

JA0335

"<u>Jurisdictional Member</u>" means a Member that is a Public Utility.

"<u>Law</u>" means any federal, state or local law, statute, act, rule, code, ordinance, decree, treaty, regulation, order, judgment, legally binding announcement, directive or published interpretation thereof, enacted, issued or promulgated by any Governmental Entity.

"<u>Load Serving Entity</u>" has the meaning set forth in the NERC Rules of Procedure, as approved by FERC.

"<u>Market Auditor</u>" means an independent entity engaged by the Southeast EEM Agent to perform the scope of responsibilities identified in <u>Section 10.2</u> and in the Southeast EEM Market Rules.

"<u>Material Vendor Contract</u>" means an agreement between the Southeast EEM Agent, on behalf of the Members, and any vendor or supplier that, together with all other such agreements with such vendor or supplier and its Affiliates, involves aggregate consideration payable by the Members.

"<u>Member</u>" or "<u>Members</u>" has the meaning set forth in the preamble, except that to the extent any of the Members have not executed this Agreement at the time that it is filed with FERC, such Member may execute this Agreement no later than thirty (30) days after the Effective Date. Thereafter, any entity listed on <u>Exhibit A</u> that has not executed the Agreement may seek to become an Additional Member pursuant to <u>Section 3.2.3</u>.

"<u>Member Net Energy for Load</u>" means, except as modified pursuant to <u>Section 7.3.1</u>, the Net Energy for Load calculated for each Member and submitted in NERC's business plan and budget filed annually with FERC in accordance with 18 C.F.R. § 39.4(b), as amended. For purposes of <u>Section 4.1.5</u> and <u>Section 7.2</u>, (i) a Representative's Member that is an entity part of a Disaggregated Utility, and (ii) any Affiliates of a Representative's Member, shall in each case be assigned the total Net Energy for Load of the associated entities in such Disaggregated Utility or of such Member Affiliates, as applicable.

"<u>Membership Board</u>" means the membership board established pursuant to <u>Article 4</u>.

"<u>MW</u>" means megawatt or megawatts.

"<u>MWh</u>" means megawatt-hour or megawatt-hours.

"<u>NAESB EIR</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>NERC</u>" means the North American Electric Reliability Corporation or its successor.

"<u>Net Energy for Load</u>" means net generation of an electric system plus Energy received from others less Energy delivered to others through interchange; it includes system losses but excludes Energy required for the storage of Energy at energy storage facilities. For purposes of this definition "electric system" means a Load Serving Entity.

"Non-Firm Energy" shall have the meaning set forth to it in the Southeast EEM Market Rules

"Non-Firm Energy Exchange Transmission Service" shall have the meaning set forth in the Southeast EEM Market Rules.

"Non-Firm Energy Exchange Transmission Service Agreement" means an agreement for the provision of Non-Firm Energy Exchange Transmission Service between a Participant and a Participating Transmission Provider, as provided in such Participating Transmission Provider's Tariff, as any such agreement may be updated from time to time.

"Non-Jurisdictional Member" means a Member that is not a Public Utility.

"OATI webRegistry" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer Information" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer Price" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offeror" shall have the meaning set forth in the Southeast EEM Market Rules.

"Operating Committee" means that committee established pursuant to Article 5.

"Operating Costs" shall mean dues, costs, expenses and other payment obligations assessed pursuant to this Agreement, or other fees or liabilities that may be imposed by the Membership Board or in accordance with the Southeast EEM Market Rules that arise under this Agreement. For the avoidance of doubt, Operating Costs includes fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder and the cost of employing third party vendors by the Southeast EEM Agent regardless of whether such costs are billed to the Members through the Southeast EEM Agent, the Southeast EEM Administrator, a third party or directly by such vendors.

"Other Court/Governmental Entity Action" has the meaning set forth in Section 8.6.

"Participant" shall have the meaning set forth in the Southeast EEM Market Rules.

"Participant Agreement" has the meaning set forth in Section 3.3.

"Participating Transmission Provider" means a transmission provider that is providing Non-Firm Energy Exchange Transmission Service.

"Popular Vote" has the meaning set forth in Section 4.1.5(a)(i).

"Public Utility" has meaning set forth in Section 201 of the FPA.

"Record Date" means the date upon which FERC accepted the most recent annual Business Plan/Budget, including Net Energy for Load values, filed by NERC pursuant to the requirements of 18 C.F.R. § 39.4, as amended.

"Regulatory Filing" means any filing or submission made with or to a Governmental Entity.

"Related Parties" has the meaning set forth in Section 9.1.

"Reliability Obligations" has the meaning set forth in Section 11.2.

"Representative" has the meaning set forth in Section 4.1.2(a).

"Representative Losses" has the meaning set forth in Section 6.5.

"RUS" means the Rural Utilities Service, or its successor.

"Secretary" has the meaning set forth in Section 4.3.3.

"Sector" means individually and collectively, the Investor Owned Utilities, Cooperatives and Governmental Utilities.

"Seller" shall have the meaning set forth in the Southeast EEM Market Rules.

"SERC" has the meaning set forth in Section 11.2.

"Significant Matters" means (i) any amendment to this Agreement (excluding updates to Exhibit A solely to update notice information pursuant to Section 16.8), including but not limited to the Southeast EEM Market Rules, (ii) the appointment, removal, substitution and replacement of the Southeast EEM Agent and/or the Southeast EEM Administrator and the approval of, and any amendment or extension of, the agreement(s) between the Southeast EEM Agent (on behalf of the Members, including the Southeast EEM Agent Scope) and/or the Southeast EEM Administrator, (iii) the development of, or any material modification to, the Southeast EEM Algorithm or the Southeast EEM System, (iv) the appointment, removal, substitution and replacement of the Market Auditor, and any amendment or extension of the agreement(s) between the Southeast EEM Agent (on behalf of the Members) and the Market Auditor that would modify the scope set forth in Section 10.2.1, (v) any other contract or writing that obligates any Member to pay two hundred thousand dollars ($200,000) or more in a calendar year in excess of such Member's allocated share of costs as set forth in the Annual Budget, (vi) the submission of any Regulatory Filing on behalf of the Members, provided that (a) no Member can be compelled to join any Regulatory Filing, and (b) no Member can be compelled to take any action that in the reasonable view of such Member would jeopardize its jurisdictional status, (vii) the sale of all or substantially all of the property held by the Southeast EEM Agent (if any) for the benefit of the Southeast EEM System, or (viii) pursuant to Section 4.2.2, the (A) suspension of a Member's voting rights, (B) removal of a Member from any committee appointment, and (C) suspension of any Member's access to the Southeast EEM System.

"Sink" shall have the meaning set forth in the Southeast EEM Market Rules.

"Source" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Administrator" means that entity hired by the Southeast EEM Agent, on behalf of the Membership Board acting in its capacity on behalf of the Members, to operate the Southeast EEM System from day to day.

"Southeast EEM Administrator Agreement" means that certain agreement by and between the Southeast EEM Administrator and Southeast EEM Agent (in its capacity as agent for the Members), which agreement sets forth the rights and obligations of the Southeast EEM Administrator, as may be amended from time to time in accordance with this Agreement.

"Southeast EEM Agent" means that entity designated by the Membership Board from time to time, which has certain limited rights and responsibilities under this Agreement as expressly set forth in Article 6 below.

"Southeast EEM Agent Scope" has the meaning set forth in Section 6.1.

"Southeast EEM Algorithm" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Commencement Date" means the date upon which the Southeast EEM commences operation.

"Southeast EEM Order" has the meaning set forth in Section 8.6.

"Southeast EEM Manuals" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Market Rules" means the Rules of the Southeast Energy Exchange Market as set forth in Appendix B, as may be amended from time to time pursuant to Section 4.1.9.

"Southeast Energy Exchange Market" or "Southeast EEM" means the Territory-wide, automated, intra-hour electric energy exchange operated by means of the Southeast EEM System and utilizing Non-Firm Energy Exchange Transmission Service pursuant to the terms and conditions of this Agreement.

"Southeast EEM System" means the Southeast EEM Algorithm and any ancillary or supporting software solutions that (i) automatically matches Bids and Offers among Participants for the next Delivery Interval during which the wholesale sale of Non-Firm Energy will be sold by the Seller and the purchase of the Non-Firm Energy will be purchased by the Buyer to serve load in the Territory and (ii) automatically reserves and tags Non-Firm Energy Exchange Transmission Service.

"Southeast EEM System Interface" shall have the meaning set forth in the Southeast EEM Market Rules.

"Stakeholders" means interested state commissions, customers, interested future Southeast EEM Market Members or Participants, public interest groups or any other interested parties.

"<u>Tariff</u>" means a Participating Transmission Provider's FERC-jurisdictional Open Access Transmission Tariff, non-jurisdictional transmission tariff or non-jurisdictional transmission service guidelines, as applicable.

"<u>Tariff Filings</u>" has the meaning set forth in <u>Section 8.3</u>.

"<u>Territory</u>" means, collectively, the areas served by the Participating Transmission Providers, which as of the Effective Date includes the Balancing Authority Areas operated by the following Balancing Authorities: Associated Electric Cooperative, Inc.; Louisville Gas and Electric Company and Kentucky Utilities Company; Tennessee Valley Authority; Duke Energy Progress (f/k/a Carolina Power and Light Company); Duke Energy Carolinas; South Carolina Electric & Gas Company (n/k/a Dominion Energy South Carolina, Inc.); Santee Cooper; Southern Company; and Power South Energy Cooperative. A current description of the Territory shall be maintained on the Southeast EEM System Interface.

"<u>Voluntary Withdrawal Date</u>" has the meaning set forth in <u>Section 4.2.1</u>.

"<u>Withdrawal Date</u>" means a Voluntary Withdrawal Date or a Governmental Action Withdrawal Date, as applicable.

1.2    <u>Rules of Construction</u>.  The capitalized terms listed in this <u>Article 1</u> shall have the meanings set forth herein whenever the terms appear in this Agreement, whether in the singular or the plural or in the present or past tense.  Other terms used in this Agreement but not listed in this <u>Article 1</u> shall have meanings defined herein or by NERC and the Tariff of each Participating Transmission Provider or, if not so defined, shall have meanings as commonly used in the English language.  In the event of a conflict regarding a defined term contained herein and the provisions of a Tariff or NERC rules, the provisions set forth by the applicable Tariff and NERC rules shall take precedence over the defined terms set forth in this Agreement. Words not otherwise defined herein that have well known and generally accepted technical or trade meanings are used herein in accordance with such recognized meanings.  In addition, the following rules of interpretation shall apply:

The masculine shall include the feminine and neuter.

References to "<u>Articles</u>," "<u>Sections</u>," or "<u>Exhibits</u>" shall be to articles, sections, or exhibits of this Agreement.

References to "days" that are not specifically defined as "Business Days" shall be calendar days, which term includes every day on the calendar including weekends and holidays.

The <u>Exhibits</u> and <u>Appendices</u> attached hereto are incorporated in and are intended to be part of this Agreement; <u>provided</u>, <u>however</u>, that in the event of a conflict between the terms of any <u>Exhibit</u> and the terms of this Agreement, the terms of this Agreement shall take precedence.

This Agreement was negotiated and prepared by all Parties with the advice and participation of counsel.  The Parties have agreed to the wording of this Agreement and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this Agreement or any part hereof.

JA0340

Unless expressly provided otherwise in this Agreement, where the Agreement requires the consent, approval, or similar action by a Party, such consent or approval shall not be unreasonably withheld, conditioned or delayed, except in each case that the foregoing shall not apply to any action of a Party under Article 11.

Use of the words "include" or "including" or similar words shall be interpreted as "including but not limited to" or "including, without limitation."

## ARTICLE 2

### ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION

2.1     The Members shall cause the establishment and operation of the Southeast EEM System as set forth herein and administered via the Southeast EEM System Interface or such other protocol as determined by the Membership Board, to facilitate the matching of Sellers with Buyers for the purpose of entering into Energy Exchanges.

2.2     The Southeast EEM Administrator shall operate the Southeast EEM System in accordance with the Southeast EEM Market Rules for the purpose of matching Bids and Offers for the four (4) fifteen (15) minute increments in every hour of every day, including but not limited to Business Days, weekends, and NERC holidays.

2.3     As will be set forth in the Southeast EEM Administrator Agreement, the Southeast EEM Administrator will be primarily responsible for: (i) the on-going functions of the Southeast EEM System and overseeing and/or performing the operation and maintenance services necessary to allow the Southeast EEM System to operate in a reliable manner; (ii) the protection and safeguarding of data submitted to and transmitted from the Southeast EEM System; (iii) limiting access to the Southeast EEM System to Participants; and (iv) maintaining open communications by and among the Southeast EEM Administrator, Participants and the Southeast EEM Agent. For avoidance of doubt, the Membership Board, pursuant to Article 4, may decide to engage one or more third parties to perform the responsibilities of the Southeast EEM Administrator.

2.4     All Bid Information and Offer Information submitted to the Southeast EEM System shall be used by the Southeast EEM Administrator only for operation, maintenance, and the on-going functions of the Southeast EEM System or as requested by the Market Auditor, in each case in accordance with this Agreement, the Southeast EEM Market Rules and applicable Law.

## ARTICLE 3

### MEMBERSHIP AND PARTICIPATION

3.1     Each Member shall comply with all applicable rules, policies, guidelines, or other standards or requirements set forth in this Agreement and as may otherwise be required by the Membership Board or applicable Law.

JA0341

3.2     Member Criteria.

3.2.1    To be a Member of the Southeast EEM, an entity must be: (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory. The Tariff of any Member who provides transmission service must contain Non-Firm Energy Exchange Transmission Service provisions for those Energy Exchanges that seek to utilize such Member's transmission system.

3.2.2    If an entity and one or more of its Affiliates are Members, or if multiple entities of a Disaggregated Utility are Members, then only one entity from the group of entities (including any subsidiaries, affiliates or divisions thereof) may have a Representative on the Membership Board, and for the sake of clarity, for all purposes hereunder, such Disaggregated Utility shall be counted as a single Member.

3.2.3    An entity that satisfies the criteria set forth in this Agreement for qualification and admission as a Member, as determined by the Membership Board, shall be eligible to become a Member during the period between July 1st and September 30th of each calendar year (the "Enrollment Period") and may become an additional Member (an "Additional Member") effective as of the first day of the following calendar year in which such entity satisfies the Member criteria set forth in Section 3.2 after executing this Agreement or a joinder hereto in the form of Exhibit B (the "Joinder") that is countersigned by the Southeast EEM Agent, submitting a duly executed copy to the Secretary and the Southeast EEM Administrator, and upon payment of all applicable fees, dues and contributions as specified or authorized in Article 7. For the avoidance of doubt, an entity seeking to become an Additional Member shall be bound by the terms of this Agreement on the date such entity executes a Joinder that is countersigned by the Southeast EEM Agent.

3.3     Participant Criteria.    To become a "Participant," an entity must (i) meet all requirements of being a Participant as set forth in the Southeast EEM Market Rules, and (ii) execute a Participant Agreement in the form attached hereto as Appendix A (the "Participant Agreement") which agreement shall, among other things, contractually bind such entity to comply with the Southeast EEM Market Rules.

3.4     Participating Transmission Providers.    Prior to the Southeast EEM Commencement Date, or, for any Participating Transmission Provider offering service after such commencement date, prior to the date upon which it commences providing Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and, if required by Law, shall obtain acceptance of such provisions from FERC or such other Governmental Entity(ies) having jurisdiction over such Tariff. Participating Transmission Service Providers shall take such other actions and provide such information to the Southeast EEM Administrator as required by the provisions of the Southeast EEM Market Rules or as otherwise reasonably requested by the Southeast EEM Administrator in order to operate the Southeast EEM.

3.5     Member Standard of Conduct.   Members shall not provide any non-public transmission function information they receive by virtue of their participation in the Southeast EEM to any of their marketing function employees or provide any undue preference through the sharing of non-public market information they receive by virtue of their participation in the Southeast EEM to their marketing function employees.   For purposes of this Section 3.5, marketing function employees of a Member's Affiliates shall be deemed marketing function employees of the Member.


# ARTICLE 4

# GOVERNANCE

4.1     Membership Board.

4.1.1   Power and Qualification of the Membership Board.  Except as set forth in Article 5, all business of the Southeast EEM System and performance of any agreements entered into or otherwise assumed for the benefit of the Members shall be managed under the direction of the Membership Board.

4.1.2   Number of Representatives.  Subject to the limitations set forth in Section 3.2.2:

(a)     The Membership Board shall consist of one (1) representative for each Member (each, a "Representative").

(b)     Each Member shall appoint one (1) Representative to serve until such Representative is replaced by such Member. No Member shall be permitted to have more than one (1) Representative on the Membership Board.

4.1.3   Method of Selecting or Removing Representatives; Vacancies.

(a)     A Representative shall be removed or replaced solely at the discretion of the Member that originally appointed such Representative; provided, however, that each Member must at all times have a Representative in place to vote on matters pursuant to Section 4.1.5.

(b)     All Representative vacancies, occurring for any reason, shall be filled by the Member who appointed such Representative.

4.1.4   Resignations.  A Representative may resign at any time by delivering written notice to the Member who appointed such Representative, the Membership Board and the Southeast EEM Administrator.   Such resignation shall take effect when such notice is delivered to the applicable Member, unless the notice specifies a later effective date.

11

4.1.5    <u>Quorum of Representatives and Action by the Membership Board; Voting</u>.

(a)    The votes of the Members shall be held by the Representatives and shall be weighted with each Representative holding:

(i)    one (1) vote for each Representative of the Southeast EEM System (the "<u>Popular Vote</u>"); and

(ii)    a number of votes (the "<u>Net Energy for Load Vote</u>") equal to the following calculation:

Net Energy for Load Vote = (MNEL/ANEL)

*Where:*

*MNEL = such Member Net Energy for Load of the Representative's Member, Affiliates of such Member and those related entities part of a Disaggregated Utility as of the Record Date; and*

*ANEL = the sum of the Member Net Energy for Load for all Members as of the Record Date.*

(b)    Subject to <u>Section 4.1.7(c)</u>, attendance by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes shall constitute a quorum for the transaction of business. Except for Significant Matters, the actions of the Membership Board shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance, <u>and</u> (ii) more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "<u>Affirmative Majority Vote</u>").

(c)    Subject to <u>Section 4.1.7(c)</u>, the actions of the Membership Board to decide on matters related to the Significant Matters shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance <u>and</u> (ii) more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "<u>Affirmative Supermajority Vote</u>").

(d)    The number of Net Energy for Load Vote of each Representative shall be adjusted each year following the Enrollment Period and prior to the start of the next calendar year to reflect the revision to such proportions resulting from the inclusion of Additional Members (if any) when determining Net Energy for Load Vote for each Representative. Notwithstanding anything to the contrary herein, a Member's right to have its Representative vote

JA0344

or be included in a Representative's Net Energy for Load Vote may be suspended pursuant to Section 4.2.2 during any period in which such Member is delinquent in the payment of any of the dues or costs and expenses allocated to such Member in accordance with Article 7. If a Member's Representative's right to vote has been suspended, the Membership Board shall recalculate the Net Energy for Load Vote of each other Representative excluding such suspended Member's Representative, and each other calculation required by this Section 4.1.5 and Article 4 (including for purposes of determining if there is a quorum and whether there is an Affirmative Majority Vote and Affirmative Supermajority Vote, as applicable) shall be determined excluding such suspended Member's Representative.

      4.1.6   <u>Meetings of the Membership Board</u>. Meetings of the Membership Board, unless otherwise provided in this Agreement, may be called (i) by the Chair of the Membership Board, or (ii) by a written consent delivered to the Membership Board that is executed by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes. Meetings of the Membership Board, regular or special, may be held at such place within the Territory and upon such notice as may be prescribed by resolution of the Membership Board.

      4.1.7   <u>Notice of Meetings of Representatives</u>.

      (a)   The Chair of the Membership Board, or a Representative directed by the Chair of the Membership Board, shall provide written notice by electronic mail (and shall confirm receipt of such notice by requesting a return receipt) of each Membership Board meeting to all Representatives. Such notice shall state the date, place, hour and purpose or purposes of the meeting, including any Significant Matters to be discussed, and shall be delivered by a nationally recognized overnight courier service to each Representative's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting.

      (b)   Any Member may designate, by submitting a written communication to the Chair of the Membership Board, an alternate to act on behalf of the Representative ("<u>Alternate Representative</u>"). Any reference herein to "Representative" shall be deemed a reference to the Alternate Representative where applicable.

      (c)   Notwithstanding anything to the contrary set forth herein, the Membership Board shall only vote on matters set forth in a duly delivered notice pursuant to this Section 4.1.7; provided, however that the Membership Board may (i) discuss any and all matters within the scope of the Membership Board's duties at any duly constituted meeting of the Membership Board, and/or (ii) vote upon any matter within the scope of the Membership Board's duties that is not set forth in a duly delivered notice pursuant to this Section 4.1.7 if all Representatives are present at such meeting of the Membership Board and such matter is approved in accordance with the applicable voting requirements set forth in Section 4.1.5.

JA0345

4.1.8    Action by Representatives in Lieu of a Meeting; Participation in Meetings by Conference Telephone.

(a)    Unless otherwise restricted by this Agreement, any action required or permitted to be taken at a meeting of the Membership Board may be taken without a meeting if the action is evidenced by written consent describing the action taken, signed by all of the Representatives. The written consents and the resolutions thereto by the Representatives shall be filed with the minutes of the Membership Board or filed with the records maintained by the Secretary reflecting the action taken.  Action taken under this Section 4.1.8(a) becomes effective when the last Representative signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided the consent states the date of execution by each Representative.

(b)    The Representatives may participate in any meeting of the Membership Board or of a committee thereof by means of conference telephone or by any means of communication by which all Representatives participating may hear one another during the meeting; all meetings shall be available for participation via such means.  A Representative participating in a meeting by such means is deemed to be present in person at the meeting.

4.1.9    Powers Exclusive to the Membership Board.

(a)    The following matters are reserved to and may only be addressed by the Membership Board:

(i)    all Significant Matters;

(ii)    the creation and appointment of committees and officers pursuant to Section 4.3;

(iii)    the establishment and amendment of Annual Budgets;

(iv)    the establishment and modification of billing processes for Operating Costs;

(v)    the approval of Southeast EEM Manuals or amendments to Southeast EEM Manuals proposed by the Operating Committee;

(vi)    the approval and establishment of the Southeast EEM Commencement Date following the satisfaction of the conditions set forth in Section 8.4.2;

(vii)    all Deadlock Issues; and

(viii)    the authorization of the Southeast EEM Agent to execute, transfer or terminate Participant Agreements.

(b)    Any changes, modifications or amendments to this Agreement agreed to by the Membership Board as provided herein shall be submitted to the required

14

Governmental Entities for approval or acceptance and the orders on such submissions shall be deemed to be and treated as Southeast EEM Orders for purposes of Article 8.

4.2     Removal or Withdrawal of Members.  Upon withdrawal, suspension or removal of a Member as set forth below, such Member shall no longer be entitled to exercise the voting power provided under this Agreement, shall be automatically removed from any committee appointments, and shall not be entitled to any other rights as a Member hereunder.  Notwithstanding the foregoing, (i) a Member that withdraws or is removed or is suspended by the Membership Board or is no longer a Member during a calendar year shall remain liable for all dues, costs and expenses and other payment obligations as provided in Section 4.2.1 and Section 4.2.4, and (ii) nothing in this Section 4.2 shall act to prevent a Member who is no longer a Member, but is in compliance with all surviving obligations under this Agreement, from becoming a Participant; provided it has met the criteria for a Participant set forth in the Southeast EEM Market Rules. Any Member that withdraws or is removed by the Membership Board or is no longer a Member during a calendar year shall pre-pay all amounts owed by such Member under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.2.1     Except as set forth in Section 8.5, Section 8.6 and Section 8.7, any Member shall have the right to withdraw from the Southeast EEM System (and a Participating Transmission provider shall take all necessary actions to withdraw the provisions for Non-Firm Energy Exchange Transmission Service from its Tariff) by providing at least (i) thirty (30) days advance written notice to the Membership Board in the case of any Member that is not a Balancing Authority or Participating Transmission Provider and (ii) at least ninety (90) days advance written notice to the Membership Board in the case of any Member that is a Balancing Authority or Participating Transmission Provider (the effective date of such withdrawal, in the case of clause (i) or (ii), as applicable, the "Voluntary Withdrawal Date"). A withdrawing Member shall continue to be liable for (A) all Operating Costs allocated to and owed by the withdrawing Member at the time that it delivered its notice of withdrawal, and (B) its allocated share of future Operating Costs as provided in Section 4.2.4; provided, however, that for the sake of clarity and notwithstanding anything to the contrary herein, the withdrawing Member shall not be responsible for any new Operating Costs first approved and incurred  after the date such Member provides written notice of its intent to withdraw, and a withdrawing Member that is also a Participating Transmission Provider shall have no obligation to provide Non-Firm Energy Exchange Transmission Service following the Voluntary Withdrawal Date.

4.2.2     If a Member fails to cure nonpayment of any financial obligations related to the Southeast EEM (including undisputed amounts payable and any other amounts due to any third parties as directed by the Membership Board or pursuant to the Southeast EEM Market Rules) within ten (10) Business Days after receipt of notice by the Operating Committee of such nonpayment, the Membership Board shall have the right in its discretion to: (i) suspend such Member's voting rights, (ii) remove such Member from any committee appointments and (iii) suspend such Member's access to the Southeast EEM System.

4.2.3     The Membership Board may remove a Member for any of the following reasons: (i) failure to comply with this Agreement, (ii) repeated failure to consummate valid Energy Exchanges resulting from Bids or Offers submitted by a Member, arranged by or through the Southeast EEM System in accordance with and subject to the Southeast EEM Market Rules or the

Southeast EEM Manuals; and (iii) failure to comply with the standards, rules, procedures or other requirements for participation in the Southeast EEM System, as established and modified from time to time by the Operating Committee.

4.2.4    Any Member that provides notice to withdraw in accordance with <u>Section 4.2.1</u>, <u>Section 8.5</u>, <u>Section 8.6</u> or <u>Section 8.7</u> or who is otherwise removed pursuant to <u>Section 4.2.3</u> shall remain liable for its share of all costs and expenses in accordance with <u>Article 7</u>. If such Member withdraws prior to the Annual Budget Determination Date, such Member shall only be responsible for the costs and expenses allocated to such Member for the year in which such Member withdraws. If such Member withdraws after the Annual Budget Determination Date, such Member shall (i) be responsible for the costs and expenses allocated to such Member pursuant to <u>Section 7.2.2</u> for the year in which such Member withdraws and the following year for which the Annual Budget has already been determined, and (ii) pre-pay all amounts owed by such Member under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.3    <u>Committees and Officers</u>.

4.3.1    An Affirmative Majority Vote may appoint such committees or officers as the Membership Board deems necessary or desirable to carry on the business of the Southeast EEM System and may delegate to any such committee or officer such authority to act on behalf of the Membership Board.    Each officer shall hold office until its successor is designated by an Affirmative Majority Vote.    Any officer may resign at any time upon written notice to the Membership Board.    Any officer may be removed by an Affirmative Majority Vote at any time, with or without cause.    A vacancy in any officer position shall be filled at the discretion of, and by, an Affirmative Majority Vote.

4.3.2    The Membership Board shall appoint a chair of the Membership Board (the "<u>Chair of the Membership Board</u>") who shall be responsible for calling and overseeing all meetings of the Membership Board, and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.3.3    The Membership Board shall appoint a secretary of the Membership Board (the "<u>Secretary</u>") who shall be responsible for overseeing the maintenance of the books and records of the Membership Board and its Members and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.4    <u>Annual Meeting of Participants and Stakeholders</u>. The Membership Board shall hold an annual meeting of Participants and Stakeholders (the "<u>Annual Meeting</u>") at a time determined by the Membership Board that is reasonably proximate to (either before or after) May 1st of each year. The Southeast EEM Administrator shall provide written notice of the Annual Meeting to all Participants.    Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by a nationally recognized overnight courier service to each Participant's usual place of business as recorded in the Southeast EEM Administrator's records, or such notice shall be delivered by internet electronic mail (with return receipt requested for purposes of confirming receipt) sent to the electronic mail address for such Participant as recorded in the Southeast EEM Administrator's records, not less than seven (7) Business Days prior to the date of

the Annual Meeting. In addition, the Southeast EEM Administrator shall publicly post the notice of the Annual Meeting, including the date, place and time of such Annual Meeting, on the Southeast EEM System Interface or other public website administered for the Southeast EEM, not less than seven (7) Business Days prior to the date of the Annual Meeting. The Participants and Stakeholders may participate in Annual Meetings by means of conference telephone or by any means of communication by which all Participants and Stakeholders participating may hear one another during the meeting, and all Annual Meetings shall be available for participation via such means.

4.5 <u>Annual Meeting of Members</u>. The Membership Board shall hold an annual meeting attended only by Members (the "<u>Annual Member Meeting</u>") at a time determined by the Membership Board that is reasonably proximate to (either before or after) October 30th of each year. The Secretary shall provide written notice of the Annual Member Meeting to, and confirm actual receipt of such notice by, all Members. Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by nationally recognized overnight courier service to each Member's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Member's Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the Annual Member Meeting. The Members may participate in the Annual Member Meeting by means of conference telephone or by any means of communication by which all Members participating may hear one another during the meeting, and all meetings shall be available for participation via such means.

## ARTICLE 5

## OPERATING COMMITTEE

5.1 <u>Power and Qualification of the Operating Committee</u>. Except with respect to matters specifically reserved to the Membership Board pursuant to <u>Section 4.1.9</u>, the Members hereby agree and hereby appoint the Operating Committee to supervise the day-to-day operation of the Southeast EEM System, with each individual member of the Operating Committee referred to as a "<u>Committee Member</u>". The Operating Committee shall be responsible for developing and maintaining the Southeast EEM Manuals for approval by the Membership Board.

5.2 <u>Number of Committee Members</u>. The Operating Committee shall consist of four (4) Committee Members, as determined by this Agreement.

5.3 <u>Election and Term of Committee Members; Appointment of Chair</u>.

5.3.1 Except as provided in this Agreement, the Members of each Sector shall elect the Committee Members as provided in <u>Section 5.4</u> at the Annual Member Meeting. The Committee Members shall be allocated by Sectors: (a) the Members comprising Investor-Owned Utilities shall elect two (2) Committee Members; (b) the Members comprising Cooperatives shall elect one (1) Committee Member; and (c) the Members comprising Governmental Utilities shall elect one (1) Committee Member. Each Committee Member shall be entitled to cast one (1) vote. Notwithstanding the foregoing, no Member shall be permitted to have more than one (1) representative serve on the Operating Committee. Each Committee Member's term shall

commence upon election and continue until the earlier of such Committee Member's resignation or the date of the next Annual Member Meeting and the election of such Committee Member's successor.

    5.3.2    The properly elected Committee Members shall determine which Committee Member shall be the chair of the Operating Committee by the majority approval of the Committee Members.  The chair of the Operating Committee may be removed or replaced with or without cause at any time upon the majority approval of the Committee Members.

    5.4    <u>Method of Selecting or Removing Committee Members</u>.  Each Sector may establish the method and criteria for electing or appointing the Committee Member(s) of such Sector as set forth in <u>Section 5.3</u> and for selecting or removing the Committee Member or Committee Members elected or appointed by such Sector and shall provide a copy of such method and criteria to the Southeast EEM Administrator as well as any updates thereto.  A Committee Member shall be deemed properly appointed by the applicable Sector upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power pursuant to such Sector's criteria to elect such Committee Member.  A Sector may remove a Committee Member with or without cause by delivering to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to remove the Committee Members.  Such Committee Member's removal shall be effective on the later of the date such certificate is delivered to the Southeast EEM Administrator or date specified in the certificate.

    5.5    <u>Vacancies</u>.  All Committee Member vacancies, occurring for any reason, shall be filled by the Members of the Sector in which the vacancy occurs, in the same manner as a Committee Member is elected pursuant to <u>Section 5.4</u>.  A Committee Member elected or appointed to fill a vacancy shall assume office upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to fill the vacancy.

    5.6    <u>Resignations</u>.  A Committee Member may resign at any time by delivering written notice to the Secretary and to the Members of the Sector which elected or appointed such Committee Member.  Such resignation shall take effect when such notice is delivered to the Southeast EEM Administrator, unless the notice specifies a later effective date.

    5.7    <u>Quorum of Committee Members and Action by the Operating Committee</u>.

    5.7.1    Attendance by at least one (1) Committee Member representing each of the three (3) Sectors shall constitute a quorum for the transaction of business.  The act of all the votes of the Committee Members present at a meeting at which a quorum is present shall constitute the action of the Operating Committee.

    5.7.2    To the extent that the Operating Committee cannot obtain a unanimous vote on any business or issue properly before the Operating Committee when a quorum is present (the "<u>Deadlock Issue</u>"), then the Operating Committee may, upon the written request of a Committee Member, submit the Deadlock Issue to the Membership Board for final resolution. For purposes of clarity, a vote of the Operating Committee that is held at a meeting for which a quorum is present shall be considered unanimous if at least one (1) Committee Member representing each of the three (3) Sectors is present.

JA0350

5.8    Meetings of the Operating Committee.  Meetings of the Operating Committee may be called (i) by the chair of the Operating Committee, or (ii) by a written consent delivered to the chair of the Operating Committee that is executed by a majority of the Committee Members.

5.9    Notice of Meetings of Committee Members; Member Observation Rights.

(a)    The Southeast EEM Administrator shall provide written notice of each Operating Committee meeting to all members of the Operating Committee as well as to all Members.  Such notice shall state the date, place and hour of the meeting and shall be delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Committee Member and for such Member as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting.  Members who are not Committee Members shall have the right to attend, observe and participate in any discussion at any Operating Committee Meeting, but may not cast a vote.

(b)    Any Committee Member unable to attend a meeting may designate, in writing, an alternate from the same Sector as such Committee Member to act on behalf of the Committee Member ("Alternate Committee Member").  Any reference herein to "Committee Member" shall be deemed a reference to the Alternate Committee Member where applicable.

(c)    A Committee Member's attendance at or participation in a meeting waives any required notice to him or her of such meeting unless, at the beginning of such meeting or promptly upon his or her arrival, such Committee Member objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

(d)    A notice shall specify the business to be transacted at, or the purpose of, any meeting of the Operating Committee; provided, however, such notice shall not limit the actions the Operating Committee may take at a meeting.

5.10    Action by Committee Members in Lieu of a Meeting; Meetings by Telephone Conference.

(a)    Any action required or permitted to be taken at a meeting of the Operating Committee may be taken without a meeting if at least one (1) Committee Member representing each of the three (3) Sectors consents in writing to the adoption of a resolution authorizing the action. The resolution and the written consents thereto by the Committee Members shall be filed with the minutes of the Operating Committee or filed with the records maintained by the Secretary reflecting the action taken.  Any action taken under this Section 5.10(a) shall be effective when the last Committee Member signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided, the consent states the date of execution by each Committee Member.  Such consent shall have the same force and effect as a unanimous vote.

(b)    The Committee Members and Members may participate in any meeting of the Operating Committee or of a committee thereof by means of telephone conference or by any means of communication by which all Committee Members and Members participating

may hear one another during the meeting, and all meetings shall be available for participation via such means. A Committee Member participating in a meeting by such means is deemed to be present in person at the meeting.

5.11 <u>Liability of Committee Members</u>. The Operating Committee and the Committee Members shall not be liable to any Member for any act done or omitted by Committee Members while acting in good faith and in the exercise of reasonable judgment. The Members shall indemnify the Committee Members (solely in such capacity) and hold them harmless against any loss or expense actually incurred without gross negligence or willful misconduct on the part of the Committee Members and arising out of or in connection with the acceptance or administration of their role on the Operating Committee.

# ARTICLE 6

## APPOINTMENT OF SOUTHEAST EEM AGENT

6.1 Each Member agrees to appoint the Southeast EEM Agent as its representative and as each such Member's true and lawful agent and authorizes the Southeast EEM Agent to act for such Member in accordance with the scope of the Southeast EEM Agent's responsibilities (the "<u>Southeast EEM Agent Scope</u>") as specifically defined by the Membership Board in <u>Appendix C</u>. Each Member grants unto the Southeast EEM Agent only that authority which is granted to the Southeast EEM Agent by the Membership Board under this Agreement and that is necessary to perform the actions required in connection with the development and operation of the Southeast EEM System, and in each case in a manner consistent with the Southeast EEM Agent Scope. Each Member agrees and acknowledges that a third party shall be entitled to rely on any action taken, or the failure to take any action, by the Southeast EEM Agent, on behalf of Members pursuant to and in accordance with this <u>Article 6</u> (each, an "<u>Authorized Action</u>"), and that each Authorized Action shall be binding on each Member as fully as if such Members had taken such Authorized Action directly. The initial Southeast EEM Agent and any replacement Southeast EEM Agent, as determined by the Membership Board in accordance with <u>Section 4.1.9</u>, must meet any criteria set by the Membership Board from time to time (collectively, the "<u>Southeast EEM Agent Criteria</u>"). Any entity that does not meet the Southeast EEM Agent Criteria may not serve as the Southeast EEM Agent; provided, however, that the Membership Board may, in its discretion, alter or revise the Southeast EEM Agent Criteria.

6.2 Each Member acknowledges and agrees that upon execution of this Agreement, and upon any delivery by the Southeast EEM Agent of any waiver, amendment, agreement, opinion, certificate or other document within the Southeast EEM Agent Scope executed by the Southeast EEM Agent, such Member shall be bound by such documents or action as fully as if such Member had executed and delivered such documents. Each Member shall pay its allocated share of (i) all Operating Costs arising from contracts entered into by the Southeast EEM Agent entered into in accordance with the Southeast EEM Agent Scope, and (ii) fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder.

6.3 The Southeast EEM Agent may resign at any time upon sixty (60) days written notice to the Membership Board and may be removed at any time with or without cause by the Membership Board pursuant to <u>Section 4.1.9</u>. Upon the resignation of the Southeast EEM Agent

JA0352

pursuant to this <u>Section 6.3</u> or its removal pursuant to <u>Section 4.1.9</u>, the resigning or removed Southeast EEM Agent shall take or cause to be taken, all actions and do, or cause to be done, or execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the Membership Board may reasonably deem necessary, proper or advisable to transition the rights and obligations of the Southeast EEM Agent to the replacement Southeast EEM Agent, as promptly as practicable or sooner as required by this Agreement, including, without limitation, such actions as are necessary to assign all contracts, agreements or other documents executed on behalf of the Members within the Southeast EEM Agent Scope to the replacement Southeast EEM Agent.

6.4     For the avoidance of doubt, it is the intent of the Members that the Operating Committee, not the Southeast EEM Agent, be responsible for interfacing and coordinating with third party vendors with regard to the performance of contracts with such vendors. Further, in the event that the Southeast EEM Agent is required to take any ministerial action under such contracts, the Southeast EEM Agent shall only do so at the direction of the Membership Board or Operating Committee and in accordance with the Southeast EEM Agent Scope.  The Southeast EEM Agent shall have no right or access to data related to the Southeast EEM beyond what it has as a Member and Participant.

6.5     The Southeast EEM Agent will incur no liability of any kind with respect to any action or omission by the Southeast EEM Agent in connection with the Southeast EEM Agent's role pursuant to this Agreement and any agreements ancillary hereto within the Southeast EEM Agent Scope, except in the event of liability directly resulting from the Southeast EEM Agent's gross negligence or willful misconduct.  The Members will indemnify, defend and hold harmless the Southeast EEM Agent from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "<u>Representative Losses</u>") arising out of or in connection with the Southeast EEM Agent's execution and performance of this Agreement and any agreements ancillary hereto, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Southeast EEM Agent or actions beyond the Southeast EEM Agent Scope, the Southeast EEM Agent will reimburse the Members the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct. In no event will the Southeast EEM Agent be required to advance its own funds on behalf of the Members or otherwise.  The Members acknowledge and agree that the foregoing indemnities will survive the resignation or removal of the Southeast EEM Agent or the termination of this Agreement.

## ARTICLE 7

## BUDGETING AND COST RESPONSIBILITY

7.1     <u>Member Responsibility</u>.  Each Member will be assigned and is responsible for its allocated share of Operating Costs and such other dues or fees as assessed by the Membership Board from time to time based on the methodology set forth in <u>Section 7.2</u>. If a Member fails to cure any nonpayment of its allocated share of Operating Costs or any other amount assessed against such Member under this Agreement within ten (10) Business Days after receiving notice from the

JA0353

Operating Committee of such non-payment, such Member may, in the discretion of the Membership Board, lose its right to vote on matters related to this Agreement or to have representation on the Membership Board and any committees unless and until such amounts are paid in full. Any amounts owed that are not paid in accordance with this Agreement shall be delinquent and shall accrue interest at the Interest Rate, such interest to be calculated from the due date to the date the delinquent amount is paid in full.

7.2     Allocation of Costs.  Operating Costs, including but not limited to the costs and expenses of the Southeast EEM System, shall be allocated and assessed to each Member based on the following formula, provided that (i) for purposes of a Disaggregated Utility, such Disaggregated Utility shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the entities of such Disaggregated Utility according to their direction (which allocation shall not control for any purposes hereunder), and (ii) for purposes of Member Affiliates, the Member Affiliates shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the Member Affiliates according to their direction (which allocation shall not control for any purposes hereunder):

$$[(1/4)(TC)(1/TNM)] + [(3/4)(TC)(MNEL/ANEL)] = MAC, \text{ where:}$$

$TC$ = Total allocable costs.

$TNM$ = the total number of Members.

$MNEL$ = such Member Net Energy for Load of the Representative's Member,

Affiliates of such Member and those related entities part of a Disaggregated

Utility as of the Record Date.

$ANEL$ = the sum of all the Member Net Energy for Load as of the Record Date.

$MAC$ = Member's allocated costs.

7.2.1     Billing Process.  Each Member shall be billed directly by the Southeast EEM Administrator for its allocated share of Operating Costs in accordance with the terms of this Agreement. In the event that the direct billing process described in the foregoing sentence proves to be unworkable for certain Operating Costs, the Membership Board shall use commercially reasonable efforts to (i) require third party vendors to structure all Southeast EEM invoices on an individual Member basis based upon the cost methodology set forth in this Agreement; or (ii) if such third party vendors refuse to provide such individual Member billings services, establish an alternative billing procedure for such Operating Costs (including the engagement of a third party billing service provider) to ensure such invoices are billed on an individual Member basis. The Membership Board shall establish such an alternative billing procedure in a timely manner; provided, however, that a delay in establishing such a procedure shall not eliminate the Members' individual obligations to pay their allocated share of Operating Costs. Nothing in this Section 7.2.1 is intended to modify or diminish the Membership Board's authority to establish or amend billing procedures from time to time.

JA0354

7.2.2    Annual Budget.  On or before October 30th of each calendar year, but in any case no earlier than October 1st of each calendar year, the Membership Board shall set the annual budget for the following calendar year (the "Annual Budget Determination Date"), which budget shall include but not be limited to all projected Operating Costs, including all vendor costs and all costs and expenses associated with the Southeast EEM Agent (the "Annual Budget").  Costs are deemed allocated to each Member as of the Annual Budget Determination Date, but, except as otherwise provided herein, are not payable until such costs are due and payable subject to the applicable agreements concerning such costs.

7.3    Additional Members.  The costs and expenses of the Southeast EEM System allocated to each Member shall be adjusted each year in accordance with Section 7.2 following the Enrollment Period but prior to the Annual Budget Determination Date to reflect any changes in a Member Net Energy for Load valuation or the inclusion of Additional Members in such calculations for the following calendar year.

7.3.1    Submission of Information.

(a)    Upon the request of the Secretary or upon a schedule approved by the Membership Board, each Member shall provide its Member Net Energy for Load values, and any other information required for the calculations set forth in Section 4.1.5 and Section 7.2, to the Southeast EEM Administrator and all other Members.  If a Member proposes to use a Member Net Energy for Load value that differs from the Net Energy for Load value as provided to NERC by the Record Date (an "Alternate MNEL Value"), such Member shall submit a written request to the Operating Committee at least thirty (30) days prior to the Annual Budget Determination Date requesting the Operating Committee's approval of such Member's Alternate MNEL Value in the upcoming year. The submitting Member's request shall contain (i) an explanation of why the Alternate MNEL Value differs from the Member Net Energy for Load value submitted to NERC, and (ii) all other reasonably necessary information evidencing such Member's calculation of the Alternate MNEL Value. The Operating Committee shall review a Member's request to use an Alternate MNEL Value and shall use commercially reasonable efforts to approve, deny or request additional information regarding such request within fifteen (15) days from the date the Operating Committee receives the request.

(b)    If the Operating Committee denies a Member's request to use an Alternate MNEL Value, the Member may, within thirty (30) days of such denial, submit the request to the Membership Board for review, and the Membership Board shall, as soon as reasonably practicable, hold a vote to either uphold or overturn the Operating Committee's denial of the request, as determined by an Affirmative Majority Vote. The requesting Member shall provide to the Membership Board such information reasonably requested by the Membership Board in order to evaluate the Member's request. If the Operating Committee or the Membership Board, as applicable, approves a Member's Alternate MNEL Value, such Alternate MNEL Value shall be used for the calculations set forth in Section 4.1.5 and Section 7.2 in the following calendar year. If the Operating Committee or the Membership Board, as applicable, deny such requesting Member's request to use an Alternative MNEL Value, the Member's Member Net Energy for Load value shall be that Member Net Energy for Load as determined by the Membership Board in accordance with this Agreement; provided, however, that during the pendency of the review of a

Member's Net Energy for Load pursuant to this <u>Section 7.3.1</u> and until such value is finally determined, the requesting Member's Member Net Energy for Load value shall be the Member Net Energy Load value provided by such Member that was approved and used in the most recent calendar year.

## ARTICLE 8

### FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE

8.1     This Agreement is subject to valid Laws, orders, rules and regulations of duly constituted Governmental Entities having jurisdiction. Nothing contained in this Agreement shall be construed as a grant of jurisdiction over any Member by any Governmental Entity not otherwise having jurisdiction by Law.

8.2     <u>Filing With and Approval or Acceptance by Governmental Entities</u>.

8.2.1     Any entity desiring to become a Member that is subject to the jurisdiction of any Governmental Entity from which approval or acceptance of this Agreement or participation in the Southeast EEM is required for such entity to participate in the Southeast EEM shall institute proceedings to obtain such acceptance or approval or shall provide such notice, except as provided in <u>Section 8.2.2</u> below. All required approvals, acceptances and notices must be received by such entity prior to its participation in the Southeast EEM. The Members shall cooperate in securing all required Governmental Entity approvals or acceptances of this Agreement.

8.2.2     No later than sixty (60) days prior to the proposed Effective Date, the Southeast EEM Agent shall file this Agreement with FERC on behalf of the Jurisdictional Members in accordance with <u>Section 8.2.1</u> under Section 205(c) of the FPA.  Within ten (10) Business Days of the date of such filing, the remaining Jurisdictional Members shall file certificates of concurrence with such filing and the Non-Jurisdictional Members shall file comments in support of such filing.

8.3     On the same date that the Southeast EEM Agent files this Agreement with FERC, the Jurisdictional Members that are also transmission service providers will make filings with FERC to amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and become Participating Transmission Providers, in accordance with <u>Section 3.4</u> above (the "<u>Tariff Filings</u>").

8.4     <u>Effective Date and Southeast EEM Commencement Date</u>.

8.4.1     Unless specific provisions become effective earlier by the explicit terms contained herein, this Agreement shall be binding upon the Members upon the effective date established by FERC in a FERC order accepting the Agreement without modification or condition (the "<u>Effective Date</u>"); provided, however, that that this Agreement shall not become binding upon an individual Member who seeks acceptance or approval from a Governmental Entity pursuant to <u>Section 8.2.1</u> above until the later of: (x) the date of issuance of an order by such Governmental Entity approving without modification or condition this Agreement and/or such Member's participation in the Southeast EEM and (y) the Effective Date; and provided, further, that the Members agree that this Agreement will bind each of them upon signing, subject only to the approvals and acceptances provided in this <u>Section 8.4</u>. In the event FERC does not accept the

Agreement as filed, the Members may agree to changes or modifications to the Agreement pursuant to an Affirmative Supermajority Vote as set forth in <u>Section 8.6</u>, in which event the Effective Date shall be the date that FERC accepts the revised Agreement with any such changes or modifications agreed to pursuant to <u>Section 8.6</u>.

      8.4.2   The Southeast EEM Commencement Date shall not occur until after (i) the Effective Date, (ii) the issuance by FERC of an order or orders accepting without modification or condition all of the Jurisdictional Member Participating Transmission Provider's Tariff Filings, and (iii) the Membership Board has approved and established the Southeast EEM Commencement Date in accordance with <u>Section 4.1.9(vi)</u>.

      8.5   If a Governmental Entity (other than FERC) to which a Member's participation in the Southeast EEM has been submitted for approval pursuant to <u>Section 8.2.1</u> has not issued an order on such request within four (4) months from the date of submission, the Member for which such approval was requested may withdraw from this Agreement by providing written notice to all other Members no later than fifteen (15) days after such four-month period has elapsed. Withdrawal under this <u>Section 8.5</u> shall be subject to the provisions of <u>Section 4.2</u>.

      8.6   The individual provisions of this Agreement are inter-related and inter-dependent, and the agreement of the Members to the terms hereof is based on the expectation that it will be approved by all necessary Governmental Entities in its entirety. Accordingly, the terms of this Agreement are not severable, and are an integrated package that is submitted with the understanding and condition that it will be approved by the necessary Governmental Entities in its entirety. As such, if at any time (i) a Governmental Entity issues an order that does not accept or approve this Agreement or a Tariff Filing in its entirety without condition or requires modifications to the Agreement or the relevant Tariff ("<u>Southeast EEM Order</u>"), or (ii) any state or federal Laws or regulations, now existing or enacted or promulgated after the Effective Date are interpreted by a Governmental Entity in such a manner as to indicate that the structure or terms of this Agreement are more likely than not to be a violation of such Laws or regulations or are more likely than not to impact the jurisdictional status of any Member (a "<u>Change in Law</u>"), or (iii) if any provision or portion of this Agreement shall for any reason be held or adjudged to be invalid or illegal or unenforceable by any court of competent jurisdiction or other Governmental Entity ("<u>Other Court/Governmental Entity Action</u>"), the Members will engage in good faith negotiations during a forty-five (45) day period after the date of the Southeast EEM Order or Change in Law or Other Court/Governmental Entity Action to agree to Agreement modifications or conditions that are consistent with the modifications and conditions imposed by such Southeast EEM Order, Change in Law or Other Court/Governmental Entity Action; provided, however, that in any such negotiation the Members are not under any obligation to reach an agreement. Any changes, modifications or conditions to the effectiveness of this Agreement agreed to by an Affirmative Supermajority Vote shall be submitted to the required Governmental Entities for approval or acceptance and the orders on such filings shall be deemed to be and treated as Southeast EEM Orders for purposes of this <u>Article 8</u>. If an Affirmative Supermajority Vote cannot be achieved within such forty-five (45) day period, then the Agreement shall terminate and be of no force and effect. If a Member does not agree with the modifications to the Agreement adopted by the Affirmative Supermajority Vote, such non-agreeing Member shall be subject to the waiver of rights provisions of <u>Section 16.9</u>, but shall have the right to withdraw from this Agreement and the Southeast EEM upon thirty (30) days prior written notice. Upon such notice of withdrawal by a

Member, any other Member may withdraw from this Agreement by providing written notice to the other Members within twenty-five (25) days after the date of the first Member's notice of withdrawal. Any notice to withdraw provided in accordance with this <u>Section 8.6</u> shall become effective as of the later of the date provided in such notice and the date such Member is permitted to withdraw in accordance with <u>Section 8.5</u> (the "<u>Governmental Action Withdrawal Date</u>"). Withdrawal under this <u>Section 8.6</u> shall be subject to the provisions of <u>Section 4.2</u>.

8.7     A Non-Jurisdictional Member, in its sole discretion, may immediately withdraw from this Agreement if it becomes apparent that the Non-Jurisdictional Member's engagement in activities under this Agreement or FERC's approval of this Agreement would (i) jeopardize the tax-exempt status of interest paid by the Non-Jurisdictional Member on outstanding debt obligations, (ii) render the Non-Jurisdictional Member a Public Utility subject to FERC's jurisdiction, or (iii) if the Non-Jurisdictional Member determines that any conflict exists between provisions of this Agreement and applicable Laws and regulations of the state of its creation, or rate schedules adopted by its governing body under state Law, in which case such state Laws, regulations, or rate schedules shall govern with respect to such Non-Jurisdictional Member.  The withdrawing Non-Jurisdictional Member may withdraw from this Agreement on this basis by providing written notice to all other Members and the Southeast EEM Administrator. Withdrawal under this <u>Section 8.7</u> shall be subject to the provisions of <u>Section 4.2</u>.

## ARTICLE 9

## RELEASE AND LIABILITY; NO FIDUCIARY DUTIES

9.1     Except as expressly set forth in <u>Section 14.2</u>, to the maximum extent permitted by applicable Law, each Member releases and discharges every other Member from any and all liability for any and all liabilities, claims, losses, damages, expenses and other claims whatsoever the releasing Member, its officers, directors, trustees, agents, employees, affiliates, successors or assigns (collectively "<u>Related Parties</u>") may have that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. In addition, to the maximum extent permitted by applicable Law (i) no Member shall be liable to any other Member or its Related Parties for any liabilities, damages, obligations, payments, losses, costs or expenses under this Agreement in any amount in excess of the actual compensatory damages suffered by such other Member or its Related Parties in connection with, or resulting from, the releasing Member's performance or non-performance of this Agreement, or any actions undertaken by the releasing Member in connection with or related to this Agreement, and (ii) each Member waives any right to recover from any other Member or its Related Parties incidental, punitive, exemplary, special, indirect, multiple or consequential damages (including attorneys' fees or litigation costs to recover the same and any claims arising from any loss of interchange sales or revenues, loss of profits, costs of substitute power, costs of additional operating expenses, or suits by third parties) in connection with, or resulting from, performance or non-performance of this Agreement, or any actions undertaken in connection with or related to this Agreement or that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. Notwithstanding the foregoing, however, no Member shall be released, discharged, indemnified or held harmless with respect to any liability for damages or other claims arising from any action or failure to act by that Member that is unlawful, undertaken in bad faith, grossly negligent or the product of willful misconduct. Nothing herein shall release any

JA0358

Member from any obligation or liability it may have pursuant to any other agreement with any other Member.

9.2     EXCEPT FOR THE WARRANTIES AND REPRESENTATIONS SET FORTH IN ARTICLE 13 HEREOF, NONE OF THE MEMBERS, COLLECTIVELY OR INDIVIDUALLY, MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, TO ANY MEMBER, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.3     The provisions set forth in this Article 9 shall be given the maximum effect permitted by Law and shall indefinitely survive the termination or expiration of this Agreement with respect to any Member or Members.

9.4     No Fiduciary Duties.  Nothing in this Agreement should be construed or interpreted as creating a partnership by and among the Members. To the extent any Member attempts to construe this Agreement as evidence of a partnership or otherwise a basis for requiring certain implied duties and rights among the Members, notwithstanding any other provisions of this Agreement, or any other agreement, the Members covenant and agree not to prosecute, file or maintain any action, controversy, dispute, or proceeding, and do hereby expressly eliminate, waive, disclaim and release, any and all fiduciary duties of the Members that may arise pursuant to performance of their obligations or exercise of their rights pursuant to this Agreement, or that may arise pursuant to any other standard, to any Party herein, including, without limitation, its Members, and in the case of insolvency or the zone of insolvency, to creditors of any character or claim. This Agreement (including this provision) is not intended to, and shall not, create or impose any fiduciary duties on the Member or any other party for any purpose, without limitation.

9.5     No Implied Covenants. Each Member acknowledges and agrees that, and notwithstanding any other provisions of this Agreement or any other agreement contemplated herein or any applicable provisions of Law or equity or otherwise, no covenants, duties or obligations, whether express, implied, statutory or otherwise, including, without limitation, (i) the duty of good faith and fair dealing, (ii) the fiduciary duties of care, loyalty and obedience, shall apply to the acts, omissions, behavior or conduct of the Members, in any context, except for those covenants, duties and obligations expressly contained in this Agreement.

9.6     No Restriction on Competition of Members. Each of the Members agrees, severally and not jointly, that for the term of this Agreement, they are expressly permitted and authorized to directly or indirectly own, manage, operate, join, control and/or participate in the ownership, management, operation or control of, any business engaged in business or operations that compete or relate to, directly or indirectly, the business of the Southeast EEM System. The legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines shall not be applied to any such competitive venture or activity of a Member or its Affiliates. No Member or its Affiliates will have any obligation to the Southeast EEM System or the Southeast EEM System's other Members or Participants with respect to any opportunity relating to the Southeast EEM System or its business.

JA0359

# ARTICLE 10

## TRANSPARENCY; CONFIDENTIALITY; AUDITING

10.1    <u>Transparency; Confidentiality</u>.

10.1.1 The decision and obligation to report quantities, prices, or other data regarding Energy Exchange transactions to either a Governmental Entity, a reputable index developer or a data hub will be the responsibility of each Seller and Buyer. Neither the Southeast EEM Administrator, nor the Southeast EEM Agent nor the Members shall be responsible for reporting Energy Exchange transactions made by other entities through the Southeast EEM System.

10.1.2 Except as provided in <u>Appendix B</u>, the identity of all Bidders, Offerors, Sellers and Buyers shall be kept confidential from all third party entities, other than the FERC, the Market Auditor, and the Southeast EEM Administrator except to the extent required by Law, regulation, or order.

10.1.3 The Southeast EEM Administrator shall post and maintain on the Southeast EEM System Interface: (i) a list of all Members and Participants and their contact information, (ii) the notice provisions provided in this Agreement as set forth in Section 16.8, (iii) the notice information of each Annual Meeting and Annual Member Meeting, including the date, place and time of such Annual Meeting and Annual Member Meeting, and (iv) a current description of the Territory.

10.1.4 The Southeast EEM Administrator shall prepare and post reports that would include data aggregated by the Southeast EEM System as set forth in Section V of the Southeast EEM Market Rules.

10.2    <u>Auditing</u>.

10.2.1 The Southeast EEM Agent will engage the Market Auditor to perform the auditing scope of work as set forth in Section VI of the Southeast EEM Market Rules.

10.2.2 The Market Auditor and Southeast EEM Administrator may share information related to the Southeast EEM on a confidential and reciprocal basis.

10.2.3 The Market Auditor has independent authority to prepare and submit any reports described herein without any prior review or approval by any Member or any other outside sources.

10.3    Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this <u>Article 10</u> to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 11

## SOUTHEAST EEM MARKET RULES

11.1    Set out in <u>Appendix B</u> to this Agreement are the Southeast EEM Market Rules that shall govern the Bid, Offer and matching procedures of the Southeast EEM System and the reservation and tagging functions of the Southeast EEM System, as such appendix may be amended and revised from time to time by the Membership Board in accordance with <u>Section 4.1.9</u>.

11.2    The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to violate any reliability criteria, guideline, standard or requirement (hereafter referred to as "<u>Reliability Obligations</u>") of NERC, the applicable Balance Authority, and any other recognized region or subregion of NERC (including the SERC Reliability Corporation ("<u>SERC</u>")), including any successors to NERC or SERC, or applicable state or federal Reliability Obligations, to the extent any such Reliability Obligations are applicable to a Member. Each Member shall participate in the Southeast EEM System in a manner that conforms to all Reliability Obligations as may be applicable to it. The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to engage in conduct not consistent with Good Utility Practice.

11.3    The Operating Committee shall establish rules and procedures, including appropriate audit procedures, under which any Member may request a determination of whether the hardware, software, management, or operation of, or Member participation in, the Southeast EEM System, as they may affect the requesting Member, comply with all rules, guidelines, requirements and other standards for the Southeast EEM System as set forth in the Southeast EEM Market Rules in <u>Appendix B</u>. The Operating Committee, in a manner consistent with all applicable provisions of this Agreement, may make recommendations to the Membership Board to apportion the costs of making revisions or modifications to the Southeast EEM System.

## ARTICLE 12

## DISPUTE RESOLUTION

12.1    Any dispute between two (2) or more Members arising under this Agreement shall first be referred to a designated senior representative of each of the Members involved in such dispute for resolution on an informal basis as promptly as practicable. Such designated senior representatives shall meet, negotiate and attempt in good faith to resolve the dispute quickly, informally, and inexpensively. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days (or other such period as the Parties may agree upon) by mutual agreement, such dispute within ten (10) Business Days shall be submitted to a mediator and resolved in accordance with the mediation procedures set forth below.

12.2    Following the procedures set forth in <u>Section 12.1</u>, any dispute between two (2) or more Members arising under this Agreement shall be subject to non-binding mediation prior to the initiation of judicial, mutually agreed upon arbitration, or other dispute resolution proceedings, unless the Parties to the dispute mutually shall determine from the nature of the dispute, the

positions of the Parties, and other relevant facts and circumstances that mediation will not lead to resolution of the dispute. The Parties to any such dispute shall select a mediator to assist in the resolution of their dispute. The mediator shall (i) be knowledgeable in the subject matter of the dispute and (ii) have no official, financial, or personal conflict of interest with respect to the issues in controversy, unless the interest is fully disclosed in writing to all participants and all participants waive in writing any objection to the interest.

12.3    The disputing Parties shall attempt in good faith to resolve their dispute in accordance with the procedures and timetable established by the mediator. In furtherance of the mediation efforts, the mediator may:

12.3.1  Require the Parties to meet for face-to-face discussions, with or without the mediator;

12.3.2  Act as an intermediary between the disputing Parties;

12.3.3  Require the disputing Parties to submit written statements of issues and positions; and

12.3.4  If requested by the disputing Parties, provide a written recommendation on resolution of the dispute.

12.4    If a resolution of the dispute is not reached by the thirtieth (30th) day after the appointment of the mediator or such later date as may be agreed to by the Parties, the mediator shall promptly provide the disputing Parties with a written, confidential, non-binding recommendation on resolution of the dispute, including the mediator's assessment of the merits of the principal positions being advanced by each of the disputing Parties. At a time and place specified by the mediator after delivery of the foregoing recommendation, but no later than fifteen (15) days after issuance of the mediator's recommendation, the disputing Parties shall meet in a good faith attempt to resolve the dispute in light of the mediator's recommendation. Each disputing Party shall be represented at the meeting by a person with authority to settle the dispute, along with such other persons as each disputing Party shall deem appropriate. If the disputing Parties are unable to resolve the dispute at or in connection with this meeting, then: (i) any disputing Party may commence such judicial, mutually agreed upon arbitration, or other dispute resolution proceedings as may be appropriate; and (ii) the recommendation of the mediator shall have no further force or effect, and shall not be admissible for any purpose in any subsequent arbitral, judicial, or other dispute resolution proceeding.

12.5    The costs of the time, expenses, and other charges of the mediator and of the mediation process shall be borne by the Parties to the dispute, with each side in a mediated matter bearing equal costs. Each Party shall bear its own costs and attorney's fees incurred in connection with any mediation under this Agreement.

JA0362

## ARTICLE 13

## REPRESENTATIONS AND WARRANTIES

13.1    Each Member represents and warrants to each other Member that on the date it executes this Agreement and throughout the term of this Agreement, the following representations and warranties are, and will continue to be, true and correct in all material respects:

13.1.1  it is duly organized, validity existing and in good standing under the Laws of the state of its incorporation or organization;

13.1.2  it will at all times comply with the provisions of this Agreement and all Exhibits and Appendices hereto, each as amended from time to time;

13.1.3  it has all requisite corporate or other organizational power to carry on its business as contemplated by this Agreement;

13.1.4  except for the authorizations and approvals described in Article 8 of this Agreement, it has all authorizations from Governmental Entities necessary for it to legally perform its obligations under this Agreement;

13.1.5  the execution, delivery and performance of this Agreement and any other documentation it is required to deliver under this Agreement are within its powers, have been  duly authorized by all necessary action, and do not violate any of the terms or conditions in its governing documents, any contract or other agreement to which it is a party or any Law applicable to it;

13.1.6  the individual(s) executing and delivering this Agreement and any other documentation required to be delivered under this Agreement on behalf of such Member are duly empowered and authorized to do so at the time of such execution and delivery;

13.1.7  this Agreement has been duly and validly executed and delivered by such Member and constitutes such Member's legal, valid and binding obligation; and

13.1.8  all information that has been provided by or on behalf of a Member pursuant to this Agreement, is true and correct in all material respects. Each Member further covenants that all information provided to the Operating Committee, the Market Auditor, the Southeast EEM Agent or the Southeast EEM Administrator by or on behalf of such Member pursuant to this Agreement, subsequent to the date hereof, shall be true and correct in all material respects.

## ARTICLE 14

## DEFAULTS

14.1    A Member shall be in default in payment when payment is not made in accordance with the billing procedures established under this Agreement within ten (10) Business Days after its final due date. A default by any Member in its payment obligations under this Agreement shall be cured by payment of all overdue amounts together with interest accrued at the Interest Rate, prorated daily from the due date to the date the payment curing the default is made.

31

14.2     Notwithstanding Article 9, a defaulting Member shall be liable to the non-defaulting Members for all costs, including costs of collection and reasonable attorney fees incurred by such non-defaulting Members, plus interest at the Interest Rate. The proceeds paid by a defaulting Member to remedy any such default shall be distributed as directed by the Membership Board to the non-defaulting Members in proportion to the additional costs and expenses actually paid by the non-defaulting Members as a result of the default.

14.3     The rights of a Member who is in default of any of its payment or other material obligations herein may be terminated by the Membership Board. This provision allowing the non-defaulting Members to terminate such rights is in addition to any other remedies provided in this Agreement, at Law, or in equity, and shall in no way limit the non-defaulting Members' ability to seek judicial enforcement of the defaulting Member's obligations under this Agreement. Upon the effective date of such termination of rights, all rights of the defaulting Member and all obligations of non-defaulting Members to the defaulting Member imposed by this Agreement, except (i) payment obligations, (ii), the indemnification obligations set forth in Section 6.5, (iii) the release and other obligations set forth in Article 9, (iv) the confidentiality obligations set forth in Article 10 and Article 15, and (v) the obligations set forth in Section 16.9 and Section 16.14, shall immediately be terminated, except that no such termination shall impact Enabling Agreements any such Member is a party to.

14.4     Upon termination of the rights of a defaulting Member under this Agreement, the Operating Committee shall review responsibility and cost allocations of the non-defaulting Members and make adjustments thereto as it deems necessary.

## ARTICLE 15

## CONFIDENTIALITY

15.1     Any information provided by a Member to any other Member pursuant to this Agreement that is labeled "Confidential" shall be used by the receiving Member solely in connection with the purposes of this Agreement and shall not be disclosed by the receiving Member to any third party, except with the providing Member's consent, and upon request of the providing Member shall be returned thereto. Notwithstanding the above, a Member may disclose any such information to third parties as may be necessary for such Member to perform its obligations under this Agreement (including, but not limited to, the Member's employees, officers, directors, trustees, attorneys and other consultants). To the extent that such disclosures are necessary, the Members shall endeavor in disclosing any such information to seek to preserve the confidentiality of such information. This provision shall not prevent any Member from providing any confidential information received from any other Member to any court or governmental body to enforce its rights or perform its obligations hereunder or as may otherwise be required by such court or body or by Law, provided that, to the extent required, if feasible, the disclosing Member shall have given prior notice to the Member that provided such information of such required disclosure and, if so requested by such other Member, shall have used all reasonable efforts to oppose the requested disclosures, if appropriate under the circumstances, or to otherwise make such disclosure pursuant to a protective order or other similar arrangement for confidentiality. Without limiting the scope of the foregoing, the Members shall use all reasonable efforts to maintain the confidentiality of any confidential information in any filings with, or submissions to, any governmental or regulatory

JA0364

authorities. Information shall not be considered confidential for purposes of this Article 15 if the Member receiving such information from another Member can demonstrate by competent documentary evidence that such information: (a) was rightfully in the possession of the receiving Member prior to its disclosure to the receiving Member by the disclosing Member; (b) was in the public domain prior to its disclosure by the disclosing Member to the receiving Member; (c) came into the public domain, by publication or otherwise, through no direct or indirect act or omission of the receiving Member, subsequent to its disclosure by the disclosing Member to the receiving Member; or (d) was supplied to the receiving Member by a third party having the legal right to disclose it to the receiving Member, but only if the third party does not owe a duty of confidentiality to the disclosing Member with respect to such information.

15.2    Any information provided by a Member to a mediator or arbitrator pursuant to this Agreement that is labeled "Confidential" shall be subject to the provisions of this Article 15. For such purposes, any mediation or arbitration arranged pursuant to Article 12 of this Agreement shall provide for such mediator or arbitrator to comply with the provisions applicable to a Member receiving Confidential information from another Member.

15.3    Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this Article 15 to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 16

## MISCELLANEOUS

16.1    "Public Utility" Status of Members. Certain Members are not Public Utilities. Nothing in this Agreement is intended to subject such Members to FERC jurisdiction as Public Utilities, and Members that are not Public Utilities shall not be required to take any action or participate in any filing or appeal that would confer FERC jurisdiction over such Members that does not otherwise exist.

16.2    Transfer of Interest in Agreement. No voluntary transfer of interest, rights, or obligations of any Member under this Agreement shall be made without the written consent and approval of all other Members except to a successor in operation of all or substantially all of its electric utility assets. Written approval when required shall not be unreasonably withheld. Any successor or assignee of the rights of any Member, whether by voluntary transfer, judicial or foreclosure sale or otherwise, shall be subject to all the provisions and conditions of this Agreement, to the same extent as though such successor or assignee were the original Member hereunder, and no assignment or transfer of any rights hereunder shall be effective unless and until the assignee or transferee agrees in writing to assume all of the obligations of the assignor or transferor and to be bound by all of the provisions and conditions of this Agreement; provided, that the execution of a mortgage or trust deed or a judicial or foreclosure sale made thereunder, or if through the disposition by the Administrator of the RUS, shall not be deemed a voluntary transfer within the meaning of this Section 16.2. If, due to reorganization, sale/purchase, or other means, a Member no longer owns or operates generation or has load obligation in the Territory, its membership(s) will be evaluated by the Operating Committee and any appropriate change in representation will be subject to approval of the Operating Committee.

JA0365

16.3    Relationship of Parties.

16.3.1 Nothing contained herein shall be construed to create an association, joint venture, trust, or partnership, or impose a trust, partnership, covenant, obligation, or liability on or with regard to any one or more of the Parties. Each Party shall be individually responsible for its own covenants, obligations, and liabilities under this Agreement.

16.3.2 All rights of the Parties are several, not joint. No Party shall be under the control of or shall be deemed to control another Party. Except as expressly provided in this Agreement, no Party shall have a right or power to bind another Party without its express written consent.

16.4    Third Party Beneficiaries.  This Agreement shall not be construed to create rights in, or to grant remedies to, any third party as a beneficiary of this Agreement, or of any duty, obligation or undertaking established herein. No party not a signatory hereto shall be entitled to enforce this Agreement against any person or entity.

16.4.1 No Reliance Interest on Non-Firm Energy Exchange Transmission Service. Notwithstanding anything to the contrary in this Agreement, Non-Firm Energy Exchange Transmission Service over a Participating Transmission Provider's transmission system shall only be offered to the extent of that Participating Transmission Provider's participation in the Southeast EEM, and only for that purpose.  For the avoidance of doubt, owing to the voluntary nature of a Member's participation in this Agreement, membership in this Agreement shall not give rise to any third-party expectation or reliance interest on the availability of Non-Firm Energy Exchange Transmission Service upon the withdrawal of a Member.

16.5    No Dedication of Facilities.  Any undertaking by one Party to another Party under any provision of this Agreement shall not constitute the dedication of the Southeast EEM System or any portion thereof of the undertaking Party to the public or to the other Party, and it is understood and agreed that any such undertaking by a Party shall cease upon the termination of such Party's obligations under this Agreement.

16.6    Other Agreements.  No provision of this Agreement shall preclude a Member from entering into other agreements or conducting transactions under existing agreements (including where applicable any Enabling Agreements) with other Members, Participants or Additional Members. This Agreement shall not be deemed to modify or change any rights or obligations under any prior contracts or agreements between or among any of the Members.

16.7    Further Assurances.  The Parties to this Agreement hereby agree to provide all other information, execute and deliver any further instruments or documents, and take or forbear from any further acts that may be reasonably required or useful to carry out the intent and purpose of this Agreement, provided that such requirements are consistent with the express terms of this Agreement and all applicable Laws and regulations, and in the case of confidential information subject to Article 15 of this Agreement. Without limiting the scope of the foregoing, each Member shall, subject to the confidentiality provisions set forth in Article 15, provide the Membership Board with any information that is reasonably necessary to operate the Southeast EEM System or for the Operating Committee or the Southeast EEM Administrator to implement any provisions of this

Agreement, or any other business related to the development or the operation of the Southeast EEM System.

16.8 <u>Notices</u>. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be (i) delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such recipient as recorded in the Secretary's records, and (ii) delivered in person, by nationally recognized overnight courier service, or by first class mail, certified or registered, postage prepaid, to the addresses of the Members set forth in <u>Exhibit A</u> hereto. Any Member may change its address by giving notice in writing stating its new address to the Southeast EEM Administrator and the Secretary, and the Secretary shall promptly update <u>Exhibit A</u> accordingly. Any notice, demand or other communication shall be deemed given and effective as of the date of delivery in person or upon receipt as set forth on the return receipt if delivered by certified or registered mail or by overnight courier service. The inability to deliver because of changed address of which no notice was given, or the rejection or other refusal to accept any notice, demand or other communication, shall be deemed to be receipt of the notice, demand or other communication as of the date of such inability to deliver or the rejection or refusal to accept.

16.9 <u>Amendments</u>. Except as otherwise provided in the following two sentences, this Agreement, including each of the <u>Exhibits</u> and <u>Appendices</u> hereto, may be modified or amended in the manner set forth in this <u>Section 16.9</u>, <u>Article 4</u>, and <u>Article 8.</u> In accordance with <u>Article 3</u> of this Agreement, an entity that meets the criteria for qualification and admission as a Member, as determined by the Membership Board, may become an Additional Member and a Party to this Agreement by executing this Agreement or a Joinder hereto, and upon payment of all applicable fees, dues and contributions so specified or authorized in this Agreement, the Secretary shall revise, or cause to be revised, <u>Exhibit A</u> to include such Additional Member. The Parties hereby stipulate and agree that this Agreement was entered into as a result of arm's-length negotiations between the Parties. Further, the Parties believe that the terms and conditions of this Agreement are just and reasonable and shall remain so over the life of the Agreement. The Parties waive all rights to challenge the validity of this Agreement or whether it is just and reasonable for and with respect to the entire term, and hereby agree to make no filings with any Governmental Entity challenging the terms and conditions of this Agreement as to whether they are just and reasonable or in the public interest. The Parties hereby further stipulate and agree that no Party may bring or support any action, proceeding or complaint seeking to modify, cancel, suspend, or abrogate the terms and conditions of this Agreement. Absent an amendment to this Agreement pursuant to <u>Section 4.1.9,</u> <u>Article 4</u> and <u>Article 8</u> approving the proposed change, the standard of review for changes to any portion of this Agreement proposed by a non-Party, or FERC acting *sua sponte*, shall be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event shall be lower than the "public interest" standard of review set forth in *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

16.10 <u>Headings</u>. Section headings used in this Agreement are for convenience and reference only and are not to be considered in construing the terms of this Agreement.

16.11 <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to its conflict of laws principles or rules.

JA0367

16.12 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof. This Agreement supersedes all prior agreements and oral understandings among the Members with respect to such matters.

16.13 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument, binding upon all Parties hereto, notwithstanding that all of such Parties may not have executed the same counterpart.

16.14 <u>WAIVER OF JURY TRIAL</u>. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH MEMBER WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

JA0368

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: __December 28, 2020__

Member: _Associated Electric Cooperative, Inc._

By: _[signature]_

Name: _DAVID J. TUDOR_

Title: _CEO & GM_

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: 12/18/2020

Member: Dalton Utilities

By: _[signature]_

Name: William R. McDaniel III

Title: Director of Energy Services

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:___December 18, 2020_____

Dominion Energy South Carolina, Inc.

Member:_____

By: _Kelly Kissam_____

Name: __Keller Kissam_____

Title: _President, Electric Operations_

REVIEWED
BY
LEGAL
12/16/20

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: February 8, 2021

Member: Duke Energy Carolinas, LLC

By: *V. Nelson Peeler*

Name: V. Nelson Peeler

Title: SVP, Trans and Fuels Strategy and Policy

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

JA0372

       **IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: February 8, 2021

Member: Duke Energy Progress, LLC

By: *V. Nelson Peeler*

Name: V. Nelson Peeler

Title: SVP, Trans and Fuels Strategy and Policy

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:

By:

Name:

Title:

    **IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:   December 28, 2020

Member: *Kentucky Utilities Company*

By: *[signature]*

Name: *Lonnie E. Bellar*

Title: *Chief Operating Officer*

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

    **IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:      December 28, 2020

Member: *Louisville Gas and Electric Company*

By: *[signature]*

Name: *Lonnie E. Bellar*

Title: *Chief Operating Officer*

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: February 10, 2021

**Member:** North Carolina Electric Membership Corporation

**By:** _____

**Name:** Joseph P. Brannan

**Title:** Executive Vice President & CEO

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE:  December 22, 2020

Member: North Carolina Municipal Power Agency Number 1

By:

Name:  Matthew E. Schull

Title:  Chief Operating Officer

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By:  _____

Name:  _____

Title:  _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: 12|21|2020

Member: _PowerSouth Energy Cooperative_

By: _Gary Smith_

Name: _Gary Smith_

Title: _President & CEO_

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

Form Approved By Legal Dept.

_Virginia Whitus_

Date 12|21|2020

JA0378

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE: <u>December 21, 2020</u>

Member:  <u>Southern Company Services, as agent for Alabama Power Company, Georgia Power Company, and Mississippi Power Company</u>

By: _____

Name:  <u>Adrianne Collins</u>

Title:  <u>SVP, Power Delivery</u>

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:  <u>Southern Company Services, as agent for Alabama Power Company, Georgia Power Company, and Mississippi Power Company</u>

By: _____

Name:  <u>Adrianne Collins</u>

Title:  <u>SVP, Power Delivery</u>

JA0379

       **IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

  DATE:  December 17, 2020

Member:  Tennessee Valley Authority

By:

Name:  Aaron P. Melda

Title:  Senior Vice President

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By:       _____

Name:    _____

Title:     _____

## EXHIBIT A

## NAMES AND ADDRESSES OF THE MEMBERS

**Alabama Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Associated Electric Cooperative, Inc.**
2814 S. Golden
PO Box 754
Springfield, MO 65807

**Dalton Utilities**
1200 VD Parrott, Jr. Parkway
PO Box 869
Dalton, GA 30722

**Dominion Energy South Carolina, Inc.**
220 Operation Way, MC C222
Cayce, SC 29033

**Duke Energy Carolinas, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Duke Energy Progress, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Georgia Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Georgia System Operations Corporation**
2100 East Exchange Place
Tucker, GA 30084

**Georgia Transmission Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**Kentucky Utilities Company**
One Quality Street
Lexington, KY 40507

**Louisville Gas and Electric Company**
220 West Main Street
Louisville, KY 40202

**MEAG Power**
1470 Riveredge Pwky., NW
Atlanta, GA 30328

**Mississippi Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**North Carolina Electric Membership Corporation**
3400 Sumner Blvd.
Raleigh, NC 27616

**North Carolina Municipal Power Agency No. 1**
1427 Meadow Wood Blvd.
Raleigh, NC 27604

**Oglethorpe Power Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**PowerSouth Energy Cooperative**
2027 East Three Notch Street
Andalusia, AL 36421

**Santee Cooper**
One Riverwood Avenue
Moncks Corner, SC 29461

**Tennessee Valley Authority**
400 West Summit Hill Drive, WT 6A-K
Knoxville, Tennessee 37902

**EXHIBIT B**

**FORM OF JOINDER AGREEMENT**

**JOINDER AGREEMENT**

Reference is made to the Southeast Energy Exchange Market Agreement, dated as of December 28, 2020, as the same may be amended from time to time (the "Southeast EEM Agreement"), by and among the entities listed on Exhibit A thereto. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Southeast EEM Agreement.

The undersigned hereby agrees to become a Member of the Southeast EEM and be bound by the terms of the Southeast EEM Agreement as if an original party thereto. The Membership Board hereby consents to the addition of the undersigned as a Member of the Southeast EEM and as party to the Southeast EEM Agreement as if an original party thereto. A duly executed copy of this Joinder Agreement shall be delivered to the Secretary and the Southeast EEM Administrator.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed as of the date set forth below.

Date: _____ ___, 20__

[NAME OF JOINING MEMBER],
A [Jurisdiction] [Entity Type]

By: _____

Name: _____

Title: _____

ACKNOWLEDGED AND ACCEPTED:

By: _____

Name: _____

Title: Secretary, Membership Board

## APPENDIX A

## FORM OF PARTICIPANT AGREEMENT

1.0     This Participant Agreement ("Agreement"), dated as of _____, is entered

into, by and between [INSERT NAME OF ENTITY], the Southeast EEM Agent acting in

its capacity as the agent of the Members of the Southeast Energy Exchange Market

("Southeast EEM") and_____ ("Participant").

2.0     The Participant and Southeast EEM agree that this Agreement shall incorporate, in their

entirety, Appendix B to the Southeast EEM Agreement ("Southeast EEM Market Rules"),

designated as Alabama Power Company's Market Based Rate Tariff, Rate Schedule No.

1011, Southeast EEM Agreement, and the Southeast EEM Manuals.  Any term not defined

herein shall have the meaning ascribed to it in the Southeast EEM Market Rules.  In the

event of any conflict between this Agreement and the Southeast EEM Market Rules, the

Southeast EEM Market Rules shall control.

3.0     The Participant has submitted an application for participation in the Southeast EEM and

has been determined by the Southeast EEM to meet all requirements of being a Participant

as defined in the Southeast EEM Market Rules. The Participant warrants that all

information submitted in the application is true and accurate.

4.0     The Participant agrees to be bound by and accepts all of the terms of the Southeast EEM

Market Rules and the Southeast EEM Manuals, as both may be amended from time to time.

Any amendments to the Southeast EEM Market Rules or the Southeast EEM Manuals are

automatically and without further action incorporated into this Agreement.

1

5.0     The Southeast EEM agrees that Participant shall be deemed a "<u>Participant</u>" under the terms of the Southeast EEM Market Rules, with all rights of participation and access to the Southeast EEM System afforded Participants under the Southeast EEM Market Rules.

6.0     The Participant shall supply the Southeast EEM Administrator with any and all information deemed reasonably necessary for the administration of the Southeast EEM System.

7.0     Either Party can assign or transfer any or all of its rights and/or obligations under this Agreement upon thirty (30) days written notice. Any such transfer or assignment shall be conditioned upon the successor in interest accepting the rights and/or obligations under this Agreement as if said successor in interest was an original Party to this Agreement.

8.0     An event of "<u>Force Majeure</u>" means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, pandemic, epidemic, breakage or accident to machinery or equipment, any curtailment, order, regulation or restriction imposed by governmental military or lawfully established civilian authorities or any other cause beyond a Party's control. A Force Majeure event does not include an act of negligence or intentional wrongdoing. Neither the Southeast EEM Agent, the Southeast EEM, the Members, nor the Participant will be considered in default as to any obligation under this Agreement if prevented from fulfilling the obligation due to an event of Force Majeure. However, a Party whose performance under this Agreement is hindered by an event of Force Majeure shall make all reasonable efforts to perform its obligations under this Agreement.

9.0    The Participant shall at all times indemnify, defend, and save the Southeast EEM System, the Southeast EEM Agent and the Southeast EEM Administrator harmless from, any and all damages, losses, claims, including claims and actions relating to demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from the Southeast EEM Agent's or Southeast EEM Administrator's, as applicable, performance of its obligations under this Agreement and the Southeast EEM Market Rules, except in cases of negligence or intentional wrongdoing by the Southeast EEM Agent or Southeast EEM Administrator, as applicable.

10.0   This Agreement shall be deemed to be a contract made under, and for all purposes shall be governed by and construed in accordance with, the laws of the State of Delaware.

11.0   This Agreement shall be effective upon execution by both parties and shall remain in full force and effect until terminated pursuant to Sections 12 or 13 of this Agreement.

12.0   The Southeast EEM may terminate this Agreement by providing written notice of termination to the Participant in the event the Participant commits a material violation of its obligations under the terms of the Southeast EEM Market Rules which, if capable of being remedied, is not remedied within thirty (30) days after the date the Southeast EEM has given the Participant written notice of the violation, unless excused by reason of Force Majeure as provided in Section 8 of this Agreement.

13.0   The Participant may terminate this Agreement upon thirty (30) days written notice to the Southeast EEM.

14.0    Upon termination of this Agreement for any reason, Participant shall not have access to the Southeast EEM System, nor be entitled to submit Bids or Offers thereunder.

15.0    This Agreement may be executed in one or more counterparts at different times, each of which shall be regarded as an original and all of which, taken together, shall constitute one and the same Agreement.

16.0    Any notice or request made to either of the Parties to this Agreement shall be made to the following representatives:

Southeast EEM                    Participant

Title:          _____          _____

Address:        _____          _____

                _____          _____

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective authorized officials.

Southeast EEM                              Participant

By: _____          By: _____

Name: _____        Name: _____

Title: _____       Title: _____

Date: _____        Date: _____

JA0387

**APPENDIX B**

**SOUTHEAST EEM MARKET RULES**

## I.    INTRODUCTION AND APPLICABILITY.

Set forth below are the rules governing: 1) Participation in the Southeast EEM; 2) Bidding, Offering,  and matching procedures for Energy Exchanges arranged through the Southeast EEM System, 3) Southeast EEM System data reporting, and 4) the processes for auditing Energy Exchanges and the hardware, software, management and operation of the Southeast EEM System. This Appendix B is subject to the terms and conditions of the Agreement. In the event of a conflict between the terms of the Agreement and the terms of this Appendix B, the terms of the Agreement shall control.

## II.    DEFINITIONS.

The following terms shall be defined as indicated for the purposes of this Appendix B. Definitions and terms expressed in the singular shall include the plural and *vice versa*.   Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

"Agreement" means the Southeast Energy Exchange Market Agreement By and Among the Members of the Southeast EEM to which this Appendix B is appended.

"Balancing Authority" means the responsible entity that integrates resource plans ahead of time, maintains demand and resource balance within a Balancing Authority Area, and supports interconnection frequency in real time.

"Balancing Authority Area" means the collection of generation, transmission and loads within the metered boundaries of the Balancing Authority.  The Balancing Authority maintains load-resource balance within this area.

"Bid" means a voluntary submission containing the required Bid Information to purchase a certain amount of Non-Firm Energy (set forth in MW).

"Bid Information" means the information applicable to Bids set forth in Section IV.B.3.

"Bid Price" means the price, in $/MWh for the amount of Non-Firm Energy submitted in a Bid.   This represents the maximum price that the Bidder is willing to pay.

"Bidder" means a Participant who submits a Bid into the Southeast EEM System.

"Buyer" means a Bidder that has been matched with an Offeror for an Energy Exchange through the Southeast EEM System.

"Clock Hour" means the sixty-minute period ending at :00.

"Company System Administrator" has the meaning set forth in Section VI.B.2.

1

"Contract Path" means the continuous transmission path for the flow of Non-Firm Energy between the Participants reserved for an Energy Exchange using the transaction matching, reservation and tagging functions of the Southeast EEM System.

"Delivery Interval" means a fifteen (15) minute period in which Non-Firm Energy is intended to be delivered by a Seller to its matched Buyer(s).

"Energy Exchange" means a transaction for the purchase and sale of Non-Firm Energy in the Southeast EEM between Buyers and Sellers pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Rules.

"Electronic Tag" or "e-Tag" means the primary method for coordination of Interchange Schedules or Energy Schedules where Energy is transferred between Balancing Authority Areas and coordination required between multiple entities. Various entities can communicate important information pertaining to the Interchange transaction to each other via the internet using computer applications, which are based on the e-Tag specifications and schema maintained by the North American Energy Standards Board ("NAESB").

"Energy Exchange Notification" means the notice provided to Bidders and Offerors who were matched for an Energy Exchange by the Southeast EEM Algorithm; to be automatically generated by the Southeast EEM System and provided before the start of a Delivery Interval; and to include data on the matched Energy Exchange including Buyer, Seller, price, amount of Non-Firm Energy, Source, Sink, delivery location, applicable Delivery Interval, and other any other necessary data for Participants to record the transaction.

"Energy Exchange Price" means the price, in $/MWh, calculated by the Southeast EEM Algorithm for a specific Energy Exchange.

"FERC" means the Federal Energy Regulatory Commission.

"Good Utility Practice" means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment and in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice does not require the optimum practice, method, or act to the exclusion of all others, but rather is intended to include acceptable practices, methods, or acts generally accepted in the SERC Reliability Corporation region.

"Losses" means the total cost of the electrical energy lost in the transmission of electrical energy from a Source to a Sink based on the real power loss factor (%) ("Loss Factor") and loss rate ($/MWh) ("Loss Rate") of each Participating Transmission Provider on the Energy Exchange's Contract Path.

"NAESB Electric Industry Registry" or "NAESB EIR" means thea central registry and repository of information required for commercial transactions that is maintained by NAESB.

"Network Map" means the computer-based representation of all Participating Transmission Provider service territories, Balancing Authorities, valid transmission paths (Point of Receipt – Point of Delivery combinations), Sources, and Sinks.

"Non-Firm Energy" means a product for which delivery or receipt of the energy may be interrupted for any reason or no reason, without liability on the part of either buyer or seller.

"Non-Firm Energy Exchange Transmission Service" means transmission service provided by a transmission provider, pursuant to its Tariff, that has the following characteristics: (i) it is non-firm transmission service with the lowest curtailment priority, provided solely on an as-available basis for 15-minute Energy Exchanges, after taking into account other higher priority uses and the limitations of the transmission system of the Participating Transmission Provider; (ii) it is available solely for Energy Exchanges; (iii) it is identified and offered in the Tariff as "Non-Firm Energy Exchange Transmission Service;" (iv) the charge for such service, and related Schedule 1 and Schedule 2 (or equivalent) ancillary services, is $0/MWh; (v) the charge for financial losses is based on the methodology established in the Participating Transmission Provider's Tariff; (vi) the service must be obtained by a Participant using the transaction matching, reservation and tagging functions of the Southeast EEM System, rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by a Participating Transmission Provider; (vii) the service may not be reassigned, redirected, or sold by the transmission customer; (viii) in combination with the other Participating Transmission Providers' provisions of Non-Firm Energy Exchange Transmission Service, the service allows for a continuous Contract Path for Energy Exchanges; and (ix) the Participating Transmission Provider is required to provide the information specified in and as required by Section IV.A.2 of the Southeast EEM Market Rules to the Southeast EEM System. For the avoidance of doubt, nothing in this Agreement shall obligate any Participating Transmission Provider to (a) plan, construct, or maintain its transmission system for the benefit of any Participant; (b) provide Non-Firm Energy Exchange Transmission Service in a manner that is contrary to the terms of the Participating Transmission Provider's Tariff, or contrary to Good Utility Practice, each as determined in the sole judgment of the Participating Transmission Provider; (c) provide Non-Firm Energy Exchange Transmission Service following termination of its Southeast EEM Member status; (d) provide Non-Firm Energy Exchange Transmission Service to a non - Participant; or (e) file its Tariff with FERC if the Tariff is not already required to be filed with FERC.

"OASIS" means an Open Access Same-Time Information System that conforms to the requirements of Part 37 of the FERC's regulations, 18 CFR §§ 37.1, et seq.

"OATI webRegistry" means the system developed by Open Access Technology International, Inc. to perform the NAESB EIR functions.

"Offer" means a voluntary submission containing the required Offer Information to sell a certain amount of Non-Firm Energy (set forth in MW).

"Offer Price" means the price, in $/MWh for the amount of Non-Firm Energy offered in an Offer. This represents the minimum price that the Offeror is willing to collect to sell.

"Offer Information" means the information applicable to Offers set forth in Section IV.B.3, as well as other information that may be required by the Southeast EEM Administrator.

"Offeror" means a Participant who submits an Offer into the Southeast EEM System.

"Participant Profile" means that information identified in Section IV.A.1., Section IV.C.6., and such other information requested by the Southeast EEM System Interface to assist in the creation of Energy Exchanges.

"Participant" means an entity that meets the requirements set forth in Section III of this Appendix B.

"Participant Specific Constraints" has the meaning set forth in Section IV.A.1.b. and IV.C.5.

"Seller" means an Offeror that has been matched with a Buyer through the Southeast EEM System.

"Sink" means a pre-approved and validated OATI webRegistry sink point.

"Source" means a pre-approved and validated OATI webRegistry source point.

"Southeast EEM Algorithm" means the mathematical equations that determine the matching Bids and Offers resulting in Energy Exchanges.

"Southeast EEM System Interface" means the graphical user interface ("GUI") and application programming interfaces ("API") used by the Southeast EEM System that meet the Southeast EEM System requirements developed by the Southeast EEM Administrator and the Operating Committee.

"Southeast EEM Manuals" means the instructions, rules, procedures and guidelines established by the Operating Committee for the Southeast EEM.

"System Administrators" means, collectively, the Southeast EEM Administrator and Company System Administrators.

## III.   PARTICIPATION

A.   Any entity that meets the requirements of this Section III may become a Participant.

B.   A Participant must:

1.   Own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory;

2.   Execute a Participant Agreement in the form attached to the Agreement as Appendix A (the "Participant Agreement") which agreement shall, among

JA0391

other things, contractually bind such entity to comply with the rules set forth in this Appendix B;

3.    Deliver the executed Participant Agreement to the Secretary and the Southeast EEM Administrator, which shall become effective when countersigned by the Southeast EEM Agent at the direction of the Operating Committee;

4.    Execute and deliver a Non-Firm Energy Exchange Transmission Service Agreement with each Participating Transmission Provider who requires delivery of such agreement, or otherwise have access to Non-Firm Energy Exchange Transmission Service from each Participating Transmission Provider; and

5.    Have or enter into an Enabling Agreement with at least three (3) or more Participants.

## IV.    BIDS/OFFERS AND MATCHING PROCEDURES.

### A.    Pre-Bid/Offer Information Requirements.

1.    Information Submitted by Participants.

a.    Prior to being permitted to submit Bids or Offers, each Participant shall provide the Southeast EEM all required information in its Participant Profile. Participants are responsible for providing accurate information to the Southeast EEM System in its Participant Profile, as well as submitting any updates or modifications to the Southeast EEM Administrator to maintain the accuracy of Participant's Profile.

b.    Participant-Specific Constraints.

i.    Prior to being permitted to submit Bids or Offers, each Participant shall provide to the Southeast EEM in its Participant Profile, any constraints the Southeast EEM Algorithm must take into account in matching Bids or Offers from such Participant ("Participant-Specific Constraints"). Participant-Specific Constraints can be either counterparty specific or geographic.

ii.    Offers from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific Constraints are set such that there are at least three other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Seller, and Bids from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific

5

Constraints are set such that there are at least three (3) other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Buyer.

iii. Participants shall not be required to provide a reason for any Participant-Specific Constraint. The reason for such constraints could be, but is not limited to, the following:

(a) Lack of an Enabling Agreement with a Participant;

(b) Counterparty issues (e.g., credit);

(c) Affiliates restrictions; and

(d) Geographic issues causing supply or delivery point restrictions and related regulatory requirements.

c. Prior to being permitted to submit Bids or Offers, each Participant must affirm that it has executed Service Agreements for Non-Firm Energy Exchange Transmission Service with each Participating Transmission Provider that requires delivery of such agreement or that it otherwise has access to Non-Firm Energy Exchange Transmission Service as to each Participating Transmission Provider through such Participating Transmission Provider's Tariff.

2. Prior to being permitted to provide Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall provide sufficient information to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM Territory for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges.

3. Participant shall supply the Southeast EEM Administrator with any and all information the Operating Committee deems reasonably necessary for the administration of the Southeast EEM System.

## B. Bids and Offers.

1. Delivery Intervals. Each Clock Hour will consist of four (4) Delivery Intervals:

xx:00 to xx:15;

xx:15 to xx:30;

xx:30 to xx:45; and

JA0393

xx:45 to xx:00 of the next Clock Hour.

2.    Deadlines.

a.    For each Clock Hour, every Participating Transmission Provider's available capacity for NFEETS must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of such next Clock Hour.  To the extent a Participating Transmission Provider can update its available capacity for NFEETS within a Clock Hour, such updated information must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of the applicable Delivery Interval.

b.    Each Participating Transmission Provider's Loss Factor and Loss Rate must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes prior to the Clock Hour for which the Loss Factor and Loss Rate are to apply.  If the Participating Transmission Provider does not update its Loss Factor and Loss Rate, the values for the prior Clock Hour will apply.

c.    Bid and Offers must be submitted through the Southeast EEM System Interface not earlier than seven (7) days prior to the applicable Delivery Interval and not later than fifteen (15) minutes prior to the Delivery Interval for which they are submitted. Participants may modify or cancel previously submitted Bids or Offers at any time before 15 minutes prior to the upcoming Delivery Interval; no further modifications may be submitted to a Bid or Offer within the fifteen (15)-minute period prior to the applicable Delivery Interval.

d.    The Southeast EEM System will: 1) match the Bids and Offers for the next Delivery Interval, subject to the constraints and limitations established pursuant to this Appendix; and 2) provide an Energy Exchange Notification to all Participants who were matched as an Energy Exchange for the upcoming Delivery Interval, and 3) submit all necessary transmission reservations and e-Tags ten (10) minutes prior to the relevant Delivery Interval.

3.    Bid and Offer Requirements.

a.    Each Bid or Offer must include the following components:

i.    Participant name.

ii.   Whether the submission is a Bid or an Offer.

7

       iii.     An amount of Non-Firm Energy (MW) for the Bid or Offer in increments of 4MW blocks.

       iv.     For all Offers, an Offer Price and for all Bids, a Bid Price.

       v.     For all Offers, a Source and for all Bids, a Sink.

       vi.     The specific Delivery Interval to which the Bid or Offer applies.

       vii.     Whether the submission: 1) must be matched in full or not at all or 2) can be matched at any volume below the Bid or Offer volume (subject to the 4MW increment rule) ("All or Nothing Selection").

       viii.     Any other components as may be required for the Southeast EEM System to perform actions set forth in Section IV.C of this Appendix or to generate the reports described in Section V of this Appendix.

    **b.**     An Offer may include the maximum Energy Exchange Price that the Participant is willing to accept for a particular Source/Sink pair for the applicable Delivery Interval.

    **c.**     Participants are permitted to submit multiple Bids or Offers for the same Delivery Interval with varying Source or Sink locations, as applicable, Non-Firm Energy amounts, and pricing, subject to any limitation on the number of Bids or Offers that may be submitted at any one Source or Sink for a particular Delivery Interval as may be established in the Southeast EEM Manuals.

    **d.**     Submission of Bids and Offers is voluntary; Participants are not required to submit any Bids or Offers for any Delivery Interval.

**C.**    **Matching.**

    **1.**    Subject to the constraints defined below and all Bid Information and Offer Information, the Southeast EEM Algorithm will evaluate all Bids and Offers for each Delivery Interval and produce Energy Exchanges.

        The Southeast EEM Algorithm will match Bids and Offers so as to result in Energy Exchanges that maximize the Southeast Energy Exchange Market total benefit for the applicable Delivery Interval while simultaneously honoring all the requirements identified in Section IV.A.1 and the constraints identified in Section IV.C.6. The total benefit shall be calculated by aggregating the benefits from each Energy Exchange for the applicable Delivery Interval.

JA0395

**2.** The benefit associated with each Energy Exchange will be calculated by taking the difference between the Bid Price and Offer Price and multiplying it by the MW amount of Non-Firm Energy identified in the Energy Exchange, <u>less</u> the costs of transmission services (Losses) provided along the Contract Path.

**3.** For any Energy Exchange where the Energy Exchange Price exceeds the maximum value submitted in accordance with Section IV.B.3.b., the Energy Exchange Price will be adjusted down to that maximum value, such that the total benefit associated with the Energy Exchange remains the same, but the benefit allocation will be adjusted in the Buyer's favor.

**4.** Matching Principles.

    **a.** Whole and/or partial amounts of Non-Firm Energy shall be matched, consistent with the Participant's All or Nothing Selection in its Bid Information or Offer Information.

    **b.** Bids or Offers that can be matched with multiple Participants shall be allowed, subject to the matching rules set forth in this Appendix.

**5.** Match/Energy Exchange Price.

    **a.** Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.

    **b.** Data demonstrating Losses will be incorporated into the Energy Exchange Price.

        i. Each Participating Transmission Provider determines the method for pricing its Losses;

        ii. Each Participating Transmission Provider is responsible for updating its Tariff to address how Losses will be priced; and

        iii. Loss Rate and Loss Factor are an input into the algorithm by the relevant Participating Transmission Provider.

**6.** Constraints.

    **a.** Participant-Specific Constraints. In matching Bids and Offers, the Southeast EEM Algorithm will take into account the Participant-Specific Constraints submitted by the Bidders and Offerors in accordance with Section IV.A.1.b.

JA0396

**b.** Generally Applicable Constraints.

  i. In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the available capacity for NFEETS on any given Contract Path to be exceeded.

  ii. Energy Exchanges shall not be made that cause:

   (a) A Buyer to purchase more MW than the amount set forth in its Bid;

   (b) A Seller to sell more MW than the amount set forth in its Offer; and

   (c) For matched Bids and Offers, the Energy Exchange Price to (i) be less than the Offer Price plus half of net Losses, as calculated per Section IV.C.5.a, and (ii) more than the Bid Price minus net Losses, as calculated per Section IV.C.5.a.

  iii. The Southeast EEM Algorithm shall only make Energy Exchanges that yield positive benefits to both Buyer and Seller, as defined in Section IV.C.2, after Losses have been considered.

  iv. The total MW of potential Energy Exchanges in any Delivery Interval shall not exceed the aggregate amount of Non-Firm Energy identified in the applicable Offers or Bids for such Delivery Interval.

  v. A Participant's Bid may not be matched with an Offer made by the same Participant.

  vi. The Southeast EEM Algorithm shall not create Energy Exchanges in the same Delivery Interval that would create offsetting Energy Exchanges whereby Participant 1 sells to Participant 2 while Participant 2 sells to Participant 1 during the same interval at the same location.

**7.** Treatment of Identical Offers or Bids.

**a.** In the event that multiple Bids or Offers that are at the same price at a Source or Sink are identical which create the same benefit for the Southeast EEM, a randomized preference will be assigned to the Bid(s) or Offer(s).

JA0397

8. Notification, Scheduling, and Transmission for Energy Exchanges.

    a. After an Energy Exchange for a Delivery Interval is determined:

        i. The Bidder and Offeror shall be notified of match via an Energy Exchange Notification.

        ii. Transmission reservations and e-Tags shall be automatically created by the Southeast EEM System based on the matches within the time frame noted above. All e-Tags will be sent to the applicable Participating Transmission Provider(s), Balancing Authority(ies) and matched Participants. Consistent with the discretion afforded to Participating Transmission Providers and Balancing Authorities in the NAESB business practices, each participating Balancing Authority within the Territory agrees that it will not reject an e-Tag automatically created by the Southeast EEM System on the basis that it was submitted less than twenty (20) minutes prior to the Delivery Interval but at least ten (10) minutes prior to the Delivery Interval.

        iii. The Southeast EEM System will generate and provide sufficient information to Participating Transmission Providers to validate and collect payment for Losses from applicable Buyers and Sellers for each Energy Exchange.

        iv. Appropriate OASIS information will be provided to the relevant Participating Transmission Service Providers.

9. The contractual "point of sale" of an Energy Exchange will be at the Buyer's Balancing Authority border for a transaction delivered out of or thru one or more Balancing Authorities. For an Energy Exchange that stays within one Balancing Authority (Source and Sink in same Balancing Authority), the "point of sale" will be at the bus of the Seller's Source. For an Energy Exchange fully delivered to a Buyer's Balancing Authority border, the Participant acting as the Seller will be the responsible party for the transmission service to deliver the Non-Firm Energy to the "point of sale" and the Buyer will be responsible for the transmission service required to sink the Non-Firm Energy. For an Energy Exchange that stays within one Balancing Authority, the Buyer will be the responsible party for the transmission service required to sink the Non-Firm Energy. For avoidance of doubt, Non-Firm Energy Exchange Transmission Service must be used for the entire Contract Path from Source to Sink for all Energy Exchanges.

JA0398

V.  **SOUTHEAST EEM ENERGY EXCHANGE REPORTS.**

The Southeast EEM Administrator and the Company System Administrators shall create and maintain the reports concerning Energy Exchanges as required by the Operating Committee. The reports that are provided by the System Administrators shall include, but need not be limited to, the following:

A.  **Public Monthly Informational Report.**  This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website on or before midnight of the fifth Business Day of the following month and shall include the following information from the prior month:

   1.  Minimum, maximum, and average match prices;

   2.  Amount of Non-Firm Energy offered and sold as well as bid and purchased over all Delivery Intervals;

   3.  Amount of Non-Firm Energy that flowed once matched as an Energy Exchange;

   4.  Total number of Energy Exchanges;

   5.  Total benefit to be calculated in accordance with Section IV.C.2;

   6.  Minimum, maximum, and average MW Energy Exchange amount; and

   7.  Energy Exchanges made but not executed.

B.  **Public Daily Informational Report.**  This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website by 6:00 A.M. CPT and shall include the following aggregated information from the prior day:

   1.  Total number of Bids and Offers during each Clock Hour of the prior day;

   2.  Amount of Non-Firm Energy offered and sold as well as bid and purchased during each Clock Hour of the prior day;

   3.  Number of Energy Exchanges executed for each Clock Hour of the prior day;

   4.  Total number of Participants who submitted Bids for each Clock Hour of the prior day;

   5.  Total number of Participants who submitted Offers for each Clock Hour of the prior day; and

   6.  Weighted average match price per Clock Hour.

12

C.   **Public Hourly Informational Report.**   This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website fifteen (15) minutes after the applicable Clock Hour and shall include the following aggregated information from the applicable Clock Hour:

1.   Total number of Bids and Offers during that Clock Hour;

2.   Amount of Non-Firm Energy offered and sold as well as bid and purchased during that Clock Hour;

3.   Number of Energy Exchanges executed for that Clock Hour;

4.   Total number of Participants who submitted Bids during that Clock Hour; and

5.   Total number of Participants who submitted Offers during that Clock Hour.

## VI.   AUDITING AND DATA ADMINISTRATION.

A.   **Archiving of Data.**   All Southeast EEM System input data necessary to recreate and audit any Delivery Interval, and all Southeast EEM System output data for each Delivery Interval, shall be archived such that at least the three prior months of data can be retrieved in real time. Five (5) years of data shall be archived off-line. Participants may request access to their own data and it shall be made available upon request within 24 hours. Data older than five (5) years shall be deleted at the end of each month on a rolling basis.

B.   **Access to Southeast EEM System Energy Exchange Data.**

1.   The Southeast EEM Administrator shall have access, via system software, to the results of the matching process for any Delivery Interval of on-line history. The data to which the System Administrators have access shall include raw Participant data, matched output data, and intermediate results of the algorithm. To be clear, the Southeast EEM Administrator shall be able to run all of the reports available in the system and view the data for all Participants.

2.   Each Participant will be required to identify an administrator that is authorized by the Participant to run and review all of the reports available in the Southeast EEM System that are redacted to all show the information related to the Participant it represents (the "Company System Administrator"). The Southeast EEM System will provide each Company System Administrator with the right to grant access to certain reports and related data to identified delegates within the Participant's organization. Each Company System Administrator (and any delegate identified by the Company System Administrator) shall be able to run all of the reports available in the system but receive only the data that belong to the Participant it represents.

13

**C.** **Additional Southeast EEM Administrator Functions.** Subject to the limitations set forth in subsection (B) above, the Southeast EEM Administrator shall employ the system software to perform the following functions:

    **1.** Oversee the matching process;

    **2.** Maintain model data and Southeast EEM System parameters; and

    **3.** View Participant usage statistics and generate Participant benefit reports.

**D.** **Auditing Process.** Auditing functions will be performed by the Market Auditor at the direction of the Membership Board. The Market Auditor will report its conclusions, and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis. The Membership Board will maintain sole responsibility for determining whether to share the information any further. Auditing functions include the following:

    **1.** Verify that the Southeast EEM System operates in accordance with the Southeast EEM Rules, including the determination and application of Bids, Offers, constraints, matched settlements, OASIS reservations, and e-tags.

    **2.** Ensure that Energy Exchange data is available to the applicable Participants in accordance with the Southeast EEM Rules.

    **3.** Report to the Membership Board any concerns regarding the reliability and accuracy of the Southeast EEM System process and results including any instance of operational problems or anomalies with the functioning of the Southeast EEM System.

    **4.** Provide evaluation regarding the proper function of the Southeast EEM System, and the effectiveness of any Southeast EEM System specific controls in place related to the operation of the Southeast EEM System.

    **5.** Refer any complaints received to the Membership Board, and investigate further at the Membership Board's direction.

    **6.** The Membership Board will be responsible for defining the time interval(s) for the auditing function to be performed and report back to the governing body. Such interval(s) will be published in the Southeast EEM Manuals.

**E.** **Data Administration.**

    **1.** Parameters. The Southeast EEM Administrator shall set and maintain the following Southeast EEM System configuration parameters, which shall be posted for access by all Members:

        **a.** The matching process start time for each Clock Hour;

**b.** The number of minutes before the start of the matching process when no additional Bids and Offers will be accepted;

**c.** The number of minutes before the start of the matching process by which the processing of any in-transit Bids and Offers must be completed;

**d.** The addition or deletion of Participants;

**e.** The addition or deletion of a Company System Administrator for each Participant;

**f.** Manage, store, and safeguard data (e.g., Bid, Offer, match, and Participant Information) to ensure appropriate levels of confidentiality and records retention;

**g.** Grant access to the data on the Southeast EEM System as appropriate;

**h.** Supply data to Participants involved in Energy Exchanges to complete the applicable transaction, including (but not limited to):

    i. Participant identification of the Buyer and the Seller;

    ii. Balancing Authority Area identifications for the MWh quoted by the Buyer and the Seller;

    iii. e-Tag number;

    iv. Transaction quantity in MW/MWh, including the MWh out of the Source area and the MWh into the Sink area;

    v. Information specifically related to an Energy Exchange (not price of the other side of the match as may reveal sensitive transmission information);

    vi. Energy Exchange Price;

    vii. Benefit for the Buyer and the Seller in total dollars and $/MWh; and

    viii. Energy Exchanges not executed.

**i.** Supply needed information/data for auditing functions to ensure that the Southeast EEM System is being properly administered.

JA0402

## APPENDIX C

## SOUTHEAST EEM AGENT SCOPE

The Southeast EEM Agent Scope shall be limited to the following:

a. Subject to paragraph (b) below, the Southeast EEM Agent shall execute contracts with third parties solely as the agent for and on behalf of the Members and not in the Southeast EEM Agent's own name or for its own account.

b. The Southeast EEM Agent shall be empowered to execute contracts only after being given specific written or electronic authorization to do so by the Membership Board, or in the case of minor or unsubstantial contracts, the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

c. The Southeast EEM Agent shall be authorized to execute amendments to contracts entered into on behalf of the Members, provided that such amendment is authorized by the Membership Board or, in the case of minor or unsubstantial contracts, by the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

d. For convenience, the Southeast EEM Agent shall be authorized to accept notices under the contracts that it executes on behalf of the Members.

e. The Southeast EEM Agent shall **not** be involved in the billing process under the vendor contracts. Third-party vendors will bill the Members directly for their proportionate share of the costs under the contracts executed by the Southeast EEM Agent on behalf of the Members.

f. If certain vendors are unwilling to bill Members directly, the Membership Board shall develop an alternative billing arrangement, such as using a third-party billing agent.

g. The Southeast EEM Agent shall **not** have any special role in, or authority over, the operation or administration of the Southeast EEM System. The vendor contracts shall specify that the day-to-day contact for such vendor shall be the Operating Committee, not the Southeast EEM Agent.

h. The Southeast EEM Agent shall not be exposed to incremental liability for actions taken within the Southeast EEM Agent Scope.

Attachment B

Affidavit of Aaron Melda and Lonnie Bellar

JA0404

## UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| *Southern Company Services, Inc.* | )<br>)<br>) | Docket No. ER21-___-000 |

### JOINT AFFIDAVIT OF AARON MELDA AND LONNIE BELLAR
### ON BEHALF OF
### THE MEMBERS OF THE SOUTHEAST ENERGY EXCHANGE MARKET

### Introduction

1.  Our names are Aaron Melda and Lonnie Bellar. Mr. Melda's business address is 1100 Market Street, Chattanooga, Tennessee, 37402. Mr. Bellar's business address is 220 W. Main Street, Louisville, Kentucky, 40202.

2.  Aaron Melda is Senior Vice President Transmission & Power Supply at the Tennessee Valley Authority ("TVA"). In that role, he is responsible for safe and reliable execution of operations, power supply, maintenance, and construction activity on TVA's transmission system. Mr. Melda has more than 20 years of experience in leadership roles throughout the electric utility industry. He previously served as Vice President, Transmission Operations & Power Supply, where he was responsible for the safe, reliable, real-time operation of TVA's bulk transmission system and power supply. Prior to that, Mr. Melda served as Vice President, Enterprise Planning, where he was responsible for TVA's strategic planning process, long range financial plan, load and commodity forecasting, commodity risk oversight, and fleet asset planning and strategy. He also served as Executive Director, Watts Bar Nuclear Unit 2 Completion, where he was responsible for the safe, high quality start-up and turnover of Watts Bar Nuclear U2. Prior to this role, he served TVA as the Senior Vice President, Operations Support where he led Engineering, Training, and Support Services. In addition to these roles, he also has experience as a Plant Manager, Projects Manager, and Field Engineer. He received his Bachelor of Science degree in Mechanical Engineering from the Georgia Institute of Technology and a Master's degree in Business Administration from Vanderbilt University.

3.  Lonnie Bellar is the Chief Operating Officer ("COO") of Louisville Gas & Electric Company and Kentucky Utilities Company ("LG&E/KU"). In that role, he is responsible for oversight and direction of all operational areas of the business of LG&E/KU, including power generation, energy supply and analysis, electric distribution and transmission, gas transmission, distribution and storage, safety, and environmental and customer services. Mr. Bellar has been at LG&E/KU since 1987, where he has served in various management positions within generation planning and generation services, financial planning and controlling, electric transmission, state regulation and rates, and gas operations. In January 2017, he became Senior Vice President of Operations and served in that position until he became COO in March 2018. He received his dual-degree bachelor's in engineering arts from Georgetown College and in electrical engineering from the University of Kentucky.

4.     Our companies are among the 14 founding Members[1] of the Southeast Energy Exchange Market ("Southeast EEM"). We are jointly presenting this affidavit in support of the Southeast EEM proposal, which represents a delicate balance, both to entities like LG&E/KU that are subject to the jurisdiction of the Federal Energy Regulatory Commission ("Commission" or "FERC"), and entities like TVA that are not. This is not the first effort to develop a regional market in the Southeast, as the Commission knows,[2] but it is the first one to enjoy such broad support from the transmission owners and load serving entities in the region.

5.     This joint affidavit provides an overview of the Southeast EEM, its expected benefits, and the core principles and reasoning that have driven Members' decision-making in the formation of this enhanced bilateral market and enabled consensus across this diverse group of entities. Deeper detail on the proposed operation of the Southeast EEM is provided in the joint affidavit of Mr. Corey Sellers of Southern Company and Mr. Chris McGeeney of Associated Electric Cooperative, Inc., included with this submission as Attachment C (the "Operations Affidavit"). Dr. Susan Pope of FTI Consulting provides her opinion that the Southeast EEM presents additional opportunities for the benefit of buyers, sellers and their customers in the existing Southeast bilateral energy market and will not present any additional market power concerns or market manipulation opportunities. Dr. Pope's affidavit is included with this filing as Attachment D (the "Economic Affidavit"). And Andrew Rea of Guidehouse sponsors a report prepared by Guidehouse and Charles River Associates demonstrating the benefits expected from the Southeast EEM ("Benefits Analysis"). The Guidehouse affidavit and Benefits Study are included with this filing as Attachments E and E-1, respectively.

## The Southeast Today

6.     The Southeast EEM is an enhancement of the existing bilateral market in the Southeast that is intended to reduce customer costs across the region by providing additional opportunities for bilateral trades, rather than creating an entirely new market system. Accordingly, in order to understand the Southeast EEM, it is first necessary to understand today's electricity markets in the Southeast.

7.     Much of the Southeast is served by entities that are not subject to FERC's jurisdiction, with the federal government (*e.g.*, TVA), local governments, electric cooperatives, and municipalities playing large roles. In addition, the region includes a number of vertically integrated utilities regulated by the Commission. Each of these entities has its own set of goals, but all share a desire to reduce customer costs by increasing efficiencies.

---

[1]     When we refer to Members, we are talking about those entities that have executed the Southeast Energy Exchange Market Agreement ("Southeast EEM Agreement"). Capitalized terms used herein have the meaning given them in the Southeast EEM Agreement.

[2]     An approximately four-year effort in the wake of Order No. 2000 was unsuccessful.

8.     As of the date of this filing, the Members of the Southeast EEM who have come together in pursuit of that shared goal are:

- Associated Electric Cooperative, Inc. ("AECI");

- Dalton Utilities;

- Dominion Energy South Carolina, Inc. ("Dominion Energy SC");

- Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP" (together with DEC, "Duke");

- LG&E/KU;

- North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1");

- PowerSouth Energy Cooperative ("PowerSouth");

- Alabama Power Company;

- Georgia Power Company;

- Mississippi Power Company (together with Alabama Company and Georgia Power Company, "Southern Companies");

- North Carolina Electric Membership Corporation ("NCEMC"); and

- TVA.

In addition, the following entities have participated in the creation of the Southeast EEM and are contemplating or in the process of seeking the necessary approvals for the execution of the Southeast EEM Agreement to become Members:

- Georgia System Operations Corporation ("GSOC");

- Georgia Transmission Corporation ("GTC");

- Municipal Electric Authority of Georgia ("MEAG Power");

- Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and

- South Carolina Public Service Authority ("Santee Cooper").

These Southeast EEM Members (together with the proposed Members) collectively own approximately 160,000 MW of generating capacity, and serve about 640 TWh of energy for load and cover ten Balancing Authority ("BA") areas across two time zones, as shown on the following map (the "Region"):

JA0407



9.  Each of the Members either has a load serving responsibility or serves an entity that has that responsibility.  Thus, each Member has an obligation and responsibility to plan to serve its load through its own generation, or long-term power purchase arrangements, or both.  Such entities can use bilateral power purchases and sales to reduce customers' cost of energy closer to real time, such as in the hourly market.  Trades generally occur on an hourly basis as the shortest increment, and most often occur with only entities in the same or directly interconnected balancing authorities.  To the best of our knowledge, very few 15-minute trades occur bilaterally.  Generally,[3] a short-term power purchase will be sought if more expensive generation can be backed down.  An entity will typically engage in a short-term power sale when there is an opportunity to provide power bilaterally to a counterpart at a price greater than the seller's own cost to produce and deliver the power, after satisfying any obligations it may have to its own load.  In other words, short-term purchases are generally made for economic purposes to displace more expensive generation.  Therefore, these purchases typically reduce customer costs.  When sales are made, a significant portion of the margin from the sale will be credited back to customers, which helps to achieve net cost savings.  Most utilities use a mechanism such as a fuel adjustment clause to pass back credits to customers for purchases and sales.  Other utilities, such as TVA, pass back the savings from sales by lowering base revenue requirements instead.

10. For example, LG&E/KU plan their systems on a combined basis by maintaining capacity within a target reserve margin range, which the companies develop to maintain reliability at the lowest reasonable cost.  This range is updated as part of the companies' integrated

---

[3]     Our description here of how Southeastern markets work is driven by our knowledge of TVA and LG&E/KU and our experience, and the experiences of our companies, with others in the region.  We have not, for example, conducted a survey of all Southeast EEM Members on these general background issues.

resource planning ("IRP") process, which is ordered and reviewed by the Kentucky Public Service Commission ("KPSC") triennially. In their resource planning, LG&E/KU do not rely on short-term power purchases as a means of serving load. Rather, LG&E/KU use hourly non-firm economic purchase opportunities to reduce customers' cost of energy. Hourly non-firm off-system sales are executed when the price that can be negotiated with a willing buyer exceeds the companies' cost of generation. Customers share in the off-system sales margin via a mechanism in retail rates approved by the KPSC.

11. TVA also uses an IRP process to plan its generation system in compliance with the TVA Act (16 U.S.C. § 831y-1), which requires that TVA operate a reliable, low-cost, and environmentally sustainable system that supports economic development in its service area. The process also involves significant input from stakeholders and the public. TVA is a federal, publicly-owned corporation governed by a Presidentially-appointed Board of Directors. The Board adopts and approves the planning direction in TVA's IRP, along with identified near-term actions. The broad planning direction in the IRP informs more specific long-range plans that are updated annually based on evolving market conditions, environmental regulations, and technology advancements. TVA's most recent IRP was finalized in 2019, with an update to be initiated no later than 2024.

12. TVA utilizes the short-term market to increase flexibility in its operations and to reduce costs for its ratepayers. TVA proactively manages its portfolio, including short-term market purchases and transmission, to reduce overall costs and to bolster reliability. In accordance with the TVA Act, TVA also executes off-system sales when excess power is available and bilaterally negotiated prices are greater than the cost of its own generation. The rates that the TVA Board sets include a monthly fuel cost adjustment, which operates to pass along 100% of the savings achieved by economic purchases to its customers. Decisions made in the IRP process can place demands on the operation of TVA's power system (e.g., the addition of solar recommended in the IRP has the potential to increase short-term system volatility). Participation in markets that enable short-term trades, which would include the Southeast EEM, is one tool that TVA can utilize to manage such volatility.

13. As can be seen, electric service providers in the Southeast seek bilateral transactions that can either save costs directly (purchases) or earn a margin to offset costs (sales). While this works well for transactions with neighboring entities, if additional wheels are needed to reach a counterparty in a distant balancing authority, transaction economics can diminish because of added transmission costs. Additionally, today's bilateral market relies on buyers and sellers being able to find each other, through phone calls or messaging, to negotiate a deal, to find and reserve transmission service, and to e-Tag scheduled energy flow on a timely basis. These factors result in some economic energy going unpurchased and some available transmission going unutilized. A central objective of the Members' efforts to identify potential regional improvements, which has led to the development of the Southeast EEM, is finding ways to increase the use of available transmission and increase opportunities for economic energy purchases and sales.

14. In addition to the practical limitations on trading in the Southeast today, there are also other restrictions that must be observed. Perhaps chief among these is the "TVA fence" – a name sometimes used to describe statutory restrictions on transactions by TVA.

15. In 1959, Congress amended the TVA Act to permit TVA to issue bonds and self-finance system projects. Up until that time, TVA was funded primarily through Congressional appropriations. In exchange for the ability to self-finance, Congress limited TVA's ability to sell power. As a general rule, TVA cannot make any contracts for the sale or delivery of power which would have the effect of making TVA, directly or indirectly, a source of power supply outside the area where TVA was the primary source of power supply on July 1, 1957. This restriction created a "fence" around the TVA service area and was codified in section 15d(a) of the TVA Act, 16 U.S.C. § 831n-4. There are, however, several exceptions to the general rule, one of which impacts TVA's participation in the Southeast EEM. TVA can sell power outside the fence to those "other power-generating organizations" with whom TVA had exchange power arrangements in place on July 1, 1957. At that time, TVA had 14 exchange power partners. Over time, through acquisitions, mergers, and the development of other affiliations, the number has fluctuated and resulted in litigation. In 1997, TVA entered into a Consent Judgment in *Alabama Power Company, et al. v. Tennessee Valley Authority* (CV-97-C-0885-S) in the U.S. District Court for the Northern District of Alabama. As part of the Consent Judgment, TVA committed to sell excess power only to a defined list of "Authorized Exchange Power Companies," which must be physically delivered to the Authorized Exchange Power Company and sink within that company's service area.

16. As a result, of the current Southeast EEM participants, TVA can sell power to Duke Energy, LG&E/KU, and Southern Companies. Nothing precludes TVA from purchasing power, however, from any Southeast EEM participant. To effectuate TVA sales to Authorized Exchange Power Companies, transmission is secured on the applicable transmission system to ensure physical delivery. An e-Tag is created to document the actual flow of energy, including source/sink and start/stop times. Schedules are verified with the applicable adjacent Balancing Authority prior to implementation. Specified valid sinks for Authorized Exchange Power Companies are built into TVA's applications and validations are conducted as transmission service reservations and e-Tags are processed.

17. Any redesigned or enhanced market involving TVA must observe the TVA fence. Moreover, given TVA's central location in the Southeast, if TVA cannot participate in a redesigned market, then others (LG&E/KU and AECI) would not have a contiguous connection to the rest of the market. If they cannot connect through TVA, they must connect through one of the neighboring RTOs, thus adding another wheel, and the added transmission expense, to any transaction with a counterparty in the Southeast. From the outset, creating a market design that recognizes and gives effect to the TVA fence has been an important goal of the design effort, and it is an important component of the delicate balance struck by the final Southeast EEM design.

18. In addition, any market design in the Southeast must recognize Members' obligations related to their market-based rate ("MBR") authority. To accommodate these requirements, and as further explained in the Operations Affidavit, the automatic software

system that will be the foundation of the Southeast EEM – called the "Southeast EEM System" – will allow Participants to toggle geographic regions and counterparties "off," meaning that matches will not be made with entities in the toggled off area or with a buyer or seller that has been toggled off.  Maintaining the ability to represent physical transactions and contract paths via e-Tags and enabling Southeast EEM Participants to control the geographic regions and counterparties with which they will trade are important design elements of the Southeast EEM that will allow it to work in tandem and respect the TVA fence and MBR obligations.

19.   In short, the Southeast EEM founding Members began their design process from a foundation of solid, successful individual entity planning processes, and sought to increase benefits by facilitating the trading that each entity does around the assets that result from those planning processes.  At the same time, to be an inclusive regional market, the market design needed to honor the TVA fence, respect the non-jurisdictional status of entities across the region by avoiding market design elements that would cede control to an independent market operator or market monitor or potentially erode those entities' non-jurisdictional status, and preserve and avoid conflicts with the existing IRP-driven structure and state-regulated resource planning requirements that work well for the Southeast region.  With this in mind, the Members began the design process conceptually, by sifting, debating, refining, and ultimately agreeing to core principles for achieving additional benefits, as follows:

- Each electric service provider/state maintains control of generation and transmission investment decisions;

- Each transmission provider remains independent with its own transmission tariff (or equivalent[4]);

- Each Balancing Authority remains independent;

- Bureaucracy is minimized while benefits to customers are maximized;

- Participation is voluntary;

- Market benefits exceed cost, collectively and for each market participant; and

- Transparency in governance and operations is ensured while Member confidentiality is maintained.

20.   In developing the Southeast EEM Agreement, the Southeast EEM Members have pursued these core principles.  The process has involved hundreds of individuals and thousands of hours of work from the Member entities.  The process also has involved extensive stakeholder outreach to governmental entities and non-governmental entities such as environmental groups, trade associations, and individual customers.  In many cases, there

---

[4]      TVA has transmission service guidelines that are equivalent to a tariff.

Document Accession #: 20210212-5033     Filed Date: 02/12/2021

were multiple discussions with the same entity. The resulting exchanges of ideas were robust and welcome. All told, we estimate there were hundreds of conversations of this nature. The result of all of this combined effort is the proposal submitted to the Commission today.

## Market Overview

21. As described more fully in the Operations Affidavit, at its core, the Southeast EEM is a matching service. The Southeast EEM will use an algorithm to match willing buyers and sellers that are already able to transact with each other under existing power sales agreements and authorizations. The energy exchange transactions matched through the Southeast EEM will be accomplished in much the same way that energy transactions always have under preexisting bilateral contracts. The "match" of buyers and sellers made by the algorithm commits both buyer and seller to the transaction. The Southeast EEM System will submit an e-Tag for the transaction to the relevant Transmission Service Provider(s), BA(s), and Participant(s), and that e-Tag will indicate to the parties to the match how to adjust their dispatch. Transactions will still be settled bilaterally outside of the Southeast EEM as they are today. Failure to carry through on committed transactions will result in imbalance penalties, just as it does today.

22. The Southeast EEM has two simple design features that work together to create matches of buyers and sellers to produce customer savings.

23. First, if Southeast EEM Participating Transmission Providers' transmission is not being used for other transactions, it will be made available on an intra-hour basis at no cost (other than financial losses and any applicable imbalance charges) for 15-minute Southeast EEM Energy Exchanges under the Participating Transmission Providers' tariffs. This new service is called "Non-Firm Energy Exchange Transmission Service" or "NFEETS." Since the Southeast EEM will only use transmission that is not otherwise being used, it will not result in underfunding of transmission, which will still be paid for through current rate constructs, *i.e.*, through revenues received from customers of Network Service and Point-to-Point Service, or their equivalent. It is possible that availability of the new free service will lead to some slight decrease in Point-to-Point revenues, which in turn would lessen revenue credits used to offset Network Service charges. However, today, Participating Transmission Providers' revenues from short-term wheeling transactions of the type that could be replaced by Southeast EEM transactions are minimal. In general, we expect that any small increase in Network Service Charges will be more than offset by reductions in overall customers' costs attained through the Southeast EEM.

24. Second, the Southeast EEM will use load bids and generation offers to match buyers and sellers for transactions on a split-the-savings basis that benefits both the buyer and the seller. In today's short-term bilateral market, transactions between buyers and sellers are typically done on an hourly basis. The Southeast EEM will allow for shorter-term, intra-hour, transactions and greater flexibility through an automated matching system. The Southeast EEM will provide a platform that enhances efficiency by using the information input by buyers and sellers to expand the universe of potential trading matchups and to automatically find counterparties.

25.  The decision to use split-the-savings pricing is a natural outgrowth of the goal of achieving customer benefits for everyone participating in the Southeast EEM.  As we described earlier, electric providers in the Southeast use bilateral trades in conjunction with systems designed through integrated resource planning (or equivalent) procedures to enhance customer savings.  They do this by using bilateral transactions to trade around the assets developed through their planning processes.  Purchases of power produce savings when they allow a generator with higher marginal costs to be backed down, and sales of power produce savings by allowing crediting of margins from sales against customer costs.  Split-the-savings, as the name rightfully suggests, divides the benefit among the buyer and the seller, and so enhances the benefits that Participants already obtain by trading around their planned resources.

26.  As discussed in more detail below, savings for the region from the Southeast EEM conservatively are expected to be around $40 million per year based on the Benefits Analysis, and all participants and their customers are expected to share in the savings. These savings can be achieved not only at a low cost but also quickly because this market enhancement can be implemented much faster than a more involved market redesign could be.  This is a low risk, high reward venture, and one where the rewards (*i.e.*, savings to customers) can begin immediately upon implementation.  In addition to monetary savings, the Southeast EEM will allow for better integration of diverse generation resources, including rapidly growing renewables, and is expected to reduce renewable curtailments. These were all key considerations of the Members in deciding to move forward with the Southeast EEM.

27.  Along with these benefits, the Members will continue to provide highly reliable service to their customers, a hallmark of the Southeast region.  Moreover, while Southeast EEM bilateral transactions can produce savings, they will not replace or even aid the need of each LSE to remain resource adequate.  NFEETS is the lowest priority, as-available transmission service.  That means that LSEs will need to remain able to supply their load if an Energy Exchange does not occur.  Typically we would expect this to occur through an LSE maintaining sufficient ramping ability among its owned or contracted resources to make up any shortfalls from purchases or sales in the Southeast EEM market.

28.  In sum, the changes proposed here are not intended to be a fundamental, ground-up reconstruction of the market design in the Southeast.  This is not an RTO.  The Members believe that the existing just and reasonable IRP-based structure produces significant benefits, and that the Southeast EEM will enhance those benefits.  From our viewpoint, the right baseline for comparison is the existing Southeast bilateral market.  The table below shows that comparison and is intended to focus on what is (and is not) changing.

|  | **Existing Southeast Market** | **Addition of Southeast EEM** |
|---|---|---|
| **Nature of market** | • Bilateral:  long-term, seasonal, day-ahead, hourly (limited intra-hour) | • Significantly enhances bilateral, intra-hour (15-minute increments) |

|  | Existing Southeast Market | Addition of Southeast EEM |
|---|---|---|
|  | • Products traded: Capacity, firm energy, non-firm energy, and other products | • Products traded: Facilitates non-firm energy transactions only |
| **Transmission Service** | • Point-to-Point ("PTP") Service or Network Integration Transmission Service ("NITS") required for any transmission system used<br>• Rate based on transmission tariff schedules plus Losses and ancillary services<br>• e-Tags submitted by parties to transaction | • Adds Non-firm Energy Exchange Transmission Service priced at $0/MWh plus losses (which must be financial)<br>• e-Tags submitted by Southeast EEM System (for both intra-BA and inter-BA Energy Exchange transactions) |
| **Transactional Friction** | • Buyers and sellers locate one another, negotiate with each other, obtain transmission service, and schedule delivery of energy with e-Tags (using phones, fax, and electronic communications) | • Buyers and sellers self-identify to Southeast EEM System, which matches them according to an algorithm; Southeast EEM System submits transmission service reservations and e-Tags to schedule delivery of energy with applicable BA(s)/Transmission Service Provider(s)/Participants |
| **Pricing and Settlements** | • Market-based or cost-based, as appropriate<br>• Negotiated between counterparties subject to any limitations imposed by market power mitigation or other restrictions, such as TVA fence or counterparty credit limits<br>• Settlements occur bilaterally | • Market-based, but subject to cost capping where applicable for MBR mitigation<br>• Determined by matching algorithm on a split-the-savings basis, including transmission losses, with matching subject to identified constraints (*e.g.,* to respect TVA fence or counterparty credit limits)<br>• Settlements occur bilaterally |

|  | **Existing Southeast Market** | **Addition of Southeast EEM** |
|---|---|---|
| **Transparency** | • EQRs, notices of change in status and triennial market power updates<br>• FERC audit rights<br>• e-Tags collected by FERC pursuant to Order No. 771 | • EQRs, notices of change in status and triennial market power updates<br>• FERC audit rights<br>• Southeast EEM transaction e-Tags collected by FERC pursuant to Order No. 771 will be identifiable<br>• Additional, publicly posted aggregate information about Southeast EEM transactions and an Annual Meeting |
| **Resource Adequacy** | • Per individual entity and/or state oversight | • No change |
| **Reliability** | • BAs, Transmission Providers, generators and LSEs have roles assigned by NERC | • No change |
| **State Issues** | • Any retail access or demand response issues are under state or non-jurisdictional authority | • No change |

## Southeast EEM Benefits

29.    As discussed above, the goal of the Southeast EEM is to achieve customer benefits at a low incremental cost. Before moving forward, the Members needed to confirm that their goal could be achieved. Accordingly, as part of their initial analysis, the Members hired Guidehouse and Charles River Associates to conduct the Benefits Analysis to study the Southeast EEM's proposed intra-hour market design that would supplement the existing day-ahead and hour-ahead bilateral market and would make use of unutilized transmission capability. That Benefits Analysis was completed in July of 2020, and is part of the filing package submitted today, sponsored by Andrew Rea of Guidehouse.

30.    In addition to studying the aggregate regional benefits of the Southeast EEM's proposed design, Guidehouse and Charles River had private discussions with each Member to confirm and discuss the expected individual internal costs for that entity. In combination with the high-level estimates of joint costs to develop the Southeast EEM System discussed below, this review of individual internal costs provided Members the data needed to evaluate the expected costs and benefits of the proposal. More recently, the Members retained economist Dr. Susan Pope of FTI Consulting, an expert with robust credentials in the area of market design, to confirm that the Southeast EEM could be expected to provide incremental benefits, which she verifies in her affidavit submitted today.

31. The Benefits Analysis conservatively estimates that implementation of the Southeast EEM will result in $40 million of benefits per year, market wide. The benefits are driven by fuel cost savings, which as discussed above, are achieved through increased opportunities from economic energy purchases and sales enabled by the Southeast EEM. This base case benefit value is based on the Members' current IRPs. The Benefits Analysis also evaluates an alternative "carbon constrained" scenario that factors in high levels of renewable penetration. Under that scenario, benefits are estimated to steadily increase over time, with benefits of over $100 million market-wide by 2037. The Benefits Analysis estimates that internal costs, on the other hand, would be low in comparison – estimated to be $3.1 million per year. While this does not include the cost of developing and running the Southeast EEM System and performing the auditing function, it is expected that those costs will be of similar magnitude to internal costs. As explained by Mr. Sellers and Mr. McGeeney (at P 31), Members reached out to a number of vendors to ensure that there are available vendors that can achieve the goals of the Southeast EEM. Those vendors also provided initial estimates and received estimates ranging from $1 million to $5 million for initial development and implementation of the Southeast EEM System and less than $1 million per year in ongoing costs to operate the Southeast EEM System.

32. Additionally, as noted above, the Southeast EEM is expected to support increased renewables integration in the Southeast. It is generally recognized that facilitating greater liquidity in sub-hourly transactions can help support greater integration of renewable resources.[5] Transmission service providers are required under their OATTs to provide imbalance service to generators and to loads. Greater levels of renewable resource penetration can require transmission service providers to carry additional flexible capacity in reserve to be able to balance the variable output of renewable resources against their schedules. If there is little or no sub-hourly market liquidity, this generally means the transmission providers must be prepared to balance all variation in renewable output across the full hour. By creating greater liquidity in sub-hourly wholesale transactions, especially across a broad geographic area encompassing possibly different weather conditions and renewable policies, the Southeast EEM can provide additional opportunities for transmission service providers to either procure additional energy or to dispose of excess energy, rather than having to rely exclusively on increasing or decreasing the output from their own generation resources that provide imbalance service. Furthermore, renewable resources that elect to participate directly in the Southeast EEM will have an opportunity to avoid or reduce their imbalances by entering into sub-hourly sales when the output of their resources trends higher than the hourly quantities forecasted and scheduled farther in advance. Thus, the Members expect and believe that Southeast EEM benefits will significantly exceed the modest costs of developing and operating the Southeast EEM.

---

[5] *See, e.g.*, *Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,231 at P 76 (2014) (discussing the general agreement that the CAISO Energy Imbalance Market would improve the integration of renewable resources).

## Participation and Governance

33.     Only Southeast EEM Members will pay for the Southeast EEM, and Membership is voluntary.  Because the goal of the Southeast EEM is to bring benefits to customers through reduced costs gained from efficient transactions that would not otherwise occur, the eligibility criteria for membership is tied to load-serving responsibilities, ensuring that the entities with decision-making authority over the design, goals, and objectives of the Southeast EEM will share a common purpose of achieving benefits for customers.

34.     Southeast EEM Members will participate in the Southeast EEM in exactly the same way as any user of the Southeast EEM – known as Southeast EEM Participants.  Southeast EEM participation is open to anyone with a source or sink in the Southeast EEM Territory.  Southeast EEM Members will have only two differences from other Southeast EEM Participants:  they will pay for the Southeast EEM; and in return, they will have voting rights.  Mr. McGeeney and Mr. Sellers describe the operation of the Southeast EEM governance structure in more detail in the Operations Affidavit.  Participation in the Southeast EEM is completely voluntary.  Participants can use the Southeast EEM System as much or as little as they wish and can discontinue their Participant status at any time without any cost responsibility.

35.     Because Membership is voluntary, Members are free to withdraw at any time, with 30 or 90 days' notice, depending on whether the Member is a BA or Transmission Service Provider.  Members will remain responsible for costs incurred up to the date of their notice of withdrawal.  In addition, the Southeast EEM Agreement provides an immediate withdrawal right for non-jurisdictional entities in the event that continued Membership would impact their jurisdictional status.  Again, those Members would remain responsible for costs previously allocated to them.  Withdrawal does not require a filing with the Commission.  However, if a jurisdictional Member withdraws, it would need to file with the Commission to amend its Tariff to remove NFEETS and would file to cancel its version of the Southeast EEM Agreement.[6]

## Timing

36.     The Members anticipate the Southeast EEM Commencement Date to occur in the first quarter of 2022.  As noted above, being able to implement quickly is a key benefit of the Southeast EEM's simple approach/high reward design.

37.     Commission acceptance of the Southeast EEM Agreement (and the jurisdictional participating transmission providers' tariff revisions being separately submitted) is a necessary pre-condition to forward progress.  The Members who will be paying for development of this market are not able to commit significantly more capital towards

---

[6]     The exact nature of the filings to be made would depend on whether the party withdrawing made the filing for the Southeast EEM Agreement, or filed a concurrence.  But for present purposes, the point is that there would be a filing.

market development until they have the regulatory certainty provided by a Commission order accepting the Southeast EEM Agreement without material modification.

## **Conclusion**

38.  The Southeast EEM Members take pride in what we have achieved.  By working collaboratively with all concerned, our Members have designed a market enhancement that comprehensively blankets the region and unites both jurisdictional and non-jurisdictional participants in a large cohesive footprint with the goal of achieving consumer benefits through increased bilateral trading efficiencies.  The Southeast EEM is positioned to succeed where prior Southeast market initiatives have failed.  Recognizing that much of the Southeast is not subject to FERC jurisdiction, and does not wish to become subject to that jurisdiction, the Southeast EEM has been carefully crafted to produce significant benefits at a low cost while honoring each of the Members' unique needs and limitations.

39.  This concludes our affidavit.

## VERIFICATION OF AARON MELDA

Pursuant to 18 U.S.C. § 1746 (2020), I state under penalty of perjury that the foregoing testimony is true and correct to the best of my knowledge, information, and belief, with the exception of Paragraph 3.

Executed this 10th day of February, 2021.

_____
Aaron Melda
Tennessee Valley Authority
Senior Vice President Transmission & Power Supply

JA0419

## VERIFICATION OF LONNIE BELLAR

Pursuant to 18 U.S.C. § 1746 (2020), I state under penalty of perjury that the foregoing testimony is true and correct to the best of my knowledge, information, and belief, with the exception of Paragraph 2.

Executed this 10th day of February, 2021.

_Lonnie Bellar_
Lonnie Bellar
Louisville Gas & Electric Company and Kentucky Utilities Company
Chief Operating Officer

JA0420

Attachment C

Affidavit of Christopher McGeeney and Corey Sellers

JA0421

Document Accession #: 20210212-5033     Filed Date: 02/12/2021

## UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |
|---|---|---|
| | ) | |
| *Southern Company Services, Inc.* | ) | Docket No. ER21-___-000 |
| | ) | |

### JOINT AFFIDAVIT OF CHRISTOPHER MCGEENEY AND COREY SELLERS
### ON BEHALF OF
### THE MEMBERS OF THE SOUTHEAST ENERGY EXCHANGE MARKET

### Introduction

1.  Our names are Christopher McGeeney and Corey Sellers. Mr. McGeeney's business address is 2814 S. Golden Springfield, MO, 65807. Mr. Seller's business address is 600 North 18th Street, Birmingham, AL, 35203.

2.  Mr. McGeeney's current title is Senior Manager, Transmission Services at Associated Electric Cooperative, Inc. ("AECI"). Mr. McGeeney has almost twenty years of experience in the electric industry. In his role, he manages a team responsible for generator interconnection and transmission related policy issues. Prior to his current role, Mr. McGeeney has held several positions at AECI related to transmission policy and natural gas and power marketing. Prior to joining AECI in 2002, he worked as an hourly power trader at Aquila Merchant Services, Inc. Mr. McGeeney obtained a Bachelor of Science degree in Agricultural Systems Management from the University of Missouri – Columbia and a Master's in Business Administration from Drury University.

3.  Mr. Sellers is the General Manager of Transmission Policy and Services/Energy Policy with Southern Company Services Inc. ("Southern Companies"). In this role Mr. Sellers is responsible for strategic policy activities related to the Federal Energy Regulatory Commission ("FERC") and wholesale transmission customer service through the administration of Southern Companies' joint Open Access Transmission Tariff. Mr. Sellers began his career with Southern Companies as a cooperative education student in 1993. He has held various positions during his career including roles in Energy Management System Services, Generation IT, Energy Trading, Transmission, and most recently as the Assistant to the Chief Operating Officer. Mr. Sellers attended the University of Alabama where he received his Bachelor of Science degree in Computer Science with a minor in Mathematics.

4.  Our companies are among the 14 founding members ("Members") of the Southeast Energy Exchange Market ("Southeast EEM"). We are jointly presenting this affidavit ("Affidavit") to describe key aspects of the Southeast Energy Exchange Market Agreement ("Southeast EEM Agreement") and the Southeast EEM Market Rules ("Market Rules") that are attached as Appendix B to the Southeast EEM Agreement. In addition to describing these key elements, we also explain why the Members selected them.

### Involvement in Development of the Southeast EEM

5.     We have each taken a leading role in overseeing and participating in the team tasked with supporting the Southeast EEM development from an operational perspective (the "Ops Team").  The Ops Team includes individuals from each of the founding Members with significant experience with bilateral trading and transmission arrangements within the Southeast, as well as knowledge of the supporting informational technology ("IT") systems.  The main team has met nearly every week since early 2020.  In addition, the team established several sub-groups that specifically targeted issues concerning transmission, technology, and algorithm issues and reported their findings back to the main group.  The Ops Team considered input from various sources within the membership, including from generator owners, transmission service providers, transmission dependent utilities, as well as stakeholders, including customers.  In short, the Ops Team has taken its charge very seriously and has devoted a substantial amount of time and effort to identify potential operational and implementation issues with the Southeast EEM and build consensus around solutions.

6.     The charge to the Ops Team has been to develop key design features of the Southeast EEM, with the overriding goal of keeping the design as simple as possible while at the same time maximizing customer benefits.  In addition to this goal, the Ops Team always has considered the core principles discussed by witnesses Mr. Aaron Melda and Mr. Lonnie Bellar in their affidavit, included with this filing as Attachment B ("Overview Affidavit")[1] to ensure that the market enhancement that was developed met those principles.

7.     The Ops Team developed and had input on many of the elements of the Southeast EEM Agreement and Market Rules, which reflect the principles and goals that the Ops Team sought to achieve.

8.     The remainder of this Affidavit describes the key aspects of the Southeast EEM Agreement and Market Rules.  Specifically, this Affidavit describes:

   a.   An overview of the Southeast EEM's design and proposed operation;

   b.   Roles within the Southeast EEM;

   c.   Membership and Participation;

   d.   Governance;

   e.   Market Operations; and

   f.   Reliability.

---

[1]     *See* Overview Affidavit at P 18.

JA0423

## Overview of the Southeast EEM

9.      At the highest level, the Southeast EEM is not itself a new market.  It is an extension of
and enhancement to the existing bilateral market that will utilize an automated trading
platform (the "Southeast EEM System") and zero-price transmission to facilitate bilateral
energy contracts in the Southeast on an intra-hour basis.  This will reduce transactional
friction and promote the use of unused transmission capacity, thereby increasing
efficiency, allowing for enhanced energy cost savings, avoiding transmission rate
pancaking, and facilitating renewable integration in the region, while maintaining current
high standards for reliability.  The Southeast EEM System will rely on inputs from
transmission service providers ("Participating Transmission Providers") and voluntary
submissions from bidders and offerors ("Participants").  Using this data, as described
below, the Southeast EEM System will match bids and offers based on a computer
algorithm that considers all of the inputs and generates a solution set of matches that
produces the maximum benefits, market-wide, subject to the defined constraints.  The
intent is to provide an incremental, but substantial, improvement to, rather than a
replacement of, the existing bilateral trading process in the Southeast.

10.     The Southeast EEM Agreement is an agreement among the Members that outlines the
relationship and obligations between the Members and establishes the structure of and
rules for the Southeast EEM.  The rules that govern the functioning of the Southeast EEM
System and apply to all Participants are called the "Market Rules," and are attached to the
Southeast EEM Agreement as Appendix B.  Under the Market Rules, the Southeast EEM
System will match bids and offers for transactions through an algorithm ("Energy
Exchanges").  The associated buyers and sellers of the matched bids and offers will then
consummate the Energy Exchanges pursuant to the terms of separate bilateral wholesale
power sales agreements between them ("Enabling Agreements").  The Southeast EEM
System will not clear or settle transactions and will not be a counterparty to transactions.
All sales made by FERC-jurisdictional sellers through the Southeast EEM System will be
made pursuant to the seller's market-based rate ("MBR") authorization.  Non-FERC
jurisdictional entities like AECI also will transact under market-based principles.  The
Southeast EEM System itself will be developed by a third-party vendor, who will be
retained by the Members to develop the software.  That same entity or a separate entity
will be selected to operate the Southeast EEM System as the "Southeast EEM
Administrator."

11.     The inputs to the Southeast EEM System are discussed in more detail below, but, in
summary, it will rely on transmission data from Participating Transmission Providers and
certain initial pre-transaction inputs from Participants (e.g., counterparties with whom the
Participant can transact considering items such as Enabling Agreements, credit limit, and
any market-based rate mitigation requirements).  Then, for every fifteen-minute
increment of every hour of every day (each referred to as a "Delivery Interval"),
Participants will be able to submit bids and offers.  The submission of bids and offers is
voluntary, and Participants may elect to submit, or not submit, as many bids or offers as

they choose at different sources and sinks controlled by that Participant.[2]  After it receives bids and offers, the Southeast EEM System will run an algorithm based on all applicable constraints, including available transmission capacity, the Participants' inputs, and the bid and offer information, and will match bids and offers as Energy Exchanges. The Southeast EEM System will generate individual settlement prices for each Energy Exchange on a split-the-savings (*i.e.*, "midpoint") basis.

12.     Once a bid and an offer are matched, the Southeast EEM System will generate an e-Tag for the Energy Exchange and submit it to the applicable Balancing Authorities ("BA"), Participating Transmission Providers, and Participants.  The Southeast EEM System, however, will not dispatch generation or otherwise consummate the transaction.  Rather, each Energy Exchange will be a separate bilateral transaction between the matched entities, subject to the terms and conditions of the underlying Enabling Agreement between them.  The automation provided by the Southeast EEM System will improve market efficiencies, as discussed below, and ultimately will benefit customers by reducing the delivered cost of power.

## Summary of Southeast EEM Roles

13.     Seven different roles each play a part in the functioning of the Southeast EEM, some overlapping.  Each of these roles, summarized below, are discussed in more detail later:

| | |
|---|---|
| **Members** | Will be the parties to the Southeast EEM Agreement; will fund initial development of Southeast EEM System and on-going costs; will have voting rights; may also be Participants, as described below. |
| **Participants** | Will not be parties to the Southeast EEM Agreement unless are also Members; must sign a Market Participant Agreement; will be able to participate in the market; Participants that are not also Members will not have funding obligations or voting rights. |
| **Membership Board** | Will be the governing body comprised of a representative from each of the Members. |
| **Operating Committee** | Will handle day-to-day operations, comprised of four representatives from the Members. |
| **Agent** | Will perform a purely administrative role (*e.g.*, will act as signatory to the agreement with Southeast EEM Administrator); will be one of the Members. |
| **Southeast EEM Administrator** | Will be an independent third party contracted to operate the Southeast EEM System; will not be a Member, Participant, Agent, or Auditor. |

---

[2]     The Southeast EEM System will have a limitation on how many bids or offers can be submitted at the same source or sink by a single Participant for any one Delivery Interval.

| Auditor | Will be an independent third party that reports to Membership Board; tasked with ensuring that the Southeast EEM System functions properly (*e.g.*, that it adheres to the Market Rules); will not be a Member, Participant, Agent, or Southeast EEM Administrator. |
| --- | --- |
| Participating Transmission Providers | Will provide "Non-Firm Energy Exchange Transmission Service" ("NFEETS") to Participants under their respective transmission service tariffs or guidelines; may also be Members or Participants; are not a party to the Southeast EEM Agreement or the Market Participant Agreement in their capacity as a Participating Transmission Provider.[3] |

## Membership and Participation in the Southeast EEM

14.     The signatories to the Southeast EEM Agreement are called "Members."  As described in more detail below, Members will pay the costs of establishing the Southeast EEM System as well as ongoing operating costs and will have a role in Southeast EEM governance. When developing the governance structure for the Southeast EEM, the Members had two primary goals:  1) fairly allocating voting rights to ensure that higher paying Members have higher voting rights while respecting smaller entities; and 2) respecting and recognizing the diverse Member interests.

15.     Each of the founding Members has executed the Southeast EEM Agreement.  Several additional entities anticipate executing the Southeast EEM Agreement pending necessary internal and other approvals.  Additional Members can join during the annual "open season window" if they meet all Member requirements, which are established in Section 3.2 of the Southeast EEM Agreement.  Specifically, Members must be one of the following:  (i) a Load Serving Entity located in the Territory;[4] (ii) an association, Cooperative or Governmental Entity that is a Load Serving entity located in the Territory; or (iii) an association, Cooperative, or Governmental Utility created for the purpose of providing Energy to a Cooperative or governmental Load Serving Entities (or the Load Serving Entities being served by an association, Cooperative or Governmental Entity) located in the Territory.  The third category is intended to capture disaggregated cooperatives that are not affiliated, but have responsibilities related to the same load ("Disaggregated Cooperatives").  There are several such cooperatives located in the Southeast.  The founding Members decided to base membership around load serving requirements because the core goal of the Southeast EEM is to benefit customers through reduced costs gained by more efficient transactions, and the membership criteria ensures alignment of Members' interests around that core goal.  While membership is based on load serving obligations, participation in the Southeast EEM was structured to apply

---

[3]     To the extent the Participating Transmission Provider is also a Member, it will be a party to the Southeast EEM Agreement, and to the extent a Participating Transmission Provider is also a Participant, it will be a party to a Market Participant Agreement.

[4]     Capitalized terms used in this Affidavit that are not defined have the meaning given to them in the Southeast EEM Agreement.

broadly, as discussed below.  The Southeast EEM Agreement requires Members that provide transmission service to provide NFEETS under their tariffs or applicable transmission rules.[5]

16.  To provide certainty about cost allocation, discussed further below, Members will be able to join during an annual "Enrollment Period" that will run from July 1 through September 30 of each calendar year.  *See* Southeast EEM Agreement at Section 3.2.3.  This period aligns with the creation of the annual budget and with the allocation of voting rights for the upcoming year.

17.  Use of and participation in the Southeast EEM System itself is voluntary and is open to all resources that have a valid source or sink within the Southeast EEM territory.  In other words, generation or load that is physically interconnected to a Participating Transmission Provider and within a Balancing Authority Area and can physically transact in the bilateral markets today can use the Southeast EEM.[6]  Entities that wish to participate in the Southeast EEM are required to execute a Market Participation Agreement and are called "Participants."  Members can be Participants, but Participants are not required to be Members, nor will all Participants necessarily satisfy the membership criteria.

18.  Participants need not be parties to the Southeast EEM Agreement.  Instead, Participants can use the Southeast EEM System so long as they meet the criteria established in Part III of the Market Rules.  As noted above, Participants must "own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory."  In addition, Participants must:  1) execute and deliver a signed "Market Participant Agreement"; 2) have transmission arrangements to obtain NFEETS from each Participating Transmission Provider; and 3) have Enabling Agreements with at least three other non-affiliated Participants to be able to be matched through the Southeast EEM System.  When voluntarily participating in the Southeast EEM, FERC-jurisdictional entities are required to transact pursuant to their market-based rate tariffs.  The Market Participant Agreement obligates Market Participants to abide by the Market Rules.  There will be no cost to non-Member Participants for participating in the Southeast EEM.

19.  Both membership and participation are voluntary – that is a core principle of the Southeast EEM.  A Participant can stop using the Southeast EEM System at any time.  In that event, it would be unable to use NFEETS service for any other purpose because it is only available for Energy Exchanges.  Thus, to continue using a Participating Transmission Provider's system, such former Participant would need to utilize a different form of service offered by the provider.  Members can terminate their membership, subject to the

---

[5]  Some of the Members do not have transmission tariffs. For example, as discussed in the Overview Affidavit, Tennessee Valley Authority has Transmission Principles. For purposes of this affidavit, we refer to any such transmission rules generically as a "tariff."

[6]  To the extent demand response resources or distributed energy resources could have a valid source or sink and be able to participate in the wholesale market pursuant to applicable state laws, they could participate in the Southeast EEM.  However, at this time, the Members do not believe such resources would meet those criteria.

notice provisions in the Southeast EEM Agreement. Because the Southeast EEM System relies on a "Network Map" model, entities that are BAs or Participating Transmission Providers must give 90 days' notice, which provides time for the models to be updated. *See* Southeast EEM Agreement Section 4.2.1. All other Members must provide 30 days' notice. In addition, non-Commission jurisdictional Members can withdraw immediately if they believe continued membership would jeopardize their non-jurisdictional status. As discussed in more detail below, withdrawing Members must pay all costs previously allocated to them.

20.     The Members view the cost allocation provisions of the Southeast EEM Agreement to be fair and not a barrier to withdrawal. As described in the Overview Affidavit at P 31, the costs to establish and maintain the Southeast EEM are anticipated to be relatively low compared to other models or market designs, which was one of the primary goals of the Southeast EEM. Accordingly, the Members expect that start-up costs will be paid within the first year (rather than recovered over time) and that ongoing costs will remain low.

21.     The primary differences between Members and Participants in terms of involvement in the Southeast EEM are cost responsibility and governance, both of which are discussed below. As explained in the Overview Affidavit, Members are responsible for financing the development and operation of the Southeast EEM System, and will have decision-making authority and voting rights.

## Governance

22.     The highest governing body in the Southeast EEM will be the Membership Board, which will be responsible for all major decisions. The Southeast EEM Agreement also calls for the creation of an Operating Committee to be responsible for day-to-day issues. Both the Membership Board and the Operating Committee will be comprised of representatives from the Members.

23.     Article 4 of the Southeast EEM Agreement establishes the rules of the Membership Board. Each Member, including Members with multiple participating affiliates in the Southeast EEM (*e.g.*, Southern Companies) and Disaggregated Cooperatives will have one representative on the Membership Board. Each Representative will have two votes: 1) a single vote ("Popular Vote"); and 2) a weighted vote based on the Member's Net Energy for Load ("MNEL") relative to total NEL for all Members ("NEL Vote"). Votes can only occur if there is a quorum and if the issue was properly noticed. For all votes, the combined NEL vote must represent at least three entities. For "Significant Matters," defined in the Southeast EEM Agreement to include the most critical issues (e.g., amendments to the Southeast EEM Agreement), an action will pass with a majority of the Popular Vote, but requires a supermajority NEL vote. For all other matters, an action will pass with a majority of the Popular Vote and the NEL Vote.

|  | Popular Vote | NEL Vote | Minimum Members in Support |
|---|---|---|---|
| **General Matters** | >50% | >50% | 3 |
| **Significant Matters** | >50% | >67% | 3 |

24.    The voting rights were carefully negotiated among the prospective Members.  The Members desired a voting methodology to ensure that all Members have fair representation since there will be a greater use of some Members' resources.  NEL was chosen as an appropriate proxy for Members' use and benefit from the Southeast EEM because Net Energy for Load will reflect Members' relative shares of generation and load responsibilities.  The Popular Vote balances smaller Members' interests by giving all Members an equal vote.  Additionally, the requirement that a NEL vote must include the MNEL of at least three entities was designed to ensure that no one Member could control the Membership Board.

25.    Article 5 of the Southeast EEM Agreement establishes the rules of the Operating Committee.  The Operating Committee will handle all day-to-day activities of the Southeast EEM, including interfacing with the Southeast EEM Administrator, and can act on any matter not specifically reserved to the Membership Board.  The Operating Committee will have four Members, each with a single, equal vote:  two from the Investor-Owned Utility ("IOU") Sector, one from the Cooperative Sector, and one from the Governmental Utility Sector.  The Members agreed to this composition because the IOU Sector, at present, makes up about half of the total NEL, with the Cooperative Sector and Governmental Utility Sector making up the other half, as can be seen from the chart of initial NEL values below.  Committee Members will be selected by their Sectors and will have year-long terms.  Each Sector also has the authority to remove its Operating Committee Member(s).  Votes by the Operating Committee must be unanimous, with any issues that cannot be resolved taken up to the Membership Board.  All Members have a right to attend, observe, and participate in Operating Committee Meetings, but cannot vote if they are not a Committee Member.  These rules were designed, again, to ensure that the diverse interests of the Southeast EEM are represented, that no one Member can control day-to-day activities, and that there will be sufficient transparency for all Members.

**Cost Allocation to Members**

26.    Members are obligated to pay all costs of establishing, operating and maintaining the Southeast EEM System.  Section 7.2.3 of the Southeast EEM Agreement provides that the Membership Board will set an annual budget for the upcoming calendar year every on or before October 1, and each Member will be allocated a portion of the budgeted costs at that time.  *See* Southeast EEM Agreement at Section 7.2.2.  While the costs will be allocated at the beginning of each year, actual payments will not be due until the applicable costs are incurred.  The Members desired an upfront annual cost allocation to provide budgeting certainty.

27.    Southeast EEM costs will be allocated to Members in two ways:  1) 25% of the total costs will be allocated equally to each Member based on the number of Member

Representatives; and 2) the remaining 75% of costs will be allocated based on each Member's NEL, with Members paying an amount proportionate to their NEL as a percentage of the total NEL. NEL values will be reestablished each year based on the values that NERC reports for each entity in its business plan and budget filed annually with FERC in accordance with 18 C.F.R. § 39.4(b). The breakdown of costs is provided as a formula in Section 7.2 of the Southeast EEM Agreement:

$$[(1/4)(TC)(1/TNM)] + [(3/4)(TC)(MNEL/ANEL)] = MAC, \text{ where:}$$

*TC = Total allocable costs.*

*TNM = the total number of Members.*

*MNEL = such Net Energy for Load of the Representative's Member and Member Affiliates as of the Record Date.*

*ANEL = the sum of all Member's Net Energy for Load as of the Record Date.*

*MAC = Member's allocated costs.*

28. This hybrid cost allocation methodology is intended to reflect the reality that some costs of the Southeast EEM will be incurred no matter the number or size of Members and, therefore, should be allocated equally among Members, while other costs will be incurred because of the added scale, use, and benefit of Members with more generation or load and, therefore, should be allocated based on size. By using NEL in both the voting rights and cost allocation methodology, Members have also sought to ensure that those Members which are expected to make more use and receive more benefits from the Southeast EEM based on their larger generation portfolio and load responsibilities will not only have a larger voting interest, but will also bear more cost responsibility.

29. The current breakdown of MNEL based on the current membership (and anticipated membership)[7] is as follows:

| Party | 2021 MNEL (MWh)[8] |
|-------|---------------------|
| AECI | 23,474,005 |
| Dalton | 2,067,319 |
| Dominion Energy SC | 23,120,146 |
| Duke | 133,066,383 |
|     Duke Energy Carolinas | 86,663,827 |
|     Duke Energy Progress | 46,402,556 |

---

[7] Entities that have not yet executed the Southeast EEM Agreement, but have stated their intent to do so subject to necessary approvals are included for completeness and designated with an asterisk.

[8] The NEL values in this chart are based on the values reported to the North American Electric Reliability Corporation ("NERC") in its August 24, 2020 "Request for Acceptance of 2021 Business Plans and Budgets of NERC and Regional Entities and for Approval of Proposed Assessments to Fund Budgets," filed in Docket No. RR20-6-000.

| Party | 2021 MNEL (MWh)[8] |
|---|---|
| GSOC, GTC, OPC* | 41,261,927 |
| LG&E & KU | 33,165,655 |
| MEAG* | 11,326,212 |
| NC Municipal Power Agency 1 (Electricities) | 4,921,479 |
| NCEMC | 13,323,038 |
| PowerSouth | 9,228,988 |
| Santee Cooper* | 8,728,235 |
| Southern Companies | 153,910,118 |
|     Alabama Power Company | 56,216,517 |
|     Georgia Power Company | 87,610,754 |
|     Mississippi Power Company | 10,082,847 |
| TVA | 159,328,344 |
| **Total ANEL** | 616,921,849 |

30.  As an example of this cost allocation methodology, if the costs for this year were $1,000,000, the amounts allocated to each of our companies (AECI and Southern Companies) would be calculated as follows:

**AECI Sample Cost Allocation**

    a)  $[(1/4)(\$1,000,000)(1/13^9)] + [(3/4)(\$1,000,000)(23,474,005/616,921,849)]$

    b)  $[(0.25)(\$1,000,000)(0.0769)] + [(0.75)(\$1,000,000)(0.0381)]$

    c)  $[(\$250,000)(0.0769)] + [(\$750,000)(0.0381)]$

    d)  $[\$19,225] + [\$28,575]$

    e)  $[\$19,225] + [\$28,575] = \$47,800$

**Southern Companies Sample Cost Allocation**

    a)  $[(1/4)(\$1,000,000)(1/13)] + [(3/4)(\$1,000,000)(153,910,118/616,921,849)]$

    b)  $[(0.25)(\$1,000,000)(0.0769)] + [(0.75)(\$1,000,000)(0.2495)]$

    c)  $[(\$250,000)(0.0769)] + [(\$750,000)(0.2495)]$

    d)  $[\$19,225] + [\$187,125]$

    e)  $[\$19,225] + [\$187,125] = \$206,350$

---

[9]  Note, because the cost allocation, like representation on the Membership Board, considers affiliated entities and Disaggregated Cooperatives as one entity, under the anticipated membership list above, the total number of Member Representatives that would be subject to the 25% allocation of costs is 13.

Document Accession #: 20210212-5033          Filed Date: 02/12/2021

The Southeast EEM Agreement provides a mechanism to adjust these values if new Members join or if Members withdraw. New Member cost allocations are addressed in Section 7.3 of the Southeast EEM Agreement. Because new Members can only join during the annual Enrollment Period, costs will be allocated to them in accordance with the annual budgeting process. Withdrawing Members will remain responsible for all costs previously allocated to them (*i.e.*, all costs of the Annual Budget or additional costs assessed by the Membership Board), but not for any costs assessed on or after the date of their notice to withdraw. *See* Southeast EEM Agreement Section 4.2.1.

## Pre-Market Activities

31.   Before the Southeast EEM can begin operations, the Members must select a vendor to develop the Southeast EEM System. That vendor may or may not be the same vendor ultimately selected to be the Southeast EEM Administrator, the entity that will operate the Southeast EEM System once developed in accordance with the requirements and obligations established in the Southeast EEM Agreement and Market Rules. The Members are about to begin a request for proposals ("RFP") process to select a vendor to design the Southeast EEM System. In the early stages of the Southeast EEM development, the founding Members reached out to a number of vendors with general specifications to test the feasibility and cost of creating the Southeast EEM System. As a result of those initial discussions, the Members are comfortable that there are available vendors to achieve their goals for the Southeast EEM System. Selection of a vendor for the Southeast EEM System and an entity for the Administrator are "Significant Matters" under the Southeast EEM Agreement and will require a majority Popular Vote and a supermajority NEL Vote. The Members anticipate responses to the RFP in the first quarter of 2021, and intend to select the vendor in early 2021. However, the Members do not presently intend significant new capital expenditures – and will condition the commencement of performance of any vendor contract on FERC acceptance of the Southeast EEM Agreement – until the Commission has accepted these filings without material modification, and thereby has provided regulatory certainty.

32.   In addition, before the market can commence, each of the Members that is a transmission service provider must amend its tariff to provide NFEETS. Entities that provide this transmission service are called Participating Transmission Providers. At the outset, all of the Participating Transmission Providers are also Members, but the Southeast EEM Agreement does not preclude non-Members from providing the service. NFEETS must have the following characteristics:

- It is non-firm transmission;

- It is available on an as-available basis (*i.e.*, it is only available after all other uses have been taken into account);

- It is provided solely for 15-minute Energy Exchanges;

- It has the lowest curtailment priority;

- The rate for service is $0/MWh;

- There are no associated Schedule 1 or Schedule 2 ancillary service charges;

- Real Power Losses ("Losses") will be "financial" in that they will be supplied by the applicable Participating Transmission Provider and paid for by the matched bidder and offeror to each Energy Exchange. Such financial losses will be assessed based on the loss factor and loss rate in the Participating Transmission Provider's tariff and equally shared between the matched bidder and offeror;

- It may be obtained only using the reservation, scheduling and tagging functions of the Southeast EEM System (rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by the Participating Transmission Provider);

- It may not be reassigned, sold, or redirected;

- It can only be provided by a Participating Transmission Provider whose system, if added to the other Participating Transmission Provider systems, creates a continuous Contract Path; and

- The Participating Transmission Provider must provide the information required by the Southeast EEM Market Rules (*e.g.*, available transmission).

33. Of note, like all forms of transmission service, Losses will be incurred in the provision of NFEETS and, consistent with FERC precedent, the Participating Transmission Providers are not obligated to provide such Losses. When considering how to incorporate the recovery of Losses into the Southeast EEM System, the Ops Team determined that the best option would be to require all Participating Transmission Providers to utilize financial losses for Energy Exchanges, rather than allow for in-kind losses. Use of financial losses permits losses to be considered by the algorithm when evaluating benefits to match bids and offers for Energy Exchanges. Because in some cases, the benefit margin between an individual bid and an offer may be small, it is important to consider Losses upfront in the matching process to ensure that the transaction, as a whole, after considering Losses, results in a net benefit for the buyer and seller.

## Market Operations Overview

34. One of the Southeast EEM's biggest enhancements to the bilateral market is the ability to compress the timeline for bilateral trading to facilitate intra-hour trading availability on a wide scale. Although the bilateral markets as they exist today are robust, intra-hour transactions have historically been limited by practical time constraints. Today, buyers and sellers must discover each other, negotiate key terms (like price), and make transmission service arrangements to consummate a deal. Introducing technology to automatically find buyers and sellers, set the price based on their parameters, and tag energy transactions, combined with the new zero-cost, as-available NFEETS that will reduce hurdle rates, will make intra-hour trading more practical, beneficial, and economic on a large scale.

35. For comparison, the two illustrative charts below show timing in the hourly market versus the Southeast EEM intra-hour market:

**Existing Hourly Market**



**Southeast EEM Intra-Hour Trading**



The Southeast EEM will rely on data provided by Participating Transmission Providers and Participants to enable the algorithm to run within the time requirements above.

During initial market set up, and to accommodate any new or withdrawing Members, the Southeast EEM System will create a Network Map of all potential Contract Paths within the Southeast EEM footprint. This will require Participating Transmission Providers to provide sufficient information to detail all TSP areas, valid transmission paths, and source and sink locations. This baseline Network Map will be the foundation for running the algorithm for every fifteen-minute period. The algorithm will be programmed with certain market rules (referred to as "Generally Applicable Constraints"), *e.g.*, it will not allow a match between a Participant's own Bid and Offer. In addition, the algorithm will consider the following information submitted by Participants and Participating Transmission Providers:

| Information Description | Provided By | Deadline for Algorithm Input |
|---|---|---|
| Available transmission | Participating Transmission Providers, calculated in accordance with their Tariffs and adjusted for other scheduling impacts | 15 minutes before the top of each hour (may be updated on an intra-hour basis if Participating Transmission Provider has that functionality) |
| Real Power Loss Factor and Financial Loss Rate | Participating Transmission Providers, provided in accordance with their Tariffs | Can be updated prior to any 15-minute Bid/Offer submission deadline |
| Participant Specific Constraints (counterparty or geographic limitations) | Participants | Established as general conditions; may be updated at any time before the 15-minute Bid/Offer submission deadline |
| Bid/Offer Information | Participants | 15 minutes before the start of each applicable Delivery Interval |

We discuss this information in more detail below. Importantly, these data inputs ensure that Energy Exchanges can only use transmission that is voluntarily made available to the Southeast EEM. The algorithm will not generate matches that rely on Contract Paths that are not modeled in the Network Map. Additionally, the algorithm will not generate matches that would cause the available NFEETS transmission (as reported by the respective Participating Transmission Providers) to be exceeded on any Contract Path. In other words, there are protections built into the algorithm that prevent unauthorized use of transmission systems.

36.   Based on these inputs, the algorithm will run to produce a set of matches. The algorithm will solve using a mixed integer linear programming concept and will produce a set of matched Bids and Offers that creates the most benefit during each market interval while

adhering to all constraints. The total benefit will be calculated as the "savings" produced by each of the Energy Exchanges (*i.e.*, the difference between the sum of all matched Bid Prices and the sum of all matched Offer Prices, less the cost of Losses allocated to the Energy Exchanges and multiplied by the total MWh).

## **Market Operations – Bids, Offers, and Matching**

37.   The algorithm will consider two categories of constraints, as set forth in the Market Rules: 1) Generally Applicable Constraints; and 2) Participant-Specific Constraints.

38.   Generally Applicable Constraints, as the name suggests, apply equally to all Participants. The constraints are transmission availability and pre-set market rules on matching. Section IV.C.6 of the Market Rules provides the following rules that the algorithm must abide by for all matches:

- In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the available transmission capacity reported to the Southeast EEM System to be exceeded on any given segment of the Contract Path. A segment of the Contract Path means a unidirectional path between a Point of Receipt ("POR") and Point of Delivery ("POD") on a Transmission Service Provider's system.

- Energy Exchanges shall not be made that cause:

  o   A Buyer to purchase more MWs than the amount set forth in its Bid;

  o   A Seller to sell more MWs than the amount set forth in its Offer; and

  o   For matched Bids and Offers, the Energy Exchange Price (determined based on the split the saving method discussed below) to be less than the Offer Price or more than the Bid Price considering any applicable Losses.

- Total MW of potential Energy Exchanges in any Delivery Interval shall not exceed the volume of Offers for such Delivery Interval. Also, total MW of potential Energy Exchanges in any Delivery Interval shall not exceed the volume of Bids for such Delivery Interval.

- All transmission flows in a Delivery Interval related to Energy Exchanges on any Contract Path should be greater than or equal to 0 MW but less than or equal to the Contract Path's available transmission for such Intra-Hour Segment.

- A Bid of a Participant shall not be matched with an Offer of the same Participant.

- The Southeast EEM Algorithm shall not create Energy Exchanges in the same Delivery Interval that would create offsetting Energy Exchanges whereby Participant 1 sells to Participant 2 while Participant 2 sells to Participant 1 during the same interval at the same location.

39.   Participant-Specific Constraints, again, as the name suggests, are constraints that are submitted by individual Participants and only apply to Bids and/or Offers submitted by

that Participant. The rules for Participant-Specific Constraints are established in Section IV.A.b of the Market Rules. When joining the Southeast EEM, Participants will be required to create a "User Profile" that includes basic information about the Participant. As part of this process, the Participant will also need to reflect any Participant-Specific Constraints. These constraints will be recognized by the Participant's decision to "toggle on or off" its ability to be matched with counterparties or in specific geographic areas (*e.g.*, Balancing Authority Areas). The settings may be different for Bids versus Offers depending on the Participant's selection. *See* Market Rules Section IV.A. However, to be eligible for matching, a Participant's Participant-Specific Constraints must be set such that there are at least three other non-affiliated Participants with whom the submitting Participant can be matched. An Offeror seeking an Energy Exchange must have its Participant-Specific Constraints set to permit matching with at least three other non-affiliated Participants who can be matched for an Energy Exchange as Buyers. A Bidder seeking an Energy Exchange must have its Participant-Specific Constraints set to permit matching with at least three other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as Sellers (the "Three Eligible Counterparty Requirement"). The requirement applies only to the number of potential counterparties that are enabled to transact with the participant submitting a Bid or Offer; it does not require that each of the potential counterparties submit a Bid or Offer in the relevant interval.

40.     Participant-Specific Constraints could be entered for a number of reasons. For example, a Participant could toggle off a counterparty because it does not have an Enabling Agreement with them or because credit limitations have been exceeded. The constraints will also be the mechanism through which some Commission-jurisdictional market-based rate ("MBR") Sellers ensure compliance with their MBR authorization and the Commission's affiliate restrictions. Each of the Commission-jurisdictional entities has MBR authority with some mitigation in place for specific BAAs. Those entities will be able to program that mitigation into their bids and offers, by setting up Participant-Specific Constraints. For example, our understanding is that, because they are not permitted to make sales at market-based rates in their own BAAs, Dominion Energy South Carolina, Inc. ("Dominion Energy SC"), Duke Energy Carolinas, LLC ("DEC"), Duke Energy Progress, LLC ("DEP"), and Louisville Gas & Electric Company("LGE&E") and Kentucky Utilities Company ("KU") have each decided to turn off their ability to be matched with buyers within their own BAAs. To comply with its mitigation requirements, Southern Companies will instead be submitting a "maximum match price" that will be used to modify the Energy Exchange Price if that price is above the "maximum match price" for buyers in its mitigated BAAs. The adjustment will be made after the optimization function of the algorithm is performed to ensure that there are no unintended impacts on optimization. This will retain the same overall benefit for the Energy Exchange but shift a greater portion of the benefit to the buyer. Similarly, entities subject to the Commission's affiliate restrictions that are affiliated with other Participants will be able to ensure that they are not matched with their affiliates by turning them off as counterparties in all geographic locations. In addition, as explained by Mr. Melda in the Overview Affidavit, TVA will establish geographical constraints to respect the "TVA fence." While the Southeast EEM will provide the necessary tools, it will be each

Participant's responsibility to ensure that its User Profile accurately reflects its constraints and that its selected Participant-Specific Constraints will ensure compliance with any regulatory requirements.

41. As in the bilateral market today, the onus to ensure compliance with MBR authority obligations, affiliate restrictions, and all other Commission requirements will remain with the individual jurisdictional entities. The Southeast EEM System will not monitor Participant-Specific Constraints or require Participants to submit a reason for their selection. Rather, the Southeast EEM Agreement establishes tools – *e.g.*, the toggle on and off – to allow the Participants to ensure their own compliance. As an added protection, the default setting for all locations and all counterparties will be "off," so that the Participants must affirmatively turn on their ability to trade with specific counterparties and in specific locations. The Commission will be able to monitor the FERC-jurisdictional entities' compliance with their MBR authorization and affiliate restrictions in the same manner they do today – by reviewing the transactions in each Participant's EQRs or through audits. As of filing, thirteen Members submit EQRs. Specifically: Alabama Power, Georgia Power, Mississippi Power, AECI, Dominion Energy SC, DEC, DEP, LG&E, KU, North Carolina Municipal Power Agency Number 1, PowerSouth Energy Cooperative, North Carolina Electric Membership Corporation, and Tennessee Valley Authority.[10] This represents approximately 98% of total NEL of the Members. Southeast EEM transactions will be recognizable in EQRs because the transaction terms will be for 15 minutes. Although it is possible that a non-Southeast EEM transaction could have a 15-minute term, such transactions are rare.

42. Besides constraint information, the algorithm will also rely on information submitted with Bids and Offers. All Bids and Offers must include the following information, specified in Section IV.B.3 of the Market Rules:

- Participant name.

- Whether the submission is a Bid or an Offer.

- An amount of Non-Firm Energy for the Bid or Offer in increments of four MW,[11] and an indication of whether the block size is allowed to be partially matched, referred to as the "All or Nothing" flag.

    o Additionally, there will be a limit on the number of bids or offers submitted by a Participant at any one Source or Sink during the same Delivery Interval.

- For all Offers, an Offer Price and for all Bids, a Bid Price (both in $/MWh).

---

[10] Additionally, while not a Member at the time of filing, Oglethorpe Power Corporation also files EQRs.

[11] The requirement to use a four MW increment for all Bids and Offers is to allow for intra-hour integration, thus avoiding rounding issues in the settlement process.

- For all Offers, a Source and for all Bids, a Sink.

- The specific Delivery Interval for which the specified Bid or Offer is valid.

In addition, Offers may include a maximum match price. Moreover, to be able to submit bids and offers for a particular Delivery Interval, the Participant's Participant-Specific Constraints must be set such that they comply with the Three Eligible Counterparty Requirement described above.

43. Using all constraint information and rules and Bid and Offer data, the algorithm will use a mixed integer linear programming concept to determine the optimal solution. That solution will be a set of matches that creates the most market benefit. The benefit will be measured by the total "savings," (*i.e.*, the difference for all matched transactions between the sum of matched Bid Prices and the sum of matched Offer Prices). The algorithm will not be sequential – *i.e.*, it will not create one match, and then another, and so on. It will create an entire data set based on all Bid and Offer data and respecting all constraints.

44. To the extent that there are Bids/Offers that are identical in terms of price and Sink/Source and, therefore, provide the same benefit, a randomized prioritization will be used. Additionally, randomization will be employed in the algorithm in all other situations if a heuristic is required to resolve ties or ambiguities. For instance, if more than one set of matches yields the same (maximal) benefit, a randomized process will be used to determine the final set of matches

45. Constraints will ensure that the algorithm only matches feasible Bids and Offers. For example, if a Participant has toggled off another Participant, the algorithm will not consider their Bids and Offers as potential matches. Transmission availability will be handled similarly with one important difference. If both counterparties to a potential match have indicated a willingness to accept a partial match, a transmission constraint could potentially decrease the volume of the match rather than prohibit it entirely. For example, if Participant A and Participant B submitted a Bid and Offer, each for 100 MW, and only 80 MW of transmission was available along the Contract Path, the algorithm could match the two participants for an 80 MW match.[12] This example assumes that the match reflects all other constraints and, along with all other matches, represents the optimal solution.

46. In addition, each Bid or Offer may be matched with one or more counterparties. For example, if Participant A submitted an Offer of 100 MW, it may be matched with Participant B for 20 MW and with Participant C for 80 MW,[13] where each of the two

---

[12] This partial matching functionality would nevertheless be subject to the requirement that each Energy Exchange transaction will be in increments of four MW.

[13] This result would be possible even if Participant A designated its 100 MW Offer as "all or nothing," as this constraint applies to whether the full quantity of the Offer or Bid is matched, and does

Energy Exchange transactions may have a different Sink and may be delivered on differed transmission paths.

47. Matches made through the Southeast EEM System are for non-firm energy and will be consummated in accordance with the underlying Enabling Agreement for the matched Energy Exchange. Each such Enabling Agreement will be entered into separately between the Participants, under terms and conditions of their choosing – the Southeast EEM will have no role in that. If an Offeror is matched with a Bidder but does not alter its dispatch to effectuate the match, its under-generation will be treated as imbalance, just as it would with bilateral physical transactions today. The same is true if a load fails to dispatch its owned or contracted generation down to reflect a Southeast EEM purchase. As the Ops Team says, "submitted is committed" in terms of Bids and Offers. This is necessary to make the Southeast EEM System function properly and will also help ensure that participants submit only *bona fide* Bids and Offers they are able and willing to physically perform on if matched.

48. Based on the running of the algorithm, the Southeast EEM System will generate the following information:

   - e-Tags to be submitted to appropriate TSPs/BAs and Participants.

   - Notifications to matched Participants of the Energy Exchange, including the Energy Exchange Price and volume.

   - Data to Participating Transmission Providers necessary for Participating Transmission Providers to settle financial losses with appropriate Participants.

49. The prices for matches will be on a split-the-savings basis (*i.e.*, "midpoint"), and will incorporate transmission losses for Participating Transmission Provider systems that are utilized in a transaction. The Members evaluated and considered several options for match pricing. Specifically, the Members considered: 1) bid-based matching, in which the price would be set based on the buyer's bid price; 2) offer-based matching, in which the price would be set at the seller's offer price; and 3) split the savings, in which the price would be set at the midpoint between buyer's bid price and the seller's offer price. In all three scenarios, benefits would be measured as the difference between the bid price and offer price, and so market-wide benefits would be the same. However, in individual transactions, bid-based pricing would give all the benefits to generators while offer-based pricing would give all the benefit to load. The Members selected split-the-savings pricing because they desired a methodology that would evenly distribute market benefits to buyer and sellers and ultimately benefit customers. Further, the Members believe that split-the-savings pricing will incentivize Participants to submit bids and offers at or near their marginal costs (generation) or avoided costs (load) to have a higher chance of matching.

50. As mentioned above, the price for NFEETS will be $0/MWh, so the algorithm will not factor in any incremental transmission cost. However, parties will be responsible for

---

not necessarily constrain the algorithm to matching the full quantity via a single Energy Exchange transaction.

Losses on each transmission system that the transaction utilizes. As with other types of transmission service, Losses will be the responsibility of the transmission customer, not the Transmission Provider. As noted above, NFEETS Transmission Customers are required to pay financial losses and will not have the option to provide physical losses. The Members determined that requiring financial losses to be paid by all customers would be fair and would allow the algorithm to solve in the necessary time frame. Financial losses will be based on the loss factor and loss rates established in each Participating Transmission Provider's tariff. Losses will be charged by the Participating Transmission Provider to the transmission customer in each Energy Exchange, as is the case today. However, the algorithm will factor Losses into the split-the-savings match price and will allocate the total costs for Losses equally between the buyer and seller. It will be up to the seller and buyer to settle the financial loss charge with the applicable Participating Transmission Provider(s). Recovery for financial losses is appropriate and necessary to ensure that Energy Exchanges do not "lean" on other generation to provide system losses. The Ops Team determined that using financial losses would best achieve the goal of market simplicity.

51. The below simplified example shows how matching will occur and Energy Exchange Prices will be determined under the Southeast EEM System:



- Source A: 100 MW Offer @ 20.00 $/MWh matched to
- Sink B: 100 MW Bid @ 30.00 $/MWh
- Midpoint without Losses: 25.00 $/MWh ($2,500.00 total)
- LGE/KU to charge Losses to Offeror from Source A: 3.0 MW @ 22.00 $/MWh = $66.00
- TVA to charge Losses to Offeror from Source A: 2.8 MW @ 26.00 $/MWh = $72.80
- SOCO to charge Losses to Bidder in Sink B: 2.2 MW @ 31.00 $/MWh = $68.20
- Must add ½ of the Seller Losses to the Midpoint
  - $2,500.00 + ($66.00 + $72.80)/2 = $2,569.40
- Must subtract ½ of the Buyer Losses from that Price
  - $2,569.40 – ($68.20)/2 = $2,535.30
- Midpoint with Losses (*i.e.*, Energy Exchange Price): 25.35 $/MWh (rounded price)

## **Auditing and Reporting**

52. Subject to approval by the Membership Board, the Southeast EEM Agent will engage an independent entity to periodically review the operation of the Southeast EEM System and be responsible for responding to questions from Participants and/or regulators regarding the integrity of the matching process (the "Auditor"). Selection of the Auditor will be a "Significant Matter." The Auditor will not be a market monitor. Rather, its purpose is to ensure that the Southeast EEM functions in accordance with the Market Rules. In addition, the Auditor may also receive complaints from Participants, which it will refer to the Membership Board and investigate at the Membership Board's discretion.

53. The Southeast EEM Administrator will publicly publish information about the Southeast EEM on an hourly, daily, and monthly basis. The information is intended to provide market transparency and give confidence to Participants and other stakeholders that the Southeast EEM is performing as anticipated and providing benefits. At the same time, the information provided is intended to ensure that commercially sensitive information is protected. For that reason, pricing information will not be provided at all until the next trading day and will be aggregated. The Members believe the information to be shared (outlined below) strikes the proper balance between the two competing interests. Individual transaction data will continue to be made available in EQRs for those entities that are required to file. Specifically, the Southeast EEM Administrator will generate the following information, to be publicly posted on the Southeast EEM website:

- Monthly:
  - Minimum, maximum, and weighted average match prices;
  - Amount of energy offered and sold as well as bid and purchased over specified intervals;
  - Amount of energy that flowed once matched;
  - Total amount of energy transacted;
  - Total number of transactions;
  - Total benefit;
  - Minimum, maximum, and average MW match amount; and
  - Matches made but not executed.
- For the prior day provide aggregated summary data (at 6:00 AM CPT) including:
  - Total number of bids and offers during an hour;
  - Amount of energy offered and sold as well as bid and purchased during that hour;
  - Number of transactions executed for an hour;
  - Total number of Participants; and
  - Weighted average match price per hour.
- For the prior hour provide summary data including:
  - Total number of bids and offers during that hour;
  - Amount of energy offered and sold as well as bid and purchased during that hour;
  - Number of transactions executed for that hour; and
  - Total number of participants.

54.  These reports will provide more transparency than exists today in the Southeast bilateral markets.

## The Southeast EEM does not Harm Reliability

55.  The Ops Team considered potential reliability implications when developing the key elements of the Southeast EEM, and ultimately selected the framework discussed herein in part because it does not negatively impact reliability and indeed is expected to improve reliability by adding another tool to manage generation and load balance in shorter increments of time.  Part of the simplicity and strength of the Southeast EEM design is that it does not change any current reliability roles, responsibilities, or the way transmission capacity availability is calculated and provided to transmission customers.  The reliability obligations that BAs and TSPs have today are unchanged under the Southeast EEM.

56.  The Southeast EEM cannot be used to meet a LSE's resource adequacy obligations.  LSE's must meet those obligations independently of their Southeast EEM participation.  That means that LSEs must have owned or purchased generation sufficient to meet their needs.  To the extent they participate in the Southeast EEM and are matched for an energy exchange, purchases would permit the LSE to back down generation.

57.  The requirements for NFEETS were designed so that the service will not negatively impact other customers.  It is a truly "as available" service.[14]  It will be available only if capacity remains after all other uses have been reserved.  The Southeast EEM Administrator will submit e-Tags so that any Participating Transmission Provider and BA whose system is used for an Energy Exchange Transaction will be notified and can take that transaction into account.  Further, if a reliability issue arises, NFEETS will be the first to be curtailed.  The bottom line is that transmission customers will be in no worse position operationally because their transmission service provider offers NFEETS.

## Conclusion

58.  The Southeast EEM is an operationally sound proposal that has relatively low costs to implement and will provide cost savings for Participants without negatively impacting reliability.  It is a thoughtful and carefully designed proposal.

59.  This concludes our affidavit.

---

[14]     Because it is an as-available service with the lowest priority, there is no need for the performance of transmission studies for the provision of NFEETS to a customer.

## VERIFICATION OF CHRISTOPHER MCGEENEY

Pursuant to 18 U.S.C. § 1746 (2020), I state under penalty of perjury that the foregoing testimony is true and correct to the best of my knowledge, information, and belief, with the exception of Paragraph 3.

Executed this 10th day of February, 2021.

Christopher McGeeney
Associated Electric Cooperative, Inc.
Senior Manager, Transmission Services

## VERIFICATION OF COREY SELLERS

Pursuant to 18 U.S.C. § 1746 (2020), I state under penalty of perjury that the foregoing

testimony is true and correct to the best of my knowledge, information, and belief, with the

exception of Paragraph 2.

Executed this _10_ day of February, 2021.

_____
Corey Sellers
Southern Company
General Manager of Transmission Policy and Services/Energy Policy

JA0445

Attachment D

Affidavit of Susan L. Pope

JA0446

# UNITED STATES OF AMERICA

# BEFORE THE

# FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| *Southern Company Services, Inc.* | ) | **Docket No. ER21-___-000** |
| | ) | |
| | ) | |

### AFFIDAVIT

### OF

### SUSAN L. POPE

### ON BEHALF OF

### THE MEMBERS OF THE SOUTHEAST ENERGY EXCHANGE MARKET

February 12, 2021

## Table of Contents

1.  **Introduction** ................................................................................................................. **1**

    1.1 Understanding of Southeast EEM Proposal ........................................................ 1

    1.2 Assignment by Counsel ...................................................................................... 2

    1.3 Assumptions ........................................................................................................ 2

    1.4 Summary of Conclusions .................................................................................... 3

    1.5 Organization of Affidavit .................................................................................... 4

2.  **Qualifications** .............................................................................................................. **4**

3.  **Southeast EEM Benefits** ............................................................................................ **5**

    3.1 Beneficial Design Features ................................................................................. 5

    3.2 Bidding Incentives ............................................................................................... 9

    3.3 Reliability and Resource Adequacy Impacts ..................................................... 16

    3.4 Conclusions ........................................................................................................ 18

4.  **Market Power** ............................................................................................................ **18**

5.  **Market Manipulation** ............................................................................................... **20**

    5.1 Protection Against Potentially Unfair Access to NFEETS .................................. 21

    5.2 Protection Against Possible Manipulation of the Average Exchange Price ............... 24

**Attachment D-1: Susan L. Pope CV**

JA0448

# 1. INTRODUCTION

1. My name is Susan L. Pope.  I am a Managing Director at FTI Consulting, Inc.  My business address is 200 State Street, Boston, Massachusetts 02109.

## 1.1 UNDERSTANDING OF SOUTHEAST EEM PROPOSAL

2. The proposed Southeast Energy Exchange Market ("**Southeast EEM**") is a set of agreements, procedures, and processes to enable use of an automated platform to arrange for bilateral energy transactions with 15-minute granularity ("**Energy Exchanges**").  The automated platform ("**Southeast EEM System**") will match willing buyers and willing sellers in bilateral transactions across the multi-state footprint of the Southeast EEM member transmission service providers ("**Participating Transmission Providers**").  The Energy Exchanges arranged in each 15-minute interval will depend on the bids and offers of buyers and sellers, available transmission, charges for transmission losses, counterparty restrictions, and requirements under each jurisdictional seller's market-based rate ("**MBR**") authority.  Considering these inputs and constraints, the software for the Southeast EEM System will match buyers and sellers into Energy Exchanges so as to maximize the benefits of the set of bilateral transactions arranged for each 15-minute interval (the "**Algorithm**").[1]

3. Participants in the Southeast EEM must be able to buy and/or sell physical energy within the footprint of the Participating Transmission Providers ("**Territory**").  Buyers must have at least one valid sink location, and sellers must have at least one valid source location.  Additionally, Participants must arrange for transmission service with all Participating Transmission Providers and have enabling agreements for purchases and sales of energy with at least three non-affiliated counterparties.[2]

4. Energy Exchanges arranged by the Southeast EEM System will be delivered using a new Non-Firm Energy Exchange Transmission Service ("**NFEETS**") product, which will have a lower NERC priority than any other transmission service offered by the Participating Transmission Providers.  NFEETS will utilize available transmission that remains for a 15-minute interval after each Participating Transmission Provider accounts for all of the e-Tags submitted for existing transmission reservations.[3] NFEETS will be available at zero cost, other than charges for transmission losses and imbalances ("**zero-cost transmission**").  The Southeast EEM System will automatically submit e-Tags to Participating Transmission Providers for the NFEETS arranged during each 15-minute interval.

5. The Southeast EEM System will calculate a split-the-savings price to be paid by the buyer to the seller of each Energy Exchange ("**Energy Exchange Price**").  The result of the buyer paying the Energy

---

[1]  For a complete description of the inputs and constraints of the Algorithm, *See* Appendix B: Southeast EEM Market Rules and Attachment C: Operations Affidavit.

[2] Appendix B: Southeast EEM Market Rules, Section III.B.

[3] Participating Transmission Providers will also account for unscheduled power flows in determining available transmission.

1

Exchange Price to the seller is that each receives half of the energy-related benefits of the Energy Exchange, as measured by the difference between the bid price and offer price, and each pays half of the cost of transmission losses. The Algorithm will ensure that both the buyer and the seller benefit (relative to their bid or offer) from each Energy Exchange, taking into account their payment for half of the cost of transmission losses.[4]

## 1.2 ASSIGNMENT BY COUNSEL

6.  I have been asked by counsel for the filing members of the Southeast EEM ("**Members**") to evaluate three questions as they relate to the Southeast EEM proposal ("**Proposal**"):[5]

    1.  <u>Economic Benefits</u>: Will the Southeast EEM enable an increase in economic efficiency relative to the current rules and procedures for arranging bilateral energy sales within the Southeast EEM Territory?

    2.  <u>Market Power</u>: Could the Southeast EEM create opportunities for participants in the Southeast EEM ("**Participants**") to exercise market power?[6]

    3.  <u>Market Manipulation</u>: Could the Southeast EEM create opportunities for Participants to engage in market manipulation?

## 1.3 ASSUMPTIONS

7.  In developing my opinion on the above questions, I have relied on certain assumptions and information regarding the Proposal.

8.  *First*, I assume that the implementation of the Southeast EEM will adhere to the market rules as presented in Appendix B ("**Market Rules**") to the Southeast Energy Exchange Market Agreement ("**Southeast EEM Agreement**") and in Attachment C to the Southeast EEM Agreement, the Affidavit of Mr. McGeeney and Mr. Sellers ("**Operations Affidavit**"), *i.e.*, the implementation will not include any material additions to, or deletions from, the Market Rules or the market rules as explained in the Operations Affidavit.[7]

9.  *Second*, all bilateral transactions arranged through the Southeast EEM will occur under Members' existing Federal Energy Regulatory Commission-approved MBR authority and existing Open Access

---

[4] Market Rules, Section IV.C.6.b.

[5] Members are entities who have signed the Southeast Energy Exchange Market Agreement and have funding obligations and voting rights.

[6] Participants are entities who have signed the Market Participant Agreement for the Southeast EEM, giving them the ability to participate in the Southeast EEM. All Members are Participants, but Participants are only Members if they also sign the Southeast EEM Agreement.

[7] *See* Market Rules; Operations Affidavit.

JA0450

Transmission Tariffs ("**OATTs**") for jurisdictional entities. [8]  The Member OATTs will be revised to include NFEETS per the terms of the Southeast EEM Agreement. Southeast EEM transactions by non-jurisdictional entities will occur under the authority of their existing arrangements for market-based sales and transmission service.[9]

10. *Third*, I assume the jurisdictional Southeast EEM Participants will utilize the functionality of the Southeast EEM System to ensure that their participation in the Southeast EEM abides by all market power mitigation measures that the Federal Energy Regulatory Commission (the "**Commission**" or "**FERC**") imposes on them.  As explained in the Affidavit of Mr. McGeeney and Mr. Sellers, Participant offers into the Southeast EEM can include counterparty and geographic restrictions to enable them to abide by market power mitigation measures, limiting the parties with whom they can bilaterally trade. Additionally, the Energy Exchange Prices determined by the Southeast EEM System can be capped at the level set by any applicable MBR order.

11. *Fourth*, I assume the software to implement the Southeast EEM platform will maximize the total benefits of the set of Energy Exchanges arranged every 15 minutes with a reasonable degree of consistency.  If and when the software implementation requires a rule to resolve ties or ambiguities, I assume that it will utilize a randomization approach.

12. *Fifth*, FERC will continue to monitor adherence to the rules, restrictions, and requirements – that apply to some Members' pre-Southeast EEM bilateral trading activity – to address the potential for the exercise of horizontal or vertical market power.  Likewise, FERC will continue to have the authority it has today over Participating Transmission Providers' OATTs and administer the underlying principles of open-access and non-discrimination.

## 1.4 SUMMARY OF CONCLUSIONS

13. Based on the information and assumptions set forth above and the reasons discussed below, I conclude as follows:

1. <u>Economic Benefits</u>: The Southeast EEM can reasonably be expected to facilitate an on-going increase in the economic benefits from bilateral trading in the Territory, as measured by a reduction in the variable cost of serving load relative to the *status quo.*  The anticipated benefits stem from a reduction in transaction costs and the elimination of transmission service costs for NFEETS, which facilitate efficiency gains from bilateral transactions that would not otherwise occur.

2. <u>Market Power</u>: The Southeast EEM will enable application of market power mitigation measures required today for bilateral trades in the Southeast, per the MBRs of jurisdictional Participants. Taking the current bilateral market as a starting point, the Southeast EEM is designed to eliminate barriers to competition for trades with a 15-minute duration.  The Southeast EEM's combination of zero-cost, non-pancaked transmission service and automated 15-minute trading reduce the

---

[8] Operations Affidavit at P 40.

[9] Operations Affidavit at P 10.

costs of competition making it more likely that willing buyers and sellers will be able to enter into cost-reducing 15-minute trades. The conclusion that the exercise of market power should not be possible in the Southeast EEM is bolstered by the fact that it is a voluntary, residual market, in effect ruling out the possibility of one or more Participants exercising horizontal market power.

3. <u>Market Manipulation</u>: To the best of my understanding, the Market Rules do not provide a material opportunity for strategic conduct in order to obtain priority access to zero-cost NFEETs or to affect the posted weighted-average Energy Exchange Price to benefit the settlement of a related contract. It is highly unlikely that Participants or financial market traders would choose to settle contracts based on the weighted-average Energy Exchange Price, because (among other things) it is calculated across the large Southeast EEM region and, for this reason, is not reflective of the actual market price for energy at any location.

## 1.5 ORGANIZATION OF AFFIDAVIT

14. The rest of my affidavit is structured as follows:

- Section 2 explains my qualifications as they relate to the assignment by counsel to evaluate certain economic aspects of the Southeast EEM Proposal;

- Section 3 discusses how key features of the Southeast EEM Proposal will enable an increase in economically efficient bilateral trades in the Territory. This section considers whether these benefits could be materially diminished by the bidding incentives of the Proposal or by impacts related to reliability and resource adequacy;

- Section 4 explains why the Southeast EEM will increase competition for 15-minute trades and will not create an opportunity for sellers or buyers to exercise market power; and

- Section 5 explains that there are no apparent opportunities for market manipulation due to the introduction of the Southeast EEM.

## 2. QUALIFICATIONS

15. I have almost 30 years of experience in providing advisory services to design and improve the operation of electricity markets. I have had long-term projects involving almost all organized electricity markets in the U.S., working on behalf of regulators, transmission owners, generation owners, system operators, governmental entities, industry associations, and trading entities. My work focuses on improving or evaluating the economic efficiency of electricity supply while maintaining standards of reliability. A copy of my resume is provided in Attachment D-1: Susan L. Pope CV.

16. Since 2011, I have been a Managing Director at FTI Consulting, where I am part of an economic practice providing expert services to the electric power sector. Prior to joining FTI Consulting, I was a Principal at LECG, LLC and, prior to this, a Principal and Associate at Putnam, Hayes and Bartlett, Inc. I hold a Ph.D. in Business Economics and an undergraduate degree in Applied Mathematics from Harvard University in Cambridge, Massachusetts.

17. Of relevance to my assignment by counsel, I provided expert advice to the Northwest Power Pool in 2013-2014 during an effort to form a short-term spot market among a group of electrically

JA0452

interconnected entities that did not operate as a power pool. This work centered on the issues arising in implementing any type of centralized exchange or short-term regional dispatch, while maintaining traditional mechanisms for transmission scheduling and pricing. Like the Southeast EEM Proposal, the Northwest Power Pool sought to enable a market including a large, non-FERC jurisdictional entity as well as entities subject to FERC jurisdiction.

18. Additionally, I have been engaged on several projects related to the California ISO Energy Imbalance Market ("**EIM**") which, among other things, is used to schedule residual transmission capacity. I engaged in early assessments of the operation of the EIM on behalf of the Northwest Power Pool and later assessed EIM operation for work on behalf of the Independent Electricity System Operator of Ontario.

19. I also had a lead role for many years in assisting the transmission owning utilities within New York, who were developing the market rules for the New York ISO. Through this work and work in other regions, I developed expertise concerning the connection between transmission pricing and the costs and challenges of maintaining transmission system reliability, how transmission cost shifting can occur as a result of changes to rules for transmission access and pricing, the challenges encountered in including non-jurisdictional entities in regional electricity markets, the connection between transmission pricing and transmission access, and the challenges of maintaining historic transmission rights while introducing improvements to mechanisms for short-term energy purchases and sales. For the New York ISO, the Midcontinent ISO, and the California ISO, I was the lead consultant in designing region-specific mechanisms to address transmission cost shifting potentially arising from their energy market designs.

20. My recent work includes co-authoring testimony in support of reforms to PJM's operating reserve market, advising the Independent Electricity System Operator of Ontario on the redesign of its electricity markets (since 2017), testifying in Alberta about possible issues with their proposed capacity market, co-leading a series of meetings to advise the Public Utility Authority of Israel on the introduction of competitive electricity markets, and co-authoring reports on electricity market design alternatives on behalf of several regulatory authorities in Australia.

## 3. SOUTHEAST EEM BENEFITS

### 3.1 BENEFICIAL DESIGN FEATURES

21. The Southeast EEM design will enable an increase in economically efficient bilateral energy transactions in the Southeast EEM Territory. In the context of the Southeast EEM Proposal, a transaction is considered economically efficient if it reduces the total production costs to serve demand in the Southeast EEM Territory during a 15-minute interval; that is, if it enables lower cost supply to be used instead of higher cost supply.

22. There are two general reasons why the Southeast EEM will enable cost reductions that cannot be achieved with the bilateral trading tools and procedures currently used within the Territory:[10]

- Reduction in Transaction Costs: The Southeast EEM will employ automation to quickly match willing buyers with willing sellers, enabling 15-minute trades to be arranged over a broad geographic area; and

- Zero-Cost Transmission: The transmission service charge will be zero for NFEETS.

### 3.1.1.  REDUCTION IN TRANSACTION COSTS[11]

23. Bilateral energy markets generally rely on potential buyers and potential sellers to communicate directly with each other to identify opportunities for mutually beneficial transactions. Efficient bilateral transactions are arranged in this manner all of the time but discovering information about willing counterparties requires manual effort and time. The cost of this effort can become large relative to the benefit for transactions with shorter durations. For example, the effort involved in identifying and executing an hourly transaction is not likely to be much greater than the effort required to identify and execute a 15-minute transaction, but the benefit of making that effort might be four times as large for the hourly transaction.

24. As a practical matter, there is a limit to how short the duration of a transaction can be while still providing sufficient benefit to justify the transaction cost of identifying and executing the trade. Experience in the major bilateral markets in the United States indicates that there is little to no sub-hourly trading activity, and I am informed by Southeast EEM Members that such sub-hourly trades are rare in the Southeast.[12] This suggests that hourly granularity may be the shortest transaction duration that is worth pursuing through conventional bilateral trading activity.

25. The shortest term for bilateral trading within the Southeast EEM Territory today is primarily hourly.[13] These trades typically require a source of supply (*i.e.,* generation) that will be available for the entire hour and also a sink (*i.e.,* demand) that typically is served for the entire hour.  Furthermore, these hourly commitments must be finalized no later than 20 minutes prior to the start of the operating hour ("**T-20**").

---

[10] Current bilateral trading tools and procedures in the Southeast are described in Attachment B: Overview Affidavit at P 6-19.

[11] In economics, "transaction cost" refers to costs incurred in making a transaction including, for example, effort, costs of obtaining information, and other costs referred to in this filing as arising from transactional friction.  For purposes of this affidavit, I do not include explicit charges for transmission reservations or transmission losses within the meaning of transaction cost.

[12] Operations Affidavit at P 34.

[13] Operations Affidavit at P 34-35.

JA0454

26. Under the Proposal, the Members would build a platform for automated matching of willing buyers and sellers in order to overcome the transaction costs inhibiting short-duration trades. The Southeast EEM would enable transaction commitments for 15 minutes at a time, with bids and offers due 15 minutes prior to the start of each 15-minute interval according to the planned timeline. Automation of 15-minute trades will enable buyers and sellers to effectuate bilateral trades appropriating economic benefits that are unrealized, for a variety of reasons, under the *status quo* procedures for bilateral trading in the Southeast.[14]

27. Additional efficient trades will occur because automation of 15-minute trading will make it easier for transactions to be used to meet customer loads or to use supply resources that may be present for part of an operating hour, but not for all of it. Furthermore, the reduction in the cost of trading will likely encourage parties who might not otherwise have sought a bilateral trade to submit bids and offers, expanding the opportunity for beneficial trades to be arranged. The Proposal also facilitates transactions that become economic due to changes in supply and demand within each hour, so that bilateral trading activity will no longer be largely frozen based on T-20 conditions. This could help to reduce the costs of integrating increasing quantities of intermittent renewable resources, because the output of these units varies continuously. A load-serving entity may, for example, purchase energy through the Southeast EEM to balance a reduction in wind supply, rather than using a more expensive supply source to compensate for the reduction.

28. Finally, the Proposal supports execution of Energy Exchanges through coordination with the transmission scheduling processes of Participating Transmission Providers to effectuate physical delivery. By automating the trading process and arranging for e-Tags, the Southeast EEM reduces the costs and friction of sub-hourly trading across a broad region.

### 3.1.2. ZERO-COST TRANSMISSION

29. The Southeast EEM Proposal includes the new NFEETS product to be offered at zero cost (other than charges for losses and imbalances) by all Participating Transmission Providers.[15] This substantially reduces the potential that 15-minute transactions that would otherwise be economically efficient are not executed due to the cost of transmission service from source to sink. For example, a load-serving entity could reduce production costs to meet demand by purchasing power from a generator at a price of $30/MWh rather than running its own generator that costs $35/MWh. However, if delivery of the purchased power required transmission service to be procured at a cost of $6/MWh, then there would be no net benefit to the parties of undertaking the transaction.

30. The application of tariff rates, while necessary to recover fixed and sunk costs such as transmission facilities, may impede otherwise economic transactions at the margin; in the example, the charge to recover sunk transmission costs prevents a reduction in the cost of serving load. Elimination of a transmission charge for NFEETS removes this impediment for 15-minute trades arranged through the Southeast EEM. In the prior example, NFEETS could enable the $30/MWh purchased power to be

---

[14] *See* Operations Affidavit at P 34.

[15] Operations Affidavit at P 13 & 33.

used to serve demand instead of the more expensive \$35/MWh generator. A NFEETS charge greater than zero could impede some otherwise efficient 15-minute transactions from occurring.

31. Importantly, the Proposal provides zero-cost transmission service across the entire Southeast EEM Territory, eliminating the pancaked transmission rates potentially preventing many efficient sub-hourly trades today. Bilateral trades scheduled using current OATT services incur transmission charges for each of the transmission systems used to complete the trade. These charges can cause otherwise economically efficient trades to be unprofitable, particularly between potential sources and sinks that are separated by one or more transmission wheels. NFEETS eliminates pancaked transmission charges for 15-minute transactions across a broad region, enabling additional economic trades that would not otherwise occur.[16]

32. The Southeast EEM's combination of zero-cost, non-pancaked transmission service and automated 15-minute trading enable willing buyers and sellers to arrange beneficial trades that use available transmission remaining after deliveries have been scheduled under existing OATT service. The Proposal will yield benefits by arranging bilateral trades using the available transmission of multiple Participating Transmission Providers in ways that are unlikely to occur today. The automated system will have a substantial advantage in searching for transmission paths with available transmission to complete beneficial trades, overcoming transaction costs and information barriers. Further, the Algorithm will exhaustively seek out all possible beneficial trades across the Territory, as measured by voluntary bids and offers, capturing the additional benefits made available by scheduling otherwise unused available transmission with zero-cost transmission service.

### 3.1.3. MAXIMIZATION OF TOTAL BENEFITS

33. The design of the Southeast EEM leverages automation and zero-cost transmission to facilitate beneficial sub-hourly bilateral transactions. Building on this, the Proposal seeks to maximize the sum of the benefits of the trades arranged for each 15-minute period.[17]  As explained in the Affidavit of Mr. McGeeney and Mr. Sellers, trades will be arranged based on the bids and offers of willing buyers and sellers and will account for available transmission limits, transmission loss charges, and counterparty constraints.[18]

34. The Southeast EEM System will only arrange Energy Exchanges with a positive benefit to both the buyer and the seller. The total benefit of a single Energy Exchange transaction is the savings enabled by the transaction, as measured by the bid of the buyer minus the offer of the seller multiplied by the megawatt-hour quantity of the transaction, less the total cost of losses for the transaction. After

---

[16] Overview Affidavit at P 13.

[17] The term, "benefits", as used in this context, is not synonymous with "economic cost savings," since it is calculated from voluntary bids and offers.

[18] Operations Affidavit at P 38.

JA0456

settlements for energy and losses have been completed, the buyer and seller each receive half of this total benefit.[19]

35. The total benefit of the Southeast EEM in a 15-minute interval is the sum of the benefits received by all buyers and sellers matched in Energy Exchanges.

## 3.2 BIDDING INCENTIVES

36. The anticipated economic benefits of the Southeast EEM could be reduced if the bidding incentives created by the Proposal design were to cause a substantial number of efficient trades not to occur.[20] If there were opportunities for participants to decrease their costs or increase their profits by submitting bids or offers that deviated, perhaps substantially, from their underlying costs, there would not be a loss in economic efficiency so long as the bidding behavior did not prevent an Energy Exchange that would have been economically beneficial from occurring.[21] If Participants make mistakes, and increase their offers too much, or decrease their bids too much, they might not be matched in Energy Exchanges that would be beneficial. If the Proposal creates incentives for bids and offers to deviate from underlying costs in a manner that causes them to often fail to be matched, although a match would have been beneficial, then the bidding incentives could limit the economic efficiency benefits that are realized.

### 3.2.1.  SPLIT-THE-SAVINGS PRICING

37. In this section I conclude that, because of a Participant's uncertainty about how far its bid or offer can deviate from its cost without causing it to not be matched at all, it does not appear that bidding incentives are likely to cause a material limitation on the efficient trades that the Southeast EEM is otherwise likely to create. Moreover, in situations of reduced uncertainty, I would still expect rational Participants to determine how to bid and offer so as to be beneficially matched the majority of the time. Taking into account expected compliance with the market power mitigation measures required today for bilateral trades and the 3 eligible counterparty requirement (as discussed in later sections of my affidavit), it is highly likely that the Southeast EEM will facilitate an ongoing increase in the economic benefits from bilateral trading in the Territory, as measured by a reduction in the variable cost of serving load.

38. Energy Exchanges arranged by the Southeast EEM System will be settled based on split-the-savings pricing as applied to the individual transaction. Each Energy Exchange arranged for a 15-minute interval will likely be settled at a different Energy Exchange Price; *i.e.,* the buyer for each Energy

---

[19] The division of the benefits of an Energy Exchange may not be equal between the buyer and seller when the Energy Exchange Price the buyer pays to the seller is capped by the price allowed under an approved MBR. In these instances, the buyer may receive more than half of the total benefits of the Energy Exchange.

[20] In theory, the benefits also would be impacted if inefficient trades occurred, but this would suppose conduct in which buyers bid above their avoided costs or sellers offered at less than their marginal production cost despite the risk of losing money when paired in an Energy Exchange.

[21] In this section I focus on possible incentives to modify bids or offers in order to increase profits on a single bilateral trade. In later sections I discuss the potential for the exercise of market power or market manipulation.

Exchange is likely to be paying a different price to its matched seller than the price paid by other matched buyers to their sellers during the same interval. This result is consistent with the way pricing works for bilateral transactions today, where a different price is negotiated for each transaction.

39. Under the Proposal, the Energy Exchange Price per megawatt-hour the buyer pays to the seller is calculated as follows:

(1)    **Energy Exchange Price** ($/MWh) =

$$\frac{\frac{1}{2}(Bid\ Price + Offer\ Price)(MWh) + \frac{1}{2}(Seller\ Losses - Buyer\ Losses)}{MWh}$$

Where *Bid Price* and *Offer Price* refer to prices in $/MWh and *Seller Losses* and *Buyer Losses* refer to the total cost of losses.

40. The net result of the buyer paying the Energy Exchange Price to the seller is that each receives half of the energy benefits, as measured by the difference between the bid price and offer price, and each pays half of the cost of transmission losses for the Energy Exchange. The reason the Energy Exchange Price is not calculated by simply splitting the total loss charges for the transaction is that the seller will likely be billed for all loss charges except those charged by the Participating Transmission Provider to whom the buyer is interconnected; these loss charges will likely be paid by the buyer. Since the buyer and seller will be paying different amounts to transmission providers for the losses for their transaction, the difference is accounted for in calculating the Energy Exchange Price the buyer pays the seller, thereby equalizing the benefits received by each.

41. With the Southeast EEM split-the-savings pricing, there may be an incentive for buyer bids and seller offers to deviate from their underlying costs because the Energy Exchange Price is calculated directly from their bids and offers, *i.e.*, by changing its bid or offer a Participant would change the price for the trade. The incentive should be substantially mitigated by the uncertainty buyers and sellers face about the bid or offer level required to be beneficially matched, as discussed below.

### 3.2.2. BILATERAL TRANSACTION PRICING TODAY

42. Today, buyers with the potential to avoid high costs for the supply used to serve their load seek out sellers that might be able to sell them lower-cost energy, and vice versa. When arranging for a bilateral transaction, buyers have an incentive to negotiate payment of the lowest price that a seller is willing to accept; doing so maximizes the share of the transaction benefit that accrues to the buyer. Similarly, a bilateral seller has an incentive to negotiate a price that is as high as a buyer is willing to pay; doing so maximizes the share of the transaction benefit that accrues to the seller.

43. Today, buyers and sellers are generally known to one another during the negotiation of a trade and might have an idea of one another's costs based on their transactional history. The negotiated price might depend, for example, on the parties' historical relationship, knowledge of each other's alternatives, the volume of annual trades by each, or the overall degree of competition among buyers

10

and among sellers. The amount of pressure a buyer or seller can apply in negotiating the bilateral trade price is limited by the amount of risk each is willing to bear that the counterparty will choose to do business elsewhere or decline to transact at all.

44. The incentive to negotiate a price above marginal production costs (*i.e.,* by the seller), or below avoided costs (*i.e.*, by the buyer) can affect the split of the economic benefits of a bilateral transaction between the buyer and the seller, but does not reduce the total economic benefit of a completed transaction. Economic efficiency is not affected by the particular price negotiated between a buyer and seller. Rather, economic efficiency suffers when a buyer's negotiating position leads it to bid a price below the seller's cost and/or a seller's negotiating position leads it to offer a price greater than the buyer's avoided cost and, as a result, an otherwise efficient bilateral transaction does not occur at all.

### 3.2.3. BIDDING UNDER UNCERTAINTY IN THE SOUTHEAST EEM

45. The incentive to achieve a favorable transaction price, as described above for bilateral transactions today, extends to Energy Exchanges arranged by the Southeast EEM System. However, in the Southeast EEM the Energy Exchange Price is not directly negotiated between a buyer and a seller. Instead, it is calculated from the buyer's bid and the seller's offer for each Energy Exchange arranged by the Algorithm. This introduces uncertainties that should tend to dampen the willingness of buyers and sellers to act upon the incentive for buyer bids and seller offers to deviate from their underlying costs.

### 3.2.1.3. Enabling of Competition

46. In considering whether or by how much to deviate from cost-based bidding in each 15-minute interval, Participants in the Southeast EEM will confront substantial uncertainty. With the Southeast EEM there is no opportunity to negotiate with one or more potential counterparties; a seller cannot lower its offer when a buyer looks like it might walk away (or vice versa) and there is no ability to revise a bid or offer when it fails to be matched in an Energy Exchange. Each buyer and seller have only one chance to state its bid or offer. The risk of submitting a bid or offer that deviates substantially from costs is material because there is no recourse if a seller offers too high or a buyer bids too low.

47. The expectation is that there will be broad participation in the Southeast EEM, due to its low costs for participation and zero-cost transmission. The intention is to enable robust competition among multiple sellers submitting multiple offers and multiple buyers submitting multiple bids. Participants will not have a clear view of who the other buyers and sellers will be during each interval, or the strength of the incentive of these other parties to be paired in an Energy Exchange, *i.e.*, how close to cost they are likely to be bidding or offering. These factors could make it more difficult for many Participants to infer by how much they could safely deviate from cost-based bids and offers than it is for them to make the same inference today when they negotiate directly with a single counterparty.

48. Because of the competition expected to occur in the Southeast EEM, a lowered bid or increased offer that is matched in one 15-minute interval may not be matched in the next. It generally will be difficult for a seller to predict, for example, whether increasing its offer might cause it to fail to be paired in an Energy Exchange because other sellers make lower offers in that interval. The expectation is that there will be many bids and offers that could change as often as every 15-minutes. If this occurs it is

11

unlikely that a Participant could estimate the shape of the underlying supply and demand curves at its location so as to accurately and consistently predict whether it would be profitable to deviate from cost-based bidding. In the Southeast EEM there will likely be an incentive for many Participants to bid and offer consistently with their underlying costs.

### 3.2.2.3.   Information Provided by Prior Energy Exchange Prices

49. The information available about Southeast EEM Energy Exchange Prices in prior intervals is unlikely to be of material use in reducing a Participant's uncertainty about the potential to profit by deviating from cost-based bids and offers at its location. This conclusion pertains to both the weighted-average hourly energy prices published at 6:00 AM CPT on the following day,[22] and the Energy Exchange Prices a Participant sees for its own transactions in previous intervals or for like-intervals on similar days. Neither of these types of information are likely to provide consistently useful information about the marginal bid or offer at a Participant's location that would be paired in an Energy Exchange. If a buyer knew the likely level of the marginal bid, it would add a small margin to it in submitting its own bids, analogously to how a buyer today would attempt to bid just above its competitors in order to close a bilateral deal at the lowest possible price. Likewise, if a seller knew the likely amount of the marginal offer at its location, it would decrease its own offer to just under this in order to secure the deal at the highest possible profit.

50. The Southeast EEM will publish, with a one-day lag, the weighted-average hourly Energy Exchange Prices from the prior day.[23] The posted weighted-average prices will be calculated over all individual Energy Exchange Prices in the Territory in a given hour. These individual prices are likely to be very unpredictable and, to the best of my understanding, will not be indicative of, or converge on, the marginal bid or offer that cleared at a location. For these reasons, the day-after average hourly prices posted by the Southeast EEM are very unlikely to reduce the uncertainty that likely will serve to encourage cost-based bids and offers.

51. There are three primary drivers of the unpredictability of individual Energy Exchange Prices. The first is the use of split-the-savings pricing for individual Energy Exchanges. Energy Exchange Prices will be calculated separately for each transaction and will vary, even between buyers in the same balancing area, based on the bids and offers for a particular transaction and the transmission loss charges for the NFEETS arranged for that transaction (*See* Equation 1).

52. The second driver of variability in Energy Exchange Prices builds on the first: the Members' decision to operate the Southeast EEM using an Algorithm that will pair buyers and sellers into bilateral transactions so as to maximize the benefits of all Energy Exchanges arranged during each 15-minute

---

[22] Operations Affidavit at P 53.

[23] When split-the-savings pricing was used for the settlement of pool-based redispatch of economy energy in northeast power pools, the pool-wide settlement price was published and known to market participants. Because this information was available, parties were able to arrange for bilateral contracts to privately appropriate greater benefits (*i.e.,* profits or cost savings) than they would have received by participating in the pool-based redispatch. A similar incentive does not exist to bypass the Southeast EEM, because NFEETs is only available through the Southeast EEM System and the published average price is not an implicit clearing price.

interval. The Algorithm's determination of which bid and offer to pair together as a transaction and the transmission path for the transaction will depend on all of the other bids and offers made in the same interval, all of the counterparty constraints, all transmission loss rates, and all transmission limits. A change in any input could alter which bids the Algorithm matches with which offers and the associated transmission paths. Even small changes in inputs, such as the addition of a counterparty constraint, could cause ripple effects in the Algorithm's determination of the set of Energy Exchanges that maximizes total benefits in an interval.

53. The third driver of variability builds on the first two: the decision to resolve ties and ambiguities in the determination of Energy Exchange matches by using randomized prioritization.[24, 25] The first anticipated use of randomized prioritization will be to resolve ties, which could occur, for example, if two or more buyers in the same balancing area submitted identical bids but there were insufficient supply offered to allow both bids to be fully matched. If this occurred, the Algorithm would need a way to decide the priority order for matching the identical bids, because the marginal loss charge per megawatt-hour to their balancing authority border would also be identical. Under the Proposal, the Algorithm will use randomization to prioritize the identical bids. For instance, it could randomly deduct very small increments from all but one of the identical bids in order to distinguish their individual priority for being assigned a match.[26] The same approach would be used if two or more sellers in the same balancing area were to submit identical offers.

54. Additionally, randomization will be used to determine Energy Exchange matches if different pairings of buyers and sellers yield the same total (maximized) benefit.[27] For example, the Algorithm might

---

[24] Operations Affidavit at P 44.

[25] Randomization is applied to solve ties and indeterminacies in optimization algorithms in a number of markets. For example, the Nord Pool power market's EUPHEMIA software applies randomization to solve schedule indeterminacy in complex orders and block order ties (Euphemia Public Description: Single Price Coupling Algorithm (12 Oct. 2020), https://www.nordpoolgroup.com/globalassets/download-center/single-day-ahead-coupling/euphemia-public-description.pdf). In addition, ELIA, the Belgian transmission system operator, runs a capacity remuneration auction that applies random selection if other tie-breaking rules do not resolve the indeterminacy of multiple solutions with the same social welfare (Elia CRM Design Note: Auction Process (1 Oct. 2019), https://www.elia.be/-/media/project/elia/elia-site/public-consultations/20191002/crm-design-note---auction-process.pdf).

[26] This description likely simplifies how a software developer might actually resolve a tie with randomization, but to the best of my knowledge the high-level description is conceptually correct.

[27] To the best of my knowledge, the extent to which randomization may be used to determine some matches could depend on the particular approach the software contractor takes to the design and implementation of the matching Algorithm and will not be known until the software Algorithm is tested on a realistic model of the full Southeast EEM region, including a reasonable and full set of bids and offers. The Algorithm might terminate and provide whatever matches exist at the point it reaches the desired level of solution accuracy, such as the Mixed Integer Programming Gap ("**MIP Gap**"). Alternatively, the software solution approach for the Southeast EEM System might require heuristics if there are ties (defined for present purposes as identical bids or offers in the same Participating Transmission Provider service area), multiple sets of matches that yield the same total benefits, or for other reasons after taking into account all input and constraint data in attempting to identify a unique,

JA0461

determine that maximum benefits will result from matching bids B1 and B2 in Participating Transmission Provider area Beta with offers S1 and S2, also in Participating Transmission Provider area Beta, taking into account all inputs and constraints used in the benefit optimization. Bids B1 and B2 are not the same per megawatt-hour and neither are offers S1 and S2.  The total benefit per megawatt-hour for this subset of matches is:

(2)     Total Benefit ($/MWh) $= (B1 + B2 - S1 - S2) - 2 * (Losses\ Charges/MWh\ for\ Beta)$

55. This benefit is the same whether the bids and offers are matched as (B1/S1 and B2/S2) or (B1/S2 and B2/S1).  The Algorithm cannot determine how to match the two bids with the two offers based on benefit maximization alone, because two different sets of matches have exactly the same total benefits per megawatt-hour.

56. In these situations, the pairing of bids and offers into Energy Exchanges will be randomized (within the set of alternative pairings that have the same total benefits) because the Energy Exchange Price for each buyer could depend materially on which seller it is paired with, and vice versa. Importantly, even though the Energy Exchange pairing could be partially random in some instances, the Algorithm will ensure there are benefits to each buyer and seller as determined by the bid, offer, and losses charges for the assigned transmission path.

57. With split-the-savings, the price paid by an Energy Exchange buyer or received by a seller will explicitly depend on who their counterparty is. But, in some cases, determination of this counterparty and its associated bid or offer will be randomly determined from among a set of alternatives. Thus, individual Energy Exchange Prices can be the result of randomized Energy Exchange pairings within a set of alternatives that all maximize overall benefits.[28]

58. For these reasons, Energy Exchange Prices for individual transactions and the weighted-average Energy Exchange Price published with a one-day lag are unlikely to provide information about the marginal bids and offers that were matched in an interval.

59. In this section I have so far discussed why many Participants in the Southeast EEM are likely to bid and offer close to their costs much of the time, although there is an incentive for them to depart from

---

optimized solution.  Counterparty restrictions and minimization of marginal losses will reduce the extent to which randomization could be needed to arrange matches.  In order to prevent the selection of heuristics that might incentivize conduct that could reduce benefits, the market rules require randomization to be used to resolve such situations. *See* Operations Affidavit at P 44.

[28] Because of the way that Energy Exchange Prices are calculated and the potential impact of randomization on individual prices, the publication of weighted-average split-the-savings prices on the day after trades occur is extremely unlikely to facilitate collusion among sellers or among buyers.  This weighted-average price is not a market clearing price or index that could be used for this purpose.

JA0462

this conduct because of the split-the-savings pricing formula. It is expected that competition will create uncertainty for most Participants about whether or not they will be matched in an Energy Exchange if their bid or offer materially deviates from their costs.[29] If a seller increases its offer above its costs, or a buyer decreases its bid below its avoided costs, each participant risks not being matched and not receiving any benefit. This uncertainty will generally increase pressure for bids and offers that do not deviate significantly from costs, and the uncertainty generally will not be reduced by information about Energy Exchange Prices in prior intervals.

### 3.2.3.3.    Situations with Diminished Uncertainty

60. At times there might not be sufficient uncertainty to drive all Participants toward cost-based bidding in the Southeast EEM.  If this occurs, efficiency benefits would continue to occur as expected, so long as Participants do not make large errors in determining a reasonable amount by which their bids and offers can deviate from costs, yet still be matched. If a Participant's estimate is reasonably good and it is matched, it would appropriate a greater share of the benefits of its Energy Exchange, but there would be no loss of economic benefits.

61. The competition or uncertainty Participants face may be reduced in certain situations and they might be able to discern that they can likely modify their bids or offers and still be matched.[30] The following are two situations in which Participants might face less uncertainty and, hence, be able to deviate from cost-based bidding with limited risk:

- During intervals in which it is fairly clear that there will be reduced competition at the margin. For example, suppose a party offering supply is fairly certain that its actual marginal costs are low relative to the marginal costs of buyers likely to be bidding in an interval and also low relative to the next most expensive supplier. In this situation the entity might be reasonably sure that it could offer a bit higher than the actual cost of its marginal supply.  Load is high relative to supply, so low-cost suppliers will have an incentive to raise their offers above their costs while still ensuring a match.[31]  As long as a reduction in competition at the margin does not lead to such grossly mis-estimated bids and offers that efficient trades fail to be arranged on a regular basis, this conduct is unlikely to materially limit the anticipated benefits of the Southeast EEM.

---

[29] As discussed elsewhere in my affidavit, the Market Rules enable FERC-jurisdictional sellers to limit their Southeast EEM sales so as to comply with limitations imposed in their MBR authorization.  It is expected that they will employ Participant constraints to prevent Southeast EEM sales to counterparties or in locations where the Commission has determined that adequate competition may not exist.

[30] This type of conduct  happens in markets that are considered to be competitive when a supplier that is confident that it will be marginal bids up to its estimate of the level of the next "step" of a supply curve.

[31] This behavior occurs in every market and is expected to provide less of an advantage to larger buyers and sellers in the Southeast EEM than in bilateral markets today in the Southeast.  This is because there are likely to be more buyers and sellers competing with one another in the Southeast EEM due to reduced transaction and transmission costs.

- _If a Participant is able to engage in price-discovery._ If a buyer or seller makes a relatively large number of bids or offers in approximately the same location during an interval or during like intervals over time, it may be able to determine the approximate magnitude of the marginal accepted bid or offer. For instance, a supplier offering 4 MW blocks at increasing prices would see the price of its highest matched offer.[32] Despite this price discovery, however, the Participant will still face uncertainty because of (among other things) the possibility of changes in other Participants' bids and offers in future periods. I would expect rational Participants to be able to determine relatively quickly whether and when they can profit by deviating from cost-based bidding, so that there is unlikely to be a material loss in efficiency from unmatched bids and offers.

62. As long as robust competition occurs as expected in the Southeast EEM, I expect market uncertainty to incent rational Participants to bid and offer close to their underlying costs most of the time. In the Southeast EEM there will likely be an increased incentive for many Participants to bid and offer consistently with their underlying costs. Moreover, in situations with reduced uncertainty, rational Participants should learn the reasonable amount of deviation they can make and still be matched, so that relatively few efficient trades would fail to be arranged. On the whole, the bidding incentives of the Southeast EEM are unlikely to lead to material inefficiency because of the failure to effectuate beneficial trades, _i.e._, the benefits of the Southeast EEM are unlikely to be materially limited by bidding incentives that could lead to failure to arrange some efficient trades.

## 3.3 RELIABILITY AND RESOURCE ADEQUACY IMPACTS

63. The Southeast EEM design includes rules to address potential adverse consequences that could reduce its overall benefits. These rules are intended to avoid shifts in the share of transmission costs paid by native-load customers or increases in energy costs for non-NFEETS customers.

64. The Southeast EEM System will not arrange a bilateral trade if there is insufficient transmission to support the transaction. However, transmission limits calculated for a simplified transmission representation are approximations of the actual transmission constraints that may be encountered on the full transmission system during real-time system operation. The transmission limit approximations make assumptions about the sources and sinks of incremental trades, but the additional trades scheduled in the Southeast EEM might differ materially from these assumptions. As a result, Energy Exchanges have the potential to be infeasible even though the NFEETS arranged by the Southeast EEM Algorithm to support them is based on information about within-hour transmission availability provided by each Participating Transmission Provider.

---

[32] Buyers and sellers with fewer Energy Exchanges will have less information about the likely magnitude of marginal bids and offers than larger buyers and sellers. This will benefit buyers and sellers that participate in the Southeast EEM frequently and in larger megawatt quantities. However, the informational advantage of larger buyers and sellers will be less than in the current bilateral market, because the reduction in transaction costs is expected to increase participation in the market and will increase the ability of small Participants to engage in price discovery.

JA0464

65. The Southeast EEM Agreement states that NFEETS is non-firm transmission service with the lowest curtailment priority.[33]  NFEETS schedules will not cause curtailment of previously arranged point-to-point or network transmission service, because all of those reservations will have higher priority.  The intention is that no customers, other than those using NFEETS, will bear any consequences due to scheduling Energy Exchanges based on transmission availability approximations.[34]  Participating Transmission Providers will not incur higher energy costs to serve native load customers because they will not redispatch supply to avoid curtailing NFEETS.[35]

66. Additionally, the Members do not expect there to be material changes in transmission service charges due to providing NFEETS at zero cost. In the example I used above, $6/MWh is the tariff rate the transmission service provider charges to recover the revenue requirement of its transmission facilities; it is not a variable cost incurred to effectuate the Southeast EEM transaction.  Hence, if that charge is not collected when NFEETS is used, it does not constitute a failure to recover direct variable costs from NFEETS customers. Furthermore, NFEETS utilizes transmission that would otherwise go unused; in the absence of NFEETS, no transmission revenue would be paid to the Participating Transmission Provider for use of this transmission.

67. As discussed in Attachment B: Overview Affidavit ("**Overview Affidavit**"), the Southeast EEM has the potential, albeit a limited one, to affect the share of the transmission revenue requirement paid by the native load customers of the Participating Transmission Providers.[36]  This could occur if the availability of NFEETS were to cause a decrease in point-to-point transmission service reservations. Participating Transmission Provider revenues from point-to-point service are not expected to change materially, however, because NFEETS cannot be relied on to serve firm load and because of the minimal contribution of short-term wheeling revenues to the Participating Transmission Providers'

---

[33] Market Rules, Section II.

[34] Transmission availability will be directional, and the scheduling of NFEETS will not assume the availability of counterflow. Thus, if an Energy Exchange in one direction were to become infeasible, there would not be a decrease in counterflow that could impair the feasibility of Energy Exchanges in the opposite direction.  For the same reason, if the parties to an Energy Exchange failed to execute their transaction, it would not impair the feasibility of other Energy Exchanges scheduled at the same time by the Algorithm.

[35] NFEETS is unlikely to be curtailed once a 15-minute transaction has begun due to the time required to invoke Transmission Loading Relief ("**TLR**") procedures.  If a reliability issue occurred within a 15-minute interval the automatic generation control ("**AGC**") of a balancing authority area would automatically respond to maintain inter-control area interchange schedules.  Some automatic generation adjustment could occur instead of curtailment of NFEETS.  However, for the buyer and seller balancing areas, the adjustment would likely be a return to the use of supply resources that were replaced by the Energy Exchange, so there would be no net loss of benefits for native load customers in these balancing areas.  Within-interval AGC adjustments could impact the energy costs of customers in balancing authority areas providing wheeling for the transactions, but such cost impacts would likely be more than offset by the benefits these customers receive from the Southeast EEM.

[36] Overview Affidavit at P 23.

JA0465

recovery of their transmission revenue requirement.[37] To the extent there is some small decrease in revenues from point-to-point service, native load customers would pay a larger share of the transmission revenue requirement through charges for network service.  At the same time, the Southeast EEM is expected to reduce energy costs for native load customers, so any increase in network service transmission rates would be roughly balanced by expected benefits from decreases in their energy costs.[38]

### 3.4 CONCLUSIONS

68. The Southeast EEM can reasonably be expected to facilitate an on-going increase in the economic benefits from bilateral trading in the Southeast EEM Territory, as measured by a reduction in the variable cost of serving load. The anticipated benefits stem from a reduction in transaction costs and the elimination of transmission service costs for NFEETS, which facilitate efficiency gains from bilateral transactions that would not otherwise occur. On the whole, the bidding incentives of the Southeast EEM are unlikely to materially limit the expected benefits because there is unlikely to be a material failure to effectuate beneficial trades. Additionally, the Southeast EEM should not result in payment of energy costs by non-NFEETS customers or an allocation of transmission costs to native-load customers that are not balanced by the benefits they are expected to receive from the Southeast EEM.

### 4.  MARKET POWER

69. The Southeast EEM will enable all jurisdictional Participants to abide by any market power mitigation measures ordered by the Commission in approving their MBRs. As described in more detail in the Operations Affidavit, the Southeast EEM System will include tools to enable compliance with price caps and counterparty trading restrictions ordered by the Commission.[39]  This will enable Participants to ensure their Energy Exchange sales arranged by the Southeast EEM System comply with their MBR approvals.  The Proposal thus encompasses the mitigation measures ordered to address the potential for market power in the current bilateral markets in the Southeast.  No Participant could exercise

---

[37] Overview Affidavit at P 23.

[38] Overview Affidavit at P 9. "When sales are made, a significant portion of the margin from the sale will be credited back to customers, which helps to achieve net cost savings.  Most utilities use a mechanism such as a fuel adjustment clause to pass back credits to customers for purchases and sales.  Other utilities, such as TVA, pass back the savings from sales by lowering base revenue requirements instead."

[39] Operations Affidavit at P 40.  In addition to enabling Participant-specific constraints, the Algorithm will implement price caps imposed on Southern Company after Energy Exchanges have been determined.  If the Algorithm calculates a price for a trade in which Southern Company is the seller that exceeds its price cap for the buyer, the Energy Exchange Price will be set equal to the price cap.

JA0466

market power in the Southeast EEM unless it already could exercise market power in today's hourly bilateral market.

70. Taking the current bilateral market as a starting point, including the mitigation measures imposed on jurisdictional Participants, the Proposal aims to reduce barriers inhibiting 15-minute bilateral trades. The Proposal is expected to attract robust participation by buyers and sellers in the Southeast, due to its low transaction cost and the provision of zero-cost, non-pancaked NFEETS. Also, the Southeast EEM System will arrange these zero-cost bilateral trades using the available transmission of multiple Participating Transmission Providers spanning the broad Southeast EEM Territory, further encouraging competition. The Southeast EEM's pairing of zero-cost, non-pancaked transmission service with automated 15-minute trading is intended to engage willing buyers and sellers in the market, thereby fostering competition.

71. Additionally, the Southeast EEM is a voluntary, residual market, in effect ruling out the possibility of one or more Participants exercising horizontal market power as defined by the Commission.[40] Under the Proposal, no load-serving entity should ever be in the position of having to buy power in the Southeast EEM in order to serve its load. The Market Rules do not absolve each load-serving entity from having a reliable plan to serve its load prior to the intra-hour execution of the Algorithm. The Southeast EEM is a residual market intended to produce benefits by enabling load-serving entities to purchase lower cost supply to substitute for the higher cost supply they would otherwise use to serve their load. Also, because the NFEETS arranged by the Southeast EEM System is the lowest priority transmission service, load-serving entities cannot rely on arranging Energy Exchanges to reliably serve their customers. In addition, participation in the Southeast EEM is entirely voluntary (*i.e.,* there is no must-offer requirement for sellers),[41] so even if NFEETS were available, a load-serving entity could not rely on supply being available if it were unable to serve its load. Because a load-serving entity must be able to serve its load without relying on purchases arranged through the Southeast EEM, it should always have an alternative to purchasing power through the Southeast EEM. For this reason, the prices load-serving entities (*i.e.*, buyers) will pay for Energy Exchanges will be capped at their avoidable cost. Moreover, both generators and loads will continue to have the option to settle imbalances under the existing approved Participating Transmission Provider OATTs.[42] Because the Southeast EEM is a voluntary, residual market it does not appear to be possible for a seller to raise

---

[40] The Commission distinguishes between vertical and horizontal market power. Vertical market power is defined as "issues relating to whether the seller and its affiliates have transmission market power or whether they can erect other barriers to entry" and is mitigated, with respect to transmission, by the existence of a Commission-approved OATT (Order No. 697, FERC Stats. & Regs. ¶ 31,252 at 227). Horizontal market power is tested jointly through pivotal supplier analysis based on annual peak demand and market analysis tests applied on a season basis (Order No. 816, 153 FERC ¶ 61,065 at 3).

[41] Additionally, there is no requirement for load-serving entities to purchase energy through the Southeast EEM.

[42] The voluntary aspect of the Southeast EEM is a distinguishing feature in comparison with the CAISO EIM in regard to the potential for the exercise of market power. Transmission service providers that have joined the CAISO EIM have modified their OATTs to pass through the EIM clearing prices as charges for customer imbalances. The fact that transmission customers have no alternative to paying EIM prices for imbalances supports non-discriminatory open access in the EIM but is also one of the reasons why the EIM has had to consider the potential for the exercise of market power and includes a process for offer mitigation.

prices above competitive levels for a sustained period of time through the exercise of horizontal market power, i.e., through physical or economic withholding. For the same reason, it does not appear to be possible for buyers to exercise horizontal market power in order to consistently lower prices below competitive levels.

72. The Southeast EEM will enable application of market power mitigation measures required today for bilateral trades in the Southeast, per the MBRs of jurisdictional Participants. Taking the current bilateral market as a starting point, the Southeast EEM is designed to eliminate barriers to increased competition for 15-minute trades. Additionally, the Southeast EEM is a voluntary, residual market, in effect ruling out the possibility of one or more Participants exercising horizontal market power.

## 5.  MARKET MANIPULATION

73. Manipulative use of the Southeast EEM will be prohibited by Commission Order No. 670 and the regulations it established.  In this order, the Commission defines market manipulation as:

1) The use of any device, scheme, or artifice to defraud;

2) Making untrue statements of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

3) Acts, practices or courses of business that operate or would operate as a fraud or deceit upon any entity.[43]

74. The Commission has provided examples of typical types of market manipulation but elsewhere cautions that it is not possible to list every type of manipulation because the determination of manipulation is a fact-specific inquiry.[44]  The examples are:

- Gaming of market rules, which is defined as market conduct that circumvents or takes unfair advantage of market rules or conditions in a deceptive manner, thereby harming the functioning of a market and potentially other market participants or consumers.

- Cross-market manipulation, which occurs when a party trades in one market or product with the intention of moving the prices in that market in a direction that benefits its position in a related market or product.[45]

---

[43] Order No. 670, *Prohibition of Energy Market Manipulation,* FERC Stats. & Regs. ¶ 31,202 (2006).

[44] FERC Staff White Paper on Anti-Market Manipulation Enforcement Efforts Ten Years after EPAct 2005 (2016) (Enforcement Staff White Paper on Manipulation), available at https://www.ferc.gov/legal/staff-reports/2016/marketmanipulationwhitepaper.pdf.

[45] Recent examples include making uneconomic trades in a market for which an index is calculated, for the purpose of affecting the settlement price of related transactions that settle using the index price or making uneconomic sales or purchases in the day-

- Misrepresentations, which are distinguished by the submission of false information to market operators or index publishers or even by the omission of a material fact such that the information provided is materially misleading.[46]

The Commission's findings on market manipulation emphasize that it often includes the execution of riskless or low-risk transactions for the purpose of receiving a collateral benefit.

75. To evaluate the potential for the Southeast EEM to provide new opportunities for possible market manipulation I consider whether:

- A Participant might be able to unfairly obtain zero-cost NFEETS and thereby profit at the potential expense of the efficiency benefits realized by the Southeast EEM, the benefits realized by other Participants, or the transmission costs paid by electricity customers; or

- A Participant might be able to profit from manipulation of the average hourly Energy Exchange Prices published daily and monthly.

76. I consider the potential for these two types of possible market manipulation because the Southeast EEM differs from today's bilateral energy markets in the Southeast due to the publication of an average price for bilateral trades and by providing access to zero-cost transmission.

## 5.1 PROTECTION AGAINST POTENTIALLY UNFAIR ACCESS TO NFEETS

77. The Proposal includes the requirement for every bid and offer into the NFEETS to be able to be matched with at least three possible counterparties, all of whom are unaffiliated ("**3 eligible counterparty requirement**").[47] This requirement was added to the Proposal after I considered questions raised by Commission staff during a conference call.

### 5.1.1. POSSIBLE CONDUCT ADDRESSED BY THE 3 ELIGIBLE COUNTERPARTY REQUIREMENT

78. The 3 eligible counterparty requirement helps to address certain potential bidding strategies. Without the 3 eligible counterparty requirement it would appear to be possible for a pair of Participants (*i.e.*, a buyer and a seller) to bid and offer into the Southeast EEM in a manner inconsistent with their underlying costs in order to obtain priority access to NFEETS. This conduct would combine use of the counterparty constraints with an uneconomic bid and an uneconomic offer in order to cause the Algorithm to place high priority on matching the buyer and seller in an Energy Exchange. Because the Algorithm will be seeking to maximize the benefits of the Southeast EEM trades arranged for each

---

ahead market of an ISO to change the settlement price for a related product (*i.e.,* financial transmission rights). *See Barclays Bank PLC*, 144 FERC ¶ 61,041 (2013) and *Constellation Energy Commodities Grp., Inc.,* 138 FERC ¶ 61,168 (2012).

[46] Order No. 670, *Prohibition of Energy Market Manipulation,* FERC Stats. & Regs. ¶ 31,202 at P 41 (2006).

[47] Pursuant to the Market Rules, a seller submitting an offer must toggle its counterparty restrictions so that it is able to sell to at least three buyers, and vice versa. Operations Affidavit at P 39.

interval, the buyer and seller could cause it (in the absence of the 3 eligible counterparty requirement) to either pair the buyer's high bid with the seller's low offer or arrange no trade for either party.

79. As part of this strategy, the buyer and seller would agree in advance on the approximate Energy Exchange Price that the Algorithm would calculate for their trade and on their bid and offer prices. For instance, they might agree that the Energy Exchange Price for their transaction, excluding charges for transmission losses, should be $20/MWh and that the buyer will bid $38/MWh and the seller will offer $2/MWh.[48]

80. The buyer and seller would also "toggle off" all other counterparties except for each other to remove the risk of their uneconomic bid or offer being paired with an unintended counterparty. If this were to occur, they might lose money at the Energy Exchange Prices for these unintended trades. Because of the counterparty toggles, the benefit-maximizing Algorithm's only alternative would be to match the buyer and seller with each other, and it would do so if transmission were available. In the example, the buyer and seller would receive priority access to NFEETS for a $20/MWh bilateral trade so long as their bid and offer are sufficiently extreme in relation to competing bids and offers and transmission is available.

81. Without the 3 eligible counterparty requirement, Participants might attempt to use this device to effectuate pre-arranged bilateral trades in the Southeast EEM.[49] The conduct could lead the Algorithm to arrange for a set of Energy Exchanges that has lower actual economic benefits than could have been achieved in the alternative. The buyer's high bid might misrepresent how much it is actually willing to pay, and the seller's low offer might misrepresent the price at which it is willing to sell in order to create a transaction that appears to create large benefits; neither may be actually willing to transact at the offer and bid they make.[50]

82. Several factors would limit use of this strategy even in the absence of the 3 eligible counterparty requirement. First, it would require cooperation between a buyer and seller that trust one another. This is not a difficult hurdle to overcome for a repeated deal, though, because cheating on the agreement would be immediately detected. Second, the potential savings from avoiding the payment for non-firm OATT service is likely not large enough to justify the risk of paying substantial fines and legal fees if the conduct were detected by the Commission's Office of Enforcement and determined to be problematic. Third, the strategy could not be used to schedule energy needed to serve load because available transmission might not be available to support the trade in some intervals, even though by offering high and bidding low the two parties would be scheduled if any available transmission were available to support the transaction. Fourth, the counterparty restrictions necessary to eliminate the

---

[48] If negative offers were permitted, the bid and offer could be even more extreme than in this example. For instance, if the agreed-upon Energy Exchange Price were $20/MWh, the seller could offer -$20/MWh and the buyer could bid $60/MWh.

[49] This conduct could be effectuated with or without "all or nothing" bids and offers. *See* Operations Affidavit at P 42.

[50] If more extreme bids and offers were necessary to ensure priority access to NFEETS and there were a floor on negative offers, the buyer and seller could utilize a side-deal similar to a contract for differences. In addition to the buyer paying the seller the Energy Exchange Price, there would be an additional payment from the seller to the buyer (or vice versa) to achieve the agreed-upon net per megawatt-hour trade price.

risk of loss-making trades (*i.e.,* instead of the desired trade) would apply to all bids and offers made by the buyer or seller during the 15-minute interval. In intervals when this strategy is used, the buyer and seller would be forfeiting the potential to benefit from additional Energy Exchanges.  A related point is that by negotiating the trade price in advance, either the buyer or the seller could be missing the opportunity to realize higher benefits through an Energy Exchange arranged according to the intended functioning of the Southeast EEM.  Fifth, the counterparty restrictions used for the strategy would make it relatively easy to identify in the Electric Quarterly Reports ("**EQRs**"), as these would show relatively large and likely repeated Energy Exchanges between the two parties and no additional Southeast EEM trades for either of them in the same interval.  If the intended trade were not large and repeated, the effort of engaging in the strategy would likely exceed the benefits to the two parties.

### 5.1.2.  3 ELIGIBLE COUNTERPARTY REQUIREMENT

83.  The Proposal includes the requirement for every bid and offer into the Southeast EEM to be able to be matched with at least three possible Participants, all of whom are non-affiliated.[51]  The purpose of this rule is to make the conduct described in the prior section risky and difficult to implement, thereby deterring attempts to submit misleading information to obtain free transmission through the Southeast EEM.[52]

84.  With the 3 eligible counterparty requirement, an attempt to cause the Algorithm to provide free transmission for a buyer and seller would need the cooperation of six non-affiliated Participants at the same time.  Arranging for cooperation among six unaffiliated parties in a strategy with relatively low benefits and possibly very high costs would likely be extremely difficult.  This conclusion applies without regard to whether all six of the parties were simultaneously attempting to cause the Algorithm to provide zero-cost transmission for their trades, or a subset were passively playing the role of counterparty in order to facilitate the execution of the strategy by others.  In either case it would be very difficult to coordinate communication about the intervals in which the strategy was being attempted and the bids and offers required of each of the parties.  The coordination would leave a discoverable paper or electronic trail.  Trust would be difficult to maintain because of the incentive of each party to betray the others to avoid detection or possible legal action.

85.  The 3 eligible counterparty restriction would also deter a second possible type of market conduct that could be attempted by buyers who may buy from a mitigated seller subject to a price cap under its MBR approval.  The buyer in this case could bid so as to obtain priority access to NFEETS in order to pay no more than the price cap set in the relevant MBR.  This device could be possibly profitable

---

[51] Operations Affidavit at P 39.

[52] The Members considered other alternatives for deterring the identified conduct.  These were rejected largely because they would be complicated to implement.  For example, if there were a rule limiting the frequency with which counterparty constraints could be changed, there also would need to be an approval process for exceptions.  The Operations Team (*See* Operations Affidavit at P 5) intentionally proposed that changes to counterparty constraints could be made at any time for any reason in order to accommodate the entry of new Participants, changes in the creditworthiness of counterparties, changes to enabling agreements, and any other reasons that a Participant might need or want to change its counterparty constraints that have not been identified at this time.  The 3 eligible counterparty requirement was adopted because of its simplicity in comparison to creating a process to review and validate off-cycle requests to change counterparty constraints.

during intervals when the capped price is below the buyer's avoided cost and Energy Exchange Prices are likely to be high. At these times the buyer could bid high, in order to increase its chance of being matched, and then toggle its counterparty restrictions so that it could only be matched with the mitigated seller. The possibly deceptive element of this conduct is that it would bid high to create the appearance of benefits, although it might not actually be willing to pay its bid price. In this way it could try to arrange for an Energy Exchange at the lower capped price, rather than risk being matched with a non-mitigated seller and paying a higher Energy Exchange Price. This device is risky because there is no guarantee that the mitigated seller will offer energy in the interval in which the buyer wishes to purchase. It also will be deterred by the 3 eligible counterparty restriction and other limitations described above.

## 5.2 PROTECTION AGAINST POSSIBLE MANIPULATION OF THE AVERAGE EXCHANGE PRICE

86. The Southeast EEM, as proposed, is very unlikely to offer opportunities for cross-market manipulation. The Southeast EEM-wide weighted-average hourly trade price, which will be published at 6:00 AM CPT on the following day, conceivably could be used as a reference price for the settlement of related contracts in the future (*e.g.*, contracts for differences).[53] However, it is very unlikely that Participants or financial market traders would choose to settle contracts based on the weighted-average Energy Exchange Price because it is calculated across the large Southeast EEM region and for this reason is not reflective of the actual market price for energy at any location.

87. Additionally, it would be extremely difficult for a Participant to bid or offer so as to materially impact the published Southeast EEM weighted-average hourly trade price. As previously discussed, the Southeast EEM does not appear to be vulnerable to the exercise of horizontal market power by either buyers or sellers, *i.e.*, to does not appear to be vulnerable to physical or economic withholding. Further, it would likely be extremely difficult to affect the weighted-average hourly trade price through other means in an attempt to profit on the settlement of related contracts. The published price is the weighted average of all individual Energy Exchanges arranged during an hour, each of which is separately calculated. A Participant would need to be able to affect the Energy Exchange Price for a large MWh volume of Energy Exchange transactions in four different intervals in order to impact the published average hourly price. Additionally, as previously discussed, the Energy Exchange Price for each transaction would depend on the bid or offer of the counterparty, which would not be predictable. Suppose, for example, that a large Participant were to attempt to change the weighted-average trade price by modifying its bids or offers for a large MWh volume of trades. This strategy would be unattractive from the start because in order to be sure to be matched in trades and thereby affect the

---

[53] To the best of my knowledge, there is currently no exchange-traded energy product or market trading hub at a location within the Southeast EEM. S&P Global Market Intelligence publishes average day-ahead monthly on peak prices "Into Southern." This is a proxy hub price "[f]or locations where there is little or no market data available." Proxy hub prices are estimated based on estimated statistical relationships to prices at established market hubs. *See* S&P Global Platts Methodology and specification guide: M2MS – Power methodology at 5 (May 2018), https://www.spglobal.com/platts/plattscontent/_assets/_files/en/our-methodology/methodology-specifications/m2ms_power_methodology.pdf.

weighted-average price, the Participant would likely need to make loss-taking bids or offers. Further, the Participant would need to be able to physically source or sink the large volume of energy transacted in the trades it makes to attempt to move the price.

88. Other possibilities for conduct that might be considered to be market manipulation seem to be even more unlikely.  The Southeast EEM includes rules to prevent wash trades, even though it is not clear how they could occur or could benefit a Participant.  Also, Participating Transmission Providers might misrepresent their available transmission when they report it, at least hourly, to the Southeast EEM System.  However, it is not apparent how an affiliate seller could consistently benefit from this strategy because of the way Energy Exchange Prices are calculated, and it would entail a blatant violation of the Commission rules requiring the separation of transmission operations from generation functions.[54]

89. The 3 eligible counterparty requirement effectively deters the potential for Participants to attempt to unfairly increase their priority for receiving NFEETS.  Additionally, it is unlikely that the published weighted average Energy Exchange price would be used for the settlement of contracts or could be manipulated.  No other new avenues for possible market manipulation are apparent to me at this time.

90. This completes my affidavit.

---

[54] *Final Rulemaking, Standards of Conduct for Transmission Providers,* 74 Fed. Reg. 54,463 (2009) (to be codified at 18 CFR pt. 358).

JA0473

**VERIFICATION OF SUSAN L. POPE**

Pursuant to 18 U.S.C. § 1746 (2020), I state under penalty of perjury that the foregoing testimony

is true and correct to the best of my knowledge, information, and belief.

Executed this 10th day of February 2021.

_Susan Pope_

_____

Susan L. Pope

FTI Consulting, Inc.

Managing Director

JA0474

Attachment D-1

Curriculum Vitae of Dr. Susan Pope

JA0475





## Susan Pope

### Managing Director

Susan.Pope@fticonsulting.com

200 State Street
9th Floor
Boston, MA 02109
Tel: (617) 747 - 1860

**Education**

A.B. *cum laude* in Applied Mathematics, Harvard University

Ph.D. and M.A. in Business Economics, Harvard University

Susan Pope is a Managing Director at FTI Consulting and is based in Boston. She is in the Economic Consulting Practice and specializes in the economic and public policy analysis of electricity markets by advising clients on the design, improvement, and performance of bid-based electricity spot markets, capacity markets, and ancillary service markets.

Susan worked with the New York Power Pool on the development of the New York ISO and the LMP-based electricity markets implemented in November 1999, with ISO-New England on the development of its electricity markets implemented in 2003, with the Midcontinent ISO on the development of its Stage 2 congestion management market implemented in 2005, and with the California ISO on its market redesign implemented in 2009.

For the last several years Susan and her colleagues have been supporting the Ontario IESO on the redesign of its energy and ancillary services markets. She recently wrote a paper (with Professor William Hogan) assessing energy price formation in ERCOT. This initiated proceedings at the Public Utility Commission of Texas and important changes to the ERCOT markets. Her recent work also includes direct testimony in Alberta concerning their proposed capacity market, a series of meetings to advise the Public Utility Authority of Israel on the introduction of competitive electricity markets, co-authoring reports on behalf of several regulatory authorities in Australia, and testimony (with Professor William Hogan) supporting reforms to PJM's operating reserve market. The PJM reforms were recently accepted by the Federal Energy Regulatory Commission.

## PROFESSIONAL EXPERIENCE

- *FTI Consulting,* Managing Director, Boston MA, 2011 – Present
- *LECG*, Principal, Cambridge MA, 1998 – 2011
- *Putnam, Hayes & Bartlett, Associate and Principal*, Cambridge MA, 1989 – 1998

## SELECTED PROJECTS

### Electric Utility Experience

- Supporting the Independent Electric System Operator of Ontario in the detailed design of a single settlement real-time electricity market and a financially binding day-ahead market; working with client and software developers on granular rules for bidding, settlements, and market power mitigation.

- Providing expert testimony for a large group comprised of investor-owned utilities, cooperative utilities, municipal utilities, and a federally-owned corporate agency in the southeastern U.S. that is seeking regulatory approval to create a centrally administered and automated 15-minute energy exchange.

Document Accession #: 20210212-5033          Filed Date: 02/12/2021



- Providing expert testimony for a large utility client in arbitrations arising from reductions in electricity demand due to the coronavirus pandemic.

- On behalf of the Australian Energy Security Board, Australian Energy Market Operator, and Australian Energy Market Commission, co-authored reports assessing alternative approaches to ensure electricity security (ancillary services) and reliability (capacity) in future years given rapidly changing resource mix (collaboration among FTI teams in U.S., Australia, France and United Kingdom).

- Assessed ERCOT's planned implementation of real-time market co-optimization of energy and operating reserves on behalf of a major U.S. power generation company.

- Co-authored an expert report (with William W. Hogan) in support of PJM's filing to the Federal Energy Regulatory Commission to improve its scarcity price formation through the implementation of an improved Operating Reserve Demand Curve.

- Submitted written and oral evidence as an independent expert to the Alberta Utilities Commission regarding the proposal by the Alberta Electric System Operator to introduce a market for installed capacity in Alberta.

- Advised the senior staff of Israel's Public Utility Authority – Electricity on electricity market reforms, with a focus on how to support efficient supply under existing contracts and market-driven investment to meet future capacity needs.

- On behalf of the Australian Energy Market Operator, collaborated with colleagues in the United Kingdom on a report about alternative approaches to transmission planning and cost recovery, see http://www.aemo.com.au/Electricity/National-Electricity-Market-NEM/Planning-and-forecasting/Planning-and-network-regulation.

- Co-authored a critique of a recent decision by the Agency for the Cooperation of Electricity Regulators (European Union) concerning a proposal by AQUIND for a non-regulated transmission interconnector between England and France.

- On behalf of an Australian client, collaborated with colleagues in the United Kingdom on a report comparing wholesale electricity market designs, focusing on different approaches to transmission congestion management and capacity mechanisms in PJM, CAISO, Great Britain and Europe.

- Prepared a paper for the Natural Gas Supply Association assessing the implications for natural gas suppliers of PJM's proposed enhancements (2017) to its energy price formation.

- For Powerex, co-authored a paper on the challenges of estimating opportunity costs to efficiently mitigate the local market power of energy-limited energy imbalance market resources.

- On behalf of two of the largest U.S. electricity suppliers, evaluated price formation in ERCOT's real-time electricity market and wrote a white paper for presentation to the Public Utility Commission of Texas; discussed white paper before the Texas Senate and PUCT.

- Supported the Independent Electric System Operator of Ontario in a multi-year project to design a single settlement real-time electricity market and a financially binding day-ahead market with unit commitment; co-led stakeholder meetings to explain the fundamentals of electricity market design and workable alternatives.



- Provided economic analysis and testimony to support a client in a proceeding addressing proposed changes to PJM's market rules for FTR settlements; represented client at FERC technical conference.

- Directed a team to provide expert economic support concerning the operation of western electricity markets and long-term electricity price forecasts for southern California for a significant arbitration concerning the closure of a large generating facility.

- Provided economic analysis to support a client anticipating litigation related to the New York Public Service Commission's proposal to pay certain nuclear generating units in the state for Zero Emission Credits (ZECs).

- Advised a coalition of financial marketers in FERC proceedings investigating the costs and benefits of financial bidding in the PJM market and the potential impacts on uplift.

- Assisted an eastern ISO in evaluating the economic and reliability impacts of the addition or removal of local capacity zones, and the process for determining zones, local capacity requirements and related cost allocations.

- Led a meeting of the Board of Portland General Electric (PGE) to discuss efforts to form an energy imbalance market in the Pacific Northwest and PGE's plans to join the California ISO Energy Imbalance Market.

- Provided expert economic support over many months to committees of the Northwest Power Pool evaluating the possible implementation of an energy imbalance market; explained fundamentals of energy market dispatch and pricing and supported meetings with FERC staff.

- Led an international team of economic experts engaged to design all aspects of the electricity market rules to restructure the electricity market in Mexico; wrote draft electricity market rules.

- Provided expert testimony concerning PJM's application of its hybrid cost allocation methodology to new baseline transmission project totaling almost $1 billion.

- Completed a white paper for the Electric Power Supply Association (EPSA) explaining problems with ISO/RTO price formation and recommending possible improvements; represented EPSA in FERC technical workshop on price formation.

- Assisted a large power trading client in evaluating the regulatory and strategic implications of the "resource shuffling" provisions of the California Air Resource Board's cap-and-trade program for $CO_2$ emissions.

- Provided economic support and developed estimates of renewable generation costs in a dispute before the World Trade Organization pertaining to Feed in Tariffs for renewable energy in the Province of Ontario.

- Led project team analyzing market bidding behavior in California and Western electricity markets during the Western power crisis in 2000 and assisted in preparation of significant testimony on behalf of the Competitive Supplier Group in Docket No. EL00-95-248.

- Provided economic analysis and testimony to support a client anticipating potential Federal Energy Regulatory Commission (FERC) enforcement action related to its bids into the forward capacity market in ISO New England.

- Provided expert economic support for several significant expert reports for a client under investigation by the FERC Office of Enforcement in relation to its bids at an ISO intertie.



- Completed an affidavit for the Electric Power Supply Association (EPSA) responding to a FERC Notice of Proposed Rulemaking concerning sub-interval pricing and shortage pricing trigger intervals in real-time electricity markets.

- Assisted an eastern ISO in designing proposed tariff rules to evaluate the need for reliability must run units and to compensate units with reliability must run contracts.

- Provided testimony for Dynegy Market and Trade, LLC and Illinois Power Marketing Company concerning competitive behavior and the clearing price in Zone 4 in the Midcontinent ISO's 2015/2016 annual capacity auction.

- Provided expert economic support to a large eastern utility concerning the implementation of PJM's interim capacity market auctions, which it is using during the transition to its performance incentive capacity market design.

- Advised a large power trader on issues of market design and regulatory strategy resulting from the impact of the California ISO Energy Imbalance Market on existing transmission rights in the Pacific Northwest.

- Provided advisory services to a financial marketer seeking to improve price formation in ISO New England; represented client in meetings with industry groups (generators, financial marketers and state regulators) and with the ISO.

- Led a project team to provide testimony for a group of electricity suppliers pertaining to the supply and demand for electricity in the Pacific Northwest during the Western power crisis in 2000-2001; see Docket No. EL01-10-085.

- Provided testimony for NRG concerning ISO New England's pay-for-performance modifications to its capacity market rules.

- Provided economic support concerning the dispatch offer price for the coal units of a Midwestern utility, and the treatment of contract costs versus market prices in retail rates.

- Assisted in the analysis of the impact on capacity prices of the possible creation of a new downstate capacity zone in the NYISO.

- Provided economic support concerning the design of market mechanisms to maintain long-term electricity supply reliability in ERCOT, focusing on the role of operating reserve demand curves.

- Provided economic analysis and testimony for a financial marketer facing a FERC enforcement investigation of its trading activities in two ISOs.

- Provided analyses and regulatory support regarding Order 1000 (transmission planning and cost recovery) and PJM resource planning processes for an independent transmission company in the eastern U.S.

- Prepared, along with Scott M. Harvey and William W. Hogan, an evaluation of a number of aspects of the NYISO capacity market and provided recommendations for areas of improvement.

- Prepared testimony concerning exceptional dispatch in the CAISO; see Docket No. ER12-2539-000.

- Prepared an assessment of the level of granularity of the settlements for loads within the eastern ISOs.



- Prepared a public assessment, along with Scott M. Harvey, of several proposals for the allocation of the costs of a large interstate transmission project in the MISO. Attended meetings with the MISO, stakeholders, and regulators to discuss cost allocation for the Multi-Value project.

- Worked with the Midcontinent ISO and William W. Hogan to develop a theoretical and computational approach to establishing energy prices that would minimize the uplift arising in the implementation of competitive electricity markets.

- Prepared a report, with Scott M. Harvey, on the methodologies that eastern ISOs use to calculate settlements for loads, the rationale for and regulatory history of the different approaches, and the changes that have occurred over time.

- Assisted the ISO/RTO Council in preparing their 2009 State of the Market Report.

- Prepared a paper (with Scott M. Harvey) for the MISO describing ISO practices for scheduling transmission outages and a methodology for charging transmission owners for the congestion rent shortfall costs associated with transmission outages.

- Assisted the NYISO in developing proposals for future enhancements to their TCC markets.

- Assisted the NYISO in developing a methodology to charge for revenue shortfalls that could occur due to the outage of merchant transmission facilities, taking into account the financial transmission rights awarded to parties that have funded the new transmission facilities.

- Worked with the NYISO to develop a proposal for increasing the availability of long-term fixed price transmission congestion contracts.

- Worked with the IESO (Ontario) in the development and testing of an enhanced day-ahead unit commitment and associated financial settlements.

- Assisted a PJM market participant in a matter relating to FTR default.

- Working for a PJM market participant, coauthored a paper concerning competitive electricity market issues potentially arising from policies regarding transmission expansion and generation capacity markets; filed in FERC ANOPR proceeding.

- Worked with the California ISO in their stakeholder process to develop rules for the definition, allocation and auction of financial transmission rights, in support of their filing to implement LMP as part of their MRTU; filed supporting testimony 1/07.

- Coauthored a study (with Scott M. Harvey and Bruce McConihe) analyzing the benefits from the implementation of coordinated electricity markets in New York and PJM.

- Assisted the Midcontinent ISO in developing rules for allocating financial transmission rights, and all other market rules pertaining to financial transmission rights, in support of their LMP market system; worked intensively with their Transmission Rights Task Force.

- Worked with the NYISO to develop a process for awarding incremental financial transmission rights to parties that build new transmission.

- Served as a consultant to the NYISO in developing market rules to address revenue shortfalls that occur in the settlement of financial transmission rights when transmission lines are out of service, or for other reasons; assisted in testing methodology and with tariff filings.



- Advised Entergy and the SeTrans ISA Sponsors in developing rules for allocating financial transmission rights and awarding incremental financial transmission rights to parties that "participant fund" expansions to the transmission system, in support of an LMP market system.

- Advised the NYISO in analyzing the cause of a substantial congestion rent shortfall, and in addressing the settlement consequences of the shortfall.

- Prepared a paper for Mirant showing how a demand/supply imbalance in the West contributed to spikes in electricity prices from May 2000 to June 2001.

- Assisted several clients in determining how to perform the analyses required to provide financial transmission rights as options.

- Assisted the NYISO, ISO New England and Ontario IMO in assessing alternative approaches to creating a combined day-ahead electricity market for the Northeast.

- Worked with a large Midwestern utility to create a proposal for an independent transmission company that would operate a bid-based electricity spot market and use locational pricing.

- Advised the Northwest RTO on market-based systems for congestion management, the creation of an electricity spot market and the design and allocation of financial transmission rights.

- Assisted in testing the pricing software of the NYISO prior to startup.

- Assisted in developing methodologies for performing price verification for the NYISO's LMP system.

- Assisted ISO New England in developing a congestion management system based on locational pricing and financial transmission rights.

- Led seminars on LMP and financial rights for many companies, such as Ontario Hydro.

- Participated in meetings with FERC economic staff to discuss issues such as participant funding of transmission expansion under LMP.

- Served as a consultant to the New York utilities in the development of plans and filings for restructuring the New York Power Pool as the New York Independent System Operator.

- Evaluated alternative models for pricing energy, transmission, capacity and ancillary services within a competitive power market.

- Developed market-based energy, transmission and ancillary services pricing systems, including the two-settlement system, locational pricing and financial transmission rights.

- Participated in the development of regulatory filings and regulatory strategy for implementing electric industry restructuring and a competitive generation market.

- Developed systems for allocating financial transmission rights, including a multi-round auction, auction revenue rights, and the "business solution".

- Assisted in developing alternative methods for transmission pricing.

- Participated in the development of the LMP system for the PJM interconnection.

- Assisted diverse parties, such as independent generators and marketers, in assessing restructured electricity markets in the U.S.



- Performed detailed analyses and built models of the impact of market and regulatory changes on the value of electric utility generation assets.

- Assisted with the development of models to forecast locational electricity prices.

- Evaluated the fit between restructured electricity markets and retail access programs.

- Estimated real and reactive locational marginal cost prices of power using linear programming models.

- Developed linear programming models to estimate ex post locational marginal cost electricity prices.

- Assessed market and regulatory risks confronting a consortium of energy utilities and analyzed the potential impact on their value and cost of capital.

- Developed testimony and analyses to assess regulatory policies requiring monetization of environmental externalities.

- Assessed the economic benefits of consolidating Massachusetts's electric utilities.

### Other Consulting

- Developed economic arguments and damages estimates for a case concerning alleged price discrimination in the wholesale gasoline market.

- Analyzed learning curves to support expert testimony concerning predatory behavior and patent infringement in the semiconductor industry.

- Estimated the market value of a closely held private company for a tax arbitration case.

- Assisted large multinational oil and gas clients in developing an economic foundation for cost allocation for an arbitration proceeding.

- Participated in evaluating the antitrust liability of a group of consumer product companies accused of price fixing.

- Developed data and economic arguments to support expert testimony concerning an allegation of tying of software products.

## PUBLICATIONS

- "Beneficiaries-Pay Approach Best for Transmission Cost Allocation," Natural Gas and Electricity, Vol. 28, #2, September 2011.

- "L'aumento del prezzo dell'elettricita in California: la realta dei fatti," Susan L. Pope, p. 109-139 in "Piu energia per tutti, Perche la concorrenza funziona," Carlo Stagnaro and Margo M. Thorning, Istituto Bruno Leoni, 2005.

- "Transmission Capacity Reservations Implemented through a Spot Market with Transmission Congestion Contracts," with William W. Hogan and Scott M. Harvey, Electricity Journal, Vol. 9, #9, November 1996.

## WORKING PAPERS AND REPORTS



- Jason Mann, Nicholas Brooks, Susan Pope, William Hogan and Fabien Roques, "Resource Adequacy Mechanisms in the National Electricity Market - A Report for the Energy Security Board," July 16, 2020".

- Susan L. Pope and William W. Hogan, Martina Lindovska and Jason R.H. Mann, "Embracing Merchant Transmission Investment", October 15, 2018, prepared for AQUIND Ltd.

- Susan L. Pope and Kevin Wellenius, "Challenges of Estimating Opportunity Costs of Energy-Limited Resources and Implications for Efficient Local Market Power Mitigation," May 9, 2018, prepared for Powerex.

- Susan L. Pope and William W. Hogan, "Priorities for the Evolution of and Energy-Only Electricity Market Design in ERCOT," prepared for NRG and Calpine, May 2017.

- Scott Harvey and Susan Pope, "LHV Impact Analysis," Prepared for the NYISO, January 14, 2016.

- Susan L. Pope, "Price Formation in ISOs and RTOs: Principles and Improvements," Electric Power Supply Association paper, Filed in Docket No. ER14-14-000, October 29, 2014.

- Scott M. Harvey, William W. Hogan and Susan L. Pope, "Evaluation of the New York Capacity Market", Prepared for the NYISO, March 5, 2013.

- Scott M. Harvey and Susan L. Pope, "Evaluation of MVP Transmission Cost Allocation Design", Prepared for the Midwest ISO, June 10, 2010.

- Michael Cadwalader, Paul Gribik, William Hogan and Susan Pope, "Extended LMP and Financial Transmission Rights," June 9, 2010.

- Scott M. Harvey and Susan L. Pope, "Evaluation of Midwest ISO Injection/Withdrawal Transmission Cost Allocation Design," Prepared for the Midwest ISO, March 5, 2010 (Updated April 15, 2010).

- Michael Cadwalader, Scott M. Harvey and Susan L. Pope, "Comments on the Evaluation of an Unconstrained Price Day-Ahead Market Compared to an Enhanced Day-Ahead Commitment Process," Prepared for IESO, August 29, 2008.

- Scott M. Harvey, Bruce M. McConihe and Susan L. Pope, "Analysis of the Impact of Coordinated Electricity Markets on Consumer Electricity Charges," November 20, 2006 (Revised June 18, 2007).

- Paul R. Gribik, William W. Hogan and Susan L. Pope, "Market-Clearing Electricity Prices and Energy Uplift," December 31, 2007.

- Scott M. Harvey and Susan L. Pope, "CRR Study 2 Report Addendum," California Independent System Operator, September 30, 2005.

- Scott M. Harvey and Susan L. Pope, "CRR Study 2:  Evaluation of Alternative CRR Allocation Rules," California Independent System Operator, August 24, 2005.

- Scott M. Harvey and Susan L. Pope, "Illustration of Issues Arising in CRR Allocation to LAPs," California Independent System Operator, July 1, 2005.

- Scott M. Harvey, Susan L. Pope and William W. Hogan, "Comments on the California ISO MRTU LMP Market Design," California Independent System Operator, February 23, 2005.

- Scott M. Harvey and Susan L. Pope, "MSWG Expansion TCC Approach, Revised," NYISO Market Structures Working Group, November 15, 2001.



- Scott Harvey and Susan L. Pope, "TCC Awards for Transmission Expansion: Identification of Unresolved Issues in the Proposed MSWG Award Process," NYISO Market Structures Working Group, November 15, 2001.

- Susan L. Pope, "California Electricity Price Spikes:  An Update on the Facts," December 9, 2002.

- Scott M. Harvey and Susan L. Pope, "Application of the Make-Whole Approach and Shortfall Reduction Procedure to the Day-Ahead Market and TCC Auction," NYISO Market Structures Working Group, October 17, 2003.

- Scott M. Harvey and Susan L. Pope, "Pre-Scheduling:  Forward Ramp and Transmission Reservations, Concept of Operation," for NYISO, August 8, 2001.

- Scott M. Harvey, Susan L. Pope, John P. Buechler and Robert M. Thompson, "Feasibility Study for a Combined Day-Ahead Market in the Northeast," May 4, 2001 (Draft Reports January 19, 2001 and April 20, 2001).

- Michael D. Cadwalader, Scott M. Harvey, William W. Hogan and Susan L. Pope, "Coordinating Congestion Relief Across Multiple Regions," October 7, 1999.

- Scott M. Harvey, William W. Hogan, Susan L. Pope, Andrew P. Hartshorn and Kurt Zala, "Preliminary Report - Phase IV Market Trials," October 8, 1999.

- Scott M. Harvey, William W. Hogan, Susan L. Pope, Andrew P. Hartshorn and Kurt Zala, "Report on Phase III Market Trials," September 17, 1999.

- Michael D. Cadwalader, Scott M. Harvey, William W. Hogan and Susan L. Pope, "Market Coordination of Transmission Loading Relief Across Multiple Regions," November 18, 1998.

- Michael D. Cadwalader, Scott M. Harvey, William W. Hogan and Susan L. Pope, "Reliability, Scheduling Markets and Electricity Pricing," May 1998.

- Scott M. Harvey, William W. Hogan and Susan L. Pope, "Transmission Capacity Reservations Implemented Through a Spot Market with Transmission Congestion Contracts," July 9, 1996 (revised versions, various dates).

- Scott M. Harvey, William W. Hogan and Susan L. Pope, "Transmission Capacity Reservations and Transmission Congestion Contracts," June 1996 (revised versions, various dates).

## CONFERENCES AND OTHER PUBLIC PRESENTATIONS

- Susan L. Pope, panelist for Western Power Trading Forum Web Discussion: The Future of Regional RA Procurement, May 22, 2020.

- Susan L. Pope, "Transmission Congestion:  why it occurs and causes differences in energy prices," CAISO EIM Regional Issues Forum, March 11, 2020.

- Susan L. Pope, speaker at Energy Trading Institute Annual Conference, March 5, 2018, "RTO/ISO and Economist Perspective Panel".

- Susan L. Pope, "Competitive Electricity Markets:  Ontario's Journey to LMP," Consortium for Energy Policy Research at Harvard, December 19, 2018.



- Susan L. Pope, speaker at Energy Bar Association 2019 Mid-Year Energy Forum, October 29, 2018, session title: "New Tech, Aging Regs".

- Susan L. Pope, "Market Power Mitigation in Ontario and Learnings from U.S. ISOs," Annual Workshop on the Economics of Electricity Policy and Markets, IVEY Energy Policy and Management Centre, October 18, 2018.

- Susan L. Pope, Western Power Trading Forum NW Roundtable, October 5, 2018, panel discussion of CAISO proposal for default energy bids for market power mitigation.

- Co-Chair of Gulf Cost Power Association 33rd Annual Fall Conference, October 2-3, 2018, moderated panel: "Interactive Look at the Future Electric Industry".

- William W. Hogan and Susan L. Pope, "Priorities for the Evolution of an Energy-Only Electricity Market Design in ERCOT," InfoCast ERCOT Market Summit, February 28, 2018.

- Joe Cavicchi, Scott M. Harvey, and Susan Pope, "ERUC Fundamentals: Design Elements 9-13," Prepared for Ontario IESO, Toronto, Ontario, November 27, 2017.

- Joe Cavicchi, Scott M. Harvey, and Susan Pope "ERUC Fundamentals: Design Elements 1-8," Prepared for Ontario IESO, Toronto, Ontario, October 30, 2017.

- Joe Cavicchi, Scott M. Harvey and Susan Pope, "ERUC: Overviews and Design Elements," Prepared for Ontario IESO, Toronto, Ontario, October 11, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase 2 (Options) – Session 2, Load Pricing and Market Power Mitigation Options," Prepared for Ontario IESO, Toronto, Ontario, August 17, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase 2 – Session 2, Module G: Market Power Mitigation Options," Prepared for Ontario IESO, Toronto, Ontario, August 17, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase 2 – Session 1, Price Formation Options," Prepared for IESO, Toronto, Ontario, July 27, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 3, Module H: Make Whole Payments and Uplift," Prepared for IESO, Toronto, Ontario, July 27, 2017.

- Susan L. Pope, "Priorities for the Evolution of an Energy-Only Electricity Market Design in ERCOT," Gulf Coast Power Association, Austin, TX, July 12, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 3, Module G: Market Power Mitigation Appendix," Prepared for IESO, Toronto, Ontario, June 29, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 3, Module G: Market Power Mitigation," Prepared for IESO, Toronto, Ontario, June 29, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 3, Module F: Load Pricing," Prepared for IESO, Toronto, Ontario, June 29, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 2, Module E: Pricing Operation Restrictions and Operator Actions," Prepared for IESO, Toronto, Ontario, June 2, 2017.



- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 2, Module D: Multi-Interval Optimization and Pricing," Prepared for IESO, Toronto, Ontario, June 2, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 2, Module C: Pricing Constraint Violations," Prepared for IESO, Toronto, Ontario, June 2, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 2, Module B: Reserve Pricing," Prepared for IESO, Toronto, Ontario, June 2, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues, Phase I – Session 2, Module A: Energy Pricing," Prepared for IESO, Toronto, Ontario, June 2, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues -- Introduction" Prepared for IESO, Toronto, Ontario, June 2, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues Phase I Discussion," Prepared for Ontario IESO, Toronto, Ontario, May 4, 2017.

- Susan L. Pope, "Priorities for Improving Energy Price Formation in ERCOT," Gulf Coast Power Association 31st Annual Spring Conference, Houston, TX, April 20, 2017.

- Susan L. Pope, invited moderator for EUCI "Price Formation Issues in Wholesale Energy Markets" Conference, Baltimore, MD, April 10, 2017.

- Scott M. Harvey and Susan Pope, "Single Schedule Market Pricing Issues Phase I Discussion," Prepared for IESO, Toronto, Ontario, May 4, 2017.

- Susan l. Pope, "Update on Energy Price Formation," University of Texas Gas and Power Institute, September 8, 2016.

- Susan L. Pope, invited panelist for Skadden, Arps et al. Eleventh Annual Energy Conference, "Whither Electricity Markets," March 8, 2016.

- Susan L. Pope, invited panelist for FERC Technical Conference, Dockets Nos. EL16-6-001 and ER16-121-000, February 4, 2026 (addressing PJM's ARR and FTR allocations and settlements).

- Scott M. Harvey and Susan Pope, "G-J Impact Analysis," Prepared for New York ISO, Albany, NY, January 14, 2016.

- Susan L. Pope, moderated panel discussion, "Uplift and Price Formation in PJM," Infocast PJM Market Summit 2015, September 17, 2015.

- Susan L. Pope, UBS conference call speaker, "Delving into Scarcity Price Formation," October 31, 2014.

- Susan L. Pope, invited panelist for FERC Workshop, "Price Formation in Energy and Ancillary Services Markets Operated by Regional Transmission Organizations and Independent System Operators," Docket No. AD14-14-000, September 5, 2014.

- Susan L. Pope, "Electricity Industry Fundamentals," EUCI Conference, June 16, 2013.

- Scott M. Harvey, William H. Hogan, and Susan L. Pope, "Evaluation of the New York ISO Capacity Market: Summary of Draft Report," New York ISO ICAP Working Group, September 11, 2012.

- Scott M. Harvey, William H. Hogan, and Susan L. Pope, "Preliminary Evaluation of the New York ISO Capacity Market," New York ISO ICAP Working Group, July 31, 2012.



- Scott M. Harvey and Susan L. Pope, "Funding Uneconomic Transmission Investments: Wind Energy in the Midwest ISO," Rutgers Advanced Workshop in Regulation and Competition, June 25, 2010.

- Scott M. Harvey and Susan L. Pope, "Comments on MVP Transmission Cost Allocation Design," Prepared for Midwest ISO, June 10, 2010.

- Scott M. Harvey and Susan L. Pope, "Final Report on Midwest ISO Injection/Withdrawal Transmission Cost Allocation Design," March 10, 2010, Prepared for Midwest ISO RECB meeting, March 11, 2010.

- Scott M. Harvey and Susan L. Pope, "Defining and Implementing Transmission Maintenance Performance Incentives in LMP Markets," Infocast Transmission Summit 2006, March 15, 2006.

- Scott M. Harvey, Bruce M. McConihe and Susan L. Pope, "Analysis of Impact of Coordinated Electricity Markets on Consumer Electricity Charges," Center for Research in Regulated Industries, Rutgers University, 20th Annual Western Conference, Monterey, CA, November 20, 2006 (Revised June 18, 2007).

- Susan L. Pope, "FTRs: Status and Next Steps," EUCI National Perspectives on Financial Transmission Rights, March 20, 2007.

- Scott M. Harvey and Susan L. Pope, "Defining and Implementing Transmission Maintenance Performance Incentives in LMP Markets," Infocast Transmission Summit 2006, March 15, 2006.

- Susan L. Pope, "CRR Allocation Rules: Illustration of CAISO's Proposed Treatment of Retail Access," October 5, 2005.

- Scott M. Harvey and Susan L. Pope, "CRR Allocation Methodology Examples," California Independent System Operator, August 31, 2005.

- Scott M. Harvey and Susan L. Pope, "Expanded CRR Study 2 Results," California Independent System Operator, August 18, 2005.

- Susan L. Pope and Scott M. Harvey, "CRR Allocation Rules: CAISO Straw Proposal for LSEs," California Independent System Operator, August 18, 2005.

- Susan L. Pope and Scott M. Harvey, "CRR Allocation Rules: Discussion of Eligible LSE CRR Sources," California Independent System Operator, July 14, 2005.

- Scott M. Harvey and Susan L. Pope, "CRR Study 2 Metrics and CRR Allocation by Eastern and Midwestern ISOs," California Independent System Operator, June 21, 2005.

- Susan L. Pope, "CRR Allocation Objectives: Stakeholder Discussion Paper," California Independent System Operator, May 19, 2005.

- Scott M. Harvey, Susan L. Pope and William W. Hogan, "Comments on ISO MRTU LMP Market Design," California Independent System Operator, March 2, 2005.

- Richard Doying and Susan L. Pope, "FTR Allocation Time Frame," Midwest ISO Market Subcommittee, September 4, 2003.

- Richard Doying and Susan L. Pope, "FTR Definition for 'Slice of System Sales'," Midwest ISO Market Subcommittee, September 4-5, 2003.

- Susan L. Pope and Richard Doying, "FTR Allocation, Nomination and Re-Nomination," Prepared for the Midwest ISO Transmission Rights Task Force, September 4-5, 2003.

Document Accession #: 20210212-5033       Filed Date: 02/12/2021



- Susan L. Pope and Richard Doying, "Market Subcommittee: FTR Allocation SFT Alternatives," Revision 1, August 21, 2003, Prepared for the Midwest ISO Transmission Rights Task Force, August 21, 2003.

- Richard Doying and Susan L. Pope, "Adjustments to FTR Initial Allocation – Re-Nomination, Reflecting 'Take-Backs' from July 7th Meeting," Prepared for the Midwest ISO Transmission Rights Task Force, August 22, 2003.

- Richard Doying and Susan L. Pope, "Adjustments to FTR Initial Allocation – Re-Nomination," MISO Transmission Rights Task Force, July 18, 2003.

- Richard Doying and Susan L. Pope, "FTRs for Pumped Storage," MISO Transmission Rights Task Force, April 17, 2003.

- Richard Doying and Susan L. Pope, "Treatment of Grandfathered Transmission Agreements in Transition to NYISO," MISO Transmission Rights Task Force, April 17, 2003.

- Susan L. Pope and Richard Doying, "Opt-Out in the FTR Initial Allocation," MISO Transmission Rights Task Force, March 21, 2003.

- Susan L. Pope, Arthur Desell and Greg Williams, "Management of Day-Ahead Congestion Rent Shortfall: Short List Topics," NYISO Congestion Reduction Task Force, January 29, 2003.

- Susan L. Pope and Richard Doying, "Initial Allocation of FTRs – Examining the Alternatives," MISO Transmission Rights Task Force, January 9-10, 2003

- Susan L. Pope and Richard Doying, "Initial Allocation of FTRs – Introductory Remarks," MISO Transmission Rights Task Force," January 9-10, 2003.

- Susan L. Pope and Richard Doying, "Pre-OATT Rights – Issues Impacting Initial FTR Allocation," MISO Transmission Rights Task Force, January 9-10, 2003.

- Susan L. Pope and Carl Monroe, "Options, Obligations and Pro-Rationing – Treatment of Existing Entitlements in the Initial Allocation of FTRs," MISO Transmission Rights Task Force, November 22, 2002.

- Susan L. Pope and Roberto Paliza, "Initial Allocation Methodology," MISO Transmission Rights Task Force, October 18, 2002.

- Susan L. Pope, "FTRs, ARRs and Load Growth," MISO Transmission Rights Task Force, October 18, 2002.

- Susan L. Pope and Roberto Paliza, "Market Design Issues," MISO Transmission Rights Task Force, October 1, 2002.

- Susan L. Pope and Roberto Paliza, "Discussion of FTR Issues Raised by the SMD NOPR," MISO Transmission Rights Task Force, August 30, 2002.

- Susan L. Pope, "LMP Congestion Money Flow and Transmission Rights Allocation," MISO Transmission Rights Task Force, June 20, 2002.

- Arthur Desell (NYISO) and Susan L. Pope (LECG), "Congestion Reduction Task Force, Meeting I," June 15, 2002.

- Susan L. Pope, "MISO Congestion Management System: Transmission Rights Task Force: Day-2 Transmission Rights Allocation Approaches," MISO Transmission Rights Task Force, April 23, 2002.

Document Accession #: 20210212-5033        Filed Date: 02/12/2021



- Susan L. Pope, "TCC Awards for Transmission Expansions," PJM Regional Transmission Planning Stakeholder Process Meeting, April 12, 2002.

- Susan L. Pope, "TCC Awards for Transmission Expansions," NYISO Business Issues Committee, March 20, 2002.

- Susan L. Pope and Scott M. Harvey, "TCC Awards for Transmission Expansions," FERC Staff, March 11, 2002.

- Susan L. Pope, "MSWG Expansion TCC Award Process: Project Update II," NYISO Market Structure Working Group," February 12, 2002.

- Susan L. Pope and Scott M. Harvey, "MISO Congestion Management System: Financial Transmission Rights in MISO, Allocation Issues and Process," MISO Transmission Rights Allocation Task Force, January 30, 2002.

- Susan L. Pope, "MSWG Expansion TCC Award Process: Project Update," NYISO Market Structure Working Group," January 15, 2002.

- Susan L. Pope and Scott M. Harvey, "LMP and Financial Rights Basics," MISO Transmission Rights Task Force, Carmel, IN, January 10, 2002.

- Susan L. Pope and Scott M. Harvey, "Financial Transmission Rights in MISO – Overview of Allocation Process and Issues," MISO Transmission Rights Task Force, Carmel, IN, January 10, 2002.

- Scott M. Harvey and Susan L. Pope, "TCC Expansion Awards for Controllable Devices: Initial Discussion," NYISO Market Structures Working Group, November 16, 2001.

- Susan L. Pope and Scott M. Harvey, "MSWG Expansion TCC Award Process: Task 1: Resolution of Ambiguities," NYISO Market Structures Working Group, November 16, 2001.

- Susan L. Pope and Scott M. Harvey, "MSWG Expansion TCC Award Process: Task 1: Modified Award Process," NYISO Market Structures Working Group, November 16, 2001.

- Susan L. Pope, "TCC Auction Feasibility Test with Pre-Existing TCC Options," NYISO Market Structures Working Group, November 16, 2001.

- Scott M. Harvey and Susan L. Pope, "MSWG Expansion TCC Approach, Revised," NYISO Market Structures Working Group, November 15, 2001.

- Scott M. Harvey and Susan L. Pope, "TCC Awards for Transmission Expansion: Identification of Unresolved Issues in the Proposed MSWG Award Process," NYISO Market Structures Working Group, November 15, 2001.

- Susan L. Pope, "An Empirical Assessment of the Success of Financial Rights Auctions in PJM and New York," EUCI Electric Power Market Performance Conference, Denver, CO, September 20, 2001.

- Susan L. Pope, "Financial Rights Auctions in PJM and New York: Empirical Assessment," EUCI Electric Power Market Performance Conference, Denver, CO, September 20, 2001.

- Susan L. Pope and John Chandley, "Overview of ITC Congestion Management Proposal," Prepared for ITC/Alliance/MISO Meeting, March 24, 2000.

- Susan L. Pope, "LMP – Market-Based Real-Time Balancing and Congestion Management," Midwest ISO Owner's Committee, Midwest ISO Policy Subcommittee, March 15, 2000.



- Scott M. Harvey, William W. Hogan, Susan L. Pope, Andrew P. Hartshorn and Kurt Zala, "Review of Phase IV Market Trials," Prepared for New York ISO – Market Participants Meeting, October 11, 1999.

- Scott M. Harvey, William W. Hogan, Susan L. Pope, Andrew P. Hartshorn and Kurt Zala, "Review of Phase III Market Trials," Prepared for New York ISO – Market Participants Meeting, September 21, 1999.

- Scott M. Harvey, Susan L. Pope and Andrew P. Hartshorn, "Allocation of Financial Transmission Rights in California, New York and PJM," NEPOOL Joint CMS/MSS Group, August 4, 1999.

- Scott M. Harvey, Susan L. Pope and Andrew P. Hartshorn, "Nodal-Zonal Pricing Part II – Zonal FCRs," NEPOOL Joint CMS/MSS Group, August 4, 1999.

- Scott M. Harvey and Susan L. Pope, "A Nodal-Zonal Pricing System," NEPOOL Joint CMS/MSS Group, July 19, 1999.

- Susan L. Pope, "Overcoming Transmission Constraints: Market-Based Approach to Congestion Management," EPRM Power '99 Conference, Houston, TX, June 23-24, 1999.

- Susan L. Pope, "Overview of Locational Pricing Principles," Designing the Ideal ISO for Your Regional Energy Market, Infocast Conference, Washington, DC, May 28, 1999.

- Scott M. Harvey and Susan L. Pope, "Ancillary Services in a Two-Settlement System," NEPOOL Joint CMS/MSS Group, May 27, 1999.

- Scott M. Harvey and Susan L. Pope, "Reliability Commitment and Scheduling Issues," NEPOOL Joint CMS/MSS Group, May 27, 1999.

- Scott M. Harvey and Susan L. Pope, "Overview of the Straw Proposal," NEPOOL Joint CMS/MSS Group, May 10, 1999.

- Scott M. Harvey and Susan L. Pope, "Market Hubs and Transaction Scheduling," NEPOOL Joint CMS/MSS Group, May 10, 1999.

- Richard Dudeck (Williams), Charles A. King (NYISO), Scott M. Harvey and Susan L. Pope, "An Introduction to Independent System Operators and Electric Industry Restructuring," 1999 SERC System Operator Conference, April 28-29, 1999.

- John Chandley and Susan L. Pope, "The Role of Financial Rights in Congestion Management: Price Certainty and Liquidity," Megawatt Daily Transmission Issues Conference, March 24-25, 1999.

- Susan L. Pope, "Business Implications of Transmission Pricing: Why Congestion Matters," ACI Electric Power Market Restructuring Conference, Washington, DC, February 18, 1999.

- Scott M. Harvey and Susan L. Pope, "Locational Pricing," NEPOOL Regional Market Operations Committee and NEPOOL Regional Transmission Operations Committee, Westborough, MA, September 25, 1998.

- Scott M. Harvey and Susan L. Pope, "Locational Pricing," NEPOOL Regional Transmission Planning Committee, Westborough, MA, September 8, 1998.

- John D. Chandley and Susan L. Pope, "Overview on Transmission Pricing and Congestion: Possible Solutions," Pasha Publications Conference on PJM Power, June 16, 1998.



- Susan L. Pope and Steve Henderson, "Understanding Transmission," SERC Power Markets Conference, May 19, 1998.

- Scott M. Harvey, Susan L. Pope and Michael D. Cadwalader, "Understanding Transmission," Pasha Publications/MW Daily, ERCUT Power Markets Conference, March 31, 1998.

- Susan L. Pope, "Transferring Transmission Rights – The Case for Financial Rights," InfoCast Conference on Congestion Pricing & Tariffs, January 22-23, 1998.

- Susan L. Pope, "Hub-and-Spoke Transmission Congestion Contracts," Presented to NYPSC Staff, May 22, 1997.

- Scott M. Harvey and Susan L. Pope, "The Impact of Alternative Electricity Market Structures on Stranded Generation Costs," IBC Stranded Costs Conference, June 20, 1996.

## TESTIMONY

- William W. Hogan and Susan L. Pope, PJM Reserve Markets:  Operating Reserve Demand Curve Enhancements, Exhibit 1 to PJM filing for Enhanced Price Formation In Reserve Markets of PJM Interconnection, L.L.C. (Docket Nos. ER19-1486-000 and EL19-58-000), March 29, 2019.

- Susan L. Pope,  Direct Evidence, Alberta Utilities Commission Proceeding ID No. 23757 regarding the Alberta Electricity System Operator Comprehensive Market Design,  May 21, 2019 (engaged by Industrial Power Consumers Association of Alberta and Alberta Direct Connect Consumer Association to provide objective evidence to the Alberta Utilities Commission).

- Susan L. Pope, Rebuttal Evidence, Alberta Utilities Commission Proceeding ID No. 23757 regarding the Alberta Electricity System Operator Comprehensive Market Design, April 4, 2019.

- Susan L. Pope, Written Evidence, Alberta Utilities Commission Proceeding ID No. 23757 regarding the Alberta Electricity System Operator Comprehensive Market Design, February 28, 2019.

- Susan L. Pope, Comments on Alberta Capacity Market Design, Alberta Utilities Commission Proceeding ID No. 23757 regarding the Alberta Electricity System Operator Comprehensive Market, November 2, 2018.

- Susan L. Pope, prefiled testimony for The State of Texas Senate Committee on Business and Commerce, May 1, 2018 Hearing, Panel 3 (on behalf of NRG and Calpine).

- Susan L. Pope, Affidavit on Behalf of Elliott Bay Energy Trading, LLC (concerning ARR and FTR settlements and markets), FERC Docket Nos. ER16-121-000, EL16-6-000 and EL16-6-001, March 15, 2016.

- Susan L. Pope, Affidavit of Dr. Susan L. Pope on Behalf of MPS Merchant Services, Inc., FERC Docket Nos. EL00-95-280, EL00-95-271 and EL00-95-281, November 4, 2015 (concerning price effects alleged during CA electricity crisis).

- Susan L. Pope, Affidavit, Settlement Intervals and Shortage Pricing in Markets Operated by Regional Transmission Organizations and Independent System Operators, FERC Docket No. RM15-24-000, November 30, 2015 (on behalf of EPSA).

- Susan L. Pope, Affidavit (concerning the Zone 4 price in MISO's capacity auction for 2015/2016), FERC Docket Nos. EL15-70-000, EL15-71-000 and EL15-72-000, July 2, 2015 (on behalf of Dynegy).



- Susan L. Pope, Affidavit, Complaint of Consolidated Edison Company of New York, Inc. (concerning PJM's hybrid transmission cost allocation methodology), FERC Docket No. ER15-18 -000, November 7, 2014.

- Susan L. Pope, Affidavit (concerning ISO-NE's Performance Incentive program for capacity resources), FERC Docket No. ER14-1050-000, February 7, 2014 (on behalf of NRG).

- Susan L. Pope, Affidavit (concerning PJM request for waiver of offer-price cap), FERC Docket No. ER14-1145-000, January 31, 2014 (on behalf of Electric Power Supply Association).

- Susan L. Pope, First Affidavit, California Independent System Operator Corporation, FERC Docket No. ER12-2539-000, September 18, 2012 (on behalf of JP Morgan).

- Susan L. Pope, Second Affidavit, California Independent System Operator Corporation, FERC Docket No. ER12-2539-000, October 18, 2012 (on behalf of JP Morgan.)

- William W. Hogan and Susan L. Pope, Comments on Wholesale Competition in Regions within Organized Electric Markets, FERC Docket Nos. RM07-19-00 and AD07-7-000, Sept 17, 2007.

- Susan L. Pope, Long-Term Firm Transmission Rights in Organized Electricity Markets, FERC Docket No. RM06-8-000, January 29, 2007 (on behalf of the California Independent System Operator).

- Scott M. Harvey and Susan L. Pope, California Independent System Operator, FERC Docket No. ER06-615-000, February 8, 2006 (in support of MRTU).

- Scott M. Harvey, William W. Hogan and Susan L. Pope, Electricity Market Design and Structure: Working Paper on Rate and Transition Issues in Standardized Transmission Service and Wholesale Electric Market Design, FERC Docket No. RM01-12-000, May 1, 2002.

- Susan L. Pope, New York Independent System Operator Docket Nos. ER97-1523-011, OA97-470-010, ER97-4234-008, ER97-1523-018, OA97-401-017, ER97-4234-015, ER97-1523-019, OA97-470-018, ER97-4234-016, Direct, May 8, 2000 (on behalf of Member Systems and New York ISO).

- Susan L. Pope, Prepared Direct Testimony, FERC Docket No. ER97-1523-000, OA97-470-000, and ER97-4234-000, not consolidated (on behalf of the New York Power Pool), May 28, 1999.

- Susan L. Pope, On Congestion Pricing Under the Proposal to Restructure the New York State Electricity Market, FERC Docket No. ER97-1523-000 (on behalf of the New York Power Pool), December 12, 1997.

Attachment E

Affidavit of Andrew Rea, Guidehouse Inc. in
Support of Benefits Analysis

JA0493

STATE OF CALIFORNIA     )
                        )     SS.
COUNTY OF LOS ANGELES)

## AFFIDAVIT OF ANDREW REA

I, Andrew Rea, having first been duly sworn, state and aver as follows:

1.      I am currently a Partner with Guidehouse Inc.

2.      I am familiar with, and have personal knowledge of, the Southeast Energy Exchange Market analysis performed by Guidehouse related to examining the potential benefits of forming a Southeast Energy Exchange Market.

3.      The Guidehouse *Southeast EEM Benefits and Non-Centralized Costs* report previously published on July 6, 2020, has been updated on November 18, 2020, with clarifying edits that did not change the result or analysis.  The updated report was prepared under my direction or supervision in accordance with applicable standards.

4.      The report filed with this verification is a true and correct copy of the *Southeast EEM Benefits and Non-Centralized Costs* report issued by Guidehouse.

Further affiant sayeth not.

_____
Andrew Rea


Dated:  February 11, 2021

JA0494

Attachment E-1

Benefits Analysis by Guidehouse Inc. and
CRA International

**Guidehouse**  **CRA** Charles River Associates

**Southeast EEM Benefits and Non-Centralized Costs**

# Southeast EEM Benefits and Non-Centralized Costs

**Prepared for:**

Participants in Southeast Energy Exchange Market

*Submitted by:*
**Guidehouse, Inc.**
1200 19th Street NW
Suite 700
Washington, DC 20036

**Charles River Associates Inc.**
200 Clarendon Street
Boston, MA 02116-5092

Issued: July 6, 2020
Updated: November 18, 2020

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0496



Southeast EEM Benefits and Non-Centralized Costs

# TABLE OF CONTENTS

**Executive Summary** ......................................................................................................... iv
   Study Scope and Purpose ............................................................................................. iv
   Southeast EEM Overview .............................................................................................. v
   Modeling Approach ........................................................................................................ v
   Southeast EEM Benefits ............................................................................................... vi
   Non-Centralized (Internal) Costs ................................................................................ viii

**1. Study Background, Assumptions, and Methodology** ........................................... 1
   1.1 Study Scope and Purpose ....................................................................................... 1
   1.2 Market Outlooks ...................................................................................................... 1
      1.2.1 IRP Baseline Outlook ...................................................................................... 2
      1.2.2 Carbon-Constrained Outlook ........................................................................... 2
   1.3 Study Methodology .................................................................................................. 3
      1.3.1 Southeast EEM Overview ................................................................................ 3
      1.3.2 Modeling Approach .......................................................................................... 4
      1.3.3 Load and Renewable Uncertainty .................................................................... 5
      1.3.4 Short-term Bid and Offer Curves ..................................................................... 6
   1.4 Key Study Assumptions ........................................................................................... 7

**2. Southeast EEM Benefits** ........................................................................................ 8
   2.1 Southeast EEM Gross Benefits ............................................................................... 8
   2.2 Benefits Discussion ................................................................................................. 8
   2.3 Sensitivities and Parameter Testing ...................................................................... 11
   2.4 Conclusions ........................................................................................................... 11

**3. Southeast EEM Non-Centralized Costs** .............................................................. 12
   3.1 Approach to Estimating Costs ............................................................................... 12
      3.1.1 Cost Categories ............................................................................................. 12
      3.1.2 Interview Approach ........................................................................................ 13
      3.1.3 Costs Levelization and Adjustment for Inflation ............................................ 13
   3.2 Start-up Costs ....................................................................................................... 13
   3.3 On-going Costs ...................................................................................................... 14
   3.4 Insights and Conclusions ...................................................................................... 15

**Appendix A. Supporting Data** ................................................................................. A-1
   A.1 Assumptions ........................................................................................................ A-1
   A.2 Southeast EEM Results ........................................................................................ A-6

**Appendix B. Southeast EEM Participant COST Interview Process** ...................... B-8
   B.1 Cost Template ...................................................................................................... B-9



**Southeast EEM Benefits and Non-Centralized Costs**

## DISCLAIMER

This report was prepared by Guidehouse Inc. ("Guidehouse")[1] and CRA International, Inc. ("CRA") for Project BEST. The work presented in this report represents Guidehouse and CRA's professional judgment based on the information available at the time this report was prepared. Guidehouse and CRA are not responsible for the reader's use of, or reliance upon, the report, nor any decisions based on the report. GUIDEHOUSE AND CRA MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED. Readers of the report are advised that they assume all liabilities incurred by them, or third parties, as a result of their reliance on the report, or the data, information, findings, and opinions contained in the report.

---

[1] Guidehouse LLP completed its acquisition of Navigant Consulting, Inc. and its operating subsidiaries on October 11, 2019. For more information, see: https://guidehouse.com/news/corporate-news/2019/guidehouse-completes-acquisition-of-navigant.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0498



**Southeast EEM Benefits and Non-Centralized Costs**

## EXECUTIVE SUMMARY

### Study Scope and Purpose

A coalition of Southeast utilities, cooperatives, and municipalities engaged Guidehouse and Charles River Associates (collectively referred to as Guidehouse/CRA) to examine the potential benefits of forming a Southeast Energy Exchange Market (Southeast EEM). The proposed Southeast EEM is a centralized automated market for trading energy between electric utilities in the Southeast U.S. on an intra-hour basis. Southeast EEM participants include Associated Electric Cooperative Inc., Central Electric Power Cooperative, Dalton Utilities, ElectriCities of North Carolina, Inc., Dominion Energy South Carolina, Duke Energy Carolinas, Duke Energy Progress, Georgia System Operations Corporation, Georgia Transmission Corporation, LG&E and KU Energy, MEAG Power, NC Electric Membership Corporation, Oglethorpe Power Corporation, Santee Cooper, Southern Company, and TVA. In aggregate, the prospective Southeast EEM participants have over 160 GW of capacity serving over 640 TWh of energy for load. As an intra-hour market, the Southeast EEM would supplement the existing day/hour-ahead bilateral market in the Southeast making use of any remaining available transfer capability (ATC) to obtain additional savings in energy costs and improved renewable integration in the region.

Guidehouse/CRA estimated Southeast EEM benefits against a status quo of no intra-hour interface trading, with two market outlooks evaluated: an *IRP Baseline Outlook* and a *Carbon-Constrained Outlook*. The *IRP Baseline Outlook* is based on the Guidehouse Reference Case outlook on North American power markets, supplemented by each Southeast EEM participant's most recent integrated resource plan (IRP). The *Carbon-Constrained Outlook* is an alternative market outlook that explores a high renewable future in the Southeast with ambitious carbon reduction goals. For purposes of the benefits analysis, Southeast EEM operations are assumed to begin in 2021 and benefits are assessed over the 20-year period from 2021 to 2040.

Based on the Guidehouse/CRA analysis, Southeast EEM benefits across the Southeast EEM footprint are projected to be over $40 million (2020$) per year in the *IRP Baseline Outlook*. In the *Carbon-Constrained Outlook*, with much higher renewable and energy storage penetration in the out-years, Southeast EEM benefits increase substantially over time to reach over $100 million (2020$) per year by 2037.

In addition to the benefits analysis, Guidehouse/CRA assisted each potential Southeast EEM participant in estimating the internal non-centralized costs, such as additional labor and software, that would be incurred for each participant to start-up and operate in the proposed Southeast EEM market. The aggregate sum of these Southeast EEM participant internal non-centralized costs are approximately $3.1 million per year (2020$) when levelized in real terms over the 2021-2040 period.[2]

---

[2] These internal member costs do not include the costs of operating the Southeast EEM trading platform, and the costs of other centralized Southeast EEM administrative and monitoring expenses.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0499



## Southeast EEM Benefits and Non-Centralized Costs

## Southeast EEM Overview

Under the proposed Southeast EEM, there will be 15-minute intra-hour trading across Southeast EEM participant interfaces, making use of any remaining non-firm ATC, with bids and offers matched through a platform to be developed by a third-party vendor with access provided to each of the Southeast EEM participants for supplying their input information.

In the Southeast EEM, there will be a new $0/MWh transmission product which can only be procured in the intra-hour market for any remaining non-firm ATC and represents the lowest level priority of non-firm transmission service. All resulting Southeast EEM transactions are between two parties, with the point of sale for each transaction at the buyer's BA interface. Southeast EEM trade prices are calculated using a bilateral "split savings" approach between the matched bid and offer. Each Balancing Authority ("BA") would be responsible for continuing to ensure adequate resource plans for meeting reserve requirements and would continue to oversee its generation and load balancing.

## Modeling Approach

A combination of production cost modeling and linear programming optimization was used to estimate Southeast EEM benefits. Guidehouse uses PROMOD, a commercially available software, to develop its wholesale energy market price and plant performance forecasts.[3] In this study, PROMOD is first used to simulate regional system operations under status quo conditions, including the daily and hourly bilateral trading that takes place today. The hourly PROMOD data (e.g., output of each generating unit in the footprint) is then pulled into the Southeast EEM Model to analyze whether additional economic intra-hour trades can be made among Southeast EEM participants. This sub-hourly model incorporates load and renewable generation uncertainty, ATC, and the $0/MWh non-firm transmission product.[4] The modeling process is illustrated in Figure 1

### Figure 1. Southeast EEM Modeling Flow Diagram



One Southeast EEM objective is to assist utilities in the Southeast with lowering energy cost for customers and renewable integration. With solar capacity representing the predominant renewable technology in the Southeast, the largest sub-hourly imbalances are observed during "solar hours" (hours ending 8:00 am to 7:00 pm). A distribution of the aggregated 15-minute renewable imbalances during solar hours for the Southeast EEM participants is shown in Figure 2 for 2022 and 2037. As shown, in approximately 16% of these 15-minute periods during solar hours, imbalances exceed +/- 130 MW for the participating BAs, with certain 15-minute periods having much larger imbalances.

---

[3] PROMOD is a detailed energy production cost model used to simulate hourly chronological operation of generation and transmission resources on a nodal basis.

[4] As discussed in Section 1.3.2, any market-based rate restrictions for sales within BAs that were identified in discussions with Southeast EEM participants are incorporated in the sub-hourly bilateral trade modeling. Financial transmission losses are considered in the model.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0500



## Southeast EEM Benefits and Non-Centralized Costs

In the *Carbon-Constrained Outlook*, the significant renewable expansion by the late 2030s results in the larger imbalances becoming much more frequent.  It should be noted that the Southeast EEM can help participants manage periods of excess energy and high net demand ramping created by renewable integration. However, the EEM will not be able to address minute-to-minute renewable volatility and intermittency due to the 15-minute schedule transaction update frequency.

**Figure 2. Distributions of 15-Minute Renewable Imbalances During Solar Hours**

*Note: distribution frequency truncated at 0.01 for illustrative purposes; each bar in the histogram represents a 5 MW bin; higher imbalances attributed to Balancing Authorities with higher renewable penetration*

## Southeast EEM Benefits

As shown in Figure 3, Southeast EEM benefits (prior to netting any Southeast EEM start-up or operating costs) average $47M per year (2020$) in the *IRP Baseline Outlook*. Benefits increase slightly in the mid-term largely as a result of higher renewable penetration, before stabilizing for the remainder of the forecast.[5]

In the *Carbon-Constrained Outlook*, benefits increase significantly in the out-years driven by increasing sub-hourly uncertainty from higher renewable penetration and increased flexibility from the expansion of battery storage. While benefits are considerably higher in the *Carbon-Constrained Outlook*, they are also more uncertain, as the resource mix and power system operation in the 2030s represents a significant change from today.

---

[5] The annual benefits are represented as a range in these charts to reflect the uncertainty primarily associated with market participation and ATC, and to a lesser degree, ramping capability of gas and storage assets and permissible renewable curtailment.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy



## Southeast EEM Benefits and Non-Centralized Costs

**Figure 3. Southeast EEM Benefits**



The Southeast EEM benefits are derived from fuel cost savings, as the Southeast EEM gives participants access to a lower cost, more efficient pool of resources in managing subhourly load and renewable uncertainty. As shown in Table 1, annual benefits represent approximately 0.3% to 0.4% of total annual production costs in the Southeast EEM footprint in the *IRP Baseline Outlook*. Benefits as a proportion of total production costs are much higher in the *Carbon-Constrained Outlook*, reaching 1.1% by 2037.

**Table 1. Southeast EEM Benefits Relative to Southeast EEM Footprint Production Costs**

| Year | Southeast EEM Footprint Production Costs ($2020) | | Southeast EEM Gross Benefit ($2020) | |
|---|---|---|---|---|
| | IRP Baseline | Carbon-Constrained | IRP Baseline | Carbon-Constrained |
| **2022** | $10.8B | | $37M – $46M | |
| **2027** | $12.0B | $11.4B | $46M – $58M | $57M – $71M |
| **2032** | $13.0B | $11.7B | $41M – $50M | $78M – $98M |
| **2037** | $14.1B | $12.1B | $44M – $55M | $121M – $151M |

In an average hour, 15-minute sub-hourly trades represent approximately 1-2% of the total energy for load within the Southeast EEM participant footprint. In effect, the PROMOD hourly output of individual generating units in the Southeast EEM footprint is modified by plus/minus 1 to 2% on average through sub-hourly trading.

Renewable imbalance is a large driver of the Southeast EEM benefits. While it is difficult to attribute an exact proportion, Southeast EEM benefits seem to be roughly evenly split between renewable integration benefits and the benefits from taking advantage of interface price differentials with zero-cost sub-hourly transmission. A number of parameter tests were conducted to better understand the source of the benefits. Southeast EEM benefits are robust across all years, both market outlooks, and all model parameter tests.

**Guidehouse**   CRA **Charles River Associates**

## Southeast EEM Benefits and Non-Centralized Costs

There are several key uncertainties and risks associated with the value of the Southeast EEM:

- The study assumes a well-functioning, and relatively high-participation market. Limited participation by members is the largest risk to Southeast EEM benefits.
- The $0 transmission rate sub-hourly trading could eventually cannibalize some hourly trading yielding a reduction in non-firm transmission revenues.
- The resource mix in the *Carbon-Constrained Outlook* represents a significant change from today for the Southeast making results much more uncertain.

The Southeast EEM can also set the stage for more complex markets that could unlock even greater benefits for its members. For example, while a 5-minute market would be more complex and costly, it would likely facilitate greater renewable integration benefits and possibly a reduction in reserves held for balancing.

## Non-Centralized (Internal) Costs

In forming the Southeast EEM, two separate and distinct cost streams would be incurred: shared Southeast EEM costs and internal member costs. The former costs are those incurred to facilitate the central market and settlement process and the latter are incurred at the member level to interface with the market and manage the process locally through scheduling and processing transactions. Guidehouse/CRA focused on the latter cost category (internal member costs) through an interview process with each prospective Southeast EEM participant.

Non-centralized internal costs can be segregated into two categories. The first are "start-up" costs, one-time costs related to the initial market development period. Start-up costs are primarily comprised of costs associated with meeting initial operational requirements, governance requirements, and regulatory filings, but may include other non-recurring costs as well. The second category of costs are the ongoing ones required to facilitate participation in the market. These ongoing costs are primarily labor for schedulers and traders as well as ongoing regulatory costs.

The Southeast EEM benefits modeling assumes that all economic intra-hour trades will be made; thus, members estimated internal costs robust enough to actively optimize bids every 15 minutes. For purposes of this analysis, the costs considered are incremental, meaning that only out-of-pocket expenses for software, outside legal support, additional staffing, etc. were considered. Use of existing in-house capabilities and existing staff were excluded from consideration. The collective amount of internal non-centralized costs is shown in Table 2.

**Table 2. Southeast EEM Member Aggregate Non-Centralized Start-up and Operating Costs**
(*millions of dollars*)

| Category | Total | 20-year Real Levelized ($2020) |
|---|---|---|
| **Start-up Costs** | $3.8 (one time) | $0.3 |
| **Operating Costs** | $2.8 (per year, growing at inflation) | $2.8 |
| | **Total:** | **$3.1** |

Costs are summarized in terms of a 20-year real levelized annual amount in aggregate across all Southeast EEM members. Internal non-centralized start-up costs total to $3.8 million across the members and are approximately $0.3 million per year (2020$) if recovered over 20 years. On-going internal operating costs across the members are estimated to be $2.8 million per year. In sum, total costs levelized over 20 years total to $3.1 million (2020$).



**Guidehouse** | **CRA** Charles River Associates

**Southeast EEM Benefits and Non-Centralized Costs**

# 1. STUDY BACKGROUND, ASSUMPTIONS, AND METHODOLOGY

## 1.1 Study Scope and Purpose

A coalition of Southeast utilities, cooperatives, and municipalities engaged the Guidehouse/CRA team to examine the potential benefits of forming a Southeast Energy Exchange Market (Southeast EEM). The proposed Southeast EEM is a centralized automated market for trading energy between electric utilities in the Southeast U.S. on an intra-hour basis. As an intra-hour market, the Southeast EEM supplements the existing day/hour-ahead bilateral market in the Southeast U.S. by making use of any remaining available transfer capability (ATC) to obtain further savings in energy costs and improved renewable integration in the region.

Southeast EEM participants include Associated Electric Cooperative Inc., Central Electric Power Cooperative, Dalton Utilities, ElectriCities of North Carolina, Inc., Dominion Energy South Carolina, Duke Energy Carolinas, Duke Energy Progress, Georgia System Operations Corporation, Georgia Transmission Corporation, LG&E and KU Energy, MEAG Power, NC Electric Membership Corporation, Oglethorpe Power Corporation, Santee Cooper, Southern Company, and TVA.

Guidehouse/CRA estimated Southeast EEM benefits against a status quo case of no intra-hour interface trading, with two market outlooks evaluated: an *IRP Baseline Outlook* and a *Carbon-Constrained Outlook*. For purposes of the benefits analysis, Southeast EEM operations are assumed to begin in 2021, and benefits are assessed over the 20-year period from 2021 to 2040.

In addition to the benefits analysis, Guidehouse/CRA assisted each potential Southeast EEM participant in estimating the internal costs, such as additional labor and software, that would be incurred for each participant to start-up and operate in the proposed Southeast EEM market. The aggregate sum of these Southeast EEM participant internal costs are presented in this report.[6]

## 1.2 Market Outlooks

In aggregate, the proposed Southeast EEM participants collectively have over 160 GW of capacity serving over 640 TWh of energy for load. Collectively, the current capacity mix by technology type is captured in Figure 4. Today, coal and gas-fired facilities represent 68% of Southeast EEM footprint capacity, with the remainder made up of nuclear and renewable power.

**Figure 4. Southeast EEM Footprint 2020 Capacity Mix**



- Gas
- Coal
- Nuclear
- Hydro
- Storage
- Solar
- Wind
- Other

---

[6] These internal member costs do not include the costs of the entity that would operate the Southeast EEM trading platform, and the costs of other centralized Southeast EEM administrative and monitoring expenses.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0504



## Southeast EEM Benefits and Non-Centralized Costs

The two market outlooks considered in the study represent two plausible futures of how the Southeast power system could evolve over the next two decades and give insight into how benefits may change as the resource mix evolves.

### 1.2.1 IRP Baseline Outlook

The *IRP Baseline Outlook* is based on each participant's projected load and generation capacity plan. Some of these plans have been shared publicly through IRP filings and some of which have not been made public. Broader assumptions such as long-term fuel prices are based on Guidehouse's semi-annually updated Reference Case outlook on North American power markets, which is used for transaction support and is widely accepted by both financial institutions and market participants throughout the Eastern Interconnect. Guidehouse's Reference Case relies on the involvement of numerous subject matter experts with specific knowledge and understanding of such items as fuel pricing, generation development, transmission infrastructure expansion, asset operation, environmental regulations, and technology deployment.

Figure 5 shows the forecasted energy generation mix for the Southeast EEM footprint in the *IRP Baseline Outlook*. While the share of gas and solar generation increases at the expense of coal, the generation mix in 2037 is largely similar to that of today's system.

**Figure 5: Southeast EEM Footprint Forecasted Generation Mix, IRP Baseline Outlook**



### 1.2.2 Carbon-Constrained Outlook

The *Carbon-Constrained Outlook* is an alternative market outlook that explores a high renewable future in the Southeast with ambitious carbon reduction goals. The future resource mix in this outlook was determined using participant's IRP carbon reduction plans if available. If not, the outlook was developed using reasonable assumptions of what a high-renewable and storage, low-carbon future may look like in the Southeast. For companies with IRP timeframes that end before the study period (ending in 2040), the remaining years of the IRP carbon plan were extrapolated to 2040 assuming no coal generation in 2040 (unless a participant provided Guidehouse/CRA with an alternate resource mix). As coal retires, energy storage, rather than natural gas, is projected to be the primary means of meeting peak reliability requirements. The expansion of battery storage throughout the Southeast EEM footprint is shown in Figure 6.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0505



**Southeast EEM Benefits and Non-Centralized Costs**

Figure 6. Southeast EEM Footprint Battery Storage Additions – Carbon-Constrained Outlook



As shown in Figure 7, the proportion of solar and wind generation in 2037 is three times that in the *IRP Baseline Outlook*, resulting in a much more variable system with greater imbalances, larger morning and evening ramping needs, reduced carbon emissions, and more zero-marginal cost hours.

Figure 7. Southeast EEM Footprint Forecasted Generation Mix, Carbon-Constrained Outlook



# 1.3 Study Methodology

### 1.3.1 Southeast EEM Overview

Under the proposed Southeast EEM, there will be 15-minute intra-hour trading across Southeast EEM participant interfaces subject to there being any remaining ATC at the interface, with bids and offers matched through a central software platform to be developed by a third-party vendor with access provided to each of the Southeast EEM participants for supplying their input information.

In the proposed Southeast EEM, there will be a new $0/MWh transmission product which can only be used in the intra-hour market and represents the lowest level of non-firm transmission using any remaining ATC. All resulting Southeast EEM transactions are between two parties, with the point of sale for each transaction at the buyer's BA interface. Each Southeast EEM bid to buy, and offer to sell, must provide the MW size, the price in terms of $/MWh, and the source for offers and the sink for bids.



## Southeast EEM Benefits and Non-Centralized Costs

Southeast EEM trade prices are calculated using a bilateral "split savings" approach between the matched bid and offer that maximizes EEM benefits. Each Balancing Authority ("BA") would be responsible for continuing to ensure adequate resource plans for meeting reserve requirements and would continue to oversee its generation and load balancing. There is no reserve sharing and participants cannot rely on the Southeast EEM for its balancing needs. No sub-hourly bilateral trading is assumed to take place with entities outside of the Southeast EEM footprint.

### 1.3.2 Modeling Approach

Guidehouse used a combination of production cost modeling and linear programming optimization to estimate Southeast EEM benefits. Guidehouse uses PROMOD, a commercially available software, to develop its wholesale energy market price and plant performance forecasts. PROMOD is a detailed energy production cost model used to simulate hourly chronological operation of generation and transmission resources on a nodal basis throughout the Eastern Interconnect. Within PROMOD, production costs are calculated based upon heat rate, fuel cost, and other operating costs, expressed as a function of output.[7]

PROMOD is first used to simulate regional system operations under status quo conditions, including the daily and hourly bilateral trading that takes place today, but not including the intra-hour trading that would take place in the Southeast EEM. PROMOD simulates a security-constrained unit-commitment and dispatch for the entire Eastern Interconnect, including each BA within the Southeast EEM footprint. Throughout the study, the unit-commitment and dispatch provide schedules for energy and sufficient operating reserves and other ancillary services, based on requirements specified by the participants. Once the commitment schedule is set and units are dispatched to satisfy BA load, PROMOD next simulates bilateral trading among BAs, including BAs outside of the Southeast EEM footprint. The simulation of bilateral trading employs interface constraints and hurdle rates to represent transmission costs and other factors limiting inter-BA trading. The reasonableness of the resulting physical bilateral trades was verified by comparing to trading levels taking place today.

As an intra-hour market, the Southeast EEM cannot be fully captured in the PROMOD hourly modeling. The hourly PROMOD data (e.g., output of each generating unit in the footprint) is pulled into the Southeast EEM Model to analyze whether additional economic intra-hour trades can be made among Southeast EEM participants. This sub-hourly model takes into account load and renewable generation uncertainty, ATC, and the $0/MWh transmission product.[8] Bilateral trading friction hurdles between BAs modeled in PROMOD[9] are also eliminated in the sub-hourly modeling to reflect the Southeast EEM centralized bid matching. Due to the complexity of the required modeling, only four years within the study period were explicitly modeled (2022, 2027, 2032, and 2037). This was sufficient to assess the potential value of the Southeast EEM. The modeling process is illustrated in Figure 8.

---

[7] Detailed production cost modeling assumptions used in this study, including capacity additions and retirements, natural gas price forecasts, emissions price forecasts and load growth, are provided in Appendix A.

[8] Any market-based rate restrictions for sales within BAs that were identified in discussions with Southeast EEM participants are incorporated in the sub-hourly bilateral trade modeling, including the TVA "fence" (TVA, under the 1959 Bond Act, is prohibited from selling electricity outside its congressionally mandated territory, with the exception of 14 power generators on TVA`s borders with whom it already was exchanging electricity as of July 1, 1957).

[9] Energy transfers between balancing authorities are subject to economic and transactional barriers referred to as hurdle rates in production cost modelling. These hurdle rates comprise transmission fees based on Open Access Transmission Tariffs in addition to bilateral-trading friction which represent other barriers to trading such as minimum trading margins and/or administrative charges.



## Southeast EEM Benefits and Non-Centralized Costs

**Figure 8. Southeast EEM Modeling Flow Diagram**



### 1.3.3 Load and Renewable Uncertainty

To estimate sub-hourly renewable imbalances, Guidehouse relied on NREL's geospatial Solar and Wind Integration Data Sets to simulate random days of renewable operations. These random days simulate historical operation of renewable resources including impacts of regional weather and geographic diversity. This approach ensures that the cross-correlation of the renewable generation over the entire Southeast EEM footprint is considered by randomizing the time period being drawn and pulling the operation of each resource from this period.

Each NREL solar dataset includes one year of historical simulated 5-minute data and each NREL wind dataset includes over five years of historical simulated 5-minute data. Renewable sites are selected to represent the geographic diversity of each Southeast EEM participant's current and future renewable portfolio. NREL also provides corresponding hourly schedules for each simulated solar plant, from which the area-control-error (ACE) contribution due to renewable uncertainty can be calculated (ACE ~ Output – Schedule). The ACE contributions of individual sites are scaled appropriately based on the actual capacity assumed to be at the given location, which is based on each participant's resource build-out plan.

With solar the predominant renewable technology deployed in the Southeast; the largest sub-hourly imbalances are observed during solar hours (hours ending 8:00 am to 7:00 pm). A distribution of the aggregated 15-minute renewable imbalances during solar hours for the Southeast EEM participants is shown in Figure 9 for 2022 and 2037. In the *Carbon-Constrained Outlook*, the significant renewable expansion by the late 2030s results in much higher imbalances, as shown by the much larger tails in the imbalance distributions.

Guidehouse    CRA Charles River Associates

**Southeast EEM Benefits and Non-Centralized Costs**

**Figure 9. Distributions of 15-Minute Renewable Imbalances During Solar Hours**



Note: distribution frequency truncated at 0.01 for illustrative purposes; each bar in the histogram represents a 5 MW bin; higher imbalances attributed to Balancing Authorities with higher renewable penetration

In addition to renewable uncertainty, load-uncertainty is also considered and estimated using a normal distribution with a standard deviation proportional to each participant's average load.

### 1.3.4 Short-term Bid and Offer Curves

Typical days[10] of hourly PROMOD operation provide a set point from which hourly supply curves are created for each of the Southeast EEM members that consider what online resources are available, and able to ramp up or down to meet their 15-minute obligations. The renewable and load uncertainty discussed in Section 1.3.3 is subsequently applied to create the 15-minute net generation that must be met. At a high level, the baseline assumption is that each member will meet their 15-minute requirements with their own available resources. The Southeast EEM model analyzes the alternative case in which each participant bids in their resources and the market can make trades that reduce overall costs on the 15-minute time frame. To construct the bid and offer curves for each Southeast EEM participant, the following assumptions are made:

- Online combined-cycle plants (CCs) and simple-cycle combustion turbines (CTs) can ramp down to minimum generation limits or ramp up to their max capability

- Storage resources, including batteries and pumped-hydro, can ramp up or down at the marginal cost of energy

- Some renewable curtailment is permitted

Generally, each member holds spinning reserves or offline quick-start CTs for renewable balancing. While offline CTs are not brought online to trade in the 15-minute Southeast EEM, there are rare instances (though more prevalent in the later years of the *Carbon-Constrained Outlook*) where these offline CTs would need to ramp up to correct for large negative imbalances if the Southeast EEM market did not

---

[10] Typical days are chosen in each month for the selected test years (2022, 2027, 2032, and 2037) in order to capture seasonal patterns to trading volumes and benefits.



**Southeast EEM Benefits and Non-Centralized Costs**

exist. Rather than ramping these offline units, a member can use Southeast EEM trading instead and avoid the associated costs of starting a new unit.

## 1.4 Key Study Assumptions

Key study assumptions and their impacts on Southeast EEM benefits are summarized in Table 3.

### Table 3. Key Study Assumptions

| Topic | Assumption Description | Impact |
|---|---|---|
| Market Participation | While the study generally assumes the Southeast EEM is a high-participation, well-functioning market, modeled participation is somewhat limited to reflect that some imbalance will be handled internally as opposed to being met with the market. Sensitivity analysis on market participation was conducted to determine an appropriate range on the benefit results. | High |
| Transmission Representation | While the hourly PROMOD baseline operation simulates system operation nodally with a full transmission representation, potential transmission constraints are not considered in the sub-hourly trades. | Low |
| Transmission Losses | The study assumes 2% losses with pancaking. | Low |
| $0/MWh Transmission Service Cost | The study assumes zero cost intra-hour transmission service available for EEM transactions. | High |
| Trading Friction | Bilateral trading friction hurdles between BAs modeled in PROMOD are eliminated in the Southeast EEM. The Southeast EEM Model will execute any trade, regardless of margin, that has a global benefit to the Southeast EEM participants. | Medium |
| Bid/Offer Behavior | The study assumes that participants are submitting bids and offers at true costs. The impact of more complex bidding strategies was not accessed. | High |
| ATC | Trades are limited to 2019 average ATC, however this may be conservative if actual market operation could result in more transmission capacity being released. | Low |
| Fuel Prices | Guidehouse develops a fundamental gas price forecast fully integrated with the power market forecasts. In general, lower gas prices reduces benefits of the Southeast EEM. | Medium |

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0510



**Southeast EEM Benefits and Non-Centralized Costs**

## 2. SOUTHEAST EEM BENEFITS

### 2.1 Southeast EEM Gross Benefits

As shown in Figure 10, Southeast EEM gross benefits (prior to netting any Southeast EEM start-up or operating costs) average $47M per year (real 2020 dollars) in the *IRP Baseline Outlook*, with benefits increasing slightly in the mid-term largely as a result of higher renewable penetration, before stabilizing for the remainder of the forecast. In the *Carbon-Constrained Outlook*, there is significant upside to benefits driven by increasing sub-hourly uncertainty from higher renewable penetration and increased flexibility from the expansion of battery storage. While benefits are considerably higher in the *Carbon-Constrained Outlook*, they are also more uncertain, as the resource mix and power system operation in the 2030s represents a significant deviation from today.

Figure 10. Southeast EEM Gross Benefits



### 2.2 Benefits Discussion

The Southeast EEM benefits are derived from fuel cost savings as the Southeast EEM gives participant's access to a lower cost, more efficient pool of resources to manage subhourly load and renewable uncertainty.[11] As shown in Table 4, in the *IRP Baseline Outlook*, annual benefits represent approximately 0.3% to 0.4% of total production costs within the Southeast EEM participant footprint. Benefits as a proportion of total production costs are much higher in the Carbon-Constrained Outlook, reaching 1.1% by 2037.

---

[11] As a simple example, if Company X has a negative 300 MW sub-hourly imbalance due to renewable variability; instead of ramping up its own combined-cycle unit at an incremental cost of $28/MWh, Company X will purchase energy in the Southeast EEM from Company Y which is able to ramp up at $24/MWh. The split-savings trading price of $26 provides benefits to both Company X and Y.



## Southeast EEM Benefits and Non-Centralized Costs

**Table 4. Southeast EEM Benefits Relative to Southeast EEM Footprint Production Costs**

| Year | Southeast EEM Footprint Production Costs ($2020) | | Southeast EEM Gross Benefit ($2020) | |
|------|-------------|-------------------|-------------|-------------------|
| | IRP Baseline | Carbon-Constrained | IRP Baseline | Carbon-Constrained |
| **2022** | $10.8B | | $37M - $46M | |
| **2027** | $12.0B | $11.4B | $46M - $58M | $57M - $71M |
| **2032** | $13.0B | $11.7B | $41M - $50M | $78M - $98M |
| **2037** | $14.1B | $12.1B | $44M - $55M | $121M - $151M |

In the *IRP Baseline Outlook*, approximately 60% of Southeast EEM trades are less than 100 MW, 90% are less than 350 MW, and 98% are less than 600 MW, yielding a weighted average of about 130 MW. With its higher underlying renewable imbalances, average trade size increases in the *Carbon-Constrained Outlook*, with approximately 60% of trades less than 150 MW, 90% less than 475 MW, and 98% less than 1,000 MW. Cumulative distributions of trading volumes are shown in Figure 11. In a typical hour there are projected to be 40 to 50 15-minute trades (or wheel-throughs) in the Southeast EEM. In 2022, the average is 41 trades (or wheel-throughs) within each hour at an average of 130 MW per trade, yielding an average hourly trade volume of 1,323 MWh.[12] As noted above, there are about $45 million (2020$) of annual Southeast EEM benefits on average in the *IRP Baseline Outlook*. If there are 41 15-minute trades within each hour on average then each trade results in approximately $2/MWh benefit for each company participating in the transaction.[13] Several factors explain the relatively large average size of the bilateral trades estimated by the Southeast EEM model. In the Southeast EEM model, intra-hour bilateral trades occur that become economic due to the elimination of hurdle rates applicable to daily and hourly schedules. Additionally, intra-hour trades are scheduled in the model even if their margin is low, until no further trades are possible due to ATC limits. Sensitivity analysis discussed further in Section 2.3 shows that even if many of these large trades simulated by the Southeast EEM model did not occur in practice, the benefits estimated in this study would not be significantly impacted.

**Figure 11. Cumulative Distribution of Southeast EEM Trading Volume**



---

[12] 129 MW x 1/4th hour x 41 trades per hour = 1,323 MWh

[13] [$45,000,000 / (129 MW * 1/4th hour * 41 trades per hour * 8760 hours per year)] * 50% split = 1.94 $/MWh

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy



## Southeast EEM Benefits and Non-Centralized Costs

Responding to imbalance resulting from renewables is a primary driver of benefits. While it is difficult to attribute an exact proportion, annual Southeast EEM benefits seem to be roughly evenly split between renewable integration benefits and the benefits from taking advantage of interface price differentials with zero-cost sub-hourly transmission. As shown in Figure 12 through Figure 14, during periods where renewable integration is most difficult (i.e. morning and evening ramps), Southeast EEM benefits tend to be higher as Southeast EEM participants can leverage lower cost resources elsewhere within the Southeast EEM participant footprint to correct imbalances. Overall, benefits during solar hours (hours ending 9:00 am to 7:00 pm) are nearly double those of non-solar hours.

**Figure 12. Average Summer Season Benefits Aggregated by Time of Day – IRP Baseline**



**Figure 13. Average Winter Season Benefits Aggregated by Time of Day – IRP Baseline**



**Figure 14. Average Shoulder Season Benefits Aggregated by Time of Day – IRP Baseline**



*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy



**Southeast EEM Benefits and Non-Centralized Costs**

## 2.3 Sensitivities and Parameter Testing

Several model parameters were varied to give insight into the uncertainty and robustness of the results. These parameters included market participation, ramping capability of gas and storage assets, permissible renewable curtailment, and ATC.

Without observing historical market operation, it is difficult to estimate the expected degree of market participation, making this the single largest uncertainty. Several sensitivities were run to determine the impact that would result from participants managing imbalances internally as opposed to using the Southeast EEM. It is reasonable to expect benefits to be on the lower end of the estimates in the early years of the Southeast EEM as participants become comfortable with the market. The model sensitivities show that there is considerable room for upside to benefits if participants go "all-in" with their bid/offer curves and aggressively use their storage resources as well.

For ATC, the study assumes average 2019 levels, however this may be conservative if actual market operation could result in more transmission capacity being released. To determine the impact of ATC on the results, a test was conducted where ATC was capped at 200 MW (which is significantly less than what was observed in 2019 for some pathways). Despite the large reduction in ATC, benefits only decreased by about 10% for the year. This suggests that the majority of the benefits estimated in the study occurred for trades using ATC up to 200 MW with additional trades, utilizing available ATC, showing diminishing marginal benefits. Other parameters such as ramping capability and permissible renewable curtailment were much less consequential.

## 2.4 Conclusions

Southeast EEM benefits are robust across all years, both market outlooks, and all model parameter tests. Southeast EEM gross benefits average $47M per year (real 2020 dollars) in the *IRP Baseline Outlook*, with forecasted annual benefits nearly triple in the *Carbon-Constrained Outlook* by the late 2030s.

There are several key uncertainties and risks associated with the benefits of the Southeast EEM:

- The study assumes a well-functioning, and relatively high-participation market. Limited participation by members is the largest risk to Southeast EEM benefits.
- The $0 transmission rate sub-hourly trading could eventually cannibalize some hourly trading yielding a reduction in non-firm transmission revenues.
- The resource mix in the *Carbon-Constrained Outlook* is unclear for the Southeast making results much more uncertain.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0514



**Southeast EEM Benefits and Non-Centralized Costs**

# 3. SOUTHEAST EEM NON-CENTRALIZED COSTS

## 3.1 Approach to Estimating Costs

### 3.1.1 Cost Categories

In forming the Southeast EEM, two separate and distinct cost streams would be incurred: central entity costs and internal member costs. The former costs are those incurred to facilitate the central market and settlement process and the latter are incurred at the member level to interface with the central entity and manage the process locally through scheduling and processing transactions. Guidehouse/CRA focused on the latter cost category (internal member costs) related to non-centralized costs associated with the development and operation of the market.

Non-centralized costs can be segregated into two categories. The first are "start-up" costs, one-time costs related to the initial market development period. Start-up costs are primarily comprised of regulatory and one -time software expenditures but may include other non-recurring costs as well. The second category of costs are the ongoing ones required to facilitate participation in the market. These ongoing costs are primarily labor for schedulers and traders as well as ongoing regulatory costs. Ongoing labor costs also include IT and other support activities. Ongoing, non-labor costs may include direct hardware and software costs plus raining and other recurring support costs.

It is important to note that the costs aggregated in this analysis are incremental costs – that is, costs that are not otherwise embedded in the participants existing cost structure. The Guidehouse/CRA team aggregated the cost estimates following one-on-one interviews with each prospective Southeast EEM participant. The costs estimated are categorized as shown in Table 5.

**Table 5. Cost Categories Estimated**

| Start-up Costs | Ongoing Costs |
|---|---|
| • Legal and Regulatory Costs<br>• Meetings, Travel, and Training<br>• Hardware and Software Costs | • Labor (addition of full-time employees)<br>   ○ Rates and Regulatory<br>   ○ Traders<br>   ○ Schedulers<br>   ○ IT<br>   ○ Other<br>• Non-labor<br>   ○ Travel and Training<br>   ○ Hardware and Software<br>• Other |

As noted, costs considered for the purposes of this analysis are incremental, meaning that only out-of-pocket expenses for software, outside legal support, additional staffing, etc. were considered. Use of in-house capabilities and existing staff were expressly excluded from consideration. As a result, to the extent individual market participants are able to leverage existing staff and internal resources those costs were not included in the cost benefit analysis.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0515



## Southeast EEM Benefits and Non-Centralized Costs

### 3.1.2 Interview Approach

Cost assumptions were developed using a standardized spreadsheet tool and interviews with member teams (see Appendix B.1). For confidentiality purposes, the interview process was conducted in a series of individual member meetings. To the extent possible, Guidehouse/CRA provided guidance on the cost development but did not share confidential member information with other market participants. In addition, the working team did not share ranges or level of magnitude estimates of costs to any member during the interview process so as not to bias the information collected through the process.

The cost team first distributed a cost template to each individual Member. Member representatives provided start-up and on-going operation costs. Members provided their own unique estimates for each cost category described in Table 5. To accommodate for cases where there was uncertainty or dependencies related to individual costs, members were permitted to input a range of estimated cost values: "High," "Low," and "Median." We used "Median" values for our final cost estimates.

One-on-one interviews were conducted with each individual Southeast EEM participant. The cost team worked with member representatives from various operations functions; roles within the membership that participated in the interview process included Managers or Directors of Transmission, Resource Operations, Bulk Power, Operations Interface, or similar. See Appendix B for further details regarding the interview process.

### 3.1.3 Costs Levelization and Adjustment for Inflation

The resultant costs reflect the total, 20-year levelized annual start-up and ongoing costs across all Southeast EEM participants. Cost values are expressed in real 2020 dollars (assuming 2.0% annual inflation). All start-up and ongoing costs are presented on a levelized basis to facilitate a comparison versus the modeled market benefits. However, the lump sum start-up costs would be $3.8 million across all market participants excluding central entity costs.

## 3.2 Start-up Costs

Aggregate start-up costs stated on a 20-year annual levelized basis are shown in Figure 15. Individual member costs and representative ranges are not presented in this report to ensure member confidentiality.

Estimated costs are split about equally between infrastructure costs and regulatory requirements with some provision for incremental administrative costs. Some potential market participants expressed uncertainty regarding the level of software costs depending on the vendor selected for the central clearinghouse function. The driver of uncertainty was related to compatibility with existing software systems and infrastructure.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

**Guidehouse** **CRA** Charles River Associates

**Southeast EEM Benefits and Non-Centralized Costs**

**Figure 15. Breakout of Real 2020$ Levelized EIM Startup Costs by Function ($000)**



## 3.3 On-going Costs

As with startup costs, ongoing costs are aggregated to maintain each Member's confidentiality. Results on a 20-year annual levelized basis are displayed in Figure 16 and Figure 17. The majority of the annualized costs are labor-related and of those, the costs are heavily weighted towards trading activity. Non-labor costs are largely related to hardware and software requirements.

**Figure 16. Real $2020 Levelized Annual Labor Cost by Function ($000)**



**Figure 17. Real 2020$ Levelized Annual Non-Labor Costs ($000)**



*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0517



**Southeast EEM Benefits and Non-Centralized Costs**

## 3.4 Insights and Conclusions

The primary uncertainty identified by potential market participants relates to the compatibility between the existing software systems in house with the software provided by the selected central entity. This uncertainty may be mitigated through coordination among market participants during vendor selection.

The anticipated ability of individual market participants to rely on tools and resources that already exist in house varies across potential market members. As a result, the cost benefit equation for individual members needs to be examined individually even though the benefits of the market in aggregate appear to significantly outweigh the aggregate market costs.

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0518



**Southeast EEM Benefits and Non-Centralized Costs**

# APPENDIX A. SUPPORTING DATA

## A.1 Assumptions

**Table A-1. Natural Gas Price Forecasts ($2020/MMBtu)**

|      | Columbia Gas - Appalachia | Texas Eastern, M-1 (Kosi) | Transco, Zone 4 | Transco, Zone 5 Delivered | Dominion South Point |
|------|------|------|------|------|------|
| **2021** | $2.35 | $2.45 | $2.55 | $2.59 | $2.15 |
| **2022** | $2.47 | $2.58 | $2.68 | $2.65 | $2.22 |
| **2023** | $2.51 | $2.66 | $2.75 | $2.70 | $2.26 |
| **2024** | $2.67 | $2.90 | $2.99 | $2.94 | $2.41 |
| **2025** | $2.76 | $3.11 | $3.20 | $3.15 | $2.48 |
| **2026** | $2.76 | $3.19 | $3.29 | $3.25 | $2.43 |
| **2027** | $2.77 | $3.27 | $3.40 | $3.35 | $2.40 |
| **2028** | $2.82 | $3.38 | $3.50 | $3.45 | $2.42 |
| **2029** | $2.90 | $3.48 | $3.60 | $3.55 | $2.47 |
| **2030** | $2.93 | $3.53 | $3.66 | $3.61 | $2.48 |
| **2031** | $2.93 | $3.58 | $3.71 | $3.64 | $2.46 |
| **2032** | $3.02 | $3.64 | $3.77 | $3.72 | $2.54 |
| **2033** | $3.07 | $3.70 | $3.83 | $3.77 | $2.58 |
| **2034** | $3.10 | $3.76 | $3.90 | $3.84 | $2.61 |
| **2035** | $3.14 | $3.83 | $3.95 | $3.88 | $2.62 |
| **2036** | $3.17 | $3.88 | $4.00 | $3.92 | $2.63 |
| **2037** | $3.21 | $3.93 | $4.06 | $3.98 | $2.66 |
| **2038** | $3.25 | $3.98 | $4.10 | $4.02 | $2.68 |
| **2039** | $3.30 | $4.03 | $4.16 | $4.07 | $2.71 |
| **2040** | $3.35 | $4.08 | $4.20 | $4.12 | $2.74 |

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0519



## Southeast EEM Benefits and Non-Centralized Costs

**Table A-2. Southeast EEM Participants Aggregated Additions (MW) – *IRP Baseline Outlook***

|  | CC | CT Gas | Nuclear | Pumped Hydro | Battery | Wind | Offshore Wind | Solar |
|---|---|---|---|---|---|---|---|---|
| **2020** | 0 | 15 | 0 | 0 | 0 | 472 | 0 | 1,751 |
| **2021** | 0 | 0 | 1,108 | 65 | 48 | 159 | 0 | 2,630 |
| **2022** | 475 | 0 | 1,117 | 65 | 58 | 0 | 0 | 2,307 |
| **2023** | 0 | 100 | 15 | 65 | 50 | 0 | 0 | 762 |
| **2024** | 726 | 1,336 | 15 | 65 | 93 | 0 | 0 | 1,202 |
| **2025** | 1,338 | 0 | 4 | 0 | 90 | 0 | 0 | 305 |
| **2026** | 0 | 470 | 0 | 0 | 119 | 0 | 0 | 558 |
| **2027** | 1,838 | 0 | 0 | 0 | 83 | 0 | 0 | 768 |
| **2028** | 0 | 905 | 6 | 0 | 23 | 0 | 0 | 648 |
| **2029** | 600 | 3,055 | 0 | 0 | 27 | 0 | 0 | 654 |
| **2030** | 0 | 300 | 10 | 0 | 24 | 0 | 0 | 694 |
| **2031** | 0 | 3,040 | 0 | 0 | 25 | 0 | 0 | 731 |
| **2032** | 600 | 0 | 0 | 0 | 23 | 0 | 0 | 606 |
| **2033** | 0 | 3,432 | 0 | 0 | 30 | 0 | 0 | 810 |
| **2034** | 968 | 3,114 | 0 | 0 | 28 | 0 | 0 | 647 |
| **2035** | 1,324 | 523 | 0 | 0 | 0 | 0 | 0 | 552 |
| **2036** | 1,260 | 18 | 0 | 0 | 0 | 0 | 0 | 575 |
| **2037** | 1,984 | 934 | 0 | 0 | 0 | 0 | 0 | 224 |
| **2038** | 2,468 | 18 | 0 | 0 | 50 | 0 | 0 | 381 |
| **2039** | 870 | 18 | 0 | 0 | 0 | 0 | 0 | 287 |
| **2040** | 1,830 | 934 | 0 | 0 | 75 | 0 | 0 | 393 |

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0520



## Southeast EEM Benefits and Non-Centralized Costs

**Table A-3. Southeast EEM Participants Aggregated Additions (MW) –** *Carbon-Constrained Outlook*

|      | CC    | CT Gas | Nuclear | Pumped Hydro | Battery | Wind | Offshore Wind | Solar |
|------|-------|--------|---------|--------------|---------|------|---------------|-------|
| **2020** | 0     | 15     | 0       | 0  | 0     | 472 | 0   | 1,751 |
| **2021** | 0     | 0      | 1,108   | 65 | 48    | 159 | 0   | 3,105 |
| **2022** | 475   | 300    | 1,117   | 65 | 58    | 100 | 0   | 4,082 |
| **2023** | 0     | 100    | 15      | 65 | 250   | 100 | 0   | 2,962 |
| **2024** | 726   | 1,336  | 15      | 65 | 493   | 150 | 0   | 3,002 |
| **2025** | 1,838 | 50     | 4       | 0  | 490   | 200 | 0   | 2,705 |
| **2026** | 600   | 1,070  | 0       | 0  | 669   | 250 | 200 | 2,658 |
| **2027** | 2,438 | 200    | 0       | 0  | 833   | 150 | 200 | 2,718 |
| **2028** | 1,338 | 1,555  | 6       | 0  | 1,023 | 525 | 200 | 2,498 |
| **2029** | 2,144 | 2,415  | 0       | 0  | 977   | 350 | 200 | 2,679 |
| **2030** | 500   | 800    | 10      | 0  | 1,024 | 250 | 500 | 2,519 |
| **2031** | 1,338 | 2,200  | 0       | 0  | 675   | 250 | 400 | 2,531 |
| **2032** | 840   | 300    | 0       | 0  | 1,023 | 325 | 200 | 2,606 |
| **2033** | 0     | 1,902  | 0       | 0  | 1,280 | 250 | 200 | 2,910 |
| **2034** | 968   | 1,434  | 0       | 0  | 1,128 | 250 | 200 | 2,697 |
| **2035** | 500   | 1,363  | 0       | 0  | 950   | 350 | 200 | 2,652 |
| **2036** | 0     | 18     | 0       | 0  | 300   | 75  | 400 | 2,025 |
| **2037** | 2,468 | 1,434  | 0       | 0  | 650   | 275 | 700 | 1,874 |
| **2038** | 1,500 | 18     | 0       | 0  | 350   | 75  | 0   | 1,931 |
| **2039** | 1,838 | 18     | 0       | 0  | 200   | 75  | 0   | 2,087 |
| **2040** | 1,830 | 934    | 0       | 0  | 275   | 75  | 0   | 1,893 |

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0521



## Southeast EEM Benefits and Non-Centralized Costs

**Table A-4. Southeast EEM Participants Aggregated Retirements (MW) – *IRP Baseline Outlook***

|  | CC | CT Gas | ST / IC Gas | ST Coal | Nuclear | Other Renewable | Other |
|---|---|---|---|---|---|---|---|
| **2020** | 0 | (780) | 0 | (1,017) | 0 | 0 | 0 |
| **2021** | 0 | (16) | 0 | 0 | 0 | 0 | 0 |
| **2022** | 0 | (14) | 0 | 0 | 0 | 0 | 0 |
| **2023** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2024** | 0 | 0 | 0 | (2,056) | 0 | 0 | (232) |
| **2025** | 0 | (97) | (254) | (300) | 0 | (53) | 0 |
| **2026** | 0 | 0 | (243) | (362) | 0 | 0 | 0 |
| **2027** | 0 | 0 | 0 | (570) | 0 | 0 | 0 |
| **2028** | 0 | 0 | 0 | (1,579) | 0 | 0 | 0 |
| **2029** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2030** | 0 | 0 | (173) | 0 | 0 | 0 | (65) |
| **2031** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2032** | 0 | 0 | 0 | (546) | 0 | 0 | 0 |
| **2033** | 0 | 0 | 0 | (1,409) | 0 | 0 | 0 |
| **2034** | 0 | 0 | 0 | (4,166) | (876) | 0 | 0 |
| **2035** | 0 | (494) | 0 | (1,162) | 0 | 0 | 0 |
| **2036** | 0 | (390) | 0 | (734) | (851) | 0 | 0 |
| **2037** | 0 | 0 | 0 | (476) | (883) | 0 | 0 |
| **2038** | 0 | 0 | 0 | (3,092) | 0 | 0 | 0 |
| **2039** | (209) | 0 | 0 | (842) | 0 | 0 | 0 |
| **2040** | (519) | 0 | 0 | (342) | (860) | 0 | 0 |

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0522



## Southeast EEM Benefits and Non-Centralized Costs

**Table A-5. Southeast EEM Participants Aggregated Retirements (MW) –** *Carbon-Constrained Outlook*

|  | CC | CT Gas | ST / IC Gas | ST Coal | Nuclear | Other Renewable | Other |
|---|---|---|---|---|---|---|---|
| **2020** | 0 | (780) | 0 | (1,017) | 0 | 0 | 0 |
| **2021** | 0 | (16) | 0 | 0 | 0 | 0 | 0 |
| **2022** | 0 | (14) | 0 | (1,234) | 0 | 0 | 0 |
| **2023** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2024** | 0 | 0 | 0 | (2,176) | 0 | 0 | (232) |
| **2025** | 0 | (97) | (254) | (2,077) | 0 | (53) | 0 |
| **2026** | 0 | 0 | (243) | (1,684) | 0 | 0 | 0 |
| **2027** | 0 | 0 | 0 | (3,047) | 0 | 0 | 0 |
| **2028** | 0 | 0 | 0 | (3,860) | 0 | 0 | 0 |
| **2029** | 0 | 0 | 0 | (3,774) | 0 | 0 | 0 |
| **2030** | 0 | 0 | (173) | (1,598) | 0 | 0 | (65) |
| **2031** | 0 | 0 | 0 | (1,022) | 0 | 0 | 0 |
| **2032** | 0 | 0 | 0 | (1,014) | 0 | 0 | 0 |
| **2033** | 0 | 0 | 0 | (4,378) | 0 | 0 | 0 |
| **2034** | 0 | 0 | 0 | (4,665) | 0 | 0 | 0 |
| **2035** | 0 | (494) | 0 | (1,340) | 0 | 0 | 0 |
| **2036** | 0 | (390) | 0 | (2,078) | 0 | 0 | 0 |
| **2037** | 0 | 0 | 0 | (2,925) | 0 | 0 | 0 |
| **2038** | 0 | 0 | 0 | (631) | 0 | 0 | 0 |
| **2039** | (209) | 0 | 0 | (2,431) | 0 | 0 | 0 |
| **2040** | (519) | 0 | 0 | (1,382) | 0 | 0 | 0 |



**Southeast EEM Benefits and Non-Centralized Costs**

## A.2 Southeast EEM Results

**Table A-6. Southeast EEM Gross Benefits ($2020 Millions) – IRP Baseline**

| Year | Summer | | Winter | | Shoulder | | Total |
|------|--------|--------|--------|--------|--------|--------|-------|
| | Solar | Non-Solar | Solar | Non-Solar | Solar | Non-Solar | |
| **2022** | $7M - $8.8M | $3.8M - $4.7M | $7.5M - $9.3M | $3.6M - $4.5M | $9.5M - $11.9M | $5.8M - $7.3M | **$37.1M - $46.4M** |
| **2027** | $7M - $8.8M | $3.6M - $4.5M | $13.2M - $16.5M | $4.7M - $5.9M | $12.8M - $16M | $4.9M - $6.1M | **$46.2M - $57.7M** |
| **2032** | $6.7M - $8.2M | $4.2M - $5.1M | $12.7M - $15.5M | $4.2M - $5.2M | $8.8M - $10.8M | $4.7M - $5.7M | **$41.3M - $50.5M** |
| **2037** | $5.7M - $7.1M | $5.1M - $6.4M | $14.2M - $17.7M | $6M - $7.5M | $8.4M - $10.5M | $4.9M - $6.2M | **$44.3M - $55.3M** |

**Table A-7. Southeast EEM Gross Benefits ($2020 Millions) – Carbon-Constrained**

| Year | Summer | | Winter | | Shoulder | | Total |
|------|--------|--------|--------|--------|--------|--------|-------|
| | Solar | Non-Solar | Solar | Non-Solar | Solar | Non-Solar | |
| **2022** | $7M - $8.8M | $3.8M - $4.7M | $7.5M - $9.3M | $3.6M - $4.5M | $9.5M - $11.9M | $5.8M - $7.3M | **$37.1M - $46.4M** |
| **2027** | $11.1M - $13.9M | $4.7M - $5.9M | $15.7M - $19.6M | $5.5M - $6.9M | $13.5M - $16.9M | $6M - $7.6M | **$56.6M - $70.8M** |
| **2032** | $18.6M - $23.3M | $5.6M - $7M | $24.7M - $30.9M | $7.6M - $9.5M | $16.2M - $20.2M | $5.5M - $6.8M | **$78.3M - $97.9M** |
| **2037** | $29.2M - $36.6M | $10.9M - $13.6M | $32.7M - $40.9M | $14.5M - $18.2M | $20.7M - $25.9M | $12.6M - $15.7M | **$120.6M - $150.8M** |

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0524



## Southeast EEM Benefits and Non-Centralized Costs

**Table A-8. Cumulative Distribution of Southeast EEM Trading Volumes**

| Transaction Size (MW) | IRP Baseline Outlook | | | | Carbon-Constrained Outlook | | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2027 | 2032 | 2037 | 2027 | 2032 | 2037 |
| **10** | 19.9% | 18.2% | 18.3% | 16.1% | 15.0% | 14.1% | 11.7% |
| **25** | 30.2% | 29.5% | 29.4% | 27.1% | 26.7% | 24.2% | 20.2% |
| **50** | 40.8% | 39.9% | 39.4% | 36.3% | 36.6% | 32.7% | 28.1% |
| **75** | 54.6% | 52.6% | 51.9% | 49.0% | 48.6% | 45.2% | 40.1% |
| **100** | 60.5% | 59.7% | 59.9% | 57.3% | 56.1% | 52.2% | 47.2% |
| **200** | 76.4% | 76.0% | 77.2% | 75.1% | 72.0% | 66.7% | 62.9% |
| **300** | 87.9% | 86.7% | 87.5% | 86.2% | 84.5% | 78.3% | 74.5% |
| **400** | 92.7% | 91.8% | 92.9% | 92.1% | 90.0% | 85.9% | 82.3% |
| **500** | 95.9% | 94.9% | 96.0% | 95.5% | 93.5% | 91.1% | 89.4% |
| **750** | 98.9% | 98.1% | 99.0% | 99.3% | 97.8% | 95.7% | 95.7% |
| **1000** | 99.5% | 99.1% | 99.4% | 99.7% | 98.6% | 97.1% | 97.4% |
| **1250** | 100.0% | 99.9% | 100.0% | 100.0% | 100.0% | 99.7% | 99.6% |

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0525

**Guidehouse**   **CRA** Charles River Associates

**Southeast EEM Benefits and Non-Centralized Costs**

# APPENDIX B. SOUTHEAST EEM PARTICIPANT COST INTERVIEW PROCESS

The purpose of each individual interview was to:

1. Familiarize ourselves with each prospective Southeast EEM member's current capabilities and procedures for scheduling, settlement, and marketing; and,

2. Review the cost template each Southeast EEM member had completed prior to the call.

**Table 6. Prospective Southeast EEM Member Interview Schedule**

| April 17th, 2020 | April 20th, 2020 | April 21st, 2020 | April 22nd, 2020 | April 23rd, 2020 | April 24th, 2020 | April 27th, 2020 |
|---|---|---|---|---|---|---|
| Dominion Energy South Carolina<br><br>Duke Energy Progress and Carolinas | PowerSouth | GTC, GSOC, OPC | ElectriCities<br><br>MEAG and TEA | LG&E and KU<br><br>Southern Company | AECI<br><br>Tennessee Valley Authority | Santee Cooper and TEA |

Sample questions posed to each prospective Southeast EEM member during their one-on-one interview included:

- What is your current procedure for power marketing, scheduling, and settlements?

    o Are settlements made on an hourly or sub-hourly level?

    o Are trades entered manually or automatically?

- What are your current software capabilities for these functions?

- Do you anticipate adding any full-time employees to interface with the new Southeast EEM?

- Will you need to file an update to your current transmission tariff?

- Will you require additional metering?

*Confidential and Proprietary*
©2020 Guidehouse Inc.
Do not distribute or copy

JA0526



## Southeast EEM Benefits and Non-Centralized Costs

## B.1 Cost Template

The cost template used to develop the non-centralized costs for each prospective Southeast EEM member is shown in Figure 18.

### Figure 18. Cost Template



FERC rendition of the electronically filed tariff records in Docket No. ER21-01111-000
Filing Data:
CID: C001552
Filing Title: Southeast EEM Agreement Filing
Company Filing Identifier: 444
Type of Filing Code: 10
Associated Filing Identifier:
Tariff Title: Market Based Rate Tariff
Tariff ID: 1
Payment Confirmation:
Suspension Motion:


Tariff Record Data:
Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 Rate Schedule No. 1011, Southeast EEM Agreement, 0.0.0, A
Record Narative Name:
Tariff Record ID: 2056
Tariff Record Collation Value: 167772160      Tariff Record Parent Identifier: 0
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:


# SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT

Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 Table of Contents, , 0.0.0, A
Record Narative Name:
Tariff Record ID: 2057
Tariff Record Collation Value: 167804928      Tariff Record Parent Identifier: 2056
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

ARTICLE 1 DEFINITIONS AND RULES OF INTERPRETATION........................................1

ARTICLE 2 ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION............9

ARTICLE 3 MEMBERSHIP AND PARTICIPATION ............................................................9

ARTICLE 4 GOVERNANCE.................................................................................................11

ARTICLE 5 OPERATING COMMITTEE.............................................................................17

ARTICLE 6 APPOINTMENT OF SOUTHEAST EEM AGENT ...........................................20

ARTICLE 7 BUDGETING AND COST RESPONSIBILITY .................................................21

ARTICLE 8 FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE ...................24

ARTICLE 9 RELEASE AND LIABILITY; NO FIDUCIARY DUTIES .................................26

ARTICLE 10 TRANSPARENCY; CONFIDENTIALITY; AUDITING .................................28

ARTICLE 11 SOUTHEAST EEM MARKET RULES......................................................29

ARTICLE 12 DISPUTE RESOLUTION.........................................................................29

ARTICLE 13 REPRESENTATIONS AND WARRANTIES ..................................................31

ARTICLE 14 DEFAULTS...........................................................................................31

ARTICLE 15 CONFIDENTIALITY ...............................................................................32

ARTICLE 16 MISCELLANEOUS .................................................................................33

**EXHIBITS**

EXHIBIT A          Names and Addresses of the Members

EXHIBIT B          Form of Joinder Agreement

**APPENDICES**

APPENDIX A          Form of Participant Agreement

APPENDIX B          Southeast EEM Market Rules

APPENDIX C          Southeast EEM Agent Scope

Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 Southeast EEM Agreement, , 0.0.0, A
Record Narative Name:
Tariff Record ID: 2058
Tariff Record Collation Value: 167837696          Tariff Record Parent Identifier: 2056
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

**SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT**

This SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT (as the same may be amended from time to time in accordance with the terms hereof, the "Agreement"), by and among each of the entities listed on Exhibit A hereto (each entity, a "Party," and collectively, the "Parties"), as that exhibit may be amended from time to time in accordance with the terms hereof, is made, entered into and effective this 28th day of December, 2020. Hereinafter, Parties to this Agreement may be referred to individually as a "Member" and collectively as the "Members."

## **W I T N E S S E T H**

WHEREAS, there is presently no centrally operated electricity market in the southeastern United States and, accordingly, inter-utility electricity transactions presently occur through bilateral transactions;

WHEREAS, Members believe that a voluntary, region-wide, bilateral, automated, intra-hour electric exchange utilizing unreserved transmission capacity of Participating Transmission Providers at a zero-dollar transmission rate will provide value to their customers by creating efficiencies, transparency, and market liquidity;

WHEREAS, Members desire to participate and to permit other entities to participate as Participants in the exchange; and

WHEREAS, the Members believe that the foregoing objectives can be achieved through a joint effort to sponsor and create a common trading platform that facilitates bilateral electricity transactions between and within their respective service territories.

NOW, THEREFORE, the Members, for good and valuable consideration, enter into this Agreement that sets forth their mutual covenants, rights, and obligations for establishing, funding, and participating in the Southeast Energy Exchange Market (defined below).

## **ARTICLE 1**

## **DEFINITIONS AND RULES OF INTERPRETATION**

1.1     Definitions.   The following terms shall have the meaning hereinafter specified:

"Additional Member" has the meaning provided to it in Section 3.2.3.

"Affiliate" has the meaning set forth in 18 C.F.R. § 35.36(9), as amended.

"Affirmative Majority Vote" has the meaning set forth in Section 4.1.5(b).

"Affirmative Supermajority Vote" has the meaning set forth in Section 4.1.5(c).

"Alternate Committee Member" has the meaning set forth in Section 5.9(b).

"Alternate MNEL Value" has the meaning set forth in Section 7.3.1(a).

"Alternate Representative" has the meaning set forth in Section 4.1.7(b).

"Annual Budget" has the meaning set forth in Section 7.2.2.

"Annual Budget Determination Date" has the meaning set forth in Section 7.2.2.

"Annual Meeting" has the meaning set forth in Section 4.4.

"Annual Member Meeting" has the meaning set forth in Section 4.5.

"<u>Authorized Action</u>" has the meaning set forth in <u>Section 6.1</u>.

"<u>Balancing Authority</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Balancing Authority Area</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bid</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bid Information</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bidder</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Business Day</u>" means each weekday, Monday through Friday, excluding NERC holidays.

"<u>Buyer</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Chair of the Membership Board</u>" has the meaning set forth in <u>Section 4.3.2</u>.

"<u>Change in Law</u>" has the meaning set forth in <u>Section 8.6</u>.

"<u>Committee Member</u>" has the meaning set forth in <u>Section 5.1</u>.

"<u>Cooperatives</u>" means those electric membership cooperative Members that serve load, and cooperatives that provide generation, transmission and/or system operations services to electric membership cooperatives that serve load, in each case in the Territory.

"<u>Deadlock Issue</u>" has the meaning set forth in <u>Section 5.7.2</u>.

"<u>Delivery Interval</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Disaggregated Utility</u>" means multiple entities of a disaggregated generation/transmission/system operations utility system.

"<u>Effective Date</u>" has the meaning set forth in <u>Section 8.4.1</u>.

"<u>Enabling Agreement</u>" means a bilateral agreement for the purchase and sale of Energy that provides for Energy Exchanges between a Seller and a Buyer and that, for Sellers that are Public Utilities and require authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under Section 205 of the FPA, has been entered into pursuant to such Seller's market-based rate authority.

"<u>Energy</u>" means electric energy delivered as three-phase alternating current.

"<u>Energy Exchange</u>" means a transaction for the purchase and sale of Non-Firm Energy using the transaction matching, reservation and tagging functions of the Southeast EEM between

Participants pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Market Rules.

"<u>Enrollment Period</u>" has the meaning set forth in <u>Section 3.2.3</u>.

"<u>FERC</u>" means the Federal Energy Regulatory Commission or any successor to its rights and obligations under Part II of the FPA.

"<u>FPA</u>" means the Federal Power Act, as amended.

"<u>Good Utility Practice</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Governmental Action Withdrawal Date</u>" has the meaning set forth in <u>Section 8.6</u>.

"<u>Governmental Entity</u>" means any federal, state, county, municipal, local or foreign government or entity or any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, arbitrator, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or any enforcement authority or other similar recognized organization or body exercising similar powers or authority, including FERC, any public utility commission or public service commission or similar authority, but excluding in each case, any Member acting in its capacity as a Member hereunder and not otherwise in a governmental capacity.

"<u>Governmental Utility</u>" means any electric utility located in the Territory that is owned, operated or controlled by the United States, or any state or commonwealth included in the Territory, any political subdivision of a state or commonwealth included in the Territory, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing.

"<u>Interest Rate</u>" means the lesser of (i) the per annum rate of interest announced from time to time by Citibank, N.A. (or a suitable replacement specified by the Operating Committee) as its "prime rate" for commercial loans effective on the date payment is due as established from time to time by such bank, plus two percent (2%), or (ii) the maximum lawful rate permitted by applicable Law.

"<u>Investor Owned Utilities</u>" means those investor owned utility Members that serve load in the Territory.

"<u>Jurisdictional Member</u>" means a Member that is a Public Utility.

"<u>Law</u>" means any federal, state or local law, statute, act, rule, code, ordinance, decree, treaty, regulation, order, judgment, legally binding announcement, directive or published interpretation thereof, enacted, issued or promulgated by any Governmental Entity.

"<u>Load Serving Entity</u>" has the meaning set forth in the NERC Rules of Procedure, as approved by FERC.

JA0532

"Market Auditor" means an independent entity engaged by the Southeast EEM Agent to perform the scope of responsibilities identified in Section 10.2 and in the Southeast EEM Market Rules.

"Material Vendor Contract" means an agreement between the Southeast EEM Agent, on behalf of the Members, and any vendor or supplier that, together with all other such agreements with such vendor or supplier and its Affiliates, involves aggregate consideration payable by the Members.

"Member" or "Members" has the meaning set forth in the preamble, except that to the extent any of the Members have not executed this Agreement at the time that it is filed with FERC, such Member may execute this Agreement no later than thirty (30) days after the Effective Date. Thereafter, any entity listed on Exhibit A that has not executed the Agreement may seek to become an Additional Member pursuant to Section 3.2.3.

"Member Net Energy for Load" means, except as modified pursuant to Section 7.3.1, the Net Energy for Load calculated for each Member and submitted in NERC's business plan and budget filed annually with FERC in accordance with 18 C.F.R. § 39.4(b), as amended. For purposes of Section 4.1.5 and Section 7.2, (i) a Representative's Member that is an entity part of a Disaggregated Utility, and (ii) any Affiliates of a Representative's Member, shall in each case be assigned the total Net Energy for Load of the associated entities in such Disaggregated Utility or of such Member Affiliates, as applicable.

"Membership Board" means the membership board established pursuant to Article 4.

"MW" means megawatt or megawatts.

"MWh" means megawatt-hour or megawatt-hours.

"NAESB EIR" shall have the meaning set forth in the Southeast EEM Market Rules.

"NERC" means the North American Electric Reliability Corporation or its successor.

"Net Energy for Load" means net generation of an electric system plus Energy received from others less Energy delivered to others through interchange; it includes system losses but excludes Energy required for the storage of Energy at energy storage facilities. For purposes of this definition "electric system" means a Load Serving Entity.

"Non-Firm Energy" shall have the meaning set forth to it in the Southeast EEM Market Rules

"Non-Firm Energy Exchange Transmission Service" shall have the meaning set forth in the Southeast EEM Market Rules.

"Non-Firm Energy Exchange Transmission Service Agreement" means an agreement for the provision of Non-Firm Energy Exchange Transmission Service between a Participant and a Participating Transmission Provider, as provided in such Participating Transmission Provider's Tariff, as any such agreement may be updated from time to time.

"Non-Jurisdictional Member" means a Member that is not a Public Utility.

"OATI webRegistry" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer Information" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer Price" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offeror" shall have the meaning set forth in the Southeast EEM Market Rules.

"Operating Committee" means that committee established pursuant to Article 5.

"Operating Costs" shall mean dues, costs, expenses and other payment obligations assessed pursuant to this Agreement, or other fees or liabilities that may be imposed by the Membership Board or in accordance with the Southeast EEM Market Rules that arise under this Agreement.  For the avoidance of doubt, Operating Costs includes fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder and the cost of employing third party vendors by the Southeast EEM Agent regardless of whether such costs are billed to the Members through the Southeast EEM Agent, the Southeast EEM Administrator, a third party or directly by such vendors.

"Other Court/Governmental Entity Action" has the meaning set forth in Section 8.6.

"Participant" shall have the meaning set forth in the Southeast EEM Market Rules.

"Participant Agreement" has the meaning set forth in Section 3.3.

"Participating Transmission Provider" means a transmission provider that is providing Non-Firm Energy Exchange Transmission Service.

"Popular Vote" has the meaning set forth in Section 4.1.5(a)(i).

"Public Utility" has meaning set forth in Section 201 of the FPA.

"Record Date" means the date upon which FERC accepted the most recent annual Business Plan/Budget, including Net Energy for Load values, filed by NERC pursuant to the requirements of 18 C.F.R. § 39.4, as amended.

"Regulatory Filing" means any filing or submission made with or to a Governmental Entity.

"Related Parties" has the meaning set forth in Section 9.1.

"Reliability Obligations" has the meaning set forth in Section 11.2.

"Representative" has the meaning set forth in Section 4.1.2(a).

JA0534

"Representative Losses" has the meaning set forth in Section 6.5.

"RUS" means the Rural Utilities Service, or its successor.

"Secretary" has the meaning set forth in Section 4.3.3.

"Sector" means individually and collectively, the Investor Owned Utilities, Cooperatives and Governmental Utilities.

"Seller" shall have the meaning set forth in the Southeast EEM Market Rules.

"SERC" has the meaning set forth in Section 11.2.

"Significant Matters" means (i) any amendment to this Agreement (excluding updates to Exhibit A solely to update notice information pursuant to Section 16.8), including but not limited to the Southeast EEM Market Rules, (ii) the appointment, removal, substitution and replacement of the Southeast EEM Agent and/or the Southeast EEM Administrator and the approval of, and any amendment or extension of, the agreement(s) between the Southeast EEM Agent (on behalf of the Members, including the Southeast EEM Agent Scope) and/or the Southeast EEM Administrator, (iii) the development of, or any material modification to, the Southeast EEM Algorithm or the Southeast EEM System, (iv) the appointment, removal, substitution and replacement of the Market Auditor, and any amendment or extension of the agreement(s) between the Southeast EEM Agent (on behalf of the Members) and the Market Auditor that would modify the scope set forth in Section 10.2.1, (v) any other contract or writing that obligates any Member to pay two hundred thousand dollars ($200,000) or more in a calendar year in excess of such Member's allocated share of costs as set forth in the Annual Budget, (vi) the submission of any Regulatory Filing on behalf of the Members, provided that (a) no Member can be compelled to join any Regulatory Filing, and (b) no Member can be compelled to take any action that in the reasonable view of such Member would jeopardize its jurisdictional status, (vii) the sale of all or substantially all of the property held by the Southeast EEM Agent (if any) for the benefit of the Southeast EEM System, or (viii) pursuant to Section 4.2.2, the (A) suspension of a Member's voting rights, (B) removal of a Member from any committee appointment, and (C) suspension of any Member's access to the Southeast EEM System.

"Sink" shall have the meaning set forth in the Southeast EEM Market Rules.

"Source" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Administrator" means that entity hired by the Southeast EEM Agent, on behalf of the Membership Board acting in its capacity on behalf of the Members, to operate the Southeast EEM System from day to day.

"Southeast EEM Administrator Agreement" means that certain agreement by and between the Southeast EEM Administrator and Southeast EEM Agent (in its capacity as agent for the Members), which agreement sets forth the rights and obligations of the Southeast EEM Administrator, as may be amended from time to time in accordance with this Agreement.

"Southeast EEM Agent" means that entity designated by the Membership Board from time to time, which has certain limited rights and responsibilities under this Agreement as expressly set forth in Article 6 below.

"Southeast EEM Agent Scope" has the meaning set forth in Section 6.1.

"Southeast EEM Algorithm" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Commencement Date" means the date upon which the Southeast EEM commences operation.

"Southeast EEM Order" has the meaning set forth in Section 8.6.

"Southeast EEM Manuals" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Market Rules" means the Rules of the Southeast Energy Exchange Market as set forth in Appendix B, as may be amended from time to time pursuant to Section 4.1.9.

"Southeast Energy Exchange Market" or "Southeast EEM" means the Territory-wide, automated, intra-hour electric energy exchange operated by means of the Southeast EEM System and utilizing Non-Firm Energy Exchange Transmission Service pursuant to the terms and conditions of this Agreement.

"Southeast EEM System" means the Southeast EEM Algorithm and any ancillary or supporting software solutions that (i) automatically matches Bids and Offers among Participants for the next Delivery Interval during which the wholesale sale of Non-Firm Energy will be sold by the Seller and the purchase of the Non-Firm Energy will be purchased by the Buyer to serve load in the Territory and (ii) automatically reserves and tags Non-Firm Energy Exchange Transmission Service.

"Southeast EEM System Interface" shall have the meaning set forth in the Southeast EEM Market Rules.

"Stakeholders" means interested state commissions, customers, interested future Southeast EEM Market Members or Participants, public interest groups or any other interested parties.

"Tariff" means a Participating Transmission Provider's FERC-jurisdictional Open Access Transmission Tariff, non-jurisdictional transmission tariff or non-jurisdictional transmission service guidelines, as applicable.

"Tariff Filings" has the meaning set forth in Section 8.3.

"Territory" means, collectively, the areas served by the Participating Transmission Providers, which as of the Effective Date includes the Balancing Authority Areas operated by the

following Balancing Authorities: Associated Electric Cooperative, Inc.; Louisville Gas and Electric Company and Kentucky Utilities Company; Tennessee Valley Authority; Duke Energy Progress (f/k/a Carolina Power and Light Company); Duke Energy Carolinas; South Carolina Electric & Gas Company (n/k/a Dominion Energy South Carolina, Inc.); Santee Cooper; Southern Company; and Power South Energy Cooperative. A current description of the Territory shall be maintained on the Southeast EEM System Interface.

"Voluntary Withdrawal Date" has the meaning set forth in Section 4.2.1.

"Withdrawal Date" means a Voluntary Withdrawal Date or a Governmental Action Withdrawal Date, as applicable.

1.2     Rules of Construction.  The capitalized terms listed in this Article 1 shall have the meanings set forth herein whenever the terms appear in this Agreement, whether in the singular or the plural or in the present or past tense.   Other terms used in this Agreement but not listed in this Article 1 shall have meanings defined herein or by NERC and the Tariff of each Participating Transmission Provider or, if not so defined, shall have meanings as commonly used in the English language.   In the event of a conflict regarding a defined term contained herein and the provisions of a Tariff or NERC rules, the provisions set forth by the applicable Tariff and NERC rules shall take precedence over the defined terms set forth in this Agreement. Words not otherwise defined herein that have well known and generally accepted technical or trade meanings are used herein in accordance with such recognized meanings.   In addition, the following rules of interpretation shall apply:

The masculine shall include the feminine and neuter.

References to "Articles," "Sections," or "Exhibits" shall be to articles, sections, or exhibits of this Agreement.

References to "days" that are not specifically defined as "Business Days" shall be calendar days, which term includes every day on the calendar including weekends and holidays.

The Exhibits and Appendices attached hereto are incorporated in and are intended to be part of this Agreement; provided, however, that in the event of a conflict between the terms of any Exhibit and the terms of this Agreement, the terms of this Agreement shall take precedence.

This Agreement was negotiated and prepared by all Parties with the advice and participation of counsel.   The Parties have agreed to the wording of this Agreement and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this Agreement or any part hereof.

Unless expressly provided otherwise in this Agreement, where the Agreement requires the consent, approval, or similar action by a Party, such consent or approval shall not be unreasonably withheld, conditioned or delayed, except in each case that the foregoing shall not apply to any action of a Party under Article 11.

Use of the words "include" or "including" or similar words shall be interpreted as "including but not limited to" or "including, without limitation."

JA0537

## ARTICLE 2

## ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION

2.1     The Members shall cause the establishment and operation of the Southeast EEM System as set forth herein and administered via the Southeast EEM System Interface or such other protocol as determined by the Membership Board, to facilitate the matching of Sellers with Buyers for the purpose of entering into Energy Exchanges.

2.2     The Southeast EEM Administrator shall operate the Southeast EEM System in accordance with the Southeast EEM Market Rules for the purpose of matching Bids and Offers for the four (4) fifteen (15) minute increments in every hour of every day, including but not limited to Business Days, weekends, and NERC holidays.

2.3     As will be set forth in the Southeast EEM Administrator Agreement, the Southeast EEM Administrator will be primarily responsible for: (i) the on-going functions of the Southeast EEM System and overseeing and/or performing the operation and maintenance services necessary to allow the Southeast EEM System to operate in a reliable manner; (ii) the protection and safeguarding of data submitted to and transmitted from the Southeast EEM System; (iii) limiting access to the Southeast EEM System to Participants; and (iv) maintaining open communications by and among the Southeast EEM Administrator, Participants and the Southeast EEM Agent. For avoidance of doubt, the Membership Board, pursuant to <u>Article 4</u>, may decide to engage one or more third parties to perform the responsibilities of the Southeast EEM Administrator.

2.4     All Bid Information and Offer Information submitted to the Southeast EEM System shall be used by the Southeast EEM Administrator only for operation, maintenance, and the on-going functions of the Southeast EEM System or as requested by the Market Auditor, in each case in accordance with this Agreement, the Southeast EEM Market Rules and applicable Law.

## ARTICLE 3

## MEMBERSHIP AND PARTICIPATION

3.1     Each Member shall comply with all applicable rules, policies, guidelines, or other standards or requirements set forth in this Agreement and as may otherwise be required by the Membership Board or applicable Law.

3.2     <u>Member Criteria</u>.

3.2.1     To be a Member of the Southeast EEM, an entity must be: (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory. The Tariff of any Member who provides transmission service must contain Non-Firm Energy Exchange

JA0538

Transmission Service provisions for those Energy Exchanges that seek to utilize such Member's transmission system.

3.2.2    If an entity and one or more of its Affiliates are Members, or if multiple entities of a Disaggregated Utility are Members, then only one entity from the group of entities (including any subsidiaries, affiliates or divisions thereof) may have a Representative on the Membership Board, and for the sake of clarity, for all purposes hereunder, such Disaggregated Utility shall be counted as a single Member.

3.2.3    An entity that satisfies the criteria set forth in this Agreement for qualification and admission as a Member, as determined by the Membership Board, shall be eligible to become a Member during the period between July 1st and September 30th of each calendar year (the "Enrollment Period") and may become an additional Member (an "Additional Member") effective as of the first day of the following calendar year in which such entity satisfies the Member criteria set forth in Section 3.2 after executing this Agreement or a joinder hereto in the form of Exhibit B (the "Joinder") that is countersigned by the Southeast EEM Agent, submitting a duly executed copy to the Secretary and the Southeast EEM Administrator, and upon payment of all applicable fees, dues and contributions as specified or authorized in Article 7. For the avoidance of doubt, an entity seeking to become an Additional Member shall be bound by the terms of this Agreement on the date such entity executes a Joinder that is countersigned by the Southeast EEM Agent.

3.3    Participant Criteria.   To become a "Participant," an entity must (i) meet all requirements of being a Participant as set forth in the Southeast EEM Market Rules, and (ii) execute a Participant Agreement in the form attached hereto as Appendix A (the "Participant Agreement") which agreement shall, among other things, contractually bind such entity to comply with the Southeast EEM Market Rules.

3.4    Participating Transmission Providers.    Prior to the Southeast EEM Commencement Date, or, for any Participating Transmission Provider offering service after such commencement date, prior to the date upon which it commences providing Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and, if required by Law, shall obtain acceptance of such provisions from FERC or such other Governmental Entity(ies) having jurisdiction over such Tariff.  Participating Transmission Service Providers shall take such other actions and provide such information to the Southeast EEM Administrator as required by the provisions of the Southeast EEM Market Rules or as otherwise reasonably requested by the Southeast EEM Administrator in order to operate the Southeast EEM.

3.5    Member Standard of Conduct.   Members shall not provide any non-public transmission function information they receive by virtue of their participation in the Southeast EEM to any of their marketing function employees or provide any undue preference through the sharing of non-public market information they receive by virtue of their participation in the Southeast EEM to their marketing function employees.  For purposes of this Section 3.5, marketing function employees of a Member's Affiliates shall be deemed marketing function employees of the Member.

# ARTICLE 4

## GOVERNANCE

4.1     Membership Board.

    4.1.1     Power and Qualification of the Membership Board.   Except as set forth in Article 5, all business of the Southeast EEM System and performance of any agreements entered into or otherwise assumed for the benefit of the Members shall be managed under the direction of the Membership Board.

    4.1.2     Number of Representatives.   Subject to the limitations set forth in Section 3.2.2:

    (a)     The Membership Board shall consist of one (1) representative for each Member (each, a "Representative").

    (b)     Each Member shall appoint one (1) Representative to serve until such Representative is replaced by such Member. No Member shall be permitted to have more than one (1) Representative on the Membership Board.

    4.1.3     Method of Selecting or Removing Representatives; Vacancies.

    (a)     A Representative shall be removed or replaced solely at the discretion of the Member that originally appointed such Representative; provided, however, that each Member must at all times have a Representative in place to vote on matters pursuant to Section 4.1.5.

    (b)     All Representative vacancies, occurring for any reason, shall be filled by the Member who appointed such Representative.

    4.1.4     Resignations.   A Representative may resign at any time by delivering written notice to the Member who appointed such Representative, the Membership Board and the Southeast EEM Administrator.   Such resignation shall take effect when such notice is delivered to the applicable Member, unless the notice specifies a later effective date.

    4.1.5     Quorum of Representatives and Action by the Membership Board; Voting.

    (a)     The votes of the Members shall be held by the Representatives and shall be weighted with each Representative holding:

    (i)     one (1) vote for each Representative of the Southeast EEM System (the "Popular Vote"); and

    (ii)     a number of votes (the "Net Energy for Load Vote") equal to the following calculation:

Net Energy for Load Vote = (MNEL/ANEL)

JA0540

*Where:*

*MNEL = such Member Net Energy for Load of the Representative's Member, Affiliates of such Member and those related entities part of a Disaggregated Utility as of the Record Date; and*

*ANEL = the sum of the Member Net Energy for Load for all Members as of the Record Date.*

(b)　　Subject to Section 4.1.7(c), attendance by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes shall constitute a quorum for the transaction of business.  Except for Significant Matters, the actions of the Membership Board shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance, and (ii) more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "Affirmative Majority Vote").

(c)　　Subject to Section 4.1.7(c), the actions of the Membership Board to decide on matters related to the Significant Matters shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance and (ii) more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "Affirmative Supermajority Vote").

(d)　　The number of Net Energy for Load Vote of each Representative shall be adjusted each year following the Enrollment Period and prior to the start of the next calendar year to reflect the revision to such proportions resulting from the inclusion of Additional Members (if any) when determining Net Energy for Load Vote for each Representative. Notwithstanding anything to the contrary herein, a Member's right to have its Representative vote or be included in a Representative's Net Energy for Load Vote may be suspended pursuant to Section 4.2.2 during any period in which such Member is delinquent in the payment of any of the dues or costs and expenses allocated to such Member in accordance with Article 7.  If a Member's Representative's right to vote has been suspended, the Membership Board shall recalculate the Net Energy for Load Vote of each other Representative excluding such suspended Member's Representative, and each other calculation required by this Section 4.1.5 and Article 4 (including for purposes of determining if there is a quorum and whether there is an Affirmative Majority Vote and Affirmative Supermajority Vote, as applicable) shall be determined excluding such suspended Member's Representative.

4.1.6　　Meetings of the Membership Board.  Meetings of the Membership Board, unless otherwise provided in this Agreement, may be called (i) by the Chair of the Membership

JA0541

Board, or (ii) by a written consent delivered to the Membership Board that is executed by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes. Meetings of the Membership Board, regular or special, may be held at such place within the Territory and upon such notice as may be prescribed by resolution of the Membership Board.

4.1.7   Notice of Meetings of Representatives.

(a)   The Chair of the Membership Board, or a Representative directed by the Chair of the Membership Board, shall provide written notice by electronic mail (and shall confirm receipt of such notice by requesting a return receipt) of each Membership Board meeting to all Representatives. Such notice shall state the date, place, hour and purpose or purposes of the meeting, including any Significant Matters to be discussed, and shall be delivered by a nationally recognized overnight courier service to each Representative's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting.

(b)   Any Member may designate, by submitting a written communication to the Chair of the Membership Board, an alternate to act on behalf of the Representative ("Alternate Representative"). Any reference herein to "Representative" shall be deemed a reference to the Alternate Representative where applicable.

(c)   Notwithstanding anything to the contrary set forth herein, the Membership Board shall only vote on matters set forth in a duly delivered notice pursuant to this Section 4.1.7; provided, however that the Membership Board may (i) discuss any and all matters within the scope of the Membership Board's duties at any duly constituted meeting of the Membership Board, and/or (ii) vote upon any matter within the scope of the Membership Board's duties that is not set forth in a duly delivered notice pursuant to this Section 4.1.7 if all Representatives are present at such meeting of the Membership Board and such matter is approved in accordance with the applicable voting requirements set forth in Section 4.1.5.

4.1.8   Action by Representatives in Lieu of a Meeting; Participation in Meetings by Conference Telephone.

(a)   Unless otherwise restricted by this Agreement, any action required or permitted to be taken at a meeting of the Membership Board may be taken without a meeting if the action is evidenced by written consent describing the action taken, signed by all of the Representatives. The written consents and the resolutions thereto by the Representatives shall be filed with the minutes of the Membership Board or filed with the records maintained by the Secretary reflecting the action taken. Action taken under this Section 4.1.8(a) becomes effective when the last Representative signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided the consent states the date of execution by each Representative.

(b)   The Representatives may participate in any meeting of the Membership Board or of a committee thereof by means of conference telephone or by any means

of communication by which all Representatives participating may hear one another during the meeting; all meetings shall be available for participation via such means. A Representative participating in a meeting by such means is deemed to be present in person at the meeting.

4.1.9    Powers Exclusive to the Membership Board.

(a)    The following matters are reserved to and may only be addressed by the Membership Board:

(i)    all Significant Matters;

(ii)    the creation and appointment of committees and officers pursuant to Section 4.3;

(iii)    the establishment and amendment of Annual Budgets;

(iv)    the establishment and modification of billing processes for Operating Costs;

(v)    the approval of Southeast EEM Manuals or amendments to Southeast EEM Manuals proposed by the Operating Committee;

(vi)    the approval and establishment of the Southeast EEM Commencement Date following the satisfaction of the conditions set forth in Section 8.4.2;

(vii)    all Deadlock Issues; and

(viii)    the authorization of the Southeast EEM Agent to execute, transfer or terminate Participant Agreements.

(b)    Any changes, modifications or amendments to this Agreement agreed to by the Membership Board as provided herein shall be submitted to the required Governmental Entities for approval or acceptance and the orders on such submissions shall be deemed to be and treated as Southeast EEM Orders for purposes of Article 8.

4.2    Removal or Withdrawal of Members.   Upon withdrawal, suspension or removal of a Member as set forth below, such Member shall no longer be entitled to exercise the voting power provided under this Agreement, shall be automatically removed from any committee appointments, and shall not be entitled to any other rights as a Member hereunder. Notwithstanding the foregoing, (i) a Member that withdraws or is removed or is suspended by the Membership Board or is no longer a Member during a calendar year shall remain liable for all dues, costs and expenses and other payment obligations as provided in Section 4.2.1 and Section 4.2.4, and (ii) nothing in this Section 4.2 shall act to prevent a Member who is no longer a Member, but is in compliance with all surviving obligations under this Agreement, from becoming a Participant; provided it has met the criteria for a Participant set forth in the Southeast EEM Market Rules. Any Member that withdraws or is removed by the Membership Board or is no longer a Member during a calendar year shall pre-pay all amounts owed by such Member

JA0543

under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.2.1    Except as set forth in <u>Section 8.5</u>, <u>Section 8.6</u> and <u>Section 8.7</u>, any Member shall have the right to withdraw from the Southeast EEM System (and a Participating Transmission provider shall take all necessary actions to withdraw the provisions for Non-Firm Energy Exchange Transmission Service from its Tariff) by providing at least (i) thirty (30) days advance written notice to the Membership Board in the case of any Member that is not a Balancing Authority or Participating Transmission Provider and (ii) at least ninety (90) days advance written notice to the Membership Board in the case of any Member that is a Balancing Authority or Participating Transmission Provider (the effective date of such withdrawal, in the case of clause (i) or (ii), as applicable, the "<u>Voluntary Withdrawal Date</u>"). A withdrawing Member shall continue to be liable for (A) all Operating Costs allocated to and owed by the withdrawing Member at the time that it delivered its notice of withdrawal, and (B) its allocated share of future Operating Costs as provided in <u>Section 4.2.4</u>; provided, however, that for the sake of clarity and notwithstanding anything to the contrary herein, the withdrawing Member shall not be responsible for any new Operating Costs first approved and incurred  after the date such Member provides written notice of its intent to withdraw, and a withdrawing Member that is also a Participating Transmission Provider shall have no obligation to provide Non-Firm Energy Exchange Transmission Service following the Voluntary Withdrawal Date.

4.2.2    If a Member fails to cure nonpayment of any financial obligations related to the Southeast EEM (including undisputed amounts payable and any other amounts due to any third parties as directed by the Membership Board or pursuant to the Southeast EEM Market Rules) within ten (10) Business Days after receipt of notice by the Operating Committee of such nonpayment, the Membership Board shall have the right in its discretion to: (i) suspend such Member's voting rights, (ii) remove such Member from any committee appointments and (iii) suspend such Member's access to the Southeast EEM System.

4.2.3    The Membership Board may remove a Member for any of the following reasons: (i) failure to comply with this Agreement, (ii) repeated failure to consummate valid Energy Exchanges resulting from Bids or Offers submitted by a Member, arranged by or through the Southeast EEM System in accordance with and subject to the Southeast EEM Market Rules or the Southeast EEM Manuals; and (iii) failure to comply with the standards, rules, procedures or other requirements for participation in the Southeast EEM System, as established and modified from time to time by the Operating Committee.

4.2.4    Any Member that provides notice to withdraw in accordance with <u>Section 4.2.1</u>, <u>Section 8.5</u>, <u>Section 8.6</u> or <u>Section 8.7</u> or who is otherwise removed pursuant to <u>Section 4.2.3</u> shall remain liable for its share of all costs and expenses in accordance with <u>Article 7</u>. If such Member withdraws prior to the Annual Budget Determination Date, such Member shall only be responsible for the costs and expenses allocated to such Member for the year in which such Member withdraws. If such Member withdraws after the Annual Budget Determination Date, such Member shall (i) be responsible for the costs and expenses allocated to such Member pursuant to <u>Section 7.2.2</u> for the year in which such Member withdraws and the following year for which the Annual Budget has already been determined, and (ii) pre-pay all amounts owed by

such Member under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.3     Committees and Officers.

4.3.1     An Affirmative Majority Vote may appoint such committees or officers as the Membership Board deems necessary or desirable to carry on the business of the Southeast EEM System and may delegate to any such committee or officer such authority to act on behalf of the Membership Board. Each officer shall hold office until its successor is designated by an Affirmative Majority Vote. Any officer may resign at any time upon written notice to the Membership Board. Any officer may be removed by an Affirmative Majority Vote at any time, with or without cause. A vacancy in any officer position shall be filled at the discretion of, and by, an Affirmative Majority Vote.

4.3.2     The Membership Board shall appoint a chair of the Membership Board (the "Chair of the Membership Board") who shall be responsible for calling and overseeing all meetings of the Membership Board, and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.3.3     The Membership Board shall appoint a secretary of the Membership Board (the "Secretary") who shall be responsible for overseeing the maintenance of the books and records of the Membership Board and its Members and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.4     Annual Meeting of Participants and Stakeholders. The Membership Board shall hold an annual meeting of Participants and Stakeholders (the "Annual Meeting") at a time determined by the Membership Board that is reasonably proximate to (either before or after) May 1st of each year. The Southeast EEM Administrator shall provide written notice of the Annual Meeting to all Participants. Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by a nationally recognized overnight courier service to each Participant's usual place of business as recorded in the Southeast EEM Administrator's records, or such notice shall be delivered by internet electronic mail (with return receipt requested for purposes of confirming receipt) sent to the electronic mail address for such Participant as recorded in the Southeast EEM Administrator's records, not less than seven (7) Business Days prior to the date of the Annual Meeting. In addition, the Southeast EEM Administrator shall publicly post the notice of the Annual Meeting, including the date, place and time of such Annual Meeting, on the Southeast EEM System Interface or other public website administered for the Southeast EEM, not less than seven (7) Business Days prior to the date of the Annual Meeting. The Participants and Stakeholders may participate in Annual Meetings by means of conference telephone or by any means of communication by which all Participants and Stakeholders participating may hear one another during the meeting, and all Annual Meetings shall be available for participation via such means.

4.5     Annual Meeting of Members. The Membership Board shall hold an annual meeting attended only by Members (the "Annual Member Meeting") at a time determined by the Membership Board that is reasonably proximate to (either before or after) October 30th of each year. The Secretary shall provide written notice of the Annual Member Meeting to, and confirm

JA0545

actual receipt of such notice by, all Members.  Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by nationally recognized overnight courier service to each Member's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Member's Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the Annual Member Meeting. The Members may participate in the Annual Member Meeting by means of conference telephone or by any means of communication by which all Members participating may hear one another during the meeting, and all meetings shall be available for participation via such means.

## ARTICLE 5

## OPERATING COMMITTEE

5.1    <u>Power and Qualification of the Operating Committee</u>.  Except with respect to matters specifically reserved to the Membership Board pursuant to <u>Section 4.1.9</u>, the Members hereby agree and hereby appoint the Operating Committee to supervise the day-to-day operation of the Southeast EEM System, with each individual member of the Operating Committee referred to as a "<u>Committee Member</u>". The Operating Committee shall be responsible for developing and maintaining the Southeast EEM Manuals for approval by the Membership Board.

5.2    <u>Number of Committee Members</u>.   The Operating Committee shall consist of four (4) Committee Members, as determined by this Agreement.

5.3    <u>Election and Term of Committee Members; Appointment of Chair</u>.

5.3.1    Except as provided in this Agreement, the Members of each Sector shall elect the Committee Members as provided in <u>Section 5.4</u> at the Annual Member Meeting.  The Committee Members shall be allocated by Sectors: (a) the Members comprising Investor-Owned Utilities shall elect two (2) Committee Members; (b) the Members comprising Cooperatives shall elect one (1) Committee Member; and (c) the Members comprising Governmental Utilities shall elect one (1) Committee Member.  Each Committee Member shall be entitled to cast one (1) vote.   Notwithstanding the foregoing, no Member shall be permitted to have more than one (1) representative serve on the Operating Committee.   Each Committee Member's term shall commence upon election and continue until the earlier of such Committee Member's resignation or the date of the next Annual Member Meeting and the election of such Committee Member's successor.

5.3.2    The properly elected Committee Members shall determine which Committee Member shall be the chair of the Operating Committee by the majority approval of the Committee Members.   The chair of the Operating Committee may be removed or replaced with or without cause at any time upon the majority approval of the Committee Members.

5.4    <u>Method of Selecting or Removing Committee Members</u>.  Each Sector may establish the method and criteria for electing or appointing the Committee Member(s) of such Sector as set forth in <u>Section 5.3</u> and for selecting or removing the Committee Member or

Committee Members elected or appointed by such Sector and shall provide a copy of such method and criteria to the Southeast EEM Administrator as well as any updates thereto. A Committee Member shall be deemed properly appointed by the applicable Sector upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power pursuant to such Sector's criteria to elect such Committee Member. A Sector may remove a Committee Member with or without cause by delivering to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to remove the Committee Members. Such Committee Member's removal shall be effective on the later of the date such certificate is delivered to the Southeast EEM Administrator or date specified in the certificate.

5.5     Vacancies.     All Committee Member vacancies, occurring for any reason, shall be filled by the Members of the Sector in which the vacancy occurs, in the same manner as a Committee Member is elected pursuant to Section 5.4. A Committee Member elected or appointed to fill a vacancy shall assume office upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to fill the vacancy.

5.6     Resignations.     A Committee Member may resign at any time by delivering written notice to the Secretary and to the Members of the Sector which elected or appointed such Committee Member. Such resignation shall take effect when such notice is delivered to the Southeast EEM Administrator, unless the notice specifies a later effective date.

5.7     Quorum of Committee Members and Action by the Operating Committee.

5.7.1     Attendance by at least one (1) Committee Member representing each of the three (3) Sectors shall constitute a quorum for the transaction of business. The act of all the votes of the Committee Members present at a meeting at which a quorum is present shall constitute the action of the Operating Committee.

5.7.2     To the extent that the Operating Committee cannot obtain a unanimous vote on any business or issue properly before the Operating Committee when a quorum is present (the "Deadlock Issue"), then the Operating Committee may, upon the written request of a Committee Member, submit the Deadlock Issue to the Membership Board for final resolution. For purposes of clarity, a vote of the Operating Committee that is held at a meeting for which a quorum is present shall be considered unanimous if at least one (1) Committee Member representing each of the three (3) Sectors is present.

5.8     Meetings of the Operating Committee.     Meetings of the Operating Committee may be called (i) by the chair of the Operating Committee, or (ii) by a written consent delivered to the chair of the Operating Committee that is executed by a majority of the Committee Members.

5.9     Notice of Meetings of Committee Members; Member Observation Rights.

(a)     The Southeast EEM Administrator shall provide written notice of each Operating Committee meeting to all members of the Operating Committee as well as to all Members. Such notice shall state the date, place and hour of the meeting and shall be delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Committee Member and for such

JA0547

Member as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting.  Members who are not Committee Members shall have the right to attend, observe and participate in any discussion at any Operating Committee Meeting, but may not cast a vote.

(b)    Any Committee Member unable to attend a meeting may designate, in writing, an alternate from the same Sector as such Committee Member to act on behalf of the Committee Member ("Alternate Committee Member").  Any reference herein to "Committee Member" shall be deemed a reference to the Alternate Committee Member where applicable.

(c)    A Committee Member's attendance at or participation in a meeting waives any required notice to him or her of such meeting unless, at the beginning of such meeting or promptly upon his or her arrival, such Committee Member objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

(d)    A notice shall specify the business to be transacted at, or the purpose of, any meeting of the Operating Committee; provided, however, such notice shall not limit the actions the Operating Committee may take at a meeting.

5.10    Action by Committee Members in Lieu of a Meeting; Meetings by Telephone Conference.

(a)    Any action required or permitted to be taken at a meeting of the Operating Committee may be taken without a meeting if at least one (1) Committee Member representing each of the three (3) Sectors consents in writing to the adoption of a resolution authorizing the action.  The resolution and the written consents thereto by the Committee Members shall be filed with the minutes of the Operating Committee or filed with the records maintained by the Secretary reflecting the action taken.  Any action taken under this Section 5.10(a) shall be effective when the last Committee Member signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided, the consent states the date of execution by each Committee Member.  Such consent shall have the same force and effect as a unanimous vote.

(b)    The Committee Members and Members may participate in any meeting of the Operating Committee or of a committee thereof by means of telephone conference or by any means of communication by which all Committee Members and Members participating may hear one another during the meeting, and all meetings shall be available for participation via such means.  A Committee Member participating in a meeting by such means is deemed to be present in person at the meeting.

5.11    Liability of Committee Members. The Operating Committee and the Committee Members shall not be liable to any Member for any act done or omitted by Committee Members while acting in good faith and in the exercise of reasonable judgment. The Members shall indemnify the Committee Members (solely in such capacity) and hold them harmless against any loss or expense actually incurred without gross negligence or willful misconduct on the part of the

Committee Members and arising out of or in connection with the acceptance or administration of their role on the Operating Committee.

<div align="center">

**ARTICLE 6**

**APPOINTMENT OF SOUTHEAST EEM AGENT**

</div>

6.1     Each Member agrees to appoint the Southeast EEM Agent as its representative and as each such Member's true and lawful agent and authorizes the Southeast EEM Agent to act for such Member in accordance with the scope of the Southeast EEM Agent's responsibilities (the "Southeast EEM Agent Scope") as specifically defined by the Membership Board in Appendix C. Each Member grants unto the Southeast EEM Agent only that authority which is granted to the Southeast EEM Agent by the Membership Board under this Agreement and that is necessary to perform the actions required in connection with the development and operation of the Southeast EEM System, and in each case in a manner consistent with the Southeast EEM Agent Scope. Each Member agrees and acknowledges that a third party shall be entitled to rely on any action taken, or the failure to take any action, by the Southeast EEM Agent, on behalf of Members pursuant to and in accordance with this Article 6 (each, an "Authorized Action"), and that each Authorized Action shall be binding on each Member as fully as if such Members had taken such Authorized Action directly. The initial Southeast EEM Agent and any replacement Southeast EEM Agent, as determined by the Membership Board in accordance with Section 4.1.9, must meet any criteria set by the Membership Board from time to time (collectively, the "Southeast EEM Agent Criteria").  Any entity that does not meet the Southeast EEM Agent Criteria may not serve as the Southeast EEM Agent; provided, however, that the Membership Board may, in its discretion, alter or revise the Southeast EEM Agent Criteria.

6.2     Each Member acknowledges and agrees that upon execution of this Agreement, and upon any delivery by the Southeast EEM Agent of any waiver, amendment, agreement, opinion, certificate or other document within the Southeast EEM Agent Scope executed by the Southeast EEM Agent, such Member shall be bound by such documents or action as fully as if such Member had executed and delivered such documents.  Each Member shall pay its allocated share of (i) all Operating Costs arising from contracts entered into by the Southeast EEM Agent entered into in accordance with the Southeast EEM Agent Scope, and (ii) fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder.

6.3     The Southeast EEM Agent may resign at any time upon sixty (60) days written notice to the Membership Board and may be removed at any time with or without cause by the Membership Board pursuant to Section 4.1.9.  Upon the resignation of the Southeast EEM Agent pursuant to this Section 6.3 or its removal pursuant to Section 4.1.9, the resigning or removed Southeast EEM Agent shall take or cause to be taken, all actions and do, or cause to be done, or execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the Membership Board may reasonably deem necessary, proper or advisable to transition the rights and obligations of the Southeast EEM Agent to the replacement Southeast EEM Agent, as promptly as practicable or sooner as required by this Agreement, including, without limitation, such actions as are necessary to assign all contracts, agreements or other documents executed on behalf of the Members within the Southeast EEM Agent Scope to the replacement Southeast EEM Agent.

6.4    For the avoidance of doubt, it is the intent of the Members that the Operating Committee, not the Southeast EEM Agent, be responsible for interfacing and coordinating with third party vendors with regard to the performance of contracts with such vendors. Further, in the event that the Southeast EEM Agent is required to take any ministerial action under such contracts, the Southeast EEM Agent shall only do so at the direction of the Membership Board or Operating Committee and in accordance with the Southeast EEM Agent Scope.  The Southeast EEM Agent shall have no right or access to data related to the Southeast EEM beyond what it has as a Member and Participant.

6.5    The Southeast EEM Agent will incur no liability of any kind with respect to any action or omission by the Southeast EEM Agent in connection with the Southeast EEM Agent's role pursuant to this Agreement and any agreements ancillary hereto within the Southeast EEM Agent Scope, except in the event of liability directly resulting from the Southeast EEM Agent's gross negligence or willful misconduct.  The Members will indemnify, defend and hold harmless the Southeast EEM Agent from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "Representative Losses") arising out of or in connection with the Southeast EEM Agent's execution and performance of this Agreement and any agreements ancillary hereto, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Southeast EEM Agent or actions beyond the Southeast EEM Agent Scope, the Southeast EEM Agent will reimburse the Members the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct. In no event will the Southeast EEM Agent be required to advance its own funds on behalf of the Members or otherwise.  The Members acknowledge and agree that the foregoing indemnities will survive the resignation or removal of the Southeast EEM Agent or the termination of this Agreement.

## ARTICLE 7

## BUDGETING AND COST RESPONSIBILITY

7.1    Member Responsibility.  Each Member will be assigned and is responsible for its allocated share of Operating Costs and such other dues or fees as assessed by the Membership Board from time to time based on the methodology set forth in Section 7.2. If a Member fails to cure any nonpayment of its allocated share of Operating Costs or any other amount assessed against such Member under this Agreement within ten (10) Business Days after receiving notice from the Operating Committee of such non-payment, such Member may, in the discretion of the Membership Board, lose its right to vote on matters related to this Agreement or to have representation on the Membership Board and any committees unless and until such amounts are paid in full. Any amounts owed that are not paid in accordance with this Agreement shall be delinquent and shall accrue interest at the Interest Rate, such interest to be calculated from the due date to the date the delinquent amount is paid in full.

7.2    Allocation of Costs.  Operating Costs, including but not limited to the costs and expenses of the Southeast EEM System, shall be allocated and assessed to each Member based on

JA0550

the following formula, provided that (i) for purposes of a Disaggregated Utility, such Disaggregated Utility shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the entities of such Disaggregated Utility according to their direction (which allocation shall not control for any purposes hereunder), and (ii) for purposes of Member Affiliates, the Member Affiliates shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the Member Affiliates according to their direction (which allocation shall not control for any purposes hereunder):

$$[(1/4)(TC)(1/TNM)] + [(3/4)(TC)(MNEL/ANEL)] = MAC, \text{ where:}$$

*TC = Total allocable costs.*

*TNM = the total number of Members.*

*MNEL = such Member Net Energy for Load of the Representative's Member,*

*Affiliates of such Member and those related entities part of a Disaggregated*

*Utility as of the Record Date.*

*ANEL = the sum of all the Member Net Energy for Load as of the Record Date.*

*MAC = Member's allocated costs.*

      7.2.1   <u>Billing Process</u>.  Each Member shall be billed directly by the Southeast EEM Administrator for its allocated share of Operating Costs in accordance with the terms of this Agreement. In the event that the direct billing process described in the foregoing sentence proves to be unworkable for certain Operating Costs, the Membership Board shall use commercially reasonable efforts to (i) require third party vendors to structure all Southeast EEM invoices on an individual Member basis based upon the cost methodology set forth in this Agreement; or (ii) if such third party vendors refuse to provide such individual Member billings services, establish an alternative billing procedure for such Operating Costs (including the engagement of a third party billing service provider) to ensure such invoices are billed on an individual Member basis. The Membership Board shall establish such an alternative billing procedure in a timely manner; provided, however, that a delay in establishing such a procedure shall not eliminate the Members' individual obligations to pay their allocated share of Operating Costs. Nothing in this <u>Section 7.2.1</u> is intended to modify or diminish the Membership Board's authority to establish or amend billing procedures from time to time.

      7.2.2   <u>Annual Budget</u>.  On or before October 30th of each calendar year, but in any case no earlier than October 1st of each calendar year, the Membership Board shall set the annual budget for the following calendar year (the "<u>Annual Budget Determination Date</u>"), which budget shall include but not be limited to all projected Operating Costs, including all vendor costs and all costs and expenses associated with the Southeast EEM Agent (the "<u>Annual Budget</u>"). Costs are deemed allocated to each Member as of the Annual Budget Determination Date, but,

JA0551

except as otherwise provided herein, are not payable until such costs are due and payable subject to the applicable agreements concerning such costs.

7.3     Additional Members.  The costs and expenses of the Southeast EEM System allocated to each Member shall be adjusted each year in accordance with Section 7.2 following the Enrollment Period but prior to the Annual Budget Determination Date to reflect any changes in a Member Net Energy for Load valuation or the inclusion of Additional Members in such calculations for the following calendar year.

     7.3.1     Submission of Information.

     (a)     Upon the request of the Secretary or upon a schedule approved by the Membership Board, each Member shall provide its Member Net Energy for Load values, and any other information required for the calculations set forth in Section 4.1.5 and Section 7.2, to the Southeast EEM Administrator and all other Members.  If a Member proposes to use a Member Net Energy for Load value that differs from the Net Energy for Load value as provided to NERC by the Record Date (an "Alternate MNEL Value"), such Member shall submit a written request to the Operating Committee at least thirty (30) days prior to the Annual Budget Determination Date requesting the Operating Committee's approval of such Member's Alternate MNEL Value in the upcoming year. The submitting Member's request shall contain (i) an explanation of why the Alternate MNEL Value differs from the Member Net Energy for Load value submitted to NERC, and (ii) all other reasonably necessary information evidencing such Member's calculation of the Alternate MNEL Value. The Operating Committee shall review a Member's request to use an Alternate MNEL Value and shall use commercially reasonable efforts to approve, deny or request additional information regarding such request within fifteen (15) days from the date the Operating Committee receives the request.

     (b)     If the Operating Committee denies a Member's request to use an Alternate MNEL Value, the Member may, within thirty (30) days of such denial, submit the request to the Membership Board for review, and the Membership Board shall, as soon as reasonably practicable, hold a vote to either uphold or overturn the Operating Committee's denial of the request, as determined by an Affirmative Majority Vote. The requesting Member shall provide to the Membership Board such information reasonably requested by the Membership Board in order to evaluate the Member's request. If the Operating Committee or the Membership Board, as applicable, approves a Member's Alternate MNEL Value, such Alternate MNEL Value shall be used for the calculations set forth in Section 4.1.5 and Section 7.2 in the following calendar year.  If the Operating Committee or the Membership Board, as applicable, deny such requesting Member's request to use an Alternative MNEL Value, the Member's Member Net Energy for Load value shall be that Member Net Energy for Load as determined by the Membership Board in accordance with this Agreement; provided, however, that during the pendency of the review of a Member's Net Energy for Load pursuant to this Section 7.3.1 and until such value is finally determined, the requesting Member's Member Net Energy for Load value shall be the Member Net Energy Load value provided by such Member that was approved and used in the most recent calendar year.

JA0552

**ARTICLE 8**

**FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE**

8.1     This Agreement is subject to valid Laws, orders, rules and regulations of duly constituted Governmental Entities having jurisdiction. Nothing contained in this Agreement shall be construed as a grant of jurisdiction over any Member by any Governmental Entity not otherwise having jurisdiction by Law.

8.2     Filing With and Approval or Acceptance by Governmental Entities.

8.2.1     Any entity desiring to become a Member that is subject to the jurisdiction of any Governmental Entity from which approval or acceptance of this Agreement or participation in the Southeast EEM is required for such entity to participate in the Southeast EEM shall institute proceedings to obtain such acceptance or approval or shall provide such notice, except as provided in Section 8.2.2 below. All required approvals, acceptances and notices must be received by such entity prior to its participation in the Southeast EEM. The Members shall cooperate in securing all required Governmental Entity approvals or acceptances of this Agreement.

8.2.2     No later than sixty (60) days prior to the proposed Effective Date, the Southeast EEM Agent shall file this Agreement with FERC on behalf of the Jurisdictional Members in accordance with Section 8.2.1 under Section 205(c) of the FPA.  Within ten (10) Business Days of the date of such filing, the remaining Jurisdictional Members shall file certificates of concurrence with such filing and the Non-Jurisdictional Members shall file comments in support of such filing.

8.3     On the same date that the Southeast EEM Agent files this Agreement with FERC, the Jurisdictional Members that are also transmission service providers will make filings with FERC to amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and become Participating Transmission Providers, in accordance with Section 3.4 above (the "Tariff Filings").

8.4     Effective Date and Southeast EEM Commencement Date.

8.4.1     Unless specific provisions become effective earlier by the explicit terms contained herein, this Agreement shall be binding upon the Members upon the effective date established by FERC in a FERC order accepting the Agreement without modification or condition (the "Effective Date"); provided, however, that that this Agreement shall not become binding upon an individual Member who seeks acceptance or approval from a Governmental Entity pursuant to Section 8.2.1 above until the later of: (x) the date of issuance of an order by such Governmental Entity approving without modification or condition this Agreement and/or such Member's participation in the Southeast EEM and (y) the Effective Date; and provided, further, that the Members agree that this Agreement will bind each of them upon signing, subject only to the approvals and acceptances provided in this Section 8.4. In the event FERC does not accept the Agreement as filed, the Members may agree to changes or modifications to the Agreement pursuant to an Affirmative Supermajority Vote as set forth in Section 8.6, in which event the

JA0553

Effective Date shall be the date that FERC accepts the revised Agreement with any such changes or modifications agreed to pursuant to Section 8.6.

8.4.2    The Southeast EEM Commencement Date shall not occur until after (i) the Effective Date, (ii) the issuance by FERC of an order or orders accepting without modification or condition all of the Jurisdictional Member Participating Transmission Provider's Tariff Filings, and (iii) the Membership Board has approved and established the Southeast EEM Commencement Date in accordance with Section 4.1.9(vi).

8.5    If a Governmental Entity (other than FERC) to which a Member's participation in the Southeast EEM has been submitted for approval pursuant to Section 8.2.1 has not issued an order on such request within four (4) months from the date of submission, the Member for which such approval was requested may withdraw from this Agreement by providing written notice to all other Members no later than fifteen (15) days after such four-month period has elapsed. Withdrawal under this Section 8.5 shall be subject to the provisions of Section 4.2.

8.6    The individual provisions of this Agreement are inter-related and inter-dependent, and the agreement of the Members to the terms hereof is based on the expectation that it will be approved by all necessary Governmental Entities in its entirety. Accordingly, the terms of this Agreement are not severable, and are an integrated package that is submitted with the understanding and condition that it will be approved by the necessary Governmental Entities in its entirety. As such, if at any time (i) a Governmental Entity issues an order that does not accept or approve this Agreement or a Tariff Filing in its entirety without condition or requires modifications to the Agreement or the relevant Tariff ("Southeast EEM Order"), or (ii) any state or federal Laws or regulations, now existing or enacted or promulgated after the Effective Date are interpreted by a Governmental Entity in such a manner as to indicate that the structure or terms of this Agreement are more likely than not to be a violation of such Laws or regulations or are more likely than not to impact the jurisdictional status of any Member (a "Change in Law"), or (iii) if any provision or portion of this Agreement shall for any reason be held or adjudged to be invalid or illegal or unenforceable by any court of competent jurisdiction or other Governmental Entity ("Other Court/Governmental Entity Action"), the Members will engage in good faith negotiations during a forty-five (45) day period after the date of the Southeast EEM Order or Change in Law or Other Court/Governmental Entity Action to agree to Agreement modifications or conditions that are consistent with the modifications and conditions imposed by such Southeast EEM Order, Change in Law or Other Court/Governmental Entity Action; provided, however, that in any such negotiation the Members are not under any obligation to reach an agreement. Any changes, modifications or conditions to the effectiveness of this Agreement agreed to by an Affirmative Supermajority Vote shall be submitted to the required Governmental Entities for approval or acceptance and the orders on such filings shall be deemed to be and treated as Southeast EEM Orders for purposes of this Article 8. If an Affirmative Supermajority Vote cannot be achieved within such forty-five (45) day period, then the Agreement shall terminate and be of no force and effect. If a Member does not agree with the modifications to the Agreement adopted by the Affirmative Supermajority Vote, such non-agreeing Member shall be subject to the waiver of rights provisions of Section 16.9, but shall have the right to withdraw from this Agreement and the Southeast EEM upon thirty (30) days prior written notice. Upon such notice of withdrawal by a Member, any other Member may withdraw from this Agreement by providing written notice to the other Members within twenty-five (25) days after the date of the first

JA0554

Member's notice of withdrawal. Any notice to withdraw provided in accordance with this <u>Section 8.6</u> shall become effective as of the later of the date provided in such notice and the date such Member is permitted to withdraw in accordance with <u>Section 8.5</u> (the "<u>Governmental Action Withdrawal Date</u>").    Withdrawal under this <u>Section 8.6</u> shall be subject to the provisions of <u>Section 4.2</u>.

8.7    A Non-Jurisdictional Member, in its sole discretion, may immediately withdraw from this Agreement if it becomes apparent that the Non-Jurisdictional Member's engagement in activities under this Agreement or FERC's approval of this Agreement would (i) jeopardize the tax-exempt status of interest paid by the Non-Jurisdictional Member on outstanding debt obligations, (ii) render the Non-Jurisdictional Member a Public Utility subject to FERC's jurisdiction, or (iii) if the Non-Jurisdictional Member determines that any conflict exists between provisions of this Agreement and applicable Laws and regulations of the state of its creation, or rate schedules adopted by its governing body under state Law, in which case such state Laws, regulations, or rate schedules shall govern with respect to such Non-Jurisdictional Member.   The withdrawing Non-Jurisdictional Member may withdraw from this Agreement on this basis by providing written notice to all other Members and the Southeast EEM Administrator. Withdrawal under this <u>Section 8.7</u> shall be subject to the provisions of <u>Section 4.2</u>.

## ARTICLE 9

## RELEASE AND LIABILITY; NO FIDUCIARY DUTIES

9.1    Except as expressly set forth in <u>Section 14.2</u>, to the maximum extent permitted by applicable Law, each Member releases and discharges every other Member from any and all liability for any and all liabilities, claims, losses, damages, expenses and other claims whatsoever the releasing Member, its officers, directors, trustees, agents, employees, affiliates, successors or assigns (collectively "<u>Related Parties</u>") may have that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. In addition, to the maximum extent permitted by applicable Law (i) no Member shall be liable to any other Member or its Related Parties for any liabilities, damages, obligations, payments, losses, costs or expenses under this Agreement in any amount in excess of the actual compensatory damages suffered by such other Member or its Related Parties in connection with, or resulting from, the releasing Member's performance or non-performance of this Agreement, or any actions undertaken by the releasing Member in connection with or related to this Agreement, and (ii) each Member waives any right to recover from any other Member or its Related Parties incidental, punitive, exemplary, special, indirect, multiple or consequential damages (including attorneys' fees or litigation costs to recover the same and any claims arising from any loss of interchange sales or revenues, loss of profits, costs of substitute power, costs of additional operating expenses, or suits by third parties) in connection with, or resulting from, performance or non-performance of this Agreement, or any actions undertaken in connection with or related to this Agreement or that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. Notwithstanding the foregoing, however, no Member shall be released, discharged, indemnified or held harmless with respect to any liability for damages or other claims arising from any action or failure to act by that Member that is unlawful, undertaken in bad faith, grossly negligent or the product of willful misconduct. Nothing herein

shall release any Member from any obligation or liability it may have pursuant to any other agreement with any other Member.

9.2     EXCEPT FOR THE WARRANTIES AND REPRESENTATIONS SET FORTH IN ARTICLE 13 HEREOF, NONE OF THE MEMBERS, COLLECTIVELY OR INDIVIDUALLY, MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, TO ANY MEMBER, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.3     The provisions set forth in this Article 9 shall be given the maximum effect permitted by Law and shall indefinitely survive the termination or expiration of this Agreement with respect to any Member or Members.

9.4     No Fiduciary Duties.     Nothing in this Agreement should be construed or interpreted as creating a partnership by and among the Members. To the extent any Member attempts to construe this Agreement as evidence of a partnership or otherwise a basis for requiring certain implied duties and rights among the Members, notwithstanding any other provisions of this Agreement, or any other agreement, the Members covenant and agree not to prosecute, file or maintain any action, controversy, dispute, or proceeding, and do hereby expressly eliminate, waive, disclaim and release, any and all fiduciary duties of the Members that may arise pursuant to performance of their obligations or exercise of their rights pursuant to this Agreement, or that may arise pursuant to any other standard, to any Party herein, including, without limitation, its Members, and in the case of insolvency or the zone of insolvency, to creditors of any character or claim. This Agreement (including this provision) is not intended to, and shall not, create or impose any fiduciary duties on the Member or any other party for any purpose, without limitation.

9.5     No Implied Covenants. Each Member acknowledges and agrees that, and notwithstanding any other provisions of this Agreement or any other agreement contemplated herein or any applicable provisions of Law or equity or otherwise, no covenants, duties or obligations, whether express, implied, statutory or otherwise, including, without limitation, (i) the duty of good faith and fair dealing, (ii) the fiduciary duties of care, loyalty and obedience, shall apply to the acts, omissions, behavior or conduct of the Members, in any context, except for those covenants, duties and obligations expressly contained in this Agreement.

9.6     No Restriction on Competition of Members. Each of the Members agrees, severally and not jointly, that for the term of this Agreement, they are expressly permitted and authorized to directly or indirectly own, manage, operate, join, control and/or participate in the ownership, management, operation or control of, any business engaged in business or operations that compete or relate to, directly or indirectly, the business of the Southeast EEM System. The legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines shall not be applied to any such competitive venture or activity of a Member or its Affiliates. No Member or its Affiliates will have any obligation to the Southeast EEM System or the Southeast EEM System's other Members or Participants with respect to any opportunity relating to the Southeast EEM System or its business.

# ARTICLE 10

## TRANSPARENCY; CONFIDENTIALITY; AUDITING

10.1     Transparency; Confidentiality.

10.1.1    The decision and obligation to report quantities, prices, or other data regarding Energy Exchange transactions to either a Governmental Entity, a reputable index developer or a data hub will be the responsibility of each Seller and Buyer. Neither the Southeast EEM Administrator, nor the Southeast EEM Agent nor the Members shall be responsible for reporting Energy Exchange transactions made by other entities through the Southeast EEM System.

10.1.2    Except as provided in Appendix B, the identity of all Bidders, Offerors, Sellers and Buyers shall be kept confidential from all third party entities, other than the FERC, the Market Auditor, and the Southeast EEM Administrator except to the extent required by Law, regulation, or order.

10.1.3    The Southeast EEM Administrator shall post and maintain on the Southeast EEM System Interface: (i) a list of all Members and Participants and their contact information, (ii) the notice provisions provided in this Agreement as set forth in Section 16.8, (iii) the notice information of each Annual Meeting and Annual Member Meeting, including the date, place and time of such Annual Meeting and Annual Member Meeting, and (iv) a current description of the Territory.

10.1.4    The Southeast EEM Administrator shall prepare and post reports that would include data aggregated by the Southeast EEM System as set forth in Section V of the Southeast EEM Market Rules.

10.2     Auditing.

10.2.1    The Southeast EEM Agent will engage the Market Auditor to perform the auditing scope of work as set forth in Section VI of the Southeast EEM Market Rules.

10.2.2    The Market Auditor and Southeast EEM Administrator may share information related to the Southeast EEM on a confidential and reciprocal basis.

10.2.3    The Market Auditor has independent authority to prepare and submit any reports described herein without any prior review or approval by any Member or any other outside sources.

10.3      Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this Article 10 to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 11

### SOUTHEAST EEM MARKET RULES

11.1     Set out in <u>Appendix B</u> to this Agreement are the Southeast EEM Market Rules that shall govern the Bid, Offer and matching procedures of the Southeast EEM System and the reservation and tagging functions of the Southeast EEM System, as such appendix may be amended and revised from time to time by the Membership Board in accordance with <u>Section 4.1.9</u>.

11.2     The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to violate any reliability criteria, guideline, standard or requirement (hereafter referred to as "<u>Reliability Obligations</u>") of NERC, the applicable Balance Authority, and any other recognized region or subregion of NERC (including the SERC Reliability Corporation ("<u>SERC</u>")), including any successors to NERC or SERC, or applicable state or federal Reliability Obligations, to the extent any such Reliability Obligations are applicable to a Member. Each Member shall participate in the Southeast EEM System in a manner that conforms to all Reliability Obligations as may be applicable to it. The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to engage in conduct not consistent with Good Utility Practice.

11.3     The Operating Committee shall establish rules and procedures, including appropriate audit procedures, under which any Member may request a determination of whether the hardware, software, management, or operation of, or Member participation in, the Southeast EEM System, as they may affect the requesting Member, comply with all rules, guidelines, requirements and other standards for the Southeast EEM System as set forth in the Southeast EEM Market Rules in <u>Appendix B</u>. The Operating Committee, in a manner consistent with all applicable provisions of this Agreement, may make recommendations to the Membership Board to apportion the costs of making revisions or modifications to the Southeast EEM System.

## ARTICLE 12

### DISPUTE RESOLUTION

12.1     Any dispute between two (2) or more Members arising under this Agreement shall first be referred to a designated senior representative of each of the Members involved in such dispute for resolution on an informal basis as promptly as practicable. Such designated senior representatives shall meet, negotiate and attempt in good faith to resolve the dispute quickly, informally, and inexpensively. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days (or other such period as the Parties may agree upon) by mutual agreement, such dispute within ten (10) Business Days shall be submitted to a mediator and resolved in accordance with the mediation procedures set forth below.

12.2     Following the procedures set forth in <u>Section 12.1</u>, any dispute between two (2) or more Members arising under this Agreement shall be subject to non-binding mediation prior to the initiation of judicial, mutually agreed upon arbitration, or other dispute resolution

proceedings, unless the Parties to the dispute mutually shall determine from the nature of the dispute, the positions of the Parties, and other relevant facts and circumstances that mediation will not lead to resolution of the dispute.  The Parties to any such dispute shall select a mediator to assist in the resolution of their dispute. The mediator shall (i) be knowledgeable in the subject matter of the dispute and (ii) have no official, financial, or personal conflict of interest with respect to the issues in controversy, unless the interest is fully disclosed in writing to all participants and all participants waive in writing any objection to the interest.

12.3     The disputing Parties shall attempt in good faith to resolve their dispute in accordance with the procedures and timetable established by the mediator. In furtherance of the mediation efforts, the mediator may:

12.3.1   Require the Parties to meet for face-to-face discussions, with or without the mediator;

12.3.2   Act as an intermediary between the disputing Parties;

12.3.3   Require the disputing Parties to submit written statements of issues and positions; and

12.3.4   If requested by the disputing Parties, provide a written recommendation on resolution of the dispute.

12.4     If a resolution of the dispute is not reached by the thirtieth (30th) day after the appointment of the mediator or such later date as may be agreed to by the Parties, the mediator shall promptly provide the disputing Parties with a written, confidential, non-binding recommendation on resolution of the dispute, including the mediator's assessment of the merits of the principal positions being advanced by each of the disputing Parties. At a time and place specified by the mediator after delivery of the foregoing recommendation, but no later than fifteen (15) days after issuance of the mediator's recommendation, the disputing Parties shall meet in a good faith attempt to resolve the dispute in light of the mediator's recommendation. Each disputing Party shall be represented at the meeting by a person with authority to settle the dispute, along with such other persons as each disputing Party shall deem appropriate. If the disputing Parties are unable to resolve the dispute at or in connection with this meeting, then: (i) any disputing Party may commence such judicial, mutually agreed upon arbitration, or other dispute resolution proceedings as may be appropriate; and (ii) the recommendation of the mediator shall have no further force or effect, and shall not be admissible for any purpose in any subsequent arbitral, judicial, or other dispute resolution proceeding.

12.5     The costs of the time, expenses, and other charges of the mediator and of the mediation process shall be borne by the Parties to the dispute, with each side in a mediated matter bearing equal costs. Each Party shall bear its own costs and attorney's fees incurred in connection with any mediation under this Agreement.

## ARTICLE 13

## REPRESENTATIONS AND WARRANTIES

13.1     Each Member represents and warrants to each other Member that on the date it executes this Agreement and throughout the term of this Agreement, the following representations and warranties are, and will continue to be, true and correct in all material respects:

13.1.1   it is duly organized, validity existing and in good standing under the Laws of the state of its incorporation or organization;

13.1.2   it will at all times comply with the provisions of this Agreement and all Exhibits and Appendices hereto, each as amended from time to time;

13.1.3   it has all requisite corporate or other organizational power to carry on its business as contemplated by this Agreement;

13.1.4   except for the authorizations and approvals described in Article 8 of this Agreement, it has all authorizations from Governmental Entities necessary for it to legally perform its obligations under this Agreement;

13.1.5   the execution, delivery and performance of this Agreement and any other documentation it is required to deliver under this Agreement are within its powers, have been duly authorized by all necessary action, and do not violate any of the terms or conditions in its governing documents, any contract or other agreement to which it is a party or any Law applicable to it;

13.1.6   the individual(s) executing and delivering this Agreement and any other documentation required to be delivered under this Agreement on behalf of such Member are duly empowered and authorized to do so at the time of such execution and delivery;

13.1.7   this Agreement has been duly and validly executed and delivered by such Member and constitutes such Member's legal, valid and binding obligation; and

13.1.8   all information that has been provided by or on behalf of a Member pursuant to this Agreement, is true and correct in all material respects. Each Member further covenants that all information provided to the Operating Committee, the Market Auditor, the Southeast EEM Agent or the Southeast EEM Administrator by or on behalf of such Member pursuant to this Agreement, subsequent to the date hereof, shall be true and correct in all material respects.

## ARTICLE 14

## DEFAULTS

14.1     A Member shall be in default in payment when payment is not made in accordance with the billing procedures established under this Agreement within ten (10) Business Days after its final due date. A default by any Member in its payment obligations under this

JA0560

Agreement shall be cured by payment of all overdue amounts together with interest accrued at the Interest Rate, prorated daily from the due date to the date the payment curing the default is made.

14.2    Notwithstanding Article 9, a defaulting Member shall be liable to the non-defaulting Members for all costs, including costs of collection and reasonable attorney fees incurred by such non-defaulting Members, plus interest at the Interest Rate. The proceeds paid by a defaulting Member to remedy any such default shall be distributed as directed by the Membership Board to the non-defaulting Members in proportion to the additional costs and expenses actually paid by the non-defaulting Members as a result of the default.

14.3    The rights of a Member who is in default of any of its payment or other material obligations herein may be terminated by the Membership Board. This provision allowing the non-defaulting Members to terminate such rights is in addition to any other remedies provided in this Agreement, at Law, or in equity, and shall in no way limit the non-defaulting Members' ability to seek judicial enforcement of the defaulting Member's obligations under this Agreement. Upon the effective date of such termination of rights, all rights of the defaulting Member and all obligations of non-defaulting Members to the defaulting Member imposed by this Agreement, except (i) payment obligations, (ii), the indemnification obligations set forth in Section 6.5, (iii) the release and other obligations set forth in Article 9, (iv) the confidentiality obligations set forth in Article 10 and Article 15, and (v) the obligations set forth in Section 16.9 and Section 16.14, shall immediately be terminated, except that no such termination shall impact Enabling Agreements any such Member is a party to.

14.4    Upon termination of the rights of a defaulting Member under this Agreement, the Operating Committee shall review responsibility and cost allocations of the non-defaulting Members and make adjustments thereto as it deems necessary.

## ARTICLE 15

## CONFIDENTIALITY

15.1    Any information provided by a Member to any other Member pursuant to this Agreement that is labeled "Confidential" shall be used by the receiving Member solely in connection with the purposes of this Agreement and shall not be disclosed by the receiving Member to any third party, except with the providing Member's consent, and upon request of the providing Member shall be returned thereto. Notwithstanding the above, a Member may disclose any such information to third parties as may be necessary for such Member to perform its obligations under this Agreement (including, but not limited to, the Member's employees, officers, directors, trustees, attorneys and other consultants). To the extent that such disclosures are necessary, the Members shall endeavor in disclosing any such information to seek to preserve the confidentiality of such information. This provision shall not prevent any Member from providing any confidential information received from any other Member to any court or governmental body to enforce its rights or perform its obligations hereunder or as may otherwise be required by such court or body or by Law, provided that, to the extent required, if feasible, the disclosing Member shall have given prior notice to the Member that provided such information of such required disclosure and, if so requested by such other Member, shall have used all reasonable efforts to oppose the requested disclosures, if appropriate under the circumstances, or

to otherwise make such disclosure pursuant to a protective order or other similar arrangement for confidentiality. Without limiting the scope of the foregoing, the Members shall use all reasonable efforts to maintain the confidentiality of any confidential information in any filings with, or submissions to, any governmental or regulatory authorities. Information shall not be considered confidential for purposes of this Article 15 if the Member receiving such information from another Member can demonstrate by competent documentary evidence that such information: (a) was rightfully in the possession of the receiving Member prior to its disclosure to the receiving Member by the disclosing Member; (b) was in the public domain prior to its disclosure by the disclosing Member to the receiving Member; (c) came into the public domain, by publication or otherwise, through no direct or indirect act or omission of the receiving Member, subsequent to its disclosure by the disclosing Member to the receiving Member; or (d) was supplied to the receiving Member by a third party having the legal right to disclose it to the receiving Member, but only if the third party does not owe a duty of confidentiality to the disclosing Member with respect to such information.

15.2    Any information provided by a Member to a mediator or arbitrator pursuant to this Agreement that is labeled "Confidential" shall be subject to the provisions of this Article 15. For such purposes, any mediation or arbitration arranged pursuant to Article 12 of this Agreement shall provide for such mediator or arbitrator to comply with the provisions applicable to a Member receiving Confidential information from another Member.

15.3    Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this Article 15 to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 16

## MISCELLANEOUS

16.1    "Public Utility" Status of Members. Certain Members are not Public Utilities. Nothing in this Agreement is intended to subject such Members to FERC jurisdiction as Public Utilities, and Members that are not Public Utilities shall not be required to take any action or participate in any filing or appeal that would confer FERC jurisdiction over such Members that does not otherwise exist.

16.2    Transfer of Interest in Agreement. No voluntary transfer of interest, rights, or obligations of any Member under this Agreement shall be made without the written consent and approval of all other Members except to a successor in operation of all or substantially all of its electric utility assets. Written approval when required shall not be unreasonably withheld. Any successor or assignee of the rights of any Member, whether by voluntary transfer, judicial or foreclosure sale or otherwise, shall be subject to all the provisions and conditions of this Agreement, to the same extent as though such successor or assignee were the original Member hereunder, and no assignment or transfer of any rights hereunder shall be effective unless and until the assignee or transferee agrees in writing to assume all of the obligations of the assignor or transferor and to be bound by all of the provisions and conditions of this Agreement; provided, that the execution of a mortgage or trust deed or a judicial or foreclosure sale made thereunder, or if through the disposition by the Administrator of the RUS, shall not be deemed a voluntary

JA0562

transfer within the meaning of this <u>Section 16.2</u>. If, due to reorganization, sale/purchase, or other means, a Member no longer owns or operates generation or has load obligation in the Territory, its membership(s) will be evaluated by the Operating Committee and any appropriate change in representation will be subject to approval of the Operating Committee.

16.3     <u>Relationship of Parties</u>.

16.3.1   Nothing contained herein shall be construed to create an association, joint venture, trust, or partnership, or impose a trust, partnership, covenant, obligation, or liability on or with regard to any one or more of the Parties. Each Party shall be individually responsible for its own covenants, obligations, and liabilities under this Agreement.

16.3.2   All rights of the Parties are several, not joint. No Party shall be under the control of or shall be deemed to control another Party. Except as expressly provided in this Agreement, no Party shall have a right or power to bind another Party without its express written consent.

16.4     <u>Third Party Beneficiaries</u>.   This Agreement shall not be construed to create rights in, or to grant remedies to, any third party as a beneficiary of this Agreement, or of any duty, obligation or undertaking established herein. No party not a signatory hereto shall be entitled to enforce this Agreement against any person or entity.

16.4.1   <u>No Reliance Interest on Non-Firm Energy Exchange Transmission Service.</u>   Notwithstanding anything to the contrary in this Agreement, Non-Firm Energy Exchange Transmission Service over a Participating Transmission Provider's transmission system shall only be offered to the extent of that Participating Transmission Provider's participation in the Southeast EEM, and only for that purpose.   For the avoidance of doubt, owing to the voluntary nature of a Member's participation in this Agreement, membership in this Agreement shall not give rise to any third-party expectation or reliance interest on the availability of Non-Firm Energy Exchange Transmission Service upon the withdrawal of a Member.

16.5     <u>No Dedication of Facilities</u>.   Any undertaking by one Party to another Party under any provision of this Agreement shall not constitute the dedication of the Southeast EEM System or any portion thereof of the undertaking Party to the public or to the other Party, and it is understood and agreed that any such undertaking by a Party shall cease upon the termination of such Party's obligations under this Agreement.

16.6     <u>Other Agreements</u>.   No provision of this Agreement shall preclude a Member from entering into other agreements or conducting transactions under existing agreements (including where applicable any Enabling Agreements) with other Members, Participants or Additional Members. This Agreement shall not be deemed to modify or change any rights or obligations under any prior contracts or agreements between or among any of the Members.

16.7     <u>Further Assurances</u>.   The Parties to this Agreement hereby agree to provide all other information, execute and deliver any further instruments or documents, and take or forbear from any further acts that may be reasonably required or useful to carry out the intent and purpose of this Agreement, provided that such requirements are consistent with the express terms of this Agreement and all applicable Laws and regulations, and in the case of confidential information

subject to Article 15 of this Agreement. Without limiting the scope of the foregoing, each Member shall, subject to the confidentiality provisions set forth in Article 15, provide the Membership Board with any information that is reasonably necessary to operate the Southeast EEM System or for the Operating Committee or the Southeast EEM Administrator to implement any provisions of this Agreement, or any other business related to the development or the operation of the Southeast EEM System.

16.8    Notices. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be (i) delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such recipient as recorded in the Secretary's records, and (ii) delivered in person, by nationally recognized overnight courier service, or by first class mail, certified or registered, postage prepaid, to the addresses of the Members set forth in Exhibit A hereto. Any Member may change its address by giving notice in writing stating its new address to the Southeast EEM Administrator and the Secretary, and the Secretary shall promptly update Exhibit A accordingly.   Any notice, demand or other communication shall be deemed given and effective as of the date of delivery in person or upon receipt as set forth on the return receipt if delivered by certified or registered mail or by overnight courier service. The inability to deliver because of changed address of which no notice was given, or the rejection or other refusal to accept any notice, demand or other communication, shall be deemed to be receipt of the notice, demand or other communication as of the date of such inability to deliver or the rejection or refusal to accept.

16.9    Amendments. Except as otherwise provided in the following two sentences, this Agreement, including each of the Exhibits and Appendices hereto, may be modified or amended in the manner set forth in this Section 16.9, Article 4, and Article 8. In accordance with Article 3 of this Agreement, an entity that meets the criteria for qualification and admission as a Member, as determined by the Membership Board, may become an Additional Member and a Party to this Agreement by executing this Agreement or a Joinder hereto, and upon payment of all applicable fees, dues and contributions so specified or authorized in this Agreement, the Secretary shall revise, or cause to be revised, Exhibit A to include such Additional Member. The Parties hereby stipulate and agree that this Agreement was entered into as a result of arm's-length negotiations between the Parties.   Further, the Parties believe that the terms and conditions of this Agreement are just and reasonable and shall remain so over the life of the Agreement.   The Parties waive all rights to challenge the validity of this Agreement or whether it is just and reasonable for and with respect to the entire term, and hereby agree to make no filings with any Governmental Entity challenging the terms and conditions of this Agreement as to whether they are just and reasonable or in the public interest.   The Parties hereby further stipulate and agree that no Party may bring or support any action, proceeding or complaint seeking to modify, cancel, suspend, or abrogate the terms and conditions of this Agreement.   Absent an amendment to this Agreement pursuant to Section 4.1.9, Article 4 and Article 8 approving the proposed change, the standard of review for changes to any portion of this Agreement proposed by a non-Party, or FERC acting *sua sponte*, shall be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event shall be lower than the "public interest" standard of review set forth in *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

JA0564

16.10 <u>Headings</u>. Section headings used in this Agreement are for convenience and reference only and are not to be considered in construing the terms of this Agreement.

16.11 <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to its conflict of laws principles or rules.

16.12 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof. This Agreement supersedes all prior agreements and oral understandings among the Members with respect to such matters.

16.13 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument, binding upon all Parties hereto, notwithstanding that all of such Parties may not have executed the same counterpart.

16.14 <u>WAIVER OF JURY TRIAL</u>. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH MEMBER WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:_____

Member: _____

By:        _____

Name:    _____

Title:     _____

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By:        _____

Name:    _____

Title:     Record Content Description, Tariff Record
Title, Record Version Number, Option Code:
 Exhibit A, Names and Addresses of the Members,
0.0.0, A
Record Narative Name:
Tariff Record ID: 2059
Tariff Record Collation Value: 167870464     Tariff
Record Parent Identifier: 2056
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

## <u>EXHIBIT A</u>

## <u>NAMES AND ADDRESSES OF THE MEMBERS</u>

**Alabama Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Associated Electric Cooperative, Inc.**
2814 S. Golden
PO Box 754

Springfield, MO 65807

**Dalton Utilities**
1200 VD Parrott, Jr. Parkway
PO Box 869
Dalton, GA 30722

**Dominion Energy South Carolina, Inc.**
220 Operation Way, MC C222
Cayce, SC 29033

**Duke Energy Carolinas, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Duke Energy Progress, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Georgia Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Georgia System Operations Corporation**
2100 East Exchange Place
Tucker, GA 30084

**Georgia Transmission Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**Kentucky Utilities Company**
One Quality Street
Lexington, KY 40507

**Louisville Gas and Electric Company**
220 West Main Street
Louisville, KY 40202

**MEAG Power**
1470 Riveredge Pwky., NW
Atlanta, GA 30328

**Mississippi Power Company**
30 Ivan Allen Jr. Blvd. NW

JA0567

Atlanta, GA 30308

**North Carolina Electric Membership Corporation**
3400 Sumner Blvd.
Raleigh, NC 27616

**North Carolina Municipal Power Agency No. 1**
1427 Meadow Wood Blvd.
Raleigh, NC 27604

**Oglethorpe Power Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**PowerSouth Energy Cooperative**
2027 East Three Notch Street
Andalusia, AL 36421

**Santee Cooper**
One Riverwood Avenue
Moncks Corner, SC 29461

**Tennessee Valley Authority**
400 West Summit Hill Drive, WT 6A-K
Knoxville, Tennessee 37902

Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 Exhibit B, Form of Joinder Agreement, 0.0.0, A
Record Narative Name:
Tariff Record ID: 2060
Tariff Record Collation Value: 167903232     Tariff
Record Parent Identifier: 2056
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

<u>**EXHIBIT B**</u>

<u>**FORM OF JOINDER AGREEMENT**</u>

**JOINDER AGREEMENT**

Reference is made to the Southeast

JA0568

Energy Exchange Market Agreement, dated as of December 28, 2020, as the same may be amended from time to time (the "Southeast EEM Agreement"), by and among the entities listed on Exhibit A thereto.   Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Southeast EEM Agreement.

The undersigned hereby agrees to become a Member of the Southeast EEM and be bound by the terms of the Southeast EEM Agreement as if an original party thereto. The Membership Board hereby consents to the addition of the undersigned as a Member of the Southeast EEM and as party to the Southeast EEM Agreement as if an original party thereto. A duly executed copy of this Joinder Agreement shall be delivered to the Secretary and the Southeast EEM Administrator.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed as of the date set forth below.

Date: _____ ___, 20__

[NAME OF JOINING MEMBER],
A [Jurisdiction] [Entity Type]

By: _____

Name: _____
_____

Title: _____

ACKNOWLEDGED AND ACCEPTED:

JA0569

By: _____

Name: _____
_____

Title: Secretary, Membership Board

Record Content Description, Tariff Record Title, Record
Version Number, Option Code:
 Appendix A, Form of Participation Agreement, 0.0.0, A
Record Narative Name:
Tariff Record ID: 2061
Tariff Record Collation Value: 167936000     Tariff
Record Parent Identifier: 2056
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

## APPENDIX A

## FORM OF PARTICIPANT AGREEMENT

1.0     This Participant Agreement ("Agreement"), dated as of _____, is entered into, by and between [INSERT NAME OF ENTITY], the Southeast EEM Agent acting in its capacity as the agent of the Members of the Southeast Energy Exchange Market ("Southeast                     EEM") and_____

JA0570

("<u>Participant</u>").

2.0    The Participant and Southeast EEM agree that this Agreement shall incorporate, in their entirety, <u>Appendix B</u> to the Southeast EEM Agreement ("<u>Southeast EEM Market Rules</u>"), designated as Alabama Power Company's Market Based Rate Tariff, Rate Schedule No. 1011, Southeast EEM Agreement, and the Southeast EEM Manuals.  Any term not defined herein shall have the meaning ascribed to it in the Southeast EEM Market Rules.  In the event of any conflict between this Agreement and the Southeast EEM Market Rules, the Southeast EEM Market Rules shall control.

3.0    The Participant has submitted an application for participation in the Southeast EEM and has been

determined by the Southeast EEM to meet all requirements of being a Participant as defined in the Southeast EEM Market Rules. The Participant warrants that all information submitted in the application is true and accurate.

4.0     The Participant agrees to be bound by and accepts all of the terms of the Southeast EEM Market Rules and the Southeast EEM Manuals, as both may be amended from time to time. Any amendments to the Southeast EEM Market Rules or the Southeast EEM Manuals are automatically and without further action incorporated into this Agreement.

5.0     The Southeast EEM agrees that Participant shall be deemed a "Participant" under the terms of the Southeast EEM Market Rules, with all rights of participation and access

JA0572

to the Southeast EEM System afforded Participants under the Southeast EEM Market Rules.

6.0   The Participant shall supply the Southeast EEM Administrator with any and all information deemed reasonably necessary for the administration of the Southeast EEM System.

7.0   Either Party can assign or transfer any or all of its rights and/or obligations under this Agreement upon thirty (30) days written notice. Any such transfer or assignment shall be conditioned upon the successor in interest accepting the rights and/or obligations under this Agreement as if said successor in interest was an original Party to this Agreement.

8.0   An event of "<u>Force Majeure</u>" means

any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, pandemic, epidemic, breakage or accident to machinery or equipment, any curtailment, order, regulation or restriction imposed by governmental military or lawfully established civilian authorities or any other cause beyond a Party's control. A Force Majeure event does not include an act of negligence or intentional wrongdoing. Neither the Southeast EEM Agent, the Southeast EEM, the Members, nor the Participant will be considered in default as to any obligation under this Agreement if prevented from fulfilling the obligation due to an event of Force Majeure. However, a Party whose performance under this Agreement is hindered by an event

of Force Majeure shall make all reasonable efforts to perform its obligations under this Agreement.

9.0    The Participant shall at all times indemnify, defend, and save the Southeast EEM System, the Southeast EEM Agent and the Southeast EEM Administrator harmless from, any and all damages, losses, claims, including claims and actions relating to demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from the Southeast EEM Agent's or Southeast EEM Administrator's, as applicable, performance of its obligations under this Agreement and the Southeast EEM Market Rules, except in cases of negligence or intentional wrongdoing by the

Southeast EEM Agent or Southeast EEM Administrator, as applicable.

10.0     This Agreement shall be deemed to be a contract made under, and for all purposes shall be governed by and construed in accordance with, the laws of the State of Delaware.

11.0     This Agreement shall be effective upon execution by both parties and shall remain in full force and effect until terminated pursuant to Sections 12 or 13 of this Agreement.

12.0     The Southeast EEM may terminate this Agreement by providing written notice of termination to the Participant in the event the Participant commits a material violation of its obligations under the terms of the Southeast EEM Market Rules which, if capable of being remedied, is not remedied within

JA0576

thirty (30) days after the date the Southeast EEM has given the Participant written notice of the violation, unless excused by reason of Force Majeure as provided in Section 8 of this Agreement.

13.0    The Participant may terminate this Agreement upon thirty (30) days written notice to the Southeast EEM.

14.0    Upon termination of this Agreement for any reason, Participant shall not have access to the Southeast EEM System, nor be entitled to submit Bids or Offers thereunder.

15.0    This Agreement may be executed in one or more counterparts at different times, each of which shall be regarded as an original and all of which, taken together, shall constitute one and the same

Agreement.

16.0    Any notice or request made to either
of the Parties to this Agreement
shall be made to the following
representatives:

<u>Southeast EEM</u>

<u>Participant</u>

Title:

_____

_____

Address:

_____

_____

_____

_____

**IN WITNESS WHEREOF**, the

JA0578

Parties have caused this Agreement to be

executed by their respective authorized

officials.

<u>Southeast EEM</u>

<u>Participant</u>

By: _____

Name: _____

Title: _____

Date: _____

Record Content Description, Tariff Record Title, Record
Version Number, Option Code:
 Appendix B, Southeast EEM Market Rules, 0.0.0, A
Record Narative Name:
Tariff Record ID: 2062
Tariff Record Collation Value: 167968768     Tariff
Record Parent Identifier: 2056
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

**<u>SOUTHEAST EEM MARKET RULES</u>**

**I.      <u>INTRODUCTION          AND</u>**

JA0579

## APPLICABILITY.

Set forth below are the rules governing: 1) Participation in the Southeast EEM; 2) Bidding, Offering, and matching procedures for Energy Exchanges arranged through the Southeast EEM System, 3) Southeast EEM System data reporting, and 4) the processes for auditing Energy Exchanges and the hardware, software, management and operation of the Southeast EEM System. This Appendix B is subject to the terms and conditions of the Agreement. In the event of a conflict between the terms of the Agreement and the terms of this Appendix B, the terms of the Agreement shall control.

## II.     DEFINITIONS.

The following terms shall be defined as indicated for the purposes of this Appendix B. Definitions and terms expressed in the singular shall include the plural and *vice versa*. Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

"Agreement" means the Southeast Energy Exchange Market Agreement By and Among the Members of the Southeast EEM to which this Appendix B is appended.

"Balancing Authority" means the responsible entity that integrates resource plans ahead of time, maintains demand and resource balance within a Balancing Authority Area, and supports interconnection frequency in real time.

"Balancing Authority Area" means the collection of generation, transmission and loads within the metered boundaries of the Balancing Authority. The Balancing Authority maintains load-resource balance

JA0580

within this area.

"<u>Bid</u>" means a voluntary submission containing the required Bid Information to purchase a certain amount of Non-Firm Energy (set forth in MW).

"<u>Bid Information</u>" means the information applicable to Bids set forth in Section IV.B.3.

"<u>Bid Price</u>" means the price, in $/MWh for the amount of Non-Firm Energy submitted in a Bid. This represents the maximum price that the Bidder is willing to pay.

"<u>Bidder</u>" means a Participant who submits a Bid into the Southeast EEM System.

"<u>Buyer</u>" means a Bidder that has been matched with an Offeror for an Energy Exchange through the Southeast EEM System.

"<u>Clock Hour</u>" means the sixty-minute period ending at :00.

"<u>Company System Administrator</u>" has the meaning set forth in Section VI.B.2.

"<u>Contract Path</u>" means the continuous transmission path for the flow of Non-Firm Energy between the Participants reserved for an Energy Exchange using the transaction matching, reservation and tagging functions of the Southeast EEM System.

"<u>Delivery Interval</u>" means a fifteen (15) minute period in which Non-Firm Energy is intended to be delivered by a Seller to its matched Buyer(s).

"<u>Energy Exchange</u>" means a transaction for the purchase and sale of Non-Firm Energy in the Southeast EEM

between Buyers and Sellers pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Rules.

"<u>Electronic Tag</u>" or "<u>e-Tag</u>" means the primary method for coordination of Interchange Schedules or Energy Schedules where Energy is transferred between Balancing Authority Areas and coordination required between multiple entities. Various entities can communicate important information pertaining to the Interchange transaction to each other via the internet using computer applications, which are based on the e-Tag specifications and schema maintained by the North American Energy Standards Board ("NAESB").

"<u>Energy Exchange Notification</u>" means the notice provided to Bidders and Offerors who were matched for an Energy Exchange by the Southeast EEM Algorithm; to be automatically generated by the Southeast EEM System and provided before the start of a Delivery Interval; and to include data on the matched Energy Exchange including Buyer, Seller, price, amount of Non-Firm Energy, Source, Sink, delivery location, applicable Delivery Interval, and other any other necessary data for Participants to record the transaction.

"<u>Energy Exchange Price</u>" means the price, in $/MWh, calculated by the Southeast EEM Algorithm for a specific Energy Exchange.

"<u>FERC</u>" means the Federal Energy Regulatory Commission.

"<u>Good Utility Practice</u>" means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of

reasonable judgment and in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice does not require the optimum practice, method, or act to the exclusion of all others, but rather is intended to include acceptable practices, methods, or acts generally accepted in the SERC Reliability Corporation region.

"Losses" means the total cost of the electrical energy lost in the transmission of electrical energy from a Source to a Sink based on the real power loss factor (%) ("Loss Factor") and loss rate ($/MWh) ("Loss Rate") of each Participating Transmission Provider on the Energy Exchange's Contract Path.

"NAESB Electric Industry Registry" or "NAESB EIR" means thea central registry and repository of information required for commercial transactions that is maintained by NAESB.

"Network Map" means the computer-based representation of all Participating Transmission Provider service service territories, Balancing Authorities, valid transmission paths (Point of Receipt – Point of Delivery combinations), Sources, and Sinks.

"Non-Firm Energy" means a product for which delivery or receipt of the energy may be interrupted for any reason or no reason, without liability on the part of either buyer or seller.

"Non-Firm Energy Exchange Transmission Service" means transmission service provided by a transmission provider, pursuant to its Tariff, that has the following characteristics: (i) it is non-firm

transmission service with the lowest curtailment priority, provided solely on an as-available basis for 15-minute Energy Exchanges, after taking into account other higher priority uses and the limitations of the transmission system of the Participating Transmission Provider; (ii) it is available solely for Energy Exchanges; (iii) it is identified and offered in the Tariff as "Non-Firm Energy Exchange Transmission Service;" (iv) the charge for such service, and related Schedule 1 and Schedule 2 (or equivalent) ancillary services, is $0/MWh; (v) the charge for financial losses is based on the methodology established in the Participating Transmission Provider's Tariff; (vi) the service must be obtained by a Participant using the transaction matching, reservation and tagging functions of the Southeast EEM System, rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by a Participating Transmission Provider; (vii) the service may not be reassigned, redirected, or sold by the transmission customer; (viii) in combination with the other Participating Transmission Providers' provisions of Non-Firm Energy Exchange Transmission Service, the service allows for a continuous Contract Path for Energy Exchanges; and (ix) the Participating Transmission Provider is required to provide the information specified in and as required by Section IV.A.2 of the Southeast EEM Market Rules to the Southeast EEM System. For the avoidance of doubt, nothing in this Agreement shall obligate any Participating Transmission Provider to (a) plan, construct, or maintain its transmission system for the benefit of any Participant; (b) provide Non-Firm Energy Exchange Transmission Service in a manner that is contrary to the terms of the Participating

JA0584

Transmission Provider's Tariff, or contrary to Good Utility Practice, each as determined in the sole judgment of the Participating Transmission Provider; (c) provide Non-Firm Energy Exchange Transmission Service following termination of its Southeast EEM Member status; (d) provide Non-Firm Energy Exchange Transmission Service to a non - Participant; or (e) file its Tariff with FERC if the Tariff is not already required to be filed with FERC.

"OASIS" means an Open Access Same-Time Information System that conforms to the requirements of Part 37 of the FERC's regulations, 18 CFR §§ 37.1, et seq.

"OATI webRegistry" means the system developed by Open Access Technology International, Inc. to perform the NAESB EIR functions.

"Offer" means a voluntary submission containing the required Offer Information to sell a certain amount of Non-Firm Energy (set forth in MW).

"Offer Price" means the price, in $/MWh for the amount of Non-Firm Energy offered in an Offer. This represents the minimum price that the Offeror is willing to collect to sell.

"Offer Information" means the information applicable to Offers set forth in Section IV.B.3, as well as other information that may be required by the Southeast EEM Administrator.

"Offeror" means a Participant who submits an Offer into the Southeast EEM System.

"Participant Profile" means that information identified in Section IV.A.1., Section IV.C.6., and such other information

JA0585

requested by the Southeast EEM System Interface to assist in the creation of Energy Exchanges.

"Participant" means an entity that meets the requirements set forth in Section III of this Appendix B.

"Participant Specific Constraints" has the meaning set forth in Section IV.A.1.b. and IV.C.5.

"Seller" means an Offeror that has been matched with a Buyer through the Southeast EEM System.

"Sink" means a pre-approved and validated OATI webRegistry sink point.

"Source" means a pre-approved and validated OATI webRegistry source point.

"Southeast EEM Algorithm" means the mathematical equations that determine the matching Bids and Offers resulting in Energy Exchanges.

"Southeast EEM System Interface" means the graphical user interface ("GUI") and application programming interfaces ("API") used by the Southeast EEM System that meet the Southeast EEM System requirements developed by the Southeast EEM Administrator and the Operating Committee.

"Southeast EEM Manuals" means the instructions, rules, procedures and guidelines established by the Operating Committee for the Southeast EEM.

"System Administrators" means, collectively, the Southeast EEM Administrator and Company System Administrators.

## III.    PARTICIPATION

**A.**    Any entity that meets the requirements of this Section III may become a Participant.

**B.**    A Participant must:

    **1.**    Own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory;

    **2.**    Execute a Participant Agreement in the form attached to the Agreement as Appendix A (the "Participant Agreement") which agreement shall, among other things, contractually bind such entity to comply with the rules set forth in this Appendix B;

    **3.**    Deliver the executed Participant Agreement to the Secretary and the Southeast EEM Administrator, which shall become effective when countersigned by the Southeast EEM Agent at the direction of the Operating Committee;

    **4.**    Execute and deliver a Non-Firm Energy

JA0587

Exchange Transmission Service Agreement with each Participating Transmission Provider who requires delivery of such agreement, or otherwise have access to Non-Firm Energy Exchange Transmission Service from each Participating Transmission Provider; and

5. Have or enter into an Enabling Agreement with at least three (3) or more Participants.

## IV. BIDS/OFFERS AND MATCHING PROCEDURES.

### A. Pre-Bid/Offer Information Requirements.

1. Information Submitted by Participants.

a. Prior to being permitted to submit Bids or Offers, each Participant shall provide the Southeast EEM all required information in its Participant Profile. Participants are

responsible for providing accurate information to the Southeast EEM System in its Participant Profile, as well as submitting any updates or modifications to the Southeast EEM Administrator to maintain the accuracy of Participant's Profile.

b.      Participant-Specific Constraints.

i.      Prior to being permitted to submit Bids or Offers, each Participant shall provide to the Southeast

EEM in its Participant Profile, any constraints the Southeast EEM Algorithm must take into account in matching Bids or Offers from such Participant ("Participant-Specific Constraints"). Participant-Specific Constraints can be either counterparty specific or

geographic.

ii. Offers from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific Constraints are set such that there are at least three other non-affiliated Participants with whom the submitting Participant can be matched for

an Energy Exchange as a Seller, and Bids from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific Constraints are set such that there are at least three (3) other non-affiliated Participants with whom the

submitting Participant can be matched for an Energy Exchange as a Buyer.

iii.

Participants shall not be required to provide a reason for any Participant-Specific Constraint. The reason for such constraints could be, but is not limited to, the follow

ing:

(a)

i
p
a
r
t
;

(b)

(
o
u
r
t
e
r
p
a
r
t
y

i
s
s
u
e
s

(
e
.
g
.
,

o
r
e
c
i
t
)
;

(c)

(d)

c
r
s

a
r
c

r
e
l
a
t
e
c

r
e
g
u
l
a
t
o
r
y

r
e
c
u
i
r
e
r
e
r
t
s
.

**c.** Prior to being permitted to submit Bids or Offers,

each Participant must affirm that it has executed Service Agreements for Non-Firm Energy Exchange Transmission Service with each Participating Transmission Provider that requires delivery of such agreement or that it otherwise has access to Non-Firm Energy Exchange Transmission Service as to each Participating Transmission Provider through such Participating Transmission Provider's Tariff.

2. Prior to being permitted to provide Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall provide sufficient

information to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM Territory for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges.

3. Participant shall supply the Southeast EEM Administrator with any and all information the Operating Committee deems reasonably necessary for the administration of the Southeast EEM System.

**B. Bids and Offers.**

1. Delivery Intervals. Each Clock Hour will consist of four (4) Delivery Intervals:

xx:00 to xx:15;

xx:15 to xx:30;

xx:30 to xx:45; and

xx:45 to xx:00 of the next Clock Hour.

2. Deadlines.

a. For each Clock Hour, every Participating Transmission

Provider's available capacity for NFEETS must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of such next Clock Hour. To the extent a Participating Transmission Provider can update its available capacity for NFEETS within a Clock Hour, such updated information must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of the applicable Delivery Interval.

b.  Each Participating Transmission

Provider's Loss Factor and Loss Rate must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes prior to the Clock Hour for which the Loss Factor and Loss Rate are to apply. If the Participating Transmission Provider does not update its Loss Factor and Loss Rate, the values for the prior Clock Hour will apply.

c.     Bid and Offers must be submitted through the Southeast EEM System Interface not earlier than seven (7) days prior to the applicable Delivery Interval and not later than fifteen (15) minutes prior

to the Delivery Interval for which they are submitted. Participants may modify or cancel previously submitted Bids or Offers at any time before 15 minutes prior to the upcoming Delivery Interval; no further modifications may be submitted to a Bid or Offer within the fifteen (15)-minute period prior to the applicable Delivery Interval.

d.  The Southeast EEM System will: 1) match the Bids and Offers for the next Delivery Interval, subject to the constraints and limitations established pursuant to this Appendix; and 2)

provide an Energy Exchange Notification to all Participants who were matched as an Energy Exchange for the upcoming Delivery Interval, and 3) submit all necessary transmission reservations and e-Tags ten (10) minutes prior to the relevant Delivery Interval.

**3.** Bid and Offer Requirements.

**a.** Each Bid or Offer must include the following components:

i.

Participant name.

ii.

Whether the submission is a

Bid or an Offer.

iii. An amount of Non-Firm Energy (MW) for the Bid or Offer in increments of 4MW blocks.

iv. For all Offers, an Offer Price and for all Bids, a Bid Price.

v. For all Offers, a Source and for all Bids, a Sink.

vi. The specific Delivery

Interval to which the Bid or Offer applies.

vii.

Whether the submission: 1) must be matched in full or not at all or 2) can be matched at any volume below the Bid or Offer volume (subject to the 4MW increment rule) ("All or Nothing

Selection").

viii. Any other components as may be required for the Southeast EEM System to perform actions set forth in Section IV.C of this Appendix or to generate the reports described in Section V of this Appendix.

b. An Offer may include the maximum Energy Exchange Price that the Participant is

willing to accept for a particular Source/Sink pair for the applicable Delivery Interval.

c.  Participants are permitted to submit multiple Bids or Offers for the same Delivery Interval with varying Source or Sink locations, as applicable, Non-Firm Energy amounts, and pricing, subject to any limitation on the number of Bids or Offers that may be submitted at any one Source or Sink for a particular Delivery Interval as may be established in the Southeast EEM Manuals.

d.  Submission of Bids and Offers is

voluntary; Participants are not required to submit any Bids or Offers for any Delivery Interval.

C.    **Matching.**

1.    Subject to the constraints defined below and all Bid Information and Offer Information, the Southeast EEM Algorithm will evaluate all Bids and Offers for each Delivery Interval and produce Energy Exchanges.

The Southeast EEM Algorithm will match Bids and Offers so as to result in Energy Exchanges that maximize the Southeast Energy Exchange Market total benefit for the applicable Delivery Interval while simultaneously honoring all the requirements identified in Section IV.A.1 and the constraints identified in Section IV.C.6. The total benefit shall be calculated by aggregating the benefits from each

Energy Exchange for the applicable Delivery Interval.

2. The benefit associated with each Energy Exchange will be calculated by taking the difference between the Bid Price and Offer Price and multiplying it by the MW amount of Non-Firm Energy identified in the Energy Exchange, <u>less</u> the costs of transmission services (Losses) provided along the Contract Path.

3. For any Energy Exchange where the Energy Exchange Price exceeds the maximum value submitted in accordance with Section IV.B.3.b., the Energy Exchange Price will be adjusted down to that maximum value, such that the total benefit associated with the Energy Exchange remains the same, but the benefit allocation will be adjusted in the Buyer's favor.

4. Matching Principles.

a. Whole and/or partial amounts of

JA0610

Non-Firm Energy shall be matched, consistent with the Participant's All or Nothing Selection in its Bid Information or Offer Information.

**b.** Bids or Offers that can be matched with multiple Participants shall be allowed, subject to the matching rules set forth in this Appendix.

5. Match/Energy Exchange Price.

**a.** Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the

Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.

**b.** Data demonstrating Losses will be incorporated into the Energy Exchange Price.

i. Each Participating Transmission Provider determines the method for pricing its Losses;

ii. Each Participating Transmission Provider is responsible

for updating its Tariff to address how Losses will be priced; and

iii. Loss Rate and Loss Factor are an input into the algorithm by the relevant Participating Transmission Provider.

**6.** Constraints.

**a.** Participant-Specific Constraints. In matching Bids and Offers, the Southeast EEM Algorithm will take into

JA0613

account the Participant-Specific Constraints submitted by the Bidders and Offerors in accordance with Section IV.A.1.b.

**b.** Generally Applicable Constraints.

i. In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the available capacity for NFEETS on any given

Contract Path to be exceeded.

ii.

Energy Exchanges shall not be made that cause:

(a)

Document Accession #: 20210212-5033     Filed Date: 02/12/2021

(b)

i
r

i
t
s

(
f
f
e
r
;

a
r
c

(c)

l
c
r

r
a
t
c
l
e
c

l
i
c
s

a
r
c

(
f
f
e
r

iii. The Southeast EEM Algorithm shall only make Energy Exchanges that yield positive

benefits to both Buyer and Seller, as defined in Section IV.C.2, after Losses have been considered.

iv. The total MW of potential Energy Exchanges in any Delivery Interval shall not exceed the aggregate amount of Non-Firm Energy identif

ied in the applicable Offers or Bids for such Delivery Interval.

v. A Participant's Bid may not be matched with an Offer made by the same Participant.

vi. The Southeast EEM Algorithm shall not create Energy Exchanges in the same Delive

ry Interval that would create offsetting Energy Exchanges whereby Participant 1 sells to Participant 2 while Participant 2 sells to Participant 1 during the same interval at the same location.

7. Treatment of Identical Offers or Bids.

   a. In the event that multiple Bids or Offers that are at the same price at a Source or Sink are identical which create the same

benefit for the Southeast EEM, a randomized preference will be assigned to the Bid(s) or Offer(s).

8. Notification, Scheduling, and Transmission for Energy Exchanges.

    a. After an Energy Exchange for a Delivery Interval is determined:

        i. The Bidder and Offeror shall be notified of match via an Energy Exchange Notification.

        ii.

            Transmission reservations and

e-Tags shall be automatically created by the Southeast EEM System based on the matches within the time frame noted above. All e-Tags will be sent to the applicable Participating Transmission Provider(s), Balancing Authority(ies) and matched Partici

pants. Consistent with the discretion afforded to Participating Transmission Providers and Balancing Authorities in the NAESB business practices, each participating Balancing Authority within the Territory agrees that it will not reject an e-Tag

JA0629

automatically created by the Southeast EEM System on the basis that it was submitted less than twenty (20) minutes prior to the Delivery Interval but at least ten (10) minutes prior to the Delivery Interval.

iii. The Southeast EEM System will genera

te and provide sufficient information to Participating Transmission Providers to validate and collect payment for Losses from applicable Buyers and Sellers for each Energy Exchange.

iv.

Appropriate OASIS information will be provided to the

relevant Participating Transmission Service Providers.

9.  The contractual "point of sale" of an Energy Exchange will be at the Buyer's Balancing Authority border for a transaction delivered out of or thru one or more Balancing Authorities. For an Energy Exchange that stays within one Balancing Authority (Source and Sink in same Balancing Authority), the "point of sale" will be at the bus of the Seller's Source. For an Energy Exchange fully delivered to a Buyer's Balancing Authority border, the Participant acting as the Seller will be the responsible party for the transmission service to deliver the Non-Firm Energy to the "point of sale" and the Buyer will be responsible for the transmission service required to sink the

Non-Firm Energy. For an Energy Exchange that stays within one Balancing Authority, the Buyer will be the responsible party for the transmission service required to sink the Non-Firm Energy. For avoidance of doubt, Non-Firm Energy Exchange Transmission Service must be used for the entire Contract Path from Source to Sink for all Energy Exchanges.

V.    **SOUTHEAST EEM ENERGY EXCHANGE REPORTS.**

The Southeast EEM Administrator and the Company System Administrators shall create and maintain the reports concerning Energy Exchanges as required by the Operating Committee. The reports that are provided by the System Administrators shall include, but need not be limited to, the following:

A.    **Public Monthly Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website on or before midnight of the fifth Business Day of the following month and shall include the following information from the prior

month:

1.  Minimum, maximum, and average match prices;

2.  Amount of Non-Firm Energy offered and sold as well as bid and purchased over all Delivery Intervals;

3.  Amount of Non-Firm Energy that flowed once matched as an Energy Exchange;

4.  Total number of Energy Exchanges;

5.  Total benefit to be calculated in accordance with Section IV.C.2;

6.  Minimum, maximum, and average MW Energy Exchange amount; and

7.  Energy Exchanges made but not executed.

B.  **Public Daily Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website by 6:00 A.M. CPT and shall include the following aggregated information from the prior day:

1.  Total number of Bids and Offers during each Clock Hour of the prior day;

2.  Amount of Non-Firm Energy offered and sold as well as bid and purchased during each Clock Hour of

the prior day;

**3.** Number of Energy Exchanges executed for each Clock Hour of the prior day;

**4.** Total number of Participants who submitted Bids for each Clock Hour of the prior day;

**5.** Total number of Participants who submitted Offers for each Clock Hour of the prior day; and

**6.** Weighted average match price per Clock Hour.

**C.** **Public Hourly Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website fifteen (15) minutes after the applicable Clock Hour and shall include the following aggregated information from the applicable Clock Hour:

**1.** Total number of Bids and Offers during that Clock Hour;

**2.** Amount of Non-Firm Energy offered and sold as well as bid and purchased during that Clock Hour;

**3.** Number of Energy Exchanges executed

JA0635

for that Clock Hour;

4.    Total number of Participants who submitted Bids during that Clock Hour; and

5.    Total number of Participants who submitted Offers during that Clock Hour.

## VI.    AUDITING AND DATA ADMINISTRATION.

A.    **Archiving of Data.**    All Southeast EEM System input data necessary to recreate and audit any Delivery Interval, and all Southeast EEM System output data for each Delivery Interval, shall be archived such that at least the three prior months of data can be retrieved in real time. Five (5) years of data shall be archived off-line. Participants may request access to their own data and it shall be made available upon request within 24 hours. Data older than five (5) years shall be deleted at the end of each month on a rolling basis.

B.    **Access to Southeast EEM System Energy Exchange Data.**

1.    The Southeast EEM Administrator shall have access, via system software, to the results of the

matching process for any Delivery Interval of on-line history. The data to which the System Administrators have access shall include raw Participant data, matched output data, and intermediate results of the algorithm. To be clear, the Southeast EEM Administrator shall be able to run all of the reports available in the system and view the data for all Participants.

2.     Each Participant will be required to identify an administrator that is authorized by the Participant to run and review all of the reports available in the Southeast EEM System that are redacted to all show the information related to the Participant it represents (the "Company System Administrator"). The Southeast EEM System will provide each Company System Administrator with the right to grant access to certain reports and related data to identified delegates within the

Participant's organization. Each Company System Administrator (and any delegate identified by the Company System Administrator) shall be able to run all of the reports available in the system but receive only the data that belong to the Participant it represents.

**C.     Additional Southeast EEM Administrator Functions.** Subject to the limitations set forth in subsection (B) above, the Southeast EEM Administrator shall employ the system software to perform the following functions:

**1.**     Oversee the matching process;

**2.**     Maintain model data and Southeast EEM System parameters; and

**3.**     View Participant usage statistics and generate Participant benefit reports.

**D.     Auditing Process.** Auditing functions will be performed by the Market Auditor at the direction of the Membership Board. The Market Auditor will report its conclusions, and provide any supporting data

in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis. The Membership Board will maintain sole responsibility for determining whether to share the information any further. Auditing functions include the following:

1.  Verify that the Southeast EEM System operates in accordance with the Southeast EEM Rules, including the determination and application of Bids, Offers, constraints, matched settlements, OASIS reservations, and e-tags.

2.  Ensure that Energy Exchange data is available to the applicable Participants in accordance with the Southeast EEM Rules.

3.  Report to the Membership Board any concerns regarding the reliability and accuracy of the Southeast EEM System process and results including any instance of operational problems or anomalies with the functioning of the Southeast EEM

System.

4. Provide evaluation regarding the proper function of the Southeast EEM System, and the effectiveness of any Southeast EEM System specific controls in place related to the operation of the Southeast EEM System.

5. Refer any complaints received to the Membership Board, and investigate further at the Membership Board's direction.

6. The Membership Board will be responsible for defining the time interval(s) for the auditing function to be performed and report back to the governing body. Such interval(s) will be published in the Southeast EEM Manuals.

E. **Data Administration.**

1. Parameters. The Southeast EEM Administrator shall set and maintain the following Southeast EEM System configuration

JA0640

parameters, which shall be posted for access by all Members:

**a.** The matching process start time for each Clock Hour;

**b.** The number of minutes before the start of the matching process when no additional Bids and Offers will be accepted;

**c.** The number of minutes before the start of the matching process by which the processing of any in-transit Bids and Offers must be completed;

**d.** The addition or deletion of Participants;

**e.** The addition or deletion of a Company System Administrator for each Participant;

**f.** Manage,

store, and safeguard data (e.g., Bid, Offer, match, and Participant Information) to ensure appropriate levels of confidentiality and records retention;

g. Grant access to the data on the Southeast EEM System as appropriate;

h. Supply data to Participants involved in Energy Exchanges to complete the applicable transaction, including (but not limited to):

   i. Participant identification of the Buyer and the Seller;

   ii.

Balancing Authority Area identifications for the MWh quoted by the Buyer and the Seller;

iii.    e-Tag number;

iv.

Transaction quantity in MW/MWh, including the MWh out of the Source area and the MWh into the Sink area;

v.

Inform

ation specifically related to an Energy Exchange (not price of the other side of the match as may reveal sensitive transmission information);

vi.

Energy Exchange Price;

vii.

Benefit for the Buyer and the Seller in total dollars and $/MW

h; and

viii.

Energy Exchanges not executed.

i. Supply needed information/data for auditing functions to ensure that the Southeast EEM System is being properly administered.

Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 Appendix C, Southeast EEM Agent Scope, 0.0.0, A
Record Narative Name:
Tariff Record ID: 2063
Tariff Record Collation Value: 168001536      Tariff
Record Parent Identifier: 2056
Proposed Date: 2021-05-13
Priority Order: 1000000000
Record Change Type: NEW
Record Content Type: 1
Associated Filing Identifier:

## APPENDIX C

## SOUTHEAST EEM AGENT SCOPE

The Southeast EEM Agent Scope shall be limited to the following:

a. Subject to paragraph (b) below, the Southeast EEM Agent shall execute contracts with third parties solely as the agent for and on behalf of the

Members and not in the Southeast EEM Agent's own name or for its own account.

b. The Southeast EEM Agent shall be empowered to execute contracts only after being given specific written or electronic authorization to do so by the Membership Board, or in the case of minor or unsubstantial contracts, the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

c. The Southeast EEM Agent shall be authorized to execute amendments to contracts entered into on behalf of the Members, provided that such amendment is authorized by the Membership Board or, in the case of minor or unsubstantial contracts, by the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

d. For convenience, the Southeast EEM Agent shall be authorized to accept notices under the contracts that it executes on behalf of the Members.

e. The Southeast EEM Agent shall *not* be involved in the billing process under the vendor contracts. Third-party vendors will bill the Members directly for their proportionate share of the costs under the contracts executed by the Southeast EEM Agent on behalf of the Members.

f. If certain vendors are unwilling to

bill Members directly, the Membership Board shall develop an alternative billing arrangement, such as using a third-party billing agent.

g. The Southeast EEM Agent shall ***not*** have any special role in, or authority over, the operation or administration of the Southeast EEM System. The vendor contracts shall specify that the day-to-day contact for such vendor shall be the Operating Committee, not the Southeast EEM Agent.

h. The Southeast EEM Agent shall not be exposed to incremental liability for actions taken within the Southeast EEM Agent Scope.

————

JA0647

Document Content(s)

1_Trans Ltr to SEEM Agreement.PDF..............................................1
2_Att. A_Southeast EEM Agreement.PDF .........................................45
3_Att. B_Overview Aff.PDF.....................................................46
4_Att. C_Operations Aff.PDF..................................................63
5_Att. D_Economics Aff.PDF...................................................88
6_Att. D-1_Susan Pope CV.PDF................................................117
7_Att. E_Guidehouse Aff.PDF.................................................135
8_Att. E-1_Benefits Analysis.PDF............................................137
FERC GENERATED TARIFF FILING.RTF............................................170

JA0648

| | | |
|---|---|---|
| Alabama Power Co. | ) | Docket No. ER21-1111-000 |
| | ) | |
| Dominion Energy South Carolina, Inc. | ) | Docket No. ER21-1112-000 |
| | ) | |
| Louisville Gas & Electric Co. | ) | Docket No. ER21-1114-000 |
| | ) | |
| Duke Energy Carolinas, LLC, & | ) | |
| Duke Energy Progress, LLC | ) | Docket No. ER21-1115-000 |
| | ) | |
| Duke Energy Carolinas, LLC | ) | Docket No. ER21-1116-000 |
| | ) | |
| Duke Energy Progress, LLC | ) | Docket No. ER21-1117-000 |
| | ) | |
| Louisville Gas & Electric Co. | ) | Docket No. ER21-1118-000 |
| | ) | |
| Georgia Power Co. | ) | Docket No. ER21-1119-000 |
| | ) | |
| Kentucky Utilities Co. | ) | Docket No. ER21-1120-000 |
| | ) | |
| Mississippi Power Co. | ) | Docket No. ER21-1121-000 |
| | ) | |
| Alabama Power Co. | ) | Docket No. ER21-1125-000 |
| | ) | |
| Dominion Energy South Carolina, Inc. | ) | Docket No. ER21-1128-000 |

## MOTION FOR LEAVE TO INTERVENE
### OF
### TENNESSEE VALLEY AUTHORITY
### <u>AND COMMENTS IN SUPPORT</u>

Pursuant to Rule 214 of the Rules of Practice and Procedure of the Federal Energy

Regulatory Commission ("Commission"), 18 C.F.R. § 385.214 (2020), Tennessee Valley

Authority ("TVA") hereby submits this motion for leave to intervene and provide comments in

the above-captioned proceeding.

1

JA0649

# I. Intervention

1. Communications concerning this motion should be addressed as follows, and the following individuals should be included on the official service list in this proceeding:

> Tricia L. Roelofs
> Gen. Mgr., BA & Resource Operations
> Tennessee Valley Authority
> 1101 Market Street
> Chattanooga, TN   37402-2801
> (202) 436-6043
> tlroelofs@tva.gov
>
> Richard T. Saas
> Sr. Attorney
> Tennessee Valley Authority
> 1101 Market Street
> Chattanooga, TN   37402-2801
> (423) 751-8220
> rtsaas@tva.gov

2. On February 12, 2021, Southern Company Services, Inc. ("Southern Company") as agent for Alabama Power Company, on behalf of itself and the other Members of the Southeast Energy Exchange Market ("Southeast EEM") submitted the Southeast Energy Exchange Market Agreement ("Southeast EEM Agreement") for filing with the Commission in Docket No. ER21-1111-000 ("Application").  The Southeast EEM Agreement sets forth the framework and the rules for establishing and maintaining a new voluntary electronic trading platform designed to enhance the existing bilateral market in the southeastern United States utilizing zero-charge transmission service (the "Southeast EEM System").  In the other captioned dockets listed above, Dominion Energy South Carolina, Inc., Louisville Gas and Electric Company, Duke Energy Progress, LLC, Duke Energy Carolinas, LLC, Georgia Power Company, Kentucky Utilities Company, and Mississippi Power Company submitted concurrences with the Southeast EM Agreement.

JA0650

3.  TVA is a wholly-owned corporate agency and instrumentality of the United States of America, organized and existing pursuant to the Tennessee Valley Authority Act, *as amended*, 16 U.S.C. §§ 831-831ee (2018) (TVA Act).  TVA produces and sells electric power at wholesale to 153 municipal and cooperative distributors for resale to their customers, consistent with the preference provisions of the TVA Act.  16 U.S.C. § 831i.  TVA also supplies power directly at retail to industrial customers having very large or unusual loads and to several Federal Government facilities.  TVA power serves over 10 million people in an 80,000 square mile area in parts of Alabama, Georgia, Kentucky, Mississippi, North Carolina, Tennessee, and Virginia.  TVA delivers power to its customers over the second largest transmission system in country, consisting of 16,300 miles of high voltage transmission lines and 69 interconnections with neighboring electric systems.

4.  TVA is a Member of the Southeast EEM[1] and its participation is necessary for Associated Electric Cooperative, Inc., Louisville Gas and Electric Company ("LG&E"), and Kentucky Utilities Company ("KU") to engage in transactions through the Southeast EEM System.[2]  As part of Southern Company's Application in this proceeding, TVA co-sponsored a Joint Affidavit by Mr. Aaron Melda, TVA's Senior Vice President, Transmission & Power Supply, with Mr. Lonnie Bellar, LG&E/KU's Chief Operating Officer, describing the structure of the Southeast EEM and the benefits that will result from its implementation.[3]

5.  TVA has a substantial interest in this proceeding, which cannot be adequately represented by any other party.  TVA submits that its intervention and participation in this proceeding will be in the public interest.

---

[1] TVA is a founding Member of the Southeast EEM, and plans to participate pending TVA Board approval (following a Commission decision in this proceeding) and completion of the applicable environmental reviews.
[2] *See* Application, Attachment B, at 4.
[3] Application, Attachment B.

3

## II. Comments

6. TVA supports the Southeast EEM because it will benefit TVA's customers. It will increase the efficiency of transactions, thus reducing TVA's costs of purchases and increasing TVA's net revenue from sales of excess power.[4] In addition, the Southeast EEM is expected to support increased renewables integration in the Southeast, which aligns with TVA's commitment to reduce its carbon footprint and incorporate more green resources into its generation portfolio.

7. Unlike other electric utilities, TVA is charged under the TVA Act with a broad set of responsibilities that it carries out in the public interest. In addition to supplying power, TVA provides flood control, navigable waterways, land and natural resource management, environmental stewardship, recreational facilities, and economic development to the people of the Tennessee Valley. Under the preference provisions of the TVA Act, 16 U.S.C. § 831i, TVA provides electric service to 153 municipalities and other local government entities and consumer-owned cooperatives in the Tennessee Valley. TVA plans, builds, and operates its utility system for the purpose of satisfying these preference customers with reliable, low-cost power in an environmentally responsible matter. This unique public power model has been in place since the enactment of the TVA Act in 1933 and enables economic development in the region. Participation in the Southeast EEM will further TVA's ability to provide low-cost power to the benefit of its customers.

8. As discussed by Mr. Melda in the Joint Affidavit, TVA generally cannot sell power outside its traditional service area. This geographic restriction on TVA's sales authority is known as the "Fence" and is codified in section 15d(a) of the TVA Act. 16 U.S.C. § 831n-4. An exception to the general rule is that TVA can sell power beyond the Fence to certain power

---

[4] Application, Attachment B, at 5; *see also id.* at 11-12.

JA0652

generating organizations with whom TVA had exchange power arrangements in place on July 1, 1957.  In the context of the Southeast EEM, TVA can only sell power to Duke, LG&E/KU, and the Southern Companies.[5]  The Southeast EEM System is designed to ensure that no transactions violate section 15d(a) of the TVA Act.[6]

8.  The Southeast EEM Members have designed a market enhancement that covers the region and unites jurisdictional and non-jurisdictional participants in a large cohesive footprint to achieve consumer benefits through increased bilateral trading efficiencies.  As most Southeast EEM Members are not subject to FERC's jurisdiction (and desire to remain so), the Southeast EEM has been carefully crafted to produce significant benefits at a low cost while honoring each Member's unique needs and limitations.[7]

### III.  Conclusion

WHEREFORE, TVA respectfully requests that the Commission grant it leave to intervene and admit it as a party to the proceeding, accept its comments, and approve the Application to establish the Southeast EEM.

Respectfully submitted,

____/s/ Richard T. Saas ____
Richard T. Saas
Tennessee Valley Authority
1101 Market Street
Chattanooga, TN   37401

Counsel for
Tennessee Valley Authority

---

[5] The Fence only restricts TVA's sales authority.  TVA can purchase power from any seller.
[6] Application, Attachment B, at 6.
[7] *Id.* at 14.

JA0653

**CERTIFICATE OF SERVICE**

In accordance with Rule 2010 of FERC's Rules of Practice and Procedure, 18 C.F.R. §

385.2010 (2020), I hereby certify that I have this day served the foregoing document upon each

person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Chattanooga, Tennessee, this 15th day of March 2021.


       /s/ Richard T. Saas
       Richard T. Saas

JA0654

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Alabama Power Company | ) ) | ER21-1111-000 |
| Dominion Energy South Carolina, Inc. | ) ) | ER21-1112-000 |
| Louisville Gas and Electric Company | ) | ER21-1114-000 |
| Duke Energy Progress, LLC Duke Energy Carolinas, LLC | ) ) ) | ER21-1115-000 |
| Duke Energy Carolinas, LLC | ) ) | ER21-1116-000 |
| Duke Energy Progress, LLC | ) ) | ER21-1117-000 |
| Louisville Gas and Electric Company | ) ) | ER21-1118-000 |
| Georgia Power Company | ) ) | ER21-1119-000 |
| Kentucky Utilities Company | ) ) | ER21-1120-000 |
| Mississippi Power Company | ) ) | ER21-1121-000 |
| Alabama Power Company | ) ) | ER21-1125-000 |
| Dominion Energy South Carolina, Inc. | ) ) ) ) | ER21-1128-000 (not consolidated) |

**COMMENTS OF ADVANCED ENERGY ECONOMY, ADVANCED ENERGY BUYERS GROUP, RENEWABLE ENERGY BUYERS ALLIANCE, AND THE SOLAR ENERGY INDUSTRY ASSOCIATION**

JA0655

# TABLE OF CONTENTS

BACKGROUND ................................................................................................... 3

EXECUTIVE SUMMARY .................................................................................. 6

COMMENTS ........................................................................................................ 9

I.     THERE ARE MANY OPEN QUESTIONS TO RESOLVE BEFORE THE COMMISSION RULES ON THE REASONABLENESS OF THE SEEM PROPOSAL. ........................................................................................................ 9

     A.     The SEEM Filing Entities propose a loose power pool but have failed to propose an independently-administered pool-wide OATT required for such a proposal. ........................................................................................................ 9

          1.     The SEEM Proposal is a loose power pool ............................................. 10

          2.     The SEEM Proposal, as a loose power pool, needs a joint pool-wide OATT prior to operation. ........................................................................ 15

     B.     The SEEM Proposal, whether or not it is a loose power pool, must have just and reasonable and not unduly discriminatory membership and governance policy ....................................................................................................... 15

          1.     The SEEM Proposal must allow unrestricted membership by any bulk power market participant in the Southeast ...................................... 16

          2.     The SEEM Proposal must provide for fair and transparent governance. ............................................................................................ 17

          3.     The SEEM Proposal must provide stakeholders with a process for participating in SEEM decision-making. .................................................. 20

     C.     The lack of transparency of market prices and transactions, as well as opportunities to exercise market power, require market monitoring and potentially the implementation of market mitigation measures. ......................... 21

     D.     The projected savings from SEEM are not fully supported and other market options likely provide much greater cost savings. ............................................... 27

     E.     The Commission should investigate whether the OATT amendments by SEEM Filing Entities are consistent with or superior to the *pro forma* OATT and whether it presents opportunities for undue discrimination. ......................... 34

          1.     The SEEM proposal raises significant market transparency concerns given that it prohibits use of existing Open Access Same Time Information Systems. ............................................................................. 34

i

JA0656

2.      The proposal to apply generator imbalance penalties is unclear and may be unjust and unreasonable. ............................................................. 36

3.      The SEEM proposal raises significant concerns about financial impacts on existing, firm transmission customers. ................................... 39

4.      There is insufficient detail about the SEEM Algorithm to conclude that it is just and reasonable and not unduly discriminatory.................... 42

5.      The SEEM Filing Entities have not supported a change to the transmission loss provisions of their OATTs............................................ 45

F.      The SEEM Proposal raises issues regarding interaction at the seams of RTO markets. .......................................................................................................... 47

REQUEST FOR REMEDIES................................................................................................ 49

REQUEST FOR TECHNICAL CONFERENCE ...................................................................... 50

CONCLUSION..................................................................................................................... 53

JA0657

**COMMENTS OF ADVANCED ENERGY ECONOMY, ADVANCED ENERGY BUYERS GROUP, RENEWABLE ENERGY BUYERS ALLIANCE, AND THE SOLAR ENERGY INDUSTRY ASSOCIATION**

Advanced Energy Economy ("AEE"),[1] the Advanced Energy Buyers Group ("Buyers Group"), Renewable Energy Buyers Alliance ("REBA"), and Solar Energy Industries Association ("SEIA") (collectively "Clean Energy Coalition") respectfully submit these comments on the Southeast Energy Exchange Market ("SEEM") Agreement filed on February 12, 2021, by Southern Company Services, Inc. on behalf of Alabama Power Company and the other sponsoring Members of the SEEM ("SEEM Members") in Docket No. ER21-1111, as well as on the other filings submitted by those public utilities (collectively, "SEEM Filing Entities") listed in the above-captioned dockets. Together these filings propose a trading platform to allow for sub-hourly energy transactions, priced based on a formula rate, that use a new class of non-firm transmission service made available across ten Balancing Authority Areas ("SEEM Proposal").

As explained in more detail below, Clean Energy Coalition supports the development of additional competitive wholesale market options in the Southeast and the rest of the United States. The SEEM Proposal has emerged at the same time that customer demand for clean energy supplies to satisfy their sustainability commitments are rapidly increasing and states in the Southeast are expressing greater interest in the potential for more competitive wholesale markets in the region to lower consumer costs and help the region transition to a decarbonized future. Clean Energy Coalition welcomes steps by utilities and stakeholders in the region to provide customers with more options to access desired clean energy suppliers and clean energy developers with more

---

[1] AEE submitted a doc-less motion to intervene in each of the above-captioned dockets on March 12, 2021. Buyers Group submitted a doc-less motion to intervene in each of the above-captioned dockets on March 12, 2021. REBA submitted a doc-less motion to intervene in each of the above-captioned dockets on March 11, 2021. SEIA submitted doc-less motions to intervene in each of the above-captioned dockets on either March 12, 2021 (ER21-1119, ER21-1121, and ER21-1125) or February 26, 2021 (all others).

1

JA0658

opportunities to compete on a level playing field to serve those customer demands. Taking these steps would unlock significant benefits for consumers, promote economic development throughout the Southeast, and put the region on a market-based path to decarbonization.

The SEEM Proposal lacks sufficient details on many important issues, however, making it unclear whether it represents a first step toward more competitive wholesale market options for customers in the region. Moreover, many of these missing details could have significant cost, transparency, and market implications for customers and stakeholders, and could end up moving the region further away from the competitive options that states and consumers increasingly seek. Accordingly, in these comments, Clean Energy Coalition identifies a number of issues raised by the SEEM Proposal, and urges the Federal Energy Regulatory Commission ("FERC" or the "Commission") to direct the SEEM Members to supplement their filings to address these issues and provide the additional details necessary to evaluate the proposed construct. Addressing these issues is necessary to ensure that, consistent with long-standing Commission precedent, sufficient stakeholder and participant protections against undue discrimination are in place, and that the SEEM (if implemented) has a transparent and responsive structure that is adaptable to stakeholder needs.

In addition, Clean Energy Coalition requests that the Commission establish a future technical conference, outside of these dockets, to convene a discussion with state officials, customers, utilities, independent power producers, and other stakeholders in the Southeast regarding the future of wholesale power markets in the region. As noted above, state leaders and customers in the region have expressed their desire to explore the development of competitive wholesale markets, but unfortunately, few if any states in the region were consulted or even made aware of the development of the SEEM Proposal. A Commission-convened discussion, outside of

2

JA0659

the details of the SEEM Proposal, would give these key stakeholders and others a forum to examine market structures that would maximize benefits for customers.

## BACKGROUND

AEE is a national organization of businesses making the energy we use secure, clean, and, affordable. AEE represents more than 100 companies and organizations that span the advanced energy industry and its value chains, and AEE's members include many companies and organizations located or active in the proposed footprint of the SEEM. AEE's members include companies involved in electric storage, energy efficiency, demand response, wind, solar photovoltaics, solar thermal electric, ground-source heat pumps, electric vehicles, advanced metering infrastructure, transmission and distribution efficiency, fuel cells, advanced nuclear power, combined heat and power, and enabling software. Used together, these technologies and services will create and maintain a higher-performing energy system—one that is reliable and resilient, diverse, cost-effective, and clean—while also improving the availability and quality of customer-facing services.

AEE also facilitates the work of the Buyers Group, a business-led coalition of large energy users engaging on policies to expand opportunities to procure energy that is secure, clean, and affordable. Members of the Buyers Group are market leaders and major employers spanning different industry segments, including technology, retail, and manufacturing. These companies are among the 71% of Fortune 100 companies and 43% of Fortune 500 companies that have established renewable and/or climate targets as part of our corporate sustainability commitments. They share a common interest in expanding the use of advanced energy, such as renewable energy like wind, solar, geothermal, and hydropower; demand-side resources like energy efficiency, demand response, and energy storage; and onsite generation from solar photovoltaics, advanced natural gas turbines, and fuel cells.

3

JA0660

REBA is a national association for large-scale energy buyers seeking to procure renewable energy across the U.S. With more than 250 members from across the commercial and industrial sectors, non-profit organizations, as well as energy providers and service providers, REBA is working toward the creation of a resilient, zero-carbon energy system. REBA's goal is to catalyze 60 gigawatts of new renewable energy projects by 2025 and to unlock the energy market for all large-scale energy buyers by creating viable pathways to procurement.

SEIA is the national trade association of the solar energy industry. As the voice of the industry, SEIA works to make solar a mainstream and significant energy source by expanding markets, reducing costs and increasing reliability, removing market barriers, and providing education on the benefits of solar energy. SEIA represents solar companies that own and operate a wide-variety of projects throughout the country, including solar installations at the transmission and distribution levels, as well as behind-the-meter solar at commercial, industrial, and residential host-sites. The Southeast region, including the facilities owned and operated by the SEEM parties, plays an important role to the U.S. solar plus storage industry. SEIA represents solar companies that will be impacted by SEEM and not adequately represented by any other party.

Together, the members of these four organizations have significant interests in the SEEM Proposal and the development of new competitive market structures in the Southeast. Developers of clean and advanced energy and associated technologies, including members of the above organizations, face significant difficulties in and barriers to bringing their products and services to market in the region. Even though non-utility generators have the ability to offer economic wholesale power supplies to customers, it is difficult to secure opportunities to sell those supplies on a non-discriminatory basis given that Commission-jurisdictional incumbent utilities, in addition to serving much of the Southeast as bundled retail customers, also dominate the wholesale energy

4

JA0661

market within their respective footprints. Further, because the Southeast grid is broken up into a patchwork of Balancing Authority Areas instead of a single regional grid, sending power across balancing areas requires multiple transmission reservations across systems and the payment of pancaked transmission rates due to the addition of wheeling charges.[2] Low-cost renewable power, such as solar energy in North Carolina, is sometimes curtailed rather than used.[3] Idiosyncratic solutions, like Southern Company's existing auction for imbalance energy, do not provide the sort of long-term commitment to open competition needed to enable the entry of durable clean and advanced energy solutions. Indeed, even though studies have shown that "nearly every coal plant (92 percent of existing capacity)" in the Southeast "was uneconomic compared to local wind or solar," without open competition in a centralized wholesale market, utilities in the region largely plan to follow a regionally fragmented and overbuilt business-as-usual approach into the future, without "economically optimal dispatch" and "with only minimal coordination of imports and exports."[4] Opening markets to supply competition is the best solution both for prices in the region and emissions goals.[5]

Many of the same problems stymie progress on the buyer side of the equation as well. Numerous large purchasers of energy, including members of our organizations, seek to purchase

---

[2] *See* Eric Gimon *et al.*, *Summary Report: Economic and Clean Energy Benefits of Establishing a Southeast U.S. Competitive Wholesale Electricity Market*, Energy Innovation and Vibrant Clean Energy at 5, 8 (Aug. 2020) ("Energy Innovation Southeast Market Summary Report"), *available at* https://energyinnovation.org/wp-content/uploads/2020/08/Economic-And-Clean-Energy-Benefits-Of-Establishing-A-Southeast-U.S.-Competitive-Wholesale-Electricity-Market_FINAL.pdf.

[3] *See, e.g.*, John Downey, *Developers Cry Foul as Duke Energy Briefly Interrupts Private Solar-Power Purchases*, CHARLOTTE BUSINESS JOURNAL (July 10, 2018), https://www.bizjournals.com/charlotte/news/2018/07/10/developers-cry-foul-as-duke-energy-briefly.html.

[4] *See* Energy Innovation Southeast Market Summary Report, at 5, 7-8, 16-17. *See also* Eric Gimon et al, *The Coal Cost Crossover: Economic Viability of Existing Coal Compared to New Local Wind and Solar Resources*, Energy Innovation Southeast Market Summary Report at 1 (Mar. 2019) (explaining that an increasing percentage of the U.S. coal fleet is "more expensive than cleaner alternatives" that could be developed locally), *available at* https://energy innovation.org/wp-content/uploads/2019/03/Coal-Cost-Crossover_Energy-Innovation_VCE_FINAL.pdf.

[5] *See* Energy Innovation Southeast Market Summary Report at 12 (explaining that "a competitive market with no carbon policy does a better job of reducing emissions than" utility company emissions targets).

affordable, clean, and advanced energy solutions in the Southeast. However, with only a handful of major suppliers and no centralized market, there is little transparency in energy prices throughout the region. Utilities like Duke Energy and Southern Company have announced plans to build more clean generation capacity,[6] but market structure barriers mean that buyers often do not have the ability to contract directly with new developers who can more quickly and flexibly meet their energy needs with more customer-specific products and at a lower cost. While Order No. 888, almost 25 years ago, committed the Commission "to remov[ing] impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers,"[7] that principle is not a reality for consumers in the Southeast.

## EXECUTIVE SUMMARY

The filings submitted by the SEEM Members in the above-captioned dockets to implement the SEEM Proposal lack foundational details critical to the efficient design and operation of an energy market or market-like trading platform in the Southeast. To properly evaluate the SEEM Proposal, Clean Energy Coalition urges the Commission to require the SEEM Members to supplement their filings (through a deficiency response) to address several critical issues where more information is necessary and/or modifications to the proposal may be necessary to comply with the Commission's open access requirements and ensure sufficient consumer and stakeholder protections are in place. Specifically, and as described in more detail in the remainder of these comments, Clean Energy Coalition has identified the following issues within the SEEM Proposal

---

[6] *See id.*

[7] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996), *order on reh'g*, Order No. 888-A, 62 Fed. Reg. 12,274 (Mar. 14, 1997), *order on reh'g*, Order No. 888-B, 62 Fed. Reg. 64,688 (Nov. 25, 1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), aff'd in relevant part sub nom. *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), aff'd sub nom. *New York v. FERC*, 535 U.S. 1 (2002).

that require further close examination by the Commission before the proposed construct moves forward:

- **SEEM is a loose power pool that is subject to Order No. 888 filing requirements.** The SEEM Proposal has all of the characteristics that make up a loose power pool and as a result, pursuant to Order No. 888, the SEEM Members should have on file with the Commission a pool-wide Open Access Transmission Tariff ("OATT"). Under Order No. 888, the pool-wide OATT must be independently administered by a public utility in a manner that includes opportunities for stakeholders to provide input on power pool decision-making and administration.

- **SEEM must have unrestricted membership, fair and transparent governance, and a meaningful stakeholder process.** Even if the Commission finds that the SEEM proposal is not a loose power pool, as a regional entity that facilitates coordination between utilities, the SEEM must still meet the transparency and independence requirements of the Commission's open access precedents. This includes eliminating discriminatory barriers to membership in SEEM, a fair and transparent governance system that is not unduly influenced by vertically integrated utilities to the exclusion of other parties, and a stakeholder process that permits meaningful conversation and input among wholesale sellers, customers, public interest groups, state commissions, and other state officials.

- **The SEEM Platform must be transparent and allow for auditing, monitoring, and the mitigation of market power when necessary.** Because of a lack of transparency into market activity, Participants' ability to impose opaque and selective constraints on transactions, and a lack of independent oversight or ability to prevent the exercise of market power, the SEEM Platform falls well short of offering either open competition among

JA0664

resources or even the assurance that market power will not be exercised via the platform. The SEEM platform must produce meaningful market activity information after sufficient time lag, avoid offering market power opportunities to incumbents via trading constraints, and have an independent and trustworthy administrator and market monitor that can detect and prevent the exercise of market power. All of these elements are currently absent from the Southeast Energy Exchange Market Agreement ("SEEM Agreement").

- **The SEEM Proposal must be supported and recommended by a verifiable estimate of its promised benefits**. The benefits analysis submitted to support the SEEM concept fails to clearly define and support the benefits it claims the SEEM Proposal will generate and, even if its promised benefits are indeed accurate, they pale in comparison to the benefits from other regional trading and integration models. The SEEM Filing Entities have not yet shown that the costs, risks, and potential downsides of the SEEM construct outweigh the alleged benefits.

- **The SEEM Proposal has not yet been shown to be consistent with or superior to the *pro forma* OATT.** The Commission's open access and just and reasonable rate precedents require the use of Open Access Same-Time Information Systems ("OASIS"), the avoidance of unduly discriminatory market algorithms, and do not allow imbalance penalties, transmission loss provisions, or cost shifts among customer classes or utilities to work inequitable results. Each of these items must be addressed by the SEEM Filing Entities to complete their proposal.

- **The SEEM Filing Entities have not explained how the market will mesh with the three Regional Transmission Organization ("RTO") markets on its borders.** Existing interactions are already complex between SEEM Members and the three RTOs that share

JA0665

borders with those SEEM Members. The new transmission service proposed in the SEEM Filings, as well as increases in very short bilateral transactions likely will exacerbate this complexity. The Filing Entities and the Commission should address these interactions— including interregional coordination generally, existing operations with neighbors specifically, and whether existing seams agreements with RTOs need to be modified— prior to SEEM implementation.

Finally, Clean Energy Coalition respectfully requests that the Commission, outside of these dockets and regardless of how it rules on the SEEM Proposal, convene a technical conference to explore future competitive wholesale market development in the Southeast. Evidence is mounting that a robust and economically efficient competitive regional wholesale market in the Southeast would provide significant benefits to the region, well above the benefits projected by the SEEM Members to be realized through the SEEM Proposal. It would be a valuable use of time to explore the future of Southeast markets with all interested stakeholders in the region.

## COMMENTS

I. **THERE ARE MANY OPEN QUESTIONS TO RESOLVE BEFORE THE COMMISSION RULES ON THE REASONABLENESS OF THE SEEM PROPOSAL.**

A. **The SEEM Filing Entities propose a loose power pool but have failed to propose an independently-administered pool-wide OATT required for such a proposal.**

When the Commission directed the unbundling of transmission, ancillary services, and energy sales and opened access to transmission services in Order No. 888, power pools were no exception.[8] Public utilities that propose to pool all or part of their transmission system with other

---

[8] Order No. 888, 61 Fed. Reg. at 21,594.

JA0666

unaffiliated utilities must have a joint pool-wide tariff on file, administered by a Public Utility that is not a member of the pool, that is consistent with or superior to the *pro forma* OATT, effective on the date that transactions begin under the pooling arrangements.[9] Like the other reforms in Order No. 888, the Commission instituted these specific reforms of power pool arrangements to remedy undue discrimination in access to monopoly-owned transmission systems. As detailed below, the SEEM Proposal is a power pool for which a pool-wide tariff is required. The Commission should investigate whether lack of a pool-wide OATT as part of the SEEM Proposal fails to meet the Commission's requirements, and whether SEEM Members may have reinstituted discriminatory practices in the provision of the zero-cost Non-Firm Energy Exchange Transmission Service ("NFEET Service").

### 1.    The SEEM Proposal is a loose power pool.

The SEEM Proposal meets both prongs of the Commission's definition of a loose power pool. As the Commission explained in Order No. 888-A, a loose power pool is "[1] any multilateral arrangement, other than a tight power pool or a holding company arrangement, [2] that explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[10]

Under the first prong, the SEEM Agreement is an agreement among unaffiliated Public Utilities and non-public utilities ("SEEM Members") to pool certain facilities for pool-wide use. The pooled facilities are the portion of each Member's transmission system for which there are no transmission reservations in the next hour.[11] Any SEEM Member that operates a transmission system must contribute these as-available facilities to the pool every hour, 15 minutes prior to the

---

[9] *See* 18 C.F.R. § 35.28(c)(3).

[10] Order No. 888-A, 62 Fed. Reg. at 12,313 (Mar. 14, 1997).

[11] *See* SEEM Agreement, Attachment A § II, NFEET Service definition.

JA0667

hour.[12] As one of the SEEM Members explains in its transmittal letter, "[a]s required by the Southeast EEM Agreement, NFEET Service can only be provided by Participating Transmission Providers whose system, if added to the other participating transmission systems, creates a continuous contract path."[13]

SEEM Members must also provide information about their systems "to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM Territory for purposes of confirming available capacity" prior to use of the pooled transmission services.[14] The SEEM Algorithm then uses this Network Map to confirm availability of and to allocate NFEET Service capacity.[15]  Through use of the Algorithm, the SEEM System matches transactions that use the pooled transmission for the purchase and sale of energy, makes the transmission service reservations for the contract path on the pooled transmission system, and tags the transactions.[16] Indeed, the NFEET Service can only be used if the SEEM System operates to reserve, schedule, and tag each transaction.[17]

The SEEM proposal easily satisfies the second prong of the definition of a loose power pool because it contains discounted transmission arrangements with special terms and conditions. The SEEM Agreement Transmittal Letter makes clear that the NFEET Service contains many

---

[12] *See* SEEM Agreement, Attachment A, § 3.2.1 ("The Tariff of any Member who provides transmission service must contain [NFEET Service] provisions for those Energy Exchanges that seek to utilize such Member's transmission system."); *id.* Appendix B (SEEM Market Rules), § IV.B.2.

[13] Louisville Gas & Electric OATT Filing, Transmittal Letter, Docket No. ER21-1118, at 5 (Feb. 12, 2021) ("LG&E OATT Filing"); *see* SEEM Agreement Transmittal Letter at 25 (same); SEEM Agreement, Attachment A, § II, NFEET Service definition at (viii).

[14] SEEM Agreement, Attachment A, § IV.A.2.

[15] *See* SEEM Agreement, Appendix B, § II (defining Contract Path, Network Map); § IV.A.2 (explaining information requirements for creation of Network Map).

[16] *See* SEEM Agreement Transmittal Letter at 10; *see also* SEEM Agreement, Attachment A, at Art. 1.1 (defining "Energy Exchange" and "Southeast EEM Administrator").

[17] SEEM Agreement Transmittal Letter at 24.

discounts and special terms and conditions as compared with transmission services available under the SEEM public utilities' OATTs:

- It is non-firm transmission;

- It is available on an as-available basis (i.e., it is only available after all other uses have been taken into account);

- It is provided solely for 15-minute Energy Exchanges;

- It has the lowest curtailment priority;

- The rate for service is $0/MWh;

- There are no associated Schedule 1 or Schedule 2 ancillary service charges; [and]

- Losses will be 'financial' in that they will be supplied by the applicable Participating Transmission Provider and paid for by the matched bidder and offeror in each Energy Exchange.[18]

Some Members of the SEEM Filing Entities have asserted that the SEEM Proposal is not a loose power pool.[19] This is not the case. It is irrelevant to the Commission's definition of loose power pools that (1) there are multiple Balancing Authority Areas in the SEEM Proposal; (2) only NFEET Service, and not all of the transmission facilities of each SEEM Member, is turned over for pool operation; and (3) the SEEM Proposal may not provide for joint dispatch, joint planning or joint operation of the SEEM Members' transmission systems. First, loose power pools do not typically operate as a single control area, or in current parlance, as a single Balancing Authority

---

[18] *Id.*

[19] *See In the Matter of Protest Related to Informational Filing by Duke Energy Carolinas, LLC, & Duke Energy Progress, LLC*, Docket No. E-2, Sub. 1268, 2021 WL 523050, at *4 (Feb. 5, 2021) (noting that Duke Energy Progress and Duke Energy Carolinas "contest the characterization of the SEEM as a power pool arrangement because there is no joint dispatch, joint operation, or joint planning").

JA0669

Area.[20]  For example, Western Systems Power Pool and Southwest Power Pool ("SPP") operated their pools over multiple control areas.[21]

Second, Order No. 888-A provided that it is permissible that some transmission services may be provided from a pool, while other transmission services are provided by the individual transmission providers.[22] It is not discriminatory to provide some pool-wide transmission services to Members under a pooling agreement and to provide other transmission services to Members under the individual OATT of each SEEM Member as long as Members and non-Members have access to the same transmission services on a comparable basis and pay the same or a comparable rate for transmission.[23] Indeed, as long as there is a pool-wide tariff in compliance with FERC's regulations, participants may take service under the individual OATTs of public utilities that participate in the power pool.[24]

Third, the Commission's definition of loose power pool does not require the pooling agreement, which here is the SEEM Agreement, to provide for transmission planning, dispatch of generation, or operation of the transmission system. Again, the definition simply requires a multilateral agreement that contains discounted transmission rates or special terms and conditions

---

[20] Order No. 888, 61 Fed. Reg. at 21,594.

[21] *Western Systems Power Pool*, 83 FERC ¶ 61,099 at 61,477 (1998) (noting that membership was originally open only to those that operated their own control areas); *Southwest Power Pool, Inc.*, 82 FERC ¶ 61,267 at 62,053 (1998) (noting that transmission services are provided over 18 control areas), *reh'g granted in part*, 85 FERC ¶ 61,031 (1998).

[22] *See* Order No. 888-A, 62 Fed. Reg. at 12,313; *Public Service Co. of Colorado*, 79 FERC ¶ 61,141 at 61,617 (1997) (explaining that under Order No. 888, FERC directed a pool-wide tariff where previously "Members must make available transmission for pool transactions, but separate individual company rate schedules govern the actual service").

[23] Order No. 888-A, 62 Fed. Reg. at 12,313; *Southwest Power Pool*, 82 FERC ¶ 61,267 at 62,049 (approving provision of pool services under power pool OATT for short-term firm and non-firm point-to-point service and long-term point-to-point transmission services and network transmission services under the OATTs of the public utility members of the power pool).

[24] *See Western Systems Power Pool*, 83 FERC ¶ 61,099 at 61,477 (accepting proposal in which "WSPP members will be required to obtain transmission for WSPP transactions under their Individual Open Access Tariffs" and amendments to the "pool-wide open access tariff (limited to short-term transmission services) that would be used by any pool member that does not already have an Individual Open Access Tariff on file with the Commission (e.g., a municipal utility member)").

13

of transmission. It is clear that the SEEM pool does not provide joint system transmission planning, although there is considerable overlap of the pool with the Southeastern Regional Transmission Planning ("SERTP") region; there may be efficiencies to be gained in eventually having the SEEM pool administer the regional planning process required by Order No. 1000.[25]  It is also clear that, while the SEEM System administers the OATT process for determining which transmission customers receive transmission service and provides reservations for the NFEET Service, much like an independent transmission organization,[26] the SEEM Proposal will not control the operation of the transmission systems of the SEEM Members, as would an independent system operator ("ISO") or RTO. Operational control of transmission systems is a defining characteristic of RTOs and ISOs, not loose power pools. With regard to generation dispatch, there is no clear information about whether the SEEM Proposal will provide joint dispatch. The SEEM System will send signals to Participants in the market, just prior to the operating period, that will cause them to increase their generation, in the case of a seller, or decrease their generation, in the case of a buyer that is a load-serving entity backing down its more expensive generation. In many respects, these signals functionally serve as generation dispatch. However, for the purposes of determining whether the SEEM Proposal is a power pool, there is no need to decide this issue because generation dispatch is not a requirement for a loose power pool.

---

[25] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 76 Fed. Reg. 49,842, 49,854-49,918 (Aug. 11, 2011).

[26] *See, e.g.*, *Louisville Gas & Electric Co.*, 137 FERC ¶ 61,195 at PP 14-17 (2011) (describing the functions performed by new, conditionally-approved Independent Transmission Organization for Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities ("KU")); *Duke Power*, 113 FERC ¶ 61,288 at PP 2-3 (2005) (describing the role of Midwest ISO as the independent entity performing open access transmission functions, but not taking operational control of Duke Power's transmission grid).

2.     **The SEEM Proposal, as a loose power pool, needs a joint pool-wide OATT prior to operation.**

Commission regulations require each public utility member of the power pool to have a joint pool-wide or system-wide OATT on file with FERC prior to operating the power pool.[27]  The tariff must be the *pro forma* OATT "or such other open access transmission tariff as may be approved by the Commission consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the pro forma tariff."[28]  Because the features of the SEEM Proposal are those of a loose power pool, it must conform to Commission requirements for loose power pools, including an OATT and appropriate membership and governance policies. The Commission should further investigate whether a pool-wide OATT is applicable to the proposed SEEM as currently envisioned. While the Commission is limited in terms of the modifications that it can unilaterally impose under Section 205 of the Federal Power Act ("FPA"),[29] it can make clear to the SEEM Filing Entities that a pool-wide OATT filed by an independent Public Utility must be submitted and accepted prior to the operation of the SEEM.[30]

**B.     The SEEM Proposal, whether or not it is a loose power pool, must have just and reasonable and not unduly discriminatory membership and governance policy.**

The Clean Energy Coalition requests that the Commission investigate whether adoption of a single pool-wide *pro forma* OATT is required, and whether the membership and governance

---

[27] 18 C.F.R. § 35.28(c)(3).

[28] *Id.*; *MidContinent Area Power Pool*, 78 FERC ¶ 61,203 at 61,881 (1997) (stating that Public Utility power pools "may file a revised pool tariff with terms and conditions that differ from those in the compliance filing tariff, if they can demonstrate that the proposed revisions are consistent with, or superior to, the terms and conditions of the compliance filing tariff. (citing Order No. 888 at 21,619)).

[29] *See NRG Power Marketing, LLC v. FERC*, 862 F.3d 108, 114-15 (D.C. Cir. 2017).

[30] Giving guidance to filers is often part of the iterative process of forming regional arrangements and entities. *See, e.g., Southwest Power Pool, Inc.*, 106 FERC ¶ 61,110, at 61,368-69 (2004) (granting RTO status upon successful completion of additional steps, including implementation of an independent Board, modification of its governance structure, and selection of an independent market monitor to monitor the competitiveness and efficiency of the market); *order on compliance*, 108 FERC ¶ 61,003 at 61,014 (2004) (recognizing "that SPP has made significant progress in satisfying the prerequisites for RTO status" and directing further changes).

15

expectations for loose power pools set forth in Order No. 888 apply to the SEEM. However, even if the Commission ultimately decides that the SEEM Proposal does not result in the creation of a loose power pool, the Commission must address membership and governance shortcomings of the current SEEM Proposal.

### 1. The SEEM Proposal must allow unrestricted membership by any bulk power market participant in the Southeast.

Under the current SEEM Proposal, eligibility criteria for membership is tied to load-serving responsibilities.[31] Only entities that serve load can qualify as Members. This is inconsistent with Order No. 888 and related Commission precedent. In Order No. 888, the Commission clarified that the membership criteria in collaborations like power pool agreements "must allow any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location."[32] And with respect to power pools, coordination arrangements, and bilateral arrangements that allow preferential transmission pricing or access, it is "not enough to cure undue discrimination in transmission" if trading "with a selective group" involves "discriminatorily exclud[ing] others from becoming a member" and "provides preferential. . . transmission rights and rates" to members.[33] SEEM membership should therefore be open to any bulk power market participant in the Southeast, including independent power producers. The SEEM Filing Entities' non-discriminatory pool-wide tariff must ensure that membership criteria is consistent with Commission requirements. Absent that, the SEEM Proposal must be improved to remove these discriminatory barriers to membership.

---

[31] Overview Affidavit, Attachment B, at 13.

[32] Order No. 888, 61 Fed. Reg. at 21,594; *see MidContinent Area Power Pool*, 78 FERC ¶ 61,203 at 61,881 (explaining this and other requirements for loose power pools).

[33] Order No. 888, 61 Fed. Reg. at 21,593. In that discussion, Order No. 888 "use[d] the term power pool in a very broad context" to include "arrangements that represent some form of pooling" including "multilateral coordination arrangements." *Id.* at 21,593 n.415.

2.     **The SEEM Proposal must provide for fair and transparent governance.**

Even if the Commission does not find that SEEM is a loose power pool with associated governance requirements, the SEEM Proposal calls for regional collaboration and coordination with open and even-handed governance. As proposed, the governance provisions in the SEEM Agreement would allow concentrated decision-making authority in the hands of three large utilities in the Southeast: two Commission-jurisdictional public utilities and one federal power authority. These public utilities, which each maintain horizontal market power in their local Balancing Authority Areas, and the federal power authority have done little to advance the status quo minimum open access market structure in the Southeast for the quarter of a century since the Commission issued Order No. 888.

Order No. 888 builds on decades of precedent that finds exclusionary governance provisions inconsistent with the antidiscrimination requirements of the FPA. To remedy undue discrimination, the Commission and, before it, the Federal Power Commission ("FPC"), required entities like loose power pools to adopt governance rules that ensure fairness and transparency.[34] Indeed, the FPC required, and the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") upheld, removal of restrictions on membership in a loose power pool that allowed for one class of members to have more privileges than the other, creating unreasonable governance provisions and undue discrimination.[35]   Later, the Commission found that the governance rules of that same loose power pool "do not satisfy Order No. 888 because they give undue influence to vertically integrated utilities."[36] In particular, the Commission found

---

[34] *See* Order No. 888, 61 Fed. Reg. at 21,561 (citing *Central Iowa Power Cooperative v. FERC*, 606 F.2d 1156 (D.C. Cir. 1979)).

[35] *See Central Iowa Power Cooperative*, 606 F.2d at 1167.

[36] *Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075 at 61,317 (1999), *petitions for review denied, Alliant Energy Corp. v. FERC*, 253 F.3d 748 (D.C. Cir. 2001).

17

JA0674

impermissible a voting structure that awarded additional votes based on electric revenues from transmission revenues from pool transmission facilities, power sales revenues to non-pool customers from existing pool generation, and also power sales revenues over the past three years.[37] The Commission "direct[ed] [the power pool] to revise the governance for the Management Committee to eliminate voting on the basis of Electric Revenues which, as presently designed . . . gives too much influence to the vertically integrated utility members that own the transmission system."[38]

As currently structured, the governance of the SEEM is controlled by its Members, all load-serving entities,[39] through the Membership Board and Operating Committee.[40] Each Member has two votes on the Membership Board: 1) a single vote ("Popular Vote"); and 2) a weighted vote based on the Member's net energy for load ("NEL Vote").[41] For any vote, the combined NEL Vote must represent at least three entities.[42] To pass significant changes, e.g., market rule amendments, requires a majority Popular Vote *and* a greater than 67% NEL Vote.[43]  All other changes require majority votes of the Popular Vote and NEL Vote.[44]  The Operating Committee, which handles day-to-day activities and action on any matter not reserved for the Membership Board, will have four Members, each with a single, equal vote: two from the Investor-Owned Utility Sector, one from the Cooperative Sector, and one from the Governmental Utility Sector.[45] Votes by the

---

[37] *Id*. at 61,317 & n.43 ("Each member has one vote plus additional votes awarded on the basis of Electric Revenues, with a 20 percent cap on the votes of any single member or group of affiliates.").

[38] *Id*. at 61,317-18.

[39] *See* SEEM Agreement § 3.2.1 (member criteria).

[40] SEEM Agreement Transmittal Letter at 21-22.

[41] *See* SEEM Agreement at § 4.1.5 (describing the assignment of member votes according to Net Energy for Load).

[42] SEEM Agreement Transmittal Letter at 21; SEEM Agreement § 4.1.5(b) (noting that the majority of Net Energy for Load Vote must be comprised of at least three member representatives). Affiliated Members are counted as a single Member for the popular vote.

[43] SEEM Agreement Transmittal Letter at 21

[44] *Id.*

[45] *Id*. at 22.

Operating Committee must be unanimous, with any issues that cannot be resolved taken up to the Membership Board.[46]

This governance structure is not just and reasonable, not only because it excludes whole classes of interested parties from any participation in governance as addressed above regarding membership, but also because it allows for control entirely by vertically integrated utilities. In order for the Commission to find the SEEM agreement to be just and reasonable, the SEEM Filing Parties must revise these provisions to be consistent with the Commission's more open requirements for regional entities that are or function like loose power pools. It is not consistent with Order No. 888 or its application to regional coordination efforts for influence to be wielded by one type of market participant. This leaves others without a say in the operation of the regional entity or the development and potential adoption of market rule changes. For the SEEM Agreement to satisfy the FPA's "just and reasonable" standard, the SEEM Filing Entities must reform the governance structure to be consistent with the Commission's longstanding rules and restrict the undue influence of vertically integrated utilities in the SEEM Proposal.[47]

Indeed, even if the Commission decides, contrary to its regulations, that a pool-wide tariff is not required, the proposed governance of the SEEM does not provide for reasonable representation. The proposed voting structure effectively gives the three largest utility Members veto rights over any significant issues. Assuming conservatively that membership expands to include all those entities that have not yet signed the SEEM Agreement, Tennessee Valley Authority ("TVA"), Southern Company, and Duke Energy would control about 26%, 25% and 22% of the NEL Vote, respectively.[48]  The remaining ten Members make up a mere 28% of the

---

[46] *Id.*

[47] Order No. 888, 61 Fed. Reg. at 21,561; *see also Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075 at 61,317.

[48] *See* Operations Affidavit, Attachment C, at 9-10.

19

JA0676

NEL Vote with the largest share of a single small Member being almost 7%.[49]  This means that a change to any market rule or other significant provision of the SEEM Agreement would require at least two of the three largest Members in addition to all of the smaller ones. Any other change would require at least one of the three largest Members and all of the smaller ones. In this way, TVA, Southern Company, and Duke Energy maintain control over the SEEM Market Rules and structures. In practice, this will lock in all of the provisions in the current SEEM Agreement for the foreseeable future and not allow for changes to be made to respond to circumstances that may arise in the course of operating the SEEM or for any evolution to more beneficial forms of markets.

### 3.    The SEEM Proposal must provide stakeholders with a process for participating in SEEM decision-making.

The Commission should require that the SEEM tariff (whether a system-wide power pool OATT or other agreement) provide for a robust stakeholder process that explicitly contemplates the participation of customers, independent suppliers, public interest groups, and state and local regulators. Each of these groups have important input to offer on regional energy issues and should be permitted to provide that input on the administration of SEEM. A formal structure for considering that input in the SEEM decision-making process is vital.

As currently proposed, the SEEM Agreement provides for an annual meeting that "will be an open forum for stakeholders to address any issues they may have with the Southeast EEM."[50] This once-a-year commitment to a single meeting is plainly insufficient. The annual meeting will provide a venue for stakeholders to discuss issues, but that is all it would entail. The SEEM Agreement Filing gives no indication that the Membership Board is in any way obligated to

---

[49] *Id.*
[50] SEEM Agreement Transmittal Letter at 23.

JA0677

respond to or even consider issues raised by stakeholders at the annual meeting.[51]  The Commission should remedy this by requiring that SEEM, like other regional efforts, include a substantive and meaningful stakeholder process. Specifically, the Commission should make clear that the SEEM must have a stakeholder process that ensures inclusiveness, balances diverse stakeholder interests, provides for representation of minority positions, and responds to the ongoing system needs of SEEM Participants and other stakeholders.[52]

### C.  The lack of transparency of market prices and transactions, as well as opportunities to exercise market power, require market monitoring and potentially the implementation of market mitigation measures.

While the SEEM Proposal could incrementally increase market opportunities in the Southeast, the proposal suffers from flaws that ultimately may stymie its success. Because of the lack of transparency into market activity, participants' ability to impose opaque constraints on trading, and anemic auditing and oversight provisions, the SEEM Proposal falls well short of the image projected by its proponents—that it will be an actual regional marketplace with open participation that will drive customer savings. Clean Energy Coalition requests that the Commission direct SEEM Filing Entities to supplement their incomplete filing with information regarding the following: (1) how they will provide necessary transparency through release of pertinent data, after a reasonable time lag, that is consistent with regional entity practices; (2) how and to what extent Energy Exchanges will erode the hourly bilateral market and how this will affect the potential to exercise market power; (3) what options, other than Counterparty Specific

---

[51] SEEM Agreement, Article 4, § 4.4.

[52] *Accord*, *Wholesale Competition in Regions With Organized Electric Markets*, Order No. 719, 73 Fed. Reg. 64,100, 64,102 (Oct. 17, 2008) (articulating principles of RTO and ISO responsiveness to customers and other stakeholders); *California Independent System Operator Corp.*, 133 FERC ¶ 61,067 at P 41 (2010) (noting that "governance policies and stakeholder processes should be well suited to enhance appropriate stakeholder access to RTO/ISO boards and, in turn, facilitate the boards' direct receipt and consideration of stakeholder concerns and recommendations, including minority views").

Constraints, would allow SEEM Members to address affiliate and market-based rate limitations without presenting significant opportunities for market power abuses; (4) how the SEEM Proposal will provide meaningful monitoring or mitigation of the opportunities for exercise of market power in the SEEM; and (5) a structural market power analysis to assess whether SEEM Members have market power under the SEEM structure in neighboring Balancing Authority Areas.

The SEEM Members claim that the SEEM Agreement was developed with "objectives of transparent operation with minimal bureaucracy to maximize benefits to customers."[53] Unfortunately, the proposed Market Rules do not reflect this intention. Instead of transparency, the rules, procedures, and decision-making structure offer meager information regarding transactions and market prices. Only Members under the SEEM Agreement have decision-making power and Participants' audit rights are limited to their own information. Without more transparency that offers some assurance of fairness and proper market function, independent sellers and buyers of power may severely limit their participation in SEEM, which in turn will defeat the goal of maximizing benefits to customers. The public reports to be published by the SEEM Administrator do not increase transparency appreciably—these reports' "pricing information will be aggregated" and provided at some later point.[54]  It is not clear how this information will shed light on whether the SEEM is working properly and providing benefits. As the Commission knows, RTOs and ISOs provide bids and offer information after sufficient time lag; this has not resulted in anti-competitive price discovery. Thus information like trading intervals, trade price-volume sources and sinks, average pricing for intervals, and sub-regional pricing should be published, after a similar time lag and in a similar manner to other regional entities.

---

[53] SEEM Agreement Transmittal Letter at 17.
[54] *See* SEEM Agreement Transmittal Letter at 30; SEEM Agreement, Appendix B § V.

JA0679

Furthermore, SEEM presents potential risks of expansion of market power of incumbents. The SEEM Agreement Filing makes clear that each of the Public utilities forming the SEEM lacks market-based rates in their own Balancing Authority Areas due to market power concerns.[55] This existing market power could be exacerbated by the zero-charge transmission rate for NFEET Service eroding the demand for hourly trading, as reported in the Guidehouse Report.[56] As the vertically integrated SEEM Members rely more on Energy Exchanges, the bilateral market and hourly trading may diminish. With a diminished hourly bilateral market, more sellers may be forced into the SEEM, with less than clear results. Moving more and more trading into the SEEM, without a clear window into the functioning of that market, offers vertically integrated utilities an opportunity to negotiate among themselves the prices for the power that they purchase. This is especially harmful to independent power providers that are not allowed input into the governance of the market, the modification of market rules, or provided with independent insight or transparency into market function. And, as the Commission knows, flawed market design, especially in real-time markets, can "create[] opportunities for bad outcomes."[57]

Troubling too is the fact that suppliers are permitted to include any constraints, without limitation, on their Offers and Bids.[58] Little transparency, yet wide discretion, is a recipe for undue discrimination among similar transactions. The SEEM Filing Entities explain that each Participant may enumerate "counterparties with whom it will not accept a match or geographic areas where it will not trade—known as "Counterparty Specific Constraints" that "can be selected for any

---

[55] *See* SEEM Agreement Transmittal Letter at 39 & n.147.

[56] Benefits Analysis, Attachment E, page 19 of 32.

[57] *See* William W. Hogan, *Electricity Market Design: California ISO/PX 'Fundamentally Flawed'*, Harv. Electricity Pol'y Grp. at 13 (Oct. 1, 2019), *available at* https://scholar.harvard.edu/whogan/files/hogan_hepg_calmelt_100119.pdf.

[58] *See* SEEM Agreement, Appendix B, Market Rules § IV.A.1.b.

reason."[59] Participants may also supply "information about its Bid or Offer" of its own determination.[60] The matching process then connects bids with offers accordingly,[61] though the SEEM Proposal makes clear that the platform "will not set or police individual restrictions"[62] as those are up to Participants. In other words, the Market Rules allow for self-styled constraints on offers that, while presented as a means for Participants to mind their affiliate and market power restrictions, would effectively allow them to limit transactions for almost any reason, not only those legal requirements. In so doing, SEEM Members may be able to withhold NFEET Service from their competitors by not designating their competitors as counterparties. Since Participants "do not have to identify a reason for their selection," seemingly even to the platform or any independent observer,[63] this constraint discretion undoubtedly allows for Participants to only transact with certain entities, and if so motivated, to the exclusion of independent power providers. SEEM Filing Entities should explain what other options were considered to address affiliate and market-based rate limitations and whether these options present the same significant opportunities for market power abuses.[64]

Even if there were a clear paper trail for an independent authority to follow, the proposed administration and auditing structures are also acutely insufficient to ward against undue discrimination because they provide no meaningful safeguards or assurances for Participants not in charge of the Membership Board.[65] With respect to administration, the Membership Board alone

---

[59] SEEM Agreement Transmittal Letter at 26-27.

[60] *Id*. at 27-28.

[61] *Id.* at 29.

[62] *Id.* at 27. So long as "at least three potential counterparties for each transaction" are enabled, a transaction may proceed and Participants "do not have to identify a reason for their selection." *See id.*

[63] *See id.*

[64] *See* Operations Affidavit, Attachment C, at PP 40–41.

[65] *See* SEEM Agreement Transmittal Letter at 16-17.

would retain the power to hire and fire, without cause, the SEEM Agent, a Member that acts as signatory for the Members.[66]  The SEEM Agent in turn hires the SEEM Administrator that runs the day-to-day operations of the SEEM System.[67] This effectively gives the Membership Board control over the day-to-day operations of the SEEM System—only one signatory that will "perform a purely administrative role" is between the operator and the Members.[68] This puts too much control into the hands of those with the incentives and ability to implement the Market Rules in ways that benefit load-serving entities or vertically integrated utilities to the detriment of other participants in the market.

The requirement for periodic audits of the Market Rules by an "independent" SEEM Auditor is of no help. The SEEM Filing Entities go to great lengths to explain that the SEEM Auditor will not act a market monitor and will only ensure that SEEM is "operating correctly and in accordance with the Market Rules."[69]   However, even within these extremely narrow parameters, the SEEM Agreement goes on to specify that the Membership Board alone will hire the Auditor and that it alone would determine how often, if ever, the Auditor performs its auditing function.[70] Additionally, the Membership Board would retain sole authority to determine whether to share this information with anyone outside of the Board, that is, if any reports are produced by the auditor.[71] Thus, the Membership Board need not release *any* information or act on *any* flaws identified by the auditor. It is free to ignore them.

---

[66] *See id.* at 18; *see also* SEEM Agreement §§ 6.1, 6.3.

[67] SEEM Agreement, Art. 1, definition of *Southeast EEM Administrator*.

[68] *See* SEEM Agreement Transmittal Letter at 18.

[69] SEEM Agreement Transmittal Letter at 17 ("The Auditor will not be a market monitor; it will not monitor Participant behavior, nor will it be tasked with suggesting improvements to the Southeast EEM"); *id*. ("[T]here is no need for a market monitoring function. . . ."); *id*. ("Members are unwilling to fund the costs of a market monitor.").

[70] SEEM Agreement, Appendix B at § VI.D.6.

[71] *Id.* at § VI.D.

Regardless of whether the SEEM Proposal forms a loose power pool, these problems show why the Commission must require an independent market administrator as well as an independent market monitor that can meaningfully monitor SEEM market behavior and market participants. Any activity that constrains transmission or excludes competitors in the SEEM for market advantage would amount to market manipulation, yet it is not at all plain from the SEEM Proposal how those activities could be detected and remedied. Calling the SEEM Administrator and SEEM Auditor "independent" does not make them independent[72]—only the structure of their relationships can make the market operators independent of and free from undue influence by any Member or Participant in the SEEM.[73]

Substantively, to guard against the exercise of market power prior to the Algorithm solving for the market benefits and matching Offers and Bids, the independent market monitor should develop mitigation measures that operate as an overlay on top of Participants' submissions. Consistent with Commission policy, the exercise of market power must be addressed prior to running the market to avoid the disruptive and difficult task of re-running the market later to determine just and reasonable outcomes. If the Commission were to depend solely on Electronic Quarterly Reports to determine whether the exercise of market power occurred in the SEEM, the retrospective option the current SEEM Proposal embraces,[74] it would inevitably have to "unscramble the eggs" of the market outcomes to remedy the harm. Given the market power that already exists for Public Utility Members of the SEEM, it is reasonable for the Commission to

---

[72] *See* SEEM Agreement Transmittal Letter at 18.

[73] *See Southern Company Services, Inc.*, 125 FERC ¶ 61316 at PP 48–50 (2008) (directing development of an Independent Auction Monitor).

[74] *See* SEEM Agreement Transmittal Letter at 7, 30-31.

require, for any SEEM that goes forward, the formulation and implementation of mitigation measures by an independent market monitor.

Finally, to supplement their incomplete filing, the SEEM Filing Entities should submit a market power analysis by which the Commission can judge each entity's structural market power under the SEEM. While the SEEM Agreement Filing makes clear that the SEEM Members that are public utilities do not have market-based rates in their own balancing areas, the Commission should investigate whether these utilities have structural market power under the SEEM in any of the other balancing areas in the SEEM Territory. The Commission has ordered such analysis before and it should do so here in a deficiency letter.[75]

In sum, the Commission should request information on how the SEEM Filing Entities will implement, in their tariffs, minimum market transparency, antidiscrimination, and market administration and monitoring protections that allow for confidence in and effective oversight of the SEEM.

### D.    The projected savings from SEEM are not fully supported and other market options likely provide much greater cost savings.

Clean Energy Coalition asks that the Commission direct a supplemental filing that provides detail on:   (1) the definition of "benefit" in the SEEM benefits analysis; (2) participation assumptions in that analysis; and (3) the discount, if any, applied to account for curtailment of Available Transmission Capacity ("ATC") in the analysis.

The SEEM Filing Entities portray the Proposal as a new opportunity to unlock efficiencies, but these projections are likely overstate and should be put in perspective. When presented with a

---

[75] *See California Independent System Operator Corp.*, 147 FERC ¶ 61,231 at P 219 (2014) (ordering new EIM member to submit market power analysis "so that the Commission can assess whether [member] has structural market power in its BAAs under the EIM structure"), *reh'g denied, clarification granted*, *California Independent System Operator Corp.*, 149 FERC ¶ 61,058 (2014).

new market-oriented proposal, the Commission conducts "a 'common-sense assessment'" that asks whether "the costs that will be incurred are consistent with the ratepayers' overall needs and interests."[76] Though this is not a formal "quantified cost-benefit analysis" requirement, the Commission must determine whether the "overall design" of market-based proposals are just and reasonable, which requires close attention to the professed benefits and anticipated costs of the proposal.[77] The SEEM Filing Entities have gone further than that and identified that their SEEM proposal is "based . . . on . . . the principle that market benefits must exceed costs, collectively and for each market participant."[78] To substantiate that principle, the SEEM filing includes a "benefits analysis" that projects "approximately $40 million in market-wide benefits per year, largely from fuel cost savings" if SEEM Members' integrated resource plans come to fruition.[79] It compares those projected benefits to "individual internal company start-up and ongoing costs (totaling about $3.1 million per year on a levelized basis)" plus start-up costs for the SEEM Platform of "$1 million to $5 million, with ongoing annual costs estimated below $1 million."[80] The benefits analysis also projects that benefits would increase with greater penetration of solar and wind generation in the Southeast beyond that expected by Member integrated resource plans.[81] Most of the benefits projected in the benefits analysis come from providing access to lower cost resources "in managing subhourly load and renewable uncertainty."[82]

---

[76] *Southwest Power Pool, Inc.*, 173 FERC ¶ 61,267 at P 30 & n.52 (2020) (quoting *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,157, at P 30 (2016) and finding the design of SPP's Western Energy Imbalance Service Market to be just and reasonable).

[77] *Id.* at P 30.

[78] SEEM Agreement Transmittal Letter at 12.

[79] Transmittal Letter at 2-3, 11, 32.

[80] Transmittal Letter at 11.

[81] Transmittal Letter at 12, 32-33. It should be noted that the SEEM Filing Entities provide no basis for how this "carbon constrained scenario" would ever come to pass given that the SEEM itself will in no way require the procurement of more wind or solar resources in the Southeast.

[82] Benefits Analysis, Attachment E-1 at page 7 of 32 ("Guidehouse Report").

However, as the Commission knows, "the devil is in the details,"[83] and projections are only as good as the assumptions underlying them. Specifically, here there are at least three critical details of the benefits analysis that should make the Commission question the accuracy of the analysis and not rely upon it in making ultimate conclusions or determinations. At a minimum, the Commission should request additional information of the SEEM Filing Entities to give the Commission and parties full information about the benefits claimed in the SEEM filing.

The threshold issue that requires additional information is how the SEEM Filing Entities determined what constitutes a 'benefit' in the proffered benefits analysis. Quite simply, the benefits may be overstated, may not reflect the proposed pricing in the SEEM, and may not aid the Commission in evaluating the proposal. The Guidehouse Report explains that the "[SEEM] benefits are derived from fuel cost savings" because the SEEM Proposal would allow load-serving entities "access to a lower cost, more efficient pool of resources to manage subhourly load and renewable uncertainty."[84] The report gives a "simple example" of a SEEM settlement resolving a 300 megawatts ("MW") sub-hourly imbalance at $26/MWh, but does not explain exactly how much even that "simple example" contributes to the benefits calculation—it merely says "[t]he split-savings trading price of $26 provides benefits to both Company X and Company Y."[85] Only by reference to the overall benefits estimate, reported on the next page as "about $45 million" a year, does the report estimate a dollars-per-MWh figure for benefits.[86] And that calculation finds

---

[83] *See California Independent System Operator Corp.*, 116 FERC ¶ 61,274 at PP 741-43 (2006) (finding proposed approach to congestion revenue rights allocation and auction methodology to be reasonable, but reaffirming the Commission's "expressed interest in the dry run" the filer intended to undertake and report on before the process actually went live), *requests for clarification and rehearing granted in part and denied in part*, 119 FERC ¶ 61,076 at PP 391-92, 400-01 (2007), *requests for clarification and rehearing granted in part and denied in part*, 120 FERC ¶ 61,271 (2007).

[84] Benefits Analysis, Attachment E-1 at page 16 of 32.

[85] *Id*. at 8 n.11.

[86] *Id*. at 9 & n.13.

29

JA0686

an "approximately $2/MWh benefit for *each company participating* in the transaction," suggesting that the entire price difference between buyers and sellers in SEEM settlements should count as a 'benefit' from the market as a whole.[87]

Indeed, despite the Guidehouse Report's statement that "benefits are derived from fuel cost savings,"[88] which would suggest that 'benefit' means savings that might eventually accrue to customers, other parts of the SEEM filing explain that the "term, 'benefits,' as used in this context, is *not* synonymous with 'economic cost savings,'" but instead is measured by the total difference between buyers' bids and sellers' offers:

> The total benefit of a single Energy Exchange transaction is the savings enabled by the transaction, as measured by the bid of the buyer minus the offer of the seller multiplied by the megawatt-hour quantity of the transaction, less the total cost of losses for the transaction.[89]

Whether and how these benefits actually flow back to customers is unclear. And even if that 'benefit' did flow back to customers in full on both sides of the transaction, this measurement of benefits also depends on the further assumption that participants exhibit 'true cost' bid/offer behavior,[90] which is neither required nor guaranteed.[91]

Second, the benefits analysis is not fully clear about its participation assumptions, even though "[l]imited participation by members is the largest risk to Southeast EEM benefits" that the authors identified.[92] The SEEM Agreement allows Participants to place constraints on their offers

---

[87] *Id.* at 9 & n.13 (emphasis added); *see also* Economics Affidavit, Attachment D at P 5 (each transaction participant "receives half of the energy-related benefits of the Energy Exchange, as measured by the difference between the bid price and offer price, and each pays half of the cost of transmission losses").

[88] Benefits Analysis, Attachment E-1 at page 16 of 32.

[89] Economics Affidavit, Attachment D at P 34 (emphasis added).

[90] Benefits Analysis, Attachment E-1 at page 15 of 32.

[91] *See* Economics Affidavit, Attachment D, at PP 36, 41, 59 (describing "an incentive for buyer bids and seller offers to deviate from their underlying costs" due to split-the-difference pricing).

[92] Benefits Analysis, Attachment E-1 at page 8 of 32. The study "somewhat limited" participation in its assumptions to account for this issue but reports market participation levels as having a "High" impact on results. *Id.* at page 15 of 32.

for any reason.[93] While there is a requirement for participation in Energy Exchanges that the constraints must be set such that there are at least three other non-affiliated Participants with whom the submitting Participant can be matched,[94] the default is non-participation. Members must take affirmative action to actively toggle on other Participants in order to offer or bid in the SEEM.[95] This structure could reduce transactions to a level well below that assumed in the Guidehouse Report. To believe the results of the benefits analysis, one must "assume[] a well-functioning, and relatively high-participation market."[96] But the study also reported that "modeled participation is somewhat limited to reflect that some imbalance will be handled internally as opposed to being met with the market."[97] Indeed, market participation assumptions have a "High" impact on results, yet it is not clear what the difference is between "relatively high-participation" or "somewhat limited" participation, and what this "single largest uncertainty" means for the trustworthiness of the benefits numbers reported.[98] This too bears further explanation, as it is not clear the degree to which the results of the benefits analysis are driven by its participation assumptions.

Third, the Benefits Analysis does not appear to discount the benefits for the potential of NFEET Service curtailment. While the Guidehouse Report recognizes that "there will be a new $0/MWh transmission product which can only be procured in the intra-hour market for any remaining non-firm ATC and represents the lowest level priority of non-firm transmission service,"[99] it uses average 2019 ATC for calculating benefits as compared with a base case for

---

[93] Operations Affidavit, Attachment C, at P 40.

[94] *Id.* at P 39.

[95] *Id.* at P 41 ("the default setting for all locations and all counterparties will be 'off,' so that the [p]articipants must affirmatively turn on their ability to trade with specific counterparties and in specific locations").

[96] Benefits Analysis, Attachment E-1 at page 19 of 32

[97] *Id.* at page 15 of 32.

[98] *Id.* at pages 15, 19 of 32.

[99] *Id.* at pages 5 of 32.

31

JA0688

which it assumes that the remaining ATC is unused.[100] But the NFEET Service as the lowest priority of non-firm transmission service will be subject to the most curtailments. Therefore, it may be an inappropriate assumption to use the full average 2019 ATC for calculating benefits.

While these three details provide a reason for questioning the benefits estimate for SEEM, there is a more fundamental reason for the Commission to carefully scrutinize any claimed benefits here. The utilities repeatedly make analogies to other regional constructs like the Western Energy Imbalance Market ("Western EIM"), seeking to invite the comparison between the SEEM proposal and the efficiency-advancing regional efforts the Commission has seen before.[101] This comparison with other market deserves exploration. Even taking the benefits analysis at face value, the results show just how far away from a true efficiency-advancing regional effort the SEEM proposal is in actuality. The SEEM Filing Entities project a $40 million annual benefit from implementation of the SEEM proposal, subject to the above uncertainties and questions. The annual economic benefits projected at the outset of the Western EIM were "between $21 and $129 million" for the imbalance market connection between the California Independent System Operator and PacifiCorp alone,[102] and, in practice, since market operation (and thanks in large part due to robust participation) the actual benefits have run into the hundreds of millions of dollars per year.[103] Studies of participation in full RTO/ISO market constructs show benefits an order of magnitude greater; billions can be saved per year when utilities, including vertically integrated utilities, form true regional markets.[104] If only one state in the SEEM footprint were to participate in an RTO,

---

[100] *See id*. at 15 of 32.

[101] *See, e.g.*, Transmittal Letter at 35 & n.130, 36 & n.135, 37 & n.140.

[102] *See California Independent System Operator Corp.*, 147 FERC ¶ 61,231, at P 4.

[103] *See Benefits*, Western Energy Imbalance Market (as of Jan. 29, 2021) (reporting annual benefits in 2017 of $145.82 million, in 2018 of $276.44 million, in 2019 of $296.91 million and in 2020 of $325.08 million), *available at* https://www.westerneim.com/Pages/About/QuarterlyBenefits.aspx.

[104] *See* Judy Chang *et al.*, *Potential Benefits of a Regional Wholesale Power Market to North Carolina's Electricity Customers*, Brattle Group at 6 (Apr. 2019) (Table 2 – Recent Retrospective RTO Membership Study Benefits)

JA0689

that decision alone is projected to have greater customer benefit than all of the utilities' participation in SEEM is claimed to have.[105] If the Southeast were to band together to create a new RTO, the potential benefits could total in the hundreds of billions by 2040.[106] The Clean Energy Coalition encourages the SEEM Filing Entities and the Commission to think more ambitiously than the proposal offered in these proceedings, given the tremendous upside to true regional market integration.

Finally, while the Clean Energy Coalition recognizes that the total start-up and ongoing costs of the SEEM are expected to be low, that is, perhaps around $4 million annually, plus $1 million to $5 million to develop the SEEM Platform,[107] the question remains whether even this level of expenditure is prudent given the uncertainty in benefits of SEEM, the potential downside risks it presents for market power and governance in the region, and the insignificance of its projected benefits relative to the benefits of an organized imbalance market operating with locational marginal pricing or a full-scale RTO market. An expenditure of $5 million to establish a trading Platform is still $5 million not well spent should the region or any individual Member (or its regulator) determine in a couple of years that another market model is more appropriate. Any Member that departs from SEEM is required to pay "any costs previously allocated to them prior to the date of their withdrawal"; it is not entirely costless to exit the market.[108]  Importantly,

---

(collecting results of retrospective RTO membership studies), *available at* http://brattlefiles.blob.core.windows.net/ files/16092_nc_wholesale_power_market_whitepaper_april_2019_final.pdf; *see also* Midcontinent Independent System Operator, Inc., *2020 MISO Value Proposition – Executive Summary* (Feb. 12, 2021) (showing that "MISO provides between $3.1 and $3.9 billion in annual net economic benefits to its region with over $30b to date"), *available at* https://cdn.misoenergy.org/2020%20Value%20Propostion%20Exec%20Summary521884.pdf; PJM Interconnection, L.L.C., *PJM Value Proposition* (2019) ("PJM operations, markets and planning result in annual savings of $3.2−4 billion."), *available at* https://pjm.com/about-pjm/~/media/about-pjm/pjm-value-proposition.ashx.

[105] *See* Chang *et al.*, *supra* note 26 at 7 (production cost benefits recognized in RTO membership studies, if applied to Duke's North Carolina thermal power plants, "would yield roughly $60 million to $180 million in annual customer savings").

[106] *See generally* Energy Innovation Southeast Market Summary Report.

[107] *See* SEEM Agreement Transmittal Letter at 11.

[108] SEEM Agreement Transmittal Letter at 19; *see also* Platform Agreement, § 4.2.

the efforts and money spent to implement the SEEM should form a foundation for broader market reform and policy solutions in the region[109]—not calcify an incremental step that provides only the most modest of net benefits to the region.

### E. The Commission should investigate whether the OATT amendments by SEEM Filing Entities are consistent with or superior to the *pro forma* OATT and whether it presents opportunities for undue discrimination.

Clean Energy Coalition asks the Commission to require the SEEM Filing Entities to provide further information on the following incomplete aspects of the SEEM Proposal: (1) whether the proposal meets the Commission's OASIS requirements; (2) whether it properly applies imbalance charges; (3) the magnitude of cost shifts to point-to-point and network customers (that are not native load customers of SEEM Members) and among SEEM Members from loss of non-firm point-to-point transmission revenues; (4) detailed information on the Algorithm, its development costs, and its operation; and (5) whether the restriction against in-kind payment of transmission losses is unduly discriminatory.

### 1. The SEEM proposal raises significant market transparency concerns given that it prohibits use of existing Open Access Same Time Information Systems.

The proposed NFEET Service departs from settled practices and Commission precedent on market transparency in at least one critical way—the SEEM Filing Entities explain that NFEET Service "may be obtained only using the reservation, scheduling and tagging functions of the Southeast EEM System (rather than directly through Open Access Same Time Information System) . . . offered by the Participating Transmission Provider."[110] While the Clean Energy

---

[109] Broader market reforms have the best potential to provide solutions to help address the climate crisis and displace new investments in fossil generation that may become stranded with carbon pricing or similar policies. *See* Tyler Fitch, *Carbon Stranding: Climate Risk and Stranded Assets in Duke's Integrated Resource Plan*, Energy Transition Inst. (Jan. 2021), *available at* https://energytransitions.org/carbon-stranding.

[110] SEEM Agreement Transmittal Letter at 24.

JA0691

Coalition understands that non-public utilities may have other methods for reserving transmission capacity, all Commission-jurisdictional Transmission Providers are required by Commission regulation to post transfer capability and accept transmission service requests through an OASIS.[111] The reason for this requirement is that "accurate postings and fair treatment" are necessary to "competitive utilization of transmission systems" and to "discerning any patterns of undue discrimination."[112] Indeed, for decades, the Commission has made clear "that open access non-discriminatory transmission service requires that information about the transmission system must be made available to all transmission users at the same time by way of the" Transmission Provider's OASIS.[113] Yet here, the SEEM proposal not only does not operate through the existing OASIS framework; it expressly *forbids* NFEET Service from being obtained through those systems.

The SEEM Proposal contains precious little information about this no-OASIS requirement and how it is just and reasonable and not unduly discriminatory, or even how the SEEM platform will ensure market transparency and full, public information about NFEET Service use.[114] The SEEM Filing Entities pledge to post information to the "Southeast EEM website," but do not

---

[111] 18 C.F.R. § 37.5(a) ("Each Transmission Provider is required to provide for the operation of an OASIS, either individually or jointly with other Transmission Providers, in accordance with the requirements of this Part."); *id.* at 37.1 ("This part applies to any public utility that owns, operates, or controls facilities used for the transmission of electric energy in interstate commerce and to transactions performed under the *pro forma* tariff required in part 35 of this chapter."); *see also id.* § 37.6 (Information to be posted on the OASIS).

[112] *Open Access Same-Time Information System and Standards of Conduct*, Order on OASIS-Related Issues, 83 FERC ¶ 61,360, at 62,456 (1998), *rehearing denied*, 86 FERC ¶ 61,139 (1999).

[113] *Id.* at 62,450.

[114] *See* Transmittal Letter at 10-11 (comparing the "Existing Market" to "Addition of Southeast EEM" regarding "Transparency" with the only changes being "Southeast EEM transaction eTags collected by FERC pursuant to Order No. 771 will be identifiable" and "Additional, publicly posted aggregate information about Southeast EEM transactions and an Annual Meeting"); *id.* at 30-31 (describing transparency and auditing plans, mostly with respect to generation transactions); Benefits Analysis, Attachment E-1 at page 23 of 32 (explaining that uncertainties remain regarding "the compatibility between the existing software systems in house with the software provided by the selected central entity").

35

indicate whether this portal will serve as the OASIS for the SEEM or explain how it meets the Commission's OASIS requirements.[115]

The Commission has the ability to grant waivers from OASIS requirements,[116] for example when those "regulations are incompatible with the transmission services provided under" the transmission provider's tariff,[117] but that is clearly not the case here. And these particular transmission providers are not small utilities or owners of limited and discrete facilities either.[118] Thus, it is incumbent upon the SEEM Filing Entities to explain how the no-OASIS approach to the SEEM Platform is just and reasonable, and consistent with the Commission's market transparency policies when it comes to the availability of NFEET Service.

2.    **The proposal to apply generator imbalance penalties is unclear and may be unjust and unreasonable.**

The SEEM Filing Entities propose to apply generator imbalance penalties on Energy Exchange transactions,[119] but fail to explain exactly how these penalties will be applied. LG&E and KU ("LG&E/KU") provides this further explanation in its OATT filing:  "If a Southeast EEM transaction is cut, or not fulfilled, the affected Participant must have the capability to ramp its owned or contracted generation to make up the difference, or face imbalance charges, just like it would for any non-firm transaction."[120] But that explanation is still lacking in several

---

[115] Operations Affidavit at P 53; *see also* SEEM Agreement art. 10 (Transparency; Confidentiality; Auditing).

[116] *See, e.g.*, *New York Independent Sys. Operator, Inc.*, 134 FERC ¶ 61,255 at PP 6-7 (2011) (describing prior orders granting "waivers from certain Open-Access Same Time Information Systems (OASIS) posting requirements").

[117] *See, e.g.*, *New York Independent Sys. Operator, Inc.*, 130 FERC ¶ 61,104 at P 18 (2010); *Alcoa Power Generating Inc., (Tapoco Division)*, 120 FERC ¶ 61,037 at P 15 (2007) (granting waiver where no OATT needed to be on file).

[118] *See, e.g.*, *American Municipal Power, Inc.*, 163 FERC ¶ 61,220 at PP 15-17 (2018); *Central Minnesota Municipal Power Agency*, Order on Requests for Disclaimer of Jurisdiction and for Waiver of Order Nos. 888 and 889, 79 FERC ¶ 61,260, at  62,127 (1997).

[119] SEEM Agreement Transmittal Letter at 30 (if "Participants to the transaction do not operate in accordance with the e-Tag schedule (*i.e.,* generator does not ramp up to serve schedule), the offending Participant(s) may be subject to imbalance charges through the applicable transmission tariffs"); *see* Operations Affidavit at P 47 (explaining that imbalance penalties will apply as they always have).

[120] LG&E OATT Filing, Transmittal Letter at 11.

36

important details, as explained next, and may be unjust and unreasonable as applied to SEEM transactions.

First, there should be only one transmission customer per Energy Exchange transaction and that transmission customer should be responsible for imbalance charges. To do otherwise contradicts the Commission's *pro forma* OATT requirements regarding imbalances and could result in double charges.[121]  The SEEM Proposal contemplates that every buyer and seller would be a transmission customer taking NFEET Service under the OATT of every public utility in the Territory.[122]  When buyers and sellers are matched and a reservation is made by the SEEM System, either the buyer or seller must be designated as the transmission customer. The SEEM Filing Entities have not explained how this will occur, nor have they explained which entity will be designated as the transmission customer. Because it is unclear whether the load or generator will be the transmission customer in the Energy Exchange transaction, it is impossible to determine whether transmission providers will properly apply imbalance penalties. Moreover, because there is a single contract path for each Energy Exchange transaction, the imbalances should be treated as if they are in a single Balancing Authority. This result could be efficiently achieved through a pool-wide tariff, as required by the Commission's regulations for multilateral agreements with discounted transmission like the SEEM Proposal (and as discussed above).[123]

Second, penalties are "applied hourly to any generator imbalance that occurs as a result of the Transmission Customer's scheduled transaction(s)" and netted on a monthly basis.[124]  SEEM

---

[121] *See Pro Forma* OATT, Schedule 9 (adopted in *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 72 Fed. Reg. 12,266, 12,529 (Mar. 15, 2007)) ("The Transmission Provider may charge a Transmission Customer a penalty for either hourly generator imbalances under this Schedule [Generator Imbalance Service] or hourly imbalances under Schedule 4 [Energy Imbalance Service] for the same imbalance, but not both.").

[122] SEEM Agreement, Appendix B, § III.B.4.

[123] *See* above at pages 10-16.

[124] *Pro Forma* OATT, Schedule 9.

JA0694

Filing Entities have not explained how 15-minute transactions will be handled when the penalties are applied hourly. Nor have they explained whether a generator with multiple Energy Exchange transactions during the same interval will have those imbalances netted. The SEEM Agreement Filing indicates that generators should be able to ramp up to meet their SEEM schedules, but if the ramping occurs over a single 15-minute interval instead of the normal hourly interval, it is likely that generators will incur more imbalance penalties.

Third, because the NFEET Service is the lowest priority service, it is the most likely to be curtailed, which shifts unreasonable risks of imbalance penalties onto Participants in the SEEM. A pool-wide tariff would mitigate this risk by ensuring that imbalance penalties are applied only once—to either the generator or the load—when the transaction using the pooled facilities is curtailed. So that potential Participants understand the risks that they face in the SEEM, the SEEM Filing Entities should provide detailed examples of the charges that will apply to buyers and sellers when NFEET Service is curtailed.

Finally, SEEM Filing Entities have not explained whether imbalance penalties will apply to buyers or sellers located in non-public utility Balancing Authority Areas. If these SEEM Members will apply penalties, the SEEM Filing Entities should explain how the penalties are calculated and whether that method differs from the Commission's *pro forma* OATT requirements.

The Commission requires that to the extent a transmission provider wishes to deviate from the *pro forma* OATT generator imbalance provisions, it may demonstrate in an FPA section 205 proceeding that the proposed changes are consistent with or superior to the *pro forma* OATT.[125] Without the details outlined above, it is impossible to determine whether the SEEM transmission

---

[125] Order No. 890, 72 Fed. Reg. 12,266, 12,349; *see also Public Service Company of Colorado*, 157 FERC ¶ 61,157 (2016) (conditionally accepting proposal to modify energy and generator imbalance charges).

providers will need to modify the imbalance provisions of their tariff and justify those changes as consistent with or superior to the *pro forma* OATT.

<blockquote>
3.      **The SEEM proposal raises significant concerns about financial impacts on existing, firm transmission customers.**
</blockquote>

By choosing to offer NFEET Service at $0/MWh, the SEEM Filing Entities' proposal leads to an indirect financial impact that should concern the Commission. The SEEM Filing Entities acknowledge in their presentation that, as a general matter, "any Point-to-Point uses provide revenues that act as credits to reduce the revenue requirements paid by network load."[126] They also predict "that availability of NFEET Service may result" in reduced non-firm Point-to-Point service reservations, and thus reduce credits that "offset payments by network load."[127] Indeed, the Benefits Analysis acknowledges that a "$0 transmission rate sub-hourly trading could eventually cannibalize some hourly trading yielding a reduction in non-firm transmission revenues."[128] The SEEM Filing Entities do not attempt to quantify the potential increase in network service costs or the resulting consequences for network customers; they reason instead that the effect must be minimal,[129] and whatever its actual magnitude, the costs and benefits to native load customers will be "roughly balanced" since increases in transmission charges would be offset by "decreases in their energy costs."[130]

What SEEM Filing Entities fail to acknowledge is that this increase in the transmission revenue requirement due to fewer credits from non-firm Point-to-Point service reservations also increases the cost of Firm and Conditional Firm Point-to-Point service. These transmission

---

[126] SEEM Agreement Transmittal Letter at 36 & n.137 (citing Order No. 888, FERC Stats. & Regs. ¶ 31,036, at p.304).

[127] *Id.* at 36-37 (citing Benefits Analysis at 8, 19).

[128] Benefits Analysis, Attachment E-1 at page 19 of 32.

[129] *See* Transmittal Letter at 37 n.139 (citing Economic Affidavit at P 67 (citing in turn Overview Affidavit at P 23)).

[130] SEEM Agreement Transmittal Letter at 37

customers who have secured firm transmission service on these highly congested systems would thus likely bear some of the costs of the decision to price the NFEET Service at $0/MWh. As holders of firm transmission rights (but not native load customers of the utilities), they would be unlikely to benefit from Energy Exchange sales, because presumably they would use their firm rights to complete transactions. Thus, these transmission customers—be they buyers or sellers— likely would not benefit from SEEM and in fact may see increased costs because of it. Furthermore, the SEEM Entities have not pledged to hold transmission customers harmless from increases caused by the SEEM Proposal. The Commission should require more information about whether the proposal to price NFEET Service at $0/MWh would adversely impact or unduly discriminate against holders of Firm and Conditional Firm transmission rights.

With regard to the effect on network customers, the SEEM Filing Entities' dismissal of the problem deserves a probing review. Their reason is premised on a view that native load and network load are the same thing. The SEEM may benefit *native* load by reducing energy costs, but does not necessarily benefit all of *network* load equally.

The SEEM Filing Entities appear to recognize this problem, offering two arguments addressing the erosion of non-firm point-to-point revenues. The first is that the Commission, in addressing the Western EIM construct, found that "the elimination of pancaked transmission rates" in the EIM was likely to "result[] in lower energy costs overall and thus benefit[] native load customers in CAISO and in an EIM Entity BAA who largely bear transmission costs."[131] That citation suggests that because native load and network load are "largely" the same customers, the Commission can look past issues that affect them differently, even where the SEEM Filing Entities have not specifically identified the magnitude of the impacts on either customer group or explained

---

[131] *California Independent System Operator Corp.*, 147 FERC ¶ 61,231 at P 156; *see also* Transmittal Letter at 37 & n.140 (citing *CAISO*, 147 FERC ¶ 61,231 at P 156).

why those disparate impacts are justified. That is the essence of an undue discrimination problem.[132]

The second argument the SEEM Filing Entities offer fares no better. They offer that: "If, against expectation, the level of erosion" of Point-to-Point charges "somehow exceeds benefits, a Member or Participating Transmission Provider can leave the Southeast EEM at any time, for any reason."[133] While Members that are Participating Transmission Providers may have that contractual right under the SEEM construct, a network load customer that bears additional transmission service charges because its transmission provider participates in SEEM would not have that luxury. The network customer bears the cost of its Transmission Provider's decision to participate in SEEM and make use of NFEET Service.[134]

There is also the possibility that the SEEM platform will lead to cost shifts between SEEM Members. Some Members may have more revenue from Point-to-Point reservations than other Members. When the flight from paid Point-to-Point reservations to effectively free NFEET Service inevitably occurs, the effects may be worse for transmission customers of a Member with formerly high Point-to-Point revenues. The effect of the cost shift may be worse on some Members and is likely to be uneven across the SEEM Territory, resulting in a cost shift among Members and their customers. The Commission should request a supplemental filing that reveals sufficient detail into the lost Point-to-Point revenues and the resulting cost shifts to ensure that there is not undue

---

[132] *See Transource, LLC v. PJM Interconnection, L.L.C.,* 168 FERC ¶ 61,119 at P 240 (2019) ("a finding of undue discrimination requires a showing that  (1) two classes of customers are treated differently; and (2) the two classes of customers are similarly situated" (citations omitted)); *PJM Interconnection, L.L.C.*, 155 FERC ¶ 61,061 at P 13 (2016) (differential treatment must be "justified by some legitimate factor" to be permissible under the FPA (citation omitted)); *see also* 16 U.S.C. § 824d(b).

[133] SEEM Agreement Transmittal Letter at 37 & n.141 (citing SEEM Agreement § 4.2.1).

[134] *See* SEEM Agreement § 4.2.1.

discrimination among the SEEM members and various classes of transmission customers and that the SEEM does not result in unintended risks or consequences.

### 4. There is insufficient detail about the SEEM Algorithm to conclude that it is just and reasonable and not unduly discriminatory.

The SEEM Algorithm determines whether exchange transactions will occur by matching Offers and Bids subject to constraints entered by Participants and available transmission provide by Participating Transmission Providers.[135] That much is clear from the SEEM Agreement, which constitutes the "filed rate."[136]  But beyond that, the SEEM Agreement fails to provide any real detail that would allow the Commission to determine whether the proposed rate is just and reasonable.

Neither the Algorithm nor the formulas and methodologies it will employ are included in the proposed rate. Rather, the SEEM Agreement provides only simple statements of principles that are subject to multiple interpretations to describe the matching process.[137] Participants selling and buying energy need to be able to use the tariff to reasonably determine whether the matching process and resulting rates applied to their sales or purchases are consistent with the filed rate.[138] This is not possible with the current SEEM Agreement. The SEEM Agreement must contain all of the provisions of the market that "significantly affect rates and services."[139]

---

[135] SEEM Agreement, Exhibit B § IV.C.

[136] SEEM Agreement Transmittal Letter at 23 ("[B]ecause the Market Rules are part of the filed rate, any changes to the Market Rules will need to be filed at FERC").

[137] E.g., SEEM Agreement, Exhibit B § IV.C.4(a)-(b).

[138] *Southwest Power Pool, Inc.*, 112 FERC ¶ 61,303 at P 25 (2005) ("When conflicts arise, SPP's tariff determines whether actions taken are consistent with the filed rate and, therefore, SPP's imbalance tariff provisions should include a greater level of detail than those submitted in the current filing."), *rehearing dismissed*, 113 FERC ¶ 61,115 (2005).

[139] 16 U.S.C. § 824d; *see also ANL Funding I, LLC v. ISO New England, Inc.*, 110 FERC ¶ 61,040 at P 22-23 (2005) (finding that ISO New England's operating procedures "could significantly affect compensation" that generators receive by limiting their bidding options).

JA0699

Indeed, there is even a gap between the level of detail in the filing materials and those in the SEEM Agreement. In the filing materials, a very simple formula for determining the Energy Exchange price is shown.[140] Yet, that same formula is not included in the SEEM Agreement. Instead, a description of the formula is included in the SEEM Agreement Market Rules that introduces the ambiguous word of "average" in describing how the price will be determined. Given these and other missing details, the Commission should direct SEEM Filing Entities to supplement their filing with an updated agreement that provides more detail on how the SEEM Algorithm will operate, including the formula rate for calculating the Energy Exchange prices, and provide, for the benefit of parties and the Commission, detailed examples of how the Algorithm will solve given different scenarios of inputs, constraints, and transmission limitations.[141]

Clean Energy Coalition is concerned that, given the complexity of the problem that the Algorithm must solve every 15 minutes, that the SEEM Filing Entities have underestimated the costs of developing and administering the market. For example, the Algorithm must solve for thousands of source and sink combinations overlaid on the transmission systems of 13 balancing authorities, price-quantity pairs in Bids and Offers, constraints selected by Participants, and the trading partners selected by Participants. The costs to develop and *maintain* this complex market model are not well documented, and the lack of detail in the SEEM Agreement filing presents the risk that the system will not be robust, accurate, or secure. The Commission should probe further into these costs to ensure that the system is robust, secure, and appropriately implemented and maintained, and to ensure that customers are protected from unexpected costs that are inconsistent with the estimates in the SEEM Agreement filing.

---

[140] *E.g.*, SEEM Agreement Transmittal Letter at 28-29.

[141] *See Southwest Power Pool, Inc.*, 112 FERC ¶ 61,303, at P 24 (rejecting imbalance market proposal and providing guidance to "incorporate the rules for managing [curtailments and imbalance market] these interactions into its tariff, and include the formula rate for calculating the [Locational Imbalance Price] at each node").

JA0700

Another concern is that many of the implementation details, even those included in the transmittal letter and expert affidavit, will be included in business practice manuals ("SEEM Manuals") rather than the SEEM Agreement Market Rules.[142] For example, Dr. Susan Pope, expert witness for SEEM Filing Entities, describes a randomization process that will apply when (1) two or more buyers in the same balancing area submit identical bids but there is insufficient supply offered to allow both bids to be fully matched, and (2) different pairings of buyers and sellers yield the same total (maximized) benefit.[143] First, only the second of these applications of randomization is even mentioned in the SEEM Agreement.[144] And, second, there is no detail around how the randomization will be selected; Dr. Pope is forced to guess as to how it will work in order to conduct her economic analysis.[145]

There is no assurance provided in the SEEM Proposal that the Market Rules will contain all the rules significantly affecting rates and services. Therefore, the SEEM Filing Entities' assurances[146]—that Participants will be able to provide input on changes to Market Rules when the proceeding comes before the Commission—ring hollow. If the rules about the matching process and calculation of the rate are included in the business practice manuals, and changes are made solely at the discretion of the Operating Committee, there will be no recourse for market Participants. In sum, because the Algorithm is not described in sufficient detail in the SEEM Agreement to answer questions about whether it will produce just and reasonable rates and services, the Commission should direct the SEEM Filing Entities to provide additional detailed information on the Algorithm, its development costs, and its operation.

---

[142] *See* SEEM Agreement Transmittal Letter at 25, n.80.
[143] Economics Affidavit, Attachment D, at PP 53-54.
[144] SEEM Agreement, Exhibit B § IV.C.7.
[145] Economics Affidavit, Attachment D, at P 53 & n.26.
[146] SEEM Agreement Transmittal Letter at 23.

JA0701

5.    **The SEEM Filing Entities have not supported a change to the transmission loss provisions of their OATTs.**

The SEEM Filing Entities propose to financially settle Real Power Losses in each Energy Exchange transaction based on the applicable Participating Transmission Provider's loss factor and loss rate in its OATT.[147]  In-kind losses are not allowed for Energy Exchange transactions.[148] In Order No. 888, the Commission considered options other than financial settlement of losses providing that "[a] customer seeking transmission service must bring to the transaction sufficient energy and capacity to replace the losses associated with its intended transaction."[149]

If the SEEM Proposal is revised to include a joint pool-wide tariff, the Clean Energy Coalition would not object to the settlement of losses exclusively through financial means for Energy Exchange transactions using the pooled facilities and a common loss factor. Using a common loss factor and an index or other measure to determine costs of losses over pooled facilities puts all sellers on an equal footing. However, because SEEM Filing Entities have not proposed a pool-wide tariff, in contradiction of FERC's regulations, they must demonstrate, at a minimum, that the financial settlement of losses for Energy Exchange transactions is consistent with their existing OATT or, if proposing a change, that the change is consistent with or superior to the *pro forma* OATT.[150]  Special rules that narrow the options for Energy Exchange transactions as compared with the options for other non-firm transactions may be unduly discriminatory.

For example, proposed Attachment S (NFEET Service) of LG&E/KU's OATT provides that "[l]osses shall be charged as set forth in Schedule 11 (Loss Compensation Service) of the

---

[147] SEEM Agreement Transmittal Letter at 24.

[148] Overview Affidavit, Attachment B at 10 of 14 (explaining that SEEM "[a]dds Non-firm Energy Exchange Transmission Service priced at $0/MWh plus losses (which must be financial)").

[149] Order No. 888, 61 Fed. Reg. at 21,583.

[150] *See Southwest Power Pool, Inc.*, 82 FERC ¶ 61,267 at 62,049 (finding "proposal to require customers to purchase losses from the SPP Transmission Providers [instead of provide in-kind losses] is inconsistent with Order No. 888" and directing SPP to adopt "provisions of the *pro forma* transmission tariff").

JA0702

Tariff, using (i) the loss factor specified in Schedule 11 and (ii) rate for compensation specified for option 3 in Schedule 11."[151]  Transmission Customers using other firm and non-firm transmission services on LG&E/KU's system have two other options for addressing losses that allow a Transmission Customer to purchase or provide power to physically replace its losses, i.e., in-kind losses.[152]  Neither LG&E/KU nor any of the other SEEM Filing Entities has explained adequately why Transmission Customers using Energy Exchanges cannot physically settle losses like all other Transmission Customers. Financial settlement of losses may be the most expensive form of loss compensation. For example, LG&E/KU charges a rate that represents its highest incremental energy costs (even after opportunity sales) plus a capacity rate of $6/MWh.[153]

Moreover, financial settlement of losses is not the only way to ensure "each Energy Exchange will only be entered into if the transaction will produce benefits to the buyer and seller after taking into account Losses . . ."[154]  Sellers and buyers of Exchange Energy are sophisticated entities and can incorporate their own cost of losses into their Offers and Bids—and still split the costs of losses through the SEEM Algorithm. In turn, those sellers and buyers can settle their losses by physical delivery of power to the Participating Transmission Provider just as now occurs with other bilateral transactions. Financial settlement of losses to the exclusion of in-kind replacement may disadvantage SEEM Participants and unduly restrict a Transmission Customer's ability to determine the most appropriate commercial arrangements to address real power losses associated with its transactions in the most cost-effective manner. The Commission should not allow for

---

[151] LG&E OATT Filing, LG&E/KU OATT, Proposed Attachment S at § 6.1.2.

[152] LG&E OATT Filing, Transmittal Letter, at 9.

[153] LG&E OATT Filing, Transmittal Letter, at 10 ("Per Schedule 11, the charge for Loss Compensation Service is set at 'at a rate not to exceed 100 percent of the Transmission Owner's incremental cost to produce energy after serving all other obligations (including economy and opportunity transactions) and a Generation Capacity Loss Adder of $.006 per kWh.'").

[154] *Id*. at 9-10.

46

unduly discriminatory treatment among different uses of the transmission system, when all uses produce the same losses, without some reason that withstands scrutiny.

**F.     The SEEM Proposal raises issues regarding interaction at the seams of RTO markets.**

As the SEEM Agreement Filing shows, the SEEM Territory shares borders with three RTOs:  PJM Interconnection, L.L.C. ("PJM"), Midcontinent Independent System Operator, Inc. ("MISO"), and SPP.[155]  Yet, the SEEM Proposal does not address, or even mention, how the automated platform that matches buyers and sellers across the Territory and the new transmission service to support these exchanges will affect interactions with the RTOs. The Commission should require the SEEM Filing Entities to explain how the proposed market will affect interregional coordination generally, existing operations with neighbors specifically, and whether existing seams agreements with RTOs need to be modified.

The SEEM Proposal creates a new class of NFEET Service that changes the curtailment priorities among existing transmission services. SEEM Filing Entities assert that this will not affect reliability or existing operations, principally because the service will be offer on an "as available" basis.[156]  They have not, however, explained how these new transactions will impact curtailments on the border of the SEEM Territory. Will NFEET Service be curtailed before other non-firm transactions on border of the Territory are curtailed?  How will the NFEET Service change the interaction with RTOs that use market flows instead of contract path control? Will market flow be curtailed prior to NFEET Service? Will transmission loading relief procedures with RTO neighbors otherwise need to be adjusted to account for the new NFEET Service? These are all open questions that must be answered.

---

[155] SEEM Agreement Transmittal Letter at 5 (map).
[156] Operations Affidavit at PP 19, 23.

47

JA0704

With the creation of other markets, the Commission has directed seams agreements to govern the many issues that can arise between markets and on the markets' boundaries.[157] The Commission should do so here as well. If participation in the SEEM is as robust as expected and achieves the economic benefits and diminution of market power that the SEEM expert assumes,[158] it is also likely to have impacts on real-time power flows that will impact the neighboring RTOs. For example, will the increased usage of SEEM pooled transmission facilities cause loop flows or unreserved usage on neighboring systems? At a minimum, additional coordination at the seams prior to implementation of the SEEM could avoid unintended consequences in neighboring RTOs.

Indeed, the SEEM Proposal raises an important issue related to the prior resolution of a seam issue between MISO, SPP, and many of the same parties that are SEEM Members. Under a settlement filed with and accepted by the Commission, MISO reached agreement with SPP, Associated Electric Cooperative, Inc., Southern Company, TVA, Power South Energy Cooperative, and LG&E/KU to pay for MISO's "Available System Capacity Usage."[159] According to MISO, the Settlement resolved a dispute about loop flows on neighboring systems caused by MISO's market flows.[160] Under the Settlement, MISO pays between about $16 and $40 million per year to "have the ability to use on a non-firm, as available basis, available system transmission capacity of the other Parties' systems" subject to conditions spelled out in the settlement.[161] SEEM Filing Parties now propose to use that same non-firm, as-available transmission service to make Energy Exchanges and to charge $0/MWh (plus losses) for the service.

---

[157] *See, e.g.*, *Southwest Power Pool, Inc.*, 106 FERC ¶ 61,110 at PP 201-204.

[158] Economic Affidavit, Attachment D at PP 45-53, 68.

[159] *See* Offer of Settlement, Docket Nos. EL14-21-000, *et al.* (filed Oct. 13, 2015) ("Settlement").

[160] Settlement Transmittal Letter at 5.

[161] Settlement § 2.1; *see* Settlement § 2.6.3 (compensation levels).

48

JA0705

The Commission should investigate whether the SEEM Filing Entities are using the same transmission facilities for the MISO market flows as they are using for enhancing the bilateral energy market in the Territory. How will SEEM Members along the MISO border account for the service that they currently provide to MISO so as not to double-count the capacity for Energy Exchanges?  Furthermore, SEEM Filing Entities should explain why the different rates for what appears to be the same service is not unduly discriminatory.

### REQUEST FOR REMEDIES

For the reasons discussed above, the Commission must take a hard look at the SEEM Proposal to determine whether proposes a market that will result in just and reasonable outcomes and rates that are not preferential or unduly discriminatory. This task is made particularly difficult because the SEEM Proposal is unclear on implementation details or states that some details will be determined at a later time, and potential market Participants have not yet been provided information regarding such details. Accordingly, the Commission should direct the SEEM Filing Entities to provide additional explanations and information regarding the above issues so that both potential market Participants and the Commission may properly evaluate the SEEM Proposal. The Commission should require the SEEM Filing Entities to provide the additional information described herein such that parties and the Commission have the opportunity to fully evaluate the justness and reasonableness of the SEEM Proposal and its impacts.

When evaluating the SEEM Proposal in its current form or with additional modifications consistent with the discussion above, the Commission should keep in mind that the development of more robust competitive wholesale markets would bring significant benefits to the region above and beyond the modest benefits estimated to come from SEEM. If changes are not made to the proposal to increase transparency, stakeholder protections, and provide shared governance, it could solidify a relatively inconsequential change that stymies any positive development of mechanisms

JA0706

to address present and future energy challenges. The SEEM could be a springboard for further market development that would lower costs for customers, provide buyers with access to clean, economically efficient, and carbon-free energy to meet their corporate goals, and create a higher-performing energy system—but not without modifications to the current proposal that build in adaptability and transparency. Without greater market and stakeholder protections—including market monitoring and mitigation, transparency, open governance, and public utility status for the SEEM power pool administrator—the SEEM could become an institution that does not change for another 25 years, putting in jeopardy the future market development in the Southeast.

## REQUEST FOR TECHNICAL CONFERENCE

Regardless of how the Commission ultimately rules on the SEEM Proposal, Clean Energy Coalition requests that the Commission establish a one-day technical conference outside of these dockets to facilitate discussion among state leaders, utilities, customers, independent power providers, and other stakeholders regarding the future development of competitive market structures in the Southeast beyond the narrow SEEM Proposal. The growing evidence of the potential benefits that broader regional competitive wholesale markets could bring to states and customers in the region, and the strong interest of state energy policymakers in the region in exploring new constructs to maximize consumer benefits, make the time ripe for the Commission to convene such a discussion.

Establishing more coordinated competitive wholesale markets in the Southeast would go much further than SEEM in resolving long-standing barriers to entry (noted above) blocking clean energy developers from the wholesale market and hurting the ability of customers to access low-cost clean energy products. These barriers include issues of incumbent market power, transmission access, and transmission rate pancaking, which have all led to curtailment of low-cost clean energy

JA0707

production and development in the region.[162] Recent studies have shown that billions of dollars of potential consumer savings are being left on the table by failing to move toward competitive wholesale markets that resolve these challenges. One study finds that a competitive wholesale market in the form of an RTO in the Southeast could yield as much as $384 billion in consumer savings by 2040, reducing retail costs by 23%.[163] That study also finds that such a market structure would reduce carbon emissions in the region by 37%compared to 2018 levels, without any additional policies or mandates.[164] Another study finds that an energy imbalance market, while not optimal as compared to an RTO, would itself produce benefits of $100 to $600 million annually to Duke Energy alone, more than double the projected annual region-wide benefits of SEEM.[165]

Recognizing the significant benefits that could accrue to consumers and businesses in the region, states in the Southeast are focusing attention and resources on exploring potential wholesale market reforms that could improve competition and customer access to low-cost energy supplies. For example, South Carolina enacted Act. No. 187 of 2020, which creates an Electricity Market Reform Measures Study Committee tasked with, *inter alia*, assessing the benefits to South Carolina customers of establishing or joining a broader regional wholesale market such as an RTO or energy imbalance market.[166] South Carolina legislators (including one appointed to the Study Committee) have already submitted letters to be posted in these dockets asking FERC to convene a joint federal-state dialogue regarding the potential for wholesale market reforms that allow for

---

[162] *See* Energy Innovation Southeast Market Summary Report at 5, 8.

[163] *See id.*

[164] *Id.*

[165] Matt Butner, *An Energy Imbalance Market in the Southeastern United States: Context, Benefits, and Design Considerations for Stakeholders and Policymakers*, Energy Transitions Institute (Sept. 2020), *available at* https://energytransitions.org/energy-imbalance-market.

[166] *See generally* S.C. Act 187, H.4940, 123d Sess., Joint Resolution to Establish the Electricity Market Reform Measures Study Committee (S.C. eff. Sept. 29, 2020), *available at* https://www.scstatehouse.gov/billsearch.php?billnumbers=4940&session=123&summary=B.

51

JA0708

"open market[s] for generation, storage, and demand-management" to "reinforce and facilitate state reliability, affordability, and clean energy goals in the Southeast."[167] Similarly, a broad set of policymakers in North Carolina (including the North Carolina Utilities Commission, Department of Environmental Quality, Attorney General, and General Assembly), under the direction of Governor Cooper's Executive Order 80, recently engaged in a lengthy collaboration process to study updates to utility regulations and wholesale electricity market structures that would support the state's 2019 Clean Energy Plan.[168] The group studied various wholesale market reforms and designs, including SEEM, an energy imbalance market, and an RTO, and recommended that the General Assembly conduct a study of the costs and benefits of wholesale electricity market reform.[169]

The SEEM Proposal, which had been under development for months, came to light in the middle of these and other state efforts to assess competitive wholesale power markets. Yet, aside from "courtesy" informational filings sent to North Carolina and South Carolina regulators, states were not consulted on the SEEM Proposal design or its objectives. As a result, state regulators and officials with an interest in exploring wholesale market reforms have not had an opportunity for any meaningful regional dialogue with customers, independent energy developers, utilities, and other stakeholders regarding such potential reforms.

---

[167] Letter from South Carolina State Senator Tom Davis to the Honorable Richard Glick, Chairman, Federal Energy Regulatory Commission, Re: *Invitation to Joint Technical Conference/Docket No. ER21-1111* (Mar. 4, 2021); *see also* Letter from South Carolina State Representative Nathan Ballentine to the Honorable Richard Glick, Chairman, Federal Energy Regulatory Commission, Re: *Docket # ER21-1111; Invitation for Fed/State Technical Conference* (Mar. 9, 2021). It is the Clean Energy Coalition's understanding that these letters were mailed in hard copy to the Commission and will be posted in Docket No. ER21-1111.

[168] *See* Josh Brooks et al., *North Carolina Energy Regulatory Process, Summary Report and Compilation of Outputs*, Rocky Mountain Inst., Regul. Assistance Project (Dec. 22, 2020), *available at* https://files.nc.gov/ncdeq/climate-change/clean-energy-plan/2020-NERP-Final-Report.pdf.

[169] *Id*. at 20-24.

The one-day technical conference Clean Energy Coalition requests here would establish a forum for such a dialogue. That technical conference should primarily be focused on fostering a discussion among the Commission and state regulators and policymakers across the region regarding the goals that states and their customers seek to achieve through electricity market reforms. Given the Commission's vast experience in regulating various types of wholesale electricity markets, the Commission stands to play an essential and vital part of this conversation. Customers, independent clean energy developers, utilities, and other stakeholders should also be included, all with a focus on discussing consumer needs and the potential for competitive electricity market reforms to address those needs. Our organizations stand ready to work with the Commission on the design of this technical conference.

## CONCLUSION

Clean Energy Coalition respectfully requests that the Commission direct the SEEM Filing Entities to provide additional information and address the shortcomings of their current proposal, and that the Commission independently convene a one-day technical conference to facilitate a productive dialogue on competitive market structures in the Southeast.

JA0710

Respectfully submitted,

/s/ *Jeffery Scott Dennis*
Jeffery S. Dennis, Managing Director and
General Counsel
Caitlin Marquis, Director
Advanced Energy Economy
1010 Vermont Ave. NW, Suite 300,
Washington, D.C. 20005
Telephone: (202) 380-1950
jdennis@aee.net
cmarquis@aee.net


/s/ *Sean Gallagher*
Sean Gallagher
Vice President of State and Regulatory Affairs
Gizelle Wray
Director of Regulatory Affairs and Counsel
Will Giese
Southeast Regional Director
Solar Energy Industries Association
1425 K St NW Ste. 1000
Washington, DC 20005
(202) 682-0556
sgallagher@seia.org
gwray@seia.org
wgiese@seia.org


/s/ *Bryn Baker*
Bryn Baker, Policy Director
Renewable Energy Buyers Alliance
1425 K St NW, Ste 1100
Washington, D.C. 20005
Telephone: Office: 833-303-7322 ext 117
bbaker@rebuyers.org


Dated: March 15, 2021

JA0711

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in these proceedings.

Dated this 15th day of March, 2021.

/s/ Jeffery S. Dennis
Advanced Energy Economy

Document Content(s)
FINAL Clean Energy Coalition SEEM Comments.PDF ...........................1



March 24, 2021

*E-Filing*

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20436

Re:     Docket No. ER21-1111 et al. – Errata to Motion to Intervene and Limited Protest and
        Comments of Public Interest Organizations

Dear Secretary Bose:

On March 15, 2021 Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council ("Public Interest Organizations") submitted a Protest[1] in response to the Southeast Energy Exchange Market ("SEEM") Proposal.[2]

The Public Interest Groups submit this erratum to correct an inadvertent clerical error in the title of the filing. The Public Interest Groups filed a Protest alone which did not include a Motion to Intervene or Comments. The correct tile of the filing is "Protest of Public Interest Groups." All Public Interest Groups had intervened before filing the Protest.[3] In the filing, the Public Interest Groups protest the SEEM Proposal in its entirety, not in part. Additionally, the Public Interest Groups do not provide comments beyond their protest. The errata does not change any of the conclusions or content of the protest.

If you have any questions regarding this erratum, please contact the undersigned.

---

[1] Motion to Intervene and Limited Protest and Comments of Public Interest Organizations under ER21-1111 et al., Accession No. 20210315-5405 (Mar. 15, 2021).
[2] Southeast Energy Exchange Market Agreement, Accession No. 20210212-5033 (Feb. 12, 2021) ("SEEM Proposal").
[3] Motion to Intervene of Sustainable FERC Project, et. al, under ER21-1111, et a., Accession No. 20210309-5048 (Mar. 9, 2021); Motion to Intervene of Southern Alliance for Clean Energy under ER21-111, et. al., Accession No. 20210312-5030 (Mar. 12, 2021); Motion to Intervene of North Carolina Sustainable Energy Association under ER21-1111, et. al., Accession No. 20210312-5157 (Mar. 12, 2021); Motion to Intervene of Energy Alabama, et. al. under ER21-1111, et. al., Accession No. 20210315-5052 (Mar. 15, 2021); Motion to Intervene of Southface Institute under ER21-1111, et. al., (Mar. 15, 2021).

Respectfully submitted,

/s/ *Danielle Fidler*
Danielle Fidler
Staff Attorney, Clean Energy Program
Daniel Franz Legal Fellow, Clean Energy
Program
Earthjustice 1001 G Street NW, Suite 1000
Washington, DC 20001
dfidler@earthjustice.org
dfranz@earthjustice.org

*Counsel for Sustainable FERC Project and
Natural Resources Defense Council*

Frank Rambo
Senior Attorney
Southern Environmental Law Center
201 W Main St. #14
Charlottesville, VA 22902
frambo@selcva.org

*Counsel on behalf of Energy Alabama, Sierra
Club, South Carolina Coastal Conservation
League, GASP, Georgia Conservation Voters,
Southern Alliance for Clean Energy, Southface
Energy Institute, Inc., Vote Solar, Georgia
Interfaith Power and Light, and Partnership for
Southern Equity*

Maia Hutt
Staff Attorney
Southern Environmental Law Center
601 W Rosemary St., Suite 220
Chapel Hill, NC 27516
mhutt@selcnc.org

*Counsel on behalf of Energy Alabama, Sierra
Club, South Carolina Coastal Conservation
League, GASP, Georgia Conservation Voters,
Southern Alliance for Clean Energy, Southface
Energy Institute, Inc., Vote Solar, Georgia*

2

JA0715

*Interfaith Power and Light, and Partnership for Southern Equity*

Peter Ledford
General Counsel and Director of Policy
4800 Six Forks Rd., Suite 300
Raleigh, NC 27609
peter@energync.org

*Counsel for North Carolina Sustainable Energy Association*

3

JA0716

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | ) | ER21-1111-000 |
| | ) | |
| Dominion Energy South Carolina, Inc. | ) | ER21-1112-000 |
| | ) | |
| Louisville Gas and Electric Company | ) | ER21-1114-000 |
| | ) | |
| Duke Energy Progress, LLC | ) | |
| Duke Energy Carolinas, LLC | ) | ER21-1115-000 |
| | ) | |
| Duke Energy Carolinas, LLC | ) | ER21-1116-000 |
| | ) | |
| Duke Energy Progress, LLC | ) | ER21-1117-000 |
| | ) | |
| Louisville Gas and Electric Company | ) | ER21-1118-000 |
| | ) | |
| Georgia Power Company | ) | ER21-1119-000 |
| | ) | |
| Kentucky Utilities Company | ) | ER21-1120-000 |
| | ) | |
| Mississippi Power Company | ) | ER21-1121-000 |
| | ) | |
| Alabama Power Company | ) | ER21-1125-000 |
| | ) | ER21-1128-000 |
| Dominion Energy South Carolina, Inc. | ) | |
| | ) | (not consolidated) |

## PROTEST OF PUBLIC INTEREST ORGANIZATIONS

1

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 4

II.  THE COMMISSION SHOULD REJECT THE SEEM PROPOSAL BECAUSE IT IS
     UNJUST, UNREASONABLE, UNDULY PREFERENTIAL AND DISCRIMINATORY,
     AND FAILS TO COMPLY WITH THE COMMISSION'S REQUIREMENTS ................. 6

   A. THE SEEM PROPOSAL MUST BE REJECTED BECAUSE IT FAILS TO COMPLY
      WITH FERC'S REQUIREMENTS FOR POWER POOLS ................................. 7

   B. SEEM IS A LOOSE POWER POOL ........................................................ 8

   C. THE SEEM PROPOSAL DOES NOT COMPLY WITH THE COMMISSION'S
      REQUIREMENTS FOR POWER POOLS ..................................................... 10

   D. THE SEEM PROPOSAL DOES NOT ENSURE JUST AND REASONABLE RATES
      AND ITS STRUCTURE LENDS ITSELF TO UNDUE DISCRIMINATION AND MUST
      THEREFORE BE REJECTED ................................................................ 13

      1.   The SEEM Proposal is an organized wholesale market whose rates must be just,
           reasonable, and not unduly discriminatory. .............................................. 13

      2.   The Commission should rely on core principles and lessons learned from its
           regulation and review of other organized markets. ...................................... 16

      3.   The SEEM Filing as proposed is unjust, unreasonable, and unduly discriminatory. . 19

         a.   The SEEM Proposal fails to improve upon existing markets or provide sufficient
              safeguards against market power abuse. ................................................. 19

            i.  The SEEM Algorithm may not be computationally feasible. ................................ 20

            ii. The proposed SEEM design is worse than the status quo. ..................................... 21

            iii. The proposed SEEM design facilitates the exercise of market power. .................. 23

            iv. Applicants' cost-benefit analysis is insufficient to justify the SEEM Proposal. ..... 26

         b.   The governance structure in the SEEM Proposal creates opportunities for specific
              applicants to control and manipulate the market. ....................................... 28

            i.  The SEEM voting mechanism allows certain Applicants to exercise market power.
                ............................................................................................. 28

            ii. The governance structure denies independent power producers the ability to
                meaningful engage in decision making ................................................... 30

         c.   The SEEM Proposal lacks the core principles of market monitoring, market
              mitigation, transparency, and independence that are needed to protect against market
              power abuse ................................................................................ 32

            i.  The SEEM Proposal lacks adequate market monitoring ..................................... 32

2

JA0718

ii. The SEEM Proposal lacks adequate market analysis and mitigation ..................... 34

iii.The SEEM Proposal fails to include elements of transparency. ........................... 37

iv.The SEEM Proposal fails to include elements of independence. .......................... 38

    4.    The SEEM Proposal is impermissibly vague. ............................................... 42

E. THE COMMISSION SHOULD REJECT THE FILINGS AND GIVE GUIDANCE TO THE APPLICANTS REGARDING RESUBMISSION OF THEIR FILINGS ................. 42

III. THE SEEM PROPOSAL FAILS TO MEANINGFULLY ADDRESS THE SOUTHEAST'S EXORBITANT BILLS AND LOW UTILIZATION OF COST-EFFECTIVE RENEWABLE ENERGY ........................................................................................... 44

A. THE SOUTHEAST'S ELECTRIC POWER SECTOR IS CHARACTERIZED BY HIGH ELECTRICITY BILLS AND LOW RENEWABLE RESOURCE PENETRATION. ....... 45

B. SEEM WOULD BARELY SCRATCH THE SURFACE ON HIGH BILLS OR LOW RENEWABLE PENETRATION IN THE SOUTHEAST. .................................................. 48

C. OTHER IN-REGION EFFORTS ARE UNDERWAY TO CONSIDER WHOLESALE MARKET REFORMS THAT ADDRESS CUSTOMER COSTS AND CAPITALIZE ON COST-EFFECTIVE RENEWABLE POWER. ................................................................... 51

    1.    North Carolina ........................................................................................ 52

    2.    South Carolina ........................................................................................ 53

    3.    Tennessee Valley Authority .................................................................... 54

    4.    Kentucky ................................................................................................. 55

    5.    Mississippi .............................................................................................. 55

    6.    Georgia ................................................................................................... 56

IV. REQUEST FOR DEFICIENCY LETTER ........................................................................ 56

V. REQUEST FOR TECHNICAL CONFERENCE ............................................................... 59

VI. CONCLUSION .................................................................................................................. 63

JA0719

## I.     __INTRODUCTION__

Pursuant to Rule 211 of the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure, Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council ("Public Interest Organizations" or "PIOs") respectfully submit this protest in response to the Southeast Energy Exchange Market ("SEEM") Proposal[1] submitted by Alabama Power Company for acceptance under Section 205(c) of the Federal Power Act and Part 35 of the Commission's regulations. The entire proposal includes related filings in the above captions by members of the SEEM Proposal ("Applicants") to modify their Open Access Transmission Tariffs or concur with the Proposal (together, the "SEEM Proposal," "SEEM filings," or "proposal").

After long decades of monopoly utility dominance in the Southeast, the green shoots of competition have started to emerge. State actors and stakeholders across the region have begun exploring and quantifying the benefits of wholesale market and utility reform with the goal of relieving consumers who pay some of the highest electricity bills in the nation and encouraging the Southeast's burgeoning clean energy—particularly solar—industry. These efforts present an opportunity to make meaningful strides towards improving transparency, accountability, and equity in the region's energy systems.

Against this backdrop, the Applicants have put forth the legally deficient SEEM Proposal—an arrangement that purports to address the Southeast's current problems, but is at

---

[1] Southeast Energy Exchange Market Agreement, Accession No. 20210212-5033 (Feb. 12, 2021) ("SEEM Proposal").

4

least as likely to exacerbate them. Instead of embracing meaningful reform, the SEEM Proposal represents an incremental improvement to coordination that comes at much too great a cost and risk: increasing the market power of monopoly utilities, disadvantaging clean independent power producers seeking transmission access, and reducing transparency and oversight. If approved, this proposal could lock the region into a flawed market structure and stymie the meaningful reform at work in the states.

The SEEM Proposal has two primary legal infirmities. First, it is a power pool that fails to comply with the Commission's regulatory requirements. Second, it is likely to exacerbate the exercise of market power in the Southeast and produce rates that are unjust, unreasonable, and unduly discriminatory.

The Commission has long exercised its authority under the Federal Power Act ("FPA") to shape the development of competitive wholesale markets and ensure that proposals are just, reasonable, and do not unduly discriminate. The Commission's long-standing emphasis on independence, transparency, independent oversight, and stakeholder inclusion as critical components of wholesale market reform, whether or not that reform takes a precise form such as a Regional Transmission Organization ("RTO") or Independent System Operator ("ISO"). The same concerns the Commission expressed in Order 888 and its progeny regarding market power and non-discriminatory access to transmission are present here.

Therefore, the Commission can and should reject the SEEM filings and issue guidance as described in this Protest. If the Commission does not reject the filings outright, the Public Interest Organizations request that the Commission accept and suspend the filings for the maximum five-month period, subject to the outcome of a technical conference on the SEEM Proposal. The PIOs also request that the Commission direct the SEEM Applicants to provide

JA0721

additional information on their proposal through a deficiency letter. Finally, the Commission

should consider convening a technical conference or joint regional meeting regarding market

reform in the Southeast.

## II.    THE COMMISSION SHOULD REJECT THE SEEM PROPOSAL BECAUSE IT IS UNJUST, UNREASONABLE, UNDULY PREFERENTIAL AND DISCRIMINATORY, AND FAILS TO COMPLY WITH THE COMMISSION'S REQUIREMENTS

The Commission bears responsibility for ensuring that the nation's electric supply is

developed and operated commensurate with the public interest and that all rates and charges

associated with the sale or transmission of electricity in the wholesale market are just,

reasonable, and not unduly discriminatory.[2]  To this end, the Commission has long exercised its

authority under the FPA to shape the development of competitive wholesale markets to ensure

just and reasonable market conditions.[3] The Commission must exercise this authority and reject

the SEEM Proposal because it violates the Commission's regulations for power pools, fails to

ensure just and reasonable rates, and is structured in a manner that facilitates

discriminatory behavior.[4]

Beginning with Order No. 888, the Commission recognized that unregulated wholesale

energy markets – including pooling arrangements – were inherently unduly discriminatory, and

found that minimizing the opportunity for utilities to exercise monopoly power was imperative to

ensure the competition required by the FPA.[5]  As the Commission further developed competitive

---

[2] 16 U.S.C. § 824d–e.

[3] *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719, 125 FERC ¶ 61,071, at P 10 (2008).

[4] SEEM Proposal.

[5] *See Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996); *order on reh'g*, Order No. 888-A, 62 Fed. Reg. 12,274 (Mar. 14, 1997); *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997); *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998); *aff'd in relevant part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

6

reform through subsequent regulations (*i.e.*, Order No. 2000[6] and Order No. 719), market power remained the touchstone for whether rates or practices are unjust, unreasonable, or unduly discriminatory. In its market reform efforts, the Commission has consistently emphasized the need for independence, transparency, oversight, and stakeholder inclusion to minimize market power and ensure just, reasonable, and nondiscriminatory rates. As discussed below, regardless of the type of market proposal before it—whether energy imbalance market ("EIM"), energy imbalance services, energy auctions, or power pools—the Commission has consistently returned to these foundational principles. These principles are equally applicable to the SEEM Proposal before the Commission today.

### A.  THE SEEM PROPOSAL MUST BE REJECTED BECAUSE IT FAILS TO COMPLY WITH FERC'S REQUIREMENTS FOR POWER POOLS

As proposed, the SEEM Proposal would create a loose power pool arrangement without a proposed joint pool-wide tariff in violation of Order No. 888. The Commission should reject the filing and direct the applicants in the above-captioned filings[7] ("Applicants") to file a Commission-approved pool-wide Open Access Transmission Tariff ("OATT") and revise the SEEM Proposal to offer third parties the same transmission services that SEEM Members and Participants provide themselves.

---

[6] *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810 (2000). For subsequent page references found in this document, please see https://www.ferc.gov/sites/default/files/2020-04/RM99-2A.pdf.

[7] "As of the date of filing, the following entities are Members of the Southeast EEM: Alabama Power, Georgia Power Company, and Mississippi Power Company (collectively, 'Southern Companies'); Associated Electric Cooperative, Inc. ('AECI'); Dalton Utilities ('Dalton'); Dominion Energy South Carolina, Inc. ('Dominion Energy SC'); Duke Energy Carolinas, LLC ('DEC') and Duke Energy Progress, LLC ('DEP' (together with DEC, 'Duke'); Louisville Gas & Electric Company ('LG&E') and Kentucky Utilities Company ('KU') (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, 'LG&E/KU'); North Carolina Municipal Power Agency Number 1 ('NCMPA Number 1'); Power South Energy Cooperative ('PowerSouth'); North Carolina Electric Membership Corporation ('NCEMC'); and Tennessee Valley Authority ('TVA')." SEEM Proposal, at 1 n.1.

FERC's Open Access rules regulating power pools are intended to eliminate undue discrimination endemic to pooling arrangements. As the Commission explained,

> [I]t [is] imperative that this Commission take the necessary steps within its jurisdiction to ensure that all wholesale buyers and sellers of electric energy can obtain non-discriminatory transmission access . . . To do so, we must eliminate the remaining patchwork of closed and open jurisdictional transmission systems and ensure that all these systems, including those that already provide some form of open access, cannot use monopoly power over transmission to unduly discriminate against others. If we do not take this step now, the result will be benefits to some customers at the expense of others.[8]

The SEEM Proposal would undermine these objectives by allowing the operation of a power pool that limits transmission access for independent power producers while providing free transmission for monopoly utilities.[9]

## B.    SEEM IS A LOOSE POWER POOL

The SEEM Proposal meets FERC's definition of a loose power pool.  In Order No. 888, FERC defined a loose power pool as "any multi-lateral (more than 2 public utilities) arrangement, many of which contain discounted and/or special transmission arrangements."[10] On rehearing of Order No. 888, FERC clarified "that a loose pool is any multilateral arrangement, other than a tight power pool or a holding company arrangement, that explicitly or

---

[8] Order No. 888 at 21,541; *see also id.* ("The legal and policy cornerstone of these rules is to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce.").

[9] As explained by the D.C. Circuit in *Transmission Access Policy Study Grp.*, 225 F.3d at 683–684:

> Entry into the transmission market is difficult and restricted, so those utilities that already own transmission facilities enjoy a natural monopoly over that field. The transmission-owning utilities can use their position to favor their own generated electricity and to exclude competitors from the market, whether by denying transmission access outright, or by providing transmission services to competitors only at comparatively unfavorable rates, terms, and conditions. Utilities that own or control transmission facilities naturally wish to maximize profit. The transmission-owning utilities thus can be expected to act in their own interest to maintain their monopoly and to use that position to retain or expand the market share for their own generated electricity, even if they do so at the expense of lower-cost generation companies and consumers.

[10] Order No. 888 at 21,594.

implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[11] FERC intentionally "defined pooling arrangements in the broadest terms possible."[12]

The SEEM Proposal meets both elements of this definition. First, the SEEM Proposal is a multi-lateral agreement in which Members must provide access to their transmission systems for transactions that make use of the pooled facilities.[13] The pooled transmission facilities are incorporated into a Network Map that the SEEM Administrator uses for allocating available transmission through the SEEM Algorithm.[14] These pooled facilities are accessible to any Participating Transmission Provider or Participant with an Energy Exchange, so long as either the Energy Exchange resource or the load has a Non-Firm Energy Exchange Transmission Service ("NFEETS") Agreement with the Participating Transmission Owner.[15] Critically, the transmission service provided by one Participating Transmission Provider "in combination with the other Participating Transmission Providers' provisions of Non-Firm Energy Exchange Transmission Service, . . . allows for a continuous Contract Path for Energy Exchanges[.]"[16] This is what makes SEEM a pooling arrangement. The pooled transmission is the non-firm transmission that is released to SEEM fifteen minutes before the hour for the next hour. It includes all of the potential Contract Path that may be used by Energy Exchange Participants.[17]

---

[11] Order No. 888-A at 12,313.

[12] *Wolverine Power Supply Coop.*, 85 FERC ¶ 61,099, 61,355 (Oct. 21, 1998).

[13] *See* Order No. 888 at 21,594; Order No. 888-A at 12,313.

[14] *See* SEEM Proposal, Attach. A ("SEEM Agreement") at App. B. ("SEEM Market Rules"), Section II (Definitions of "Contract Path", "Network Map").

[15] SEEM Agreement at Article 1.1 (Definition of "NFEETS Agreement").

[16] SEEM Market Rules, Section II.

[17] *See id.* Section IV ("Prior to being permitted to provide Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall provide sufficient information to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM *Territory for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges*.") (emphasis added); *Id.* Section IV (requiring each Participating Transmission Provider to provide their available capacity to the pool 15 minutes prior to the next Clock Hour; *id.* Section II (providing that the Algorithm cannot exceed the available capacity of the Contract Path—i.e. pooled transmission—for Energy Exchange reservations).

JA0725

The SEEM Proposal meets the second element of FERC's definition of a loose power pool because it contains "discounted and/or special transmission arrangements."[18] In the SEEM Proposal, the definition of NFEETS provides that the transmission rate and rates for Schedule 1 and 2 are provided at a discounted rate of "$0/MWh."[19] The definition also provides for special terms and conditions that will apply to the pooled transmission – it will have "the lowest curtailment priority,"[20] and Energy Exchanges are the only qualified use of the pooled transmission facilities.[21]

It does not matter that only a small portion of the participating utilities' transmission capacity is turned over to the SEEM Algorithm for the use of the power pool. In Order No. 888, FERC specified that "systems, *including those that already provide some form of open access*, cannot use monopoly power over transmission to unduly discriminate against others."[22]

The SEEM Proposal is a multi-lateral agreement that provides special and discounted transmission services to participating utilities. This arrangement falls squarely within FERC's broad definition of a power pool.

### C.   THE SEEM PROPOSAL DOES NOT COMPLY WITH THE COMMISSION'S REQUIREMENTS FOR POWER POOLS

Because of the risk of undue discrimination in pooling arrangements, FERC has imposed special requirements upon power pools. The primary goal of these requirement is to "ensure comparability regarding transmission services that are offered on a pool-wide basis . . .

---

[18] Order No. 888 at 21,594; *See* Order No. 888-A at 12,313.
[19] SEEM Market Rules, Section II.
[20] *Id.*
[21] *Id.*
[22] Order No. 888 at 21,541 (emphasis added); *see also* Order No. 888-A at 12,313 ("[W]e do not find it to be unduly discriminatory to provide some pool-wide transmission services to members under a pooling agreement and to provide other transmission services to members under the individual tariff of each member, as long as members and non-members have access to the same transmission services on a comparable basis and pay the same or a comparable rate for transmission.")

JA0726

comparability for loose pools can be achieved if pooling agreements are modified: (1) to allow open membership and (2) to make the transmission service in the loose pool agreement available to others."[23]  As proposed, the SEEM Proposal fails to satisfy these requirements. The SEEM Applicants must reform their power pooling arrangement to comply with Order No. 888 and 888-A or else "excise all discounted and/or special arrangements transmission service from the pooling arrangement."[24]

Members of loose pools must offer to third parties the same transmission services that members provide themselves under their pool-wide agreements. Specifically, "utilities must now provide access to their transmission lines to anyone purchasing or selling electricity in the interstate market on the same terms and conditions as they use their own lines."[25] To this end, all power pools must have a pool-wide tariff on file with FERC prior to commencement of operations.[26] Public utilities within a loose pool must take service under that pool-wide tariff for all pool transactions.[27] The pool-wide tariff must be the *pro forma* OATT promulgated by the Commission or another tariff approved by the Commission.[28] This requirement is effective on the date that transactions begin under the arrangement or agreement.[29]

---

[23] Order No. 888-A at 12,313.

[24] *Id.* The Commission requires public utilities that are members of an existing loose pool to either (1) reform their pooling arrangements in accordance with Order No. 888 or (2) excise all discounted and/or special arrangements transmission service from the pooling arrangement. That is, in the latter case the members could continue to provide other services (e.g., generation), but would cease to be a loose pool for purposes of Order No. 888.

[25] *Transmission Access Policy Study Grp.*, 225 F.3d at 681.

[26] 18 C.F.R. § 35.28(c)(3) ("Every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, and that is a member of a power pool. . . must have on file a joint pool-wide or system-wide open access transmission tariff"). Moreover, any public utilities that have a "multi-lateral trading arrangement or agreement that contains transmission rates, terms or conditions" must have a FERC-approved joint pool-wide or system-wide OATT.  *Id.*

[27] Order No. 888 at 21,594.

[28] 18 C.F.R. § 35.28(c)(3)

[29] *Id.*

In addition to facilitating open access to transmission, a pool-wide OATT allows entities to challenge a pool's choice to include certain transactions as pool transactions and to exclude other transactions as non-pool transactions on the grounds that the choice was unduly discriminatory or anti-competitive based on the particular facts surrounding the pool and its members.[30]  In other words, the presence of a pool-wide OATT allows the members of a power pool to be held accountable if they engage in unduly discriminatory or anti-competitive conduct.

Not only have the SEEM Applicants proposed a power pool without filing a pool-wide OATT—a straightforward violation of FERC's rules—but the terms of the SEEM Proposal exclude participation in the pooling arrangement by anyone but SEEM Members and Participants. To become a Participant and gain access to SEEM's transmission services, an entity must meet several requirements, including entry into an Enabling Agreement—"a bilateral agreement for the purchase and sale of Energy"—with at least three SEEM Participants.[31] However, SEEM Members, who by definition are load-serving entities, are under no obligation to enter into Enabling Agreements with other entities, and nothing in the SEEM Proposal prevents them from entering into Enabling Agreements in a discriminatory manner.  Even if an entity does meet all the requirements, the Participant Agreement only becomes effective when countersigned by the Southeast EEM Agent "at the direction of the Operating Committee."[32]

FERC has long recognized that "the inherent characteristics of monopolists make it inevitable that they will act in their own self-interest to the detriment of others by refusing transmission and/or providing interior transmission to competitors in the bulk power markets."[33]

---

[30] Order No. 888-C.
[31] SEEM Market Rules, Section III.
[32] *Id.* Section III. As previously noted, the Operating Committee is made up entirely by transmission-owning SEEM Members. SEEM Agreement at Article 5.
[33] Order No. 888 at 21,567.

JA0728

So it is here—by exercising unmitigated authority over who is permitted to execute Enabling

Agreements and become a SEEM Participant, the Applicants cement their control over the

transmission system and all but guarantee that competitors will be provided inferior transmission

service.  This is the exact harm that Order No. 888 and its progeny were intended to correct.

### D.   THE SEEM PROPOSAL DOES NOT ENSURE JUST AND REASONABLE RATES AND ITS STRUCTURE LENDS ITSELF TO UNDUE DISCRIMINATION AND MUST THEREFORE BE REJECTED

Independent of its status as a power pool,[34] the SEEM Proposal falls short of the

applicable FPA Section 205 standard for organized markets. The proposed market structure

creates opportunities for the Applicants to abuse their market power through SEEM, is

needlessly complex in a manner that discourages participation, and lacks adequate analytical

support.  Additionally, the SEEM Proposal lacks the elements of good governance that the

Commission requires when reviewing organized markets including market mitigation, market

monitoring, independence, and transparency. For all these reasons, as detailed below, the

Commission should reject the SEEM Proposal for being unjust, unreasonable, and unduly

discriminatory.

### 1.  The SEEM Proposal is an organized wholesale market whose rates must be just, reasonable, and not unduly discriminatory.

The SEEM Proposal improperly characterizes SEEM as an "expansion to the existing . . .

bilateral market in the Southeast."[35] The proposal describes SEEM as a "trading platform" and

claims that "neither the sale of power nor the sale of transmission service will be effectuated

---

[34] A market's status as a power pool is independent of its status as an organized market. A power pool can also be an ISO, RTO, or other organized market. Notable examples include MISO, which is both a power pool and ISO; PJM, which is both a power pool and an ISO; and SPP, which is both a power pool and an RTO. *Electric Power Markets*, FEDERAL ENERGY REGULATION COMMISSION, https://www.ferc.gov/industries-data/market-assessments/electric-power-markets (last updated Oct. 23, 2020).

[35] SEEM Proposal at 13.

through the Southeast EEM System or under the Southeast EEM Agreement."[36] Throughout its

filing, the Applicants attempt to cabin the Commission's jurisdiction over SEEM to the service

of each utilities' transmission tariffs and SEEM's relationship to that service,[37] incorrectly

asserting that SEEM "is not . . . a contractual vehicle for the sale or transmission of electric

energy at wholesale" and that "the Southeast EEM Agreement is not required to be reviewed by

the Commission by virtue of its relationship to [power sales.]"[38]  Applicants argue that "[w]hile

Southern Company is filing the entire Southeast EEM Agreement, the Commission's authority to

review it remains limited by its statutory authority."[39]

Contrary to these assertions, SEEM is an organized marketplace for the sale of wholesale

power over which the Commission has clear jurisdiction. SEEM has rules that control who

participates and how prices are generated, replacing the negotiations that are definitional to

bilateral contracting. Participants are no longer entering into bilateral contract negotiations with

one another directly and are required to defer such negotiations to the SEEM algorithm.

Contract rates are a defining component of a bilateral agreements.[40] By contrast, auctions

and other organized markets produce tariff rates are subject to a different standard under Section

205 than contract rates.[41] In *Devon Power LLC*, the Commission explained that rates produced

by an auction produced tariff rates rather than contract rates because prices are set by a rate

methodology and the contracting parties had little active participation in the auction.[42] Similarly,

under the rules of the SEEM Proposal, the algorithm makes matches and sets rates for a

---

[36] *Id.* at 14.

[37] *Id.*

[38] *Id.*

[39] *Id.*, *citing California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004) (finding that the Commission exceeded its statutory authority to examine practices "related to" rates when it attempted to replace CAISO's governing board based on its own method of selection).

[40] *See generally Devon Power LLC*, 134 FERC ¶ 61,208, 62043 (Mar. 17, 2011).

[41] *See id.* at 62,043–44.

[42] *Id.* at 62,044.

transaction. The individual Participants do not participate in this process beyond making initial

bids/offers and fulfilling matches once they are made. This system does not reflect the benefits of

free negotiation that is assumed when reviewing contract rates. Consequently, the Commission

can and should review the SEEM Proposal as an organized market rather than as an expansion of

the existing bilateral market as the Applicants claim.  As the Commission stated when evaluating

the appropriate scope of its jurisdiction over and applicable requirements pertaining to an

algorithm-based energy exchange in *Automated Power Exchange*:

> We agree … that the rate schedule APX submitted does not meet all of the Commission's requirements. APX argues that it does not need to meet these requirements because they are inconsistent with market-based rate authority. We disagree. APX is not merely selling power at market-based rates. APX is a power exchange, a concept that reflects a fundamental restructuring of the industry which substantially alters the operation of the electric power market. Under a typical market-based transaction the price is determined through arms-length negotiations between the buyer and seller. In contrast, the electronic operation of APX's Market Engine and APX's decisions in that regard will determine the market price.
>
> Moreover, APX's power exchange is starkly different from the traditional way power is sold, i.e., through explicit rates on file with the Commission which guarantees that all market participants have the same information about the market, and protects consumers by providing rates that are just, reasonable, and not unduly preferential or discriminatory. Consequently, in this new power exchange environment the Commission has the same responsibility . . . .[43]

The Applicants' characterization of the SEEM Proposal as a "market enhancement" of

the existing bilateral market[44] does not insulate the SEEM Proposal from the level of review

given to other markets and the filing itself acknowledges the Commission's authority under

205(c) to review the SEEM Proposal under the just, reasonable, and not unduly discriminatory

standard of review.[45]

---

[43] *Automated Power Exchange, Inc*., 84 FERC ¶ 61,020, 61,090 (1998); *upheld Automated Power Exchange, Inc. v. FERC*, 204 F.3d 1144 (D.C. Cir. 2000).
[44] SEEM Proposal at 4.
[45] SEEM Proposal at 1 and 5.

**2. The Commission should rely on core principles and lessons learned from its regulation and review of other organized markets.**

In reviewing the SEEM Proposal for whether it is unjust, unreasonable, or unduly discriminatory, the Commission should draw upon its long history of regulating and evaluating various types of organized markets. The core principles used by the Commission when evaluating other market structures are equally applicable to this filing.

The Commission's development of competitive market structures through regulation is highly relevant and applicable to the SEEM filing. Order No. 888 was one of the first major steps towards competitive wholesale market reform and set the groundwork for subsequent regulation and market reform. Order No. 888 opened up transmission by ordering functional unbundling, yet the Commission recognized that this was only a first step and that "additional safeguards are necessary to protect against market power abuses."[46] The Commission specifically noted that "the filing of open access tariffs by . . . members of a power pool is not enough to cure undue discrimination" where membership is open to some but not all and noted that "the same holds true of bilateral arrangements that allow preferential transmission pricing or access," stating that "[t]hese agreements and arrangements need to be changed."[47] The Commission opened the door for utilities to engage in market restructuring to address concerns of discrimination and market power abuse.[48] It noted that several organized markets were considering reorganization as an Independent System Operator ("ISO") as only one available method and set standards designed to ensure that "a properly constituted ISO [would be] a means by which public utilities can

---

[46] Order No. 888, at 21,552.
[47] *Id.* at 21,593.
[48] "Thus, we intend to accommodate other mechanisms that public utilities may submit, including voluntary corporate restructurings (e.g., ISOs, separate corporate divisions, divestiture, poolcos), to ensure that open access transmission occurs on a non-discriminatory basis. We also will continue to monitor—and stand ready to work with parties engaging in—innovative restructuring proposals occurring around the country." Order No. 888, at 21,552.

16

JA0732

comply with the Commission's non-discriminatory transmission tariff requirements."[49] To assist in guiding the restructuring process, the Commission established general principles that it would apply in determining whether such reorganized markets would meet the Commission's non-discriminatory tariff requirements, which included: (1) governance should be structured in a fair and non-discriminatory manner; (2) market operations and finances must be independent of transmission owners; (3) tariffs must be clear and neither favor nor disfavor any user or class of users; (4) trading rules should promote efficiency in the marketplace; and (5) information on system operation, conditions, available capacity and constraints, and all contracts or other service arrangements of the ISO should be made publicly available.[50]

The Commission built upon these principles when it issued Order No. 2000 based on the understanding that the risk of market power abuse was still prevalent even after functional unbundling.[51] Order No. 2000 set minimum criteria specifically designed to address problems common to *all* competitive markets and specifically expanded market monitoring functions in organized markets, noting that "[s]ince the inception of organized energy markets, the Commission has required RTOs and ISOs to employ a market monitoring function" as monitors "have consistently played a vital role in reporting on the state of the markets and ferreting out wrongdoing by market participants."[52] In Order No. 719, the Commission implemented even more regulations addressing remaining market power issues and setting requirements for the relationship between organized markets and market monitoring units. There the commission noted that "[i]mproving the competitiveness of organized wholesale markets is integral to the

---

[49] Order No. 888, at 21,596.
[50] *Id.* at 21,596-597.
[51] "[F]unctional unbundling does not change the incentives of vertically integrated utilities to use their transmission assets to favor their own generation, but instead attempt to reduce the ability of utilities to act on those incentives." Order No. 2000, at 35.
[52] *Id.* at 64,137.

Commission fulfilling its statutory mandate to ensure supplies of electric energy at just, reasonable and not unduly discriminatory or preferential rates."[53]

The SEEM Proposal presents the same fundamental market power issues that the Commission addressed while regulating organized markets. The Commission created ISOs and RTOs as exemplar organized market structures, that if designed in a thoughtful and fair way, address these issues, but the strategies the Commission used in these regulations are applicable to addressing market power issues in all organized markets. In developing Order Nos. 888, 2000, and 719, the Commission determined what was required to avoid undue discrimination. Those determinations are highly relevant in understanding whether the SEEM Proposal similarly avoids undue discrimination as an alternative market design.

The Commission's decisions to date regarding market structures similar to SEEM should guide its analysis here. These include the Commission's review of California Independent System Operator's ("CAISO") Western Energy Imbalance Market (WEIM), SPP's imbalance market, and Southern Company's power auction. Each of these market structures is voluntary and separate from traditional RTO/ISO wholesale markets. In each case, the Commission reviewed the filings under Section 205, examined the market power issues, and issued requirements to ensure that the filing was just, reasonable, and not unduly discriminatory.

There are core principles for ensuring just, reasonable, and not unduly discriminatory rates for organized markets that can be drawn out from the Commission's regulation and evaluation of individual organized markets. The Commission consistently returns to the same requirements for curtailing market power: market mitigation, market monitoring, good governance, independence, and transparency. The Commission has long applied lessons learned

---

[53] Order 719 at 64,101.

from previous actions to guide its analysis of active proceedings,[54] and should do so here. The SEEM Proposal fails to sufficiently integrate any of these core principles and should be rejected for failing to meet the Commission's standards of just, reasonable, and not undue discrimination for organized markets.

However, as discussed further in section II.C, in rejecting the filing, Commission should provide guidance to the Applicants as to what modifications are required to meet the Commission's just and reasonable standard for their proposed market.

### 3. The SEEM Filing as proposed is unjust, unreasonable, and unduly discriminatory.

The SEEM Proposal as filed fails to meet any of the core principles required by the Commission to ensure that organized wholesale markets are just, reasonable, and not unduly discriminatory. Contrary to Applicants' assertions, the SEEM Proposal does not appear to improve upon the status quo, has failed to establish that its potential benefits outweigh its costs, and, if anything, increases the potential for market power abuse. Nor has SEEM instituted any of the structural mechanisms deemed necessary to counteract such potential abuse. The SEEM's governance structure heavily favors its largest members, lacks transparency, independence, robust monitoring, or mitigation measures designed to deter noncompetitive behavior. As a result, the proposal as filed fails to meet the 205 standard and must be rejected.

### a. The SEEM Proposal fails to improve upon existing markets or provide sufficient safeguards against market power abuse.

PIOs have long advocated for competitive market reform in the Southeast and commend the stated goals of SEEM to "reduce transactional friction in the Southeast and increase the

---

[54] Order No. 2000, at 632; *e.g.*, *Sw. Power Pool, Inc.*, 112 FERC ¶ 61,303, 62, 343 (Sept. 19, 2005) ("SPP September 2005 Order").

JA0735

efficiency of the existing bilateral market."[55] However, as explained in the written testimony of

Dr. Paul Sotkiewicz, the SEEM Proposal not only fails to meet this target, but "raises more

questions than it provides solutions to problems."[56] As an initial matter, Applicants have failed to

demonstrate that SEEM's market design is computationally feasible. Additionally, the proposed

design fails to improve upon the status quo and is in some ways worse. Most troubling, the

SEEM design also facilitates the exercise of market power and manipulation not present in the

current bilateral market. Finally, the cost-benefit analysis provided in support of the SEEM

Proposal is not well supported, non-transparent, and does not provide sufficient information or

detail to assess the reasonableness of the results.

###### i.     The SEEM Algorithm may not be computationally feasible.

The proposed SEEM market design also employs a complex programming algorithm that

matches buyers and sellers and is designed to preserve much of the existing bilateral market

structure by allowing participants to set a number of different constraints.[57] The programming

algorithm is a mixed integer program with constraints that include: (1) the unfettered ability of

Participants to choose who they do and do not wish to transact; (2) the ability to submit block

bids or offers that require either the whole bid or offer be accepted or otherwise be rejected; (3) a

requirement there must be at least three eligible, non-affiliated counterparties for which a

Participant can exchange energy in order to be matched; and (4) an unknown set of potential

contract paths that could be used to match bids and offers between different Balancing Authority

areas ("BAAs").[58]  In light of the timing of the market and the proposed bidding, the model has

to be able to solve what is possibly a large and difficult mixed integer problem in only 5

---

[55] SEEM Proposal at 2.
[56] Sotkiewicz Aff. at P 113 (attached hereto as Exhibit A).
[57] SEEM Proposal at 15–16; SEEM Market Rules, Section IV.A.b.
[58] Sotkiewicz Aff. at P 85; SEEM Market Rules, Sections IV.A.1.b, IV.A.2, IV.B.3.a.

JA0736

minutes.[59]  Applicants have not yet chosen a vendor and no prototype of the program has been

shown in the SEEM Proposal.[60]

Such a large number of integer constraints can be computationally burdensome within

such a short solution time.[61]  As Dr. Sotkiewicz points out, despite often encompassing a larger

footprint or having more generators on the system, current ISO/RTO market dispatch algorithms

and software are simpler and more complete in concept and operation than the proposed SEEM

market algorithm due to the lack of mixed integer constraints.[62]

The SEEM matching algorithm has not even been developed yet, and thus has not been

shown to be computationally feasible given the limited time to run the algorithm and schedule

transactions across multiple BAAs.[63]  Surprisingly, Applicants have not acknowledged the

computational complexity of the proposed model and appear not to have considered the

possibility that the market design may not be feasible.[64]

> **ii.     The proposed SEEM design is worse than the status quo.**

Currently, wholesale energy is in the Southeast is traded in bilateral markets where

buyers and sellers of wholesale power execute transactions that could be hourly, daily, weekly,

monthly or even multi-year long-term contracts.[65]  Existing trading in the Southeast is quite

common and sophisticated, with almost every utility participating and either maintaining their

own in-house trading desk and expertise or outsourcing it to professional services.[66] Information

about available resources and operating costs used to inform bidding are publicly available and

---

[59] Sotkiewicz Aff. at P 84; SEEM Market Rules, Section IV.B.2.
[60] Sotkiewicz Aff. at P 84.
[61] *Id.* at PP 82–92.
[62] *Id.* at PP 90–92.
[63] SEEM Filing at 11; Sotkiewicz Aff. at 84.
[64] Sotkiewicz Aff. at P 89.
[65] *Id.* at P 15.
[66] *Id.* at P 24.

JA0737

easily located on the Open Access Same-time Information System ("OASIS"), making search costs minimal, and submission of eTags for scheduled transactions are largely automated.[67] Short-term bilateral contracts might use non-firm transmission, which can lower costs but also carries the risk that it could be curtailed.[68] Long-term contracts use firm transmission, which has higher costs because it cannot be curtailed.[69] If the counterparties are located in different BAAs, as the exchange travels between the source and sink, transmission rates are incurred and are added - or "pancaked" - on top of each other, making trade across BAAs more expensive.[70] Pricing tends to represent a split of the savings for each party generated by the trade.[71]

The Applicants argue that SEEM would advance the efficiencies and lower costs compared to the existing bilateral market by using an automated software system with an algorithm designed to match bids and offers voluntarily submitted for 15-minute intervals of non-firm, zero-cost transmission, with prices based on a "split-the-savings" basis.[72]

Because the existing market is so sophisticated and widely used, any reduction in transaction costs from SEEM are likely minimal.[73] The split-savings pricing proposal is also largely a reflection of current price formation.[74] And while zero-cost transmission eliminates some of the costs of transacting across a wider area, since SEEM only allows trading of 15-minute increments of non-firm transmission, the likelihood of being curtailed for such a low-

---

[67] *Id.* at PP 24–27.
[68] *Id.* at PP 17–18.
[69] *Id.* at P 19.
[70] *Id.* at P 21.
[71] *Id.* at P 30.
[72] SEEM Proposal at 4.
[73] Sotkiewicz Aff. at PP 43–45.
[74] *Id.* at PP 50–52. While Dr. Sotkiewicz and PIOs do not specifically opine on whether the proposed split-savings model is unjust or unreasonable *per se*, it is generally thought to be inefficient when compared to other pricing models. *See id.* at P 32, n.17. The Commission itself noted in Order 2000 raised concerns about split-savings pricing, stating that "[m]arket designs that base prices on the averaging or socialization of costs, may distort consumption, production, and investment decisions and ultimately lead to economically inefficient outcomes." Order 2000 at 941. For this reason, PIOs recommend that the proposed pricing model be addressed as part of a technical conference (see Section V below).

22

priority product is high, especially in light of the existing seams with the PJM Interconnection

LLC ("PJM"), Midcontinent Independent System Operator ("MISO"), and Southwest Power

Pool ("SPP") markets.[75]

But there are also ways in which the SEEM Proposal is worse than the status quo. For

example, the current bilateral market is governed by rules set by FERC and no one party or

coalition has control over the rules governing bilateral transactions. Under SEEM, however, the

rules were developed by a coalition that gives preferences to some Members over others.[76] In

this way SEEM represents a regression in the equality of opportunity and treatment than is

currently available.[77]

### iii. The proposed SEEM design facilitates the exercise of market power.

Of greatest concern is that the proposed SEEM design erects new barriers to trading that

do not exist in the current bilateral market. In particular, the SEEM structure provides large

market participants the opportunity to prevent transactions from taking place at all.[78] Such

barriers can facilitate the exercise of market power by large market participants in ways that

would not be detected by SEEM's own reporting requirements, the typical Market Based Rate

("MBR") authority evaluations, or by Electric Quarterly Reports data.[79]

Applicants argue that SEEM does not have market power implications because most

SEEM Members have MBR authority for selling outside of their own BAAs.[80] But MBR

authority focuses on the ability to raise prices above competitive levels through the exercise of

---

[75] *Id.* at PP 39–41.
[76] *Id.* at P 37.
[77] *Id.* at P 38.
[78] *Id.*
[79] *Id.* at P 53.
[80] SEEM Proposal at 39.

horizontal market power, and Applicants' expert, Dr. Pope, also focuses her analysis on the ability of SEEM Participants to act together to raise market prices.[81]

But market power and manipulation can come in forms other than raising prices above competitive levels through the exercise of horizontal market power. The SEEM Proposal exists in a market structure where the major players are all state-regulated, franchise monopolies whose returns are based almost entirely on capital investments, which results in short- and long-term incentives that are quite different from other organized markets.[82]  In the Southeast, competition and the availability of lower cost suppliers erodes the potential profits that come from a monopoly's main source of revenue: building additional generation.[83]  Competition and lower cost options threaten most parties in the Southeast system:  Investor-Owned Utilities ("IOUs") need to show their regulators that existing (higher-cost) assets are "used and useful" and that future supply needs can be met by more investment – upon which they receive a regulated rate of return – rather than just purchasing supply on the open market.[84]  For public power generation and transmission entities, they do not want business decisions that lead to a request in change of strategy or management.[85]  Transmission owning utilities do not want to appear as if they have excess capacity, which could be a signal that transmission is overbuilt.[86]  For all of these parties, to signal through SEEM that there is sufficient NFEETS available could send a signal to parties paying for Firm and Non-firm transmission with pancaked rates to satisfy those needs through

---

[81] *Id.* at 40–42.
[82] Sotkiewicz Aff. at P 56.
[83] *Id.* at P 57.
[84] *Id.*
[85] *Id.* at P 58.
[86] *Id.* at P 59.

JA0740

SEEM instead, which would lead to a spiraling effect that reduces transmission revenues and makes other regional generation more competitive as well.[87]

The SEEM structure provides several levels to prevent transactions from taking place that would otherwise be consistent with market rules, primarily through the unfettered ability to toggle off certain counterparties known to have lower cost resources.  This could also be used as part of a coordinated strategy among large generation-owning SEEM Members.[88]  Given the 3 counterparty requirement for trades to go through, it would only take three of the five largest generation owning entities to not offer their generation that would likely block trades with lower cost parties.[89]  In the long run, merchant generation or renewable developers already in the market could be financially squeezed and forced to sell their assets to the large Member IOUs and such signals would be a powerful deterrent to competitive new entry.[90]

Nothing currently required by SEEM or other monitoring would provide a paper trail of such strategies.

Additionally, a consequence of this unique ability to toggle off other Participants permits one market Participant to foreclose the possibility of transactions with specific counterparties is that it can lead to undue discrimination. Although the bilateral market also allows parties to choose with whom they wish to contract, one must ask whether the structure of SEEM and the breadth of the geographic market better enables this type of unfettered discrimination.  There are also incentives to deny certain participants access to zero-cost transmission in SEEM as a way of

---

[87] *Id.* at P 60; "The $0 transmission rate sub-hourly trading could eventually cannibalize some hourly trading yielding a reduction in non-firm transmission revenues." SEEM Proposal, Attach. E-1: Benefits Analysis by Guidehouse Inc. and CRA International at 11 ("Guidehouse/CRA Report").
[88] Sotkiewicz Aff. at 60.
[89] *Id.* at P 63.
[90] *Id.* at P 64.

forcing them to pay for higher-priced firm transmission in the traditional bilateral market that rises to the level of cross-market manipulation.[91]

Finally, while the three-counterparty rule might prevent some types of collusion, as suggested by Dr. Pope,[92] it also creates larger barriers to completing an economically beneficial match than currently exist in a bilateral market where two parties can find each other and complete a mutually beneficial transaction without the need for other eligible bids. When combined with the three-counterparty rule, unfettered discrimination is particularly problematic in light of the geographic dominance of the five largest Members who own both transmission and generation.[93]  All operate their respective BAAs and are geographically spread out across the SEEM map.[94]  This provides opportunities to block potentially beneficial matches that would cross more than one BAA and transmission provider, since the number of "eligible counterparties" would easily be less than three and easy to imagine the ability to unduly discriminate against specific parties in a way that is totally undetectable under the current construct, which only aggregates numbers of bids, offers, sales, and Participants.  This lack of transparency is further compounded by the lack of an independent market monitor with the authority and independence to investigate for such market power abuses.[95]

>        **iv.    Applicants' cost-benefit analysis is insufficient to justify the SEEM Proposal.**

Applicants rely on an analysis by Guidehouse Inc. and CRA International to assert that SEEM will provide annual benefits of to $40 million in the base case scenario and $100 million

---

[91] *Id.* at PP 68–73.
[92] SEEM Proposal, Attach. D at PP 83–85.
[93] Sotkiewicz Aff. at PP 76–77.
[94] *Id.*
[95] *Id.* at 78–79, 83.

JA0742

in a carbon constrained scenario.[96]  However there are serious concerns regarding the validity of the modeling used and the Guidehouse/CRA Report provides no details regarding key assumptions necessary to verify their assessment.[97]

As an initial matter, the Guidehouse/CRA Report uses a modeling tool that does not have the ability to model dispatch on the 15-minute intervals that will be used in SEEM, despite the existence of several other modeling options that do.[98]  Whatever simulations were done to model for 15-minute intervals were done in-house and absent any explanation and supporting documentation, one cannot assess the strength of the modeling or the reasonability of the results.[99]

Additionally, the analysis provides no detailed outputs regarding key elements, including: (1) estimated bilateral trading prices; (2) changes in generation dispatch by utility and fuel type; (3) production cost savings accruing to each of the modeled market participants; (4) potential trades that were available but unable to be executed due to transmission constraints; (5) the amount of curtailed renewable resources before and after the implementation of SEEM; or (6) changes in emissions from the impact of a changing amount of solar power across the SEEM region, despite being cited as the main purpose for SEEM.[100]  The lack of this kind of detail makes it difficult to assess or verify the reasonableness of the results.[101]

The failure to fully account for transmission system constraints is a fatal flaw that renders the entire benefits analysis and estimates meaningless and despite the relatively low reported

---

[96] Guidehouse/CRA Report at 9 and n.13.
[97] Sotkiewicz Aff. at P 94.
[98] *Id.* at P 100.
[99] *Id.*
[100] *Id.* at P 94.
[101] *Id.* at P 111.

costs to set up and run SEEM, Applicants have not actually established that the benefits of

SEEM will actually exceed its costs.[102]

> **b. The governance structure in the SEEM Proposal creates opportunities for specific applicants to control and manipulate the market.**

The governance structure in the SEEM Proposal presents two major structural concerns

that consolidate powers to the monopoly utilities who are Members: (1) the voting mechanism

gives Duke, Southern Company, and TVA the ability to functionally control certain decisions by

the Member Board, and (2) the Membership Board excludes classes of Participants from being

engaged in governance. These structural issues create opportunities for Applicants to control and

manipulate SEEM in a discriminatory manner.

> **i. The SEEM voting mechanism allows certain Applicants to exercise market power.**

The proposed governance structure of SEEM creates market power for three Applicants:

Southern Company, Duke, and Tennessee Valley Authority ("TVA"). The governance allows for

any two of these three Applicants to block future modifications to market rules or market

structures—structures and rules that will need to evolve to provide a more beneficial market with

meaningful market participation. The SEEM Proposal sets up a voting system where each

Member receives one vote for a popular vote, and a number of votes proportional to load size for

the Net Energy for Load ("NEL") Vote.[103] Significant actions require more than 50% of the

popular vote and more than 67% of the NEL Vote (and comprising at least three Members) in

---

[102] *Id.* at P 110.
[103] SEEM Proposal at 21–22; SEEM Agreement at Articles 4, 4.1.5.

order to pass.[104] Other actions require more than 50% of the popular vote and more than 50% of the NEL Vote (and comprising at least three Members) in order to pass.[105]

Under the proposed voting system, a small number of Applicants can block general and significant matters through the NEL Vote with minimal coordination. Based on data provided in Table 1 below, any two of the three largest Applicants—Southern Company (28%), Duke (23%), and TVA (29%)—can block any proposed general or major action by preventing either a majority or supermajority required for the NEL Vote.[106] These Applicants maintain their ability to block NEL votes even as SEEM adds the Members anticipated in the filing.[107] Under the voting rules, the Applicants can still exercise significant control by unilaterally blocking actions and there is little to protect from them effectively acting as a voting block.

**Table 1: Estimated Net Energy Load Votes[108]**

| Members | 2018 EIA sales (MWh) | Total of initial Members | Total including potential Members |
|---|---|---|---|
| Southern Company | 151,048,974 | 28% | 25% |
| AECI | 20,217,641 | 4% | 3% |
| Dalton | 1,722,943 | 0% | 0% |
| DESC | 22,657,235 | 4% | 4% |
| Duke | 125,860,523 | 23% | 21% |

---

[104] SEEM Proposal at 21–22; SEEM Agreement at Articles 4, 4.1.5.

[105] SEEM Proposal at 21–22; SEEM Agreement at Articles 4, 4.1.5.

[106] Southern Company and Duke have a combined 51% of the NEL votes of all initial SEEM members; Southern Company and TVA have a combined 57% of the NEL votes; and Duke and TVA have a combined 52% of the NEL votes.

[107] Southern Company and Duke have a combined 46% of the NEL votes of all initial and potential SEEM members; Southern Company and TVA have a combined 51% of the NEL votes; and Duke and TVA have a combined 47% of the NEL votes.

[108] To estimate the Net Energy Load vote for each member the total retail sales for each utility was calculated from the EIA's 2018 Retail Sales for all sectors: Tbl. 10, https://www.eia.gov/electricity/sales_revenue_price/. Where members are wholesale providers to distribution utilities, such as in the case of TVA, the retail sales from each distribution customer were summed to get the total for that SEEM member. The NEL vote was estimated to be that member's 2018 retail sales as a percentage of the total 2018 retail sales of all SEEM members.

| LG&E/KU | 31,188,583 | 6% | 5% |
|---|---|---|---|
| NCMPA | 4,089,959 | 1% | 1% |
| PowerSouth | 8,224,272 | 2% | 1% |
| NCEMC | 18,548,364 | 3% | 3% |
| TVA | 157,237,029 | 29% | 26% |
| | | | |
| Potential Members: | | | |
| GSOC/ Oglethorpe | 38,500,638 | | 6% |
| MEAG | 8,985,333 | | 2% |
| Santee Cooper | 8,458,687 | | 1% |

### ii. The governance structure denies independent power producers the ability to meaningful engage in decision making

The SEEM Proposal places all governance authority in the hands of Members via the Membership Board, Operating Committee, and the Agent.[109] The SEEM Proposal lacks any governance role for Participants who are not Members. Although the SEEM Proposal allows for the addition of new Members,[110] the requirements for membership close off that availability to certain classes of Participants. The SEEM Proposal requires that a Member "must be: (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory."[111] This definition excludes independent power producers and other participants from becoming Members and having access to SEEM governance.

---

[109] *See* SEEM Proposal at 15–16, 21–22; SEEM Agreement at Article 4.
[110] SEEM Agreement at Article 3.2.3.
[111] *Id.* at Article 3.2.1.

JA0746

The SEEM Proposal justifies tying Membership to load-serving responsibility by stating it "ensur[es] that the entities with decision-making authority over the design, goals, and objectives of the Southeast EEM will share a common purpose of achieving benefits for customers."[112] The SEEM Proposal then goes on to state "[the Members] will pay for the Southeast EEM; and in return, they will have voting rights."[113] Neither of these explanations justifies completely excluding entire classes of Participants from having any participation in governance; although the current qualifications for being a Member make an entity an important participant in governance, the absence of these qualifications do not make an entity's input invaluable. There are various designs that would have opened governance to a wider range of Participants while still achieving the SEEM Proposals stated benefits of ensuring common purpose and giving Applicants providing start-up funds with an important role in governance.[114] Instead, the SEEM Proposal completely excludes classes of Participants—*e.g.* independent power producers and large-scale commercial or industrial customers—which opens up the potential for Applicants to exercise market power over these Participants through SEEM.

The use of the algorithm in the SEEM Proposal creates ambiguity in how bidding practices will develop in SEEM. Those bidding practices will have a direct impact on potential Participants in the region. The inability for classes of Participants such as independent power producers to substantively engage in shaping SEEM to address issues that arise in bidding practices creates market power issues. Participants' ability to participate in the stakeholder

---

[112] SEEM Proposal, Attach. B at 13.

[113] *Id.*

[114] Jennifer Chen, *Evaluating Options for Enhancing Wholesale Competition and Implications for the Southeastern United States*, NICHOLAS INSTITUTE FOR ENVIRONMENTAL POLICY SOLUTIONS, DUKE UNIVERSITY (Mar. 2020), https://nicholasinstitute.duke.edu/publications/evaluating-options-enhancing-wholesale-competition-and-implications-southeastern; Jennifer Chen & Michael Bardee, *How Voluntary Electricity Trading Can Help Efficiency in the Southeast*, R STREET (Aug. 2020), https://www.rstreet.org/wp-content/uploads/2020/08/No.-201-Energy-Trade-in-the-Southeast.pdf.

engagement processes is not enough to mitigate this market power. All Participants do not

necessarily need to be able to become Members, but governance cannot be completely

inaccessible to entire classes of Participants. The clear absence of stakeholder governance in the

SEEM Proposal makes it unduly discriminatory.

### c. The SEEM Proposal lacks the core principles of market monitoring, market mitigation, transparency, and independence that are needed to protect against market power abuse

Throughout its regulation and evaluation of organized markets, the Commission has

identified market monitoring, mitigation, transparency, and independence as core principles of

good market design that mitigate market power. The Commission has recognized the value of

integrating these tools for structurally building in market power mitigation into organized market

designs to ensure the market is just, reasonable, and not unduly discriminatory. The SEEM

Proposal fails to integrate these core principles.

### i. The SEEM Proposal lacks adequate market monitoring

Market monitoring plans are a common tool that the Commission has required in order to

ensure that an organized markets are just, reasonable, and not unduly discriminatory.

The Commission requires sufficient market monitoring procedures when reviewing

organized markets on an individual basis. In the WEIM filing, CAISO recognized the

Commission's implicit requirement for market monitoring and proposed the use of its existing

Department of Market Monitoring, and the Commission found that the department's "extensive

experience in monitoring an imbalance market in the West" made it an appropriate measure that

helped ensure that the filing was not unduly discriminatory.[115] As other entities joined the

WEIM, the Commission was careful to note in each case that the joining entity would be subject

---

[115] *Cal. Indep. System Operator Corp.*, 147 FERC ¶ 61,231, 62,393–4 (June 19, 2014) ("CAISO June 2014 Order").

JA0748

to market monitoring under CAISO's existing tariff.[116] In the filing for Southern Company's power auction, the Commission required the market monitor to verify the calculations and utilities' inputs used in the auction, confirm that transmission service is not unreasonably withheld, file market reports to the Commission, and report complaints and serious concerns to the Commission.[117] In a subsequent filing, the Commission directed Southern Company to make specific clarifications to the auction rules to reflect the Commission's requirements.[118] Similarly, in the SPP energy imbalance market filing, the Commission extensively and critically reviewed SPP's market monitoring and mitigation, finding that "[u]ntil these inadequacies are remedied, we cannot find SPP's proposal to be just and reasonable" and rejected the filing.[119]

Additionally, market monitoring is considered a minimum function of Section 205 tariffs, as are general market monitoring plan requirements;[120] and the Commission views mitigation provisions with an eye towards "making them as non-discretionary as possible."[121] Additionally, the Commission requires organized markets to assess their impact on other markets in the region.[122]

The SEEM Proposal fails to include any market monitoring. Instead, the Applicants assert "[w]ithout any new opportunities for the exercise of market power and with strong safeguards regarding potential market manipulation, there is no need for a market monitoring

---

[116] *E.g.*, *PacifiCorp*, 147 FERC ¶ 61,227, 62,337–39 (2014) ("PacifiCorp June 2014 Order"); *Cal. Indep. System Operation Corp.*, 166 FERC ¶ 61,098, 61,426 (Feb. 8, 2019).

[117] *S. Co. Servs., Inc.*, 125 FERC ¶ 61,316, 62,552 (Dec. 18, 2008) ("Southern Company December 2008 Order").

[118] *S. Co. Servs., Inc.*, 129 FERC ¶ 61,253, 62,430 (Dec. 17, 2009) ("Southern Company December 2009 Order").

[119] SPP September 2005 Order, at 62343, 62347–49.

[120] "The monitoring plan must be designed to ensure that there is objective information about the markets that the RTO operates or administers and a vehicle to propose appropriate action regarding any opportunities for efficiency improvement, market design flaws, or market power identified by that information. The monitoring plan also must evaluate the behavior of market participants, including transmission owners, if any, in the region to determine whether their behavior adversely affects the ability of the RTO to provide reliable, efficient and nondiscriminatory transmission service." Order No. 2000, at 463.

[121] Order No. 719, at P 379.

[122] Order No. 2000, at 463.

function."[123] The SEEM Proposal includes an Auditor to monitor SEEM functioning, but the Applicants specifically state "it will not monitor Participant behavior."[124] Additionally, the market would not be uniformly monitored under any of the Applicants' existing market and mitigation procedures as it was in WEIM. As discussed above, the SEEM Proposal does create new and unchecked opportunities to exercise market power despite the Applicants' contention otherwise. The SEEM Proposal's abdication of any responsibility to monitor SEEM for instances of market abuse is unjust, unreasonable, and unduly discriminatory. Compared to the Commission's consistent requirement and careful review of market monitoring procedures, the SEEM Proposal falls well below the threshold in which the Commission has rejected filings.

ii.     **The SEEM Proposal lacks adequate market analysis and mitigation**

The Commission has regularly required market power analyses when considering proposed organized markets to help the Commission determine whether the filing is just, reasonable, and not unduly discriminatory. Because rates that are formed when sellers have the incentive and ability to exercise unmitigated market power are inherently unjust and unreasonable, the Commission requires every seller to demonstrate that it does not have unmitigated market power or has mitigated market power if the seller seeks to transact under market-based rates.[125]

In the WEIM filing, CAISO failed to provide that information and the Commission required CAISO to make additional informational filings about the presence of structural market power.[126] Similarly, the SEEM Proposal fails to include a market power analysis which severely

---

[123] SEEM Proposal, at 17.
[124] *Id.*
[125] Order No. 888 at 21,554.
[126] CAISO June 2014 Order at 62,410.

limits the Commission's ability to evaluate potential market power issues and what market mitigation measures are necessary to address them.

Instead of providing market analysis, the Applicants assert that "there is no [] ability of the Members to exercise market power."[127] The Applicants attempt to distinguish the SEEM from the requirements to provide market power analysis and a notice of change in status seen in the WEIM by focusing on the voluntary nature of SEEM.[128] Yet, the Commission required updated evaluation of market power based on the inherent potential for market power issues to arise in *any* new geographic market.[129] The Applicants misrepresent that the Commission required market power analysis in response to perceived market power issues with the WEIM— which the Applicants claim is absent from SEEM because it is voluntary.[130] In fact, the opposite is true. The Commission relies on all new entrants to the WEIM to provide a market power study prior to joining the WEIM to demonstrate that the entrant does not have market power authority.[131] The Commission presumes market power issues exist and uses market power reports to identify the specifics of those issues. As discussed above, the SEEM Proposal presents many market power concerns. The Applicants are required to file a market power analysis to detail those issues. The current reliance on a blanket dismissal of any potential for market power issues makes the filing unjust, unreasonable, and potentially unduly discriminatory.

Similarly, the Commission requires mitigation plans and procedures tailored to address specific market power concerns for any market filing. In the WEIM filing, the Commission highlighted the fact that participants would be subject to CAISO's existing mitigation

---

[127] SEEM Proposal at 39, n.149.
[128] *Id*.
[129] PacifiCorp June 2014 Order at 62,338–39; *Nevada Power Co.*, 155 FERC ¶ 61,186, *6 (2016).
[130] *See* SEEM Proposal at 39, n.149. It is worth noting that this distinction that the Applicants draw is undermined by the fact that participation in the WEIM is also voluntary. *See Nevada Power Co.*, 155 FERC ¶ 61,186, *2–*3.
[131] *Nevada Power Co.*, 155 FERC ¶ 61,186, *6–*7.

JA0751

protocols.[132] Similarly, in accepting the Southern Company power auction filing, the Commission explicitly noted specific provisions that sufficiently mitigated issues particular to the proposed auction.[133] In the SPP Imbalance Market filing, the Commission rejected the original filing, in part, for failing to provide required mitigation measures, stating "it is not clear that the tariff addresses the ability of generators that are owned or operated by the same entity to exercise market power in concert."[134] In order to implement the imbalance market, SPP made a subsequent filing with a comprehensive mitigation plan specifically addressing the concerns raised by the Commission.[135] To meet the standard set by Section 205 of the FPA, a filing needs to actively identify and mitigate specific market issues to a degree that the Commission finds sufficient.

The SEEM Proposal fails to include market mitigating procedures or measures. The SEEM Proposal envisions that market mitigation only exists on an individual utility basis through its market-based rate tariff.[136] The Applicants argue that these existing measures are sufficient to address market power concerns with SEEM.[137] The argument relies on the Applicants' underlying and mistaken assumption that SEEM will not create market power and only have "inherently pro-competitive" effects.[138] To the contrary, the SEEM Proposal creates multiple opportunities for Members to exercise market authority that is unavailable under the existing bilateral structure, as discussed above.[139] The Applicants fail to fully analyze or provide

---

[132] *E.g.*, PacifiCorp June 2014 Order at 62,337–39.
[133] Southern Company December 2008 Order at 62,551.
[134] SPP September 2005 Order at 62,350.
[135] *Sw. Power Pool, Inc.*, 114 FERC ¶ 61,289, 61,999–62,007 (Mar. 20, 2006) ("SPP March 2006 Order") ("We find that SPP's proposed mitigation and monitoring plans, *as modified*, are adequate mitigation measures to ensure just and reasonable rates in the imbalance market.") (emphasis added).
[136] SEEM Proposal at 7.
[137] *Id.* at 39.
[138] *Id.* at 38.
[139] *See* discussion *supra* Section II.B.3.

JA0752

mitigation procedures or measures for any of the identified or potential market power issues. The unmitigated market power issues in the SEEM Proposal make it unjust, unreasonable, and unduly discriminatory.

### iii.    The SEEM Proposal fails to include elements of transparency.

In Order No. 888, the Commission explicitly noted that making transmission system information publicly available—including information on system operation, condition, available capacity and constraints, and all contracts or other service arrangements of the ISO—was a fundamental principle for an ISO as an organized market.[140] Similarly, Order No. 2000, required RTOs to serve as the administrator for data reporting to OASIS for the purpose of making it publicly available.[141] Transparency is a critical element of protecting against market power in organized markets. The Commission clearly draws this relation in its statement "the potential for undue discrimination increases in a competitive environment unless the market can be made structurally efficient and transparent with respect to information . . . ."[142]

The SEEM Proposal claims to address transparency by "publish[ing] robust public information" about the administration of the market.[143] Despite this assertion, Article 10 of the rules themselves provides that "[t]he decision and obligation to report quantities, prices, or other data regarding Energy Exchange transactions . . . will be the responsibility of each Seller and Buyer. Neither the Southeast EEM Administrator, nor the Southeast EEM Agent nor the Members shall be responsible for reporting Energy Exchange transactions made by other entities through the Southeast EEM System."[144] Instead, the SEEM Administrator is only responsible for

---

[140] Order No. 888 at 21,596–7.
[141] Order No. 2000 at 426.
[142] *Id.* at 37.
[143] SEEM Proposal at 30.
[144] SEEM Agreement at Article 10.1.1.

JA0753

publicly providing a list of Members and Participants, notices, a description of territory, and

reports "that would include data aggregated by the Southeast EEM System."[145] Under these

rules, the identity of all Participants is kept confidential from third parties—with exceptions as

required by law and the agreement.[146] Ultimately, what the SEEM Proposal intends to publish

does almost nothing to increase public access to information about energy transactions in the

Southeast beyond what is already available through utilities' individual reporting.

On the contrary, the SEEM Proposal adds a layer of obfuscation to transactions in the

Southeast. The proposed third-party Auditor reports its review and analysis of SEEM market

data, concerns based on that data, and complaints to the Membership Board.[147] The SEEM

Proposal does not provide for third-party access to that information. Critically, information about

the operation of the exchange and the matching algorithm is not publicly available under the

SEEM Proposal. The matching algorithm is one of the primary features of the SEEM Proposal

by which SEEM sets rates. The algorithm is unique to SEEM and consequently, details about the

operation of the algorithm and how it uses the data fed into it to make matches is only available

to the public if provided by SEEM. The SEEM Proposal only provides for the publication of

aggregated data, which raises serious questions about whether data about the algorithm's

operation will be available. The availability of this data is important to ensuring substantive

review of SEEM's operation for market power operations. The lack of transparency in the SEEM

Proposal allows the Applicants to potentially conceal market power abuse under SEEM and

supports a finding that it is unjust, unreasonable, and unduly discriminatory.

### iv.     The SEEM Proposal fails to include elements of independence.

---

[145] *Id.* at Article 10.1.3, 10.1.4.
[146] *Id.* at Article 10.1.2.
[147] *Id.* at 30–31.

JA0754

The Commission's regulation of organized markets reflects the importance of independence of market governance from any individual market participant or any one class of participants.[148] The Commission explained the importance of including a fair representation of different types of uses of a system and that the "rules of governance, however, should prevent control, and appearance of control, of decision-making by any class of participants."[149] The Commission has described the principle of independence as "the bedrock" upon which organized markets must be built.[150] To that effect, the Commission identified independence from market participants as a required characteristic of an RTO, stating "[w]ithout such independence, it will be difficult for an RTO to act in a non-discriminatory manner."[151]

The SEEM Proposal does not do enough to ensure the independence of the governance. The governance structure lacks any independence from market participants. SEEM is governed by the Membership Board and run by the Operating Committee comprised of Members and an Agent who is a Member.[152] Members' ability and desire to be Participants in SEEM is a foundational principle of SEEM.[153] As discussed previously, the membership requirements exclude certain classes of Participants. Additionally, there are concerns about individual Members having disproportionate amounts of power under the voting system. These issues are exacerbated by the lack of independence in the governance structure and increase the potential for SEEM being used for discriminatory behavior.

In addition to market governance, the Commission has set clear expectations of independence for market monitors and market administrators. In evaluating the sufficiency of the

---

[148] Order No. 888 at 21,596.
[149] *Id*.
[150] Order No. 2000 at 152–54.
[151] *Id.* at 197.
[152] SEEM Proposal at 15.
[153] SEEM Agreement, at Preamble.

JA0755

market monitor in the WEIM filing, the Commission explicitly noted "[t]he Commission previously has found that the [market monitor and governing board] satisfy the Commission's independence requirements," and no evidence suggested that the WEIM would jeopardize that independence.[154] In the Southern Company power auction filing, the Commission emphasized the independent auction monitor's obligation to report complaints and serious concerns— including tariff violations, violations of rules, and suspected market manipulation—to the Commission and required Southern Company to change the market rules to reflect that obligation.[155] The Southern Company filing also included a plan to move administrative functions away from Southern Company personnel and to an independent auction administrator. The Commission required Southern Company to submit a compliance filing better detailing the exact duties and responsibilities of the independent auction monitor and what extent Southern Company personnel would retain administrative authority over the market.[156] Independence is consistently considered and valued by the Commission as critical to ensuring that entities creating markets do not have the opportunity to exercise market authority over that market.

The SEEM Proposal does not do enough to ensure independence for market monitoring and administration. The SEEM Proposal includes a SEEM Administrator to implement, manage, and oversee operations of SEEM.[157] The SEEM Proposal defines the Administrator as an entity hired to operate the SEEM System "from day to day."[158] The SEEM Proposal also states that the Operating Committee "will handle all day-to-day activities" of SEEM.[159] Although certain reporting duties are assigned to the SEEM Administrator, there is no clear delineation of roles

---

[154] CAISO June 2014 Order at 62,393–4.
[155] Southern Company December 2009 Order at 62,430.
[156] *Id.* at 62,420.
[157] SEEM Proposal at 16–17.
[158] SEEM Agreement, at Article 1.
[159] SEEM Proposal, Attach. C, at 8.

JA0756

and responsibilities between the SEEM Administrator and the Operating Committee. Even as a third-party, the Administrator needs greater insulation form the Members Board to be truly independent. As filed, the SEEM Administrator's roles and responsibilities are ambiguous, and therefore subject to the Member Board's discretion upon implementation. The Member Board's functional authority over the SEEM Administrator leaves opportunity for potential market abuse. Additional structural independence is needed to mitigate that opportunity.

As previously discussed, the Auditor is an "independent" third-party that is hired by and reports market data and Participant complaints directly to the Membership Board. The Auditor is not a market monitor, does not monitor individual Participants for market manipulation, and has no reporting requirements to the Commission or any other entity outside of SEEM.[160] The lack of a true market monitor is itself unjust, unreasonable, and unduly discriminatory. The complete lack of independence of the sole limited monitoring function that does exist, makes market power concerns associated with the lack of market monitoring all that more significant and concerning.

The SEEM Proposal fails to build independence into its structure in a way that supports the independent operation of SEEM and mitigation of potential market power. This failure is particularly concerning in the context of the Applicants insistence that there is no opportunity and therefore no need to attempt to monitor or mitigate market power. The Commission has placed value in independence as sound market design and the lack of it in this filing supports a finding that the filing is unjust, unreasonable, and unduly discriminatory.

---

[160] SEEM Market Rules, Section VI.D.

JA0757

### 4. The SEEM Proposal is impermissibly vague.

In reviewing organized markets, the Commission has stated that "[w]here there is a need for additional information in order to understand [a] proposal or where [a utility] acknowledges that it has not yet filed parts of its imbalance market proposal, we require that [utility] make further filings."[161] Multiple components of the SEEM Proposal require additional information in order for it to be understood and evaluated. As discussed above, several details regarding the matching process and algorithm are not included in the SEEM Proposal.[162] As the primary function of SEEM, it is critical to understand these mechanisms in detail to evaluate its ability to determine just and reasonable rates. This lack of information is particularly egregious in light of the complete lack of any meaningful market power analysis as discussed above. Additionally, the Enabling Agreements between Participants is another critical component of how the market will function and a significant source for potential discriminatory behavior. And, as pointed out, SEEM's cost-benefit analysis is so lacking in essential information as to be largely meaningless.[163]  As filed, the SEEM Proposal does not provide adequate information to evaluate it under Section 205 of the FPA. Absent this information, the SEEM Proposal must be rejected as potentially unjust, unreasonable, and unduly discriminatory.

### E. THE COMMISSION SHOULD REJECT THE FILINGS AND GIVE GUIDANCE TO THE APPLICANTS REGARDING RESUBMISSION OF THEIR FILINGS

While the Public Interest Organizations request that the Commission reject the filings as not meeting all requirements to substantiate just and unreasonable filings under Section 205 of

---

[161] SPP March 2006 Order at 61,976.
[162] *See supra*, Section II.B.3.
[163] *Id.*, Section II.B.3.iv.

JA0758

the FPA, we acknowledge that some aspects of the filing are reasonable and that, with changes, the proposal could be found to be just and reasonable.

The Commission has recognized its authority to iteratively develop organized markets through directing compliance filings based on its determination under section 205.[164] The Commission has regularly undergone an iterative process of modification to mitigate market power issues and ensure just, reasonable, and non-discriminatory rates.[165] Although the Commission is prohibited from "impos[ing] a new rate scheme" under *NRG Power Marketing*, the D.C. Circuit has upheld the Commission's authority to suggest modifications when rejecting filings under section 205.[166] As filed, the SEEM proposal is unjust, unreasonable, and unduly discriminatory. Yet, the Commission can nonetheless use this filing to support a forward step towards a more robust wholesale market in the Southeast by providing the Applicants guidance on how to address the SEEM Proposal's deficiencies. Developing organized markets is a complex process that generally requires multiple rounds of rejections, deficiency letters, and compliance filings. The Commission should view this filing as the first step in the iterative process for the SEEM.

The Public Interest Organizations therefore request that the Commission, in rejecting the filings, provide guidance on modifications that would convert the current proposal to one that

---

[164] *PacifiCorp*, 147 FERC ¶ 61,227, 62,317-18 (June 19, 2014) ("PacifiCorp June 2014 Order").

[165] "We recognize that the implementation of organized markets is to some extent an iterative process that requires modifications to tariff provisions after the transmission provider and market participants gain actual market experience." *See Sw. Power Pool, Inc.*, 114 FERC ¶ 61,289, 61, 976 (Mar. 20, 2006) ("SPP March 2006 Order"). *E.g.*, *Sw. Power Pool, Inc.*, 112 FERC ¶ 61,303, 62,341 (Sept. 19, 2005) (*"SPP September 2005 Order"*) (rejecting SPP's tariff for inadequacies related to its market monitoring and mitigation plans addressed in subsequent compliance filings. *See* SPP March 2006 Order. at 61,994-62,006; *Sw. Power Pool, Inc.*, 116 FERC ¶ 61,053, 61,245-48 (2006)); *S. Co. Servs., Inc.*, 125 FERC ¶ 61,316, 62,551 (2008) ("If Southern Companies will implement the first condition when they launch the Proposed Auctions and they commit to implement the second condition within one year of the date of this order, then the Commission would be satisfied that the resulting auctions would be adequate to mitigate any potential market power that Southern Companies might have in the Southern Balancing Authority Area.").

[166] *NRG Power Marketing, LLC. V. FERC*, 862 F.3d 108, 114-16 (D.C. Cir. 2017).

has sufficient membership participant rights and serves to provide protections from market power abuses and thereby meets the Commission's just and reasonable standard. In particular, the PIOs respectfully request that the Commission provide the following guidance, consistent with the arguments supported above:

- As structured, the SEEM Proposal constitutes a loose power pool for which a pool-wide tariff and open pool membership are required;

- SEEM's governance should be broadened to include input from all market Participants and to remedy the voting power of the three largest Applicants in SEEM;

- Consistent with Commission action in other fledgling markets, a full market power analysis is required for the SEEM footprint;

- Additional safeguards, including an independent market monitor, a monitoring plan and, as necessary, a mitigation plan, are needed to protect against market power abuses;

- Elements of independence and transparency must be structurally integrated into the governance and administration of SEEM as additional market mitigation; and

- Greater transparency of data is required, consistent with data retention and release policies followed by RTOs.

## III.  THE SEEM PROPOSAL FAILS TO MEANINGFULLY ADDRESS THE SOUTHEAST'S EXORBITANT BILLS AND LOW UTILIZATION OF COST-EFFECTIVE RENEWABLE ENERGY

Applicants hold out their proposal as responding to two issues in the Southeast: high energy costs and low renewable penetration. Yet, the SEEM Agreement fails to meaningfully address either. In short, the SEEM Agreement fails by its own terms, and does not bring about the energy market reforms that the region desperately needs.

44

JA0760

### A.   THE SOUTHEAST'S ELECTRIC POWER SECTOR IS CHARACTERIZED BY HIGH ELECTRICITY BILLS AND LOW RENEWABLE RESOURCE PENETRATION.

Residential customers in states in the SEEM footprint are burdened with some of the highest electricity bills in the nation. The chart below shows that in the eight primary states falling in the SEEM region, customers pay above the national average for their monthly bill. Based on this data, compiled by the U.S. Energy Information Administration ("EIA"), six of the nine most expensive states in the nation are within the region.[167]

| State | Average Monthly Bill (Dollar and cents) | National Ranking for Monthly Bill |
|---|---|---|
| Alabama | 150.45 | 3 |
| South Carolina | 144.73 | 4 |
| Mississippi | 135.87 | 5 |
| Virginia | 135.46 | 6 |
| Tennessee | 132.33 | 8 |
| Georgia | 131.84 | 9 |
| North Carolina | 123.25 | 15 |
| Missouri | 117.82 | 24 |
| **All SEEM** | **133.97** | **9.2** |
| **Nationwide** | **115.49** | **-** |

These numbers are especially troubling when put into their broader economic context. Residential customers in the region also have some of the lowest incomes in the nation and highest rates of poverty. The figures below show the stark situation facing many utility customers in the Southeast.

---

[167] U.S. EIA, *Table T5.a: 2019 Average Monthly Bill- Residential* (Oct. 6, 2020), https://www.eia.gov/electricity/sales_revenue_price/pdf/table5_a.pdf.

JA0761

| State | 2018 Median Income[168] | Percentage Below 100% of Poverty Line[169] |
|---|---|---|
| Alabama | 49,936 | 12.9 |
| South Carolina | 57,444 | 15.1 |
| Mississippi | 42,781 | 19.2 |
| Virginia | 77,151 | 8.8 |
| Tennessee | 56,060 | 13.1 |
| Georgia | 55,821 | 12.1 |
| North Carolina | 53,369 | 12.7 |
| Missouri | 61,726 | 9.4 |
| **SEEM Average** | **56,786** | **12.9** |
| **Nationwide Average** | **63,179** | **10.5** |

Together, these factors have made energy burdens, the portion of household income spent on home energy costs, in the South the highest in the nation.

The impact of electricity costs is most dire for Southerners on the low end of the economic spectrum. The Department of Energy found that many low-income households in the region face energy burdens of 10% or higher.[170] Further, four of the five states with the highest low-income energy burden in the country are located in the SEEM footprint: Mississippi, South Carolina, Alabama, and Georgia.[171] Similar findings were reported by the American Council for an Energy-Efficient Economy ("ACEEE"). In its recently released report on energy burdens around the nation,[172] ACEEE used census regions to identify areas with high household energy

---

[168] U.S. Census Bureau, *Table H-8: Median Household Income by State: 1984 to 2018*, https://www2.census.gov/programs-surveys/cps/tables/time-series/historical-income-households/h08.xls.
[169] U.S. Census Bureau, *POV46: Poverty Status by State: 2019*, https://www2.census.gov/programs-surveys/cps/tables/pov-46/2020/pov46_weight_10050_1.xlsx.
[170] U.S. Dep't of Energy, *Low-Income Household Energy Burden Varies Among States – Efficiency Can Help In All of Them* (Dec. 2018), https://www.energy.gov/sites/prod/files/2019/01/f58/WIP-Energy-Burden_final.pdf.
[171] *Id.*
[172] Ariel Drehobl et al., *How High Are Household Energy Burdens? An Assessment of National and Metropolitan Energy Burden across the U.S.*, American Council for an Energy-Efficient Economy (Sept. 10, 2020), https://www.aceee.org/sites/default/files/pdfs/u2006.pdf. ACEEE's energy burden analysis includes heating fuel when calculating home energy burdens, however, in the South electricity is the dominant heating fuel. U.S. Dep't of Energy, Office of Energy Efficiency & Renewable Energy, *Low-Income Household Energy Burden Varies Among States – Efficiency Can Help in All of Them* (Dec. 2018) https://www.energy.gov/sites/prod/files/2019/01/f58/WIP-Energy-Burden_final.pdf.

burdens. Two of those regions—East South Central and South Atlantic—would be particularly

impacted by the SEEM Proposal. The report found 38% of households in the East South Central

region were "highly burdened," spending more than 6% of their income on energy, the worst

marks in the entire nation.[173] In the South Atlantic region, 26% of households were highly

burdened, above the national average.[174] The South is also home to a troublingly high percentage

of customers who are "severely burdened," meaning they spend over 10% of their income on

their energy needs, with the report finding that 21% of households in the East South Central

region and 14% of households in the South Atlantic region qualify for that designation.[175]

Customers in the South are not only struggling to afford their energy, the region has some

of the lowest levels of renewable penetration in the entire country. This is despite having

enormous potential for cost-effective renewable generation.[176] One assessment of the failure of

Applicant utilities in the SEEM region to tap into low-cost renewable resources is provided in a

---

[173] Drehobl et al., at 14, App. B.2.

[174] *Id.*

[175] *Id.* at App. B.2. The Southeast also fares poorly according to another key indicator of energy bill affordability— disconnections. In the Duke Energy Carolina and Duke Energy Progress territory in North Carolina, the percentage of residential customers being disconnected from service has steadily climbed over the last several years, indicating a grave electricity bill affordability challenge in the region.  *See, e.g.*, Direct Testimony and Exhibits of John Howat, Docket No. E-2, Sub 1219 (N.C. Utils. Comm'n. Apr. 13, 2020), https://starw1.ncuc.net/NCUC/ViewFile.aspx?Id=41b3fcfe-db06-4678-a980-814858cec98f. Georgia Power has been issuing at least 325,000 residential disconnection notices per month since April 2020 out of a total of 2.2 million residential customers, suggesting that around 3 or 4 out of every 25 customers are facing energy insecurity. Georgia Power disconnected over 13,000 people per month since July 2020, peaking at 22,000 customers in August 2020. *See* PSC Monthly Bad Debt Report for January 2021, Docket No. 42516, at PDF page 4 (Ga. Pub. Serv. Comm'n Feb. 15, 2021), https://psc.ga.gov/search/facts-document/?documentId=184366. Alabama Power has been unable to collect over $10.8 million in residential electricity bills in 2019, representing 13% of the total expected revenue from residential power sales.  *See* Jurisdictional Allocation Study for 2019, Docket Nos. 18117 and 18416, at PDF page 20 (Ala. Pub. Serv. Comm'n May 1, 2020), https://www.pscpublicaccess.alabama.gov/pscpublicaccess/PSC/PSCDocumentDetailsPage.aspx?DocumentId=1fb7 6afe-0b5a-4d3b-8401-599c21498444&Class=Filing. In Tennessee, phone calls for utility bill assistance are up 139% since the beginning of the pandemic, with the Tennessee Valley Authority continuing to disconnect families who are unable to pay. *See* Friends of the Earth, *Advocates Call on Biden to Stop Utility Disconnections Under TVA During Pandemic* (Mar. 10, 2021), https://foe.org/news/advocates-call-on-biden-to-stop-utility-disconnections-under-tva-during-pandemic/.

[176] Christopher T M Clark et al., *Technical Report: Economic & Clean Energy Benefits of Establishing a Competitive Wholesale Electricity Market in the Southeast United States*, Vibrant Clean Energy, LLC and Energy Innovation: Policy & Technology, LLC, at 87 (Aug. 2020), https://vibrantcleanenergy.com/wp-content/uploads/2020/08/SERTO_WISdomP_VCE-EI.pdf.

national study that created high-resolution maps of the entire country for the levelized cost of
energy ("LCOE") for new wind and solar. The study compared this LCOE to the marginal cost
of energy ("MCOE") at every existing coal-fired power plant in the country as of 2018 and
projected for 2025.[177] Their 2018 analysis showed that almost 40% of the coal generation that
had a higher MCOE than the LCOE of the potential locally-sited wind and solar was located in
the eight SEEM states, approximately 37,500 MW. The authors then projected that of almost a
quarter of the additional coal generation that would be more expensive to run than new local
renewables in 2025 would be in the SEEM footprint, almost 12,000 MW.[178] Despite this and
other analyses showing the enormous cost-effectiveness of renewables in the region, generation
data from the U.S. EIA show that in 2019 solar and wind accounted for only 1.9% of power in
the eight states that would be predominantly fall within the SEEM footprint.[179]

### B. SEEM WOULD BARELY SCRATCH THE SURFACE ON HIGH BILLS OR LOW RENEWABLE PENETRATION IN THE SOUTHEAST.

Applicants hold their proposal out as having the primary goals of lowering costs to
customers and optimizing renewable energy resources.[180] But their own analysis reveals that

---

[177] Eric Gimon et al., *The Coal Cost Crossover: Economic Viability of Existing Coal Compared to New Local Wind and Solar Resources*, Vibrant Clean Energy, LLC and Energy Innovation: Policy & Technology, LLC (Mar. 2019), https://energyinnovation.org/wp-content/uploads/2019/04/Coal-Cost-Crossover_Energy-Innovation_VCE_FINAL2.pdf. As the authors note, in the South the most viable new renewable resource is solar: "Another strong regional trend is in the Southeast, where almost all coal plants are substantially at risk to replacement by local solar in 2025 …. The trend is so strong that it is hard to imagine Southeastern utilities not relying heavily on solar and complementary load shifting resources to replace the coal and save customers money." *Id.*

[178] *Technical Report: Economic & Clean Energy Benefits of Establishing a Competitive Wholesale Electricity Market in the Southeast United States*, Vibrant Clean Energy and Energy Innovation (Aug. 2020) at 87.

[179] U.S. EIA, *Net Generation by State by Type of Producer by Energy Source (EIA-906, EIA-920, and EIA-923)* (Annual data: 1990–2019).

[180] Southern Co. Services, Inc. Southeast Energy Exchange Market Agreement, 4, 12, Dkt No. ER21-1111 (Feb. 12, 2021).

SEEM would not make meaningful progress on these problems – if it makes progress at all. If these truly are the goals of SEEM, then it is practically set up to fail.[181]

Even under a best-case scenario for the savings that SEEM could yield, the Proposal would do little to reduce the electricity bills that are a burden to many Southerners. Applicants project that under the optimal base case scenario SEEM would produce $40 million a year of savings across the entire region. That amount would tick up to $100 million a year by 2037 under a carbon constrained outlook. For the many reasons discussed above and in Section VII of the Sotkiewicz Affidavit, these projected savings are dubious and should not be relied on. But even taken at face value, placing them in context reveals how little SEEM would do to decrease bills. Under its best base case scenario, SEEM would provide approximately $1/year of benefit for residential customers.[182] The estimated $40 million and $100 million in benefits breaks down to only $0.0625/MWh and $0.15625/MWh respectively.[183]

SEEM's overly complicated and sharply constrained approach to altering the structure for wholesale market transactions means that it would do little to achieve its second purported goal: better integrating renewables.  As discussed above and in the Sotkiewicz Affidavit, the design of SEEM undermines its ability to meaningfully expand the potential to tap into cost-effective renewable generation. The Guidehouse/CRA Report acknowledges this bottom-line effect, stating that the "hourly output of individual generating units in the Southeast EEM footprint is

---

[181] This is especially true compared to the potential cost savings and renewable benefits that could flow from more robust wholesale market structures.  *See* Jennifer Chen and Michael Bardee, *How Voluntary Electricity Trading Can Help Efficiency in the Southeast*, R Street (Aug. 2020) https://www.rstreet.org/wp-content/uploads/2020/08/No.-201-Energy-Trade-in-the-Southeast.pdf (finding that net savings from the SEEM "appear to be small compared to the net benefits utilities have reaped through EIMs").

[182] This number represents $40 billion divided among SEEM utilities' ultimate customers, proportional to the utilities' revenue by customer class, based on EIA 2018 data as reported by utilities in form EIA-861.  U.S. EIA, *Annual Electric Power Industry Report, Form EIA-861 detailed data files* (Release date: Oct. 6, 2020), https://www.eia.gov/electricity/data/eia861/.

[183] Sotkiewicz Aff. at P 93.

modified by plus/minus 1 to 2% on average through sub-hourly trading."[184] Even putting aside

Dr. Sotkiewicz's explanation of why this number is unsubstantiated, if this 1-2% modification

would swing entirely in favor of renewable energy resources, SEEM would still do relatively

little to take advantage of low-cost renewable power potential in the region.

If anything, SEEM has real potential to hinder the Southeast's burgeoning renewable

industry. The SEEM Proposal potentially locks out independent power producers—often solar

and wind generators—in at least two significant ways. First, the SEEM Market Rules require that

a Participant "[o]wn or otherwise control a Source within the Territory and/or be contractually

obligated to serve a Sink within the Territory." [185] It is not clear that independent power

producers could meet this criteria. To become a Participant an entity must also enter into an

Enabling Agreement—"a bilateral agreement for the purchase and sale of Energy"[186]—with at

least three SEEM Participants.[187] However, SEEM Members and Participants are under no

obligation to enter into Enabling Agreements with other entities. Even if an entity does meet all

the requirements, the Participant Agreement only becomes effective when countersigned by the

Southeast EEM Agent "at the discretion of the Operating Committee." [188] In other words,

independent power producers may be locked out of SEEM's special transmission arrangements

and competitively disadvantaged.

Further, SEEM's complex requirements would likely burden any smaller independent

power producers permitted to participate. For example, as explained in Section VI of the

Sotkiewicz Affidavit, Members and Participants may opt for a "fill or kill" offer or bid that says

---

[184] Guidehouse/CRA Report at vii.
[185] SEEM Market Rules, at Section III (Participation).
[186] SEEM Agreement, Article 1 (Definitions and Rules of Interpretation).
[187] SEEM Market Rules at Section III.
[188] *Id.* Section III(B)(3). As previously noted, the Operating Committee is made up entirely by transmission-owning SEEM Members. SEEM Agreement, Article 5 (Operating Committee).

the offer or bid must be taken completely or not at all.[189] One potential effect of this is that bids may be designed in such a way that excludes smaller generating facilities entirely or that puts a finger on the scale in favor of Participant's generation. In the Southeast, large load serving entities hold most of the generation, and given the regulatory paradigm, will also likely have the most excess generation to sell into the market. As a result, SEEM has the potential to protect uneconomic, unsustainable generation technologies such as coal at the cost of clean generation such as solar.

### C.   OTHER IN-REGION EFFORTS ARE UNDERWAY TO CONSIDER WHOLESALE MARKET REFORMS THAT ADDRESS CUSTOMER COSTS AND CAPITALIZE ON COST-EFFECTIVE RENEWABLE POWER.

In contrast to the SEEM Proposal, which fails to meet its stated goals, other efforts by state officials and a diversity of stakeholders are considering more robust reforms to the wholesale market to allow for greater competition that could yield economic benefits to all consumers and take advantage of costs-effective renewables. These efforts have come against a backdrop of expensive and controversial—and in some cases failed—energy projects that several of the Applicants themselves have undertaken. Among them are the abandoned V.C. Summer nuclear facility in South Carolina, undertaken by South Carolina Public Service Authority (Santee Cooper) and the predecessor to Dominion Energy South Carolina,[190] the abandoned

---

[189] Sotkiewicz Aff. at P 85.
[190] Peter Maloney, *Death of a nuke build: Summer abandonment leaves ratepayers holding the bag*, UTILITY DIVE (Aug. 4, 2017), https://www.utilitydive.com/news/death-of-a-nuke-build-summer-abandonment-leaves-ratepayers-holding-the-bag/448597/; Sammy Fretwell & Joseph Bustos, *South Carolina utility commission overhauled three years after nuclear project fiasco*, THE STATE (Sept. 23, 2020), https://www.thestate.com/news/local/environment/article245953960.html.

JA0767

Kemper integrated gasification combined cycle ("IGCC") plant by Mississippi Power,[191] and the Vogtle Nuclear Plant expansion by Georgia Power.[192]

## 1. North Carolina

Pursuant to North Carolina's Clean Energy Plan developed under Governor Roy Cooper's Executive Order 80[193] on climate change, the Department of Environmental Quality convened a diverse group of stakeholders to study how utility business model reforms can better align utility incentives with the public interest. The stakeholders have worked diligently for over a year to evaluate a suite of reforms, including options to create a fair and more competitive wholesale market, such as RTOs, EIMs and competitive resource procurement.[194] Participants include elected officials, industrial consumers, consumer advocates, environmental groups, cities clean energy developers, and independent power producers. Implementing a well-designed and independent organized wholesale market in the state has been found to have the potential to promote affordability, decarbonization, and economic development. For example, research by the Brattle Group suggests that Duke Energy ratepayers in North Carolina could save hundreds of millions of

[191] Robert Walton, *DOJ opens investigation into Kemper plant as Southern warns of possible 'material impact,'* UTILITY DIVE (May 2, 2019), https://www.utilitydive.com/news/doj-opens-investigation-into-kemper-plant-as-southern-warns-of-possible-ma/553936/. s

[192] Matt Kempner, *Georgia Vogtle nuclear report: more delays, $1B in extra costs, flaws*, THE ATLANTA JOURNAL-CONSTITUTION (June 8, 2020), https://www.ajc.com/news/local/georgia-vogtle-nuclear-report-more-delays-extra-costs-flaws/mBxlgXiDcf0SIaTFr0cZXL/. Link to testimony of independent construction monitor Donald N. Grace, P.E., https://psc.ga.gov/search/facts-document/?documentId=183339 (Nov. 24, 2020), p. 27 (highly unlikely that approved in-service dates of Nov. 2021 for Unit 3 and Nov. 2022 for Unit 4 will be achieved, and even if achieved, completing project will cost $1.5 billion to $2 billion more than current approved budget)s

[193] North Carolina Department of Environmental Quality, *Climate Change & Clean Energy: Plans & Progress*, https://deq.nc.gov/energy-climate/climate-change/nc-climate-change-interagency-council/climate-change-clean-energy.

[194] Josh Brooks et al., *North Carolina Energy Regulatory Process: In Fulfillment of the North Carolina Clean Energy Plan B-1 Recommendation*, Rocky Mountain Institute and Regulatory Assistance Project (Dec. 22, 2020), https://files.nc.gov/ncdeq/NERP%202020_Final%20Report%20and%20Products%20%281%29_0.pdf.

JA0768

dollars by joining an RTO.[195] Last year, the legislature introduced a market reform study bill to evaluate opportunities for the state.

### 2. South Carolina

After the failure of the $9 billion VC Summer nuclear project, the South Carolina legislature has focused heavily on market reform in the state as a means of ensuring that another such financial disaster does not occur. The South Carolina legislature is currently considering several bills that could sell or reform the state-owned utility Santee Cooper, a process that began in reaction to Santee Cooper's involvement in the failed V.C. Summer nuclear project.[196]

In September 2020, the General Assembly passed House Bill 4940, which creates a study committee to evaluate various electricity market reform options,[197] with little opposition; the Governor signed it into law later that month. The committee includes members of the General Assembly, with an advisory committee comprised of a range of interests, such as the state's Office of Regulatory Staff, investor-owned utilities, public power, municipal electric utilities, electric cooperatives, consumers, clean industry developers, and environmental groups.[198]

---

[195] Judy Chang et al., *Potential Benefits of a Regional Wholesale Power Market to North Carolina's Electricity Customers*, The Brattle Group (Apr. 2019), https://brattlefiles.blob.core.windows.net/files/16092_nc_wholesale_power_market_whitepaper_april_2019_final.pdf.

[196] Several Santee Cooper-related bills are currently in front of the South Carolina legislature, including S. 464, and H. 3194, 124th Sess., Gen Assemb. (S.C. 2021).

[197] H4940, 123rd Sess., Gen. Assemb. (S.C. 2020), https://www.scstatehouse.gov/billsearch.php?billnumbers=4940&session=123&summary=B.

[198] *Id.* "(B) The study committee shall include a nonvoting advisory board. The advisory board is comprised of: (1) the Executive Director of the Office of Regulatory Staff, or her designee; (2) a representative of AARP South Carolina; (3) the South Carolina President of Duke Energy, or his designee; (4) the Chief Executive Officer of the South Carolina Public Service Authority, or his designee; (5) the President of Dominion Energy South Carolina, or his designee; (6) two representatives of residential consumers of electricity in South Carolina appointed by the Chairman of the Senate Judiciary Committee; (7) two representatives of commercial consumers of electricity in South Carolina appointed by the Chairman of the House of Representatives Labor, Commerce and Industry Committee; (8) two representatives of industrial consumers of electricity in South Carolina, one of the representatives must be appointed by the Chairman of the House of Representatives Labor, Commerce and Industry Committee, and one representative must be appointed by the Chairman of the Senate Judiciary Committee; (9) a representative of the Coastal Conservation League; (10) a member company of, and appointed by, the South Carolina Solar Business Alliance; (11) a member company of, and appointed by, the South Carolina Chamber of Commerce; (12) a representative of the South Carolina Electric Cooperatives; (13) a representative of Piedmont

53

### 3. Tennessee Valley Authority

The Tennessee Valley Authority ("TVA") is also facing significant reform pressure. Presidential budgets under the Obama Administration[199] and Trump Administration[200] have included proposals to sell TVA's transmission system, and TVA scandals have also led to the ouster of two board members.[201] Memphis Light Gas & Water ("MLGW") is TVA's largest customer—representing about 10% of TVA's load at approximately 3,5000 MWs. MLGW conducted an integrated resource plan that shows the city could save almost $100 million annually by joining MISO and building considerable quantities of renewable energy resources.[202] MISO conducted its own analysis showing significant benefits.[203] While the CEO of the Memphis utility recently advised suspending the process for joining MISO, he also noted a number of uncertainties that may spur the utility to revisit the issue in the near future.[204] Other local power companies ("LPC's") in TVA territory are also considering major reforms to the TVA system, including

---

Municipal Power Agency; (14) a representative of the South Carolina Municipal Power Association; (15) a member company of, and appointed by, the South Carolina Manufacturers' Alliance; (16) a representative of a renewable power developer primarily engaged in the development of utility-scale solar projects appointed by the Chairman of the House of Representatives Labor, Commerce and Industry Committee; (17) a representative of a renewable power developer primarily engaged in the development of residential-rooftop solar projects appointed by the Chairman of the Senate Judiciary Committee; (18) a representative of Central Electric Cooperative; (19) the South Carolina President of Lockhart Power, or his designee; and (20) a representative of the farming or agricultural community appointed by the Chairman of the House of Representatives Labor, Commerce and Industry Committee."

[199] Philip Bump, *Goodbye, New Deal: Obama Proposes Selling the TVA*, The Atlantic (Apr. 11, 2013), https://www.theatlantic.com/politics/archive/2013/04/goodbye-new-deal-obama-proposes-selling-tva/316380/.

[200] Off. of Mgmt. & Budget, Exec. Off. of the President, Budget of the United States Government, Fiscal Year 2020 (2019), https://www.govinfo.gov/content/pkg/BUDGET-2020-BUD/pdf/BUDGET-2020-BUD.pdf.

[201] Michael D. Shear, *Trump Dismisses 2 T.V.A. Board Members After Outsourcing Disputes*, The New York Times, https://www.nytimes.com/2020/08/03/us/politics/trump-tennessee-valley-authority.html.

[202] Siemens, *Integrated Resource Plan Report: Memphis Light Gas & Water*, at App. A (July 2020), http://www.mlgw.com/images/content/files/pdf/MLGW-IRP-Final-Report_Siemens-PTI_R108-20.pdf.

[203] MISO, *MISO's Response to Memphis Light, Gas & Water's Membership Assessment Request* (July 17, 2020), http://www.mlgw.com/images/content/files/pdf/MLGW%20Membership%20Assessment%20Report%207-29-20_Redacted(1).pdf.

[204] Jeni Diprizio, *MLGW President recommends staying with TVA, suspending search for another power supplier, for now*, LOCAL MEMPHIS (Mar. 3, 2021), https://www.localmemphis.com/article/news/investigations/i-team/mlgw-president-recommends-staying-tva-suspending-search-another-power-supplier/522-0264a275-01f8-4345-8ee1-315ad947ac7b.

unbundled access to TVA transmission.[205] Rather than pursue systematic reforms like aggressive decarbonization, open transmission access, and local, democratic decision-making,[206] TVA has sought to eliminate pressure to change by locking its LPCs into perpetual contracts.[207]

### 4. Kentucky

Kentucky contains PJM, MISO and TVA, but Louisville Gas & Electric and Kentucky Utilities ("LGE&KU"), the largest utility in the state, has no affiliation with a larger organized market. In its latest integrated resource planning process, Kentucky Public Service Commission ("PSC") Staff requested that LGE&KU conduct a study regarding re-joining MISO or joining PJM.[208] This recommendation was made prior to the public discussions regarding SEEM. In September, the MISO Environmental Sector stakeholder group filed a request to MISO to run a study that would fulfill the Kentucky PSC Staff's request,[209] but MISO declined this recommendation.

### 5. Mississippi

Like South Carolina, Mississippi has also been under extreme pressure due to substantial financial failures around a large power project. The Kemper IGCC carbon capture sequestration

---

[205] *See Complaint and Petition for Order Under Federal Power Act Sections 210 and 211A Against Tennessee Valley Authority*, Accession Number 20210111-5071 (Jan. 11, 2021) (petitioning for FERC to order TVA to provide unbundled transmission access to four local power companies seeking to terminate their all-requirements contracts with TVA).

[206] While privatizing TVA is among the major reform proposals, the undersigned do not endorse it.

[207] TVA has signed more than 140 of its 153 LPCs to perpetual contracts. One provision allows LPCs to procure three to five percent of their power locally. While TVA touts this as progress over past all-requirements contracts with no such opportunity for local generation, the effect is a permanent restriction of the rapidly growing market for distributed and renewable energy LPCs can procure. *See* Amended Complaint, *Protect Our Aquifer v. Tennessee Valley Authority*, Case No. 2:20-cv-02615-TLP-atc (W.D. Tenn. Nov. 5, 2020) (alleging that TVA's exclusive, perpetual contracts with distributors place "restrictive caps of three to five percent on the amount of power that local distributors can produce and procure locally from clean energy sources such as solar").

[208] *Order*, Case No. 2018-00348 (Ky. Pub. Serv. Comm'n Staff July 20, 2020), https://psc.ky.gov/pscscf/2018%20Cases/2018-00348//20200720_PSC_ORDER.pdf.

[209] Simon Mahan, *Southern Wind Energy Association - Sector: Environmental/Other Stakeholder Organizations (non-member sector)*, PSC: MTEP21 Scope Development (20200811) (Sept. 18, 2020), https://www.misoenergy.org/stakeholder-engagement/stakeholder-feedback/psc-mtep21-scope-development-20200811/.

JA0771

project was initially designed to burn coal and sequester carbon emissions. After billions of dollars and years of delay, Mississippi Power and Southern Company decided to change its fuel source from coal to natural gas, without sequestering carbon emissions. That decision launched a Department of Justice investigation into possible misuse of federal funds to support the project.[210] A previous Department of Justice investigation into market manipulation by Entergy led to that company agreeing to join an RTO.[211]

### 6. Georgia

Unlike South Carolina, Georgia is pushing forward with the construction of the Vogtle Nuclear Reactors. As noted above, these facilities are billions of dollars over budget, and years behind schedule. The Georgia Public Service Commission also recently reviewed the Georgia Power Company's avoided cost under PURPA. In that docket, SEEM issues were raised by intervening parties as well as PSC Public Interest Advocacy Staff. On March 11, the Commission issued an order requiring Georgia Power Company to file a report identifying SEEM's impacts on avoided cost calculations within six months of the SEEM Proposal's approval by FERC.[212]

## IV.  REQUEST FOR DEFICIENCY LETTER

If the Commission does not reject the filing, the Public Interest Organizations request that the Commission direct the Applicants to provide additional information on their proposal pursuant to 18 C.F.R. § 375.307(a)(1)(v). The SEEM Proposal is plainly deficient because it does not provide potential market participants or the Commission with sufficient information

---

[210] Robert Walton, *DOJ opens investigation into Kemper plant as Southern warns of possible 'material impact'*, Utility Dive (May 2, 2019), https://www.utilitydive.com/news/doj-opens-investigation-into-kemper-plant-assouthern-warns-of-possible-ma/553150/.

[211] U.S. Dept. of Justice, *Justice Department Statement on Entergy Corp.'s Transmission System Commitments and Acquisition of KGen Power Corp.'s Plants in Arkansas and Mississippi* (Nov. 14, 2012), https://www.justice.gov/opa/pr/justice-department-statement-entergy-corp-s-transmission-system-commitmentsand-acquisition.

[212] *Order*, Attach. A at 1, Docket Nos. 4822, 16573, 19279 Attach. A, 1 (Ga. Pub. Serv. Comm'n Mar. 11, 2021).

JA0772

regarding the impact the proposal would have on customer bills, renewable energy adoption, and

transmission access for independent power producers; how the arrangement would comply with

Commission regulations covering power pools; and how the proposal would guard against

market manipulation or other undue discrimination. Therefore, as filed, the SEEM Proposal fails

to provide adequate information for the Commission to substantively review the proposal under

FPA Section 205.

The Public Interest Organizations request the Commission require the Applicants to

provide the information indicated below:

1. Many of the details for how SEEM will actually function remain impermissibly

   ambiguous, and Applicants must:

   a.  Explain how SEEM will ensure available contract path transmission across

       multiple balancing authorities.

   b.  Provide greater detail for how the matching algorithm uses the various inputs to

       produce matches.

   c.  Provide additional analysis demonstrating that the design is computationally

       feasible for addressing specific issues identified in the Sotkiewicz Affidavit,

       including the computational burden of examining large numbers of integer

       constraints, the potential for infeasible clock time computations, and the number

       of possible permutations that would need to be evaluated in order to maximize

       surplus.

2.  The benefits analysis provided by Guidehouse/CRA is flawed and misrepresents the

    benefits available under SEEM. Applicants must provide subsequent benefits analysis

and updated benefits data that address the concerns outlined in the Sotkiewicz Affidavit in Section VII.

3. The Applicants chose to forgo a market power analysis for the SEEM Proposal, simply stating that "the Southeast EEM will not create market power."[213] In light of raised concerns, Applicants must:

   a. Provide additional support for the conclusion that all changes to the bilateral market are "inherently pro-competitive."[214]

   b. Explain any analysis the Applicants did to identify and consider potential market power issues before concluding that there were none.

   c. Provide a market power analysis considering the various market power concerns raised in this protest.

4. Transactions between Participants will be completed pursuant to Enabling Agreements between individual parties.[215] The SEEM Proposal allows parties to individually negotiate the terms and conditions of these Enabling Agreements on an individual basis.[216] The details of these Enabling Agreements are critical to fully understanding how SEEM will function.

   a. Provide the Enabling Agreements of all entities who will be Participants when the SEEM would go into effect.

   b. Explain how the SEEM Proposal ensures that SEEM Members and Participants do not selectively enter into Enabling Agreements in a discriminatory manner.

---

[213] SEEM Proposal at 38.
[214] *Id.*
[215] *Id.* at 14.
[216] SEEM Proposal, Attach. C at 19.

5. Pursuant to the obligations imposed on the SEEM Proposal as a power pool, the Applicants must provide additional information.

    a. FERC Order 888-A requires power pooling arrangements to allow open membership. Explain how the membership criteria in the SEEM Proposal complies with the Commission's power pool requirements.

    b. Explain how access to pooled transmission as contemplated by the SEEM Proposal is consistent with the Commission's non-discrimination requirements for power pools.

## V.    **REQUEST FOR TECHNICAL CONFERENCE**

In the event that the Commission does not reject the filing, the Public Interest Organizations respectfully request that the Commission convene an appropriate technical conference.

First, based on current deficiencies in the record and the lack of upfront and widespread stakeholder input, the Public Interest Organizations request that the Commission suspend the filings for the maximum five-month period, subject to the outcome of a technical conference on the SEEM Proposal.

This proceeding raises issues that cannot be resolved based on the record before the Commission and are more appropriately addressed in a technical conference. These issues include, but are not limited to, the impact that the SEEM Proposal would have on customer bills, renewable energy adoption, and transmission access for independent power producers; whether the SEEM Proposal would allow or encourage market manipulation or other undue discrimination; whether SEEM's pricing model will lead to economically efficient and just and

JA0775

reasonable rates; whether SEEM's benefits exceed its costs; and how the SEEM Proposal would affect state-based efforts at greater wholesale market reform.[217]

Additional support for this request stems from the inadequate stakeholder process involved in this filing and the need for true stakeholder input when considering and integrating an appropriate range of public input into the SEEM design. As a policy matter, the Commission has encouraged stakeholder involvement throughout its competitive market reform efforts. In Order No. 719, the Commission required RTOs and ISOs to submit a compliance filing "demonstrating that it has in place, or will adopt, practices and procedures to ensure that its board of directors is responsive to customers and other stakeholders."[218] The Commission set the following review criteria for stakeholder involvement: (1) inclusiveness, (2) fairness in balancing diverse interests, (3) representation of minority positions, and (4) ongoing responsiveness.[219] The Commission emphasized it valued stakeholder input both in creation and ongoing operations of the RTO and that stakeholder involvement ensures working towards the best solutions addressing regional needs.[220]

The Commission reflected its preference for stakeholder involvement in the context of individual market design processes as well. Ongoing stakeholder engagement was a key principle in CAISO's implementing agreement for the WEIM, and the Commission identified the stakeholder process as a key step in the market development process.[221] In the Southern Company auction filing, the Commission recognized the contributions of various organizations that participated in a technical conference to ideas incorporated into the filing.[222]

---

[217] *See also* Chen & Bardee, *supra* note 112.
[218] Order No. 719, at P 477.
[219] *Id.*
[220] *Id.* at PP 479–80, 511–15.
[221] *Id.* at PP 479–81.
[222] Southern Company December 2009 Order, at 62,416.

60

JA0776

Contrary to the Commission's policy, the Applicants developed the majority of the SEEM Proposal in the absence of meaningful stakeholder engagement. The Applicants developed the SEEM Proposal in private beginning in January 2020, produced a final outline of the SEEM structure for late May 2020[223] and received the final Guidehouse/CRA Report in July 2020.[224] The Applicants failed to engage in any public stakeholder processes throughout this period. The proposal only entered the public purview on July 17, 2020, after the SEEM Proposal was finished being developed.[225] After SEEM became public knowledge, some Applicants—particularly Southern Company and Duke—provided informational briefings to select organizations on an individualized and invite-only basis, including some of the PIOs. Additionally, the stakeholders included tended to be limited to organizations already engaged with these utilities in specific ways, and there was no outreach to potentially impacted communities or a wider range of stakeholders. The Applicants only engaged in a limited stakeholder process with a limited group of stakeholders after having already finalized their plans and commitments to the current SEEM design. A *post hoc* marketing campaign for insiders does not meet Commission requirements for an inclusive, fairly-balanced stakeholder process that is responsive to stakeholder concerns.

Timing the technical conference before ruling on the SEEM Proposal is critical to ensuring that the SEEM Proposal supports broad reform in the Southeast. The Commission has recognized the value in designing markets in a way that provides opportunity for ongoing market reform. In Order No. 2000, the Commission adopted the principle of "open architecture," stating

---

[223] Project BEST Email (Apr. 30, 2020).
[224] Guidehouse/CRA Report at 1.
[225] John Downey, *EXCLUSIVE: How Duke Energy could join other power giants to remake Southeast markets*, CHARLOTTE BUSINESS JOURNAL (July 17, 2020), https://www.bizjournals.com/charlotte/news/2020/07/17/duke-energy-partners-local-control-for-se-market.html.

61

JA0777

that "[w]e will require that the RTO design have the ability to evolve over time."[226] The Commission recognized this principle in the Southern Company filing, by noting the market participant's desire for a broader auction process and Southern Company's assurance that the market would "enhance market options now without prejudicing further developments."[227] In the SPP EIM filing, the Commission stated:

> The importance of a well-designed market with explicit and understandable market rules cannot be overstated. The Commission has had to address flaws in market designs and market rules after markets have started. Given these experiences with other markets, the stakes are too high to allow implementation of a market design, such as SPP proposes, that is missing important elements and assurances regarding reliable and stable market operations.[228]

The Commission's ongoing policy to facilitate continuing market reform and improvement necessitates that markets are reviewed with an eye towards supporting—or at a minimum, not standing in the way of—future development. The technical conference is critical to providing the Commission full information and a holistic view in reviewing the SEEM Proposal.

Second, and regardless of the Commission's decisions on the SEEM proposal or whether to hold a technical conference centered on SEEM, the Public Interest Organizations recommend that the Commission establish a broader technical conference or joint regional meeting regarding market reform in the Southeast. This could be held in conjunction with or separate form a technical conference centered on the SEEM Proposal itself. As previously discussed, the SEEM Proposal comes amidst ongoing robust discussions regarding market reform in the region.[229] Convening a technical conference would ensure that the SEEM Proposal furthers the debate about greater competitive market reform in the Southeast and facilitates region-wide discussion

---

[226] Order No. 2000, at 502.
[227] Southern Company December 2008 Order, at 62,545–46.
[228] SPP March 2006 Order, at 61,976.
[229] *Supra* Section III.C.

and planning for broader competitive market reform, inclusive of a diverse array of stakeholders, and with clear opportunities for public input.

The Public Interest Organizations encourage the Commission to convene such a technical conference or joint regional meeting that would consider the following issues:

1. The potential benefits for the Southeast of utility participation in a reformed wholesale market that goes beyond the SEEM Proposal, such as a fair and well-designed, independently-operated regional transmission organization or energy imbalance market (RTO or EIM);

2. The costs and benefits of the Applicants' SEEM Proposal as compared to a robust and well-designed RTO or EIM;

3. Whether implementing the SEEM Proposal would impede or delay broader wholesale reforms; and

4. The ways in which the benefits of broader wholesale reforms can be realized in the region while preserving or enhancing state jurisdiction and prerogatives.

## VI.   <u>CONCLUSION</u>

As detailed in this Protest, the SEEM Proposal falls short of the legal standards for approval. It fails to comply with the Commission's regulatory requirements for power pools, will exacerbate the exercise of market power in the Southeast and will produce rates that are unjust, unreasonably, and unduly discriminatory. The SEEM Proposal also runs headlong into other state efforts towards comprehensive wholesale market reform.

For all these reasons, the Public Interest Organizations urge the Commission to reject the SEEM filings and issue guidance explaining how the filings can be revised to comply with Section 205 of the FPA. If the Commission does not reject the SEEM filings outright, it should convene a technical conference for the purpose of supplementing the record or direct the Applicants to provide additional critical information through a deficiency letter. Finally, and regardless of the Commission's decision on the SEEM Proposal, the Public Interest

JA0779

Organizations encourage the Commission to convene a technical conference or joint regional meeting regarding market reform in the Southeast.

The Commission has an opportunity to exercise its authority to establish a foundation for wholesale market reform in the Southeast. This foundation, instead of being fashioned by the self-interest of the long-time monopoly utilities in the region, would enable the competitive procurement of clean energy and hold down costs for customers in a manner that reflects the views of the many public and private entities that have so much at stake in how the Southeast's electricity system evolves.

Dated: March 15, 2021.

Respectfully submitted,

*/s/ Danielle Fidler*
Danielle Fidler
Staff Attorney, Clean Energy Program
Daniel Franz
Legal Fellow, Clean Energy Program
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
dfidler@earthjustice.org
dfranz@earthjustice.org

John Moore
Director
Sustainable FERC Project
20 N. Wacker St., Suite 1600
Chicago, IL 60201
Moore.fercproject@gmail.com

*Counsel for Sustainable FERC Project and Natural Resources Defense Council*

Frank Rambo
Senior Attorney
Southern Environmental Law Center
201 W Main St. #14
Charlottesville, VA 22902
frambo@selcva.org

JA0780

*Counsel on behalf of Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Georgia Conservation Voters, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, and Partnership for Southern Equity*

Maia Hutt
Staff Attorney
Southern Environmental Law Center
601 W Rosemary St., Suite 220
Chapel Hill, NC 27516
mhutt@selcnc.org

*Counsel on behalf of Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Georgia Conservation Voters, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, and Partnership for Southern Equity*

Peter Ledford
General Counsel and Director of Policy
4800 Six Forks Rd., Suite 300
Raleigh, NC 27609
peter@energync.org

*Counsel for North Carolina Sustainable Energy Association*

65

JA0781

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been served in accordance with 18 C.F.R. §

385.2010 upon each party designated on the official service lists in this proceedings listed

above, by email.

Dated at Washington, D.C. this 15th day of March, 2021.

<div align="right">

*/s/ Danielle Fidler*
Danielle Fidler
Staff Attorney, Clean Energy Program
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
dfidler@earthjustice.org

</div>

# Exhibit A

to the

Protest of Public Interest Organizations

Affidavit of Paul M. Sotkiewicz

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Alabama Power Company | ) ) | ER21-1111-000 |
| Dominion Energy South Carolina, Inc. | ) ) | ER21-1112-000 |
| Louisville Gas and Electric Company | ) ) | ER21-1114-000 |
| Duke Energy Progress, LLC<br>Duke Energy Carolinas, LLC | ) ) ) | ER21-1115-000 |
| Duke Energy Carolinas, LLC | ) ) | ER21-1116-000 |
| Duke Energy Progress, LLC | ) ) | ER21-1117-000 |
| Louisville Gas and Electric Company | ) ) | ER21-1118-000 |
| Georgia Power Company | ) ) | ER21-1119-000 |
| Kentucky Utilities Company | ) ) | ER21-1120-000 |
| Mississippi Power Company | ) ) | ER21-1121-000 |
| Alabama Power Company | ) ) | ER21-1125-000 |
| | ) | ER21-1128-000 |
| Dominion Energy South Carolina, Inc. | ) ) | (not consolidated) |

## <u>AFFIDAVIT OF PAUL M. SOTKIEWICZ, PH.D.</u>

### I.    INTRODUCTION AND QUALIFICATIONS

1.  My name is Dr. Paul M. Sotkiewicz. I am the President and Founder of E-Cubed Policy Associates, LLC ("E-Cubed") and formerly served as the Chief Economist in the Market Service Division of PJM Interconnection, L.L.C. ("PJM"). I have been retained by the Natural Resource Defense Council ("NRDC") and Southern Environmental Law Center ("SELC") to submit this affidavit in support of the Public Interest Organizations' protest

JA0784

regarding the Southeast Energy Exchange Market ("SEEM") Agreement filing[1] made in ER21-1111 on February 12, 2021 by Southern Company Services, Inc. ("Southern Company") on behalf of the Members of SEEM[2] and other potential SEEM Members.[3]

2.  Prior to founding E-Cubed, I worked for PJM in Audubon, Pennsylvania from February 2008 to October 2016. In my time at PJM, I served as a Senior Economist until March 2010 and subsequently as the Chief Economist in the Market Service Division until June 2015. From July 2015 to October 2016, I worked as a contractor for PJM under the title of Senior Economic Policy Advisor. Prior to joining PJM, I served as the Director of Energy Studies at the Public Utility Research Center, University of Florida from August 2000 to February 2008 and I was an Economist at the Federal Energy Regulatory Commission ("FERC" or "the Commission") from September 1998 to August 2000. I have a B.A. in History and Economics from the University of Florida (1991), and an M.A. (1995) and Ph.D. (2003) in Economics from the University of Minnesota.

3.  I have nearly 25 years of experience on matters at the intersection of utility regulatory policy, power system economics, and environmental economics. I advise private-sector, public-sector, and non-government organization clients on a range of economic issues

---

[1] Southeast Energy Exchange Market Agreement, Accession No. 20210212-5033 (Feb. 12, 2021) ("SEEM Proposal").
[2] As of February 12, 2021 "SEEM Members" includes Alabama Power, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP") with DEC and DEP collectively referred to as ("Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") collectively, ("LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); Power South Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA"). SEEM Proposal, at 1, n. 1.
[3] Potential SEEM Members as cited in the filing are Georgia System Operations Corporation ("GSOC"); Georgia Transmission Corporation ("GTC"); Municipal Electric Authority of Georgia ("MEAG Power"); Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and South Carolina Public Service Authority ("Santee Cooper"). SEEM Proposal at 1, n. 1.

related to electricity market design and performance, power generation economics, utility regulatory policy, and the economic impacts of state and federal environmental policies.

4.  The entirety of my experience and work history can be found in my professional biography in Attachment A and my CV in Attachment B.

### A. Specific Experience Related to the Formation of New Competitive Wholesale Power Markets and Market Design

5.  As an economist at FERC from 1998–2000, I worked on market design issues and filings related to the newly formed ISO/RTO markets. I primarily concentrated on the New York ISO in ER97-1523 and subsequent dockets related to energy and ancillary service market design and various California ISO market dockets related to requested changes in ancillary service and real-time market design. Additionally, my experience at FERC touched upon the start-up of ISO-New England and PJM design changes after implementing locational marginal pricing ("LMP").

6.  While at PJM, I worked in the design and implementation of the first version of the operating reserve demand curve construct to implement reserve shortage pricing under FERC Order No. 719, capacity market reforms related to Capacity Performance and the Minimum Offer Price Rule, and the incorporation of demand response into PJM's energy markets among other initiatives.

7.  Since forming E-Cubed in 2016, I have directly advised system operators in the United States and Canada on market design and policy changes related to distributed energy resources and accounting for climate (New York Independent System Operator), the design of new capacity markets in the face of climate initiatives (the Alberta Electric System

JA0786

Operator), and the consistency of energy market settlements that account for generation operation and a move to LMP (Ontario Independent Electric System Operator).

8. I have recently represented a rural electric cooperative (Intermountain Rural Electric Association) in a state proceeding in Colorado[4] regarding the formation of organized wholesale power markets and examining the efficacy of the Xcel Energy Joint Dispatch Agreement,[5] as well as the designs of the Western Energy Imbalance Market ("WEIM") operated by the California ISO and the recently approved Southwest Power Pool ("SPP") Imbalance Market. This work also included a summary of costs and benefits of participating in such markets.

## II.    EXECUTIVE SUMMARY: KEY CONCLUSIONS

9. I have been asked by Public Interest Organizations to provide an examination and analysis of the SEEM design with respect to the efficiency, possible advances, and complications as well as an evaluation of the proposed SEEM market design and the accompanying benefit-cost analysis ("BCA") provided by Guidehouse/CRA.[6] Having spent most of my career in the development and continuing evolution of wholesale power markets in North America and witnessing the benefits, innovation, and cost savings they have provided first-hand when they are well designed, I am pleased to see the Southeast finally making moves toward organized markets.

---

[4] *Exhibit 2 to Intermountain Rural Electric Ass'n Notice of Filing Initial Comments,* Proceeding No. 19M-0495E (Colorado Pub. Utils. Comm'n Nov. 15, 2019) ("Sotkiewicz IREA Affidavit").
[5] *Order Accepting Joint Dispatch Agreement and Tariff Revisions*, 154 FERC ¶ 61,107 (2016). For a summary of the performance of the Joint Dispatch Agreement *see* Sotkiewicz IREA Affidavit at PP 32–36.
[6] SEEM Proposal, Attach. E-1, *Southeast EEM Benefits and Non-Centralized Costs*, Guidehouse Inc. and CRA International (Nov. 18, 2020) ("Guidehouse/CRA Report").

10. Unfortunately, the filed SEEM market design does not meet the minimum standards to improve efficiency or offer market design advances beyond bilateral trading arrangements in place today. The proposed SEEM market design employs an overly complex mixed integer programming algorithm that matches buyers and sellers to preserve bilateral transactions. This matching algorithm has not even been developed yet, and thus has not been shown to be computationally feasible given the limited time to run the algorithm and schedule transactions across multiple Balancing Authorities. In operation and concept, current ISO/RTO market security constrained economic dispatch ("SCED") algorithms and software are simpler and more complete than the filed SEEM market algorithm.

11. Furthermore, the SEEM market design introduces the ability for market participants to use settings to foreclose potentially economically efficient trades with counterparties that can be used to execute market power and market manipulation strategies that have not been examined. The stated reasons in the filing for this ability to avoid trading with specified counterparties by stating it is necessary to allow participants to (1) avoid counterparties that may not meet credit requirements or have credit agreements in place,[7] (2) foreclose transactions with parties with whom market-based rate ("MBR") transactions would not be permitted,[8] or (3) avoid trading with parties with whom trades may not be allowed by law.[9] In order to be matched in the algorithm, a market participant must have settings that allows it to match with at least three eligible unaffiliated counterparties. The ability to choose in advance in the market algorithm to foreclose transactions that are not based on legal

---

[7] SEEM Proposal, Attach. A, ("SEEM Agreement") at App. B ("SEEM Market Rules").

[8] *Id.*

[9] SEEM Agreement, Attach. B, *Joint Affidavit of Aaron Melda and Lonnie Bellar on Behalf of The Members of the Southeast Energy Exchange Market*, at PP 14–17. By law TVA cannot sell outside its territory or "fence" but can be a buyer from an entity outside its fence. TVA can only sell to Duke, LG&E/KU, and Southern Companies.

restrictions such as for TVA, and for which there is no actual restriction on a participant's ability to reject a potential trading partner, can be easily used for market manipulation purposes to further exploit franchise monopoly positions by foreclosing the ability for some loads to take advantage of zero-cost transmission and forcing those loads to pay for transmission to conduct transaction the current bilateral market framework. These possible paths for manipulation have not been evaluated or acknowledged by Dr. Susan Pope in her supporting affidavit for the SEEM filing.[10]

12. Finally, the accompanying BCA provided by Guidehouse/CRA fails to offer adequate support for the purported benefits of $40 million annually in the Integrated Resource Planning ("IRP") Baseline Outlook and $100 million in the Carbon Constrained Outlook.[11] The modeling analysis in the Guidehouse/CRA Report does not match up with the filed SEEM design and consequently does not support these purported benefits.[12] If anything, the BCA provides a maximum or upper bound on benefits as actual benefits will be lower due to participant constraints and the use of contract path transmission that does not match up with actual power flows leading to possible Transmission Loading Relief ("TLR") curtailing transactions. Another way of looking at the upper bound on benefits is that it amounts to $1.94/MWh for all energy transacted[13] and only $0.0625/MWh for all load served in the region covered by SEEM.[14]

---

[10] SEEM Agreement, Attach. D, *Affidavit of Susan L. Pope, Ph.D. on Behalf of The Members of the Southeast Energy Exchange Market*. Dr. Pope only considers horizontal market power at PP 69–72 and at P 75. Two forms of market manipulation: 1) unfairly obtain zero-cost transmission of NFEETS to the detriment of other Participants; and 2) Manipulation of average hourly Exchange Prices published daily and monthly.
[11] Guidehouse/CRA Report at 4, 17 (table 4).
[12] *See infra* Section VII.
[13] Guidehouse/CRA Report at 17, n. 13.
[14] The $40 million in net benefit is divided by the 640 TWh of energy (640,000,000 MWh) to arrive at the $0.0625/MWh benefit.

13. The BCA provided is a "black box" where the full modeling framework has not been defined or articulated well and detailed simulation outputs are largely absent but for aggregate cost savings numbers. Finally, the upper bound estimates of benefits are not realistic given that the BCA does not actually implement the proposed SEEM design.

14. In short, while the SEEM market design offers $0/MWh transmission costs that eliminates rate pancaking across the broad SEEM region, these advantages are offset by the following: (1) the overly complex design and ability to implement trading restrictions; (2) the applicability to only transactions in 15-minute intervals; and (3) the new vehicles by which existing franchise monopolies can manipulate the SEEM design. Finally, the potential for SEEM to reduce transaction costs is small and likely not material as no showing has been made for such cost reductions.

## III.   OVERVIEW OF CURRENT BILATERAL TRADING MECHANISM

15. The current bilateral trading mechanism in the Southeast is one in which buyers and sellers of wholesale power each search for willing counterparties to make wholesale power trades. Once willing buyers and sellers have located each other, they can either choose short-term transactions that could be hourly, daily, weekly, or monthly or enter into multi-year long-term contracts.[15]

---

[15] These multi-year contracts may be one year or longer in duration.

## A.     Role of Transmission for Delivery of Energy

16. Once willing counterparties have found each other, they need to arrange delivery of the power from supply source to load sink by reserving transmission service. This can be in the form of Firm Point-to-Point ("PtP") or Non-firm PtP transmission service.

### *1. Non-firm PtP Transmission Service and Short-term Wholesale Power Transactions*

17. For short-term deliveries, Non-firm PtP service may be sufficient to ensure delivery of the power from source to sink. Non-firm transmission service is lower cost and can be obtained when parties know there is available transmission capacity that is not being used by Firm transmission customers. The use of Non-firm PtP transmission service can lower the cost to conduct short-term transactions when parties are reasonably assured that such service is available.

18. Still, for short-term transactions, Non-firm PtP carries the risk that it could be curtailed for reliability reasons or to allow those parties with Firm PtP or Firm Network Integrated Transmission Service ("NITS") to use the system when needed since they have paid a premium to ensure they can flow transactions.

### *2. Firm PtP and Firm NITS Service and Long-Term Contracts for Wholesale Power*

19. Long-term contracts are usually associated not only with energy, but also to ensure the delivery of capacity to load serving entities that require the energy and capacity to ensure their load can be reliably served at all times and under all conditions from source to sink.

Firm transmission service also has the highest priority and cannot be curtailed, and consequently is higher cost than Non-firm service.

20. For example, native load being served from the generation owned by the transmission owning utility, is paying for Firm NITS. The same may also be true of transmission dependent utilities ("TDU") such as municipal or cooperative utilities serving their own native load. It may also be the case that Firm PtP transmission service may be used to satisfy the long-term needs of TDU when the source and sink locations are clearly defined.

*3. The Role of Transmission Rate Pancaking in Determining Bilateral Trade Outcomes*

21. Of course, the purpose of bilateral trades, like any other form of market trading, is to create "win-win" situations for the load and supply counterparties. But if the counterparties must move power across multiple transmission system, the cost for transmission increases for each system and transmission charges must be additively incurred or "pancaked" on top of each other. Rate pancaking makes economically beneficial trades between counterparties located in different transmission utility areas or Balancing Authorities ("BA") more expensive and erodes the "gains from trade".

22. With rate pancaking, it is easier for parties to conduct trades within the same transmission owner area or BA than it is to search for willing counterparties to conduct economically beneficial trades that would require transmission service across multiple BAs and transmission owners. Transactions across multiple transmission owners and BAs are only economic when the cost of buying power is low enough to overcome the costs of pancaked transmission rates.

JA0792

23. Furthermore, if such trades are made between counterparties, it is likely that these trades would be done using Non-firm service due to its lower cost. Yet, the use of Non-firm service also carries a greater risk of the transaction being curtailed due to reliability or transmission unavailability since the transaction involves more than one transmission owning utility and BA.

### B.   The Role of Information and Transaction Costs in Bilateral Trading

24. Searching for available and willing counterparties and available transmission service takes time and resources. However, almost every utility participating in bilateral trading in wholesale power has either their own in-house trading desk and expertise or such services can be outsourced, and thus the costs of search are relatively minimal given the prevalence of publicly available information. For example, Southern Company provides its expertise and information publicly.[16]

25. For example, with publication of daily fuel prices, especially for gas, and publicly available knowledge about what resources may be available and their relative costs of operation, those parties with surplus power to sell are relatively easy to locate for load looking to buy power in the short-term market.

26. All transmission providers must post information on available transmission on its Open Access Same-time Information System[17] so that parties know the availability and cost of transmission to complete bilateral transactions.

---

[16] Southern Company, *Energy Trading*, http://146.126.90.209/about-us/our-business/generation/trading.cshtml (last visited Mar. 15, 2021).
[17] Open Access Technology International, https://www.oasis.oati.com/ (last visited Mar. 15, 2021).

27. Overall search costs are minimal. The only other remaining costs are those costs of submitting eTags to reflect scheduled transactions and those processes are already largely automated. In short, the current bilateral market search and transaction costs with today's specialization, access to information, computing power, and automation are already quite small. SEEM has little or no effect on these costs as it is limited to a small subset of bilateral transactions and otherwise ***does not provide measurable cost reductions***.

### C.    Gains from Trade in Bilateral Transactions

28. Willing counterparties will only complete a transaction when they both feel like they have benefitted from a trade. From the perspective of a buyer serving load, it is beneficial to complete a trade when the price paid (including that for transmission) is lower than the cost of either generating the power itself, or the cost of purchasing power from another counterparty.

29. From the perspective of the seller, it is economically beneficial if it receives a price that is higher than its cost to generate the power, providing the seller with a profit on the power it sells.

30. If all parties have good information about the costs of producing power and the willingness to pay for power, then the negotiated price will be somewhere between these two values based on the cost of available alternatives. A reasonable approximation for this would be to "split the savings" each party to the transaction would receive from completing the transaction.

31. A short example makes this point clear. Suppose a buyer of power can self-generate at a cost of $70/MWh from an old, inefficient resource and this cost is reasonably known to the seller. But it finds a counterparty whose costs for surplus power are well below that at

JA0794

$30/MWh and for which there is good information to verify that cost. By completing the transaction, the entire system saves $40/MWh in costs.

32. The "split the savings" solution would result in the parties completing the transaction at $50/MWh with the buyer serving load taking $20/MWh of the $40/MWh savings and the seller providing power takes the other $20/MWh in savings as profits on the sale of power.[18]

## IV.    THE SEEM MARKET DESIGN IN COMPARISON TO THE EXISTING BILATERAL MARKET TRADING ARRANGEMENTS

33. The SEEM design is not meant to replace the entirety of the bilateral trading markets in the Southeast, nor is the SEEM design meant to emulate coordinated joint dispatch of resources to serve load.  Instead, it is designed to be a residual bilateral market in which only very short-term trades (15-minute blocks over one hour) can be completed and is not designed to displace multi-hourly, daily, weekly, monthly, or long-term trading and contracts currently available. Moreover, it is only designed to match buyers and sellers when there is available non-firm, zero-cost transmission service (referred to as Non-Firm Energy

---

[18] While I am not opining on the use of "split the savings" pricing proposed in the SEEM filing given the intent to preserve the transactions as bilateral in nature, efficient pricing requires pricing at the marginal cost of delivering one more MW of energy at each location, or locational marginal pricing ("LMP"). All ISO/RTO markets in the United States price energy based on LMP. The WEIM prices energy based on location. The Xcel Joint Dispatch Agreement (*see* 154 FERC ¶ 61,107 (2016)) while not using locational pricing at least provides pricing at marginal cost assuming no congestion or marginal losses. *See also Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810 (2000). For subsequent page references found in this document, please see https://www.ferc.gov/sites/default/files/2020-04/RM99-2A.pdf. *Id.* at 642–643, "Market designs that base prices on the averaging or socialization of costs, may distort consumption, production, and investment decisions and ultimately lead to economically inefficient outcomes. Where possible and cost effective, cost causality principles can be used to price services and eliminate averaging. For example, in some congestion management mechanisms, the cost of alleviating congestion is spread over all loads. This scheme could have some generators creating monetary benefits for other generators. In addition, it could lead to over-consumption of power by some loads and under-consumption by other loads. Moreover, such averaging mechanisms for congestion management do not send the correct price signals for the location of new generation, thus leading to problems with long-term implications." (footnotes omitted)

JA0795

Exchange Transmission Service or "NFEETS" in the SEEM filing) and when other conditions are met as well.

34. When compared with the existing bilateral market framework in the Southeast, the SEEM design does not offer much improvement from the current bilateral markets in terms of reducing the risk of transaction curtailments, reducing matching and transactions costs, or price formation. In several ways, SEEM is worse than the status quo, and also leaves large potential cost savings unrealized as discussed below.

> **A.    Any Participants Located in the SEEM Region Can Transact in SEEM, but Market Rules and Governance are Controlled Only by SEEM Members in Contrast to Traditional Bilateral Markets**

35. Fundamentally, markets of any type are institutions in which there are either formal or informal rules. These rules are either developed through government regulation such as the rules regarding MBR authority and open access transmission at FERC, or they are owned, developed, and approved by those participants in the market such as in ISO/RTO markets, Energy Imbalance Markets ("EIM"), and other market agreements with some type of governance process that provides all market participants a voice[19] before being reviewed and/or modified by FERC.

36. The current bilateral market in the Southeast operates on terms and conditions that are governed by FERC regulations and the Commission-determined ability for parties to

---

[19] For example, in PJM all market participants must join PJM as members, and being a member provides voting rights. Moreover, voting for market rule changes is based on sector weighted voting across 5 sectors. *see* PJM Interconnection, L.L.C. *Amended and Restated Operating Agreement*, Sections 8 and 11 (July 14, 2011) https://www.pjm.com/directory/merged-tariffs/oa.pdf.

JA0796

transact at MBR.[20] No one party or coalition of parties has control over the rules governing bilateral market transactions.

37. SEEM, as proposed is different in this regard. The rules as filed were developed by a coalition of Members who own most of the generation and the transmission in the region. Non-members, such as merchant generation owners and renewable developers that are not load serving entities ("LSE") in the SEEM region[21] and non-Member loads can participate in SEEM, but merchant generation and renewable developers have no say in how the rules may change or not.[22] Even among the Members, paraphrasing George Orwell in *Animal Farm*, some Members are more equal than other Members.[23] Given the information provided in the filing, Southern Companies and TV each possess 25 percent of the net load voting rights, and Duke possesses 21 percent of the net load voting rights.[24] In effect, there may be a member majority in favor of significant changes to the market rules, but two members with large loads can effectively block any changes to their benefit.[25]

38. In effect, SEEM, as filed, is a regression in the equality of opportunity and treatment that is in effect today. A small coalition of large, mostly vertically integrated franchise monopoly utilities hold most of the control and have the power to make the rules without regard to smaller Members or non-Member Participants in SEEM. Such an imbalance of power in governance can only lead to discriminatory outcomes favoring those making the

---

[20] 18 CFR § 35.37.

[21] SEEM Agreement, Article 3, Section 3.2.1.

[22] *Id.*, Article 4, (sets out the governance structure and limits voting to members).

[23] *Id.*, Article 4, Section 4.1.5 (ii) (explains the weighting of voting power by net energy for load relative to the entire region. These weights can be determined from information provided in Attach. C, P 29 (table)); George Orwell, *Animal Farm: A Fairy Story,* Secker and Warburg, London, 1945.

[24] These can be computed from Attach. C, at P 29 (table values).

[25] SEEM Agreement, Article 4, Section 4.1.5(c) (that requires a simple majority of votes from Members and 67% of net load votes for Significant Matters. This means that there are many possible blocking coalitions to a change the majority of Members would favor).

rules and the potential for market power opportunities through market design as discussed below in Section V.

### B. SEEM Does not Change the Risks that Transactions Using Non-firm Transmission Will Not be Curtailed

39. SEEM uses Non-firm Transmission at zero-cost to facilitate the 15-minute increment short-term trades through its algorithm. While zero-cost transmission eliminates some of the costs of undertaking short-term bilateral transactions across a wider footprint in the region, it does not eliminate the risks of transactions being curtailed due to reliability reasons or to make room for transactions with Firm transmission.

40. As the filing parties have noted, the new zero-cost transmission is the lowest priority transmission and can be interrupted for other Non-firm transmission requests. Additionally, even though the so-called rate pancaking is being eliminated for this small subset of transactions, any transaction being matched that requires transmission across multiple transmission providers or BAs is still likely to be curtailed as not all transmission providers will have available non-firm capacity on defined contract paths.

41. Furthermore, the footprint of SEEM has many transmission and operational "seams" with pre-existing ISO/RTO markets including PJM, MISO, and SPP. The contract path nature of transmission under SEEM does not match up with the physical flows of transactions being matched. Consequently, the likelihood of one of these RTOs at the seam, or another BA within SEEM asking for a TLR to curtail the transaction is likely to be greater than under the current bilateral market. The reason for this is that it is likely some transactions scheduled by the SEEM algorithm will almost assuredly move across a wider region and result in a larger prevalence of unscheduled loop flows. These likely outcomes coupled

with the fact NFEETS is the lowest priority transmission service, it is likely many SEEM transactions could be curtailed by TLRs, and thus not be completed as envisioned by the SEEM design.

42. In theory, while the prospect of eliminating some rate pancaking in the limited circumstance of these 15-minute transactions seems attractive, it does not change the risk that these transactions will be curtailed. In fact, the zero-cost NFEETS that are the basis of the SEEM design will be curtailed before any other transactions with Firm or Non-firm transmission service on the system.

### C. The Reduction in Transaction and Search Costs under SEEM are Likely *De Minimis*

43. The current bilateral market participants already have voluminous information about the costs of supplying counterparties and the reservation prices (willingness to pay) of buying counterparties for short-term transactions. These participants have experienced and sophisticated trading operations in house or under contract. They understand what the potential gains from trade are in the context of potential bilateral transactions.

44. The only offering that SEEM provides is to shape transactions into 15-minute blocks and to match buyers and sellers in a way that is not any different than happens today other than being potentially faster. But again, any benefit is limited to 15-minute blocks and does not work for multi-hour, daily, weekly, or monthly requirements.

45. Finally, while arguments about reduced search and transactions costs have an intuitive allure, the proposal has not shown the reduction in such transactions and search costs SEEM would provide to market participants.

### D.    The SEEM Design Leaves Large Reductions in Overall Costs on the Table

46. As a practical matter, the SEEM design must take the unit commitment of resources on the system as given. These already committed resources may have higher running costs. Coal-fired resources, older gas or oil steam resources are likely candidates to be already committed given longer start up times. Additionally, less efficient gas resources may be committed and have ratable take requirements from the gas pipeline that would be costly to alter due to pipeline imbalance penalties.

47. The time period to "commit" once a transaction has been matched in the SEEM design is a mere five minutes, which is not sufficient time to schedule gas transportation and start up a gas-fired resource, let alone commit or de-commit a large steam unit which may be needed in subsequent 15-minute intervals if a transaction is curtailed.

48. That is, cost savings from moving the dispatch of resources up or down is small relative to the savings that could be achieved by avoiding starting up a large, expensive steam resource and instead starting up a lower cost resource or making room for a zero running cost wind or solar resource.

49. In contrast, with solar and wind forecasting models in place, multi-hour trades could occur that avoid the expense of committing and running large inefficient resources. These savings are unachievable under the SEEM design as proposed.

### E.    The SEEM Design Does Not Provide Any Advances in Energy Price Formation or Actionable Information to Market Participants

50. Bilateral transaction price formation already relies on parties knowing information about the costs and willingness to pay of other counterparties and likely results in prices being negotiated at something approximating the "split the savings" formula that is proposed for SEEM.

51. Given known information about other parties' costs and willingness to pay, the SEEM matching algorithm and pricing mechanism is consistent with truthful revelation of costs and willingness to pay.  This already exists with information know today in the bilateral markets. The only difference is that the SEEM algorithm will match the lowest available offer price with the highest available willingness to pay (demand bid) which maximizes the gains from trade and splits those evenly between the contracting parties.

52. As a practical matter, the maximization of the surplus/gains from trade that could be gained from SEEM are easily eroded by the different constraints placed on matching bids and offers and the possibility of being unable to complete a transaction due to insufficient available transmission or transaction curtailment due to TLRs.

### V.    SEEM CREATES BARRIERS THAT DO NOT EXIST IN THE CURRENT BILATERAL MARKET STRUCTURE TO FACILTATE COLLUSIVE MARKET POWER OPPORTUNITIES

53. The SEEM design erects additional barriers to trading across the Southeast that do not exist under the current bilateral trading regime that can facilitate coordinated action by large market participants to exercise market power in ways that are not evaluated under the

typical MBR authority evaluations.  Nor would such coordinated action show in any reporting provided by SEEM as it is currently filed, or in any Electric Quarterly Reports ("EQR") data.  This is because successful exercise of market power as described below would result in *no* SEEM transactions taking place.

### A.   Market Power and Market Manipulation Can Come in Forms Other than Raising Prices above Competitive Levels

54. In granting MBR authority, the Commission examines the ability of a seller to raise prices above competitive levels through the traditional exercise of horizontal market power. With sufficient competition the ability for any one seller to raise prices uncompetitively is unlikely as other competitors will undercut that price, driving prices to their marginal or incremental cost. As has been noted, most Members have been granted MBR authority when selling outside of their own and their affiliates' Balancing Authority area or geographic markets to non-affiliated entities.

55. FERC also is on the watch for market manipulation designed to shape how market prices are reported through transactions that lack any real purpose or through obtaining services (such as the NFEETS proposed in this filing) for manipulative purposes, such as "wash trading."

56. Yet, SEEM exists in an environment that is quite different from ISO/RTO markets and the WEIM. The short-term and long-term incentives are quite different in the Southeast relative to ISO/RTO markets. In the ISO/RTO markets, profitability rests upon being cost-efficient operationally and in making investment decisions. That is, given operational efficiency, the lower the investment cost, the greater the profits that can be earned. In contrast in the SEEM region, the basis of the power industry is state regulated, the area is composed of

franchise monopoly models where returns are based almost entirely upon capital investments. This is the opposite incentive from ISO/RTO markets as the greater the capital investment, the greater are total returns.[26] Additionally, operational costs are simply pass through costs under cost-of-service regulation such that there are few incentives for minimizing operating costs. SEEM adds an overlay of an overly complex automated market on top of these incentives that run counter to cost minimizing incentives.

*1. Underlying Incentives of Generation and Transmission Owning*

*Participants*

57. Given the franchise monopoly nature of the underlying structure, competition and the idea that there may be lower cost suppliers available erode potential profits from building additional generation. Investor-Owned Utilities ("IOUs") want the appearance of not having lower cost generation supply options available so they can show their respective state regulators, city commissions, customer-owners, or contracted load that their existing assets are "used and useful" and low cost. For IOUs, this also means showing state regulators that future supply needs can be met by more investment, upon which they receive a regulated rate of return, rather than buying supply on the open market.

58. Generation and transmission owning cooperatives, municipals, or federal power administrations (collectively referred to here as "public power") have incentives to protect their position. Since they are owned or serve the customer/owners, public power does not want any business decisions to reflect poorly upon them or become known, as customer/owners may rightfully request a change in strategy or management.

---

[26] Averch, Harvey and Johnson, Leland L., Behavior of the Firm Under Regulatory Constraint, *American Economic Review*, Vol. 52, No. 5, 1962, pp. 1052–1069

JA0803

59. Transmission owning utilities have incentives to sell Firm PtP Transmission or even gain revenues from Non-firm PtP Transmission, in addition to charging the cost of Network Transmission Service to serve native load. The idea that there is transmission capacity that is unused could be a signal that transmission is overbuilt, and runs counter to the profit incentives of transmission owners.

60. Signaling that there is sufficient NFEETS available through SEEM could signal to those parties currently paying for Firm PtP and Non-firm PtP, and in some cases, paying pancaked transmission rates, to not renew Firm PtP and Non-firm PtP service since they can satisfy their needs through SEEM. This would lead to a spiraling effect that cannibalizes transmission revenues and makes other regional generation more competitive by avoiding the costs of pancaked transmission services.

61. Providing incentives to return or not renew Firm PtP and Non-firm PtP and making other regional generation more competitive relative to the status quo runs counter to the incentives for a franchise monopoly transmission and generation owner who wants to build more transmission to earn returns on investment, but needs load or competing generation to pay for it. Additionally, providing incentives for other generation resources to compete with one's own generation means fewer opportunities for rate base generation growth if power can be purchased at lower cost in the market.

*2. Market Manipulation under SEEM Links to Protecting Franchise Monopoly Market Share and Profits Leading to Actions that Reduce the Number of Efficiency Enhancing Transactions*

62. Under the SEEM design, there are many levers that can be used to prevent otherwise efficiency enhancing transactions from taking place that would be consistent with the

JA0804

proposed market rules. One is the ability to toggle off certain counterparties that are known to have lower cost resources than one's own and do so under the guise of "credit policy"[27] or not having MBR in the home BA.[28] This not only prevents transactions with lower cost entities, but it can be used as part of coordinated strategy among large generation owning SEEM Members to prevent such trades.

63. With the requirement that at least three counterparties be available to be matched, it would only take three of the five largest generation owning entities (Southern Company, TVA, Duke, LG&E/KU, and Dom SC) to "toggle off" potential counterparties in a coordinated strategy to block any beneficial trades from happening with entities that are "net short"[29].

64. In the long run, if some participants such as merchant generation or merchant renewable developers already in the Southeast market are "toggled off," they could get financially squeezed and forced to sell their assets to the large incumbent Member IOUs if such an option is available. Meanwhile, potential new entrants would see a clear signal that their new entry is not wanted, and abuse of SEEM would serve as a powerful deterrent to competitive new entry.

65. Contrary to what the SEEM Members have stated in their filing, there would be no paper trail documenting the use of this strategy, as only aggregated offers and bids that did not get matched are reported, not non-executed trades.[30] Trades that may have been executed

---

[27] SEEM Market Rules, Section IV.A.1.b. iii.

[28] SEEM Proposal, Attach. C at P 40.

[29] An entity is net short if its load is greater than available generation for meeting load requirements during most hours of the year or even only summer or winter peaking periods.

[30] SEEM Market Rules, Section V.B.2 states that the total amount of non-firm energy offered and sold as well as bid and purchased for each Clock Hour of the prior day will be reported daily.

but for the participant restrictions will not show up in the EQR, nor will such information be reported out in daily, weekly, or monthly reports.

66. Why would the largest generation owning Members want to block such low-cost trades? One reason is that they already have contracts in place for most generation requirements and have locked these in with Firm PtP, and to execute a similar deal at lower costs for generation and $0/MWh transmission cost may cause the existing contract to not be renewed or renewed at lower costs when the contract expires. In the alternative, cost advantage information about potential competitors to supply energy could potentially come to light through SEEM, and thus the current supplier may want to keep such information as opaque as possible.

67. The rationale for keeping information regarding the cost advantages of competitors private is obvious. Large vertically integrated IOUs use their own integrated resource plan ("IRP") process to meet load requirements with limited external resources. Once a new generation asset is planned in an IRP, the IOU has an incentive to ensure that it does not get delayed or canceled because lower cost generation is available elsewhere as it would lose the returns on the capital investment they would expect from self-building generation. Moreover, IOU incentives to follow through on these investment commitments becomes more entrenched when such commitments are made in earnings calls with investors who then expect these investments to happen. A failure to follow through on such investment commitments would not be viewed favorably by investors and could have a negative effect on stock prices.

**B.    Market Participants Have the Ability to Refuse Trades with Certain Counterparties that Can Be Discriminatory and Lead to Market Abuses.**

68. One of the unique aspects of the SEEM design that is not present in any other organized market is the unfettered ability for one market participant to foreclose the possibility of any transaction with certain counterparties. While all markets are voluntary in nature, the ability to discriminate between parties with whom transactions can be completed is not efficiency enhancing nor will it lead to maximizing the "gains from trade," and it can lead to potentially harmful market behavior.

69. One reason provided in the filing for precluding transactions with some parties was to account for being able to meet individual company creditworthiness requirements.[31] On its face, this seems reasonable, but one must consider whether those conditions also hold in the traditional bilateral market. If there is differential treatment of the same party between SEEM and traditional bilateral trading, this would appear to be discriminatory.

70. Another reason for participation constraints provided in the filing is to allow market Participants that do not have MBR authority in their own BAs the option of not conducting transactions with parties in their own BA to avoid violating their MBR requirements.[32] The SEEM filing seems to indicate this option will be chosen by some transmission and generation owning Participants/Members.[33] Effectively, market participants are being shut out of the SEEM market from a large volume of potentially beneficial trades even at cost-

---

[31] SEEM Market Rules, Section IV.A.1.b. iii and SEEM Proposal, Attach. C at 16.
[32] SEEM Proposal, Attach. C at 16.
[33] *Id.*

JA0807

based rates, even though the SEEM design can accommodate such non-MBR transactions as Southern Company appears to be opting into.[34]

71. Load or generation parties who are "toggled off" from transactions by other parties in their BA will be forced to cross multiple transmission providers and BAs to benefit from any other transaction in SEEM and be at much higher risk for being curtailed as well as paying for one-half of pancaked transmission losses.[35] In addition, these parties will be at risk for imbalance charges imposed by their home BA when the transaction is curtailed.[36]

72. Moreover, they would be "forced" to go to the traditional bilateral markets to pay for transmission to conduct cost-based transactions they would otherwise have access to under zero-cost transmission with SEEM. This is undue discrimination from a market and economic perspective. Assume a load Participant is located in the BA of a SEEM Member that does not have MBR authority in its BA, but does when selling into other BAs, and thus that Member limits its SEEM transactions to those outside of its BA. The load can buy at cost-based energy rates from the SEEM Member, but only if it pays for transmission. The load cannot use the new zero-cost NFEETS to buy energy from within its BA. The load can choose to use the NFEETS service but only to buy energy from outside its BA. This constitutes undue discrimination among similarly situated transmission customers in an economic sense that erodes efficient market outcomes.

73. This scenario presents a clear case of a SEEM Member with both generation and transmission ownership that can use its ability to preclude transactions that would be cost-

---

[34] *Id.* According to this discussion, Southern Companies will make an adjustment to the transaction price that would ensure load in their BA pays cost-based rates with more savings being shifted to the load buying power in SEEM.
[35] *E.g., see* SEEM Proposal, Attach. C at 15.
[36] SEEM Proposal at 29–30. *See also* SEEM Proposal, Attach. C at 19, that states, "submitted is committed."

based with the load Participant in their BA to sell at MBR into another BA since it would be more profitable, and also increase (or not erode) its transmission revenues by effectively forcing the load Participant to buy transmission service. In either case, it could be argued that such a strategy is cross-market manipulation. In the first case, it is market manipulation by foreclosing one BA "submarket" to take an opportunity in another "submarket." In the latter case, market manipulation occurs by foreclosing the local BA submarket to benefit transmission sales.

## C.    The Requirement for Three Eligible Counterparties to be Available to Facilitate a Match

74. Under the current system of bilateral trading, counterparties can find each other and complete a mutually beneficial transaction without the need for other "eligible counterparties" to be available as well before completing a transaction. This constraint adds another layer of complication and is a barrier to efficient matching.

75. For any demand bid to be matched, there must be three eligible counterparties with supply offers available for matching. Conversely, for a supply offer to be matched, there must be three eligible counterparties with demand bids available to facilitate the match in the SEEM algorithm.

76. In effect, it appears the "price for zero-cost transmission" is a much larger barrier to completing an economically beneficial match with this "three-counterparty rule." It is easy to envision an economically beneficial match being stopped for the lack of "eligible counterparties".

77. There are five large utilities that are transmission owners and also large generation owners, and all operate their respective BAs, but they are geographically and electrically spread out from the Atlantic coast to the Mississippi River, and from the Gulf coast to the Ohio River.

78. It is not difficult to imagine that many transactions that could be efficiency enhancing would cross more than one BA and transmission provider. If transmission is not available in one BA, or the number of "eligible counterparties" is less than three, then the transaction would not be matched.

79. It is also not difficult to imagine a situation where some parties choose to toggle on or off their ability to transact with a specific counterparty. It would be straightforward through tacit collusion to minimize the number of matched transactions for a counterparty to limit that counterparty's ability to participate in SEEM.

## D. The Current SEEM Proposal Lacks a Dedicated Market Monitor and Reporting Requirements that Would Uncover Actions that Prevent Transactions for Manipulative Reasons

80. Filing parties for SEEM explicitly depend upon FERC Enforcement Staff to undertake the market monitoring function to ensure rules are followed and not being manipulated to alter market outcomes. In fact, SEEM filing parties stress that the reporting proposed under SEEM, and the fact that completed transaction would be reported in each market participant's EQR filings, misses the point.

81. The actions described above would not be reported in the EQR, since no transaction would be completed, even though the lack of a transaction itself could be evidence of a kind of market manipulation that would prevent one transaction, and yet force another transaction

JA0810

to be undertaken. Relying on EQR filings is simply insufficient for examining behavior that prevents transactions.

82. Moreover, the reporting provided by SEEM would not provide any data on the number of times a beneficial transaction did not occur for lack of counterparties.[37] SEEM proposes monthly reports that would report Energy Exchanges made but not executed. SEEM will not provide the reasons for a trade not being executed such as a TLR, participant constraint, or an "all-or-nothing" bid or offer.[38]

83. Publicly available daily information does not provide any data regarding the number of transactions that would have been matched, but for participant constraints, or transmission unavailability, or the reasons for lack of counterparties (transmission unavailable, toggling off the counterparty, or simply not enough participation). Only aggregated numbers of offers, bids, sales, and Participants are proposed to be reported.[39] This is where an independent market monitor is needed to collect this data, report out what it can publicly, and serve as the eyes and ears of FERC staff to watch the market for any problems that may be present.

## VI.    SEEM MEMBERS HAVE FAILED TO SHOW THE DESIGN IS COMPUTATIONALLY FEASIBLE

84. SEEM filing parties describe their market algorithm as a mixed integer program for which no vendor has yet been chosen and for which no prototype has been shown.[40] Given the timing of the market, with bids and offers made fifteen minutes before the start of the next

---

[37] *See* SEEM Market Rules, Section V.
[38] *See id.* at Section V.A.7.
[39] *See id.* at Section V.B.
[40] SEEM Proposal, Attach. C at 11.

interval[41], matched parties being notified and eTags submitted ten minutes prior to the start of the interval[42] means that there are only five minutes in which to solve what is possibly a large and difficult mixed integer program.

85. The integer constraints include: (1) choices on counterparties with whom a party wishes to transact or not transact; (2) the ability to submit "all-or-nothing" or "fill or kill" block bids or offers that require either the whole bid or offer be accepted or otherwise be rejected; (3) the three-party counterparty rule that requires there must be at least three eligible, non-affiliated counterparties for which a Participant can exchange energy in SEEM in order to be matched; (4) an unknown set of potential contract paths that could be used to match bids and offers between sources and sink BAs.

86. One can think of integer constraints as being {0,1} decisions in which there is no available solution in between. For example, fill the entire offer, or reject it. Allow transactions with counterparty X, or not. Match an economically beneficial transaction over contract path 1 or contract path 2 or contract path 3.

87. The reason large numbers of integer constraints can be computationally burdensome from a solution time perspective is that as the number of these constraints increases along with the number of participants, the number of combinations that must be checked for the maximizing solution grows exponentially. For example, if there is only a single {0,1} integer constraint and 5 market participants,[43] the number of combinations that must be checked is 25. But if there are two {0,1} integer constraints with 5 participants, the number

---

[41] SEEM Market Rules, Section IV, B.2.c
[42] *Id.* at Section IV, B.2.d. The language in the market rules stands in contrast to Attachment C at 13, figure showing the submission of eTags 5 minute prior to the delivery interval.
[43] This value is 5 taken to the power of the number of possible states which is two: 0 or 1, or $5^2$=25.

of combinations grows to 625. [44] This means in the last case the maximization problem must be solved 625 different times to find the maximizing solution for the market.

88. To maximize the gains from trade (surplus) with multiple integer constraints, and some not as easy as $\{0,1\}$, is not an easy linear programming optimization problem or a more tractable problem with only one integer constraint to consider. The Guidehouse/CRA SEEM benefit analysis proves this point very clearly in that it was a linear programming optimization problem that appears to be simulated over multiple draws of different levels of solar output.[45] In solving their model, Guidehouse/CRA could only do four separate years using a linear optimization problem.[46]

89. The SEEM filing parties have appeared to not have considered these issues or the potential for infeasible clock time computations of their model. It is not even clear how many possible permutations of matches would need to be examined to match buyers and sellers and maximize surplus subject to the various integer constraints enumerated above.

### A.  ISO/RTO Real-time Market Security Constrained Economic Dispatch ("SCED") Is a Simpler Computational Problem and Faster to Solve

1.  ISO/RTO SCED may be large in the sense of encompassing a larger footprint or having more generators on the system, is a computationally simpler problem to solve. As a practical matter, SCED that is run every five minutes in ISO/RTO markets is not a mixed

---

[44] This value is 5 taken to the power of the number of possible states which is now four: $\{0,0\}$, $\{1,1\}$, $\{0,1\}$, or $\{1,0\}$, or $5^4=625$
[45] Guidehouse/CRA Report at 13–14, including Figure 9 that presents frequency distributions. There is no mention of how many draws were taken from these solar distributions if any were done.
[46] *Id.* at 12.

integer program, but a large linear program that is computationally much easier to solve in a short clock time of about three minutes[47]. In this context, the clock time needed to solve the SEEM market given its greater computational complexity appears unrealistic given known SCED algorithms.

90. The reason for the short clock time to compute the next dispatch solution is that there are no integer constraints that require solving the problem multiple times based on a change in each of any included integer constraints. There is no need to start up or shut down units during the five-minute dispatch interval. There are no participation constraints. The transmission system is modeled as a set of linear constraints based on factors that tells how much generation will flow over each transmission constraint rather than checking over multiple potential contract paths.

91. To the extent that ISO/RTO system operators need to commit off-line resources such as combustion turbines, this is done outside of the SCED run in what can be called a "look-ahead" or intermediate term run that looks several five-minute intervals into the future to commit, de-commit, or shut down a resource, which are the only integer constraints to be considered. To place this in the context of the SEEM design, the last look-ahead run that would consider a commit, start-up, de-commit, or shut down decision occurs ten minutes before the SCED run for the dispatch interval.[48] Conservatively, this means that it requires more time to run the software and send notice to generators about 15 minutes prior to the

---

[47] *See* Aaron Baizman and Phil D'Antonio, *Recap and Dispatch Methodology*, Slide 13 (Oct. 27, 2020), https://www.pjm.com/-/media/committees-groups/committees/mic/2020/20201027-five-minute/20201027-items-03-04-issue-status-update-and-long-term-solution-education.ashx. *See also* PJM Interconnection L.L.C., *Manual 11 Energy & Ancillary Services Market Operations*, *Revision 112*, at 51 (January 5, 2021), https://www.pjm.com/~/media/documents/manuals/m11.ashx ("PJM Manual 11").

[48] *See* PJM Manual 1 at 50. The figure shows what is known as IT SCED that runs up to ten minutes before the SCED run.

dispatch interval. Additionally, the number of integer constraints is likely fewer than those in the SEEM design.

## VII.    THE PURPORTED BENEFITS OF THE PROPOSED SEEM MARKET DESIGN LACK SUFFICIENT MODELING DETAIL AND RELEVANCE TO THE PROPOSED MARKET ALGORITHM

93.    The work by Guidehouse/CRA lacks sufficient detail in how exactly the market dispatch was conducted to arrive at the value of the benefits from SEEM. In the IRP Baseline Outlook, the annual benefits are estimated to be $40 million or only $0.0625/MWh for all load in the SEEM footprint.[49]  The annual benefits under the Carbon Constrained Outlook are estimated to be $100 million or $0.15625/MWh for all load in the SEEM region.[50]

94.    The Guidehouse/CRA BCA provides no detailed outputs regarding (1) projected bilateral trading prices; (2) changes in dispatch of generators by utility and fuel type; (3) production cost savings accruing to each of the modeled market participants; (4) potential trades that were available but unable to be executed due to a lack of available transmission capability; (5) the amount of curtailed renewable resources before and the implementation of the SEEM market; or (6) changes in emissions across the SEEM region—particularly notable given that Guidehouse/CRA cited helping balance solar resources in the region as a main purpose of SEEM.

---

[49] Guidehouse/CRA Report at 17 and n.13. The $40 million in net benefit is divided by the 640 TWh of energy (640,000,000 MWh) to arrive at the $0.0625/MWh benefit.
[50] *Id*. The $100 million in net benefit is divided by the 640 TWh of energy (640,000,000 MWh) to arrive at the $0.15625/MWh benefit.

## A. Lack of Sufficient Detail in Modeling the Baseline Cases Absent the SEEM Design

95. Guidehouse/CRA reports it uses PROMOD to simulate regional system operations on an hourly basis using security constrained unit commitment and economic dispatch of resources and includes bilateral trading in the simulations.[51] PROMOD is a widely used vendor-supplied production cost software package from Hitachi/ABB that allows the transmission system to be modeled with economic dispatch of generation resources on an hourly basis but does not have the ability to model dispatch on a sub-hourly basis.[52]

96. For both IRP Baseline and Carbon Constrained Outlooks, Guidehouse/CRA only provides a percentage generation mix for 2022 and 2037 but does not provide actual generation in total MWh or the actual installed capacity of each resource type in their report.[53] With respect to fuel costs there is no detail provided on delivered cost of coal as is provided for natural gas.[54]

97. And while it may be assumed that each BA dispatches its own resources to satisfy the load and reserve needs in isolation as part of the PROMOD simulations used to simulate system operation in the SEEM region, it is not explicitly stated and leaves to the imagination how exactly these PROMOD base cases were executed. Given that PROMOD can also be run to dispatch wider regions as a single area, such as ISO/RTOs or SEEM, an explicit statement would be helpful in evaluating the benefits.

---

[51] *Id.* at 12–13.
[52] *Id.* at 12. *See also* https://www.hitachiabb-powergrids.com/offering/product-and-system/energy-portfolio-management/market-analysis/promod.
[53] *Id.* at 10-11, Figs. 5, 6.
[54] *Id.*, App. A at 24, Tbl. A.1 .

98. Furthermore, rather than include known bilateral transactions that can be observed from EQR data, Guidehouse/CRA instead simulated bilateral transactions *after* the initial PROMOD runs with security constrained unit commitment and economic dispatch,[55] which I assume to be each SEEM BA in isolation.[56] The simulated bilateral transactions are compared to actual bilateral transactions for reasonableness. But the report does not provide any evidence on whether the simulated bilateral trading compares "reasonably" to the known bilateral transactions currently taking place or what those differences might be.

99. The lack of modeling detail or outputs from the PROMOD simulations setting-up the base case to run and evaluate the SEEM simulations against is simply inadequate to evaluate the possible benefits from transitioning to implementing SEEM. These inputs include fuel costs for all resources, load forecasts and load profiles, available capacity, and detailed outputs are helpful in analyzing the reasonableness of the modeling results either through data analysis or attempting to replicate the results. No such detailed input or output data has been provided and thus the results cannot be verified for reasonableness.

## B. The Modeling of SEEM Does Not Correspond to the Proposed Market Design and is Inadequate to Evaluate the Reasonableness of Benefits as Calculated

100.        Guidehouse/CRA state they use production cost modeling and linear programming optimization to assess the benefits from SEEM, but that PROMOD is not capable of

---

[55] *Id.* at 12.
[56] *Id.* All that is stated is, "PROMOD simulates a security-constrained unit-commitment and dispatch for the entire Eastern Interconnect, including each BA within the Southeast EEM footprint." From this I cannot discern with certainty whether this was run for the entire Eastern Interconnection as a single area, or done by each BA.

JA0817

modeling the 15-minute intervals.[57] But Guidehouse/CRA does not cite any simulation software packages that could model power system operation and dispatch at sub-hourly intervals. For example, software packages such as PROBE offered by PowerGEM[58] or PLEXOS provided by Energy Exemplar are able to model markets and operations down to five-minute intervals.[59] Absent any information or documentation, I must assume the Guidehouse/CRA simulations at 15-minute intervals were developed in-house, and it is difficult to assess the robustness of the modeling software to understand whether the results are reasonable.

101.    Furthermore, the SEEM modeling done by Guidehouse/CRA accounts for the uncertainty in demand and solar power output in a way which accounts for the stated computational complications and clock times only allowing four years to be modeled (2022, 2027, 2032, and 2037)[60] as opposed to modeling SEEM over a longer continuous period.

102.    However, the proposed SEEM design is not a linear program as modeled by Guidehouse/CRA, but is instead a mixed integer programming algorithm with various integer constraints such as "fill or kill" block bids/offers, the ability to foreclose trades with a subset of market participants, a three-counterparty requirement, and others as discussed above in Section VI.

103.    Additionally, it is unclear how transmission was modeled by Guidehouse/CRA for the SEEM design. In Table 3, Key Study Assumptions, it is stated that under transmission

---

[57] *Id.* at 5, 12.
[58] https://www.power-gem.com/PROBE.html
[59] https://energyexemplar.com/all-applications/
[60] Guidehouse/CRA Report at 12.

JA0818

representation, no transmission constraints were considered.[61] Yet under Table 3, Available Transmission Capability ("ATC"), it states that trades are limited to ATC values from 2019 which is a form of representing transmission constraints which would be consistent with the contract path methodology used by SEEM.[62] Under trading friction in Table 3, the assumption states "The Southeast EEM Model will execute any trade, regardless of margin, that has a global benefit to the Southeast EEM participants,"[63] which indicates there are no transmission constraints being considered.

104.     Consequently, it is not possible to contextualize the reasonableness of the benefits calculations in the Guidehouse/CRA Report regarding transmission. At best, it appears the SEEM modeling does not account for potential transmission constraints based on actual power flows which means that some potential trades identified by the Guidehouse/CRA model may not actually happen due to being curtailed by TLRs issued by adjacent BAs (PJM, SPP, and MISO) based on loop flows. At worst, it could be interpreted that the model entirely ignored ATC and that not all economically beneficial trades would occur under the SEEM design as proposed.

105.     Given these unknowns and limitations of the modelling of SEEM, the $40 million and $100 million annual benefits in the IRP Baseline and Carbon Constrained Outlooks respectively are at best an upper bound on benefits. These figures being upper bounds is further supported by the fact that the SEEM modeling was conducted under more computationally tractable assumptions than the filed SEEM design itself. The critical question is how low the benefits might be under various sensitivities and changes to

---

[61] *Id.* at 15.
[62] *Id.*
[63] *Id.*

assumptions such as toggling on or off participation with counterparties, the three-participant rule, more complex contract paths that cross multiple BAs, and "fill or kill" block bids and offers as described in Section VI above.

### C. There are No Results Provided under Sensitivity Runs in the Benefits Analysis

106.     Guidehouse/CRA states they have run various sensitivity analyses under different assumptions regarding the level of market participation, ATC, fuel prices, and renewable curtailment among others as alluded to in Table 3.[64] But the number of actual sensitivities conducted and their respective results are not provided in any meaningful way. Instead, they describe the individual impact of each assumption on results as generic "high, medium or low" impacts.[65] For example, market participation is cited as having a high impact on results, but no quantitative results are provided as to how much low market participation erodes the potential benefits.

### D. Environmental Impacts and Costs of Older Resources Likely to Retire are Non-Transparent

107.     For fuel pricing, Table 3 identifies a key assumption that lower gas prices result in lower benefits in SEEM. This is a surprising observation and points out a major problem with the benefit analysis in that there is no impact on any operating coal units that would almost certainly be ramped downward to make room for gas or solar resources. Another

---

[64] *Id.*.
[65] *Id.*

logical implication of this observation is that solar will be displacing lower emitting gas resources rather than higher emitting and higher cost coal resources.

108.     Given that the analysis does not attempt to change the output of coal units in the model,[66] and the likelihood that coal resources are more expensive to run than combined cycle gas units, as evidenced by the retirement of coal units and new entry of combined cycle gas in the model, it appears the analysis is designed to take as given the operation of coal units as "self-scheduled," and not provide information that may show these resources are operating when they should not be. This phenomenon is seen in ISO/RTO markets when coal resources that are uneconomic operate as self-scheduled anyway.[67]

109.     Furthermore, given that solar resource penetration is one of the main drivers for the benefits attributed to SEEM, there is no reporting on the impacts of changing the amount of allowed solar power curtailment on SEEM benefits. This seems to be a glaring omission in the benefit analysis.

## E.     Overall Conclusion Regarding the Benefits Analysis

110.     Failure to fully account for transmission system constraints based on actual power flows along with the omission of key participation constraints, potentially complex contract paths, and "fill or kill" bids and offers embedded in the SEEM design is a fatal flaw that renders the entire benefits analysis and estimates meaningless. In this sense, despite the low reported costs of set up and ongoing participation, it is not clear whether benefits will actually exceed the costs.

---

[66] *Id.* at 14.
[67]  Joe Daniel, Sandra Sattler, Ashtin Massie, Mike Jacobs, *Used, But How Useful? How Electric Utilities Exploit Loopholes, Forcing Customers to Bail Out Uneconomic Coal-Fired Power Plants* (May 2020), https://www.ucsusa.org/sites/default/files/2020-05/Used%20but%20How%20Useful%20May%202020.pdf

JA0821

111.     Furthermore, the lack of transparency in data inputs, model outputs, and results of sensitivity scenarios in detail have not been provided, making it difficult to assess or verify the reasonableness of the results and further calling into question the validity of the analysis to in providing a meaningful estimate of benefits.

112.     A robust and verifiable analysis should include the effects of power flows and the potential for loop flows and some transactions being curtailed by TLRs to model the actual SEEM design as close as possible. A good analysis would provide transparency on the data inputs and model outputs at granular levels that could be useful to affected consumers, state regulators, and other interested parties to assess the impacts of the SEEM design on costs and emissions outcomes and renewable resource curtailments. Finally, a thoughtful analysis would have used, where possible, available software packages known to the power industry with available documentation as the basis for modeling the benefits of SEEM. But unfortunately, none of these appear to be considered or undertaken for the SEEM benefit analysis.

## VIII.   SUMMARY AND CONCLUSIONS

113.     The prospect of the Southeast moving toward more coordinated operation across BAs to facilitate the wider trading of power that improves system efficiency, lowers costs, and enhances reliability as the penetration of variable renewable generation increase is critical and necessary moving forward. Unfortunately, the SEEM design as submitted is simply not up to the task and raises more questions than it provides solutions to problems. If anything, SEEM would create a larger set of problems in its design that would facilitate opportunities to exercise market power and manipulation that are not available in the

current bilateral market without providing any substantial improvements over the current bilateral market paradigm.

114.     In addition to the aforementioned market power deficiencies, the SEEM design proposes an algorithm that is not standard relative to current ISO/RTO market and dispatch software and is computationally more difficult to solve, and it has not been proven that the algorithm can be solved in the time necessary. Finally, the BCA provided in support of the SEEM filing is not well supported, non-transparent, and does not provide sufficient information or detail to assess the reasonableness of the results, nor is it run based on the proposed market design, but is rather based on more computationally tractable assumptions.

115.     While the Commission should not give up on markets in the Southeast, regrettably this SEEM proposal should be rejected for all the reasons provided herein.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
This concludes my affidavit.

JA0823

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Alabama Power Company | ) ) | ER21-1111-000 |
| Dominion Energy South Carolina, Inc. | ) ) | ER21-1112-000 |
| Louisville Gas and Electric Company | ) | ER21-1114-000 |
| Duke Energy Progress, LLC Duke Energy Carolinas, LLC | ) ) ) | ER21-1115-000 |
| Duke Energy Carolinas, LLC | ) ) | ER21-1116-000 |
| Duke Energy Progress, LLC | ) ) | ER21-1117-000 |
| Louisville Gas and Electric Company | ) ) | ER21-1118-000 |
| Georgia Power Company | ) ) | ER21-1119-000 |
| Kentucky Utilities Company | ) ) | ER21-1120-000 |
| Mississippi Power Company | ) ) | ER21-1121-000 |
| Alabama Power Company | ) ) | ER21-1125-000 |
| Dominion Energy South Carolina, Inc. | ) ) ) | ER21-1128-000 (not consolidated) |

## <u>VERIFICATION OF PAUL M. SOTKIEWICZ, PH.D.</u>

Pursuant to 28 U.S.C. § 1746, I, Paul M. Sotkiewicz, Ph.D., declare under penalty of perjury under the laws of the United States of America that the statements contained in

JA0824

theforegoing Affidavit of Paul M. Sotkiewicz, Ph.D. are true and correct to the best of my

knowledge and belief.

_____

Paul M. Sotkiewicz, Ph.D.

Executed on
this 15th day of March 2021

Document Accession #: 20210324-5235    Filed Date: 03/24/2021

# Attachment A

## to the

## Affidavit of Paul M. Sotkiewicz

JA0826





**E-Cubed Policy Associates, LLC**

WWW.E-CUBEDPOLICY.COM | GAINESVILLE, FLORIDA

# Paul M. Sotkiewicz, Ph.D

## President, E-Cubed Policy Associates, LLC

**Paul M. Sotkiewicz, Ph.D.** is the President and Founder of E-Cubed Policy Associates, LLC ("E-Cubed"), an energy and environmental economic consultancy based in Gainesville, Florida that started in 2016. Dr. Sotkiewicz brings 25 years of experience across parts of three decades at the intersection of utility regulatory policy, power system economics, and environmental economics to provide analysis and advice to private and public sector clients on a range of economic issues related to electricity market design and performance, power generation economics, market power mitigation, utility regulatory policy, distributed energy resources and the economic impacts of state and federal environmental policies on the power and gas industries. Recent clients include market and system operators such as the Alberta Electric System Operator and New York Independent System Operator; trade associations such as the Electric Power Supply Association, New England Power Generators Association, PJM Power Providers Group, and the American Petroleum Institute; merchant generation and transmission developers in North American power markets including JPower USA Ltd., Panda Power Funds, Vistra Energy, ENMAX, Rockland Capital and Kalina Distributed Power; and generation and transmission cooperatives including Intermountain Rural Electric Association and Buckeye Power.  Dr. Sotkiewicz also supports law firms in litigation proceedings including rate case, need determinations, and market power/manipulation cases.

Prior to founding E-Cubed, Dr. Sotkiewicz worked for PJM Interconnection, LLC in the role of Chief Economist and as a Senior Economic Policy Advisor. At PJM, Dr. Sotkiewicz provided analysis and advice regarding all aspects of PJM's markets and supported regulatory filings and implementation of market design changes. At PJM Dr. Sotkiewicz led initiatives related to shortage pricing and real-time dispatch co-optimization of energy and reserves, integration of demand response in PJM's markets including price formation and compensation of demand resources. At PJM Dr. Sotkiewicz supported PJM's regulatory position with respect to the application of the Three Pivotal Supplier Test supplier market power, helped develop an opportunity cost calculator for run-limited resources used for market mitigation purposes, and administered implementation of the minimum offer price rule (MOPR) to curb buyer-side market power in the PJM capacity market. Paul also authored or co-authored a series of policy analyses and whitepapers on ranging from transmission cost allocation to gas-electric coordination to the effects of environmental rules on PJM's markets. While at PJM, Dr. Sotkiewicz was a frequent speaker at FERC Computation Technical Conferences related to advances in unit commitment models and computation methods that could be applied in ISO/RTO markets.

As an economist at the United States Federal Energy Regulatory Commission (FERC) in the Office of Economic Policy and later, on the Chief Economic Advisor's staff at Dr. Sotkiewicz conducted research and provided analysis and advice on market design issues related to the ISO/RTO markets, in particular the California ISO and New York ISO, as they were being formed and implemented and worked on merger cases to analyze any potential for market power. As part of this work, Dr. Sotkiewicz has co-authored peer review articles related to unit commitment models and price formation to account for discrete decisions related to start-up, shut-down, and minimum run conditions.

Dr. Sotkiewicz is the author or co-author of multiple book chapters and publications related to wholesale market design and policy including price formation in unit commitment models, the integration of demand response and distributed energy resources in markets and operations environmental economic policy, distribution rate design, economic decisions for nuclear resource build decisions, and renewable resource integration. In addition to his tenures at PJM and FERC, Dr. Sotkiewicz served as the Director of Energy Studies at the Public Utility Research Center (PURC), University of Florida was an Instructor in the Department of Economics at the University of Minnesota where he earned the Walter Heller Award for Outstanding Teaching of Economic Principles four times.

Dr. Sotkiewicz holds a Bachelor of Arts in history and economics from the University of Florida (1991), a Master of Arts (1995) and Doctorate in Economics from the University of Minnesota (2003).

JA0827

# Attachment B

to the

Affidavit of Paul M. Sotkiewicz

JA0828

# PAUL M SOTKIEWICZ, Ph.D.

President and Founder, E-Cubed Policy Associates, LLC
5502 NW 81st Avenue, Gainesville, FL 32653
E-mail: drpaulg8r@gmail.com Phone: +1-352-244-8800 Mobile: +1-610-955-2411

## EDUCATION

PhD, Economics, University of Minnesota, 2003
M.A., Economics, University of Minnesota, 1995
B.A. (High Honors), History/Economics, University of Florida, 1991

## PROFESSIONAL AND ACADEMIC EXPERIENCE

**2016-        President and Founder, E-Cubed Policy Associates, LLC, Gainesville, FL**

- Founded to provide expert advice, testimony, and policy research to private sector and government clients at the intersection of energy, environmental, and economic policy and regulation
- Supporting litigation defending market participants against accusations of market manipulation in PJM's markets
- Conducting analysis of recent past and future expected profitability of nuclear power plants under consideration for state subsidies to keep these facilities in commercial operation and providing reports and testimony in front of state legislative bodies.
- Provide capacity market design and expertise to the ENMAX Corp. in Calgary, AB with regard to the AESO capacity market proposal filed in late 2018
- Supported rate case litigation for a reactive power rate case for Panda Stonewall explaining the history behind markets and that the filed rate from Panda Stonewall was consistent with precedent and lost market opportunities
- Providing PJM expertise to JPower USA Ltd in its development of new combined cycle gas facilities in PJM and help move the project through the PJM interconnection processes as well as advising on existing facilities in the PJM and NYISO market
- Provided capacity market design expertise to the Alberta Electric System Operator in 2017 as they started their transition from an energy-only market to a combined energy and capacity market
- Supporting the Greek Electricity Market authoring, through ECCO International, a whitepaper on market power mitigation with a special look at buyer side market power mitigation in the energy market with the different indices that could be indicative of buyer market power.
- Authored a Meter Data Study for the NYISO encompassing a survey of metering requirements for demand resources and distributed energy resources in key ISO/RTO markets, the current use of demand response baseline methodologies and possible use of such baselines for distributed energy resources in the context of REV in New York.
- Work with clients in generation and merchant transmission development projects in different parts of PJM related to helping them through the interconnection process, understanding market rules, and regulatory policy and economic advice in the face of changing market rules.
- Supporting clients in docketed proceedings at FERC and at the Florida Public Service Commission providing expert testimony and analysis to be used in regulatory proceedings. These proceedings include need determinations, rate filings, RTO market design changes, and policy related proceedings.
- Supporting US government initiatives in exporting knowledge and experience regarding US electric power market development to the Chinese government as they undertake green energy initiatives and look to improve the overall efficiency of the power system.

**2015-2016   Contractor, YOH Inc. and working under the title of Senior Economic Policy Advisor, PJM Interconnection, L.L.C., Audubon, PA**

**2010-2015   Chief Economist, Market Services Division, PJM Interconnection, L.L.C., Audubon, PA** AA0829

**2008-2010   Senior Economist, Market Services Division, PJM Interconnection, L.L.C., Audubon, PA**

- Provide analysis and advice with respect to the PJM market design and market performance including demand response mechanisms, intermittent and renewable resource integration, market power mitigation strategies, capacity markets, ancillary service markets, and the potential effects of environmental policies on the PJM markets.

- Co-authored papers related to effects of the proposed Waxman-Markey climate change bill in 2009, the implementation of the Mercury and Air Toxics Standards (MATS) and Cross State Air Pollution Rule in 2011, and the potential effects of the EPA-proposed Clean Power Plan in 2015.

- Led the Stakeholder Process to implement reserve shortage pricing in PJM in 2009-2010 and provided expert testimony associated with FERC filings in 2010.

- Co-authored paper to explain various market and policy concepts for PJM and its stakeholders including a paper explaining generator costs and compensation in 2010, a paper on possible routes to take on transmission cost allocation in 2010, and a whitepaper on capacity market issues in 2012.

- Advised PJM executives on market power mitigation issues related to the Three Pivotal Supplier test and cost-based offers used for market power mitigation in the PJM Energy Market in 2008-2009

- Advised PJM executives and Board of Managers on demand response compensation prior to the issuance of FERC Order 745.

- Supported and advised the Capacity Market Operations staff and PJM executives on all matters related to the Reliability Pricing Model (RPM) capacity market including implementation of the Minimum Offer Pricing Rule in its various iterations, administered determinations and/or reasonableness of Market Seller Offer Caps during disputes between Capacity Market Sellers and the Independent Market Monitor.

- Provided advice to Capacity Market Operations staff and PJM executives on the RPM Triennial Parameter Review Process in 2011 and in 2014 including supporting legal staff in making filings, providing expert testimony, and providing expert advice during the 2011 and 2012 hearing and settlement process at FERC.
  Supported and provided advice to Capacity Market Operations staff and PJM executives on Capacity Performance through stakeholder presentations, regulatory filings, and working jointly with the IMM in developing many of the ideas and concepts taken from ISO New England's Pay for Performance design for us in PJM.

- Supported the Federal State Government Policy outreach through by providing subject matter expertise during one-on-one meetings with regulatory staff and Commissioners related to any issues of mutual interest and import between PJM and state commission, state environmental regulators, FERC staff, and EPA staff as needed.

- Co-authored and co-led PJM's responses to the Independent Market Monitor's (IMM's) *State of the Market Reports* as well as remaining in communication with the IMM on various matters of concern and interest related to PJM market performance and design.

- Led technical and non-technical external outreach efforts to promote PJM markets or explain PJM positions on policy or market design issues of current interest to industry stakeholders including academic audiences, and invited presentations at industry sponsored events.

- Provided support in gas/electric coordination discussions within PJM and the between the power and gas industries, as well as operations support during critical operating periods in January 2014 through calls and inquiries to PJM generators and pulling environmental permits to better understand generator operating limitations on back-up fuel.

- Provided periodic reports on market performance and the state of PJM's markets to the PJM Board of Managers Competitive Markets Committee including the relationship between PJM's markets and major fuel market, environmental policy, and macroeconomic trends.

- Acted in the role of an internal consultant and advisor to all PJM departments and divisions, as needed, to address any questions or concerns surround market performance, market design, and general economic or environmental policy questions.

- Supported development and issuance of the PJM Renewable Integration Study by outside vendors.

**2000–2008    Director of Energy Studies, Public Utility Research Center and Lecturer, Department of Economics, University of Florida, Gainesville, FL**

- Designed and delivered executive education and outreach programs in electric utility and regulatory policy and strategy for professionals in government, regulatory agencies, and industry primarily for developing countries.
- Responsible for electricity regulatory policy curriculum for the *PURC/World Bank International Training Program on Utility Regulation and Strategy* offered twice per year for 65 to 95 industry and regulatory professionals in each course.
- Acted as the electricity expert and liaison to the Florida electric utilities who were contributing members of PURC.
- Developed electricity related topics and obtained speakers for the PURC Annual Conferences held each February on matters related to environmental policy, wholesale market restructuring, so-called "hurricane hardening" of power systems after the 2004-2005 hurricane seasons, and other policy related matters of interest to the state of Florida.
- Served the PURC liaison to the consultants retained by PURC to evaluate the hardening of electricity infrastructure in the wake of the 2004 and 2005 hurricane seasons.
- Conducted original academic research related to electricity regulation and policy and published in peer reviewed academic and policy journals
- Developed customized regulatory training courses or sessions jointly prepared with other organizations for on-site delivery in Panama, Trinidad & Tobago, Brazil, Mexico, Peru, Bolivia, Argentina, Grenada, South Africa, Zambia, Namibia, and Cambodia
- Served as an advisor and subject matter expert on wholesale restructuring and market issue to Florida Governor Jeb Bush's *Energy 2020 Study Commission* 2000-2001.
- Taught classes as needed in the Economics Department on environmental economics, regulatory economics, and a large lecture class of managerial economics

**1999–2000    Economist, Office of Markets, Tariffs, and Rates, United States Federal Energy Regulatory Commission, Washington, DC**

**1998–1999    Economist, Office of Economic Policy, United States Federal Energy Regulatory Commission**

- Provided analysis and research related to filings made by ISO/RTO markets as they commenced operations as centralized wholesale power markets.
- Led the economic analysis and evaluation of the NYISO wholesale power market in its initial filings of its market design and subsequent filings after operations commenced.
- Led economic analysis and evaluation of multiple filings by the California ISO related to requested market design changes filed after starting operations in 1998.
- Supported analysis and evaluation of other ISO/RTO markets as needed.
- Supported and provided analysis on merger applications as needed.
- Conducted original research while on the staff of the Chief Economic Advisor in the Office of Markets, Tariffs, and Rates related to unit commitment models used in day-ahead electricity markets and pricing in the presence of lumpy decisions and operational characteristics (technically known as non-convexities).

**1992–1998    Instructor, Department of Economics, Augsburg College, Minneapolis, MN**

- Taught small classes of introductory microeconomics, labor economics, money and banking, and environmental economics

**1992–1998    Instructor, Department of Economics, University of Minnesota, Minneapolis, MN**     JA0831

Document Accession #: 20210324-5235     Filed Date: 03/24/2021

- Taught large lecture classes of primarily introductory microeconomics to classes of up to 600 students 3 times per year, managing a staff of teaching assistants and graders and developing curriculum and exams.
- Taught smaller classes of introductory microeconomics as well as environmental economics

## PUBLICATIONS AND BOOK CHAPTERS

Erik Ela ; Farhad Billimoria ; Kenneth Ragsdale ; Sai Moorty ; Jon O'Sullivan ; Rob Gramlich ; Mark Rothleder ; Bruce Rew ; Matti Supponen ; Paul Sotkiewicz, "Future Electricity Markets: Designing for Massive Amounts of Zero-Cost Variable Renewable Resources," *IEEE Power and Energy Magazine,* Volume 17, Issue 6, November/December 2019, Page 58-66.

Covino, Susan, Andrew Levitt, and Paul Sotkiewicz, "The Fully Integrated Grid: Wholesale and Retail, Transmission and Distribution", in *Future of Utilities- Utilities of the Future: How Technological Innovations in Distributed Energy Resources Will Reshape the Electric Power Sector*, Fereidoon P. Sioshansi, editor, Chapter 22, pp.417-434, 2016.

M. Ahlstrom; E. Ela; J. Riesz; J. O'Sullivan; B. F. Hobbs; M. O'Malley; M. Milligan; P. Sotkiewicz; J. Caldwell, "The Evolution of the Market: Designing a Market for High Levels of Variable Generation", *IEEE Power and Energy Magazine*, Volume: 13, Issue: 6, 2015, Pages: 60 – 66.

Bresler, Stuart, Paul Centollela, Susan Covino, and Paul Sotkiewicz, "Smarter Demand Response in RTO Markets: The Evolution Towards Price Responsive Demand in PJM", in *Energy Efficiency: Towards the End of Demand Growth*, Fereidoon P. Sioshansi, editor, Chapter 16, pp.419-442, 2013.

Covino, Susan, Pete Langbein, and Paul Sotkiewicz, "The Fully Integrated Grid: Wholesale and Retail, Transmission and Distribution", in *Smart Grid: Integrating Renewable, Distributed, and Efficient Energy*, Fereidoon P. Sioshansi, editor, Chapter 17, pp.421-452, 2012.

P. M. Sotkiewicz, "Value of Conventional Fossil Generation in PJM Considering Renewable Portfolio Standards: A Look into the Future", *Power and Energy Society General Meeting, 2012 IEEE*

R. F. Chu; P. F. McGlynn; P. M. Sotkiewicz, "Transmission Planning for Generation at Risk due to Environmental Regulations and Public Policy Initiatives" *Power and Energy Society General Meeting, 2012 IEEE*

P. M. Sotkiewicz; J. M. Vignolo, "The Value of Intermittent Wind DG under Nodal Prices and Amp-mile Tariffs", *Transmission and Distribution: Latin America Conference and Exposition (T&D-LA), 2012 Sixth IEEE/PES*

Helman, Udi, Harry Singh, and Paul Sotkiewicz, "RTOs, Regional Electricity Markets, and Climate Policy", in *Generating Electricity in Carbon Constrained World,* Fereidoon P. Sioshansi, editor, Chapter 19, pp.527-564, 2010.

J. C. Smith; S. Beuning; H. Durrwachter; E. Ela; D. Hawkins; B. Kirby; W. Lasher; J. Lowell; K. Porter; K. Schuyler; P. Sotkiewicz, "The Wind at Our Backs", *IEEE Power and Energy Magazine*, Volume: 8, Issue: 5, 2010 Pages: 63 - 71

J. C. Smith; S. Beuning; H. Durrwachter; E. Ela; D. Hawkins; B. Kirby; W. Lasher; J. Lowell; K. Porter; K. Schuyler; P. Sotkiewicz, "Impact of Variable Renewable Energy on US Electricity Markets*", Power and Energy Society General Meeting, 2010 IEEE*

Holt, Lynne, Paul M. Sotkiewicz, and Sanford V. Berg. 2010. "Nuclear Power Expansion: Thinking About Uncertainty"

Document Accession #: 20210324-5235        Filed Date: 03/24/2021

*The Electricity Journal*, 235:26-33.

Holt, Lynne, Sotkiewicz, Paul, and Berg, Sanford, "(When) To Build or Not to Build? The Role of Uncertainty in Nuclear Power Expansion." <u>Texas Journal of Oil, Gas, and Energy Law</u>, Volume 3, Number 2, 2008, pp. 174-217.

Sotkiewicz, Paul M. and Vignolo, J. Mario, "Towards a Cost Causation Based Tariff for Distribution Networks with DG." <u>IEEE Transaction on Power Systems,</u> Vol. 22, No. 3, August 2007, pp. 1051-1060.

Sotkiewicz, Paul and Vignolo, Jesus Mario. "Distributed Generation." <u>The Encyclopedia of Energy Engineering and Technology</u>, Vol. 1, pp 296-302. Ed. Barney Capehart. New York: CRC Press, Taylor and Francis Group, 2007.

Sotkiewicz, Paul. "Emissions Trading." <u>The Encyclopedia of Energy Engineering and Technology</u>, Vol. 1, pp. 430-437. Ed. Barney Capehart. New York: CRC Press, Taylor and Francis Group, 2007.

Vignolo, Jesus Mario and Sotkiewicz, Paul M., "Towards Efficient Tariffs for Distribution Networks with Distributed Generation", <u>Cogeneration and On-site Power Production</u>, November-December 2006, pp. 67-75.

Jamison, Mark A. and Sotkiewicz, Paul M., "Defining the New Policy Conflicts," <u>Public Utilities Fortnightly,</u> July 2006, pp. 36-40, 50.

Sotkiewicz, Paul M. and Vignolo, Jesus Mario "Nodal Pricing for Distribution Networks: Efficient Pricing for Efficiency Enhancing DG." <u>IEEE Transaction on Power Systems</u>, Vol. 21, No. 2, May 2006, pp. 639-652.

Sotkiewicz, Paul M. and Vignolo, Jesus Mario "Allocation of Fixed Costs in Distribution Networks with Distributed Generation," <u>IEEE Transaction on Power Systems</u>, Vol. 21, No. 2, May 2006, pp. 1013-1014.

Sotkiewicz, Paul M., and Lynne Holt, "Public Utility Commission Regulation and Cost Effectiveness of Title IV: Lessons for CAIR." <u>Electricity Journal</u> 18(8): 68-80, October 2005.

O'Neill, Richard P., Sotkiewicz, Paul M., Hobbs, Benjamin F., Rothkopf, Michael H., and Stewart, William R. Jr., "Efficient Market Clearing Prices in Markets with Non-Convexities." <u>European Journal of Operational Research</u>, Volume 164, Issue 1, 1 July 2005, Pages 269-285.

Sotkiewicz, Paul M., "The Impact of State-Level Public Utility Commission Regulation on the Market for Sulfur Dioxide Allowances, Compliance Costs, and the Distribution of Emissions" Ph.D. Dissertation, Department of Economics, University of Minnesota, January 2003.

O'Neill, Richard P., Helman, Udi, Sotkiewicz, Paul M., Rothkopf, Michael H., and Stewart, William R. Jr., "Regulatory Evolution, Market Design, and the Unit Commitment Problem" <u>The Next Generation of Unit Commitment Models</u>, B. Hobbs, M. Rothkopf, R. O'Neill, and H.P. Chao editors. 2001.

Sotkiewicz, Paul M. "Opening the Lines", <u>Forum for Applied Research and Public Policy, Special Issue on the Role of Public Power in Utility Restructuring</u>, Summer 2000, pp. 61-64.

## SELECTED WORKING PAPERS AND UNPUBLISHED MANUSCRIPTS

Holt, Lynne, and Paul M. Sotkiewicz. "Understanding Fuel Diversity Trade-Offs and Risks: Making Decisions for the Future (pdf)" University of Florida, Department of Economics, PURC Working Paper, 2007.

O'Neill, Richard P., Sotkiewicz, Paul and Rothkopf, Michael. "Equilibrium Prices in Exchanges with Non-convex Bids." PURC Working Paper, January 2006, updated September 2007.

JA0833

Document Accession #: 20210324-5235    Filed Date: 03/24/2021

Sotkiewicz, Paul M. "Cross-Subsidies That Minimize Electricity Consumption Distortions" University of Florida, Department of Economics, PURC Working Paper, 2003.

**CONSULTING AND ADVISING EXPERIENCE PRIOR TO JOINING PJM IN 2008**

2007        Advisor to the Government of Vietnam regarding the design and experience of wholesale electricity markets as Government looked at the creation of US style ISOs to attract investment in generation assets for IPPs

2007        Independent Expert in the Matter of the Public Utilities Commission of Belize Initial Decision in the 2007 Annual Review Proceeding for Belize Electricity Limited

2006        Advisor to the Division of Air Resource Management, Florida Department of Environmental Protection (FDEP) Regarding Implementation the Clean Air Interstate Rule (CAIR)

**HONORS AND AWARDS**

| | |
|---|---|
| 2007 | Fulbright Senior Specialist Grant in Economics with a specific request for expertise in electricity markets, electricity regulation, and distribution tariff design, Universidad de la República, Montevideo, Uruguay. |
| 2007 | Principal Investigator, PPIAF/World Bank Grant to conduct two on-site training courses on the regulation of the electric power sector and on independent power producers and power purchase agreements for the Electricity Authority of Cambodia. Grant award $59,900. |
| 2006 | "Efficient Market Clearing Prices in Markets with Non-Convexities" published in _European Journal of Operational Research_ received New Jersey Policy Research Organization Bright Idea Research Award in Decision Sciences. |
| 2003 | Transportation and Public Utilities Group, Ph.D. Utilities Dissertation Award for "The Impact of State-Level Public Utility Commission Regulation on the Market for Sulfur Dioxide Allowances, Compliance Costs, and the Distribution of Emissions" |
| 1992-97 | Distinguished Instructor, Department of Economics, University of Minnesota |
| 1995-96 1994-95 1993-94 1992-93 | Walter Heller Award for Outstanding Teaching of Economic Principles, Department of Economics, University of Minnesota |
| 1991-92 | Distinguished Teaching Assistant, Department of Economics, University of Minnesota |
| 1991 | Phi Beta Kappa, University of Florida |

## Referee and Review Experience

_IEEE Transactions on Power Systems_

_Ecological Economics_

_Environmental Science and Technology_

_Determining the Economic Value of Coastal Preservation and Restoration on Critical Energy Infrastructure,_ prepared for The Economic and Market Impacts of Coastal Restoration: America's Wetland Economic Forum II, September 28, 2006 Washington, DC

_National Research Council of the National Academy of Sciences_ report entitled "Changes in New Source Review Programs for Stationary Sources of Air Pollutants", February 2006

_California Energy Commission (CEC) Energy Innovations Small Grant (EISG) Program_

_Energy Journal_

_Journal of Environmental Economics and Management_

_IEEE PES Letters_

_IASTED International Journal of Power and Energy Systems_

_The Next Generation of Unit Commitment Models_ B. Hobbs, M. Rothkopf, R. O'Neill, and H.P. Chao editors 2001.

JA0835

Document Accession #: 20210324-5235          Filed Date: 03/24/2021

## Professional Affiliations

American Economic Association
International Association for Energy Economics
Association of Environmental and Resource Economists
IEEE Power and Energy Society

## EXPERT TESTIMONY

*PJM Interconnection, L.L.C.* **FERC Docket No. ER09-1063-004, Affidavit in Support of PJM's Compliance Filing with Order No. 719 and Order on Compliance Filing** *PJM Interconnection, L.L.C.*, **129 FERC ¶ 61,250 (2009). June 18, 2010**
In support of its compliance filing to establish a mechanism that ensures appropriate pricing during periods of operating reserve shortages, as required by the Commission's Order No. 719, I provided the following: 1) A high-level overview of PJM's markets, planning, and operations, including a description of what is meant by an operating reserve shortage, and how such shortages arise; 2) An overview of PJM reserve requirements, current reserve market structure, and data on PJM's prices and operations at times when the grid it manages has experienced operating reserve shortages; 3) A showing why PJM's then current scarcity pricing did not satisfy the Commission's Order No. 719 criteria for operating reserve shortage pricing mechanisms; 4) Description of the main elements of PJM's proposal to comply with Order No. 719's shortage pricing policy, and how PJM's proposal satisfies the six criteria for reserve shortage pricing set by Order No. 719.

*PJM Interconnection, L.L.C.* **FERC Docket No. ER09-1063-004, Affidavit in Support of Answer to Comments and Motion for Leave to Answer to Protests, August 23, 2010.** The purpose of this affidavit is to provide the following regarding PJM's proposed shortage pricing mechanism: 1) The complementary relationship between capacity adequacy in the Reliability Pricing Model ("RPM") and shortage pricing; 2) Additional evidence showing why PJM' shortage pricing proposal leads to energy prices that reflect the cost and/or value of energy, allocates energy to those who value it most, enhance operational reliability, and leads to efficient market outcomes while the alternate proposal from the Independent Market Monitor (IMM) fails to achieve any of these goals; 3) An explanation of how the proposed mechanism is consistent with shortage pricing mechanisms in the New York Independent System Operator ("NYISO") and ISO New England ("ISO-NE") that the Commission has already approved as Order 719 compliant.

*PJM Interconnection, L.L.C.* **FERC Docket No. ER12-513, Affidavit in Support of Filing to Update its RPM Auction Parameters (aka Triennial Review) December 1, 2011.** This affidavit was submitted in support of three aspects of PJM's proposed changes related to PJM's capacity market, known as the Reliability Pricing Model ("RPM") including: 1) The continued use of a nominal levelized approach to calculating the estimated Cost of New Entry ("CONE") that is used in RPM's Variable Resource Requirement ("VRR") Curve; 2) retention of a combustion turbine ("CT") as the Reference Resource.

*PJM Interconnection, L.L.C.* **FERC Docket No. ER-14-2490, Affidavit in Support of Filing to Update its RPM Auction Parameters (aka Quadrennial Review) September 25, 2014** This affidavit was submitted in support of five aspects of PJM's proposed changes related to PJM's capacity market, known as the Reliability Pricing Model ("RPM"): 1) adoption of The Brattle Group's ("Brattle") recommended VRR Curve shape right shifted by 1% of the Installed Reserve Margin ("IRM"); 2) continued use of a nominal levelized approach to calculating the estimated Cost of New Entry ("CONE") that is used in RPM's Variable Resource Requirement ("VRR") Curve; 3) retention of a combustion turbine ("CT") as the Reference Resource; 4) use of a composite of Bureau of Labor Statistics ("BLS") indices to adjust Gross CONE estimates in between periodic VRR parameter reviews; and 5) adoption of the labor estimates provided by the PJM Independent Market Monitor ("IMM") to determine Gross CONE values.

*Grid Reliability and Resilience Pricing* **FERC Docket No. RM18-1, Affidavit in Support of the Electric Power Supply Association (EPSA), October 23, 2017**. This affidavit provides evidence the Department of Energy Notice of Proposed Rulemaking ("NOPR" or "Proposal") released on September 28, 20171 and appearing in the Federal Register on October 2, 2017 does nothing to enhance reliability or "resiliency" of the bulk power system and will only succeed in distorting wholesale power markets while also raising costs. Consequently, my affidavit supports EPSA's contention the NOPR should be rejected outright by the Commission.

*ISO New England Inc. and New England Power Pool Participants Committee*, **FERC Docket No. ER18-620-000, Affidavit in Support of the Protest of the New England Power Generators Association, Inc. January 29, 2018.** In summary, my affidavit explains that the proposed updated DDBT from $5.50/kW-month to $4.30/kW-month: 1) Relies on a flawed and logically inconsistent methodology that differs from the DDBT methodology approved by the Commission three years ago; 2) Sets a dangerous precedent in ISO-NE taking a position on the direction of its Forward Capacity Market ("FCM") in terms of supply-demand balance and expected market prices that could anchor expectation of market participants. The anchoring of such expectations can change FCA bidding and operational behavior that could harm reliability; 3) The previous methodology approved by the Commission of using Static De-List Bids from oil steam and oil combustion turbine generators remains the appropriate methodology for determining the DDBT; and 4) The cost-based DDBT is likely higher than for FCAs 10-12 given that net going forward costs for oil steam and oil combustion turbine units has likely increased given their age, and other risks and opportunity costs that may be coming into play. My affidavit concludes that the current DDBT should be retained until such time as a new DDBT threshold and be determined using the current Commission-approved methodology following the discovery of the actual costs and risks faced by oil units.

**Petition for Determination of Need for Seminole Combined Cycle Facility in Docket No. 20170266-EC and Joint Petition for Determination of Need for Shady Hills Generating Facility in Docket No. 20170267-EC, January 29, 2018. Testimony and Exhibits on Behalf of Quantum Pasco Power, LP, Michael Tulk, and Patrick Daly.** My testimony supports the notion that there is no need for either combined cycle facility as Seminole Electric has consistently over-forecast its load growth since the "great recession" and that once correcting for these large errors, there is no need to build two new combined cycle facilities when there where other lower cost merchant generator facilities that offered their capacity to Seminole.

*PJM Interconnection, L.L.C.* **FERC Docket No. E18-34, Affidavit in Support of EPSA's Filing and Comments in PJM's Fast Start Pricing Proposal, March 14, 2018** My affidavit in this proceeding provides support for PJM's desire to allow resources with up to two-hour start up times to be considered "fast start" resources and to set price in accordance with the fast start pricing principles the Commission has enumerated in its Fast Start Pricing NOPR. I explain PJM's use of IT SCED and request to allow two-hour start time resources to set prices as fast start resources is entirely consistent with the ideas the Commission has enumerated with respect to fast start pricing.

*PJM Interconnection, L.L.C. Capacity Repricing or in the Alternative MOPR-Ex Proposal: Tariff Revisions to Address Impacts of State Public Policies on the PJM Capacity Market*, **FERC Docket No. ER18-1314-000, Affidavit is Support of Comments of American Petroleum Institute, JPower USA Development, Ltd., and Panda Power generation Infrastructure Fund, LLC May 7, 2018.** My affidavit provides evidence that 1) The PJM Capacity Repricing Proposal is not just and reasonable and is unduly discriminatory and results in an inefficient commitment of resources; 2) The alternative proposal from PJM, MOPR-Ex, is just and reasonable and results in the most efficient and cost-effective se of resource commitments; and 3) The current and previous iterations of the MOPR are not just and reasonable and are unduly discriminatory because they do not apply to existing resources and they only apply to gas-fired resources. Furthermore, my affidavit provides evidence that MOPR has always been viewed as a market power mitigation mechanism that was originally intended to thwart or mitigate the exercise of buyer-side market power. I show in this affidavit that MOPR, and in particular MOPR-Ex, still is a powerful market power mitigation tool that mitigates exercise of supplier market power that are facilitated by the current round of state subsidies to generation. Moreover, I show that Capacity Repricing helps facilitate the exercise of supplier market power through three different means.

***Grid Resilience in Regional Transmission Organizations and Independent System Operators,*** **FERC Docket No. AD18-7-000, Affidavit is Support of Comments of the American Petroleum Institute, May 9, 2018.** This affidavit focuses of the comments submitted by PJM and: 1) Supports the idea that in the context bulk power system markets and operation resilience and reliability are indistinguishable and that markets and well-designed incentives are the best avenue to achieve a resilient and reliable bulk power system; 2) Explains why market mechanisms rather than suspension of market and command and control regimes are better at achieving resiliency/reliability even during emergency conditions and that PJM has not made a case for given the authority to suspend markets; 3) That PJM has not made the case that price formation through integer relaxation is linked to resilience/reliability while other price formations that are crucial to reliability/resilience such as shortage pricing and fast start pricing are being considered concurrently; and 4) So-called "fuel security" is only a minimal contributor to resilience/reliability while transmission and distribution assets are the leading causes for shedding firm load and gas-fired units have been shown to not even being the leading category of generation outages. With respect to generator reliability/resilience, simply providing additional compensation (or minimize penalties) to generators in wholesale markets, without any ties to generator performance, does nothing to enhance reliability/resilience of generators to withstand or minimize the impact of adverse events on the bulk power system. Experience in PJM prior to, and following the discussion and implementation of capacity performance has shown this to be the case as generator performance has improved even in the face of lower energy market prices.

***New England Power Generators Association, Complainant v. ISO New England Inc., Respondent.*** **FERC Docket No. Docket No. EL18-154-000, Affidavit in Support of Complaint and Request for Expedited Consideration of the New England Power Generators Association, Inc. May 24, 2018** This affidavit in support of NEPGA's complaint shows the impact of treating Mystic Units 8 and 9 as a price taker on the ISO-NE markets as well as NEPGA's proposed alternative to accommodating the participation of the Mystic units. Discussions include: 1) treating Mystic and other resources retained for fuel security as price takers will do significant harm to the competitiveness of the FCM market and is inconsistent with the first principles of capacity markets articulated by the Commission; 2) the proposal to insert an above market cost resource into the FCM as a price taker does exactly the same harm as an exercise of buyer-side market power, which he Commission has found to be unjust, unreasonable, and unduly discriminatory; and 3) the proposed remedy offered by NEPGA does not distort the results of the Forward Capacity Auction, results in competitive pricing outcomes in FCA, does not displace otherwise economic resources, and provides better reliability outcomes for ISO-NE load than the current ISO-NE proposal.

***New England Power Generators Association, Complainant v. ISO New England Inc., Respondent.*** **FERC Docket No. Docket No. EL18-154-000, Affidavit in Support of the Motion for Leave and Answer of the New England Power Generators Association, Inc. June 19, 2018.** This affidavit in support of NEPGA's answer refutes the answer of ISO-NE and protesters and responds that nothing in ISO-NE's answer to the Complaint or the protests to the Complaint provides a basis for ignoring that treating the Mystic Units as price takers would suppress prices below competitive levels and inefficiently displace otherwise economic resources in a manner that is observationally equivalent to the harm done by an exercise of buyer-side market power.

***Panda Stonewall, LLC.*** **FERC Docket No. ER17-1821-002, Testimony is Support of Panda Stonewall, LLC Reactive Power Filing, July 2, 2018.** This testimony supports Panda Stonewall's reactive power rate case that has gone to hearing and in particular supports the inclusion of firm gas pipeline transportation, the use of proxy cost of capital values from the PJM CONE study, and supports the inclusion of cost administrative and overhead costs consistent with fixed, going forward costs incurred by Panda Stonewall to remain in commercial operation. Furthermore, the testimony puts the costs of reactive power into the context of the wider PJM market and other opportunities for compensation and well as providing historical context around the Commission-approved AEP Methodology for reactive power rates.

***ISO New England Inc.*** **FERC Docket No. ER18-2364-000, Affidavit in Support of the Protest of the New England Power Generators Association, Inc. September 21, 2018.** This testimony supports NEPGAs protest that the proposed ISO-NE treatment of resources held for winter fuel security as price takers in the FCA makes no sense since winter fuel security is not associated with overall resource adequacy which is based on the summer peak. Moreover, the testimony shows clearly the artificial price suppression that would occur based on ISO-NE proposed treatment of resources held for winter fuel security in the FCA.

*Calpine Corporation v. PJM Interconnection, L.L.C. Docket No, EL16-49; PJM Interconnection L.L.C. Docket No. ER18-1314-000, ER18-1314-001, EL18-178* **Affidavit in Support of the Electric Power Supply Association, October 2, 2018.** This testimony refutes the idea that the Commission proposed remedy a resource specific FRR Alternative equally removes both demand and supply from the market and therefore does no harm. Such a mechanism is the equivalent of an exercise of buyer side market power, artificially reduces price below competitive levels, inefficiently displaces lower cost, economic resources with higher cost resources, shifts cost and benefits between market participants, and reduces overall market efficiency. Additionally, PJM market simulations for scenarios from the 2020/2021 auction show the kind of damage that can be done to the market through the proposed remedy or equivalently buyer sider market power by showing prospective price decreases and generation displacement, and the level of subsidy that could be used to facilitate a successful exercise of buyer-side market power.

*Panda Stonewall, LLC.* **FERC Docket No. ER17-1821-002, Rebuttal Testimony is Support of Panda Stonewall, LLC Reactive Power Filing, October 12, 2018.** This rebuttal testimony supports Panda Stonewall's reactive power rate case responding to interveners and FERC staff and in particular supports the inclusion of firm gas pipeline transportation, the use of proxy cost of capital values from the PJM CONE study, and supports the inclusion of other administrative and overhead costs consistent with fixed, going forward costs incurred by Panda Stonewall to remain in commercial operation. Furthermore, the testimony puts the costs of reactive power into the context of the wider PJM market and other opportunities for compensation and well as providing historical context around the Commission-approved AEP Methodology for reactive power rates.

*In the Matter of the Implementation of L. 2018, c. 16 Regarding the Establishment of a Zero Emission Certificate Program for Eligible Nuclear Power Plants, New Jersey Board of Public Utilities,* **BPU Docket No. EO 18080899, Testimony in Support of PJM Power Providers, October 22, 2018.** This testimony responds to questions posed by the BPU in this docket and provides analysis showing that the nuclear units in New Jersey seeking ZECs are not in need of them to remain in commercial operation. The testimony shows that these resources, given know forward prices for energy and capacity prices are able to cover their going forward costs in the absence of subsidies in the form of ZECs and will remain in commercial operation in spite of warnings these resources will retire in the absence of ZEC payments.

*Calpine Corporation v. PJM Interconnection, L.L.C. Docket No, EL16-49; PJM Interconnection L.L.C. Docket No. ER18-1314-000, ER18-1314-001, EL18-178* **Affidavit in Support of the Electric Power Supply Association, November 6, 2018.** This testimony responds to the Illinois Commerce Commission's protest that suggests the RPM Capacity Market be eliminated and replaced by an energy-only market construct because the capacity market is not a market at all. It also responds to the notion that markets should account directly for environmental policy and because they do not, the Illinois zero emission credit program for nuclear resources is justified. The testimony refutes these ideas by describing in detail that all markets have administrative rules and that markets can account for environmental policies when properly formulated to put a price on emissions rather than subsidizing resources out-of-market. Moreover, this testimony provides evidence of the need for the RPM Capacity Market to maintain resource adequacy as an energy only construct would not result in sufficient resources covering going forward costs in the energy market alone.

*Alberta Utilities Commission, Consideration of ISO Rules to Implement and Operate the Capacity Market, Proceeding No. 23757,* **Evidence in Support of ENMAX Corporation, February 28, 2019.** This evidence outlines the elements of the Alberta Electric System Operator (AESO) proposed capacity market framework that require changes to make align the capacity market with fair, efficient, and openly competitive market principles. The evidence addresses the resource adequacy model, capacity value of resources, penalties and bonuses, market power mitigation, Net CONE determination, and interactions with the energy market framework. The evidence also provides a high-level overview of the objectives of a capacity market and how it should interact with the energy and retail markets in Alberta.

*In the Matter of the Implementation of L. 2018, c. 16 Regarding the Establishment of a Zero Emission Certificate Program for Eligible Nuclear Power Plants, New Jersey Board of Public Utilities,* **BPU Docket No. EO 18080899, Response to Staff Questions on Accounting for Risk in Support of PJM Power Providers, March 8, 2019.** This is a response to BPU staff questions regarding market risk. This response discusses the mitigation of overall market risk based on changing conditions, optimal energy market offers and mitigation of energy market operational risk, and optimal

offers and risk mitigation in the capacity market that are available to all generation resources including nuclear resources.

***In the Matter of the Implementation of L. 2018, c. 16 Regarding the Establishment of a Zero Emission Certificate Program for Eligible Nuclear Power Plants, New Jersey Board of Public Utilities,* BPU Docket No. EO 18080899, Reply Testimony in Support of PJM Power Providers, March 19, 2019.** This reply testimony responds to PSEG comments regarding the need for ZECs for New Jersey's nuclear units. This reply testimony updates the economic analysis showing New Jersey nuclear units are currently profitable and expected to remain profitable in the future. Furthermore, this reply points out that PSEG did not dispute the costs used in the initial analysis or the idea that new entry of combined cycle gas generation can reduce emissions at zero cost at the margin given these resources will enter the market absent subsidies. The reply argues, contrary to what is stated by PSEG, that the threat to retire is not credible given the statements and evidence provided by PSEG in its Securities and Exchange Commission (SEC) filings. This reply also provides evidence that it would be infeasible for PSEG to buy out of its capacity commitments in Incremental Auctions (IAs) given the supply and demand conditions present in IAs to date.

***Alberta Utilities Commission, Consideration of ISO Rules to Implement and Operate the Capacity Market, Proceeding No. 23757,* Reply Evidence in Support of ENMAX Corporation, April 4, 2019.** This evidence replies to the comments of other interveners regarding various elements of the Alberta Electric System Operator (AESO) proposed capacity market framework. The reply evidence responds to intervener comments on elements of the Net CONE determination, capacity and energy market power mitigation, the capacity value of resources inconsistencies between the resource adequacy model and offered supply, and penalties and bonuses.

**Colorado Public Utilities Commission in the Matter of the Commission's Implementation of §§ 40-2.3-101 and 102, C.R.S. The Colorado Transmission Coordination Act, PROCEEDING NO. 19M-0495E, in Support of the Intermountain Rural Electric Association, November 15, 2019.** This evidence provides the Colorado Commission with an overview of the benefits of RTO markets for electric cooperatives.

***American Transmission Systems Incorporated, Docket No. ER20-1740* Affidavit is Support of Buckeye Power Inc. Counter the Capacity Market Benefits of ATSI Moving from MISO to PJM and Recovery of Transition Costs, May 29, 2020.** This affidavit provides empirical evidence and theoretical support that load connected to the ATSI transmission system paid more in capacity costs in PJM than they would have paid had ATSI stayed in MISO to counter ATSI's argument that ATSI connected load would have paid more for capacity had ATSI remained in MISO.

***Alberta Utilities Commission ("AUC") Distribution System Inquiry Proceeding 24116*, Response from Kalina to AUC Information Request Round 2, Jointly with Regulatory Law Chambers, Terradigm Energy, Inc, and Nican International Consulting, Ltd on Behalf of Kalina Distributed Power, June 17, 2020.** This response to information requests provides support for an optimal distribution tariff design that rewards resources that reduce the need for additional upgrades and reduce line losses and send price signals regarding the optimal location on the distribution system. This response also argues against tariff policies that would inefficiently charge such resources for costs they do not cause to either the distribution system or the transmission system and argues that efficient pricing is consistent with the competitive objectives of the Alberta energy market.

***Investigation into Resource Adequacy Alternative, New Jersey Board of Public Utilities,* BPU Docket No. EO 20030203, Prepared Comments in Support of PJM Power Providers, June 24, 2020.** These prepared comments address the benefits of Reliability Pricing Model (RPM) Participation for New Jersey customers and the additional costs of moving to a Fixed Resource Requirement (FRR) Plan as proposed by PSEG and Exelon in earlier comments. These comments note the extra costs could be over $700 million per year for New Jersey customers and would facilitate the exercise of market power by a small set of generation owners.

***American Transmission Systems Incorporated, Docket No. ER20-1740* Reply Affidavit is Support of Buckeye Power Inc. Counter the Capacity Market Benefits of ATSI Moving from MISO to PJM and Recovery of Transition Costs, June 25, 2020**. This reply affidavit supports the previously supplied empirical evidence and theoretical support that load connected to the ATSI transmission system paid more in capacity costs in PJM than they would have paid had ATSI

IAQ840

stayed in MISO to counter ATSI's argument that ATSI connected load would have paid more for capacity had ATSI remained in MISO. Additionally, the reply affidavit responds to ATSI critiques of the original affidavit and the ATSI responses to answers.

***Alberta Utilities Commission ("AUC") Distribution System Inquiry Proceeding 24116***, **Concluding Remarks of Kalina Distributed Power, Jointly with Regulatory Law Chambers, Terradigm Energy, Inc, and Nican International Consulting, Ltd on Behalf of Kalina Distributed Power, July 15, 2020.** These concluding remarks reiterates support for an optimal distribution tariff design that rewards resources that reduce the need for additional upgrades and reduce line losses and send price signals regarding the optimal location on the distribution system. These concluding remarks provide established economic theory to explain why the current policies that inefficiently charge such resources for costs they do not cause are not in the best interests of Alberta's energy market or Alberta energy customers.

***Investigation into Resource Adequacy Alternative, New Jersey Board of Public Utilities,*** **BPU Docket No. EO 20030203, "Prospective Minimum Offer Price Rule Price Floors and Cost-Effectiveness of the PSEG/Exelon Fixed Resource Requirement Plan for New Jersey" in Support of PJM Power Providers, July 22, 2020.** This whitepaper responds to the PSEG and Exelon comments submitted on June 24, 2020 and responds to the report of the PSEG/Exelon Consultant assertions about the alleged cost savings of moving to a Fixed Resource Requirement (FRR) Plan as proposed by PSEG and Exelon in earlier comments. This paper also discusses the Minimum Offer Price Floor levels for various clean energy resources to show they would largely not be excluded from the RPM capacity market and would likely clear the market given historic capacity prices.

***PJM Interconnection, L.L.C. FERC Docket No. EL19-58-003 "Forward Looking Energy and Ancillary Service Offset,"*** **Affidavit in Support of Comments of the Electric Power Supply Association, September 2, 2020.** This affidavit supports and explains PJM's forward looking energy and ancillary service offset filing in the context of Commission approved  methods that use the same framework as the energy and environmentally limited opportunity costs which uses forward looking fuel and power prices in much the same way as the PJM proposal. The Affidavit also calls for further analysis of the forward-looking methodology once there is some realizations of actual power and gas prices compared to the forward prices used in the methodology.

## POLICY WHITEPAPERS and Reports

**NYISO Meter Data Study-Final Report,** December 8, 2017. Available at [https://www.nyiso.com/documents/20142/1391862/NYISO-Meter-Data-Study-Report.pdf/db0de386-04b1-8818-3f77-194bc71a8c37](https://www.nyiso.com/documents/20142/1391862/NYISO-Meter-Data-Study-Report.pdf/db0de386-04b1-8818-3f77-194bc71a8c37). This report examines the meter data policies in the NYISO in comparison to similar polices in PJM, CAISO, and ISO-NE and the role of entities providing meter services for DER as may be required into the future. This report address and provides recommendations on 1) Baselines for DER as required and modification to existing baselines if needed; 2) Potential for the statistical sampling of a subset of DERs for establishing baselines and for market settlement in the energy, capacity and ancillary services markets; 3) Interactions of baselines and DER aggregation; and 4) Simultaneous participation in both retail and wholesale markets by DERs.

**The Market and Financial Position of Nuclear Resources in Pennsylvania,** April 5, 2019. Available at [https://citizens-against-nuclear-bailouts.prezly.com/new-report-highlights-long-term-profit-projections-for-pennsylvania-nuclear-generators](https://citizens-against-nuclear-bailouts.prezly.com/new-report-highlights-long-term-profit-projections-for-pennsylvania-nuclear-generators) and [https://cdn.uc.assets.prezly.com/210b1e76-c577-4ffb-9bb9-c60c1f4299b8/-/inline/no/](https://cdn.uc.assets.prezly.com/210b1e76-c577-4ffb-9bb9-c60c1f4299b8/-/inline/no/)
This paper shows that nuclear resources in Pennsylvania are profitable historically and going forward and are in no need of any kind of subsides to keep these resources in service.

**The Market and Financial Position of Nuclear Resources in Ohio,** May 13, 2019. Available at [https://img1.wsimg.com/blobby/go/30b6d3a5-dffd-4a1b-9b4d-0bf3451282cd/downloads/OH%20Nuclear%20Analysis%2020190513-final.pdf?ver=1559092681975](https://img1.wsimg.com/blobby/go/30b6d3a5-dffd-4a1b-9b4d-0bf3451282cd/downloads/OH%20Nuclear%20Analysis%2020190513-final.pdf?ver=1559092681975)
This paper shows that nuclear resources in Ohio, Davis-Besse and Perry, are profitable historically and going forward and are in no need of any kind of subsides to keep these resources in service as had been proposed under House Bill 6.

**Economic Benefits to Ohio Electricity Consumers from the Repeal of House Bill 6,** September 16, 2020. This paper shows that the Repeal of HB 6 in Ohio would lead to lower electricity bills for Ohio consumers with saving coming from keeping energy effic8ieny and demand response programs, and the repeal of subsidies for legacy coal units and the Davis-Besse and Perry nuclear units.

JA0842

Document Content(s)

2021-03-24_SEEM Errata_FINAL.PDF..........................................1

JA0843

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **Alabama Power Company** | ) | **Docket No. ER21-1111-000** |
| **Dominion Energy South Carolina, Inc.** | ) | **Docket No. ER21-1112-000** |
| **Louisville Gas and Electric Company** | ) | **Docket No. ER21-1114-000** |
| **Duke Energy Progress, LLC** | ) | **Docket No. ER21-1115-000** |
| **Duke Energy Carolinas, LLC** | ) | |
| **Duke Energy Carolinas, LLC** | ) | **Docket No. ER21-1116-000** |
| **Duke Energy Progress, LLC** | ) | **Docket No. ER21-1117-000** |
| **Louisville Gas and Electric Company** | ) | **Docket No. ER21-1118-000** |
| **Georgia Power Company** | ) | **Docket No. ER21-1119-000** |
| **Kentucky Utilities Company** | ) | **Docket No. ER21-1120-000** |
| **Mississippi Power Company** | ) | **Docket No. ER21-1121-000** |
| **Alabama Power Company** | ) | **Docket No. ER21-1125-000** |
| **Dominion Energy South Carolina, Inc.** | ) | **Docket No. ER21-1128-000** |
| | ) | **(Not Consolidated)** |

---

## MOTION FOR LEAVE TO ANSWER AND ANSWER OF THE SOUTHEAST EEM MEMBERS

---

Noel Symons
Julia Dryden English
Katlyn A. Farrell
Carrie A. Mobley
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC  20006
(202) 857-2929
nsymons@mcguirewoods.com
jenglish@mcguirewoods.com
kfarrell@mcguirewoods.com
cmobley@mcguirewoods.com

*Counsel for the Members of the
Southeast Energy Exchange Market*

March 30, 2021

JA0844

# TABLE OF CONTENTS

Page

I.     Motion for Leave to Answer ...................................................................................2

II.    Executive Summary ................................................................................................3

III.   Some intervenors improperly seek to expand the scope of the proceeding beyond
       consideration of whether the actual Southeast EEM proposal is just, reasonable
       and not unduly discriminatory. ..............................................................................7

       A.    The Southeast EEM is not a loose power pool, and in any event
             transmission will be provided on a non-discriminatory basis.................................8

       B.    This is not the proceeding for considering whether some other form of
             market should be implemented in the Southeast......................................................14

             1.    Under Section 205, the Southeast EEM proposal cannot be denied
                   or modified merely because some would prefer an alternative
                   approach. ..................................................................................... 14

             2.    The Southeast EEM is not subject to RTO rules. ..................................... 16

             3.    Intervenors' arguments in favor of alternative approaches are not
                   persuasive and provide no basis for the Commission to deny the
                   Southeast EEM Filings. ............................................................... 17

             4.    Approval of the Southeast EEM does not preclude future market
                   development........................................................................... 19

       C.    Arguments regarding the functioning of the current Southeast market are
             incorrect. ................................................................................20

IV.    Arguments that address issues within the scope of the Southeast EEM Filings do
       not justify rejection of the proposal. ........................................................22

       A.    The Southeast EEM will produce net benefits..........................................22

       B.    Requests for market monitors and market power studies are not premised
             on the facts pertinent to this market and should be rejected. ..........................29

       C.    It is appropriate for the LSEs that fund the Southeast EEM to govern it,
             subject as needed to Commission oversight.  .........................................37

       D.    The proposed governance structure is sufficiently transparent, but the
             Members will adopt some intervenor suggestions......................................41

       E.    The minor requirements of and limitations on participation in the
             Southeast EEM are not unduly discriminatory and are necessary from an
             operational perspective. .............................................................41

       F.    Intervenors generally support the proposed $0 rate for NFEETS, and
             minimal concerns about losses and imbalance charges appear to be based
             on misconceptions.....................................................................45

       G.    The proposal includes the appropriate level of market data transparency............48

JA0845

H.    The Market Rules include the terms and conditions necessary to determine how the Algorithm should function – nothing further is necessary in the filed rate. ............................................................................................48

I.    No intervenor raised any real reliability concerns. ................................................51

V.    Requests for further process should be rejected. ................................................................54

A.    Consolidation is unnecessary. ................................................................................54

B.    There is no need for a technical conference in this proceeding. ...........................55

C.    The Southeast EEM Members provided sufficient evidence in the record for the Commission to accept the proposal without a deficiency letter, and intervenors raise no real factual issues. ................................................................58

VI.    Conclusion ............................................................................................................................58

JA0846

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **Alabama Power Company** | ) | **Docket No. ER21-1111-000** |
| **Dominion Energy South Carolina, Inc.** | ) | **Docket No. ER21-1112-000** |
| **Louisville Gas and Electric Company** | ) | **Docket No. ER21-1114-000** |
| **Duke Energy Progress, LLC** | ) | **Docket No. ER21-1115-000** |
| **Duke Energy Carolinas, LLC** | ) | |
| **Duke Energy Carolinas, LLC** | ) | **Docket No. ER21-1116-000** |
| **Duke Energy Progress, LLC** | ) | **Docket No. ER21-1117-000** |
| **Louisville Gas and Electric Company** | ) | **Docket No. ER21-1118-000** |
| **Georgia Power Company** | ) | **Docket No. ER21-1119-000** |
| **Kentucky Utilities Company** | ) | **Docket No. ER21-1120-000** |
| **Mississippi Power Company** | ) | **Docket No. ER21-1121-000** |
| **Alabama Power Company** | ) | **Docket No. ER21-1125-000** |
| **Dominion Energy South Carolina, Inc.** | ) | **Docket No. ER21-1128-000** |
| | ) | **(Not Consolidated)** |

## MOTION FOR LEAVE TO ANSWER AND ANSWER OF THE
## SOUTHEAST EEM MEMBERS

Pursuant to Rules 212 and 213 of the Rules of Practice and Procedure of the Federal

Energy Regulatory Commission ("Commission" or "FERC"), the Southeast EEM Members[1]

hereby move for leave to answer and answer ("Answer") the March 15, 2021 comments to the

---

[1]     For purposes of this Filing, the Southeast EEM Members are: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion Energy SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP"") (together with DEC, "Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, "LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); PowerSouth Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA") (each a "Member" and collectively, the "Members"). In addition, the following entities have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members: Georgia System Operations Corporation ("GSOC"); Georgia Transmission Corporation ("GTC"); Municipal Electric Authority of Georgia ("MEAG Power"); Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and South Carolina Public Service Authority ("Santee Cooper").

JA0847

Southeast EEM Members' February 12, 2021 filings to implement the Southeast Energy

Exchange Market ("Southeast EEM").[2]  The Southeast EEM Agreement Filings requested the

Commission accept the Southeast EEM Agreement, without modification, to become effective

on May 13, 2021, and to accept related changes to the Commission-jurisdictional Members'

open access transmission tariffs ("OATT").

　　The protests and comments filed largely are not about the actual rate proposed in this

proceeding, and none identify any flaws that would require rejection, modification, or further

process.  Accordingly, the Southeast EEM proposal should be accepted without further process.

## I.      Motion for Leave to Answer

　　Rule 213(a)(2) of the Commission's regulations prohibits answers to answers unless

otherwise ordered by the decisional authority.[3]  The Southeast EEM Members respectfully move

to answer the comments and protests filed by the intervenors in the above-captioned dockets.[4]

---

[2]      The Southeast EEM Members made twelve separate filings: the Southeast EEM Agreement Filing (Docket No. ER21-1111-000); certificate of concurrence filings for Georgia Power (Docket No. ER21-1119-000), Mississippi Power (Docket No. ER21-1121-000), Dominion Energy SC (Docket No. ER21-1112-000), DEC (Docket No. ER21-1116-000), DEP (Docket No. ER21-1117-000), KU (Docket No. ER21-1120-000), and LG&E (Docket No. ER21-1114-000) (the "Concurrence Filings"); and open access transmission revision filings for Southern Companies (Docket No. ER21-1125-000), Dominion Energy SC (Docket No. ER21-1128-000), DEC (Docket No. ER21-1115-000), and LG&E (Docket No. ER21-1118-000) (the "OATT Filings") (collectively, "Southeast EEM Filings").  Capitalized words used in this Answer that are not otherwise defined have the meaning ascribed to them in the Southeast EEM Filings.

[3]      18 C.F.R. § 385.213(a)(2) (2020).

[4]      Specifically, the Southeast EEM Members are responding to the following intervenors:  Public Citizen, Inc. ("Public Citizen Protest"); Entergy Operating Companies ("Entergy Protest"); Carolina Clean Energy Business Association ("CCEBA Comments"); Advanced Energy Economy, Advanced Energy Buyers Group, and Renewable Energy Buyers' Alliance (together the "CEC") ("CEC Comments"); American Forest and Paper Association ("AFPA Comments"); Voltus, Inc. ("Voltus Protest"); Environmental Defense Fund ("EDF Comments"); Southern Renewable Energy Association ("SREA Comments"); the Georgia Association of Manufacturers ("GAM Comments"); Pine Gate Renewables, LLC ("Pine Gate Comments"); R Street Institute ("R Street Institute Comments"); PJM Interconnection, L.L.C. ("PJM Comments"); Tennessee Valley Public Power Association, Inc. ("TVPPA Intervention"); Senator Tom Davis; Representative Nathan Ballentine; Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface

2

JA0848

Good cause exists to grant this motion because this answer clarifies issues in dispute, corrects

incorrect or misleading statements, and otherwise provides information to assist the Commission

in its decision-making process.[5]

## II.    Executive Summary

The sole purpose of these Section 205 proceedings is to determine whether the Southeast

EEM Filings propose rates that are just, reasonable and not unduly discriminatory.  However,

various intervenors either request that the Commission consider their preference for an

alternative approach, such as a Regional Transmission Organization ("RTO") or Energy

Imbalance Market ("EIM"), or mischaracterize the nature the Southeast EEM, confusing it for a

loose power pool.

The Southeast EEM proposal offers two small but significant enhancements to the

existing bilateral market in the Southeast, without changing the fundamental nature of the

existing market.  Indeed, the Southeast EEM will enhance, not replace, the existing bilateral

market by providing an opportunity to leverage automation and zero-cost transmission,

facilitating beneficial non-firm, sub-hourly bilateral transactions.  Consistent with the purpose of

---

Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council (together, the "PIOs") ("PIOs Protest"); and Midcontinent Independent System Operator, Inc. ("MISO Comments").

[5]      *See, e.g.*, *Ne. Utils. Servs. Co. v. NRG Energy, Inc.*, 101 FERC ¶ 61,327 at P 17 (2002) (accepting an answer clarifying the issues); *Potomac-Appalachian Transmission Highline, LLC*, 140 FERC ¶ 61,229 at P 102 (2012) (accepting an answer that "corrected the record" and informed the Commission's decision-making); *Sw. Power Pool, Inc.*, 172 FERC ¶ 61,179 at P 22 (2020) (accepting an answer that aided in decision-making); *Pac. Gas & Elec. Co.*, 172 FERC ¶ 61,171 at P 27 (2020) (same); *Midcontinent Indep. Sys. Operator, Inc.*, 172 FERC ¶ 61,169 at P 52 (2020) (same).

JA0849

the Southeast EEM, most regional transactions will still be conducted through existing bilateral market mechanisms that will not be impacted by the Southeast EEM proposal.[6]

Looking only to some of the protests as guideposts, one might think the Southeast EEM Members had filed a very different proposal.  The lengthiest protests in particular attempt to shoehorn arguments and issues into this proceeding that are irrelevant to the Southeast EEM Filings.  At their core, these filings request a more fundamental reshaping of the Southeast market, *e.g.*, creation of an RTO, as an alternative to the Southeast EEM proposed in this proceeding.[7]  To that end, these intervenors urge the Commission to either reject the actual filing before it or apply concepts that are only relevant to those other frameworks.  Such arguments are little more than a collateral attack on the existing Southeast bilateral wholesale markets and their underlying retail regulatory framework.

In addition to perpetuating a logical fallacy, these arguments are also outside the scope of these proceedings.  The Southeast EEM Members filed their proposal under Federal Power Act ("FPA") Section 205, which means this proceeding is about the proposal before the Commission, not alternatives proffered by intervenors.  More specifically, debates about whether an RTO, EIM, or other major changes to the utility industry should or could be imposed on the jurisdictional entities in the Southeast[8] are beyond the scope of this Section 205 proceeding because:  1) the Southeast EEM Filings do not seek approval of the current market structure in

---

[6]     Southeast EEM Agreement Filing, Overview Aff. at P 6.

[7]     *See* Section III below.

[8]     As discussed in Section V.B below, the Southeast is a honeycomb of jurisdictional and non-jurisdictional providers, such that any effort that does not cooperatively include non-jurisdictional entities would lead to a far less cohesive footprint than the Southeast EEM proposal.  Six of the current fourteen Southeast EEM Members are non-jurisdictional, as are the five additional entities that are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members.

JA0850

the Southeast, and 2) in any event, it is black letter law that the Commission must evaluate the

proposal before it, without considering the merits of other proposals.[9]

Looking at the full set of pleadings submitted in response to the Southeast EEM proposal,

several themes emerge:

> Perhaps the most important thing shown (or more precisely, not shown) by the interventions is that no party identified any meaningful design flaw in the Southeast EEM proposal. While certain concerns regarding governance, transparency, and potential to exercise market power are within the scope of the proceeding, for the most part these concerns either misunderstand the proposal, or are unfounded as a matter of facts, law and public policy.

> Some intervenors try to advance policy agendas by calling for wholesale changes to aspects of the Southeast bilateral construct that are not at issue. These intervenors attempt to circumvent that scope problem by arguing that the Southeast EEM proposal is a loose power pool under Order No. 888. As previous Commission decisions make clear, that is incorrect. In any event, the Southeast EEM fully addresses the primary Order No. 888 issues associated with loose power pools by providing service to all customers within the Southeast EEM footprint (including independent power producers ("IPPs") and Members) on the same non-discriminatory terms and conditions.

> Many of the same intervenors also seek to impermissibly broaden the scope of the proceeding by asking the Commission to consider whether the existing Southeastern bilateral market should be replaced. Those requests are accompanied by requests for technical conferences to address that extraneous issue and deficiency letters. However, while these intervenors sometimes attempt to cast their requests in terms of the proposal before the Commission, none identify any real factual deficiencies in the support provided for the Southeast EEM Filings.

> Overall the Southeast EEM proposal was well received. Of the 67 pleadings[10] submitted in the case, over 80% supported the proposal in whole or substantial part, or did not

---

[9]     *See* Section III.B below.

[10]     Counting a document-less intervention and a substantive filing by the same intervenor or group of intervenors as one pleading.

JA0851

oppose it.[11]  Importantly, none of the public utility commissions from the states in which the Southeast EEM would operate objected, while six intervened.[12]

In sum, the proposal before the Commission in this proceeding is for two important, but narrow, additions to the existing bilateral market, as further discussed below.  Importantly, as expressly affirmed by many intervenors, this is a positive progression for the Southeast.[13]  This positive, pro-competitive change should be assessed on its own merits, as the law requires.  The requests for a deficiency letter or a technical conference in this docket should be rejected because the record in the case strongly supports approval of the actual proposal before the Commission.  The Southeast EEM proposal is just, reasonable, and not unduly discriminatory, and should be approved, without suspension, hearing or modification, effective May 13, 2021, as requested.

As to arguments for a technical conference to explore policy issues related to the general restructuring of the Southeast markets, the Southeast EEM Members take no position in the current case, but note that this proceeding is not the forum to debate the larger issues that have been raised.  These broad policy debates will implicate a wide range of complex and far-reaching issues, including but not limited to potential intrusions on State regulatory jurisdiction.

---

[11]     By the Southeast EEM Members' count, 10 intervenors (or groups of intervenors) oppose or seek major modifications to the Southeast EEM Filings, and 57 either support, do not oppose, or seek only minor modifications to the Southeast EEM Filings.

[12]     Specifically, the South Carolina Public Service Authority, North Carolina Public Utilities Commission, Mississippi Public Service Commission, Missouri Public Service Commission, Georgia Public Service Commission, and the Kentucky Public Service Commission intervened but did not oppose the filings.  Additionally, staff of the North Carolina Utilities Commission, Mississippi Public Utilities Staff, South Carolina Office of Regulatory Staff, and the North Carolina Department of Justice intervened, but did not oppose the filings.

[13]     *See* R Street Institute Comments at 3 ("R Street supports the initial step of the utilities included in this proposal. The Southeast has long been reluctant to embrace the potential benefits of Regional Transmission Organizations (RTOs), so this imbalance, bilateral market proposal can be seen as a step in the right direction."); SREA Comments at 2 ("[T]he Southeastern Energy Exchange Market (SEEM) is a step towards better market efficiency . . . ."); AFPA Comments at 6 ("AF&PA supports this step towards the use of a more economically efficient regional transmission system to facilitate short-term opportunity sales of energy."); EDF Comments at 4 ("[T]he Southeast EEM represents a step in the direction of a more coordinated and efficient electric system.").

6

Moreover, potentially interested parties and the public at large are not on notice that such broader issues could be considered in this proceeding. Further, there are additional issues regarding the extent to which a broad restructuring would be feasible given the many non-Commission-jurisdictional Southeast EEM Members. Finally, and perhaps most importantly, implementation of the instant proposal in no way will impede or restrict a broad market restructuring if the appropriate federal and state policy makers elect to go in that direction. Consequently, there is no reason to delay the real gains proposed here while such extraneous issues are considered.

III.     **Some intervenors improperly seek to expand the scope of the proceeding beyond consideration of whether the actual Southeast EEM proposal is just, reasonable and not unduly discriminatory.**

Most arguments against the implementation of the Southeast EEM misunderstand or mischaracterize the proposal before the Commission. The Southeast EEM is solely a mechanism to more efficiently trade *residual* energy using *residual* transmission for 15-minute intra-hour bilateral transactions. This is accomplished through two small but significant additions to the existing bilateral market: 1) unutilized Southeast EEM Participating Transmission Providers' transmission capacity will be made available on an intra-hour basis at no charge (other than financial losses) for 15-minute Southeast EEM Energy Exchanges under the Participating Transmission Providers' tariffs; and 2) the Southeast EEM will use a computer algorithm that considers load bids, generation offers, and constraints to match buyers and sellers in transactions, settled on a split-the-savings basis, that benefit both the buyer and the seller.[14]

All existing trading mechanisms will be preserved, and in addition, buyers and sellers will have a new, additional avenue to sell and purchase energy through the Southeast EEM. There will be no change to the way that entities in the region will maintain reliability and

---

[14]     Southeast EEM Agreement Filing, Transmittal Letter at 8-9.

7

JA0853

resource adequacy, or plan their systems, which will continue to be overseen under local (state and non-jurisdictional) authority.

In short, while the proposal represents a beneficial addition to the existing bilateral market in the Southeast, one of its key virtues is its simplicity. There are those who wish for a more aggressive change in the Southeast, such as formation of an RTO, a power pool, or some other form of organized market. But the Southeast EEM proposal is an exercise of the Section 205 filing rights of the jurisdictional Members. Efforts to make the Southeast EEM proposal something it is not, and judge it by standards applied to different sorts of arrangements, must be rejected.

A.     **The Southeast EEM is not a loose power pool, and in any event transmission will be provided on a non-discriminatory basis.**

The CEC and the PIOs argue that the Southeast EEM amounts to a loose power pool because Non-Firm Energy Exchange Transmission Service ("NFEETS") will be used to effectuate Energy Exchanges.[15] But these arguments mistake both the letter and the purpose of the power pool principles articulated in Order Nos. 888 and 888-A.[16] The Southeast EEM is not a loose power pool. And in any event, the Southeast EEM Agreement binds each signatory to implement the same non-discriminatory rules for zero-charge NFEETS for all transmission customers and thereby permits region-wide transactions on uniform, non-discriminatory terms

---

[15]     *See* CEC Comments at 9-15; PIOs Protest at 8-13.

[16]     *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) ("Order No. 888"), Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 ("Order No. 888-A"), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

JA0854

and conditions, and so addresses the undue discrimination concerns the Commission identified in Order Nos. 888 and 888-A[17] without requiring a separate OATT.

A loose power pool only exists if there is a multilateral arrangement discounting transmission; if a public utility "excise[d] all discounted and/or special arrangements transmission service from the pooling arrangement," then the arrangement "would cease to be a loose pool for purposes of Order No. 888."[18] Therefore, central to the question of whether Order No. 888 and 888-A principles apply to an arrangement is whether the arrangement contains a discounted transmission rate.

NFEETS is not discounted transmission, so the Southeast EEM is not a loose power pool. In similar circumstances in *Public Service Co. of Colorado*,[19] the Commission rejected arguments that the Public Service Company of Colorado ("PSCo") Joint Dispatch Agreement ("JDA") was a loose power pool, finding that the use of a zero-rate transmission product that relied on otherwise unused transmission capacity did not constitute a discount. The Commission stated that because the transmission service would otherwise go unused, there would be no opportunity costs associated with the transmission. The Commission also noted that the parties would not have discretion as to whether and how the transmission, called Joint Dispatch Transmission Service ("JDTS"), was used. Instead, the Commission found that it was a "function of least cost dispatch" and therefore was not a discount to non-firm transmission

---

[17]     "The primary goal of Order No. 888's requirements for pooling arrangements, including 'loose' pools, is to ensure comparability regarding transmission services that are offered on a pool-wide basis." Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, at 30,241.

[18]     *See id.*

[19]     *See Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107 at PP 84-85 (2016).

service, and did not serve as a replacement of that service.[20]  Thus, the Commission rejected

arguments that the PSCo JDA created a discount on transmission.

Like JDTS, NFEETS is based on use of otherwise unused transmission with no

opportunity costs.[21]  Additionally, similar to the PSCo JDA, the Southeast EEM Members and

Participants will not have discretion as to whether and how NFEETS is used.  Much like the

allocation of JDTS on the basis of least cost dispatch, NFEETS will be awarded only to those

offers and bids paired through the Algorithm.[22]  The matching (and resulting scheduling of

NFEETS) will be performed by the Algorithm in a way that maximizes benefits for the region,

thus taking the determination of matches and the related access to NEEFTS out of the control of

the Southeast EEM Members.[23]  Finally, NFEETS also does not serve as a replacement to any

existing transmission service.  It is a new transmission service with the lowest priority and, as the

Southeast EEM Agreement Filing made clear, Participants will need to have alternative

---

[20]     *See id.* at P 84.

[21]     Southeast EEM Agreement Filing, Overview Aff. at P 23 ("Since the Southeast EEM will only use transmission that is not otherwise being used, it will not result in underfunding of transmission, which will still be paid for through current rate constructs, *i.e.*, through revenues received from customers of Network Service and Point-to-Point Service, or their equivalent."); *id.*, Economics Aff. at P 66 ("Hence, if that charge is not collected when NFEETS is used, it does not constitute a failure to recover direct variable costs from NFEETS customers. Furthermore, NFEETS utilizes transmission that would otherwise go unused; in the absence of NFEETS, no transmission revenue would be paid to the Participating Transmission Provider for use of this transmission.").

[22]     *Id.*, Operations Aff. at P 32 (noting that NFEETS "may be obtained only using the reservation, scheduling and tagging functions of the Southeast EEM System (rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by the Participating Transmission Provider)").

[23]     *Id.*, Economics Aff. at P 52 ("The Algorithm's determination of which bid and offer to pair together as a transaction and the transmission path for the transaction will depend on all of the other bids and offers made in the same interval, all of the counterparty constraints, all transmission loss rates, and all transmission limits.  A change in any input could alter which bids the Algorithm matches with which offers and the associated transmission paths.  Even small changes in inputs, such as the addition of a counterparty constraint, could cause ripple effects in the Algorithm's determination of the set of Energy Exchanges that maximizes total benefits in an interval.").

arrangements in place to ensure that they remain resource adequate if supply is not available in

the NFEETS to serve their load, if such supply cannot be scheduled in NFEETS due to

transmission limitations, or if NFEETS is curtailed.[24]  Therefore, NFEETS, like JDTS, is not a

discounted transmission service, and neither NFEETS nor the Southeast EEM Agreement are

subject to the requirements applicable to loose power pools.[25]

In any event, the Southeast EEM structure prevents undue discrimination, thereby

addressing the Commission's primary concern in issuing the loose pool requirements in Order

Nos. 888 and 888-A.  As the Commission said in Order No. 888, filing of OATTs by public

utilities would not cure undue discrimination "if those public utilities can continue to trade with a

selective group within a power pool that discriminatorily excludes others from becoming a

member and that provides preferential intra-pool transmission rights and rates."[26]  In the only

case cited by intervenors that orders the creation of a joint OATT, the Commission found that a

multi-lateral trading agreement necessitated filing of a joint OATT because, among other things,

---

[24]     *Id.*, Transmittal Letter at 38 (explaining that "generators serving native load will never be redispatched to accommodate intra-hour Southeast EEM transactions – Southeast EEM transactions would be curtailed instead" and that "[t]his means that every load-serving entity participating in the market needs a plan to serve its own load outside and independent of the Southeast EEM.").

[25]     The attempt to label the Southeast EEM as a power pool is also at odds with the common understanding of the term.  While the Commission stated in Order No. 888 that it intended the term to have broad reach, *see* Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,726 & n. 415, in a prior Notice of Inquiry proceeding specific to the issue, the Commission said that in a loose pool, "the participating utilities work together to establish principles and practices for interconnected operation, review area power supply problems and establish criteria for power supply adequacy, exchange generation and transmission construction plans, and plan coordinated efforts to attain optimal economy and reliability, [but] there is no central dispatch and there may be less joint planning."  *Inquiry Concerning Alternative Power Pooling Institutions under the Fed. Power Act*, 59 Fed. Reg. 54,851, 54,854 (Nov. 2, 1994).  The Southeast EEM does none of these things.

[26]     Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,726; Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, at 31,241 ("The primary goal of Order No. 888's requirements for pooling arrangements, including 'loose' pools, is to ensure comparability regarding transmission services that are offered on a pool-wide basis.").

it "provides a transmission rate that is available for the delivery of power and energy between the parties to the agreement only."[27]

In other words, a joint OATT can be a cure to undue discrimination arising from selective provision of a transmission discount. But it is not the only cure. An equally effective measure is for every participating public utility (and non-public utility for that matter) to agree to embed in their OATTs (or equivalent) the same exact terms and conditions for providing the new form of transmission service to all transmission customers. That was the express holding in *Western Systems Power Pool*.[28] And that is exactly what the Southeast EEM Agreement does. As explained in the Southeast EEM Agreement Filing, zero-cost NFEETS will be made available to all Participants on non-discriminatory terms, not just the Southeast EEM Members who are parties to the Southeast EEM Agreement.[29] The OATT Filings in the unconsolidated dockets

---

[27]     *See Wolverine Power Supply Coop., Inc.*, 85 FERC ¶ 61,099, at 61,355 (1998).

[28]     *See W. Sys. Power Pool*, 83 FERC ¶ 61,099, at 61,478 ("In Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, at p. 30,242, the Commission clarified that it was acceptable to rely on the Individual Open Access Tariffs of pool members as long as the pool members themselves are required to obtain access for pool transactions under the terms and conditions of the Individual Open Access Tariffs and pay the rates under those tariffs . . . . WSPP proposes that, in lieu of a joint pool-wide open access tariff, WSPP power sellers will be required to obtain transmission for use of their own systems under their Individual Open Access Tariffs . . . . In addition, transmission service by other WSPP members would be provided under their Individual Open Access Tariffs . . . . Consistent with our findings in Order Nos. 888 and 888-A . . . . we find WSPP's proposal, to have pool members use their Individual Open Access Tariffs where filed and available, to be acceptable.").

[29]     *See* Southeast EEM Agreement Filing, Transmittal at 24-25; *id.* at 16 ((Participation is open to "any entity that "own[s] or otherwise control[s] a Source within the Territory and/or is contractually obligated to serve a Sink within the Southeast EEM footprint," as well as any entities that can physically transact in the future.") (citing Market Rules at Part III)). *See also* Section IV.E below (explaining why the minor limits on participation are necessary and appropriate). In *Public Service Co. of Colorado*, after rejecting arguments that the PSCo JDA constituted a loose power pool, the Commission also noted that "nonetheless . . . the Joint Dispatch Agreement allows any entity to join, provided, as relevant here, it makes arrangements with its transmission provider to have access to unused ATC at a zero dollar rate," and further found that "PSCo and other Parties are not attempting to restrict access to their own transmission resources; rather, to the extent any resource only needs the transmission resources of Parties to join the Joint Dispatch Agreement, it only needs to sign the Joint Dispatch Agreement to receive Joint Dispatch Transmission Service." *See Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107 at P 85.

JA0858

further establish that NFEETS will be provided on non-discriminatory terms to all Participants, regardless of whether they are a Southeast EEM Member.

In addition to being unwarranted (because the Southeast EEM is not a power pool) and unnecessary (because NFEETS is offered under non-discriminatory terms and conditions), a single OATT would be impractical and perhaps unworkable.  Given the fact that the Southeast EEM only affects residual transmission, such that even under intervenors' reading there is no reason for a "pool"-wide agreement for **all** transmission service, the Southeast EEM Agreement is the appropriate vehicle for preventing undue discrimination because it dictates a uniform approach to provision of NFEETS by each transmission provider while otherwise preserving each transmission provider's authority over the rest of its OATT.[30]  The result will be that Participants will be able to enter into a single NFEETS transaction, through the Southeast EEM System, that will be scheduled through each Participating Transmission Providers' OASIS.  Such a single transaction could cross the entire 1,100 mile length of the footprint, just as if there were a single joint OATT in place.  Intervenors' seeming call for there to be **two** tariffs and **two** transmission service providers for each transmission system (*i.e.*, a joint OATT for NFEETS and individual OATTs for other service) would not provide any increase in functionality or benefits, and therefore is unnecessarily costly and perhaps impossibly complicated.[31]

Finally, remaining arguments supporting classification as a pool are based on misconceptions or mischaracterizations about the way that other aspects of the proposal will work.  Refutation of arguments that the Southeast EEM is insufficiently "open to any bulk power

---

[30]      TVA has transmission service guidelines that are equivalent to a tariff.

[31]      Doubling up on operators would increase costs and would also add administrative and operational complications.

JA0859

market participant in the Southeast, including independent power producers,"[32] and that the Southeast EEM governance structure "allows for control entirely by vertically integrated utilities"[33] are provided in the discussions of market power and governance, below in Sections IV.B and IV.C.

    **B.**    **This is not the proceeding for considering whether some other form of market should be implemented in the Southeast.**

        **1.**    **Under Section 205, the Southeast EEM proposal cannot be denied or modified merely because some would prefer an alternative approach.**

Some of the intervenors filed comments requesting that the Commission reject or modify the proposed Southeast EEM in favor of creating an organized wholesale electric market in the form of an RTO or EIM, or delay approval until a technical conference to explore alternatives to the Southeast EEM can be held. None of these requests are properly before the Commission. Because the Southeast EEM was filed under Section 205 of the FPA, the Commission may not direct substantial changes to the filing.[34] Furthermore, when determining whether to accept a filing, the test is whether the proposal is just and reasonable, not whether it is superior to other possible proposals.[35]

---

[32]    CEC Comments at 16.

[33]    CEC Comments at 19; *id.* at 17 (citing *Cent. Iowa Power Coop. v. FERC*, 606 F.2d 1156 (D.C. Cir. 1979); *Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075, at 61,317 (1999), *petitions for review denied*, *Alliant Energy Corp. v. FERC*, 253 F.3d 748 (D.C. Cir. 2001)). *See also* PIOs Protest at 12-13.

[34]    *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 110 (D.C. Cir. 2017) ("*NRG*") ("Section 205 does not allow FERC to make modifications to a proposal that transform the proposal into an entirely new rate of FERC's own making.").

[35]    *See, e.g.*, *Sw. Power Pool, Inc.*, 158 FERC ¶ 61,063 at P 13 (2017) (citing *Cities of Bethany v. FERC*, 727 F.2d 1131 (D.C. Cir. 1981) ("FERC has interpreted its authority to review rates under the FPA as limited to an inquiry into whether the rates proposed by a utility are reasonable — and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs"), *cert denied*, 469 U.S. 917 (1984)); *OXY USA, Inc. v. FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995) ("[T]he Commission may approve the methodology proposed in the settlement agreement if it is 'just and reasonable'; it need not be the only reasonable methodology or even the most accurate."); *See also Am. Elec. Power Serv. Corp.*, 44 FERC ¶ 61,206, at 61,749 (1988) ("The Commission's task is to determine

14

JA0860

Despite the well-established law on this issue, some of the intervenors attempt to persuade the Commission to reject the proposed Southeast EEM not because it is unjust and unreasonable, but because they prefer the creation of an organized wholesale electric market in the form of an RTO or EIM.[36]  For example, CEC asks the Commission and the Southeast EEM Members "to think more ambitiously" and consider creating an RTO, asserting that an RTO would provide superior financial benefits.[37]  SREA asserts that a regional market using Locational Marginal Pricing ("LMP") would be superior to Southeast EEM.[38]  The PIOs' witness, Paul Sotkiewicz, argues that a different market design could achieve additional savings from generation unit commitments and dispatch changes.[39]  Likewise, the R Street Institute and AFPA suggest that a Southeast EIM would provide more benefits than the Southeast EEM.[40]  While these intervenors favor market designs other than the one before the Commission, the Commission has been clear that when considering a Section 205 filing, it considers whether the proposed rate is just and reasonable; it does not consider whether there is a superior approach.[41]

---

whether AEP's proposal is just and reasonable. It is not required to find that the proposal is the 'best', or 'superior' to all others, in order to adopt it. Since AEP Service has shown that its method is just and reasonable, it is entitled to use it.").

[36]     Of course, the Southeast EEM Members do not represent all the entities necessary to establish an RTO in the Southeast.  The Commission in Order No. 2000 recognized that state action was necessary for RTO formation.  *See, e.g.*, *Reg'l Transmission Orgs.*, Order No. 2000, 89 FERC ¶ 61,285 (1999) ("Order No. 2000"), *order on reh'g,* Order No. 2000-A, 90 FERC ¶ 61,201 (2000) ("Order No. 2000-A"), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) ("*Snohomish*") ("[M]ost states must approve a utility joining an RTO, and several states have required their utilities to turn over their transmission facilities to an independent transmission operator. Also, states must approve the siting of transmission facilities that are called for in an RTO expansion plan.").

[37]     CEC Comments at 32-33.

[38]     SREA Comments at 6.

[39]     PIOs Protest, Exhibit A, Affidavit of Paul M. Sotkiewicz at PP 46-49.

[40]     R Street Institute Comments at 8-9; AFPA Comments at 2, 12.

[41]     *See supra* note 35.

JA0861

Furthermore, although the Commission may approve minor modifications if the utility consents

to the modification,[42] the Commission may not impose an entirely different scheme.[43]  The

Commission must reject intervenors' requests to turn a tariff filing into a "broad redesign" of the

Southeast market.[44]

> ## 2.      The Southeast EEM is not subject to RTO rules.

As an indirect way of trying to argue that the Commission should ignore the filing before

it and require the Southeast EEM Members to create what is essentially an RTO or organized

market,  certain intervenors urge the Commission to impose concepts and requirements on the

Southeast EEM that have been applied to RTOs and similar entities.  However, contrary to the

PIOs' implications in suggesting the Southeast EEM is an "organized market," the bilateral

transactions under the Southeast EEM are not subject to RTO rules.[45]  RTO rules come from

Order No. 2000.[46]  Because RTO membership is voluntary,[47] the Commission incentivizes RTO

---

[42]     *NRG*, 862 F.3d at 115.

[43]     *Id.* at 114.

[44]     *See, e.g.*, *ISO New England Inc*., 123 FERC ¶ 61,021 at P 56 (2008) (in a Section 205 proceeding, intervenors unsuccessfully sought to turn a tariff filing into an open season to redesign the ISO's distributed energy resources program).

[45]     *See* PIOs Protest at 13-16.

[46]     *See generally* Order No. 2000, 89 FERC ¶ 61,285 (establishing, among other things, the minimum characteristics and minimum functions required of RTOs).

[47]     *See N.C. Waste Awareness & Reduction Network, Inc. v. Duke Energy Carolinas, LLC*, 151 FERC ¶ 61,079 at P 64 (2015) ("The Commission's longstanding policy is that RTO participation is voluntary." (citing Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092, at 31,357 and *Snohomish*, 272 F.3d at 615)).

JA0862

membership – and adherence to RTO rules – with an incentive return on equity ("ROE").[48]  The

Southeast EEM Members have not voluntarily elected to join an RTO, nor have they sought the

incentive ROE reward for doing so.  So they have not opted in to RTO rules, and the PIOs have

no basis for forcing them to do so.  There also is not some other set of rules for "organized

markets" that apply here.[49]  The proposal must be judged on its own merits.

### 3. Intervenors' arguments in favor of alternative approaches are not persuasive and provide no basis for the Commission to deny the Southeast EEM Filings.

In an effort to justify rejection of the Southeast EEM, the PIOs identify what they

perceive as market deficiencies in certain states and TVA, and limited activities in some states to

explore reforms in their respective electric regulation.  The Southeast EEM proposal does not

propose to change the underlying bilateral market structure in the Southeast; the proposal is to

---

[48]      In Order No. 2000, the Commission determined that the most appropriate approach for facilitating the creation and efficient expansion of RTOs/ISOs was to make membership in the organizations voluntary for public utilities.  *See* Order No. 2000, 89 FERC ¶ 61,285, at 31,033 ("we continue to believe . . . that at this time we should pursue a voluntary approach to participation in RTOs"). In Order No. 679, the Commission stated that it would "approve, when justified, requests for ROE-based incentives for public utilities that join and/or continue to be a member of an ISO, RTO, or other Commission-approved Transmission Organization."  *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 at P 326 (2006) ("Order No. 679").  It also stated that "[t]he basis for the incentive is a recognition of the benefits that flow from membership in such organizations and the fact continuing membership is generally voluntary."  *Id*. at P 331.

[49]      CEC's and PIOs' expositions on *Devon Power, LLC*, 134 FERC ¶ 61,208, 62,043 (2011) ("*Devon*") and *Automated Power Exchange, Inc.*, 84 FERC ¶ 61,020, 61,090 (1998), *petition denied sub nom. Automated Power Exchange, Inc. v. FERC*, 204 F.3d 1144 (D.C. Cir. 2000) make little sense.  The Southeast EEM Members have not contested the Commission's jurisdiction – after all, they made the filings at issue here.  *Devon* concluded that market clearing price transactions are not bilateral transactions, which is irrelevant here because there is no market clearing price.  *Automated Power Exchange, Inc.* concluded that the entity running a power exchange was a public utility because it had discretion to alter clearing price rates.  Again, this is irrelevant because the Southeast EEM Administrator will have no discretion to change the prices established when the Southeast EEM System matches buyers and sellers based on splitting the savings between the buyer offer and seller bid.  So if these entities are arguing that some other level of review applies as a result of those cases, the argument fails.  If they are arguing that the cases establish a need for review, the point is moot: this proceeding already exists.

add two new features to the market. The critiques of market features that are not changing therefore are collateral attacks on Commission orders approving those features. The benefits of the fully realized proposal actually before the Commission in this proceeding should not be delayed to pursue other aspirations.

The examples provided by the PIOs demonstrate only one thing: there is no consensus in the Southeast for market restructuring other than the Southeast EEM.[50] The Commission is aware that attempts to organize an RTO in the Southeast have failed in the past.[51] Yet, the Southeast EEM proposal does represent consensus to enhance the existing bilateral market.

Some intervenors point to a 16-year old study that suggested that an EIM in the Southeast would provide hundreds of millions in dollars of savings to transmission owners over a ten-year period.[52] Some point to other studies in their urging that greater market reforms take place in the Southeast.[53] Requests for FERC to review or to require the Southeast EEM Members to study the benefits of a proposal different than the one proposed is no different than asking FERC to approve "an entirely different" rate, which it cannot do under FPA Section 205.[54]

Two intervenors assert that "ideal" regional energy markets use LMP, which would produce better price signals.[55] Such arguments recommending LMP or other RTO-type market

---

[50] PIOs Protest at 51-56.

[51] *See, e.g.*, Electric Energy Market Task Force, Report to Congress on Competition in Wholesale and Retail Markets for Electric Energy, https://www.ferc.gov/sites/default/files/2020-04/epact-final-rpt_0.pdf. ("In other regions, including most of the Southeast, the West outside of California, and other parts of the Midwest, RTOs have been considered, but formation has stalled. State regulators and utilities in these regions have found it difficult to assess the potential benefits and costs of establishing RTOs. They have been reluctant to create new institutional arrangements that could diminish local control over transmission facilities and could impose additional costs on retail customers.").

[52] R Street Institute Comments at 8; CEC Comments at 50-51.

[53] SREA Comments at 7.

[54] *NRG*, 862 F.3d at 114.

[55] SREA Comments at 6; *see also* R Street Institute Comments at 6.

18

JA0864

changes amount to a collateral attack on the existing market.  LMP would not be a residual

market added to the existing bilateral market like the Southeast EEM.  An LMP market would be

a full-scale replacement of the existing market, even though the existing market has not been

placed at issue in this proceeding.  Other changes of similar scale would be required for an RTO,

like the transfer of operational control of transmission assets to the RTO.  Because such matters

have not been placed in issue by the Southeast EEM Filings, arguments against them are a

collateral attack on the many prior orders finding the existing market structure to be just and

reasonable.[56]

### 4.   Approval of the Southeast EEM does not preclude future market development.

Underlying many protests appears to be an incorrect assumption that approval of the

Southeast EEM will preclude further evolution or market reform in the Southeast.  This is simply

not true.  The Southeast EEM will enhance the existing bilateral market but does nothing that

would interfere with or impede consideration of other changes in an appropriate forum.  Should

lawmakers and stakeholders in the Southeast determine that some other structure or market

design is appropriate, nothing about the Southeast EEM prevents such changes.

Ultimately, the irony should not be lost on the Commission that the very entities that are

calling for change in the Southeast are opposing or questioning the positive changes being

proposed with the Southeast EEM.  Nevertheless, nothing in the Southeast EEM proposal

---

[56]   These would include, among other things, orders approving the individual open access tariffs of the jurisdictional utilities.  *See, e.g.*, *Sacramento Mun. Util. Dist. v. FERC*, 428 F.3d 294, 299 (D.C. Cir. 2005) (rejecting a collateral attack on the CAISO Tariff and stating that "[t]he Commission proceedings approving the California ISO tariff and the firm transmission rights proposal took place in 1997 and 1999, respectively. Because the time for seeking judicial review has long passed, Sacramento's argument amounts to an impermissible collateral attack on the previously approved [CAISO] tariff."); *Sacramento Mun. Util. Dist. v. FERC*, 474 F.3d 797, 802 (D.C. Cir. 2007) (rejecting another collateral attack on the CAISO Tariff).

prevents further changes or evolution of the electric markets in the Southeast.  Indeed, should the Commission approve the Southeast EEM and allow it to operate for some time, data from its operations may better inform discussion about future market evolution.  However, the Southeast EEM must be allowed to move forward to enable such an evaluation.

### C.    Arguments regarding the functioning of the current Southeast market are incorrect.

The Southeast EEM Members believe that the existing market functions well and reliably serves customers at electricity prices that are generally below the national average.  Though these issues are beyond the scope of the proceeding for the reasons discussed above, the Southeast EEM Members correct several statements for purposes of ensuring an accurate record.

The PIOs claim that the Southeast EEM proposal fails to address its own goals because it does not address "high electricity bills and low renewable penetration."[57]  In support of its claim that "[r]esidential customers in states in the Southeast EEM footprint are burdened with some of the highest electricity bills in the nation," they provide a chart showing average monthly bills and corresponding national rankings, and try to exaggerate the import of this data by identifying percentages of poverty rates and low-income earners in those states.[58]  But the data the PIOs present is misleading.  When looking at electricity costs, average monthly bills are not the best metric.  By definition, average monthly bills are a function of the amount of electricity used, in addition to cost.  Of course, in the Southeast, usage likely will be greater because of hotter weather and the resulting greater use of air conditioning.[59]

---

[57]    PIOs Protest at 45.

[58]    *Id.* at 45-46.

[59]    *See, e.g.*, U.S. Energy Information Admin., *The South anchors growth in use of electricity for air conditioning since 1993*, (Aug. 15, 2003), https://www.eia.gov/todayinenergy/detail.php?id=12551#:~:text=Homes%20in%20the%20South%20are,homes%20in%20any%20other%20region

When examined instead using the metric of average price in cents per kWh – a metric that is not dependent on usage and instead is isolated to cost – the Southeast fares ***better*** than the national average, including most states with RTOs.  Using the same Energy Information Administration data that the PIOs use, below is the PIOs' chart with the addition of data and rankings for average price per kWh (shaded area represents new information).

| State | Average Monthly Bill (Dollar and cents) | National Ranking for Monthly Bill [1 Being Most Expensive] | Average Price (cents/kWh) | National Ranking for Average Price [1 Being Most Expensive] |
|---|---|---|---|---|
| Alabama | 150.45 | 3 | 12.53 | 23 |
| South Carolina | 144.73 | 4 | 12.99 | 18 |
| Mississippi | 135.87 | 5 | 11.27 | 36 |
| Virginia | 135.46 | 6 | 12.07 | 29 |
| Tennessee | 132.33 | 8 | 10.87 | 42 |
| Georgia | 131.84 | 9 | 11.76 | 31 |
| North Carolina | 123.25 | 15 | 11.42 | 35 |
| Missouri | 117.82 | 24 | 11.14 | 39 |
| All Southeast EEM* | 133.97 | 9.2 | 11.75 | 31.75 |
| Nationwide | 115.49 | - | 13.01 | - |

\*  It should be noted that the PIOs did not include the portions of Kentucky, Oklahoma and Florida that are in the Southeast EEM footprint.

Shaded areas are additional data regarding average price per kWh.  All data is from same source as used by the PIOs:  https://www.eia.gov/electricity/sales_revenue_price/pdf/table5_a.pdf

---

("Over the past 20 years, the use of air conditioning has increased in all regions of the United States, but this increase has been most pronounced in the South Census region . . . . Air conditioning has been widespread throughout most of the South for many years, but many households in the South have shifted from room air conditioning to central air conditioning . . . . Central air conditioners often consume more energy because they cool more of the area within a home . . . . and home size in the South has grown faster than the country as a whole . . . . almost all new homes in the South have central air conditioning. Homes in the South are also more likely to have central air conditioning than homes in any other region.").

JA0867

In short, this data shows that all-in (generation, transmission and distribution), residential customers in the Southeast have lower rates than the national average.[60]  In any event, the issue in this proceeding is whether the Southeast EEM Agreement Filing is just and reasonable, which it is.  Therefore, it must be approved, and arguments about market features that are not at issue here must be rejected.[61]

## IV.  Arguments that address issues within the scope of the Southeast EEM Filings do not justify rejection of the proposal.

### A.  The Southeast EEM will produce net benefits.

The Southeast EEM Agreement Filing included more evidence regarding benefits than necessary to support the Southeast EEM proposal, including qualitative and quantitative analysis of anticipated benefits from implementation of the Southeast EEM.  In particular, Dr. Pope explained how the "Southeast EEM's combination of zero-cost, non-pancaked transmission service and automated 15-minute trading" will arrange beneficial transactions "in ways that are unlikely to occur today."[62]  Further, she explained how the design seeks to maximize the sum of the benefits (as measured by the seller's offer minus the buyer's bid) of Southeast EEM matches[63] and that it "will only arrange Energy Exchanges with a positive benefit to both the

---

[60]     SREA states that the "lack of competition has led to massive infrastructure failures" citing the VC Summer nuclear reactor, the Kemper IGCC facility, the Plains and Eastern HVDC transmission project, and the Atlantic Coast Pipeline. SREA Comments at 2.  Each of these projects have long histories and specific reasons (legal, business and economic) for their status.  Merely stating that those projects were sited in some of the Southeast EEM states is not proof that a Commission organized wholesale market would be superior to the Southeast EEM proposal or that the existing structure is not working for the benefit of customers as judged by the states with the authority to make those determinations.

[61]     *See supra* note 35.

[62]     Southeast EEM Agreement Filing, Economics Aff. at P 32; *see also generally id.* at PP 29-33.

[63]     *Id.* at PP 33-34.

buyer and the seller," considering transmission losses.[64]  The Southeast EEM Agreement Filing also included a quantitative benefits analysis prepared by two independent parties – Guidehouse and Charles River Associates ("CRA") ("Benefits Analysis").  The Benefits Analysis provides evidence of the potential magnitude of benefits under two scenarios, a "base case" and a "carbon constrained case."[65]

Most intervenors acknowledge that the proposal produces benefits over the status quo.[66] The PIOs do claim that the proposal may be worse than the status quo, but that argument is premised entirely on the incorrect notion that the Southeast EEM will increase opportunities to exercise market power.[67]  That argument is baseless and fully addressed by the Southeast EEM Filings, as discussed in the next subsection.

A number of the intervenors question whether the Benefits Analysis overstates the *level* of benefits that the Southeast EEM would provide.[68]  Even if the Commission were to find these

---

[64]     *Id.* at P 34.

[65]     *See id.*, Transmittal Letter at 32-33 (describing Benefits Analysis).

[66]     AFPA Comments at 2, 15 ("AF&PA supports the Southeast EEM proposal because it appears to be a modest improvement over the status quo."); CEC Comments at 49 (comparing perceived "modest benefits" of Southeast EEM to preferred model); EDF Comments at 4 ("EDF generally agrees that the Southeast EEM will promote the efficient use of the existing transmission system and has the potential to support decarbonization of the electric grid by facilitating energy transactions to balance intermittent resources across the Southeast EEM footprint and prevent curtailment of renewable resources."); GAM Comments at 2 ("GAM is encouraged by any plan that would help reduce the costs of production for its members and for domestic manufacturing generally."); PJM Comments at 2 ("The Southeast EEM appears to provide a potentially helpful modification to the existing bilateral market by providing for balancing authority-to-balancing authority transactions utilizing 15-minute intervals and price matched transactions on a 'split-the-savings' basis."); R Street Institute Comments at 8 (comparing anticipated Southeast EEM benefits to preferred model); and TVPPA Comments at 5 ("The SEEM Agreement's basic construct – an algorithm-driven, bilateral market based on shared savings for energy imbalance transactions among the SEEM's Members and Participants – appears capable of providing modest levels of economic benefit to the SEEM Members.").

[67]     PIOs Protest at 21-26.

[68]     *See, e.g.*, CEC Comments at 30-31; PIOs Protest at 27; TVPPA Comments at 6.

JA0869

claims credible, they would not be a basis to reject the Southeast EEM proposal. As the CEC

acknowledges,[69] the Commission recently affirmed when evaluating Southwest Power Pool's

("SPP") Western Energy Imbalance Service ("WEIS") proposal, the Commission "does not

require a quantified cost-benefit analysis of proposals."[70] Likewise, no quantified cost-benefit

analysis is required for the Southeast EEM proposal.

In any event, the Benefits Analysis is a reasonable and conservative estimation of the

Southeast EEM's potential benefits, and there is not any "fatal flaw"[71] in the report. The

Benefits Analysis was not an after-the-fact justification of a decision already made. Rather, the

Southeast EEM Members retained Guidehouse and CRA as independent third parties while

deciding whether to pursue development of the Southeast EEM.[72] The purpose of the Benefits

Analysis was to help the Southeast EEM Members decide whether the proposed construct would

produce net benefits above the costs that they would agree to incur to implement it.[73]

The CEC appears to not understand how benefits were calculated under the Benefits

Analysis and generally what the term "benefits" refers to in the Southeast EEM Agreement

---

[69]     CEC Comments at 28.

[70]     *Sw. Power Pool, Inc.*, 173 FERC ¶ 61,267 at P 30 (2020) ("*WEIS Order*") (citing *PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,208 at P 49 (2015) ("[T]he Commission does not generally require the mathematical specificity of a cost-benefit analysis to support a market rule change."), *order on reh'g*, 155 FERC ¶ 61,157 at P 30 (2016) ("[W]hile the Commission is required to consider all relevant factors and make a 'common-sense assessment' that the costs that will be incurred are consistent with the ratepayers' overall needs and interests, the Commission's finding need not be accompanied by a quantitative cost-benefit analysis."), *aff'd sub nom. Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 660-61 (D.C. Cir. 2017); *see also Sw. Power Pool, Inc.*, 141 FERC ¶ 61,048 at P 57 (2012) ("[W]e note that our approval of the Integrated Marketplace proposal is not based on any specific cost-benefit amount. A cost-benefit analysis is largely a tool for stakeholders to evaluate different market designs and to determine their interest in moving forward with a market proposal.").

[71]     PIOs Protest at 27.

[72]     Southeast EEM Agreement Filing, Overview Aff. at P 29.

[73]     *Id.* at PP 29-30.

Filing.[74]  The term, "benefits" has a consistent meaning in all of the Southeast EEM Filings,

including the Benefits Analysis.  The benefits of the Southeast EEM are the cumulative savings

from substituting supply sources with a lower short-run marginal cost for supply sources with a

higher short-run marginal cost that would have otherwise been used to serve load during a 15-

minute period.[75]  The Benefits Analysis states, at one point, that Guidehouse/CRA derived its

benefits estimation based on production cost modeling, which takes into account "heat rate, fuel

cost, and other operating costs, expressed as a function of output" and included its production

cost modeling assumptions in Appendix A to the analysis.[76]

The CEC argues that benefits may be overstated because the Benefits Analysis does not

consider curtailment of NFEETS.[77]  The PIOs similarly note that the Benefits Analysis does not

consider transmission constraints.[78]  As an initial matter, the Benefits Analysis notes that use of

2019 available transfer capability ("ATC") may actually be conservative, because "actual market

---

[74]      CEC Comments at 29-30.

[75]      *See* Southeast EEM Agreement Filing, Economics Aff. at P 21 ("In the context of the Southeast
EEM Proposal, a transaction is considered economically efficient if it reduces the total production costs to
serve demand in the Southeast EEM Territory during a 15-minute interval; that is, if it enables lower cost
supply to be used instead of higher cost supply); *id.*, Overview Aff. at P 9 (explaining that load serving
entities ("LSEs") pursue "short-term purchases . . . for economic purposes to displace more expensive
generation") and at P 25 (explaining that the Southeast EEM's split-the-savings pricing was implemented
to match the existing bilateral markets, i.e., "[p]urchases of power produce savings when the allow a
generator with higher marginal costs to be backed down, and sales of power produce savings by allowing
crediting of markings from sales against customer costs"); *id.*, Benefits Analysis at 7; *id.*, Transmittal
Letter at 8-9.

[76]      *Id.*, Benefits Analysis at 12; 24-28.  The Benefits Analysis does inartfully says in one place that
benefits will result from "fuel cost savings," which the CEC notes as the source of its confusion, CEC
Comments at 30 (citing Southeast EEM Agreement Filing, Benefits Analysis at 7), and it is true that
short-run marginal cost of some supply resources might not be directly tied to fuel usage.  That very same
sentence of the Benefits Analysis, however, makes the more general point that the Southeast EEM "gives
participants access to a lower cost, more efficient pool of resources in managing subhourly load and
renewable uncertainty."  Southeast EEM Agreement Filing, Benefits Analysis at 7.

[77]      CEC Comments at 30-31.

[78]      PIOs Protest at 50.

operation could result in more transmission capacity being released."[79]  In addition, Guidehouse/CRA conducted a sensitivity test capping ATC at 200 MW, which represents "significantly less than what was observed in 2019 for some pathways."[80]  Even with the significant ATC restriction, "benefits only decreased by about 10% for the year."[81]  Based on the sensitivity test Guidehouse/CRA concluded that the benefits were unlikely to have been materially overestimated due to the ATC assumptions employed.[82]

With respect to the CEC's concern about the potential for benefits to be diminished due to curtailments resulting from Transmission Loading Relief ("TLR") procedures, Dr. Pope explained in the Economics Affidavit that "NFEETS is unlikely to be curtailed once a 15-minute transaction has begun due to the time required to invoke [TLR] procedures."[83]  Neither NFEETS nor any other transmission schedule flowing within a 15-minute interval is likely to be curtailed within the interval due to the short schedule time.  Further, Participating Transmission Providers consider congestion on the transmission system when calculating the availability of NFEETs.  Furthermore, with non-firm hourly ATC being determined each hour, this refresh rate should provide dependable unreserved non-firm hourly ATC to be utilized for Southeast EEM transactions.  Thus, it is unlikely that Southeast EEM transactions will create congestion.

---

[79]     Southeast EEM Agreement Filing, Benefits Analysis at 15.

[80]     *Id.* at 19.

[81]     *Id.*

[82]     It appears that the PIOs misunderstand the import of the statement in Table 3 of the Benefits Analysis that states "potential transmission constraints are not considered in the sub-hourly trades." Southeast EEM Agreement Filing, Benefits Analysis at 7.  The quoted phrase explains that the Benefits Analysis sub-hourly model did not consider transmission constraints of the type applied in running a transmission power flow model.  This is logical, since the Southeast EEM will not run a power flow model in arranging 15-minute Energy Exchanges.  As also reported in Table 3, the sub-hourly model employs ATC constraints instead, which is consistent with proposed Southeast EEM operations.

[83]     *Id.*, Economics Aff. at P 65 & n. 35.

Therefore, intervenors' concerns regarding curtailments and transmission constraints are misplaced and ignore the evidence presented.

TVPPA questions the level of benefits that TVA customers may obtain in light of TVA's counterparty limitations.[84] The Benefits Analysis included TVA's restrictions – both the "TVA Fence" and its counterparty limitations.[85] TVA's decision to participate in the evaluation of its costs compared to anticipated benefits was therefore based on the appropriate assumptions of expected benefits. The CEC similarly raises a concern that the Benefits Analysis did not consider the "toggle," *i.e.*, the ability to set counterparty specific constraints, which could result in lower levels of participation.[86] The Benefits Analysis makes clear that it considered "market-based rate restrictions for sales within BAs" where Southeast EEM Members are mitigated.[87] In other words, the Benefits Analysis considered known geographical and counterparty restrictions for which the toggle would be used.

The PIOs criticize the Benefits Analysis because it used a "modeling tool that does not have the ability to dispatch" in 15-minute intervals.[88] Their witness admits that PROMOD, the modeling tool used, "is a widely used and vendor-supported production cost software package . . . that allows the transmission system to be modeled with economic dispatch of generation

---

[84]     TVPPA Comments at 6.

[85]     Southeast EEM Agreement Filing, Benefits Analysis at n. 8 ("Any market-based rate [("MBR")] restrictions for sales within [Balacing Authorities ("BAs")] that were identified in discussions with Southeast EEM participants are incorporated in the sub-hourly bilateral trade modeling, including the TVA "fence" (TVA, under the 1959 Bond Act, is prohibited from selling electricity outside its congressionally mandated territory, with the exception of 14 power generators on TVA's borders with whom it already was exchanging electricity as of July 1, 1957).").

[86]     CEC Comments at 30-31.

[87]     Southeast EEM Agreement Filing, Benefits Analysis at 12.

[88]     PIOs Protest at 27; *id.*, Exhibit A, Affidavit of Paul M. Sotkiewicz at P 98.

JA0873

sources."[89]  Further, the Benefits Analysis makes clear that PROMOD was used as a starting

point for an internally developed "sub-hourly model" that "incorporates load and renewables

generation uncertainty, ATC, and the $0/MWh non-firm transmission product."[90]  The report

further includes a "modeling flow diagram."[91]  That Guidehouse and CRA did not include

proprietary details about their sub-hourly modeling tool is neither surprising nor a basis to

conclude that the Benefits Analysis is flawed.

The PIOs' witness incorrectly asserts that the Benefits Analysis "leaves to the

imagination" how base cases were developed and whether Guidehouse/CRA assumed for the

base cases that "each BA dispatches its own resources to satisfy the load and reserves needs in

isolation."[92]  However, the Benefits Analysis explicitly states that PROMOD was first used

"under status quo conditions,"[93] *i.e.*, it assumes that BAs dispatch their own resources to serve

their load requirements.[94]  The Benefits Analysis model was run consistently with the fact that

under the Southeast EEM model, implementation of the Southeast EEM does not change the

traditional roles of BAs and LSEs.  It is a residual market.

---

[89]     *Id.*, Exhibit A, Affidavit of Paul M. Sotkiewicz at P 95.

[90]     *See* Southeast EEM Agreement Filing, Benefits Analysis at 5; 12.

[91]     *See id.* at 5.

[92]     PIOs Protest, Exhibit A, Affidavit of Paul M. Sotkiewicz at P 97.

[93]     Southeast EEM Agreement Filing, Benefits Analysis at 5.

[94]     The Benefits Analysis also states:  "[O]nce the commitment schedule is set and units are
dispatched to satisfy BA load, PROMOD next simulates bilateral trading among BAs, including BAs
outside of the Southeast EEM footprint."  *Id.*, Benefits Analysis at 4.  In relation to its modeling
approach, the Benefit Analysis further states that its PROMOD runs simulated "unit-commitment and
dispatch provide schedules for energy and sufficient operating reserves and other ancillary services, based
on requirements specified by the participants."  *Id.* at 12.

**B.      Requests for market monitors and market power studies are not premised on the facts pertinent to this market and should be rejected.**

Most of the arguments about market power and market manipulation are arguments, like others discussed above, that the Southeast EEM should be treated like an RTO.  As explained above, the Southeast EEM is not an RTO, and it is particularly inapt to treat it like one when it comes to market power and manipulation.  The core functioning of the Southeast market is not being changed by this proposal.  The Southeast will remain a market where bilateral transactions largely take place under market-based rates, except where market power mitigation applies.  The Southeast EEM adds an opportunity for residual bilateral transactions.  Those residual transactions likewise will take place under market-based rates, except where market power mitigation applies.

Because the Southeast EEM is adding automated functions, in the form of the Southeast EEM System and its Algorithm, the Southeast EEM Agreement appropriately adds an auditing function to ensure that the added market functions are working properly.[95]  The auditing function is appropriately scaled to the additions to the bilateral market proposed here.  Market power studies and market monitors, on the other hand, are illogical over-responses, and thus would require unnecessary, unjust and unreasonable costs.

The Southeast EEM Members have demonstrated, through logical exploration of the actual facts applicable to this case and the expert testimony of Dr. Susan Pope, that no new

---

[95]      Southeast EEM Agreement Filing, Operations Aff. at P 52 ( the "purpose [of the auditor] is to ensure that the Southeast EEM functions in accordance with the Market Rules.").

JA0875

market power studies or anti-manipulation measures are needed based on the proposed

enhancement to the bilateral market.  The reasons for this are straightforward:

- The Commission already mitigates the exercise of market power by each jurisdictional entity by limiting or conditioning as necessary those entities' ability to sell power at market-based rates.[96]

- That mitigation will apply to each jurisdictional entity's sale of power in Energy Exchange transactions, which must be executed under existing market-based rate tariffs (subject to all applicable mitigation).[97]

- Energy Exchange transactions are residual 15-minute transactions, meaning that "[t]he Southeast EEM cannot be used to meet a LSE's resource adequacy obligations," which must instead be met by the LSE "independently of their Southeast EEM participation."[98]  Because every LSE should always have other resources available, no LSE can be forced to enter into an Energy Exchange transaction at a price higher than it could obtain in the existing hourly or longer markets.  This means that existing mitigation measures, which already prevent the exercise of market power in such markets, will prevent it in the Energy Exchange as well.[99]

- If anything, NFEETS could be considered as broadening relevant geographic markets and diluting market power.[100]

- Withholding cannot work to the benefit of larger market participants because there is no market clearing price.[101]

- Market manipulation does not appear to be possible: related positions cannot be gamed because the average published clearing price for Energy Exchange transactions will be unpredictable and is not locational;[102] the three-eligible-counterparty rule prevents schemes to create artificial benefits to obtain $0

---

[96]     *Id.*, Economics Aff. at P 69; *see also id.*, Operations Aff. at P 40.

[97]     *Id.*

[98]     *Id.*, Operations Aff. at P 56.

[99]     *Id.*, Economics Aff. at P 69.

[100]     *Id.*, Transmittal Letter at 38 (explaining that the proposal "will enhance efficiencies and reduce opportunities to exercise market power by allowing more buyers to transact with more sellers over a much bigger region." (citing to *id.*, Economics Aff. at PP 20-31)).

[101]     *Id.*, Economics Aff. at P 71.

[102]     *Id.* at PP 86-87.

JA0876

NFEETS;[103] and Dr. Pope does not see potential for other manipulative schemes based on the Southeast EEM design.[104]

Proponents of market power studies and market monitors rely primarily on the argument that what applies to RTOs and EIMs should apply here. That contention is particularly unavailing given that it ignores all of the differences between the current proposal and an RTO or EIM and also ignores the fact that the Commission approved the PSCo JDA, which did not have a market monitor.[105] Intervenors fail to explain factually and logically why, when it comes to this specific rate proposal, the reasoning of Dr. Pope and the Southeast EEM Members was wrong. Their thin attempts to construct scenarios in which the Southeast EEM proposal might require a market power study or a market monitor fail, usually because they are based on misconceptions about how critical market mechanisms will work.

Besides the "RTOs and EIMs have them" rationale, the arguments for a market monitor and market power studies[106] rest exclusively on the idea that the Southeast EEM creates new opportunities for exercise of market power.[107] The CEC says "[a]s the vertically integrated SEEM Members rely more on Energy Exchanges, the bilateral market and hourly trading may diminish" such that "more sellers may be forced into the SEEM."[108] This "offers vertically

---

[103]     *Id.* at PP 83-85.

[104]     *Id.* at P 89.

[105]     *See generally Pub. Serv. Co. of Colo.*, Proposed Revised Joint Dispatch Agreement, Docket No. ER16-180-000 (filed Oct. 30, 2015); *Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107 (2016).

[106]     *See* PIOs Protest at 17-18, 32-34, 39-41; CEC Comments at 17, 26-27; R Street Institute Comments at 5-6; SREA Comments at 5.

[107]     CEC Comments at 23; PIOs Protest at 32-34.

[108]     CEC Comments at 23.

JA0877

integrated utilities an opportunity to negotiate among themselves" which is "especially harmful to independent power providers."[109]

This argument is flawed in a number of ways. First, there is no basis for presuming the "vertically integrated SEEM Members" will rely so heavily on the Southeast EEM so as to diminish other bilateral trading. As noted, all LSEs must arrange for energy sufficiency prior to the running of the Southeast EEM using OATT service.[110] Because LSEs cannot be guaranteed to be matched via the Southeast EEM System and even matched Energy Exchanges will have the lowest priority transmission service, heavily relying on the Southeast EEM to satisfy load-serving obligations, rather than entering into longer-term bilateral trades supported by higher priority transmission, is too risky.

The CEC argument is also fundamentally flawed because utilities can negotiate among themselves today, subject to mitigation that will still apply under the Southeast EEM. As explained by Dr. Pope, because the Southeast EEM market is a residual, lowest priority market, no one can be forced into it.[111] Participants like IPPs will have the same opportunity to participate in these pre-Southeast EEM markets as they do today. Moreover, the Southeast EEM will allow Participants like IPPs to make sales they would not otherwise make which will result in increased benefits. Split-the-savings pricing ensures that generators will benefit equally with loads.

The PIOs' witness takes the opposite tack from CEC. He worries that instead of forcing IPPs into the Southeast EEM market, the system will be manipulated to keep them out, by

---

[109]    *Id.*

[110]    Southeast EEM Agreement Filing, Operations Aff. at P 52

[111]    *Id.*, Economics Aff. at P 71.

toggling them off as counterparties.[112]  He suggests that vertically integrated utilities will use the toggles to keep out their competitors, which could eventually force the competitors to sell their businesses to the vertically integrated utilities.[113]  This argument, too, does not hold up to close consideration.

To begin with, the same witness who appears to be saying here that the Southeast EEM will become such an important element of bilateral trading in the Southeast that lack of successful participation in the Southeast EEM could be a pivotal cause of the failure of an IPP investment, elsewhere claims that the Southeast EEM might have a low level of benefits due to having lower participation than the Benefits Analysis assumes.[114]  This internal inconsistency entirely undercuts the credibility of both arguments, and the Commission should not afford them any weight.

In any event, a Southeast EEM "toggle" is just a manifestation of a decision that any market participant can make today, as the PIOs concede.[115]  The Commission already ensures that market power is mitigated, and if anything under the Southeast EEM large participants would have even less ability to "block" transactions than they ostensibly might have today, because of the significantly expanded access to potential counterparties provided by $0 NFEETS.[116]

---

[112]     PIOs Protest, Exhibit A, Affidavit of Paul M. Sotkiewicz at P 63.

[113]     *Id.* at P 64.

[114]     *Id.* at PP 102-105.

[115]     PIOs Protest at 25.

[116]     Additionally, the level of collusion among the utilities that the PIOs witness posits could occur in an attempt to exclude an IPP from trading in the Southeast EEM is not reasonable.  Such attempted collusion would risk severe penalties for little or no gain, since the Algorithm would still be likely to match a low-cost IPP with a non-colluding counterparty.

JA0879

Further, the toggles serve a real and important function for Participants in the Southeast EEM.  Participants can use toggles to implement counterparty specific constraints, including whether they have enabling agreements with certain entities, whether they are affiliated with entities, and whether they have exceeded credit thresholds.  Whether some other way of accomplishing this goal could have been used is beyond the scope of this proceeding – the question is whether this proposal is just and reasonable, and the record shows that it is.

Counterparty credit exposure is an extremely important element of risk management, and entails limiting total exposure by limiting the amount of credit extended.  Once that credit limit is reached, a party typically will not enter into a new transaction with that party.  Because the Southeast EEM transactions are bilateral, a toggle is needed to allow parties to ensure that credit limits with particular counterparties are not exceeded.

Participants also are expected to use the toggle to ensure their own compliance with applicable regulations and commercial agreements, just as they do today in the bilateral market.  To require the Southeast EEM Administrator to approve a Participant's individual constraints or to involve Commission oversight to this function[117] would be a collateral attack on their existing MBR authority, which leaves compliance up to the company.  The Commission, for good reason, leaves compliance with its rules in the hands of each entity, because each entity is structured differently and needs its own tailored compliance measures.  Further, it would place an unreasonable burden on the Southeast EEM Administrator – not even RTOs are tasked with ensuring their participants are complying with regulations like the Affiliate Restrictions or their MBR tariffs.

---

[117]     *See* AFPA Comments at 10-11.

JA0880

These are the main expected uses of toggles.  Others may arise from time to time that are not foreseeable today.  The Southeast EEM Members concluded that it would not be prudent to limit the use of toggles in future contingencies.  Such limitations would be problematic, inconsistent with existing bilateral trading practices upon which the Southeast EEM builds, and could lead to an intrusive oversight of risk management and compliance measures that would be unhelpful at best.

A variation on the toggling-as-market-power theory is the concern that the three-counterparty rule can be used to box entities out of the Southeast EEM, if large counterparties toggle off IPPs.[118]  The PIOs say that "[g]iven the 3 counterparty requirement for trades to go through, it would only take three of the five largest generation owning entities to not offer their generation that would likely block trades with lower cost parties."[119]  But the three-counterparty rule is satisfied if there are three *eligible* counterparties, *i.e.* parties with whom an IPP has an enabling agreement, and does not depend on having offers from each potential counterparty.[120]

The PIOs also rather confusingly argue that the Southeast EEM Members will want to undermine the functioning of the Southeast EEM because it is contrary to certain incentives that the PIOs assign to such Members.  Most of these incentives also suppose a willingness to create a market with the intention of subverting it by taking on substantial risk to collude with other Members for rather speculative gains.  For example, the PIOs argue that Southeast EEM Members are incentivized to deny certain parties access to zero-cost transmission "as a way of forcing them to pay for higher-priced firm transmission."[121]  If such incentive was real, the

---

[118]    PIOs Protest at 25.

[119]    *Id.*

[120]    Southeast EEM Agreement Filing, Operations Aff. at P 39.

[121]    PIOs Protest at 25-26.

simplest way to act on it would have been to not file the Southeast EEM proposal.  The PIOs

further assert that "transmission owning utilities do not want to appear as if they have excess

capacity,"[122] perhaps having missed that one of the two central purposes of the Southeast EEM is

to utilize capacity that is not being used, as the filing materials say repeatedly.[123]

At bottom, there is no credible theory or consistent logic to the arguments about

incentives for exercising market power claimed by the PIOs.  If utilities in the Southeast were

driven, when it came to consideration of the Southeast EEM, by the idea that "competition and

the availability of lower cost suppliers erodes the potential profits that come from a monopoly's

main source of revenue: building additional generation,"[124] then again, there would be no

Southeast EEM proposal.  According to the PIOs, this supposed incentive supports their claim

that IPPs will be excluded while utilities trade with one another.  But "lower cost suppliers" are

not limited to IPPs.  Other utilities can be lower cost suppliers.  Utilities can and do compete in

the wholesale market.  And at any given moment one might be a lower cost provider, while

being a higher cost provider before or after as the regional load and generation mix shifts.

So if the PIOs were right about the incentives, and that the way to act on the incentives is

to toggle off competitors, the generation and transmission owning members of the Southeast

EEM would toggle off everyone, not just IPPs, making the whole exercise a bizarre waste of

time.  Applying Occam's razor here, it should be evident that the Southeast EEM Members

---

[122]     *Id.*

[123]     Southeast EEM Agreement Filing, Transmittal Letter at 2, 4, 5, 37; *id.*, Operations Aff. at P 9; *id.*, Economics Aff. at PP 32, 66.

[124]     PIOs Protest at 24.

JA0882

created the Southeast EEM because they do intend to use it, and benefit from it, and benefits will be at their greatest with eligible counterparties maximized.

Finally, the PIOs argue that the Commission's holdings in *PacifiCorp* and *Nevada Power* require use of market power studies here.[125]  These arguments misrepresent the explanation already provided as to why those cases do not apply here.[126]  Rather than repeat that explanation, we instead respectfully refer the Commission back to it.

In sum, the market power arguments offered by intervenors are illogical, and the other arguments are either based on mischaracterization of testimony and precedent, or unsupported claims that market power studies or a market monitor are warranted for the Southeast EEM because RTOs have them.  The arguments should be rejected.

### C.    It is appropriate for the LSEs that fund the Southeast EEM to govern it, subject as needed to Commission oversight.

Several intervenors question the Membership requirements and the principle that decisional authority is vested in the Southeast EEM Members.[127]  However, consistent with the Commission's recent findings on the SPP WEIS, the Southeast EEM Members' governance of the Southeast EEM is appropriate since they are the entities that are funding its creation and operation.[128]

Intervenors may see Southeast EEM governance as being more than it is.  For the most part, governance rights are merely rights to propose rate changes to the Commission.  To the

---

[125]     *See* PIOs Protest at 34-35.

[126]     *See* Southeast EEM Agreement Filing, Transmittal Letter at n. 149.

[127]     *See* Public Citizen Protest at 2-3; SREA Comments at 4-5; R Street Institute Comments at 4; CEC Comments at 19-21; and PIOs Protest at 30.

[128]     *See WEIS Order*, 173 FERC ¶ 61,267 at P 66 ("limiting voting rights to WJDA signatories is reasonable because only WJDA signatories have made a financial commitment to the WEIS Market.").

JA0883

extent that intervenors are suggesting that they should have a hand in deciding what changes are proposed to the Commission under FPA Section 205, they misunderstand Section 205, which does not require utilities to cede their filing rights, or permit the Commission to require them to do so.[129] Moreover, the Commission's oversight of any changes that are proposed to be made to the Southeast EEM Agreement will ensure that fairness is preserved. By statute, any changes to that agreement can only be approved if they are just, reasonable, and not unduly discriminatory.[130] To suggest that more is necessary to meet the statutory standard is illogical. Intervenors, and all others, will retain their rights under Section 206 – the same rights they have, for example, when they take any other form of transmission service under any other OATT.

Intervenors' arguments are, again, conflating the Southeast EEM with other structures, like RTOs, and are ignoring or misunderstanding the limited nature of this endeavor. This is not an RTO subject to Order No. 2000 standards.[131] It is not a loose power pool.[132] It is a small but important addition to the existing framework for bilateral transactions. If two Southeast EEM Members entered into a bilateral transaction today there would be no third parties involved in governing that transaction. If one of those Southeast EEM Members then procured transmission to effectuate the transaction there again would be no third party "governance" involved – that would be a transaction between the customer and the transmission owner under the transmission

---

[129]     *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) (the Commission does not have jurisdiction to "require the utility petitioners to cede rights expressly given to them in section 205[.]").

[130]     *See* 16 U.S.C. § 824d(a). In addition, under the rule of reason, any change that materially affects rates, terms and conditions of the Southeast EEM must be filed. *See* 16 U.S.C. § 824d(c); *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985) (interpreting the statute to require filing of those "practices that affect rates and service *significantly*, that are realistically *susceptible* of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous.") (emphases in original).

[131]     *See* PIOs Protest at 17-18.

[132]     CEC Comments at 10-15.

38

JA0884

owner's OATT.  In that example, if the transmission owner wanted to make changes to its

OATT, its election to do so would not be subject to a vote of its customers.  Instead, it would

make a filing with the Commission, just as the Southeast EEM Members have done here, to seek

permission to make the change, and the customers would have the opportunity to comment, just

as some have done here.[133]  The statutory process is working as Congress intended.

The governance proposed for the Southeast EEM is also in line with the way the region

functions today.  It is emphatically the nature of the existing market system in the Southeast that

LSEs can design their transactions to meet their goals (including who to transact with, and under

what circumstances).  It is unremarkable and unobjectionable that in designing a system to

increase benefit to their customers, LSEs should choose to ensure that they can maintain that

flexibility.  None of those requesting a role in "governing" facilities for which they do not have

Section 205 rights explain why the market additions proposed here warrant that intrusion.  In

fact, nothing about the process of matching entities in a bilateral transaction, or the subsequent

provision of NFEETS under an OATT, provides a basis for third party involvement in

governance.

Some commenters argue that governance should be broadened to explicitly include state

regulatory bodies, among others.[134]  Notably, no state commission requested a role in

governance, even though six intervened in this proceeding.  The Southeast EEM Members who

---

[133]     The Southeast EEM Members note that even though customers would not have a vote, the current structure does not in any way bar stakeholder outreach prior to filing a change, just like the extensive outreach the Members undertook prior to making the Southeast EEM Filings.  *See* Southeast EEM Agreement Filing, Transmittal at 12; *id.*, Overview Aff. at P 20 (Stakeholder outreach has included "governmental entities and non-governmental entities such as environmental groups, trade associations, and individual customers. In many cases, there were multiple discussions with the same entity.  The resulting exchanges of ideas were robust and welcome.").

[134]     *See* Voltus Protest at 3; SREA Comments at 3-5; CEC Comments at 16; PIOs Protest at 30.

are subject to state authority are of course mindful of that, meaning that states will have a role through their relationship with Southeast EEM Members.

The CEC argues that the proposed governance and voting structure creates opportunities for the Southeast EEM Members to exercise market power and manipulation.[135]  This claim is based upon a fundamental lack of understanding of how the Southeast EEM will work – in fact, Southeast EEM Members will participate in the Southeast EEM the same way that all other Participants do: they will have no advantage or unique ability to exercise market power or manipulate prices.  Per the Southeast EEM Agreement, Southeast EEM Members will participate in the Southeast EEM as Participants.[136]  There are not different classes of participation that would give Southeast EEM Members an advantage.

The Southeast EEM Agreement also contains limitations on the use of transmission information and market information[137] that will bind all Southeast EEM Members to requirements comparable to the Affiliate Restrictions and Standards of Conduct.  And, as discussed above, any attempt by the Southeast EEM Members to change the rules or structure of the Southeast EEM must first be submitted to and reviewed by FERC under Section 205, subject to review and comment by all interested parties, thereby ensuring that market power and manipulation cannot take root through rules changes.

---

[135]      *See* CEC Comments at 26.

[136]      *See* Southeast EEM Agreement Filing, Transmittal Letter at 16 (explaining that "[e]ntities that submit bids and offers into the Southeast EEM System are called 'Participants' under the Southeast EEM Agreement" and that "Participation is open to all entities that can physically transact in bilateral markets in the Southeast today, i.e., any entity that 'own[s] or otherwise control[s] a Source within the Territory and/or is contractually obligated to serve a Sink within the Southeast EEM footprint,' as well as any entities that can physically transact in the future"); *see also id.*, Southeast EEM Agreement, Market Rules at III (listing Participant requirements).

[137]      *Id.*, Southeast EEM Agreement Article 3.5.

JA0886

**D.      The proposed governance structure is sufficiently transparent, but the Members will adopt some intervenor suggestions.**

Several commenters request more transparency in governance, for example by making meetings of the Membership Board observable by the public and or publishing meeting minutes.[138]  The Southeast EEM Members do not believe these measures to be necessary for the Commission to find the Southeast EEM proposal just and reasonable, but are amenable to those specific requests and commit to allow for public observation of Board meetings, sometimes limited in attendance for confidentiality purposes,[139] and to make meeting minutes public.  The Southeast EEM Members further commit to including those requirements in the business practice manuals to be developed.[140]

**E.      The minor requirements of and limitations on participation in the Southeast EEM are not unduly discriminatory and are necessary from an operational perspective.**

Intervenors argue that the Participant criteria do not constitute the bare minimum necessary to maximize participation, thus presenting unduly high barriers to participation and restrictions on the services that Participants can offer.[141]  In fact, the Participant criteria were developed to be as inclusive as possible and conform to the requirements for entities transacting in the bilateral market today, which is a physical market.  The requirements for participation are as follows:

- A Participant must execute a Participant Agreement and deliver the executed Participant Agreement to the Secretary and the Southeast EEM Administrator;

---

[138]     *See* EDF Comments at 5, 8-10; R Street Institute Comments at 4.

[139]     *See WEIS Order*, 173 FERC ¶ 61,267 at P 53, n. 90 ("Portions of the WMEC meetings may be limited in attendance for confidentiality purposes . . . .").

[140]     Further, the Southeast EEM Members commit to posting any applicable business practice manuals and meeting minutes on the Southeast EEM Website, https://southeastenergymarket.com/.

[141]     *See* Voltus Protest at 4; *see also* EDF Comments at 4-5, 7-8.

JA0887

- A Participant must execute and deliver a Non-Firm Energy Exchange Transmission Service Agreement with each Participating Transmission Provider who requires delivery of such agreement, or otherwise have access to Non-Firm Energy Exchange Transmission Service from each Participating Transmission Provider;

- A Participant must have or enter into an Enabling Agreement with at least three (3) or more Participants; and

- A Participant must own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory.[142]

Contrary to Voltus' claims, these requirements constitute the bare minimum necessary to maximize participation and each is fundamental to the proper functioning of the market. First, the Participant Agreement terms and conditions (with which not even Voltus takes issue) are quite standard and do not even require Participants to contribute to the start-up costs or operating expenses of the Southeast EEM.[143] Second, since NFEETS is a core element of the Southeast EEM, it would be impossible for the Algorithm to function without Participants having service agreements in place with each of the Participating Transmission Providers. Third, the three-counterparty rule is not a barrier to entry.[144] Rather, as described above, it is intended to balance the desire to allow maximum participation while addressing a potential avenue of market manipulation.

The final requirement, that Participants own or control a Source and/or Sink within the Territory, is likewise a fundamental criteria needed to ensure technical feasibility and to ensure that the Southeast EEM is able to function reliably within the parameters of the larger existing Southeast bilateral market. Yet intervenors claim that this requirement wrongfully prohibits three categories of transactions and resources from participating:  1) demand response ("DR")

---

[142]    Southeast EEM Agreement Filing, Southeast EEM Agreement, Market Rules at III.

[143]    *See id.*, Transmittal Letter at 16.

[144]    *See* Voltus Protest at 4.

42

JA0888

and distributed energy resources ("DER"); 2) financial transactions; and 3) transactions with a source or sink outside of the Southeast EEM Territory.[145]

EDF seeks further analysis of participation of DR and DER resources.[146]  While the Southeast EEM Members are not opposed to the inclusion of these resources in principle, the requirement that entities have contractual rights to, or control over, a Webregistry source and/or sink is fundamental to the functioning of the Algorithm because that information is needed for completion of e-Tags to effectuate an Energy Exchange.[147]  If DR or DER is included in the Webregistry as a source or sink, such resources can participate in the Southeast EEM.

Introducing financial transactions would fundamentally change the Southeast EEM proposal.  The Southeast EEM is a residual real-time physical market that results in tagged transmission transactions.  It does not run day-ahead followed by a real-time market like the day-ahead financial energy markets run by RTOs.  Because it is a residual market intended to make use of unused physical transmission, this market runs last, with tags generated 15 minutes before power flows for the physical flow of energy.  At the point that the schedules occur, BAs are only dealing with physical schedules.[148]  In day-ahead markets in RTOs, which typically accommodate financial transactions, there is a subsequent market in real-time in which day-ahead financial transactions are cleared; there is no market for arranging financial schedules after

---

[145]     *See* Voltus Protest at 4; EDF Comments at 4-5, 7-8.

[146]     *See* EDF Comments at 7-8.

[147]     Southeast EEM Agreement Filing, Operations Aff. at P 17; *Id.*, Southeast EEM Agreement, Market Rules at IV.B.3.v (requiring "For all Offers, a Source and for all Bids, a Sink"); *id.*, Market Rules at II (defining a "Source" as "a pre-approved and validated OATI webRegistry source point" and a "Sink" as "a pre-approved and validated OATI webRegistry sink point.").

[148]     To ensure reliability, BAs must confirm the Net Balancing Authority Area Scheduled Interchange (*i.e.*, scheduled physical flows between Balancing Authorities), which is a fixed parameter each BA operates to by managing real-time imbalances within the BA control area.  Reliability is supported by each BA operating the assets under its control to maintain the agreed-upon Net Balancing Authority Area Scheduled Interchange.

JA0889

the day-ahead market.  The output of all RTO real-time markets is physical schedules.  The Southeast EEM also operates to determine real-time schedules, so all of the schedules must be physical.  A financial product in the Southeast EEM simply would not work.

Allowing transactions with resources from outside of the Southeast EEM Territory would present a level of operational and reliability complexity that is beyond the Southeast EEM's ability to solve at the current time.  Among other things, unless coordination agreements are developed that change tagging practices of Southeast EEM neighbors, transactions from outside the region will have a similar timing issue to the one described above:  outside transactions will be tagged before Southeast EEM transactions.  For transactions entirely within the Southeast EEM Territory, bidders' submission of quantity, price, source and sink information will allow the Southeast EEM algorithm to build an e-tag.  Any transactions involving the use of transmission outside of the Territory, however, would require the coordination of e-tags with non-NFEETS transmission providers in the less-than-20 minute timeframe required, which is not possible at this time.  The Southeast EEM Members are willing to discuss these complex issues with MISO, PJM and SPP for possible future expansion of Southeast EEM transaction eligibility, but for now it is not feasible to implement out-of-Territory transactions within the current framework of the Southeast EEM proposal.

It is worth noting, however, that the Southeast EEM Territory is always open to expansion when a potential new Member that provides transmission service is willing to join and implement NFEETS.  And nothing in the Southeast EEM design prohibits a load from importing generation from a neighboring region on an hourly or longer basis, and selling in-region output from generation freed up by such a transaction through the Southeast EEM.

JA0890

F.     **Intervenors generally support the proposed $0 rate for NFEETS, and minimal concerns about losses and imbalance charges appear to be based on misconceptions.**

Unsurprisingly, there was little opposition to the $0 NFEETS rate. The CEC did take aim at the rate, claiming it could harm network load.[149] But substantial actual network loads supported the proposal, including of course the Members of the Southeast EEM, who are all LSEs.[150] The CEC similarly argues that the Southeast EEM proposal may "lead to cost shifts among SEEM Members."[151] This "we know what's best for you better than you do" positioning by the CEC illustrates that arguments they make are based on their desired outcome of stopping the Southeast EEM, rather than principled evaluation of each issue.

The merits of this issue were thoroughly explained by Mr. Melda and Mr. Bellar:

> Since Southeast EEM will only use transmission that is not otherwise being used, it will not result in underfunding of transmission, which will still be paid for through current rate constructs, *i.e.*, through revenues received from customers of Network Service and Point-to-Point Service, or their equivalent. It is possible that availability of the new free service will lead to some slight decrease in Point-to-Point revenues, which in turn would lessen revenue credits used to offset Network Service charges. However, today, Participating Transmission Providers' revenues from short-term wheeling transactions of the type that could be replaced by Southeast EEM transactions are minimal. In general, we expect that any small increase in Network Service charges will be more than offset by reductions in overall customers' costs attained through the Southeast EEM.[152]

No contrary evidence was offered. The CEC claims that Firm Point-to-Point customers may be harmed because their costs may increase but, according to the CEC, "they would be

---

[149]     CEC Comments at 39-40.

[150]     *See also generally* AFPA Comments (industrial customers generally supporting Southeast EEM proposal). While it appears that the CEC may include some businesses that are end-use customers, the purpose of those customers belonging to the CEC is because "[t]hey share a common interest in expanding the use of advanced energy." CEC Comments at 3.

[151]     CEC Comments at 41.

[152]     Southeast EEM Agreement Filing, Overview Aff. at P 23.

unlikely to benefit from Energy Exchange sales, because presumably they would use their firm rights to complete transactions."[153]  This speculation is illogical.  First, the only evidence in the record is that foregone revenues from non-firm transmission will be minimal.  Second, any rational load, whether served by Network Service or Point-to-Point Service, will view its transmission costs as sunk, and still make Energy Exchange transactions where such transactions reduce the delivered cost of power.  Indeed, native load will not be relieved of its requirement to pay for network service when it takes NFEETS for a particular transaction.[154]  Thus, all customers have the same opportunities to obtain the same benefits on the same terms and conditions.  That is the opposite of undue discrimination.

The CEC also questions why financial losses are used,[155] arguing that the change has not been explained.  The explanation is in the Affidavit of Mr. Sellers and Mr. McGeeney,[156] and stands unrefuted.  The CEC maintains they would be willing to accept financial losses if the Southeast EEM Members agreed to an EIM or RTO.[157]  But this is not an exercise in haggling; the jurisdictional Southeast EEM Members are exercising their statutory right to propose a rate, and the Commission's role in reviewing it is passive and reactive.[158]  The CEC does not offer a

---

[153]     CEC Comments at 39-40.

[154]     Southeast EEM Agreement Filing, Transmittal Letter at 37 ("[E]ach LSE must maintain adequate firm NITS and Point-to-Point Service on the transmission system where it is located in the amount of its entire wholesale and retail native load.").

[155]     CEC Comments at 45-46

[156]     *See* Southeast EEM Agreement Filing, Operations Aff. at P 33.

[157]     CEC Comments at 45.

[158]     *Sw. Power Pool, Inc.*, 166 FERC ¶ 61,019 at P 31 (2019) ("[T]he Commission's charge under FPA section 205 [is] to determine whether [a] proposal [is] just and reasonable and not unduly discriminatory.  The courts have described this role as 'essentially passive and reactive,' restricted to 'evaluating the confined proposal.') (citing *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (citing *City of Winnfield v. FERC*, 744 F.2d 871, 875-76 (D.C. Cir. 1984))).

JA0892

substantive reason why the explanations provided in support of financial losses are insufficient, nor do they attempt to distinguish the cases cited in support of the use of financial losses.[159]

The CEC's arguments about imbalance charges[160] also lack merit. The CEC argues that there should be only one transmission charge, and hence one imbalance charge, per Energy Exchange.[161] But transmission across multiple systems today must pay for imbalance on both the source and sink systems. Eliminating some of those imbalance charges would unjustly and unreasonably require transmission owners to subsidize imbalances. As to applying imbalance charges on an hourly basis,[162] again that is how it occurs today, even when there are 15-minute transactions, as there sometimes are. Imbalances are integrated across the hour, and that will continue with imbalances resulting from Energy Exchanges.

The CEC's concern that NFEETS creates opportunities for undue discrimination because it "forbids" Participants from obtaining NFEETS through OASIS[163] is also incorrect. The Southeast EEM Agreement Filing made clear that NFEETS necessary for matched transactions will be scheduled through OASIS on all impacted transmission systems, which will be done by the Southeast EEM System, rather than directly by individual counterparties.[164] Moreover, as discussed above, access to NFEETS will be comparable for all similarly situated resources.

---

[159]    *See, e.g.*, *Louisville Gas & Elec. Co.*, Revisions to LG&E/KU Joint OATT Transmission Tariff, Transmittal Letter at 10, Docket No. ER21-1118-000 (citing to *Ariz. Pub. Serv. Co.*, 143 FERC ¶ 61,280 at P 28 (2013); *Ariz. Pub. Serv. Co.*, 155 FERC ¶ 61,112 at P 125 (2016)).

[160]    CEC Comments at 36-39.

[161]    *Id.* at 37.

[162]    *Id.* at 37-38.

[163]    *Id.* at 34-35.

[164]    *See, e.g.*, Southeast EEM Agreement, Market Rules at IV.C.8.iv (requiring that information to be submitted through OASIS).

### G.     The proposal includes the appropriate level of market data transparency.

Some commenters request that more granular data be published.[165] They argue generally that this will send potentially useful price signals.[166] But Southeast EEM transactions are not locational, and the results of the matching algorithm will be unpredictable.[167] The usefulness of additional information therefore is limited. Moreover, Southeast EEM Members are concerned that offering to provide more specific data identifying pricing of individual transactions, or bids and offers, could raise concerns among antitrust regulators.[168] The Southeast EEM Members have given careful consideration to these requests for publication of additional information, and continue to believe that the proposed data disclosures, as supplemented by information reported in Electric Quarterly Reports, strike the best balance.

### H.     The Market Rules include the terms and conditions necessary to determine how the Algorithm should function – nothing further is necessary in the filed rate.

The Market Rules provide Southeast EEM Participants with the rules by which the market will operate and do so with sufficient specificity. Intervenors' concerns with the computer algorithm that will actually implement those rules – both in terms of specificity and feasibility[169] – are not a basis to find that the proposal is not just and reasonable.

---

[165]     EDF Comments at 5-7; R Street Institute Comments at 6-8; CEC Comments at 21-22; PIOs Protest at 37-38; Voltus Protest at 5.

[166]     R Street Institute Comments at 8.

[167]     Southeast EEM Agreement Filing, Economics Aff. at PP 49-50.

[168]     Without appropriate safeguards, price information exchanges among competitors may facilitate collusion or otherwise reduce competition. *See*, U.S. Dep't of Justice & Fed. Trade Comm'n, Statements of Antitrust Enforcement Policy in Health Care at 49 (1996), http://www.justice.gov/atr/public/guidelines/1791.htm; *see also*, *e.g.*, *In re Coordination Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445-50 (9th Cir. 1990) (exchanges of price information treated as plus factor from which jury could infer agreement among rivals to fix prices).

[169]     Entergy Protest at 7; CEC Comments at 42; PIOs Protest at 21.

The CEC and Entergy argue in some form that the Algorithm should be included in the Market Rules. The CEC makes several general allegations that the Market Rules do not contain sufficient detail.[170] The CEC requests that the Southeast EEM Agreement be revised to include the "formula rate for calculating the Energy Exchange Prices." The Market Rules already present the mathematical equation for how Energy Exchange prices will be calculated.[171] Demanding that it be written in numbers and symbols rather than words is the epitome of elevating form over substance. The CEC's further request that the agreement include "detailed examples of how the Algorithm will solve given different scenarios of inputs, constraints, and transmission limitations,"[172] is well beyond the scope of what is required under FPA Section 205. The CEC even refers to these allegedly missing provisions as "implementation details,"[173] which are exactly the type of information that the Commission regularly finds are best left to unfiled business practice manuals.[174] Entergy's request that the Algorithm be included in the filed rate to permit assessment of impacts on MISO fares no better; as explained below the Southeast EEM proposal passes the test for impacts on neighboring systems recently established in a proceeding regarding the SPP WEIS.

---

[170]   CEC Comments at 42-44.

[171]   Southeast EEM Agreement, Market Rules at IV.C.5.a ("Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.").

[172]   CEC Comments at 43.

[173]   *Id.* at 44.

[174]   *See, e.g.*, *Cal. Indep. Sys. Operator Corp.*, 154 FERC ¶ 61,200 at P 4 (2016) ("Decisions on whether to place an item in CAISO's tariff or the business practice manual are shaped by the Commission's 'rule of reason' policy, which dictates that provisions that 'significantly affect rates, terms, and conditions' of service must be included in the tariff, while items better classified as ***implementation details*** may be included only in the business practice manual." (emphasis added)).

JA0895

The PIOs allege that the proposed Southeast EEM design "may not be computationally feasible" and that the Southeast EEM Members "appear not to have considered" whether or not the design was feasible.[175]  As explained in the Operations Affidavit, the Southeast EEM Members took the job of designing the Southeast EEM seriously and dedicated substantial personnel hours from various roles across the Southeast EEM Member companies to develop the proposal, including a dedicated subgroup on "algorithm issues."[176]  The Southeast EEM Members decided, for example, not to include "linked" bids in the design due to possible impacts on feasibility.  The Southeast EEM Members also did initial outreach to potential vendors in the early stages of planning as part of their due diligence "to test the feasibility and cost of creating the Southeast EEM System."[177]

In any event, the feasibility of the Algorithm is a necessary precondition to Southeast EEM start up, rendering the PIOs' argument moot.  The platform cannot function without it.  The Southeast EEM Members initiated an RFP process in early February and has received proposals from several vendors that are competing to design the Southeast EEM System.  The Southeast EEM Members remain optimistic that their proposed Q1 2022 go-live date for the Southeast EEM is realistic, provided, of course, that the Commission's order is not delayed.  That date, however, is designed to be flexible to allow time to address any issues that arise.  The Southeast EEM Agreement and the Southeast EEM Filings recognize the potential for delays and so do not

---

[175]     PIOs Protest at 20-21.

[176]     Southeast EEM Agreement Filing, Operations Aff. at P 5.

[177]     *Id.* at P 31 (emphasis added); *see also id.*, Overview Aff. at P 31.  The Southeast EEM Members also note that none of the vendors, in their responses to the Request for Proposals, expressed concerns surrounding the implementation of the Algorithm in the time allotted.

include a hard-wired Commencement Date.[178]  The Southeast EEM Members have committed to

make a filing with the Commission at least 30 days prior to the Commencement Date.  These

precautions provide the necessary flexibility to ensure that the system will not go live until it is

technically feasible to do so.

### I.       No intervenor raised any real reliability concerns.

In its comments, PJM noted that the proposal appears to "provide for a potentially helpful

modification to the existing bilateral market" and that it does not at this time "anticipate any

negative effects to PJM's system."[179]  Similarly, MISO noted that it "appreciates the efficiencies

that the Southeast EEM is expected to create for its members" and that it does not wish to "delay

or obstruct" the Commission's review of the proposal.[180]  MISO says that "no formal

coordination [between MISO and Southeast EEM] is needed at this time,"[181] but is requesting a

commitment that the Southeast EEM Members coordinate with it should there be "an expansion

of scope of market activities or operations within the Southeast EEM" in the future.[182]

The Southeast EEM Members agree with PJM and MISO, that based on the current

proposal, there is not an immediate need for any type of additional seams or operating

agreement.  Several Southeast EEM Members have existing coordination agreements with PJM

and/or MISO and will continue to coordinate in the future as necessary.  Like PJM and MISO,

---

[178]     Southeast EEM Agreement Filing, Southeast EEM Agreement at Article 1.1 (defining "Commencement Date" as "the date upon which the Southeast EEM commences operation" separately from the definition of the "Effective Date" of the agreement); *id.*, Transmittal Letter at 42.

[179]     PJM Comments at 2.

[180]     MISO Comments at 3.

[181]     *Id.* at 7.

[182]     *Id.* at 4.

JA0897

those Southeast EEM Members have concluded that the Southeast EEM proposal does not

necessitate any changes to those agreements, which are beyond the scope of this proceeding.

Nonetheless, the CEC[183] and Entergy[184] argue that more is necessary.  In particular, they

draw inaccurate comparisons to Entergy's integration into MISO.[185]  However, the Southeast

EEM proposes to observe all physical and contractual limits on the transmission system of the

Southeast EEM Members.  To put it simply, an Energy Exchange would never be matched if it

needed to rely on a neighboring systems transmission system.  Thus, Southeast EEM flows are

not comparable to flows under the MISO Settlement Agreement.  Indeed, the Southeast EEM

does not alter how transmission availability is calculated for bilateral transactions today and will

not adversely affect the MISO Settlement Agreement.

Additionally, the Southeast EEM proposal passes the test recently stated by the

Commission in two cases with respect to the SPP WEIS.  In the first case, the Commission

rejected SPP's approach, finding that the "proposal incorrectly presume[d] that [non-

participants'] transmission is SPP's to use for the WEIS Market in the first instance, and that the

obligation to ensure that the WEIS Market respects non-participating entities transmission rights

---

[183]     CEC Comments at 47-48.

[184]     *See generally*, Entergy Protest.

[185]     When Entergy integrated into MISO in 2013, it was (and still is) connected to the rest of MISO through a 1,000 MW contract path.  Despite this physical limitation, at the time of Entergy's integration, MISO did not consider the 1,000 MW contract path as a limitation to its market-wide joint dispatch, based on its interpretation of a disputed contract provision, resulting in significant excess flows on systems neighboring MISO.  *See generally Sw. Power Pool, Inc. v. Midcontinent Indep. Sys. Operator, Inc.*, Complaint and Request for Fast Track Processing and Motion to Consolidate, Docket No. EL14-21-000 (filed Jan. 28, 2014).  MISO, Entergy and others subsequently entered into a settlement agreement whereby MISO makes payments when its system dispatch exceeds that 1,000 MW contractual limitation.  *See generally, Sw. Power Pool, Inc.*, Offer of Settlement, Docket No. EL14-21-000 (filed Oct. 13, 2015), *accepted* 154 FERC ¶ 61,021 (2016) ("MISO Settlement Agreement").

rests with those entities, rather than with the WEIS Market itself."[186]  In other words, initially the WEIS approach failed because it looked like the MISO approach, but without the settlement and resulting payments for use of neighboring transmission systems that allowed the MISO approach to go forward.  In response, SPP tightened its approach, proposing use of a security constrained economic dispatch ("SCED") that would reflect transmission constraints based on transmission availability information provided by WEIS participants.  The Commission found this was sufficient to ensure that the market solution would be "forced to respect" the transmission rights held by participants.[187]

Because the Southeast EEM likewise will rely only on Participating Transmission Providers' transmission system and reflect transmission constraints based on transmission availability, the second WEIS decision controls the outcome here.  As Mr. McGeeney and Mr. Sellers made clear in the Operations Affidavit, the data inputs for the Southeast EEM System "ensure that Energy Exchanges can only use transmission that is voluntarily made available to the Southeast EEM."[188]  The Algorithm will be designed to "prevent unauthorized use of transmission systems,"[189] including those that border the Southeast EEM Territory.  Such commitments are sufficient.[190]  So while MISO's approach was to use transmission it did not have rights to use, the Southeast EEM will: 1) limit NFEETS to the physical capabilities of

---

[186]     *See Sw. Power Pool, Inc.*, 172 FERC ¶ 61,115 at P 42 (2020).

[187]     *WEIS Order*, 173 FERC ¶ 61,267 at PP 124-25 ("We find that SPP's proposed modeling of transmission rights will limit flows resulting from WEIS Market dispatch, and we disagree with protesters that this is unclear. Because transmission constraints reflecting transmission rights made available by WEIS Participants will be integrated into the SCED market prior to the market running, the market solution will be forced to respect those rights.").

[188]     Southeast EEM Agreement Filing, Operations Aff. at P 35.

[189]     *Id.*

[190]     *WEIS Order*, 173 FERC ¶ 61,267 at PP 124-25.

JA0899

Member systems by relying on a "Network Map" that includes only Participating Transmission Providers' systems,[191] and 2) take those physical limitations into account to match up individual transactions,[192] just as occurs in the bilateral market today, and just as the Commission recently approved in the WEIS.[193]

## V.     Requests for further process should be rejected.

### A.     Consolidation is unnecessary.

It is not necessary to consolidate the Southeast EEM proceedings as some request.[194] Despite intervenors' arguments that multiple dockets are an administrative burden, all intervenors in the proceeding managed to appropriately file their comments in each docket with a caption that the proceedings are not consolidated.  Therefore, whatever burden that presented is now in the past.  It is also not appropriate to consolidate proceedings.  Notwithstanding the common nexus of facts, the filings are by different entities who retain their individual Section 205 rights.  Moreover, the Commission's general rule is that consolidation is only appropriate where further process is necessary,[195] and here further process is neither necessary nor appropriate.

---

[191]     *See* Southeast EEM Agreement Filing, Operations Aff. at PP 35-36 (describing data inputs that "prevent unauthorized use of transmission systems").

[192]     *See id.*  For these reasons, MISO's note (at 7-8) that AECI is connected to TVA (which further connects it to the rest of the Southeast EEM footprint) via a single contract path with up to 700 MWA of contract path capacity does not raise the same reliability and transmission usage concerns as Entergy's integration into MISO.

[193]     *WEIS Order*, 173 FERC ¶ 61,267 at PP 124-25.

[194]     Public Citizen Protest at 2; Voltus Protest at 7.

[195]     *See Midwest Indep. Transmission Sys. Operator, Inc.*, 123 FERC ¶ 61,142 at P 22 (2008).

JA0900


**B.      There is no need for a technical conference in this proceeding.**

While several intervenors acknowledge any technical conference can occur separately from this proceeding,[196] certain intervenors improperly urge the Commission to delay its ruling on this Section 205 filing until a technical conference can be held to determine if the creation of an organized wholesale market such as an RTO or EIM would be a superior alternative.[197]  For the same reasons discussed above in Section III.B, these requests should be rejected.  The Commission considers whether *this* Section 205 filing is just and reasonable, not whether some potential alternative—even one that might arise from a technical conference—may be superior.[198]  There is nothing about the merits of this proceeding that warrants the sort of fact finding that would take place at a technical conference.

If the Commission elects to hold a technical conference on the future of the Southeast, there is no reason to do it in this docket and impede realization of the benefits of the Southeast EEM.  It is worth reiterating here the delicate balance represented by the proposal before the Commission, and that previous attempts to develop an RTO in the Southeast have not been successful.[199]   In this context, the proposed Southeast EEM is a significant step to increasing

---

[196]      Tom Davis Letter at 2; Nathan Ballentine Letter at 2; SREA Comments at 8; CEC Comments at 2.

[197]      Voltus Protest at 6; PIOs Protest at 59-63.

[198]      *NRG*, 862 F.3d at 115.  *See also supra* note 35.

[199]      For example, in 2002, numerous Southeastern utilities made joint filings at FERC related to a proposed "SeTrans Regional Transmission Organization."  *See, e.g.*, *Cleco Power LLC*, 101 FERC ¶ 61,008 (2002), *order on reh'g*, 103 FERC ¶ 61,272 (2003).  Creation of the SeTrans Regional Transmission Organization failed because "[t]he retail commissions in the [Southeast] region have expressed significant concerns about the role of an RTO and its effects on matters subject to their jurisdiction, including concerns about native load protection and cost impacts.  They have expressed their concerns in numerous public forums, letters to FERC and Congress, and in SEARUC resolutions.  In recent weeks, it has become increasingly apparent that most of the public service commissions continue to have these concerns.  The jurisdictional Sponsors have now concluded that it is highly unlikely that consensus support and acceptance for the SeTrans RTO will be forthcoming from all applicable state and federal agencies.  In light of this determination, the Sponsors have decided unanimously to suspend the

JA0901

cooperation, utilization, and achieving benefits in the Southeast, as many intervenors

recognized.[200]

As the Commission examines the requests for a technical conference, it may also wish to

consider the practicalities that would confront any effort to force an all-at-once leap to an

organized wholesale electric market and transmission sharing system, as opposed to building

through consensus, step-by-step.  A simple look at the regional map shows a comprehensive

Southeastern market cannot be achieved by Commission fiat,[201] because the transmission grid

needed for regional integration is substantially under the control of non-jurisdictional entities like

TVA:



---

SeTrans effort.").  *Cleco Power LLC*, Status Report Regarding the SeTrans RTO Proposal, Docket No.
EL02-101-000 (filed Dec. 11, 2003).

[200]        *See supra* note 13.

[201]        Even leaving aside, for present purposes, whether the Commission could order jurisdictional
utilities to take such a step.

JA0902

Moreover, half the expected net energy for load in the footprint is either non-jurisdictional, or not able to connect to the rest of the region without using non-jurisdictional transmission:

| Member/Prospective Member | NEL | Percentage of Total |
|---|---|---|
| AECI | 23,474,005 | 4% |
| Dalton Utilities | 2,067,319 | 0% |
| Dominion Energy SC | 23,120,146 | 4% |
| Duke Energy Carolinas | 86,663,827 | 14% |
| Duke Energy Progress | 46,402,556 | 8% |
| GSOC, GTC, OPC | 41,261,927 | 7% |
| LG&E & KU | 33,165,655 | 5% |
| MEAG | 11,326,212 | 2% |
| NC Municipal Power Agency 1 (Electricities) | 4,921,479 | 1% |
| NCEMC | 13,323,038 | 2% |
| PowerSouth | 9,228,988 | 1% |
| Santee Cooper | 8,728,235 | 1% |
| Southern Companies | 153,910,118 | 25% |
| TVA | 159,328,344 | 26% |
|  |  |  |
| **Total** | 616,921,849 | 100% |
|  |  |  |
| **Southeast EEM if Non-jurisdictional Members & utilities that connect through non-jurisdictional Members are removed** | 310,096,647 | 50% |

The existing Southeast market is built on sound decision-making by various jurisdictions that each review and select the generation mix that best reliably serves load. The result is a regional grid that enjoys below-average costs of electricity[202] and above-average reliability.[203] So the

---

[202]    *See supra* at 21 (chart comparing state versus national averages of electricity prices).

[203]    *See* NERC, 2020 Long-Term Reliability Assessment at 123 (Dec. 2020), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2020.pdf (Describing NERC's assessment of the SERC region, including that: "ARMs are at or above 20% in all assessment areas and do not fall below the NERC 15% target reference margin at any point during the

JA0903

central idea that worked for building a consensus in the Southeast was to build upon and enhance the successful foundation that already exists in the Southeast. The resulting Southeast EEM proposal is based on thoughtful region-wide dialogue and exchanges of ideas between jurisdictional and non-jurisdictional entities resulting in the consensus filing made here. In short, the Southeast EEM proposal represents a success where prior plans have failed. The Southeast EEM Members ask the Commission to respect that successful collaborative decisional process by acting on this proposal separately from any other Southeastern initiative the Commission may decide to undertake.

### C. The Southeast EEM Members provided sufficient evidence in the record for the Commission to accept the proposal without a deficiency letter, and intervenors raise no real factual issues.

Several intervenors argue that the Commission should issue a deficiency letter or reject the filing.[204] They generally allege that more information is necessary related to stakeholder and consumer protections and compliance with open access requirements. Each of these critiques has been addressed and disposed of above. Therefore, there are no open questions of fact, and so no need for a deficiency letter. The Southeast EEM Members provided substantial information in support of their proposal, and the Commission should act on the record before it.

## VI. Conclusion

For the reasons set forth above, the Southeast EEM Members respectfully request that the Commission accept this Answer and accept the Southeast EEM Agreement, without suspension,

---

assessment period. Additionally, all assessment areas maintain ten-year reserve margins above SERC's internally calculated reference reserve margin . . . SERC entities have sufficient generation to meet demand over this assessment period . . . No reliability issues are expected within the assessment area.").

[204]     CEC Comments at 6, 21-22, 27, 41, 43; PIOs Protest at 56-59.

JA0904

hearing or modification, to become effective on May 13, 2021, and accept the associated OATT

Filings to become effective as of the Commencement Date of the Southeast EEM.

<div align="center">

Respectfully submitted,

/s/ Noel Symons

</div>

Noel Symons
Julia Dryden English
Katlyn A. Farrell
Carrie A. Mobley
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-2929
nsymons@mcguirewoods.com

*Counsel for the Members of the*
*Southeast Energy Exchange Market*

March 30, 2021

JA0905

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day caused to be served a copy of the foregoing upon all parties on the service list in these proceedings in accordance with the requirements of Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010 (2020).

Dated at Washington, D.C. this 30th day of March, 2021.

/s/ Carrie A. Mobley
Carrie A. Mobley
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
cmobley@mcguirewoods.com

*Counsel for the Members of the*
*Southeast Energy Exchange Market*

JA0906

Document Content(s)
Southeast EEM Motion for Leave to Answer and Answer.PDF...................1

**McGuireWoods LLP**
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Phone: 202.857.1700
www.mcguirewoods.com

**Noel Symons**
Direct: 202.857.2929

# McGUIREWOODS

NSymons@McGuireWoods.com

June 7, 2021

**VIA ETARIFF**

Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re:     ***Alabama Power Co.*, Docket No. ER21-1111-000**
***Dominion Energy South Carolina, Inc.*, Docket No. ER21-1112-000**
***Louisville Gas & Elec. Co.*, Docket No. ER21-1114-000**
***Duke Energy Progress, LLC, Duke Energy Carolinas, LLC*, Docket No. ER21-1115-000**
***Duke Energy Carolinas, LLC*, Docket No. ER21-1116-000**
***Duke Energy Progress, LLC*, Docket No. ER21-1117-000**
***Louisville Gas & Elec. Co.*, Docket No. ER21-1118-000**
***Georgia Power Co.*, Docket No. ER21-1119-000**
***Kentucky Utilities Co.*, Docket No. ER21-1120-000**
***Mississippi Power Co.*, Docket No. ER21-1121-000**
***Alabama Power Co.*, Docket No. ER21-1125-000**
***Dominion Energy South Carolina, Inc.*, Docket No. ER21-1128-000**
**(not consolidated)**

**Response to Deficiency Letter**

Dear Secretary Bose:

The Members of the Southeast Energy Exchange Market ("Southeast EEM") hereby respond to the Deficiency Letter issued by the Staff of the Federal Energy Regulatory Commission ("Commission" or "FERC") on May 4, 2021.[1]

The Southeast EEM Members[2] appreciate the opportunity to respond to the questions

---

[1]     *Ala. Power Co.*, Deficiency Letter, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000 ER21-1128-000 (May 4, 2021) ("Deficiency Letter").  Because the Deficiency Letter was issued in each Southeast EEM Filing docket, the Southeast EEM Members are filing this Response in each docket.  The only difference is the tariff record accompanying each eTariff submission, which correspond to the company making the filing.

[2]     For purposes of this Filing, the Southeast EEM Members are: Alabama Power Company, Georgia

---

Atlanta | Austin | Baltimore | Charlotte | Charlottesville | Chicago | Dallas | Houston | Jacksonville | London | Los Angeles - Century City
Los Angeles - Downtown | New York | Norfolk | Pittsburgh | Raleigh | Richmond | San Francisco | Tysons | Washington, D.C.

markets are required to purchase energy if necessary to serve their firm load and sellers must sell energy they will be injecting in excess of their firm contractual commitments made prior to the balancing market.  Participants in such markets, such as the Western EIM, are required to settle imbalances on their firm commitments.  In the Southeast EEM, *the buyer can specify its maximum purchase price, and choose not to transact through the Southeast EEM at a price above that maximum, even if the buyer has an imbalance*.  In the Southeast EEM, the LSE specifies its Bid Price, and the rules expressly provide that the LSE will not be matched at a price above its Bid Price, minus net Losses.[21]  A rational resource-adequate LSE will tend to specify a maximum bid price at a level that is at or near its marginal cost of energy for its firm resource. Accordingly, the marginal energy costs for firm resources used by LSEs to maintain resource adequacy will be *de facto* price caps for matches for LSEs in the Southeast EEM, meaning that suppliers will not be able to raise Southeast EEM prices above the marginal energy costs of the purchasing LSEs.

Because Offerors will not be able to raise energy prices above the marginal energy cost of the Bidder, the only question remaining is whether Offerors could first influence the marginal energy cost of the Bidders, and thereby create an opportunity to raise prices in the Southeast EEM Market.  And the answer to that question is no, due to the Commission's existing market power mitigation measures, which have already been applied to each jurisdictional Member.[22] Thus, the Southeast EEM Market will interact with the existing bilateral market, from a market power perspective, in that already-mitigated prices of hourly or longer firm transactions will also serve to mitigate prices for Southeast EEM Energy Exchanges.

The Southeast EEM is not a balancing market.[23]  Nor will the Southeast EEM replace the balancing service provided by the ten balancing authorities across the Southeast EEM footprint.[24] Again, this underscores the differences between the "EEM" approach on the table here, and the "EIM" approach used in the West.  Balancing markets have clearing prices for imbalances that cannot be avoided, while in the EEM, because it is not a Balancing Authority and does not

---

[21]     Southeast EEM Agreement, Market Rules, IV.C.6.b.ii.c.

[22]     *See S.C. Elec. & Gas Co.*, 121 FERC ¶ 61,263 at P 6 (2007) (finding that Dominion Energy SC's (f/k/a South Carolina Electric and Gas Company) "proposal not to make sales within its balancing authority area under its market-based rate tariff adequately addressed [Dominion Energy SC's] failure of the market share screen in its balancing authority area"); *LG&E Energy Mktg., Inc.*, Docket Nos. ER06-1046-000, *et al.* (letter order issued July 6, 2006) (accepting "revised market-based rate tariff sheets that would, among other things, restrict the LG&E Parties' authority to make sales at market-based rates in the LG&E/KU control area" upon LG&E/KU's exit from the Midwest Independent System Operator, Inc.); *Ala. Power Co.*, 163 FERC ¶ 61,090 at P 32 (2018) (finding that the price cap and auction process established in each of the Southern Companies' MBR tariffs "serve as adequate mitigation for the Southern, SCEG, Tallahassee, and Santee Cooper balancing authority areas"); *Duke Power*, 111 FERC ¶ 61,506 at P 61 (2005) (Commission prohibiting Duke sales within the DEC balancing authority to "mitigate the potential for the exercise of generation market power"); *Fla. Power Corp.*, 113 FERC ¶ 61,131 (2016) (prohibiting Duke sales in the DEP BA).

[23]     Attachment D, Pope Aff. at PP 27-50.

[24]     *Id.* at P 27.

June 6, 2021
Page 13

balance supply and demand in real-time, buyers and sellers may simply decline to transact if an Energy Exchange is not available at a beneficial match price.

For all of these reasons, Southeast EEM transactions will only decrease customer costs. This is so because a Southeast EEM Participant will only enter into an Energy Exchange as a buyer if doing so will decrease its energy costs, as just explained, and will not enter into or be forced into a transaction at a price it is unwilling to pay.

> a. *Please identify what product(s) currently available in the bilateral wholesale energy market could reasonably be a substitute for the 15-minute residual energy Southeast EEM product.*

**Response:**

As discussed above, a purchasing LSE must be independently resource adequate, meaning that Southeast EEM Energy Exchanges may replace the "energy" component of a firm transaction (if the firm transaction provides that flexibility), but will not replace the "capacity" component of the transaction. Instead, each LSE will retain its firm rights to call upon its firm resources, in quantities sufficient to serve its load, even when it buys replacement energy through a non-firm Energy Exchange.[25]

This means that the product currently available in the bilateral wholesale market that could reasonably be a substitute for the 15-minute residual energy Southeast EEM product is the energy that can be called upon by an LSE from the firm resource it backed down (i.e., dispatched down) in favor of the energy from a Southeast EEM Energy Exchange. As also explained above, and by Dr. Pope, the availability of this callable firm energy, coupled with existing market power mitigation, will prevent any effort to exercise market power through the Southeast EEM.[26]

> b. *What is the supply in MWs of 15-minute residual energy expected to be offered, in terms of the number of companies offering to sell energy and the size of their offers, in a typical peak and off-peak period? What is the expected demand, in terms of the number of companies offering to purchase energy and their size, in a typical peak and off-peak period?*

**Response:**

Before market launch, forward looking estimates of the level of supply and demand in this voluntary residual market are difficult to make with any precision or certainty.[27] However, Dr. Pope expects that the market will attract robust participation by buyers and sellers in the Southeast.[28]

---

[25]    Similarly, non-firm energy sales or purchases could be replaced with Southeast EEM Energy Exchanges if the Energy Exchanges are more economic.

[26]    *See* Exhibit D, Pope Aff. at PP 37-39, 44-48.

[27]    *See* Southeast EEM Filings, Benefits Analysis at 19.

[28]    *Id.*, Econ. Aff. at P 70 ("The Proposal is expected to attract robust participation by buyers and sellers in the Southeast, due to its low transaction cost and the provision of zero-cost, non-pancaked

June 6, 2021
Page 14

In any event, with the commitments made herein the Commission will receive significant data on supply and demand conditions once the Southeast EEM is in operation, if approved. Specifically, the Administrator will provide the following actual data on supply conditions: (1) MWs of 15-minute residual energy offered, (2) the entities offering to sell energy, (3) the price and quantity information in the offer, and (4) and any restrictions on the identity or location of counterparties with whom each offer can be matched. The Administrator will also provide the follow data on demand conditions: (1) price and quantity information of bids in each 15-minute increment, (2) the entities bidding to purchase energy, (3) the price and quantity information in the bid, and (4) any restrictions on the identity or location of counterparties with whom each bid can be matched. This will provide sufficient detail for the Commission to evaluate peak and off-peak periods.

If there are periods of low transaction volumes, there will still be incremental benefits relative to a paradigm in which the Southeast EEM is not implemented, because (as described above at the start of the response to Question 3) each incremental transaction in the Southeast EEM will be at a lower price than the marginal cost of the energy being replaced, and the purchases that establish such marginal energy costs are already subject to market power mitigation. In other words, whether the volume of transactions in the Southeast EEM is low or high, customers will benefit. And because of the split-the-savings pricing, generators will benefit as well, including IPPs that elect to participate.

Additionally, because the Southeast EEM Members commit below to reporting data to the Commission that is comparable to what is required under Order No. 760 (although different in nature due to the differing market designs),[29] the Commission will have more than sufficient data to conduct analysis and oversight.

> c. *Do you expect trades for 15-minute residual energy will expand across the whole Southeast EEM Territory? Do you expect to have areas where some sellers are unlikely to find a match?*

**Response:**

Yes, the Southeast EEM Members anticipate that it is possible, and even likely, that Energy Exchanges will expand across the whole Southeast EEM Territory.[30] That is certainly the goal. This is an important aspect of the enhancement of the existing bilateral market.

Whether there are areas where some sellers are unlikely to find a match will depend on residual available transmission capacity. Transmission may or may not be available, just as is

---

NFEETS. Also, the Southeast EEM System will arrange these zero-cost bilateral trades using the available transmission of multiple Participating Transmission Providers spanning the broad Southeast EEM Territory, further encouraging competition. The Southeast EEM's pairing of zero-cost, non-pancaked transmission service with automated 15-minute trading is intended to engage willing buyers and sellers in the market, thereby fostering competition.").

[29]     *See* Response to Question 4.a.

[30]     *See* Southeast EEM Filings, Benefits Analysis at 17 (projecting between 40-45 15-minute trades (or wheel-throughs) in the Southeast EEM in a typical hour, with an average of 41 trades projected within each hour at 130 MW per trade in 2022).

June 6, 2021
Page 15

the case today. Additionally, there will likely be times during which sellers may be unable to find a match, just as there are today. With the advent of the Southeast EEM there should be more transactions than there currently are. This is because the role of the Southeast EEM is to create opportunities for transactions that would not occur otherwise – or to put it in the terms used in the question--to help sellers find matches they could not find today. And the underlying intent behind one of the purposes of the Southeast EEM is to maximize efficiency by fully utilizing the transmission system. So as Dr. Pope points out. "[i]f and when all residual ATC on one or more ATC limits is scheduled, it will indicate that the Southeast EEM Algorithm is functioning as intended."[31] Because Southeast EEM transactions will occur only on the basis of ATC that is available after all other uses of the transmission system are taken into account, there is no potential for Southeast EEM transactions to cause congestion that could preclude other transactions using other forms of OATT service.[32] And even if residual ATC is fully utilized for NFEETS supporting Energy Exchanges, there will still be no opportunity to exercise market power.[33]

> d. *Do you expect congestion, as in frequently binding constraints, would affect how trades are distributed across the Southeast EEM Territory in any time period? Do you expect that there will be frequent times when one area may not be able to trade with another because of congestion? If so, how would you expect to measure congestion in the Southeast EEM?*

**Response:**

In the Southeast, congestion can manifest as unavailability of transmission with which to conduct a transaction, or, in rare instances, cutting of a transaction through transmission loading relief ("TLR"). As noted above, it is a goal of the Southeast EEM to fully utilize otherwise unutilized transmission to enhance the efficient use of the system, such that any resulting unavailability of transmission will represent fulfilment of a goal of the Southeast EEM. As further noted above, this will not create congestion applicable to other types of transactions.

It is important to note that such full utilization of available residual transmission will not create "congestion" applicable to other transactions, such as firm transactions used to maintain resource adequacy, or even transactions supported by ordinary non-firm transmission. There are two safeguards against this, each independently sufficient. First, NFEETS will only be granted if there is residual ATC available along every leg of the Contract Path after all other non-NFEETS transmission schedules are taken into account.[34] This safeguard will work because NFEETS is only available after the time window to obtain other forms of transmission has closed. Second,

---

[31]     Attachment D, Pope Aff. at P 52.

[32]     *Id.* at P 53.

[33]     *Id.* at P 54.

[34]     To make this more clear, the Southeast EEM Members propose to amend Section IV.C.6.B.i of the Southeast EEM Agreement to read "In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the ATC of any Participating Transmission Provider on any given Contract Path to be exceeded."

June 6, 2021
Page 16

in the unlikely event that a TLR is called resulting in curtailment, NFEETS has lowest priority, and will be curtailed first.

Moreover, neither un-availability of transmission or TLRs will create opportunities to exercise market power, for the reasons already explained in more detail above in the response to Question 3; specifically, the 15-minute bilateral transactions for residual energy are not a substitute for obligations to maintain resource adequacy for LSEs to serve their load obligations, such that existing mitigation applicable to firm purchases made to meet those existing obligations will also suffice for Southeast EEM Energy Exchanges.

Finally, the Southeast EEM Members do not propose to measure congestion, *per se*. However, the Southeast EEM Members are proposing, as part of the data provided confidentially to the Commission every seven days, to provide (if feasible) information on the Implied Marginal Benefit of foregone transactions over each ATC limit, as explained in Dr. Pope's affidavit.[35] This information will be information about the benefit (the difference between the Bid and Offer) that is not realized for the next Energy Exchange that would have been scheduled over a constrained transmission facility if there had been sufficient transmission for an additional transaction.[36] Dr. Pope believes that the Commission could find this information helpful in monitoring for any attempts at market manipulation or to exercise market power.[37] As discussed in response to the next question, the revised Southeast EEM Agreement provides for this information to be provided confidentially to the Commission "to the extent such information can reasonably be produced by the Southeast EEM Algorithm."[38] The Southeast EEM Members commit to report to the Commission, in the notification filing that will be provided ahead of market launch, whether such information will be provided, and if not, what difficulties were encountered that made the effort to produce the information unreasonable.

> 4. *Filing Parties state that the Southeast EEM will not create new opportunities for market manipulation, such that the Commission's existing auditing and monitoring tools for bilateral markets will remain sufficient. Specifically, Filing Parties explain that the Commission will have access to individual trades via the Electronic Quarterly Reports (EQR) that 13 of the Southeast EEM Members are required to submit, representing approximately 98% of the total net energy for load of the Members. Filing Parties further explain that the Commission will continue to have access to e-Tag data submitted pursuant to Order No. 771. Filing Parties assert that Southeast EEM transactions will be easily identifiable in EQR and e-Tag data given the 15-minute duration of the schedule and use of NFEETS. Filing Parties also note that the Commission will have access to the aggregated Southeast EEM data in the informational reports that the Southeast EEM Administrator (Administrator) will post publicly. Lastly, Filing Parties state that the "three-eligible-counterparty rule," i.e., the requirement that all Participants have "toggled on" at least three unaffiliated potential counterparties each time they bid or offer, will protect against opportunities*

---

[35]    Attachment D, Pope Aff. at PP 16-26.

[36]    *Id.* at P 21.

[37]    *Id.* at PP 16, 24.

[38]    *See* Attachment A, Proposed Revisions to the Southeast EEM Agreement, at App'x D.

*for market manipulation.*

    a. *Please explain what, if any, information will routinely be available to the Commission to detect and address potential market manipulation in a near real-time manner (e.g., less than 30 days) in the Southeast EEM.*

**Response:**

    The Southeast EEM Members commit to providing information comparable to what RTOs provide under Order No. 760, but adjusted for the different market design of the Southeast EEM.  The list here includes all of the types of data identified by Commission Staff below in Question 4.b, plus additional information identified by Dr. Pope and the Southeast EEM Members as being potentially helpful.  Specifically, the Southeast EEM Members propose to amend the Southeast EEM Agreement to require the Southeast EEM Administrator to confidentially provide the following information to the Commission, and to the Market Auditor, every seven days:

- Participant, bid/offer price, quantity, location, and All or Nothing information for each bid and offer in each interval;

- Specific parameter data for each Participant for all 15-minute intervals, including counterparties the Participant has elected to not be matched with for an interval and Balancing areas for which the Participant has elected not to be matched with a counterparty during an interval;

- Enabling Agreement counterparties for each Participant;

- The Network Map, updated as necessary;

- For each interval, ATC made available to the Southeast EEM by each Participating Transmission Provider, as well as the amounts of such ATC that are not used by the Southeast EEM;

- Price caps, as relevant for each Participant;

- Matched bids and offers with their associated scheduled MWh quantity and Energy Exchange Price;

- Implied marginal benefit information for each ATC limit for each interval, to the extent such information can reasonably be produced by the Southeast EEM Algorithm; and

- Descriptive information, such as market participant names and unique identifiers.[39]

    The Southeast EEM Members propose to provide this information with respect to all transactions within the Southeast EEM, regardless of whether the parties to the transaction are jurisdictional.  However, submission of this data with respect to non-jurisdictional entities is voluntary in conjunction only with the participation of such entities in the Southeast EEM, and the Southeast EEM Members request that the Commission expressly confirm that submission

---

[39]    *See* Attachment A, Proposed Revisions to Southeast EEM Agreement, App'x D.

June 6, 2021
Page 18

and receipt of such data does not and will not affect the jurisdictional status of non-jurisdictional Members in any way. Also, with respect to the confidentiality of the information submitted, the Southeast EEM Members request that the Commission affirm that, like the information submitted by RTOs in response to Order No. 760, the data submitted by the Southeast EEM to FERC will remain non-public, and subject to FOIA Exemption 4.[40]

To implement this commitment, the Southeast EEM Members propose to add a new Section 2.5 to the Southeast EEM Agreement, which will state as follows:

> **The Southeast EEM Administrator shall provide the information set forth in Appendix D to FERC in accordance with FERC's secure file transfer protocol, and to the Market Auditor, every seven (7) days for the immediately preceding seven (7)-day period and shall answer any follow-up questions from FERC regarding such information, which questions and answers shall be posted on the Southeast EEM Website in the same manner as the reports of the Market Auditor, including the same requirements for confidential treatment of transmission information and commercially sensitive information.[41]**

> b. *Please explain whether the Administrator, Southeast EEM Market Auditor, or Membership Board will have the authority to respond to requests from the Commission for the following information for any and all Participants: specific parameter data for all 15-minute intervals, including toggled counterparty choices; Enabling Agreement counterparties; toggled balancing authority area choices; Available Transfer Capability made available to the Southeast EEM; bid/offer curves with price and quantity information; price caps; and/or matched bids with their associated price information.*

**Response:**

As described above, the Southeast EEM Members propose that the Administrator will confidentially provide this information to the Commission and the Market Auditor every seven days. The Southeast EEM Members believe that this will ensure that the Commission has access to meaningful information that will help detect any market concerns in near real-time. To the extent that the Commission has follow-up information requests, it may make such requests to the Administrator, in writing, or if specific to a particular Participant, to the Participant itself. For requests directed to the Administrator, the Administrator will follow the posting process outlined below in Response to Question 7.d.ii, and notify the Membership Board of such posting.

> c. *Please explain whether the Administrator, Southeast EEM Market Auditor, or Membership Board will be required to inform the Commission of potential violations of the Southeast EEM Market Rules or the Commission's statutes, regulations, or orders when and if they are identified.*

---

[40] *See* Enhancement of Elec. Mkt. Surveillance & Analysis through Ongoing Elec. Delivery of Data from Reg'l Transmission Orgs. & Indep. Sys. Operators, Order No. 760, 139 FERC ¶ 61,053 at PP 34-36 (2012) ("Order No. 760").

[41] *See* Attachment A, Proposed Revisions to Southeast EEM Agreement, Section 2.5.

**Response:**

      With the new commitments to provide data to the Commission and increase the transparency of Market Auditor reports to Participants, there will be significant transparency and ability to identify any violations of the Southeast EEM Market Rules or the Commission's statutes, regulations, or orders. The Commission can act upon such information *sua sponte*, and a Participant could file a complaint. With these safeguards, the Southeast EEM Members do not believe it is necessary to amend the Southeast EEM Agreement to require the Administrator or Membership Board to inform the Commission of potential violations; however, individual Southeast EEM Members or Participants may do so under the current Southeast EEM Agreement and Market Rules.

      As discussed further below, the transparency of Market Auditor reports is being increased, such that Participants, including the Southeast EEM Members and all others transacting in the Southeast EEM Market, and the Commission if it wishes, can access that information. This ensures that Participants can bring any such matters to the attention of the Commission or the Commission can raise them on its own motion. Furthermore, having access to the additional data mentioned above, including the Market Auditor reports, allows the Commission and Participants to identify and pursue any potential violations if they occur. Also, as explained below, the Southeast EEM Members are proposing to revise the *Mobile-Sierra* language in the Southeast EEM Agreement so that the just and reasonable standard would apply to provisions of general applicability. That said, it is the intent of the Southeast EEM Members to be proactive in addressing any unexpected problems with the functioning of the Southeast EEM, potentially through market rules changes that would be filed and subject to notice and comment and Commission review and approval. The Southeast EEM Members will also work to ensure compliance with the filed agreement, as they would any other filed tariff. None of the Southeast EEM Members want a market that does not work to design.

    5. *To become a Participant in the Southeast EEM, a prospective Participant must, among other requirements, have or enter into an Enabling Agreement with at least three or more Participants. The Southeast EEM Agreement defines an Enabling Agreement as "a bilateral agreement for the purchase and sale of Energy that provides for Energy Exchanges between a Seller and a Buyer and that, for Sellers that are Public Utilities and require authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under Section 205 of the FPA, has been entered into pursuant to such Seller's market-based rate authority." Filing Parties state that all transactions in the Southeast EEM will be consummated under Enabling Agreements instead of being consummated within the Southeast EEM itself.*

        a. *Are there any limitations on a Participant's ability to refuse to enter into an Enabling Agreement with a prospective or current Participant?*

**Response:**

      As a starting point, it is important to recognize that Enabling Agreements are used today in the Southeast bilateral market. These are typically standardized agreements that parties have in-place to facilitate regular bilateral energy transactions. These same Enabling Agreements, as well as new Enabling Agreements Participants may enter into, will be used for making bilateral

June 6, 2021
Page 20

transaction as part of the Southeast EEM.  In the current bilateral market, there are no prescribed limitations on a party's ability to refuse to enter into an Enabling Agreement with a prospective or current party.

Likewise, the Southeast EEM Agreement does not contain any such limitations, but it does require Participants to have an Enabling Agreement with three or more other Participants.  This is purely a safeguard against market manipulation, as explained by Dr. Pope.[42]

As noted above, the Enabling Agreements are not unique to Southeast EEM participation; many are already in place to facilitate bilateral transactions today.  The Southeast EEM Members are providing a list of the entities with which they have entered into Enabling Agreements, thereby demonstrating the diversity of such agreements already.  These Enabling Agreements would apply to Southeast EEM transactions, so where one exists a new one would not be necessary.  The list is attached as Attachment C.[43]  Collectively between the Southeast EEM Members, there are at least 180 counterparties to existing Enabling Agreements today.  The list is provided to demonstrate that, in the current bilateral market, entities are already incentivized to have a robust, diverse network of trading partners. With the expanded reach of the Southeast EEM, such diversity is only expected to increase; every Participant, Southeast EEM Members included, has the incentive to enter into numerous Enabling Agreements to maximize potential matches, and thereby potential benefits. Moreover, as noted, Enabling Agreement data used by the Algorithm will be reported to the Commission.

The Southeast EEM Members reiterate that they have no incentive to block trading in the Southeast EEM, and in fact, have every incentive to encourage robust trading.  It would not have made sense for the Southeast EEM Members to propose the Southeast EEM if that were not the case.  Nor is it credible that such a diverse group of Southeast EEM Members (including an agency of the Federal Government) would have come together around such a goal.

With that being said, the Southeast EEM Members are providing additional transparency both to the Commission and Participants.[44]  This will allow the Commission and all market participants visibility into the process and if there are any concerns going forward they can be resolved under the Federal Power Act ("FPA") if and when they arise.

  b. *Are Participants required to provide any reason for refusing to sign an Enabling Agreement with a prospective or current Participant?*

---

[42]     *See* Southeast EEM Filings, Econ. Aff. at PP 77-83 (describing the conduct the Rule was created to address and how the rule prevents such conduct).

[43]     This list, which is a composite list of the counterparties to Enabling Agreements of the Southeast EEM Members today, does not include Enabling Agreements of those entities that have not yet executed the Southeast EEM Agreement.  This list includes Enabling Agreements to buy and to sell, and each counterparty is listed only once, even if that entity has Enabling Agreements with more than one Southeast EEM Member (as many do).  The Southeast EEM Members note that this list includes Enabling Agreements with entities outside the Southeast EEM footprint, as well as a diverse array of entities that could, upon satisfying the criteria for participation and assuming they have Points of Receipt and Points of Delivery within the Southeast EEM footprint, sell through the Southeast EEM.

[44]     In particular, *see* Responses to Question 4.a and Question 7.d.i.

June 6, 2021
Page 21

**Response:**

As Enabling Agreements are currently used in the Southeast, buyers and sellers are not required to state any explicit reason for choosing not to enter into an Enabling Agreement with another participant. Likewise, the Southeast EEM Agreement does not require a Participant to state any explicit reason for choosing not to enter into an Enabling Agreement with another Participant. In other words, the Southeast EEM will not change the existing framework and requirements for entering into an Enabling Agreement, or for choosing not to do so. The data provided in response to Question 5.a demonstrates that in the existing bilateral market, there is already a robust and diverse network of Enabling Agreements, which should address any concern that Participants have an incentive or will act to restrict the number of Enabling Agreements with prospective or current Participants.

As a practical matter, it makes sense for Participants to maintain their autonomy to decide whether to enter into an Enabling Agreement—Enabling Agreements are bilateral agreements between parties. Enabling Agreements require negotiation and mutual agreement, particularly on commercial terms like credit requirements, and it is not the role of the Southeast EEM to mandate entering into agreements.

The Southeast EEM is an extension of the existing just and reasonable bilateral market, and the very term "bilateral" connotes that agreements in the Southeast are freely negotiated between the two parties to such agreements. Moreover, the foundational premise of market-based rate authority is to provide entities the freedom to enter into such freely negotiated bilateral contracts in lieu of pre-approved rates, terms and conditions.[45] Importantly, restrictions on such contracting necessary to prevent exercise of market power have already been addressed through market power mitigation measures.[46] However, additional transparency measures the Southeast EEM Members are offering to provide will provide increased visibility to the Commission and Participants,[47] and if there are any concerns, they can be resolved, hopefully on

---

[45]     *Mkt.-Based Rates for Wholesale Sales of Energy, Capacity & Ancillary Servs. by Pub. Utils*, Order No. 697, 119 FERC ¶ 61,295 at PP 943-54 (2007), *order on reh'g*, Order No. 697-A, 123 FERC ¶ 61,055 (2008) (explaining the reasoning behind not requiring all negotiated MBR–based contracts to be filed with the Commission).

[46]     *See S.C. Elec. & Gas Co.*, 121 FERC ¶ 61,263 at P 6 (2007) (finding that Dominion Energy SC's (f/k/a South Carolina Electric and Gas Company) "proposal not to make sales within its balancing authority area under its market-based rate tariff adequately addressed [Dominion Energy SC's] failure of the market share screen in its balancing authority area"); *LG&E Energy Mktg., Inc.*, Docket Nos. ER06-1046-000, *et al.* (letter order issued July 6, 2006) (accepting "revised market-based rate tariff sheets that would, among other things, restrict the LG&E Parties' authority to make sales at market-based rates in the LG&E/KU control area" upon LG&E/KU's exit from the Midwest Independent System Operator, Inc.); *Ala. Power Co.*, 163 FERC ¶ 61,090 at P 32 (2018) (finding that the price cap and auction process established in each of the Southern Companies' MBR tariffs "serve as adequate mitigation for the Southern, SCEG, Tallahassee, and Santee Cooper balancing authority areas"); *Duke Power*, 111 FERC ¶ 61,506 at P 61 (2005) (Commission prohibiting Duke sales within the DEC balancing authority to "mitigate the potential for the exercise of generation market power"); *Fla. Power Corp.*, 113 FERC ¶ 61,131 (2016) (prohibiting Duke sales in the DEP BA).

[47]     *See* Responses to Question 4.a and Question 7.d.i.

JA0918

June 6, 2021
Page 22

a consensual basis, but if not, then through a complaint or investigation.

    *c.   What are the options for prospective or current Participants to challenge refusals by Participants to enter into an Enabling Agreement?*

**Response**

    Southeast EEM Participants can submit complaints to the Market Auditor, which will be referred to the Membership Board.[48]  In addition, if a prospective or current Participant wants to challenge the refusal by another Jurisdictional Participant to enter into an Enabling Agreement, it may file a complaint with the Commission under Section 206 of the FPA, just as it could today. Moreover, as noted, the Southeast EEM Members are proposing to provide additional transparency both to the Commission and Participants, including transparency around the treatment of complaints made to the Market Auditor.

    *6.   Filing Parties propose that the Administrator will create and maintain informational reports, including a monthly report of the weighted average match prices and daily reports containing the weighted average exchange price.  According to Filing Parties' affiant, manipulation of the average exchange price is unlikely because the weighted average Southeast EEM prices are not well-suited for settling related contracts that would be susceptible to manipulation and, further, it would be difficult for participants to materially change the weighted-average prices.  Additionally, Filing Parties' affiants clarify that any party that does not consummate its Southeast EEM transactions—either by dispatching up its cleared supply or dispatching down its current supplies to reflect its cleared demand—will face imbalance charges.*

    *a.   Please explain how access to e-Tag data, EQRs, and any other data provided by the Administrator or Southeast EEM Market Auditor (Auditor) could be used to detect potential exchanges that are cleared by the Southeast EEM but not physically consummated.*

**Response:**

    The Algorithm will output information on matches, not physically consummated transactions.  Financial consummation of transactions will be a matter of private contracting between the parties to the matched transaction.  Consummation of transmission scheduling will occur via the e-Tagging process.  If a transaction is not physically consummated, in whole or in part, imbalances may occur and, for point-to-point transmission customers, imbalance charges could result.[49]  Unfortunately, however, data on physical imbalances for specific bilateral

---

[48]    Southeast EEM Agreement, Market Rules, VI.D.5.

[49]    *See* Southeast EEM Filings, Ops. Aff. at P 47 ("Matches made through the Southeast EEM System are for non-firm energy and will be consummated in accordance with the underlying Enabling Agreement for the matched Energy Exchange. Each such Enabling Agreement will be entered into separately between the Participants, under terms and conditions of their choosing – the Southeast EEM will have no role in that. If an Offeror is matched with a Bidder but does not alter its dispatch to effectuate the match, its under-generation will be treated as imbalance, just as it would with bilateral physical transactions today. The same is true if a load fails to dispatch its owned or contracted generation down to reflect a Southeast EEM purchase. As the Ops Team says, "submitted is committed" in terms of Bids and

June 6, 2021
Page 23

transactions energy is not metered and cannot otherwise be calculated, and so cannot be isolated to Southeast EEM transactions.  The Southeast EEM Members have spent considerable time and energy, working with subject matter experts across the Southeast EEM Member companies, to attempt to devise a means to provide Southeast EEM-specific data to the Commission with respect to physically unconsummated transactions, and have not been able to devise a means to do so.  We do note, however, that any pattern of unconsummated transactions could very well trigger complaints by Participants to the Market Auditor, or directly to FERC.  Moreover, as noted, a Participant that matches but does not perform remains financially committed, which protects the other party to the transaction, and serves as a disincentive to such behavior.  Dr. Pope believes that Participants are very unlikely to have any incentive to deliberately and systematically enter into transactions that they do not intend to physically consummate.[50] Among other things, there is no clearing price in the Southeast EEM to attempt to manipulate through such behavior.

> b.  *Please explain the reasoning for including unconsummated transactions in the calculation of the weighted average exchange price.*

**Response:**

All transactions are included in calculating the Weighted Average Match Price[51] because they represent a binding financial commitment between the parties. The Southeast EEM matches buyers and sellers, and matched buyers and sellers are committed to transact, under their bilateral Enabling Agreement, at the price set by the Algorithm.  Whether a transaction is then physically consummated by energy actually being delivered is a private matter of contractual performance between the buyer and the seller.  Put differently, the Weighted Average Match Price includes all transactions because whether a transaction is physically consummated is not a factor in determining which parties match with one another.  Thus, calculating in this fashion provides the best representation of the matching performed by the Algorithm.

> c.  *Please describe what, if any, data or information on unconsummated Southeast EEM transactions will be made available to the Commission, either in reports provided by the Southeast EEM Administrator or elsewhere.*

**Response:**

See response to Question 6.a.

> 7.  *The Southeast EEM Agreement states that the Administrator will be responsible for, among other things, (1) the on-going functions of the Southeast EEM System and overseeing and/or performing the operation and maintenance services necessary to allow the Southeast EEM System to operate in a reliable manner, and (2) maintaining open communications by and among the Southeast EEM Administrator, Participants*

---

Offers. This is necessary to make the Southeast EEM System function properly and will also help ensure that participants submit only bona fide Bids and Offers they are able and willing to physically perform on if matched.").

[50]   Attachment D, Pope Aff. at PP 58-62.

[51]   Weighted Average Match Price is the term used by the Southeast EEM Agreement, and we have assumed for purposes of answering the question that this is the term to which the question refers.

*and the Southeast EEM Agent. The proposed Southeast EEM Market Rules state that the Auditor will perform its functions at the direction of the Membership Board. The Auditor will report its conclusions and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis. The Membership Board will maintain sole responsibility for determining whether to share the information any further.*

    *a. What authority does the Administrator have to report concerns with the functionality, correct operations, and accordance with Market Rules of the Southeast EEM, or to recommend improvements to the Southeast EEM, to the Membership Board or to any other entities? Must the Administrator wait for an auditing interval to report such concerns to the Auditor, or does the Administrator have other means of sharing concerns with the Membership Board or other parties?*

**Response:**

    The Administrator role was intentionally designed to be purely ministerial with circumscribed responsibilities focused on the day-to-day operation of the Southeast EEM System. However, the Administrator is expected to work closely with the Market Auditor, who is empowered with several responsibilities, including verifying that the Southeast EEM operates in accordance with the Market Rules and reporting to the Membership Board any operational concerns. To further equip the Market Auditor for these responsibilities and in addition to the coordination already permitted and required within the Southeast EEM Agreement,[52] the Southeast EEM Members are proposing to have the Administrator provide the same information it provides to the Commission every seven days to the Market Auditor. Thus, the Market Auditor, whose role is aimed at ensuring that the Southeast EEM functions as intended, will have the information needed to do that job, and the role of the Administrator need not be expanded to duplicate that responsibility. Moreover, the Southeast EEM Members also are proposing to increase transparency to both the Commission and to Participants, who can then request changes under Section 206, subject, of course, to making the requisite showings.[53] Finally, the Southeast EEM Members expect to be proactive in addressing any legitimate concerns raised by the Market Auditor (or anyone else), such that protections provided by Section 206, while available, should prove unnecessary. The Southeast EEM Members want this market to work, and work well.

    *b. The proposed Southeast EEM Market Rules describe one of the Auditor's auditing functions as to "[p]rovide evaluation regarding the proper function of the Southeast EEM System, and the effectiveness of any Southeast EEM System specific controls in place related to the operation of the Southeast EEM System."*

        *i. Please explain the process that the Auditor will use to ensure that the Southeast EEM system is functioning properly.*

---

[52]    *See* Southeast EEM Agreement, Sections 2.4, 10.1.2, 10.2.2; *id.*, Market Rules, VI.D.

[53]    As discussed below, Southeast EEM Agreement provisions of general applicability now will be subject to the just and reasonable standard.

June 6, 2021
Page 25

**Response:**

The integrity of Southeast EEM will be protected by two lines of defense: (1) the selected software platform implementing the Algorithm; and (2) the Market Auditor, who will provide "checks" on the system functioning. The Southeast EEM Members are currently seeking a platform developer that will provide a responsible, automated approach to testing the Southeast EEM System that helps ensure that output of the Algorithm is high quality and free of errors and regressions. Section IV.C.6 of the Market Rules provide several rules that the Algorithm must follow for all matches.[54] For instance, the Market Rules provide that the Algorithm shall not make any Energy Exchanges that would cause the available transmission capacity reported to the Southeast EEM System to be exceeded on any ATC limit in the Southeast EEM Territory.[55]

As part of the second line of defense, every month the Market Auditor will check, through testing, to ensure that ATC is not being exceeded, including verification that the Network Map is accurate. The Auditor will similarly test to ensure that each of the Generally Applicable Constraints listed in the Market Rules are being followed by the Algorithm on a monthly basis.[56] Examples include confirming that a Buyer does not purchase more MW than the amount set forth in its Bid;[57] that a Participant's Bid is not matched with an Offer made by the same Participant;[58] or that an offsetting Energy Exchange, whereby Participant 1 sells to Participant 2 while Participant 2 sells to Participant 1 during the same interval at the same location, does not occur.[59]

The Market Auditor will also review data to ensure that Participant-Specific Constraints,[60] as communicated by the Participant, are properly implemented by the Algorithm once a month. For instance, if a Participant "toggles" off another Participant, the Market Auditor will confirm whether the Algorithm properly accounted for that toggle in its optimization.

Finally, the Market Auditor will ensure that the Algorithm properly implements the information submitted with Bids and Offers.[61] For instance, every month the Market Auditor will review to determine whether all Offers properly include a Source and all Bids properly

---

[54]     Southeast EEM Filings, Ops. Aff. at P 38.

[55]     Southeast EEM Agreement, Market Rules, IV.C.6.b.i.

[56]     Clarified Southeast EEM Agreement language covering this point is discussed in the Response to Question 7.b.ii.

[57]     *See* Southeast EEM Agreement, Market Rules, IV.C.6.b.ii.(a).

[58]     *See id.*, IV.C.6.b.v.

[59]     *See id.*, IV.C.6.b.vi.

[60]     *See id.*, IV.A.1.b

[61]     *See id.*, IV.B.3.

June 6, 2021
Page 26

include a Sink,[62] that a Delivery Interval is included,[63] and that the 4 MW rule is being properly implemented.[64]

> ii. *Please describe what is meant by "any Southeast EEM System specific controls in place related to the operation of the Southeast EEM System."*

**Response:**

The Southeast EEM Members agree that the term "specific controls" was unduly vague. It was meant to connote Generally Applicable Constraints and Participant-Specific Constraints, and accordingly the Southeast EEM Members propose to change the provision as follows:

> Provide evaluation regarding the proper function**ing** of the Southeast EEM System, ~~and~~ **including verifying** the ~~effectiveness~~**compliance** of ~~any~~**the** Southeast EEM System ~~specific controls~~**with the Participant-Specific Constraints and Generally Applicable Constraints identified** in ~~place~~ **Section IV.B.6** related to the operation of the Southeast EEM System.[65]

> c. *The proposed Southeast EEM Market Rules describe one of the Auditor's auditing functions as to "[r]efer any complaints received to the Membership Board, and investigate further at the Membership Board's direction."*

> > i. *Please explain whether the Membership Board is required to respond to the Auditor's reports and referred complaints.*

**Response:**

The Southeast EEM Members expect to be proactive to address any identified problems, although there is no requirement for the Membership Board to respond to the Market Auditor's reports and reported complaints. Moreover, the Market Rules will be filed rates of the FERC-jurisdictional Members, and they will work to ensure compliance with the Market Rules as they do with all of their Tariffs.

Moreover, as explained below,[66] Auditor reports, including complaints referred to the Membership Board, will now be available to the Commission and Participants, such that the Commission can address them *sua sponte*, or a Participant can bring the issues addressed in a report to the Commission's attention (including through a complaint under Section 206 of the FPA) if they are not satisfied with the approach taken by the Membership Board, subject of course to making the requisite showings.

---

[62]     *Id.*, IV.B.3.a.v.

[63]     *Id.*, IV.B.3.a.vi.

[64]     *Id.*, IV.B.3.a.iii.

[65]     Attachment A, Proposed Revisions to the Southeast EEM Agreement, Market Rules, Section VI.D.4.

[66]     *See* Response to Question 7.d.ii.

June 6, 2021
Page 27

> ii. *Please explain the criteria that the Membership Board will use to evaluate the Auditor's reports and referred complaints and to determine whether further action is necessary.*

**Response:**

There are no specific criteria; instead, the Membership Board will appropriately address any such reports or complaints on a case-by-case basis. This is necessary in order to retain flexibility to react to unforeseen circumstances.

> d. *Filing Parties' affiants state that the Auditor will be responsible for responding to questions from Participants and/or regulators regarding the integrity of the matching process.*
>
> > i. *Please clarify to which regulators the Auditor will be required to respond. Please also clarify on what timeline the Auditor will respond to questions from regulators or Participants.*

**Response:**

In addition to the Commission and NERC, the Market Auditor will be required to respond to the state Commissions in the region, which currently include Alabama, South Carolina, Mississippi, Virginia, Tennessee, Georgia, North Carolina, and portions of Kentucky, Oklahoma and Florida. In the case of TVA, the Auditor will respond to questions from its Inspector General. The Market Auditor will also be required to respond to any other regulators that oversee the operations of any Member. The Market Auditor will use reasonable efforts to respond within 30 days.

> > ii. *Please clarify whether the Auditor will be required to send its response to a question from a regulator or Participant to the Membership Board for review, prior to responding.*

**Response:**

The Market Auditor's response to a regulator's or Participant's question will be provided to the Membership Board simultaneously with the Market Auditor's submission of the response to the regulator or Participant. This will be accomplished via postings on the Southeast EEM Website. Specifically, the Market Auditor will provide any information request to the Administrator, which will post the request to the Southeast EEM Website. The Market Auditor then will provide its response to the Administrator, which will post the response as well. To achieve this additional transparency, the Southeast EEM Members propose that all requests to the Market Auditor be in writing. To the extent that such information (whether the question or the response) is confidential, it will be posted to a confidential section of the Southeast EEM Website. At the end of the answer to this question there are two flowcharts showing how information access will be provided, and transparency increased.

In order to effectuate this revision, the Southeast EEM Members propose the following language be added to the Market Rules' description of the Market Auditor's functions:

**<u>Respond to written questions from Participants, FERC, NERC, applicable state commissions in the region, Tennessee Valley Authority's Inspector General, and any other applicable regulators that oversee the electric</u>**

JA0924

June 6, 2021
Page 28

**operations of any Member regarding the integrity of the matching process.
Such information requests and Market Auditor responses (which will be
provided, where reasonable, within 30 days), along with any reports
generated by the Market Auditor in accordance with these Market Rules,
will be provided to the Administrator, which will post such documents to the
Southeast EEM website. To the extent that such information (whether the
question or the response or other document) is Transmission Function
Information or Commercially Sensitive Information, it will be posted to a
confidential section of the Southeast EEM website, and access by
Participants shall be governed pursuant to the confidentiality provision of
the Participant Agreement. Access by regulators shall be subject to a
standing request that such regulators treat such information with the highest
degree of confidentiality permissible under law applicable to each such
regulator. "Transmission Function Information" shall have the meaning
provided at 18 C.F.R. Sections 358.3(j), or the successor to that provision.
Commercially Sensitive Information shall include any information that could
confer a competitive advantage on the recipient, or whose disclosure could
harm or commercially disadvantage an entity associated with the
information, including, but not limited to, any Participant-specific
information, such as the bid and offer information provided to FERC and
the Market Auditor every seven days. The entity providing the information
for the Administrator to post to the Website (i.e., typically the Market
Auditor) shall be responsible for determining which information posted to
the Website should be placed in the confidential section of the Website, and
shall resolve any uncertainty in favor of treating the information
confidentially. In no event shall the Market Auditor or Administrator cause
Commercially Sensitive Information that is identifiable to a particular
Participant or Critical Energy/Electric Infrastructure Information to be
posted to the Southeast EEM Website. Southeast EEM Members shall have
access to information posted on the website at the same time and subject to
the same restrictions as other Participants. To the extent that the Market
Auditor is required to provide a report or document to the Membership
Board, it will do so by notifying the Membership Board when the report or
document has been posted to the website.[67]**

    While the general thrust of this requirement is to increase transparency, Participant-
specific information and Critical Energy Infrastructure Information ("CEII") will not be posted.
Such information will be redacted from any document or information that is posted. Unredacted
copies will be confidentially provided to the Commission or other applicable regulator upon
request.

    The Southeast EEM Members also propose to delete the following sentence in the Market
Rules, at Section VI.D: "The Membership Board will maintain sole responsibility for

---

[67]    *See* Attachment A, Proposed Revisions to Southeast EEM Agreement, Market Rules, VI.D.6. As
noted below, this is a new provision that will cause the former Section IV.D.6 to become VI.D.7.

determining whether to share the information any further." Doing so will avoid conflict with the transparency revisions proposed herein. In its place, the Southeast EEM Members propose to add the following sentence to that section (bolded and underlined):

> **Auditing Process.** Auditing functions will be performed by the Market Auditor at the direction of the Membership Board. The Market Auditor will report its conclusions, and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis. **This will be accomplished through the Website posting process identified in Section VI.D.6, thereby ensuring that access to these reports by the Members and others will be simultaneous, subject to any applicable confidentiality restrictions. . .**

The Southeast EEM Members also propose to revise the complaints provision in Section VI.D.5 of the Market Rules to ensure that both complaints submitted by Participants, as well as any subsequent investigation, are subject to the new Website posting requirement:

> ~~Refer~~ **Report** any complaints received to the Membership Board, and investigate **and report** further at the Membership Board's direction.

To accommodate the new targeted 30-day deadline for responding to regulators, the Southeast EEM Members propose to revise the Market Rules to state as follows:

> **Except as otherwise specified herein**, the Membership Board will be responsible for defining the time interval(s) for the auditing function to be performed and **for the Auditor to** report back to the governing body. Such interval(s) will be published in the Southeast EEM Manuals.[68]

The Southeast EEM Agreement contains restrictions on access to non-public transmission function information and competitively sensitive information by marketing function personnel of the Southeast EEM Members or their affiliates.[69] Additionally, in light of the proposed availability of this information to Participants, and the potential commercial sensitivity of some such information, the Southeast EEM Members are proposing that Participants (including Members) be subject to an enhanced restriction – i.e., that they commit that information posted by the Administrator in the confidential section of the Southeast EEM Website will not be provided to marketing function employees.[70] To this end, the Southeast EEM Members are proposing changes to the Participant Agreement. Specifically, the Southeast EEM Members propose to add the following to the Participant Agreement:

> The Participant shall supply the Southeast EEM Administrator with any and all information deemed reasonably necessary for the administration of the Southeast EEM System. **The Participant acknowledges and agrees that it will not**

---

[68]     Under the as-filed Southeast EEM Agreement, the revision at issue was Section VI.B.6, but under the proposed revisions will be Section VI.B.7.

[69]     *See* Southeast EEM Agreement, Section 3.5 (Member Standard of Conduct).

[70]     *See* Attachment A, Proposed Revisions to Southeast EEM Agreement, Participant Agreement, Section 6.0.

June 6, 2021
Page 30

**provide information posted in the confidential section of the Southeast EEM Website to any employee of itself or an affiliate engaged in Marketing Functions, where Marketing Functions shall be those meeting the definition found at 18 C.F.R. Section 358.3(d), except that for purposes of this Agreement Marketing Functions shall also refer to the functions described in that provision even if the entity performing those functions is not a public utility subject to FERC jurisdiction. The Participant shall identify to the Southeast EEM Administrator all employees who may access the confidential portion of the Southeast EEM website, and certify that such employees are not engaged in Marketing Functions, and the Southeast EEM Administrator will grant access to the confidential portion of the Southeast EEM Website only to such employees. The Participant shall be responsible to ensure that the Southeast EEM Administrator is notified before any such employee commences engagement in Marketing Functions such that access to the confidential section of the Southeast EEM Website can be revoked.**[71]

We note that these changes to restrict access to confidential information are not a barrier to entry – they apply *only* if the Participant *elects* to obtain such confidential information. The Participant does not need to make such an election in order to transact in the Southeast EEM.

The flowcharts below provide a visual of how information will flow between the Market Auditor, the Administrator, and Participants depending on the type of inquiry – the first chart reflects how information will flow under the various transparency requirements, while the second chart provides the decision tree for determining what information to post, and how it may be accessed, each time there is a posting determination to be made:

---

[71]     See *id.* (new language bolded and underlined).

June 6, 2021
Page 31



June 6, 2021
Page 32



iii. *Please explain what information the Auditor will have access to on its own to answer questions about the integrity of the matching process, or whether it will need to rely upon the Administrator to provide such information.*

**Response:**

The Market Auditor will receive the same reports (as discussed above) every seven days as FERC,[72] and have the same ability to ask follow up questions as necessary to fulfill its appointed role.  The Administrator will follow the posting process described in Response to Question 7.d.ii in responding to Market Auditor questions, just as it will in responding to questions from FERC.  The Southeast EEM Agreement also allows for the Market Auditor and Administrator to share information on a confidential and reciprocal basis to support the Market Auditor's responsibilities.[73]

8. *The Southeast EEM Territory shares borders with the Midcontinent Independent System Operator, Inc. (MISO), PJM Interconnection, L.L.C. (PJM), and Southwest Power Pool, Inc. (SPP).  Filing Parties state that the Southeast EEM proposes to observe all physical and contractual limits on the transmission system of the Southeast EEM Members.  Filing Parties explain that an Energy Exchange*

---

[72]     *See id.*, Section 2.5.

[73]     Southeast EEM Agreement, Section 10.2.2.

JA0929

June 6, 2021
Page 33

> *transaction under the Southeast EEM would not be matched if that transaction*
> *needed to rely on a neighboring transmission system.*

> a. *Please explain how the Southeast EEM will interact at the seams with MISO,*
> *PJM, and SPP. Please explain how SEEM will manage loop flow, including*
> *an explanation of whether such loop flow would require additional*
> *interregional coordination, beyond that which exists today and how such*
> *coordination would work to respect contractual circumstances such as the*
> *MISO Settlement.*

**Response:**

The Southeast EEM will respect other systems and abide by all existing agreements on seams issues, including contractual limits. However, to address any remaining concerns over unauthorized use of neighboring systems, the Southeast EEM Members propose certain clarifying changes to the Southeast EEM Agreement and Market Rules.

The terms of the Southeast EEM Agreement already require Participating Transmission Providers providing NFEETS to provide information required by the Market Rules, including "sufficient information to permit the Southeast EEM Administrator to create a Network Map . . . for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges."[74] Each Southeast EEM Transmission Provider already posts on its OASIS (or equivalent) its methodology for calculating ATC. To clarify the intent that a precondition for any match will be sufficient ATC on each system along the Contract Path, the Southeast EEM Members propose the following modifications to the Southeast EEM Agreement to require each Transmission Provider to commit to following its posted methodology in making its reports of ATC to the Southeast EEM System. This, in turn, will ensure that there is no match that exceeds the most limiting element along the Contract Path for that transaction.

Specifically, the language the Southeast EEM Members propose states as follows (with proposed changes bolded and underlined):

> Prior to being permitted to provide Non-Firm Energy Exchange Transmission
> Service, Participating Transmission Providers shall provide sufficient information
> to permit the Southeast EEM Administrator to create a Network Map of the
> Southeast EEM Territory for purposes of confirming available capacity for
> NFEETS along Contract Paths for all potential Energy Exchanges. **On an**
> **ongoing basis, consistent with the timing requirements of Section IV.B.2.a,**
> **each Participating Transmission Provider shall provide the Administrator**
> **with the Available Transfer Capability ("ATC") as calculated by the**
> **Participating Transmission Provider per the methodology for calculating**

---

[74]     *See* Southeast EEM Agreement, Market Rules, IV.A.2; *id.*, Market Rules, Definition of "Non-Firm Energy Exchange Transmission" (requiring the Participating Transmission Provider to provide "the information specified in and as required by Section IV.A.2 of the Southeast EEM Market Rules to the Southeast EEM System").

June 6, 2021
Page 34

**ATC that each Participating Transmission Provider already specifies in its OATT (or equivalent) and posts on its OASIS (or equivalent), as that ATC may change from time to time.**[75]

In Section IV.B.1.2, the Southeast EEM Members propose to revise the language on timing of providing ATC information to clarify that it will be ATC information.  The proposed revision will read as follows (with proposed language bolded and underlined):

> For each Clock Hour, every Participating Transmission Provider's ~~available capacity for NFEETS~~ **ATC** must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of such next Clock Hour.  To the extent a Participating Transmission Provider can update its ~~available capacity for NFEETS~~ **ATC** within a Clock Hour, such updated information must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of the applicable Delivery Interval.

Additionally, in Section IV.C.1, the Southeast EEM Members propose to broaden the "requirements" that must be honored when the Algorithm produces matches.  Instead of referring only to those requirements in Section IV.A.1, the provision will now encompass all requirements in Section IV.A in order to encompass the ATC reporting provision.  Specifically, the Southeast EEM Members propose Section IV.C.1 to read as follows:

> . . .
> The Southeast EEM Algorithm will match Bids and Offers so as to result in Energy Exchanges that maximize the Southeast Energy Exchange Market total benefit for the applicable Delivery Interval while simultaneously honoring all the requirements identified in Section ~~IV.A.1~~ **IV.A** and the constraints identified in Section IV.C.6.  The total benefit shall be calculated by aggregating the benefits from each Energy Exchange for the applicable Delivery Interval

Finally, the Southeast EEM Members propose to revise the Southeast EEM Agreement to more clearly require the Algorithm to respect ATC limits by removing the reference to "available capacity for NFEETS" and instead tying the provision to ATC calculated by the Participating Transmission Provider.  The Southeast EEM Members propose to revise Section IV.C.6.b.i as follows:

> In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the ~~available capacity for NFEETS~~ **ATC of any Participating Transmission Provider** on any given Contract Path to be exceeded.

---

[75]     *See* Attachment A, Proposed Revisions to Southeast EEM Agreement, Market Rules, IV.A.2 (proposed language bolded and underlined).

June 6, 2021
Page 35

> b.  *Filing Parties state that the Southeast EEM does not alter how transmission
>     availability is calculated for bilateral transactions today and will not
>     adversely affect the MISO Settlement, which provides for the contractual
>     rights to transfer up to 1,000 MWs of energy between MISO South and MISO
>     Midwest via transmission facilities operated by MISO.*
>
>> i.  *Please explain how the operation of the Southeast EEM (i.e., matching
>>     bids and offers and consummation of Energy Exchange transactions) and
>>     the Southeast EEM's preclusion against transactions occurring over
>>     neighboring transmission systems will respect the 1,000 MWs of
>>     contractual rights under the MISO Settlement.*

**Response:**

As part of the ATC calculation, the 1,000 MW is taken into consideration as firm service
on the MISO system, just like other firm service on the MISO system is taken into account in
calculating ATC.  Therefore, when calculating whether Energy Exchanges can occur using
NFEETS, the Southeast EEM will take into account the firm service under the MISO Settlement.
As discussed above, NFEETS will not be utilized in a transaction unless there is sufficient ATC
to accommodate the transaction on the systems of all Participating Transmission Providers along
the Contract Path.

>> ii.  *Please explain which service—NFEETS or non-firm service under the
>>      MISO Settlement—would get priority on the systems of Southeast EEM
>>      Participating Transmission Providers.*

**Response:**

NFEETS is lowest priority transmission.  MISO Settlement flows will be higher priority,
and treated as such by the Interchange Distribution Calculator and the relevant Reliability
Coordinators.

> 9.  *Filing Parties state that since the Southeast EEM  "will only use transmission that is
>     not otherwise being used, [NFEETS] will not result in underfunding of transmission."
>     At the same time, Filing Parties indicate that availability of NFEETS may result in
>     "some slight decrease in Point-to-Point revenues, which in turn would lessen revenue
>     credits used to offset" charges to network service transmission customers.  According
>     to Filing Parties, any increase in network transmission service rates would be
>     "roughly balanced" by expected benefits from decreased energy costs resulting from
>     the Southeast EEM.*
>
>> a.  *Please explain how the statement that NFEETS will only use transmission that
>>     would not otherwise be used is consistent with the potential for a reduction in
>>     point-to-point transmission service reservations as a result of NFEETS.  To
>>     the extent the increase in network service transmission rates due to an erosion
>>     of point-to-point transmission service reservations exceeds benefits to network
>>     service transmission customers resulting from the Southeast EEM, please
>>     explain how the zero-rate for NFEETS is consistent with cost causation.*

JA0932

June 6, 2021
Page 36

**Response:**

   The statement that NFEETS will only use transmission that would not otherwise be used is consistent with the potential effect on point-to-point transmission because NFEETS will only be scheduled after scheduling deadlines for other types of transmission service have passed and there is still remaining transmission available.  But it is certainly true, as the question correctly implies, that a decision that could lead to erosion of non-firm point to point revenues – i.e., a decision to forego a transaction using a different form of non-firm service in favor of seeking a match using NFEETS – could contribute to the amount of residual ATC available for NFEETS.

   As explained in response to Question 3 above, NFEETS is unlikely to be used as a substitute for firm transactions, because firm transmission provides resource adequacy, while NFEETS does not.  As to non-firm transactions, today, any point-to-point revenue credits from such transactions are already minimal in the existing bilateral market.  This is established by Mr. Melda and Mr. Bellar, who explained that the current "revenues from short-term wheeling transactions of the type that could be replaced by Southeast EEM transactions are minimal."[76]

   The slight reduction in point-to-point revenues that could result from customers voluntarily opting to transact via the Southeast EEM is consistent with cost causation because the costs (in the form of potentially higher network service or firm Point-to-Point transmission rates from reduced credits for point-to-point transmission revenues) will be borne by those who benefit from the lower cost energy alternatives enabled by the Southeast EEM.  As Dr. Pope explains, "the Southeast EEM is expected to reduce energy costs for native load customers, so any increase in network service transmission rates would be roughly balanced by expected benefits from decreases in their energy costs."[77]And indeed, the Commission has stated that cost allocation need not be made with "exacting precision,"[78] but must be only "roughly commensurate" with the anticipated benefits.[79]  The Southeast EEM meets that requirement, notwithstanding the slight reduction in point-to-point revenues that is anticipated to occur.

   This conclusion is consistent with the similar conclusion with respect to the Western EIM.  There, the Commission found that "elimination of the seam between California Independent System Operator, Corp. ("CAISO") and the EIM Entity [Balancing Area Authorities ("BAAs")] promotes more efficient and competitive electricity markets, provides customers in the EIM and in CAISO access to additional energy supplies, decreases the number of transactions that must pay pancaked rates, and therefore enhances competitive electricity markets in the region."[80]  The Commission also found the elimination of pancaked rates within the EIM would "result in downward pressure on market prices, resulting in lower energy costs overall and thus benefitting native load customers in CAISO and in an EIM Entity BAA who

---

[76]     Southeast EEM Filings, Overview Aff. at P 23.

[77]     *See* Southeast EEM Filings, Econ. Aff. at P 67.[78]     *Sithe/Indep. Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002).

[78]     *Sithe/Indep. Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002).

[79]     *See Ill. Commerce Comm'n  v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009).

[80]     *Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,231 at P 156.

JA0933

largely bear transmission costs[,]" and therefore fulfill cost causation principles.[81] The same logic applies here. Network load and firm point-to-point load will receive the benefits of the Southeast EEM, so it is fair and consistent with principles of cost causation to ask such load to shoulder any incremental transmission system revenue requirements network load is exposed to as a result of any erosion of non-firm point-to-point revenues, which is not expected to be significant.[82] Therefore, any increase in network service transmission rates or firm Point to Point rates due to an erosion of non-firm point-to-point transmission service reservations is not expected to exceed Southeast EEM benefits to network service transmission customers.

> *b. Please explain how the availability of NFEETS may impact rates for firm point-to-point transmission charged by each prospective Southeast EEM Member that is a transmission service provider.*

**Response:**

The impact on rates for firm Point-to-Point service is likely to be minimal and out outweighed by Southeast EEM benefits for the reasons explained in response to Question 9.a.

> *c. Please explain how the information Filing Parties propose to have posted regarding NFEETS meets the Commission's OASIS requirements.*

**Response:**

The Southeast EEM will interact with OASIS the same as occurs today in the bilateral market, which complies with OASIS requirements. The Southeast EEM simply automates the process of providing information to OASIS.[83]

> *10. Filing Parties state that the Southeast EEM Market Rules present the mathematical equation for how Energy Exchange prices will be calculated. Filing Parties also state that certain other implementation details are the type of information that the Commission regularly finds are best left to unfiled business practice manuals. Further, Filing Parties explain that the Southeast EEM Members commit to posting any applicable business practice manuals and meeting minutes on the Southeast EEM Website.*
>
> *a. Please clarify what implementation details related to the functioning of the Southeast EEM Algorithm—such as the conditional logic, iterations, or other computational processes that will be used by the Southeast EEM Algorithm— you propose to include in the business practice manuals.*

---

[81]     *Id.*

[82]     *See* Response to Question 9.b.

[83]     Southeast EEM Agreement, Market Rules, IV.C.8.a.iv (explaining that the Southeast EEM will provide "appropriate OASIS information . . . to the relevant Participating Transmission Service Provider"); Southeast EEM Filings, Transmittal at 10 (chart explaining that in the existing Market, Buyers and sellers locate one another and schedule delivery of energy with e-Tags; with the addition of the Southeast EEM, Buyers and Sellers are matched through the Southeast EEM, and the Southeast EEM submits transmission service reservations and e-Tags to the applicable BA(s)/Transmission Service Providers/Participants)

June 6, 2021
Page 38

**Response:**

In addition to the items identified in the Initial Filings, the Southeast EEM Members anticipate that Southeast EEM Manuals will include concrete examples of different scenarios that the Algorithm will solve.  The Southeast EEM Manuals will not include a mathematical statement of the optimization problem solved by the Algorithm (i.e., the software platform implementing the Southeast EEM), because this could be a significant undertaking and possibly an additional material Southeast EEM Member expense in addition to the planned cost of hiring a software vendor.  Further expense and administrative burden also would be incurred to check the mathematical specification and modify it, if needed, with every change to the Market Rules, if and when these occurred and even if the change appeared to be minor.

However, we note that, like other Business Practice Manuals, it is likely the contents of the Southeast EEM Manuals will evolve over time, and those changes are not presently foreseeable.  Consistent with FERC practice, the Southeast EEM will follow the rule of reason,[84] and any Participant is free to challenge the Southeast EEM's adherence to that rule, subject to making the necessary showing.

> *b.  Please clarify whether the Southeast EEM business practice manuals will be posted to a publicly viewable portion of the Southeast EEM website, i.e., whether the manuals will be publicly accessible.  If not, please clarify which entities will be able to access the manuals.*

**Response:**

The Southeast EEM Manuals will be publicly available and posted to the Southeast EEM Website.[85]

> *c.  In addition to the posting of the business practice manuals on the Southeast EEM website, please describe any data about the Southeast EEM Algorithm's operation that will be posted to the Southeast EEM website, aside from the data that will be published in hourly, daily, and monthly ex-post reporting.*

**Response:**

As detailed above, the Southeast EEM Members propose to provide a wide variety of information confidentially to the Commission.  However, much of the data to be provided to the Commission is competitively sensitive, and the Southeast EEM Members are concerned that such data if publicly posted could be used in anti-competitive fashion.  Therefore, they do not propose to post any additional market data publicly.

> *11. Filing Parties state that prior to being permitted to provide NFEETS, Participating*

---

[84]    *See, e.g.*, *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985) (Section 205(c) of the FPA "must reasonably be read to require recitation of only those practices that affect rates and service *significantly*, that are realistically *susceptible* of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous.") (emphasis in original).

[85]    *See* Southeast EEM Answer to Protests at n.140 ("[T]he Southeast EEM Members commit to posting any applicable business practice manuals and meeting minutes on the Southeast EEM Website, https://southeastenergymarket.com/.").

> *Transmission Providers shall provide sufficient information to permit the Administrator to create a Network Map of the Southeast EEM Territory for the purpose of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges. Filing Parties define "Network Map" as the computer-based representation of all Participating Transmission Provider service territories, Balancing Authorities, valid transmission paths (Point of Receipt – Point of Delivery combinations), Sources, and Sinks.*

> a. *Please describe what information will be sufficient to permit the Administrator to create a Network Map, including how that information would be updated to reflect the 15-minute intervals.*

**Response:**

The Network Map itself will be updated as needed, based on any changes in transmission topography relevant to the Network Map. Such changes are not expected to occur every 15 minutes, so the Network Map will not necessarily be updated every 15 minutes. ATC, which is not included in the Network Map, will be updated every 15 minutes, and that data, along with the Network Map, will be provided to the Commission, as detailed above in response to Question 4.

The Point of Receipt, Point of Delivery, and NAESB WebRegistry information will be used in creating the Network Map.

> b. *Please explain how the Southeast EEM Algorithm will ensure that transmission capacity submitted by Participants as available for NFEETS is consistent with Available Transfer Capacity on the relevant transmission lines.*

**Response:**

The *pro forma* Tariff language for each of the jurisdictional entities notes that "Non-Firm Energy Exchange Transmission Service will be made available for Energy Exchanges from posted ATC after procurement and scheduling deadlines have passed for the next operating hour, taking into account other higher priority uses and the limitations of the Transmission System of the Transmission Provider."

Additionally, as noted above, the Southeast EEM Members offer to revise the Agreement to state that each Participating Transmission Provider will post its ATC methodology online, and commits to using that methodology here, and that the output of those calculations will be utilized in the Algorithm in determining matches.[86]

> 12. *The Southeast EEM Agreement states that the standard of review for any changes to the Agreement proposed by a non-party or by the Commission shall be no lower than the "public interest" standard of review set forth in United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956).*

---

[86]     *See* Response to Question 8.a.

June 6, 2021
Page 40

> a. *Please provide further justification for the application of the Mobile-Sierra "public interest" standard of review to any changes to the Southeast EEM Agreement proposed by a non-party or the Commission.*

**Response:**

The Southeast EEM Members believe that there are certain portions of the Southeast EEM Agreement that may be perceived as being generally applicable in nature. The general standard of review therefore has been changed to "just and reasonable." However, other sections are more bilateral in nature, govern key rights and obligations among the Southeast EEM Members (such as cost allocation provisions and exit provisions, among others), and were therefore central to the negotiated terms the Members agreed upon in developing the Southeast EEM.[87] In other words, it is crucial to the development and implementation of the Southeast EEM that these provisions in particular provide for contractual certainty to Members. As the Commission has said in similar circumstances, it is appropriate to "balance the needs of the Transmission Owners for contractual certainty with the interests properly represented by [a market]."[88] Therefore the Southeast EEM Members are proposing to subject these provisions to the more stringent "public interest" standard. Those provisions are as follows:

- The following defined terms under Article 1:
    - Interest Rate
    - Investor Owned Utilities
    - Governmental Utilities
    - Market Auditor
    - Material Vendor Contract
    - Member
    - Member Net Energy for Load
    - Net Energy for Load
    - Operating Costs
    - Record Date
    - Sector
    - Significant Matters
    - Southeast EEM Administrator
    - Southeast EEM Agent

---

[87] *See Texaco Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998) ("[W]here parties have negotiated a . . . contract that sets firm prices . . . and that denies either party the right to change such prices or charges unilaterally, [the Commission] may abrogate or modify the contract only if the public interest so requires."); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 184 (2013), *reh'g denied*, 147 FERC ¶ 61,128 (2014) ("On one hand, all such provisions in bilateral power sales contracts freely negotiated at arm's length between sophisticated parties generally would establish contract rates and would come within the [*Mobile-Sierra*] presumption [of justness and reasonableness]. On the other hand, where the terms of an agreement would, if approved, be incorporated into the service agreements of all present and future customers, those terms are properly classified as tariff rates and the *Mobile-Sierra* presumption would not apply.").

[88] *ISO New England Inc.*, 106 FERC ¶ 61,280 at P 128 (2004), *reh'g granted in part, denied in part*, 109 FERC ¶ 61,147 (2004).

- o Territory
- Section 3.2 (Member Criteria);
- Article 4 (Governance);
- Sections 6.1 and 6.2 (Appointment of Southeast EEM Agent);
- Article 7 (Budgeting and Cost Responsibility)
- Sections 8.6 and 8.7 (Inter-related Inter-dependent provisions and Withdrawal);
- Article 9 (Release and Liability; No Fiduciary Duties);
- Section 10.3 (Equitable Relief);
- Section 11.2 (Reliability Obligations);
- Article 12 (Dispute Resolution);
- Article 14 (Defaults);
- Article 15 (Confidentiality);
- Section 16.1 ("Public Utility" Status of Members);
- Section 16.4.1 (No Reliance Interest on Non-Firm Energy Exchange Transmission Service);
- Section 16.5 (No Dedication of Facilities);
- Section 16.9 (Amendments);
- Exhibit B (Form of Joinder Agreement to add new Members); and
- Appendix C (Southeast EEM Agent Scope).[89]

The Southeast EEM Members believe that subjecting these select provisions to a higher standard of review is appropriate, and consistent with Commission precedent regarding similarly complex agreements that defy classification in their entirety.[90]

> b. *Please explain why the Southeast EEM Agreement establishes contract rates that qualify for the Mobile-Sierra presumption. Alternatively, please explain why the Commission should apply Mobile-Sierra to the Southeast EEM Agreement if it is not classified as a contract rate.*

**Response:**

Most of the Southeast EEM Agreement will be subject to the just and reasonable standard, including the entirety of the Market Rules. As discussed in the Response to Question 12.a, the remaining limited number of provisions that are now proposed to be subject to the public interest standard are bilateral in nature and govern key rights and obligations among the Southeast EEM Members, or establish important limitations on the nature of the services being provided by the Members. All provisions of general applicability have been designated as subject to the just and reasonable standards, including the entirety of the Market Rules.

---

[89] *See* Attachment A, Proposed Revisions to the Southeast EEM Agreement, Section 16.9 (Amendments).

[90] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 185 (permitting the Consolidated Transmission Owner Agreement ("CTOA") to be subject to differing standards of review because it could not "be classified in its entirety as containing contract rates or tariff rates" and noting that the differing standards would "recognize the distinctions among its provisions").

June 6, 2021
Page 42

      *c.  What standard of review will apply to amendments to the Southeast EEM*
          *Agreement proposed by the Members?*

**Response:**

    A Southeast EEM Member acting unilaterally or without the requisite vote would be subject to the rules outlined above, because such action would occur under Section 206.  The just and reasonable standard will apply to any modifications proposed by the Southeast EEM Members upon approval consistent with the rules on governance,[91] because such modifications would be submitted to the Commission by the Southeast EEM Members under Section 205.

### Additional Changes to the Agreement

    The review of the Southeast EEM Agreement caused by the Deficiency Letter led to the identification of a handful of clarifying changes to the Southeast EEM Agreement.  Specifically, the Southeast EEM Members propose the following additional modifications:

(1) The Southeast EEM Members propose to revise Section IV.C.7.a of the Market Rules to state that randomization will be used if a heuristic is required to resolve ties or ambiguities.  This is a clarification to the agreement to track a statement previously made in the Operations Affidavit.[92]  As revised, the Section will read as follows:

> In the event that multiple Bids or Offers that are at the same price at a Source or Sink are identical which create the same benefit for the Southeast EEM, a randomized preference will be assigned to the Bid(s) or Offer(s).  **Additionally, randomization will be employed in the algorithm in all other situations if a heuristic is required to resolve ties or ambiguities.**

(2) The Southeast EEM Members propose to revise Section VI.B.2 of the Market Rules to correct a scrivener's error that resulted in the omission of an important limitation on a Participant's administrator who is authorized to run and review reports available in the Southeast EEM.  That provision will now state as follows:

> Each Participant will be required to identify an administrator that is authorized by the Participant to run and review all of the reports available in the Southeast EEM System that are redacted to ~~all~~ **only** show the information related to the Participant it represents (the "Company System Administrator").  The Southeast EEM System will provide each Company System Administrator with the right to grant access to certain reports and related data to identified delegates within the Participant's organization.  Each Company System Administrator (and any delegate identified by the Company System Administrator) shall be able to run all of the reports

---

[91]    *See* Southeast EEM Agreement, § 4.1.9.

[92]    Southeast EEM Filings, Ops. Aff. at P 44.

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED VERSION

## APPENDIX B

## SOUTHEAST EEM MARKET RULES

## I.     INTRODUCTION AND APPLICABILITY.

Set forth below are the rules governing: 1) Participation in the Southeast EEM; 2) Bidding, Offering,  and matching procedures for Energy Exchanges arranged through the Southeast EEM System, 3) Southeast EEM System data reporting, and 4) the processes for auditing Energy Exchanges and the hardware, software, management and operation of the Southeast EEM System. This Appendix B is subject to the terms and conditions of the Agreement. In the event of a conflict between the terms of the Agreement and the terms of this Appendix B, the terms of the Agreement shall control.

## II.    DEFINITIONS.

The following terms shall be defined as indicated for the purposes of this Appendix B. Definitions and terms expressed in the singular shall include the plural and *vice versa*.   Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

"Agreement" means the Southeast Energy Exchange Market Agreement By and Among the Members of the Southeast EEM to which this Appendix B is appended.

"Balancing Authority" means the responsible entity that integrates resource plans ahead of time, maintains demand and resource balance within a Balancing Authority Area, and supports interconnection frequency in real time.

"Balancing Authority Area" means the collection of generation, transmission and loads within the metered boundaries of the Balancing Authority.  The Balancing Authority maintains load-resource balance within this area.

"Bid" means a voluntary submission containing the required Bid Information to purchase a certain amount of Non-Firm Energy (set forth in MW).

"Bid Information" means the information applicable to Bids set forth in Section IV.B.3.

"Bid Price" means the price, in $/MWh for the amount of Non-Firm Energy submitted in a Bid.   This represents the maximum price that the Bidder is willing to pay.

"Bidder" means a Participant who submits a Bid into the Southeast EEM System.

"Buyer" means a Bidder that has been matched with an Offeror for an Energy Exchange through the Southeast EEM System.

"Clock Hour" means the sixty-minute period ending at :00.

"Company System Administrator" has the meaning set forth in Section VI.B.2.

1

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED VERSION

"Contract Path" means the continuous transmission path for the flow of Non-Firm Energy between the Participants reserved for an Energy Exchange using the transaction matching, reservation and tagging functions of the Southeast EEM System.

"Delivery Interval" means a fifteen (15) minute period in which Non-Firm Energy is intended to be delivered by a Seller to its matched Buyer(s).

"Energy Exchange" means a transaction for the purchase and sale of Non-Firm Energy in the Southeast EEM between Buyers and Sellers pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Rules.

"Electronic Tag" or "e-Tag" means the primary method for coordination of Interchange Schedules or Energy Schedules where Energy is transferred between Balancing Authority Areas and coordination required between multiple entities. Various entities can communicate important information pertaining to the Interchange transaction to each other via the internet using computer applications, which are based on the e-Tag specifications and schema maintained by the North American Energy Standards Board ("NAESB").

"Energy Exchange Notification" means the notice provided to Bidders and Offerors who were matched for an Energy Exchange by the Southeast EEM Algorithm; to be automatically generated by the Southeast EEM System and provided before the start of a Delivery Interval; and to include data on the matched Energy Exchange including Buyer, Seller, price, amount of Non-Firm Energy, Source, Sink, delivery location, applicable Delivery Interval, and other any other necessary data for Participants to record the transaction.

"Energy Exchange Price" means the price, in $/MWh, calculated by the Southeast EEM Algorithm for a specific Energy Exchange.

"FERC" means the Federal Energy Regulatory Commission.

"Good Utility Practice" means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment and in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice does not require the optimum practice, method, or act to the exclusion of all others, but rather is intended to include acceptable practices, methods, or acts generally accepted in the SERC Reliability Corporation region.

"Losses" means the total cost of the electrical energy lost in the transmission of electrical energy from a Source to a Sink based on the real power loss factor (%) ("Loss Factor") and loss rate ($/MWh) ("Loss Rate") of each Participating Transmission Provider on the Energy Exchange's Contract Path.

"NAESB Electric Industry Registry" or "NAESB EIR" means thea central registry and repository of information required for commercial transactions that is maintained by NAESB.

"Network Map" means the computer-based representation of all Participating Transmission Provider service territories, Balancing Authorities, valid transmission paths (Point of Receipt – Point of Delivery combinations), Sources, and Sinks.

"Non-Firm Energy" means a product for which delivery or receipt of the energy may be interrupted for any reason or no reason, without liability on the part of either buyer or seller.

"Non-Firm Energy Exchange Transmission Service" means transmission service provided by a transmission provider, pursuant to its Tariff, that has the following characteristics: (i) it is non-firm transmission service with the lowest curtailment priority, provided solely on an as-available basis for 15-minute Energy Exchanges, after taking into account other higher priority uses and the limitations of the transmission system of the Participating Transmission Provider; (ii) it is available solely for Energy Exchanges; (iii) it is identified and offered in the Tariff as "Non-Firm Energy Exchange Transmission Service;" (iv) the charge for such service, and related Schedule 1 and Schedule 2 (or equivalent) ancillary services, is $0/MWh; (v) the charge for financial losses is based on the methodology established in the Participating Transmission Provider's Tariff; (vi) the service must be obtained by a Participant using the transaction matching, reservation and tagging functions of the Southeast EEM System, rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by a Participating Transmission Provider; (vii) the service may not be reassigned, redirected, or sold by the transmission customer; (viii) in combination with the other Participating Transmission Providers' provisions of Non-Firm Energy Exchange Transmission Service, the service allows for a continuous Contract Path for Energy Exchanges; and (ix) the Participating Transmission Provider is required to provide the information specified in and as required by Section IV.A.2 of the Southeast EEM Market Rules to the Southeast EEM System. For the avoidance of doubt, nothing in this Agreement shall obligate any Participating Transmission Provider to (a) plan, construct, or maintain its transmission system for the benefit of any Participant; (b) provide Non-Firm Energy Exchange Transmission Service in a manner that is contrary to the terms of the Participating Transmission Provider's Tariff, or contrary to Good Utility Practice, each as determined in the sole judgment of the Participating Transmission Provider; (c) provide Non-Firm Energy Exchange Transmission Service following termination of its Southeast EEM Member status; (d) provide Non-Firm Energy Exchange Transmission Service to a non - Participant; or (e) file its Tariff with FERC if the Tariff is not already required to be filed with FERC.

"OASIS" means an Open Access Same-Time Information System that conforms to the requirements of Part 37 of the FERC's regulations, 18 CFR §§ 37.1, et seq.

"OATI webRegistry" means the system developed by Open Access Technology International, Inc. to perform the NAESB EIR functions.

"Offer" means a voluntary submission containing the required Offer Information to sell a certain amount of Non-Firm Energy (set forth in MW).

"Offer Price" means the price, in $/MWh for the amount of Non-Firm Energy offered in an Offer. This represents the minimum price that the Offeror is willing to collect to sell.

"Offer Information" means the information applicable to Offers set forth in Section IV.B.3, as well as other information that may be required by the Southeast EEM Administrator.

"Offeror" means a Participant who submits an Offer into the Southeast EEM System.

"Participant Profile" means that information identified in Section IV.A.1., Section IV.C.6., and such other information requested by the Southeast EEM System Interface to assist in the creation of Energy Exchanges.

"Participant" means an entity that meets the requirements set forth in Section III of this Appendix B.

"Participant Specific Constraints" has the meaning set forth in Section IV.A.1.b. and IV.C.5.

"Seller" means an Offeror that has been matched with a Buyer through the Southeast EEM System.

"Sink" means a pre-approved and validated OATI webRegistry sink point.

"Source" means a pre-approved and validated OATI webRegistry source point.

"Southeast EEM Algorithm" means the mathematical equations that determine the matching Bids and Offers resulting in Energy Exchanges.

"Southeast EEM System Interface" means the graphical user interface ("GUI") and application programming interfaces ("API") used by the Southeast EEM System that meet the Southeast EEM System requirements developed by the Southeast EEM Administrator and the Operating Committee.

"Southeast EEM Manuals" means the instructions, rules, procedures and guidelines established by the Operating Committee for the Southeast EEM.

"System Administrators" means, collectively, the Southeast EEM Administrator and Company System Administrators.

## III.   PARTICIPATION

**A.**   Any entity that meets the requirements of this Section III may become a Participant.

**B.**   A Participant must:

**1.**   Own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory;

**2.**   Execute a Participant Agreement in the form attached to the Agreement as Appendix A (the "Participant Agreement") which agreement shall, among

other things, contractually bind such entity to comply with the rules set forth in this Appendix B;

3.     Deliver the executed Participant Agreement to the Secretary and the Southeast EEM Administrator, which shall become effective when countersigned by the Southeast EEM Agent at the direction of the Operating Committee;

4.     Execute and deliver a Non-Firm Energy Exchange Transmission Service Agreement with each Participating Transmission Provider who requires delivery of such agreement, or otherwise have access to Non-Firm Energy Exchange Transmission Service from each Participating Transmission Provider; and

5.     Have or enter into an Enabling Agreement with at least three (3) or more Participants.

## IV.     BIDS/OFFERS AND MATCHING PROCEDURES.

### A.     Pre-Bid/Offer Information Requirements.

1.     Information Submitted by Participants.

     a.     Prior to being permitted to submit Bids or Offers, each Participant shall provide the Southeast EEM all required information in its Participant Profile. Participants are responsible for providing accurate information to the Southeast EEM System in its Participant Profile, as well as submitting any updates or modifications to the Southeast EEM Administrator to maintain the accuracy of Participant's Profile.

     b.     Participant-Specific Constraints.

         i.     Prior to being permitted to submit Bids or Offers, each Participant shall provide to the Southeast EEM in its Participant Profile, any constraints the Southeast EEM Algorithm must take into account in matching Bids or Offers from such Participant ("Participant-Specific Constraints"). Participant-Specific Constraints can be either counterparty specific or geographic.

         ii.     Offers from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific Constraints are set such that there are at least three other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Seller, and Bids from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED **VERSION**

Constraints are set such that there are at least three (3) other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Buyer.

iii.   Participants shall not be required to provide a reason for any Participant-Specific Constraint.   The reason for such constraints could be, but is not limited to, the following:

(a)   Lack of an Enabling Agreement with a Participant;

(b)   Counterparty issues (e.g., credit);

(c)   Affiliates restrictions; and

(d)   Geographic issues causing supply or delivery point restrictions and related regulatory requirements.

**c.**   Prior to being permitted to submit Bids or Offers, each Participant must affirm that it has executed Service Agreements for Non-Firm Energy Exchange Transmission Service with each Participating Transmission Provider that requires delivery of such agreement or that it otherwise has access to Non-Firm Energy Exchange Transmission Service as to each Participating Transmission Provider through such Participating Transmission Provider's Tariff.

**2.**   Prior to being permitted to provide Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall provide sufficient information to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM Territory for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges. On an ongoing basis, consistent with the timing requirements of Section IV.B.2.a, each Participating Transmission Provider shall provide the Administrator with the Available Transfer Capability ("ATC") as calculated by the Participating Transmission Provider per the methodology for calculating ATC that each Participating Transmission Provider already specifies in its OATT (or equivalent) and posts on its OASIS (or equivalent), as that ATC may change from time to time.

**3.**   Participant shall supply the Southeast EEM Administrator with any and all information the Operating Committee deems reasonably necessary for the administration of the Southeast EEM System.

**B.   Bids and Offers.**

**1.**   Delivery Intervals.   Each Clock Hour will consist of four (4) Delivery Intervals:

6

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED **VERSION**

xx:00 to xx:15;

xx:15 to xx:30;

xx:30 to xx:45; and

xx:45 to xx:00 of the next Clock Hour.

2.    Deadlines.

    **a.**    For each Clock Hour, every Participating Transmission Provider's ~~available capacity for NFEETS~~ATC must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of such next Clock Hour.  To the extent a Participating Transmission Provider can update its ~~available capacity for NFEETS~~ATC within a Clock Hour, such updated information must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of the applicable Delivery Interval.

    **b.**    Each Participating Transmission Provider's Loss Factor and Loss Rate must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes prior to the Clock Hour for which the Loss Factor and Loss Rate are to apply.  If the Participating Transmission Provider does not update its Loss Factor and Loss Rate, the values for the prior Clock Hour will apply.

    **c.**    Bid and Offers must be submitted through the Southeast EEM System Interface not earlier than seven (7) days prior to the applicable Delivery Interval and not later than fifteen (15) minutes prior to the Delivery Interval for which they are submitted. Participants may modify or cancel previously submitted Bids or Offers at any time before 15 minutes prior to the upcoming Delivery Interval; no further modifications may be submitted to a Bid or Offer within the fifteen (15)-minute period prior to the applicable Delivery Interval.

    **d.**    The Southeast EEM System will: 1) match the Bids and Offers for the next Delivery Interval, subject to the constraints and limitations established pursuant to this Appendix; and 2) provide an Energy Exchange Notification to all Participants who were matched as an Energy Exchange for the upcoming Delivery Interval, and 3) submit all necessary transmission reservations and e-Tags ten (10) minutes prior to the relevant Delivery Interval.

3.    Bid and Offer Requirements.

    **a.**    Each Bid or Offer must include the following components:

JA0946

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED **VERSION**

  i.    Participant name.

  ii.   Whether the submission is a Bid or an Offer.

  iii.  An amount of Non-Firm Energy (MW) for the Bid or Offer in increments of 4MW blocks.

  iv.   For all Offers, an Offer Price and for all Bids, a Bid Price.

  v.    For all Offers, a Source and for all Bids, a Sink.

  vi.   The specific Delivery Interval to which the Bid or Offer applies.

  vii.  Whether the submission: 1) must be matched in full or not at all or 2) can be matched at any volume below the Bid or Offer volume (subject to the 4MW increment rule) ("All or Nothing Selection").

  viii. Any other components as may be required for the Southeast EEM System to perform actions set forth in Section IV.C of this Appendix or to generate the reports described in Section V of this Appendix.

**b.**   An Offer may include the maximum Energy Exchange Price that the Participant is willing to accept for a particular Source/Sink pair for the applicable Delivery Interval.

**c.**   Participants are permitted to submit multiple Bids or Offers for the same Delivery Interval with varying Source or Sink locations, as applicable, Non-Firm Energy amounts, and pricing, subject to any limitation on the number of Bids or Offers that may be submitted at any one Source or Sink for a particular Delivery Interval as may be established in the Southeast EEM Manuals.

**d.**   Submission of Bids and Offers is voluntary; Participants are not required to submit any Bids or Offers for any Delivery Interval.

**C.    Matching.**

**1.**   Subject to the constraints defined below and all Bid Information and Offer Information, the Southeast EEM Algorithm will evaluate all Bids and Offers for each Delivery Interval and produce Energy Exchanges.

The Southeast EEM Algorithm will match Bids and Offers so as to result in Energy Exchanges that maximize the Southeast Energy Exchange Market total benefit for the applicable Delivery Interval while simultaneously honoring all the requirements identified in Section IV.A~~I~~ and the

constraints identified in Section IV.C.6. The total benefit shall be calculated by aggregating the benefits from each Energy Exchange for the applicable Delivery Interval.

**2.** The benefit associated with each Energy Exchange will be calculated by taking the difference between the Bid Price and Offer Price and multiplying it by the MW amount of Non-Firm Energy identified in the Energy Exchange, <u>less</u> the costs of transmission services (Losses) provided along the Contract Path.

**3.** For any Energy Exchange where the Energy Exchange Price exceeds the maximum value submitted in accordance with Section IV.B.3.b., the Energy Exchange Price will be adjusted down to that maximum value, such that the total benefit associated with the Energy Exchange remains the same, but the benefit allocation will be adjusted in the Buyer's favor.

**4.** Matching Principles.

    **a.** Whole and/or partial amounts of Non-Firm Energy shall be matched, consistent with the Participant's All or Nothing Selection in its Bid Information or Offer Information.

    **b.** Bids or Offers that can be matched with multiple Participants shall be allowed, subject to the matching rules set forth in this Appendix.

**5.** Match/Energy Exchange Price.

    **a.** Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.

    **b.** Data demonstrating Losses will be incorporated into the Energy Exchange Price.

        i. Each Participating Transmission Provider determines the method for pricing its Losses;

        ii. Each Participating Transmission Provider is responsible for updating its Tariff to address how Losses will be priced; and

        iii. Loss Rate and Loss Factor are an input into the algorithm by the relevant Participating Transmission Provider.

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED **VERSION**

6.    Constraints.

a.    Participant-Specific Constraints.  In matching Bids and Offers, the Southeast EEM Algorithm will take into account the Participant-Specific Constraints submitted by the Bidders and Offerors in accordance with Section IV.A.1.b.

b.    Generally Applicable Constraints.

i.    In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the ~~available capacity for NFEETS~~ATC of any Participating Transmission Provider on any given Contract Path to be exceeded.

ii.    Energy Exchanges shall not be made that cause:

(a)    A Buyer to purchase more MW than the amount set forth in its Bid;

(b)    A Seller to sell more MW than the amount set forth in its Offer; and

(c)    For matched Bids and Offers, the Energy Exchange Price to (i) be less than the Offer Price plus half of net Losses, as calculated per Section IV.C.5.a, and (ii) more than the Bid Price minus net Losses, as calculated per Section IV.C.5.a.

iii.    The Southeast EEM Algorithm shall only make Energy Exchanges that yield positive benefits to both Buyer and Seller, as defined in Section IV.C.2, after Losses have been considered.

iv.    The total MW of potential Energy Exchanges in any Delivery Interval shall not exceed the aggregate amount of Non-Firm Energy identified in the applicable Offers or Bids for such Delivery Interval.

v.    A Participant's Bid may not be matched with an Offer made by the same Participant.

vi.    The Southeast EEM Algorithm shall not create Energy Exchanges in the same Delivery Interval that would create offsetting Energy Exchanges whereby Participant 1 sells to Participant 2 while Participant 2 sells to Participant 1 during the same interval at the same location.

JA0949

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED **VERSION**

7.    Treatment of Identical Offers or Bids.

   a.    In the event that multiple Bids or Offers that are at the same price at a Source or Sink are identical which create the same benefit for the Southeast EEM, a randomized preference will be assigned to the Bid(s) or Offer(s).  Additionally, randomization will be employed in the algorithm in all other situations if a heuristic is required to resolve ties or ambiguities.

8.    Notification, Scheduling, and Transmission for Energy Exchanges.

   a.    After an Energy Exchange for a Delivery Interval is determined:

      i.    The Bidder and Offeror shall be notified of match via an Energy Exchange Notification.

      ii.    Transmission reservations and e-Tags shall be automatically created by the Southeast EEM System based on the matches within the time frame noted above.  All e-Tags will be sent to the applicable Participating Transmission Provider(s), Balancing Authority(ies) and matched Participants. Consistent with the discretion afforded to Participating Transmission Providers and Balancing Authorities in the NAESB business practices, each participating Balancing Authority within the Territory agrees that it will not reject an e-Tag automatically created by the Southeast EEM System on the basis that it was submitted less than twenty (20) minutes prior to the Delivery Interval but at least ten (10) minutes prior to the Delivery Interval.

      iii.    The Southeast EEM System will generate and provide sufficient information to Participating Transmission Providers to validate and collect payment for Losses from applicable Buyers and Sellers for each Energy Exchange.

      iv.    Appropriate OASIS information will be provided to the relevant Participating Transmission Service Providers.

9.    The contractual "point of sale" of an Energy Exchange will be at the Buyer's Balancing Authority border for a transaction delivered out of or thru one or more Balancing Authorities. For an Energy Exchange that stays within one Balancing Authority (Source and Sink in same Balancing Authority), the "point of sale" will be at the bus of the Seller's Source.  For an Energy Exchange fully delivered to a Buyer's Balancing Authority border, the Participant acting as the Seller will be the responsible party for the transmission service to deliver the Non-Firm Energy to the "point of sale" and the Buyer will be responsible for the transmission service required to

11

sink the Non-Firm Energy. For an Energy Exchange that stays within one Balancing Authority, the Buyer will be the responsible party for the transmission service required to sink the Non-Firm Energy. For avoidance of doubt, Non-Firm Energy Exchange Transmission Service must be used for the entire Contract Path from Source to Sink for all Energy Exchanges.

## V.    SOUTHEAST EEM ENERGY EXCHANGE REPORTS.

The Southeast EEM Administrator and the Company System Administrators shall create and maintain the reports concerning Energy Exchanges as required by the Operating Committee. The reports that are provided by the System Administrators shall include, but need not be limited to, the following:

**A.    Public Monthly Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website on or before midnight of the fifth Business Day of the following month and shall include the following information from the prior month:

1.    Minimum, maximum, and average match prices;

2.    Amount of Non-Firm Energy offered and sold as well as bid and purchased over all Delivery Intervals;

3.    Amount of Non-Firm Energy that flowed once matched as an Energy Exchange;

4.    Total number of Energy Exchanges;

5.    Total benefit to be calculated in accordance with Section IV.C.2;

6.    Minimum, maximum, and average MW Energy Exchange amount; and

7.    Energy Exchanges made but not executed.

**B.    Public Daily Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website by 6:00 A.M. CPT and shall include the following aggregated information from the prior day:

1.    Total number of Bids and Offers during each Clock Hour of the prior day;

2.    Amount of Non-Firm Energy offered and sold as well as bid and purchased during each Clock Hour of the prior day;

3.    Number of Energy Exchanges executed for each Clock Hour of the prior day;

JA0951

4.  Total number of Participants who submitted Bids for each Clock Hour of the prior day;

5.  Total number of Participants who submitted Offers for each Clock Hour of the prior day; and

6.  Weighted average match price per Clock Hour.

C.  **Public Hourly Informational Report.**  This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website fifteen (15) minutes after the applicable Clock Hour and shall include the following aggregated information from the applicable Clock Hour:

1.  Total number of Bids and Offers during that Clock Hour;

2.  Amount of Non-Firm Energy offered and sold as well as bid and purchased during that Clock Hour;

3.  Number of Energy Exchanges executed for that Clock Hour;

4.  Total number of Participants who submitted Bids during that Clock Hour; and

5.  Total number of Participants who submitted Offers during that Clock Hour.

## VI.  AUDITING AND DATA ADMINISTRATION.

A.  **Archiving of Data.**  All Southeast EEM System input data necessary to recreate and audit any Delivery Interval, and all Southeast EEM System output data for each Delivery Interval, shall be archived such that at least the three prior months of data can be retrieved in real time. Five (5) years of data shall be archived off-line. Participants may request access to their own data and it shall be made available upon request within 24 hours. Data older than five (5) years shall be deleted at the end of each month on a rolling basis.

B.  **Access to Southeast EEM System Energy Exchange Data.**

1.  The Southeast EEM Administrator shall have access, via system software, to the results of the matching process for any Delivery Interval of on-line history. The data to which the System Administrators have access shall include raw Participant data, matched output data, and intermediate results of the algorithm. To be clear, the Southeast EEM Administrator shall be able to run all of the reports available in the system and view the data for all Participants.

2.  Each Participant will be required to identify an administrator that is authorized by the Participant to run and review all of the reports available in the Southeast EEM System that are redacted to ~~all~~only show the

13

information related to the Participant it represents (the "Company System Administrator"). The Southeast EEM System will provide each Company System Administrator with the right to grant access to certain reports and related data to identified delegates within the Participant's organization. Each Company System Administrator (and any delegate identified by the Company System Administrator) shall be able to run all of the reports available in the system but receive only the data that belong to the Participant it represents.

C. **Additional Southeast EEM Administrator Functions.** Subject to the limitations set forth in subsection (B) above, the Southeast EEM Administrator shall employ the system software to perform the following functions:

1. Oversee the matching process;

2. Maintain model data and Southeast EEM System parameters; and

3. View Participant usage statistics and generate Participant benefit reports.

D. **Auditing Process.** Auditing functions will be performed by the Market Auditor at the direction of the Membership Board. The Market Auditor will report its conclusions, and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis. ~~The Membership Board will maintain sole responsibility for determining whether to share the information any further.~~ This will be accomplished through the Website posting process identified in Section VI.D.6, thereby ensuring that access to these reports by the Members and others will be simultaneous, subject to any applicable confidentiality restrictions. Auditing functions include the following:

1. Verify that the Southeast EEM System operates in accordance with the Southeast EEM Rules, including the determination and application of Bids, Offers, constraints, matched settlements, OASIS reservations, and e-tags.

2. Ensure that Energy Exchange data is available to the applicable Participants in accordance with the Southeast EEM Rules.

3. Report to the Membership Board any concerns regarding the reliability and accuracy of the Southeast EEM System process and results including any instance of operational problems or anomalies with the functioning of the Southeast EEM System.

4. Provide evaluation regarding the proper ~~function~~functioning of the Southeast EEM System, ~~and~~ including verifying the ~~effectiveness~~compliance of ~~any~~the Southeast EEM System ~~specific controls~~with the Participant-Specific Constraints and Generally Applicable Constraints identified in ~~place~~Section IV.B.6 related to the operation of the Southeast EEM System.

14

JA0953

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED **VERSION**

**5.** ~~Refer~~Report any complaints received to the Membership Board, and investigate and report further at the Membership Board's direction.

**6.** ~~The~~Respond to written questions from Participants, FERC, NERC, applicable state commissions in the region, Tennessee Valley Authority's Inspector General, and any other applicable regulators that oversee the electric operations of any Member regarding the integrity of the matching process. Such information requests and Market Auditor responses (which will be provided, where reasonable, within 30 days), along with any reports generated by the Market Auditor in accordance with these Market Rules, will be provided to the Administrator, which will post such documents to the Southeast EEM website. To the extent that such information (whether the question or the response or other document) is Transmission Function Information or Commercially Sensitive Information, it will be posted to a confidential section of the Southeast EEM website, and access by Participants shall be governed pursuant to the confidentiality provision of the Participant Agreement. Access by regulators shall be subject to a standing request that such regulators treat such information with the highest degree of confidentiality permissible under law applicable to each such regulator. "Transmission Function Information" shall have the meaning provided at 18 C.F.R. Sections 358.3(j), or the successor to that provision. Commercially Sensitive Information shall include any information that could confer a competitive advantage on the recipient, or whose disclosure could harm or commercially disadvantage an entity associated with the information, including, but not limited to, any Participant-specific information, such as the bid and offer information provided to FERC and the Market Auditor every seven days. The entity providing the information for the Administrator to post to the Website (i.e., typically the Market Auditor) shall be responsible for determining which information posted to the Website should be placed in the confidential section of the Website, and shall resolve any uncertainty in favor of treating the information confidentially. In no event shall the Market Auditor or Administrator cause Commercially Sensitive Information that is identifiable to a particular Participant or Critical Energy/Electric Infrastructure Information to be posted to the Southeast EEM Website. Southeast EEM Members shall have access to information posted on the website at the same time and subject to the same restrictions as other Participants. To the extent that the Market Auditor is required to provide a report or document to the Membership Board, it will do so by notifying the Membership Board when the report or document has been posted to the website.

**~~6.~~7.** Except as otherwise specified herein, the Membership Board will be responsible for defining the time interval(s) for the auditing function to be performed and for the Auditor to report back to the governing body. Such interval(s) will be published in the Southeast EEM Manuals.

**E.     Data Administration.**

15

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED VERSION

**1.**     Parameters.  The Southeast EEM Administrator shall ~~set and~~ maintain the following Southeast EEM System configuration parameters, which shall be posted for access by all Members:

**a.**     The matching process start time for each Clock Hour;

**b.**     The number of minutes before the start of the matching process when no additional Bids and Offers will be accepted;

**c.**     The number of minutes before the start of the matching process by which the processing of any in-transit Bids and Offers must be completed;

**d.**     The addition or deletion of Participants;

**e.**     The addition or deletion of a Company System Administrator for each Participant;

**f.**     Manage, store, and safeguard data (e.g., Bid, Offer, match, and Participant Information) to ensure appropriate levels of confidentiality and records retention;

**g.**     Grant access to the data on the Southeast EEM System as appropriate;

**h.**     Supply data to Participants involved in Energy Exchanges to complete the applicable transaction, including (but not limited to):

    i.     Participant identification of the Buyer and the Seller;

    ii.     Balancing Authority Area identifications for the MWh quoted by the Buyer and the Seller;

    iii.     e-Tag number;

    iv.     Transaction quantity in MW/MWh, including the MWh out of the Source area and the MWh into the Sink area;

    v.     Information specifically related to an Energy Exchange (not price of the other side of the match as may reveal sensitive transmission information);

    vi.     Energy Exchange Price;

    vii.     Benefit for the Buyer and the Seller in total dollars and $/MWh; and

    viii.     Energy Exchanges not executed.

16

~~EXECUTION~~ <u>PROPOSED REVISIONS TO EXECUTED</u> **VERSION**

> **i.** Supply needed information/data for auditing functions to ensure that the Southeast EEM System is being properly administered.

JA0956

## APPENDIX C

## SOUTHEAST EEM AGENT SCOPE

The Southeast EEM Agent Scope shall be limited to the following:

a.  Subject to paragraph (b) below, the Southeast EEM Agent shall execute contracts with third parties solely as the agent for and on behalf of the Members and not in the Southeast EEM Agent's own name or for its own account.

b.  The Southeast EEM Agent shall be empowered to execute contracts only after being given specific written or electronic authorization to do so by the Membership Board, or in the case of minor or unsubstantial contracts, the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

c.  The Southeast EEM Agent shall be authorized to execute amendments to contracts entered into on behalf of the Members, provided that such amendment is authorized by the Membership Board or, in the case of minor or unsubstantial contracts, by the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

d.  For convenience, the Southeast EEM Agent shall be authorized to accept notices under the contracts that it executes on behalf of the Members.

e.  The Southeast EEM Agent shall *not* be involved in the billing process under the vendor contracts. Third-party vendors will bill the Members directly for their proportionate share of the costs under the contracts executed by the Southeast EEM Agent on behalf of the Members.

f.  If certain vendors are unwilling to bill Members directly, the Membership Board shall develop an alternative billing arrangement, such as using a third-party billing agent.

g.  The Southeast EEM Agent shall *not* have any special role in, or authority over, the operation or administration of the Southeast EEM System. The vendor contracts shall specify that the day-to-day contact for such vendor shall be the Operating Committee, not the Southeast EEM Agent.

h.  The Southeast EEM Agent shall not be exposed to incremental liability for actions taken within the Southeast EEM Agent Scope.

~~EXECUTION~~ PROPOSED REVISIONS TO EXECUTED **VERSION**

## APPENDIX D

## INFORMATION PROVIDED TO FERC AND MARKET AUDITOR

a.   Participant, bid/offer price, quantity, location, and All or Nothing information for each bid and offer in each interval;

b.   Specific parameter data for each Participant for all 15-minute intervals, including counterparties the Participant has elected to not be matched with for an interval and Balancing areas for which the Participant has elected not to be matched with a counterparty during an interval;

c.   Enabling Agreement counterparties for each Participant;

d.   The Network Map, updated as necessary;

e.   For each interval, ATC made available to the Southeast EEM by each Participating Transmission Provider, as well as the amounts of such ATC that are not used by the Southeast EEM;

f.   Price caps, as relevant for each Participant;

g.   Matched bids and offers with their associated scheduled MWh quantity and Energy Exchange Price;

h.   Implied marginal benefit information for each ATC limit for each interval, to the extent such information can reasonably be produced by the Southeast EEM Algorithm; and

i.   Descriptive information, such as market participant names and unique identifiers.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Alabama Power Company | ) | ER21-1111-000 |
| | ) | |
| Dominion Energy South Carolina, Inc. | ) | ER21-1112-000 |
| | ) | |
| Louisville Gas and Electric Company | ) | ER21-1114-000 |
| | ) | |
| Duke Energy Progress, LLC | ) | ER21-1115-000 |
| Duke Energy Carolinas, LLC | ) | |
| | ) | |
| Duke Energy Carolinas, LLC | ) | ER21-1116-000 |
| | ) | |
| Duke Energy Progress, LLC | ) | ER21-1117-000 |
| | ) | |
| Louisville Gas and Electric Company | ) | ER21-1118-000 |
| | ) | |
| Georgia Power Company | ) | ER21-1119-000 |
| | ) | |
| Kentucky Utilities Company | ) | ER21-1120-000 |
| | ) | |
| Mississippi Power Company | ) | ER21-1121-000 |
| | ) | |
| Alabama Power Company | ) | ER21-1125-000 |
| | ) | ER21-1128-000 |
| Dominion Energy South Carolina, Inc. | ) | |
| | ) | (not consolidated) |

**PROTEST OF PUBLIC INTEREST ORGANIZATIONS**

1

JA0959

# TABLE OF CONTENTS

I.   SEEM PARTICIPATION IS NOT OPEN TO ALL RESOURCES ON A NON-DISCRIMINATORY BASIS ................................................................................ 6

II.  DESPITE APPLICANTS' ASSERTIONS TO THE CONTRARY, MARKET POWER AND MANIPULATION CONCERNS PERSIST ............................................. 10

III. THE MARGINAL INCREASE IN TRANSPARENCY DOES NOT MITIGATE MARKET POWER CONCERNS ........................................................................... 14

   A. THE PROPOSED IMPROVEMENTS TO TRANSPARENCY ARE INSUFFICIENT WITHOUT AN INDEPENDENT MARKET MONITOR ................................. 15

   B. MARKET AUDITOR REPORTS DO NOT PROVIDE A SUFFICIENT LEVEL OF TRANSPARENCY TO MITIGATE MARKET POWER CONCERNS ......................... 18

   C. THE APPLICANTS SHOULD RELEASE ADDITIONAL DATA THAT WOULD REVEAL THE UNIQUE OPPORTUNITIES FOR MARKET MANIPULATION PRESENT UNDER THE PROPOSED MARKET AGREEMENT ................................. 19

IV.  SEEM GOVERNANCE DOES NOT PROVIDE DUE PROCESS TO PARTICIPANTS .. 20

V.   NFEETS WILL INCREASE COSTS FOR FIRM POINT-TO-POINT SERVICE WITH NO OFFSETTING BENEFIT FOR ENTITIES THAT DO NOT SERVE LOAD IN SEEM TERRITORY ............................................................................................ 23

VI.  THE APPLICANTS MAY NOT APPLY DIFFERENT STANDARDS TO DIFFERENT PARTS OF THE FILING ........................................................................... 24

VII. CONCLUSION ...................................................................................... 28

JA0960

Pursuant to Rule 211 of the Federal Energy Regulatory Commission's ("Commission")

rules of Practice and Procedure, Energy Alabama, Sierra Club, South Carolina Coastal

Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute,

Inc., Vote Solar, Georgia Interfaith Power and Light, Southern Partnership for Equity, North

Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources

Defense Council ("Public Interest Organizations" or "PIOs") respectfully submit this protest in

response to the Petitioners' June 7, 2021 response to the May 4, 2021 deficiency letter and the

Southeast Energy Exchange Market ("SEEM") Proposal submitted by Alabama Power Company

for acceptance under Section 205(c) of the Federal Power Act ("FPA") and Part 35 of the

Commission's regulations.  The entire proposal includes related filings in the above captions by

members of the SEEM Proposal[1],[2] to modify their Open Access Transmission Tariffs ("OATT")

or concur with the Proposal, including Applicants' June 7, 2021 Response to the Deficiency

Letter[3] issued by FERC Staff on May 4, 2021 (together, "SEEM filings" or "filings").[4]   The

PIOs filed a Motion to Intervene and Protest on March 15, 2021[5] and a Motion for Leave to

Respond and Response on April 12, 2021,[6] which are incorporated by reference herein.

---

[1] The SEEM member utilities included in the filing are: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion Energy SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP") (together with DEC, "Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, "LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); PowerSouth Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA") (collectively referred to hereinafter as "Applicants").
[2] Southeast Energy Exchange Market Agreement, Accession No. 20210212-5033 (Feb. 12, 2021) ("SEEM Proposal" or "Proposal").
[3] Deficiency Letter, Accession No. 20210504-3015 (May 4, 2021) ("Deficiency Letter").
[4] Resp. to Deficiency Letter, Accession No. 20210607-5164 (June 7, 2021) ("Deficiency Response").
[5] Mot. to Intervene and Limited Protest and Comment of Public Interest Organizations, Accession No. 20210315-5405 (Mar. 15, 2021) ("PIO March 15 Protest").
[6] Mot. for Leave to Respond and Resp. of Public Interest Organizations, Accession No. 20210412-5876 (Apr. 12, 2021).

JA0961

Applicants were given an opportunity to explain how their Proposal would benefit customers in the Southeast and amend their filing to ensure that the SEEM would satisfy the region's need for a transparent, nondiscriminatory wholesale market.  Instead of taking this opportunity, Applicants responded to Intervenors' concerns and the Commission's Deficiency Letter by doubling down on a flawed, self-serving proposal, dodging Commission questions, and making only minimal improvements to transparency that do not address concerns about market power or provide the public with critical information about how SEEM would function in practice.  The SEEM filings do not resolve, and in some cases reveals additional concerns about undue discrimination, market power, transparency, and governance.

Furthermore, none of the Applicants' proposed changes to the SEEM Proposal alter SEEM's status as a loose power pool or a multilateral trading agreement that contains transmission rates, terms, and conditions.  The Commission would need to change its power pool regulations, 18 C.F.R. § 35.28(c)(3), to find that the public utilities in SEEM are not required to file a pool-wide or system-wide OATT, as the definition in the regulations matches exactly with the SEEM Proposal characteristics.  Many of the Applicants are public utilities that own transmission and under the terms of the SEEM Proposal they would become members of a "multi-lateral trading arrangement or agreement," that "contains transmission rates, terms or conditions."[7]  Accordingly, these public utilities must file a pool-wide or system-wide tariff before any transactions occur pursuant to the SEEM Proposal.[8]  Contrary to Applicants' arguments, the policy driving the power pool regulations is not targeted only at pools that

---

[7] 18 C.F.R. § 35.28(c)(3).
[8] *Id*. at § 35.28(c)(3)(i).

JA0962

coordinate the operation of their systems or plan transmission together.[9]  Rather, as the

Commission explained, it "defined pooling arrangements in the broadest terms possible" so as to

eliminate undue discrimination.[10]  In Order No. 888, the Commission recognized that

implementation of OATTs by public utilities would not cure undue discrimination "if those

public utilities can continue to trade with a selective group within a power pool that

discriminatorily excludes others from becoming a member and that provides preferential intra-

pool transmission rights and rates."[11]  That, as explained in PIO's March 15 Protest, April 12

Answer, and this Protest, is exactly what Applicants propose here.  The Commission cannot

allow such undue discrimination; nor can it ignore its own regulations that require a pool-wide

OATT in these circumstances before any transactions occur pursuant to the SEEM Proposal.

For all these reasons, the Commission can and should reject the SEEM Proposal and

issue guidance as described in PIO's March 15 Protest, April 12 Response, and this Protest.  If

the Commission does not reject the filing outright, the PIOs request that the Commission issue

another deficiency letter seeking additional information and requiring the Applicants to fully

answer all the inquiries included in the May 4, 2021 Deficiency Letter.  The PIOs also request

that the Commission accept and suspend the filings for the maximum five-month period, subject

---

[9] Mot. for Leave to Answer and Answer of the Southeast EEM Members, at 11 n.25, Accession No. 20210330-5322 (Mar. 30, 2015) ("SEEM Answer"); *see also MidContinent Area Power Pool*, 78 FERC ¶ 61,203 (1997) (accepting and suspending requisite submissions of pool-wide tariffs, subject to further orders, including the tariff of Western Systems Power Pool); *W. Sys. Power Pool*, 83 FERC ¶ 61,099 at 61,476–77 (1998) (approving with modifications pool-wide tariff under which "pool members are not required to provide power or transmission services," establishing "standardized terms and rates for discretionary short-term (up to one year) and nonfirm (up to one month) power and transmission services among the members," and unbundling "transmission prices from [ ] capacity and energy prices").

[10] *Wolverine Power Supply Coop., Inc.*, 85 FERC ¶ 61,099, 61,355 (1998).

[11] *Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540, 21,593 (May 10, 1996) ("Order No. 888").

JA0963

to the outcome of a technical conference on the SEEM Proposal and/or convene a technical

conference or joint regional meeting on market reform in the Southeast.

## I.    SEEM PARTICIPATION IS NOT OPEN TO ALL RESOURCES ON A NON-DISCRIMINATORY BASIS

The Applicants' Deficiency Response does not cure, and in fact underscores, the

discriminatory aspects of the SEEM Proposal raised in the PIO's original Protest.  As previously

discussed, participation in the SEEM is limited to parties that have entered into three or more

Enabling Agreements with existing Participants.[12]  These Enabling Agreements are not

standardized and Participants are permitted to individually negotiate terms and conditions

without limitation.[13]  As explained in the PIO's original Protest, nothing prevents Applicants

from selectively entering into Enabling Agreements or negotiating terms and conditions of the

agreements in an unduly discriminatory manner in violation of the Federal Power Act[14] and the

Commission's rules governing power pools.[15]

FERC's Deficiency Letter honed in on this issue, asking the Applicants whether there are

any limitations on a Participant's ability to refuse to enter into an Enabling Agreement with a

prospective or current Participant and whether Participants are required to provide a reason for

refusing to sign an Enabling Agreement with a prospective or current Participant.[16]  The

Applicants concede that neither the existing bilateral market nor the SEEM Proposal contains

---

[12] SEEM Proposal, Attach. A ("SEEM Agreement") at App. B. ("SEEM Market Rules"), Section III.B.5 ("Participation").

[13] *See* Deficiency Response at 21.

[14] 16 U.S.C. § 824d(b) ("no public utility shall, with respect to any transmission . . . make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage"); *see also* Order No. 888; *order on reh'g*, Order No. 888-A, 62 Fed. Reg. 12,274 (Mar. 14, 1997); *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997); *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998); *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[15] PIO March 15 Protest at 10–13.

[16] Deficiency Letter at 7.

JA0964

any limitations on a party's ability to refuse to enter into an Enabling Agreement with a prospective or current party,[17] and does not require Applicants to state any explicit reason for refusing to enter into an Enabling Agreement with another Participant.[18]  In other words, Applicants admit that there is nothing in the existing bilateral market or the SEEM Proposal that addresses PIO's concern that Applicants could selectively enter into or negotiate Enabling Agreements in a discriminatory manner, for example, favoring  their current preferred bilateral partners or other SEEM members.

The Applicants point to the existence of several Enabling Agreements in the existing bilateral market as evidence they lack the incentive to enter into the agreements in an unduly discriminatory manner.[19]  But the SEEM creates a new free transmission service that is only available to Participants who have entered into a sufficient number of Enabling Agreements and is not one of the *pro forma* services required under the Commission's regulations.  In a bilateral market that is as closed to competition as the Southeast, the new transmission service that encompasses service across the entire SEEM territory and eliminates rate pancaking has significant value to owners of generation resources in the territory.  By controlling access to the transmission service by exclusionary practices related to Enabling Agreements, the Applicants have the *ability* to exercise market power over transmission service.  The Applicants already have incentive to exercise such market power because they compete to serve load with resources in the SEEM territory.[20]  This exercise of market power may be as simple as exclusion of access

---

[17] Deficiency Response at 20.
[18] *Id.* at 21.
[19] *Id.*
[20] *See Report To Congress On Competition In Wholesale And Retail Markets For Electric Energy* at 23 ("FERC recognized the potential for control of transmission to create market power and the challenge such control created in moving to greater reliance on market-based rates."), https://www.ferc.gov/sites/default/files/2020-04/epact-final-rpt_0.pdf.

JA0965

to the Non-Firm Energy Exchange Transmission Service ("NFEETS"). It could also take the form of extraction of concessions from resource owners unrelated to participation in the SEEM that may help solidify the existing market power of SEEM's member utilities.

The only way to counteract these perverse incentives and ensure that the Enabling Agreements are not entered into or negotiated in an unduly discriminatory manner is to establish a *pro-forma* agreement that is part of the SEEM Participant Agreement and available to any prospective Participant. This is standard practice for other organized markets and a requirement for non-discriminatory access.[21] Even where the Commission finds that a joint dispatch agreement is not a loose power pool, it requires that resources located in the joint dispatch area sign the Joint Dispatch Agreement that is on file with the Commission to participate in the market and receive access to the free transmission service.[22] The same should be true for the SEEM. The Commission has found that market participant agreements are a necessary prerequisite for submission of bids into a market and spell out the rights and obligations of the market participant.[23] But the SEEM Participant Agreement contains an inherent barrier to entry in its requirement for at least three executed Enabling Agreements, depriving potential market participants of their rights. For these reasons and because this barrier is controlled by the competitors of any new entrant, the SEEM Participation Agreement should contain *pro forma* requirements for the purchase and sale of energy that provides for Energy Exchanges between buyers and sellers; the Commission should not allow non-standardized Enabling Agreements.

---

[21] *See Sw. Power Pool, Inc.*, 114 FERC ¶ 61,289 at P 209 (2006) (directing SPP to file a market participant agreement "[b]ecause the imbalance market participant service agreement will contain important rate-related obligations and rights of market participants").

[22] *Pub. Serv. Co. of Colorado Black Hills/Colorado Elec. Util. Co.*, 154 FERC ¶ 61,107 at P 85 (2016) ("to the extent any resource only needs the transmission resources of Parties to join the Joint Dispatch Agreement, it only needs to sign the Joint Dispatch Agreement to receive Joint Dispatch Transmission Service").

[23] *Sw. Power Pool, Inc.*, 116 FERC ¶ 61,053 at P 16; *order on reh'g and compliance*, 117 FERC ¶ 61,110 (2006).

8

At a very basic level, the SEEM Proposal lacks any protections for prospective

Participants seeking to enter into Enabling Agreements: there is no deadline requiring counter-

parties to respond to or enter into a proposed Enabling Agreement, no guidelines regarding

collateral requirements, and no obligation to explain unreasonable proposed terms or an outright

rejection to enter into an agreement.  This means prospective Participants could be stuck in limbo

for an indefinite amount of time waiting for a counter-party to respond to a proposed Enabling

Agreement or provide reasonable terms, depriving them of valuable transmission service access

in the meantime.

The Applicants argue that there is no need to standardize Enabling Agreements because

Participants can file complaints with the Commission under Section 206 of the FPA or submit

complaints to the Market Auditor.[24]  Both of these so-called remedies are inadequate.  First, an

aggrieved party may only file a complaint with the Commission under Section 206 if the

Participant who has refused to enter into an Enabling Agreement is a jurisdictional Public

Utility—nearly half of the potential SEEM utilities are non-jurisdictional.[25]  Second, the

procedure for submitting complaints to the Market Auditor does not provide any real protections:

for example, there is no deadline for the Market Auditor to respond to a complainant, refer the

complaint to the Membership Board ("Board") for investigation, and no standard criteria used by

the Board to evaluate complaints and determine if action is necessary.[26]  Furthermore, the

internal complaint route is only available to SEEM Participants, not to prospective Participants.[27]

---

[24] Deficiency Response at 22.
[25] SEEM Answer at 4 n. 8 ("Six of the current fourteen Southeast EEM Members are non-jurisdictional, as are the five additional entities that are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members.").
[26] Deficiency Response at 26–27 and Attach. A, Proposed Revision to Southeast EEM Agreement at 62.
[27] Deficiency Response at 22. *Compare* "*Southeast EEM Participants* can submit complaints to the Market Auditor" *with* "if a *prospective or current Participant* wants to challenge the refusal by another Jurisdictional Participant to enter into an Enabling Agreement, it may file a complaint with the Commission . . ." (emphasis added).

As a result, a prospective Participant with a grievance against a non-jurisdictional SEEM Participant that prevented them from entering into enough Enabling Agreements to join SEEM would not have access to even this paltry complaint mechanism.

In sum, the Applicants' Deficiency Response does not cure, and in fact highlights the lack of non-discriminatory access to the new free transmission service. Non-discriminatory access to transmission service, including the NFEETS proposed here, is required by the FPA for wholesale markets generally and is also central to the Commission's power pool requirements.[28] The SEEM's failure to conform to this basic prerequisite to establishment of a new market means that the proposal is unjust, unreasonable, and unduly discriminatory and must be rejected.

## II.  DESPITE APPLICANTS' ASSERTIONS TO THE CONTRARY, MARKET POWER AND MANIPULATION CONCERNS PERSIST

The Applicants recognize that the Deficiency Letter's questions indicate Commission concerns about "market power, market manipulation, and market oversight."[29] Although Applicants offer to address some of the oversight concerns by making marginal increases in data transparency, they also fail to meaningfully address Commission and Intervenor concerns about the ability of SEEM members to exercise market power and to manipulate the SEEM market.

---

[28] Order No. 888 at 21,541 ("The legal and policy cornerstone of these rules is to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce."); *see id.* ("systems, including those that already provide some form of open access, cannot use monopoly power over transmission to unduly discriminate against others"); *see also* Order No. 888-A at 12,313 ("[W]e do not find it to be unduly discriminatory to provide some pool-wide transmission services to members under a pooling agreement and to provide other transmission services to members under the individual tariff of each member, as long as members and non-members have access to the same transmission services on a comparable basis and pay the same or a comparable rate for transmission."); *Wolverine Power Supply Coop.*, 85 FERC ¶ 61,099, 61,355 ("the filing of open access transmission tariffs by public utilities [will] not cure undue discrimination 'if those public utilities can continue to trade with a selective group within a power pool that discriminatorily excludes others from becoming a member and that provides preferential intra-pool transmission rights and rates.'"
[29] Deficiency Response at 2.

JA0968

The Applicants respond to these concerns by essentially denying that they exist—drawing inapposite comparisons that seek to avail themselves of case law pertaining to organized markets without taking on any of their foundational responsibilities and asserting repeatedly and with much fanfare that there is nothing to see behind its bilateral contracting curtain, despite having crafted what is clearly an organized market with preferential member treatment, no-cost transmission, rates set by a separate entity (the SEEM algorithm), and a generalized set of rules and terms governing all trades, members, and participants.[30]

Applicants continue to rely on Dr. Pope's initial and supplemental analyses to support their arguments that there is no risk of market power abuse or manipulation. Unfortunately, Dr. Pope perpetuates the cognitive dissonance of pretending SEEM is really just "a voluntary, residual, bilateral market"[31]—which, if it true, would not require a tariff filing under Section 205—while ignoring the concerns raised by PIOs and reflected in the Commission's Deficiency Letter questions about how the toggle function in particular could be used by those with market power to manipulate the market.

Instead of delving into the core of the questions that were asked by the Commission as to the expected function and reasonable expectations of market use based on existing supply and expected demand of 15-minute residual energy, the Applicants largely dodge these questions by focusing primarily on what SEEM is not[32] and what other services people will use,[33] without

---

[30] See, e.g., Deficiency Response at 4–7.

[31] Id. at Attach. D, Suppl. Aff. of Susan L. Pope at ¶ 59 ("Suppl. Pope Aff.").

[32] Applicants assert that SEEM "is not a balancing market," Deficiency Response at 12 and Suppl. Pope Aff. at ¶¶ 27–50, despite publicly stating that the SEEM is intended to "assist with imbalances." Wholesale Electricity Markets Study Group Work Products at PDF p. 24 (2020), https://files.nc.gov/ncdeq/climate-change/clean-energy-plan/Wholesale-Markets-Product-Final.pdf.

[33] Despite vehemently asserting that it is *not* a balancing market, Dr. Pope admits that SEEM actually *is* a balancing market, just not one with much incentive to use. See Suppl. Pope Aff. at ¶ 37 ("The Southeast EEM will provide a new alternative for prospectively managing imbalances known 15 minutes before the Delivery Interval, but because

really focusing on what SEEM is and why there is a valid need for it.  Dr. Pope in fact spends the

bulk of her analysis explaining the unasked and irrelevant question of how SEEM differs from

real-time balancing markets with must-offer requirements and Security Constrained Economic

Dispatch, and uses the inapposite comparison of how market power is exercised in those other,

very different markets as the primary basis for her conclusion that the potential for market power

abuse in SEEM is "unlikely."[34]

But as PIOs have explained, SEEM's toggling function and governance structure—

neither of which Applicants propose to change—creates additional opportunities for market

power abuse and manipulation by large actors with incentives to do so and who will maintain

control of the SEEM market through the voting structure and membership requirements.[35]  As

Dr. Paul Sotkiewicz points out in his initial and supplemental affidavit, the kind of market power

at issues in Regional Transmission Organizations ("RTOs") and must-offer energy imbalance

markets ("EIMs") are not particularly relevant to the structure of SEEM, which is composed

primarily of monopoly utilities with very different incentives.[36]  The primary incentive of

monopoly utilities, like those in SEEM, is not to minimize costs, but to protect their monopoly

position and to foreclose competition.[37]  This means that the Applicants will have different

bidding incentives than those relied on by Dr. Pope.[38]  Their incentive will primarily be to

prevent competition, which they can achieve in the SEEM structure by toggling off competitors

---

matches are not guaranteed, Participants will continue to rely on the same mechanisms for handling imbalances that they use today.").

[34] *See generally*, Suppl. Pope Aff. at ¶¶ 27–57 (and especially ¶ 48).

[35] Mot. for Leave to Respond and Resp. of Public Interest Organizations, at 17, Accession No. 20210412-5876 (Apr. 12, 2021) ("PIO April 12 Response").

[36] Suppl. Aff. of Paul M. Sotkiewicz, PhD at ¶¶ 10–38 ("Suppl. Sotkiewicz Aff.") (attached hereto as Attach. A).

[37] *Id.* ¶ 25.

[38] *Id.* ¶¶ 26–38.

and choosing not to submit all demand that could be met with lower cost resources.[39]  As Dr.

Sotkiewicz concludes:

> The Filing Parties are all franchise monopolies whose incentives are to retain their monopoly positions. The proposed SEEM design that allows Participants to toggle on/off competitors and does not have must offer for supply or must bid for demand requirements creates the ability to exercise market power and manipulation that cannot be captured by horizontal market power tests. Based on these incentives, the design leads to outcomes that are likely to be unjust and unreasonable.[40]

The Applicants and Dr. Pope have countered this criticism by asserting that Applicants

would not go through the trouble of creating a market they do not intend to use.[41]  They have

thus asserted, without demonstration of demand for the SEEM product or likelihood of its use,

that SEEM will attract robust participation.[42]  In fact, Dr. Pope's relies on this assumption for her

conclusion that market power in SEEM will be sufficiently mitigated.[43]  But as Dr. Sotkiewicz

points out, the experience of gross underutilization of the Southern Company Energy Auction

exemplifies the issues raised by Dr. Sotkiewicz and supports PIOs' concerns that SEEM will not

only fail to deliver the promised benefits, but is primarily an effort to distract from or derail

state- and community-led efforts in the Southeast to push for more meaningful and much-needed

market reform.[44]  As PIOs and others have pointed out, efforts to consider wholesale market

reforms underway in North Carolina, South Carolina, Kentucky, Mississippi, Georgia, and areas

served by TVA are building pressure in the Southeast for significant market reform and SEEM

offers Applicants the opportunity to try and stay ahead of and control that reform.[45]  Applicants

thus have every incentive to craft a proposal that protects their existing market power and

---

[39] *Id.* ¶¶ 31–38.
[40] *Id.* ¶ 38.
[41] SEEM Answer at 36–37.
[42] Suppl. Pope Aff. at ¶17, n.5.
[43] *Id.*  It is also of note that Dr. Pope relies on the assumption that SEEM will be widely used, but that parties will rely on firm balancing products *outside of the SEEM market* to mitigate market power.  *Id.* at ¶ 50.
[44] Suppl. Sotkiewicz Aff. at ¶¶ 63–71; PIO March 15 Protest at 4–6, 51–56.
[45] PIO March 15 Protest at 51–56; PIO April 12 Response at 17–18.

JA0971

control, and it is critical that the Commission prevent SEEM from becoming a dead-end for those reform efforts.[46]

### III.   THE MARGINAL INCREASE IN TRANSPARENCY DOES NOT MITIGATE MARKET POWER CONCERNS

As noted in the PIO's Protest, the lack of transparency in the SEEM Proposal sabotages any effort to identify and prevent market power abuse in this untested of market structure. Without access to market data, including data on unconsummated trades, the Commission cannot ensure just and reasonable rates and members of the public cannot detect potential market abuses and report them to the Commission. [47]

The SEEM Proposal originally lacked any provisions requiring the meaningful dissemination of market information to the Commission or members of the public.[48]  The PIOs argued that to prevent market power abuses SEEM must publish non-aggregated market data identifying individual transactions and parties, allow third-party access to the Market Auditor reports, and make data related to the operation of the algorithm publicly available.[49]  The Applicants responded by increasing access to some market data to the Commission, other regulators, SEEM Participants, and the Market Auditor, and increasing public access to the Market Auditor's Report.[50]  In doing so, the Applicants foist the independent market monitor role on the Commission while simultaneously denying it sufficient information about the operation of the algorithm—such as unconsummated trades—necessary to effectively perform that function.[51]  Combined with the absence of an independent, full-time market monitor, the

---

[46] PIO March 15 Protest at 4–5, 51–56;
[47] PIO March 15 Protest at 32–34 & 37–38.
[48] *Id.* at 37–38.
[49] *Id.* at 38.
[50] Deficiency Response at 27–28.
[51] *See* Suppl. Sotkiewicz Aff. at ¶¶ 55, 57.

continued lack of public access to non-aggregated market data hampers any efforts to identify

and address potential market power abuses.[52]

## A. THE PROPOSED IMPROVEMENTS TO TRANSPARENCY ARE INSUFFICIENT WITHOUT AN INDEPENDENT MARKET MONITOR

While the Applicants increased the amount of market data made available to the

Commission, other regulators, and SEEM Participants, these changes are inadequate without the

presence of a robust market monitoring rules to limit potential market power abuse.  The

Applicants proposed and codified the following changes in the filing: (1) providing confidential

data to the Commission comparable to RTO requirements under Order No. 760, and (2) allowing

the Commission, other regulators, and SEEM Participants to access to Market Auditor reports.[53]

These additional transparency measures mirror some of the requirements for RTOs and are a

positive development.  However, these requirements are designed to be supplemental to review

by a market monitor with independent authority to act on such information, which the SEEM

proposal still lacks.  It is inappropriate and impractical to leave the burden of closely watching a

market to the Commission and other regulators.[54]   Moreover, as Dr. Sotkiewicz explains, even if

the Commission was conceptually able to act as a full-time market monitor, the Applicants'

additional transparency measures do not disclose important market data such as information

regarding matched but physically unconsummated transactions.[55]  Information on matches that

did not flow is critical to identifying market manipulation and/or transmission modeling

---

[52] Deficiency Response at 38; Suppl. Sotkiewicz Aff. at ¶ 57.
[53] Deficiency Response at 3.
[54] Suppl. Sotkiewicz Aff. at ¶ 57.
[55] *Id.* at ¶ 57.

JA0973

problems.[56]  Therefore, even as modified the SEEM Proposal falls short of the transparency and monitoring requirements that the Commission requires in other types of organized markets.

The Applicant's first transparency modification is based on reporting requirements to FERC for RTOs and Independent System Operators ("ISOs") as established in Order No. 760.[57] The Commission issued Order No. 760 as a means for the Commission to review market operations and monitor for market manipulation.[58]  However, the Commission was careful to note that it "did not seek to displace or modify any of the existing market monitoring functions or any evaluations of market rules and designs performed by the [market monitors.]"[59]  The Commission went on to note that market monitors "perform a vital and necessary function in market oversight" and provide "an additional means of detecting market power abuses" to the Commission's own review.[60]  The transfer of data under this provision solely improves transparency for the Commission, not any other entity interested in the SEEM's operation. Although the Commission can and should review markets for manipulation, the burden of constant and granular monitoring should not, and cannot as a practical matter, solely fall on the Commission.[61]  Instead, FERC relies on market monitors to review the terabytes of complex data generated each year as an additional independent check.[62]  The data available under this provision must be more widely available to other entities, and specifically a robust market monitor, to perform this much-needed monitoring function.

---

[56] *Id.* at ¶¶ 54–55.
[57] Deficiency Response at 17–18.
[58] *Enhancement of Elec. Mkt. Surveillance & Analysis Through Ongoing Elec. Delivery of Data from Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 760, 139 FERC ¶ 61,053 at P 11 (2012).
[59] *Id.*
[60] *Id.*
[61] Suppl. Sotkiewicz Aff. at ¶ 57.
[62] *Id.*

JA0974

The Applicant's second transparency modification is modelled on the requirement that market monitor reports be disseminated to the Commission, other regulators, and market participants.[63]  Here too, the adequacy of this reporting as a means of transparency is premised on the report being prepared by an independent market monitor with clear roles and responsibilities regarding monitoring for market deficiencies and abuses.  Moreover, the proposed Market Auditor report provides the Market Auditor's analysis of SEEM data, not the data itself.[64]  Although providing public access to this report is an improvement on the original proposal, it does not provide enough information to allow other regulators or market participants to make their own review and analysis of the data and identify potential market abuses.  Other markets make available almost all of their data, either close to real time or, where necessary to protect market integrity and sensitive confidential information, on a delayed basis.[65]  Access to the Market Auditor report alone does not increase opportunities for meaningful monitoring by jurisdictional regulators, market participants, or other interested parties.

The SEEM Proposal does not have a market monitor.[66]  So although the additional transparency requirements mirror some Commission-sanctioned RTO requirements in form, they do not adequately increase transparency or prevent market manipulation.  Even with these improvements, critical market information is still not available to the public; the entire burden of market monitoring is placed on the Commission; and other jurisdictional regulators and participants have no access to market data, just analysis performed by the Market Auditor.

---

[63] *See Wholesale Competition in Regions with Organized Elec. Mkts.*, Order No. 719, 125 FERC ¶ 61,071 (2008).
[64] SEEM Proposal at 30–31.
[65] *See e.g.* MISO, *Market Reports*, https://www.misoenergy.org/markets-and-operations/real-time--market-data/market-reports/#nt=&t=10&p=0&s=MarketReportPublished&sd=desc (providing access to publicly available monthly and daily market data).
[66] SEEM Proposal at 17.

Absent the additional and concurrent review by a dedicated and independent market

monitor with access to the necessary information, the modified SEEM Proposal is still unjust and

unreasonable on the issue of transparency as a protection against market manipulation.

## B.  MARKET AUDITOR REPORTS DO NOT PROVIDE A SUFFICIENT LEVEL OF TRANSPARENCY TO MITIGATE MARKET POWER CONCERNS

In addition to marginally increasing access to regulators, the Applicants also increased

the Market Auditor's access to data by adding a new provision to the SEEM Agreement

requiring the Market Administrator to provide the Market Auditor with the same confidential

data it is required to provide the Commission.[67]  However, the Market Auditor's only role is to

review the market's operation.[68]  In contrast, market monitors evaluate a market for market

power abuse and market design flaws and the responsibility to report those findings to the

Commission.[69]  The Market Auditor is not tasked with reviewing the market for abuse or design

flaws.[70]

Although the proposed additional data will help the Market Auditor review the market,

without addressing the lack of independence, functional mandate, and authority of the Market

Auditor to act on such information, the Market Auditor will not be able to serve as a market

monitor.[71]  Even with this additional data, the Market Auditor is not an adequate substitute for a

---

[67] Deficiency Response at 24.
[68] *Id.*; SEEM Proposal at 17.
[69] "The monitoring plan must be designed to ensure that there is objective information about the markets that the RTO operates or administers and a vehicle to propose appropriate action regarding any opportunities for efficiency improvement, market design flaws, or market power identified by that information. The monitoring plan also must evaluate the behavior of market participants, including transmission owners, if any, in the region to determine whether their behavior adversely affects the ability of the RTO to provide reliable, efficient and nondiscriminatory transmission service." *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810, 904 (2000).
[70] "[The Market Auditor] will not monitor Participant behavior." SEEM Proposal at 17.
[71] Suppl. Sotkiewicz Aff. at ¶¶ 58–62.

market monitor and the SEEM Proposal's continued lack of an independent market monitor

makes it unjust and unreasonable.

### C. THE APPLICANTS SHOULD RELEASE ADDITIONAL DATA THAT WOULD REVEAL THE UNIQUE OPPORTUNITIES FOR MARKET MANIPULATION PRESENT UNDER THE PROPOSED MARKET AGREEMENT

The PIOs and other organizations have an interest in reviewing market data to ensure for

possible market manipulation and impacts on market trends in the Southeast. This data is

unavailable to the public under both the original and modified SEEM proposal. Specifically, the

PIOs are interested in data that would reveal unconsummated matches and the associated

opportunities for manipulation. It is particularly important that the public can monitor the SEEM

as it currently lacks a market monitor. Without making that data publicly available, the SEEM

Proposal is unprotected from market manipulation and is unjust and unreasonable.

First, the Commission should require the SEEM to release energy market offer and

demand bid data with an appropriate time lag. ISO and RTO markets release this data publicly

to allow interested parties to analyze data for market power and manipulation.[72] This type of data

was also required in the Southern Company Energy Auction when the market was opened to

third-party offers.[73]

Second, the Commission should require SEEM to publicly report data related to the

SEEM algorithm calculations. Detailed market data with masked identities is typically publicly

available as a means of transparency and public monitoring.[74] The need for visible data is

particularly high for the SEEM because the ability to toggle participants on or off is a unique

---

[72] Suppl. Sotkiewicz Aff. at ¶ 48.
[73] *Id.* ¶ 49.
[74] *Id.* ¶¶ 52–54.

JA0977

feature to the SEEM Market that is not prevalent in ISO or RTOs.[75]  As proposed by Dr.

Sotkiewicz, adequate transparency requires the release of: (1) The numbers of total possible

matching participants as evidenced by Enabling Agreements, and the number of those for which

matches were allowed in each interval; (2) Whether bids or offers were "all-or-nothing" or could

be partially filled; (3) Available Transmission Capability ("ATC") on an interval basis as this

should already be public based on postings to each Balancing Authority ("BA") and

Transmission Provider site; (4) A pipe and bubble representation of the ATC between each BA

in SEEM; (5) Matched bids and offers and the "split the savings price" used for the match; (7)

binding transmission paths along with the marginal value of the transmission constraint as

proposed by Dr. Pope; (8) all matches in the SEEM algorithm that did not actually flow

including the masked identities of the counterparties and the reason the transaction did not flow;

and (9) The detailed posting of the auction algorithm so that interested parties could run various

scenarios to see how market outcomes might differ under various conditions.[76] Providing this

information is consistent with the type of market data publicly available under other markets.[77]

## IV.    SEEM GOVERNANCE DOES NOT PROVIDE DUE PROCESS TO PARTICIPANTS

As discussed above in the context of Enabling Agreements, the internal complaint

process proposed by the Applicants is insufficient to protect Participants' rights.[78]  Several

critical questions remain unanswered about how the SEEM Auditor and Board would handle

complaints, including:

---

[75] *Id.* ¶¶ 53–54.
[76] *Id.* ¶ 53.
[77] *Id.* ¶¶ 52–54.
[78] *See supra* Part I.

JA0978

1. How will a Participant know if the Auditor has been directed by the Board to investigate their complaint?  How will a Participant know if the Board declines to have the auditor investigate their complaint?

2. What is the time frame for the Auditor to refer a complaint to the Board?

3. Is the Auditor required to refer all complaints to the Board?  If not, can a Participant appeal a decision by the Auditor not to refer a complaint to the Board?

4. What is the time frame for the Board to issue a decision or provide a remedy to the aggrieved Participant once the Board receives a complaint from the Auditor?

5. If the Board is not required to respond to the Auditor's reports and reported complaints[79] how will Participants know whether they need to bring the complaint to the Commission's attention to have it resolved?

6. With no set criteria for the Board to use to evaluate the auditor's reports and referred complaints to determine whether further action is necessary, how will the Board and/or the Auditor ensure that these decisions are consistent and do not have a discriminatory effect?

7. Can a Participant appeal a decision by the Board not to investigate a complaint?

The Commission should seek answers to these important questions through issuance of another deficiency letter.  Without this information, the internal complaint process fails to provide minimum due process protections to aggrieved Participants and may contribute to undue discrimination.[80]  This concern is exacerbated by the fact that the Membership Board is entirely

---

[79] Deficiency Response at 26.
[80] For example, the Applicants argue that there is no need to report transactions that fail to be physically consummated to the Commission because a pattern of unconsummated transactions could trigger complaints to the Market Auditor or the Commission.  Deficiency Response at 22–23.  But as previously noted, an aggrieved Participant may only complain to the Commission if the SEEM Member or Participant that wronged them is FERC

JA0979

composed of monopoly utilities and excludes certain classes of Participants from participating in the market.[81]

Although constitutional due process obligations may or may not expressly apply to a non-governmental actor like the SEEM, the Supreme Court's test in *Mathews v. Eldridge,* 424 U.S. 319 (1976), provides an appropriate framework here for what constitutes just and reasonable process under all the circumstances. The *Mathews* balancing test weighs the decision-maker's interest, the private party's interest that would be affected by an adverse decision, "the risk of an erroneous deprivation of such interest through the procedures used," and any "additional or substitute procedural safeguards."[82] The Commission has applied this standard to its own activities before, and it can be a useful guide to whether a party has received fair process.[83] The Commission should employ this balancing test to identify fundamentally fair procedural processes under the circumstances and direct the adoption of fair process in the SEEM. At a minimum, Applicants owe prospective SEEM Participants just and reasonable notice of their actions taken, timeframes for responses, and opportunity to respond to any adjudications.[84]

Another flaw in the SEEM proposal that heightens the risk of undue discrimination is the Applicants' failure to include a mathematical formula rate in the proposed tariff. The Commission disfavors formula rates "written out in words" because they may be subject to different interpretations.[85] The "split-the-savings" rate proposed by the Applicants is only

---

jurisdictional. *See supra* note 25. In such a case, the wholly inadequate Market Auditor complaint process would be the aggrieved Participant's only potential remedy.
[81] PIO March 15 Protest at 28–32.
[82] 424 U.S. at 334–35.
[83] *See, e.g., San Diego Gas & Elec. Co. v. Sellers of Mkt. Energy and Ancillary Servs. Into Mkts. Operated by the California Indep. Sys. Operator, Inc.,* 127 FERC ¶ 61,269 at PP 74–76 (2009).
[84] 16 U.S.C. § 824d(a) ("all rules and regulations affecting or pertaining to [public utility] rates or charges shall be just and reasonable").
[85] *ISO New England Inc.*, 153 FERC ¶ 61,343 at P 9 (2015).

articulated in the SEEM Agreement in narrative form.[86]  The Applicants' transmittal letter does

include a mathematical formula rate,[87] but this is insufficient to meet Commission requirements

because an affidavit is not part of the filed tariff.  If any disputes were to arise regarding this rate

the Commission would be required to rely on the narrative rate in the tariff, which may be

susceptible to multiple interpretations.  As Dr. Sotkiewicz points out, the algorithm is the

cornerstone of the filed rate for SEEM.[88]  Without a mathematical formula, it cannot be

determined wither the algorithm is working as intended and it will be impossible for the

Commission, let alone SEEM participants or the Market Auditor, to evaluate whether the market

rates are just and reasonable.

## V.  NFEETS WILL INCREASE COSTS FOR FIRM POINT-TO-POINT SERVICE WITH NO OFFSETTING BENEFIT FOR ENTITIES THAT DO NOT SERVE LOAD IN SEEM TERRITORY

The Applicants' Deficiency Response continues to gloss over the cost impacts that the

SEEM Proposal would have on independent power producers.  The Applicants acknowledge that

the creation of a zero-cost transmission service, NFEETS, may result in a "slight decrease in

Point-to-Point revenues, which in turn would lessen revenue credits used to offset" charges to

network service transmission customers.[89]  However, when asked by Commission Staff to

explain how the availability of NFEETS would impact firm point-to-point transmission

customers[90] the Applicants dodged the question.  The Applicants responded with a non-sequitur

---

[86] See SEEM Market Rules, Section IV(C)(5)(a) ("Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.").
[87] See SEEM Proposal at 29.
[88] Suppl. Sotkiewicz Aff. at ¶¶ 41–42.
[89] SEEM Proposal, Attach. B, Aff. of Aaron Melda and Lonnie Bellar ¶ 23.
[90] Deficiency Letter at 11–12 ("To the extent the increase in network service transmission rates due to an erosion of point-to-point transmission service reservations exceeds benefits to network service transmission customers resulting from the Southeast EEM, please explain how the zero-rate for NFEETS is consistent with cost causation.").

JA0981

that "firm point-to-point load will receive the benefits of the Southeast EEM, so it is. . . consistent with . . . cost causation to ask such load to shoulder any incremental transmission system revenue requirements network load is exposed to as a result of any erosion of non-firm point-to-point revenues . . ."[91]  This response assumes that all transmission customers are load-serving entities when this simply is not the case.  In fact, as Dr. Sotkiewicz explains in his Affidavit, independent power producers wheeling out of SEEM to sell energy into neighboring RTO markets such as PJM Interconnection, L.L.C. ("PJM"), Midcontinent Independent System Operator, Inc. ("MISO"), and Southwest Power Pool, Inc. ("SPP"), will be forced to pay higher firm Point-to-Point transmission rates and will not get any of the benefits because they do not serve load in SEEM territory.[92]  In other words, the vertically integrated monopoly utilities serving load in SEEM will receive most, if not all of the benefit and the independent producers selling into RTOs will pay the cost.  This outcome is not consistent with cost-causation principles, is unjust and unreasonable and unduly discriminatory.[93]

The Commission should issue another deficiency letter requiring the Applicants to answer the question posed in full and justify the shifting of costs from SEEM members to independent power producers in the Southeast.

## VI.  THE APPLICANTS MAY NOT APPLY DIFFERENT STANDARDS TO DIFFERENT PARTS OF THE FILING

Applicants continue, as they have throughout this proceeding, to dress its tariff rate up in contract rate clothes in order to avoid having to establish that their proposed tariff rate is just and reasonable.  When pressed by the Commission in Questions 12a-c to explain their view

---

[91] Deficiency Response at 37.
[92] *See* Suppl. Sotkiewicz Aff. at ¶¶ 75–77.
[93] *Id.* at ¶ 77; *see also Old Dominion Electric Cooperative v. FERC*, 898 F.3d 1254, 1260 (D.C. Cir. 2018) ("the cost-causation principle requires 'comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party.'" (citing *Midwest ISO Transmission Owners*, 373 F.3d at 1368)).

regarding the appropriate standard of review, Applicants continue to attempt to avoid Section

205's just and reasonable standard by mischaracterizing their proposed energy market as

"bilateral in nature."[94]  Of the 22 Articles, Exhibits, and Appendixes establishing the terms of the

proposed SEEM tariff, the Applicants argue that only seven of them should be fully subject to

the just and reasonable standard.  Rather, Applicants essentially propose a new standard for 205

tariffs that splits the standard of review, with the more favorable *Mobile-Sierra* presumption of

reasonableness[95] normally applicable only to contract rates as the new default standard for tariff

agreements unless a line-by-line review by the Commission reveals a particular provision of

general applicability.[96]  The Applicants' rationale is that while "certain portions" of the SEEM

tariff agreement may be generally applicable, other provisions "are more bilateral in nature,

govern key rights and obligations among the Southeast EEM Members (such as cost allocation

provisions and exit provisions, among others)," are "central to the negotiated terms the Members

agreed upon," and must "provide for contractual certainty to Members."[97]

    But these types of provisions are inherent to both tariff rate agreements and contract rate

agreements.  Looking through the list of provisions Applicants would characterize as "bilateral in

nature" include provisions that are central to all tariff agreements, including defining core market

elements, establishing membership criteria, governance structure, appointment and scope of the

market agent, budgeting and cost allocation, and reliability obligations.  Moreover, when

examining the question of whether provisions governing exit fees of the SPP membership

agreement were subject to the *Mobile-Sierra* doctrine, the Commission held that:

---

[94] Deficiency Response at 39–40.
[95] This presumption was established in *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).
[96] *Id.* at 40.
[97] *Id.*

[The Commission] need not apply different presumptions to different provisions of the membership agreement, and as a form contract, the membership agreement must be viewed in its entirety as containing rates, terms, or conditions that are generally applicable to all entities seeking SPP membership, and as a result, the agreement is not subject to a *Mobile-Sierra* presumption.[98]

The Applicants' inexplicable proposal to try to hold such integral elements to a different standard of review suggests that they have confused the concept of an agreement solely involving contract rates with one involving contract terms.

Notably, Applicants provide no case law to support the idea that tariff rate agreements filed under Section 205 should be treated akin to contract rates that benefit from the *Mobile-Sierra* doctrine. Nor do they address the directly relevant case law laying out the differences between what qualifies as a contract versus a tariff rate and rejecting the application of *Mobile-Sierra* to tariff rates.[99] Instead, Applicants draw an inapposite comparison between SEEM and a regional transmission organization's operating agreement and misapply the holdings in those cases.[100]

Applicants rely primarily on two cases for its proposed hybrid standard of review. Both of these cases[101] examined claims of RTO/ISO transmission owners that certain provisions within their RTO originating agreements (and specifically their transmission *operating agreements*) represented negotiated, contractual terms protected by the *Mobile-Sierra* doctrine.[102] As a preliminary matter, the comparison of SEEM—an agreement creating a rate

---

[98] *Am. Wind Energy Ass'n v. Sw. Power Pool, Inc.* 167 FERC ¶ 61,033 at P 72 (2019).

[99] *See Devon Power LLC*, 134 FERC ¶ 61,208, 62,043–44 (2011).

[100] Deficiency Response at 40–41. PIOs note as well the Applicants' continued pattern of pointing to organized market agreements that require the types of pricing, transparency, independence, governance, and monitoring provisions Applicants' strenuously reject requiring of SEEM that also underlie the bases for the kinds of benefits and assumptions extended by the Commission to organized markets to which Petitioners would avail themselves.

[101] *Id.* (citing *PJM Interconnection, LLC* 142 FERC ¶ 61,214 (2013), *reh'g denied*, 147 FERC ¶ 61,128 (2014); *ISO New England Inc.*, 106 FERC ¶ 61,280 at P 128 (2004), *reh'g granted in part, denied in part*, 109 FERC ¶ 61,147 (2004)).

[102] *PJM Interconnection, LLC*, 142 FERC ¶ 61,214 at PP 154, 156; *ISO New England Inc.*, 109 FERC ¶ 61,147 at PP 67–68.

and setting the rules for a voluntary residual market of 15-minute energy blocks—to the breadth and complexity of foundational RTO or ISO operating agreement covering all aspects of transmission owner membership and operations is entirely inapposite.  These are not "similarly complex agreements;"[103] this is like comparing an amoeba to a whale.  Critically, the Applicants fail to address the threshold question the Commission posed when evaluating which standard was appropriate, namely whether SEEM can be classified in its entirety as containing contract rates or tariff rates.  The Applicants do not even ask this threshold question, identify a contract rate in the Agreement, nor try to explain why SEEM cannot be classified one way or the other and thus do not warrant the Commission's assumption that SEEM cannot be classified entirely as a tariff rate.

Further, as acknowledged by the Applicants, the Commission in *PJM* found that "where the terms of an agreement would, if approved, *be incorporated into the service agreements of all present and future customers*, those terms are properly classified as tariff rates and the *Mobile-Sierra* presumption would not apply."[104]  Petitioners have argued repeatedly that it need not meet the requirement to file a pool-wide OATT because each FERC-jurisdictional member of SEEM is filing a Certificate of Concurrence and amendments to their transmission tariffs to offer zero-charge transmission service for SEEM transactions.[105]  Thus, SEEM is properly classified as a tariff rate and not subject to the *Mobile-Sierra* presumption.

Even if one were to accept Applicants' implied theory that SEEM defies categorization, Petitioners' hand-waving application of *Mobile-Sierra* to the bulk of SEEM provisions without

---

[103] *Id.* at 41.
[104] 142 FERC ¶ 61,214 at P 184 (emphasis added).
[105] SEEM Proposal at 3; SEEM Answer at 8 ("the Southeast EEM Agreement binds each signatory to implement the same non-discriminatory rules for zero-charge NFEETS for all transmission customers and thereby permits region-wide transactions on uniform, non-discriminatory terms").

JA0985

any attempt to explain in detail, provision by provision, why its proposed list of SEEM

provisions are deserving of that presumption, does not meet the burden for establishing that

*Mobile-Sierra* should apply to specific provisions required by the Commission in *ISO New*

*England*.[106]  To the contrary, the entire SEEM agreement, including the provisions Petitioners

would carve out, [107] are all fundamental pieces of the overall structure of the tariff rate and are of

general applicability over which future members or participants of SEEM will have little or no

ability to negotiate.

## VII.     <u>CONCLUSION</u>

The minimal revisions to the SEEM Proposal do not remedy the lack of transparency, due

process, and independent monitoring in this untested market construct.  Nor do these small

changes mitigate potential for monopoly utilities to exercise market power or alter the fact that

the SEEM could exclude independent power producers from accessing free transmission services

while increasing the existing transmission costs they must incur to sell into existing wholesale

markets outside of the Southeast.  As proposed, the SEEM Proposal is unjust, unreasonable, and

prone to undue discrimination and therefore must be rejected.  In alternative, the Commission

should issue another deficiency letter seeking additional information and requiring the

Applicants to fully answer all the inquiries included in the May 4, 2021 Deficiency Letter.  The

PIOs also request that the Commission accept and suspend the filings for the maximum five-

month period, subject to the outcome of a technical conference on the SEEM Proposal and/or

convene a technical conference or joint regional meeting on market reform in the Southeast.

---

[106] *See generally,* 106 FERC ¶ 61,280.
[107] *See* Deficiency Response at 40-41.

JA0986

Respectfully submitted,


*/s/ Danielle Fidler*
Danielle Fidler
Staff Attorney, Clean Energy Program
Daniel Franz
Legal Fellow, Clean Energy Program
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
dfidler@earthjustice.org
dfranz@earthjustice.org

John Moore
Director
Sustainable FERC Project
20 N. Wacker St., Suite 1600
Chicago, IL 60201
Moore.fercproject@gmail.com

*Counsel for Sustainable FERC Project and Natural Resources Defense Council*

Frank Rambo
Senior Attorney
Southern Environmental Law Center
201 W Main St. #14
Charlottesville, VA 22902
frambo@selcva.org

*Counsel on behalf of Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Georgia Conservation Voters, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, and Partnership for Southern Equity*

JA0987

Maia Hutt
Staff Attorney
Southern Environmental Law Center
601 W Rosemary St., Suite 220
Chapel Hill, NC 27516
mhutt@selcnc.org

*Counsel on behalf of Energy Alabama,
Sierra Club, South Carolina Coastal
Conservation League, GASP, Georgia
Conservation Voters, Southern Alliance for
Clean Energy, Southface Energy Institute,
Inc., Vote Solar, Georgia Interfaith Power
and Light, and Partnership for Southern
Equity*

Peter Ledford
General Counsel and Director of Policy
4800 Six Forks Rd., Suite 300
Raleigh, NC 27609
peter@energync.org

*Counsel for North Carolina Sustainable
Energy Association*

JA0988

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served in accordance with 18 C.F.R. §

385.2010 upon each party designated on the official service lists in this proceedings listed

above, by email.

Dated at Washington, D.C. this 28th day of June, 2021.

*/s/ Danielle Fidler*
Danielle Fidler
Staff Attorney, Clean Energy Program
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
dfidler@earthjustice.org

JA0989

**ATTACHMENT A**

**SUPPLEMENTAL AFFIDAVIT OF PAUL M. SOTKIEWICZ, PH.D.**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **Alabama Power Company** | ) ) | **ER21-1111-000** |
| **Dominion Energy South Carolina, Inc.** | ) ) | **ER21-1112-000** |
| **Louisville Gas and Electric Company** | ) ) | **ER21-1114-000** |
| **Duke Energy Progress, LLC** **Duke Energy Carolinas, LLC** | ) ) ) | **ER21-1115-000** |
| **Duke Energy Carolinas, LLC** | ) ) | **ER21-1116-000** |
| **Duke Energy Progress, LLC** | ) ) | **ER21-1117-000** |
| **Louisville Gas and Electric Company** | ) ) | **ER21-1118-000** |
| **Georgia Power Company** | ) ) | **ER21-1119-000** |
| **Kentucky Utilities Company** | ) ) | **ER21-1120-000** |
| **Mississippi Power Company** | ) ) | **ER21-1121-000** |
| **Alabama Power Company** | ) ) | **ER21-1125-000** |
| | ) | **ER21-1128-000** |
| **Dominion Energy South Carolina, Inc.** | ) ) | |
| | ) | **(not consolidated)** |

## <u>SUPPLEMENTAL AFFIDAVIT OF PAUL M. SOTKIEWICZ, PH.D.</u>

### I.    INTRODUCTION AND QUALIFICATIONS

1.  My name is Dr. Paul M. Sotkiewicz. I am the President and Founder of E-Cubed Policy

Associates, LLC ("E-Cubed") and formerly served as the Chief Economist in the Market

Service Division of PJM Interconnection, L.L.C. ("PJM"). I have been retained by the

1

JA0991

Natural Resource Defense Council ("NRDC") and Southern Environmental Law Center

("SELC") (collectively "Public Interest Organizations") to submit this affidavit in

support of the Public Interest Organizations' protest regarding the Southeast Energy

Exchange Market ("SEEM") Agreement response filing to the FERC deficiency letter[1]

filing made in ER21-1111 on June 7, 2021 by Southern Company Services, Inc.

("Southern Company") on behalf of the Members of SEEM[2] and other potential SEEM

Members[3] ("SEEM Filing Parties").

2.  I have previously provided testimony in this proceeding and provided my professional

background therein. I incorporate that prior testimony and my professional qualification

by reference.[4]

## II.   EXECUTIVE SUMMARY: KEY CONCLUSIONS

3.  I have been asked by Public Interest Organizations to provide an examination and

analysis of the SEEM filing made in response to the FERC Deficiency Letter[5] as it relates

to the potential exercise of market power, contrary to the assertions made by the Filing

---

[1] Resp. to Deficiency Letter, Accession No. 20210607-5164 (June 7, 2021) ("Deficiency Response").

[2] As of February 12, 2021 "SEEM Members" include Alabama Power, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP") with DEC and DEP collectively referred to as ("Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") collectively, ("LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); Power South Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA"). Southeast Energy Exchange Market Agreement, Accession No. 20210212-5033, at 1 n.1 (Feb. 12, 2021) ("SEEM Filing").

[3] Potential SEEM Members as cited in the filing are Georgia System Operations Corporation ("GSOC"); Georgia Transmission Corporation ("GTC"); Municipal Electric Authority of Georgia ("MEAG Power"); Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and South Carolina Public Service Authority ("Santee Cooper"). *Id.*

[4] Protest of Public Interest Organizations, Accession No. 20210315-5405, Ex. A at ¶¶ 1–4 (Mar. 15, 2021) ("Sotkiewicz Affidavit").

[5] Deficiency Letter, Accession No. 20210504-3015 (May 4, 2021) ("Deficiency Letter").

JA0992

Parties regarding the lack of market power. Furthermore, I am providing publicly available evidence of the lack of liquidity in the current Southern Company Auction Market and what this portends for the use of SEEM and the possible exercise of market power in ways designed to retain the monopoly positions of the SEEM Filing Parties. While not horizontal market power in which suppliers can withhold capacity from the market to raise prices above competitive levels, the kind of market power and manipulation that can take place under SEEM is still effective in achieving the goals of market power which is to raise prices (or keep them high) and extract extra economic rents from other market customers at the expense of other market participants.

4. First, I address the idea of market power/manipulation designed to retain a monopoly position by "toggling off" participants and not bidding demand into SEEM. I show this is an effective strategy to retain the monopoly position when done through tacit collusion with other similarly situated franchise monopolies.

5. Second, I explain the SEEM Filing Parties have failed to fully grasp the complexity of the proposed market clearing algorithm which has yet to be fully defined mathematically, let alone be developed by a vendor. This complexity is a good reason to have the algorithm expressed mathematically so interested parties and a market monitor can evaluate the accuracy and effectiveness of the algorithm to deliver what is promised.

6. Third, I explain the need for greater public release of data in a manner that is identical to what is provided in ISO-RTO markets and even in the Southern Company Energy Auction as well as a need for an independent market monitor to analyze the data and be the eyes and ears of FERC with regard to SEEM.

JA0993

7.  Fourth, the experience with the Southern Company Energy Auction that operates on similar principles previews the lack of actual matches that are to be had under SEEM and provides a case study on how withholding demand can be just as damaging in bilateral matching models to competitive outcomes with the result being little or no beneficial trades being executed.

8.  The last section discusses how the SEEM Filing Parties seem to conflate and confuse the concepts of Firm Point-to-Point service resource adequacy and cost causation (as it relates to the erosion of firm transmission revenues) with the ability to use zero cost transmission known as Non-Firm Energy Exchange Transmission Service ("NFEETS") under SEEM.

9.  The key conclusions are the following:

1)  Absent a good market power/manipulation analysis of the kind I discuss, there is no way in which the SEEM Proposal can be found just and reasonable in its current form. It would take must offer and must bid requirements to improve this design and help deter market power/manipulation designed to preserve the monopoly status of SEEM Filing Parties.

2)  SEEM Filing Parties must be able to provide a mathematical expression of the algorithm both for transparency and vendor implementation purposes. This is also necessary as the algorithm is the cornerstone of the filed rate. The Commission must know that the rate they are asked to approve will actually be the one implemented, and that market participants must be able to replicate and model market outcomes.

JA0994

3) More public release of data and the appointment of an independent market monitor is essential for transparency and to be the Commission's eyes and ears on SEEM if it is approved and to ensure just and reasonable outcomes that are free from market power and manipulation. Absent a robust and independent market monitoring function, no market design can be considered just and reasonable.

4) Given the Southern Company Energy Auction experience where very few executed trades are executed, it would appear unlikely SEEM would result in the kind of robust participation and trading assumed by the Filing Parties and Dr. Pope and shown in the cost-benefit analysis.

5) Finally, the design of the market, if trading is as robust as hoped, will lead to the likely erosion of firm transmission revenues that would impose costs on transmission customers who do not benefit from the SEEM benefits. The SEEM Filing Parties have not attempted to demonstrate that the costs associated with an increase in firm transmission rates are outweighed by the benefits (energy market savings to customers), nor have they attempted to show which parties would actually bear the costs of the eroding transmission revenue through higher rates.

## III.  MARKET POWER AND MANIPULATION THROUGH THE LENS OF MONOPOLISTS' INCENTIVES TO RETAIN THEIR MONOPOLY POSITION IN SEEM

10. Filing Parties and their Affiant, Dr. Susan Pope, both assert that Filing Parties cannot exercise horizontal market power due to FERC oversight and the fact that Filing Parties have Market-based Rates ("MBR"), or Filing parties are relegated to cost-based rates for

JA0995

transactions within their own Balancing Authority ("BA") or other BAs. Furthermore, they also assert they have no incentive to exercise the type of horizontal market power more common to uniform clearing price "balancing markets" as argued by Dr. Pope.[6] But what Dr. Pope describes is what I will call "vanilla brand" horizontal market power as it results from the withholding of supply from the market to drive up the uniform clearing price in order to increase overall profits for the generation supplier. The idea that SEEM is not a typical North American balancing market is irrelevant to the market power/manipulation discussion.

11. Unfortunately, neither the Filing Parties nor Dr. Pope have addressed the concerns I have provided in my earlier affidavit in which market power is more than just "vanilla brand" horizontal market power that is measured through conventional means in MBR filings.[7] Furthermore, neither the Filing Parties nor Dr. Pope have directly addressed the concerns implicit in the questions asked by Commission Staff in its Deficiency Letter regarding the use of toggles on/off of various market participants, but only commits to providing *ex post facto* toggle use information to the Commission on a regular basis. Moreover, the information provided by the Filing Parties reveals nothing about the true reasons for using the toggle, thus leaving Participants with the ability to use it in a discriminatory fashion.

12. Dr. Pope argues that imposing the three-counterparty requirement will solve the problems.[8] But what happens if there are 25 possible counterparties, as there are in the

---

[6] Deficiency Response at Attach. D, Suppl. Aff. of Susan L. Pope at ¶¶ 43–49 ("Suppl. Pope Aff.").

[7] Sotkiewicz Affidavit at ¶¶ 53–79.

[8] Suppl. Pope Aff. at ¶ 49.

JA0996

Southern Company Energy Auction ("SCEA") for any one participant, and all but three of these counterparties are toggled off? This does not appear to be a possibility contemplated by Dr. Pope. But what is also omitted in their analysis is that all the Filing Parties have load to serve, and those related incentives and possible pathways for market power and market manipulation have been totally ignored by Filing Parties and Dr. Pope.

### A. Market Power is Not Limited to Seller Market Power but Can Also be Buyer-side Market Power Through Different Means.

13. The view of the world offered by Filing Parties and Dr. Pope is that horizontal market power is the "vanilla brand" supplier market power where withholding can increase prices and profits. And they point out that the "split the savings" formula used by SEEM does not easily accommodate "vanilla brand" supply-side withholding because each transaction is priced based on the difference between the cost and the willingness to pay. But vanilla is far from the only flavor of market power and manipulation and Filing Parties do not consider any of the others.

14. The Filing Parties, all being vertically integrated utilities, may find times when they are not sellers of energy, but also buyers of energy. The Commission has not examined the ability for any of the Filing Parties to act as single buyers, or monopsonists, in their own BAs, nor has the Commission examined any possible tacit collusion of the Filing Parties as buyers, an oligopsony or a small set of buyers, that can foreclose trading opportunities for IPPs.

15. Monopsonists and oligopsonists traditionally try to withhold demand from the market or bid demand with an extremely low willingness to pay to keep prices down and reduce

JA0997

their expenditures.[9] But what may happen, and has been observed already in the SCEA, is this is not monopsony or oligopsony in the traditional sense of trying to reduce prices below competitive levels. This is a game of restricting trading to a small set of players to protect the monopoly position of each of the oligopsonists by not bidding demand, or by bidding strategies designed to restrict supply only to a select few other similarly situated parties.

16. For example, the ability to "toggle off" IPPs or certain SEEM participants while still meeting the minimum threshold of at least three participants can still be an exercise of market power and manipulation to protect the monopoly position. Filing Parties can simply toggle on only other vertically integrated filing parties and leave off IPPs and still meet the three-party threshold. In this way, the apparent trading opportunities would not expose the franchise monopoly to the possibility that they are showing their regulators there is much lower cost power available in the market than they can provide themselves, or through other similarly situated franchise monopolies.

17. What are the incentives of such actions? One is to assure they have asymmetric information about their true costs and the costs of others while keeping regulators and other interested parties "in the dark." This asymmetric information allows the franchise monopoly to continue to ask for self-build and self-generate opportunities under the guise of being "low cost."

18. Moreover, since the Filing Parties, as franchise monopolies, are likely to satisfy their respective native loads with their lowest cost resources first, the remaining available

---

[9] Call this the "chocolate flavor" of market power…more interesting and different than vanilla, but market power nonetheless.

JA0998

generation is of higher cost, and almost certainly higher cost than IPPs which have no native load to serve. Franchise monopolies have an incentive to make this information opaque as it would call into question past, current, and future decisions on self-build and operational decisions to their regulators.

19. In short, the kind of buyer-side market power than can be exercised is not one of artificially driving prices down below competitive levels, but one of excluding potential competition from lower cost resources by not bidding demand, or bidding demand but toggling off low-cost IPP suppliers.[10]

**B.  The Combination of Buyer-side Market Power Combined with Dynamic and Repeated Nature of Markets Creates Means to Preserve the Monopoly Positions under the Fig Leaf of Markets**

20. The real issue of market power in SEEM has been largely ignored by the Filing Parties. All the major net suppliers of energy in SEEM are monopolists, and the competitiveness and market power issues must be observed through the lens of those monopolists.

21. No structural test for market power (Herfindahl-Hirschman Index or "HHI", pivotal supplier(s), or concentration ratios) captures the fact that market participants are monopolists in their own franchise service territories. The delivered price test used in Market-Based Rate authority analyses cannot capture the underlying incentives of monopolists, but only address "vanilla brand" horizontal market power. If anything, the structural market power tests and the delivered price test assume that these monopolists compete against each other to sell surplus power, but they ignore the incentives to preserve their monopoly positions.

---

[10] This can be thought of as the exotic, "mint-chocolate chip" flavor of market power or manipulation.

JA0999

22. The incentives of a legally granted monopoly (franchise monopoly) are the following:

> 1) Retain that monopoly to the extent possible and not let it slip away or be eroded by competition from any other market players including other monopolies.
>
> 2) Once a monopoly, earn monopoly rents or profits that are far above what could be earned if the money were in a competitive market. By definition, a monopolist possesses market power in its own service territory.
>
> 3) Foreclose any potential competition that may enter the monopoly market because such competition erodes monopoly rents and provides the state and its regulator information that there are lower cost alternatives available.

23. From the perspective of new merchant generation in the Southeast, especially new renewables, franchise monopolies are also in the position of being monopsonists or single buyers with buyer market as discussed above, but in ways that are different than reducing the price paid for new or excess generation below competitive levels. Franchise monopolies are also, given limited sites, the gatekeepers of access to the bulk power transmission system.

24. Game theory is often used in economics to understand market dynamics and evaluate how participant behavior is likely to affect and be affected by market design and the incentives market designs present. In a game theoretic sense, markets are repeated games. The strategies of each stage of a repeated game must be consistent with the overall long-term strategies that maximize the objective function of the players. Economists learning game theory learn about cooperative games and the strategies that are cooperative equilibria. Clearly if there is cooperation whether tacit or explicit, overall the players may be better off.

25. Applying this in the context of SEEM, the end game for a monopolist is to retain its monopoly and its monopoly profits. They do this by foreclosing competition. This is especially true for embedded transmission dependent utilities ("TDU") that serve load within their franchise areas, and if such customers were able to find lower costs, they are likely to defect to other sources of supply that are lower cost. As currently designed, SEEM would make this easier as the cost of transmission is zero and rates are unpancaked.

### C. The Ability to Toggle off Market Participants Can Help Preserve Monopoly Positions

26. Monopolists will want to prevent transactions from occurring. Hence the ability to toggle off market participants. Transactions cannot occur if they have been blocked *ex ante*.

27. For example, in a scenario where there was no ability to toggle off market participants all possible matches of buyers and sellers could occur in SEEM where there is sufficient transmission capability. Consequently, net loads in SEEM could get the benefit of lower cost resources from other areas, without the need to pay for firm transmission across multiple balancing authorities, and not have to pay pancaked rates. Over time, this signals to market participants the ability to shed long-term contracts with the monopoly utility and rely more upon the spot market where there is a deeper pool of resources available.

28. As such long-term contracts expire, firm transmission is turned back and there is more unused transmission available, making the pool of possible resources even more available due to increased available transmission capability that would have zero cost under SEEM. This becomes a virtuous cycle in which the monopoly position is eroded by the availability of more competitive sources of generation. But this is exactly what the monopolist does not want to have happen.

JA1001

29. Monopolist/monopsonist/oligopsonist have two primary means of avoiding such outcomes under the SEEM design:

1) Toggle off potential market participants. In this case the monopolists, when they are net short and need to buy energy, could toggle off generation resources known to be least cost so that they end up buying only from more expensive resources, which allows the monopolist to show their state regulator that they need to build more supply, which enhances their rate base and returns.

2) Each monopolist offers at prices above their marginal cost as a strategy where they can use their MBR authority. This is part of a tacit collusive strategy to ensure that they are not purchasing power at a cost lower than they can generate it for itself, and in turn, helps each franchise monopoly retain its position and not be poached by other franchise monopolies.

### D.  Monopolists' Strategies as a Repeated Game

30. Cooperative game theory helps to explain how and why monopolists can and will likely use the toggle function to exert market power in SEEM. Starting with the simplest example, one starts by assuming there are only two franchise monopolists in the SEEM market along with other players including merchant generation that will always be net sellers and TDUs that are almost always going to be net short and will be buyers of power. Also, we assume that neither the TDUs nor the merchant generators are large enough to affect the decisions of the two franchise monopolists.

31. A simple example that assigns game values that roughly mimic the ordinal expected market outcomes drives this point home. If the franchise monopolies tacitly collude or coordinate/cooperate to play to their incentives as monopolists, whereby they toggle off

JA1002

all potential competitors and do not submit all demand that could be satisfied by lower cost resources, each gets a payoff or profit of 10.

32. If the franchise monopolists both truly compete in the sense of not toggling off any participants and offering both available supply and demand that could be satisfied by lower cost resources, each gets a payoff or profit of 6.

33. Clearly, collusion or cooperation leads to higher payoffs profits for both franchise monopolies (10) than competing against each other where payoffs are only 6.

34. Now suppose that one of the franchise monopolists competes in the sense of not toggling off participants and offers its demand where it thinks it can reduce overall costs, while the other franchise monopoly acts as a monopoly. In this situation the payoff to the "competing" monopolist is 13, while the payoff to the non-competing monopolist falls to 5. This reflects the competing monopolist eroding the other monopoly and taking away market share and profits.

35. If this game were only played one time, the dominant strategy would be to always compete as the payoffs to competing are always higher, regardless of what the other monopolist does (payoff is 13 which is greater than 10 when the other monopolist acts as a monopoly, and if the other monopolist also competes, the payoff is 6 which is greater than 5 by playing the monopoly strategy). Table 1 shows the payoffs from the game just described where the top row are the strategies for Franchise 1 and the left column contains the strategies for Franchise 2.

JA1003

**Table 1: Simple Game of Competing vs. Monopoly Retention**

| Franchise 1 <br><br> Franchise 2 | Monopoly | Compete |
|---|---|---|
| **Monopoly** | **(10,10)** | **(13, 5)** |
| **Compete** | **(5,13)** | **(6,6)** |

36. But markets are not one-time games. They are repeated hourly and daily. Over time, the profit outcomes shape participant behavior and provide incentives to cooperate to preserve their respective franchise monopoly positions. In the simple example, if this were a repeated game, what would be the optimal strategy over time for these franchise monopolists? If they compete, they will reveal information about their true costs and erode their monopoly positions and receive payoffs of 6 each time they play the game. However, if they cooperate, and each act in their interests to protect their monopoly status, each will earn a payoff of 10 over time, which is far better that earning a payoff of 6 from competing.

37. If at any point in time one of the franchise monopolies deviated from the monopoly strategy, they would be "punished" by the other payer who would then also compete. This "punishment" sends a signal to not deviate from monopoly interests and thus, lead back to each player protecting their monopoly interests as it is in their long-term best interest. So, the repeated game equilibrium would be the monopoly strategy.

38. How does this example translate to SEEM? The Filing Parties are all franchise monopolies whose incentives are to retain their monopoly positions. The proposed SEEM design that allows Participants to toggle on/off competitors and does not have must offer for supply or must bid for demand requirements creates the ability to exercise

JA1004

market power and manipulation that cannot be captured by horizontal market power tests. Based on these incentives, the design leads to outcomes that are likely to be unjust and unreasonable.

## IV. SEEM FILING PARTIES HAVE FAILED TO ADDRESS THE COMPUTATIONAL COMPLEXITIES OF THE MATCHING ALGORITHM

39. In my Affidavit, I pointed out the computational complexities and in implementing the conceptual algorithm as outlined in the Appendix B Market Rules.[11] SEEM Filing Parties still have not addressed these issues, and they are simply assumed away by their Affiant, Dr. Susan Pope despite her own acknowledgment of these complexities in her Supplemental Affidavit in various places.[12]

40. SEEM Filing Parties, responding to Commission Staff question 10a acknowledge the complexity of the algorithm in that they appear to have not yet contracted with a vendor, nor do they plan on publishing the mathematical optimization expression of the algorithm:

> The Southeast EEM Manuals will not include a mathematical statement of the optimization problem solved by the Algorithm (i.e., the software platform implementing the Southeast EEM), ***because this could be a significant undertaking and possibly an additional material Southeast EEM Member expense*** in addition to the planned cost of hiring a software vendor. Further expense and administrative burden also would be incurred to check the mathematical specification and modify it, if needed, with every change to the Market Rules, if and when these occurred and even if the change appeared to be minor.[13]

41. As a practical matter, the Filing Parties' assertion that it could be easier and less expensive to develop the software algorithm than it would be to actually mathematically

---

[11] Sotkiewicz Affidavit at ¶¶ 84–91.

[12] Suppl. Pope Aff. at n.10, ¶ 26.

[13] Deficiency Response at 38 (emphasis added).

JA1005

express the algorithm makes no sense and defies logic. It would not be possible to develop the software algorithm without an optimization problem upon which to base the software. Without transparency and oversight by other interested parties, there is no ability to know whether the algorithm matches the intended design.

42. As a purely tariff and filed rate matter, it is almost unthinkable to be unable to provide a mathematical expression of the algorithm since ***it is the cornerstone of the filed rate for SEEM.*** Without this information it is impossible for the Commission, let alone SEEM participants or the Market Auditor, to evaluate the just and reasonableness, correctness, and implementation of the algorithm.

43. This lack of transparency and ability to evaluate the algorithm is just another example of the need for greater data transparency and need for a truly independent market monitoring function as discussed in Section V below.

**V. GREATER PUBLIC DATA TRANSPARENCY AND AN INDEPENDENT MARKET MONITOR ARE ESSENTIAL TO ENSURE BEHAVIOR AND MARKET OUTCOMES IN SEEM ARE FREE FROM MARKET POWER AND MANIPULATION**

44. In response to the Commission Staff questions 4.a. and 4.b. regarding information to be provided to the Commission to guard against market power and market manipulation, SEEM Filing Parties Dr. Susan Pope explain they will provide the data enumerated in a newly created Appendix D to the Commission through the Market Auditor every seven (7) days and commit to answer any follow up question to FERC, and this is memorialized in updated language to a new Section 2.5 in the SEEM Rules.[14]

45. These data are:

---

[14] Deficiency Response at 16–18 (Sect. 2.5 of redlined rules in response to Deficiency Letter Question 4a).

JA1006

- Participant, bid/offer price, quantity, location, and All or Nothing information for each bid and offer in each interval;
- Specific parameter data for each Participant for all 15-minute intervals, including counterparties the Participant has elected to not be matched with for an interval and Balancing areas for which the Participant has elected not to be matched with a counterparty during an interval;
- Enabling Agreement counterparties for each Participant;
- The Network Map, updated as necessary;
- For each interval, ATC made available to the Southeast EEM by each Participating Transmission Provider, as well as the amounts of such ATC that are not used by the Southeast EEM;
- Price caps, as relevant for each Participant;
- Matched bids and offers with their associated scheduled MWh quantity and Energy Exchange Price;
- Implied marginal benefit information for each ATC limit for each interval, to the extent such information can reasonably be produced by the Southeast EEM Algorithm; and
- Descriptive information, such as market participant names and unique identifiers.[15]

46. It should be noted that under the proposed SEEM Agreement, these data will not be made publicly available, but only available to the Commission and other regulators and authorities. In response to Commission Staff question 7.d.i. and 7.d.ii., the Filing Parties commit to add language in the market rules that require responses from the Market Auditor to FERC, NERC, state regulators, and the TVA IG when requested to do so within 30 days of the request, and to post this information to the SEEM website and provide this simultaneously to the Membership Board.[16]

47. These proposed changes were necessary but are hardly sufficient to provide robust market monitoring along with public information transparency to allow other interested

---

[15] Deficiency Response at 17.

[16] *Id.* at 27–29 and Attach. A, Proposed Revision to Southeast EEM Agreement at 62.

parties to undertake analysis of the SEEM paradigm to look for possible anomalous patterns that may be consistent with market power or market manipulation.

### A. Public Release of More Data Hiding Participant Names Should be Available for Interested Parties to Analyze.

48. All FERC-approved ISO-RTO markets require the public release of energy market offer and demand bid data with an appropriate lag between the submission of offers and the release of bids offers masking the entities submitting.[17] In some ISO-RTO markets the release of capacity market offer data is also required, such as in MISO.[18] One reason the Commission gave for this policy going back to the start of ISO-RTO markets was to allow interested parties to analyze data and put another set of eyes on the market to detect any possible market power or market manipulation as the Commission noted it is Order conditionally accepting the market design of the New York ISO in 1999:

> We agree that the ISO should maintain data on prices and load forecast for at least three months and should make these data available to market participants. Markets operate better under full information, and the availability of this information would help the market function more efficiently. We will also require that all information regarding energy bids be kept confidential for six months to help prevent collusive behavior.
> After a six-month delay, information on individual bids should be released to the public to help interested parties monitor the market.[19]

49. Even in the Southern Company Energy Auction ("SCEA"), when SOCO moved to the so-called Phase II SCEA that allowed third party offers of energy along-side of those

---

[17] For example, *see* PJM Interconnection's Data Miner2 application, where the offer data is provided with offer identities are masked. PJM, *Data Miner 2,* https://dataminer2.pjm.com/feed/energy_market_offers/definition (last updated June 1, 2021).

[18] *See*, MISO, *2020-2021 PRA Detailed Report*, https://cdn.misoenergy.org/2020-2021%20PRA%20Detailed%20Report446950.xlsx (last visited June 28, 2021).

[19] *See* 86 FERC ¶ 61,062, ¶ 61,224 (Jan. 27, 1999) (FERC's approval of the NYISO market design).

JA1008

from SOCO, the market rules were changed to require the public release of offer and bid data after a six (6) month lag.[20] This lag was later reduced to 4 months,[21] and all bid and offer data are publicly available on the SCEA website.[22] A snapshot of these available bids and offers is provided below as an example from January 2021.

50. Figure 1 provides the Hour Ahead Energy ("HAE") demand bids and supply offers for January 1, 2021. Bids and offers are provided for each hour of the day for the HAE product. Figure 2 provides the Day-ahead Energy ("DAE") Liquidated Damages ("LD") which is firm energy for the 16-hour peak block of the day running from 6am Central Prevailing Time ("CPT") to 10pm CPT. There is also a DAE Recallable product that is non-firm that can be examined by the screen shot of not provided here.

---

[20] Southern Company Services, Inc. submits Fifth Revised Sheet No. 1 et al, Second Revised Volume No. 4, Docket No. ER09-88 (Oct. 19, 2009), Accession No. 20091022-0292 (market rules 4.2.4, redlined version).

[21] *See* Southern Company, *Auction Information – Announcement*, (Feb. 21, 2017), https://www.southerncompany.com/about/energy-auction/auction-information-page.html.

[22] Southern Company, *Historical Bid and Offers*, https://www.southerncompany.com/about/energy-auction/historical-bids-and-offers.html (last visited June 28, 2021).

JA1009

### Figure 1: Hour Ahead Energy (HAE) Bids and Offers Posted in the Southern Company Energy Auction

| Delivery Date ▲ | Delivery Hour | Bid Information | | | | Offer Information | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ent | Total MW | Max Pri | Min Pri | Ent | Total MW | Min Pr | Max Pr |
| 1/1/2021 | 1 | | | | | 2 | 4000 | 16.06 | 52.46 |
| 1/1/2021 | 2 | | | | | 2 | 4000 | 18.37 | 52.16 |
| 1/1/2021 | 3 | | | | | 2 | 4000 | 18.05 | 51.7 |
| 1/1/2021 | 4 | | | | | 2 | 4000 | 18.05 | 52.13 |
| 1/1/2021 | 5 | | | | | 2 | 4000 | 18.21 | 55.02 |
| 1/1/2021 | 6 | | | | | 2 | 4000 | 18.75 | 56.19 |
| 1/1/2021 | 7 | 2 | 200 | 12 | 12 | 2 | 4000 | 19.29 | 77.76 |
| 1/1/2021 | 8 | 2 | 200 | 12 | 12 | 2 | 4000 | 18.84 | 56.08 |
| 1/1/2021 | 9 | 2 | 200 | 12 | 12 | 2 | 4000 | 19.53 | 77.44 |
| 1/1/2021 | 10 | 2 | 200 | 12 | 12 | 2 | 4000 | 19.93 | 163.6 |
| 1/1/2021 | 11 | 2 | 200 | 12 | 12 | 2 | 4000 | 19.29 | 163.61 |
| 1/1/2021 | 12 | 2 | 200 | 12 | 12 | 2 | 4000 | 19.42 | 78.89 |
| 1/1/2021 | 13 | 2 | 200 | 12 | 12 | 2 | 4000 | 25.54 | 163.73 |
| 1/1/2021 | 14 | 2 | 200 | 12 | 12 | 2 | 4000 | 20.06 | 78.39 |
| 1/1/2021 | 15 | 2 | 200 | 12 | 12 | 2 | 4000 | 26.49 | 163.77 |
| 1/1/2021 | 16 | 2 | 200 | 12 | 12 | 2 | 4000 | 28.05 | 238.15 |
| 1/1/2021 | 17 | 2 | 200 | 13 | 13 | 2 | 4000 | 53.08 | 238.02 |
| 1/1/2021 | 18 | 2 | 200 | 13 | 13 | 2 | 4000 | 28.82 | 237.88 |
| 1/1/2021 | 19 | 2 | 200 | 13 | 13 | 2 | 4000 | 27.34 | 192.59 |
| 1/1/2021 | 20 | 2 | 200 | 13 | 13 | 2 | 4000 | 22.84 | 163.77 |
| 1/1/2021 | 21 | 2 | 200 | 13 | 13 | 2 | 4000 | 20.19 | 163.84 |
| 1/1/2021 | 22 | | | | | 2 | 4000 | 19.21 | 57.37 |
| 1/1/2021 | 23 | | | | | 2 | 4000 | 17.24 | 57.35 |
| 1/1/2021 | 24 | | | | | 2 | 4000 | 17.16 | 57.46 |

### Figure 2: Day-ahead Energy (DAE) Bids and Offers Posted in the Southern Company Energy Auction

| Delivery Date ▲ | Bid Information | | | | Offer Information | | | |
|---|---|---|---|---|---|---|---|---|
| | Entity | Total MW | Max Price | Min Price | Entity | Total MW | Min Price | Max Price |
| 1/4/2021 | 2 | 200 | 18.5 | 18.5 | 2 | 100 | 40.99 | 40.99 |
| | | | | | 2 | 100 | 41 | 41 |
| | | | | | 2 | 100 | 41.99 | 41.99 |
| | | | | | 2 | 100 | 42 | 42 |
| | | | | | 2 | 100 | 43 | 43 |
| | | | | | 2 | 100 | 44.05 | 44.11 |
| | | | | | 2 | 100 | 44.35 | 44.71 |
| | | | | | 2 | 100 | 44.73 | 44.74 |
| | | | | | 2 | 50 | 44.9 | 44.9 |
| | | | | | 2 | 50 | 45.52 | 45.52 |
| | | | | | 2 | 50 | 46.21 | 46.21 |
| | | | | | 2 | 250 | 48.3 | 48.4 |
| | | | | | 2 | 250 | 49 | 49.09 |
| | | | | | 2 | 250 | 49.61 | 49.74 |
| | | | | | 2 | 250 | 49.77 | 49.79 |
| | | | | | 2 | 250 | 54.28 | 57.94 |
| | | | | | 2 | 250 | 58.26 | 58.75 |
| | | | | | 2 | 250 | 59.43 | 61.75 |
| | | | | | 2 | 50 | 61.86 | 61.86 |

JA1010

51. Of course, the SCEA also provides energy prices for which transactions are done in the market. The most recent report of the IMA covering April 24, 2019 to April 23, 2020 showed that only 17,595 MWh of HAE energy were transacted, and transactions only took place in 219 hours out of 8,768 hours for the year (2.5% of all hours),[23] and no DAE transactions occurred.[24] This information can be verified by the bid ask spreads in the bid and offer data as well as other pertinent market information.

**B.     SEEM Limits Transparency of Publicly Available Data Making it More Difficult for Interested Parties to Analyze the Market.**

52. SEEM Filing Parties have only committed to the release of the following data publicly through various reports as shown in Appendix B Southeast EEM Market Rules, Section V. However, these omit the following data that is currently available in the SCEA with a four (4) month lag as noted in Section IV.A above: (1) Interval by interval offer prices and quantities with identities masked. This alone is an enormous omission and must be corrected to bring greater transparency necessary to ensure the SEEM design is just and reasonable.

53. However, the SEEM algorithm's computational requirement is much more complex than those used for ISO-RTO energy markets due to the "toggle on/off" ability of market participants. Given this, the following data should be provided publicly, but with identities masked: (1) The numbers of total possible matching participants as evidenced by Enabling Agreements, and the number of those for which matches were allowed in

---

[23] Eleventh Annual Informational Report for the Independent Auction Monitor, at 2, Docket Nos. ER09-88, ER17-514 (June 30, 2020), Accession No. 20200630-5318.

[24] *Id.* at 2.

each interval; (2) Whether bids or offers were "all-or-nothing" or could be partially filled; (3) ATC on an interval basis as this should already be public based on postings to each BA and Transmission Provider site; (4) A pipe and bubble representation of the ATC between each BA in SEEM; (5) Matched bids and offers and the "split the savings price" used for the match; (7) binding transmission paths along with the marginal value of the transmission constraint as proposed by Dr, Pope; (8) all matches in the SEEM algorithm that did not actually flow, including the masked identities of the counterparties and the reason the transaction did not flow; and (9) The detailed posting of the auction algorithm so that interested parties could run various scenarios to see how market outcomes might differ under various conditions. This information can be used as a means to check against the EQR data for interested parties in the public who want to do their own analysis.

54. Information on matches that did not flow can help ferret out possible manipulation and/or transmission modeling problems. Modeling problems will almost assuredly arise since SEEM is part of the Eastern Interconnect in which all BAs, including large ISO/RTO systems, experience unexpected loop flows. If matched transaction does not flow because it is curtailed, it says something about the transmission model and that the ATC value along the contract path is not right for either loop flow reasons from outside SEEM (highly likely) or the model is too basic and does not account for internal loop flows within SEEM (also highly likely with the contract path method).

55. If matched transactions do not flow because the seller did not flow it, it could be because of a problem at the resource (forced outage), or potential withholding (for the reasons I have described already). If is the buyer does not take it or cancels it, it could because the short-term load forecast changed and they do not need the power, or it could be strategic

JA1012

withholding of demand if one its own resources "suddenly becomes available." No matter the reason, information on unconsummated matches helps in monitoring the market.

56. In ISO-RTO markets, there is no "toggling on/off" participants, so this data is not needed in those markets to monitor for market power or discrimination. And in ISO-RTO markets, the use of standardized security constrained unit commitment ("SCUC") and security constrained economic dispatch ("SCED") is widely known and available in software packages for parties to replicate market outcomes. In this way SEEM is unique in allowing potential trading partners to be toggled on/off and the matching mechanisms is not standard, nor has an algorithm yet been developed as acknowledged by Dr. Susan Pope in her affidavit.[25] Thus, having this information available will be essential to help other interested parties monitor the markets.

### C. SEEM Lacks an Independent Market Monitor which is Essential to Guard Against Market Power and Market Manipulation.

57. Each ISO/RTO has a market monitor. Some have both internal and external monitors (CAISO, SPP, ISO-NE) while others have only external and totally independent market monitors (MISO, PJM, NYISO). The role of external, and independent market monitors is to act as the eyes and ears of FERC. All markets are complex and generate terabytes of data each year and it is implausible that FERC would have the bandwidth to act as a full-time market monitor for SEEM. It is in no way reasonable or even possible for FERC staff to be asked to be the only entity undertaking the market monitoring role, and even if they could, the failure to disclose additional information regarding matched, yet unconsummated transactions, would not allow Commission staff to fully monitor the

---

[25] Suppl. Pope Aff. at n.10, ¶ 26.

JA1013

market design and implementation flaws of exercise of market power and manipulation. Moreover, market monitors also provide another independent check on organized markets to ensure compliance with market rules.

58. In 2008 when FERC initially approved the Phase I version of the SCEA, it conditioned its approval on two crucial matters: (1) Allow for third parties to make energy offers into SCEA to enhance competition; and (2) establish an Independent Auction Monitor (IAM).[26]

59. With regard to the duties of the IAM, the Commission stated:

> Southern Companies must ensure that the Independent Auction Monitor is authorized to:
>
> (1) verify Southern Companies' Available Capacity calculations, including the companies' inputs into those calculations; (2) confirm that any transmission service necessary to accommodate a purchase under the auctions is not unreasonably withheld; and (3) independently file reports with the Commission regarding the auction process as described herein.
>
> Specifically, for the next three years the Independent Auction Monitor must report to the Commission every twelve months regarding the functioning of the auctions. At a minimum, such reports should include the following: (1) the clearing price for each auction; (2) the amount of energy offered and sold by each seller (identified by name) in each auction; and (3) the amount of energy bid on and purchased by each buyer in each auction. In addition, the Independent Auction Monitor's report must identify any instances where it was unable to verify Southern Companies' Available Capacity calculations and inputs or where issues arose involving availability or the terms of transmission service needed to accommodate an auction purchase. The Independent Auction Monitor must also report any complaints relating to the auctions or other serious concerns to the Commission as soon as possible rather than waiting for the next report. The Independent Auction Monitor must have independent authority to prepare and submit all such reports without any prior review or approval by Southern Companies or any other outside sources.
>
> In addition, Southern Companies must also file, as part of the compliance filing described below, the contract governing the relationship between them and the

---

[26] *Southern Company Services, Inc.*, 125 FERC ¶ 61,316, PP 48–52 (Dec. 18, 2008).

Independent Auction Monitor, including the conditions under which Southern
Companies may dismiss the Independent Auction Monitor.[27]

60. Under the SEEM proposal, no such IAM or monitoring entity exists, which is a fatal

flaw. Given the extreme complexity of the yet to be developed and implemented

algorithm, and the lack of transparency offered up by the SEEM Filing Parties, the

equivalent of the IAM is essential to ensure just and reasonable market outcomes. All

that the SEEM Filing Parties have offered to date is a Market Auditor who lacks

independence and merely serves as a data reporting function to the Commission and

reports to the Board on whether the market algorithm is reporting as intended.[28]

61. The only other role envisioned for the Market Auditor is in receiving complaints and

referring them to the Membership Board; the Market Auditor has no investigative power

or the authority to make a referral to the Commission's Office of Enforcement if it

believes such complaints brought to it has resulted in exercises of market power or market

manipulation.

62. The Market Auditor, if it is to serve the same role as an IAM, needs to have the power

and obligation to analyze and report abuses to FERC. Participants on their own may be

hesitant to report problems via a Section 206 Complaint for fear of being toggled off or

having their Enabling Agreement terminated, which SEEM Filing Parties admit can

happen for any reason,[29] and means such actions could be used to silence dissent or

---

[27] *Id.* at PP 48–50.

[28] Deficiency Response at 25.

[29] *Id.* at 19–20 (responding to Deficiency Letter Question 5a). Filing Parties stating, "In the current bilateral market, there are no prescribed limitations on a party's ability to refuse to enter into an Enabling Agreement with a prospective or current party. Likewise, the Southeast EEM Agreement does not contain any such limitations, but it does require Participants to have an Enabling Agreement with three or more other Participants. This is purely a safeguard against market manipulation, as explained by Dr. Pope." But this

JA1015

opposition. No such actions can be undertaken in ISO-RTO market transactions between parties in the Day-ahead or Real-time Energy and Ancillary Service Markets or Capacity Markets since those transactions are conducted through centralized clearing markets, but such actions can easily occur in SEEM.

## VI. PROSPECTS FOR ROBUST PARTICIPATION AND BENEFCIAL TRANSACTIONS APPEAR LIMITED GIVEN CURRENT EXPERIENCE OF THE SOUTHERN COMPANY ENERGY AUCTION

63. Filing Parties claim that they want and expect robust participation on the SEEM.[30] Yet, current evidence from the Southern Company Energy Auction ("SCEA") indicates such expectations will not be met. Moreover, "participation" does not imply anything about the prospects for consummating beneficial matches and transactions as had been the experience in SCEA.

64. The Brattle Group, serving as the IAM for the SCEA, in its latest reports for 2020 shows that of the 26 registered participants, 99.9 percent of the offered energy for HAE, and 100 percent of recallable DAE and 99.5 of Firm Liquidated Damages ("LD") DAE.[31] It would be expected that SOCO would be the largest offeror of energy given it must offer all available capacity as energy into the auction, but it shows that few of the other participants are offering energy, even though many are IPPs.

65. The public version of the report does not provide any information on the breakdown of energy demand bid into the market, but for context the load entities only bid a total of

---

only accounts for seller side market power, and not buyer-side market power or other forms of manipulation which Dr. Pope was never asked to examine.

[30] Deficiency Response at n.12 (citing Suppl. Pope Aff. at ¶ 47). *See also id.* at n.28 (citing Suppl. Pope Aff. at ¶ 70).

[31] Eleventh Annual Informational Report for the Independent Auction Monitor, at 7–8, Docket Nos. ER09-88, ER17-514 (June 30, 2020), Accession No. 20200630-5318.

JA1016

118,211 MWh over the Month of January 2021. Generation offered 2,962,527 MWh. That bid load was only 4% of the total energy offered.

66. Even more shocking, in January 2021, 99.95% of energy offered was by one participant (likely SOCO), and if the identities in the data are correct, it also bid in 97% of the demand. Thus, despite there being 26 registered participants, there is not robust participation in SCEA, so there is no reason to believe this would change with SEEM given the similar rule sets.

67. The lack of demand and cleared transactions is not a new phenomenon in the SCEA. As noted by the Commission in 2015:

> Although the Auction is intended to serve as tailored mitigation, we are not persuaded that the Auction, even with the proposed enhancements, provides adequate mitigation of Southern Companies' presumed potential to exercise market power, ***particularly given the paucity of cleared transactions since the start of the Auction and the low level of third-party participation.*** The dearth of participation in the Auction could be an indication that it is ineffective because there are few suppliers willing to sell in the Auction, ***and few buyers interested in purchasing what is being offered. A robust Auction is one in which there are a large number of buyers and sellers, of which this Auction has neither.*** The most recent Informational Report for The Southern Companies' Energy Auction states that only Southern Companies offered hour-ahead energy in the hour-ahead auction, and two participants, including Southern Companies, offered Firm Energy in at least one day-ahead auction. Only Southern Companies offered Recallable Energy. Southern Companies acknowledge that the day-ahead and hour-ahead auction matches have not attained a level of frequency sufficient in the view of index developers to produce a price index for the products sold in the Auction. ***The scarcity of transactions in both the day-ahead and hour-ahead auctions has been consistent since the commencement of the Auction, and we are not persuaded that the enhancements described above will result in a robust Auction.***[32]

---

[32] *Alabama Power Company, et. al.*, 151 FERC ¶ 61,071, P 18 (Apr. 27, 2015) (footnotes omitted and emphasis added).

JA1017

68. In response, SOCO filed changes in ER17-514 to modify the SCEA following feedback from Southeast stakeholders and also described non-tariff changes to the SCEA framework.[33] None of these changes addressed the issue of bid in demand for energy. While the Commission approved these changes,[34] and eventually terminated the 206 proceeding,[35] nothing was done to address the issue of a lack of demand in the SCEA and the continued low transaction volumes as described above as the focus was solely upon seller-side market power.

69. SOCO has never been required to bid in any demand as they are required to do for supply. Thus, it should not be surprising that the bid in demand in SCEA is quite low. This observation is also consistent with the objectives discussed above in Section III where the franchise utility is acting as a monopsonist/oligopsonist in the more traditional sense of withholding demand from the market, physically or economically, which keeps prices artificially low or keeps transactions from occurring, and also discourages more price discovery from other lower cost resources than those owned by SOCO used to serve load.

70. In response to the FERC Deficiency Letter, the Filing Parties acknowledge that 15-minute transactions are already permissible but are rare.[36] So given the decade-plus lack of transactions in the SCEA in which there is more lead time, and the fact that 15-minute transactions might be even rarer still, the prospect for a robust, liquid trading market in

---

[33] For a summary of these changes, *see*, Enhancements to the Southern Company Energy Auction, at 1–2, Docket No. ER17-514 (Dec. 9, 2016), Accession No. 20161209-5103.

[34] *Alabama Power Company, et al.*, 158 FERC ¶ 61,131 (Feb. 2, 2017).

[35] *Alabama Power Company, et al.*, 163 FERC ¶ 61,090 (May 4, 2018).

[36] Deficiency Response at 10 (in response to Deficiency Letter Question 3).

JA1018

SEEM appears to be more wishful thinking than it is based on any kind of empirical evidence that mitigation of seller-side market power alone, along with NFEETS, is the panacea for unlocking a liquid short-term market that has alluded the region for decades.

71. However, buyer-side mitigation measures and general market manipulation along with seller-side market power are all concerns for the Commissions when thinking about market design and its competitiveness and just and reasonableness. The extension of low to non-existent bid in demand into SEEM is easy to infer from the experience of SCEA. But in this case, the Commission is in a position to mandate mitigation such as "must bid in demand" to ensure against the withholding of demand that leads to uncompetitive, unjust, and unreasonable market outcomes.

## VII. SEEM FILING PARTIES CONFLATE EROSION OF FIRM TRANSMISSION REVENUES WITH RESOURCE ADEQUACY NEEDS OF LOAD SERVING ENTITIES AND COST CAUSATION OF THOSE USING FIRM TRANSMISSION

72. Commission Staff in its Deficiency Letter asked the SEEM Filing Parties to explain how the erosions of firm transmission revenues, if they are eroded more than the benefits from SEEM participation would be consistent with cost causation.[37] SEEM Filing parties confirm that such erosion is possible, but argue that NFEETS will not lead to such a large erosion of firm transmission revenues and increases in network transmission rates since NFEETS is not a firm transaction that can be used for resource adequacy.[38] Further, SEEM Filing Parties aver this is consistent with cost causation principles as those paying

---

[37] *Id.* at 11 (in response to Deficiency Letter Question 9.a.).

[38] SEEM Proposal at 36–37.

JA1019

for firm point-point and network transmission are those parties that would benefit from NFEETS service.[39]

### A. SEEM Filing Parties Confuse Firm Transmission Revenue Erosion with Resource Adequacy

73. Firm Network Service allows the holders (almost always load) to have access to all resources interconnected to the Transmission Provider's transmission system to serve load when needed. Resource Adequacy is related to the ability to have sufficient resources to serve all firm load at the expected peak while accounting for load forecast error, generators outages, and weather variation.

74. Generators that are interconnected to the transmission system of any of the FERC jurisdictional SEEM Filing Parties as a Network Resource, have already been through the generator interconnection process, and already paid for transmission upgrades to be deliverable to the system and do not pay for transmission beyond those upgrades. This is true for IPPs as well as those generating facilities owned by the SEEM Filing Parties used to serve their native load and Network Loads. Once interconnected, generators that are Network Resources are deliverable to the Network Load by design to help ensure resource adequacy.

75. Resource adequacy has no bearing on the use of Firm Point-to-Point transmission service. The only time this would come into play is for a resource located in one BA that is providing energy and capacity to load in another BA and requires Firm Point-to-Point to reach the border of the neighboring system. But given the way in which each SEEM Filing Parties' system has been developed, it is unlikely they will have much use for Firm

---

[39] *Id.* at 37.

JA1020

Point-to-Point Transmission to deliver firm energy and capacity. In this sense, the transmission systems and designated Network Resources having gone through the interconnection process are no different than ISO-RTO systems. Firm Point-to-Point transmission would not be used for local resource adequacy.

### B. Those Facing Higher Costs for Firm Point-to-Point Transmission Would Not Benefit from SEEM, and the Assertion Of Benefits Outweighing Additional Costs Has Not Been Supported.

76. The only parties that would be interested in Firm Point-to-Point Transmission Service are those generators looking for transmission to the border to sell into neighboring ISO-RTO Markets. The SEEM footprint borders on PJM, MISO, and SPP that have transparent and open markets for energy, and in MISO's and PJM's case capacity, the one economically rational reason to hold Firm Point-to-Point Transmission is to access those markets.

77. So, erosion of Firm transmission revenues from the use of SEEM leading to higher charges for other Firm Point-to-Point and Network Integration Transmission Service would fall on holders of Firm-Point-to-Point Service looking to access other markets and not participate in SEEM, and thus are not beneficiaries of the alleged, and highly uncertain benefits of SEEM. This would not be consistent with cost causation principles.

78. With regard to Network Integration Transmission Service, these customers may benefit from short term energy transactions in SEEM *only if* the transmission owning SEEM Filing Parties would offer that load into SEEM as bid-in demand and allow some of their own generation to be displaced by lower cost generation. Otherwise, there would be little benefit to SEEM load, and yet they could also face increases in their transmission costs without the commensurate benefits. This is likely to be the outcome if SEEM works like

JA1021

the SCEA has, and franchise monopolies act to reserve their positions as discussed Section III above.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

79. This concludes my affidavit.

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **Alabama Power Company** | ) | **ER21-1111-000** |
| | ) | |
| **Dominion Energy South Carolina, Inc.** | ) | **ER21-1112-000** |
| | ) | |
| **Louisville Gas and Electric Company** | ) | **ER21-1114-000** |
| | ) | |
| **Duke Energy Progress, LLC** | ) | **ER21-1115-000** |
| **Duke Energy Carolinas, LLC** | ) | |
| | ) | |
| **Duke Energy Carolinas, LLC** | ) | **ER21-1116-000** |
| | ) | |
| **Duke Energy Progress, LLC** | ) | **ER21-1117-000** |
| | ) | |
| **Louisville Gas and Electric Company** | ) | **ER21-1118-000** |
| | ) | |
| **Georgia Power Company** | ) | **ER21-1119-000** |
| | ) | |
| **Kentucky Utilities Company** | ) | **ER21-1120-000** |
| | ) | |
| **Mississippi Power Company** | ) | **ER21-1121-000** |
| | ) | |
| **Alabama Power Company** | ) | **ER21-1125-000** |
| | ) | |
| | ) | **ER21-1128-000** |
| **Dominion Energy South Carolina, Inc.** | ) | |
| | ) | **(not consolidated)** |

## AFFIDAVIT OF PAUL M. SOTKIEWICZ, PH.D.

Pursuant to 28 U.S.C. § 1746, I, Paul M. Sotkiewicz, Ph.D., declare under penalty of perjury under the laws of the United States of America that the statements contained in the foregoing Affidavit of Paul M. Sotkiewicz, Ph.D. are true and correct to the best of my knowledge and belief.

_____
Paul M. Sotkiewicz, Ph.D.

Executed on
this 28 day of June 2021

JA1023

Document Content(s)

2021-06-28_PIO_SEEM Protest and Aff..PDF..................................1

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | ) ) | ER21-1111-000 |
| Dominion Energy South Carolina, Inc. | ) | ER21-1112-000 |
| Louisville Gas and Electric Company | ) | ER21-1114-000 |
| Duke Energy Progress, LLC<br>Duke Energy Carolinas, LLC | ) )<br>) | ER21-1115-000 |
| Duke Energy Carolinas, LLC | ) ) | ER21-1116-000 |
| Duke Energy Progress, LLC | ) ) | ER21-1117-000 |
| Louisville Gas and Electric Company | ) ) | ER21-1118-000 |
| Georgia Power Company | ) ) | ER21-1119-000 |
| Kentucky Utilities Company | ) ) | ER21-1120-000 |
| Mississippi Power Company | ) ) | ER21-1121-000 |
| Alabama Power Company | ) ) | ER21-1125-000 |
| | ) ) | ER21-1128-000 |
| Dominion Energy South Carolina, Inc. | ) ) | (not consolidated) |

**MOTION TO RESPOND AND RESPONSE OF PUBLIC INTEREST ORGANIZATIONS**

1

JA1025

Duke Energy's proposed application of the *Mobile-Sierra* doctrine where the rate at issue was not a contract rate, but an ordinary tariff rate that was not intended to correct serious deficiencies in the market.[39]  Applicants have failed to demonstrate any compelling need for SEEM.  In fact, Applicants take great pains to liken SEEM more to the existing voluntary bilateral market, acknowledges that it provides a product that is currently rarely in demand, and insists that it is unable to perform the services of an energy imbalance market.[40]

### C.  The SEEM Proposal Is Inconsistent with the OATT and Presents Structural Opportunities for Undue Discrimination

The lack of a standardized Enabling Agreement as part of the SEEM rules creates serious concerns regarding opportunities for undue discrimination.  Applicants point to the list of 181 existing Enabling Agreements as evidence that there is a robust, diverse network of trading partners for SEEM.[41]  But this list simply shows that there is some existing bilateral trading between the members of SEEM that could increase with free transmission service and facilitation of access to SEEM Members' systems.[42]  It does not establish that the Members have need for or will use the type of product being offered by SEEM or guarantee that any party wishing to participate will have rights to an Enabling Agreement or one on the same terms. It also shows that an estimated 65 trading partners that border the SEEM territory would be excluded from that

---

allowed a stricter standard of review *after* 45 days post-auction where the auction had itself been determined to meet the just and reasonable standard and where such application would promote rate stability in a market that had been determined to be particularly unstable.  *Id.* at PP 19–20.  FERC was very clear in its majority and concurring opinion that discretionary application of the public interest standard to tariff rates would be very fact-specific and might be "intolerable in the context of other circumstances." *Id.* at P 24; *Id.* (LaFleur, Comm'r, concurring).

[39] *Duke Energy Carolinas, LLC*, 137 FERC ¶ 61,058 at PP 29–30; *High Island Offshore Sys., LLC*, 135 FERC ¶ 61,105, at P 23.

[40] Deficiency Response at 6,10–13; *Id.*, Attach. D, Supp. Aff. of Susan L. Pope on Behalf of SEEM Members, Sec. IV.

[41] Deficiency Response at 20; *Id.*, Attach. C.

[42] Deficiency Response, Attach. C. The list also shows inflation of the overall numbers given the 35 or more duplicates in the list, including, for example, "Southern Company Services, Inc.," "Southern Power," and "Southern Power Company," all as stand-ins for Southern Company.

free transmission service and not able to participate like SEEM Members because they do not have resources located in the territory.[43]

Applicants have not explained why it is consistent with or superior to the *pro forma* OATT to exclude at least 65 existing bilateral trading partners from access to the new free point-to-point service offered through the SEEM.  Nor can they, as FERC's open access rules require that transmission service is offered under each public utility's OATT to all transmission customers in a comparable, non-discriminatory manner, including existing trading partners.[44] Under other market structures and joint dispatch agreements, the Commission has allowed some limitations on access to free transmission service to those with resources and/or loads located on the utilities' systems.[45]  However, at a minimum, those market structures provide imbalance service—that is, balancing loads and resources to meet needs reliably in real time.  As Applicants are fond of repeating, SEEM is not an energy imbalance market and has no imbalance or reliability requirements.[46]  Thus, Applicants cannot reasonably exclude any transmission customers from the Non-Firm Energy Exchange Transmission Service ("NFEETS"), including those outside the SEEM Territory, due to reliability concerns or claims that they are not similarly situated.  As proposed, the OATTs of SEEM Members are unduly discriminatory because they

---

[43] In the PIOs' conservative analysis of the list of existing agreements, we first removed 36 duplicates, many of which represent companies located outside of the SEEM Territory.  We then identified those entities such as Western Systems Power Pool, municipal systems in Central Florida and Arkansas, and utilities in the upper Midwest that clearly do not have resources located in the Territory to identify at least 66 entities that cannot transact in SEEM under the proposed rules.  If there was any question as to whether the entity might have a resource in the SEEM territory, our analysis included that entity as a possible participant in SEEM.  For this reason, many power marketing entities are included even though pure play power marketers only market resources owned by others.
[44] Order 888 at 21,596 (Final Rule requires that transmission is offered "pursuant to a single, unbundled, grid-wide tariff that applies to all eligible users in a non-discriminatory manner.").
[45] *See Pub. Serv. Co. of Colorado*, 154 FERC ¶ 61,107 at P 85 (2016) ("to the extent any resource only needs the transmission resources of Parties to join the Joint Dispatch Agreement, it only needs to sign the Joint Dispatch Agreement to receive Joint Dispatch Transmission Service").].
[46] *See* e.g., Deficiency Response at 6 ("Southeast EEM is not transforming the existing bilateral market into a new market. It will not function as an imbalance market – balancing services will continue to be provided by the relevant balancing authorities."), Attach. D, Sec. IV; SEEM Answer at 2–3.

JA1027

preclude transmission customers that are existing bilateral trading partners from access to the

enhanced bilateral market provided by SEEM.  To meet the requirements of Order No. 888,

Applicants have an obligation to offer NFEETS to all transmission customers on the same terms,

including the 65 or more existing trading partners with resources located outside of the SEEM

Territory.[47]

In addition to ensuring that all transmission services are available on a comparable, non-

discriminatory basis, the Commission has an obligation to ensure that all transmission rates are

just and reasonable, an obligation that it reiterated recently.[48]  The Commission specifically

asked Applicants to explain how the availability of NFEETS will impact existing firm point-to-

point customers' transmission charges.[49]  As PIOs' Protest explained, Applicants offered a non-

sequitur in their Answer when they focused on net benefits of loads in the SEEM territory

instead of the effects on point-to-point transmission customer charges.[50]  It is telling that

Applicants' July 14 Answer is also devoid of any response to PIOs' arguments concerning the

increase in costs for firm point-to-point customers from the proposed discounting of NFEETS.[51]

Applicants' attempt to avoid the question should focus the Commission on the fact that rates for

firm point-to-point customers will increase due to the zero rate NFEETS.  There will be no off-

setting savings for customers that use the firm point-to-point service to wheel across the

Territory to reach their consumers or that sell into the more transparent and liquid RTO markets

---

[47] Even if the scheduling rules in neighboring RTOs *may* prevent participation in SEEM by resources located in those RTOs, there are resources on the border of the SEEM Territory outside of RTOs that should qualify to participate in SEEM.

[48] *See, e.g.*, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 176 FERC ¶ 61,024 at P 1 (2021) (seeking input on how to enhance the Commission's oversight to control transmission costs).

[49] Deficiency Letter at Q 9.b.

[50] PIO June Protest at 23–24 (quoting Deficiency Response at 37 and explaining that benefits to load do not convey to point-to-point transmission customers in all, or even many, circumstances).

[51] *See id.*

that border the SEEM Territory.[52]  For these reasons, the SEEM proposal does not adequately protect consumers, shifts costs to independent power producers, and does not yield just and reasonable rates. The Commission must apply "rigorous scrutiny of the rates charged for transmission service"—including the zero rate NFEETS—because it will raise firm transmission rates relied on by competitors of SEEM Members without any offsetting benefit for their ultimate end-use consumers.[53]

### D. PIOs' Earlier Concerns Remain Unaddressed

The SEEM proposal violates the Commission's fundamental wholesale market principles in several additional ways that the PIOs have discussed in previous filings and Applicants have continuously failed to remedy.  For example:

- The governance structure explicitly preferences transmission-owning Members over Participants.[54]

- SEEM Members may selectively enter into Enabling Agreements or negotiate terms and conditions of each agreement in an unduly discriminatory manner.[55]

- Even if independent power producers are able to obtain an Enabling Agreement with a significant number of trading partners so as to be qualified to make some exchanges, the SEEM algorithm allows Members and Participants to "toggle off"

---

[52] Nor will there be off-setting saving for transmission customers, e.g., independent power producers, that sell at all-in, fixed rates to loads in SEEM. It is undisputed that they will see increased costs for transmission services and only the SEEM load, not its service provider, has the potential to see decreased costs for energy exchanges from SEEM.
[53] *Entergy Arkansas, Inc.*, 175 FERC ¶ 61,136 (2021) (Clements, Comm'r, dissenting at P 8); *see also Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009) ("FERC is not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, or benefits that are trivial in relation to the *costs sought to be shifted to its members*." (emphasis added)); *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992) ("all approved rates [must] reflect to some degree the costs actually caused by the customer who must pay them.").
[54] *See, e.g.*, PIO June Protest at 28–29 (SEEM's proposed governance structure concentrates voting power with three entities: Southern Company, Duke, and the Tennessee Valley Authority), 30 (SEEM proposal lacks any governance roles for non-Members and prohibits independent power producers from becoming Members).
[55] *See* PIO March Protest at 10–13; PIO June Protest at 6–10; 16 U.S.C. § 824d(b).

JA1029

**McGuireWoods LLP**
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Phone: 202.857.1700
www.mcguirewoods.com

**Noel Symons**
Direct: 202.857.2929

# McGUIREWOODS

NSymons@McGuireWoods.com

August 11, 2021

**VIA ETARIFF**
Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re:     *Alabama Power Co.*, **Docket No. ER21-1111-000**
        *Dominion Energy South Carolina, Inc.*, **Docket No. ER21-1112-000**
        *Louisville Gas & Elec. Co.*, **Docket No. ER21-1114-000**
        *Duke Energy Progress, LLC, Duke Energy Carolinas, LLC*, **Docket No. ER21-1115-000**
        *Duke Energy Carolinas, LLC*, **Docket No. ER21-1116-000**
        *Duke Energy Progress, LLC*, **Docket No. ER21-1117-000**
        *Louisville Gas & Elec. Co.*, **Docket No. ER21-1118-000**
        *Georgia Power Co.*, **Docket No. ER21-1119-000**
        *Kentucky Utilities Co.*, **Docket No. ER21-1120-000**
        *Mississippi Power Co.*, **Docket No. ER21-1121-000**
        *Alabama Power Co.*, **Docket No. ER21-1125-000**
        *Dominion Energy South Carolina, Inc.*, **Docket No. ER21-1128-000**
        **(not consolidated)**

        **Response to Second Deficiency Letter; Request for Shortened Comment Period and Expedited Action**

Dear Secretary Bose:

        The Members of the Southeast Energy Exchange Market ("Southeast EEM") hereby respond to the Second Deficiency Letter issued by the Staff of the Federal Energy Regulatory Commission ("Commission" or "FERC") on August 6, 2021.[1]

---

[1]     *Ala. Power Co.*, Second Deficiency Letter, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000 ER21-1128-000 (Aug. 6, 2021) ("Deficiency Letter"). Because the Deficiency Letter was issued in each Southeast EEM Filing docket, the Southeast EEM Members are filing this Response in each docket. The only difference is the tariff record accompanying each eTariff submission, which corresponds to the company making the filing. This Response does not

Atlanta | Austin | Baltimore | Charlotte | Charlottesville | Chicago | Dallas | Houston | Jacksonville | London | Los Angeles - Century City
Los Angeles - Downtown | New York | Norfolk | Pittsburgh | Raleigh | Richmond | San Francisco | Tysons | Washington, D.C.

JA1030

August 11, 2021
Page 2

    The Southeast EEM Members[2] are eager to commence market improvements to materially benefit customers throughout the southeastern United States by enhancing opportunities for competition in the bilateral market and increasing access to lower cost energy from across the large footprint of the Southeast EEM.  The Southeast EEM Members note the limited nature of this second set of questions, and urge the Commission to expeditiously issue an order accepting the Southeast EEM proposal, subject to a compliance filing to implement the changes identified by the Southeast EEM Members in the First Deficiency Response.[3]  To that end, this response is being provided three business days after receipt of the questions.  Given the limited nature of the second Deficiency Letter and response, the Southeast EEM Members request a shortened comment period of 10 days, or August 23, 2021, and action within 30 days, or September 10.  Additionally, the Members request an effective date (as to the Southeast EEM Agreement and concurrence filings) of October 12, 2021, sixty days from the filing of this Response.  To facilitate the Commission's consideration of this proposal and the Members' requested timeframe, the Southeast EEM Members will not answer any protests again rehashing issues outside the scope of the proceeding, or previously addressed.

## Responses to Each Deficiency Letter Question

*1.  Filing Parties state in their proposal that Members who are subject to restrictions under the Commission's Standards of Conduct and affiliate restrictions will remain subject to those rules and, for avoidance of doubt, the Southeast EEM Agreement*

---

propose to modify any tariff records.  The Members previously committed to providing revised tariff records in a compliance filing 30 days after acceptance of the Southeast EEM Proposal.

[2]    For purposes of this Filing, the Southeast EEM Members are: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion Energy SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP"") (together with DEC, "Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, "LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); PowerSouth Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA") (each a "Member" and collectively, the "Members").  In addition, the following entities have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members: Georgia System Operations Corporation ("GSOC"); Georgia Transmission Corporation (An Electric Membership Corporation) ("GTC"); Municipal Electric Authority of Georgia ("MEAG Power"); Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and South Carolina Public Service Authority ("Santee Cooper").

[3]    *See* Response to Deficiency Letter, Docket Nos. ER21-1111-001, ER21-1114-001, ER21-1119-001, ER21-1121-001, ER21-1116-001, ER21-1117-001, ER21-1125-001, ER21-1115-001 (filed June 7, 2021) ("First Deficiency Response").  The First Deficiency Response was also filed in the following dockets after the 5p.m. deadline on June 7th, and so is dated as of June 8th in those dockets:  ER21-1112-001, ER21-1120-001, ER21-1128-001, and ER21-1118-001.

2

JA1031

# SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT

JA1032

ARTICLE 1 DEFINITIONS AND RULES OF INTERPRETATION ......................................... 1

ARTICLE 2 ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION............. 9

ARTICLE 3 MEMBERSHIP AND PARTICIPATION .................................................. 9

ARTICLE 4 GOVERNANCE ................................................................................ 11

ARTICLE 5 OPERATING COMMITTEE ............................................................... 17

ARTICLE 6 APPOINTMENT OF SOUTHEAST EEM AGENT ............................... 20

ARTICLE 7 BUDGETING AND COST RESPONSIBILITY ..................................... 21

ARTICLE 8 FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE .................. 24

ARTICLE 9 RELEASE AND LIABILITY; NO FIDUCIARY DUTIES ................................. 26

ARTICLE 10 TRANSPARENCY; CONFIDENTIALITY; AUDITING ................................. 28

ARTICLE 11 SOUTHEAST EEM MARKET RULES .............................................. 29

ARTICLE 12 DISPUTE RESOLUTION ................................................................. 29

ARTICLE 13 REPRESENTATIONS AND WARRANTIES.................................... 31

ARTICLE 14 DEFAULTS ..................................................................................... 31

ARTICLE 15 CONFIDENTIALITY........................................................................ 32

ARTICLE 16 MISCELLANEOUS ......................................................................... 33

**EXHIBITS**

EXHIBIT A          Names and Addresses of the Members

EXHIBIT B          Form of Joinder Agreement

**APPENDICES**

APPENDIX A         Form of Participant Agreement

APPENDIX B         Southeast EEM Market Rules

APPENDIX C         Southeast EEM Agent Scope

## SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT

This SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT (as the same may be amended from time to time in accordance with the terms hereof, the "Agreement"), by and among each of the entities listed on Exhibit A hereto (each entity, a "Party," and collectively, the "Parties"), as that exhibit may be amended from time to time in accordance with the terms hereof, is made, entered into and effective this 28th day of December, 2020. Hereinafter, Parties to this Agreement may be referred to individually as a "Member" and collectively as the "Members."

## W I T N E S S E T H

WHEREAS, there is presently no centrally operated electricity market in the southeastern United States and, accordingly, inter-utility electricity transactions presently occur through bilateral transactions;

WHEREAS, Members believe that a voluntary, region-wide, bilateral, automated, intra-hour electric exchange utilizing unreserved transmission capacity of Participating Transmission Providers at a zero-dollar transmission rate will provide value to their customers by creating efficiencies, transparency, and market liquidity;

WHEREAS, Members desire to participate and to permit other entities to participate as Participants in the exchange; and

WHEREAS, the Members believe that the foregoing objectives can be achieved through a joint effort to sponsor and create a common trading platform that facilitates bilateral electricity transactions between and within their respective service territories.

NOW, THEREFORE, the Members, for good and valuable consideration, enter into this Agreement that sets forth their mutual covenants, rights, and obligations for establishing, funding, and participating in the Southeast Energy Exchange Market (defined below).

## ARTICLE 1

## DEFINITIONS AND RULES OF INTERPRETATION

1.1     Definitions.  The following terms shall have the meaning hereinafter specified:

"Additional Member" has the meaning provided to it in Section 3.2.3.

"Affiliate" has the meaning set forth in 18 C.F.R. § 35.36(9), as amended.

"Affirmative Majority Vote" has the meaning set forth in Section 4.1.5(b).

"Affirmative Supermajority Vote" has the meaning set forth in Section 4.1.5(c).

"Alternate Committee Member" has the meaning set forth in Section 5.9(b).

"Alternate MNEL Value" has the meaning set forth in Section 7.3.1(a).

"Alternate Representative" has the meaning set forth in Section 4.1.7(b).

"Annual Budget" has the meaning set forth in Section 7.2.2.

"Annual Budget Determination Date" has the meaning set forth in Section 7.2.2.

"Annual Meeting" has the meaning set forth in Section 4.4.

"Annual Member Meeting" has the meaning set forth in Section 4.5.

"Authorized Action" has the meaning set forth in Section 6.1.

"Balancing Authority" shall have the meaning set forth in the Southeast EEM Market Rules.

"Balancing Authority Area" shall have the meaning set forth in the Southeast EEM Market Rules.

"Bid" shall have the meaning set forth in the Southeast EEM Market Rules.

"Bid Information" shall have the meaning set forth in the Southeast EEM Market Rules.

"Bidder" shall have the meaning set forth in the Southeast EEM Market Rules.

"Business Day" means each weekday, Monday through Friday, excluding NERC holidays.

"Buyer" shall have the meaning set forth in the Southeast EEM Market Rules.

"Chair of the Membership Board" has the meaning set forth in Section 4.3.2.

"Change in Law" has the meaning set forth in Section 8.6.

"Committee Member" has the meaning set forth in Section 5.1.

"Cooperatives" means those electric membership cooperative Members that serve load, and cooperatives that provide generation, transmission and/or system operations services to electric membership cooperatives that serve load, in each case in the Territory.

"Deadlock Issue" has the meaning set forth in Section 5.7.2.

"Delivery Interval" shall have the meaning set forth in the Southeast EEM Market Rules.

"Disaggregated Utility" means multiple entities of a disaggregated generation/transmission/system operations utility system.

"Effective Date" has the meaning set forth in Section 8.4.1.

"Enabling Agreement" means a bilateral agreement for the purchase and sale of Energy that provides for Energy Exchanges between a Seller and a Buyer and that, for Sellers that are Public Utilities and require authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under Section 205 of the FPA, has been entered into pursuant to such Seller's market-based rate authority.

"Energy" means electric energy delivered as three-phase alternating current.

"Energy Exchange" means a transaction for the purchase and sale of Non-Firm Energy using the transaction matching, reservation and tagging functions of the Southeast EEM between Participants pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Market Rules.

"Enrollment Period" has the meaning set forth in Section 3.2.3.

"FERC" means the Federal Energy Regulatory Commission or any successor to its rights and obligations under Part II of the FPA.

"FPA" means the Federal Power Act, as amended.

"Good Utility Practice" shall have the meaning set forth in the Southeast EEM Market Rules.

"Governmental Action Withdrawal Date" has the meaning set forth in Section 8.6.

"Governmental Entity" means any federal, state, county, municipal, local or foreign government or entity or any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, arbitrator, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or any enforcement authority or other similar recognized organization or body exercising similar powers or authority, including FERC, any public utility commission or public service commission or similar authority, but excluding in each case, any Member acting in its capacity as a Member hereunder and not otherwise in a governmental capacity.

"Governmental Utility" means any electric utility located in the Territory that is owned, operated or controlled by the United States, or any state or commonwealth included in the Territory, any political subdivision of a state or commonwealth included in the Territory, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing.

"Interest Rate" means the lesser of (i) the per annum rate of interest announced from time to time by Citibank, N.A. (or a suitable replacement specified by the Operating Committee) as its "prime rate" for commercial loans effective on the date payment is due as established from time to time by such bank, plus two percent (2%), or (ii) the maximum lawful rate permitted by applicable Law.

"Investor Owned Utilities" means those investor owned utility Members that serve load in the Territory.

"Jurisdictional Member" means a Member that is a Public Utility.

"Law" means any federal, state or local law, statute, act, rule, code, ordinance, decree, treaty, regulation, order, judgment, legally binding announcement, directive or published interpretation thereof, enacted, issued or promulgated by any Governmental Entity.

"Load Serving Entity" has the meaning set forth in the NERC Rules of Procedure, as approved by FERC.

"Market Auditor" means an independent entity engaged by the Southeast EEM Agent to perform the scope of responsibilities identified in Section 10.2 and in the Southeast EEM Market Rules.

"Material Vendor Contract" means an agreement between the Southeast EEM Agent, on behalf of the Members, and any vendor or supplier that, together with all other such agreements with such vendor or supplier and its Affiliates, involves aggregate consideration payable by the Members.

"Member" or "Members" has the meaning set forth in the preamble, except that to the extent any of the Members have not executed this Agreement at the time that it is filed with FERC, such Member may execute this Agreement no later than thirty (30) days after the Effective Date. Thereafter, any entity listed on Exhibit A that has not executed the Agreement may seek to become an Additional Member pursuant to Section 3.2.3.

"Member Net Energy for Load" means, except as modified pursuant to Section 7.3.1, the Net Energy for Load calculated for each Member and submitted in NERC's business plan and budget filed annually with FERC in accordance with 18 C.F.R. § 39.4(b), as amended. For purposes of Section 4.1.5 and Section 7.2, (i) a Representative's Member that is an entity part of a Disaggregated Utility, and (ii) any Affiliates of a Representative's Member, shall in each case be assigned the total Net Energy for Load of the associated entities in such Disaggregated Utility or of such Member Affiliates, as applicable.

"Membership Board" means the membership board established pursuant to Article 4.

"MW" means megawatt or megawatts.

"MWh" means megawatt-hour or megawatt-hours.

"NAESB EIR" shall have the meaning set forth in the Southeast EEM Market Rules.

"NERC" means the North American Electric Reliability Corporation or its successor.

"Net Energy for Load" means net generation of an electric system plus Energy received from others less Energy delivered to others through interchange; it includes system losses but

excludes Energy required for the storage of Energy at energy storage facilities.  For purposes of this definition "electric system" means a Load Serving Entity.

"Non-Firm Energy" shall have the meaning set forth to it in the Southeast EEM Market Rules

"Non-Firm Energy Exchange Transmission Service" shall have the meaning set forth in the Southeast EEM Market Rules.

"Non-Firm Energy Exchange Transmission Service Agreement" means an agreement for the provision of Non-Firm Energy Exchange Transmission Service between a Participant and a Participating Transmission Provider, as provided in such Participating Transmission Provider's Tariff, as any such agreement may be updated from time to time.

"Non-Jurisdictional Member" means a Member that is not a Public Utility.

"OATI webRegistry" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer Information" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offer Price" shall have the meaning set forth in the Southeast EEM Market Rules.

"Offeror" shall have the meaning set forth in the Southeast EEM Market Rules.

"Operating Committee" means that committee established pursuant to Article 5.

"Operating Costs" shall mean dues, costs, expenses and other payment obligations assessed pursuant to this Agreement, or other fees or liabilities that may be imposed by the Membership Board or in accordance with the Southeast EEM Market Rules that arise under this Agreement.  For the avoidance of doubt, Operating Costs includes fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder and the cost of employing third party vendors by the Southeast EEM Agent regardless of whether such costs are billed to the Members through the Southeast EEM Agent, the Southeast EEM Administrator, a third party or directly by such vendors.

"Other Court/Governmental Entity Action" has the meaning set forth in Section 8.6.

"Participant" shall have the meaning set forth in the Southeast EEM Market Rules.

"Participant Agreement" has the meaning set forth in Section 3.3.

"Participating Transmission Provider" means a transmission provider that is providing Non-Firm Energy Exchange Transmission Service.

"Popular Vote" has the meaning set forth in Section 4.1.5(a)(i).

JA1038

"Public Utility" has meaning set forth in Section 201 of the FPA.

"Record Date" means the date upon which FERC accepted the most recent annual Business Plan/Budget, including Net Energy for Load values, filed by NERC pursuant to the requirements of 18 C.F.R. § 39.4, as amended.

"Regulatory Filing" means any filing or submission made with or to a Governmental Entity.

"Related Parties" has the meaning set forth in Section 9.1.

"Reliability Obligations" has the meaning set forth in Section 11.2.

"Representative" has the meaning set forth in Section 4.1.2(a).

"Representative Losses" has the meaning set forth in Section 6.5.

"RUS" means the Rural Utilities Service, or its successor.

"Secretary" has the meaning set forth in Section 4.3.3.

"Sector" means individually and collectively, the Investor Owned Utilities, Cooperatives and Governmental Utilities.

"Seller" shall have the meaning set forth in the Southeast EEM Market Rules.

"SERC" has the meaning set forth in Section 11.2.

"Significant Matters" means (i) any amendment to this Agreement (excluding updates to Exhibit A solely to update notice information pursuant to Section 16.8), including but not limited to the Southeast EEM Market Rules, (ii) the appointment, removal, substitution and replacement of the Southeast EEM Agent and/or the Southeast EEM Administrator and the approval of, and any amendment or extension of, the agreement(s) between the Southeast EEM Agent (on behalf of the Members, including the Southeast EEM Agent Scope) and/or the Southeast EEM Administrator, (iii) the development of, or any material modification to, the Southeast EEM Algorithm or the Southeast EEM System, (iv) the appointment, removal, substitution and replacement of the Market Auditor, and any amendment or extension of the agreement(s) between the Southeast EEM Agent (on behalf of the Members) and the Market Auditor that would modify the scope set forth in Section 10.2.1, (v) any other contract or writing that obligates any Member to pay two hundred thousand dollars ($200,000) or more in a calendar year in excess of such Member's allocated share of costs as set forth in the Annual Budget, (vi) the submission of any Regulatory Filing on behalf of the Members, provided that (a) no Member can be compelled to join any Regulatory Filing, and (b) no Member can be compelled to take any action that in the reasonable view of such Member would jeopardize its jurisdictional status, (vii) the sale of all or substantially all of the property held by the Southeast EEM Agent (if any) for the benefit of the Southeast EEM System, or (viii) pursuant to Section 4.2.2, the (A) suspension of a Member's voting rights, (B) removal of a Member from any committee appointment, and (C) suspension of any Member's access to the Southeast EEM System.

JA1039

"Sink" shall have the meaning set forth in the Southeast EEM Market Rules.

"Source" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Administrator" means that entity hired by the Southeast EEM Agent, on behalf of the Membership Board acting in its capacity on behalf of the Members, to operate the Southeast EEM System from day to day.

"Southeast EEM Administrator Agreement" means that certain agreement by and between the Southeast EEM Administrator and Southeast EEM Agent (in its capacity as agent for the Members), which agreement sets forth the rights and obligations of the Southeast EEM Administrator, as may be amended from time to time in accordance with this Agreement.

"Southeast EEM Agent" means that entity designated by the Membership Board from time to time, which has certain limited rights and responsibilities under this Agreement as expressly set forth in Article 6 below.

"Southeast EEM Agent Scope" has the meaning set forth in Section 6.1.

"Southeast EEM Algorithm" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Commencement Date" means the date upon which the Southeast EEM commences operation.

"Southeast EEM Order" has the meaning set forth in Section 8.6.

"Southeast EEM Manuals" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Market Rules" means the Rules of the Southeast Energy Exchange Market as set forth in Appendix B, as may be amended from time to time pursuant to Section 4.1.9.

"Southeast Energy Exchange Market" or "Southeast EEM" means the Territory-wide, automated, intra-hour electric energy exchange operated by means of the Southeast EEM System and utilizing Non-Firm Energy Exchange Transmission Service pursuant to the terms and conditions of this Agreement.

"Southeast EEM System" means the Southeast EEM Algorithm and any ancillary or supporting software solutions that (i) automatically matches Bids and Offers among Participants for the next Delivery Interval during which the wholesale sale of Non-Firm Energy will be sold by the Seller and the purchase of the Non-Firm Energy will be purchased by the Buyer to serve load in the Territory and (ii) automatically reserves and tags Non-Firm Energy Exchange Transmission Service.

"Southeast EEM System Interface" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Stakeholders</u>" means interested state commissions, customers, interested future Southeast EEM Market Members or Participants, public interest groups or any other interested parties.

"<u>Tariff</u>" means a Participating Transmission Provider's FERC-jurisdictional Open Access Transmission Tariff, non-jurisdictional transmission tariff or non-jurisdictional transmission service guidelines, as applicable.

"<u>Tariff Filings</u>" has the meaning set forth in <u>Section 8.3</u>.

"<u>Territory</u>" means, collectively, the areas served by the Participating Transmission Providers, which as of the Effective Date includes the Balancing Authority Areas operated by the following Balancing Authorities: Associated Electric Cooperative, Inc.; Louisville Gas and Electric Company and Kentucky Utilities Company; Tennessee Valley Authority; Duke Energy Progress (f/k/a Carolina Power and Light Company); Duke Energy Carolinas; South Carolina Electric & Gas Company (n/k/a Dominion Energy South Carolina, Inc.); Santee Cooper; Southern Company; and Power South Energy Cooperative. A current description of the Territory shall be maintained on the Southeast EEM System Interface.

"<u>Voluntary Withdrawal Date</u>" has the meaning set forth in <u>Section 4.2.1</u>.

"<u>Withdrawal Date</u>" means a Voluntary Withdrawal Date or a Governmental Action Withdrawal Date, as applicable.

1.2     <u>Rules of Construction</u>.   The capitalized terms listed in this <u>Article 1</u> shall have the meanings set forth herein whenever the terms appear in this Agreement, whether in the singular or the plural or in the present or past tense.   Other terms used in this Agreement but not listed in this <u>Article 1</u> shall have meanings defined herein or by NERC and the Tariff of each Participating Transmission Provider or, if so defined, shall have meanings as commonly used in the English language.   In the event of a conflict regarding a defined term contained herein and the provisions of a Tariff or NERC rules, the provisions set forth by the applicable Tariff and NERC rules shall take precedence over the defined terms set forth in this Agreement. Words not otherwise defined herein that have well known and generally accepted technical or trade meanings are used herein in accordance with such recognized meanings.   In addition, the following rules of interpretation shall apply:

The masculine shall include the feminine and neuter.

References to "<u>Articles</u>," "<u>Sections</u>," or "<u>Exhibits</u>" shall be to articles, sections, or exhibits of this Agreement.

References to "days" that are not specifically defined as "Business Days" shall be calendar days, which term includes every day on the calendar including weekends and holidays.

The <u>Exhibits</u> and <u>Appendices</u> attached hereto are incorporated in and are intended to be part of this Agreement; <u>provided</u>, <u>however</u>, that in the event of a conflict between the terms of any <u>Exhibit</u> and the terms of this Agreement, the terms of this Agreement shall take precedence.

This Agreement was negotiated and prepared by all Parties with the advice and participation of counsel. The Parties have agreed to the wording of this Agreement and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this Agreement or any part hereof.

Unless expressly provided otherwise in this Agreement, where the Agreement requires the consent, approval, or similar action by a Party, such consent or approval shall not be unreasonably withheld, conditioned or delayed, except in each case that the foregoing shall not apply to any action of a Party under Article 11.

Use of the words "include" or "including" or similar words shall be interpreted as "including but not limited to" or "including, without limitation."

## ARTICLE 2

## ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION

2.1     The Members shall cause the establishment and operation of the Southeast EEM System as set forth herein and administered via the Southeast EEM System Interface or such other protocol as determined by the Membership Board, to facilitate the matching of Sellers with Buyers for the purpose of entering into Energy Exchanges.

2.2     The Southeast EEM Administrator shall operate the Southeast EEM System in accordance with the Southeast EEM Market Rules for the purpose of matching Bids and Offers for the four (4) fifteen (15) minute increments in every hour of every day, including but not limited to Business Days, weekends, and NERC holidays.

2.3     As will be set forth in the Southeast EEM Administrator Agreement, the Southeast EEM Administrator will be primarily responsible for: (i) the on-going functions of the Southeast EEM System and overseeing and/or performing the operation and maintenance services necessary to allow the Southeast EEM System to operate in a reliable manner; (ii) the protection and safeguarding of data submitted to and transmitted from the Southeast EEM System; (iii) limiting access to the Southeast EEM System to Participants; and (iv) maintaining open communications by and among the Southeast EEM Administrator, Participants and the Southeast EEM Agent. For avoidance of doubt, the Membership Board, pursuant to Article 4, may decide to engage one or more third parties to perform the responsibilities of the Southeast EEM Administrator.

2.4     All Bid Information and Offer Information submitted to the Southeast EEM System shall be used by the Southeast EEM Administrator only for operation, maintenance, and the on-going functions of the Southeast EEM System or as requested by the Market Auditor, in each case in accordance with this Agreement, the Southeast EEM Market Rules and applicable Law.

# ARTICLE 3

## MEMBERSHIP AND PARTICIPATION

3.1    Each Member shall comply with all applicable rules, policies, guidelines, or other standards or requirements set forth in this Agreement and as may otherwise be required by the Membership Board or applicable Law.

3.2    <u>Member Criteria</u>.

3.2.1    To be a Member of the Southeast EEM, an entity must be: (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory. The Tariff of any Member who provides transmission service must contain Non-Firm Energy Exchange Transmission Service provisions for those Energy Exchanges that seek to utilize such Member's transmission system.

3.2.2    If an entity and one or more of its Affiliates are Members, or if multiple entities of a Disaggregated Utility are Members, then only one entity from the group of entities (including any subsidiaries, affiliates or divisions thereof) may have a Representative on the Membership Board, and for the sake of clarity, for all purposes hereunder, such Disaggregated Utility shall be counted as a single Member.

3.2.3    An entity that satisfies the criteria set forth in this Agreement for qualification and admission as a Member, as determined by the Membership Board, shall be eligible to become a Member during the period between July 1st and September 30th of each calendar year (the "<u>Enrollment Period</u>") and may become an additional Member (an "<u>Additional Member</u>") effective as of the first day of the following calendar year in which such entity satisfies the Member criteria set forth in <u>Section 3.2</u> after executing this Agreement or a joinder hereto in the form of <u>Exhibit B</u> (the "<u>Joinder</u>") that is countersigned by the Southeast EEM Agent, submitting a duly executed copy to the Secretary and the Southeast EEM Administrator, and upon payment of all applicable fees, dues and contributions as specified or authorized in <u>Article 7</u>. For the avoidance of doubt, an entity seeking to become an Additional Member shall be bound by the terms of this Agreement on the date such entity executes a Joinder that is countersigned by the Southeast EEM Agent.

3.3    <u>Participant Criteria</u>.    To become a "Participant," an entity must (i) meet all requirements of being a Participant as set forth in the Southeast EEM Market Rules, and (ii) execute a Participant Agreement in the form attached hereto as <u>Appendix A</u> (the "<u>Participant Agreement</u>") which agreement shall, among other things, contractually bind such entity to comply with the Southeast EEM Market Rules.

3.4    <u>Participating Transmission Providers</u>.    Prior to the Southeast EEM Commencement Date, or, for any Participating Transmission Provider offering service after such

JA1043

commencement date, prior to the date upon which it commences providing Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and, if required by Law, shall obtain acceptance of such provisions from FERC or such other Governmental Entity(ies) having jurisdiction over such Tariff.    Participating Transmission Service Providers shall take such other actions and provide such information to the Southeast EEM Administrator as required by the provisions of the Southeast EEM Market Rules or as otherwise reasonably requested by the Southeast EEM Administrator in order to operate the Southeast EEM.

3.5    Member Standard of Conduct.    Members shall not provide any non-public transmission function information they receive by virtue of their participation in the Southeast EEM to any of their marketing function employees or provide any undue preference through the sharing of non-public market information they receive by virtue of their participation in the Southeast EEM to their marketing function employees.    For purposes of this Section 3.5, marketing function employees of a Member's Affiliates shall be deemed marketing function employees of the Member.

## ARTICLE 4

## GOVERNANCE

4.1    Membership Board.

4.1.1    Power and Qualification of the Membership Board.    Except as set forth in Article 5, all business of the Southeast EEM System and performance of any agreements entered into or otherwise assumed for the benefit of the Members shall be managed under the direction of the Membership Board.

4.1.2    Number of Representatives.    Subject to the limitations set forth in Section 3.2.2:

(a)    The Membership Board shall consist of one (1) representative for each Member (each, a "Representative").

(b)    Each Member shall appoint one (1) Representative to serve until such Representative is replaced by such Member. No Member shall be permitted to have more than one (1) Representative on the Membership Board.

4.1.3    Method of Selecting or Removing Representatives; Vacancies.

(a)    A Representative shall be removed or replaced solely at the discretion of the Member that originally appointed such Representative; provided, however, that each Member must at all times have a Representative in place to vote on matters pursuant to Section 4.1.5.

(b)    All Representative vacancies, occurring for any reason, shall be filled by the Member who appointed such Representative.

JA1044

4.1.4   <u>Resignations</u>.   A Representative may resign at any time by delivering written notice to the Member who appointed such Representative, the Membership Board and the Southeast EEM Administrator.   Such resignation shall take effect when such notice is delivered to the applicable Member, unless the notice specifies a later effective date.

4.1.5   <u>Quorum of Representatives and Action by the Membership Board; Voting</u>.

(a)   The votes of the Members shall be held by the Representatives and shall be weighted with each Representative holding:

(i)   one (1) vote for each Representative of the Southeast EEM System (the "<u>Popular Vote</u>"); and

(ii)   a number of votes (the "<u>Net Energy for Load Vote</u>") equal to the following calculation:

Net Energy for Load Vote = (MNEL/ANEL)

*Where:*

*MNEL = such Member Net Energy for Load of the Representative's Member, Affiliates of such Member and those related entities part of a Disaggregated Utility as of the Record Date; and*

*ANEL = the sum of the Member Net Energy for Load for all Members as of the Record Date.*

(b)   Subject to <u>Section 4.1.7(c)</u>, attendance by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes shall constitute a quorum for the transaction of business.   Except for Significant Matters, the actions of the Membership Board shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance, <u>and</u> (ii) more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "<u>Affirmative Majority Vote</u>").

(c)   Subject to <u>Section 4.1.7(c)</u>, the actions of the Membership Board to decide on matters related to the Significant Matters shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance <u>and</u> (ii) more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "<u>Affirmative Supermajority Vote</u>").

(d)     The number of Net Energy for Load Vote of each Representative shall be adjusted each year following the Enrollment Period and prior to the start of the next calendar year to reflect the revision to such proportions resulting from the inclusion of Additional Members (if any) when determining Net Energy for Load Vote for each Representative. Notwithstanding anything to the contrary herein, a Member's right to have its Representative vote or be included in a Representative's Net Energy for Load Vote may be suspended pursuant to <u>Section 4.2.2</u> during any period in which such Member is delinquent in the payment of any of the dues or costs and expenses allocated to such Member in accordance with <u>Article 7</u>. If a Member's Representative's right to vote has been suspended, the Membership Board shall recalculate the Net Energy for Load Vote of each other Representative excluding such suspended Member's Representative, and each other calculation required by this <u>Section 4.1.5</u> and <u>Article 4</u> (including for purposes of determining if there is a quorum and whether there is an Affirmative Majority Vote and Affirmative Supermajority Vote, as applicable) shall be determined excluding such suspended Member's Representative.

4.1.6   <u>Meetings of the Membership Board</u>. Meetings of the Membership Board, unless otherwise provided in this Agreement, may be called (i) by the Chair of the Membership Board, or (ii) by a written consent delivered to the Membership Board that is executed by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes. Meetings of the Membership Board, regular or special, may be held at such place within the Territory and upon such notice as may be prescribed by resolution of the Membership Board.

4.1.7   <u>Notice of Meetings of Representatives</u>.

(a)     The Chair of the Membership Board, or a Representative directed by the Chair of the Membership Board, shall provide written notice by electronic mail (and shall confirm receipt of such notice by requesting a return receipt) of each Membership Board meeting to all Representatives. Such notice shall state the date, place, hour and purpose or purposes of the meeting, including any Significant Matters to be discussed, and shall be delivered by a nationally recognized overnight courier service to each Representative's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting.

(b)     Any Member may designate, by submitting a written communication to the Chair of the Membership Board, an alternate to act on behalf of the Representative ("<u>Alternate Representative</u>"). Any reference herein to "Representative" shall be deemed a reference to the Alternate Representative where applicable.

(c)     Notwithstanding anything to the contrary set forth herein, the Membership Board shall only vote on matters set forth in a duly delivered notice pursuant to this <u>Section 4.1.7</u>; provided, however that the Membership Board may (i) discuss any and all matters within the scope of the Membership Board's duties at any duly constituted meeting of the Membership Board, and/or (ii) vote upon any matter within the scope of the Membership Board's duties that is not set forth in a duly delivered notice pursuant to this <u>Section 4.1.7</u> if all

Representatives are present at such meeting of the Membership Board and such matter is approved in accordance with the applicable voting requirements set forth in Section 4.1.5.

4.1.8    Action by Representatives in Lieu of a Meeting; Participation in Meetings by Conference Telephone.

(a)    Unless otherwise restricted by this Agreement, any action required or permitted to be taken at a meeting of the Membership Board may be taken without a meeting if the action is evidenced by written consent describing the action taken, signed by all of the Representatives. The written consents and the resolutions thereto by the Representatives shall be filed with the minutes of the Membership Board or filed with the records maintained by the Secretary reflecting the action taken.   Action taken under this Section 4.1.8(a) becomes effective when the last Representative signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided the consent states the date of execution by each Representative.

(b)    The Representatives may participate in any meeting of the Membership Board or of a committee thereof by means of conference telephone or by any means of communication by which all Representatives participating may hear one another during the meeting; all meetings shall be available for participation via such means.   A Representative participating in a meeting by such means is deemed to be present in person at the meeting.

4.1.9    Powers Exclusive to the Membership Board.

(a)    The following matters are reserved to and may only be addressed by the Membership Board:

(i)    all Significant Matters;

(ii)    the creation and appointment of committees and officers pursuant to Section 4.3;

(iii)    the establishment and amendment of Annual Budgets;

(iv)    the establishment and modification of billing processes for Operating Costs;

(v)    the approval of Southeast EEM Manuals or amendments to Southeast EEM Manuals proposed by the Operating Committee;

(vi)    the approval and establishment of the Southeast EEM Commencement Date following the satisfaction of the conditions set forth in Section 8.4.2;

(vii)    all Deadlock Issues; and

(viii)    the authorization of the Southeast EEM Agent to execute, transfer or terminate Participant Agreements.

JA1047

(b)    Any changes, modifications or amendments to this Agreement agreed to by the Membership Board as provided herein shall be submitted to the required Governmental Entities for approval or acceptance and the orders on such submissions shall be deemed to be and treated as Southeast EEM Orders for purposes of Article 8.

4.2    Removal or Withdrawal of Members.    Upon withdrawal, suspension or removal of a Member as set forth below, such Member shall no longer be entitled to exercise the voting power provided under this Agreement, shall be automatically removed from any committee appointments, and shall not be entitled to any other rights as a Member hereunder. Notwithstanding the foregoing, (i) a Member that withdraws or is removed or is suspended by the Membership Board or is no longer a Member during a calendar year shall remain liable for all dues, costs and expenses and other payment obligations as provided in Section 4.2.1 and Section 4.2.4, and (ii) nothing in this Section 4.2 shall act to prevent a Member who is no longer a Member, but is in compliance with all surviving obligations under this Agreement, from becoming a Participant; provided it has met the criteria for a Participant set forth in the Southeast EEM Market Rules. Any Member that withdraws or is removed by the Membership Board or is no longer a Member during a calendar year shall pre-pay all amounts owed by such Member under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.2.1    Except as set forth in Section 8.5, Section 8.6 and Section 8.7, any Member shall have the right to withdraw from the Southeast EEM System (and a Participating Transmission provider shall take all necessary actions to withdraw the provisions for Non-Firm Energy Exchange Transmission Service from its Tariff) by providing at least (i) thirty (30) days advance written notice to the Membership Board in the case of any Member that is not a Balancing Authority or Participating Transmission Provider and (ii) at least ninety (90) days advance written notice to the Membership Board in the case of any Member that is a Balancing Authority or Participating Transmission Provider (the effective date of such withdrawal, in the case of clause (i) or (ii), as applicable, the "Voluntary Withdrawal Date"). A withdrawing Member shall continue to be liable for (A) all Operating Costs allocated to and owed by the withdrawing Member at the time that it delivered its notice of withdrawal, and (B) its allocated share of future Operating Costs as provided in Section 4.2.4; provided, however, that for the sake of clarity and notwithstanding anything to the contrary herein, the withdrawing Member shall not be responsible for any new Operating Costs first approved and incurred  after the date such Member provides written notice of its intent to withdraw, and a withdrawing Member that is also a Participating Transmission Provider shall have no obligation to provide Non-Firm Energy Exchange Transmission Service following the Voluntary Withdrawal Date.

4.2.2    If a Member fails to cure nonpayment of any financial obligations related to the Southeast EEM (including undisputed amounts payable and any other amounts due to any third parties as directed by the Membership Board or pursuant to the Southeast EEM Market Rules) within ten (10) Business Days after receipt of notice by the Operating Committee of such nonpayment, the Membership Board shall have the right in its discretion to: (i) suspend such Member's voting rights, (ii) remove such Member from any committee appointments and (iii) suspend such Member's access to the Southeast EEM System.

4.2.3   The Membership Board may remove a Member for any of the following reasons: (i) failure to comply with this Agreement, (ii) repeated failure to consummate valid Energy Exchanges resulting from Bids or Offers submitted by a Member, arranged by or through the Southeast EEM System in accordance with and subject to the Southeast EEM Market Rules or the Southeast EEM Manuals; and (iii) failure to comply with the standards, rules, procedures or other requirements for participation in the Southeast EEM System, as established and modified from time to time by the Operating Committee.

4.2.4   Any Member that provides notice to withdraw in accordance with Section 4.2.1, Section 8.5, Section 8.6 or Section 8.7 or who is otherwise removed pursuant to Section 4.2.3 shall remain liable for its share of all costs and expenses in accordance with Article 7. If such Member withdraws prior to the Annual Budget Determination Date, such Member shall only be responsible for the costs and expenses allocated to such Member for the year in which such Member withdraws. If such Member withdraws after the Annual Budget Determination Date, such Member shall (i) be responsible for the costs and expenses allocated to such Member pursuant to Section 7.2.2 for the year in which such Member withdraws and the following year for which the Annual Budget has already been determined, and (ii) pre-pay all amounts owed by such Member under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.3   Committees and Officers.

4.3.1   An Affirmative Majority Vote may appoint such committees or officers as the Membership Board deems necessary or desirable to carry on the business of the Southeast EEM System and may delegate to any such committee or officer such authority to act on behalf of the Membership Board.   Each officer shall hold office until its successor is designated by an Affirmative Majority Vote.   Any officer may resign at any time upon written notice to the Membership Board.   Any officer may be removed by an Affirmative Majority Vote at any time, with or without cause.   A vacancy in any officer position shall be filled at the discretion of, and by, an Affirmative Majority Vote.

4.3.2   The Membership Board shall appoint a chair of the Membership Board (the "Chair of the Membership Board") who shall be responsible for calling and overseeing all meetings of the Membership Board, and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.3.3   The Membership Board shall appoint a secretary of the Membership Board (the "Secretary") who shall be responsible for overseeing the maintenance of the books and records of the Membership Board and its Members and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.4   Annual Meeting of Participants and Stakeholders. The Membership Board shall hold an annual meeting of Participants and Stakeholders (the "Annual Meeting") at a time determined by the Membership Board that is reasonably proximate to (either before or after) May 1st of each year.   The Southeast EEM Administrator shall provide written notice of the Annual Meeting to all Participants.   Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by a nationally recognized overnight courier service to each

Participant's usual place of business as recorded in the Southeast EEM Administrator's records, or such notice shall be delivered by internet electronic mail (with return receipt requested for purposes of confirming receipt) sent to the electronic mail address for such Participant as recorded in the Southeast EEM Administrator's records, not less than seven (7) Business Days prior to the date of the Annual Meeting. In addition, the Southeast EEM Administrator shall publicly post the notice of the Annual Meeting, including the date, place and time of such Annual Meeting, on the Southeast EEM System Interface or other public website administered for the Southeast EEM, not less than seven (7) Business Days prior to the date of the Annual Meeting. The Participants and Stakeholders may participate in Annual Meetings by means of conference telephone or by any means of communication by which all Participants and Stakeholders participating may hear one another during the meeting, and all Annual Meetings shall be available for participation via such means.

4.5     Annual Meeting of Members.    The Membership Board shall hold an annual meeting attended only by Members (the "Annual Member Meeting") at a time determined by the Membership Board that is reasonably proximate to (either before or after) October 30th of each year. The Secretary shall provide written notice of the Annual Member Meeting to, and confirm actual receipt of such notice by, all Members. Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by nationally recognized overnight courier service to each Member's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Member's Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the Annual Member Meeting. The Members may participate in the Annual Member Meeting by means of conference telephone or by any means of communication by which all Members participating may hear one another during the meeting, and all meetings shall be available for participation via such means.

## ARTICLE 5

## OPERATING COMMITTEE

5.1     Power and Qualification of the Operating Committee.    Except with respect to matters specifically reserved to the Membership Board pursuant to Section 4.1.9, the Members hereby agree and hereby appoint the Operating Committee to supervise the day-to-day operation of the Southeast EEM System, with each individual member of the Operating Committee referred to as a "Committee Member". The Operating Committee shall be responsible for developing and maintaining the Southeast EEM Manuals for approval by the Membership Board.

5.2     Number of Committee Members.    The Operating Committee shall consist of four (4) Committee Members, as determined by this Agreement.

5.3     Election and Term of Committee Members; Appointment of Chair.

5.3.1    Except as provided in this Agreement, the Members of each Sector shall elect the Committee Members as provided in Section 5.4 at the Annual Member Meeting. The Committee Members shall be allocated by Sectors: (a) the Members comprising Investor-Owned

JA1050

Utilities shall elect two (2) Committee Members; (b) the Members comprising Cooperatives shall elect one (1) Committee Member; and (c) the Members comprising Governmental Utilities shall elect one (1) Committee Member. Each Committee Member shall be entitled to cast one (1) vote. Notwithstanding the foregoing, no Member shall be permitted to have more than one (1) representative serve on the Operating Committee. Each Committee Member's term shall commence upon election and continue until the earlier of such Committee Member's resignation or the date of the next Annual Member Meeting and the election of such Committee Member's successor.

  5.3.2 The properly elected Committee Members shall determine which Committee Member shall be the chair of the Operating Committee by the majority approval of the Committee Members. The chair of the Operating Committee may be removed or replaced with or without cause at any time upon the majority approval of the Committee Members.

  5.4 <u>Method of Selecting or Removing Committee Members</u>. Each Sector may establish the method and criteria for electing or appointing the Committee Member(s) of such Sector as set forth in <u>Section 5.3</u> and for selecting or removing the Committee Member or Committee Members elected or appointed by such Sector and shall provide a copy of such method and criteria to the Southeast EEM Administrator as well as any updates thereto. A Committee Member shall be deemed properly appointed by the applicable Sector upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power pursuant to such Sector's criteria to elect such Committee Member. A Sector may remove a Committee Member with or without cause by delivering to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to remove the Committee Members. Such Committee Member's removal shall be effective on the later of the date such certificate is delivered to the Southeast EEM Administrator or date specified in the certificate.

  5.5 <u>Vacancies</u>. All Committee Member vacancies, occurring for any reason, shall be filled by the Members of the Sector in which the vacancy occurs, in the same manner as a Committee Member is elected pursuant to <u>Section 5.4</u>. A Committee Member elected or appointed to fill a vacancy shall assume office upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to fill the vacancy.

  5.6 <u>Resignations</u>. A Committee Member may resign at any time by delivering written notice to the Secretary and to the Members of the Sector which elected or appointed such Committee Member. Such resignation shall take effect when such notice is delivered to the Southeast EEM Administrator, unless the notice specifies a later effective date.

  5.7 <u>Quorum of Committee Members and Action by the Operating Committee</u>.

  5.7.1 Attendance by at least one (1) Committee Member representing each of the three (3) Sectors shall constitute a quorum for the transaction of business. The act of all the votes of the Committee Members present at a meeting at which a quorum is present shall constitute the action of the Operating Committee.

5.7.2   To the extent that the Operating Committee cannot obtain a unanimous vote on any business or issue properly before the Operating Committee when a quorum is present (the "Deadlock Issue"), then the Operating Committee may, upon the written request of a Committee Member, submit the Deadlock Issue to the Membership Board for final resolution. For purposes of clarity, a vote of the Operating Committee that is held at a meeting for which a quorum is present shall be considered unanimous if at least one (1) Committee Member representing each of the three (3) Sectors is present.

5.8    Meetings of the Operating Committee.   Meetings of the Operating Committee may be called (i) by the chair of the Operating Committee, or (ii) by a written consent delivered to the chair of the Operating Committee that is executed by a majority of the Committee Members.

5.9    Notice of Meetings of Committee Members; Member Observation Rights.

(a)    The Southeast EEM Administrator shall provide written notice of each Operating Committee meeting to all members of the Operating Committee as well as to all Members. Such notice shall state the date, place and hour of the meeting and shall be delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Committee Member and for such Member as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting. Members who are not Committee Members shall have the right to attend, observe and participate in any discussion at any Operating Committee Meeting, but may not cast a vote.

(b)    Any Committee Member unable to attend a meeting may designate, in writing, an alternate from the same Sector as such Committee Member to act on behalf of the Committee Member ("Alternate Committee Member"). Any reference herein to "Committee Member" shall be deemed a reference to the Alternate Committee Member where applicable.

(c)    A Committee Member's attendance at or participation in a meeting waives any required notice to him or her of such meeting unless, at the beginning of such meeting or promptly upon his or her arrival, such Committee Member objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

(d)    A notice shall specify the business to be transacted at, or the purpose of, any meeting of the Operating Committee; provided, however, such notice shall not limit the actions the Operating Committee may take at a meeting.

5.10    Action by Committee Members in Lieu of a Meeting; Meetings by Telephone Conference.

(a)    Any action required or permitted to be taken at a meeting of the Operating Committee may be taken without a meeting if at least one (1) Committee Member representing each of the three (3) Sectors consents in writing to the adoption of a resolution authorizing the action. The resolution and the written consents thereto by the Committee Members shall be filed with the minutes of the Operating Committee or filed with the records

maintained by the Secretary reflecting the action taken. Any action taken under this Section 5.10(a) shall be effective when the last Committee Member signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided, the consent states the date of execution by each Committee Member. Such consent shall have the same force and effect as a unanimous vote.

(b)     The Committee Members and Members may participate in any meeting of the Operating Committee or of a committee thereof by means of telephone conference or by any means of communication by which all Committee Members and Members participating may hear one another during the meeting, and all meetings shall be available for participation via such means. A Committee Member participating in a meeting by such means is deemed to be present in person at the meeting.

5.11    Liability of Committee Members. The Operating Committee and the Committee Members shall not be liable to any Member for any act done or omitted by Committee Members while acting in good faith and in the exercise of reasonable judgment. The Members shall indemnify the Committee Members (solely in such capacity) and hold them harmless against any loss or expense actually incurred without gross negligence or willful misconduct on the part of the Committee Members and arising out of or in connection with the acceptance or administration of their role on the Operating Committee.

# ARTICLE 6

## APPOINTMENT OF SOUTHEAST EEM AGENT

6.1    Each Member agrees to appoint the Southeast EEM Agent as its representative and as each such Member's true and lawful agent and authorizes the Southeast EEM Agent to act for such Member in accordance with the scope of the Southeast EEM Agent's responsibilities (the "Southeast EEM Agent Scope") as specifically defined by the Membership Board in Appendix C. Each Member grants unto the Southeast EEM Agent only that authority which is granted to the Southeast EEM Agent by the Membership Board under this Agreement and that is necessary to perform the actions required in connection with the development and operation of the Southeast EEM System, and in each case in a manner consistent with the Southeast EEM Agent Scope. Each Member agrees and acknowledges that a third party shall be entitled to rely on any action taken, or the failure to take any action, by the Southeast EEM Agent, on behalf of Members pursuant to and in accordance with this Article 6 (each, an "Authorized Action"), and that each Authorized Action shall be binding on each Member as fully as if such Members had taken such Authorized Action directly. The initial Southeast EEM Agent and any replacement Southeast EEM Agent, as determined by the Membership Board in accordance with Section 4.1.9, must meet any criteria set by the Membership Board from time to time (collectively, the "Southeast EEM Agent Criteria"). Any entity that does not meet the Southeast EEM Agent Criteria may not serve as the Southeast EEM Agent; provided, however, that the Membership Board may, in its discretion, alter or revise the Southeast EEM Agent Criteria.

6.2    Each Member acknowledges and agrees that upon execution of this Agreement, and upon any delivery by the Southeast EEM Agent of any waiver, amendment, agreement, opinion, certificate or other document within the Southeast EEM Agent Scope executed by the

Southeast EEM Agent, such Member shall be bound by such documents or action as fully as if such Member had executed and delivered such documents. Each Member shall pay its allocated share of (i) all Operating Costs arising from contracts entered into by the Southeast EEM Agent entered into in accordance with the Southeast EEM Agent Scope, and (ii) fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder.

6.3     The Southeast EEM Agent may resign at any time upon sixty (60) days written notice to the Membership Board and may be removed at any time with or without cause by the Membership Board pursuant to Section 4.1.9. Upon the resignation of the Southeast EEM Agent pursuant to this Section 6.3 or its removal pursuant to Section 4.1.9, the resigning or removed Southeast EEM Agent shall take or cause to be taken, all actions and do, or cause to be done, or execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the Membership Board may reasonably deem necessary, proper or advisable to transition the rights and obligations of the Southeast EEM Agent to the replacement Southeast EEM Agent, as promptly as practicable or sooner as required by this Agreement, including, without limitation, such actions as are necessary to assign all contracts, agreements or other documents executed on behalf of the Members within the Southeast EEM Agent Scope to the replacement Southeast EEM Agent.

6.4     For the avoidance of doubt, it is the intent of the Members that the Operating Committee, not the Southeast EEM Agent, be responsible for interfacing and coordinating with third party vendors with regard to the performance of contracts with such vendors. Further, in the event that the Southeast EEM Agent is required to take any ministerial action under such contracts, the Southeast EEM Agent shall only do so at the direction of the Membership Board or Operating Committee and in accordance with the Southeast EEM Agent Scope. The Southeast EEM Agent shall have no right or access to data related to the Southeast EEM beyond what it has as a Member and Participant.

6.5     The Southeast EEM Agent will incur no liability of any kind with respect to any action or omission by the Southeast EEM Agent in connection with the Southeast EEM Agent's role pursuant to this Agreement and any agreements ancillary hereto within the Southeast EEM Agent Scope, except in the event of liability directly resulting from the Southeast EEM Agent's gross negligence or willful misconduct. The Members will indemnify, defend and hold harmless the Southeast EEM Agent from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "Representative Losses") arising out of or in connection with the Southeast EEM Agent's execution and performance of this Agreement and any agreements ancillary hereto, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Southeast EEM Agent or actions beyond the Southeast EEM Agent Scope, the Southeast EEM Agent will reimburse the Members the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct. In no event will the Southeast EEM Agent be required to advance its own funds on behalf of the Members or otherwise. The Members acknowledge and agree that the foregoing indemnities will survive the resignation or removal of the Southeast EEM Agent or the termination of this Agreement.

# ARTICLE 7

## BUDGETING AND COST RESPONSIBILITY

7.1    Member Responsibility.    Each Member will be assigned and is responsible for its allocated share of Operating Costs and such other dues or fees as assessed by the Membership Board from time to time based on the methodology set forth in Section 7.2. If a Member fails to cure any nonpayment of its allocated share of Operating Costs or any other amount assessed against such Member under this Agreement within ten (10) Business Days after receiving notice from the Operating Committee of such non-payment, such Member may, in the discretion of the Membership Board, lose its right to vote on matters related to this Agreement or to have representation on the Membership Board and any committees unless and until such amounts are paid in full. Any amounts owed that are not paid in accordance with this Agreement shall be delinquent and shall accrue interest at the Interest Rate, such interest to be calculated from the due date to the date the delinquent amount is paid in full.

7.2    Allocation of Costs.    Operating Costs, including but not limited to the costs and expenses of the Southeast EEM System, shall be allocated and assessed to each Member based on the following formula, provided that (i) for purposes of a Disaggregated Utility, such Disaggregated Utility shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the entities of such Disaggregated Utility according to their direction (which allocation shall not control for any purposes hereunder), and (ii) for purposes of Member Affiliates, the Member Affiliates shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the Member Affiliates according to their direction (which allocation shall not control for any purposes hereunder):

$$[(1/4)(TC)(1/TNM)] + [(3/4)(TC)(MNEL/ANEL)] = MAC, \text{ where:}$$

*TC = Total allocable costs.*

*TNM = the total number of Members.*

*MNEL = such Member Net Energy for Load of the Representative's Member,*

*Affiliates of such Member and those related entities part of a Disaggregated*

*Utility as of the Record Date.*

*ANEL = the sum of all the Member Net Energy for Load as of the Record Date.*

*MAC = Member's allocated costs.*

7.2.1    Billing Process.    Each Member shall be billed directly by the Southeast EEM Administrator for its allocated share of Operating Costs in accordance with the terms of this Agreement. In the event that the direct billing process described in the foregoing sentence proves to be unworkable for certain Operating Costs, the Membership Board shall use commercially reasonable efforts to (i) require third party vendors to structure all Southeast EEM invoices on an

individual Member basis based upon the cost methodology set forth in this Agreement; or (ii) if such third party vendors refuse to provide such individual Member billings services, establish an alternative billing procedure for such Operating Costs (including the engagement of a third party billing service provider) to ensure such invoices are billed on an individual Member basis. The Membership Board shall establish such an alternative billing procedure in a timely manner; provided, however, that a delay in establishing such a procedure shall not eliminate the Members' individual obligations to pay their allocated share of Operating Costs. Nothing in this <u>Section 7.2.1</u> is intended to modify or diminish the Membership Board's authority to establish or amend billing procedures from time to time.

       7.2.2  <u>Annual Budget</u>.  On or before October 30th of each calendar year, but in any case no earlier than October 1st of each calendar year, the Membership Board shall set the annual budget for the following calendar year (the "<u>Annual Budget Determination Date</u>"), which budget shall include but not be limited to all projected Operating Costs, including all vendor costs and all costs and expenses associated with the Southeast EEM Agent (the "<u>Annual Budget</u>"). Costs are deemed allocated to each Member as of the Annual Budget Determination Date, but, except as otherwise provided herein, are not payable until such costs are due and payable subject to the applicable agreements concerning such costs.

   7.3  <u>Additional Members</u>.  The costs and expenses of the Southeast EEM System allocated to each Member shall be adjusted each year in accordance with <u>Section 7.2</u> following the Enrollment Period but prior to the Annual Budget Determination Date to reflect any changes in a Member Net Energy for Load valuation or the inclusion of Additional Members in such calculations for the following calendar year.

       7.3.1  <u>Submission of Information</u>.

            (a)    Upon the request of the Secretary or upon a schedule approved by the Membership Board, each Member shall provide its Member Net Energy for Load values, and any other information required for the calculations set forth in <u>Section 4.1.5</u> and <u>Section 7.2</u>, to the Southeast EEM Administrator and all other Members. If a Member proposes to use a Member Net Energy for Load value that differs from the Net Energy for Load value as provided to NERC by the Record Date (an "<u>Alternate MNEL Value</u>"), such Member shall submit a written request to the Operating Committee at least thirty (30) days prior to the Annual Budget Determination Date requesting the Operating Committee's approval of such Member's Alternate MNEL Value in the upcoming year. The submitting Member's request shall contain (i) an explanation of why the Alternate MNEL Value differs from the Member Net Energy for Load value submitted to NERC, and (ii) all other reasonably necessary information evidencing such Member's calculation of the Alternate MNEL Value. The Operating Committee shall review a Member's request to use an Alternate MNEL Value and shall use commercially reasonable efforts to approve, deny or request additional information regarding such request within fifteen (15) days from the date the Operating Committee receives the request.

            (b)    If the Operating Committee denies a Member's request to use an Alternate MNEL Value, the Member may, within thirty (30) days of such denial, submit the request to the Membership Board for review, and the Membership Board shall, as soon as reasonably practicable, hold a vote to either uphold or overturn the Operating Committee's

denial of the request, as determined by an Affirmative Majority Vote. The requesting Member shall provide to the Membership Board such information reasonably requested by the Membership Board in order to evaluate the Member's request. If the Operating Committee or the Membership Board, as applicable, approves a Member's Alternate MNEL Value, such Alternate MNEL Value shall be used for the calculations set forth in <u>Section 4.1.5</u> and <u>Section 7.2</u> in the following calendar year.  If the Operating Committee or the Membership Board, as applicable, deny such requesting Member's request to use an Alternative MNEL Value, the Member's Member Net Energy for Load value shall be that Member Net Energy for Load as determined by the Membership Board in accordance with this Agreement; provided, however, that during the pendency of the review of a Member's Net Energy for Load pursuant to this <u>Section 7.3.1</u> and until such value is finally determined, the requesting Member's Member Net Energy for Load value shall be the Member Net Energy Load value provided by such Member that was approved and used in the most recent calendar year.

## ARTICLE 8

### FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE

8.1     This Agreement is subject to valid Laws, orders, rules and regulations of duly constituted Governmental Entities having jurisdiction. Nothing contained in this Agreement shall be construed as a grant of jurisdiction over any Member by any Governmental Entity not otherwise having jurisdiction by Law.

8.2     <u>Filing With and Approval or Acceptance by Governmental Entities</u>.

8.2.1     Any entity desiring to become a Member that is subject to the jurisdiction of any Governmental Entity from which approval or acceptance of this Agreement or participation in the Southeast EEM is required for such entity to participate in the Southeast EEM shall institute proceedings to obtain such acceptance or approval or shall provide such notice, except as provided in <u>Section 8.2.2</u> below. All required approvals, acceptances and notices must be received by such entity prior to its participation in the Southeast EEM. The Members shall cooperate in securing all required Governmental Entity approvals or acceptances of this Agreement.

8.2.2     No later than sixty (60) days prior to the proposed Effective Date, the Southeast EEM Agent shall file this Agreement with FERC on behalf of the Jurisdictional Members in accordance with <u>Section 8.2.1</u> under Section 205(c) of the FPA.  Within ten (10) Business Days of the date of such filing, the remaining Jurisdictional Members shall file certificates of concurrence with such filing and the Non-Jurisdictional Members shall file comments in support of such filing.

8.3     On the same date that the Southeast EEM Agent files this Agreement with FERC, the Jurisdictional Members that are also transmission service providers will make filings with FERC to amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and become Participating Transmission Providers, in accordance with <u>Section 3.4</u> above (the "<u>Tariff Filings</u>").

8.4     <u>Effective Date and Southeast EEM Commencement Date</u>.

8.4.1 Unless specific provisions become effective earlier by the explicit terms contained herein, this Agreement shall be binding upon the Members upon the effective date established by FERC in a FERC order accepting the Agreement without modification or condition (the "Effective Date"); provided, however, that that this Agreement shall not become binding upon an individual Member who seeks acceptance or approval from a Governmental Entity pursuant to Section 8.2.1 above until the later of: (x) the date of issuance of an order by such Governmental Entity approving without modification or condition this Agreement and/or such Member's participation in the Southeast EEM and (y) the Effective Date; and provided, further, that the Members agree that this Agreement will bind each of them upon signing, subject only to the approvals and acceptances provided in this Section 8.4. In the event FERC does not accept the Agreement as filed, the Members may agree to changes or modifications to the Agreement pursuant to an Affirmative Supermajority Vote as set forth in Section 8.6, in which event the Effective Date shall be the date that FERC accepts the revised Agreement with any such changes or modifications agreed to pursuant to Section 8.6.

8.4.2 The Southeast EEM Commencement Date shall not occur until after (i) the Effective Date, (ii) the issuance by FERC of an order or orders accepting without modification or condition all of the Jurisdictional Member Participating Transmission Provider's Tariff Filings, and (iii) the Membership Board has approved and established the Southeast EEM Commencement Date in accordance with Section 4.1.9(vi).

8.5    If a Governmental Entity (other than FERC) to which a Member's participation in the Southeast EEM has been submitted for approval pursuant to Section 8.2.1 has not issued an order on such request within four (4) months from the date of submission, the Member for which such approval was requested may withdraw from this Agreement by providing written notice to all other Members no later than fifteen (15) days after such four-month period has elapsed. Withdrawal under this Section 8.5 shall be subject to the provisions of Section 4.2.

8.6    The individual provisions of this Agreement are inter-related and inter-dependent, and the agreement of the Members to the terms hereof is based on the expectation that it will be approved by all necessary Governmental Entities in its entirety. Accordingly, the terms of this Agreement are not severable, and are an integrated package that is submitted with the understanding and condition that it will be approved by the necessary Governmental Entities in its entirety. As such, if at any time (i) a Governmental Entity issues an order that does not accept or approve this Agreement or a Tariff Filing in its entirety without condition or requires modifications to the Agreement or the relevant Tariff ("Southeast EEM Order"), or (ii) any state or federal Laws or regulations, now existing or enacted or promulgated after the Effective Date are interpreted by a Governmental Entity in such a manner as to indicate that the structure or terms of this Agreement are more likely than not to be a violation of such Laws or regulations or are more likely than not to impact the jurisdictional status of any Member (a "Change in Law"), or (iii) if any provision or portion of this Agreement shall for any reason be held or adjudged to be invalid or illegal or unenforceable by any court of competent jurisdiction or other Governmental Entity ("Other Court/Governmental Entity Action"), the Members will engage in good faith negotiations during a forty-five (45) day period after the date of the Southeast EEM Order or Change in Law or Other Court/Governmental Entity Action to agree to Agreement modifications or conditions that are consistent with the modifications and conditions imposed by such Southeast EEM Order, Change in Law or Other Court/Governmental Entity Action; provided, however, that

JA1058

in any such negotiation the Members are not under any obligation to reach an agreement. Any changes, modifications or conditions to the effectiveness of this Agreement agreed to by an Affirmative Supermajority Vote shall be submitted to the required Governmental Entities for approval or acceptance and the orders on such filings shall be deemed to be and treated as Southeast EEM Orders for purposes of this Article 8. If an Affirmative Supermajority Vote cannot be achieved within such forty-five (45) day period, then the Agreement shall terminate and be of no force and effect. If a Member does not agree with the modifications to the Agreement adopted by the Affirmative Supermajority Vote, such non-agreeing Member shall be subject to the waiver of rights provisions of Section 16.9, but shall have the right to withdraw from this Agreement and the Southeast EEM upon thirty (30) days prior written notice. Upon such notice of withdrawal by a Member, any other Member may withdraw from this Agreement by providing written notice to the other Members within twenty-five (25) days after the date of the first Member's notice of withdrawal. Any notice to withdraw provided in accordance with this Section 8.6 shall become effective as of the later of the date provided in such notice and the date such Member is permitted to withdraw in accordance with Section 8.5 (the "Governmental Action Withdrawal Date"). Withdrawal under this Section 8.6 shall be subject to the provisions of Section 4.2.

8.7    A Non-Jurisdictional Member, in its sole discretion, may immediately withdraw from this Agreement if it becomes apparent that the Non-Jurisdictional Member's engagement in activities under this Agreement or FERC's approval of this Agreement would (i) jeopardize the tax-exempt status of interest paid by the Non-Jurisdictional Member on outstanding debt obligations, (ii) render the Non-Jurisdictional Member a Public Utility subject to FERC's jurisdiction, or (iii) if the Non-Jurisdictional Member determines that any conflict exists between provisions of this Agreement and applicable Laws and regulations of the state of its creation, or rate schedules adopted by its governing body under state Law, in which case such state Laws, regulations, or rate schedules shall govern with respect to such Non-Jurisdictional Member. The withdrawing Non-Jurisdictional Member may withdraw from this Agreement on this basis by providing written notice to all other Members and the Southeast EEM Administrator. Withdrawal under this Section 8.7 shall be subject to the provisions of Section 4.2.

## ARTICLE 9

## RELEASE AND LIABILITY; NO FIDUCIARY DUTIES

9.1    Except as expressly set forth in Section 14.2, to the maximum extent permitted by applicable Law, each Member releases and discharges every other Member from any and all liability for any and all liabilities, claims, losses, damages, expenses and other claims whatsoever the releasing Member, its officers, directors, trustees, agents, employees, affiliates, successors or assigns (collectively "Related Parties") may have that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. In addition, to the maximum extent permitted by applicable Law (i) no Member shall be liable to any other Member or its Related Parties for any liabilities, damages, obligations, payments, losses, costs or expenses under this Agreement in any amount in excess of the actual compensatory damages suffered by such other Member or its Related Parties in connection with, or resulting from, the releasing Member's performance or non-performance of this Agreement, or any actions undertaken by the releasing Member in connection with or related to this Agreement, and (ii) each

Member waives any right to recover from any other Member or its Related Parties incidental, punitive, exemplary, special, indirect, multiple or consequential damages (including attorneys' fees or litigation costs to recover the same and any claims arising from any loss of interchange sales or revenues, loss of profits, costs of substitute power, costs of additional operating expenses, or suits by third parties) in connection with, or resulting from, performance or non-performance of this Agreement, or any actions undertaken in connection with or related to this Agreement or that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. Notwithstanding the foregoing, however, no Member shall be released, discharged, indemnified or held harmless with respect to any liability for damages or other claims arising from any action or failure to act by that Member that is unlawful, undertaken in bad faith, grossly negligent or the product of willful misconduct. Nothing herein shall release any Member from any obligation or liability it may have pursuant to any other agreement with any other Member.

9.2     EXCEPT FOR THE WARRANTIES AND REPRESENTATIONS SET FORTH IN ARTICLE 13 HEREOF, NONE OF THE MEMBERS, COLLECTIVELY OR INDIVIDUALLY, MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, TO ANY MEMBER, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.3     The provisions set forth in this Article 9 shall be given the maximum effect permitted by Law and shall indefinitely survive the termination or expiration of this Agreement with respect to any Member or Members.

9.4     No Fiduciary Duties.     Nothing in this Agreement should be construed or interpreted as creating a partnership by and among the Members. To the extent any Member attempts to construe this Agreement as evidence of a partnership or otherwise a basis for requiring certain implied duties and rights among the Members, notwithstanding any other provisions of this Agreement, or any other agreement, the Members covenant and agree not to prosecute, file or maintain any action, controversy, dispute, or proceeding, and do hereby expressly eliminate, waive, disclaim and release, any and all fiduciary duties of the Members that may arise pursuant to performance of their obligations or exercise of their rights pursuant to this Agreement, or that may arise pursuant to any other standard, to any Party herein, including, without limitation, its Members, and in the case of insolvency or the zone of insolvency, to creditors of any character or claim. This Agreement (including this provision) is not intended to, and shall not, create or impose any fiduciary duties on the Member or any other party for any purpose, without limitation.

9.5     No Implied Covenants. Each Member acknowledges and agrees that, and notwithstanding any other provisions of this Agreement or any other agreement contemplated herein or any applicable provisions of Law or equity or otherwise, no covenants, duties or obligations, whether express, implied, statutory or otherwise, including, without limitation, (i) the duty of good faith and fair dealing, (ii) the fiduciary duties of care, loyalty and obedience, shall apply to the acts, omissions, behavior or conduct of the Members, in any context, except for those covenants, duties and obligations expressly contained in this Agreement.

9.6     No Restriction on Competition of Members. Each of the Members agrees, severally and not jointly, that for the term of this Agreement, they are expressly permitted and

JA1060

authorized to directly or indirectly own, manage, operate, join, control and/or participate in the ownership, management, operation or control of, any business engaged in business or operations that compete or relate to, directly or indirectly, the business of the Southeast EEM System. The legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines shall not be applied to any such competitive venture or activity of a Member or its Affiliates. No Member or its Affiliates will have any obligation to the Southeast EEM System or the Southeast EEM System's other Members or Participants with respect to any opportunity relating to the Southeast EEM System or its business.

## ARTICLE 10

## TRANSPARENCY; CONFIDENTIALITY; AUDITING

10.1    Transparency; Confidentiality.

10.1.1 The decision and obligation to report quantities, prices, or other data regarding Energy Exchange transactions to either a Governmental Entity, a reputable index developer or a data hub will be the responsibility of each Seller and Buyer. Neither the Southeast EEM Administrator, nor the Southeast EEM Agent nor the Members shall be responsible for reporting Energy Exchange transactions made by other entities through the Southeast EEM System.

10.1.2 Except as provided in Appendix B, the identity of all Bidders, Offerors, Sellers and Buyers shall be kept confidential from all third party entities, other than the FERC, the Market Auditor, and the Southeast EEM Administrator except to the extent required by Law, regulation, or order.

10.1.3 The Southeast EEM Administrator shall post and maintain on the Southeast EEM System Interface: (i) a list of all Members and Participants and their contact information, (ii) the notice provisions provided in this Agreement as set forth in Section 16.8, (iii) the notice information of each Annual Meeting and Annual Member Meeting, including the date, place and time of such Annual Meeting and Annual Member Meeting, and (iv) a current description of the Territory.

10.1.4 The Southeast EEM Administrator shall prepare and post reports that would include data aggregated by the Southeast EEM System as set forth in Section V of the Southeast EEM Market Rules.

10.2    Auditing.

10.2.1 The Southeast EEM Agent will engage the Market Auditor to perform the auditing scope of work as set forth in Section VI of the Southeast EEM Market Rules.

10.2.2 The Market Auditor and Southeast EEM Administrator may share information related to the Southeast EEM on a confidential and reciprocal basis.

10.2.3 The Market Auditor has independent authority to prepare and submit any reports described herein without any prior review or approval by any Member or any other outside sources.

10.3    Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this Article 10 to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 11

## SOUTHEAST EEM MARKET RULES

11.1    Set out in Appendix B to this Agreement are the Southeast EEM Market Rules that shall govern the Bid, Offer and matching procedures of the Southeast EEM System and the reservation and tagging functions of the Southeast EEM System, as such appendix may be amended and revised from time to time by the Membership Board in accordance with Section 4.1.9.

11.2    The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to violate any reliability criteria, guideline, standard or requirement (hereafter referred to as "Reliability Obligations") of NERC, the applicable Balance Authority, and any other recognized region or subregion of NERC (including the SERC Reliability Corporation ("SERC")), including any successors to NERC or SERC, or applicable state or federal Reliability Obligations, to the extent any such Reliability Obligations are applicable to a Member. Each Member shall participate in the Southeast EEM System in a manner that conforms to all Reliability Obligations as may be applicable to it. The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to engage in conduct not consistent with Good Utility Practice.

11.3    The Operating Committee shall establish rules and procedures, including appropriate audit procedures, under which any Member may request a determination of whether the hardware, software, management, or operation of, or Member participation in, the Southeast EEM System, as they may affect the requesting Member, comply with all rules, guidelines, requirements and other standards for the Southeast EEM System as set forth in the Southeast EEM Market Rules in Appendix B. The Operating Committee, in a manner consistent with all applicable provisions of this Agreement, may make recommendations to the Membership Board to apportion the costs of making revisions or modifications to the Southeast EEM System.

## ARTICLE 12

## DISPUTE RESOLUTION

12.1    Any dispute between two (2) or more Members arising under this Agreement shall first be referred to a designated senior representative of each of the Members involved in such dispute for resolution on an informal basis as promptly as practicable. Such designated senior representatives shall meet, negotiate and attempt in good faith to resolve the dispute quickly,

informally, and inexpensively. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days (or other such period as the Parties may agree upon) by mutual agreement, such dispute within ten (10) Business Days shall be submitted to a mediator and resolved in accordance with the mediation procedures set forth below.

12.2    Following the procedures set forth in Section 12.1, any dispute between two (2) or more Members arising under this Agreement shall be subject to non-binding mediation prior to the initiation of judicial, mutually agreed upon arbitration, or other dispute resolution proceedings, unless the Parties to the dispute mutually shall determine from the nature of the dispute, the positions of the Parties, and other relevant facts and circumstances that mediation will not lead to resolution of the dispute. The Parties to any such dispute shall select a mediator to assist in the resolution of their dispute. The mediator shall (i) be knowledgeable in the subject matter of the dispute and (ii) have no official, financial, or personal conflict of interest with respect to the issues in controversy, unless the interest is fully disclosed in writing to all participants and all participants waive in writing any objection to the interest.

12.3    The disputing Parties shall attempt in good faith to resolve their dispute in accordance with the procedures and timetable established by the mediator. In furtherance of the mediation efforts, the mediator may:

12.3.1 Require the Parties to meet for face-to-face discussions, with or without the mediator;

12.3.2 Act as an intermediary between the disputing Parties;

12.3.3 Require the disputing Parties to submit written statements of issues and positions; and

12.3.4 If requested by the disputing Parties, provide a written recommendation on resolution of the dispute.

12.4    If a resolution of the dispute is not reached by the thirtieth (30th) day after the appointment of the mediator or such later date as may be agreed to by the Parties, the mediator shall promptly provide the disputing Parties with a written, confidential, non-binding recommendation on resolution of the dispute, including the mediator's assessment of the merits of the principal positions being advanced by each of the disputing Parties. At a time and place specified by the mediator after delivery of the foregoing recommendation, but no later than fifteen (15) days after issuance of the mediator's recommendation, the disputing Parties shall meet in a good faith attempt to resolve the dispute in light of the mediator's recommendation. Each disputing Party shall be represented at the meeting by a person with authority to settle the dispute, along with such other persons as each disputing Party shall deem appropriate. If the disputing Parties are unable to resolve the dispute at or in connection with this meeting, then: (i) any disputing Party may commence such judicial, mutually agreed upon arbitration, or other dispute resolution proceedings as may be appropriate; and (ii) the recommendation of the mediator shall have no further force or effect, and shall not be admissible for any purpose in any subsequent arbitral, judicial, or other dispute resolution proceeding.

JA1063

12.5   The costs of the time, expenses, and other charges of the mediator and of the mediation process shall be borne by the Parties to the dispute, with each side in a mediated matter bearing equal costs. Each Party shall bear its own costs and attorney's fees incurred in connection with any mediation under this Agreement.

<div align="center">

**ARTICLE 13**

**REPRESENTATIONS AND WARRANTIES**

</div>

13.1   Each Member represents and warrants to each other Member that on the date it executes this Agreement and throughout the term of this Agreement, the following representations and warranties are, and will continue to be, true and correct in all material respects:

13.1.1 it is duly organized, validity existing and in good standing under the Laws of the state of its incorporation or organization;

13.1.2 it will at all times comply with the provisions of this Agreement and all Exhibits and Appendices hereto, each as amended from time to time;

13.1.3 it has all requisite corporate or other organizational power to carry on its business as contemplated by this Agreement;

13.1.4 except for the authorizations and approvals described in Article 8 of this Agreement, it has all authorizations from Governmental Entities necessary for it to legally perform its obligations under this Agreement;

13.1.5 the execution, delivery and performance of this Agreement and any other documentation it is required to deliver under this Agreement are within its powers, have been duly authorized by all necessary action, and do not violate any of the terms or conditions in its governing documents, any contract or other agreement to which it is a party or any Law applicable to it;

13.1.6 the individual(s) executing and delivering this Agreement and any other documentation required to be delivered under this Agreement on behalf of such Member are duly empowered and authorized to do so at the time of such execution and delivery;

13.1.7 this Agreement has been duly and validly executed and delivered by such Member and constitutes such Member's legal, valid and binding obligation; and

13.1.8 all information that has been provided by or on behalf of a Member pursuant to this Agreement, is true and correct in all material respects. Each Member further covenants that all information provided to the Operating Committee, the Market Auditor, the Southeast EEM Agent or the Southeast EEM Administrator by or on behalf of such Member pursuant to this Agreement, subsequent to the date hereof, shall be true and correct in all material respects.

# ARTICLE 14

## DEFAULTS

14.1    A Member shall be in default in payment when payment is not made in accordance with the billing procedures established under this Agreement within ten (10) Business Days after its final due date. A default by any Member in its payment obligations under this Agreement shall be cured by payment of all overdue amounts together with interest accrued at the Interest Rate, prorated daily from the due date to the date the payment curing the default is made.

14.2    Notwithstanding Article 9, a defaulting Member shall be liable to the non-defaulting Members for all costs, including costs of collection and reasonable attorney fees incurred by such non-defaulting Members, plus interest at the Interest Rate. The proceeds paid by a defaulting Member to remedy any such default shall be distributed as directed by the Membership Board to the non-defaulting Members in proportion to the additional costs and expenses actually paid by the non-defaulting Members as a result of the default.

14.3    The rights of a Member who is in default of any of its payment or other material obligations herein may be terminated by the Membership Board. This provision allowing the non-defaulting Members to terminate such rights is in addition to any other remedies provided in this Agreement, at Law, or in equity, and shall in no way limit the non-defaulting Members' ability to seek judicial enforcement of the defaulting Member's obligations under this Agreement. Upon the effective date of such termination of rights, all rights of the defaulting Member and all obligations of non-defaulting Members to the defaulting Member imposed by this Agreement, except (i) payment obligations, (ii), the indemnification obligations set forth in Section 6.5, (iii) the release and other obligations set forth in Article 9, (iv) the confidentiality obligations set forth in Article 10 and Article 15, and (v) the obligations set forth in Section 16.9 and Section 16.14, shall immediately be terminated, except that no such termination shall impact Enabling Agreements any such Member is a party to.

14.4    Upon termination of the rights of a defaulting Member under this Agreement, the Operating Committee shall review responsibility and cost allocations of the non-defaulting Members and make adjustments thereto as it deems necessary.

# ARTICLE 15

## CONFIDENTIALITY

15.1    Any information provided by a Member to any other Member pursuant to this Agreement that is labeled "Confidential" shall be used by the receiving Member solely in connection with the purposes of this Agreement and shall not be disclosed by the receiving Member to any third party, except with the providing Member's consent, and upon request of the providing Member shall be returned thereto. Notwithstanding the above, a Member may disclose any such information to third parties as may be necessary for such Member to perform its obligations under this Agreement (including, but not limited to, the Member's employees, officers, directors, trustees, attorneys and other consultants). To the extent that such disclosures are necessary, the Members shall endeavor in disclosing any such information to seek to preserve

the confidentiality of such information. This provision shall not prevent any Member from providing any confidential information received from any other Member to any court or governmental body to enforce its rights or perform its obligations hereunder or as may otherwise be required by such court or body or by Law, provided that, to the extent required, if feasible, the disclosing Member shall have given prior notice to the Member that provided such information of such required disclosure and, if so requested by such other Member, shall have used all reasonable efforts to oppose the requested disclosures, if appropriate under the circumstances, or to otherwise make such disclosure pursuant to a protective order or other similar arrangement for confidentiality. Without limiting the scope of the foregoing, the Members shall use all reasonable efforts to maintain the confidentiality of any confidential information in any filings with, or submissions to, any governmental or regulatory authorities. Information shall not be considered confidential for purposes of this Article 15 if the Member receiving such information from another Member can demonstrate by competent documentary evidence that such information: (a) was rightfully in the possession of the receiving Member prior to its disclosure to the receiving Member by the disclosing Member; (b) was in the public domain prior to its disclosure by the disclosing Member to the receiving Member; (c) came into the public domain, by publication or otherwise, through no direct or indirect act or omission of the receiving Member, subsequent to its disclosure by the disclosing Member to the receiving Member; or (d) was supplied to the receiving Member by a third party having the legal right to disclose it to the receiving Member, but only if the third party does not owe a duty of confidentiality to the disclosing Member with respect to such information.

15.2    Any information provided by a Member to a mediator or arbitrator pursuant to this Agreement that is labeled "Confidential" shall be subject to the provisions of this Article 15. For such purposes, any mediation or arbitration arranged pursuant to Article 12 of this Agreement shall provide for such mediator or arbitrator to comply with the provisions applicable to a Member receiving Confidential information from another Member.

15.3    Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this Article 15 to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 16

## MISCELLANEOUS

16.1    "Public Utility" Status of Members. Certain Members are not Public Utilities. Nothing in this Agreement is intended to subject such Members to FERC jurisdiction as Public Utilities, and Members that are not Public Utilities shall not be required to take any action or participate in any filing or appeal that would confer FERC jurisdiction over such Members that does not otherwise exist.

16.2    Transfer of Interest in Agreement. No voluntary transfer of interest, rights, or obligations of any Member under this Agreement shall be made without the written consent and approval of all other Members except to a successor in operation of all or substantially all of its electric utility assets. Written approval when required shall not be unreasonably withheld. Any successor or assignee of the rights of any Member, whether by voluntary transfer, judicial or

foreclosure sale or otherwise, shall be subject to all the provisions and conditions of this Agreement, to the same extent as though such successor or assignee were the original Member hereunder, and no assignment or transfer of any rights hereunder shall be effective unless and until the assignee or transferee agrees in writing to assume all of the obligations of the assignor or transferor and to be bound by all of the provisions and conditions of this Agreement; provided, that the execution of a mortgage or trust deed or a judicial or foreclosure sale made thereunder, or if through the disposition by the Administrator of the RUS, shall not be deemed a voluntary transfer within the meaning of this Section 16.2. If, due to reorganization, sale/purchase, or other means, a Member no longer owns or operates generation or has load obligation in the Territory, its membership(s) will be evaluated by the Operating Committee and any appropriate change in representation will be subject to approval of the Operating Committee.

16.3    Relationship of Parties.

16.3.1 Nothing contained herein shall be construed to create an association, joint venture, trust, or partnership, or impose a trust, partnership, covenant, obligation, or liability on or with regard to any one or more of the Parties. Each Party shall be individually responsible for its own covenants, obligations, and liabilities under this Agreement.

16.3.2 All rights of the Parties are several, not joint. No Party shall be under the control of or shall be deemed to control another Party. Except as expressly provided in this Agreement, no Party shall have a right or power to bind another Party without its express written consent.

16.4    Third Party Beneficiaries.   This Agreement shall not be construed to create rights in, or to grant remedies to, any third party as a beneficiary of this Agreement, or of any duty, obligation or undertaking established herein. No party not a signatory hereto shall be entitled to enforce this Agreement against any person or entity.

16.4.1 No Reliance Interest on Non-Firm Energy Exchange Transmission Service. Notwithstanding anything to the contrary in this Agreement, Non-Firm Energy Exchange Transmission Service over a Participating Transmission Provider's transmission system shall only be offered to the extent of that Participating Transmission Provider's participation in the Southeast EEM, and only for that purpose.  For the avoidance of doubt, owing to the voluntary nature of a Member's participation in this Agreement, membership in this Agreement shall not give rise to any third-party expectation or reliance interest on the availability of Non-Firm Energy Exchange Transmission Service upon the withdrawal of a Member.

16.5    No Dedication of Facilities.   Any undertaking by one Party to another Party under any provision of this Agreement shall not constitute the dedication of the Southeast EEM System or any portion thereof of the undertaking Party to the public or to the other Party, and it is understood and agreed that any such undertaking by a Party shall cease upon the termination of such Party's obligations under this Agreement.

16.6    Other Agreements.   No provision of this Agreement shall preclude a Member from entering into other agreements or conducting transactions under existing agreements (including where applicable any Enabling Agreements) with other Members, Participants or Additional

Members. This Agreement shall not be deemed to modify or change any rights or obligations under any prior contracts or agreements between or among any of the Members.

16.7    Further Assurances.    The Parties to this Agreement hereby agree to provide all other information, execute and deliver any further instruments or documents, and take or forbear from any further acts that may be reasonably required or useful to carry out the intent and purpose of this Agreement, provided that such requirements are consistent with the express terms of this Agreement and all applicable Laws and regulations, and in the case of confidential information subject to Article 15 of this Agreement. Without limiting the scope of the foregoing, each Member shall, subject to the confidentiality provisions set forth in Article 15, provide the Membership Board with any information that is reasonably necessary to operate the Southeast EEM System or for the Operating Committee or the Southeast EEM Administrator to implement any provisions of this Agreement, or any other business related to the development or the operation of the Southeast EEM System.

16.8    Notices. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be (i) delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such recipient as recorded in the Secretary's records, and (ii) delivered in person, by nationally recognized overnight courier service, or by first class mail, certified or registered, postage prepaid, to the addresses of the Members set forth in Exhibit A hereto. Any Member may change its address by giving notice in writing stating its new address to the Southeast EEM Administrator and the Secretary, and the Secretary shall promptly update Exhibit A accordingly.  Any notice, demand or other communication shall be deemed given and effective as of the date of delivery in person or upon receipt as set forth on the return receipt if delivered by certified or registered mail or by overnight courier service. The inability to deliver because of changed address of which no notice was given, or the rejection or other refusal to accept any notice, demand or other communication, shall be deemed to be receipt of the notice, demand or other communication as of the date of such inability to deliver or the rejection or refusal to accept.

16.9    Amendments. Except as otherwise provided in the following two sentences, this Agreement, including each of the Exhibits and Appendices hereto, may be modified or amended in the manner set forth in this Section 16.9, Article 4, and Article 8. In accordance with Article 3 of this Agreement, an entity that meets the criteria for qualification and admission as a Member, as determined by the Membership Board, may become an Additional Member and a Party to this Agreement by executing this Agreement or a Joinder hereto, and upon payment of all applicable fees, dues and contributions so specified or authorized in this Agreement, the Secretary shall revise, or cause to be revised, Exhibit A to include such Additional Member. The Parties hereby stipulate and agree that this Agreement was entered into as a result of arm's-length negotiations between the Parties.  Further, the Parties believe that the terms and conditions of this Agreement are just and reasonable and shall remain so over the life of the Agreement.  The Parties waive all rights to challenge the validity of this Agreement or whether it is just and reasonable for and with respect to the entire term, and hereby agree to make no filings with any Governmental Entity challenging the terms and conditions of this Agreement as to whether they are just and reasonable or in the public interest.  The Parties hereby further stipulate and agree that no Party may bring or support any action, proceeding or complaint seeking to modify, cancel, suspend, or abrogate the terms and conditions of this Agreement.  Absent an amendment to this Agreement pursuant to

JA1068

Section 4.1.9, Article 4 and Article 8 approving the proposed change, the standard of review for changes to any portion of this Agreement proposed by a non-Party, or FERC acting *sua sponte*, shall be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event shall be lower than the "public interest" standard of review set forth in *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

16.10  Headings. Section headings used in this Agreement are for convenience and reference only and are not to be considered in construing the terms of this Agreement.

16.11  Applicable Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to its conflict of laws principles or rules.

16.12  Entire Agreement. This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof. This Agreement supersedes all prior agreements and oral understandings among the Members with respect to such matters.

16.13  Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument, binding upon all Parties hereto, notwithstanding that all of such Parties may not have executed the same counterpart.

16.14  WAIVER OF JURY TRIAL. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH MEMBER WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

JA1069

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:_____

Member: _____

By: _____

Name: _____

Title: _____

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

JA1070

<u>**EXHIBIT A**</u>

<u>**NAMES AND ADDRESSES OF THE MEMBERS**</u>

**Alabama Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Associated Electric Cooperative, Inc.**
2814 S. Golden
PO Box 754
Springfield, MO 65807

**Dalton Utilities**
1200 VD Parrott, Jr. Parkway
PO Box 869
Dalton, GA 30722

**Dominion Energy South Carolina, Inc.**
220 Operation Way, MC C222
Cayce, SC 29033

**Duke Energy Carolinas, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Duke Energy Progress, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Georgia Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Georgia System Operations Corporation**
2100 East Exchange Place
Tucker, GA 30084

**Georgia Transmission Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**Kentucky Utilities Company**
One Quality Street
Lexington, KY 40507

**Louisville Gas and Electric Company**
220 West Main Street
Louisville, KY 40202

**MEAG Power**
1470 Riveredge Pwky., NW
Atlanta, GA 30328

**Mississippi Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**North Carolina Electric Membership Corporation**
3400 Sumner Blvd.
Raleigh, NC 27616

**North Carolina Municipal Power Agency No. 1**
1427 Meadow Wood Blvd.
Raleigh, NC 27604

**Oglethorpe Power Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**PowerSouth Energy Cooperative**
2027 East Three Notch Street
Andalusia, AL 36421

**Santee Cooper**
One Riverwood Avenue
Moncks Corner, SC 29461

**Tennessee Valley Authority**
400 West Summit Hill Drive, WT 6A-K
Knoxville, Tennessee 37902

JA1072

## EXHIBIT B

## FORM OF JOINDER AGREEMENT

## JOINDER AGREEMENT

Reference is made to the Southeast Energy Exchange Market Agreement, dated as of December 28, 2020, as the same may be amended from time to time (the "Southeast EEM Agreement"), by and among the entities listed on Exhibit A thereto. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Southeast EEM Agreement.

The undersigned hereby agrees to become a Member of the Southeast EEM and be bound by the terms of the Southeast EEM Agreement as if an original party thereto. The Membership Board hereby consents to the addition of the undersigned as a Member of the Southeast EEM and as party to the Southeast EEM Agreement as if an original party thereto. A duly executed copy of this Joinder Agreement shall be delivered to the Secretary and the Southeast EEM Administrator.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed as of the date set forth below.

Date: _____ ___, 20__

[NAME OF JOINING MEMBER],
A [Jurisdiction] [Entity Type]

By: _____

Name: _____

Title: _____

ACKNOWLEDGED AND ACCEPTED:

By: _____

Name: _____

Title: Secretary, Membership Board

JA1073

## APPENDIX A

## FORM OF PARTICIPANT AGREEMENT

1.0     This Participant Agreement ("Agreement"), dated as of _____, is entered into, by and between [INSERT NAME OF ENTITY], the Southeast EEM Agent acting in its capacity as the agent of the Members of the Southeast Energy Exchange Market ("Southeast EEM") and_____ ("Participant").

2.0     The Participant and Southeast EEM agree that this Agreement shall incorporate, in their entirety, Appendix B to the Southeast EEM Agreement ("Southeast EEM Market Rules"), designated as Alabama Power Company's Market Based Rate Tariff, Rate Schedule No. 1011, Southeast EEM Agreement, and the Southeast EEM Manuals. Any term not defined herein shall have the meaning ascribed to it in the Southeast EEM Market Rules. In the event of any conflict between this Agreement and the Southeast EEM Market Rules, the Southeast EEM Market Rules shall control.

3.0     The Participant has submitted an application for participation in the Southeast EEM and has been determined by the Southeast EEM to meet all requirements of being a Participant as defined in the Southeast EEM Market Rules. The Participant warrants that all information submitted in the application is true and accurate.

4.0     The Participant agrees to be bound by and accepts all of the terms of the Southeast EEM Market Rules and the Southeast EEM Manuals, as both may be amended from time to time. Any amendments to the Southeast EEM Market Rules or the Southeast EEM Manuals are automatically and without further action incorporated into this Agreement.

5.0    The Southeast EEM agrees that Participant shall be deemed a "<u>Participant</u>" under the terms of the Southeast EEM Market Rules, with all rights of participation and access to the Southeast EEM System afforded Participants under the Southeast EEM Market Rules.

6.0    The Participant shall supply the Southeast EEM Administrator with any and all information deemed reasonably necessary for the administration of the Southeast EEM System.

7.0    Either Party can assign or transfer any or all of its rights and/or obligations under this Agreement upon thirty (30) days written notice. Any such transfer or assignment shall be conditioned upon the successor in interest accepting the rights and/or obligations under this Agreement as if said successor in interest was an original Party to this Agreement.

8.0    An event of "<u>Force Majeure</u>" means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, pandemic, epidemic, breakage or accident to machinery or equipment, any curtailment, order, regulation or restriction imposed by governmental military or lawfully established civilian authorities or any other cause beyond a Party's control. A Force Majeure event does not include an act of negligence or intentional wrongdoing. Neither the Southeast EEM Agent, the Southeast EEM, the Members, nor the Participant will be considered in default as to any obligation under this Agreement if prevented from fulfilling the obligation due to an event of Force Majeure. However, a Party whose performance under this Agreement is hindered by an event of Force Majeure shall make all reasonable efforts to perform its obligations under this Agreement.

9.0     The Participant shall at all times indemnify, defend, and save the Southeast EEM System, the Southeast EEM Agent and the Southeast EEM Administrator harmless from, any and all damages, losses, claims, including claims and actions relating to demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from the Southeast EEM Agent's or Southeast EEM Administrator's, as applicable, performance of its obligations under this Agreement and the Southeast EEM Market Rules, except in cases of negligence or intentional wrongdoing by the Southeast EEM Agent or Southeast EEM Administrator, as applicable.

10.0    This Agreement shall be deemed to be a contract made under, and for all purposes shall be governed by and construed in accordance with, the laws of the State of Delaware.

11.0    This Agreement shall be effective upon execution by both parties and shall remain in full force and effect until terminated pursuant to Sections 12 or 13 of this Agreement.

12.0    The Southeast EEM may terminate this Agreement by providing written notice of termination to the Participant in the event the Participant commits a material violation of its obligations under the terms of the Southeast EEM Market Rules which, if capable of being remedied, is not remedied within thirty (30) days after the date the Southeast EEM has given the Participant written notice of the violation, unless excused by reason of Force Majeure as provided in Section 8 of this Agreement.

13.0    The Participant may terminate this Agreement upon thirty (30) days written notice to the Southeast EEM.

JA1076

14.0    Upon termination of this Agreement for any reason, Participant shall not have access to the Southeast EEM System, nor be entitled to submit Bids or Offers thereunder.

15.0    This Agreement may be executed in one or more counterparts at different times, each of which shall be regarded as an original and all of which, taken together, shall constitute one and the same Agreement.

16.0    Any notice or request made to either of the Parties to this Agreement shall be made to the following representatives:

<u>Southeast EEM</u>                    <u>Participant</u>

Title:          _____          _____

Address:     _____          _____

                _____          _____

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective authorized officials.

<u>Southeast EEM</u>                    <u>Participant</u>

By: _____          By:_____

Name: _____        Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

JA1077

**SOUTHEAST EEM MARKET RULES**

## I.     INTRODUCTION AND APPLICABILITY.

Set forth below are the rules governing: 1) Participation in the Southeast EEM; 2) Bidding, Offering,  and matching procedures for Energy Exchanges arranged through the Southeast EEM System, 3) Southeast EEM System data reporting, and 4) the processes for auditing Energy Exchanges and the hardware, software, management and operation of the Southeast EEM System.   This Appendix B is subject to the terms and conditions of the Agreement. In the event of a conflict between the terms of the Agreement and the terms of this Appendix B, the terms of the Agreement shall control.

## II.     DEFINITIONS.

The following terms shall be defined as indicated for the purposes of this Appendix B. Definitions and terms expressed in the singular shall include the plural and *vice versa*.     Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

"Agreement" means the Southeast Energy Exchange Market Agreement By and Among the Members of the Southeast EEM to which this Appendix B is appended.

"Balancing Authority" means the responsible entity that integrates resource plans ahead of time, maintains demand and resource balance within a Balancing Authority Area, and supports interconnection frequency in real time.

"Balancing Authority Area" means the collection of generation, transmission and loads within the metered boundaries of the Balancing Authority.   The Balancing Authority maintains load-resource balance within this area.

"Bid" means a voluntary submission containing the required Bid Information to purchase a certain amount of Non-Firm Energy (set forth in MW).

"Bid Information" means the information applicable to Bids set forth in Section IV.B.3.

"Bid Price" means the price, in $/MWh for the amount of Non-Firm Energy submitted in a Bid.   This represents the maximum price that the Bidder is willing to pay.

"Bidder" means a Participant who submits a Bid into the Southeast EEM System.

"Buyer" means a Bidder that has been matched with an Offeror for an Energy Exchange through the Southeast EEM System.

"Clock Hour" means the sixty-minute period ending at :00.

"Company System Administrator" has the meaning set forth in Section VI.B.2.

JA1078

"Contract Path" means the continuous transmission path for the flow of Non-Firm Energy between the Participants reserved for an Energy Exchange using the transaction matching, reservation and tagging functions of the Southeast EEM System.

"Delivery Interval" means a fifteen (15) minute period in which Non-Firm Energy is intended to be delivered by a Seller to its matched Buyer(s).

"Energy Exchange" means a transaction for the purchase and sale of Non-Firm Energy in the Southeast EEM between Buyers and Sellers pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Rules.

"Electronic Tag" or "e-Tag" means the primary method for coordination of Interchange Schedules or Energy Schedules where Energy is transferred between Balancing Authority Areas and coordination required between multiple entities. Various entities can communicate important information pertaining to the Interchange transaction to each other via the internet using computer applications, which are based on the e-Tag specifications and schema maintained by the North American Energy Standards Board ("NAESB").

"Energy Exchange Notification" means the notice provided to Bidders and Offerors who were matched for an Energy Exchange by the Southeast EEM Algorithm; to be automatically generated by the Southeast EEM System and provided before the start of a Delivery Interval; and to include data on the matched Energy Exchange including Buyer, Seller, price, amount of Non-Firm Energy, Source, Sink, delivery location, applicable Delivery Interval, and other any other necessary data for Participants to record the transaction.

"Energy Exchange Price" means the price, in $/MWh, calculated by the Southeast EEM Algorithm for a specific Energy Exchange.

"FERC" means the Federal Energy Regulatory Commission.

"Good Utility Practice" means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment and in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice does not require the optimum practice, method, or act to the exclusion of all others, but rather is intended to include acceptable practices, methods, or acts generally accepted in the SERC Reliability Corporation region.

"Losses" means the total cost of the electrical energy lost in the transmission of electrical energy from a Source to a Sink based on the real power loss factor (%) ("Loss Factor") and loss rate ($/MWh) ("Loss Rate") of each Participating Transmission Provider on the Energy Exchange's Contract Path.

"NAESB Electric Industry Registry" or "NAESB EIR" means thea central registry and repository of information required for commercial transactions that is maintained by NAESB.

JA1079

"Network Map" means the computer-based representation of all Participating Transmission Provider service territories, Balancing Authorities, valid transmission paths (Point of Receipt – Point of Delivery combinations), Sources, and Sinks.

"Non-Firm Energy" means a product for which delivery or receipt of the energy may be interrupted for any reason or no reason, without liability on the part of either buyer or seller.

"Non-Firm Energy Exchange Transmission Service" means transmission service provided by a transmission provider, pursuant to its Tariff, that has the following characteristics: (i) it is non-firm transmission service with the lowest curtailment priority, provided solely on an as-available basis for 15-minute Energy Exchanges, after taking into account other higher priority uses and the limitations of the transmission system of the Participating Transmission Provider; (ii) it is available solely for Energy Exchanges; (iii) it is identified and offered in the Tariff as "Non-Firm Energy Exchange Transmission Service;" (iv) the charge for such service, and related Schedule 1 and Schedule 2 (or equivalent) ancillary services, is $0/MWh; (v) the charge for financial losses is based on the methodology established in the Participating Transmission Provider's Tariff; (vi) the service must be obtained by a Participant using the transaction matching, reservation and tagging functions of the Southeast EEM System, rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by a Participating Transmission Provider; (vii) the service may not be reassigned, redirected, or sold by the transmission customer; (viii) in combination with the other Participating Transmission Providers' provisions of Non-Firm Energy Exchange Transmission Service, the service allows for a continuous Contract Path for Energy Exchanges; and (ix) the Participating Transmission Provider is required to provide the information specified in and as required by Section IV.A.2 of the Southeast EEM Market Rules to the Southeast EEM System. For the avoidance of doubt, nothing in this Agreement shall obligate any Participating Transmission Provider to (a) plan, construct, or maintain its transmission system for the benefit of any Participant; (b) provide Non-Firm Energy Exchange Transmission Service in a manner that is contrary to the terms of the Participating Transmission Provider's Tariff, or contrary to Good Utility Practice, each as determined in the sole judgment of the Participating Transmission Provider; (c) provide Non-Firm Energy Exchange Transmission Service following termination of its Southeast EEM Member status; (d) provide Non-Firm Energy Exchange Transmission Service to a non-Participant; or (e) file its Tariff with FERC if the Tariff is not already required to be filed with FERC.

"OASIS" means an Open Access Same-Time Information System that conforms to the requirements of Part 37 of the FERC's regulations, 18 CFR §§ 37.1, et seq.

"OATI webRegistry" means the system developed by Open Access Technology International, Inc. to perform the NAESB EIR functions.

"Offer" means a voluntary submission containing the required Offer Information to sell a certain amount of Non-Firm Energy (set forth in MW).

"Offer Price" means the price, in $/MWh for the amount of Non-Firm Energy offered in an Offer. This represents the minimum price that the Offeror is willing to collect to sell.

"Offer Information" means the information applicable to Offers set forth in Section IV.B.3, as well as other information that may be required by the Southeast EEM Administrator.

"Offeror" means a Participant who submits an Offer into the Southeast EEM System.

"Participant Profile" means that information identified in Section IV.A.1., Section IV.C.6., and such other information requested by the Southeast EEM System Interface to assist in the creation of Energy Exchanges.

"Participant" means an entity that meets the requirements set forth in Section III of this Appendix B.

"Participant Specific Constraints" has the meaning set forth in Section IV.A.1.b. and IV.C.5.

"Seller" means an Offeror that has been matched with a Buyer through the Southeast EEM System.

"Sink" means a pre-approved and validated OATI webRegistry sink point.

"Source" means a pre-approved and validated OATI webRegistry source point.

"Southeast EEM Algorithm" means the mathematical equations that determine the matching Bids and Offers resulting in Energy Exchanges.

"Southeast EEM System Interface" means the graphical user interface ("GUI") and application programming interfaces ("API") used by the Southeast EEM System that meet the Southeast EEM System requirements developed by the Southeast EEM Administrator and the Operating Committee.

"Southeast EEM Manuals" means the instructions, rules, procedures and guidelines established by the Operating Committee for the Southeast EEM.

"System Administrators" means, collectively, the Southeast EEM Administrator and Company System Administrators.

## III.    PARTICIPATION

**A.**    Any entity that meets the requirements of this Section III may become a Participant.

**B.**    A Participant must:

    **1.**    Own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory;

    **2.**    Execute a Participant Agreement in the form attached to the Agreement as Appendix A (the "Participant Agreement") which agreement shall, among

other things, contractually bind such entity to comply with the rules set forth in this Appendix B;

3.     Deliver the executed Participant Agreement to the Secretary and the Southeast EEM Administrator, which shall become effective when countersigned by the Southeast EEM Agent at the direction of the Operating Committee;

4.     Execute and deliver a Non-Firm Energy Exchange Transmission Service Agreement with each Participating Transmission Provider who requires delivery of such agreement, or otherwise have access to Non-Firm Energy Exchange Transmission Service from each Participating Transmission Provider; and

5.     Have or enter into an Enabling Agreement with at least three (3) or more Participants.

## IV.     BIDS/OFFERS AND MATCHING PROCEDURES.

### A.     Pre-Bid/Offer Information Requirements.

1.     Information Submitted by Participants.

a.     Prior to being permitted to submit Bids or Offers, each Participant shall provide the Southeast EEM all required information in its Participant Profile.     Participants are responsible for providing accurate information to the Southeast EEM System in its Participant Profile, as well as submitting any updates or modifications to the Southeast EEM Administrator to maintain the accuracy of Participant's Profile.

b.     Participant-Specific Constraints.

i.     Prior to being permitted to submit Bids or Offers, each Participant shall provide to the Southeast EEM in its Participant Profile, any constraints the Southeast EEM Algorithm must take into account in matching Bids or Offers from such Participant ("Participant-Specific Constraints").     Participant-Specific Constraints can be either counterparty specific or geographic.

ii.     Offers from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific Constraints are set such that there are at least three other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Seller, and Bids from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-

Specific Constraints are set such that there are at least three (3) other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Buyer.

    iii.    Participants shall not be required to provide a reason for any Participant-Specific Constraint. The reason for such constraints could be, but is not limited to, the following:

        (a)    Lack of an Enabling Agreement with a Participant;

        (b)    Counterparty issues (e.g., credit);

        (c)    Affiliates restrictions; and

        (d)    Geographic issues causing supply or delivery point restrictions and related regulatory requirements.

**c.**    Prior to being permitted to submit Bids or Offers, each Participant must affirm that it has executed Service Agreements for Non-Firm Energy Exchange Transmission Service with each Participating Transmission Provider that requires delivery of such agreement or that it otherwise has access to Non-Firm Energy Exchange Transmission Service as to each Participating Transmission Provider through such Participating Transmission Provider's Tariff.

**2.**    Prior to being permitted to provide Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall provide sufficient information to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM Territory for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges.

**3.**    Participant shall supply the Southeast EEM Administrator with any and all information the Operating Committee deems reasonably necessary for the administration of the Southeast EEM System.

**B.**    **Bids and Offers.**

**1.**    Delivery Intervals. Each Clock Hour will consist of four (4) Delivery Intervals:

xx:00 to xx:15;

xx:15 to xx:30;

xx:30 to xx:45; and

xx:45 to xx:00 of the next Clock Hour.

2.    Deadlines.

    **a.**    For each Clock Hour, every Participating Transmission Provider's available capacity for NFEETS must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of such next Clock Hour.  To the extent a Participating Transmission Provider can update its available capacity for NFEETS within a Clock Hour, such updated information must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of the applicable Delivery Interval.

    **b.**    Each Participating Transmission Provider's Loss Factor and Loss Rate must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes prior to the Clock Hour for which the Loss Factor and Loss Rate are to apply.  If the Participating Transmission Provider does not update its Loss Factor and Loss Rate, the values for the prior Clock Hour will apply.

    **c.**    Bid and Offers must be submitted through the Southeast EEM System Interface not earlier than seven (7) days prior to the applicable Delivery Interval and not later than fifteen (15) minutes prior to the Delivery Interval for which they are submitted. Participants may modify or cancel previously submitted Bids or Offers at any time before 15 minutes prior to the upcoming Delivery Interval; no further modifications may be submitted to a Bid or Offer within the fifteen (15)-minute period prior to the applicable Delivery Interval.

    **d.**    The Southeast EEM System will: 1) match the Bids and Offers for the next Delivery Interval, subject to the constraints and limitations established pursuant to this Appendix; and 2) provide an Energy Exchange Notification to all Participants who were matched as an Energy Exchange for the upcoming Delivery Interval, and 3) submit all necessary transmission reservations and e-Tags ten (10) minutes prior to the relevant Delivery Interval.

3.    Bid and Offer Requirements.

    **a.**    Each Bid or Offer must include the following components:

        i.    Participant name.

        ii.    Whether the submission is a Bid or an Offer.

iii.    An amount of Non-Firm Energy (MW) for the Bid or Offer in increments of 4MW blocks.

iv.    For all Offers, an Offer Price and for all Bids, a Bid Price.

v.    For all Offers, a Source and for all Bids, a Sink.

vi.    The specific Delivery Interval to which the Bid or Offer applies.

vii.    Whether the submission: 1) must be matched in full or not at all or 2) can be matched at any volume below the Bid or Offer volume (subject to the 4MW increment rule) ("All or Nothing Selection").

viii.    Any other components as may be required for the Southeast EEM System to perform actions set forth in Section IV.C of this Appendix or to generate the reports described in Section V of this Appendix.

**b.**    An Offer may include the maximum Energy Exchange Price that the Participant is willing to accept for a particular Source/Sink pair for the applicable Delivery Interval.

**c.**    Participants are permitted to submit multiple Bids or Offers for the same Delivery Interval with varying Source or Sink locations, as applicable, Non-Firm Energy amounts, and pricing, subject to any limitation on the number of Bids or Offers that may be submitted at any one Source or Sink for a particular Delivery Interval as may be established in the Southeast EEM Manuals.

**d.**    Submission of Bids and Offers is voluntary; Participants are not required to submit any Bids or Offers for any Delivery Interval.

**C.**    **Matching.**

**1.**    Subject to the constraints defined below and all Bid Information and Offer Information, the Southeast EEM Algorithm will evaluate all Bids and Offers for each Delivery Interval and produce Energy Exchanges.

The Southeast EEM Algorithm will match Bids and Offers so as to result in Energy Exchanges that maximize the Southeast Energy Exchange Market total benefit for the applicable Delivery Interval while simultaneously honoring all the requirements identified in Section IV.A.1 and the constraints identified in Section IV.C.6. The total benefit shall be calculated by aggregating the benefits from each Energy Exchange for the applicable Delivery Interval.

**2.**     The benefit associated with each Energy Exchange will be calculated by taking the difference between the Bid Price and Offer Price and multiplying it by the MW amount of Non-Firm Energy identified in the Energy Exchange, <u>less</u> the costs of transmission services (Losses) provided along the Contract Path.

**3.**     For any Energy Exchange where the Energy Exchange Price exceeds the maximum value submitted in accordance with Section IV.B.3.b., the Energy Exchange Price will be adjusted down to that maximum value, such that the total benefit associated with the Energy Exchange remains the same, but the benefit allocation will be adjusted in the Buyer's favor.

**4.**     Matching Principles.

　　**a.**     Whole and/or partial amounts of Non-Firm Energy shall be matched, consistent with the Participant's All or Nothing Selection in its Bid Information or Offer Information.

　　**b.**     Bids or Offers that can be matched with multiple Participants shall be allowed, subject to the matching rules set forth in this Appendix.

**5.**     Match/Energy Exchange Price.

　　**a.**     Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.

　　**b.**     Data demonstrating Losses will be incorporated into the Energy Exchange Price.

　　　　i.     Each Participating Transmission Provider determines the method for pricing its Losses;

　　　　ii.     Each Participating Transmission Provider is responsible for updating its Tariff to address how Losses will be priced; and

　　　　iii.     Loss Rate and Loss Factor are an input into the algorithm by the relevant Participating Transmission Provider.

**6.**     Constraints.

　　**a.**     Participant-Specific Constraints.   In matching Bids and Offers, the Southeast EEM Algorithm will take into account the Participant-

Specific Constraints submitted by the Bidders and Offerors in accordance with Section IV.A.1.b.

**b.**     Generally Applicable Constraints.

i.      In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the available capacity for NFEETS on any given Contract Path to be exceeded.

ii.     Energy Exchanges shall not be made that cause:

(a)     A Buyer to purchase more MW than the amount set forth in its Bid;

(b)     A Seller to sell more MW than the amount set forth in its Offer; and

(c)     For matched Bids and Offers, the Energy Exchange Price to (i) be less than the Offer Price plus half of net Losses, as calculated per Section IV.C.5.a, and (ii) more than the Bid Price minus net Losses, as calculated per Section IV.C.5.a.

iii.    The Southeast EEM Algorithm shall only make Energy Exchanges that yield positive benefits to both Buyer and Seller, as defined in Section IV.C.2, after Losses have been considered.

iv.     The total MW of potential Energy Exchanges in any Delivery Interval shall not exceed the aggregate amount of Non-Firm Energy identified in the applicable Offers or Bids for such Delivery Interval.

v.      A Participant's Bid may not be matched with an Offer made by the same Participant.

vi.     The Southeast EEM Algorithm shall not create Energy Exchanges in the same Delivery Interval that would create offsetting Energy Exchanges whereby Participant 1 sells to Participant 2 while Participant 2 sells to Participant 1 during the same interval at the same location.

**7.**     Treatment of Identical Offers or Bids.

**a.**     In the event that multiple Bids or Offers that are at the same price at a Source or Sink are identical which create the same benefit for

the Southeast EEM, a randomized preference will be assigned to the Bid(s) or Offer(s).

8.    Notification, Scheduling, and Transmission for Energy Exchanges.

   **a.**    After an Energy Exchange for a Delivery Interval is determined:

      i.    The Bidder and Offeror shall be notified of match via an Energy Exchange Notification.

      ii.    Transmission reservations and e-Tags shall be automatically created by the Southeast EEM System based on the matches within the time frame noted above. All e-Tags will be sent to the applicable Participating Transmission Provider(s), Balancing Authority(ies) and matched Participants. Consistent with the discretion afforded to Participating Transmission Providers and Balancing Authorities in the NAESB business practices, each participating Balancing Authority within the Territory agrees that it will not reject an e-Tag automatically created by the Southeast EEM System on the basis that it was submitted less than twenty (20) minutes prior to the Delivery Interval but at least ten (10) minutes prior to the Delivery Interval.

      iii.    The Southeast EEM System will generate and provide sufficient information to Participating Transmission Providers to validate and collect payment for Losses from applicable Buyers and Sellers for each Energy Exchange.

      iv.    Appropriate OASIS information will be provided to the relevant Participating Transmission Service Providers.

9.    The contractual "point of sale" of an Energy Exchange will be at the Buyer's Balancing Authority border for a transaction delivered out of or thru one or more Balancing Authorities. For an Energy Exchange that stays within one Balancing Authority (Source and Sink in same Balancing Authority), the "point of sale" will be at the bus of the Seller's Source. For an Energy Exchange fully delivered to a Buyer's Balancing Authority border, the Participant acting as the Seller will be the responsible party for the transmission service to deliver the Non-Firm Energy to the "point of sale" and the Buyer will be responsible for the transmission service required to sink the Non-Firm Energy. For an Energy Exchange that stays within one Balancing Authority, the Buyer will be the responsible party for the transmission service required to sink the Non-Firm Energy. For avoidance of doubt, Non-Firm Energy Exchange Transmission Service

must be used for the entire Contract Path from Source to Sink for all Energy Exchanges.

V.     **SOUTHEAST EEM ENERGY EXCHANGE REPORTS.**

The Southeast EEM Administrator and the Company System Administrators shall create and maintain the reports concerning Energy Exchanges as required by the Operating Committee. The reports that are provided by the System Administrators shall include, but need not be limited to, the following:

A.     **Public Monthly Informational Report.**   This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website on or before midnight of the fifth Business Day of the following month and shall include the following information from the prior month:

   1.     Minimum, maximum, and average match prices;

   2.     Amount of Non-Firm Energy offered and sold as well as bid and purchased over all Delivery Intervals;

   3.     Amount of Non-Firm Energy that flowed once matched as an Energy Exchange;

   4.     Total number of Energy Exchanges;

   5.     Total benefit to be calculated in accordance with Section IV.C.2;

   6.     Minimum, maximum, and average MW Energy Exchange amount; and

   7.     Energy Exchanges made but not executed.

B.     **Public Daily Informational Report.**   This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website by 6:00 A.M. CPT and shall include the following aggregated information from the prior day:

   1.     Total number of Bids and Offers during each Clock Hour of the prior day;

   2.     Amount of Non-Firm Energy offered and sold as well as bid and purchased during each Clock Hour of the prior day;

   3.     Number of Energy Exchanges executed for each Clock Hour of the prior day;

   4.     Total number of Participants who submitted Bids for each Clock Hour of the prior day;

   5.     Total number of Participants who submitted Offers for each Clock Hour of the prior day; and

JA1089

6.      Weighted average match price per Clock Hour.

C.      **Public Hourly Informational Report.**   This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM website fifteen (15) minutes after the applicable Clock Hour and shall include the following aggregated information from the applicable Clock Hour:

1.      Total number of Bids and Offers during that Clock Hour;

2.      Amount of Non-Firm Energy offered and sold as well as bid and purchased during that Clock Hour;

3.      Number of Energy Exchanges executed for that Clock Hour;

4.      Total number of Participants who submitted Bids during that Clock Hour; and

5.      Total number of Participants who submitted Offers during that Clock Hour.

VI.     <u>**AUDITING AND DATA ADMINISTRATION.**</u>

A.      **Archiving of Data.**   All Southeast EEM System input data necessary to recreate and audit any Delivery Interval, and all Southeast EEM System output data for each Delivery Interval, shall be archived such that at least the three prior months of data can be retrieved in real time. Five (5) years of data shall be archived off-line.   Participants may request access to their own data and it shall be made available upon request within 24 hours. Data older than five (5) years shall be deleted at the end of each month on a rolling basis.

B.      **Access to Southeast EEM System Energy Exchange Data.**

1.      The Southeast EEM Administrator shall have access, via system software, to the results of the matching process for any Delivery Interval of on-line history. The data to which the System Administrators have access shall include raw Participant data, matched output data, and intermediate results of the algorithm. To be clear, the Southeast EEM Administrator shall be able to run all of the reports available in the system and view the data for all Participants.

2.      Each Participant will be required to identify an administrator that is authorized by the Participant to run and review all of the reports available in the Southeast EEM System that are redacted to all show the information related to the Participant it represents (the "Company System Administrator").   The Southeast EEM System will provide each Company System Administrator with the right to grant access to certain reports and related data to identified delegates within the Participant's organization. Each Company System Administrator (and any delegate identified by the

JA1090

Company System Administrator) shall be able to run all of the reports available in the system but receive only the data that belong to the Participant it represents.

**C.** **Additional Southeast EEM Administrator Functions.** Subject to the limitations set forth in subsection (B) above, the Southeast EEM Administrator shall employ the system software to perform the following functions:

**1.** Oversee the matching process;

**2.** Maintain model data and Southeast EEM System parameters; and

**3.** View Participant usage statistics and generate Participant benefit reports.

**D.** **Auditing Process.** Auditing functions will be performed by the Market Auditor at the direction of the Membership Board. The Market Auditor will report its conclusions, and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis. The Membership Board will maintain sole responsibility for determining whether to share the information any further. Auditing functions include the following:

**1.** Verify that the Southeast EEM System operates in accordance with the Southeast EEM Rules, including the determination and application of Bids, Offers, constraints, matched settlements, OASIS reservations, and e-tags.

**2.** Ensure that Energy Exchange data is available to the applicable Participants in accordance with the Southeast EEM Rules.

**3.** Report to the Membership Board any concerns regarding the reliability and accuracy of the Southeast EEM System process and results including any instance of operational problems or anomalies with the functioning of the Southeast EEM System.

**4.** Provide evaluation regarding the proper function of the Southeast EEM System, and the effectiveness of any Southeast EEM System specific controls in place related to the operation of the Southeast EEM System.

**5.** Refer any complaints received to the Membership Board, and investigate further at the Membership Board's direction.

**6.** The Membership Board will be responsible for defining the time interval(s) for the auditing function to be performed and report back to the governing body. Such interval(s) will be published in the Southeast EEM Manuals.

**E.** **Data Administration.**

1.  Parameters.  The Southeast EEM Administrator shall set and maintain the following Southeast EEM System configuration parameters, which shall be posted for access by all Members:

    a.  The matching process start time for each Clock Hour;

    b.  The number of minutes before the start of the matching process when no additional Bids and Offers will be accepted;

    c.  The number of minutes before the start of the matching process by which the processing of any in-transit Bids and Offers must be completed;

    d.  The addition or deletion of Participants;

    e.  The addition or deletion of a Company System Administrator for each Participant;

    f.  Manage, store, and safeguard data (e.g., Bid, Offer, match, and Participant Information) to ensure appropriate levels of confidentiality and records retention;

    g.  Grant access to the data on the Southeast EEM System as appropriate;

    h.  Supply data to Participants involved in Energy Exchanges to complete the applicable transaction, including (but not limited to):

        i.    Participant identification of the Buyer and the Seller;

        ii.   Balancing Authority Area identifications for the MWh quoted by the Buyer and the Seller;

        iii.  e-Tag number;

        iv.   Transaction quantity in MW/MWh, including the MWh out of the Source area and the MWh into the Sink area;

        v.    Information specifically related to an Energy Exchange (not price of the other side of the match as may reveal sensitive transmission information);

        vi.   Energy Exchange Price;

        vii.  Benefit for the Buyer and the Seller in total dollars and $/MWh; and

        viii. Energy Exchanges not executed.

JA1092

    **i.**    Supply needed information/data for auditing functions to ensure that the Southeast EEM System is being properly administered.

## APPENDIX C

## SOUTHEAST EEM AGENT SCOPE

The Southeast EEM Agent Scope shall be limited to the following:

a.  Subject to paragraph (b) below, the Southeast EEM Agent shall execute contracts with third parties solely as the agent for and on behalf of the Members and not in the Southeast EEM Agent's own name or for its own account.

b.  The Southeast EEM Agent shall be empowered to execute contracts only after being given specific written or electronic authorization to do so by the Membership Board, or in the case of minor or unsubstantial contracts, the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

c.  The Southeast EEM Agent shall be authorized to execute amendments to contracts entered into on behalf of the Members, provided that such amendment is authorized by the Membership Board or, in the case of minor or unsubstantial contracts, by the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

d.  For convenience, the Southeast EEM Agent shall be authorized to accept notices under the contracts that it executes on behalf of the Members.

e.  The Southeast EEM Agent shall *not* be involved in the billing process under the vendor contracts. Third-party vendors will bill the Members directly for their proportionate share of the costs under the contracts executed by the Southeast EEM Agent on behalf of the Members.

f.  If certain vendors are unwilling to bill Members directly, the Membership Board shall develop an alternative billing arrangement, such as using a third-party billing agent.

g.  The Southeast EEM Agent shall *not* have any special role in, or authority over, the operation or administration of the Southeast EEM System. The vendor contracts shall specify that the day-to-day contact for such vendor shall be the Operating Committee, not the Southeast EEM Agent.

h.  The Southeast EEM Agent shall not be exposed to incremental liability for actions taken within the Southeast EEM Agent Scope.

JA1094

## UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Alabama Power Company | ER21-1111-000 |
| Dominion Energy South Carolina, Inc. | ER21-1112-000 |
| Louisville Gas and Electric Company | ER21-1114-000 |
| Duke Energy Progress, LLC<br>Duke Energy Carolinas, LLC | ER21-1115-000 |
| Duke Energy Carolinas, LLC | ER21-1116-000 |
| Duke Energy Progress, LLC | ER21-1117-000 |
| Louisville Gas and Electric Company | ER21-1118-000 |
| Georgia Power Company | ER21-1119-000 |
| Kentucky Utilities Company | ER21-1120-000 |
| Mississippi Power Company | ER21-1121-000 |
| Alabama Power Company | ER21-1125-000 |
| | ER21-1128-000 |
| Dominion Energy South Carolina, Inc. | |
| | (not consolidated) |

## PROTEST OF PUBLIC INTEREST ORGANIZATIONS

Pursuant to Rule 211 of the Federal Energy Regulatory Commission's ("Commission")

Rules of Practice and Procedure, Energy Alabama, Sierra Club, South Carolina Coastal

Conservation League, GASP, Georgia Conservation Voters, Southern Alliance for Clean Energy,

Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Partnership for

Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and

Natural Resources Defense Council ("Public Interest Organizations" or "PIOs") respectfully

submit this protest in response to the Petitioners' June 7, 2021 response to the May 4, 2021

deficiency letter and the Southeast Energy Exchange Market ("SEEM") Proposal submitted by

Alabama Power Company for acceptance under Section 205(c) of the Federal Power Act

("FPA") and Part 35 of the Commission's regulations. The entire proposal includes related

filings in the above captions by members of the SEEM,[1] to establish the SEEM Agreement and

related documents,[2] to modify their Open Access Transmission Tariffs ("OATT"), or concur

with the Proposal, including Applicants' June 7, 2021 Response to the Deficiency Letter[3] issued

by FERC Staff on May 4, 2021 and Applicants' August 11, 2021 Response to the Second

Deficiency Letter[4] issued by FERC Staff on August 6, 2021 (together, "SEEM filings" or

"filings").[5] The PIOs filed a Motion to Intervene and Protest on March 15, 2021[6] and a Motion

for Leave to Respond and Response on April 12, 2021[7] which are incorporated by reference

herein. The PIOs also filed a Motion for Leave to Respond and Response on July 29, 2021,[8]

which is appended to this filing.

---

[1] The SEEM member utilities included in the filing are: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion Energy SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP") (together with DEC, "Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, "LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); PowerSouth Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA") (collectively referred to hereinafter as "Applicants").

[2] Southeast Energy Exchange Market Agreement, Accession No. 20210212-5033 (Feb. 12, 2021) ("SEEM Proposal" or "Proposal").

[3] Deficiency Letter, Accession No. 20210504-3015 (May 4, 2021) ("Deficiency Letter").

[4] Second Deficiency Letter, Document Accession No. 20210806-3000 (Aug. 6, 2021) ("Second Deficiency Letter").

[5] Resp. to Deficiency Letter, Accession No. 20210607-5164 (June 7, 2021) ("Deficiency Response"); Resp. to Second Deficiency Letter; Request for Shortened Comment Period and Expedited Action ("Second Deficiency Response"), Accession Number 20210811-5101 (Aug. 11, 2021).

[6] Mot. to Intervene and Limited Protest and Comment of Public Interest Organizations, Accession No. 20210315-5405 (Mar. 15, 2021) ("PIO March 15 Protest").

[7] Mot. for Leave to Respond and Resp. of Public Interest Organizations, Accession No. 20210412-5876 (Apr. 12, 2021) ("PIO April 12 Response").

[8] Mot. For Leave to Respond and Resp. of Public Interest Organizations, Accession No. 20210729-5190 (July 29, 2021) ("PIO July 29 Response").

JA1096

This Protest adopts the arguments PIO's made in their July 29 Response as appended to this filing. The Second Deficiency Response does not address PIO's concerns about market power, governance, non-discriminatory access, and lack of an independent market monitor. The SEEM Members have not responded to many of these issues and where they have, those responses are insufficient. The SEEM proposal remains unjust, unreasonable, and unduly discriminatory, is not consistent with or superior to the *pro forma* OATT, and should be rejected; moreover the need for a technical conference to explore true market reform in the Southeast has never been greater.

In addition to the issues raised in this protest, in the appended July 29 Response PIO's protest the issue of SEEM Administrator independence. Contrary to the Applicants' Second Deficiency Response, there is nothing in the proposed SEEM Agreement that states that the "Administrator will not be a Member, Participant, Agent, or the Market Auditor, nor an affiliate of those entities."[9] The SEEM Agreement simply provides that "[f]or avoidance of doubt, the Membership Board, pursuant to Article 4, *may* decide to engage one or more third parties to perform the responsibilities of the Southeast EEM Administrator."[10] Thus there is no assurance in the proposed tariff that the SEEM Administrator(s) will not be a Member or Participant, or an affiliate of a Member or Participant. At a minimum, the Commission must direct revision to the proposed SEEM Agreement to incorporate SEEM Members' commitment that the Membership Board shall engage a third party or parties as the SEEM Administrator and that the third party will not be an affiliate of a Member, Participant, Agent, or the Market Auditor.

The PIOs respectfully request that the Commission take into account this protest, including the issues raised in the appended July 29 Response, and take action accordingly. In

---

[9] Second Deficiency Letter Response at 8.
[10] SEEM Agreement, Art. 2.3 (emphasis added).

JA1097

addition, the PIOs renew their request that the Commission reject the SEEM Proposal and

institute a technical conference to explore actual and material market reform in the Southeast.

<div align="center">Respectfully submitted,</div>

*/s/ Maia Hutt*
Maia Hutt
Staff Attorney
Southern Environmental Law Center
601 W Rosemary St., Suite 220
Chapel Hill, NC 27516
mhutt@selcnc.org

Frank Rambo
Senior Attorney
Southern Environmental Law Center
201 W Main St. #14
Charlottesville, VA 22902
frambo@selcva.org

*Counsel on behalf of Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Georgia Conservation Voters, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, and Partnership for Southern Equity*

Danielle Fidler
Senior Attorney, Clean Energy Program
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
dfidler@earthjustice.org

John Moore Director
Sustainable FERC Project
20 N. Wacker St., Suite 1600
Chicago, IL 60201
Moore.fercproject@gmail.com

*Counsel for Sustainable FERC Project and Natural Resources Defense Council*

JA1098

Peter Ledford
General Counsel and Director of Policy
4800 Six Forks Rd., Suite 300
Raleigh, NC 27609
peter@energync.org

*Counsel for North Carolina Sustainable Energy Association*

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Alabama Power Company | ) ) | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | ) ) | ER21-1112-002 |
| Louisville Gas and Electric Company | ) ) | ER21-1114-002 |
| Duke Energy Carolinas, LLC | ) ) | ER21-1116-002 |
| Duke Energy Progress, LLC | ) ) | ER21-1117-002 |
| Georgia Power Company | ) ) | ER21-1119-002 |
| Kentucky Utilities Company | ) ) | ER21-1120-002 |
| Mississippi Power Company | ) ) | ER21-1121-002 |
| | ) | (not consolidated) |

**REQUEST FOR REHEARING OF PUBLIC INTEREST ORGANIZATIONS**

Pursuant to Sections 215 and 313 of the Federal Power Act ("FPA")[1] and Rule 713 of the

Rules of Practice and Procedure[2] of the Federal Energy Regulatory Commission ("Commission"

or "FERC"), Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP,

Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia

Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North

Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources

Defense Council ("Public Interest Organizations" or "PIOs") hereby respectfully submit this

Request for Rehearing of the Commission's failure to act on the SEEM filing within the period

---

[1] 16 U.S.C. §§ 824d, 825l.
[2] 18 C.F.R. § 385.713 (2006).

JA1100

established.[3]  Under FPA Section 205(g)(1)(A), 16 U.S.C. § 824d, "the failure to issue an order

accepting or denying the change by the Commission shall be considered to be an order issued by

the Commission accepting the change" for purposes of rehearing and appeal.

## I.    INTRODUCTION

This proceeding involves a request by several utilities in the Southeast ("the Utilities")[4]

for approval to create a multi-lateral trading and transmission pooling agreement, the Southeast

Energy Exchange Market ("SEEM").  The Utilities filed their revised tariffs and the SEEM

Market Agreement and Market Rules on February 12, 2021.[5]  The Public Interest Organizations

filed a Motion to Intervene and Protest on March 15, 2021,[6] and a Motion for Leave to Respond

and Response on April 12, 2021.[7]  The Commission issued deficiency letters on May 3, 2021[8]

and August 6, 2021,[9] and the Utilities responded to the deficiency letters on June 7, 2021[10] and

August 11, 2021.[11]  The Public Interest Organizations filed additional Protests and Responses on

---

[3] Notice of Filing Taking Effect by Operation Law (Oct. 13, 2021) ("Notice of Filing Taking Effect by Operation of Law" or "the Order"), Accession No. 20211013-3010.
[4] The SEEM Member utilities included in the filing are: Ala. Power Co., Ga. Power Co., and Miss. Power Co.; Associated Elec. Coop., Inc.; Dalton Utilities; Dominion Energy S.C., Inc.; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC; Louisville Gas & Elec. Co. and Ky. Utilities Co.; N.C. Mun. Power Agency Number 1; PowerSouth Energy Coop.; N.C. Elec. Membership Corp.; and Tennessee Valley Authority (collectively, "SEEM Members").
[5] Transmittal Letter (Feb. 12, 2021) ("SEEM Proposal" or "Proposal"), Accession No. 20210212-5033.
[6] Mot. to Intervene and Limited Protest and Comment of PIOs (Mar. 15, 2021), Accession No. 20210315-5405.
[7] Mot. for Leave to Respond and Resp. of PIOs (Apr. 12, 2021), Accession No. 20210412-5876.
[8] Letter Informing Ala. Power Co. et al. that the 02/12/2021 Filing is Deficient and Requesting Additional Information Within 45 days Under ER21-1118 et al. (May 4, 2021) ("First Deficiency Letter"), Accession No. 20210504-3015.
[9] Letter Informing Ala. Power Co. that the 06/07/2021 Filing is Deficient and Requesting Additional Information Within 10 days Under ER21-1111 et al. (Aug. 6, 2021) ("Second Deficiency Letter"), Accession No. 20210806-3000.
[10] Resp. to Deficiency Letter Regarding SEEM Agreement to be Effective 8/6/2021 under ER21-1111 Filing (June 7, 2021) ("Resp. to First Deficiency Letter"), Accession No. 20210607-5164.
[11] Resp. to Second Deficiency Letter Regarding SEEM Agreement to be effective 10/12/2021 under ER21-1111 (Aug. 11, 2021) (requesting a shortened and expedited comment period) ("Resp. to Second Deficiency Letter"), Accession No. 20210811-5101.

JA1101

July 29, 2021[12] and August 16, 2021.[13]  On October 13, 2021, the Commission failed to act within the 60-day period set by Section 205 of the FPA and the SEEM Proposal went into effect by operation of law.[14]  On November 8, 2021, the Commission issued an order accepting the revisions to investor-owned utilities' Open Access Tariffs.[15]

As discussed herein, the Public Interest Organizations seek rehearing on the Commission's failure to act on the Order.  The Utilities' SEEM Proposal creates a multi-lateral trading and transmission pooling agreement that unduly discriminates against merchant generators and renewable energy developers (together, "independent power producers") by preventing them from accessing zero-cost transmission service on equal footing as the Utilities in violation of the Commission's open access rules and past precedent.  The Commission should grant rehearing because the Order allows the Utilities to (1) assign the generally-applicable terms of the SEEM Agreement[16] *Mobile-Sierra* protection; and (2) creates new opportunities for the Utilities to exercise market power in an environment that lacks the necessary transparency and oversight to prevent and detect potential abuses.  For these reasons, the SEEM Proposal is unjust, unreasonable, and unduly discriminatory and the Commission should grant rehearing and reject the SEEM Agreement.

The PIOs intend to timely request rehearing on the Order Accepting OATT Revisions and will address, at that time, that order's failure to ensure open access to transmission service and just, reasonable, and non-discriminatory rates.

---

[12] Mot. For Leave to Respond and Resp. of PIOs (July 29, 2021), Accession No. 20210729-5190.
[13] Protest of PIOs (Aug. 16, 2021), Accession No. 20210816-5211.
[14] Notice of Filing Taking Effect by Operation of Law.
[15] Order Accepting Tariff Revisions, Docket Nos. ER21-1115, et al. (Nov. 8, 2021) ("Order Accepting OATT Revisions"), Accession No. 20211108-3065.
[16] SEEM Proposal, Attach A. ("SEEM Agreement").

JA1102

## II.  STATEMENT OF ISSUES AND SPECIFICATION OF ERROR

In accordance with Rule 713(c),[17] Public Interest Organizations provide the following

specifications of error and statement of issues, including citations to representative Commission

and court precedent.

1. The Commission's Order allows the filing parties to apply the *Mobile-Sierra* public interest presumption to generally applicable rates, terms, or conditions of the SEEM Agreement in violation of Commission policy and precedent.[18]

2. The Commission's failure to require a market power analysis of the new SEEM footprint or require an independent market monitor may lead to unjust and unreasonable rates. Similarly, the Order fails to require an independent market monitor and does not mandate sufficient transparency to allow the Commission to effectively monitor the market. Both these shortcomings violate Commission precedent.[19]

3. The Commission acted arbitrarily and capriciously by failing to address the above arguments raised in PIO's protests and answers and failing to provide sufficient justification or explanation for its decision.[20]

## III.  REQUESTS FOR REHEARING

### A. The Commission failed to apply its *Mobile-Sierra* precedent to the generally applicable rates, terms, and conditions of the SEEM Agreement.

The Commission's decision to allow *Mobile-Sierra* protection for the entirety of the

SEEM Agreement violates well-established Commission and federal court precedent. Even a

more limited application of the *Mobile-Sierra* protection to the subset of enumerated provisions,

as proposed by the Utilities in their deficiency response, would have been unlawful because

---

[17] 18 C.F.R. §§ 385.713(c)(1), (2); *see* 16 U.S.C. § 824d(g).
[18] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at PP 182–87 (2013); *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 174 (2010); *Ariz. Pub. Serv. Co.*, 148 FERC ¶ 61,012, at P 4 (2014); *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185 (2015); *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,137, at P 9 (2013).
[19] *Pub. Citizen v. FERC*, 7 F.4th 1177, *3 (D.C. Cir. 2021); 18 C.F.R. § 35.37 (2020).
[20] *Del. Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 469 (D.C. Cir. 2021) (Commission acts arbitrarily if it "fail[s] to consider an important aspect of the problem…"); *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1303 (D.C. Cir. 1992). ([I]t remains the duty of the courts "to ensure that an agency engage the arguments raised before it—that it conduct a process of reasoned decisionmaking.").

these provisions would bind potential signatories—the Utilities' competitors in the market—who would not have the opportunity to "freely negotiate."[21]

The *Mobile-Sierra* doctrine provides that the rates set in a "freely negotiated" wholesale energy contract meet the "just and reasonable" requirement of the FPA—a presumption that may be overcome only if FERC concludes that the contract seriously harms the public interest.[22] *Mobile-Sierra* only applies to a contract if it "has certain characteristics that justify the presumption."[23] More specifically, the Commission has consistently held that *Mobile-Sierra* does not apply to "generally applicable" contractual provisions—those that bind current parties to the contract but would also apply to future signatories who have limited, if any, room for negotiation.[24]

Section 16.9 of the SEEM Agreement approved by the Order applies the *Mobile-Sierra* standard of review to any future changes to the SEEM Agreement.[25] Following the Commission's May 4, 2021 Deficiency Letter requesting that the Utilities justify the application of the *Mobile-Sierra* standard, the Utilities, in their June 7, 2021 response, proposed to modify their proposal so that the just and reasonable standard would be the default and the *Mobile-Sierra* public interest standard would apply only to a set of enumerated provisions.[26]

---

[21] *See Morgan Stanley Capital Group Inc. v. Public Utility Dist. No. 1 of Snohomish County, Wash.*, 554 U.S. 527, 530, 128 S.Ct. 2733, 2737 (2008); *NRG Power Marketing, LLC v. Maine Public Utilities Comm'n*, 558 U.S. 165, 167, 130 S.Ct. 693, 696 (2010).

[22] *Morgan Stanley*, 554 U.S. at 530, 128 S.Ct. at 2737; *NRG*, 558 U.S. at 167, 130 S.Ct. at 696.

[23] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 182 (2013).

[24] *See* Statement of Chairman Glick, Accession No. 20211020-4002 at P 10 (Oct. 20, 2021) (citing *Arizona Pub. Serv. Co.*, 148 FERC ¶ 61,012 at P 4 (2014); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 187 (2013); *ISO New England Inc.*, 150 FERC ¶ 61,209 at P 185 (2015); *SW. Power Pool, Inc.*, 145 FERC ¶ 61,137 at P 9 (2013)).

[25] SEEM Agreement at 35, Art. 16.9 (citing *United Gas Pipe Line Co. v. Mobile Sierra Gas Ser. Corp.*, 350 U.S. 332 (1956) and *Fed. Power Comm'n v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956)).

[26] Resp. to First Deficiency Letter at 3–4; Resp. to First Deficiency Letter, Attach. A, Proposed Revisions to SEEM Agreement, at 35–36 ("Proposed Revisions to SEEM Agreement").

JA1104

The SEEM Agreement's provisions, which were negotiated and drafted exclusively by transmission-owning Members, apply to any prospective Participant. Participants would have to accept these conditions as-is, with limited—if any—room for negotiation. In *ISO New England*, the Commission concluded that this kind of arrangement placed future signatories "in a position that differs fundamentally from that of parties who are able to negotiate freely like buyers and sellers entering into a typical power sales contract that would be entitled to a *Mobile-Sierra* presumption."[27] The *Mobile-Sierra* doctrine is framed to protect third-party interests.[28] Yet the Utilities' proposed application of the doctrine would fail to protect these interests by undermining the ability of future Participants to seek just and reasonable rates.

Moreover, *Mobile-Sierra* protection is not appropriate where, as here, the negotiating parties have "[s]ignificant commonality of interests" that "serves to undermine . . . assurance of justness and reasonableness."[29] The Utilities are the region's largest transmission-owning utilities who all share an interest in limiting competition from independent power producers in order to maximize their own energy sales.[30] It is Commission policy that *Mobile-Sierra* does not

---

[27] *ISO New England Inc.*, 150 FERC ¶ 61,209 at P 185 (2015).

[28] *NRG*, 558 U.S. at 175, 130 S.Ct at 700 ("the *Mobile-Sierra* doctrine does not overlook third-party interest; it is framed with a view to their protection"); *Northeast Utils. Serv. Co. v. FERC*, 993 F.2d 937, 961 (1st Cir. 1993) (Stating that the case for application of the *Mobile-Sierra* doctrine is strongest "where the protection is intended to safeguard the interests of third parties.").

[29] *ISO New England Inc.*, 150 FERC ¶ 61,209 at P 186 (2015) ("[T]he *Mobile-Sierra* presumption does require that the contract provisions arise in circumstances that provide the assurance of justness and reasonableness. Significant commonality of interests serves to undermine such assurance of justness and reasonableness") (internal citations omitted).

[30] As explained by the United States Court of Appeals for the District of Columbia:

> Utilities that own or control transmission facilities naturally wish to maximize profit. The transmission-owning utilities thus can be expected to act in their own interest to maintain their monopoly and to use that position to retain or expand the market share for their own generated electricity, even if they do so at the expense of lower-cost generation companies and consumers.

*Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 683–684 (D.C. Cir. 2000).

apply to "terms arrived at by horizontal competitors with a common interest to exclude any future competition."[31]

Following the Commission's May 4, 2021 Deficiency Letter requesting that the Utilities justify the application of the *Mobile-Sierra* standard, the Utilities, in their June 7, 2021 response, proposed to modify their Proposal so that the just and reasonable standard would be the default and the *Mobile-Sierra* public interest standard would apply only to a set of enumerated provisions.[32] The Utilities proposed to make these modifications in subsequent compliance filing, if directed to do so by the Commission.[33] Thus, the refiled SEEM Agreement did not contain the narrowing language and instead applied the *Mobile-Sierra* standard to all of the SEEM Agreement's terms.[34] Though the Utilities appear to have abandoned their proposed hybrid approach to application of *Mobile-Sierra* protection, even that proposed modification of the SEEM Agreement would have been deficient as it failed to safeguard the interests of prospective future Participants.

The Utilities based their hybrid approach on a distinction between "contract rates (i.e., those terms that. . . affect only the Southeast EEM Members)" and "tariff rate[s] (i.e., those that will be generally applicable to all Participants)."[35] This approach is illogical. For example,

---

[31] *Oklahoma Gas and Electric Co. v. FERC*, 827 F.3d 75, 79–80, 423 U.S. App. DC 433, 437–38 (D.C. Cir. 2016); *see also ISO New England Inc.*, 150 FERC ¶ 61,209 at P 186 (2015) ("[T]he *Mobile-Sierra* presumption does require that the contract provisions arise in circumstances that provide the assurance of justness and reasonableness. Significant commonality of interests serves to undermine such assurance of justness and reasonableness") (internal citations omitted).

[32] Resp. to First Deficiency Letter at 3–4; Proposed Revisions to SEEM Agreement 35–36 (June 7, 2021).

[33] Resp. to First Deficiency Letter at 7 ("If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Southeast EEM Members commit to subsequently submit a compliance filing to effectuate the proposed revisions to the Southeast EEM Agreement within 30 days of acceptance.")

[34] Resp. to Second Deficiency Letter, Clean Tariff at Art. 16.9 (Aug. 11, 2021).

[35] Mot. for Leave to Answer and Answer of the SEEM Members, at 19 (July 14, 2021), Accession No. 20210714-5072.

JA1106

Section 3.2 "Member Criteria" and Article 4 "Governance" which the Utilities characterize as warranting *Mobile-Sierra* protection, certainly effect Participants because the restrictive "Membership Criteria" and "Membership Board" created by Article 4, prevent Participants from having any say in the SEEM's governance structure.[36]  Applying the *Mobile-Sierra* presumption to these two provisions all but guarantees that future Participants—who had no role in the initial negotiations—are forever locked out of SEEM's governance structure.  This is exactly why the Commission disfavors application of the *Mobile-Sierra* presumption to even isolated provisions of membership agreements: "as a form contract, [a] membership agreement must be viewed in its entirety as containing rates, terms, or condition that are generally applicable to all entities seeking [] membership[.]"[37]  Moreover, even if a hybrid approach were appropriate in this context, the Utilities did not even attempt to justify the application of *Mobile-Sierra* to each specific enumerated provision, which means they failed to "carr[y] their burden in showing that their proposal . . . strikes the necessary balance of interests."[38]

In spite of this well-established precedent, Commissioners Christie and Danly summarily dismissed Protestors' concerns regarding the application of *Mobile-Sierra* protection to the terms of the SEEM Agreement.  Commissioner Christie stated, that the *Mobile-Sierra* "issue provides no basis to vote against the Southeast EEM;"[39] however, effectively sidestepping Protestors' contentions, Commissioner Christie merely laments that existing precedent is "muddled at best,"

---

[36] Resp. to First Deficiency Letter at 40.

[37] *Am. Wind Energy Ass'n v. Sw. Power Pool, Inc*. 167 FERC ¶ 61,033 at P 72 (2019); *see also PJM*, 142 FERC ¶ 61,214 at P 184 ("[W]here the terms of an agreement would, if approved, be incorporated into the service agreements of all present and future customers, those terms are properly classified as tariff rates and the *Mobile-Sierra* presumption would not apply.").

[38] *ISO New England*, 106 FERC ¶ 61,280 at P 131 (2004) ("Finally, we find that the Filing Parties have not justified, to date, the remainder of their proposed *Mobile-Sierra* requests. In fact, the Filing Parties did not even attempt to do so, other than to provide a broad overview supporting these requests.").

[39] Statement of Commissioner Christie, Accession No. 20211020-4004 at P 20 (Oct. 20, 2021).

JA1107

and provides no further substantive response.[40]  Commissioner Danly rightly recognizes that a cavalcade of existing Commission precedent supports Protestors' position.  Specifically, Commissioner Danly concedes that "[t]he Commission's recent precedent restrict[s] *Mobile-Sierra* protections to only those contracts that bear particular hallmarks . . ." and that he "freely acknowledge[s] that Chairman Glick has the weight of Commission precedent on his side."[41]  Nevertheless, Commissioner Danly then argues that both Commission and judicial precedent are "in error."[42]

Commissioner Danly's objection is predicated upon a fundamental misapprehension of the *Sierra-Mobile* doctrine.  Commissioner Danly asserts that the "very purpose of the doctrine" is "to ensure that—absent extraordinary circumstances that would justify a public interest finding—contracts can be relied upon."[43]  That simply is not, and has never been, the purpose of the *Mobile-Sierra* doctrine.  The Supreme Court, and numerous others, have explained that the justification for applying the heightened public interest standard is premised on the fact that the contract was negotiated at arm's length between "sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them.'"[44]  Those circumstances are why a contract with these exact characteristics—and only these exact characteristics—can be uniquely relied upon.  Ironically, upending years of Commission and judicial precedence, as Commissioner Danly

---

[40] *Id.*
[41] Statement of Commissioner Danly at P 24 (Oct. 20, 2021).
[42] *Id.*
[43] *Id.*
[44] *Morgan Stanley*, 554 U.S. at 545 (quoting *Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 479, 122 S. Ct. 1646, 1656 (2002)); *see also Devon Power*, 134 FERC ¶ 61,208 at P 11 (discussing *Mobile-Sierra* presumption's underlying premise).

9

JA1108

seeks, involving the application of the *Mobile-Sierra* doctrine introduces the very element that

Commissioner Danly seeks to eliminate, contractual uncertainty.

Commissioner Danly further contends that "[e]very contract entered into freely is, to one

degree or another, negotiated. This is true even if the negotiation amounts to no more than an

offer and a rejection, implicit or explicit."[45] However, the case law is clear that what the

Applicants have provided here merely reflects a strict binary, take-it-or-leave-it choice, with no

room for arm's-length negotiation.[46]

Moreover, while Commissioner Danly attempts to cabin the D.C. Circuit's decision in

*Okla. Gas & Elec. Co. v. FERC* that endorsed FERC's position,[47] Commissioner Danly does

not—and cannot—rebut the fundamental principle animating that decision, that, "[j]ust as unfair

dealing, fraud, or duress will remove a provision from the ambit of Mobile–Sierra, *so also will*

*terms arrived at by horizontal competitors with a common interest to exclude any future*

*competition*."[48] Not only has the D.C. Circuit agreed with FERC's interpretation on this issue,

the 7th Circuit in *MISO Transmission Owners v. FERC*, similarly held that "because the parties

to the agreement were 'seeking to protect themselves from competition from third parties,' the

Mobile-Sierra presumption does not apply."[49] FERC's application of *Mobile-Sierra* is ultimately

rooted in an "assumption that contract negotiations are between adversarial parties pursuing

---

[45] Statement of Commissioner Danly at P 29.
[46] *See Metro E. Ctr. for Conditioning and Health v. Qwest Commc'ns Int'l, Inc.*, 294 F.3d 924, 926 (7th Cir. 2002) (explaining that a "tariff is a take-it-or-leave-it proposition"); *see also Sw. Power Pool*, 144 FERC ¶ 61,059 at PP 127, 129–31, 135, *on reh'g*, 149 FERC ¶ 61,048 at PP 94, 98, 101, 104–06; *Midwest Indep. Sys. Operator*, 142 FERC ¶ 61,215 at PP 177, 175, 180–81, 185, *on reh'g*, 147 FERC ¶ 61,127 at PP 108, 111, 113, 118.
[47] *Id*. at fn. 67.
[48] *Oklahoma Gas & Elec. Co.*, 827 F.3d at 80 (emphasis added); *see also Am. Transmission Sys. Inc., v. FERC*, 2016 WL 3615443 (D.C. Cir. 2016, unpublished) (dismissed for lack of jurisdiction); *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017).
[49] *MISO Transmission Owners, et al. v. FERC*, 819 F.3d 329, 335 (7th Cir. 2016).

independent interests."[50]  Here, the record shows that (1) the Utilities collectively share an interest in limiting competition from independent power producers as some of the region's largest transmission-owning investor-owned utilities, and (2) the parties that join SEEM in the future will not have the same negotiating opportunities as the Utilities.

For the reasons described above, the Commission's application of the *Mobile-Sierra* doctrine to the entire SEEM Agreement was unjust and unreasonable and inconsistent with past precedent.

### B. The Commission erred in allowing the SEEM Proposal to become effective without a market-specific market power analysis or independent market monitor.

The Commission erred in allowing the SEEM Proposal to go into effect given the Utilities' failure to prove that SEEM would not allow for the exercise of market power or manipulation of the market.  Moreover, the Commission disregarded evidence from Intervenors, including PIOs, that the structure of the SEEM Proposal makes the exercise of market power both likely and difficult to detect.  The Commission's failure to require a market power analysis and independent market monitor violates its duty to ensure that participants in SEEM "either lack, or have adequately mitigated, any horizontal or vertical market power."[51]  This lack of meaningful oversight may result in the exercise of market power, which in turn will create unjust and unreasonable rates.  On rehearing the Commission should reject the proposal.

### 1. Because the Utilities did not conduct a market power analysis the SEEM Proposal may result in unjust and unreasonable rates.

The Commission unreasonably relied on jurisdictional SEEM Members' existing market-based rate authorities despite evidence that SEEM provides the Utilities the incentive and

---

[50] Ari Peskoe, *Is the Utility Transmission Syndicate Forever?*, 42 Energy L.J. 1, 49 (2021), https://www.eba-net.org/assets/1/6/5_-_%5bPeskoe%5d%5b1-66%5d.pdf.
[51] *Public Citizen*, No. 20-1156, 2021 WL 3438374, at *3 (D.C. Cir. Aug. 6, 2021) (citing 18 C.F.R. § 35.37 (2020)).

JA1110

opportunity to exercise market power. The Utilities did not include a market power study or

market mitigating procedures or measures in the SEEM Proposal. Instead the Utilities assumed

"[p]articipation in the Southeast EEM will not alter the applicability of each entity's MBR

authority requirements."[52] Commissioner Christie agreed with the Utilities that because there is

"no new product introduced," that no such study is required.[53] But this position is not consistent

with Commission precedent regarding its requirements for market power analysis.

Market-based rate sellers are required to report changes in status to the Commission that

"would reflect a departure from the characteristics the Commission relied upon in granting

market-based rate authority."[54] Participation in a "new relevant geographic market" triggers this

requirement and necessitates a new market power analysis.[55]

As Commissioner Clements explained,

> To the extent that the Commission has granted jurisdictional Southeast EEM
> Participants the authority to transact in the Southeast, it has done so based on the
> results of market power analyses of each Participant's ability to exercise market
> power in the balancing authority areas in which they own generation and
> transmission assets. Those analyses assume that each balancing authority is
> essentially its own unique market, and require a number of inputs that are specific
> to the market being studied. Given its expanded footprint, voluntary nature, and
> introduction of NFEETS, all of these inputs would necessarily be different for the
> Southeast EEM.[56]

The Utilities' failure to provide, and Commission's failure to require, a market-specific market

power analysis makes it impossible to reasonably conclude that SEEM Members and future

Participants would not be able to exercise market power. Without this guarantee, SEEM cannot

be determined to produce just and reasonable rates and should have been rejected.

---

[52] SEEM Proposal at 7.
[53] Statement of Commissioner Christie at P 14.
[54] *Pacificorp*, 147 FERC P 61,227, 62,338–39 (2014).
[55] *Id.*
[56] Statement of Commissioner Clements, Accession No. 20211020-4003 at P 44 (Oct. 20, 2021).

JA1111

2. *The SEEM Proposal lacks transparency and fails to include an independent market monitor, and therefore may result in unjust and unreasonable rates.*

To make matters worse, SEEM's lack of transparency and absence of an independent market monitor means that market power abuse could take place and the Commission would never know. Instead of an independent market monitor, the SEEM Proposal assigns a Market Auditor to review the market's operation.[57] However, the Market Auditor does not fulfill the critical oversight functions associated with an independent market monitor such as watching for market abuse and design flaws and reporting any such problems to the Commission.[58] The Market Auditor does not monitor Participant behavior.[59] Moreover, the Market Auditor is not in any way independent—it reports to the Membership Board and no one else.[60]

In response to the Commission's deficiency letters the Utilities made commitments to provide additional transparency, but those commitments were not part of the SEEM Agreement that went into effect by operation of law.[61] As things stand, the Utilities are not required, and have not proposed any modification to their tariffs that would provide the Commission or the public with weekly market data. And even if the Utilities provided the Commission with market data, it would be insufficient to allow the Commission to meaningfully monitor the market for market power abuse. As the Commission has previously explained, "transaction-specific data is the 'minimum needed for market monitoring purposes.'"[62] Without an independent market monitor or enough transparency to empower the Commission to monitor for market power abuse,

---

[57] SEEM Proposal at 17.
[58] *See, e.g.*, *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810, 904 (2000) (describing the requirements of a monitoring plan).
[59] SEEM Proposal at 17.
[60] SEEM Agreement at App. B., Section VI.D.
[61] Statement of Chairman Glick at P 13.
[62] *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1014 (9th Cir. 2004) (quoting *Revised Public Utility Filing Requirements*, 99 FERC P 61,107 (2002)).

JA1112

SEEM may be unjust and unreasonable.[63]  The Commission should correct these errors by

rejecting the proposal on rehearing.

### C. The Commission should grant rehearing because it failed to adequately explain its conclusion that the SEEM Proposal is just and reasonable.

The Commission's Order is arbitrary and capricious because it fails to address the PIOs'

and other Intervenors' protests and does not include any explanation of its conclusion.[64]

In the past, courts have found that a "deadlocked vote is unreviewable."[65]  But in 2018,

Congress revised Section 824d of the Federal Power Act to provide that if the Commission

allows the 60-day period to expire without issuing an order, "the failure to issue an order . . .

shall be considered to be an order issued by the Commission accepting the change[.]"[66]

Congress specified that such an order could be subject to a rehearing request and was appealable

to the United States Court of Appeals for the District of Columbia.[67]

A Commission order containing no explanation cannot be just and reasonable.[68]  While

the Commissioner's Fair Rates Act Statements may in theory be entitled to deference,[69] the

statements collectively "lack reasoned explanation" as noted above regarding numerous issued

---

[63] *See* Statement of Chairman Glick at PP 13–14 (explaining that without increased transparency promised in the Utilities' response to deficiency letters SEEM may be unjust and unreasonable.).

[64] *See Delaware Div. of Pub. Advocate*, 3 F.4th at 465("The Commission must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record . . . [and] must articulate a satisfactory explanation for its action[.]") (internal citations and quotations omitted).

[65] *Public Citizen, Inc. v. FERC*, 839 F.3d 1165, 1174 (D.C. Cir. 2016) (quoting *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1133 (D.C. Cir. 2007)).

[66] 16 U.S.C. § 824d(g)(1)(A).

[67] 16 U.S.C. §§ 824d(g)(2), 825I(b).

[68] *See Public Citizen, Inc. v. FERC*, 7 F.4th 1177, 1196 (D.C. Cir. 2021) ("[T]he Commission fell far short of the type of reasoned explanation that the law requires."); *Farmers Union Cent. Exchange, Inc. v. FERC*, 734 F.2d 1486, 1518, (D.C. Cir. 1984) (FERC must "articulate a satisfactory explanation for its action.").

[69] *See FEC v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992) (holding that a joint statement from three out of six FEC Commissioners dismissing a complaint was entitled to deference); *Radio-Television News Directors Ass'n v. FCC*, 184 F.3d 872, 875 (D.C. Cir. 1999) (holding that a joint statement from two out of four deadlocked FCC Commissioners declining to adopt a rule was entitled to deference).

raised by PIOs.  As explained above, the Commissioners who would have voted to approve the

SEEM Proposal have put forward positions that conflict with Commission and court precedent,

or are otherwise nonresponsive to PIOs comments.[70]

Thus, the Commission's Order, which fails to respond to the aforementioned concerns,

cannot be just and reasonable.[71]  Moreover, lacking sufficient explanation or application of

agency expertise, the Order would not be entitled to deference upon review.[72]

## IV.    RELIEF REQUESTED

For the aforementioned reasons, the PIOs respectfully request that the Commission grant

this request for rehearing and reject the SEEM Proposal for failing to meet Section 205 of the

Federal Power Act's requirement that all rates be just and reasonable.[73]  In the alternative, the

PIOs request that the Commission set the issues raised here and those to be raised in subsequent

requests for rehearing on the Order Accepting OATT Revisions for a paper hearing with a

technical conference before briefing.  The PIOs also reiterate their request for a broader technical

conference on wholesale market development in the Southeast.

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, Public Interest Organizations respectfully

request that the Commission grant rehearing of its Order and reject the SEEM Proposal.

---

[70] *See supra* at pp. 9-11, 12; *see also* Statement of Commissioner Clements at P 13 (noting that with regard to a number of arguments raised in this docket, that the other Commissioners who would have voted for the proposal did not "engage with these arguments on the merits")

[71] *Emera Maine v. FERC*, 854 F.3d 9, 23 (D.C. Cir. 2017) ("[I]n all cases, the Commission must explain its reasoning when it purports to approve rates as just and reasonable.") (quoting *TransCanada Power Mktg. Ltd. v. FERC*, 811 F,3d 1, 12 (D.C. Cir. 2015)).

[72] *See Delaware Div. of Pub. Advocate*, 3 F.4th at 465.

[73] 16 U.S.C. § 824d(a).

JA1114

Respectfully submitted,

*/s/ Maia Hutt*
Maia Hutt
Staff Attorney
Southern Environmental Law Center
601 W Rosemary St., Suite 220
Chapel Hill, NC 27516
mhutt@selcnc.org

Frank Rambo
Senior Attorney
Southern Environmental Law Center
201 W Main St. #14
Charlottesville, VA 22902
frambo@selcva.org

*Counsel on behalf of Energy Alabama, Sierra Club,*
*South Carolina Coastal Conservation League,*
*GASP, Georgia Conservation Voters, Southern*
*Alliance for Clean Energy, Southface Energy*
*Institute, Inc., Vote Solar, Georgia Interfaith Power*
*and Light, and Partnership for Southern Equity*

Aaron Stemplewicz
Senior Attorney, Clean Energy Program
Earthjustice
1617 John F. Kennedy Blvd., Suite 1130
Philadelphia, PA 19103
astemplewicz@earthjustice.org

John Moore
Director
Sustainable FERC Project
20 N. Wacker St., Suite 1600
Chicago, IL 60201
moore.fercproject@gmail.com

*Counsel for Sustainable FERC Project and Natural*
*Resources Defense Council*

Peter Ledford
General Counsel and Director of Policy
4800 Six Forks Rd., Suite 300
Raleigh, NC 27609
peter@energync.org

*Counsel for North Carolina Sustainable Energy*
*Association*

JA1115

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served in accordance with 18 C.F.R. §

385.2010 upon each party designated on the official service lists in the proceedings listed above,

by email.

Dated at Chapel Hill, N.C. this 12th day of November, 2021.


*/s/ Maia Hutt*
Maia Hutt
Staff Attorney
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
mhutt@selcnc.org

JA1116

Document Content(s)
2021-11-12 PIO's Rehearing Request.pdf....................................1

**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Alabama Power Company | ) | ER21-1111-000 |
| | ) | |
| Dominion Energy South Carolina, Inc. | ) | ER21-1112-000 |
| | ) | |
| Louisville Gas and Electric Company | ) | ER21-1114-000 |
| | ) | |
| Duke Energy Progress, LLC | ) | ER21-1115-000 |
| Duke Energy Carolinas, LLC | ) | |
| | ) | |
| Duke Energy Carolinas, LLC | ) | ER21-1116-000 |
| | ) | |
| Duke Energy Progress, LLC | ) | ER21-1117-000 |
| | ) | |
| Louisville Gas and Electric Company | ) | ER21-1118-000 |
| | ) | |
| Georgia Power Company | ) | ER21-1119-000 |
| | ) | |
| Kentucky Utilities Company | ) | ER21-1120-000 |
| | ) | |
| Mississippi Power Company | ) | ER21-1121-000 |
| | ) | |
| Alabama Power Company | ) | ER21-1125-000 |
| | ) | |
| | ) | ER21-1128-000 |
| Dominion Energy South Carolina, Inc. | ) | |
| | ) | (not consolidated) |

**REQUEST FOR REHEARING, OR IN THE ALTERNATIVE, MOTION FOR
CLARIFICATION BY THE CLEAN ENERGY COALITION**

Pursuant to Sections 205(g) and 313 of the Federal Power Act ("FPA"), 16 U.S.C. §§

824d(g), 825*l*, and Rules 212 and 713 of the Federal Energy Regulatory Commission's ("FERC"

or "Commission") Rules of Practice and Procedure, 18 C.F.R. §§ 385.212, 713 (2021),

Advanced Energy Economy ("AEE"), the Advanced Energy Buyers Group ("AEBG"),

Renewable Energy Buyers Alliance ("REBA") and the Solar Energy Industries Association

-1-

JA1118

1984) (requiring that FERC's decisions be "supported by substantial evidence in the record and reached by reasoned decisionmaking").

2. The Deadlock Notice is arbitrary and capricious because it accepts the SEEM Proposal despite its unduly discriminatory membership structure, flawed governance provisions, unduly discriminatory market rules, and susceptibility to exercise of market power and manipulation by incumbent SEEM Members. *See* Section III.B; *see, e.g.*, Order No. 888; *Cent. Iowa Power Coop.*, 606 F.2d 1156, 1170-72 (DC Cir 1979) ("*Central Iowa*"); *Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075 at 61,317 (1999), *petitions for review denied, Alliant Energy Corp. v. FERC*, 253 F.3d 748 (D.C. Cir. 2001); *Gulf States Utils. Co. v. FPC*, 411 U.S. 747, 759 (1973) ("*Gulf States*"); *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 279 (1976) ("*Conway*").

3. The Deadlock Notice is arbitrary and capricious because it accepts the SEEM Agreement's application of the *Mobile-Sierra* standard to the generally applicable provisions of the SEEM Proposal in a manner that is contrary to Commission precedent. *See* Section III.C; *see, e.g., Arizona Pub. Serv. Co.*, 148 FERC ¶ 61,012, at P 4 (2014) (contrasting settlement rates that apply only to parties to the settlement with another settlement involving generally applicable rate schedules that apply to any entity for open access service); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 187 (2013) (stating that the Commission's conclusion that right of first refusal provisions at issue created generally applicable requirements was "bolstered by the fact that any new PJM Transmission Owner would have to accept these provisions as-is, with limited room for negotiation"); *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185 (2015); *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,137, at P 9 (2013).

4. The Deadlock Notice lacks reasoned decision-making, and is therefore arbitrary and capricious, because it accepts the SEEM Proposal without responding to the "relevant" and "significant" public comments and without "adequately explain[ing] its results." *See, e.g., Motor Vehicles Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 33 (1983) ("*State Farm*"); *Sierra Club v. EPA*, 863 F.3d 834 (D.C. Cir. 2017); *Public Citizen v. FAA*, 988 F.2d 186 (D.C. Cir. 1993).

## III.    Request for Rehearing

### A.    The Commission Failed to Explain Departure from Precedent

The multilateral SEEM Proposal did not present a novel concept for which the Commission has no basis for decision. The Commission has evaluated loose power pools for more than thirty years and has reviewed multiple proposals whereby the participants share in pooled transmission (in this case, through the OATT Amendments) and exchange generation at

-8-

market-based rates (in this case, through the SEEM Agreement). For example, just like the Mid-Continent Area Power Pool ("MAPP") arrangement, the individual members of SEEM "offer and provide jurisdictional transmission service"[31] in order to enable the sharing of selected electric generating resources. When reviewing such proposals, the Commission has consistently examined the rates, terms, and conditions of multilateral agreements amongst transmission owners to ensure they contained appropriately tailored provisions to eliminate the ability to exercise market power.

In failing to address the potential exercise of market power, and failing to explain how the rates, terms, and conditions of the SEEM Proposal prevent the exercise of market power, the Commission has failed to fulfill its core obligations. Where FERC's "explanation for a contested action is lacking or inadequate, it will not survive judicial review and the matter will be returned to FERC for appropriate action."[32]

### 1.     The Commission erred by accepting the individual OATT Amendments and ignoring bedrock open access requirements applicable to loose power pools like SEEM

While Commissioner Danly correctly explains that SEEM "is not—and was never intended to be" an energy imbalance market ("EIM"), an ISO, or an RTO, neither Commissioner Danly nor Commissioner Christie acknowledged what SEEM is: **a loose power pool.** The Commission has been clear that a loose power pool is "*any multilateral arrangement*, other than a tight power pool or a holding company arrangement, that explicitly or implicitly contains

---

[31] *Mid-Continent Area Power Pool*, 92 FERC ¶ 61,229, 61,755 (2000) ("Contrary to Enron's assertion, the facts in APX are unlike the facts in the instant case. APX exercised effective control over facilities used for wholesale sales in the market and determined the final price at which energy would be sold. In contrast, MAPP does not itself own or control jurisdictional transmission facilities, or provide transmission services, or determine prices at which transmission is sold. Under the terms of the MAPP members' contractual agreements, the individual MAPP members (and not MAPP) offer and provide jurisdictional transmission service.").

[32] *Environmental Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021).

JA1120

discounted and/or special transmission arrangements."[33]  There is no dispute on the central facts:

The SEEM Proposal is a multilateral arrangement and explicitly contains discounted and/or

special transmission arrangements (the "Non-Firm Energy Exchange Transmission Service" or

"NFEETS" that is used to support SEEM transactions).  It was arbitrary and capricious for the

Commission to accept the SEEM Proposal as a just and reasonable rate without first determining

if the individual OATT Amendments were sufficient to prevent the exercise of market power and

promote open and non-discriminatory access.[34]

  As Commissioner Clements rightly recognizes, the SEEM Proposal "fails to abide by the

bedrock principles of open access and non-discrimination that were crystallized in the

Commission's landmark Order No. 888."[35]  In order to join and obtain access to NFEETS, a

prospective SEEM participant is required "(1) to obtain the countersignature of the [SEEM]

Agent at the direction of the Operating Committee, a body controlled entirely by Members, and

(2) to execute Enabling Agreements with at least three other Participants."[36]  In the initial *MAPP*

orders the Commission rejected a two-class membership system similar to that of the SEEM

Proposal.[37]  There, the Commission recognized the "significant advantages flowing from MAPP

membership and the corresponding impact of denied access" and held that the tiered membership

system was not reasonably related to MAPP's objective.[38]  The Commission's wholesale failure

---

[33] Order No. 888-A, 78 FERC ¶ 61,220.

[34] By authorizing the SEEM Agreement without a pool-wide OATT the Commission may not have the means to protect consumers from rate pancaking when the price of NFEETS is increased above $0.

[35] Commissioner Clements Statement at ¶ 2.

[36] Commissioner Clements Statement at ¶ 16.

[37] *MAPP*, 58 FPC 2622 (1977) ("Opinion No. 806").

[38] *Id.*

JA1121

to address, consistent with its precedent, whether the SEEM Proposal complies with the

Commission's long-standing open access precedent is arbitrary and capricious.

In accepting the SEEM Proposal by operation of law, the Commission risks denying

customers in the Southeast open access to transmission service on rates and terms similar to

those the transmitting utilities forming SEEM offer to themselves, contrary to long-standing

Commission precedent and regulatory requirements.[39]  The Commission's regulations mandate

that every public utility joining a "multilateral trading arrangement or agreement that contains

transmission rates, terms, or conditions" after 2011 *must* adopt a pool-wide tariff to ensure open

and non-discriminatory access.[40]  The Commission has long-held that a joint pool-wide OATT is

necessary "in order to adequately remedy the undue discrimination in transmission access and

pricing by public utilities that are members of power pools or other coordination agreements."[41]

Individual OATT filings, like the individual OATT Amendments submitted as part of the SEEM

Proposal, are "insufficient to cure undue discrimination in transmission" because the SEEM

Members "can continue to trade with a selective group within a power pool that discriminatorily

excludes others from becoming a member and that provides preferential intra-pool transmission

rights and rates."[42]  As the Clean Energy Coalition and others explained, the individual OATT

Amendments proffered as part of the SEEM Proposal do not provide sufficient protection

whereas a pool-wide OATT will ensure consumers are protected from unjust and unreasonable

rates while preventing undue discrimination. Authorizing the SEEM Proposal without ensuring

---

[39] Order No. 888, 61 Fed. Reg. 21,540, 21,541 (1996); *see also MAPP*, 87 FERC ¶ 61,075 (1999) ("[M]embers of a loose power pool, as well as non-members, must have access to the same transmission services within that power pool on a comparable basis and pay the same or a comparable rate for those services.").

[40] 18 C.F.R. § 35.28(c)(3)(i).

[41] Order No. 888, 61 Fed. Reg. 21,593.

[42] *Id.*

the tariff sheets contained sufficient protections to prevent undue discrimination by the

transmission-owning members of SEEM was arbitrary, capricious, and not consistent with

reasoned decisionmaking.

> **2.     The Commission erred by ignoring bedrock market-based rate requirements necessary to ensure the SEEM Proposal produces just and reasonable rates**

In their opening comments, the Clean Energy Coalition stated that the SEEM Parties

should provide a market power analysis by which the Commission can judge each Member's

structural market power because the non-public utilities within the SEEM Membership lack

market-based rate tariffs and the Commission has never investigated whether the public utilities

within the SEEM Membership may have structural market power under the structure established

by the SEEM Proposal or in any of the other balancing areas in the SEEM territory.  Authorizing

the SEEM Proposal, without considering how to mitigate the SEEM Members' structural market

power is arbitrary, capricious, an abuse of discretion, and inconsistent with the Commission's

obligation to protect consumers from the exercise of market power by regulated utilities.

The SEEM Proposal does not comply with the Commission's precedent requiring

algorithmic market operators to provide a tariff that "clearly set[s] forth how [it] will interact

with buyers and sellers, how it will compute prices, and what it will charge for its services."[43]

Under the SEEM Proposal made effective by operation of law, SEEM Members have sole

discretion over the inputs to, and outputs from, the price-setting algorithm and Members have no

obligation to inform participants how the algorithm will interact, compute prices, or charge for

its services.  As the Clean Energy Coalition explained, well-established precedent supports

---

[43] *See Automated Power Exch.*, 82 FERC ¶ 61,287 ("APX I"), *reh'g denied*, 84 FERC ¶ 61,020, 61,090 (1998) ("*APX II*")

examining the market power of the SEEM Members and, where such market power is detected, determining the appropriate mitigation measures necessary to protect consumers from market power abuses.[44]  Yet, the Commission failed to act.

Under the SEEM Proposal made effective by operation of law, the Participant-controlled toggle switch is the sole and exclusive means to protect against the exercise of buyer or seller market power.  As the Clean Energy Coalition further explained a Participant-controlled toggle switch does not actually mitigate the market power of the Participant controlling the switch. Authorizing the SEEM Proposal without requiring further transparency is inconsistent with the Commission's obligation to assess and address the potential for market power abuses prior to authorizing any market-based rate agreement, including the SEEM Agreement.  The Commission cannot "assert that questions critical to the market power determination were properly deferred for another day."[45]

Because the SEEM Proposal contains insufficient detail to determine whether it would produce just and reasonable rates, the Clean Energy Coalition requests rehearing.  Just like the automated and algorithmic power exchanges approved by the Commission after Order No. 888, the algorithm instituted through the SEEM Proposal will set energy prices, choose and match the parties to a transaction, and manage transmission service.[46]  Assessing the potential exercise of market power in multilateral trading agreements, like the SEEM Proposal, has always been a key

---

[44] *See, e.g., Fed. Power Comm'n v. Conway Corp.*, 426 U.S. at 279 ("The Commission must arrive at a rate level deemed by it to be just and reasonable, but in doing so it must consider the tendered allegations that the proposed rates are discriminatory and anticompetitive in effect"); *accord Cajun Elec. Power Coop. v. FERC,* 28 F.3d 173, 180 (D.C. Cir. 1994) (explaining that in approving the rate without adjudicating the question of whether the utility might retain market power the Commission "ignored this important question of fact and thus erred").

[45] *Cajun Electric*, 28 F.3d at 180.

[46] *APX*, 204 F.3d 1144 (D.C. Cir. 2000) (explaining that an algorithmic market operator with "effective control" over jurisdictional facilities must demonstrate a lack of market power and/or propose sufficient mitigation measures)

component of the Commission's analysis.  The failure to provide a reasoned explanation supporting the Commission's refusal to assess the potential exercise of market power prior to authorizing the SEEM Proposal constitutes reversible error.

**B.     The Deadlock Notice is arbitrary and capricious because it accepts the SEEM despite its unduly discriminatory provisions and susceptibility to exercise of market power and manipulation by incumbent SEEM Members**

As the Clean Energy Coalition has explained throughout this proceeding,[47] the SEEM Members failed to demonstrate — as is their burden under Section 205 of the FPA[48] — that the SEEM Proposal is just and reasonable, and not unduly discriminatory or preferential. The Deadlock Notice is arbitrary and capricious because it accepts the SEEM Proposal despite its unduly discriminatory membership and governance structure, unduly discriminatory market rules, and susceptibility to exercise of market power and manipulation by incumbent SEEM Members.

**1.     Unduly Discriminatory Membership and Governance Structure**

The SEEM membership and governance structure was not shown to be just and reasonable, and the Deadlock Notice is arbitrary and capricious.

First, the SEEM membership structure creates "two unequal classes of market participants"[49] in a manner that thwarts open access to transmission service and results in undue

---

[47] *Ala. Power Co.,* Comments of Advanced Energy Economy, Advanced Energy Buyers Group, Renewable Energy Buyers Alliance, and the Solar Energy Industry Association, Docket No. ER21-1111, *et al*. (March 15, 2021) ("CEC Opening Comments "); *Ala. Power Co.,* Motion for Leave to Answer, and Answer, Advanced Energy Economy, Advanced Energy Buyers Group, Renewable Energy Buyers Alliance, and the Solar Energy Industry Association, Docket No. ER21-1111, *et. al*, (April 14, 2021) ("Clean Energy Coalition Answer").

[48] *See, e.g., Indicated SPP Transmission Owners v. Southwest Power Pool, Inc.*, 165 FERC ¶ 61,005 at P 10 (2018) (the proponent of a rate change under Section 205 of the FPA "has the burden of proof to demonstrate that the rate is just and reasonable, and must ensure that there is a sufficient evidentiary record for the Commission to make a reasoned decision").

[49] Commissioner Clements Statement at ¶ 33.

discrimination in violation of the FPA. Open membership has long been used by the Commission to mitigate market power among a loose power pool and would serve to counter-balance the SEEM Members' control over the market.[50] Yet, under the SEEM Proposal made effective by the Deadlock Notice, only entities that (1) serve load; (2) obtain the countersignature of the SEEM Agent at the direction of a governance body controlled entirely by SEEM Members; and (3) execute Enabling Agreements with at least three other SEEM participants, are allowed to participate in SEEM.[51] As Commissioner Clements recognized, "the Three Counterparty Rule and Participant Agreement requirements may prevent a prospective Participant from accessing the market because current Participants may 'collude to exclude prospective Participants by refusing to enter into Enabling Agreements,' or the Operating Committee could direct the Agent to block access by declining to sign the Participant Agreement with a given counterparty."[52]

These membership restrictions give "preferential treatment to the small coterie of Members, granting them operational control of the complex and important market platform that allocates transmission service, as well as unique auditing and oversight abilities not shared with other Participants, and exclusive control over all meaningful governance decisions."[53]  All other would-be participants are relegated to second class status, forced to choose between "participat[ing] in a market that is controlled in all substantive respects by preferred Members and risk[ing] exposure to market flaws, potential exercises of market power, or other abuses that

---

[50] *Cent. Iowa Power Coop.*, 606 F.2d at 1170-1172 (discussing the Commission's modifications to discriminatory membership provisions of Mid-Continent Area Power Pool).

[51] Commissioner Clements Statement at ¶ 27 (citations omitted) ("A key defect of the Southeast EEM is that, except for one narrow exception, an entity must be an LSE in the Southeast EEM footprint to be a Member.  This restrictive provision, standing alone, violates the express terms of Order No. 888.").  As Commissioner Clements astutely notes, requiring potential participants to obtain consent gives Members and existing Participants "leverage they may use to block market access to transmission service." Commissioner Clements Statement at ¶ 27.

[52] Commissioner Clements Statement at ¶ 18.

[53] Commissioner Clements Statement at ¶ 33 (citing Order No. 888, 61 Fed. Reg. at 21,541).

may not be detected due to skewed and inadequate oversight, transparency and fair governance" or "forgo[ing] access to a valuable transmission service altogether."[54] This restriction on access to transmission service violates the open access and non-discrimination principles of Order No. 888.

Second, the flawed governance structure "excludes whole classes of interested parties from any participation in governance," "allows for control entirely by vertically integrated utilities," and establishes a voting structure that "effectively gives the three largest utility Members veto rights over any significant issues."[55] As the Clean Energy Coalition explained, the "proposed governance of the SEEM does not provide for reasonable representation."[56] Commission precedent requires that the SEEM Proposal meet the transparency and independence requirements of the Commission's open access precedents, including providing a transparent governance system that is not unduly influenced by vertically integrated utilities to the exclusion of other parties and a stakeholder process that permits meaningful conversation and input among wholesale sellers, customers, public interest groups, state commissions, and other state officials.[57] Conversely, the Commission has long-held that governance structures providing "undue influence to vertically integrated utilities" are not compliant with the minimum standards of FPA Section 205.[58] The Clean Energy Coalition requested that the Commission consider implementing a pool-wide OATT as a mitigation measure or, at the very least, consider adopting

---

[54] Commissioner Clements Statement at ¶ 33 (citing Order No. 888, 61 Fed. Reg. at 21,541).

[55] CEC Opening Comments at 19.

[56] CEC Opening Comments at 19; *see also* Commissioner Clements Statement at ¶ 36 ("The proposal also vests Members alone with power to meaningfully weigh in on any potential changes to the Market Rules, providing no meaningful opportunity for non-Members, including other Southeast EEM market participants, states, or customers, to have a voice.").

[57] CEC Opening Comments at 15-21.

[58] *Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075 at 61,317 (1999), *petitions for review denied, Alliant Energy Corp. v. FERC*, 253 F.3d 748 (D.C. Cir. 2001).

as mitigation measures (1) unrestricted membership; (2) fair and transparent governance; and (3) market monitoring and reporting.[59]  Thus the Deadlock Notice's failure to recognize or require mitigation of the unduly discriminatory and preferential membership and governance structures of the SEEM is arbitrary and capricious.  This effect is only compounded by the *Mobile-Sierra* provisions of the SEEM Agreement that effectively prevent the Commission from implementing subsequent mitigation remedies for any anticompetitive conduct, a protection that the D.C. Circuit found essential.[60]

## 2.     Unduly Discriminatory Market Rules

The market rules that govern operation of the market are also unduly discriminatory in violation of the FPA. These rules work in concert to ensure the "small coterie of Members"[61] retain exclusive control over membership, operation of the market, and, crucially, oversight and monitoring of the SEEM platform. Commissioner Clements noted that

> Member control over operations is provided via their exclusive ability to participate in both the [S]EEM Membership Board and Operating Committee, which are vested with near total control over the structure and operation of the market.  The Membership Board will have sole responsibility and input into the operation and oversight of the [S]EEM platform, including the hiring and firing of the Administrator, who operates the platform.  The Membership Board also chooses the Auditor, who oversees the platform, and determines how often, if ever, the Auditor performs its function.  Together, the Auditor and Administrator are responsible for ensuring that the [S]EEM's multi-lateral optimization platform functions as intended.[62]

---

[59] *See* Clean Energy Coalition Comments at 15-21; Clean Energy Coalition Answer at 7-11.

[60] *See Central Iowa Power Cooperative v. FERC.,* 606 F.2d 1156, 1172 (DC Cir 1979) ("*Central Iowa*"). *See also* Chairman Glick Statement at ¶ 11 ("Applying the *Mobile-Sierra* presumption in these circumstances will make it more difficult for third parties or even the Commission to mount legitimate challenges in the future to the justness and reasonableness of the Southeast EEM.  Put simply, there is no need (and no basis) to apply the *Mobile-Sierra* presumption here—and there is considerable risk to the public in doing so.")

[61] Commissioner Clements Statement at ¶ 33.

[62] Commissioner Clements Statement at ¶ 34 (citations omitted).

These market rules do not provide a level playing field for all participants, and the SEEM Members failed to demonstrate that they lead to just and reasonable rates. The Commission therefore erred in allowing SEEM to become effective by operation of law.

Furthermore, the SEEM Proposal made effective by operation of law lacks the necessary protections, including a transparent stakeholder process, to ensure the rates, terms, and conditions are just and reasonable. In the form made effective by the Deadlock Notice, the SEEM Proposal fails to establish a fair and transparent process by which participants can provide input to the SEEM Members, Auditor, or Administrator. Establishing a transparent and robust stakeholder process that explicitly contemplates participation by customers, independent suppliers, public interest groups, and state and local regulators would again counter-balance anticompetitive harms that could arise because the SEEM Members' have not been shown to lack market power. Likewise, "prospective Participants do not have adequate means of detecting or seeking redress regarding abuse in restricting market access," "appear not to have a right to bring complaints to the Auditor," and lack a means to access SEEM performance data that would be necessary to institute changes given the *Mobile-Sierra* presumption.[63] The market monitoring and transparency changes requested by intervening parties, including the Clean Energy Coalition, were reasonably designed and tailored to prevent market power abuses by SEEM Members that may seek to exercise their market power to foreclose competitors or diminish competition. Little to no transparency, yet wide discretion, is a recipe for undue discrimination. This risk is compounded by the *Mobile-Sierra* provisions that effectively prevent future changes to the key provisions of the SEEM Proposal.[64]

---

[63] Commissioner Clements Statement at ¶ 21 (citations omitted).

[64] Chairman Glick Statement at ¶ 11.

### 3.      Susceptibility to Market Power and Manipulation

Accepting the SEEM Agreement for market-based pricing, without first ensuring a lack of market power, is arbitrary, capricious, and an abuse of discretion.  The Commission has a "responsibility to consider" whether rates, terms, and conditions filed with it would allow wholesale sellers to exert market power, and whether mitigation measures are necessary to address such risks and ensure that rates remain just and reasonable.[65]  For more than three decades the Commission has consistently held that the lack of market power "is the key prerequisite for allowing market-oriented pricing."[66]  Yet, the Deadlock Notice fails to analyze whether SEEM Members lack market power and also fails to address whether market power mitigation measures are necessary to ensure rates remain just and reasonable.  The Clean Energy Coalition raised the concern that "SEEM presents potential risks of expansion of market power of incumbents," which may allow the SEEM Members to "withhold NFEET Service from their competitors by not designating their competitors as counterparties"[67] and could "erod[e] the demand for hourly trading, as reported in the Guidehouse Report."[68]  As Commissioner Clements observed, "[i]t is hard to imagine a more direct and problematic barrier than granting a

---

[65] See *Gulf States*, 411 U.S. at 759, *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 279 (1976), *Central Iowa*, 606 F.2d at 1162.

[66] See *Ocean State Power*, 44 FERC ¶ 61,261, 61,979 (August 19, 1988).

[67] CEC Opening Comments at 24.

[68] CEC Opening Comments at 23.

subset of market participants veto power over whether others may access transmission service, as the Participant Agreement requirement does."[69]

### C.     The Deadlock Notice is arbitrary and capricious because it accepts the SEEM Proposal despite application of the *Mobile-Sierra* standard in a manner contrary to Commission precedent

The Deadlock Notice's failure to address the unlawful application of the *Mobile-Sierra* standard is in error.  As made effective by the Deadlock Notice, Section 16.9 of the SEEM Agreement provides that absent voluntary agreement among the SEEM Members, the "standard of review for changes to any portion of this Agreement proposed by a non-Party, or FERC acting *sua sponte*, shall be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event shall be lower than the "public interest" standard of review set forth by [*Mobile-Sierra*]."[70]  The record, however, cannot support a conclusion that the SEEM Agreement is a freely-negotiated contract entitled to *Mobile-Sierra* protections.  The D.C. Circuit has been clear:  "[j]ust as unfair dealing, fraud, or duress will remove a provision from the ambit of *Mobile-Sierra*, so also will terms arrived at by horizontal competitors with a common interest to exclude any future competition."[71]

Under settled Commission precedent, the *Mobile-Sierra* presumption of justness and reasonableness applies to a contract "only if the contract has certain characteristics that justify the presumption."[72]  In ruling on whether the characteristics necessary to justify a Mobile-Sierra presumption are present, "the Commission must determine" whether the instrument at issue

---

[69] Commissioner Clements Statement at ¶ 20.

[70] SEEM Agreement at §16.9.  While the SEEM Parties compliance filing may limit application of the *Mobile-Sierra* standard to a subset of provisions the application remains unlawful as explained herein.

[71] *OG&E*, 827 F.3d at 80.

[72] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 182 (2013).

embodies either: (1) individualized rates, terms, or conditions that apply only to sophisticated parties who negotiated them freely at arm's length; or (2) rates, terms, or conditions that are generally applicable or that arose in circumstances that do not provide the assurance of justness and reasonableness associated with arm's-length negotiations.[73]  The *Mobile-Sierra* presumption does not apply to "generally applicable" contract terms "including those that bind not just the parties to the contract but also would apply to any potential future signatories with limited, if any, room for negotiation."[74]

Even if the SEEM Members submit the compliance filing they committed to provide to update the tariff sheets to reflect certain concessions and revisions to Section 16.9 as proposed in response to the First Deficiency Letter,[75] the proposed application of the *Mobile-Sierra* presumption would still be unlawful.  Section 16.9 impermissibly restricts future signatories and require that they take the provisions to which the presumption is applied as they find it. Such new signatories "thus would be placed in a position "that differs fundamentally from that of parties who are able to negotiate freely like buyers and sellers entering into a typical power sales contract that would be entitled to a *Mobile-Sierra* presumption."[76] As Chairman Glick explained, the SEEM Members "have not shown 'extraordinary' or 'compelling' circumstances that, under Commission precedent, would merit application of *Mobile-Sierra* here as a matter of agency

---

[73] *Id.*

[74] Chairman Glick Statement at ¶ 10 (citing *Arizona Pub. Serv. Co.*, 148 FERC ¶ 61,012, at P 4 (2014) (contrasting settlement rates that apply only to parties to the settlement with another settlement involving generally applicable rate schedules that apply to any entity for open access service); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 187 (2013) (stating that the Commission's conclusion that right of first refusal provisions at issue created generally applicable requirements was "bolstered by the fact that any new PJM Transmission Owner would have to accept these provisions as-is, with limited room for negotiation"); *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185 (2015); *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,137, at P 9 (2013)).

[75] *See* SEEM Deficiency Response at 43.

[76] Chairman Glick Statement at ¶ 10 (citing *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185).

JA1132

discretion."[77]  Therefore, the Commission's *sub silentio* departure from its prior precedent within this proceeding is arbitrary and capricious.

> **D.      The Deadlock Notice lacks reasoned decision-making, and is therefore arbitrary and capricious, because it accepts the SEEM Proposal without responding to public comments raising significant concerns and without adequately explaining its results**

Many parties raised material concerns with the SEEM Proposal in this proceeding.  The Deadlock Notice's failure to respond to these significant and relevant questions lacks a reasoned explanation demonstrating a "rational connection between the facts found and the choice made."[78]  For example, the Clean Energy Coalition requested that the Commission consider implementing a pool-wide OATT as a mitigation measure or, at the very least, consider adopting as mitigation measures (1) unrestricted membership; (2) fair and transparent governance; and (3) market monitoring and reporting.[79]  Furthermore, the SEEM Proposal made effective by operation of law lacks the necessary protections and fails to provide a transparent stakeholder process to ensure the rates, terms, and conditions of the tariff are just and reasonable.  As the Clean Energy Coalition explained, the "proposed governance of the SEEM does not provide for reasonable representation."[80]  In addition, the *Mobile-Sierra* presumption does not apply to "generally applicable" contractual provisions,[81] which many parties repeatedly explained.  The

---

[77] *Id.* (citing *High Island Offshore Sys., LLC*, 135 FERC ¶ 61,105, at PP 23-25 (2011); *Devon Power,* 137 FERC ¶ 61,073, at P 37 (2011)).

[78] *State Farm*, 463 U.S. at 43; *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203 (D.C. Cir. 2011) (holding that the Commission must respond to raised "facially legitimate objections"); *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005); *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001).

[79] *See* Clean Energy Coalition Comments at 15-21; Clean Energy Coalition Answer at 7-11.

[80] CEC Opening Comments at 19.

[81] *Id.* at ¶ 10.

JA1133

Deadlock Notice's failure to adjudicate these issues is arbitrary, capricious, not consistent with reasoned decision-making, and an abuse of discretion.

As Commissioner Clements observes, "[r]ather than engage with these arguments on the merits," a portion of the Commission was willing to accept the SEEM Members' assertions "without examining the ample evidence to the contrary."[82] While the Commission may have limited discretion in modifying a Section 205 filing to order specific revisions,[83] the Commission has a statutory duty under the FPA and the APA to ensure that proposals proffered by public utilities do not become effective unless the rates, terms, and conditions of such proposals are just, reasonable, and not unduly discriminatory. As the Supreme Court has made clear, reviewing courts are to "closely scrutinize" the Commission's decisions in the event the Commission "summarily disposes of proffered objections" and "approve[s] an issue without considering its anticompetitive consequences."[84] The Clean Energy Coalition requests that the Commission grant rehearing and issue an Order that considers all relevant factors and explains any departure from the Commission's prior policies governing the market mitigation measures required for loose power pools.

## IV.    Request for Clarification

In the event the Commission does not grant rehearing, the Clean Energy Coalition requests clarification and confirmation on the role and function of the SEEM Proposal and the platform that will enable transactions. As the SEEM sponsors themselves emphasize, SEEM is

---

[82] Commissioner Clements Statement at ¶ 13.

[83] *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 110 (D.C. Circ. 2017).

[84] *Gulf States,* 411 U.S. at 763 ("where the Commission summarily disposes of proffered objections, or where it exercises its discretion to approve an issue without considering its anticompetitive consequences, the reviewing court must closely scrutinize its action in light of the . . . [applicable] statutory obligations); *Central Power & Light Company v. FERC*, 575 F.2d at 939.

-23-

JA1134

nothing more than a "enhancement" to the status quo in the Southeast. The status quo in the Southeast is characterized by separate vertically-integrated utilities operating independent balancing authorities that customers must attempt to navigate individually (through impactable and costly transmission arrangements and charges) to access new supplies to meet their needs. The Clean Energy Coalition requests the below affirmative confirmations because it is important to be clear that the SEEM Agreement, the OATT Amendments, and the resulting platform, do not constitute or serve as a regional transmission entity that independently ensures open access to transmission service and conducts regional planning to ensure the adequacy of the transmission system to meet future customer needs and access new sources of generation needed to meet policy requirements and customer demands. As states, utilities, and customers consider regional wholesale market options to meet their future needs in the face of a changing resource mix, new policies, and evolving customer needs, clarity from the Commission regarding the following points will facilitate decision-making by states, utilities, customers, and stakeholders in the Southeast and elsewhere regarding future regional wholesale market options.

First, the Clean Energy Coalition seeks an affirmative confirmation that the SEEM Proposal, whether through the SEEM Agreement or the SEEM platform, does not engage in regional transmission planning, coordination, and/or operation. While the SEEM Proposal enables some degree of coordination of the limited low priority NFEETS, the SEEM Proposal does not otherwise provide for any type or regional planning, coordination, or operation. Specifically, the Clean Energy Coalition requests an affirmative clarification that the SEEM Proposal has no role, and does not enable any responsibility for, reliable planning, operation, maintenance, and upgrade and expansion of any transmission system of any SEEM Member.

-24-

JA1135

Second, the Clean Energy Coalition seeks an affirmative confirmation that, other than for the limited as-available NFEETS, the SEEM Proposal contains no provision regarding the pricing of and access to transmission service over the systems of the SEEM Members, nor does it have provisions regarding the safe, reliable, efficient, and not unduly discriminatory provision of transmission services within the footprint of the SEEM Members.

Lastly, the Clean Energy Coalition seeks an affirmative confirmation that the SEEM Proposal has no provision to ensure that consumers' needs for economic and reliable transmission are met nor does it ensure that generating resources owned by the SEEM Members or others have sufficient transmission to meet their needs.

JA1136

### V.   Conclusion

The Clean Energy Coalition are supporters of market formation and promote competition as a tool to ensure better outcomes and savings for customers. For the reasons set forth herein, the Clean Energy Coalition respectfully requests that the Commission grant rehearing and issue an Order in accordance with the requirements of the APA and the FPA.  In the alternative, the Clean Energy Coalition requests that the Commission provide the clarifications described herein.

Respectfully submitted,

*/s/ Adrienne Mouton-Henderson*
Adrienne Mouton-Henderson
Director, Policy Innovation
Renewable Energy Buyers Alliance
1425 K Street NW, Suite 1110
Washington, DC 20005
amouton-henderson@rebuyers.org

*/s/ Jeffery Scott Dennis*
Jeffery S. Dennis, Managing Director and
General Counsel
Caitlin Marquis, Director
Advanced Energy Economy
1010 Vermont Ave. NW, Suite 300,
Washington, D.C. 20005
Telephone: (202) 380-1950
jdennis@aee.net
cmarquis@aee.net

*/s/ Gizelle Wray*
Gizelle Wray
Director of Regulatory Affairs and Counsel
Melissa Alfano
Manager of Regulatory Affairs and Counsel
Solar Energy Industries Association
1425 K St NW, Suite 1000
Washington, DC 20005
(202) 682-0556
gwray@seia.org
malfano@seia.org

**November 12, 2021**

-26-

JA1137

**McGuireWoods LLP**
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Phone: 202.857.1700
www.mcguirewoods.com

**Noel Symons**
Direct: 202.857.2929

# McGuireWoods

NSymons@McGuireWoods.com

November 24, 2021

<span style="text-decoration: underline">**Via eTariff**</span>

Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C.  20426

**Re:**     ***Alabama Power Co.*, on behalf of Georgia Power Company, Mississippi Power Company, Dominion Energy South Carolina, Inc., Duke Energy Carolinas, LLC, Duke Energy Progress, LLC, Louisville Gas & Electric Company, and Kentucky Utilities Company**
**Docket No. ER22-___-000**
<u>**Revisions to the Southeast Energy Exchange Market Agreement and Request for Waiver of Prior Notice**</u>

Dear Secretary Bose:

On October 12, 2021, the Southeast Energy Exchange Market ("Southeast EEM") Agreement ("Southeast EEM Agreement"),[1] as originally filed on February 12, 2021, in Docket Nos. ER21-1111-000, *et al.* ("Underlying Proceeding"), became effective by operation of law.[2] Alabama Power Company, on behalf of the Members[3] of the Southeast EEM hereby submits

---

[1]     Alabama Power is the lead filer of the Southeast EEM Agreement.  The Southeast EEM Agreement is designated as Alabama Power Company's Rate Schedule No. 1011 in its Market-Based Rate Tariff eTariff database.  Each of the Federal Energy Regulatory Commission ("Commission")-jurisdictional Members has on file a Certificate of Concurrence to the Southeast EEM Agreement.  Each of the concurrences provides that the filer concurs with "all future amendments and modifications" to the Southeast EEM Agreement, and so are not being re-filed here.  The rate schedule numbers for each of the certificates of concurrence are as follows:  Rate Schedule No. 1011 for Georgia Power Company and Mississippi Power Company; Rate Schedule No. 234 for Dominion Energy South Carolina, Inc. ("Dominion Energy SC"); Rate Schedule No. 567 for Duke Energy Carolinas, LLC ("DEC"); Rate Schedule 394 for Duke Energy Progress, LLC ("DEP"); and Rate Schedule No. 517 for Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU").

[2]     *Ala. Power Co.*, Notice of Filing Taking Effect by Operation of Law, Docket Nos. ER21-1111-002, ER21-1112-002, ER21-1114-002, ER21-1116-002, ER21-1117-002, ER21-1119-002, ER21-1120-002, ER21-1121-002 (issued Oct. 13, 2021) ("Notice of Effectiveness").

[3]     For purposes of this Filing, the Members are: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric

---

Atlanta | Austin | Baltimore | Charlotte | Charlottesville | Chicago | Dallas | Houston | Jacksonville | London | Los Angeles - Century City
Los Angeles - Downtown | New York | Norfolk | Pittsburgh | Raleigh | Richmond | San Francisco | Tysons | Washington, D.C.

JA1138

Ms. Kimberly D. Bose
November 24, 2021
Page 2

revisions to the Agreement under Section 205(c) of the Federal Power Act ("FPA") and Part 35 of the Federal Energy Regulatory Commission's ("Commission" or "FERC") regulations[4] to stand by the commitments previously made in the Underlying Proceeding.  Specifically, the revisions are made to:  (1) file through e-Tariff previously specified revisions to the Agreement proposed by the Members in the Underlying Proceeding; (2) formalize other commitments offered by the Members in subsequent pleadings submitted in the Underlying Proceeding, but not drafted as revisions to the Southeast EEM Agreement at that time; and (3) make ministerial changes and add language that the Members have identified as necessary to facilitate initial implementation of the Southeast EEM.  All revisions have either been previously proposed and supported in the Underlying Proceeding or are ministerial in nature.  The Members respectfully request that the Commission accept these revisions, effective as of November 25, 2021, one day after the date of this filing.  The Members request waiver of the Commission's prior notice requirements to permit the requested November 25, 2021 effective date.

As an amendment filing, the scope of this new proceeding is narrow.  The Southeast EEM Agreement is now a filed rate, and will remain so whether these amendments are accepted, or not.  If the amendments are rejected, the Southeast EEM Agreement as originally filed on February 12, 2021 will remain the effective rate.[5]  As discussed further below, rejection or acceptance of the amendments are the only permissible outcomes of this Section 205 proceeding. The Commission cannot, in this proceeding, revisit the justness and reasonableness of the existing provisions of the Southeast EEM Agreement, except and only to the extent that the Members propose, through this exercise of their Section 205 rights, to change such provisions. With the exception of some minor clean-up changes, all of the revisions proposed here are in response to concerns identified by protestors and Commission Staff.  While not required to offer these changes, the Members offer them in good will and to demonstrate their commitment to transparency and collaboration, and hope that they will be received in the same spirit.

---

Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy SC; DEC and DEP (together "Duke"); LG&E and KU (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, "LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); PowerSouth Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA") (each a "Member" and collectively, the "Members").  In addition, the following entities have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members: Georgia System Operations Corporation ("GSOC"); Georgia Transmission Corporation (An Electric Membership Corporation) ("GTC"); Municipal Electric Authority of Georgia ("MEAG Power"); Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and South Carolina Public Service Authority ("Santee Cooper").

[4]       16 U.S.C. § 824d(c) (2016); 18 C.F.R. pt. 35.

[5]       The Members acknowledge that two requests for rehearing were filed in the Underlying Proceeding on November 12, 2021.

JA1139

Ms. Kimberly D. Bose
November 24, 2021
Page 3

## I.    Background

On February 12, 2021, Alabama Power Company, on behalf of the Members, filed the Southeast EEM Agreement for Commission approval in Docket No. ER21-1111-000.[6] Each of the other jurisdictional Members filed Certificates of Concurrence,[7] and each Member that is a transmission service provider filed revisions to its transmission tariff to offer zero-charge transmission service to accommodate Southeast EEM transactions ("Non-Firm Energy Exchange Transmission Service" or "NFEETS").[8] The Members requested a May 13, 2021 effective date for the Southeast EEM Agreement. The jurisdictional Members used an "open-ended" 12/31/9998 effective date for the OATT Filings, because those revisions were contingent on Commission acceptance of the Southeast EEM Agreement and the ultimate "Commencement Date" of the Southeast EEM Agreement, a date that is currently unknown.

Parties intervened in each of the unconsolidated dockets, and some filed protests or comments. The Members filed a motion for leave to answer and answer to issues raised in comments and protests on March 31, 2021.[9] On May 4, 2021, Commission Staff issued a deficiency letter,[10] to which the Members responded on June 7, 2021.[11] The Deficiency Letter focused on issues involving market power, concerns about NFEETS reducing point-to-point revenue credits, concerns about *Mobile-Sierra* protections, and other issues. As described in more detail below, the Members, in their response, proposed specific revisions to the Agreement that would 1) increase transparency by requiring the submission of a significant amount of

---

[6]    *Ala. Power Co.*, Southeast Energy Exchange Market Agreement, Docket No. ER21-1111-000 (filed Feb. 12, 2021) ("Southeast EEM Agreement Filing").

[7]    Specifically, Georgia Power submitted its concurrence in Docket No. ER21-1119-000, Mississippi Power submitted its concurrence in Docket No. ER21-1121-000, Dominion Energy SC submitted its concurrence in Docket No. ER21-1112-000, DEC submitted its concurrence in Docket No. ER21-1116-000, DEP submitted its concurrence in Docket No. ER21-1117-000, KU submitted its concurrence in Docket No. ER21-1120-000, and LG&E submitted its concurrence in Docket No. ER21-1114-000.

[8]    Specifically, Southern Companies submitted their OATT revisions in Docket No. ER21-1125-000, Dominion Energy SC submitted its OATT revisions in Docket No. ER21-1128-000, DEC submitted its OATT revisions in Docket No. ER21-1115-000, and LG&E submitted its OATT revisions in Docket No. ER21-1118-000 (the "OATT Filings").

[9]    *Ala. Power Co.*, Motion for Leave to Answer and Answer of the Southeast EEM Members, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (filed Mar. 31, 2021) ("March 31 Answer").

[10]    *Ala. Power Co.*, Deficiency Letter, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (issued May 4, 2021) ("First Deficiency Letter").

[11]    *Ala. Power Co.*, Deficiency Response, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (filed June 7, 2021) ("First Deficiency Response").

Ms. Kimberly D. Bose
November 24, 2021
Page 4

additional information to the Commission on a weekly basis,[12] 2) increase the  transparency of the Market Auditor reports,[13] 3) confirm that protections are in place for neighboring transmission systems,[14] and 4) limit *Mobile-Sierra* protections to only a few specific provisions in the Southeast EEM Agreement.[15]  The Members stated that they would make such revisions if ordered to do so by the Commission, and thus submitted an illustrative redline in .pdf format, rather than file the revisions through eTariff.  The Members committed to make a compliance filing to reflect the proposed revisions in eTariff if FERC accepted the revisions and otherwise accepted the Southeast EEM Agreement without modification.[16]

Several parties filed comments to the First Deficiency Response, and one party filed a protest.[17]  The Members filed a motion for leave to answer and answer on July 14, 2021.[18]  In its answer to protests of the First Deficiency Response, the Members offered several additional changes that they would be willing to make to the Agreement to address protestors' concerns if directed to do so by the Commission.  On August 6, 2021, Commission Staff issued a second deficiency letter,[19] to which the Members responded on August 11, 2021.[20]

---

[12]    *See id.* at 17-18

[13]    *Id.* at 27-31.

[14]    *Id.* at 32-33.

[15]    *Id.* at 39-40.

[16]    *Id.* at 7 ("If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Members commit to subsequently submit a compliance filing to effectuate the proposed revisions to the Southeast EEM Agreement within 30 days of acceptance").

[17]    Specifically, Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council (together, the "PIOs") filed a protest ("PIOs Protest to Deficiency Response").

[18]    *Ala. Power Co.*, Motion for Leave to Answer and Answer of the Southeast EEM Members, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (filed July 14, 2021) ("July 14 Answer").

[19]    *Ala. Power Co.*, Second Deficiency Letter, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (issued Aug. 6, 2021) ("Second Deficiency Letter").

[20]    *Ala. Power Co.*, Second Deficiency Response, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (filed Aug. 11, 2021) ("Second Deficiency Response").

The Southeast EEM Agreement and associated certificates of concurrence became effective by operation of law on October 12, 2021 due to Commission inaction.[21]  In accordance with the provisions of the FPA,[22] each of the Commissioners released a statement on the Commission inaction on October 20, 2021.  In his statement, Chairman Glick noted that "the original filings, not [the] subsequent responses, go into effect by operation of law" and as such, he "urge[d] the parties to stand by their additional commitments on transparency."[23]  Chairman Glick stated that "without those commitments embodied in the filing parties' responses to the deficiency letters, the Southeast EEM may be unjust and unreasonable under section 206 of the Federal Power Act."[24]  Chairman Glick reiterated his comment during the October 21st Commission meeting.[25]

On November 8, 2021, the Commission accepted the OATT Filings and directed certain Members to submit ministerial compliance filings and directed the Members to submit an informational filing at least 30 days prior to the Southeast EEM Commencement Date.[26]  In a concurring opinion Chairman Glick again expressed his desire for the Members to make a filing implementing their previously proposed transparency enhancements.[27]

## II.    **This Proceeding Is Limited to The Question of Whether the Proposed Revisions Are Just And Reasonable**

Consideration of the amendments proposed in this FPA Section 205 Filing is limited to those provisions which the Members propose to change.  "Commission review of proposed changes under FPA Section 205 does not extend to separate and discrete provisions that the filing public utility has not proposed to change."[28]  Further, the Commission's review under

---

[21]    *See* Notice of Effectiveness.

[22]    16 U.S.C. § 824d(g)(1)(B).

[23]    *Ala. Power Co.*, Statement of Chairman Glick at P 13, Docket Nos. ER21-1111-002, ER21-1112-002, ER21-1114-002, ER21-1116-002, ER21-1117-002, ER21-1119-002, ER21-1120-002, ER21-1121-002 (issued Oct. 20, 2021) ("Chairman Glick Statement").

[24]    *Id.* at P 14.  Commissioner Danly also noted that no compliance filing was triggered by the notice.  *See Ala. Power Co.*, Statement of Commissioner Danly at P 18, Docket Nos. ER21-1111-002, ER21-1112-002, ER21-1114-002, ER21-1116-002, ER21-1117-002, ER21-1119-002, ER21-1120-002, ER21-1121-002 (issued Oct. 20, 2021).

[25]    Chairman Glick Opening Statements, October 21st Commission Meeting, https://player.invintus.com/?clientID=6107166667&eventID=2021101001.

[26]    *See Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 at P 1 (2021).

[27]    *See id.* at Chairman Glick Concurrence, P 4 ("I will again take this opportunity to remind the parties of their commitments to provide extensive transaction data on a weekly basis to the Commission and to publicly post, with appropriate confidentiality limitations, any information requests from regulators along with the Southeast EEM Auditor's responses to such requests.").

[28]    *Duke Energy Carolinas, LLC*, 123 FERC ¶ 61,201 at n.9 (2008).

Ms. Kimberly D. Bose
November 24, 2021
Page 6

Section 205 is "passive and reactive."[29]  In other words, "FERC may not go 'beyond approval or rejection' of a proposal to 'adoption of an entirely different rate design' than the proposal."[30]  Any "proponents of a change in an unchanged component of rates" will "bear the burden under section 206 of the FPA to show that the existing [rate] is unjust and unreasonable and that a specific replacement [rate is] just and reasonable."[31]

### III.     Proposed Revisions to Southeast EEM Agreement

The Members have always intended to fulfill the commitments reflected in their filings because it is the right thing to do and, as Chairman Glick observed, to do otherwise might raise questions regarding the Southeast EEM.  To that end, the Members submit these proposed revisions to effectuate revisions previously offered in deficiency responses and other pleadings.  Additionally, as explained below, the Members submit several ministerial and administrative revisions to the SEEM both to reflect the use of defined terms, and to provide for administrative efficiency during the initial implementation period of the Southeast EEM prior to market launch and operations.  These revisions have all either been previously identified and supported in the Underlying Proceeding or are ministerial in nature.  These amendments are proposed as a package, and as such, are not severable from each other.[32]  Each of the proposed revisions are described in more detail below.

### A.  Revisions to Southeast EEM Agreement Proposed in the First Deficiency Response

With this Filing, the Members submit revisions to the Southeast EEM Agreement to effectuate proposed revisions to the Southeast EEM Agreement that were offered by the Members in their First Deficiency Response.  Those changes were detailed in Attachment A to the First Deficiency Response, and also recounted below.  The changes are also reflected in Attachment A to this Filing.  For ease of reference, the changes previously submitted in the illustrative redline attached to the First Deficiency Response are shown in purple, while all other changes are shown in red.

### 1.  Weekly submissions of confidential market data

As they did in the First Deficiency Response, the Members propose revisions to the Southeast EEM Agreement to effectuate the weekly submission of confidential market data to the Commission.  Specifically, the Members propose a new "Appendix D" to the Southeast EEM Agreement that describes information that will be provided to the Commission.  This information is comparable to what RTOs provide under Order No. 760, but adjusted for the different market design of the Southeast EEM, by amending the Southeast EEM Agreement to require the Southeast EEM Administrator to confidentially provide the following information to the

---

[29]     *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 114 (D.C. Cir. 2017) ("*NRG*").

[30]     *Id.* at 115.

[31]     *Mich. Elec. Transmission Co.,* 116 FERC ¶ 61,164 at P 12 (2006); *PJM Interconnection, LLC*, 114 FERC ¶ 61,201 at P 46 (2006).

[32]     *NRG*, 862 F.3d at 115 (noting that the Commission can't approve "half of a proposed a rate").

Ms. Kimberly D. Bose
November 24, 2021
Page 7

Commission, and to the Market Auditor, every seven days:

- Participant, Bid/Offer price, quantity, location, and All or Nothing information for each Bid and Offer in each Delivery Interval;

- Specific parameter data for each Participant for all 15-minute intervals, including counterparties the Participant has elected to not be matched with for a Delivery Interval and Balancing areas for which the Participant has elected not to be matched with a counterparty during a Delivery Interval;

- Enabling Agreement counterparties for each Participant;

- The Network Map, updated as necessary;

- For each Delivery Interval, ATC made available to the Southeast EEM by each Participating Transmission Provider, as well as the amounts of such ATC that are not used by the Southeast EEM;

- Price caps, as relevant for each Participant;

- Matched Bids and Offers with their associated scheduled MWh quantity and Energy Exchange Price;

- Implied marginal benefit information for each ATC limit for each interval, to the extent such information can reasonably be produced by the Southeast EEM Algorithm; and

- Descriptive information, such as Participant names and unique identifiers.[33]

The Members propose to provide this information with respect to all transactions within the Southeast EEM, regardless of whether the parties to the transaction are jurisdictional. However, submission of this data with respect to non-jurisdictional entities is voluntary in conjunction only with the participation of such entities in the Southeast EEM, and the Members request that the Commission expressly confirm that submission and receipt of such data does not and will not affect the jurisdictional status of non-jurisdictional Members in any way. Also, with respect to the confidentiality of the information submitted, the Members request that the Commission affirm that, like the information submitted by RTOs in response to Order No. 760, the data submitted by the Southeast EEM to FERC will remain non-public, and subject to FOIA Exemption 4.[34]

To implement this commitment, the Members propose to add a new Section 2.5 to the Southeast EEM Agreement, which will state as follows:

---

[33]     *See* First Deficiency Response at 17-18; Proposed Revisions to Southeast EEM Agreement, App'x D. Note that tariff revisions proposed with this Filing as represented in the list above reflect corrections to use applicable defined terms. Other than these non-substantive revisions, the list proposed here is the same as what was provided to the Commission in the First Deficiency Response.

[34]     *See Enhancement of Elec. Mkt. Surveillance & Analysis through Ongoing Elec. Delivery of Data from Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 760, 139 FERC ¶ 61,053 at PP 34-36 (2012) ("Order No. 760").

**The Southeast EEM Administrator shall provide the information set forth in
Appendix D to FERC in accordance with FERC's secure file transfer protocol,
and to the Market Auditor, every seven (7) days for the immediately preceding
seven (7)-day period and shall answer any follow-up questions from FERC
regarding such information, which questions and answers shall be posted on
the Southeast EEM Website in the same manner as the reports of the Market
Auditor, including the same requirements for confidential treatment of
transmission function information and commercially sensitive information.**[35]

### 2.  Posting of market auditor reports and responses to regulator inquiries

The First Deficiency Response also contained proposed revisions to the Southeast EEM
Agreement to clarify and increase the transparency surrounding the Market Auditor's functions
and roles.  The Members again submit those revisions here, revised to reflect defined terms.
Specifically, the Members propose the following language be added to the Market Rules'
description of the Market Auditor's functions:

**Respond to written questions from Participants, FERC, NERC, applicable
state commissions in the region, Tennessee Valley Authority's Inspector
General, and any other applicable regulators that oversee the electric
operations of any Member regarding the integrity of the matching process.
Such information requests and Market Auditor responses (which will be
provided, where reasonable, within thirty (30) days), along with any reports
generated by the Market Auditor in accordance with these Market Rules, will
be provided to the Southeast EEM Administrator, which will post such
documents to the Southeast EEM Website. To the extent that such information
(whether the question or the response or other document) is Transmission
Function Information (as defined below) or Commercially Sensitive
Information (as defined below), it will be posted to a confidential section of the
Southeast EEM Website accessible only to Participants, and access by
Participants shall be governed pursuant to the confidentiality provisions of the
Participant Agreement.  Access by regulators shall be subject to a standing
request that such regulators treat such information with the highest degree of
confidentiality permissible under law applicable to each such regulator.
"Transmission Function Information" shall have the meaning provided at 18
C.F.R. Sections 358.3(j), or the successor to that provision.  "Commercially
Sensitive Information" shall include any information that could confer a
competitive advantage on the recipient, or whose disclosure could harm or
commercially disadvantage an entity associated with the information,
including, but not limited to, any Participant-specific information, such as the
Bbid and Offer information provided to FERC and the Market Auditor every
seven days. The entity providing the information for the Southeast EEM
Administrator to post to the Southeast EEM Website (i.e., typically the Market**

---

[35]  *See* First Deficiency Response at 18; Proposed Revisions to Southeast EEM Agreement, Section
2.5.

**Auditor) shall be responsible for determining which information posted to the Southeast EEM Website should be placed in the confidential section of the Southeast EEM Website, and shall resolve any uncertainty in favor of treating the information confidentially.  In no event shall the Market Auditor or Southeast EEM Administrator cause Commercially Sensitive Information that is identifiable to a particular Participant or Critical Energy/Electric Infrastructure Information to be posted to the Southeast EEM Website. Members shall have access to information posted on the Southeast EEM Website at the same time and subject to the same restrictions as other Participants.  To the extent that the Market Auditor is required to provide a report or document to the Membership Board, it will do so by notifying the Membership Board when the report or document has been posted to the Southeast EEM Website.[36]**

While the general thrust of this requirement is to increase transparency, Participant-specific information and Critical Energy Infrastructure Information ("CEII") will not be posted.  Such information will be redacted from any document or information that is posted.  Unredacted copies will be confidentially provided to the Commission or other applicable regulator upon request.

The Members also propose to delete the following sentence in the Market Rules, at Section VI.D: "The Membership Board will maintain sole responsibility for determining whether to share the information any further."  Doing so will avoid conflict with the transparency revisions proposed herein.  In its place, the Members propose to add the following sentence to that section (bolded and underlined):

**Auditing Process.**  Auditing functions will be performed by the Market Auditor at the direction of the Membership Board.  The Market Auditor will report its conclusions, and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis.  **This will be accomplished through the Southeast EEM Website posting process identified in Section VI.D.6, thereby ensuring that access to these reports by the Members and others will be simultaneous, subject to any applicable confidentiality restrictions . . .[37]**

The Members also propose to revise the complaints provision in Section VI.D.5 of the Market Rules to ensure that complaints submitted by Participants, as well as any subsequent investigation, are subject to the new Southeast EEM Website posting requirement:

~~Refer~~ **Report** any complaints received **from a Participant** to the Membership

---

[36]     *See* Proposed Revisions to Southeast EEM Agreement, Market Rules, VI.D.6.  As noted below, this is a new provision that will cause the former Section IV.D.6 to become VI.D.7.  This provision has been updated from the First Deficiency Response to refer specifically to defined terms.

[37]     This language has been updated from the First Deficiency Response to reflect the use of defined terms.

Board, and investigate **and report** further at the Membership Board's direction.[38]

Further edits to the complaint process in this section, which the Members committed to in their July 14 Answer, are explained below in Section III.B.4.

To accommodate the new targeted 30-day deadline for responding to regulators, the Members propose to revise the Market Rules to state as follows:

> **Except as otherwise specified herein**, the Membership Board will be responsible for defining the time interval(s) for the auditing function to be performed and **for the Market Auditor to** report back to the governing body. Such interval(s) will be published in the Southeast EEM Manuals.[39]

The Southeast EEM Agreement contains restrictions on access to non-public transmission function information and competitively sensitive information by marketing function personnel of the Members or their affiliates.[40] Additionally, in light of the proposed availability of this information to Participants, and the potential commercial sensitivity of some such information, the Members are proposing that Participants (including Members) be subject to an enhanced restriction – i.e., that they commit that information posted by the Southeast EEM Administrator in the confidential section of the Southeast EEM Website will not be provided to marketing function employees.[41] To this end, the Members are proposing changes to the Participant Agreement. Specifically, the Members propose to add the following to the Participant Agreement:

> The Participant shall supply the Southeast EEM Administrator with any and all information deemed reasonably necessary for the administration of the Southeast EEM System. **The Participant acknowledges and agrees that it will not provide information posted in the confidential section of the Southeast EEM Website to any employee of itself or an affiliate engaged in Marketing Functions, where Marketing Functions shall be those meeting the definition found at 18 C.F.R. Section 358.3(d), except that for purposes of this Agreement Marketing Functions shall also refer to the functions described in that provision even if the entity performing those functions is not a public utility subject to FERC jurisdiction. The Participant shall identify to the Southeast EEM Administrator all employees who may access the confidential portion of the Southeast EEM Website, and certify that such employees are not engaged in Marketing Functions, and the Southeast EEM Administrator will grant access to the confidential portion of the Southeast EEM Website only to such employees. The Participant shall be responsible to ensure that the Southeast**

---

[38] This language has been modified from the First Deficiency Response to clarify that the Market Auditor will report complaints received from Participants.

[39] Under the currently-effective Southeast EEM Agreement, the revision at issue was Section VI.B.6, but under the proposed revisions will be Section VI.B.7. This language has been updated from the First Deficiency Response to reflect the use of applicable defined terms.

[40] *See* Southeast EEM Agreement, Section 3.5 (Member Standard of Conduct).

[41] *See* Proposed Revisions to Southeast EEM Agreement, Participant Agreement, Section 6.1.

Ms. Kimberly D. Bose
November 24, 2021
Page 11

> **EEM Administrator is notified before any such employee commences engagement in Marketing Functions such that access to the confidential section of the Southeast EEM Website can be revoked.**[42]

We note that these changes to restrict access to confidential information are not a barrier to entry – they apply *only* if the Participant *elects* to obtain such confidential information.  The Participant does not need to make such an election in order to transact in the Southeast EEM.

The flowcharts below provide a visual of how information will flow between the Market Auditor, the Administrator, and Participants depending on the type of inquiry – the first chart reflects how information will flow under the various transparency requirements, while the second chart provides the decision tree for determining what information to post, and how it may be accessed, each time there is a posting determination to be made:



---

JA1148

Ms. Kimberly D. Bose
November 24, 2021
Page 12



### 3. Protections for neighboring transmission systems

As noted in the First Deficiency Response, the Southeast EEM will respect other systems and abide by all existing agreements on seams issues, including contractual limits.[43]  However, to address any remaining concerns over unauthorized use of neighboring systems, the Members propose certain clarifying changes to the Southeast EEM Agreement and Market Rules.

The terms of the currently-effective Southeast EEM Agreement already require Participating Transmission Providers providing NFEETS to provide information required by the Market Rules, including "sufficient information to permit the Southeast EEM Administrator to create a Network Map . . . for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges."[44]  Each Southeast EEM Transmission Provider already posts on its OASIS (or equivalent) its methodology for calculating ATC.  To clarify the intent that a precondition for any match will be sufficient ATC on each system along the Contract Path, the Members propose the following modifications to the Southeast EEM Agreement to require each Transmission Provider to commit to following its posted methodology in making its reports of ATC to the Southeast EEM System.  This, in turn, will ensure that there is no match that exceeds the most limiting element along the Contract Path for

---

[43]     First Deficiency Response at 33.

[44]     *See* Southeast EEM Agreement, Market Rules, IV.A.2; *id.*, Market Rules, Definition of "Non-Firm Energy Exchange Transmission" (requiring the Participating Transmission Provider to provide "the information specified in and as required by Section IV.A.2 of the Southeast EEM Market Rules to the Southeast EEM System").

that transaction.

Specifically, the language the Members propose states as follows (with proposed changes bolded and underlined):

> Prior to being permitted to provide Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall provide sufficient information to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM Territory for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges. **Prior to the Southeast EEM Commencement Date, the then-current version of the Network Map shall be posted to the Southeast EEM Website, with future updates reported in accordance with Section V of these Market Rules.[45]  On an ongoing basis, consistent with the timing requirements of Section IV.B.2.a, each Participating Transmission Provider shall  provide the Administrator with the Available Transfer Capability ("ATC") as calculated by the Participating Transmission Provider per the methodology for calculating ATC that each Participating Transmission Provider already specifies in its OATT (or equivalent) and posts on its OASIS (or equivalent), as that ATC may change from time to time.[46]**

In Section IV.B.1.2, the Members propose to revise the language on timing of providing ATC information to clarify that it will be ATC information.  The proposed revision will read as follows (with proposed language bolded and underlined):

> For each Clock Hour, every Participating Transmission Provider's ~~available capacity for NFEETS~~ **ATC** must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of such next Clock Hour.  To the extent a Participating Transmission Provider can update its ~~available capacity for NFEETS~~ **ATC** within a Clock Hour, such updated information must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of the applicable Delivery Interval.

Additionally, in Section IV.C.1, the Members propose to broaden the "requirements" that must be honored when the Algorithm produces matches.  Instead of referring only to those requirements in Section IV.A.1, the provision will now encompass all requirements in Section IV.A in order to encompass the ATC reporting provision.  Specifically, the Members propose Section IV.C.1 to read as follows:

> . . .

---

[45]    This sentence was not contained in the First Deficiency Response, and is discussed below in Section III.B.1.

[46]    *See* Proposed Revisions to Southeast EEM Agreement, Market Rules, IV.A.2 (proposed language bolded and underlined).

The Southeast EEM Algorithm will match Bids and Offers so as to result in Energy Exchanges that maximize the Southeast Energy Exchange Market total benefit for the applicable Delivery Interval while simultaneously honoring all the requirements identified in Section ~~IV.A.1~~ **IV.A** and the constraints identified in Section IV.C.6. The total benefit shall be calculated by aggregating the benefits from each Energy Exchange for the applicable Delivery Interval.

Finally, the Members propose to revise the Southeast EEM Agreement to more clearly require the Algorithm to respect ATC limits by removing the reference to "available capacity for NFEETS" and instead tying the provision to ATC calculated by the Participating Transmission Provider. The Members propose to revise Section IV.C.6.b.i as follows:

In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the ~~available capacity for NFEETS~~ **ATC of any Participating Transmission Provider** on any given Contract Path to be exceeded.

### 4. Revised *Mobile-Sierra* protections

The Southeast EEM Agreement as originally filed and accepted is governed by the *Mobile-Sierra* "public interest" standard of review. However, in the First Deficiency Response the Members agreed to change the general standard of review to "just and reasonable" for more public-facing features of the Southeast EEM Agreement, such as the Market Rules. The Members are standing by this commitment. This will ensure that the rates terms and conditions of service for transactions within the Southeast EEM remain subject to the just and reasonable standard. However, the Members are also standing by their proposal to retain the use of the public interest standard for a limited set of provisions that provide the Members with regulatory certainty about the extent of their commitments under this agreement, which was freely negotiated at arms' length by sophisticated parties. This regulatory certainty is critical to the Member's participation. These sections govern key rights and obligations among the Members (such as cost allocation provisions and exit provisions, among others), and were therefore central to the negotiated terms the Members agreed upon in developing the Southeast EEM.[47] In other words, it is crucial to the development and implementation of the Southeast EEM that these provisions in particular provide for contractual certainty to Members. As the Commission has said in similar circumstances, it is appropriate to "balance the needs of the Transmission Owners

---

[47]  *See Texaco Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998) ("[W]here parties have negotiated a . . . contract that sets firm prices . . . and that denies either party the right to change such prices or charges unilaterally, FERC may abrogate or modify the contract only if the public interest so requires."); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 184 (2013), *reh'g denied*, 147 FERC ¶ 61,128 (2014) ("On one hand, all such provisions in bilateral power sales contracts freely negotiated at arm's length between sophisticated parties generally would establish contract rates and would come within the [*Mobile-Sierra*] presumption [of justness and reasonableness]. On the other hand, where the terms of an agreement would, if approved, be incorporated into the service agreements of all present and future customers, those terms are properly classified as tariff rates and the *Mobile-Sierra* presumption would not apply.").

for contractual certainty with the interests properly represented by [a market]."[48]  Therefore the
Members are maintaining the more stringent "public interest" standard for those provisions.  To
accomplish the foregoing, the Southeast EEM Agreement has been revised to establish a general
"just and reasonable" standard of review and lists those provisions that will remain subject to the
"public interest" standard:

- The following defined terms under Article 1:
    - Interest Rate
    - Investor Owned Utilities
    - Governmental Utilities
    - Market Auditor
    - Material Vendor Contract
    - Member
    - Member Net Energy for Load
    - Net Energy for Load
    - Operating Costs
    - Record Date
    - Sector
    - Significant Matters
    - Southeast EEM Administrator
    - Southeast EEM Agent
    - Territory
- Section 3.2 (Member Criteria);
- Article 4 (Governance);
- Sections 6.1 and 6.2 (Appointment of Southeast EEM Agent);
- Article 7 (Budgeting and Cost Responsibility)
- Sections 8.6 and 8.7 (Inter-related Inter-dependent provisions and Withdrawal);
- Article 9 (Release and Liability; No Fiduciary Duties);
- Section 10.3 (Equitable Relief);
- Section 11.2 (Reliability Obligations);
- Article 12 (Dispute Resolution);
- Article 14 (Defaults);
- Article 15 (Confidentiality);
- Section 16.1 ("Public Utility" Status of Members);
- Section 16.4.1 (No Reliance Interest on Non-Firm Energy Exchange
  Transmission Service);
- Section 16.5 (No Dedication of Facilities);
- Section 16.9 (Amendments);
- Exhibit B (Form of Joinder Agreement to add new Members); and
- Appendix C (Southeast EEM Agent Scope).[49]

---

[48]     *ISO New England Inc*., 106 FERC ¶ 61,280 at P 128 (2004), *reh'g granted in part, denied in part*,
109 FERC ¶ 61,147 (2004).

[49]     *See* Proposed Revisions to the Southeast EEM Agreement, Section 16.9 (Amendments).

Ms. Kimberly D. Bose
November 24, 2021
Page 16

The Members believe that maintaining the higher standard of review for these select provisions is appropriate, and consistent with Commission precedent regarding similarly complex agreements that defy classification in their entirety.[50]  And we note that, currently, the entire Southeast EEM Agreement is subject to *Mobile-Sierra* protection.  Thus, the only question before the Commission is whether to accept the proposed amendment (which limits the applicability of *Sierra-Mobile* to certain provisions) or reject the amendment, leaving the entirety of the Southeast EEM Agreement subject to *Mobile-Sierra*.

### 5.  Other revisions included in the First Deficiency Response

The Members propose the following additional modifications, as presented in the First Deficiency Response:

(1) The Members propose edits to Section VI.D.4 regarding the functions of the Market Auditor to clarify that the Market Auditor will verify compliance with the Participant-Specific Constraints and Generally Applicable Constraints, and to reference those constraints specifically.  The Members propose to revise Section VI.D.4 as follows:

Provide evaluation regarding the proper function**ing** of the Southeast EEM System, ~~and~~ **including verifying** the ~~effectiveness~~**compliance** of ~~any~~**the** Southeast EEM System ~~specific controls~~**with the Participant-Specific Constraints and Generally Applicable Constraints identified** in ~~place~~ **Section IV.B.6** related to the operation of the Southeast EEM System.[51]

(2) The Members propose to revise Section IV.C.7.a of the Market Rules to state that randomization will be used if a heuristic is required to resolve ties or ambiguities.  This is a clarification to the Agreement to track a statement previously made in the Operations Affidavit.[52]  As revised, the Section will read as follows:

In the event that multiple Bids or Offers that are at the same price at a Source or Sink are identical which create the same benefit for the Southeast EEM, a randomized preference will be assigned to the Bid(s) or Offer(s).  **Additionally, randomization will be employed in the algorithm in all other situations if a heuristic is required to resolve ties or ambiguities.**

(3) The Members propose to revise Section VI.B.2 of the Market Rules to correct a scrivener's error that resulted in the omission of an important limitation on a Participant's

---

[50]     *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 185 (permitting the Consolidated Transmission Owner Agreement ("CTOA") to be subject to differing standards of review because it could not "be classified in its entirety as containing contract rates or tariff rates" and noting that the differing standards would "recognize the distinctions among its provisions").

[51]     *See* First Deficiency Response at 26; Proposed Revisions to the Southeast EEM Agreement, Market Rules, Section VI.D.4.

[52]     Southeast EEM Filings, Ops. Aff. at P 44.

administrator who is authorized to run and review reports available in the Southeast EEM. That provision will now state as follows:

> Each Participant will be required to identify an administrator that is authorized by the Participant to run and review all of the reports available in the Southeast EEM System that are redacted to all**only** show the information related to the Participant it represents (the "Company System Administrator"). The Southeast EEM System will provide each Company System Administrator with the right to grant access to certain reports and related data to identified delegates within the Participant's organization. Each Company System Administrator (and any delegate identified by the Company System Administrator) shall be able to run all of the reports available in the system but receive only the data that belong to the Participant it represents.

(4) The Members propose to revise Section VI.E.1 of the Market Rules to clarify the Administrator's authority to maintain configuration parameters, and to avoid confusion about whether the Administrator is permitted to change those parameters (it is not). Specifically, the Members propose the following revision to Section IV.E.1 of the Market Rules:

> Parameters. The Southeast EEM Administrator shall set and maintain the following Southeast EEM System configuration parameters, which shall be posted for access by all Members . . .

### B. Revisions to Southeast EEM Agreement Offered in other Southeast EEM Pleadings

The Members offered to provide a number of other revisions in pleadings subsequent to the First Deficiency Response, where practical and reasonably possible. Accordingly, in an effort to demonstrate their commitment to the seamless implementation and transparent operation of the Southeast EEM, the Members propose to revise the Southeast EEM Agreement to include those additional commitments, as further described below.

### 1. Revisions to provide periodic data publicly

In their Protest to the First Deficiency Response, PIOs requested that the Members post certain types of data publicly, with identities masked.[53] Specifically, PIOs requested the Members publicly post: (1) The numbers of total possible matching participants as evidenced by Enabling Agreements, and the number of those for which matches were allowed in each interval; (2) Whether bids or offers were "all-or-nothing" or could be partially filled; (3) Available Transmission Capability ("ATC") on an interval basis as this should already be public based on postings to each Balancing Authority ("BA") and Transmission Provider site; (4) A pipe and bubble representation of the ATC between each BA in SEEM; (5) Matched bids and offers and the "split the savings price" used for the match; (6) binding transmission paths along with the

---

[53] *See* PIOs Protest to Deficiency Response at 20; Sotkiewitcz Aff. at P 53.

Ms. Kimberly D. Bose
November 24, 2021
Page 18

marginal value of the transmission constraint as proposed by Dr. Pope; (7) all matches in the SEEM algorithm that did not actually flow including the masked identities of the counterparties and the reason the transaction did not flow; and (8) The detailed posting of the auction algorithm so that interested parties could run various scenarios to see how market outcomes might differ under various conditions.[54]

The Members explained that they would not provide two components of the requested information; the "matches in the SEEM algorithm that did not actually flow," (i.e., unconsummated transactions) or the "detailed posting of the auction algorithm."[55] As Dr. Pope previously explained, "it does not appear to be possible to identify *physically* unconsummated Energy Exchange matches."[56] Dr. Pope further explained the low evidentiary value of such information, noting that she had "not identified a way for a Participant to predictably or consistently profit from bidding or offering so as to be matched in an Energy Exchange with the intention of not consummating the match" and further stated that "[c]oncerns about manipulating the market by scheduling transactions and then intentionally failing to consummate them that might arise in U.S. balancing markets do not appear to extend to the Southeast EEM."[57] As to the detailed posting of the Algorithm, the Members explained that the Market Auditor will report its conclusions on the proper functioning of the Algorithm, including verifying the compliance of the Southeast EEM System with the Participant-Specific Constraints, under the Southeast EEM Website posting process outlined in Section VI.D.6 of the Market Rules.[58] Therefore, a detailed posting of the Algorithm is not necessary.

However, as to all the other information requested, the Members stated they would "agree to provide the information publicly, subject to masking[59] and a time lag where appropriate, if directed to do so by the Commission as a condition of acceptance of the Southeast EEM Proposal."[60]

Accordingly, the Members propose to revise Section V of the Market Rules to add certain information to the monthly informational report that will be posted by the Southeast EEM Administrator each month. As noted in the July 14 Answer, the information related to the "pipe and bubble" representation of ATC is functionally equivalent to the information that will be provided in the Network Map.[61] The Network Map will be posted publicly and updated as

---

[54]     *See id.*

[55]     *See* July 14 Answer at n.23.

[56]     First Deficiency Response, Att. D, Pope Supplemental Aff. at P 62.

[57]     *See id.* at P 58.

[58]     July 14 Answer at 13-14; First Deficiency Response at 19, 27-30.

[59]     The Members note that masking includes not just Participant identities, but also Sources and Sinks included in Bid and Offer data. Including Source and Sink data would make the data easily traceable to specific entities.

[60]     July 14 Answer at 10.

[61]     July 14 Answer at 12.

Ms. Kimberly D. Bose
November 24, 2021
Page 19

necessary. Specifically, the Members propose to revise the Market Rules to add the following language regarding the Network Map: "**Prior to the Southeast EEM Commencement Date, the then-current version of the Network Map shall be posted to the Southeast EEM Website, with future updates reported in accordance with Section V of these Market Rules."[62]** This will allow for both the initial public posting of the Network Map, and for it to be updated every month as necessary.

Under Section V, the Members propose to provide the rest of the publicly posted market information referred to in the July 14 Answer. This information is similar to what is provided in the newly-proposed Appendix D submissions, except that some of the information, where necessary, will be subject to a 4-month time lag and masking to remove the identities of specific participants. The Members believe that providing this information publicly, masked and subject to a time lag as appropriate, will strike the appropriate balance between transparency into Southeast EEM operations and protecting Participant identities and other competitive information. The Members propose to revise Section V.A as follows:

> **Public Monthly Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM **W**~~w~~ebsite on or before midnight of the fifth Business Day of the following month and shall include the following information from the prior month**, with the exception of information provided under Section V.A.9-12, which information will be posted on a four-month lag starting on the fifth Business Day of the fifth month following the Southeast EEM Commencement Date:**

> 1. **Any changes made to the Network Map;**

> 2. Minimum, maximum, and average match prices;

>  . . . .

> 9. **Bid/Offer Price, quantity, and All or Nothing information for each Bid and Offer in each Delivery Interval, subject to appropriate masking to remove Participant identities and Source and Sink information;**

> 10. **Matched Bids and Offers with their associated Energy Exchange Price, subject to appropriate masking to remove Participant identities and Source and Sink information;**

> 11. **The total number of possible counterparties not subject to a Participant-Specific Constraint for each Seller in each Delivery Interval, subject to appropriate masking to remove Participant identities and Source and Sink information;**

---

[62]     *See* Proposed Revisions to Southeast EEM Agreement, Market Rules, Section IV.A.2.

12. **The total number of possible counterparties not subject to a Participant-Specific Constraint for each Buyer in each Delivery Interval, subject to appropriate masking to remove Participant identities and Source and Sink information;**

13. **ATC made available to the Southeast EEM by each Participating Transmission Provider for each Delivery Interval, as well as the amounts of such ATC that are not used by the Southeast EEM; and**

14. **Implied marginal benefit information for each ATC limit for each Delivery Interval, to the extent such information can reasonably be produced by the Southeast EEM Algorithm.[63]**

2. **Revisions to prohibit Market-Based Rate holders from providing false or misleading information to the Southeast EEM Administrator or Market Auditor**

In its comments on the First Deficiency Response, the Clean Energy Coalition ("CEC") requested that the Commission clarify that "[Southeast EEM] participants operating under a market-based rate tariff are obligated to provide accurate and factual information (and not submit false or misleading information, or omit material information) in any communication with the SEEM Administrator or Auditor, even though these entities are not serving as 'Commission-approved market monitors.'"[64]

The Members noted that they were not opposed to such a clarification should the Commission find it necessary.[65]  Accordingly, the Members propose to add a new section to the Form of Participant Agreement (Section 6.2) that states as follows:

**To the extent the Participant holds Market-Based Rate authority, the Participant acknowledges that it is obligated to provide accurate and factual information, and must exercise due diligence to avoid providing false or misleading information or omitting material information, in any communications with the Southeast EEM Administrator or the Market Auditor related to its participation in the Southeast Energy Exchange Market.[66]**

---

[63] See Proposed Revisions to Southeast EEM Agreement, Market Rules, Section V.A.

[64] CEC Comments on Deficiency Response at 6.

[65] *See* July 14 Answer at 15.

[66] *See* Proposed Revisions to Southeast EEM Agreement, App'x A, Form of Participant Agreement at Section 6.2.

### 3. Revisions to definitions of "Market Auditor" and "Southeast EEM Administrator"

CEC also expressed concerns that "the SEEM parties will select an Auditor that is affiliated with, influenced by, or under common control with at least one of the SEEM members."[67]  The Members, in the July 14 Answer, affirmed that the Market Auditor will be an independent third party, meaning that it will not be a Member, Participant, Agent, or the Southeast EEM Administrator.[68]  The Members further clarified that the Market Auditor will not be an "affiliate," as defined under the Commission's Standards of Conduct regulations, of any Member, Participant, Agent or the Southeast EEM Administrator.[69]  Accordingly, the Members propose to effectuate that commitment by revising the Southeast EEM Agreement as follows to implement this commitment:

> "Market Auditor" means an independent entity engaged by the Southeast EEM Agent to perform the scope of responsibilities identified in Section 10.2 and in the Southeast EEM Market Rules.  **The Market Auditor may not be a Member, Participant, the Southeast EEM Agent, the Southeast EEM Administrator, or an "affiliate" as defined under 18 C.F.R. § 358.3, of any Member, Participant, the Southeast EEM Agent or the Southeast EEM Administrator.**[70]

In the Second Deficiency Letter, the Commission expressed a similar concern about the Southeast EEM Administrator.  The Members affirmed in their Second Deficiency Response that "[t]he [Southeast EEM] Administrator will not be a Member, Participant, Agent, or the Market Auditor, nor an affiliate of those entities."[71]  Accordingly, Members propose to revise the Southeast EEM Agreement as follows to implement this commitment:

> "Southeast EEM Administrator" means that entity hired by the Southeast EEM Agent, on behalf of the Membership Board acting in its capacity on behalf of the Members, to operate the Southeast EEM System from day to day.  **The Southeast EEM Administrator may not be a Member, Participant, the Southeast EEM Agent, the Market Auditor, or an "affiliate" as defined under 18 C.F.R. § 358.3, of any Member, Participant, the Southeast EEM Agent or the Market Auditor.**

---

[67]    CEC Response to First Deficiency Response at 12.

[68]    July 14 Answer at 14 (citing Southeast EEM Filings, Ops. Aff. at P 13; *id.*, Transmittal at 18).

[69]    18 C.F.R. § 358.3 (2020) (defining an "affiliate" to mean "[a]nother person that controls, is controlled by or is under common control with, the specified entity" and including "a division of the specified entity that operates as a functional unit.").

[70]    *See* Proposed Revisions to Southeast EEM Agreement, Section 1.1, Definitions.

[71]    Second Deficiency Response at 8.

**4. Revisions to implement a posting requirement for complaints submitted to the Market Auditor**

In the First Deficiency Response, the Members outlined the following complaint process: 1) the Participant can submit a complaint to the Market Auditor; 2) a confidentiality determination will be made; 3) the Administrator will post the complaint to the Southeast EEM Website in accordance with the confidentiality provisions and notifies the Membership Board of the posting; 4) the Board will decide whether to investigate; 5) the Board may direct the Market Auditor to investigate and produce a report or results of investigation to the Board; 6) another confidentiality determination is made as to the report/investigation results; 7) the report/investigation results are posted to the Southeast EEM Website in accordance with the confidentiality provisions.[72]  Those revisions to the Southeast EEM Agreement are detailed above in Section III.A.2.

PIOs expressed concern that if a complaint is not acted upon by the Southeast EEM Board itself, there may be no way to know whether the complainant should exercise its FPA Section 206 rights.[73]  The Members, in their July 14 Answer, proposed two clarifications, and stated they would "include them in a compliance filing if directed by the Commission."[74]  First, the Members clarified that the Membership Board will make a determination whether to investigate a complaint within 60 days of its receiving the complaint.  Second, the Members clarified that the Membership Board will cause to be posted to the Southeast EEM Website within that time period whether there will be an investigation or not; or make clear that it needs more time to make a decision whether to investigate, after which it will cause to be posted the information on whether or not an investigation will occur.

The Members propose to implement those two clarifications here.  The clarifications ensure that all Participants will have notice of when the Board chooses not to act on a complaint, allowing an entity that files a complaint with the Market Auditor to be assured of the timeline the Board will apply in deciding whether to investigate the complaint, and if not satisfied, to be able to file a complaint with the Commission under FPA Section 206.

The proposed language to effectuate this revision is in Section VI.D.5 of the Market Rules:

> ~~Refer~~**Report** any complaints received **from a Participant** to the Membership Board, and investigate **and report** further at the Membership Board's direction. **Within sixty (60) days of receiving a complaint from the Market Auditor, the Membership Board must cause to be posted to the Southeast EEM Website either (1) a determination as to whether an investigation into the complaint will be opened; or (2) a notice that the Membership Board requires more time to determine whether to investigate the complaint.  Any notice posted under**

---

[72]     *See* First Deficiency Response at 26-31.

[73]     PIOs Protest to Deficiency Response at 21.

[74]     July 14 Answer at 7.

Ms. Kimberly D. Bose
November 24, 2021
Page 23

**this subsection will be made subject to all applicable confidentiality restrictions.**

**C.  Other revisions to Southeast EEM Agreement**

**1.  Revisions related to implementation**

Following the issuance of the Notice of Effectiveness, and upon implementing certain requirements under the Southeast EEM Agreement, the Members determined that certain revisions to the Southeast EEM Agreement are necessary to be in effect prior to market launch and operations and during the initial implementation period only.

First, the currently effective Southeast EEM Agreement contains a provision that would allow certain entities listed in Appendix A but who had not signed the Southeast EEM Agreement to join under expedited procedures following the "Effective Date."[75]  The Effective Date refers to the date in a Commission Order accepting the Agreement without modification.[76] That same provision provides that in the event a Commission Order would require modification, there is a period for the Members to consider whether to accept such changes.  Although the Agreement became effective by operation of law without modification, because there was no Commission Order issued, the Members determined that it would be consistent with the intent of the language in the existing definition of "Member" or "Members" to allow those Members who have not yet executed the Agreement to execute after having the opportunity to review the revisions proposed in this Filing.  Accordingly, the definition of "Member" or "Members" is revised to more clearly define the timeline under which entities that are included in Appendix A but have not yet joined as Members may join under expedited procedures following the implementation of these revisions.  Specifically, the Members propose to revise the definition as follows:

> "Member" or "Members" has the meaning set forth in the preamble, except that to the extent any of the Members have not executed this Agreement at the time that it is filed with FERC, such Member may execute this Agreement no later than thirty (30) days after the **Membership Board first approves an amendment to this Agreement, to be proposed to FERC, following the issuance of FERC's October 13, 2021 Notice of Filing Taking Effect by Operation of Law, or January 15, 2022, whichever is later** ~~Effective Date~~. Thereafter, any entity listed on Exhibit A that has not executed the Agreement may seek to become an Additional Member pursuant to Section 3.2.3.[77]

Additionally, the Members propose to add a new Section 16.15 that would deal specifically with the implementation period, defined as the period between October 12, 2021 through January 30, 2022.[78]  The Members originally requested a May 13, 2021 effective date for the Agreement.

---

[75]  *See* Southeast EEM Agreement, Section 1.1, Definitions, Definition of "Member" or "Members."

[76]  *See id.*, Section 8.4.1, Effective Date and Southeast EEM Commencement Date.

[77]  *See* Proposed Revisions to Southeast EEM Agreement, Section 1.1, Definitions.

[78]  *See* Proposed Revisions to Southeast EEM Agreement, Section 16.15.

Ms. Kimberly D. Bose
November 24, 2021
Page 24

Several dates in the Agreement were drafted in consideration of this proposed effective date. For example, budgeting and voting rights are drafted as being determined in October of each year, which would have given the Members several months to establish a Membership Board, elect the Operating Committee and designate the Southeast EEM Administrator. This new provision would allow for (i) initial budgeting outside the normal budgeting process (which would have been on a compressed timeline given the Notice of Effectiveness and the Agreement's October 30th timeline)[79], (ii) a Member to request an Alternate MNEL Value for the initial budget (in parallel with Section 7.3.1(a) applicable to all subsequent budgets),[80] and (iii) a modified timeline for the Annual Meeting of Members for 2021.[81]  Additionally, the provision will allow a Member who joins under the expedited procedures noted above to be included in the Net Energy for Load Vote and be appropriately accounted for in the voting process.[82]  Finally, the provision will allow the Secretary to serve the limited informational receipt and delivery responsibilities of the Southeast EEM Administrator until the appointment of the Southeast EEM Administrator, which has not yet occurred.[83]

The Members propose that the new Section 16.15 read as follows:

**16.15  Special Provisions Related to Implementation of the Agreement. Notwithstanding anything to the contrary herein, between the Effective Date of October 12, 2021 through January 30, 2022, the following provisions control:**

**16.15.1 Initial Cost Responsibility and Budget.**

**(a)      In lieu of Annual Budgets for 2021 and 2022, a single initial budget for the period from the Effective Date of October 12, 2021 through the end of 2022 shall be established no later than January 30, 2022. The initial budget will allocate costs in accordance with Section 7.2.  For avoidance of doubt, the cost allocation in the initial budget, including allocation of costs for all periods between the Effective Date and the establishment of the initial budget, shall be to all Members that have executed the Agreement on or before January 15, 2022.**

**(b)      For purposes of Section 4.2.4, the Annual Budget Determination Date for the initial budget will be January 30, 2022.**

**(c)      For purposes of Section 7.3(a), if a Member proposes to use an Alternate MNEL Value in connection with the initial budget, such Member shall submit a written request to the Operating**

---

[79]   *See id.*, Section 16.15.1(a), (b), and (d).

[80]   *See id.*, Section 16.15.1(c).

[81]   *See id.*, Section 16.15.2.

[82]   *See id.*, Section 16.15.3.

[83]   *See id.*, Section 16.15.4.

**Committee at least ten (10) days prior to the Annual Budget Determination Date requesting the Operating Committee's approval of such Member's Alternate MNEL Value in the initial budget.**

> **(d)     All references in this Agreement (other than this Section 16.15) to an "Annual Budget" shall include the initial budget established in this Section.**

> **16.15.2  The Annual Meeting of Members for 2021 shall be held no later than December 31, 2021.**

> **16.15.3  To the extent a Member listed in Exhibit A has not executed the Agreement as of the Effective Date, but executes on or before January 15, 2022, the Net Energy for Load Vote for all Members shall be recalculated to reflect the addition of such Member.**

> **16.15.4  During the implementation period of this Section and until the Southeast EEM Administrator is appointed, the Secretary will assume the limited informational receipt and delivery functions of the Southeast EEM Administrator under Section 4.4, Section 5.4, Section 5.5, Section 5.6, Section 5.9, Section 7.3.1(a), Section 8.7, and Section 16.8 and will hold all such notices and provide them to the Southeast EEM Administrator upon its appointment.[84]**

Additionally, to accommodate the revisions to Section 16.15, the Members propose to revise Section 4.1.5(d) as follows:

> **Except as provided in Section 16.15, t**~~T~~he number of Net Energy for Load Vote of each Representative shall be adjusted each year following the Enrollment Period and prior to the start of the next calendar year to reflect the revision to such proportions resulting from the inclusion of Additional Members (if any) when determining Net Energy for Load Vote for each Representative.[85]

The Members propose similar revisions to Section 7.2.2:

> Annual Budget.  **Except as provided in Section 16.15, o**~~O~~n or before **December 15** ~~October 30th~~[86] of each calendar year, but in any case no earlier than October 1st of each calendar year, the Membership Board shall set the annual budget for the following calendar year (the "Annual Budget Determination Date"), which budget shall include but not be limited to all projected Operating Costs, including all vendor costs and all costs and expenses associated with the Southeast EEM Agent

---

[84]     *See id.*, Section 16.15.

[85]     *See id.*, Section 4.1.5(d).  Similar revisions are proposed to Section 7.2.2 to accommodate the initial budget provisions in Section 16.15.

[86]     This revision is discussed in more detail in Section III.C.2.

(the "Underline{Annual Budget}").  **Except as provided in Section 16.15, c**~~C~~osts are deemed allocated to each Member as of the Annual Budget Determination Date, but, except as otherwise provided herein, are not payable until such costs are due and payable subject to the applicable agreements concerning such costs.

These revisions are necessary to allow for initial implementation and budgeting of the Southeast EEM during a limited pre-market implementation period only, and were made in light of the delays in Commission action in the Underlying Proceeding.  These revisions will not affect subsequent budgeting or voting processes.  Nor do the revisions impact overall market implementation.  Indeed, the majority of the provisions sunset by January 30, 2022.  The only provision with a potentially longer effectiveness is the revision to allow the Secretary to receive notices on behalf of the Southeast EEM Administrator until they are selected.  The Members are actively engaged with a software vendor and anticipate selecting the Southeast EEM Administrator by February of 2022.  Conversely, market go-live is currently anticipated to occur in the third quarter of 2022.

## 2.  Miscellaneous ministerial revisions

The Members propose several clarifying edits that were discovered during the preparation of this filing.  Specifically, the Members propose the following modifications:

(a) The Members propose to revise Section 4.1.5(d) to state: "**If a Member withdraws from this Agreement in accordance with Sections 4.2.1 or 8.7, the Membership Board shall recalculate the Net Energy for Load Vote of each other Representative as of the date of such withdrawal**."  This revision is intended to clarify that the Net Energy for Load Vote will be recalculated for all existing Members upon the withdrawal of a Member.

(b) The Members propose to revise Section 7.2.2 of the Southeast EEM Agreement to state that "**Except as provided in Section 16.15,** ~~O~~on or before **December 15** ~~October 30th~~ of each calendar year, but in any case no earlier than October 1st of each calendar year, the Membership Board shall set the annual budget for the following calendar year (the "<u>Annual Budget Determination Date</u>")."  The December 15 date replaces a previous October 30th deadline.  Such a revision will allow the Membership Board more time to set the annual budget following the Commission's approval of the North American Electric Reliability Corporation's ("NERC") annual business plan.  Because the plan can be accepted later than October 30th, as it was this year,[87] such a revision is necessary to give the Membership Board enough time to set the Annual Budget.

---

[87]  *See N. Am. Elec. Reliability Corp.*, 177 FERC ¶ 61,078 (2021).  The business plan and budget were approved on November 2, 2021.  Under the Southeast EEM Agreement, a Member's Net Energy for Load, or "MNEL" for budgeting and voting purposes, *see* Southeast EEM Agreement, Sections 7.2, 4.1.5, is set as of the "Record Date."  The Record Date is defined as "the date upon which FERC accepted the most recent annual Business Plan/Budget . . ." *See* Southeast EEM Agreement, Section 1.1, Definitions.

(c)  The Members propose to revise Section 10.1 (Transparency; Confidentiality) to accommodate the new Appendix D reporting requirements.  Section 10.1 will now read as follows:

**(i) t**~~T~~he decision and **any** obligation to report quantities, prices, or other data regarding Energy Exchange transactions to either a Governmental Entity, a reputable index developer or a data hub will be the responsibility of each Seller and Buyer**, and (ii): n**~~N~~either the Southeast EEM Administrator, nor the Southeast EEM Agent nor the Members shall be responsible for reporting Energy Exchange transactions made by other entities through the Southeast EEM System**; provided, however, that this Section 10.1.1 does not limit the information disclosure requirements of Section 2.5, Appendix D, or any other information disclosure requirements expressly set forth in this Agreement.**

(d)  The Members propose adding the following definition to refer specifically to the Southeast EEM Website:

**"Southeast EEM Website" means the website found at the following url: https://southeastenergymarket.com/.[88]**

(e)  Finally, the Members propose a handful of revisions to use defined terms throughout the Southeast EEM Agreement.  For example, references to the new defined term "Southeast EEM Website" have been updated accordingly.  As another example references in the language submitted in the First Deficiency Response have been updated to reflect the defined terms of Market Auditor and Southeast EEM Administrator.  These changes are reflected in the redlined revised version of the Southeast EEM Agreement attached to this filing as Attachment A.

## III.    **Requested effective date request for waiver of prior notice**

Alabama Power Company and the other Members respectfully request that the amendments to the Southeast EEM Agreement become effective November 25, 2021, one day after the date of this Filing.  Alabama Power Company and the other Members request waiver of prior notice[89] requirements under 18 C.F.R. §§ 35.2(f) and 35.3(a)(1).  Good cause exists to grant such a waiver because doing so would allow the new revisions, and in particular the revisions to cost allocation provisions, to become effective prior to the incurrence of vendor costs, which are expected to start being incurred as early as December of 2021.  Notwithstanding this request for

---

[88]    *See* Proposed Revisions to the Southeast EEM Agreement, Section 1.1, Definitions.

[89]    *Cent. Hudson Gas & Elec. Corp.*, 60 FERC ¶ 61,106, reh'g denied, 61 FERC ¶ 61,089 (1992), and *Prior Notice & Filing Requirements Under Part II of the Fed. Power Act*, 64 FERC ¶ 61,139, *clarified*, 65 FERC ¶ 61,081 (1993).

Document Accession #: 20211124-5041          Filed Date: 11/24/2021

Ms. Kimberly D. Bose
November 24, 2021
Page 28

waiver of the prior notice requirement, the Members understand that the Commission is required to act on this filing within the ordinary 60-day statutory period.[90]

## IV. __Request for additional waivers__

Alabama Power Company respectfully requests that the Commission grant such additional waivers of the Commission's regulations as may be necessary. This request is made out of an abundance of caution; Alabama Power Company and the Members are unaware of any need for a waiver. However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective November 25, 2021 will allow market implementation to proceed seamlessly, thus permitting customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date.

## V. __Communications__

Alabama Power Company respectfully requests that the following persons be added to the official service list in this proceeding:[91]

| | |
|---|---|
| Christopher H. Demko | Noel Symons |
| Associate General Counsel | Katlyn A. Farrell |
| – Energy Regulation | Carrie A. Mobley |
| Southern Company Services, Inc. | McGuireWoods, LLP |
| 30 Ivan Allen Jr, Blvd NW | 2001 K Street, N.W., Suite 400 |
| Atlanta, GA 30308 | Washington, D.C.  20006 |
| (404) 506-0241 | 202-857-2929 |
| chdemko@southernco.com | nsymons@mcguirewoods.com |
| | kfarrell@mguirewoods.com |
| | cmobley@mcguirewoods.com |

---

[90]     *See* 16 U.S.C. § 824d(d); *see cf. Electronic Tariff Filings*, Notice of Procedures for Making Statutory Filings when Authorization for New or Revised Tariff Provisions is not Required, Docket No. RM01-5-000 (issued June 3, 2020) ("A filing requesting waiver of the 30- or 60-day notice period would become effective on the 31st or 61st day if the Commission does not issue an order acting on the filing and granting the waiver.").

[91]     Alabama Power Company respectfully requests waiver of 18 C.F.R. § 385.203(b)(3) to permit more than two persons to be added to the official service list in this proceeding.

Ms. Kimberly D. Bose
November 24, 2021
Page 29

## VI.     **Filing contents**

Following is a list of documents included with this eTariff Filing:

- **Attachment A -** Redlined revised proposed revisions to Southeast EEM Agreement in .pdf format for publishing on eLibrary;
- **Attachment B** - Clean revised proposed Revisions to the Southeast EEM Agreement, in .pdf format for publishing on eLibrary;
- .rtf versions of the sections of the Southeast EEM Agreement the Members propose to revise, for filing through the Commission's eTariff software.

## VII.     **Conclusion**

The Members respectfully request that the Commission accept these revisions to the Southeast EEM Agreement to become effective on November 25, 2021.

Respectfully Submitted,

*/s/ Noel Symons*
Noel Symons
Katlyn A. Farrell
Carrie A. Mobley
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-2929
nsymons@mcguirewoods.com

*Counsel for the Members of the
Southeast Energy Exchange Market*

Dated: November 24, 2021

JA1166

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this day caused to be served a copy of the foregoing upon all parties on the service list in these proceedings in accordance with the requirements of Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010 (2020).

Dated at Washington, D.C. this 24th day of November, 2021.

/s/ Carrie A. Mobley
Carrie A. Mobley
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
cmobley@mcguirewoods.com

*Counsel for the Members of the*
*Southeast Energy Exchange Market*

JA1167

**SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT**

JA1168

ARTICLE 1 DEFINITIONS AND RULES OF INTERPRETATION ........................................ 1

ARTICLE 2 ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION............. 9

ARTICLE 3 MEMBERSHIP AND PARTICIPATION............................................................ 10

ARTICLE 4 GOVERNANCE ................................................................................................. 11

ARTICLE 5 OPERATING COMMITTEE ............................................................................. 17

ARTICLE 6 APPOINTMENT OF SOUTHEAST EEM AGENT ............................................ 20

ARTICLE 7 BUDGETING AND COST RESPONSIBILITY ................................................. 22

ARTICLE 8 FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE .................. 24

ARTICLE 9 RELEASE AND LIABILITY; NO FIDUCIARY DUTIES................................. 26

ARTICLE 10 TRANSPARENCY; CONFIDENTIALITY; AUDITING ................................. 28

ARTICLE 11 SOUTHEAST EEM MARKET RULES ............................................................ 29

ARTICLE 12 DISPUTE RESOLUTION ................................................................................ 30

ARTICLE 13 REPRESENTATIONS AND WARRANTIES.................................................... 31

ARTICLE 14 DEFAULTS ...................................................................................................... 32

ARTICLE 15 CONFIDENTIALITY....................................................................................... 32

ARTICLE 16 MISCELLANEOUS ........................................................................................ 33

**EXHIBITS**

EXHIBIT A          Names and Addresses of the Members

EXHIBIT B          Form of Joinder Agreement

**APPENDICES**

APPENDIX A          Form of Participant Agreement

APPENDIX B          Southeast EEM Market Rules

APPENDIX C          Southeast EEM Agent Scope

APPENDIX D          Information Provided to FERC and the Market Auditor

## SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT

This SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT (as the same may be amended from time to time in accordance with the terms hereof, the "Agreement"), by and among each of the entities listed on Exhibit A hereto (each entity, a "Party," and collectively, the "Parties"), as that exhibit may be amended from time to time in accordance with the terms hereof, is made, entered into and effective this 28th day of December, 2020. Hereinafter, Parties to this Agreement may be referred to individually as a "Member" and collectively as the "Members."

### W I T N E S S E T H

WHEREAS, there is presently no centrally operated electricity market in the southeastern United States and, accordingly, inter-utility electricity transactions presently occur through bilateral transactions;

WHEREAS, Members believe that a voluntary, region-wide, bilateral, automated, intra-hour electric exchange utilizing unreserved transmission capacity of Participating Transmission Providers at a zero-dollar transmission rate will provide value to their customers by creating efficiencies, transparency, and market liquidity;

WHEREAS, Members desire to participate and to permit other entities to participate as Participants in the exchange; and

WHEREAS, the Members believe that the foregoing objectives can be achieved through a joint effort to sponsor and create a common trading platform that facilitates bilateral electricity transactions between and within their respective service territories.

NOW, THEREFORE, the Members, for good and valuable consideration, enter into this Agreement that sets forth their mutual covenants, rights, and obligations for establishing, funding, and participating in the Southeast Energy Exchange Market (defined below).

### ARTICLE 1

### DEFINITIONS AND RULES OF INTERPRETATION

1.1    Definitions.  The following terms shall have the meaning hereinafter specified:

"Additional Member" has the meaning provided to it in Section 3.2.3.

"Affiliate" has the meaning set forth in 18 C.F.R. § 35.36(9), as amended.

"Affirmative Majority Vote" has the meaning set forth in Section 4.1.5(b).

"Affirmative Supermajority Vote" has the meaning set forth in Section 4.1.5(c).

"Alternate Committee Member" has the meaning set forth in Section 5.9(b).

"Alternate MNEL Value" has the meaning set forth in Section 7.3.1(a).

"<u>Alternate Representative</u>" has the meaning set forth in <u>Section 4.1.7(b)</u>.

"<u>Annual Budget</u>" has the meaning set forth in <u>Section 7.2.2</u>.

"<u>Annual Budget Determination Date</u>" has the meaning set forth in <u>Section 7.2.2</u>.

"<u>Annual Meeting</u>" has the meaning set forth in <u>Section 4.4</u>.

"<u>Annual Member Meeting</u>" has the meaning set forth in <u>Section 4.5</u>.

"<u>Authorized Action</u>" has the meaning set forth in <u>Section 6.1</u>.

"<u>Balancing Authority</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Balancing Authority Area</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bid</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bid Information</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Bidder</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Business Day</u>" means each weekday, Monday through Friday, excluding NERC holidays.

"<u>Buyer</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Chair of the Membership Board</u>" has the meaning set forth in <u>Section 4.3.2</u>.

"<u>Change in Law</u>" has the meaning set forth in <u>Section 8.6</u>.

"<u>Committee Member</u>" has the meaning set forth in <u>Section 5.1</u>.

"<u>Cooperatives</u>" means those electric membership cooperative Members that serve load, and cooperatives that provide generation, transmission and/or system operations services to electric membership cooperatives that serve load, in each case in the Territory.

"<u>Deadlock Issue</u>" has the meaning set forth in <u>Section 5.7.2</u>.

"<u>Delivery Interval</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Disaggregated Utility</u>" means multiple entities of a disaggregated generation/transmission/system operations utility system.

"<u>Effective Date</u>" has the meaning set forth in <u>Section 8.4.1</u>.

"<u>Enabling Agreement</u>" means a bilateral agreement for the purchase and sale of Energy that provides for Energy Exchanges between a Seller and a Buyer and that, for Sellers that are Public Utilities and require authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under Section 205 of the FPA, has been entered into pursuant to such Seller's market-based rate authority.

"<u>Energy</u>" means electric energy delivered as three-phase alternating current.

"<u>Energy Exchange</u>" means a transaction for the purchase and sale of Non-Firm Energy using the transaction matching, reservation and tagging functions of the Southeast EEM between Participants pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Market Rules.

"<u>Enrollment Period</u>" has the meaning set forth in <u>Section 3.2.3</u>.

"<u>FERC</u>" means the Federal Energy Regulatory Commission or any successor to its rights and obligations under Part II of the FPA.

"<u>FPA</u>" means the Federal Power Act, as amended.

"<u>Good Utility Practice</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Governmental Action Withdrawal Date</u>" has the meaning set forth in <u>Section 8.6</u>.

"<u>Governmental Entity</u>" means any federal, state, county, municipal, local or foreign government or entity or any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, arbitrator, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or any enforcement authority or other similar recognized organization or body exercising similar powers or authority, including FERC, any public utility commission or public service commission or similar authority, but excluding in each case, any Member acting in its capacity as a Member hereunder and not otherwise in a governmental capacity.

"<u>Governmental Utility</u>" means any electric utility located in the Territory that is owned, operated or controlled by the United States, or any state or commonwealth included in the Territory, any political subdivision of a state or commonwealth included in the Territory, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing.

"<u>Interest Rate</u>" means the lesser of (i) the per annum rate of interest announced from time to time by Citibank, N.A. (or a suitable replacement specified by the Operating Committee) as its "prime rate" for commercial loans effective on the date payment is due as established from time to time by such bank, plus two percent (2%), or (ii) the maximum lawful rate permitted by applicable Law.

JA1172

"Investor Owned Utilities" means those investor owned utility Members that serve load in the Territory.

"Jurisdictional Member" means a Member that is a Public Utility.

"Law" means any federal, state or local law, statute, act, rule, code, ordinance, decree, treaty, regulation, order, judgment, legally binding announcement, directive or published interpretation thereof, enacted, issued or promulgated by any Governmental Entity.

"Load Serving Entity" has the meaning set forth in the NERC Rules of Procedure, as approved by FERC.

"Market Auditor" means an independent entity engaged by the Southeast EEM Agent to perform the scope of responsibilities identified in Section 10.2 and in the Southeast EEM Market Rules. The Market Auditor may not be a Member, Participant, the Southeast EEM Agent, the Southeast EEM Administrator, or an "affiliate" as defined under 18 C.F.R. § 358.3, of any Member, Participant, the Southeast EEM Agent or the Southeast EEM Administrator.

"Material Vendor Contract" means an agreement between the Southeast EEM Agent, on behalf of the Members, and any vendor or supplier that, together with all other such agreements with such vendor or supplier and its Affiliates, involves aggregate consideration payable by the Members.

"Member" or "Members" has the meaning set forth in the preamble, except that to the extent any of the Members have not executed this Agreement at the time that it is filed with FERC, such Member may execute this Agreement no later than thirty (30) days after the Membership Board first approves an amendment to this Agreement, to be proposed to FERC, following the issuance of FERC's October 13, 2021 Notice of Filing Taking Effect by Operation of Law, or January 15, 2022, whichever is later. Thereafter, any entity listed on Exhibit A that has not executed the Agreement may seek to become an Additional Member pursuant to Section 3.2.3.

"Member Net Energy for Load" means, except as modified pursuant to Section 7.3.1, the Net Energy for Load calculated for each Member and submitted in NERC's business plan and budget filed annually with FERC in accordance with 18 C.F.R. § 39.4(b), as amended. For purposes of Section 4.1.5 and Section 7.2, (i) a Representative's Member that is an entity part of a Disaggregated Utility, and (ii) any Affiliates of a Representative's Member, shall in each case be assigned the total Net Energy for Load of the associated entities in such Disaggregated Utility or of such Member Affiliates, as applicable.

"Membership Board" means the membership board established pursuant to Article 4.

"MW" means megawatt or megawatts.

"MWh" means megawatt-hour or megawatt-hours.

"NAESB EIR" shall have the meaning set forth in the Southeast EEM Market Rules.

"NERC" means the North American Electric Reliability Corporation or its successor.

"<u>Net Energy for Load</u>" means net generation of an electric system plus Energy received from others less Energy delivered to others through interchange; it includes system losses but excludes Energy required for the storage of Energy at energy storage facilities. For purposes of this definition "electric system" means a Load Serving Entity.

"<u>Non-Firm Energy</u>" shall have the meaning set forth to it in the Southeast EEM Market Rules

"<u>Non-Firm Energy Exchange Transmission Service</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Non-Firm Energy Exchange Transmission Service Agreement</u>" means an agreement for the provision of Non-Firm Energy Exchange Transmission Service between a Participant and a Participating Transmission Provider, as provided in such Participating Transmission Provider's Tariff, as any such agreement may be updated from time to time.

"<u>Non-Jurisdictional Member</u>" means a Member that is not a Public Utility.

"<u>OATI webRegistry</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Offer</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Offer Information</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Offer Price</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Offeror</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Operating Committee</u>" means that committee established pursuant to <u>Article 5</u>.

"<u>Operating Costs</u>" shall mean dues, costs, expenses and other payment obligations assessed pursuant to this Agreement, or other fees or liabilities that may be imposed by the Membership Board or in accordance with the Southeast EEM Market Rules that arise under this Agreement. For the avoidance of doubt, Operating Costs includes fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder and the cost of employing third party vendors by the Southeast EEM Agent regardless of whether such costs are billed to the Members through the Southeast EEM Agent, the Southeast EEM Administrator, a third party or directly by such vendors.

"<u>Other Court/Governmental Entity Action</u>" has the meaning set forth in <u>Section 8.6</u>.

"<u>Participant</u>" shall have the meaning set forth in the Southeast EEM Market Rules.

"<u>Participant Agreement</u>" has the meaning set forth in <u>Section 3.3</u>.

"<u>Participating Transmission Provider</u>" means a transmission provider that is providing Non-Firm Energy Exchange Transmission Service.

JA1174

"Popular Vote" has the meaning set forth in Section 4.1.5(a)(i).

"Public Utility" has meaning set forth in Section 201 of the FPA.

"Record Date" means the date upon which FERC accepted the most recent annual Business Plan/Budget, including Net Energy for Load values, filed by NERC pursuant to the requirements of 18 C.F.R. § 39.4, as amended.

"Regulatory Filing" means any filing or submission made with or to a Governmental Entity.

"Related Parties" has the meaning set forth in Section 9.1.

"Reliability Obligations" has the meaning set forth in Section 11.2.

"Representative" has the meaning set forth in Section 4.1.2(a).

"Representative Losses" has the meaning set forth in Section 6.5.

"RUS" means the Rural Utilities Service, or its successor.

"Secretary" has the meaning set forth in Section 4.3.3.

"Sector" means individually and collectively, the Investor Owned Utilities, Cooperatives and Governmental Utilities.

"Seller" shall have the meaning set forth in the Southeast EEM Market Rules.

"SERC" has the meaning set forth in Section 11.2.

"Significant Matters" means (i) any amendment to this Agreement (excluding updates to Exhibit A solely to update notice information pursuant to Section 16.8), including but not limited to the Southeast EEM Market Rules, (ii) the appointment, removal, substitution and replacement of the Southeast EEM Agent and/or the Southeast EEM Administrator and the approval of, and any amendment or extension of, the agreement(s) between the Southeast EEM Agent (on behalf of the Members, including the Southeast EEM Agent Scope) and/or the Southeast EEM Administrator, (iii) the development of, or any material modification to, the Southeast EEM Algorithm or the Southeast EEM System, (iv) the appointment, removal, substitution and replacement of the Market Auditor, and any amendment or extension of the agreement(s) between the Southeast EEM Agent (on behalf of the Members) and the Market Auditor that would modify the scope set forth in Section 10.2.1, (v) any other contract or writing that obligates any Member to pay two hundred thousand dollars ($200,000) or more in a calendar year in excess of such Member's allocated share of costs as set forth in the Annual Budget, (vi) the submission of any Regulatory Filing on behalf of the Members, provided that (a) no Member can be compelled to join any Regulatory Filing, and (b) no Member can be compelled to take any action that in the reasonable view of such Member would jeopardize its jurisdictional status, (vii) the sale of all or substantially all of the property held by the Southeast EEM Agent (if any) for the benefit of the Southeast EEM System, or (viii) pursuant to Section 4.2.2, the (A) suspension of a Member's

6

voting rights, (B) removal of a Member from any committee appointment, and (C) suspension of any Member's access to the Southeast EEM System.

"Sink" shall have the meaning set forth in the Southeast EEM Market Rules.

"Source" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Administrator" means that entity hired by the Southeast EEM Agent, on behalf of the Membership Board acting in its capacity on behalf of the Members, to operate the Southeast EEM System from day to day. The Southeast EEM Administrator may not be a Member, Participant, the Southeast EEM Agent, the Market Auditor, or an "affiliate" as defined under 18 C.F.R. § 358.3, of any Member, Participant, the Southeast EEM Agent or the Market Auditor.

"Southeast EEM Administrator Agreement" means that certain agreement by and between the Southeast EEM Administrator and Southeast EEM Agent (in its capacity as agent for the Members), which agreement sets forth the rights and obligations of the Southeast EEM Administrator, as may be amended from time to time in accordance with this Agreement.

"Southeast EEM Agent" means that entity designated by the Membership Board from time to time, which has certain limited rights and responsibilities under this Agreement as expressly set forth in Article 6 below.

"Southeast EEM Agent Scope" has the meaning set forth in Section 6.1.

"Southeast EEM Algorithm" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Commencement Date" means the date upon which the Southeast EEM commences operation.

"Southeast EEM Order" has the meaning set forth in Section 8.6.

"Southeast EEM Manuals" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Market Rules" means the Rules of the Southeast Energy Exchange Market as set forth in Appendix B, as may be amended from time to time pursuant to Section 4.1.9.

"Southeast Energy Exchange Market" or "Southeast EEM" means the Territory-wide, automated, intra-hour electric energy exchange operated by means of the Southeast EEM System and utilizing Non-Firm Energy Exchange Transmission Service pursuant to the terms and conditions of this Agreement.

"Southeast EEM System" means the Southeast EEM Algorithm and any ancillary or supporting software solutions that (i) automatically matches Bids and Offers among Participants for the next Delivery Interval during which the wholesale sale of Non-Firm Energy will be sold by the Seller and the purchase of the Non-Firm Energy will be purchased by the Buyer to serve load

in the Territory and (ii) automatically reserves and tags Non-Firm Energy Exchange Transmission Service.

"Southeast EEM System Interface" shall have the meaning set forth in the Southeast EEM Market Rules.

"Southeast EEM Website" means the website found at the following url: https://southeastenergymarket.com/.

"Stakeholders" means interested state commissions, customers, interested future Southeast EEM Market Members or Participants, public interest groups or any other interested parties.

"Tariff" means a Participating Transmission Provider's FERC-jurisdictional Open Access Transmission Tariff, non-jurisdictional transmission tariff or non-jurisdictional transmission service guidelines, as applicable.

"Tariff Filings" has the meaning set forth in Section 8.3.

"Territory" means, collectively, the areas served by the Participating Transmission Providers, which as of the Effective Date includes the Balancing Authority Areas operated by the following Balancing Authorities: Associated Electric Cooperative, Inc.; Louisville Gas and Electric Company and Kentucky Utilities Company; Tennessee Valley Authority; Duke Energy Progress (f/k/a Carolina Power and Light Company); Duke Energy Carolinas; South Carolina Electric & Gas Company (n/k/a Dominion Energy South Carolina, Inc.); Santee Cooper; Southern Company; and Power South Energy Cooperative. A current description of the Territory shall be maintained on the Southeast EEM System Interface.

"Voluntary Withdrawal Date" has the meaning set forth in Section 4.2.1.

"Withdrawal Date" means a Voluntary Withdrawal Date or a Governmental Action Withdrawal Date, as applicable.

1.2    Rules of Construction.  The capitalized terms listed in this Article 1 shall have the meanings set forth herein whenever the terms appear in this Agreement, whether in the singular or the plural or in the present or past tense.  Other terms used in this Agreement but not listed in this Article 1 shall have meanings defined herein or by NERC and the Tariff of each Participating Transmission Provider or, if not so defined, shall have meanings as commonly used in the English language.  In the event of a conflict regarding a defined term contained herein and the provisions of a Tariff or NERC rules, the provisions set forth by the applicable Tariff and NERC rules shall take precedence over the defined terms set forth in this Agreement. Words not otherwise defined herein that have well known and generally accepted technical or trade meanings are used herein in accordance with such recognized meanings.  In addition, the following rules of interpretation shall apply:

The masculine shall include the feminine and neuter.

References to "Articles," "Sections," or "Exhibits" shall be to articles, sections, or exhibits of this Agreement.

8

JA1177

References to "days" that are not specifically defined as "Business Days" shall be calendar days, which term includes every day on the calendar including weekends and holidays.

The Exhibits and Appendices attached hereto are incorporated in and are intended to be part of this Agreement; provided, however, that in the event of a conflict between the terms of any Exhibit and the terms of this Agreement, the terms of this Agreement shall take precedence.

This Agreement was negotiated and prepared by all Parties with the advice and participation of counsel. The Parties have agreed to the wording of this Agreement and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this Agreement or any part hereof.

Unless expressly provided otherwise in this Agreement, where the Agreement requires the consent, approval, or similar action by a Party, such consent or approval shall not be unreasonably withheld, conditioned or delayed, except in each case that the foregoing shall not apply to any action of a Party under Article 11.

Use of the words "include" or "including" or similar words shall be interpreted as "including but not limited to" or "including, without limitation."

## ARTICLE 2

## ESTABLISHMENT OF SOUTHEAST EEM AND ADMINISTRATION

2.1     The Members shall cause the establishment and operation of the Southeast EEM System as set forth herein and administered via the Southeast EEM System Interface or such other protocol as determined by the Membership Board, to facilitate the matching of Sellers with Buyers for the purpose of entering into Energy Exchanges.

2.2     The Southeast EEM Administrator shall operate the Southeast EEM System in accordance with the Southeast EEM Market Rules for the purpose of matching Bids and Offers for the four (4) fifteen (15) minute increments in every hour of every day, including but not limited to Business Days, weekends, and NERC holidays.

2.3     As will be set forth in the Southeast EEM Administrator Agreement, the Southeast EEM Administrator will be primarily responsible for: (i) the on-going functions of the Southeast EEM System and overseeing and/or performing the operation and maintenance services necessary to allow the Southeast EEM System to operate in a reliable manner; (ii) the protection and safeguarding of data submitted to and transmitted from the Southeast EEM System; (iii) limiting access to the Southeast EEM System to Participants; and (iv) maintaining open communications by and among the Southeast EEM Administrator, Participants and the Southeast EEM Agent. For avoidance of doubt, the Membership Board, pursuant to Article 4, may decide to engage one or more third parties to perform the responsibilities of the Southeast EEM Administrator.

2.4     All Bid Information and Offer Information submitted to the Southeast EEM System shall be used by the Southeast EEM Administrator only for operation, maintenance, and the on-

going functions of the Southeast EEM System or as requested by the Market Auditor, in each case in accordance with this Agreement, the Southeast EEM Market Rules and applicable Law.

2.5     The Southeast EEM Administrator shall provide the information set forth in <u>Appendix D</u> to FERC in accordance with FERC's secure file transfer protocol, and to the Market Auditor, every seven (7) days for the immediately preceding seven (7)-day period and shall answer any follow-up questions from FERC regarding such information, which questions and answers shall be posted on the Southeast EEM Website in the same manner as the reports of the Market Auditor, including the same requirements for confidential treatment of transmission function information and commercially sensitive information.

<div align="center">

**ARTICLE 3**

**MEMBERSHIP AND PARTICIPATION**

</div>

3.1     Each Member shall comply with all applicable rules, policies, guidelines, or other standards or requirements set forth in this Agreement and as may otherwise be required by the Membership Board or applicable Law.

3.2     <u>Member Criteria</u>.

3.2.1    To be a Member of the Southeast EEM, an entity must be: (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory. The Tariff of any Member who provides transmission service must contain Non-Firm Energy Exchange Transmission Service provisions for those Energy Exchanges that seek to utilize such Member's transmission system.

3.2.2    If an entity and one or more of its Affiliates are Members, or if multiple entities of a Disaggregated Utility are Members, then only one entity from the group of entities (including any subsidiaries, affiliates or divisions thereof) may have a Representative on the Membership Board, and for the sake of clarity, for all purposes hereunder, such Disaggregated Utility shall be counted as a single Member.

3.2.3    An entity that satisfies the criteria set forth in this Agreement for qualification and admission as a Member, as determined by the Membership Board, shall be eligible to become a Member during the period between July 1st and September 30th of each calendar year (the "<u>Enrollment Period</u>") and may become an additional Member (an "<u>Additional Member</u>") effective as of the first day of the following calendar year in which such entity satisfies the Member criteria set forth in <u>Section 3.2</u> after executing this Agreement or a joinder hereto in the form of <u>Exhibit B</u> (the "<u>Joinder</u>") that is countersigned by the Southeast EEM Agent, submitting a duly executed copy to the Secretary and the Southeast EEM Administrator, and upon payment of all applicable fees, dues and contributions as specified or authorized in <u>Article 7</u>. For the avoidance of doubt, an entity seeking to become an Additional Member shall be bound by the terms of this

JA1179

Agreement on the date such entity executes a Joinder that is countersigned by the Southeast EEM Agent.

3.3     Participant Criteria.    To become a "Participant," an entity must (i) meet all requirements of being a Participant as set forth in the Southeast EEM Market Rules, and (ii) execute a Participant Agreement in the form attached hereto as Appendix A (the "Participant Agreement") which agreement shall, among other things, contractually bind such entity to comply with the Southeast EEM Market Rules.

3.4     Participating Transmission Providers.    Prior to the Southeast EEM Commencement Date, or, for any Participating Transmission Provider offering service after such commencement date, prior to the date upon which it commences providing Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and, if required by Law, shall obtain acceptance of such provisions from FERC or such other Governmental Entity(ies) having jurisdiction over such Tariff.  Participating Transmission Service Providers shall take such other actions and provide such information to the Southeast EEM Administrator as required by the provisions of the Southeast EEM Market Rules or as otherwise reasonably requested by the Southeast EEM Administrator in order to operate the Southeast EEM.

3.5     Member Standard of Conduct.    Members shall not provide any non-public transmission function information they receive by virtue of their participation in the Southeast EEM to any of their marketing function employees or provide any undue preference through the sharing of non-public market information they receive by virtue of their participation in the Southeast EEM to their marketing function employees.  For purposes of this Section 3.5, marketing function employees of a Member's Affiliates shall be deemed marketing function employees of the Member.


## ARTICLE 4

## GOVERNANCE

4.1     Membership Board.

4.1.1     Power and Qualification of the Membership Board.  Except as set forth in Article 5, all business of the Southeast EEM System and performance of any agreements entered into or otherwise assumed for the benefit of the Members shall be managed under the direction of the Membership Board.

4.1.2     Number of Representatives.  Subject to the limitations set forth in Section 3.2.2:

(a)     The Membership Board shall consist of one (1) representative for each Member (each, a "Representative").

(b)     Each Member shall appoint one (1) Representative to serve until such Representative is replaced by such Member. No Member shall be permitted to have more than one (1) Representative on the Membership Board.

JA1180

4.1.3    Method of Selecting or Removing Representatives; Vacancies.

(a)    A Representative shall be removed or replaced solely at the discretion of the Member that originally appointed such Representative; provided, however, that each Member must at all times have a Representative in place to vote on matters pursuant to Section 4.1.5.

(b)    All Representative vacancies, occurring for any reason, shall be filled by the Member who appointed such Representative.

4.1.4    Resignations.  A Representative may resign at any time by delivering written notice to the Member who appointed such Representative, the Membership Board and the Southeast EEM Administrator.  Such resignation shall take effect when such notice is delivered to the applicable Member, unless the notice specifies a later effective date.

4.1.5    Quorum of Representatives and Action by the Membership Board; Voting.

(a)    The votes of the Members shall be held by the Representatives and shall be weighted with each Representative holding:

(i)    one (1) vote for each Representative of the Southeast EEM System (the "Popular Vote"); and

(ii)    a number of votes (the "Net Energy for Load Vote") equal to the following calculation:

Net Energy for Load Vote = (MNEL/ANEL)

*Where:*

*MNEL = such Member Net Energy for Load of the Representative's Member, Affiliates of such Member and those related entities part of a Disaggregated Utility as of the Record Date; and*

*ANEL = the sum of the Member Net Energy for Load for all Members as of the Record Date.*

(b)    Subject to Section 4.1.7(c), attendance by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes shall constitute a quorum for the transaction of business.  Except for Significant Matters, the actions of the Membership Board shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance, and (ii) more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than fifty percent (50%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "Affirmative Majority Vote").

(c)     Subject to <u>Section 4.1.7(c)</u>, the actions of the Membership Board to decide on matters related to the Significant Matters shall pass by the affirmative vote of the Representatives present at a meeting at which a quorum is present that constitutes (i) more than fifty percent (50%) of the Popular Vote of the Representatives in attendance <u>and</u> (ii) more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance; provided that more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance must be comprised of MNEL from three (3) or more Representatives (conditions (i) and (ii) together, the "<u>Affirmative Supermajority Vote</u>").

(d)     Except as provided in <u>Section 16.15</u>, the number of Net Energy for Load Vote of each Representative shall be adjusted each year following the Enrollment Period and prior to the start of the next calendar year to reflect the revision to such proportions resulting from the inclusion of Additional Members (if any) when determining Net Energy for Load Vote for each Representative. Notwithstanding anything to the contrary herein, a Member's right to have its Representative vote or be included in a Representative's Net Energy for Load Vote may be suspended pursuant to <u>Section 4.2.2</u> during any period in which such Member is delinquent in the payment of any of the dues or costs and expenses allocated to such Member in accordance with <u>Article 7</u>. If a Member's Representative's right to vote has been suspended, the Membership Board shall recalculate the Net Energy for Load Vote of each other Representative excluding such suspended Member's Representative, and each other calculation required by this <u>Section 4.1.5</u> and <u>Article 4</u> (including for purposes of determining if there is a quorum and whether there is an Affirmative Majority Vote and Affirmative Supermajority Vote, as applicable) shall be determined excluding such suspended Member's Representative. If a Member withdraws from this Agreement in accordance with Sections 4.2.1 or 8.7, the Membership Board shall recalculate the Net Energy for Load Vote of each other Representative as of the date of such withdrawal.

4.1.6   <u>Meetings of the Membership Board</u>. Meetings of the Membership Board, unless otherwise provided in this Agreement, may be called (i) by the Chair of the Membership Board, or (ii) by a written consent delivered to the Membership Board that is executed by a majority of the holders of each of the aggregate Popular Votes and the Net Energy for Load Votes. Meetings of the Membership Board, regular or special, may be held at such place within the Territory and upon such notice as may be prescribed by resolution of the Membership Board.

4.1.7   <u>Notice of Meetings of Representatives</u>.

(a)     The Chair of the Membership Board, or a Representative directed by the Chair of the Membership Board, shall provide written notice by electronic mail (and shall confirm receipt of such notice by requesting a return receipt) of each Membership Board meeting to all Representatives. Such notice shall state the date, place, hour and purpose or purposes of the meeting, including any Significant Matters to be discussed, and shall be delivered by a nationally recognized overnight courier service to each Representative's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting.

13

(b) Any Member may designate, by submitting a written communication to the Chair of the Membership Board, an alternate to act on behalf of the Representative ("Alternate Representative"). Any reference herein to "Representative" shall be deemed a reference to the Alternate Representative where applicable.

(c) Notwithstanding anything to the contrary set forth herein, the Membership Board shall only vote on matters set forth in a duly delivered notice pursuant to this Section 4.1.7; provided, however that the Membership Board may (i) discuss any and all matters within the scope of the Membership Board's duties at any duly constituted meeting of the Membership Board, and/or (ii) vote upon any matter within the scope of the Membership Board's duties that is not set forth in a duly delivered notice pursuant to this Section 4.1.7 if all Representatives are present at such meeting of the Membership Board and such matter is approved in accordance with the applicable voting requirements set forth in Section 4.1.5.

4.1.8 Action by Representatives in Lieu of a Meeting; Participation in Meetings by Conference Telephone.

(a) Unless otherwise restricted by this Agreement, any action required or permitted to be taken at a meeting of the Membership Board may be taken without a meeting if the action is evidenced by written consent describing the action taken, signed by all of the Representatives. The written consents and the resolutions thereto by the Representatives shall be filed with the minutes of the Membership Board or filed with the records maintained by the Secretary reflecting the action taken. Action taken under this Section 4.1.8(a) becomes effective when the last Representative signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided the consent states the date of execution by each Representative.

(b) The Representatives may participate in any meeting of the Membership Board or of a committee thereof by means of conference telephone or by any means of communication by which all Representatives participating may hear one another during the meeting; all meetings shall be available for participation via such means. A Representative participating in a meeting by such means is deemed to be present in person at the meeting.

4.1.9 Powers Exclusive to the Membership Board.

(a) The following matters are reserved to and may only be addressed by the Membership Board:

(i) all Significant Matters;

(ii) the creation and appointment of committees and officers pursuant to Section 4.3;

(iii) the establishment and amendment of Annual Budgets;

(iv) the establishment and modification of billing processes for Operating Costs;

14

(v)     the approval of Southeast EEM Manuals or amendments to Southeast EEM Manuals proposed by the Operating Committee;

(vi)    the approval and establishment of the Southeast EEM Commencement Date following the satisfaction of the conditions set forth in <u>Section 8.4.2</u>;

(vii)   all Deadlock Issues; and

(viii)  the authorization of the Southeast EEM Agent to execute, transfer or terminate Participant Agreements.

(b)     Any changes, modifications or amendments to this Agreement agreed to by the Membership Board as provided herein shall be submitted to the required Governmental Entities for approval or acceptance and the orders on such submissions shall be deemed to be and treated as Southeast EEM Orders for purposes of <u>Article 8.</u>

4.2     <u>Removal or Withdrawal of Members</u>.  Upon withdrawal, suspension or removal of a Member as set forth below, such Member shall no longer be entitled to exercise the voting power provided under this Agreement, shall be automatically removed from any committee appointments, and shall not be entitled to any other rights as a Member hereunder.  Notwithstanding the foregoing, (i) a Member that withdraws or is removed or is suspended by the Membership Board or is no longer a Member during a calendar year shall remain liable for all dues, costs and expenses and other payment obligations as provided in <u>Section 4.2.1</u> and <u>Section 4.2.4</u>, and (ii) nothing in this <u>Section 4.2</u> shall act to prevent a Member who is no longer a Member, but is in compliance with all surviving obligations under this Agreement, from becoming a Participant; provided it has met the criteria for a Participant set forth in <u>the Southeast EEM Market Rules</u>. Any Member that withdraws or is removed by the Membership Board or is no longer a Member during a calendar year shall pre-pay all amounts owed by such Member under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.2.1   Except as set forth in <u>Section 8.5</u>, <u>Section 8.6</u> and <u>Section 8.7</u>, any Member shall have the right to withdraw from the Southeast EEM System (and a Participating Transmission provider shall take all necessary actions to withdraw the provisions for Non-Firm Energy Exchange Transmission Service from its Tariff) by providing at least (i) thirty (30) days advance written notice to the Membership Board in the case of any Member that is not a Balancing Authority or Participating Transmission Provider and (ii) at least ninety (90) days advance written notice to the Membership Board in the case of any Member that is a Balancing Authority or Participating Transmission Provider (the effective date of such withdrawal, in the case of clause (i) or (ii), as applicable, the "<u>Voluntary Withdrawal Date</u>"). A withdrawing Member shall continue to be liable for (A) all Operating Costs allocated to and owed by the withdrawing Member at the time that it delivered its notice of withdrawal, and (B) its allocated share of future Operating Costs as provided in <u>Section 4.2.4</u>; provided, however, that for the sake of clarity and notwithstanding anything to the contrary herein, the withdrawing Member shall not be responsible for any new Operating Costs first approved and incurred  after the date such Member provides written notice of its intent to withdraw, and a withdrawing Member that is also a Participating Transmission Provider shall have no obligation to provide Non-Firm Energy Exchange Transmission Service following the Voluntary Withdrawal Date.

4.2.2    If a Member fails to cure nonpayment of any financial obligations related to the Southeast EEM (including undisputed amounts payable and any other amounts due to any third parties as directed by the Membership Board or pursuant to the Southeast EEM Market Rules) within ten (10) Business Days after receipt of notice by the Operating Committee of such nonpayment, the Membership Board shall have the right in its discretion to: (i) suspend such Member's voting rights, (ii) remove such Member from any committee appointments and (iii) suspend such Member's access to the Southeast EEM System.

4.2.3    The Membership Board may remove a Member for any of the following reasons: (i) failure to comply with this Agreement, (ii) repeated failure to consummate valid Energy Exchanges resulting from Bids or Offers submitted by a Member, arranged by or through the Southeast EEM System in accordance with and subject to the Southeast EEM Market Rules or the Southeast EEM Manuals; and (iii) failure to comply with the standards, rules, procedures or other requirements for participation in the Southeast EEM System, as established and modified from time to time by the Operating Committee.

4.2.4    Any Member that provides notice to withdraw in accordance with Section 4.2.1, Section 8.5, Section 8.6 or Section 8.7 or who is otherwise removed pursuant to Section 4.2.3 shall remain liable for its share of all costs and expenses in accordance with Article 7. If such Member withdraws prior to the Annual Budget Determination Date, such Member shall only be responsible for the costs and expenses allocated to such Member for the year in which such Member withdraws. If such Member withdraws after the Annual Budget Determination Date, such Member shall (i) be responsible for the costs and expenses allocated to such Member pursuant to Section 7.2.2 for the year in which such Member withdraws and the following year for which the Annual Budget has already been determined, and (ii) pre-pay all amounts owed by such Member under any Material Vendor Contract that requires the acceleration or prepayment of sums owed in the event of a Member's withdrawal.

4.3    Committees and Officers.

4.3.1    An Affirmative Majority Vote may appoint such committees or officers as the Membership Board deems necessary or desirable to carry on the business of the Southeast EEM System and may delegate to any such committee or officer such authority to act on behalf of the Membership Board.  Each officer shall hold office until its successor is designated by an Affirmative Majority Vote.  Any officer may resign at any time upon written notice to the Membership Board.  Any officer may be removed by an Affirmative Majority Vote at any time, with or without cause.  A vacancy in any officer position shall be filled at the discretion of, and by, an Affirmative Majority Vote.

4.3.2    The Membership Board shall appoint a chair of the Membership Board (the "Chair of the Membership Board") who shall be responsible for calling and overseeing all meetings of the Membership Board, and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.3.3    The Membership Board shall appoint a secretary of the Membership Board (the "Secretary") who shall be responsible for overseeing the maintenance of the books and records

of the Membership Board and its Members and shall perform such duties and have such additional powers as an Affirmative Majority Vote shall designate.

4.4     Annual Meeting of Participants and Stakeholders. The Membership Board shall hold an annual meeting of Participants and Stakeholders (the "Annual Meeting") at a time determined by the Membership Board that is reasonably proximate to (either before or after) May 1st of each year. The Southeast EEM Administrator shall provide written notice of the Annual Meeting to all Participants.  Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by a nationally recognized overnight courier service to each Participant's usual place of business as recorded in the Southeast EEM Administrator's records, or such notice shall be delivered by internet electronic mail (with return receipt requested for purposes of confirming receipt) sent to the electronic mail address for such Participant as recorded in the Southeast EEM Administrator's records, not less than seven (7) Business Days prior to the date of the Annual Meeting.  In addition, the Southeast EEM Administrator shall publicly post the notice of the Annual Meeting, including the date, place and time of such Annual Meeting, on the Southeast EEM System Interface or other public website administered for the Southeast EEM, not less than seven (7) Business Days prior to the date of the Annual Meeting. The Participants and Stakeholders may participate in Annual Meetings by means of conference telephone or by any means of communication by which all Participants and Stakeholders participating may hear one another during the meeting, and all Annual Meetings shall be available for participation via such means.

4.5     Annual Meeting of Members.  The Membership Board shall hold an annual meeting attended only by Members (the "Annual Member Meeting") at a time determined by the Membership Board that is reasonably proximate to (either before or after) October 30th of each year. The Secretary shall provide written notice of the Annual Member Meeting to, and confirm actual receipt of such notice by, all Members.  Such notice shall state the date, place, hour and purpose or purposes of the meeting and shall be delivered by nationally recognized overnight courier service to each Member's usual place of business as recorded in the Secretary's records, or delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Member's Representative as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the Annual Member Meeting. The Members may participate in the Annual Member Meeting by means of conference telephone or by any means of communication by which all Members participating may hear one another during the meeting, and all meetings shall be available for participation via such means.

# ARTICLE 5

# OPERATING COMMITTEE

5.1     Power and Qualification of the Operating Committee.  Except with respect to matters specifically reserved to the Membership Board pursuant to Section 4.1.9, the Members hereby agree and hereby appoint the Operating Committee to supervise the day-to-day operation of the Southeast EEM System, with each individual member of the Operating Committee referred to as a "Committee Member". The Operating Committee shall be responsible for developing and maintaining the Southeast EEM Manuals for approval by the Membership Board.

JA1186

5.2    Number of Committee Members.  The Operating Committee shall consist of four (4) Committee Members, as determined by this Agreement.

5.3    Election and Term of Committee Members; Appointment of Chair.

5.3.1    Except as provided in this Agreement, the Members of each Sector shall elect the Committee Members as provided in Section 5.4 at the Annual Member Meeting.  The Committee Members shall be allocated by Sectors: (a) the Members comprising Investor-Owned Utilities shall elect two (2) Committee Members; (b) the Members comprising Cooperatives shall elect one (1) Committee Member; and (c) the Members comprising Governmental Utilities shall elect one (1) Committee Member.  Each Committee Member shall be entitled to cast one (1) vote.  Notwithstanding the foregoing, no Member shall be permitted to have more than one (1) representative serve on the Operating Committee.  Each Committee Member's term shall commence upon election and continue until the earlier of such Committee Member's resignation or the date of the next Annual Member Meeting and the election of such Committee Member's successor.

5.3.2    The properly elected Committee Members shall determine which Committee Member shall be the chair of the Operating Committee by the majority approval of the Committee Members.  The chair of the Operating Committee may be removed or replaced with or without cause at any time upon the majority approval of the Committee Members.

5.4    Method of Selecting or Removing Committee Members.  Each Sector may establish the method and criteria for electing or appointing the Committee Member(s) of such Sector as set forth in Section 5.3 and for selecting or removing the Committee Member or Committee Members elected or appointed by such Sector and shall provide a copy of such method and criteria to the Southeast EEM Administrator as well as any updates thereto.  A Committee Member shall be deemed properly appointed by the applicable Sector upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power pursuant to such Sector's criteria to elect such Committee Member.  A Sector may remove a Committee Member with or without cause by delivering to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to remove the Committee Members.  Such Committee Member's removal shall be effective on the later of the date such certificate is delivered to the Southeast EEM Administrator or date specified in the certificate.

5.5    Vacancies.  All Committee Member vacancies, occurring for any reason, shall be filled by the Members of the Sector in which the vacancy occurs, in the same manner as a Committee Member is elected pursuant to Section 5.4.  A Committee Member elected or appointed to fill a vacancy shall assume office upon delivery to the Southeast EEM Administrator a certificate signed by Members of the Sector with sufficient voting power to fill the vacancy.

5.6    Resignations.  A Committee Member may resign at any time by delivering written notice to the Secretary and to the Members of the Sector which elected or appointed such Committee Member.  Such resignation shall take effect when such notice is delivered to the Southeast EEM Administrator, unless the notice specifies a later effective date.

5.7    Quorum of Committee Members and Action by the Operating Committee.

JA1187

5.7.1    Attendance by at least one (1) Committee Member representing each of the three (3) Sectors shall constitute a quorum for the transaction of business.  The act of all the votes of the Committee Members present at a meeting at which a quorum is present shall constitute the action of the Operating Committee.

5.7.2    To the extent that the Operating Committee cannot obtain a unanimous vote on any business or issue properly before the Operating Committee when a quorum is present (the "Deadlock Issue"), then the Operating Committee may, upon the written request of a Committee Member, submit the Deadlock Issue to the Membership Board for final resolution. For purposes of clarity, a vote of the Operating Committee that is held at a meeting for which a quorum is present shall be considered unanimous if at least one (1) Committee Member representing each of the three (3) Sectors is present.

5.8    <u>Meetings of the Operating Committee</u>.  Meetings of the Operating Committee may be called (i) by the chair of the Operating Committee, or (ii) by a written consent delivered to the chair of the Operating Committee that is executed by a majority of the Committee Members.

5.9    <u>Notice of Meetings of Committee Members; Member Observation Rights</u>.

(a)    The Southeast EEM Administrator shall provide written notice of each Operating Committee meeting to all members of the Operating Committee as well as to all Members.  Such notice shall state the date, place and hour of the meeting and shall be delivered by internet electronic mail (with return electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such Committee Member and for such Member as recorded in the Secretary's records, not less than seven (7) Business Days prior to the date of the meeting.  Members who are not Committee Members shall have the right to attend, observe and participate in any discussion at any Operating Committee Meeting, but may not cast a vote.

(b)    Any Committee Member unable to attend a meeting may designate, in writing, an alternate from the same Sector as such Committee Member to act on behalf of the Committee Member ("<u>Alternate Committee Member</u>").  Any reference herein to "Committee Member" shall be deemed a reference to the Alternate Committee Member where applicable.

(c)    A Committee Member's attendance at or participation in a meeting waives any required notice to him or her of such meeting unless, at the beginning of such meeting or promptly upon his or her arrival, such Committee Member objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

(d)    A notice shall specify the business to be transacted at, or the purpose of, any meeting of the Operating Committee; provided, however, such notice shall not limit the actions the Operating Committee may take at a meeting.

5.10    <u>Action by Committee Members in Lieu of a Meeting; Meetings by Telephone Conference</u>.

JA1188

(a)     Any action required or permitted to be taken at a meeting of the Operating Committee may be taken without a meeting if at least one (1) Committee Member representing each of the three (3) Sectors consents in writing to the adoption of a resolution authorizing the action. The resolution and the written consents thereto by the Committee Members shall be filed with the minutes of the Operating Committee or filed with the records maintained by the Secretary reflecting the action taken. Any action taken under this Section 5.10(a) shall be effective when the last Committee Member signs the consent, unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein, provided, the consent states the date of execution by each Committee Member. Such consent shall have the same force and effect as a unanimous vote.

(b)     The Committee Members and Members may participate in any meeting of the Operating Committee or of a committee thereof by means of telephone conference or by any means of communication by which all Committee Members and Members participating may hear one another during the meeting, and all meetings shall be available for participation via such means. A Committee Member participating in a meeting by such means is deemed to be present in person at the meeting.

5.11     Liability of Committee Members. The Operating Committee and the Committee Members shall not be liable to any Member for any act done or omitted by Committee Members while acting in good faith and in the exercise of reasonable judgment. The Members shall indemnify the Committee Members (solely in such capacity) and hold them harmless against any loss or expense actually incurred without gross negligence or willful misconduct on the part of the Committee Members and arising out of or in connection with the acceptance or administration of their role on the Operating Committee.

## ARTICLE 6

## APPOINTMENT OF SOUTHEAST EEM AGENT

6.1     Each Member agrees to appoint the Southeast EEM Agent as its representative and as each such Member's true and lawful agent and authorizes the Southeast EEM Agent to act for such Member in accordance with the scope of the Southeast EEM Agent's responsibilities (the "Southeast EEM Agent Scope") as specifically defined by the Membership Board in Appendix C. Each Member grants unto the Southeast EEM Agent only that authority which is granted to the Southeast EEM Agent by the Membership Board under this Agreement and that is necessary to perform the actions required in connection with the development and operation of the Southeast EEM System, and in each case in a manner consistent with the Southeast EEM Agent Scope. Each Member agrees and acknowledges that a third party shall be entitled to rely on any action taken, or the failure to take any action, by the Southeast EEM Agent, on behalf of Members pursuant to and in accordance with this Article 6 (each, an "Authorized Action"), and that each Authorized Action shall be binding on each Member as fully as if such Members had taken such Authorized Action directly. The initial Southeast EEM Agent and any replacement Southeast EEM Agent, as determined by the Membership Board in accordance with Section 4.1.9, must meet any criteria set by the Membership Board from time to time (collectively, the "Southeast EEM Agent Criteria"). Any entity that does not meet the Southeast EEM Agent Criteria may not serve as the Southeast

EEM Agent; provided, however, that the Membership Board may, in its discretion, alter or revise the Southeast EEM Agent Criteria.

6.2     Each Member acknowledges and agrees that upon execution of this Agreement, and upon any delivery by the Southeast EEM Agent of any waiver, amendment, agreement, opinion, certificate or other document within the Southeast EEM Agent Scope executed by the Southeast EEM Agent, such Member shall be bound by such documents or action as fully as if such Member had executed and delivered such documents. Each Member shall pay its allocated share of (i) all Operating Costs arising from contracts entered into by the Southeast EEM Agent entered into in accordance with the Southeast EEM Agent Scope, and (ii) fees, costs and expenses incurred by the Southeast EEM Agent in performing its duties hereunder.

6.3     The Southeast EEM Agent may resign at any time upon sixty (60) days written notice to the Membership Board and may be removed at any time with or without cause by the Membership Board pursuant to Section 4.1.9. Upon the resignation of the Southeast EEM Agent pursuant to this Section 6.3 or its removal pursuant to Section 4.1.9, the resigning or removed Southeast EEM Agent shall take or cause to be taken, all actions and do, or cause to be done, or execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the Membership Board may reasonably deem necessary, proper or advisable to transition the rights and obligations of the Southeast EEM Agent to the replacement Southeast EEM Agent, as promptly as practicable or sooner as required by this Agreement, including, without limitation, such actions as are necessary to assign all contracts, agreements or other documents executed on behalf of the Members within the Southeast EEM Agent Scope to the replacement Southeast EEM Agent.

6.4     For the avoidance of doubt, it is the intent of the Members that the Operating Committee, not the Southeast EEM Agent, be responsible for interfacing and coordinating with third party vendors with regard to the performance of contracts with such vendors. Further, in the event that the Southeast EEM Agent is required to take any ministerial action under such contracts, the Southeast EEM Agent shall only do so at the direction of the Membership Board or Operating Committee and in accordance with the Southeast EEM Agent Scope. The Southeast EEM Agent shall have no right or access to data related to the Southeast EEM beyond what it has as a Member and Participant.

6.5     The Southeast EEM Agent will incur no liability of any kind with respect to any action or omission by the Southeast EEM Agent in connection with the Southeast EEM Agent's role pursuant to this Agreement and any agreements ancillary hereto within the Southeast EEM Agent Scope, except in the event of liability directly resulting from the Southeast EEM Agent's gross negligence or willful misconduct. The Members will indemnify, defend and hold harmless the Southeast EEM Agent from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "Representative Losses") arising out of or in connection with the Southeast EEM Agent's execution and performance of this Agreement and any agreements ancillary hereto, in each case as such Representative Loss is suffered or incurred; provided, that in the event that any such Representative Loss is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Southeast EEM Agent or actions beyond the Southeast EEM Agent

Scope, the Southeast EEM Agent will reimburse the Members the amount of such indemnified Representative Loss to the extent attributable to such gross negligence or willful misconduct. In no event will the Southeast EEM Agent be required to advance its own funds on behalf of the Members or otherwise. The Members acknowledge and agree that the foregoing indemnities will survive the resignation or removal of the Southeast EEM Agent or the termination of this Agreement.

## ARTICLE 7

## BUDGETING AND COST RESPONSIBILITY

7.1    <u>Member Responsibility</u>.  Each Member will be assigned and is responsible for its allocated share of Operating Costs and such other dues or fees as assessed by the Membership Board from time to time based on the methodology set forth in <u>Section 7.2</u>. If a Member fails to cure any nonpayment of its allocated share of Operating Costs or any other amount assessed against such Member under this Agreement within ten (10) Business Days after receiving notice from the Operating Committee of such non-payment, such Member may, in the discretion of the Membership Board, lose its right to vote on matters related to this Agreement or to have representation on the Membership Board and any committees unless and until such amounts are paid in full. Any amounts owed that are not paid in accordance with this Agreement shall be delinquent and shall accrue interest at the Interest Rate, such interest to be calculated from the due date to the date the delinquent amount is paid in full.

7.2    <u>Allocation of Costs</u>.  Operating Costs, including but not limited to the costs and expenses of the Southeast EEM System, shall be allocated and assessed to each Member based on the following formula, provided that (i) for purposes of a Disaggregated Utility, such Disaggregated Utility shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the entities of such Disaggregated Utility according to their direction (which allocation shall not control for any purposes hereunder), and (ii) for purposes of Member Affiliates, the Member Affiliates shall be counted as a single Member for purposes of this calculation and the costs will be allocated among the Member Affiliates according to their direction (which allocation shall not control for any purposes hereunder):

$$[(1/4)(TC)(1/TNM)] + [(3/4)(TC)(MNEL/ANEL)] = MAC, \text{ where:}$$

*TC = Total allocable costs.*

*TNM = the total number of Members.*

*MNEL = such Member Net Energy for Load of the Representative's Member,*

*Affiliates of such Member and those related entities part of a Disaggregated*

*Utility as of the Record Date.*

*ANEL = the sum of all the Member Net Energy for Load as of the Record Date.*

*MAC = Member's allocated costs.*

JA1191

7.2.1 <u>Billing Process</u>. Each Member shall be billed directly by the Southeast EEM Administrator for its allocated share of Operating Costs in accordance with the terms of this Agreement. In the event that the direct billing process described in the foregoing sentence proves to be unworkable for certain Operating Costs, the Membership Board shall use commercially reasonable efforts to (i) require third party vendors to structure all Southeast EEM invoices on an individual Member basis based upon the cost methodology set forth in this Agreement; or (ii) if such third party vendors refuse to provide such individual Member billings services, establish an alternative billing procedure for such Operating Costs (including the engagement of a third party billing service provider) to ensure such invoices are billed on an individual Member basis. The Membership Board shall establish such an alternative billing procedure in a timely manner; provided, however, that a delay in establishing such a procedure shall not eliminate the Members' individual obligations to pay their allocated share of Operating Costs. Nothing in this <u>Section 7.2.1</u> is intended to modify or diminish the Membership Board's authority to establish or amend billing procedures from time to time.

7.2.2 <u>Annual Budget</u>. Except as provided in <u>Section 16.15</u>, on or before December 15 of each calendar year, but in any case no earlier than October 1st of each calendar year, the Membership Board shall set the annual budget for the following calendar year (the "<u>Annual Budget Determination Date</u>"), which budget shall include but not be limited to all projected Operating Costs, including all vendor costs and all costs and expenses associated with the Southeast EEM Agent (the "<u>Annual Budget</u>"). Except as provided in <u>Section 16.15</u>, costs are deemed allocated to each Member as of the Annual Budget Determination Date, but, except as otherwise provided herein, are not payable until such costs are due and payable subject to the applicable agreements concerning such costs.

7.3 <u>Additional Members</u>. The costs and expenses of the Southeast EEM System allocated to each Member shall be adjusted each year in accordance with <u>Section 7.2</u> following the Enrollment Period but prior to the Annual Budget Determination Date to reflect any changes in a Member Net Energy for Load valuation or the inclusion of Additional Members in such calculations for the following calendar year.

7.3.1 <u>Submission of Information</u>.

(a) Upon the request of the Secretary or upon a schedule approved by the Membership Board, each Member shall provide its Member Net Energy for Load values, and any other information required for the calculations set forth in <u>Section 4.1.5</u> and <u>Section 7.2</u>, to the Southeast EEM Administrator and all other Members. If a Member proposes to use a Member Net Energy for Load value that differs from the Net Energy for Load value as provided to NERC by the Record Date (an "<u>Alternate MNEL Value</u>"), such Member shall submit a written request to the Operating Committee at least thirty (30) days prior to the Annual Budget Determination Date requesting the Operating Committee's approval of such Member's Alternate MNEL Value in the upcoming year. The submitting Member's request shall contain (i) an explanation of why the Alternate MNEL Value differs from the Member Net Energy for Load value submitted to NERC, and (ii) all other reasonably necessary information evidencing such Member's calculation of the Alternate MNEL Value. The Operating Committee shall review a Member's request to use an Alternate MNEL Value and shall use commercially reasonable efforts to approve, deny or request

additional information regarding such request within fifteen (15) days from the date the Operating Committee receives the request.

(b)     If the Operating Committee denies a Member's request to use an Alternate MNEL Value, the Member may, within thirty (30) days of such denial, submit the request to the Membership Board for review, and the Membership Board shall, as soon as reasonably practicable, hold a vote to either uphold or overturn the Operating Committee's denial of the request, as determined by an Affirmative Majority Vote. The requesting Member shall provide to the Membership Board such information reasonably requested by the Membership Board in order to evaluate the Member's request. If the Operating Committee or the Membership Board, as applicable, approves a Member's Alternate MNEL Value, such Alternate MNEL Value shall be used for the calculations set forth in <u>Section 4.1.5</u> and <u>Section 7.2</u> in the following calendar year. If the Operating Committee or the Membership Board, as applicable, deny such requesting Member's request to use an Alternative MNEL Value, the Member's Member Net Energy for Load value shall be that Member Net Energy for Load as determined by the Membership Board in accordance with this Agreement; provided, however, that during the pendency of the review of a Member's Net Energy for Load pursuant to this <u>Section 7.3.1</u> and until such value is finally determined, the requesting Member's Member Net Energy for Load value shall be the Member Net Energy Load value provided by such Member that was approved and used in the most recent calendar year.

## ARTICLE 8

## FILINGS WITH GOVERNMENT ENTITIES; EFFECTIVE DATE

8.1     This Agreement is subject to valid Laws, orders, rules and regulations of duly constituted Governmental Entities having jurisdiction. Nothing contained in this Agreement shall be construed as a grant of jurisdiction over any Member by any Governmental Entity not otherwise having jurisdiction by Law.

8.2     <u>Filing With and Approval or Acceptance by Governmental Entities</u>.

8.2.1     Any entity desiring to become a Member that is subject to the jurisdiction of any Governmental Entity from which approval or acceptance of this Agreement or participation in the Southeast EEM is required for such entity to participate in the Southeast EEM shall institute proceedings to obtain such acceptance or approval or shall provide such notice, except as provided in <u>Section 8.2.2</u> below. All required approvals, acceptances and notices must be received by such entity prior to its participation in the Southeast EEM. The Members shall cooperate in securing all required Governmental Entity approvals or acceptances of this Agreement.

8.2.2     No later than sixty (60) days prior to the proposed Effective Date, the Southeast EEM Agent shall file this Agreement with FERC on behalf of the Jurisdictional Members in accordance with <u>Section 8.2.1</u> under Section 205(c) of the FPA.  Within ten (10) Business Days of the date of such filing, the remaining Jurisdictional Members shall file certificates of concurrence with such filing and the Non-Jurisdictional Members shall file comments in support of such filing.

JA1193

8.3    On the same date that the Southeast EEM Agent files this Agreement with FERC, the Jurisdictional Members that are also transmission service providers will make filings with FERC to amend their Tariffs to include the provision of Non-Firm Energy Exchange Transmission Service and become Participating Transmission Providers, in accordance with Section 3.4 above (the "Tariff Filings").

8.4    Effective Date and Southeast EEM Commencement Date.

8.4.1    Unless specific provisions become effective earlier by the explicit terms contained herein, this Agreement shall be binding upon the Members upon the effective date established by FERC in a FERC order accepting the Agreement without modification or condition (the "Effective Date"); provided, however, that that this Agreement shall not become binding upon an individual Member who seeks acceptance or approval from a Governmental Entity pursuant to Section 8.2.1 above until the later of: (x) the date of issuance of an order by such Governmental Entity approving without modification or condition this Agreement and/or such Member's participation in the Southeast EEM and (y) the Effective Date; and provided, further, that the Members agree that this Agreement will bind each of them upon signing, subject only to the approvals and acceptances provided in this Section 8.4. In the event FERC does not accept the Agreement as filed, the Members may agree to changes or modifications to the Agreement pursuant to an Affirmative Supermajority Vote as set forth in Section 8.6, in which event the Effective Date shall be the date that FERC accepts the revised Agreement with any such changes or modifications agreed to pursuant to Section 8.6.

8.4.2    The Southeast EEM Commencement Date shall not occur until after (i) the Effective Date, (ii) the issuance by FERC of an order or orders accepting without modification or condition all of the Jurisdictional Member Participating Transmission Provider's Tariff Filings, and (iii) the Membership Board has approved and established the Southeast EEM Commencement Date in accordance with Section 4.1.9(vi).

8.5    If a Governmental Entity (other than FERC) to which a Member's participation in the Southeast EEM has been submitted for approval pursuant to Section 8.2.1 has not issued an order on such request within four (4) months from the date of submission, the Member for which such approval was requested may withdraw from this Agreement by providing written notice to all other Members no later than fifteen (15) days after such four-month period has elapsed. Withdrawal under this Section 8.5 shall be subject to the provisions of Section 4.2.

8.6    The individual provisions of this Agreement are inter-related and inter-dependent, and the agreement of the Members to the terms hereof is based on the expectation that it will be approved by all necessary Governmental Entities in its entirety. Accordingly, the terms of this Agreement are not severable, and are an integrated package that is submitted with the understanding and condition that it will be approved by the necessary Governmental Entities in its entirety. As such, if at any time (i) a Governmental Entity issues an order that does not accept or approve this Agreement or a Tariff Filing in its entirety without condition or requires modifications to the Agreement or the relevant Tariff ("Southeast EEM Order"), or (ii) any state or federal Laws or regulations, now existing or enacted or promulgated after the Effective Date are interpreted by a Governmental Entity in such a manner as to indicate that the structure or terms of this Agreement are more likely than not to be a violation of such Laws or regulations or are more likely than not to

impact the jurisdictional status of any Member (a "Change in Law"), or (iii) if any provision or portion of this Agreement shall for any reason be held or adjudged to be invalid or illegal or unenforceable by any court of competent jurisdiction or other Governmental Entity ("Other Court/Governmental Entity Action"), the Members will engage in good faith negotiations during a forty-five (45) day period after the date of the Southeast EEM Order or Change in Law or Other Court/Governmental Entity Action to agree to Agreement modifications or conditions that are consistent with the modifications and conditions imposed by such Southeast EEM Order, Change in Law or Other Court/Governmental Entity Action; provided, however, that in any such negotiation the Members are not under any obligation to reach an agreement. Any changes, modifications or conditions to the effectiveness of this Agreement agreed to by an Affirmative Supermajority Vote shall be submitted to the required Governmental Entities for approval or acceptance and the orders on such filings shall be deemed to be and treated as Southeast EEM Orders for purposes of this Article 8. If an Affirmative Supermajority Vote cannot be achieved within such forty-five (45) day period, then the Agreement shall terminate and be of no force and effect. If a Member does not agree with the modifications to the Agreement adopted by the Affirmative Supermajority Vote, such non-agreeing Member shall be subject to the waiver of rights provisions of Section 16.9, but shall have the right to withdraw from this Agreement and the Southeast EEM upon thirty (30) days prior written notice. Upon such notice of withdrawal by a Member, any other Member may withdraw from this Agreement by providing written notice to the other Members within twenty-five (25) days after the date of the first Member's notice of withdrawal. Any notice to withdraw provided in accordance with this Section 8.6 shall become effective as of the later of the date provided in such notice and the date such Member is permitted to withdraw in accordance with Section 8.5 (the "Governmental Action Withdrawal Date"). Withdrawal under this Section 8.6 shall be subject to the provisions of Section 4.2.

8.7    A Non-Jurisdictional Member, in its sole discretion, may immediately withdraw from this Agreement if it becomes apparent that the Non-Jurisdictional Member's engagement in activities under this Agreement or FERC's approval of this Agreement would (i) jeopardize the tax-exempt status of interest paid by the Non-Jurisdictional Member on outstanding debt obligations, (ii) render the Non-Jurisdictional Member a Public Utility subject to FERC's jurisdiction, or (iii) if the Non-Jurisdictional Member determines that any conflict exists between provisions of this Agreement and applicable Laws and regulations of the state of its creation, or rate schedules adopted by its governing body under state Law, in which case such state Laws, regulations, or rate schedules shall govern with respect to such Non-Jurisdictional Member. The withdrawing Non-Jurisdictional Member may withdraw from this Agreement on this basis by providing written notice to all other Members and the Southeast EEM Administrator. Withdrawal under this Section 8.7 shall be subject to the provisions of Section 4.2.

## ARTICLE 9

## RELEASE AND LIABILITY; NO FIDUCIARY DUTIES

9.1    Except as expressly set forth in Section 14.2, to the maximum extent permitted by applicable Law, each Member releases and discharges every other Member from any and all liability for any and all liabilities, claims, losses, damages, expenses and other claims whatsoever the releasing Member, its officers, directors, trustees, agents, employees, affiliates, successors or

JA1195

assigns (collectively "<u>Related Parties</u>") may have that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. In addition, to the maximum extent permitted by applicable Law (i) no Member shall be liable to any other Member or its Related Parties for any liabilities, damages, obligations, payments, losses, costs or expenses under this Agreement in any amount in excess of the actual compensatory damages suffered by such other Member or its Related Parties in connection with, or resulting from, the releasing Member's performance or non-performance of this Agreement, or any actions undertaken by the releasing Member in connection with or related to this Agreement, and (ii) each Member waives any right to recover from any other Member or its Related Parties incidental, punitive, exemplary, special, indirect, multiple or consequential damages (including attorneys' fees or litigation costs to recover the same and any claims arising from any loss of interchange sales or revenues, loss of profits, costs of substitute power, costs of additional operating expenses, or suits by third parties) in connection with, or resulting from, performance or non-performance of this Agreement, or any actions undertaken in connection with or related to this Agreement or that arise out of or relate to the establishment, development, operation or maintenance of, or any deficiency in, the Southeast EEM System. Notwithstanding the foregoing, however, no Member shall be released, discharged, indemnified or held harmless with respect to any liability for damages or other claims arising from any action or failure to act by that Member that is unlawful, undertaken in bad faith, grossly negligent or the product of willful misconduct. Nothing herein shall release any Member from any obligation or liability it may have pursuant to any other agreement with any other Member.

9.2     EXCEPT FOR THE WARRANTIES AND REPRESENTATIONS SET FORTH IN <u>ARTICLE 13</u> HEREOF, NONE OF THE MEMBERS, COLLECTIVELY OR INDIVIDUALLY, MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, TO ANY MEMBER, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.3     The provisions set forth in this <u>Article 9</u> shall be given the maximum effect permitted by Law and shall indefinitely survive the termination or expiration of this Agreement with respect to any Member or Members.

9.4     <u>No Fiduciary Duties</u>.  Nothing in this Agreement should be construed or interpreted as creating a partnership by and among the Members. To the extent any Member attempts to construe this Agreement as evidence of a partnership or otherwise a basis for requiring certain implied duties and rights among the Members, notwithstanding any other provisions of this Agreement, or any other agreement, the Members covenant and agree not to prosecute, file or maintain any action, controversy, dispute, or proceeding, and do hereby expressly eliminate, waive, disclaim and release, any and all fiduciary duties of the Members that may arise pursuant to performance of their obligations or exercise of their rights pursuant to this Agreement, or that may arise pursuant to any other standard, to any Party herein, including, without limitation, its Members, and in the case of insolvency or the zone of insolvency, to creditors of any character or claim. This Agreement (including this provision) is not intended to, and shall not, create or impose any fiduciary duties on the Member or any other party for any purpose, without limitation.

9.5     <u>No Implied Covenants</u>. Each Member acknowledges and agrees that, and notwithstanding any other provisions of this Agreement or any other agreement contemplated

JA1196

herein or any applicable provisions of Law or equity or otherwise, no covenants, duties or obligations, whether express, implied, statutory or otherwise, including, without limitation, (i) the duty of good faith and fair dealing, (ii) the fiduciary duties of care, loyalty and obedience, shall apply to the acts, omissions, behavior or conduct of the Members, in any context, except for those covenants, duties and obligations expressly contained in this Agreement.

9.6     No Restriction on Competition of Members. Each of the Members agrees, severally and not jointly, that for the term of this Agreement, they are expressly permitted and authorized to directly or indirectly own, manage, operate, join, control and/or participate in the ownership, management, operation or control of, any business engaged in business or operations that compete or relate to, directly or indirectly, the business of the Southeast EEM System. The legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines shall not be applied to any such competitive venture or activity of a Member or its Affiliates. No Member or its Affiliates will have any obligation to the Southeast EEM System or the Southeast EEM System's other Members or Participants with respect to any opportunity relating to the Southeast EEM System or its business.

## ARTICLE 10

## TRANSPARENCY; CONFIDENTIALITY; AUDITING

10.1     Transparency; Confidentiality.

10.1.1 (i) the decision and any obligation to report quantities, prices, or other data regarding Energy Exchange transactions to either a Governmental Entity, a reputable index developer or a data hub will be the responsibility of each Seller and Buyer, and (ii) neither the Southeast EEM Administrator, nor the Southeast EEM Agent nor the Members shall be responsible for reporting Energy Exchange transactions made by other entities through the Southeast EEM System; provided, however, that this Section 10.1.1 does not limit the information disclosure requirements of Section 2.5, Appendix D, or any other information disclosure requirements expressly set forth in this Agreement.

10.1.2 Except as provided in Appendix B, the identity of all Bidders, Offerors, Sellers and Buyers shall be kept confidential from all third party entities, other than the FERC, the Market Auditor, and the Southeast EEM Administrator except to the extent required by Law, regulation, or order.

10.1.3 The Southeast EEM Administrator shall post and maintain on the Southeast EEM System Interface: (i) a list of all Members and Participants and their contact information, (ii) the notice provisions provided in this Agreement as set forth in Section 16.8, (iii) the notice information of each Annual Meeting and Annual Member Meeting, including the date, place and time of such Annual Meeting and Annual Member Meeting, and (iv) a current description of the Territory.

10.1.4 The Southeast EEM Administrator shall prepare and post reports that would include data aggregated by the Southeast EEM System as set forth in Section V of the Southeast EEM Market Rules.

JA1197

10.2     Auditing.

10.2.1  The Southeast EEM Agent will engage the Market Auditor to perform the auditing scope of work as set forth in Section VI of the Southeast EEM Market Rules.

10.2.2  The Market Auditor and Southeast EEM Administrator may share information related to the Southeast EEM on a confidential and reciprocal basis.

10.2.3  The Market Auditor has independent authority to prepare and submit any reports described herein without any prior review or approval by any Member or any other outside sources.

10.3     Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this Article 10 to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 11

## SOUTHEAST EEM MARKET RULES

11.1     Set out in Appendix B to this Agreement are the Southeast EEM Market Rules that shall govern the Bid, Offer and matching procedures of the Southeast EEM System and the reservation and tagging functions of the Southeast EEM System, as such appendix may be amended and revised from time to time by the Membership Board in accordance with Section 4.1.9.

11.2     The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to violate any reliability criteria, guideline, standard or requirement (hereafter referred to as "Reliability Obligations") of NERC, the applicable Balance Authority, and any other recognized region or subregion of NERC (including the SERC Reliability Corporation ("SERC")), including any successors to NERC or SERC, or applicable state or federal Reliability Obligations, to the extent any such Reliability Obligations are applicable to a Member. Each Member shall participate in the Southeast EEM System in a manner that conforms to all Reliability Obligations as may be applicable to it. The rules, guidelines, requirements and other standards for the Southeast EEM System shall not impose any obligation on any Member that would cause any Member to engage in conduct not consistent with Good Utility Practice.

11.3     The Operating Committee shall establish rules and procedures, including appropriate audit procedures, under which any Member may request a determination of whether the hardware, software, management, or operation of, or Member participation in, the Southeast EEM System, as they may affect the requesting Member, comply with all rules, guidelines, requirements and other standards for the Southeast EEM System as set forth in the Southeast EEM Market Rules in Appendix B. The Operating Committee, in a manner consistent with all applicable provisions of this Agreement, may make recommendations to the Membership Board to apportion the costs of making revisions or modifications to the Southeast EEM System.

# ARTICLE 12

## DISPUTE RESOLUTION

12.1    Any dispute between two (2) or more Members arising under this Agreement shall first be referred to a designated senior representative of each of the Members involved in such dispute for resolution on an informal basis as promptly as practicable. Such designated senior representatives shall meet, negotiate and attempt in good faith to resolve the dispute quickly, informally, and inexpensively. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days (or other such period as the Parties may agree upon) by mutual agreement, such dispute within ten (10) Business Days shall be submitted to a mediator and resolved in accordance with the mediation procedures set forth below.

12.2    Following the procedures set forth in Section 12.1, any dispute between two (2) or more Members arising under this Agreement shall be subject to non-binding mediation prior to the initiation of judicial, mutually agreed upon arbitration, or other dispute resolution proceedings, unless the Parties to the dispute mutually shall determine from the nature of the dispute, the positions of the Parties, and other relevant facts and circumstances that mediation will not lead to resolution of the dispute.  The Parties to any such dispute shall select a mediator to assist in the resolution of their dispute. The mediator shall (i) be knowledgeable in the subject matter of the dispute and (ii) have no official, financial, or personal conflict of interest with respect to the issues in controversy, unless the interest is fully disclosed in writing to all participants and all participants waive in writing any objection to the interest.

12.3    The disputing Parties shall attempt in good faith to resolve their dispute in accordance with the procedures and timetable established by the mediator. In furtherance of the mediation efforts, the mediator may:

12.3.1  Require the Parties to meet for face-to-face discussions, with or without the mediator;

12.3.2  Act as an intermediary between the disputing Parties;

12.3.3  Require the disputing Parties to submit written statements of issues and positions; and

12.3.4  If requested by the disputing Parties, provide a written recommendation on resolution of the dispute.

12.4    If a resolution of the dispute is not reached by the thirtieth (30th) day after the appointment of the mediator or such later date as may be agreed to by the Parties, the mediator shall promptly provide the disputing Parties with a written, confidential, non-binding recommendation on resolution of the dispute, including the mediator's assessment of the merits of the principal positions being advanced by each of the disputing Parties. At a time and place specified by the mediator after delivery of the foregoing recommendation, but no later than fifteen (15) days after issuance of the mediator's recommendation, the disputing Parties shall meet in a good faith attempt to resolve the dispute in light of the mediator's recommendation. Each disputing Party shall be

represented at the meeting by a person with authority to settle the dispute, along with such other persons as each disputing Party shall deem appropriate. If the disputing Parties are unable to resolve the dispute at or in connection with this meeting, then: (i) any disputing Party may commence such judicial, mutually agreed upon arbitration, or other dispute resolution proceedings as may be appropriate; and (ii) the recommendation of the mediator shall have no further force or effect, and shall not be admissible for any purpose in any subsequent arbitral, judicial, or other dispute resolution proceeding.

12.5    The costs of the time, expenses, and other charges of the mediator and of the mediation process shall be borne by the Parties to the dispute, with each side in a mediated matter bearing equal costs. Each Party shall bear its own costs and attorney's fees incurred in connection with any mediation under this Agreement.

## ARTICLE 13

## REPRESENTATIONS AND WARRANTIES

13.1    Each Member represents and warrants to each other Member that on the date it executes this Agreement and throughout the term of this Agreement, the following representations and warranties are, and will continue to be, true and correct in all material respects:

13.1.1  it is duly organized, validity existing and in good standing under the Laws of the state of its incorporation or organization;

13.1.2  it will at all times comply with the provisions of this Agreement and all Exhibits and Appendices hereto, each as amended from time to time;

13.1.3  it has all requisite corporate or other organizational power to carry on its business as contemplated by this Agreement;

13.1.4  except for the authorizations and approvals described in Article 8 of this Agreement, it has all authorizations from Governmental Entities necessary for it to legally perform its obligations under this Agreement;

13.1.5  the execution, delivery and performance of this Agreement and any other documentation it is required to deliver under this Agreement are within its powers, have been duly authorized by all necessary action, and do not violate any of the terms or conditions in its governing documents, any contract or other agreement to which it is a party or any Law applicable to it;

13.1.6  the individual(s) executing and delivering this Agreement and any other documentation required to be delivered under this Agreement on behalf of such Member are duly empowered and authorized to do so at the time of such execution and delivery;

13.1.7  this Agreement has been duly and validly executed and delivered by such Member and constitutes such Member's legal, valid and binding obligation; and

13.1.8  all information that has been provided by or on behalf of a Member pursuant to this Agreement, is true and correct in all material respects. Each Member further covenants that

JA1200

all information provided to the Operating Committee, the Market Auditor, the Southeast EEM Agent or the Southeast EEM Administrator by or on behalf of such Member pursuant to this Agreement, subsequent to the date hereof, shall be true and correct in all material respects.

## ARTICLE 14

## DEFAULTS

14.1    A Member shall be in default in payment when payment is not made in accordance with the billing procedures established under this Agreement within ten (10) Business Days after its final due date. A default by any Member in its payment obligations under this Agreement shall be cured by payment of all overdue amounts together with interest accrued at the Interest Rate, prorated daily from the due date to the date the payment curing the default is made.

14.2    Notwithstanding Article 9, a defaulting Member shall be liable to the non-defaulting Members for all costs, including costs of collection and reasonable attorney fees incurred by such non-defaulting Members, plus interest at the Interest Rate. The proceeds paid by a defaulting Member to remedy any such default shall be distributed as directed by the Membership Board to the non-defaulting Members in proportion to the additional costs and expenses actually paid by the non-defaulting Members as a result of the default.

14.3    The rights of a Member who is in default of any of its payment or other material obligations herein may be terminated by the Membership Board. This provision allowing the non-defaulting Members to terminate such rights is in addition to any other remedies provided in this Agreement, at Law, or in equity, and shall in no way limit the non-defaulting Members' ability to seek judicial enforcement of the defaulting Member's obligations under this Agreement. Upon the effective date of such termination of rights, all rights of the defaulting Member and all obligations of non-defaulting Members to the defaulting Member imposed by this Agreement, except (i) payment obligations, (ii) the indemnification obligations set forth in Section 6.5, (iii) the release and other obligations set forth in Article 9, (iv) the confidentiality obligations set forth in Article 10 and Article 15, and (v) the obligations set forth in Section 16.9 and Section 16.14, shall immediately be terminated, except that no such termination shall impact Enabling Agreements any such Member is a party to.

14.4    Upon termination of the rights of a defaulting Member under this Agreement, the Operating Committee shall review responsibility and cost allocations of the non-defaulting Members and make adjustments thereto as it deems necessary.

## ARTICLE 15

## CONFIDENTIALITY

15.1    Any information provided by a Member to any other Member pursuant to this Agreement that is labeled "Confidential" shall be used by the receiving Member solely in connection with the purposes of this Agreement and shall not be disclosed by the receiving Member to any third party, except with the providing Member's consent, and upon request of the providing Member shall be returned thereto. Notwithstanding the above, a Member may disclose any such

JA1201

information to third parties as may be necessary for such Member to perform its obligations under this Agreement (including, but not limited to, the Member's employees, officers, directors, trustees, attorneys and other consultants). To the extent that such disclosures are necessary, the Members shall endeavor in disclosing any such information to seek to preserve the confidentiality of such information. This provision shall not prevent any Member from providing any confidential information received from any other Member to any court or governmental body to enforce its rights or perform its obligations hereunder or as may otherwise be required by such court or body or by Law, provided that, to the extent required, if feasible, the disclosing Member shall have given prior notice to the Member that provided such information of such required disclosure and, if so requested by such other Member, shall have used all reasonable efforts to oppose the requested disclosures, if appropriate under the circumstances, or to otherwise make such disclosure pursuant to a protective order or other similar arrangement for confidentiality. Without limiting the scope of the foregoing, the Members shall use all reasonable efforts to maintain the confidentiality of any confidential information in any filings with, or submissions to, any governmental or regulatory authorities. Information shall not be considered confidential for purposes of this Article 15 if the Member receiving such information from another Member can demonstrate by competent documentary evidence that such information: (a) was rightfully in the possession of the receiving Member prior to its disclosure to the receiving Member by the disclosing Member; (b) was in the public domain prior to its disclosure by the disclosing Member to the receiving Member; (c) came into the public domain, by publication or otherwise, through no direct or indirect act or omission of the receiving Member, subsequent to its disclosure by the disclosing Member to the receiving Member; or (d) was supplied to the receiving Member by a third party having the legal right to disclose it to the receiving Member, but only if the third party does not owe a duty of confidentiality to the disclosing Member with respect to such information.

15.2    Any information provided by a Member to a mediator or arbitrator pursuant to this Agreement that is labeled "Confidential" shall be subject to the provisions of this Article 15. For such purposes, any mediation or arbitration arranged pursuant to Article 12 of this Agreement shall provide for such mediator or arbitrator to comply with the provisions applicable to a Member receiving Confidential information from another Member.

15.3    Each Member is entitled to equitable relief, by injunction or otherwise, to enforce its rights under this Article 15 to prevent the release of confidential information, and may seek other remedies available at Law or in equity for breach of this provision.

## ARTICLE 16

## MISCELLANEOUS

16.1    "Public Utility" Status of Members. Certain Members are not Public Utilities. Nothing in this Agreement is intended to subject such Members to FERC jurisdiction as Public Utilities, and Members that are not Public Utilities shall not be required to take any action or participate in any filing or appeal that would confer FERC jurisdiction over such Members that does not otherwise exist.

16.2    Transfer of Interest in Agreement. No voluntary transfer of interest, rights, or obligations of any Member under this Agreement shall be made without the written consent and

JA1202

approval of all other Members except to a successor in operation of all or substantially all of its electric utility assets. Written approval when required shall not be unreasonably withheld. Any successor or assignee of the rights of any Member, whether by voluntary transfer, judicial or foreclosure sale or otherwise, shall be subject to all the provisions and conditions of this Agreement, to the same extent as though such successor or assignee were the original Member hereunder, and no assignment or transfer of any rights hereunder shall be effective unless and until the assignee or transferee agrees in writing to assume all of the obligations of the assignor or transferor and to be bound by all of the provisions and conditions of this Agreement; provided, that the execution of a mortgage or trust deed or a judicial or foreclosure sale made thereunder, or if through the disposition by the Administrator of the RUS, shall not be deemed a voluntary transfer within the meaning of this Section 16.2. If, due to reorganization, sale/purchase, or other means, a Member no longer owns or operates generation or has load obligation in the Territory, its membership(s) will be evaluated by the Operating Committee and any appropriate change in representation will be subject to approval of the Operating Committee.

16.3    Relationship of Parties.

16.3.1  Nothing contained herein shall be construed to create an association, joint venture, trust, or partnership, or impose a trust, partnership, covenant, obligation, or liability on or with regard to any one or more of the Parties. Each Party shall be individually responsible for its own covenants, obligations, and liabilities under this Agreement.

16.3.2  All rights of the Parties are several, not joint. No Party shall be under the control of or shall be deemed to control another Party. Except as expressly provided in this Agreement, no Party shall have a right or power to bind another Party without its express written consent.

16.4    Third Party Beneficiaries.  This Agreement shall not be construed to create rights in, or to grant remedies to, any third party as a beneficiary of this Agreement, or of any duty, obligation or undertaking established herein. No party not a signatory hereto shall be entitled to enforce this Agreement against any person or entity.

16.4.1  No Reliance Interest on Non-Firm Energy Exchange Transmission Service. Notwithstanding anything to the contrary in this Agreement, Non-Firm Energy Exchange Transmission Service over a Participating Transmission Provider's transmission system shall only be offered to the extent of that Participating Transmission Provider's participation in the Southeast EEM, and only for that purpose.  For the avoidance of doubt, owing to the voluntary nature of a Member's participation in this Agreement, membership in this Agreement shall not give rise to any third-party expectation or reliance interest on the availability of Non-Firm Energy Exchange Transmission Service upon the withdrawal of a Member.

16.5    No Dedication of Facilities.  Any undertaking by one Party to another Party under any provision of this Agreement shall not constitute the dedication of the Southeast EEM System or any portion thereof of the undertaking Party to the public or to the other Party, and it is understood and agreed that any such undertaking by a Party shall cease upon the termination of such Party's obligations under this Agreement.

16.6    Other Agreements. No provision of this Agreement shall preclude a Member from entering into other agreements or conducting transactions under existing agreements (including where applicable any Enabling Agreements) with other Members, Participants or Additional Members. This Agreement shall not be deemed to modify or change any rights or obligations under any prior contracts or agreements between or among any of the Members.

16.7    Further Assurances. The Parties to this Agreement hereby agree to provide all other information, execute and deliver any further instruments or documents, and take or forbear from any further acts that may be reasonably required or useful to carry out the intent and purpose of this Agreement, provided that such requirements are consistent with the express terms of this Agreement and all applicable Laws and regulations, and in the case of confidential information subject to Article 15 of this Agreement. Without limiting the scope of the foregoing, each Member shall, subject to the confidentiality provisions set forth in Article 15, provide the Membership Board with any information that is reasonably necessary to operate the Southeast EEM System or for the Operating Committee or the Southeast EEM Administrator to implement any provisions of this Agreement, or any other business related to the development or the operation of the Southeast EEM System.

16.8    Notices. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be (i) delivered by internet electronic mail (with return internet electronic mail from the recipient acknowledging receipt) sent to the internet electronic mail address for such recipient as recorded in the Secretary's records, and (ii) delivered in person, by nationally recognized overnight courier service, or by first class mail, certified or registered, postage prepaid, to the addresses of the Members set forth in Exhibit A hereto. Any Member may change its address by giving notice in writing stating its new address to the Southeast EEM Administrator and the Secretary, and the Secretary shall promptly update Exhibit A accordingly. Any notice, demand or other communication shall be deemed given and effective as of the date of delivery in person or upon receipt as set forth on the return receipt if delivered by certified or registered mail or by overnight courier service. The inability to deliver because of changed address of which no notice was given, or the rejection or other refusal to accept any notice, demand or other communication, shall be deemed to be receipt of the notice, demand or other communication as of the date of such inability to deliver or the rejection or refusal to accept.

16.9    Amendments. Except as otherwise provided in the following two sentences, this Agreement, including each of the Exhibits and Appendices hereto, may be modified or amended in the manner set forth in this Section 16.9, Article 4, and Article 8. In accordance with Article 3 of this Agreement, an entity that meets the criteria for qualification and admission as a Member, as determined by the Membership Board, may become an Additional Member and a Party to this Agreement by executing this Agreement or a Joinder hereto, and upon payment of all applicable fees, dues and contributions so specified or authorized in this Agreement, the Secretary shall revise, or cause to be revised, Exhibit A to include such Additional Member. The Parties hereby stipulate and agree that this Agreement was entered into as a result of arm's-length negotiations between the Parties. Further, the Parties believe that the terms and conditions of this Agreement are just and reasonable and shall remain so over the life of the Agreement. The Parties waive all rights to challenge the validity of this Agreement or whether it is just and reasonable for and with respect to the entire term, and hereby agree to make no filings with any Governmental Entity challenging the

terms and conditions of this Agreement as to whether they are just and reasonable or in the public interest. The Parties hereby further stipulate and agree that no Party may bring or support any action, proceeding or complaint seeking to modify, cancel, suspend, or abrogate the terms and conditions of this Agreement. Absent an amendment to this Agreement pursuant to <u>Section 4.1.9</u>, <u>Article 4</u> and <u>Article 8</u> approving the proposed change, the standard of review for changes to (i) the following defined terms: "Interest Rate", "Investor Owned Utilities", "Governmental Utilities", "Market Auditor", "Material Vendor Contract", "Member", "Member Net Energy for Load", "Net Energy for Load", "Operating Costs", "Record Date", "Sector", "Significant Matters", "Southeast EEM Administrator", "Southeast EEM Agent", and "Territory"; (ii) the following sections: <u>Section 3.2</u>, <u>Article 4</u>, <u>Section 6.1</u>, <u>Section 6.2</u>, Article 7, <u>Section 8.6</u>, Section 8.7, <u>Article 9</u>, <u>Section 10.3</u>, <u>Section 11.2</u>, <u>Article 12</u>, <u>Article 14</u>, <u>Article 15</u>, <u>Section 16.1</u>, <u>Section 16.4.1</u>, <u>Section 16.5</u>, <u>Section 16.9</u>, <u>Exhibit B</u> and <u>Appendix C</u>; in each case proposed by a non-Party, or FERC acting *sua sponte*, shall be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event shall be lower than the "public interest" standard of review set forth in *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

16.10 <u>Headings</u>. Section headings used in this Agreement are for convenience and reference only and are not to be considered in construing the terms of this Agreement.

16.11 <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to its conflict of laws principles or rules.

16.12 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof. This Agreement supersedes all prior agreements and oral understandings among the Members with respect to such matters.

16.13 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument, binding upon all Parties hereto, notwithstanding that all of such Parties may not have executed the same counterpart.

16.14 <u>WAIVER OF JURY TRIAL</u>. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH MEMBER WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

16.15 Special Provisions Related to Implementation of the Agreement. Notwithstanding anything to the contrary herein, between the Effective Date of October 12, 2021 through January 30, 2022, the following provisions control:

16.15.1 Initial Cost Responsibility and Budget.

(a) In lieu of Annual Budgets for 2021 and 2022, a single initial budget for the period from the Effective Date of October 12, 2021 through the end of 2022 shall be established no later than January 30, 2022. The initial budget will allocate costs in accordance

with Section 7.2. For avoidance of doubt, the cost allocation in the initial budget, including allocation of costs for all periods between the Effective Date and the establishment of the initial budget, shall be to all Members that have executed the Agreement on or before January 15, 2022.

(b)    For purposes of Section 4.2.4, the Annual Budget Determination Date for the initial budget will be January 30, 2022.

(c)    For purposes of Section 7.3(a), if a Member proposes to use an Alternate MNEL Value in connection with the initial budget, such Member shall submit a written request to the Operating Committee at least ten (10) days prior to the Annual Budget Determination Date requesting the Operating Committee's approval of such Member's Alternate MNEL Value in the initial budget.

(d)    All references in this Agreement (other than this Section 16.15) to an "Annual Budget" shall include the initial budget established in this Section.

16.15.2 The Annual Meeting of Members for 2021 shall be held no later than December 31, 2021.

16.15.3 To the extent a Member listed in Exhibit A has not executed the Agreement as of the Effective Date, but executes on or before January 15, 2022, the Net Energy for Load Vote for all Members shall be recalculated to reflect the addition of such Member.

16.15.4 During the implementation period of this Section and until the Southeast EEM Administrator is appointed, the Secretary will assume the limited informational receipt and delivery functions of the Southeast EEM Administrator under Section 4.4, Section 5.4, Section 5.5, Section 5.6, Section 5.9, Section 7.3.1(a), Section 8.7, and Section 16.8 and will hold all such notices and provide them to the Southeast EEM Administrator upon its appointment.

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:___December 28, 2020_____

Member: *Associated Electric Cooperative, Inc.*

By: _____

Name: _DAVID J. TUDOR_____

Title: _CEO & GM_____

Solely for purposes of <u>Article 6,</u> the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: _12/18/2020_

Member: _Dalton Utilities_

By: _[signature]_

Name: _William R. McDaniel III_

Title: _Director of Energy Services_

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:_____December 18, 2020_____

Dominion Energy South Carolina, Inc.

Member:_____

By: _Keller Kissam_ (signature)

Name: _Keller Kissam_

Title: _President, Electric Operations_

REVIEWED
BY
LEGAL
_Kw_
12/16/20

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

JA1209

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE: <u>February 8, 2021</u>

Member: <u>Duke Energy Carolinas, LLC</u>

By: <u>V. Nelson Peeler</u>

Name: <u>V. Nelson Peeler</u>

Title: <u>SVP, Trans and Fuels Strategy and Policy</u>

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: February 8, 2021

Member: Duke Energy Progress, LLC

By: *V. Nelson Peeler*

Name: V. Nelson Peeler

Title: SVP, Trans and Fuels Strategy and Policy

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE:___December 28, 2020___

Member: _Kentucky Utilities Company_

By: _Lonnie E. Bellar_

Name: _Lonnie E. Bellar_

Title: _Chief Operating Officer_

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

    **IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE:    December 28, 2020

Member: _Louisville Gas and Electric Company_

By: _Lonnie E. Beller_

Name: _Lonnie E. Beller_

Title: _Chief Operating Officer_

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: February 10, 2021

**Member:** North Carolina Electric Membership Corporation

**By:** _Joseph P. Brannan_

**Name:** Joseph P. Brannan

**Title:** Executive Vice President & CEO

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By:          _____

Name:     _____

Title:      _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: December 22, 2020

Member: North Carolina Municipal Power Agency Number 1

By: _Matts Schull_

Name: Matthew E. Schull

Title: Chief Operating Officer

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE: 12|21|2020

Member: PowerSouth Energy Cooperative

By: _Gary Smith_

Name: Gary Smith

Title: President & CEO

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: _____

By: _____

Name: _____

Title: _____

Form Approved By Legal Dept.

_Virginia Whitis_

Date 12/21/2020

JA1216

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of <u>Article 6</u>) has executed this Agreement as of the day and year indicated next to the signature.

DATE: <u>December 21, 2020</u>

Member: <u>Southern Company Services, as agent for Alabama Power Company, Georgia Power Company, and Mississippi Power Company</u>

By: _____

Name: <u>Adrianne Collins</u>

Title: <u>SVP, Power Delivery</u>

Solely for purposes of <u>Article 6</u>, the Southeast EEM Agent acknowledges and agrees with the provisions of <u>Article 6</u> and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent: <u>Southern Company Services, as agent for Alabama Power Company, Georgia Power Company, and Mississippi Power Company</u>

By: _____

Name: <u>Adrianne Collins</u>

Title: <u>SVP, Power Delivery</u>

JA1217

**IN WITNESS WHEREOF**, each of the Members and the Southeast EEM Agent (solely for purposes of Article 6) has executed this Agreement as of the day and year indicated next to the signature.

DATE:  December 17, 2020

Member:  Tennessee Valley Authority

By: _(signature)_

Name:  Aaron P. Melda

Title:  Senior Vice President

Solely for purposes of Article 6, the Southeast EEM Agent acknowledges and agrees with the provisions of Article 6 and hereby accepts the appointment as the Southeast EEM Agent as of the Effective Date:

Southeast EEM Agent:_____

By: _____

Name: _____

Title: _____

<u>**EXHIBIT A**</u>

<u>**NAMES AND ADDRESSES OF THE MEMBERS**</u>

**Alabama Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Associated Electric Cooperative, Inc.**
2814 S. Golden
PO Box 754
Springfield, MO 65807

**Dalton Utilities**
1200 VD Parrott, Jr. Parkway
PO Box 869
Dalton, GA 30722

**Dominion Energy South Carolina, Inc.**
220 Operation Way, MC C222
Cayce, SC 29033

**Duke Energy Carolinas, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Duke Energy Progress, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Georgia Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Georgia System Operations Corporation**
2100 East Exchange Place
Tucker, GA 30084

**Georgia Transmission Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**Kentucky Utilities Company**
One Quality Street
Lexington, KY 40507

**Louisville Gas and Electric Company**
220 West Main Street
Louisville, KY 40202

**MEAG Power**
1470 Riveredge Pwky., NW
Atlanta, GA 30328

**Mississippi Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**North Carolina Electric Membership Corporation**
3400 Sumner Blvd.
Raleigh, NC 27616

**North Carolina Municipal Power Agency No. 1**
1427 Meadow Wood Blvd.
Raleigh, NC 27604

**Oglethorpe Power Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**PowerSouth Energy Cooperative**
2027 East Three Notch Street
Andalusia, AL 36421

**Santee Cooper**
One Riverwood Avenue
Moncks Corner, SC 29461

**Tennessee Valley Authority**
400 West Summit Hill Drive, WT 6A-K
Knoxville, Tennessee 37902

## <u>EXHIBIT B</u>

## <u>FORM OF JOINDER AGREEMENT</u>

## **JOINDER AGREEMENT**

Reference is made to the Southeast Energy Exchange Market Agreement, dated as of December 28, 2020, as the same may be amended from time to time (the "<u>Southeast EEM Agreement</u>"), by and among the entities listed on <u>Exhibit A</u> thereto. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Southeast EEM Agreement.

The undersigned hereby agrees to become a Member of the Southeast EEM and be bound by the terms of the Southeast EEM Agreement as if an original party thereto. The Membership Board hereby consents to the addition of the undersigned as a Member of the Southeast EEM and as party to the Southeast EEM Agreement as if an original party thereto. A duly executed copy of this Joinder Agreement shall be delivered to the Secretary and the Southeast EEM Administrator.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed as of the date set forth below.

Date: _____ ___, 20__

[NAME OF JOINING MEMBER],
A [Jurisdiction] [Entity Type]

By: _____

Name: _____

Title: _____

ACKNOWLEDGED AND ACCEPTED:

By: _____

Name: _____

Title: Secretary, Membership Board

## APPENDIX A

## FORM OF PARTICIPANT AGREEMENT

1.0     This Participant Agreement ("Agreement"), dated as of _____, is entered into, by and between [INSERT NAME OF ENTITY], the Southeast EEM Agent acting in its capacity as the agent of the Members of the Southeast Energy Exchange Market ("Southeast EEM") and_____ ("Participant").

2.0     The Participant and Southeast EEM agree that this Agreement shall incorporate, in their entirety, Appendix B to the Southeast EEM Agreement ("Southeast EEM Market Rules"), designated as Alabama Power Company's Market Based Rate Tariff, Rate Schedule No. 1011, Southeast EEM Agreement, and the Southeast EEM Manuals.  Any term not defined herein shall have the meaning ascribed to it in the Southeast EEM Market Rules.  In the event of any conflict between this Agreement and the Southeast EEM Market Rules, the Southeast EEM Market Rules shall control.

3.0     The Participant has submitted an application for participation in the Southeast EEM and has been determined by the Southeast EEM to meet all requirements of being a Participant as defined in the Southeast EEM Market Rules. The Participant warrants that all information submitted in the application is true and accurate.

4.0     The Participant agrees to be bound by and accepts all of the terms of the Southeast EEM Market Rules and the Southeast EEM Manuals, as both may be amended from time to time. Any amendments to the Southeast EEM Market Rules or the Southeast EEM Manuals are automatically and without further action incorporated into this Agreement.

5.0     The Southeast EEM agrees that Participant shall be deemed a "Participant" under the terms of the Southeast EEM Market Rules, with all rights of participation and access to the Southeast EEM System afforded Participants under the Southeast EEM Market Rules.

6.0     The Participant shall supply the Southeast EEM Administrator with any and all information deemed reasonably necessary for the administration of the Southeast EEM System.

6.1     The Participant acknowledges and agrees that it will not provide information posted in the confidential section of the Southeast EEM Website to any employee of itself or an affiliate engaged in Marketing Functions, where Marketing Functions shall be those meeting the definition found at 18 C.F.R. Section 358.3(d), except that for purposes of this Agreement Marketing Functions shall also refer to the functions described in that provision even if the entity performing those functions is not a public utility subject to FERC jurisdiction.  The Participant shall identify to the Southeast EEM Administrator all employees who may access the confidential portion of the Southeast EEM Website, and certify that such employees are not engaged in Marketing Functions, and the Southeast EEM Administrator will grant access to the confidential portion of the Southeast EEM Website only to such employees.  The Participant shall be responsible to ensure that the Southeast EEM Administrator is notified before any such employee commences engagement in Marketing Functions such that access to the confidential section of the Southeast EEM Website can be revoked.

6.2     To the extent the Participant holds Market-Based Rate authority, the Participant acknowledges that it is obligated to provide accurate and factual information, and must exercise due diligence to avoid providing false or misleading information or omitting material information, in any communications with the Southeast EEM Administrator or the Market Auditor related to its participation in the Southeast Energy Exchange Market.

7.0     Either Party can assign or transfer any or all of its rights and/or obligations under this Agreement upon thirty (30) days written notice.  Any such transfer or assignment shall be conditioned upon the successor in interest accepting the rights and/or obligations under this Agreement as if said successor in interest was an original Party to this Agreement.

8.0     An event of "<u>Force Majeure</u>" means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, pandemic, epidemic, breakage or accident to machinery or equipment, any curtailment, order, regulation or restriction imposed by governmental military or lawfully established civilian authorities or any other cause beyond a Party's control. A Force Majeure event does not include an act of negligence or intentional wrongdoing. Neither the Southeast EEM Agent, the Southeast EEM, the Members, nor the Participant will be considered in default as to any obligation under this Agreement if prevented from fulfilling the obligation due to an event of Force Majeure. However, a Party whose performance under this Agreement is hindered by an event of Force Majeure shall make all reasonable efforts to perform its obligations under this Agreement.

9.0     The Participant shall at all times indemnify, defend, and save the Southeast EEM System, the Southeast EEM Agent and the Southeast EEM Administrator harmless from, any and all damages, losses, claims, including claims and actions relating to demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from the Southeast EEM Agent's or Southeast EEM Administrator's, as applicable, performance of its obligations under this Agreement and the Southeast EEM Market Rules, except in cases of negligence or intentional wrongdoing by the Southeast EEM Agent or Southeast EEM Administrator, as applicable.

10.0    This Agreement shall be deemed to be a contract made under, and for all purposes shall be governed by and construed in accordance with, the laws of the State of Delaware.

11.0    This Agreement shall be effective upon execution by both parties and shall remain in full force and effect until terminated pursuant to Sections 12 or 13 of this Agreement.

12.0    The Southeast EEM may terminate this Agreement by providing written notice of termination to the Participant in the event the Participant commits a material violation of its obligations under the terms of the Southeast EEM Market Rules which, if capable of being remedied, is not remedied within thirty (30) days after the date the Southeast EEM has given the Participant written notice of the violation, unless excused by reason of Force Majeure as provided in Section 8 of this Agreement.

13.0    The Participant may terminate this Agreement upon thirty (30) days written notice to the Southeast EEM.

14.0    Upon termination of this Agreement for any reason, Participant shall not have access to the Southeast EEM System, nor be entitled to submit Bids or Offers thereunder.

15.0    This Agreement may be executed in one or more counterparts at different times, each of which shall be regarded as an original and all of which, taken together, shall constitute one and the same Agreement.

16.0    Any notice or request made to either of the Parties to this Agreement shall be made to the following representatives:

Southeast EEM                          Participant

Title:          _____              _____

Address:     _____              _____

                _____              _____

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective authorized officials.

Southeast EEM                                  Participant

By: _____              By:_____

Name: _____            Name: _____

Title: _____             Title: _____

Date: _____             Date: _____

JA1226

**APPENDIX B**

**SOUTHEAST EEM MARKET RULES**

## I.     INTRODUCTION AND APPLICABILITY.

Set forth below are the rules governing: 1) Participation in the Southeast EEM; 2) Bidding, Offering,  and matching procedures for Energy Exchanges arranged through the Southeast EEM System, 3) Southeast EEM System data reporting, and 4) the processes for auditing Energy Exchanges and the hardware, software, management and operation of the Southeast EEM System. This Appendix B is subject to the terms and conditions of the Agreement. In the event of a conflict between the terms of the Agreement and the terms of this Appendix B, the terms of the Agreement shall control.

## II.    DEFINITIONS.

The following terms shall be defined as indicated for the purposes of this Appendix B. Definitions and terms expressed in the singular shall include the plural and *vice versa*.   Any capitalized terms not defined herein shall have the meaning set forth in the Agreement.

"Agreement" means the Southeast Energy Exchange Market Agreement By and Among the Members of the Southeast EEM to which this Appendix B is appended.

"Balancing Authority" means the responsible entity that integrates resource plans ahead of time, maintains demand and resource balance within a Balancing Authority Area, and supports interconnection frequency in real time.

"Balancing Authority Area" means the collection of generation, transmission and loads within the metered boundaries of the Balancing Authority.  The Balancing Authority maintains load-resource balance within this area.

"Bid" means a voluntary submission containing the required Bid Information to purchase a certain amount of Non-Firm Energy (set forth in MW).

"Bid Information" means the information applicable to Bids set forth in Section IV.B.3.

"Bid Price" means the price, in $/MWh for the amount of Non-Firm Energy submitted in a Bid.   This represents the maximum price that the Bidder is willing to pay.

"Bidder" means a Participant who submits a Bid into the Southeast EEM System.

"Buyer" means a Bidder that has been matched with an Offeror for an Energy Exchange through the Southeast EEM System.

"Clock Hour" means the sixty-minute period ending at :00.

"Company System Administrator" has the meaning set forth in Section VI.B.2.

"Contract Path" means the continuous transmission path for the flow of Non-Firm Energy between the Participants reserved for an Energy Exchange using the transaction matching, reservation and tagging functions of the Southeast EEM System.

"Delivery Interval" means a fifteen (15) minute period in which Non-Firm Energy is intended to be delivered by a Seller to its matched Buyer(s).

"Energy Exchange" means a transaction for the purchase and sale of Non-Firm Energy in the Southeast EEM between Buyers and Sellers pursuant to an Enabling Agreement and in conformance with the requirements of the Southeast EEM Rules.

"Electronic Tag" or "e-Tag" means the primary method for coordination of Interchange Schedules or Energy Schedules where Energy is transferred between Balancing Authority Areas and coordination required between multiple entities. Various entities can communicate important information pertaining to the Interchange transaction to each other via the internet using computer applications, which are based on the e-Tag specifications and schema maintained by the North American Energy Standards Board ("NAESB").

"Energy Exchange Notification" means the notice provided to Bidders and Offerors who were matched for an Energy Exchange by the Southeast EEM Algorithm; to be automatically generated by the Southeast EEM System and provided before the start of a Delivery Interval; and to include data on the matched Energy Exchange including Buyer, Seller, price, amount of Non-Firm Energy, Source, Sink, delivery location, applicable Delivery Interval, and other any other necessary data for Participants to record the transaction.

"Energy Exchange Price" means the price, in $/MWh, calculated by the Southeast EEM Algorithm for a specific Energy Exchange.

"FERC" means the Federal Energy Regulatory Commission.

"Good Utility Practice" means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment and in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice does not require the optimum practice, method, or act to the exclusion of all others, but rather is intended to include acceptable practices, methods, or acts generally accepted in the SERC Reliability Corporation region.

"Losses" means the total cost of the electrical energy lost in the transmission of electrical energy from a Source to a Sink based on the real power loss factor (%) ("Loss Factor") and loss rate ($/MWh) ("Loss Rate") of each Participating Transmission Provider on the Energy Exchange's Contract Path.

"NAESB Electric Industry Registry" or "NAESB EIR" means thea central registry and repository of information required for commercial transactions that is maintained by NAESB.

"Network Map" means the computer-based representation of all Participating Transmission Provider service territories, Balancing Authorities, valid transmission paths (Point of Receipt – Point of Delivery combinations), Sources, and Sinks.

"Non-Firm Energy" means a product for which delivery or receipt of the energy may be interrupted for any reason or no reason, without liability on the part of either buyer or seller.

"Non-Firm Energy Exchange Transmission Service" means transmission service provided by a transmission provider, pursuant to its Tariff, that has the following characteristics: (i) it is non-firm transmission service with the lowest curtailment priority, provided solely on an as-available basis for 15-minute Energy Exchanges, after taking into account other higher priority uses and the limitations of the transmission system of the Participating Transmission Provider; (ii) it is available solely for Energy Exchanges; (iii) it is identified and offered in the Tariff as "Non-Firm Energy Exchange Transmission Service;" (iv) the charge for such service, and related Schedule 1 and Schedule 2 (or equivalent) ancillary services, is $0/MWh; (v) the charge for financial losses is based on the methodology established in the Participating Transmission Provider's Tariff; (vi) the service must be obtained by a Participant using the transaction matching, reservation and tagging functions of the Southeast EEM System, rather than directly through Open Access Same Time Information System or other reservation, scheduling or tagging requirements applicable to other forms of transmission service offered by a Participating Transmission Provider; (vii) the service may not be reassigned, redirected, or sold by the transmission customer; (viii) in combination with the other Participating Transmission Providers' provisions of Non-Firm Energy Exchange Transmission Service, the service allows for a continuous Contract Path for Energy Exchanges; and (ix) the Participating Transmission Provider is required to provide the information specified in and as required by Section IV.A.2 of the Southeast EEM Market Rules to the Southeast EEM System. For the avoidance of doubt, nothing in this Agreement shall obligate any Participating Transmission Provider to (a) plan, construct, or maintain its transmission system for the benefit of any Participant; (b) provide Non-Firm Energy Exchange Transmission Service in a manner that is contrary to the terms of the Participating Transmission Provider's Tariff, or contrary to Good Utility Practice, each as determined in the sole judgment of the Participating Transmission Provider; (c) provide Non-Firm Energy Exchange Transmission Service following termination of its Southeast EEM Member status; (d) provide Non-Firm Energy Exchange Transmission Service to a non - Participant; or (e) file its Tariff with FERC if the Tariff is not already required to be filed with FERC.

"OASIS" means an Open Access Same-Time Information System that conforms to the requirements of Part 37 of the FERC's regulations, 18 CFR §§ 37.1, et seq.

"OATI webRegistry" means the system developed by Open Access Technology International, Inc. to perform the NAESB EIR functions.

"Offer" means a voluntary submission containing the required Offer Information to sell a certain amount of Non-Firm Energy (set forth in MW).

"Offer Price" means the price, in $/MWh for the amount of Non-Firm Energy offered in an Offer. This represents the minimum price that the Offeror is willing to collect to sell.

"Offer Information" means the information applicable to Offers set forth in Section IV.B.3, as well as other information that may be required by the Southeast EEM Administrator.

"Offeror" means a Participant who submits an Offer into the Southeast EEM System.

"Participant Profile" means that information identified in Section IV.A.1., Section IV.C.6., and such other information requested by the Southeast EEM System Interface to assist in the creation of Energy Exchanges.

"Participant" means an entity that meets the requirements set forth in Section III of this Appendix B.

"Participant Specific Constraints" has the meaning set forth in Section IV.A.1.b. and IV.C.5.

"Seller" means an Offeror that has been matched with a Buyer through the Southeast EEM System.

"Sink" means a pre-approved and validated OATI webRegistry sink point.

"Source" means a pre-approved and validated OATI webRegistry source point.

"Southeast EEM Algorithm" means the mathematical equations that determine the matching Bids and Offers resulting in Energy Exchanges.

"Southeast EEM System Interface" means the graphical user interface ("GUI") and application programming interfaces ("API") used by the Southeast EEM System that meet the Southeast EEM System requirements developed by the Southeast EEM Administrator and the Operating Committee.

"Southeast EEM Manuals" means the instructions, rules, procedures and guidelines established by the Operating Committee for the Southeast EEM.

"System Administrators" means, collectively, the Southeast EEM Administrator and Company System Administrators.

## III.    PARTICIPATION

A.    Any entity that meets the requirements of this Section III may become a Participant.

B.    A Participant must:

1.    Own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory;

2.    Execute a Participant Agreement in the form attached to the Agreement as Appendix A (the "Participant Agreement") which agreement shall, among

4

other things, contractually bind such entity to comply with the rules set forth in this Appendix B;

3.   Deliver the executed Participant Agreement to the Secretary and the Southeast EEM Administrator, which shall become effective when countersigned by the Southeast EEM Agent at the direction of the Operating Committee;

4.   Execute and deliver a Non-Firm Energy Exchange Transmission Service Agreement with each Participating Transmission Provider who requires delivery of such agreement, or otherwise have access to Non-Firm Energy Exchange Transmission Service from each Participating Transmission Provider; and

5.   Have or enter into an Enabling Agreement with at least three (3) or more Participants.

## IV.   BIDS/OFFERS AND MATCHING PROCEDURES.

### A.   Pre-Bid/Offer Information Requirements.

1.   Information Submitted by Participants.

a.   Prior to being permitted to submit Bids or Offers, each Participant shall provide the Southeast EEM all required information in its Participant Profile.  Participants are responsible for providing accurate information to the Southeast EEM System in its Participant Profile, as well as submitting any updates or modifications to the Southeast EEM Administrator to maintain the accuracy of Participant's Profile.

b.   Participant-Specific Constraints.

i.   Prior to being permitted to submit Bids or Offers, each Participant shall provide to the Southeast EEM in its Participant Profile, any constraints the Southeast EEM Algorithm must take into account in matching Bids or Offers from such Participant ("Participant-Specific Constraints"). Participant-Specific Constraints can be either counterparty specific or geographic.

ii.   Offers from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific Constraints are set such that there are at least three other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Seller, and Bids from a Participant for a Delivery Interval will not be processed unless the Participant's Participant-Specific

Constraints are set such that there are at least three (3) other non-affiliated Participants with whom the submitting Participant can be matched for an Energy Exchange as a Buyer.

iii. Participants shall not be required to provide a reason for any Participant-Specific Constraint. The reason for such constraints could be, but is not limited to, the following:

(a) Lack of an Enabling Agreement with a Participant;

(b) Counterparty issues (e.g., credit);

(c) Affiliates restrictions; and

(d) Geographic issues causing supply or delivery point restrictions and related regulatory requirements.

**c.** Prior to being permitted to submit Bids or Offers, each Participant must affirm that it has executed Service Agreements for Non-Firm Energy Exchange Transmission Service with each Participating Transmission Provider that requires delivery of such agreement or that it otherwise has access to Non-Firm Energy Exchange Transmission Service as to each Participating Transmission Provider through such Participating Transmission Provider's Tariff.

**2.** Prior to being permitted to provide Non-Firm Energy Exchange Transmission Service, Participating Transmission Providers shall provide sufficient information to permit the Southeast EEM Administrator to create a Network Map of the Southeast EEM Territory for purposes of confirming available capacity for NFEETS along Contract Paths for all potential Energy Exchanges. Prior to the Southeast EEM Commencement Date, the then-current version of the Network Map shall be posted to the Southeast EEM Website, with future updates reported in accordance with Section V of these Market Rules. On an ongoing basis, consistent with the timing requirements of Section IV.B.2.a, each Participating Transmission Provider shall provide the Administrator with the Available Transfer Capability ("ATC") as calculated by the Participating Transmission Provider per the methodology for calculating ATC that each Participating Transmission Provider already specifies in its OATT (or equivalent) and posts on its OASIS (or equivalent), as that ATC may change from time to time.

**3.** Participant shall supply the Southeast EEM Administrator with any and all information the Operating Committee deems reasonably necessary for the administration of the Southeast EEM System.

**B.    Bids and Offers.**

**1.**    Delivery Intervals.  Each Clock Hour will consist of four (4) Delivery Intervals:

xx:00 to xx:15;

xx:15 to xx:30;

xx:30 to xx:45; and

xx:45 to xx:00 of the next Clock Hour.

**2.**    Deadlines.

**a.**    For each Clock Hour, every Participating Transmission Provider's ATC must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of such next Clock Hour.  To the extent a Participating Transmission Provider can update its ATC within a Clock Hour, such updated information must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes before the start of the applicable Delivery Interval.

**b.**    Each Participating Transmission Provider's Loss Factor and Loss Rate must be available as an input to the Southeast EEM Algorithm no later than fifteen (15) minutes prior to the Clock Hour for which the Loss Factor and Loss Rate are to apply.  If the Participating Transmission Provider does not update its Loss Factor and Loss Rate, the values for the prior Clock Hour will apply.

**c.**    Bid and Offers must be submitted through the Southeast EEM System Interface not earlier than seven (7) days prior to the applicable Delivery Interval and not later than fifteen (15) minutes prior to the Delivery Interval for which they are submitted.  Participants may modify or cancel previously submitted Bids or Offers at any time before 15 minutes prior to the upcoming Delivery Interval; no further modifications may be submitted to a Bid or Offer within the fifteen (15)-minute period prior to the applicable Delivery Interval.

**d.**    The Southeast EEM System will: 1) match the Bids and Offers for the next Delivery Interval, subject to the constraints and limitations established pursuant to this Appendix; and 2) provide an Energy Exchange Notification to all Participants who were matched as an Energy Exchange for the upcoming Delivery Interval, and 3) submit all necessary transmission reservations and e-Tags ten (10) minutes prior to the relevant Delivery Interval.

**3.** Bid and Offer Requirements.

    **a.** Each Bid or Offer must include the following components:

        i. Participant name.

        ii. Whether the submission is a Bid or an Offer.

        iii. An amount of Non-Firm Energy (MW) for the Bid or Offer in increments of 4MW blocks.

        iv. For all Offers, an Offer Price and for all Bids, a Bid Price.

        v. For all Offers, a Source and for all Bids, a Sink.

        vi. The specific Delivery Interval to which the Bid or Offer applies.

        vii. Whether the submission: 1) must be matched in full or not at all or 2) can be matched at any volume below the Bid or Offer volume (subject to the 4MW increment rule) ("All or Nothing Selection").

        viii. Any other components as may be required for the Southeast EEM System to perform actions set forth in Section IV.C of this Appendix or to generate the reports described in Section V of this Appendix.

    **b.** An Offer may include the maximum Energy Exchange Price that the Participant is willing to accept for a particular Source/Sink pair for the applicable Delivery Interval.

    **c.** Participants are permitted to submit multiple Bids or Offers for the same Delivery Interval with varying Source or Sink locations, as applicable, Non-Firm Energy amounts, and pricing, subject to any limitation on the number of Bids or Offers that may be submitted at any one Source or Sink for a particular Delivery Interval as may be established in the Southeast EEM Manuals.

    **d.** Submission of Bids and Offers is voluntary; Participants are not required to submit any Bids or Offers for any Delivery Interval.

**C. Matching.**

**1.** Subject to the constraints defined below and all Bid Information and Offer Information, the Southeast EEM Algorithm will evaluate all Bids and Offers for each Delivery Interval and produce Energy Exchanges.

The Southeast EEM Algorithm will match Bids and Offers so as to result in Energy Exchanges that maximize the Southeast Energy Exchange Market total benefit for the applicable Delivery Interval while simultaneously honoring all the requirements identified in Section IV.A and the constraints identified in Section IV.C.6. The total benefit shall be calculated by aggregating the benefits from each Energy Exchange for the applicable Delivery Interval.

**2.** The benefit associated with each Energy Exchange will be calculated by taking the difference between the Bid Price and Offer Price and multiplying it by the MW amount of Non-Firm Energy identified in the Energy Exchange, _less_ the costs of transmission services (Losses) provided along the Contract Path.

**3.** For any Energy Exchange where the Energy Exchange Price exceeds the maximum value submitted in accordance with Section IV.B.3.b., the Energy Exchange Price will be adjusted down to that maximum value, such that the total benefit associated with the Energy Exchange remains the same, but the benefit allocation will be adjusted in the Buyer's favor.

**4.** Matching Principles.

    **a.** Whole and/or partial amounts of Non-Firm Energy shall be matched, consistent with the Participant's All or Nothing Selection in its Bid Information or Offer Information.

    **b.** Bids or Offers that can be matched with multiple Participants shall be allowed, subject to the matching rules set forth in this Appendix.

**5.** Match/Energy Exchange Price.

    **a.** Each Energy Exchange Price will be the sum of: 1) the average of the Bid Price and Offer Price for the Energy Exchange, and 2) half the net Losses for all Transmission Service Providers along the Contract Path, where net Losses equals the Losses paid for by Seller minus the Losses paid for by Buyer.

    **b.** Data demonstrating Losses will be incorporated into the Energy Exchange Price.

        i. Each Participating Transmission Provider determines the method for pricing its Losses;

        ii. Each Participating Transmission Provider is responsible for updating its Tariff to address how Losses will be priced; and

        iii. Loss Rate and Loss Factor are an input into the algorithm by the relevant Participating Transmission Provider.

**6.** Constraints.

    **a.** Participant-Specific Constraints. In matching Bids and Offers, the Southeast EEM Algorithm will take into account the Participant-Specific Constraints submitted by the Bidders and Offerors in accordance with Section IV.A.1.b.

    **b.** Generally Applicable Constraints.

        i. In matching Bids and Offers, the Southeast EEM Algorithm shall not make any Energy Exchanges that would cause the ATC of any Participating Transmission Provider on any given Contract Path to be exceeded.

        ii. Energy Exchanges shall not be made that cause:

            (a) A Buyer to purchase more MW than the amount set forth in its Bid;

            (b) A Seller to sell more MW than the amount set forth in its Offer; and

            (c) For matched Bids and Offers, the Energy Exchange Price to (i) be less than the Offer Price plus half of net Losses, as calculated per Section IV.C.5.a, and (ii) more than the Bid Price minus net Losses, as calculated per Section IV.C.5.a.

        iii. The Southeast EEM Algorithm shall only make Energy Exchanges that yield positive benefits to both Buyer and Seller, as defined in Section IV.C.2, after Losses have been considered.

        iv. The total MW of potential Energy Exchanges in any Delivery Interval shall not exceed the aggregate amount of Non-Firm Energy identified in the applicable Offers or Bids for such Delivery Interval.

        v. A Participant's Bid may not be matched with an Offer made by the same Participant.

        vi. The Southeast EEM Algorithm shall not create Energy Exchanges in the same Delivery Interval that would create offsetting Energy Exchanges whereby Participant 1 sells to Participant 2 while Participant 2 sells to Participant 1 during the same interval at the same location.

**7.** Treatment of Identical Offers or Bids.

    **a.** In the event that multiple Bids or Offers that are at the same price at a Source or Sink are identical which create the same benefit for the Southeast EEM, a randomized preference will be assigned to the Bid(s) or Offer(s). Additionally, randomization will be employed in the algorithm in all other situations if a heuristic is required to resolve ties or ambiguities.

**8.** Notification, Scheduling, and Transmission for Energy Exchanges.

    **a.** After an Energy Exchange for a Delivery Interval is determined:

        i. The Bidder and Offeror shall be notified of match via an Energy Exchange Notification.

        ii. Transmission reservations and e-Tags shall be automatically created by the Southeast EEM System based on the matches within the time frame noted above. All e-Tags will be sent to the applicable Participating Transmission Provider(s), Balancing Authority(ies) and matched Participants. Consistent with the discretion afforded to Participating Transmission Providers and Balancing Authorities in the NAESB business practices, each participating Balancing Authority within the Territory agrees that it will not reject an e-Tag automatically created by the Southeast EEM System on the basis that it was submitted less than twenty (20) minutes prior to the Delivery Interval but at least ten (10) minutes prior to the Delivery Interval.

        iii. The Southeast EEM System will generate and provide sufficient information to Participating Transmission Providers to validate and collect payment for Losses from applicable Buyers and Sellers for each Energy Exchange.

        iv. Appropriate OASIS information will be provided to the relevant Participating Transmission Service Providers.

**9.** The contractual "point of sale" of an Energy Exchange will be at the Buyer's Balancing Authority border for a transaction delivered out of or thru one or more Balancing Authorities. For an Energy Exchange that stays within one Balancing Authority (Source and Sink in same Balancing Authority), the "point of sale" will be at the bus of the Seller's Source. For an Energy Exchange fully delivered to a Buyer's Balancing Authority border, the Participant acting as the Seller will be the responsible party for the transmission service to deliver the Non-Firm Energy to the "point of sale" and the Buyer will be responsible for the transmission service required to sink the Non-Firm Energy. For an Energy Exchange that stays within one Balancing Authority, the Buyer will be the responsible party for the

transmission service required to sink the Non-Firm Energy. For avoidance of doubt, Non-Firm Energy Exchange Transmission Service must be used for the entire Contract Path from Source to Sink for all Energy Exchanges.

## V. **SOUTHEAST EEM ENERGY EXCHANGE REPORTS.**

The Southeast EEM Administrator and the Company System Administrators shall create and maintain the reports concerning Energy Exchanges as required by the Operating Committee. The reports that are provided by the System Administrators shall include, but need not be limited to, the following:

A. **Public Monthly Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM Website on or before midnight of the fifth Business Day of the following month and shall include the following information from the prior month, with the exception of information provided under Section V.A.9-12, which information will be posted on a four-month lag starting on the fifth Business Day of the fifth month following the Southeast EEM Commencement Date:

   1. Any changes made to the Network Map;

   2. Minimum, maximum, and average match prices;

   3. Amount of Non-Firm Energy offered and sold as well as bid and purchased over all Delivery Intervals;

   4. Amount of Non-Firm Energy that flowed once matched as an Energy Exchange;

   5. Total number of Energy Exchanges;

   6. Total benefit to be calculated in accordance with Section IV.C.2;

   7. Minimum, maximum, and average MW Energy Exchange amount;

   8. Energy Exchanges made but not executed;

   9. Bid/Offer Price, quantity, and All or Nothing information for each Bid and Offer in each Delivery Interval, subject to appropriate masking to remove Participant identities and Source and Sink information;

   10. Matched Bids and Offers with their associated Energy Exchange Price, subject to appropriate masking to remove Participant identities and Source and Sink information;

   11. The total number of possible counterparties not subject to a Participant-Specific Constraint for each Seller in each Delivery Interval, subject to

appropriate masking to remove Participant identities and Source and Sink information;

12. The total number of possible counterparties not subject to a Participant-Specific Constraint for each Buyer in each Delivery Interval, subject to appropriate masking to remove Participant identities and Source and Sink information;

13. ATC made available to the Southeast EEM by each Participating Transmission Provider for each Delivery Interval, as well as the amounts of such ATC that are not used by the Southeast EEM; and

14. Implied marginal benefit information for each ATC limit for each Delivery Interval, to the extent such information can reasonably be produced by the Southeast EEM Algorithm.

B. **Public Daily Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM Website by 6:00 A.M. CPT and shall include the following aggregated information from the prior day:

1. Total number of Bids and Offers during each Clock Hour of the prior day;

2. Amount of Non-Firm Energy offered and sold as well as bid and purchased during each Clock Hour of the prior day;

3. Number of Energy Exchanges executed for each Clock Hour of the prior day;

4. Total number of Participants who submitted Bids for each Clock Hour of the prior day;

5. Total number of Participants who submitted Offers for each Clock Hour of the prior day; and

6. Weighted average match price per Clock Hour.

C. **Public Hourly Informational Report.** This report shall be generated by the Southeast EEM Administrator and posted to the Southeast EEM Website fifteen (15) minutes after the applicable Clock Hour and shall include the following aggregated information from the applicable Clock Hour:

1. Total number of Bids and Offers during that Clock Hour;

2. Amount of Non-Firm Energy offered and sold as well as bid and purchased during that Clock Hour;

3. Number of Energy Exchanges executed for that Clock Hour;

13

4. Total number of Participants who submitted Bids during that Clock Hour; and

5. Total number of Participants who submitted Offers during that Clock Hour.

## VI. AUDITING AND DATA ADMINISTRATION.

A. **Archiving of Data.** All Southeast EEM System input data necessary to recreate and audit any Delivery Interval, and all Southeast EEM System output data for each Delivery Interval, shall be archived such that at least the three prior months of data can be retrieved in real time. Five (5) years of data shall be archived off-line. Participants may request access to their own data and it shall be made available upon request within 24 hours. Data older than five (5) years shall be deleted at the end of each month on a rolling basis.

B. **Access to Southeast EEM System Energy Exchange Data.**

1. The Southeast EEM Administrator shall have access, via system software, to the results of the matching process for any Delivery Interval of on-line history. The data to which the System Administrators have access shall include raw Participant data, matched output data, and intermediate results of the algorithm. To be clear, the Southeast EEM Administrator shall be able to run all of the reports available in the system and view the data for all Participants.

2. Each Participant will be required to identify an administrator that is authorized by the Participant to run and review all of the reports available in the Southeast EEM System that are redacted to only show the information related to the Participant it represents (the "Company System Administrator"). The Southeast EEM System will provide each Company System Administrator with the right to grant access to certain reports and related data to identified delegates within the Participant's organization. Each Company System Administrator (and any delegate identified by the Company System Administrator) shall be able to run all of the reports available in the system but receive only the data that belong to the Participant it represents.

C. **Additional Southeast EEM Administrator Functions.** Subject to the limitations set forth in subsection (B) above, the Southeast EEM Administrator shall employ the system software to perform the following functions:

1. Oversee the matching process;

2. Maintain model data and Southeast EEM System parameters; and

3. View Participant usage statistics and generate Participant benefit reports.

**D.** **Auditing Process.** Auditing functions will be performed by the Market Auditor at the direction of the Membership Board. The Market Auditor will report its conclusions, and provide any supporting data in the event that problems are identified to the Membership Board on an after-the-fact, periodic basis. This will be accomplished through the Southeast EEM Website posting process identified in Section VI.D.6, thereby ensuring that access to these reports by the Members and others will be simultaneous, subject to any applicable confidentiality restrictions. Auditing functions include the following:

1. Verify that the Southeast EEM System operates in accordance with the Southeast EEM Rules, including the determination and application of Bids, Offers, constraints, matched settlements, OASIS reservations, and e-tags.

2. Ensure that Energy Exchange data is available to the applicable Participants in accordance with the Southeast EEM Rules.

3. Report to the Membership Board any concerns regarding the reliability and accuracy of the Southeast EEM System process and results including any instance of operational problems or anomalies with the functioning of the Southeast EEM System.

4. Provide evaluation regarding the proper functioning of the Southeast EEM System, including verifying the compliance of the Southeast EEM System with the Participant-Specific Constraints and Generally Applicable Constraints identified in Section IV.B.6 related to the operation of the Southeast EEM System.

5. Report any complaints received from a Participant to the Membership Board, and investigate and report further at the Membership Board's direction. Within sixty (60) days of receiving a complaint from the Market Auditor, the Membership Board must cause to be posted to the Southeast EEM Website either (1) a determination as to whether an investigation into the complaint will be opened; or (2) a notice that the Membership Board requires more time to determine whether to investigate the complaint. Any notice posted under this subsection will be made subject to all applicable confidentiality restrictions.

6. Respond to written questions from Participants, FERC, NERC, applicable state commissions in the region, Tennessee Valley Authority's Inspector General, and any other applicable regulators that oversee the electric operations of any Member regarding the integrity of the matching process. Such information requests and Market Auditor responses (which will be provided, where reasonable, within thirty (30) days), along with any reports generated by the Market Auditor in accordance with these Market Rules, will be provided to the Southeast EEM Administrator, which will post such documents to the Southeast EEM Website. To the extent that such information (whether the question or the response or other document) is

15

Transmission Function Information (as defined below) or Commercially Sensitive Information (as defined below), it will be posted to a confidential section of the Southeast EEM Website accessible only to Participants, and access by Participants shall be governed pursuant to the confidentiality provisions of the Participant Agreement. Access by regulators shall be subject to a standing request that such regulators treat such information with the highest degree of confidentiality permissible under law applicable to each such regulator. "Transmission Function Information" shall have the meaning provided at 18 C.F.R. Sections 358.3(j), or the successor to that provision. "Commercially Sensitive Information" shall include any information that could confer a competitive advantage on the recipient, or whose disclosure could harm or commercially disadvantage an entity associated with the information, including, but not limited to, any Participant-specific information, such as the Bid and Offer information provided to FERC and the Market Auditor every seven days. The entity providing the information for the Southeast EEM Administrator to post to the Southeast EEM Website (i.e., typically the Market Auditor) shall be responsible for determining which information posted to the Southeast EEM Website should be placed in the confidential section of the Southeast EEM Website, and shall resolve any uncertainty in favor of treating the information confidentially. In no event shall the Market Auditor or Southeast EEM Administrator cause Commercially Sensitive Information that is identifiable to a particular Participant or Critical Energy/Electric Infrastructure Information to be posted to the Southeast EEM Website. Members shall have access to information posted on the Southeast EEM Website at the same time and subject to the same restrictions as other Participants. To the extent that the Market Auditor is required to provide a report or document to the Membership Board, it will do so by notifying the Membership Board when the report or document has been posted to the Southeast EEM Website.

7. Except as otherwise specified herein, the Membership Board will be responsible for defining the time interval(s) for the auditing function to be performed and for the Market Auditor to report back to the governing body. Such interval(s) will be published in the Southeast EEM Manuals.

## E. Data Administration.

1. Parameters. The Southeast EEM Administrator shall maintain the following Southeast EEM System configuration parameters, which shall be posted for access by all Members:

    a. The matching process start time for each Clock Hour;

    b. The number of minutes before the start of the matching process when no additional Bids and Offers will be accepted;

16

**c.** The number of minutes before the start of the matching process by which the processing of any in-transit Bids and Offers must be completed;

**d.** The addition or deletion of Participants;

**e.** The addition or deletion of a Company System Administrator for each Participant;

**f.** Manage, store, and safeguard data (e.g., Bid, Offer, match, and Participant Information) to ensure appropriate levels of confidentiality and records retention;

**g.** Grant access to the data on the Southeast EEM System as appropriate;

**h.** Supply data to Participants involved in Energy Exchanges to complete the applicable transaction, including (but not limited to):

    i. Participant identification of the Buyer and the Seller;

    ii. Balancing Authority Area identifications for the MWh quoted by the Buyer and the Seller;

    iii. e-Tag number;

    iv. Transaction quantity in MW/MWh, including the MWh out of the Source area and the MWh into the Sink area;

    v. Information specifically related to an Energy Exchange (not price of the other side of the match as may reveal sensitive transmission information);

    vi. Energy Exchange Price;

    vii. Benefit for the Buyer and the Seller in total dollars and $/MWh; and

    viii. Energy Exchanges not executed.

**i.** Supply needed information/data for auditing functions to ensure that the Southeast EEM System is being properly administered.

JA1243

## APPENDIX C

## SOUTHEAST EEM AGENT SCOPE

The Southeast EEM Agent Scope shall be limited to the following:

a.  Subject to paragraph (b) below, the Southeast EEM Agent shall execute contracts with third parties solely as the agent for and on behalf of the Members and not in the Southeast EEM Agent's own name or for its own account.

b.  The Southeast EEM Agent shall be empowered to execute contracts only after being given specific written or electronic authorization to do so by the Membership Board, or in the case of minor or unsubstantial contracts, the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

c.  The Southeast EEM Agent shall be authorized to execute amendments to contracts entered into on behalf of the Members, provided that such amendment is authorized by the Membership Board or, in the case of minor or unsubstantial contracts, by the Operating Committee, in either case as delivered to the Southeast EEM Agent by the Membership Board or the Operating Committee, as applicable.

d.  For convenience, the Southeast EEM Agent shall be authorized to accept notices under the contracts that it executes on behalf of the Members.

e.  The Southeast EEM Agent shall not be involved in the billing process under the vendor contracts. Third-party vendors will bill the Members directly for their proportionate share of the costs under the contracts executed by the Southeast EEM Agent on behalf of the Members.

f.  If certain vendors are unwilling to bill Members directly, the Membership Board shall develop an alternative billing arrangement, such as using a third-party billing agent.

g.  The Southeast EEM Agent shall not have any special role in, or authority over, the operation or administration of the Southeast EEM System. The vendor contracts shall specify that the day-to-day contact for such vendor shall be the Operating Committee, not the Southeast EEM Agent.

h.  The Southeast EEM Agent shall not be exposed to incremental liability for actions taken within the Southeast EEM Agent Scope.

## APPENDIX D

## INFORMATION PROVIDED TO FERC AND MARKET AUDITOR

a. Participant, Bid/Offer Price, quantity, location, and All or Nothing information for each bid and offer in each Delivery Interval;

b. Specific parameter data for each Participant for all 15-minute Delivery Intervals, including counterparties the Participant has elected to not be matched with for a <u>Delivery I</u>nterval and Balancing areas for which the Participant has elected not to be matched with a counterparty during a Delivery Interval;

c. Enabling Agreement counterparties for each Participant;

d. The Network Map, updated as necessary;

e. For each Delivery Interval, ATC made available to the Southeast EEM by each Participating Transmission Provider, as well as the amounts of such ATC that are not used by the Southeast EEM;

f. Price caps, as relevant for each Participant;

g. Matched Bids and Offers with their associated scheduled MWh quantity and Energy Exchange Price;

h. Implied marginal benefit information for each ATC limit for each interval, to the extent such information can reasonably be produced by the Southeast EEM Algorithm; and

i. Descriptive information, such as Participant names and unique identifiers.

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| **Alabama Power Company** | ) | **Docket Nos. ER21-1111-003, -004** |
| **Dominion Energy South Carolina, Inc.** | ) | **Docket Nos. ER21-1112-003; -004** |
| **Louisville Gas and Electric Company** | ) | **Docket Nos. ER21-1114-003; -004** |
| **Duke Energy Progress, LLC** | ) | **Docket No. ER21-1115-003** |
| **Duke Energy Carolinas, LLC** | ) | |
| **Duke Energy Carolinas, LLC** | ) | **Docket Nos. ER21-1116-003; -004** |
| **Duke Energy Progress, LLC** | ) | **Docket Nos. ER21-1117-003; -004** |
| **Louisville Gas and Electric Company** | ) | **Docket No. ER21-1118-003** |
| **Georgia Power Company** | ) | **Docket Nos. ER21-1119-003; -004** |
| **Kentucky Utilities Company** | ) | **Docket Nos. ER21-1120-003; -004** |
| **Mississippi Power Company** | ) | **Docket Nos. ER21-1121-003; -004** |
| **Alabama Power Company** | ) | **Docket No. ER21-1125-003** |
| **Dominion Energy South Carolina, Inc.** | ) | **Docket No. ER21-1128-003** |
| | ) | **(Not Consolidated)** |

## MOTION FOR LEAVE TO ANSWER AND ANSWER OF THE
## SOUTHEAST EEM MEMBERS TO REQUESTS FOR REHEARING

The rehearing requests filed in this proceeding are time-barred, and by statute must be rejected. Specifically, the November 12, 2021 requests for rehearing filed by the Public Interest Organizations ("PIOs") and the Clean Energy Coalition ("CEC") ("Requests for Rehearing") regarding the Southeast Energy Exchange Market Agreement ("Southeast EEM Agreement") were filed at least two days after the running of the 30-day period for rehearing permitted by statute. Rejection of such late requests is mandatory pursuant to Section 313 of the Federal Power Act ("FPA").[1]

Pursuant to Rules 212 and 213 of the Rules of Practice and Procedure[2] of the Federal Energy Regulatory Commission ("Commission" or "FERC"), the Southeast EEM Members[3]

---

[1] 16 U.S.C. § 825*l*(a) (2019).

[2] 18 C.F.R. §§ 385.212, 385.213 (2020).

[3] For purposes of this Answer, the Members are: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, "Southern Companies"); Associated Electric

1

JA1246

hereby move for leave to answer and answer ("Answer"). "[J]urisdiction is an issue that [the Commission] may consider at any time," including rehearing.[4] Indeed, "[t]he 30-day time requirement of the [FPA] is as much a part of the jurisdictional threshold as the mandate to file for a rehearing."[5] The Commission therefore can and should accept this Answer,[6] particularly because this is the first opportunity the Members have to address the timeliness of the rehearing requests.[7]

The untimely nature of the rehearing requests makes their substance moot. Moreover, the arguments about the substance of the Southeast EEM Agreement have been thoroughly rebutted

---

Cooperative, Inc. ("AECI"); Dalton Utilities ("Dalton"); Dominion Energy South Carolina, Inc. ("Dominion Energy SC"); Duke Energy Carolinas, LLC ("DEC") and Duke Energy Progress, LLC ("DEP") (together with DEC, "Duke"); Louisville Gas & Electric Company ("LG&E") and Kentucky Utilities Company ("KU") (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, "LG&E/KU"); North Carolina Municipal Power Agency Number 1 ("NCMPA Number 1"); PowerSouth Energy Cooperative ("PowerSouth"); North Carolina Electric Membership Corporation ("NCEMC"); and Tennessee Valley Authority ("TVA") (each a "Member" and collectively, the "Members"). In addition, the following entities have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members: Georgia System Operations Corporation ("GSOC"); Georgia Transmission Corporation (An Electric Membership Corporation); Municipal Electric Authority of Georgia ("MEAG Power"); Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe"); and South Carolina Public Service Authority ("Santee Cooper").

[4]     *Turlock Irrigation Dist.*, 144 FERC ¶ 61,051 at P 28 (2013) ("*Turlock*").

[5]     *Cities of Campbell v. FERC*, 770 F.2d 1180, 1183 (D.C. Cir. 1985).

[6]     *See Turlock*, 144 FERC ¶ 61,051 at P 28; *see also e.g., SFPP, L.P.*, 117 FERC ¶ 61,275 at P 2 (2006) (accepting filing proponent's answer to request for rehearing where the request for rehearing "raised an issue of fact"); *Sys. Energy Res. Inc.*, 96 FERC ¶ 61,165, at 61,731 (2001) (accepting answers to request for rehearing because "they aid[ed] [the Commission] in understanding and resolving the issues that this rehearing presents"). The motion also should be granted as to the other issues raised in the Answer because they will assist in the Commission's decision-making. 18 C.F.R. § 385.213(a)(2) (2020); *see also, e.g., Pac. Gas & Elec. Co.*, 172 FERC ¶ 61,171 at P 27 (2020) (same); *Midcontinent Indep. Sys. Operator, Inc.*, 172 FERC ¶ 61,169 at P 52 (2020) (same).

[7]     *See Carolina Power & Light Co.*, 94 FERC ¶ 61,165, at 61,591 (2001) (accepting answers to request for rehearing "only to the extent that they help[ed] to clarify the parties' positions" on an issue raised in the rehearing request).

JA1247

previously.[8]  However, in this Answer, the Members also seek to address substantive issues to the extent they are novel or have become moot based on later events.  In the category of "new" arguments, the Requests for Rehearing raise an odd new substantive argument that the Administrative Procedure Act ("APA") automatically renders any order issued by operation of Section 205(g) of the FPA[9] invalid.  In addition, CEC for the first time requests declaratory statements from the Commission.  The remaining issues raised by CEC and the PIOs are now largely moot as a result of the Members' November 24 filing to amend the Southeast EEM Agreement and implement prior commitments that provide additional transparency.[10]  And further arguments, for example claims that the Southeast EEM is a loose power pool, have been expressly rejected by the Commission in an order issued after the Southeast EEM Agreement went into effect.[11]  It is appropriate to permit the Members to address these developments in this Answer.

---

[8]      *See, e.g.*, *Ala. Power Co.*, Southeast Energy Exchange Market Agreement, Transmittal Letter at 38-42 and Attachment D, Affidavit of Dr. Susan L. Pope, Docket Nos. ER21-1111-000, *et al.* (filed Feb. 12, 2021) ("Southeast EEM Agreement Filing") (addressing arguments about market power and market monitors); *Ala. Power Co.*, Motion for Leave to Answer and Answer of the Southeast EEM Members at 29-37; 41-44, Docket Nos. ER21-1111-000, *et al.* (filed Mar. 30, 2021) ("Answer to Protests") (responding to protests about market power, market monitors, and barriers to entry); *Ala. Power Co.*, Response to Deficiency Letter at 2-33 and Attachment D, Supplemental Affidavit of Dr. Susan L. Pope, Docket Nos. ER21-1111-000, *et al.* (filed June 7, 2021) ("First Deficiency Letter Response"); *Ala. Power Co.*, Response to Second Deficiency Letter; Request for Shortened Comment Period and Expedited Action at 2-8, Docket Nos. ER21-1111-000, *et al.* (filed Aug. 11, 2021) ("Second Deficiency Letter Response") (responding to question about market auditor role and information protection); *see also* Southeast EEM Agreement Filing, Transmittal Letter at 13 & n.35 (explaining rationale for proposing *Mobile-Sierra* standard of review); First Deficiency Letter Response at 40-41 (addressing arguments about *Mobile-Sierra* and proposing certain provisions be changed to just and reasonable standard); *Ala. Power Co.*, Motion for Leave to Answer and Answer of the Southeast EEM Members at 18-23, Docket Nos. ER21-1111-000, *et al.* (filed July 14, 2021) (responding to protests to First Deficiency Letter Response and explaining why *Mobile-Sierra* protections are appropriate for certain terms in the Southeast EEM Agreement); *see also* Answer to Protests at 8-14 (explaining why the Southeast EEM is not a loose power pool).

[9]      16 U.S.C. § 824d(g).

[10]      *Ala. Power Co.*, Revisions to the Southeast Energy Exchange Market Agreement and Request for Waiver of Prior Notice, Docket No. ER22-476-000 (filed Nov. 24, 2021) ("Amendment Filing").

[11]      *See Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) ("OATT Order").

JA1248

## I.     The Requests for Rehearing are Time-Barred, and Must be Rejected

The Requests for Rehearing were filed late and must be rejected.  It appears the Petitioners may have conflated the *effective date* of the Southeast EEM Agreement (October 12, 2021) with the *issuance date* of the order accepting the Southeast EEM Agreement (no later than October 11, 2021)*.*  But the effective date of the Southeast EEM Agreement is not the beginning of the statutory 30-day period established by FPA Section 313, which begins to run as of the day of the "issuance of [the] order," which occurred no later than October 11, 2021.  The relevant portion of the FPA states:

> Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the ***issuance of such order***.[12]

In a case like this, where the Southeast EEM Agreement went into effect by operation of law, the date of the issuance of the order is also prescribed by law, under Section 205(g), as the date when the Commission fails to issue an order:

> With respect to a change described in subsection (d), if the Commission permits the **60-day period established therein to expire** without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—
>
> **(A)     the failure to issue an order** accepting or denying the change by the Commission **shall be considered to be an order** issued by the Commission accepting the change **for purposes** of section 825l(a) of this title[.][13]

"Section 825*l*(a) of this title," is FPA Section 313(a), the above-quoted provision establishing the 30-day time limit for rehearing requests.  Reading Section 205(g) and Section

---

[12]     16 U.S.C. § 825*l*(a).

[13]     16 U.S.C. § 824d(g) (emphasis added).

JA1249

313(a) together, parties "may apply for a rehearing within thirty days after" the date of "the failure to issue an order accepting or denying the change by the Commission."

FPA Section 205(d) provides that the Southeast EEM Agreement went into effect 60 days after filing "unless the Commission otherwise orders":

> Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public.[14]

Before Section 205(g) was enacted, this meant that a failure to issue an order within 60 days meant that the rate not only went into effect, but that this was not reviewable by an appellate court.[15] Section 205(g) cures the reviewability issue by providing that "the failure to issue an order" becomes an "order" for purposes of rehearing and judicial review once "the Commission permits the 60-day period established therein to expire without issuing an order."  Because the Members filed their last amendment filing on August 11, 2021, the 60-day period for Commission action ran on October 10, 2021.[16]  By statute, therefore, the deadline for rehearing requests was 30 days from that date, or November 9, 2021.

While there may not be uniform agreement on the last date for Commission action, the plain language of the statute and all evidence in this proceeding show agreement that it was before October 12, 2021 – the date it would have needed to be for the Requests for Rehearing to be timely.  According to Commissioner Clements, the "statutory deadline" for Commission action in

---

[14]     *Id.* § 824d(d).

[15]     *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1174 (D.C. Cir. 2016) ("*Public Citizen*") (dismissing as unreviewable appeal of Commission deadlock noting that "[a]ny unfairness associated with this outcome inheres in the very text of the FPA" such that "it lies with Congress, not this Court, to provide the remedy").

[16]     As noted below, the Members requested an effective date of October 12, 2021, or 62 days after filing.  Nevertheless, by statute, the Commission was still required to act within 60 days of the filing date unless the Commission ordered otherwise, or based on the Commission's own precedent, at the least *before* the proposed effective date.  *See infra* note 20.

JA1250

this proceeding was the last business day before the requested effective date, October 8, 2021.[17]

According to the notice that the Southeast EEM Agreement went into effect by operation of law

("Notice of Effectiveness"), the deadline was October 11, 2021: "[p]ursuant to section 205 of the

FPA, in the absence of Commission action on or before October 11, 2021, the proposed Southeast

EEM Agreement and concurrences thereto became effective by operation of law."[18]  Even

supposing that one of these views is correct instead of the above offered reading of the plain

language of the statute, the latest possible deadline for a request for rehearing was 30 days from

October 11, which was November 10, 2021 – two days *before* the rehearing requests here were

filed.  In short, regardless which interpretation is correct, the Requests for Rehearing were filed

out of time and are time-barred by statute.

 The effective date of the Southeast EEM Agreement (October 12, 2021) is not the last

day for Commission action within the meaning of Sections 205(d) and 205(g).  Commission

precedent expressly recognizes the difference between the deadline for orders and effective dates.

The Commission "gives itself 60 full days" to act, and thus requires that parties request an

effective date no sooner (barring waiver) than the "61st day."[19]  If the requested date is more than

61 days from the date of the filing, the Commission still must act "prior to" the proposed effective

---

[17] Letter from Commissioner Clements to Senator John Barrasso, filed in Docket Nos. ER21-1111-000, *et al.* (Sept. 24, 2021) ("Clements Letter") ("The Commission must act by the statutory deadline of October 8, 2021, and I am committed to continuing to work with my colleagues on the Commission to reach a decision.").

[18] *Ala. Power Co.*, Notice of Filing Taking Effect by Operation of Law, Docket Nos. ER21-1111-002, ER21-1112-002, ER21-1114-002, ER21-1116-002, ER21-1117-002, ER21-1119-002, ER21-1120-002, ER21-1121-002 (issued Oct. 13, 2021).

[19] *Duke Energy Fla., LLC*, 156 FERC ¶ 61,222 at P 9 & n.24 (2016) ("Duke Energy's requested effective date of September 26, 2016, is one day short of the full notice period. The Commission begins counting the 60 days from the date the Commission has a complete filing, and allows itself 60 full days. Thus, absent a waiver of notice, the proposed rate or change cannot become effective until the 61st day.").

date.[20]  As to the Notice of Effectiveness issued on October 13th, "Notices describing the effects of [a] deadlock are not reviewable orders under the FPA."[21]

The 30-day rehearing deadline is statutory and cannot be waived.[22]  The rule permits no exceptions, other than where FERC's own system malfunctions and prevents timely filing,[23] even where a filer faces technical difficulties and submits the request on the correct day but after the close of business.[24]  Here, the PIOs and CEC offer no explanation for their late filing, and certainly do not maintain that the Commission's filing process was unavailable.

The Members filed the last revisions to the Southeast EEM Agreement on August 11, 2021 and requested an effective date of October 12, 2021, 62 days from the date of the filing.  Under the Commission's precedent that it has until the day before the requested effective date, it had until Monday, October 11th, the date specified as the final day for action in the Notice of Effectiveness.  If the Commission wanted to act on a business day, its last day to do so was October 8th, as noted by Commissioner Clements.  Under the most favorable interpretation for the PIOs and CEC, the

---

[20]     *See Nat'l Fuel Gas Supply Corp.*, 46 FERC ¶ 61,409, at 62,290 (1989) (interpreting Section 4(d) of the Natural Gas Act, the corollary to FPA Section 205(d), and stating "[i]n cases where an extended notice period is given, section 4(d) only requires the Commission to act **prior to** the proposed effective date") (emphasis added); *see also, Electronic Tariff Filings*, Docket No. RM01-5-000, Notice of Procedures for Making Statutory Filings when Authorization for New or Revised Tariff Provisions is not Required at 5 (issued June 3, 2020), https://www.ferc.gov/sites/default/files/2020-06/notice-06-03-20.pdf ("In cases in which a filer proposes an effective date for a tariff record that is later than the day after the end of the statutory notice period, the filing would become effective on that later date in the absence of a Commission order issued **before** that later date that rejects the filing or suspends its effectiveness." (emphasis added).

[21]     *Public Citizen*, 839 F.3d at 1170 (citations omitted).

[22]     *See, e.g.*, *Appalachian River Res. Enhancement, LLC*, 113 FERC ¶ 61,275, at 62,083 (2005) ("Because the 30-day rehearing deadline is statutory based, it cannot be extended, and the request for rehearing filed by Jackson County, North Carolina must be rejected as untimely.").

[23]     *See, e.g.*, *Wabash Valley Power Ass'n, Inc.*, 172 FERC ¶ 61,177 at P 9 & n.16 (2020) (accepting rehearing request filed after 5:00 p.m. deadline when the Commission's eFiling system could not accept filings and function was not restored until after the deadline).

[24]     *See, e.g.*, *Sw. Power Pool, Inc.*, 98 FERC ¶ 61,038, at 61,104 (2002) (denying request for rehearing delivered by messenger tendered after 5 p.m. based on "inclement weather and poor road conditions"); *Ark. Power & Light Co.*, 19 FERC ¶ 61,115, at 61,217-18 (1982) (denying request for rehearing tendered after 5 p.m. on the 30th day where the filer had a word processor break down at 4:15 on the day of filing).

JA1252

deadline for Commission action was October 11th, meaning that the last day to file a request for rehearing was November 10th.

In sum, the plain language of Section 205(g) is that the clock starts running on the last day for Commission action,[25] the Requests for Rehearing claim to interpret Section 205(g),[26] thus demonstrating awareness of its applicability, and the record provided ample notice that the last day for Commission action was before October 12, 2021.[27]  Indeed, CEC acknowledged that the "sixty-day prior notice period for each of the SEEM Agreement and the OATT Amendments expired on *or before* October 12"[28] and the PIOs state that they are submitting their "Request for Rehearing *of the Commission's failure to act* on the SEEM filing within the period established."[29] The Requests for Rehearing are at least two days out of time and must be rejected.

## II.     New arguments and developments do not justify grant of rehearing

### A.       The APA arguments are wrong because they would nullify Section 205(g)

The PIOs and CEC both seek to make much of the fact that there was no explanation, in a majority-approved, FERC-authored order, for the rejection of their arguments when the Southeast EEM Agreement went into effect by operation of law.  They claim this violates the APA.[30]  But Congress enacted FPA Section 205(g) to allow rates that went into effect by operation of law to be

---

[25]      Nor does the cross reference in Section 205(g) to Section 313 render it ambiguous.  *In re Baker*, 430 F.3d 858, 860 (7th Cir. 2005) ("Cross-references and limiting language may be narrative annoyances to the reader, but they do not, without more, make laws ambiguous.").

[26]      *See, e.g.*, CEC Request for Rehearing at 3 ("Section 205(g) of the FPA provides that 'the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes' of seeking rehearing.") (quoting Section 205(g)).

[27]      *See* Clements Letter (October 8, 2021); Notice of Effectiveness (October 11, 2021).

[28]      *See* CEC Request for Rehearing at 3 (emphasis added).

[29]      PIOs Request for Rehearing at 1-2 (emphasis added).

[30]      CEC Request for Rehearing at 4, 8-12; PIOs Request for Rehearing at 14-15.

JA1253

subject to appellate review. Specifically, Section 205(g) treats the acceptance of the rate by operation of law that results from Commission inaction as an order "for purposes" of rehearing and judicial review. [31] Nothing in Section 205(g) changes or modifies the means under Section 205(d) by which a rate goes into effect by operation of law. That means in every such case there will *not* be a written opinion of the Commission explaining the reasons the rate is just and reasonable. Rather, it is just and reasonable because Congress said it is, subject to review on rehearing and by an appellate court, if pursued.

The PIOs' and CEC's argument would have the Commission entirely ignore Congress's intent to provide a pathway for judicial review, even if the Commissioners are unable to reach a majority decision. Instead, the PIOs and CEC seem to be arguing that acceptance by operation of law without a Commission order is a sufficient predicate for *granting* rehearing, rather than *considering* a rehearing request, as the statute permits.[32] In other words, because there is no Commission order to lay out the basis for the Commission's reasoned decision-making, the PIOs and CEC appear to argue that acceptance by operation of law must necessarily be arbitrary and capricious and the Commission must grant rehearing. But to begin with, that is not how rehearing works. The purpose of the FPA's rehearing provision is to allow the Commission to reconsider its decisions.[33] This permits the Commission to, among other things, provide additional explanation

---

[31]     "[T]he failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change *for purposes of section 825l(a)* of this title[.]" 16 U.S.C. § 824d(g)(A) (emphasis added).

[32]     Again, Section 205(g) treats the Commission's failure to act as an "order" for "purposes of" review under Section 313. Section 313 gives the Commission authority to consider and take one of several actions on timely rehearing requests. *See* 16 U.S.C. § 825l(a) ("Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing.").

[33]     16 U.S.C. § 825l(a).

in support of decisions it does not reverse.[34]  Thus, if the Commission were to reject rehearing here on the basis of a majority vote, it can satisfy APA requirements by providing, in the order denying rehearing, a reasoned basis for rejecting each of the arguments raised on rehearing.

If the Commission remains deadlocked, then no order will be forthcoming.  Without an order, rehearing is deemed to be denied,[35] and appeal becomes available.[36]  If the PIOs/CEC interpretation was correct, which it is not, every acceptance by operation of law under FPA Section 205(g) would necessarily be reversed upon judicial review because there was no Commission explanation for the rejection of the arguments opposing the proposed rate.  And the effect of a finding that the Commission failed to provide a reasoned decision would be to remand to the Commission for further explanation.  If the Commission again deadlocked, the problem would repeat.

In short, the PIOs/CEC interpretation is that Congress "fixed" the problem of non-reviewability identified in *Public Citizen* with a "review" mechanism that would result, automatically, in a recurring cycle of rehearings, appeals, and remands that would provide no resolution to the regulated entities.  The PIOs/CEC interpretation therefore makes no sense.  Congress did not replace one review problem with a different one.  Statutory provisions should not be interpreted in a way that renders them meaningless.[37]  Congress showed it wanted the

---

[34]     *Fla. Power Corp.*, 66 FERC ¶ 61,200 at n.5 (1994) (explaining that a rehearing request, in addition to allowing a party the ability to sharpen its arguments, "equally affords the Commission an opportunity to sharpen its explanations for the actions it took in its initial order.").

[35]     16 U.S.C. § 825*l*(a) ("Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied.").

[36]     *Id.* § 825*l*(b); *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18-19 (D.C. Cir. 2020) (rejecting motions to dismiss petitions for review filed after the statutorily-prescribed timeline had elapsed with no Commission action).

[37]     *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 7 F.4th 31, 37 (1st Cir. 2021) ("Courts interpret statutes to 'give effect, if possible, to every word Congress used' and to reject interpretation[s] of the statute that would render an entire subparagraph meaningless.'") (citations omitted).

regulatory process to move forward, with a meaningful court review, so that rates would not be stuck in limbo. Section 205(g) is manifestly an exception to the APA – a congressional directive to move forward to judicial review despite the lack of a written decision supported by a majority of Commissioners.

B.     **The *Mobile-Sierra* protections remaining after the Amendment Filing do not affect the rates, terms and conditions of Southeast EEM service**

CEC and the PIOs question the lawfulness of the *Mobile-Sierra* provisions of the Southeast EEM Agreement.[38]  As made effective by operation of law, the Southeast EEM Agreement contains *Mobile-Sierra* protection for the entire Southeast EEM Agreement, including all Exhibits and Appendices thereto.  However, consistent with commitments the Members made in response to Staff questions in a Deficiency Letter, the Members submitted the Amendment Filing, which significantly curtails *Mobile-Sierra* protections.  The Requests for Rehearing on *Mobile-Sierra* are therefore largely moot.

To be sure, the Members did not propose to remove *Mobile-Sierra* protection from every single provision of the Southeast EEM Agreement, so the Requests for Rehearing on the issue are not completely mooted.  And the Members acknowledge that Chairman Glick's statement indicated disagreement with the remaining designations.  But we respectfully submit that *Mobile-Sierra* protection is appropriate for the limited remaining provisions.

Provisions of the Southeast EEM Agreement that govern the provision of service to Participants in the Southeast EEM are now proposed, through the Amendment Filing, to be subject to the just and reasonable standard.  This includes the rules for Energy Exchanges, including all of the rules determining which Participants' bids and offers are accepted, and at what price and quantity.  It also includes the rules for determining who can be a Participant in the Southeast EEM.

---

[38]     CEC Request for Rehearing at 20-22; PIOs Request for Rehearing at 4-11.

JA1256

It includes the rules specifying that Members are treated the same as other Participants.  And it includes newly proposed requirements, such as the information transparency requirements proposed in the Amendment Filing.   In short, it includes the Market Rules, the pro forma Market Participant Agreement, and other rules of general applicability, namely substantial other portions of the Southeast EEM Agreement, including the requirements for the transmission service utilized to facilitate the Southeast EEM ("NFEETS").  This ensures that the public interest standard will not apply to rates, terms and conditions for participating in and taking service in the Southeast EEM.

The Southeast EEM Agreement is a unique agreement.  It contains market-facing features, like the Market Rules in Appendix B, that will now be subject to a just and reasonable standard.  But it also contains features, like an Regional Transmission Organization ("RTO") transmission owners' agreement, that set forth the rights and obligations of the entities who are voluntarily agreeing, with one another, to utilize their facilities to provide this service.  RTO membership agreements receive public interest protection,[39] and so should the limited provisions of this nature that are designated for public interest protection in the Southeast EEM Agreement.  Simply saying that the Southeast EEM Agreement has *some* market facing features does not explain why other provisions that are properly within the scope of private contract must face regulatory uncertainty.

The purpose of permitting private parties to contract in a way that elevates the standard of review to the public interest standard is to allow those parties to strike a deal with a significant

---

[39]     *See, e.g.*, *ISO New England Inc.*, 106 FERC ¶ 61,280 at P 128 (2004), *reh'g granted in part, denied in part*, 109 FERC ¶ 61,147 (2004) (recognizing the use of *Mobile-Sierra* as being an appropriate way to "balance the needs of the Transmission Owners for contractual certainty with the interests properly represented by [a market]."); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 185 (2013) (permitting the Consolidated Transmission Owner Agreement ("CTOA") to be subject to differing standards of review because it could not "be classified in its entirety as containing contract rates or tariff rates" and noting that the differing standards would "recognize the distinctions among its provisions").

JA1257

degree of regulatory certainty that their rights and obligations will not be overturned and changed

in unintended ways.[40]  This is particularly important in the context of a voluntary agreement where

more than half the Members are not subject to Commission jurisdiction.  The Southeast EEM

provisions still subject to heightened protection are exactly the type of provisions where the

Members, who are incurring the cost and burden of establishing this new market, are entitled to

agree to contain their risks.  Therefore, the Members are entitled to regulatory certainty as to the

contractual commitments they have made, including significant costs they have agreed will be

incurred, and costs they have agreed not to incur.   For example:

- Provisions governing withdrawal[41] from the Southeast EEM are appropriate for protection, because experience in other constructs shows that withdrawal fees can become substantial,[42] and the Members should not be subject to the risk that the agreement will be challenged and such costs may be imposed on them.  Further, because many of the Members are not Commission jurisdictional, it is imperative that they be able to withdraw to preserve their non-jurisdictional status.

---

[40]     *See United Gas Pipe Line Co.* v. *Mobile Gas Serv. Corp.*, 350 U.S. 332, 344 (1956) (*Mobile-Sierra* "permits the stability of supply arrangements which all agree is essential to the health of the [energy] industry" because the nature of the industry "may frequently require substantial investments which the consumer would be unwilling to make without long-term commitments from the distributor, and the distributor can hardly make such commitments if its supply contracts are subject to unilateral change by the natural gas company whenever its interests so dictate."); *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11, 15 (D.C. Cir. 2002) ("*Atlantic City I*") ("[T]he purpose of the *Mobile-Sierra* doctrine is to preserve the benefits of the parties' bargain"); *Maine Pub. Serv. Co. v. FERC*, 964 F.2d 5, 10 (D.C. Cir. 1992) (explaining that the D.C. Circuit has "determined that contractual rates promote economic stability") (citations omitted).

[41]     *See* Agreement, Section 4.2.1 (related to Member withdrawal); Section 8.6 (related to withdrawal based on a Governmental action).

[42]     For example, the Midcontinent Independent System Operator Inc., ("MISO") Open Access Transmission, Energy, and Operating Reserve Markets Tariff ("Tariff"), requires withdrawing Transmission Owners to remain responsible for a share of costs of large-scale regional transmission projects approved prior to their withdrawal.  *See Midwest Indep. Transmission Sys. Operator, Inc.*, 155 FERC ¶ 61,174 at P 12 (2016) (describing MISO Tariff changes, including adoption of new Schedule 39 as allowing "MISO to charge, on an on-going basis, a withdrawing transmission owner a monthly MVP Usage Rate that includes a share of the costs of all MVPs that the MISO Board of Directors (MISO Board) approved prior to the effective date of the transmission owner's withdrawal.").  As an example, when MISO unsuccessfully attempted to apply these provisions to two withdrawing Transmission Owners who withdrew prior to the change in the Tariff, their "share" of the project costs was calculated at $136 million, and $514.2 million, respectively.  *Midwest Indep. Transmission Sys. Operator, Inc.*, 153 FERC ¶ 61,101 at P 49 & n.91 (2015).

JA1258

- Similarly, entities that withdraw from RTOs can be subject to "hold harmless" conditions if customers develop a reliance interest on the provision of service.[43] The Southeast EEM contains provisions preventing the development of such reliance interests,[44] and specifying similarly that the Members have no obligation to plan their systems to provide such service,[45] and regulatory certainty that these provisions not be subject to alteration was important to the Members in agreeing to provide these services.

- The definition of "Member" was also carefully crafted to ensure that entities with Section 205 decision-making authority over the design, goals, and objectives of the Southeast EEM share a primary focus and common purpose of achieving benefits for customers. Ensuring a commonality of purpose and direction was foundational to this voluntary, cooperative arrangement that brought together a diverse group of entities from across the region, where other efforts have failed in the past.[46] Without that common purpose and assurance that additional Members will continue to share that purpose, the Southeast EEM would not have come to fruition.

- Provisions governing cost allocation are only the concern of the Members,[47] because costs are not allocated to non-Members, who incur no charge for use of the Southeast EEM.

- The Members also believe it fundamentally important that they determine who will serve as the Southeast EEM Administrator and the Market Auditor. The Members cannot be required to cede their Section 205 authority to another entity,[48] and so agreed to enhanced protection of the provisions governing these agents[49] to provide regulatory certainty that they cannot be required to do so, in back door fashion, through expansion of the roles of these entities. It bears emphasizing here that the rules *applied* by the Southeast EEM Administrator and the Market Auditor – the Market Rules – will be subject to modification under the just and reasonable standard.

---

[43]     *See, e.g.*, *Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282 at PP 43-51 (2006) (describing hold harmless obligations related to LG&E's and KU's withdrawal from MISO).

[44]     *See* Agreement, Section 16.4.1 (No Reliance Interest on Non-Firm Energy Exchange Transmission Service).

[45]     *See id.*, Section 16.5 (no dedication of facilities).

[46]     Southeast EEM Agreement Filing, Transmittal Letter at 7-8 (explaining the core principles under which the Southeast EEM was created); *Id.*, Overview Aff. at 19 (same).

[47]     *See* Agreement at Article 7 (Budgeting and Cost Allocation).

[48]     *See Atlantic City I*, 295 F.3d at 11, 15 (vacating Commission order that required RTO participants to cede Section 205 rights as a condition to membership); *Atl. City Elec. Co v. FERC*, 329 F.3d 856, 859 (2003) ("*Atlantic City II*") (reaffirming and clarifying *Atlantic City I*, stating "FERC has no jurisdiction to enter limitations requiring utilities to surrender their rights under § 205 of the FPA").

[49]     *See* Agreement, Sections 6.1 and 6.2 (Appointment of Southeast EEM Agent); Appendix C (Southeast EEM Agent Scope); Article 1 (defining Market Auditor, Southeast EEM Administrator, Southeast EEM Agent, and Significant Matter); and Article 4 (describing how the Board votes on Significant Matters, including designation of the agents).

JA1259

In short, *Mobile-Sierra* protections are now limited to provisions that, if altered, would undermine the assurances that the contracting parties made to each other about the extent of their contractual commitments. This goal of understanding and limiting the Members' commitments, and any associated costs to be incurred, and making sure that provisions that provide such limitations can only be changed against the will of the contracting parties if the public interest so requires, is no different than the regulatory certainty sought by parties to any other private contract. It does not matter that additional Members could join the Southeast EEM. New rules can still be negotiated and agreed upon when new Members join an existing agreement, as shown when the "Integrated System" joined Southwest Power Pool, and negotiated specific rules applicable to it.[50] *Mobile-Sierra* protections prohibit unilateral changes made to a contract by third parties or the Commission — not to the Members' agreed-upon changes. The remaining provisions of the Southeast EEM Agreement are therefore entitled to *Mobile-Sierra* protection. Rehearing should be denied as to these provisions and declared moot as to the remaining provisions addressed by the Amendment Filing.

Finally, it is worth noting again the significant customer savings expected from the Southeast EEM.[51] It would be odd, to say the least, to reject the Southeast EEM Agreement, and potentially forego these gains, out of a concern that some provisions that are a matter of private agreement on how to insulate the contracting parties from unintended costs might not be changeable in the future unless the public interest requires it. Such a decision would, of itself, fail the public interest.

---

[50]    *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,113 at P 112 (2014), *order on reh'g and clarification*, 153 FERC ¶ 61,051 (2015); *Sw. Power Pool, Inc.*, 155 FERC ¶ 61,168 (2016) (accepting settlement offer related to Integrated System integration).

[51]    *See generally*, Southeast EEM Agreement Filing, Guidehouse/Charles River Associates Benefits Analysis at 4 (estimating benefits of approximately $31 million per year on a levelized basis).

JA1260

**C.     The transparency enhancements proposed in the Amendment Filing are more than adequate to protect against market power**

Both the PIOs and CEC are concerned about lack of transparency and the potential for exercise of market power.[52]  Those arguments are moot in light of the Members' Amendment Filing, which incorporates significant additional transparency measures.   Indeed, even before that Southeast EEM Witness Dr. Susan Pope explained that the structure of the Southeast EEM did not give rise to any new market manipulation opportunities.[53]  Neither the PIOs, CEC, nor any of the Commissioners have been able to identify a plausible theory to contradict Dr. Pope.  Nonetheless, the Members agreed to incorporate additional transparency measures, including a requirement for reporting of information to the Commission, which has now been implemented in the Amendment Filing.[54]  These additional transparency measures, along with the Commission's extensive existing regime for studying market power and protecting against market manipulation, are more than sufficient.

**D.     Arguments about loose power pools and undue discrimination should be rejected for the same reasons given in the *OATT Order***

In the *OATT Order*, the Commission rejected arguments that the Southeast EEM creates a loose power pool,[55] and found that "it appears there would be no practical difference between a joint system-wide OATT and the identical NFEETS provisions that each Participating Transmission Provider has filed."[56]  The Commission also rejected claims of collusion as

---

[52]     PIOs Request for Rehearing at 13-14; CEC Request for Rehearing at 14-20.

[53]     Southeast EEM Agreement Filing, Economics Aff. at PP 86-87.

[54]     Amendment Filing at 6-8.

[55]     *OATT Order*, 177 FERC ¶ 61,080 at P 62.

[56]     *Id.* at P 73.

JA1261

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Duke Energy Progress, LLC | Docket Nos. | ER21-1115-000 |
| Duke Energy Carolinas, LLC | | ER21-1115-001 |
| | | ER21-1115-002 |
| | | |
| Louisville Gas and Electric Company | | ER21-1118-002 |
| | | |
| Alabama Power Company | | ER21-1125-000 |
| | | ER21-1125-001 |
| | | ER21-1125-002 |
| | | |
| Dominion Energy South Carolina, Inc. | | ER21-1128-002 |
| | | |
| | | (Not consolidated) |

**REQUEST FOR REHEARING OF PUBLIC INTEREST ORGANIZATIONS**

Pursuant to Section 313 of the Federal Power Act ("FPA")[1] and Rule 713 of the Rules of

Practice and Procedure[2] of the Federal Energy Regulatory Commission ("Commission" or

"FERC"), Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP,

Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia

Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North

Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources

Defense Council ("Public Interest Organizations" or "PIOs") hereby respectfully submit this

Request for Rehearing of the Commission's November 8, 2021 Order Accepting Tariff

Revisions (the "Order").[3]

---

[1] 16 U.S.C. § 825l.
[2] 18 C.F.R. § 385.713.
[3] *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (Nov. 8, 2021) ("Order Accepting Tariff Revisions").

JA1262

to its prior precedents.[22]

2. The Commission's determination that SEEM is not a loose power pool violates the plain language of Order No. 888 and Order No. 888-A.[23]

3. The Commission's Order waiving the requirements of 18 C.F.R. § 35.28(c)(3) lacks a rational basis and undermines Order No. 888's open access mandate.[24]

4. The Commission's assumption that SEEM will produce net benefits lacks a rational basis.[25]  The Order failed to respond to evidence presented by PIOs showing that the Benefits Analysis relied upon by the Utilities has significant methodological shortcomings and likely overestimates SEEM's benefits.[26]

5. The Commission's Order approving NFEETS in spite of the Utilities' admission that NFEETS will cause a cost-shift violates cost-causation principles.  Entities excluded from SEEM by the Agreement's restrictive membership requirements will bear this cost burden without receiving any benefits.[27]

## III.    REQUESTS FOR REHEARING

### A.  The Commission's Order Authorizes the Utilities to Unduly Restrict Transmission Access

The Commission's Order accepts the Utilities' invitation to ignore the numerous

mechanisms in the SEEM Agreement and revised OATTs that could be used to restrict

---

[22] *Sithe/Indep. Power Partners, L.P. v. FERC*, 165 F.3d 944, 949–50, (D.C. Cir. 1999) (explaining that the Commission "must provide a reasoned explanation for any failure to adhere to its own precedents."); *Hatch v. FERC*, 654 F.2d 825, 834 (D.C. Cir. 1981) (same proposition); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) (same proposition).

[23] Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 62 Fed. Reg. 12,274, 12,313 (Mar. 14, 1997) ("Order No. 888-A"); *Wolverine Power Supply, Inc.*, 85 FERC ¶ 61,099, 61,355 (Oct. 21, 1998) (explaining that FERC intentionally "defined pooling arrangements in the broadest terms possible."); *Sithe/Indep. Power Partners, L.P.*, 165 F.3d at 949–50 (explaining that the Commission "must provide a reasoned explanation for any failure to adhere to its own precedents."); *Hatch*, 654 F.2d at 834 (same proposition); *Greater Boston Television Corp.*, 444 F.2d at 852 (same proposition).

[24]  Order No. 888-A, 62 Fed. Reg. at 12,313.

[25] *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1151, 1513 (D.C. Cir. 1984) (requiring that FERC's decisions be "supported by 'substantial evidence' in the record and reached by 'reasoned decision–making'"); *Motor Vehicles Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (requiring an agency to articulate a "rational connection between the facts found and the choice made").

[26] *Nat. Res. Defense Council, Inc. v. U.S. EPA*, 859 F.2d 156, 188, 210  (D.C. Cir. 1988) (agency must articulate a "rational connection between the facts found and the choice made" demonstrating a consideration of "all significant points articulated by the public."); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) (agencies must respond to all "relevant" and "significant" public comments).

[27] *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368–69 (D.C. Cir. 2004) (describing the cost-causation principles as "requiring that all approved rates reflect to some degree the costs actually caused by the customer who must pay them") (quoting *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)).

JA1263

transmission access based on the fiction that the Utilities have no incentive to do so.  This approach is contrary to fundamental economic principles, the Commission's long-standing commitment to non-discriminatory open access, and the standards set forth in Order No. 888 and Section 205 of the FPA.

1. *The Utilities did not meet their burden under FPA Section 205 to show that the proposed tariff revisions satisfy the just and reasonable standard*

The Commission's decision to approve the Utilities' proposed tariff revisions despite substantial evidence presented by PIOs and other protestors that the revisions were likely to produce unjust, unreasonable, and unduly discriminatory rates is arbitrary, capricious, and lacks a reasoned basis.  The PIOs, through their protests and expert affidavits, demonstrated that the revisions to the OATTs contemplated by the SEEM Proposal create a number of the opportunities for the Utilities to restrict access to transmission service to disadvantage potential competitors.[28]  For example, access to NFEETS is contingent upon a prospective Participant (1) executing at least three Enabling Agreements with counterparties who are already in SEEM, and (2) obtaining the countersignature of the Participant Agreement by the SEEM Agent, who is controlled by an Operating Committee composed exclusively of SEEM Members.[29]  These requirements create the opportunity for existing SEEM Participants to exclude certain prospective Participants by refusing to enter into Enabling Agreements—or using the Enabling Agreements as an opportunity to exercise leverage over a prospective Participant.[30]  SEEM Members have even more power—those sitting on the Operating Committee could direct the

---

[28] PIOs March 2021 Protest, Ex. A, Aff. of Paul M. Sotkiewicz, Ph.D. ("Sotkiewicz Aff."); Protest of PIOs (June 28, 2021), Accession No. 20210628-5162 ("PIOs June 2021 Protest"), Attach. A, Suppl. Aff. of Paul M. Sotkiewicz Ph.D. ("Suppl. Sotkiewicz Aff.").
[29] Commissioner Clements Dissent, Attachment A at ¶ 16.
[30] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3 (D.C. Cir. Aug. 6, 2021) (citing 18 C.F.R. § 35.37 (2020)). The Commission's regulations require a market-based rate seller to demonstrate that "the seller cannot erect any barriers to entry against potential competitors."

JA1264

Agent to decline to sign the Participant Agreement with a given counterparty.[31]  The Utilities

admitted that there is no standardized Enabling Agreement, no requirement that Participants sign

Enabling Agreements with prospective Participants, and no criteria for determining when the

SEEM Agent should or should not sign the Participation Agreement with a prospective

participant.[32]  In other words, Participants, and especially Members, have unfettered ability to

block prospective participants, including their competitors, from accessing NFEETS.  PIOs

explained that there was an easy way to fix this problem: establish a standardized Enabling

Agreement and require Participants to sign the Enabling Agreement unless they articulate a

legitimate reason for not doing so, as has been the practice the Commission has required for

other multilateral agreements.[33]  Likewise, instituting enforceable rules on when and how the

Operating Committee determines whether the SEEM Agent should sign Participation

Agreements would alleviate the risk that the requirement is used to unduly restrict access to

transmission service.

 Barriers to transmission access persist even if a prospective Participant does meet the

membership requirements: the three-counterparty rule, which requires three potential

counterparties for a transaction to go through, and the "toggle" feature, which allows Participants

to "toggle off" counterparties at will and without disclosure, create opportunities for Participants

or groups of Participants to exclude a particular counterparty or type of competitor from

---

[31] *See* PIOs March 2021 Protest at 12–13, 50 (setting forth concerns regarding the potential anti-competitive leveraging of the Three-Counterparty Rule and/or Participant Agreement).

[32] Resp. to First Deficiency Letter at 20 ("In the current bilateral market, there are no prescribed limitations on a party's ability to refuse to enter into an Enabling Agreement with a prospective or current party. Likewise, the Southeast EEM Agreement does not contain any such limitations, but it does require Participants to have an Enabling Agreement with three or more other Participants."); *see also* Suppl. Sotkiewicz Aff. at P 62 ("Participants on their own may be hesitant to report problems via a Section 206 Complaint for fear of being toggled off or having their Enabling Agreement terminated, which SEEM Filing Parties admit can happen for any reason[.]").

[33] PIOs June 2021 Protest at 8 (explaining that a *pro-forma* agreement is needed in order to ensure that Enabling Agreements are not entered into or negotiated in an unduly discriminatory fashion.).

JA1265

beneficial trades.[34]  Generation-owning SEEM Members with inherent incentives to avoid

competition could therefore toggle off counterparties known to have lower costs.[35]  As PIOs'

expert, Dr. Sotkiewicz, explained in his affidavit,

> [w]ith the requirement that at least three counterparties be available to be matched, it would only take three of the five largest generation owning entities (Southern Company, TVA, Duke, LG&E/KU, and Dom SC) to "toggle off" potential counterparties in a coordinated strategy to block any beneficial trades from happening with entities that are "net short." . . . In the long run, if some participants such as merchant generation or merchant renewable developers already in the Southeast market are "toggled off," they could get financially squeezed and forced to sell their assets to the large incumbent Member IOUs if such an option is available.  Meanwhile, potential new entrants would see a clear signal that their new entry is not wanted, and abuse of SEEM would serve as a powerful deterrent to competitive new entry.[36]

In sum, PIOs provided the Commission with extensive evidence indicating that SEEM created

opportunities for undue discrimination in transmission access.

The Commission does appear to dispute that SEEM creates opportunities for Members

and Participants to exclude potential competitors from access to NFEETS and beneficial trades.

Nevertheless, the Order summarily dismisses these concerns based on the assumption that the

Utilities have no incentive to take advantage of opportunities to limit their competitors' access to

transmission service.[37]  In doing so, the Commission repeated the  Utilities' claims that "[T]he

Southeast EEM Members created the Southeast EEM because they do intend to use it, and

---

[34] PIOs March 2021 Protest at 25.

[35] Sotkiewicz Aff. at PP 63–64.

[36] Id.

[37] Order Accepting Tariff Revisions at P 68 ("We also disagree with protestors' assertions that certain Participants are likely to collude to exclude prospective Participants by refusing to enter into Enabling Agreements. Such claims are unsupported and speculative. The Southeast EEM is designed to create an incentive for Participants to enter into Enabling Agreements with as many potential counterparties as possible in order to maximize the number of potential bilateral transactions and thus the benefits that may be derived by participating in Energy Exchanges matched by the Southeast EEM algorithm."); P 69 ("As for the Participant Agreement requirement, we similarly find protestors' argument that Filing Parties may unreasonably restrict access to NFEETS by directing the Agent to refuse to countersign a Participant Agreement to be speculative and unsupported. The Agent will countersign Participant Agreements at the direction of the Operating Committee, which will be comprised of representatives from each sector of the Southeast EEM membership.").

JA1266

benefit from it, and benefits will be at their greatest with eligible counterparties maximized,"[38]

and completely ignored substantial evidence offered by PIOs' expert[39] that monopoly utilities,

like the Utilities, have a well-understood incentive to protect their monopoly franchise by

blocking transmission access for its competitors.[40] This evidence is unrebutted. As

Commissioner Clements explained, the Order's,

> simplistic logic defies the fundamental purpose of utility regulation, which is premised in large part upon the basic proposition that one cannot simply assume that monopoly utilities will act in the best interest of their retail customers . . . Monopoly regulation of vertically integrated, investor-owned utilities exists because of the structural misalignment of economic incentives that fail to ensure the maximization of consumer benefits. Here, protections are necessary not as a speculative assumption of bad faith on the part of the Filing Parties, but as part of the Commission's statutory obligation.[41]

At bottom, the Commission's Order is premised on a fundamental misapprehension of its

own precedent. The question is not whether the Utilities *will* deny their competitors access, but

whether the mechanisms in the SEEM Agreement *create opportunities* for SEEM Members to

deny access to competitors if they so choose.[42] As such, the Commission's statement that "[n]o

evidence in the record suggests the Operating Committee will prevent the Agent from

countersigning a given Participant Agreement,"[43] misses the point. Protestors are not required to

---

[38] *Id.* at P 68 n.118; *see* Order Accepting Tariff Revisions (Clements, Comm'r, dissenting at P 8) ("Clements Dissent") ("[T]he Majority Order's only justification is that the Southeast EEM Members can be trusted to never take advantage of the express barriers to access they provided for in the Southeast EEM Agreement, because the benefits for retail customers will be highest with maximum participation in the Southeast EEM.").

[39] The sole reference to Dr. Sotkiewicz's affidavit appears at paragraph 39 of the Order and is limited to the cost-causation issue discussed later in this filing.

[40] *See* Suppl. Sotkiewicz Aff. at PP 20–38 (explaining the incentives of franchise monopolies and the mechanisms that SEEM offers for acting on these incentives); *see also Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 683–684 (D.C. Cir. 2000) ("Utilities that own or control transmission facilities naturally wish to maximize profit. The transmission-owning utilities thus can be expected to act in their own interest to maintain their monopoly and to use that position to retain or expand the market share for their own generated electricity, even if they do so at the expense of lower-cost generation companies and consumers.").

[41] Clements Dissent at P 5, n.145.

[42] *See* Clements Dissent at P 8.

[43] *Id.* at P 69.

demonstrate that a denial of access "will" or "is likely to" happen.[44]  As Commissioner Clements explained, "a basic tenet of Order No. 888 is that transmission providers must file tariff terms that provide open access without giving themselves an *opportunity* to exercise discretion to block access."[45]  In fact, Order No. 888 explicitly targets "the *potential* for future denials of access."[46]  The Commission's assertion that Protestors must somehow provide evidence of a denial of access *before it happens* sets an impossibly high standard all while completely abandoning the well-established principle that the burden to show that a Section 205 filing is just and reasonable lays with the public utility filing a tariff revision.[47]  The Commission must review the evidence before it and explain how, if at all, the well-founded concerns regarding exclusion of competitors are addressed by the proposal.

### 2. The proposed tariff revisions are not consistent with or superior to the pro forma OATT

The Commission's Order also violates Order No. 888's plain language and its own past decisions requiring that proposals to modify an OATT must be "consistent with or superior to" the *pro forma* OATT.  Order No. 888 allows transmission owners to either operate under FERC's standard *pro forma* OATT or file their own tariff.[48]  But any public utility that "seeks a deviation from the *pro forma* tariff promulgated by the Commission . . .  must demonstrate that

---

[44] Order Accepting Tariff Revisions at PP 68, 69 ("We also disagree with protestors' assertions that certain Participants are likely to collude to exclude prospective Participants by refusing to enter into Enabling Agreements.").

[45] Order Accepting Tariff Revisions, App. A: Statement of Comm'r Clements at P 21 (citing Order No. 888, 61 Fed. Reg. at 21, 552) ("Clements FRA Statement").

[46] Order No. 888, 61 Fed. Reg. at 21,550 (emphasis added).

[47] *See, e.g.*, *Alabama Power Co.*, 993 F.2d at 1571 (citing 16. U.S.C. § 824d(e); *Winnfield v. FERC*, 744 F.2d 871, 877 (D.C. Cir. 1984) (explaining that the rate proponent bears the burden under FPA section 205 to prove that a proposal is just and reasonable)); *Sw. Power Pool, Inc.*, 166 FERC ¶ 61,019, 61,088 ("SPP, as the rate proponent, had the burden under FPA section 205 to prove its proposal just and reasonable."); *Wabash Valley Power Ass'n, Inc.*, 110 FERC ¶ 63,055, 65,130 ("Wabash Valley acknowledges that, under Section 205 of the Federal Power Act (16 U.S.C. § 824d (2000)), it has the burden of proving that its proposed Formula Rate Tariff is just and reasonable.").

[48] 18 C.F.R. § 35.28(c)(1).

JA1268

the deviation is consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the pro forma tariff."[49]  And FERC may not approve a proposed OATT unless the proposed variations are "consistent with or superior to the terms and conditions in the Final Rule pro forma tariff."[50]

The PIOs and other protestors provided substantial evidence that the Utilities' proposed tariff revisions were not "consistent with or superior to" the *pro forma* OATT.[51]  For example, PIOs explained that the proposed tariff revisions would exclude at least 65 existing bilateral trading partners from access to NFEETS, the new free Point-to-Point service offered through the SEEM.[52]  Further, the proposed OATTs include a restriction on Transmission Customer eligibility that is not contained in the *pro forma* OATT.  The proposed OATTs require that Eligible Customers must be "in good financial standing with the Transmission Provider."[53]  This vague and undefined requirement is not required for an Eligible Customer to qualify for Point-To-Point service.[54]  Here, the Utilities offer no explanation for why this requirement was added when creditworthiness requirements are spelled out in the *pro forma* OATT and used to qualify Eligible Customers.[55]  FERC's open access rules require that transmission service is offered under each public utility's OATT to all transmission customers in a comparable, non-

---

[49] *Id.* § 35.28(c)(1)(vi).
[50] *Louisville Gas & Elec. Co.*, 114 FERC ¶ 61,282 at P 3 ("[T]he proposal, insofar as it modifies Applicants' OATT, must be 'consistent with or superior to' the *pro forma* OATT."); Order 888, 61 Fed. Reg. at 21,598 n.434 (allowing deviation from the *pro forma* standardized tariff only when the "variations [] are consistent with or superior to the terms and conditions in the Final Rule pro forma tariff.").
[51] PIOs August 2021 Protest, Attach., Mot. to Respond and Resp. of PIOs, at 3, 5, 11; Comments of Advanced Energy Econ., Advanced Energy Buyers Group, Renewable Energy Buyers All., and Solar Energy Indus. Ass'n, at 8 (Mar. 15, 2021) ("Clean Energy Coalition Comments"), Accession No. 20210315-5301.
[52] PIOs August 2021 Protest at 11.
[53] *See, e.g.*, Revisions to Joint Open Access Transmission Tariff to Implement Non-Firm Energy Exchange Transmission Service, Attach. B, Marked Tariff Sheets: Redlined revised tariff sheets of Amended OATT Sections, at Attach. X § 4.1.1, Docket Nos. ER21-1115 et al. (Feb. 12, 2021) ("Duke Energy's Marked Tariff Sheets"), Accession No. 20210212-5056.
[54] *See* Pro Forma OATT § 16.1.
[55] *Id.*

JA1269

discriminatory manner.[56]  These open access principles were set forth in Commission

proceedings promulgating the *pro forma* OATT and reflected by its terms and conditions.[57]

Therefore, the Utilities' proposed revisions—which would exclude some existing trading

partners from NFEETS and may impose significant barriers to participation for others, for

example, through vague and undefined requirements—are not "consistent with or superior to"

the *pro forma* OATT.

Another example pertains to whether transmission providers are allowed to make energy

sales to third parties using service other than Point-To-Point service.  The proposed OATTs in

the above-captioned dockets are inconsistent with the *pro forma* OATT because the *pro forma*

OATT provides that Transmission Providers "will be subject to the rates, terms and conditions of

Part II of the Tariff when making Third-Party Sales."[58]  Part II of the Tariff contains the terms

and conditions of Firm and Non-Firm Point-To-Point Transmission Service.  Part II in the

proposed OATTs does not contain the terms and conditions for NFEETS.  Thus, because

NFEETS is not a Part II transmission service, these Transmission Providers must show why their

proposal to make Third-Party Sales using their own transmission system for free under a service

that is not available to all potential users of the transmission system is consistent with or superior

to the *pro forma* OATT.[59]  A public utility seeking to depart from the terms of the *pro forma*

OATT bears the burden of demonstrating that the revised terms and conditions are consistent

---

[56] Order No. 888-A, 62 Fed. Reg. at 12,313.

[57] *Id.* at 12,276 ("The non-discriminatory services required by Order No. 888, known as open access services, are reflected in a pro forma open access tariff contained in the Rule.").

[58] Pro Forma OATT §§ 13.3, 14.3.  A Third-Party Sale is defined in Duke's Proposed OATT as "Any sale for resale in interstate commerce to a Power Purchaser that is not designated as part of Network Load under the Network Integration Transmission Service or a Point of Delivery under Network Contract Demand Service."  Duke Due Energy's Marked Tariff Sheets § 1.62.

[59] To the extent that the proposed OATTs are not modified to change Sections 13.3 and 14.3 of the tariff requiring all sales from the transmission provider to third parties to use Point-To-Point service, the transmission providers here may be in violation of their OATTs if they make Third-Party Sales using the NFEETS.

JA1270

with or superior to the pro forma tariff.[60]  Here, the Transmission Providers have made no such

showing.[61]  PIOs contend that such a showing is not possible given that the transmission

providers' proposed OATTs do not meet the Order No. 888 comparability standard.[62]

Moreover, though the Commission's Order notes that Protestors raised this issue,[63] it did

not even attempt to address whether the proposed tariff revisions are "consistent with or superior

to" the *pro forma* OATT.  The Commission's approval of the tariff revisions without even

considering whether they meet the standard set by the *pro forma* OATT violates the plain

language of Order No. 888 and departs from long-time Commission precedent.  Reversing a

previously consistent policy with no justification or explanation is by definition arbitrary and

capricious.[64]

### 3. SEEM is a loose power pool with membership provisions that are unduly preferential and discriminatory

The Commission's conclusion that SEEM is not a loose power pool is contrary to the

plain language of its regulations.  Order 888-A provides a straightforward, two-part definition of

a power pool: (1) "…any multi-lateral arrangement, other than a tight power pool or a holding

---

[60] *Northern States Power Co. (Minnesota) and Northern States Power Co. (Wisconsin)*, 83 FERC ¶ 61,098, 61,498 (1998) ("We will continue to strictly place the burden on the filing utility to demonstrate that revised terms and conditions are consistent with or superior to the pro forma tariff."); *see also Public Service Co. of New Mexico*, 85 FERC ¶ 61,240, 62,003 (1998) ("[T]he utility, among other things, must demonstrate that its proposed revisions are consistent with, or superior to, the terms and conditions of the [pro forma] tariff.").

[61] 18 C.F.R. § 35.28(c)(1), (c)(1)(v).

[62] Order No. 888-A, 62 Fed. Reg. at 12,313.

[63] Order Accepting Tariff Revisions at PP 28–29.  The Commission noted that the Clean Energy Coalition raised this issue but did not acknowledge that the PIOs' filings also explained that the Utilities had failed to demonstrate that the proposed revisions were not consistent with or superior with the *pro forma* OATT.  *See* PIOs August 2021 Protest, Attach., Mot. to Respond and Resp. of PIOs at 3, 5, 11.

[64] *Sithe/Indep. Power Partners, L.P.*, 165 F.3d at 949–50 (remanding where the court was "unable to penetrate the logic of FERC's orders to ascertain whether FERC in fact departed from established policy and precedent and, if so, whether it justified that departure."); *Hatch*, 654 F.2d at 834 ("[A]n agency must provide a reasoned explanation for any failure to adhere to its own precedents."); *Greater Boston Television Corp.*, 444 F.2d at 852 ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored[.]").

company arrangement," that (2) "explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[65] SEEM fits squarely within this definition because it is an arrangement between multiple parties—the SEEM Members—and NFEETS "provides a service not otherwise available under relevant Participants' OATTs: $0/MWh transmission service with no associated Schedule 1 or Schedule 2 ancillary service charges, and financial losses only."[66] The Commission ignored the plain language of Order 888-A and made no effort to explain why the definition contained therein was not applicable to SEEM.[67]

Instead, the Commission relied exclusively on *Public Service Co. of Colorado* ("*PSCo*"), an order that summarily concluded that the arrangement at issue was not a loose power pool without any substantive explanation.[68] *PSCo* devotes exactly one sentence to discussing the power pool issue.[69] *PSCo* never discusses the definition of a power pool established by Order No. 888 or whether the arrangement at issue fit into that definition. In any event, the Joint Dispatch Agreement at issue in *PSCo* is significantly different from the SEEM Agreement in material ways. Under the Joint Dispatch Agreement, there is no discretion as to whether members buy power during the 15-minute intervals because the system is dispatched on a least-cost basis during that time to provide for *all* imbalances. The SEEM rules would allow SEEM

---

[65] Order No. 888-A, 62 Fed. Reg. at 12,313. To the extent the Commission relies on a definition of loose power pool from 1994, *see* Order Accepting Tariff Revisions at P 64 & n.111. That narrow definition was superseded when the Commission adopted its broad definition of loose power pool under Order Nos. 888 and 888-A.

[66] Clements Dissent at P 16.

[67] *See* Order Accepting Tariff Revisions at P 64 (restating the language of Order No. 888-A without any discussion of how that language applies to the proposed OATT revisions).

[68] Clements Dissent at P 30; *PSCo*, 154 FERC ¶ 61,107 at P 85 (Feb. 18, 2016).

[69] *PSCo*, 154 FERC ¶ 61,107 at P 85 ("With regard to Tri-State's argument that Joint Dispatch Transmission Service will violate Order No. 888's requirement that loose power pools establish 'open, non-discriminatory membership provisions and modify any provisions that are unduly discriminatory or preferential,' PSCo is not proposing the establishment of a loose power pool and as such the requirements cited to are not required of the arrangement proposed by PSCo.").

JA1272

Members absolute discretion as to whether the NFEET Service is used, as they control whether they buy or sell power by putting in a bid or offer.  Indeed, the SEEM Filing provides an explicit example of Southern affiliates being able to control how NFEETS is used in the ability to exclude counterparties by toggling them off.  SEEM does not provide imbalance service[70] and unlike the Joint Dispatch Agreement in *PSCo*, members are not required to purchase from others when they are short.  For these reasons the comparison of the bilateral market expansion of SEEM to the provision of imbalance under the Joint Dispatch Agreement of *PSCo* is inapt.

The Commission contends that NFEETS is not a substitute or replacement for other non-firm services and therefore it cannot be a "discount" of non-firm transmission service.[71]  The record here shows that NFEETS is a substitute for non-firm service because, by its name, it is non-firm transmission service, and as the Commission has recognized, "Filing Parties acknowledge that there could be an erosion of non-firm point-to-point revenues" resulting from customers switching from non-firm transmission service to NFEETS.[72]  In fact, the Benefits Analysis relied upon by the Utilities assumes a high level of participation in SEEM, and therefore high utilization of NFEETS.[73]  In other words, it is likely that some transmission customers will substitute NFEETS for Non-Firm Point-To-Point Service.[74]  The Commission must correct its error and conclude that NFEETS is a discounted service insofar as it provides an alternative for Non-Firm Point-To-Point service that does not include any ancillary charges, does

---

[70] Resp. to First Deficiency Letter at 12; Resp. to First Deficiency Letter, Ex. A, Suppl. Pope Aff. at PP 27–50 ("Suppl. Pope Aff.").
[71] Order Accepting Tariff Revisions at P 64 & n.110.
[72] Order Accepting Tariff Revisions at P 38.
[73] SEEM Proposal, Attach. E-1, Benefits Analysis at 11 ("Benefits Analysis").
[74] PIOs agree that NFEETS is not a substitute for Firm Point-To-Point service but profoundly disagree with the FERC's suggestion that non-firm Point-To-Point service is used for reliability purposes.  *See* Order Accepting Tariff Revisions at P 64 & n.110.

JA1273

not entail any charges for operating the platform, and does not charge for the fixed costs of providing transmission service over the transmission systems of these transmission providers.[75]

The Commission's finding is also troubling given that the *pro forma* OATT requires that transmission providers use Point-To-Point service for their sales to third parties.[76] As discussed above, the *pro forma* OATT requires that transmission providers use Point-To-Point service for sales to third parties.[77] The Utilities plan to make Third Party Sales using NFEETS instead of Point-To-Point service. If NFEETS is not a substitute for Point-To-Point service as the Commission has found,[78] there is no justification that would allow these transmission providers to make sales through SEEM and still be consistent with the pro forma OATT and meet Order No. 888 comparability requirements. Either NFEETS is a substitute for Point-To-Point service and transmission Point-To-Point therefore can use NFEETS to make Third Party Sales or NFEETS is *not* a substitute for Point-To-Point service and none of the transmission providers can make Third Party Sales through SEEM. It cannot be both.

But regardless of whether NFEETS is a "discounted" service, the Commission erred because it altogether failed to consider whether NFEETs is a "special transmission arrangement", which is the other way that a multilateral agreement can fall under Order No. 888-A's definition of a power pool.[79] As Commissioner Clements explained,

> [T]he text of Order No. 888-A, which uses "special" and "discounted" to describe separate categories of beneficial service that may be available to loose pool members, indicates that "special transmission arrangement" describes precisely the circumstance at issue here: service not otherwise offered outside of the arrangement established by the pool members.[80]

---

[75] Clements FRA Statement at P 30; *see* Clements Dissent at P 17 n.167.
[76] Pro Forma OATT §§ 13.3, 14.3.
[77] *Id.*; *see supra* Part III.A.2.
[78] Order Accepting Tariff Revisions at P 64 & n.110.
[79] Order No. 888-A, 62 Fed. Reg. at 12,313.
[80] Clements Dissent at P 17.

JA1274

PIOs identified multiple "special" terms and conditions, including that: (1) the only qualified

use of NFEETS is for 15-minute Energy Exchanges; (2) NFEETS has "the lowest curtailment

priority" of any transmission service; (3) NFEETS "is available on an as-available basis" and, (4)

"losses will be "financial" in that they will be supplied by the applicable Participating

Transmission Provider and paid for by the matched bidder and offeror in each Energy

Exchange.[81]  NFEETS also eliminates pancaking for SEEM Participants.[82]  The Order

acknowledges that PIOs identified the presence of "*special* transmission terms and conditions" in

SEEM,[83] but does not analyze how this bears on whether SEEM is a loose power pool.

None of the cases that the Commission cites for its conclusion that SEEM is not a power

pool contain any discussion of "special transmission arrangements."[84]  Nor did the Commission

provide any independent analysis on this point.  Because the Commission did "not even attempt

to set forth an alternative interpretation of 'special transmission arrangement' that explains why

NFEETS does not qualify as such," the Order lacks a "rational connection between the facts

found and the choice made" and is therefore arbitrary and capricious.[85]  The Commission's

failure to provide an explanation is particularly egregious here, where it appears to be silently

abandoning not only its long-standing interpretation expressed in Order No. 888-A but also its

foundational policy that there should be comparability of service on transmission systems

including those systems that are pooled together.[86]

---

[81] PIO April 12, 2021 Response at 4 (citing SEEM Proposal at 24; *see also* SEEM Agreement at App. B. ("SEEM Market Rules") § II (NFEETS definition at (i) and (ii))).
[82] SEEM Proposal at 38.
[83] Order Accepting Tariff Revisions at P 55 (emphasis in original).
[84] Order No. 888-A, 62 Fed. Reg. at 12,313.
[85] Clements Dissent at P 19 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962))).
[86] *See Wolverine Power Supply*, 85 FERC ¶ 61,099, 61,355 (1998) (Explaining that Order No. 888, "in seeking to eliminate undue discrimination in pooling arrangements . . . defined pooling arrangements in the broadest terms possible.").

JA1275

### 4. *Waiver of 18 C.F.R. § 35.28(c)(3) is unjustified*

The Commission concedes that even if SEEM is not a loose power pool, the requirement to file a joint OATT contained in 18 C.F.R. § 35.28(c)(3) still applies because SEEM is a "multilateral trading arrangement or agreement that contains transmission rates, terms, or conditions."[87] The Commission justified waiving this requirement because "the Commission has previously granted such waiver where 'it would not be practical' to establish a joint system-wide OATT."[88] The Commission further reasoned that waiver would be appropriate because "there would be no practical difference between a joint system-wide OATT and the identical NFEETS provisions that each Participating Transmission Provider has filed."[89] The Commission erred in waiving its regulations for the following reasons.

First, the Commission's waiver of the system-wide OATT requirement subverts the open-access principles enshrined in Order No. 888. As explained in Order No. 888,

> The filing of open access tariffs by the public utility members of a power pool is not enough to cure undue discrimination in transmission if those public utilities can continue to trade with a selective group within a power pool that discriminatorily excludes others from becoming a member and that provides preferential intra-pool transmission rights and rates. The same holds true of certain bilateral arrangements that allow preferential transmission pricing or access. These arrangements and agreements need to be changed.[90]

The Commission reached this conclusion in spite of comments from Duke Energy arguing that for arrangements "where there are both multiple owners and operators, as in 'loose' pools, it is appropriate to have individual tariffs unless the pool members agree otherwise."[91] The Commission's attempt to frame SEEM as an arrangement that does not involve "joint planning

---

[87] Order Accepting Tariff Revisions at P 72.
[88] *Id.*
[89] *Id.* at P 73.
[90] Order No. 888, 61 Fed. Reg. at 21,593 (emphasis added).
[91] *Id.* at 21,591.

JA1276

or coordination" and therefore does not require filing of a joint OATT[92] is both facially incorrect as SEEM *does* involve joint planning and coordination,[93] and is likewise undermined by the plain language of Order No. 888-A holding that "if a utility offers transmission without charge as part of [a pool, holding company system or multi-lateral agreement], it must offer transmission to all parties requesting a similar service either without charge or at an access fee or other transmission rate that comparably reflects transmission-related costs borne by members of the agreement."[94] The Commission's attempt to fabricate a distinction between multilateral arrangements that involve "joint planning or coordination" and those that do not finds no support in the record, Order Nos. 888 and 888-A, or in subsequent Commission precedent.[95]

Second, entities in loose power pools and multi-lateral trading arrangements or agreements with similar features to SEEM that predated Order No. 888 successfully implemented system-wide OATTs to come into compliance with that order. This resulted in wide-ranging benefits for the industry as a whole. As a matter of policy, the Commission should do the same here to benefit consumers in the Southeast.

Third, the Commission is incorrect in claiming that there is no practical difference between a joint OATT and the individual OATTs that the Utilities have submitted. Applying joint OATT regulations to SEEM Members' OATTs would dictate a substantively different result from the one reached in the Order at issue here in that it would facilitate open access and

---

[92] Order Accepting Tariff Revisions at P 64.
[93] Clements Dissent at P 20 ("the OATTs *do* jointly coordinate transmission services across the loose pool members, via the algorithm that controls the provision of NFEETS service. By signing onto the Southeast EEM Agreement and integrating it into their OATTs, the relevant transmission providers have arranged for a common set of principles to coordinate the allocation of the last remaining available capacity on their transmission systems.").
[94] Order No. 888-A, 62 Fed. Reg. 12,274 at 12,313.
[95] *See also* Clements Dissent at P 20.

disallow the substantial barriers to participation that the Commission has let stand here.[96]  If the

Utilities were required to submit a joint OATT, that OATT would be subject to the joint OATT

regulations, which provide that parties who have not joined a multi-lateral trading arrangement

must be offered transmission access on comparable basis to those participating in the

arrangement.[97]  Therefore, by requiring the filing of a joint OATT, the Commission could ensure

that Order No. 888's "primary goal" of ensuring "comparability" in transmission access is

achieved.[98]  In addition, potential transmission customers that are not members of SEEM would

be able to have a one-stop shop for the SEEM transmission service, including one tariff under

which to determine the losses and ancillary services that they would pay.  Another significant

practical difference is that transmission customers would not have to navigate non-public terms

and conditions of transmission service from the many non-jurisdictional utilities that make up the

SEEM footprint.  With a system-wide OATT, important protections offered by the Federal

Power Act would apply to service over the systems of those non-jurisdictional utilities.  These

benefits of a joint system-wide tariff are not insignificant; rather, they go to the heart of

determining whether service is provided on an open and comparable basis.

Fourth, the precedent cited by the Commission on waiver of the pool-wide tariff

regulation is not applicable here.  FERC explains that it has granted a waiver where it would not

be practical to establish a joint system-wide OATT.[99]  But FERC limited its grant of waiver in

---

[96] *See also* Clements Dissent at P 24 (Explaining that participation in SEEM alone cannot satisfy Order No. 888-A's requirements for pooling arrangements because Order 888-A separately requires both open membership and access for "others" who do not directly participate in the arrangement).

[97] Order No. 888-A, 62 Fed. Reg. at 12,276 ("[Order No. 888] requires non-discriminatory (comparable) treatment for all eligible users of the monopolists' transmission facilities. The non-discriminatory services required by Order No. 888, known as open access services, are reflected in a pro forma open access tariff contained in the Rule.").

[98] *See* Clements Dissent at P 23 (citing Order No. 888-A, 62 Fed. Reg. at 12,313).

[99] Order Approving Tariff Revisions at P 72 & n.126 (citing *Bangor Hydro Elec. Co.*, 144 FERC ¶ 61,031, at PP 15–17 (2013) and *Wolverine Power Supply Coop., Inc.*, 87 FERC ¶ 61,047, 61,203 (1999)).

the *Bangor Hydro Electric Co.* case "[b]ased upon the factual circumstances represented" in that request for waiver and required that if those facts changed that a single tariff would be required.[100]  In that situation, transmission service was provided across one of the merged utilities systems by an independent Regional Transmission Organization ("RTO") and the other non-contiguous merged utility had an existing OATT.[101]  Here, none of the public utilities have given operational control of their transmission systems over to an RTO and three of the four public utilities are contiguous.  The facts here are unlike the factual circumstances represented in *Bangor Hydro*.  That is also true for *Wolverine Power Supply Coop., Inc.* cited by the Commission to support the impracticality of requiring a SEEM joint tariff.  In *Wolverine Power*, only one of the utilities had an OATT for its "integrated transmission grid" as the "the other pool members own[ed] only limited and scattered transmission facilities" that exempted them from the requirement to have an OATT.[102]  Additionally, as part of its request for waiver, "Wolverine . . . committed to file a joint pool-wide tariff within 60 days of receiving a request for pool-wide transmission service."[103]  Here, all of the public utilities have OATTs and pool-wide transmission service is not only contemplated but fundamental to the SEEM proposal.  The SEEM Members would not benefit without it.  The Commission should enforce its power pool regulation so that the benefits are available comparably to all potential users of the power pool.

**B.  The Commission's Reliance on the "Benefits Analysis" Submitted by the Utilities Lacks a Rational Basis**

The Commission's Order appears to be premised on the assumption that SEEM will provide benefits not just to SEEM Members and Participants, but to customers throughout the

---

[100] *Bangor Hydro Elec. Co.*, 144 FERC ¶ 61,031, at P 17.
[101] *Id.* at P 16.
[102] *Wolverine Power Supply Coop., Inc.*, 87 FERC ¶ 61,047 at 61,203.
[103] *Id.*

JA1279

Southeast.[104]  But PIOs and their expert have produced substantial evidence that the Benefits Analysis relied upon by the Utilities has significant methodological flaws and lacks sufficient modeling detail.[105]

For example, the Benefits Analysis relies on a model, PROMOD, that does not have the ability to model dispatch on the 15-minute intervals that will be used in SEEM.[106]  The Filing Parties have not provided an explanation for why this model was used when several other models are capable of modeling 15-minute intervals.[107]  It appears that the Benefits Analysis relied on undisclosed, in-house models to conduct 15-minute intervals—but no explanation or supporting documentation has been provided so it is impossible to assess the strength of the modeling or the reasonableness of the results.  When asked to share these details, the Utilities demurred.[108]

PIOs identified several additional shortcomings in the Benefits Analysis' methodology. For example, the Utilities also failed to provide any detailed inputs—such as fuel costs, load forecasts and load profiles—which makes it impossible for the results to be verified for reasonableness.[109]  And the Benefits Analysis is unclear about how transmission constraints were modelled—if at all.[110]  The Benefits Analysis also failed to consider how restrictions such as the three-counterparty rule and toggle feature could reduce beneficial trades and further decrease

---

[104] *See, e.g.*, Order Accepting Tariff Revisions at P 34 ("Filing Parties reiterate that the small increase in network service charges will be offset by reductions in overall customer costs."); *id.* at P 43 ("[T]he Southeast EEM, by providing a new avenue for sub-hourly, non-firm transactions to occur, will provide benefits to Participants and others throughout the Southeast, including IPPs that choose to participate. These benefits are derived from lower production costs. Accordingly, we find that since native load customers taking network service will likely see decreases in future energy costs, it is just and reasonable that these customers bear the costs of any decreased point-to-point transactions.").

[105] Sotkiewicz Aff. at PP 12–13, 93–112; PIOs March 2021 Protest at 27–28.

[106] Sotkiewicz Aff. at P 100.

[107] *Id.*

[108] PIOs April 2021 Response at 15; Mot. for Leave to Answer and Answer of the Southeast EEM Members, at 28 (Mar. 30, 2021) ("SEEM March 2021 Answer"), Accession No. 20210330-5322.

[109] Sotkiewicz Aff. at P 99.

[110] *Id.* at PP 103–04.

JA1280

projected benefits.[111]  The benefits projected by the Benefits Analysis and discussed by the

Utilities' expert, Dr. Pope, are premised on high levels of participation in SEEM,[112] so failure to

consider how these mechanisms could reduce participation is particularly problematic.[113]  As the

Benefits Analysis admits, "[l]imited participation by members is the largest risk to Southeast

EEM benefits."[114]

Based on these and other shortcomings, PIOs' expert concluded that the $40–100 million

annual benefits predicted by the Benefits Analysis are at best an upper bound of benefits and that

the critical questions of how low benefits might actually be, and whether they could be

outweighed by costs, remain unanswered.[115]  When PIOs and other protestors raised these and

other concerns about the accuracy of the Benefits Analysis, the Utilities responded that "no

quantified cost-benefit analysis is required,"[116] and addressed only a limited subset of the

arguments raised by PIOs.[117]

Since customers across the Southeast could face increased costs if the Benefits Analysis

estimates are inaccurate or did not account for important variables, such as the possibility of

decreased participation,[118] the Utilities failed to demonstrate that the proposed tariff will result in

just and reasonable rates.  But the Commission's Order does not even mention the concerns

raised by PIOs regarding the reliability of the methodology and reasonableness of the results

---

[111] *Id.* at PP 102, 105.
[112] SEEM Proposal, Attach. D, Aff. of Susan L. Pope on Behalf of SEEM, at P 62 (premising her conclusions on "robust competition" occurring "as expected" in SEEM); Benefits Analysis at 11 ("the study assumes a well-functioning, and relatively high-participation market.").
[113] Benefits Analysis at 11.
[114] *Id.*
[115] Sotkiewicz Aff. at P 105.
[116] SEEM March 2021 Answer at 24.
[117] PIOs April 2021 Response at 14–15.
[118] *See* Suppl. Sotkiewicz Aff. at PP 63–71 (presenting evidence from the Southern Company Energy Auction indicating that the Utilities' expectation of robust participation in SEEM is unlikely to occur).

JA1281

cited in the Benefits Analysis.  Having failed to even acknowledge, much less grapple with the

evidence, the Commission had no basis upon which to conclude that SEEM's purported benefits

would outweigh its costs.[119]  Instead, the Commission appears to assume that SEEM will provide

benefits that will outweigh the costs of implementing SEEM.[120]  Given the significant,

unrebutted concerns raised by PIOs and other protestors regarding the reliability of the Benefits

Analysis, and the fact that neither the Utilities nor the Commission made any effort to calculate

likely reductions in Point-to-Point revenues caused by SEEM,[121] or address the other concerns

raised by PIOs, this assumption lacks a rational basis and the Commission's failure to address

these issues is arbitrary and capricious.[122]

### C.  The Commission's Order Authorizes Monopoly Utilities to Shift Costs to Market Participants Who Are Not Permitted to or Do Not Wish to Join SEEM

The record is clear that NFEETS is expected to have detrimental cost impacts to

independent power producers ("IPP") that are not SEEM Members or Participants.  Utilities

admit that NFEETS will likely cause non-firm Point-to-Point transmission customers to move

transactions to SEEM, reducing revenue credit offsets to the transmission revenue requirements

of the various SEEM transmission owners and, therefore, shifting costs to firm Point-to-Point

and network transmission customers.[123]  Recognizing the need to identify benefits associated

---

[119] *Elec. Consumers Res. Council*, 747 F.3d (requiring that FERC's decisions be "supported by substantial evidence in the record and reached by reasoned decision making")*; Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43 (requiring an agency to articulate a "rational connection between the facts found and the choice made").

[120] Order Accepting Tariff Revisions at P 43.

[121] *See* Benefits Analysis at 11 ("The $0 transmission rate sub-hourly trading could eventually cannibalize some hourly trading yielding a reduction in non-firm transmission revenues.").

[122] *Home Box Office*, 567 F.2d at 35–36 (agencies must respond to all "relevant" and "significant" public comments); *Nat. Res. Defense Council*, 859 F.2d at 209–13 (Agency must articulate a "rational connection between the facts found and the choice made" demonstrating a consideration of "all significant points articulated by the public.").

[123] SEEM Proposal at 36–37; Benefits Analysis at viii, 11 (noting that NFEETS is likely to "cannibalize some hourly trading yielding a reduction in non-firm transmission revenues"); *see also* Sotkiewicz Aff. at P 60 ("Signaling that there is sufficient NFEETS available through SEEM could signal to those parties currently paying for Firm PtP and Non-firm PtP, and in some cases, paying pancaked transmission rates, to not renew Firm PtP and Non-firm PtP

JA1282

with the cost shift, Utilities assert that, for native and network load customers, benefits from the

overall costs savings from SEEM will outweigh the lost revenue credit offsets.[124]  As discussed

above,  PIOs have shown that these alleged benefits are speculative, and the Utilities failed to

provide credible responses to any of the significant concerns raised by PIOs and other protestors

regarding the flawed methodology used in the Benefits Analysis.[125]  Regardless, any alleged

costs savings do not extend to non-Participant IPPs that use firm Point-to-Point transmission

services to wheel energy across the proposed SEEM territory.  And the Commission's statement

that SEEM will provide these unverified benefits—derived from "lower production costs"—to

IPPs,[126] is simply wrong.[127]  IPPs do not benefit from lower production costs as they are sellers

of power and benefit from making sales at prices that are at or above their costs.

The June 28, 2021 PIO protest raised the non-Participant IPP cost causation issue to the

Commission,[128] and Commissioner Clements acknowledged it in her dissent as follows,

> [SEEM] will decrease volume and liquidity of non-firm point-to-point service
> within or across the Southeast EEM territory, making it more difficult and
> expensive for anyone who continues to engage bilaterally in the Southeast EEM
> footprint. The Filing Parties acknowledge this potential cost impact on non-
> Participants. The FPA does not permit requiring non-Participants to subsidize
> benefits for Participants . . ..[129]

Despite the record evidence and dissent from Commissioner Clements, the Commission's Order

determined that PIOs' cost causation concern is "speculative and unsupported."[130]  In making its

---

service since they can satisfy their needs through SEEM."); *see also* Clements Dissent at P 40 ("[SEEM] will
decrease volume and liquidity of non-firm point-to-point service within or across the Southeast EEM territory,
making it more difficult and expensive for anyone who continues to engage bilaterally in the Southeast EEM
footprint. The Filing Parties acknowledge this potential cost impact on non-Participants.").
[124] Resp. to First Deficiency Letter at 9, 36.
[125] *See supra* Section III.B.
[126] Order Accepting Tariff Revisions at P 43.
[127] Suppl. Sotkiewicz Aff. at PP 76–77.
[128] PIOs June 2021 Protest at 23–24.
[129] Clements Dissent at P 40.
[130] Order Accepting Tariff Revisions at P 44.

JA1283

determination, the Commission argues that "any" increase in firm Point-to-Point transmission services does not, by itself, run afoul of the principles of cost causation. However, that is not the issue argued in the PIOs' protest. Rather, the PIOs argue that limiting transmission services under NFEETS to SEEM Participants will shift costs to non-Participant firm Point-to-Point IPP customers without providing any corresponding benefits, in violation of the cost-causation principle.[131]

Finally, the Commission again turns to *PSCo*, to show that cost shifts are not a concern in this case.[132] But the Commission's reliance on *PSCo* is once again misplaced. In *PSCo*, the Commission held that, "Joint Dispatch Transmission Services does not represent a discount of non-firm transmission service, and does not serve as a substitute for that service;" therefore, this service "will not deprive firm customers of non-firm revenue credits."[133] But here, as explained above, the Utilities already admit that some users of non-firm transmission service will shift to NFEET service, using it as a substitute for non-firm transmission service.[134] And PIOs have already shown how that substitution will deprive firm Point-To-Point customers of non-firm revenue credits, increasing their costs without providing any corresponding benefits to those IPPs that sell across the SEEM Territory or outside of it to robust and functional markets in neighboring Regional Transmission Organizations.

---

[131] *See KN Energy Inc.*, 968 F.2d at 1300 (rates must "reflect to some degree the costs actually caused by the customer who must pay them"); *Midwest ISO Transmission Owners*, 373 F.3d at 1368 (the cost causation principle is determined "by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party").

[132] Order Accepting Tariff Revisions at P 64.

[133] *PSCo*, 154 FERC ¶ 61,107 at P 84.

[134] *See supra* note 122.

JA1284

## IV.    RELIEF REQUESTED

For the aforementioned reasons, the PIOs respectfully request that the Commission grant this request for rehearing and reject the OATT revisions for failing to meet Section 205 of the Federal Power Act's requirement that all rates be just and reasonable and that tariff provisions are consistent with or superior to the *pro forma* OATT.[135]  In the alternative, the PIOs request that the Commission set the issues raised here and in the November 12, 2021 Request for Rehearing for a paper hearing with a technical conference before briefing.

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, Public Interest Organizations respectfully request that the Commission grant rehearing of its Order and reject the OATT revisions.

Date: December 8, 2021.                    Respectfully submitted,

*/s/ Maia Hutt*
Maia Hutt
Staff Attorney
Southern Environmental Law Center
601 W Rosemary St., Suite 220
Chapel Hill, NC 27516
mhutt@selcnc.org

Frank Rambo
Senior Attorney
Southern Environmental Law Center
201 W Main St. #14
Charlottesville, VA 22902
frambo@selcva.org

*Counsel on behalf of Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Georgia Conservation Voters, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, and Partnership for Southern Equity*

---

[135] 16 U.S.C. § 824d(a).

JA1285

<div align="center">

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

</div>

Alabama Power Company        )        ER22-476-000
                            )

<div align="center">

**REQUEST FOR REHEARING**

</div>

Pursuant to Sections 205 and 313 of the Federal Power Act ("FPA")[1] and Rule 713 of the Rules of Practice and Procedure[2] of the Federal Energy Regulatory Commission ("Commission" or "FERC"), Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council ("Public Interest Organizations" or "PIOs"), together with Advanced Energy Economy ("AEE"), Clean Energy Buyers Association ("CEBA"), and Solar Energy Industries Association ("SEIA") (SEIA together with CEBA and AEE, the "Clean Energy Coalition" and the Clean Energy Coalition together with the Public Interest Organizations, the "Rehearing Parties") hereby respectfully submit this Request for Rehearing of the Commission's January 21, 2022 Order Accepting Tariff Revisions ("the January 21st Order" or "the Order").[3]

## I.     INTRODUCTION

This second proceeding arises out of the first request by several utilities in the Southeast ("the Applicants")[4] for approval to create a multi-lateral trading and transmission pooling

---

[1] 16 U.S.C. §§ 824d, 825l.
[2] 18 C.F.R. § 385.713 (2021).
[3] Order Accepting Tariff Revisions, 178 FERC ¶ 61,048 (Jan. 21, 2022) (hereinafter "Jan. 21 Order").
[4] The SEEM Member utilities included in the filing are Alabama Power Co., Georgia Power Co., and Mississippi Power Co.; Associated Electric Coop., Inc.; Dalton Utilities; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC; Louisville Gas & Electric Co. and Kentucky Utilities Co.; North

**B. The Commission failed to apply its *Mobile-Sierra* precedent to the generally applicable rates, terms, and conditions of the SEEM Agreement.**

The January 21st Order improperly approved the Applicants' proposal to apply the *Mobile-Sierra* public interest presumption, which shields contract terms from scrutiny by third parties and the Commission, to several of the Revised SEEM Agreement's generally applicable provisions. The Commission not only departed from its well-established precedent in allowing *Mobile-Sierra* protection to extend to contract provisions that apply to parties who had no role in negotiating the agreement, but also altogether failed to evaluate whether *Mobile-Sierra* protection was appropriate for these provisions.

As an initial matter, the *Mobile-Sierra* issue was placed squarely within the scope of the Commission's review when the Applicants refiled the SEEM Agreement and amended the scope of the *Mobile-Sierra* "public interest" standard of review. Even if one accepted the Commission's conclusion that it only had authority to review the "the changes that [the Applicants] proposed under FPA Section 205 and that it highlighted in its filing," the Commission's review should have encompassed revisions to the scope of *Mobile-Sierra* protection.[47] The Applicants proposed a significant change to section 16.9 (Amendments) of the SEEM Agreement. Therefore, the Commission has the authority, and the obligation, under FPA Section 205 to ensure that these revisions were just and reasonable.

Section 16.9 of the SEEM Agreement filed in February 2021 and approved by default in November 2022 states, in relevant part,

> Absent an amendment to this Agreement pursuant to Section 4.1.9, Article 4 and Article 8 approving the proposed change, the standard of review for changes to any portion of this Agreement proposed by a non-Party, or FERC acting *sua sponte*, shall be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event shall be lower than the "public interest" standard of review set forth in *United Gas*

---

[47] *Duke Energy Carolinas, LLC*, 123 FERC ¶ 61,201, P 10 (May 23, 2008).

8

JA1287

*Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).[48]

Section 16.9 of the Revised SEEM Agreement, provides:

> Absent an amendment to this Agreement pursuant to Section 4.1.9, Article 4 and Article 8 approving the proposed change, the standard of review for changes <u>to (i) the following defined terms: "Interest Rate", "Investor Owned Utilities", "Governmental Utilities", "Market Auditor", "Material Vendor Contract", "Member", "Member Net Energy for Load", "Net Energy for Load", "Operating Costs", "Record Date", "Sector", "Significant Matters", "Southeast EEM Administrator", "Southeast EEM Agent", and "Territory"; (ii) the following sections: Section 3.2, Article 4, Section 6.1, Section 6.2, Article 7, Section 8.6, Section 8.7, Article 9, Section 10.3, Section 11.2, Article 12, Article 14, Article 15, Section 16.1, Section 16.4.1, Section 16.5, Section 16.9, Exhibit B and Appendix C; in each case</u> proposed by a non-Party, or FERC acting *sua sponte*, shall be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event shall be lower than the "public interest" standard of review set forth in *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).[49]

The January 21st Order acknowledged this revision, stating, "[t]he Members propose to revise the standard or review provision in the SEEM Agreement."[50]  The Applicants also admit that "the Southeast EEM Agreement as originally filed and accepted is governed by the *Mobile-Sierra* 'public interest' standard of review" and that the proposed amendments "limit[] applicability of *Mobile-Sierra* to certain provisions."[51]  Regardless of whether the amendment expanded or limited the application of *Mobile-Sierra*, the Commission had an obligation to consider whether the new language in the SEEM Agreement was lawful.  Instead, the Commission stated that because the scope of *Mobile-Sierra* was being narrowed, "arguments about the portion of the standard of review provision that the Members do not propose to change

---

[48] SEEM Agreement (Feb. 12, 2021).
[49] Revisions to the Southeast Energy Exchange Market Agreement and Request for Waiver of Prior Notice Accession No. 20211124-5041, at 14, 16 (emphasis added).
[50] January 21 Order at P 7.
[51] Revisions to the Southeast Energy Exchange Market Agreement and Request for Waiver of Prior Notice Accession No. 20211124-5041, at 14, 16.

JA1288

are beyond the scope of this proceeding."[52]  But the Rehearing Parties' arguments concern the

portion of the standard of review provision that the Applicants <u>did</u> propose to change – the scope

of *Mobile-Sierra*.  These revisions put the question of whether *Mobile-Sierra* protection is

appropriate for these specific enumerated provisions directly before the Commission.  What's

more, this was the first time the question of whether these specific provisions are entitled to

*Mobile-Sierra* protection has been put before the Commission.  The Commission erred by failing

to meaningfully engage with this issue and instead summarily determining that the proposed

revisions were just and reasonable.[53]

      If the Commission had properly reviewed the scope of *Mobile-Sierra* proposed, it would

have found that the Applicants' revisions to Section 16.9 were unlawful.  The *Mobile-Sierra*

doctrine provides that the rates set in a "freely negotiated" wholesale energy contract meet the

"just and reasonable" requirement of the FPA—a presumption that may be overcome only if

FERC concludes that the contract seriously harms the public interest.[54]  *Mobile-Sierra* only

applies to a contract if it "has certain characteristics that justify the presumption."[55]  More

specifically, the Commission has consistently held that *Mobile-Sierra* does not apply to

"generally applicable" contractual provisions—those that bind current parties to the contract but

---

[52] January 21 Order at P 35.
[53] *Id.* PP 35, 36.
[54] *Morgan Stanley Capital Group v. Pub. Util. Dist. No. 1 of Snohomish County*, 554 U.S. 527, 530, 128 S.Ct. 2733, 2737 (2008); *NRG*, 558 U.S. at 167, 130 S.Ct. at 696.
[55] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 182 (2013).

JA1289

would also apply to future signatories who have limited, if any, room for negotiation.[56]  The burden to demonstrate that *Mobile-Sierra* protection applies lies with the filing parties.[57]

The SEEM Agreement's provisions, which were negotiated and drafted exclusively by its transmission-owning Members, apply to any prospective Participant.  To access the valuable new transmission service created by SEEM, a prospective Participant would have to accept these conditions as-is, with limited—if any—room for negotiation.[58]  In *ISO New England*, the Commission concluded that this kind of arrangement placed future signatories "in a position that differs fundamentally from that of parties who are able to negotiate freely like buyers and sellers entering into a typical power sales contract that would be entitled to a *Mobile-Sierra* presumption."[59]  Neither the Commission nor the Applicants deny that the SEEM Agreement's terms and conditions would bind all future Participants and that these future Participants would have no opportunity to renegotiate the SEEM Agreement's terms.[60]  Application of *Mobile-Sierra* protection under these circumstances undermines the third-party interests that the doctrine is intended to protect.[61]

---

[56] *See* Statement of Chairman Glick, Accession No. 20211020-4002 at P 10 (Oct. 20, 2021) (citing *Arizona Pub. Serv. Co.*, 148 FERC ¶ 61,012 at P 4 (2014); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 187 (2013); *ISO New England Inc.*, 150 FERC ¶ 61,209 at P 185 (2015); *SW. Power Pool, Inc.*, 145 FERC ¶ 61,137 at P 9 (2013)).

[57] *ISO New England*, 106 FERC ¶ 61,280 at P 131 (2004).

[58] *See* January 21 Order, Glick concurrence P 2.

[59] *ISO New England Inc.*, 150 FERC ¶ 61,209 at P 185 (2015).

[60] Amending the SEEM Agreement is considered a "Significant Matter" which requires "more than fifty percent (50%) of the Popular Vote of the Representatives in attendance and (ii) more than sixty-seven percent (67%) of the Net Energy for Load Vote of the Representatives in attendance." SEEM Agreement 4.1.5(c).

[61] *NRG*, 558 U.S. at 175, 130 S.Ct at 700 ("the *Mobile-Sierra* doctrine does not overlook third-party interest; it is framed with a view to their protection"); *Northeast Utils. Serv. Co. v. FERC*, 993 F.2d 937, 961 (1st Cir. 1993) (Stating that the case for application of the *Mobile-Sierra* doctrine is strongest "where the protection is intended to safeguard the interests of third parties.").

JA1290

The Revised SEEM Agreement, filed on November 24, 2021, applies *Mobile-Sierra*

protection to following provisions:

- The following defined terms under Article 1:
  - Interest Rate
  - Investor Owned Utilities
  - Governmental Utilities
  - Market Auditor
  - Material Vendor Contract
  - Member
  - Member Net Energy for Load
  - Net Energy for Load
  - Operating Costs
  - Record Date
  - Sector
  - Significant Matters
  - Southeast EEM Administrator
  - Southeast EEM Agent
  - Territory
- Section 3.2 (Member Criteria)
- Article 4 (Governance)
- Sections 6.1 and 6.2 (Appointment of Southeast EEM Agent)
- Article 7 (Budgeting and Cost Responsibility)
- Sections 8.6 and 8.7 (Inter-related Inter-dependent provisions and Withdrawal)
- Article 9 (Release and Liability; No Fiduciary Duties)
- Section 10.3 (Equitable Relief)
- Section 11.2 (Reliability Obligations)
- Article 12 (Dispute Resolution)
- Article 14 (Defaults)
- Article 15 (Confidentiality)
- Section 16.1 ("Public Utility" Status of Members")
- Section 16.4.1 (No Reliance Interest on Non-Firm Energy Exchange Transmission Service)
- Section 16.5 (No Dedication of Facilities)
- Section 16.9 (Amendments)
- Exhibit B (Form of Joinder Agreement to add new Members)
- Appendix C (Southeast EEM Agent Scope)

The Commission has made no findings regarding whether these specific provisions of the SEEM

Agreement warrant *Mobile-Sierra* protection.  Nor could it:  the Applicants did not even attempt

JA1291

to "explain[] why the specific provision[s] at issue should be subject" to *Mobile-Sierra*.[62] The "broad overview" provided in the Applicants' transmission letter did not come close to providing the requisite level of detail needed to demonstrate that their proposal "strikes the necessary balance of interest."[63] The Applicants failed to "carr[y] their burden in showing that the *Mobile-Sierra* protection they requested was appropriate."[64] Consequently, the Commission had no rational basis for approving the application of *Mobile-Sierra* protection to the enumerated provision.

Finally, the neither the Commission nor the Applicants attempted to distinguish the SEEM Agreement from other contracts negotiated among transmission-owning monopoly utilities that have routinely been found ineligible for *Mobile-Sierra* protection. In *Okla. Gas & Elec. Co. v. FERC*, the D.C. Circuit explained that *Mobile-Sierra* did not apply to anti-competitive terms which create a "barrier to entry for non-incumbent transmission owners."[65] The 7th Circuit in *MISO Transmission Owners v. FERC*, similarly held that because the parties to the agreement were "seeking to protect themselves from competition from third parties," the Mobile-Sierra presumption does not apply."[66] Here, the record shows that (1) the Applicants, some of the region's largest transmission-owning investor-owned utilities, collectively share an interest in limiting competition from independent power producers,[67] and (2) the parties that join

---

[62] *Midwest Independent Transmission System Operator*, 142 FERC ¶ 61,215 at 190 (Mar. 22, 2013).

[63] *ISO New England*, 106 FERC ¶ 61,280 at P 131 (2004) ("Finally, we find that the Filing Parties have not justified, to date, the remainder of their proposed *Mobile-Sierra* requests. In fact, the Filing Parties did not even attempt to do so, other than to provide a broad overview supporting these requests.").

[64] *Id.* at P 161.

[65] *Oklahoma Gas & Elec. Co. v. FERC*, 827 F.3d 75, 76-77 (D.C. Cir. 2016); *see also Am. Transmission Sys. Inc., v. FERC*, 2016 WL 3615443 (D.C. Cir. 2016, unpublished) (dismissed for lack of jurisdiction); *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017).

[66] *MISO Transmission Owners, et al. v. FERC*, 819 F.3d 329, 335 (7th Cir. 2016).

[67] As explained by the United States Court of Appeals for the District of Columbia:

> Utilities that own or control transmission facilities naturally wish to maximize profit. The transmission-owning utilities thus can be expected to act in their own interest to maintain their

SEEM in the future will not have the same negotiating opportunities as the Utilities.[68]  The

Commission and the courts have consistently held that contracts negotiated under such

circumstances do not merit *Mobile-Sierra* protection.[69]

The January 21st Order ignores well-established precedent limiting the application of

*Mobile-Sierra* protection to contracts that do not bind third parties who have minimal

opportunities for negotiation.  Further, the Order flouts the Commission's consistent practice of

denying *Mobile-Sierra* protection to contracts "arrived at by horizontal competitors with a

common interest to exclude any future competition."[70]  The Commission failed to acknowledge

or provide a reasoned basis for its departure from past precedent, therefore the January 21st

Order is arbitrary and capricious.[71]

## IV.    RELIEF REQUESTED

For the aforementioned reasons, the Rehearing Parties respectfully request that the

Commission grant this request for rehearing and reverse its January 21, 2022 Order Accepting

Tariff Revisions.

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, the Rehearing Parties respectfully request that

the Commission grant this request for rehearing and reject the Revised SEEM Agreement.

---

monopoly and to use that position to retain or expand the market share for their own generated
electricity, even if they do so at the expense of lower-cost generation companies and consumers.

*Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 684 (D.C. Cir. 2000).

[68] *See* Glick Concurrence at P 2.

[69] *See, e.g.*, *Oklahoma Gas & Elec. Co.*, 827 F.3d at 76-77; *MISO Transmission* Owners, 819 F.3d at 335.

[70] *Oklahoma Gas & Elec. Co.*, 827 F.3d at 80; *see also Am. Transmission Sys. Inc., v. FERC*, 2016
WL 3615443 (D.C. Cir. 2016, unpublished) (dismissed for lack of jurisdiction); *Emera Maine v. FERC*, 854 F.3d
662 (D.C. Cir. 2017).

[71] *Sithe/Indep. Power Partners, L.P.*, 165 F.3d at 950 (remanding where the court was "unable to penetrate the logic
of FERC's orders to ascertain whether FERC in fact departed from established policy and precedent and, if so,
whether it justified that departure."); *Hatch*, 654 F.2d at 834 ("[A]n agency must provide a reasoned explanation for
any failure to adhere to its own precedents."); *Greater Boston Television Corp.*, 444 F.2d at 852 ("[A]n agency
changing its course must supply a reasoned analysis indicating that prior policies and standards are being
deliberately changed, not casually ignored[.]").

JA1293

# McGuireWoods

**McGuireWoods LLP**
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Phone: 202.857.1700
Fax: 202.857.1737
www.mcguirewoods.com

**Noel Symons**
Direct: 202.857.2929
nsymons@mcguirewoods.com
Fax: 202.828.2992

December 9, 2022

<span style="text-decoration: underline">Via eTariff</span>

Ms. Kimberly D. Bose
Secretary
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

      Re:     ***Alabama Power Company***
                **Docket No. ER23-\_\_\_-000**
                <span style="text-decoration: underline">**Revisions to Exhibit A of Southeast EEM Agreement and Request for**</span>
                <span style="text-decoration: underline">**Waiver of Prior Notice**</span>

Dear Secretary Bose:

      Pursuant to Section 205 of the Federal Power Act,[1] Alabama Power Company, on behalf of the Southeast Energy Exchange Market ("Southeast EEM") Members,[2] hereby submits revisions to the Southeast EEM Agreement to reflect the addition of four new Southeast EEM Members:  Duke Energy Florida, LLC ("DEF"), Tampa Electric Company ("Tampa Electric"), JEA, and Seminole Electric Cooperative, Inc. ("Seminole") (the "New Members").[3]

---

[1]      16 U.S.C. § 824e.

[2]      The following entities are already Members of the Southeast EEM:  Alabama Power Company, Georgia Power Company, and Mississippi Power Company; Associated Electric Cooperative, Inc.; Dalton Utilities; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC; Louisville Gas & Electric Company  and Kentucky Utilities Company (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU); North Carolina Municipal Power Agency Number 1; Power South Energy Cooperative; North Carolina Electric Membership Corporation; Tennessee Valley Authority; Georgia System Operations Corporation; Georgia Transmission Corporation (An Electric Membership Corporation); Municipal Electric Authority of Georgia; Oglethorpe Power Corporation (An Electric Membership Corporation); and South Carolina Public Service Authority ("Santee Cooper") (each a "Member" and collectively, the "Members").

[3]      JEA and Seminole are not Commission-jurisdictional entities under the Federal Power Act, *see* 16 U.S.C. § 824(f), and therefore will not file a joinder agreement or tariff revisions with the Federal Energy Regulatory Commission ("Commission").  DEF and Tampa Electric are Commission-jurisdictional entities, and recently filed joinder agreements and accompanying tariff revisions to effectuate their membership in the Southeast EEM.  *See Duke Energy Fla., LLC*, Joinder Agreement to Southeast Energy Exchange Market Agreement, Docket No. ER23-325-000 (filed Nov. 1, 2022); *Tampa Elec. Co.*, Joinder Agreement to Southeast Energy Exchange Market Agreement, Docket No. ER23-324-000 (filed Nov. 1,

Ms. Kimberly D. Bose
December 9, 2022
Page 2

The Southeast EEM Members respectfully request an effective date of January 1, 2023 for the revisions, subject to the outcome of the Southeast EEM New Member Filings.

## I.    Background

The Southeast EEM is a new trading platform that was developed by a coalition of entities in the Southeast to enhance existing bilateral energy markets in the region utilizing zero-charge transmission service voluntarily provided by participating transmission service providers ("Participating Transmission Providers"). The framework for the Southeast EEM is contained in the Southeast Energy Exchange Market Agreement by and between the Members ("Southeast EEM Agreement"). The Southeast EEM Agreement went into effect by operation of law on October 12, 2021,[4] and was later amended by the Southeast EEM Members.[5] The Southeast EEM Agreement is contained in Alabama Power Company's Market-Based Rate Tariff database as Rate Schedule No. 1011.

## II.    Revisions to Exhibit A

Exhibit A of the Southeast EEM Agreement provides the names and addresses of each Member of the Southeast EEM. Section 16.9 of the Southeast EEM Agreement states that "an entity that meets the criteria for qualification and admission as a Member, as determined by the Membership Board, may become an Additional Member and a Party to this Agreement by executing this Agreement or a Joinder hereto, and upon payment of all applicable fees, dues and contributions so specified or authorized in this Agreement, the Secretary shall revise, or cause to be revised, Exhibit A to include such Additional Member."

The Southeast EEM Membership Board has determined that each of the New Members meets the criteria for qualification and admission as a Member. Each of the New Members has executed a joinder agreement. JEA and Seminole have revised their tariffs to provide Non-Firm Energy Exchange Transmission Service ("NFEETS"). Additionally, on November 1, 2022, DEF and Tampa Electric submitted the Southeast EEM New Member Filings consisting of their executed joinder agreements and associated tariff revisions to effectuate their becoming a party to the Southeast EEM Agreement.

---

2022); *Duke Energy Fla., LLC*, Revisions to Joint OATT to Provide NFEETS, Docket No. ER23-338-000 (filed Nov. 1, 2022); *Tampa Elec. Co.*, Attachment N - Non-Firm Energy Exchange Transmission Service, Docket No. ER23-323-000 (filed Nov. 1, 2022) (collectively, the "Southeast EEM New Member Filings").

[4]     *Ala. Power Co.*, Notice of Filing Taking Effect by Operation of Law, Docket Nos. ER21-1111-002, *et al.* (issued Oct. 13, 2021); *Ala. Power Co.*, 177 FERC ¶ 61,178 (2021) (rejecting rehearing requests as untimely), *reh'g denied*, 178 FERC ¶ 61,196 (2022).

[5]     *Ala. Power Co.*, Revisions to the Southeast Energy Exchange Market Agreement and Request for Waiver of Prior Notice, Docket No. ER22-476-000 (filed Nov. 24, 2021); *Ala. Power Co.*, 178 FERC ¶ 61,048 (2022) ("*Amendment Order*"), *order on reh'g*, 179 FERC ¶ 61,128 (2022) ("*Amendment Rehearing Order*") (accepting revisions to the Southeast EEM Agreement).

Ms. Kimberly D. Bose
December 9, 2022
Page 3

In accordance with Section 16.9, the Southeast EEM Secretary has authorized the revision of Exhibit A to reflect the addition of the New Members. This filing, in turn, submits the revisions to Exhibit A to add the New Members (as well as their addresses) to the list of Members in Exhibit A.[6]

## III.    Documents Submitted

In accordance with the Commission's eTariff regulations, an XML filing package is being submitted containing the following materials:

- This transmittal letter;

- Attachment A – Clean Revised Exhibit A; and

- Attachment B – Redlined Revised Exhibit A.

## IV.    Requested Effective Date and Request for Waiver of Prior Notice

The Southeast EEM Members respectfully request a January 1, 2023 effective date for the revised Exhibit A, subject to the outcome of the Southeast EEM New Member Filings.

In addition, because the requested effective date is less than 60 days after the date of this filing, the Southeast EEM Members request waiver of Section 35.3(a)(1) of the Commission's regulations.[7] Good cause exists for granting this waiver because it will allow the effective date of the revisions to align with the requested effective dates of the Southeast EEM New Member Filings[8] and will align with the anticipated effective date of the New Members' Membership in the Southeast EEM.

---

[6]     This filing is limited in scope to the procedural revisions to Exhibit A that implement the requirements of the Southeast EEM Agreement—the filed rate. Any challenges outside of that scope must be rejected. *See Amendment Order*, 178 FERC ¶ 61,048 at P 30 ("[T]he SEEM Agreement went into effect by operation of law and is, therefore, the rate on file . . . . The justness and reasonableness of the existing provisions of the SEEM Agreement to which the Members do not propose revisions in this proceeding is not pending before us. Thus, arguments that alleged deficiencies in the SEEM Agreement are not remedied by the proposed revisions are beyond the scope of this proceeding."); *Amendment Rehearing Order*, 179 FERC ¶ 61,128 at PP 15-18 (rejecting as unpersuasive filed-rate arguments on rehearing).

[7]     18 C.F.R. § 35.3(a)(1).

[8]     DEF and Tampa Electric requested a January 1, 2023 effective date for the joinder agreements, and a 12/31/9998 effective date for the tariff revision filings, with a request for action by January 1, 2023.

Ms. Kimberly D. Bose
December 9, 2022
Page 4

**VI.    Communications**

Alabama Power Company respectfully requests that the following persons be added to the official service list in this proceeding:[9]

Christopher H. Demko
Associate General Counsel
– Energy Regulation
Southern Company Services, Inc.
30 Ivan Allen Jr, Blvd NW
Atlanta, GA 30308
(404) 506-0241
chdemko@southernco.com

Noel Symons
Katlyn A. Farrell
Carrie Mobley
Corban A. Coffman
McGuireWoods, LLP
888 16th Street, N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C.  20006
202-857-2929
nsymons@mcguirewoods.com
kfarrell@mguirewoods.com
cmobley@mcguirewoods.com
ccoffman@mcguirewoods.com

**VII.    Conclusion**

For the reasons set forth above, the Southeast EEM Members respectfully request that the Commission issue an order accepting the revisions to Exhibit A of the Southeast EEM Agreement, effective January 1, 2023, subject to the outcome of the Southeast EEM New Member Filings.

Respectfully submitted,

/s/ *Noel Symons*

Noel Symons
Katlyn A. Farrell
Carrie Mobley
Corban A. Coffman
McGuireWoods LLP
888 16th Street NW
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
202-857-2929
nsymons@mcguirewoods.com

*Counsel for the Southeast Energy
Exchange Market Members*

---

[9]    Alabama Power Company respectfully requests waiver of 18 C.F.R. § 385.203(b)(3) to permit more than two persons to be added to the official service list in this proceeding.

JA1297

Attachment A

Clean Exhibit A

## EXHIBIT A

## NAMES AND ADDRESSES OF THE MEMBERS

**Alabama Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Associated Electric Cooperative, Inc.**
2814 S. Golden
PO Box 754
Springfield, MO 65807

**Dalton Utilities**
1200 VD Parrott, Jr. Parkway
PO Box 869
Dalton, GA 30722

**Dominion Energy South Carolina, Inc.**
220 Operation Way, MC C222
Cayce, SC 29033

**Duke Energy Carolinas, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Duke Energy Florida, LLC**
299 First Avenue North
St. Petersburg, FL 33701

**Duke Energy Progress, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Georgia Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Georgia System Operations Corporation**
2100 East Exchange Place
Tucker, GA 30084

**Georgia Transmission Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**JEA**
21 W. Church Street
Jacksonville, FL 32202-3155

**Kentucky Utilities Company**
One Quality Street
Lexington, KY 40507

**Louisville Gas and Electric Company**
220 West Main Street
Louisville, KY 40202

**MEAG Power**
1470 Riveredge Pwky., NW
Atlanta, GA 30328

**Mississippi Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**North Carolina Electric Membership Corporation**
3400 Sumner Blvd.
Raleigh, NC 27616

**North Carolina Municipal Power Agency No. 1**
1427 Meadow Wood Blvd.
Raleigh, NC 27604

**Oglethorpe Power Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**PowerSouth Energy Cooperative**
2027 East Three Notch Street
Andalusia, AL 36421

**Santee Cooper**
One Riverwood Avenue
Moncks Corner, SC 29461

**Seminole Electric Cooperative, Inc.**
16313 N. Dale Mabry Highway
Tampa, FL 33618

**Tampa Electric Company**
702 North Franklin Street
Tampa, FL 33602

**Tennessee Valley Authority**
400 West Summit Hill Drive, WT 6A-K
Knoxville, Tennessee 37902

Attachment B

Redlined Exhibit A

# EXHIBIT A

## NAMES AND ADDRESSES OF THE MEMBERS

**Alabama Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Associated Electric Cooperative, Inc.**
2814 S. Golden
PO Box 754
Springfield, MO 65807

**Dalton Utilities**
1200 VD Parrott, Jr. Parkway
PO Box 869
Dalton, GA 30722

**Dominion Energy South Carolina, Inc.**
220 Operation Way, MC C222
Cayce, SC 29033

**Duke Energy Carolinas, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Duke Energy Florida, LLC**
299 First Avenue North
St. Petersburg, FL 33701

**Duke Energy Progress, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Georgia Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Georgia System Operations Corporation**
2100 East Exchange Place
Tucker, GA 30084

**Georgia Transmission Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

JA1303

**JEA**
21 W. Church Street
Jacksonville, FL 32202-3155

**Kentucky Utilities Company**
One Quality Street
Lexington, KY 40507

**Louisville Gas and Electric Company**
220 West Main Street
Louisville, KY 40202

**MEAG Power**
1470 Riveredge Pwky., NW
Atlanta, GA 30328

**Mississippi Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**North Carolina Electric Membership Corporation**
3400 Sumner Blvd.
Raleigh, NC 27616

**North Carolina Municipal Power Agency No. 1**
1427 Meadow Wood Blvd.
Raleigh, NC 27604

**Oglethorpe Power Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**PowerSouth Energy Cooperative**
2027 East Three Notch Street
Andalusia, AL 36421

**Santee Cooper**
One Riverwood Avenue
Moncks Corner, SC 29461

**Seminole Electric Cooperative, Inc.**
16313 N. Dale Mabry Highway
Tampa, FL 33618

**Tampa Electric Company**
702 North Franklin Street
Tampa, FL 33602

**Tennessee Valley Authority**
400 West Summit Hill Drive, WT 6A-K
Knoxville, Tennessee 37902

JA1305

FERC rendition of the electronically filed tariff records in Docket No. ER23-00588-000
Filing Data:
CID: C001552
Filing Title: Southeast EEM Agreement Amendment Filing (Exhibit A Revisions)
Company Filing Identifier: 707
Type of Filing Code: 10
Associated Filing Identifier:
Tariff Title: Market Based Rate Tariff
Tariff ID: 1
Payment Confirmation:
Suspension Motion:


Tariff Record Data:
Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 Exhibit A, Names and Addresses of the Members, 1.0.0, A
Record Narative Name:
Tariff Record ID: 2059
Tariff Record Collation Value: 167870464      Tariff Record Parent Identifier: 2056
Proposed Date: 2023-01-01
Priority Order: 1000000000
Record Change Type: CHANGE
Record Content Type: 1
Associated Filing Identifier:

# EXHIBIT A

## NAMES AND ADDRESSES OF THE MEMBERS

**Alabama Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Associated Electric Cooperative, Inc.**
2814 S. Golden
PO Box 754
Springfield, MO 65807

**Dalton Utilities**
1200 VD Parrott, Jr. Parkway
PO Box 869
Dalton, GA 30722

**Dominion Energy South Carolina, Inc.**
220 Operation Way, MC C222
Cayce, SC 29033

**Duke Energy Carolinas, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Duke Energy Florida, LLC**
299 First Avenue North

JA1306

St. Petersburg, FL 33701

**Duke Energy Progress, LLC**
550 South Tryon Street
Charlotte, NC 28202

**Georgia Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**Georgia System Operations Corporation**
2100 East Exchange Place
Tucker, GA 30084

**Georgia Transmission Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**JEA**
21 W. Church Street
Jacksonville, FL 32202-3155

**Kentucky Utilities Company**
One Quality Street
Lexington, KY 40507

**Louisville Gas and Electric Company**
220 West Main Street
Louisville, KY 40202

**MEAG Power**
1470 Riveredge Pwky., NW
Atlanta, GA 30328

**Mississippi Power Company**
30 Ivan Allen Jr. Blvd. NW
Atlanta, GA 30308

**North Carolina Electric Membership Corporation**
3400 Sumner Blvd.
Raleigh, NC 27616

**North Carolina Municipal Power Agency No. 1**
1427 Meadow Wood Blvd.
Raleigh, NC 27604

**Oglethorpe Power Corporation (An Electric Membership Corporation)**
2100 East Exchange Place
Tucker, GA 30084

**PowerSouth Energy Cooperative**
2027 East Three Notch Street
Andalusia, AL 36421

**Santee Cooper**
One Riverwood Avenue
Moncks Corner, SC 29461

**Seminole Electric Cooperative, Inc.**
16313 N. Dale Mabry Highway
Tampa, FL 33618

**Tampa Electric Company**
702 North Franklin Street
Tampa, FL 33602

**Tennessee Valley Authority**
400 West Summit Hill Drive, WT 6A-K
Knoxville, Tennessee 37902

Document Content(s)

Final_SEEM Agreement Exh. A Revisions_TL.pdf............................1
Attachment A - Clean Exhibit A.pdf......................................5
Attachment B - Redlined Exhibit A.pdf...................................9
FERC GENERATED TARIFF FILING.rtf.......................................13

JA1309