No. 22-1018

# In the
# United States Court of Appeals
# For the District of Columbia Circuit

───────────────

ADVANCED ENERGY ECONOMY, *ET AL.*,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

───────────────

Petition for Review of Orders of the Commission

───────────────

## FINAL BRIEF OF INTERVENORS
## SOUTHEAST EEM MEMBERS IN SUPPORT OF RESPONDENT

───────────────

Noel Symons
Katlyn A. Farrell
Carrie Mobley
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, D.C. 20006
(202) 857-1700
*nsymons@mcguirewoods.com*
*kfarrell@mcguirewoods.com*
*cmobley@mcguirewoods.com*

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-4716
*mfitzgerald@mcguirewoods.com*

**ORAL ARGUMENT
SCHEDULED FOR
MARCH 15, 2023**

February 1, 2023

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the Brief of Petitioners.

## B. Rulings Under Review

References to the rulings at issue appear in the Brief of Respondent.

## C. Related Cases

There are no related cases under D.C. Circuit Rule 28(a)(1)(C).

# CORPORATE DISCLOSURE STATEMENTS

## Associated Electric Cooperative, Inc.

Associated Electric Cooperative, Inc. ("AECI") is a rural electric cooperative that provides wholesale power and high-voltage transmission to its six regional generation and transmission cooperative member-owners. Along with providing power sales and transmission service to its member cooperatives, AECI also takes and provides transmission service through enabling transmission agreements with and makes off-system power sales to various counterparties in the SE region of the United States. These six regional generation and transmission cooperatives, in turn, supply wholesale power to thirty-nine distribution cooperatives in Missouri, three distribution cooperatives in southeast Iowa, and nine distribution cooperatives in northeast Oklahoma, serving more than 910,000 customers.

AECI has no parent company and no publicly held company has a 10% or greater ownership interest in it.

## Dalton Utilities

Dalton Utilities is a government corporation: a full-service municipal utility, governed by the Board of the Water, Light and Sinking Fund Commissioners. Established in 1913 by an Act of the Georgia General Assembly, the Commission consists of five members (appointed by the Dalton Mayor and Council) and is

empowered to determine utility rates, control expenditures, and make necessary improvements/expansions to the various utility systems. Dalton Utilities receives no tax monies and operates solely on customer revenues.

### Dominion Energy South Carolina, Inc.

Dominion Energy South Carolina, Inc. is a corporation organized in South Carolina that is engaged in the generation, transmission, and distribution of electricity to customers in South Carolina. It is a direct, wholly-owned subsidiary of SCANA Corporation, which is in turn, a direct, wholly-owned subsidiary of Dominion Energy, Inc. Dominion Energy, Inc. is a publicly traded corporation (stock ticker "D").

### Duke Energy Progress, LLC and Duke Energy Carolinas, LLC

Duke Energy Progress, LLC ("Duke Energy Progress") and Duke Energy Carolinas, LLC ("Duke Energy Carolinas") are North Carolina limited liability companies that provide firm native load service and related electric services to customers in North Carolina and South Carolina. Duke Energy Progress and Duke Energy Carolinas are each wholly-owned subsidiaries of Duke Energy Corporation (NYSE: DUK), which is a publicly held company incorporated in Delaware. Duke Energy Corporation has no parent company and no publicly held corporation owns 10 percent or greater ownership interest in Duke Energy

Corporation.

## Georgia System Operations Corporation

Georgia System Operations Corporation is a Georgia nonprofit corporation operating on a cooperative basis that provides system operations services to transmission, generation, and distribution electric cooperatives across the State of Georgia and a founding member of the Southeast Energy Exchange Market. Georgia System Operations Corporation has no parent corporation. No publicly held corporation owns any portion of it, and it is not a subsidiary or an affiliate of any public owned corporation.

## Georgia Transmission Corporation

Georgia Transmission Corporation (An Electric Membership Corporation) is a not-for-profit electric cooperative that provides electric transmission service mainly to its distribution electric cooperative members in Georgia and is a founding member of the Southeast Energy Exchange Market. Georgia Transmission Corporation has no parent corporation. No publicly held corporation owns any portion of it, and it is not a subsidiary or an affiliate of any publicly owned corporation.

## Louisville Gas and Electric Company and Kentucky Utilities Company

Louisville Gas and Electric Company ("LG&E") and Kentucky Utilities

Company ("Kentucky Utilities") are regulated utilities that serve about 1.3 million customers.

LG&E and Kentucky Utilities are wholly-owned subsidiaries of LG&E and KU Energy LLC ("LKE"), a holding company, which in turn is a wholly-owned indirect subsidiary of PPL Corporation. Other than PPL Corporation, no publicly held company owns 10% or more of any LKE membership interest or LG&E's and Kentucky Utilities' shareholding interests. No publicly held company has a 10% or greater ownership interest in PPL Corporation. PPL Corporation is a publicly traded corporation (stock ticker "PPL"). The Vanguard Group, Inc., an investment advisor, reports certain beneficial ownership, for certain purposes, over 11.82% of PPL Corporation shares.

### Municipal Electric Authority of Georgia

The Municipal Electric Authority of Georgia (MEAG Power) is a government corporation and instrumentality of the State of Georgia created by an act of the Georgia General Assembly in 1975 to provide affordable and reliable wholesale electric power to those eligible political subdivisions in Georgia. MEAG Power has no parent company or shareholders.

### North Carolina Electric Membership Corporation

NCEMC is a not-for profit generation and transmission cooperative

incorporated under North Carolina law that owns and purchases generation and transmission services on behalf of its 25 member distribution cooperatives. NCEMC is wholly owned by its members and has no parent companies. No publicly held company has any ownership interest in NCEMC.

## North Carolina Municipal Power Agency Number 1

North Carolina Municipal Power Agency Number 1 is a public body and body corporate and politic organized in accordance with the provision of Chapter 159B of the North Carolina General Statutes. It is a government corporation.

## Oglethorpe Power Corporation

Oglethorpe Power Corporation (An Electric Membership Corporation) ("Oglethorpe") is a Georgia electric membership corporation that owns and operates fourteen generating facilities located across the State of Georgia and a founding member of the Southeast Energy Exchange Market. Oglethorpe has no parent corporation. No publicly held corporation owns any portion of Oglethorpe, and it is not a subsidiary or an affiliate of any public owned corporation.

## PowerSouth Energy Cooperative

PowerSouth Energy Cooperative is a Generation and Transmission electric cooperative that supplies and delivers wholesale power to 20 member systems, comprised of 16 distribution cooperatives and 4 municipal electric systems, in

Alabama and northwest Florida. PowerSouth has no parent company and no publicly held company has a 10% or greater ownership interest in PowerSouth.

## South Carolina Public Service Authority

The South Carolina Public Service Authority ("Santee Cooper") is a body corporate and politic created by the South Carolina General Assembly in 1934 "to manufacture, produce, generate, transmit, distribute, and sell water power, steam electric power, hydroelectric power, or mechanical power within and without the State of South Carolina." S.C. Code § 58-31-30(A)(8). Santee Cooper has no parent company or shareholders.

## Alabama Power Company

Alabama Power Company ("Alabama Power") is a corporation organized under the laws of the State of Alabama. Alabama Power is a regulated public utility engaged in the generation, transmission, distribution, and purchase of electricity and the sale of electric service within a service area comprising most of the State of Alabama.

The Southern Company (trading symbol "SO") owns all of Alabama Power's outstanding common stock, which represents a substantial majority of the overall voting power of Alabama Power's equity securities. Alabama Power also has preferred stock outstanding, all of which are publicly traded (trading symbol

"ALP PR Q" for 5.00% Series Class A Preferred Stock).

## Georgia Power Company

Georgia Power Company ("Georgia Power") is a corporation organized under the laws of the State of Georgia. Georgia Power is a regulated public utility engaged in the generation, transmission, distribution, and purchase of electricity and the sale of electric service within a service area comprising most of the State of Georgia.

Georgia Power is a wholly-owned, direct subsidiary of The Southern Company. The Southern Company is a publicly traded corporation (trading symbol "SO").

## Mississippi Power Company

Mississippi Power Company ("Mississippi Power") is a corporation organized under the laws of the State of Mississippi. Mississippi Power is engaged in the generation, transmission, distribution, and purchase of electricity and the sale of electric service within 23 counties in southeastern Mississippi, at retail in 123 communities (including Biloxi, Gulfport, Hattiesburg, Laurel, Meridian, and Pascagoula), as well as in rural areas, and at wholesale to one municipality, six rural electric distribution cooperative associations and one generating and transmitting cooperative.

Mississippi Power is a wholly-owned, direct subsidiary of The Southern

Company.  The Southern Company is a publicly traded corporation (trading symbol "SO").

## Tennessee Valley Authority

The Tennessee Valley Authority ("TVA") is a corporate agency and instrumentality of the United States created and existing under the Tennessee Valley Authority Act of 1933, as amended, 16 U.S.C. §§ 831-831ee (2006 & Supp. III 2009), and has no parent corporation.  No publicly held company has any ownership interest in TVA.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................... 1

STATUTES AND REGULATIONS .................................................................. 3

SUMMARY OF THE ARGUMENT ................................................................ 4

STANDING ............................................................................................... 7

ARGUMENT ............................................................................................. 7

I.  This appeal is unreviewable by procedural default. ........................ 7

    A.  Rehearing of the 2-2 was jurisdictionally out of time. ........... 7

        1.  Petitioners' arguments about Rule 2007 ignore the facts. ......... 8

        2.  Petitioners also ignore the implications and odd results of their view of Rule 2007. ......................................... 10

    B.  "Inextricably linked" doctrine does not support review of either the 2-2 or the Tariff Order, but instead undermines it. ................... 13

II. Alternatively, any merits review of the 2-2 is largely solved by the Tariff Order, and is deferential in any event. ................................ 17

    A.  The Tariff Order provides a majority Commission ruling on most of Petitioners' issues. .................................. 18

    B.  Review of a 2-2 should be deferential and not follow the APA model. ........................................................ 19

        1.  There is no agency action to review under the arbitrary and capricious standard. ................................. 19

        2.  Individual Commissioner statements are not a reviewable "order." ......................................... 21

        3.  This Court's review should ask simply whether, based on the record, any reasonable Commissioner could vote to approve. ................................................. 23

III. The SEEM Agreement and implementing tariff revisions are just and reasonable and the Commission properly accepted them. ................ 26

    A.  SEEM is a beneficial enhancement to the existing bilateral market, not a vehicle for utility collusion. ...................... 26

B. SEEM does not violate Order No. 888 open access principles. ........32

1. Arguments for a joint tariff elevate form over substance. ........32

2. SEEM's Participation and Member Criteria do not create barriers to access. ........................36

    a. There are no "classes" of participation: Members and Participants are subject to the same market participation rules. ..................36

    b. SEEM's Participation Criteria are just and reasonable and based on operational constraints of the pre-existing bilateral market. ...................37

C. SEEM does not violate cost causation. ...........39

D. *Mobile–Sierra* properly applies to certain aspects of the Agreement. .........................40

E. Regardless, the Commissioner Statements alone satisfy the APA. ................................43

CONCLUSION ...................................................47

# TABLE OF AUTHORITIES[1]

Page(s)

## Court Cases

*Advanced Energy Mgmt. All. v. FERC,*
860 F.3d 656 (D.C. Cir. 2017)........................................................... 3

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002)......................................................... 37, 40

*Cities of Batavia v. FERC,*
672 F.2d 64 (D.C. Cir. 1982)............................................................. 14

*Cities of Bethany v. FERC,*
727 F.2d 1131 (D.C. Cir. 1984)......................................................... 3

*Columbia Gas Transmission Corp. v. FERC,*
404 F.3d 459 (D.C. Cir. 2005).......................................................... 35

*Hatch v. FERC,*
654 F.2d 825 (D.C. Cir. 1981)......................................................... 46

*Indiana & Michigan Electric Co. v. FPC,*
502 F.2d 336 (D.C. Cir. 1974).......................................................... 12

*Kansas Cities v. FERC,*
723 F.2d 82 (D.C. Cir. 1983)........................................................... 14

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.,*
140 S. Ct. 1589 (2020) .................................................................. 16

*Midwestern Gas Transmission Co. v. FERC,*
734 F.2d 828 (D.C. Cir. 1984)............................................... 15, 16, 17

*Moreau v. FERC,*
982 F.2d 556 (D.C. Cir. 1993), *overruled in part on other grounds by*
*Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) ............................ 8

---

[1] There are no authorities "chiefly" relied on under Circuit Rule 28.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................ 20

*New Eng. Power Gen. Ass'n v. FERC*,
    879 F.3d 1192 (D.C. Cir. 2018) ............................... 14, 15

*New Eng. Power Gen. Ass'n v. FERC*,
    707 F.3d 364 (D.C. Cir. 2013) ....................................... 41

*NRG Power Mktg., LLC v. FERC*,
    862 F.3d 108 (D.C. Cir. 2017) ...................................... 44

*Old Dominion Electric Coop. v. FERC*,
    892 F.3d 1223 (D.C. Cir. 2018) .................................... 11

*Old Dominion Electric Coop. v. FERC*,
    898 F.3d 1254 (D.C. Cir. 2018) .................................... 39

*Prohibition Juice Co. v. U.S. FDA*,
    45 F.4th 8 (D.C. Cir. 2022) ..................................... 20, 21

*Pub. Citizen, Inc. v. FERC*,
    839 F.3d 1165 (D.C. Cir. 2016) .................................. 8, 19

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) .............................. 23, 24, 39

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ...................................................... 20

*Texaco Inc. v. FERC*,
    148 F.3d 1091 (D.C. Cir. 1998) .................................... 42

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*,
    350 U.S. 332 (1956) ...................................................... 40

*Williston Basin Interstate Pipeline Co. v. FERC*,
    475 F.3d 330 (D.C. Cir. 2006) ..................................... 7, 8

*Xcel Energy Servs. Inc. v. FERC*,
    41 F.4th 548 (D.C. Cir. 2022) ...................................... 31

## Administrative Cases

*Ala. Power Co.,*
177 FERC ¶ 61,178 (2021)......................................................... 11

*Ala. Power Co.,*
178 FERC ¶ 61,048 (2022)................................................... 14, 41

*Ala. Power Co.,*
179 FERC ¶ 61,128 (2022).......................................................... 41

*Californians for Renewable Energy,*
175 FERC ¶ 61,213 (2021)......................................................... 21

*Duke Energy Progress, LLC,*
177 FERC ¶ 61,080 (2021)...................... 18, 31, 32, 33, 34, 35, 36, 38, 40, 46

*Duke Energy Progress, LLC,*
178 FERC ¶ 61,195 (2022)......................................................... 31

*Pub. Serv. Co. of Colo.,*
154 FERC ¶ 61,107 (2016)................................................ 32, 33, 37

*Sw. Power Pool, Inc.,*
149 FERC ¶ 61,113 (2014).......................................................... 43

*Sw. Power Pool, Inc.,*
153 FERC ¶ 61,051 (2015).......................................................... 43

*Sw. Power Pool, Inc.,*
155 FERC ¶ 61,168 (2016).......................................................... 43

*Sw. Power Pool, Inc.,*
173 FERC ¶ 61,267 (2020).......................................................... 37

*Wolverine Power Supply Coop., Inc.,*
87 FERC ¶ 61,047 (1999)........................................................... 35

## Statutes

5 U.S.C. § 706 ................................................................. 4, 19

16 U.S.C. § 824d ........................................................ 5, 10, 20, 21, 22, 24

16 U.S.C. § 825*l* ..................................................................... 7, 23

16 U.S.C. § 831n-4 .................................................................... 35

42 U.S.C. § 7171(e) .................................................................... 19

## Other Authorities

FERC Opposition to Motion to Strike,
  *PJM Power Providers Grp. v. FERC*, No. 21-3068
  (3d Cir. Sept. 19, 2022), Dkt. 229 ................................................ 20

## Glossary

| | |
|---|---|
| Amendment Order | *Ala. Power Co.*, 178 FERC ¶ 61,048 (2022) (R.274), JA0203-25 |
| Amendment Rehearing Order | *Ala. Power Co.*, 179 FERC ¶ 61,128 (2022) (R.286), JA0276-85 |
| APA | Administrative Procedure Act |
| Br. | Petitioners' Corrected Opening Brief |
| Christie Statement | Statement of Commissioner Mark C. Christie in FERC Dkt. Nos. ER21-1111-002, *et al.*, (R.229), JA0060-75 |
| Clements Statement | Statement of Commissioner Allison Clements in FERC Dkt. Nos. ER21-1111, *et al.*, (R.228), JA0035-59 |
| Danly Statement | Statement of Commissioner James P. Danly in FERC Dkt. Nos. ER21-1111, *et al.*, (R.230), JA0076-0116 |
| Exhibit A Revisions | SEEM Agreement Amendment Filing, FERC Dkt. No. ER23-588-000 (Dec. 9, 2022), JA1294-1309 |
| First Deficiency Resp. | Response to Deficiency Letter regarding SEEM Agreement (June 7, 2021) (R.183), JA0908-58 |
| Glick Statement | Statement of Chairman Richard Glick in FERC Dkt. Nos. ER21-1111, *et al.*, (R.227), JA0025-34 |
| Harvard Am. Br. | Brief of Amicus Curiae Harvard Electricity Law Initiative |

| | |
|---|---|
| March 30 Answer | Motion for Leave to Answer and Answer of the SEEM Members (Mar. 30, 2021) (R.177), JA0844-0907 |
| Notice of Filing Taking Effect | *Ala. Power Co.*, Notice of Filing Taking Effect, FERC Dkt. No. ER21-1111-002 (Oct. 13, 2021) (R.226), JA0022-24 |
| November 29 Answer | Motion for Leave to Answer and Answer of the SEEM Members (Nov. 29, 2021) (R.239), JA1246-61 |
| Rejection Order | *Ala. Power Co.*, 177 FERC ¶ 61,178 (2021) (R.247), JA0194-0202 |
| Resp. Br. | Brief of Respondent Federal Energy Regulatory Commission |
| RTO | Regional transmission organization |
| SEEM | Southeast Energy Exchange Market |
| Tariff Order | *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (R.232), JA0117-93 |
| Tariff Rehearing Order | *Duke Energy Progress, LLC*, 178 FERC ¶ 61,195 (2022) (R.284), JA0226-56 |
| TVA | Tennessee Valley Authority |

# INTRODUCTION

The Southeast Energy Exchange Market, or SEEM, enhances the existing bilateral market for wholesale power sales. In the Southeast, individual electric utilities operate their own transmission systems and mostly use their own generation to serve end-use customers. But sometimes there are opportunities to produce customer savings by contracting bilaterally to obtain the output of someone else's generation at lower cost. The utilities buy and sell wholesale energy through bilateral transactions. Prices are individually negotiated between the parties. The system works well, and results in some of the lowest energy prices in the country. JA0867, March 30 Answer at 21.

The utilities found a way to make that existing successful structure in the Southeast even more efficient, by creating the SEEM. SEEM incrementally improves the market in two small—but significant—ways. First, SEEM creates zero-cost, non-firm transmission ("Non-Firm Energy Exchange Transmission Service") over otherwise-unused transmission capacity. JA0099, Danly Statement at ¶ 33 (noting that unused transmission "would otherwise be left fallow"). Second, SEEM uses an automated Algorithm to match bids and offers for electricity on 15-minute intervals, to use the non-firm zero-cost transmission. JA0289, SEEM Agreement Filing (R.4), Transmittal at 4. These adjustments

improve efficiency by bringing unused transmission capacity into free use to facilitate more efficient bilateral energy contracts across a 10-state region, so utilities can effectively use the contracted resource when doing so would be less expensive than generating their own electricity.

SEEM is expected to result in customer benefits of more than $40 million per year. It covers a large footprint 1,100 miles across. Its founding members include 19 different electric service providers in the region. Among them are private investor-owned utility companies, state agencies, municipal utilities, non-profit electric cooperatives, and a Federal agency (the Tennessee Valley Authority).

SEEM launched on November 9, 2022. None of Petitioners' parade of horribles appears to be happening. The Algorithm is working. Customer savings are happening. No one is being shut out of the bilateral market. In fact, contrary to allegations that SEEM set up a closed club, four new entities are already joining SEEM, effective January 1, 2023. JA1294-1309, Exhibit A Revisions (asking FERC to accept the new Members).

Petitioners would prefer a regional transmission organization, or RTO, as all four Commissioners separately recognized. JA0061, 0064, Christie Statement at ¶¶ 1, 7; JA0089-91, Danly Statement at ¶ 21; JA0057, Clements Statement at ¶ 52; JA0025, 0030-31, Glick Statement at ¶¶ 1, 15. Thus, Petitioners ask for relief

that would effectively impose the elements of a regional transmission organization without naming it so. For instance, Petitioners seek a joint regional tariff and a Market Monitor. But "the decision whether to form a new RTO … is a policy decision that is ultimately for the elected policy-makers in [SEEM] states to make, not for FERC to impose." JA0070, Christie Statement at ¶ 18.

The issue before the Commission was whether SEEM's proposed improvements to the existing bilateral market were just and reasonable under the Federal Power Act, not whether Petitioners could imagine a supposedly superior alternative proposal. *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (the Commission has "an essentially passive and reactive role"); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (the Commission appropriately did not determine "whether [one] method is more appropriate than [another] method, but rather whether the [proposed] method is reasonable and adequate.").

The Commission properly accepted the SEEM, first by law and then by majority vote in accepting tariff revisions and amendments to implement it.

### STATUTES AND REGULATIONS

The SEEM Members adopt the Statutes and Regulations in the Brief of

Respondent.  Resp. Br. 5 & Addendum.

I.  Petitioners filed their rehearing request two days too late after the SEEM Agreement was approved.  As a result, this Court cannot review the 2-2 vote that approved the SEEM Agreement by operation of law.  Because the 2-2 approval is unreviewable, all of Petitioners' other dominoes fall too.  The inextricably intertwined doctrine cannot resurrect Petitioners' appeal—in fact, the connection between the 2-2 and Tariff Order means the Tariff Order should be affirmed as well.

II.  Alternatively, any merits review of the 2-2 is largely solved by the Tariff Order, and would be deferential in any event.  In the Tariff Order, which Petitioners argue is closely intertwined with the 2-2 acceptance of SEEM, a majority of the Commission addressed and rejected Petitioners' arguments about cost causation, the geographic limitations of SEEM, and Order 888 issues, including whether there should be a joint tariff.  If this Court reaches the merits at all, it should consider the Tariff Order as an adequate response to these concerns.

If the 2-2 must stand alone, the traditional arbitrary-and-capricious standard of review cannot work.  There are no "agency action[s], findings, [or] conclusions" in the 2-2.  5 U.S.C. § 706.  Instead, by statute *Congress* has dictated that a 2-2

4

vote is considered acceptance of the proposal. 16 U.S.C. § 824d(g). So by its terms APA review does not apply. Instead, if any reasonable Commissioner could have accepted the proposal (as two did), the Court should affirm. This review can consider any portion of the record relevant to the issue under review (not just the statements each Commissioner provided about why they voted as they did). Under this standard, Petitioners' arguments quickly fail.

III. The SEEM Agreement and the Tariff Order are just and reasonable, and properly accepted. SEEM is a market enhancement that makes small but meaningful additions to the existing bilateral market in the Southeast. It creates a system to allow the free use of otherwise-unused transmission capacity, and sets up an automated system to match voluntary buyers and sellers of electricity. Petitioners have no evidence to support their speculation that anything nefarious exists in SEEM.

Nor does it make sense for Petitioners to demand that SEEM require a joint tariff. The Commission properly found that SEEM is not a "loose power pool." And there is no reason for a joint tariff when the transmission-owning Members of SEEM have amended their individual tariffs to accept the same set of rules.

The set of requirements for joining SEEM are not onerous or exclusionary. Requiring all Participants to accept the basic rules creates no barrier, and requiring

each to be able to transact with three or more other participants aims to prevent collusion problems. Last, requiring all Participants to have generation or load within the SEEM footprint is a simple matter of technological limitations. That the 1,100-mile-wide footprint can function well should not be twisted into a criticism that it is not yet larger.

SEEM does not violate cost causation. The evidence is that any change in cost allocation will be tiny. The free transmission, or Non-Firm Energy Exchange Transmission Service, is the lowest priority transmission, meaning it will always be the first curtailed. Thus, any company that uses that transmission must still have firm, committed transmission in place to serve their load as a backstop. As an expert has confirmed, it would not make sense for Non-Firm Energy Exchange Transmission Service to change the cost of firm transmission by a significant amount, and certainly not in an improper way.

*Mobile-Sierra* was properly applied to certain parts of the SEEM Agreement. Petitioners' arguments that *Mobile-Sierra* should not apply wholesale are moot, because the Commission long ago narrowed *Mobile-Sierra* to certain provisions. Applying *Mobile-Sierra* to certain provisions adds needed contractual certainty and avoids expensive ongoing legal risk. It falls well within the broad discretion the Commission has over when it makes sense to apply *Mobile-Sierra*.

Last, even if this Court does apply the full APA standard to the Commissioner statements of Danly and Christie, it should reject Petitioners' arguments. Both Commissioners properly recognized that Petitioners wanted a regional transmission organization, yet could not properly challenge SEEM for not being something it was never intended to be. The statements are "tolerably terse," not "intolerably mute" in response to the thrust of Petitioners' complaints.

## STANDING

Standing is in dispute in this appeal, as addressed in Argument Section I.

## ARGUMENT

## I. This appeal is unreviewable by procedural default.

This Court should deny all petitions here in a two-step analysis. First, Petitioners untimely sought rehearing on the initial 2-2 acceptance of the SEEM Agreement, so this Court lacks jurisdiction to review that proceeding. Second, the acknowledged links between the 2-2 and the later Tariff Order mean that Petitioner's jurisdictional failure on the 2-2 also waived the same arguments against the Tariff Order. That ruling would dispose of this entire appeal.

### A. Rehearing of the 2-2 was jurisdictionally out of time.

Timely rehearing is a statutory prerequisite to judicial review. 16 U.S.C. § 825*l*(a)-(b); *Williston Basin Interstate Pipeline Co. v. FERC*, 475 F.3d 330, 334-35

(D.C. Cir. 2006) (holding under the parallel Natural Gas Act that an untimely petition for rehearing "could not possibly establish a basis for judicial review" because "an application for rehearing is a jurisdictional prerequisite to judicial review of Commission orders … but it cannot serve this function if it is not timely filed."). *See also Moreau v. FERC*, 982 F.2d 556, 563 (D.C. Cir. 1993), *overruled in part on other grounds by Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (holding that "we lack jurisdiction" after a petitioner had filed for rehearing untimely at the Commission because "the time requirements of the statute are as much a part of the jurisdictional threshold as the mandate to file for a rehearing").

## 1. Petitioners' arguments about Rule 2007 ignore the facts.

The Commission is right that Petitioners untimely sought rehearing of the 2-2 acceptance of the SEEM Agreement. *See* Resp. Br. 32-40. Intervenors propose another reason—a simpler path for this Court. The Court need not even entertain the Rule 2007 arguments Petitioners make. *See Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) (noting this Court's "independent obligation" to analyze its own jurisdiction).

Petitioners do not challenge the way that Rule 2007 counts their own 30-day rehearing period. Instead, Petitioners say that the Commission counted wrong on its *own* deadline to act, which in turn triggered the start of their thirty days. Br.

66 (asserting that the Commission could have acted "until the close of Commission business on October 12, 2021").

The Commission announced to all parties how it was counting its deadline. The Commission promptly advised Petitioners that it had triggered their rehearing clock on October 11. In its Notice, the Commission stated: "in the absence of Commission action on or before October 11, 2021, the proposed [SEEM] Agreement … became effective by operation of law." JA0023, Notice of Filing Taking Effect at 2 (adding that the Agreement took effect on October 12, as requested). Petitioners had weeks after receiving the Notice to timely seek rehearing on the Commission's count. Instead, Petitioners waited *32 days* and then filed a rehearing petition arguing only the merits issues.

On these facts it does not matter how the Commission decided its own deadline was October 11. It did decide that, and it told Petitioners so right away. If that count was wrong, Petitioners should have filed for rehearing within 30 days of October 11 and made that argument. Petitioners could have timely sought rehearing and argued that the Commission's failure to act was properly October 12, giving the SEEM Agreement an effective date of October 13 instead of the 12th. They did not do that. Instead, beyond question, they filed 32 days later— two days too late from October 11. Thus, Petitioners lost the chance to bring the

merits issues they did argue on rehearing as well as the timing issue they did not.

The Commission "failed to act" under 16 U.S.C. § 824d(g) on October 11, because it allowed the SEEM Agreement to go into effect October 12, as the filing parties requested. *Could* the Commission have announced instead that the SEEM Agreement was effective October 13 because the Commission thought it was entitled to October 12 to decide whether to act on it? No, for the reasons the Commission explains. *See* Resp. Br. 35-40. But even if the Commission *could* have delayed the effective date—if Petitioners were right about Rule 2007—it did not do so. So at a minimum, the Commission's count of days within which it could have acted became final and unreviewable 30 days after the Commission announced that count.

Thus, this Court lacks jurisdiction over the appeal of the 2-2 acceptance of the SEEM Agreement.

> ### 2. Petitioners also ignore the implications and odd results of their view of Rule 2007.

Even if this Court entertains Petitioners' Rule 2007 arguments, they fail for two more reasons.

First, Petitioners fail to grapple with or explain the implications of their theory. Petitioners argue that the Commission could have acted on October 12. If that is true, then either (1) the SEEM Agreement did not take effect until October

13; or (2) the Commission could have rejected the SEEM Agreement after it took effect on October 12.

No one contends that the SEEM Agreement took effect on October 13. In fact, the SEEM Agreement took effect at 12:01 am on October 12. That date aligns with every document, as well as the understanding of the Commission and all parties here. No one argues otherwise. Thus, for Petitioners to be right, the Commission must have had the authority to reject the SEEM Agreement on October 12, *after* it took effect.

The Commission has no such authority. "The filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate." *Old Dominion Electric Coop. v. FERC*, 892 F.3d 1223, 1230 (D.C. Cir. 2018). The Commission recognized this. JA0198, Rejection Order at ¶ 12 (observing that after the rate took effect, the Commission could "no longer issue an order … accepting or denying the filing" because it "cannot retroactively invalidate the rate that was already on file as of the first moments of October 12, 2021"). Petitioners offer no response to this.

Without an argument that the rate took effect October 13, or any argument that the Commission can override an effective rate the day it has taken effect,

Petitioners' theory collapses.

Second, Petitioners' theory yields results at odds with the Federal Power Act. Under Petitioners' interpretation of Rule 2007, no rate change can ever take effect by operation of law the day after any holiday, emergency, or snow day, or on *any* Monday. According to Petitioners, no matter whether the filing seeks to take effect in 60, 62, 65, or 75 days, the last day before a rate takes effect must be a regular Commission workday. It is bizarre at the outset to say that tariffs cannot take effect on Mondays (so strange that one would expect it to be express in a statute, not implied from a counting regulation).

But it also does not make sense to say that this no-Mondays rule is merely Rule 2007 "govern[ing] computation of the sixty-day period." Br. 66. After all, Petitioners' argument would be the same if the SEEM filing had set an effective date five or six days later. That is, Petitioners would be claiming that a period that must be at least 60 days cannot end on the 65th or 66th day either if those days fall on a weekend. Allowing extensions like these would be just as offensive to the statutory scheme as the Commission's "de facto" extensions rejected in *Indiana & Michigan Electric Co. v. FPC*, 502 F.2d 336, 341 (D.C. Cir. 1974).

Nor is it unusual to have new tariff provisions take effect on or around weekends and holidays. Utilities regularly request an effective date at the

beginning of a monthly billing period, such as January 1.  Yet, for instance, in 2022-2023, December 31 will be a Saturday, January 1 a Sunday, and January 2 a holiday.  So in Petitioners' view, a filing made 62 days in advance that requests an effective date of January 1 cannot go into effect until January 4, the 65th day.  Once again, that process for computation cannot be right.  Such an approach would leave the utility without the just compensation it is entitled to under Section 205 of the Federal Power Act.

### B. "Inextricably linked" doctrine does not support review of either the 2-2 or the Tariff Order, but instead undermines it.

Next, Petitioners argue that even if they cannot directly appeal the 2-2, they can appeal it indirectly based on their later appeal of the Tariff Order.  Br. 70-72.  But the intervenors never "endorsed this view." *Contra* Br. 71.  The inextricably linked doctrine does not help Petitioners here.

To begin, of course the 2-2 and the Tariff Order are "linked."  They are two separate steps in one broader process: implementing the SEEM.  The 2-2 vote meant that the Commission accepted the SEEM Agreement itself.  The following Tariff Order then implemented the SEEM Agreement by accepting the SEEM Members' tariff revisions required by the Agreement.  Petitioners made the same arguments against both the SEEM Agreement and its implementation in the tariff proceedings.

13

But where Petitioners go wrong is in what they draw from these facts. Petitioners contend that they can appeal the initial 2-2 even after missing their jurisdictional deadline, just because they did timely appeal the later Tariff Order. In truth, the opposite is true. Missing the deadline for the initial 2-2 means Petitioners cannot appeal the 2-2, nor can they effectively appeal the following Tariff Order. Once the 2-2 acceptance of the SEEM Agreement stands, Petitioners have nothing to gain from trying to overturn tariff revisions that just implement the unassailable filed rate—the SEEM Agreement. *See, e.g.*, JA0217, Amendment Order at ¶ 30 (noting that the SEEM Agreement was "the rate on file" and that "the justness and reasonableness of the existing provisions of the SEEM Agreement" are "beyond the scope of this proceeding").

The "inextricably linked" case law does not support Petitioners. They cite and rely only on *Cities of Batavia v. FERC*, 672 F.2d 64 (D.C. Cir. 1982) and *Kansas Cities v. FERC*, 723 F.2d 82 (D.C. Cir. 1983). But the line they quote from *Cities of Batavia* has long been recognized as "dicta from a footnote." *New Eng. Power Gen. Ass'n v. FERC*, 879 F.3d 1192, 1199 (D.C. Cir. 2018) (adding that "the jurisdictional issue there was resolved on other grounds"). Similarly, in *Kansas Cities*, the court allowed an appeal from a later order to address an earlier order when "it was unclear whether the petitioners were 'aggrieved' by the earlier

order, as is required for jurisdiction" on appeal. *Id.* at 1199. Here, Petitioners were aggrieved by the 2-2 acceptance of the SEEM Agreement, and they understood that at the time. *See* Br. 24-25 (arguing that Petitioners have standing).

Thus, Petitioners cite no case with any parallel to this one. This Court has never *held* that an aggrieved party can miss a governing jurisdictional appeal deadline, but later perfect the same appeal anyway by timely appealing a later order. Such a rule would have no limiting principle. Indeed, some Petitioners have recently challenged tariff revision filings implementing the addition of new Members to SEEM on the sole ground that the SEEM Agreement, on file for over a year now, "remains" unjust and unreasonable. JA1097, Joint Protest of Public Interest Organizations et al. at 3 (R.216).

Instead, *Midwestern Gas Transmission Co. v. FERC* is the better parallel to this case. 734 F.2d 828 (D.C. Cir. 1984). In *Midwestern*, as here, more than one order was part of the same broader process. The company failed to seek rehearing of the first order, although "there was no doubt that Midwestern was aggrieved." *Id.* at 832. In appealing the second order, the company cited *Cities of Batavia* and *Kansas Cities* to assert that it should be able to challenge the first order as well. The court rejected that argument. Recognizing that the first and second orders were, "in effect, the same order" in terms of their effect on Midwestern, the court

held that "when Midwestern accepted without challenge its certificate containing the revenue-crediting condition, it waived its opportunity to challenge the condition later." *Id.* at 832.

Under *Midwestern*, when a first Commission decision lays the groundwork and aggrieves a party, that party must timely seek rehearing and appeal, or it will waive those issues going forward. The same is true here. This familiar principle applies in the common law as well as under the Federal Power Act. *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020) ("claim preclusion prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated").

On these facts, the relationship of the 2-2 and the Tariff Order makes this point even clearer. After a 2-2 vote, the SEEM Agreement went into effect by law. Once the SEEM Agreement was effective, and became a filed rate, tariff revisions to implement the filed rate were necessary. JA0342, Agreement Filing, SEEM Agreement § 3.2 (requiring the tariff of any Member providing transmission service to contain SEEM provisions); JA0342, *id.* § 3.4 (requiring the amendment of tariffs to provide Non-Firm Energy Exchange Transmission Service). The Tariff Order could not have coherently rejected the tariff revisions so long as they faithfully implemented the accepted SEEM Agreement. Thus, the

SEEM Agreement itself is the foundation for the following Tariff Order. Failing to timely seek rehearing of the SEEM Agreement "waive[s]" Petitioners' "opportunity to challenge" those points later. *Midwestern*, 734 F.2d at 832. The Court can stop here, and deny all the petitions on this ground.[2]

## II. Alternatively, any merits review of the 2-2 is largely solved by the Tariff Order, and is deferential in any event.

But if the Court decides that the 2-2 rehearing was timely filed, or that "inextricably linked" doctrine saves review of the 2-2, then the question is how to review that proceeding. The answer is, first, that the Tariff Order provides a majority Commission ruling on all but one of the same issues here. And second, even if review is required of the 2-2 standing alone, under a proper analysis review is deferential and the deadlock outcome should be upheld.

---

[2] Petitioners appealed three "orders"—the 2-2, the Tariff Order, and the Amendment Order. Br. iv-v. They make no argument in their Opening Brief against the Amendment Order. Thus, Petitioners concede the Amendment Order should survive appeal if the others do. Resp. Br. 99-100.

### A. The Tariff Order provides a majority Commission ruling on most of Petitioners' issues.

Petitioners argue at length that the 2-2 must be reversed or vacated because, they say, the two individual Commissioner statements supporting the outcome do not thoroughly respond to their barrage of attacks on the SEEM Agreement. In making that argument, Petitioners conveniently ignore the Tariff Order.

In the Tariff Order—which, again, Petitioners themselves assert is "inextricably intertwined" with the 2-2—the Commission addressed most of Petitioners' issues. That order addressed Petitioners' concerns about the provision of Non-Firm Energy Exchange Transmission Service at zero cost, including their arguments about financial effects on existing customers and cost shifts. JA0133-36, Tariff Order at ¶¶ 40-46. The Tariff Order also addressed the open access issues, including whether SEEM is a loose power pool, whether a joint tariff was required, and in general whether Non-Firm Energy Exchange Transmission Service and the geographic scope of SEEM are just and reasonable. JA0142-49, Tariff Order at ¶¶ 62-74.

The Tariff Order and Tariff Rehearing Order thus provide a full and reasoned majority-vote Commission response to most of Petitioners' arguments. *See* Br. 52-64 (arguments about Order 888, waiver of the joint tariff requirement, the geographic limitations, and cost causation). Petitioners chose to combine their

challenges to both sets of orders in one appeal.  If this Court reaches the merits at all, it would make little sense to address the 2-2 acceptance of SEEM while ignoring the follow-on orders in which the Commission rejected the same arguments still being peddled here.

## B.  Review of a 2-2 should be deferential and not follow the APA model.

Despite all this, Petitioners assert that full Administrative Procedure Act review applies to the 2-2 outcome.  They urge that "the statements of the Commissioners who would have voted to accept the tariff filing supply the agency rationale for the Court's review."  Br. 27.  Petitioners are wrong.

### 1.  There is no agency action to review under the arbitrary and capricious standard.

It does not make sense to apply arbitrary-and-capricious APA review to a 2-2 deadlock when the filing is accepted by operation of law.

First, by its plain language, the APA section that Petitioners rely on applies only to "agency action, findings, and conclusions."  5 U.S.C. § 706.

Yet a 2-2 vote creates no "agency action, findings, [or] conclusions."  Agency action requires a majority vote.  42 U.S.C. § 7171(e) ("actions of the Commission shall be determined by a majority vote of the members present").  "Only a majority of a collective body is empowered to act for the body."  *Pub. Citizen*, 839 F.3d at 1169 (calling this an "almost universally accepted common-law rule").  A 2-2

deadlock yields no majority and is not "agency action." Even the new statute recognizes this. It says that "the *failure to issue an order … shall be considered to be an order* issued by the Commission accepting the change for purposes of [seeking rehearing]." 16 U.S.C. § 824d(g)(1)(A) (emphasis added). The statute sets up an imaginary "order" based on the Commission's failure to issue one.

Acceptance of the SEEM Agreement was not the Commission's choice, but a decision by Congress on what to do when the Commission cannot act. According to the Commission itself, "[i]t is Congress—not the FERC chairman, another commissioner, or FERC's lawyers—that has directed the institutional determination [on a 2-2 vote]." FERC Opposition to Motion to Strike at 5-6, *PJM Power Providers Grp. v. FERC*, No. 21-3068 (3d Cir. Sept. 19, 2022), Dkt. 229.

No "agency action, findings and conclusions" exist. The Commission as a body has not spoken at all, and so never could "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For the same reason, *SEC v. Chenery Corp.*, 332 U.S. 194 (1947) cannot apply because the agency itself can never provide any rationale supporting the outcome in a deadlock. *See Prohibition Juice Co. v. U.S. FDA*, 45 F.4th 8, 24

(D.C. Cir. 2022) (noting that *Chenery* generally "does not allow us to affirm an agency decision on a ground other than that relied upon by the agency").

### 2. Individual Commissioner statements are not a reviewable "order."

In deadlocks, the law asks each Commissioner for "a written statement explaining the views of the Commissioner with respect to the change." 16 U.S.C. § 824d(g)(2). Petitioners suggest that this Court should review the individual statements of the two Commissioners who voted to accept the SEEM Agreement. Petitioners focus on whether the Commissioners' statements track APA "reasoned decision-making." Br. 28, 28-35.

But imposing such APA standards on Commissioner statements strays from the text of § 824d(g) and is not practical.

First, as a matter of precedent and statutory text, each Commissioner is not drafting anything like a Commission order. "Individual Commissioners' statements reflect their personal views and do not reflect the views of the Commission as a deliberative body. The Commission speaks through, and only through, its orders." *Californians for Renewable Energy*, 175 FERC ¶ 61,213, at ¶ 13 (2021). And the statute does not say that individual Commissioner statements serve as an "order." Instead, it says that the "failure to issue an order … shall be considered to be an order … for purposes of [seeking rehearing]." 16 U.S.C. §

824d(g)(1)(A).  In fact, the statute calling for *individual* statements from all Commissioners, both for and against, undermines the idea that any of the statements should serve as an "order."  The statute could, for instance, specify that the Commissioners who voted yes should join in a single statement that will serve as the order.  It does not say that, or anything like it.  The statements satisfy the law simply by "explaining the views of the Commissioner," *id.* § 824d(g)(2), and while that may be helpful in improving the record for appeal, it is no Commission order.

Second, there is no practical way to apply the APA across several separate statements.  There are four statements—two in support of the SEEM Agreement, and two against it.  Reasonable statements can be long or short, detailed or sparse.  There is no requirement that they respond to each other or any particular concern challengers have raised.  All that each statement must do is "explain[] the views of the Commissioner."  16 U.S.C. § 824d(g)(2).

Equally confounding, individual statements on the same side may not agree with each other or may plow different ground.  Commissioner Christie and Commissioner Danly voted to accept the SEEM Agreement.  But their views do not overlap perfectly.  Christie and Danly did focus on different points in their statements.  Petitioners even suggest that there are conflicts between them.  Br. 36,

42.  What if the yes-voters do not agree on all the same rationales?  APA review would be garbled immediately.

Petitioners offer no answers to these problems.  They just focus most heavily on the issues that Commissioners Christie and Danly spent the least ink on.  They argue that Christie and Danly do not "substantively engage" with the other two Commissioner statements.  Br. 28, 32-33.  Petitioners either label them inconsistent with each other, or ignore whether they are consistent, thus paying no heed to what the ultimate position of the imagined "order" would be.  Br. 36.

All of this shows that it makes no sense to apply the full APA agency reasoning requirements to a failure to issue an order.

### 3.     This Court's review should ask simply whether, based on the record, any reasonable Commissioner could vote to approve.

The best path forward is not to apply the arbitrary-and-capricious APA standard to Commission deadlock appeals at all.  Instead, this Court should use a familiar deferential construct: the substantial evidence standard.  If the full record contains substantial evidence in support of the proposal, such that a reasonable Commissioner could have voted yes, then this Court should affirm.  *E.g.*, 16 U.S.C. § 825*l*(b) (requiring "substantial evidence" review of Commission factfindings); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014)

("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

Using that standard comes with many benefits. It avoids the morass of trying to hold multiple individual commissioner statements (which neither alone nor together are an "order" or "agency action") to the arbitrary and capricious standard. It provides a reasonable avenue for deferential oversight by this Court, acknowledging that the Court owes "great deference in this realm because the statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition." *S.C. Pub. Serv. Auth.*, 762 F.3d at 55 (noting that rate-related matters are either "fairly technical" or "involve policy judgments that lie at the core of the regulatory mission"). And it respects both Congress' longstanding view that a 2-2 deadlock means a proposal is approved, *see* 16 U.S.C. § 824d(d), and Congress' newly expressed view that such an outcome should also be subject to *some* appellate review. *See* 16 U.S.C. § 824d(g).

In other words, in a normal agency appeal, the question may be whether the Commission's order reasonably addressed Petitioners' points. On appeal of a no-order deadlock and an imputed statutory outcome, the question is whether the Commission reasonably *could have* acted as Congress has imputed to it, based on the full record. Arguments made supporting a filing at the Commission but that

no Commissioner happens to mention in a supporting statement are proper defenses of the imputed outcome on appeal.  Supporting (and opposing) statements are also part of the record available for review.  But their content is not what the Court should be testing in this appeal—only whether the two supporting Commissioners acted reasonably based on the full record.

Applying that standard, this Court can deny the petition in short order. Indeed, the Commission did consider Petitioners' points, and the responses by the SEEM Agreement proponents, and weighed them reasonably.

Both Commissioner Danly and Commissioner Christie did acknowledge the concerns raised by Petitioners.  *See* JA0089-90, Danly Statement at ¶ 21 & n.44 (describing objections by Commissioner Clements and Commissioner Glick, which echoed protestor arguments on membership, governance, oversight, the need for a market monitor, transparency, participation and access, and undue discrimination); JA0064-70, Christie Statement at ¶¶ 7-19 (addressing intervenor concerns related to collusion and exclusion, governance, market monitoring, benefits of the SEEM, availability and quality of Energy Exchange data, the independence and transparency of the Administrator and Auditor, barriers to participation, lack of market analysis, and claims that the SEEM will harm consumers); JA0093-97, Danly Statement at ¶¶ 24-30 (addressing *Mobile-Sierra*);

JA0066-67, 0071-72, Christie Statement at ¶¶ 11, 20 (same). Commissioner

Glick's Statement also addressed market power and how "the Commission's

monitoring capabilities, enforcement authority, and ability to institute an FPA

Section 206 action provide adequate protections should any [SEEM] members or

participants engage in any conduct that may transgress the FPA or Commission

Regulations." JA0026, Glick Statement at ¶ 3.

Considering each of these findings together, along with all the presentations

made by the SEEM proponents, gives this Court ample information to rely on in

upholding the SEEM.

## III. The SEEM Agreement and implementing tariff revisions are just and reasonable and the Commission properly accepted them.

### A. SEEM is a beneficial enhancement to the existing bilateral market, not a vehicle for utility collusion.

SEEM will produce an estimated $40 million in market-wide benefits per

year, to begin, and larger amounts over time. JA0499, Agreement Filing, Benefits

Analysis at 4. The effort to create SEEM grew out of recognition that creating

more 15-minute transactions could efficiently use some transmission in the

Southeast that was going unused. Utilities determined that making the unused

transmission available regionally by eliminating the hurdle of multiple transmission

rates would efficiently increase use of low cost power. JA0287, Transmittal at 2.

To obtain these benefits, SEEM makes just two incremental changes to the

existing bilateral market in the Southeast.  First, it provides zero-dollar non-firm transmission service in otherwise unused transmission capacity.  Second, it provides automated matching of buyers and sellers to use that capacity at split-the-savings pricing.

SEEM is not a ground-up redesign of the existing bilateral market.  It is not a regional transmission organization.  It is an improvement bolted on to a market that was already working quite well.  JA0406, Agreement Filing, Melda/Bellar Aff. at ¶ 6 (SEEM "provid[es] additional opportunities for bilateral trades, rather than creating an entirely new market system.").  Most of the transactions and service to load in the Southeast will still occur outside the SEEM mechanism, because *all* transmission service obtained through SEEM is non-firm—that is, interruptible. Utilities still must maintain firm rights to deliver electricity to maintain reliability, and due to longer-lead timing requirements for firm reservations, they must make such decisions *before* they know if they will be matched through SEEM.  JA0413, Melda/Bellar Aff. at ¶ 27 (entities will typically maintain adequate supply through "owned or contracted resources").  SEEM simply provides a last-minute opportunity to lower customer costs if transmission remains available after all higher priority transmission uses are accounted for.

Petitioners seek to block SEEM in hopes that Southeastern states will then

turn to a regional transmission organization. To this end, they seek to recast the simple yet important customer benefits of SEEM as something nefarious. At the outset, all of Petitioners' theories of collusion, manipulation, and discrimination rest on the incredible notion that 19 entities came together to allow use of *otherwise unused* transmission *at no charge* for some secret, complex, profit-oriented reason. Yet fewer than half of the SEEM Members are entities that generate profits for shareholders at all. One—the Tennessee Valley Authority—is a Federal agency. Many others are electric cooperatives, municipal utilities, and nonprofits.

Even setting aside the lack of credible collusive motive, the various collusion and discrimination theories make no sense. For example, the toggle feature (each Participant's ability to toggle trading partners "on" or "off") merely reflects the same decisions about who to trade with that have always been part of the already just and reasonable bilateral market in the Southeast prior to SEEM.

Toggle decisions also have obvious legitimate economic reasons, such as concerns about over-extending credit to a particular counter-party, and legitimate regulatory reasons, such as abiding with the restrictions that the Commission places on some affiliate transactions. JA0312, Transmittal at 27. FERC's existing tools make sure that bilateral electricity transactions are just and reasonable, and

will work just as well with the bilateral transactions entered into through the SEEM.  JA0466, Agreement Filing, Pope Aff. at ¶ 69.

Members wanted to be sure that the SEEM's additions to the existing market could not be subverted for improper purposes.  They retained an expert in electric market design, Dr. Susan Pope, to probe the construct.  She recommended that Market Rules require three potential counterparties to be toggled "on" at all times, to prevent collusive behavior by making it unpredictable which counterparties would be matched for transactions.  JA0471-72, Pope Aff. at ¶¶ 83-85.  The Members took her advice.  But Petitioners claim that this too is part of a supposed collusive scheme.  Again, Petitioners' goal here is to obstruct SEEM, not make sure it is just and reasonable.

In fact, the three-counterparty rule was just one of many pro-competitive measures taken in creating SEEM.  For example, because providing certain price information to competitors might create opportunities for collusion and anti-competitive conduct, JA0894, March 30 Answer at 48 n.168, the SEEM Members developed an Algorithm that "factors in multiple pieces of information (such as transmission availability and the bids of other Participants) that will be unknown to Participants, [which] renders it difficult to guarantee the preferred match when multiple potential counterparties are involved."  JA0326, Transmittal at 41.

SEEM Members also undertook transparency measures to make the Algorithm as transparent as possible without providing opportunities for collusion or manipulation. Members arranged a data feed to the Commission every seven days containing a variety of information that will allow the Commission to assess whether manipulative conduct is occurring. JA0914-15, First Deficiency Resp. at 17-18; JA0958, First Deficiency Resp., Proposed Revisions to SEEM Agreement, Appendix D. Members also increased the transparency of the Administrator's and the Market Auditor's functions and made rules requiring disclosure of regulators' questions and answers, as well as Market Auditor reports, to Participants through the SEEM website. Within SEEM, Members access information in the same way, and access it subject to the same restrictions, as other Participants. JA0954, Proposed Revisions to SEEM Agreement, Appendix B, Market Rules § VI.D.6.

Petitioners and amici ignore these efforts. Instead, they ask for features of a regional transmission organization that are unnecessary and sometimes harmful in SEEM's different construct. *E.g.*, Harvard Am. Br. 22-23.

Petitioners also claim that the Members are colluding to harm competitors. Br. 4. But it does not make sense that creating a free use of non-firm, otherwise unused transmission would be a coherent way to inflict higher prices on anyone.

If anything, under the SEEM, large participants would have even less ability to "block" transactions than they ostensibly might have today, because SEEM provides significantly expanded access to potential counterparties across the 1,100-mile-wide market. *See* JA0240, Tariff Rehearing Order at ¶ 26 ("We agree with Filing Parties that there are increased incentives to trade with counterparties for the purposes of maximizing [] potential joint benefits. . . . [A]utomated matching by the [SEEM] Algorithm will make it easier for trading partners to find each other and engage in economic transactions that otherwise may not occur.").

Petitioners draw a false parallel to *Xcel Energy Services Inc. v. FERC*, where the Commission found that potential for discrimination existed because the utility controlled the program, and so could favor its own transactions. 41 F.4th 548, 554-55 (D.C. Cir. 2022). SEEM Members do not control who uses transmission; the Algorithm allocates it. JA0856, March 30 Answer at 10. Nor do Members control who can participate. No source or sink within the SEEM region has been barred or complained about being excluded. *Xcel* is inapt.

In the end, the Commission properly found that concerns about collusion were "speculative." JA0146, Tariff Order at ¶ 68. No evidence of collusion or obvious potential for discrimination has been identified. And, highlighting the

far-fetched nature of Petitioners' speculation, throughout the run-up and launch of SEEM, no entity has claimed that it was blocked from anything.

## B. SEEM does not violate Order No. 888 open access principles.

### 1. Arguments for a joint tariff elevate form over substance.

Petitioners argue at length for a joint tariff, a common feature of regional transmission organizations. These arguments fail because, as the Commission correctly found, replicating the same nondiscriminatory standards across the tariffs of each transmission owner in SEEM functions the same as having those requirements on a single regional tariff. Moreover, a joint tariff would create practical problems, threating SEEM's customer benefits.

Preliminarily, the Commission properly rejected Petitioners' arguments that SEEM is a loose power pool. JA0143-44, Tariff Order at ¶ 64. Non-Firm Energy Exchange Transmission Service does not constitute a discounted service because there are no opportunity costs associated with it. JA0143-44, *id.* The transmission would otherwise "be left fallow." JA0099, Danly Statement at ¶ 33; *see Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107, at ¶¶ 84-85 (2016) ("*PSCo*") (approving zero-cost transmission and finding it did not constitute a discount). Moreover, Non-Firm Energy Exchange Transmission Service is not made selectively available to any one class of customers at the expense of others, and Members are not in control of how it is used. JA0856, March 30 Answer at 10

("scheduling … will be performed by the Algorithm").  Nor does Non-Firm

Energy Exchange Transmission Service replace another product in the market,

contrary to Petitioners' claims, Br. 60-61, because Participants will still need the

same amount of *firm* transmission service to remain resource adequate.  *See*

JA0143-44, Tariff Order at ¶ 64 & n.110; JA0856-57, March 30 Answer at 10-

11.  The combination of all three of these (no discounts, no control over

transmission, and no replacement product) shows that SEEM is not a loose power

pool, as the Commission properly found, and consistent with its prior precedent.

*See PSCo*, 154 FERC ¶ 61,107, at ¶¶ 84-85.

In any event, even if SEEM *were* a loose power pool, the Commission

appropriately granted waiver of the joint tariff requirement for SEEM.  As the

Commission correctly put it, requiring a joint tariff would "place form over

substance," and would provide "no practical difference" from the proposal before

the Commission because it would simply duplicate provisions already contained in

each jurisdictional transmission providers' existing tariffs.  JA0148-49, Tariff

Order at ¶ 73.

At the same time, as the Commission acknowledged, requiring a joint tariff

would be unduly burdensome, if not downright unworkable, under the SEEM

construct.  JA0148-49, *id.* (a joint tariff would "jeopardize the expected benefits" of

SEEM and impose "unnecessary costs" and administrative burdens on SEEM Members).  One of the primary benefits of SEEM is its simplicity.  JA0854, March 30 Answer at 8.  But requiring two tariffs and two transmission service providers for each transmission system (i.e., a joint tariff for Non-Firm Energy Exchange Transmission Service and individual tariffs for all other service) would introduce an unnecessarily costly and complicated wrinkle into the simple SEEM construct, while providing no benefits.  JA0859, *id.* at 13.

Further, a joint tariff would corrode SEEM's ability to function because of the Tennessee Valley Authority, a non-jurisdictional Federal agency to which the joint tariff requirement could not apply.  JA0148-49, Tariff Order at ¶ 73.  TVA's service territory is in the heart of the SEEM footprint.

Petitioners suggest that TVA should just forgo membership in SEEM.  Br. 57-58.  That is an untenable position.  Without TVA, two other members could not join SEEM because they would lack the physical connection provided by TVA.  JA0410, Agreement Filing, Melda/Bellar Aff. at ¶ 17 ("if TVA cannot participate in a redesigned market, then others … would not have a contiguous connection to the rest of the market.").

Petitioners next suggest that TVA could simply submit to the Commission's jurisdiction.  Br. 57-58.  But TVA cannot, by contract, expand the Commission's

jurisdiction. "As a statutory entity, the Commission cannot acquire jurisdiction merely by agreement of the parties before it." *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 463 (D.C. Cir. 2005) (holding that parties agreeing to a tariff and filing it could not extend the Commission's jurisdiction beyond the scope Congress gave it). It would make no sense for TVA to join a joint tariff when the Commission lacks jurisdiction to enforce any of its provisions against TVA.

In a 1959 amendment to the TVA Act, Congress imposed unique statutory restrictions on TVA's ability to sell power beyond its service territory as it existed in 1957. JA0410, Melda/Bellar Aff. at ¶¶ 14-16; 16 U.S.C. § 831n-4 (limiting to whom TVA may sell power that is surplus to its needs). SEEM was designed to allow TVA to adhere to those statutory restrictions, and a joint tariff would not and could not accommodate those limitations. JA0653, TVA Comments at 5 (R.132); JA0437-38, McGeeney/Sellers Aff. at ¶ 40.

In short, the Commission's decision not to require a joint tariff was appropriate here. As the Commission correctly reasoned, "[r]equiring the submission of another tariff by these entities … would place form over substance." JA0149, Tariff Order at ¶ 73. *See also Wolverine Power Supply Coop., Inc.*, 87 FERC ¶ 61,047, 61,202 (1999) (waiving as "impractical" joint tariff requirement because a joint tariff "would not accomplish the Commission's goal of assuring

comparable transmission access" where Wolverine already offered transmission service in its individual tariff).

### 2. SEEM's Participation and Member Criteria do not create barriers to access.

As the Commission acknowledged, the SEEM participation requirements do not constitute new barriers to market access. Rather, they reflect either: (1) necessary conditions because of operational realities of SEEM; or (2) conditions of the pre-existing bilateral market. JA0144-45, Tariff Order at ¶ 65.

### a. There are no "classes" of participation: Members and Participants are subject to the same market participation rules.

Amici argues that non-utility plant owners are "limited to second-class participation [in SEEM]." Harvard Am. Br. 22. But SEEM does not create "class[es]" of participation. Members must follow the Market Rules just the same as other Participants. Even information access is the same for Members and other Participants. *See* JA0301, Transmittal at 16; JA0391-92, SEEM Agreement, Appendix B, Market Rules § III (listing Participant requirements).

To be sure, the Members have some rights and obligations that other Participants do not, but these rights do not provide an advantage in the market. For example, Members are obligated under the SEEM Agreement to pay for the SEEM, so they have the governance rights necessary to determine how their

money is spent.  *See Sw. Power Pool, Inc.*, 173 FERC ¶ 61,267, at ¶ 66 (2020)

("limiting voting rights to [] signatories is reasonable because only [] signatories

have made a financial commitment to the WEIS Market.").  Members also have

not ceded their right to propose changes to the Commission under Section 205,

nor can they be required to do so.  *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9

(D.C. Cir. 2002) (the Commission cannot "require the utility petitioners to cede

rights expressly given to them in section 205").  But Members cannot *unilaterally*

alter the SEEM Agreement.  Any change must be proposed to the Commission,

where any Participant can comment, and the proposal cannot be implemented

unless the Commission finds it just, reasonable and not unduly discriminatory.

> **b.    SEEM's Participation Criteria are just and reasonable and based on operational constraints of the pre-existing bilateral market.**

Anyone can participate in SEEM so long as they meet reasonable minimum

participation requirements.  Eligibility requirements are a common feature of filed

rates.  *PSCo*, 154 FERC ¶ 61,107, at ¶ 85 (finding comparable eligibility

requirements for zero-cost transmission reasonable).

There are four participation requirements under the SEEM Agreement.

JA0391-92, SEEM Agreement, Appendix B, Market Rules § III.  The first and

second requirements simply require potential participants to agree to abide by the

rules and agree to take the Non-Firm Energy Exchange Transmission Service.

The third requirement, the "three-counterparty rule," requires that participants can

trade with at least three other parties. That rule does not enable market

manipulation, but prevents it.

The fourth and final requirement, that participants own or control a source

(generator) or a sink (load) within the SEEM territory, is a practical necessity.

SEEM transactions rely on "e-tags" that satisfy certain requirements for the 15-

minute delivery intervals enabled by SEEM. Currently, there is no way to produce

e-tags that meet those requirements along the entire path to an outside resource or

load. JA0145, Tariff Order at ¶ 66. *See also* JA0390, SEEM Agreement,

Appendix B, Market Rules § II (defining non-firm energy exchange transmission

service as requiring use of SEEM's tagging functions). SEEM breaks down

economic transactional hurdles across its 1,100 mile-wide footprint. That it

cannot (yet) break down barriers over a broader area is no reason to throw away

benefits achievable today.

In sum, the Commission rightly determined that "the participation

requirements set forth … are consistent with the need to ensure the technical

feasibility of the [SEEM] and that seek to address concerns regarding the potential

for market manipulation within the [SEEM]." JA0144-45, Tariff Order at ¶ 65.

## C. SEEM does not violate cost causation.

Petitioners contend that SEEM violates cost causation principles. Br. 60-64. But Petitioners have presented no evidence of impermissible cost shifts.

Under cost causation principles, costs assessed against a party cannot be "grossly disproportionate" to the benefits they receive. *See Old Dominion Electric Coop. v. FERC*, 898 F.3d 1254, 1261 (D.C. Cir. 2018); *S.C. Pub. Serv. Auth.*, 762 F.3d at 88 (holding that "nothing requires the Commission to ensure full or perfect cost causation" and finding an imperfect cost causation outcome "wholly reasonable under the deferential review we accord in rate-related matters").

Here, the evidence is that any change in cost allocation will be slight. Petitioners rely on one sentence in the benefits analysis submitted with the SEEM Members' initial Agreement Filing surmising that there could be some potential reduction in point-to-point revenues, meaning that some entities might lose revenue. Br. 61-63. But the evidence shows that any reductions in point-to-point revenues would be very minor. JA0412, Melda/Bellar Aff. at ¶ 23 (referring to a "possible … slight decrease" in point-to-point revenues).

The key is that Non-Firm Energy Exchange Transmission Service is the lowest priority transmission: the first to be cut if need arises. So to sustain their obligations to reliably serve load, utilities will still need to reserve and pay for *firm*

transmission sufficient to meet their load, just as they did before SEEM. JA0412, *id.* Thus, there is no evidence that SEEM will reduce *firm* transmission revenues by any meaningful amount—certainly nothing "grossly disproportionate." JA0134-35, Tariff Order at ¶¶ 43-44; JA0412, Melda/Bellar Aff. at ¶ 23. There is no evidence that SEEM will inflict meaningful costs on any entity outside SEEM. JA0135, Tariff Order at ¶ 44 (noting a lack of any direct complaints from independent power producers "about possible cost shifts or higher firm point-to-point transmission rates").

### D. *Mobile-Sierra* properly applies to certain aspects of the Agreement.

The *Mobile-Sierra* doctrine protects contract rates that are negotiated at arm's length, thus providing parties regulatory certainty that their agreed-upon rights and obligations will not be changed in unintended ways. *See United Gas Pipe Line Co.* v. *Mobile Gas Serv. Corp.*, 350 U.S. 332, 344 (1956) (*Mobile-Sierra* "permits the stability of supply arrangements"); *Atl. City Elec. Co.*, 295 F.3d at 11, 14-15 (*Mobile-Sierra* "preserve[s] the benefits of the parties' bargain").

First, most of Petitioners' arguments about *Mobile-Sierra*, Br. 37-44, are moot. Although *Mobile-Sierra* protection at first applied to the entire SEEM Agreement by a 2-2 Commission vote, the Commission later accepted a revision that applied *Mobile-Sierra* only to twenty provisions of the SEEM Agreement.

Resp. Br. 65-66 (listing them); JA0219, Amendment Order at ¶ 35; JA0284-85,

Amendment Rehearing Order at ¶ 17. Any broad arguments about whether

*Mobile-Sierra* should apply to the entire agreement have been mooted by those

revisions.

Second, even Petitioners' own recitation of the *Mobile-Sierra* rules reflects

that the Commission has broad discretion over when and how to apply *Mobile-*

*Sierra*. Br. 37, 41-42 (describing a "fact-specific balancing test"); *New Eng. Power*

*Gen. Ass'n v. FERC*, 707 F.3d 364, 371 (D.C. Cir. 2013) (noting the

Commission's "considerable discretion" over *Mobile-Sierra*, including its power to

apply it whenever "the logic of *Mobile-Sierra* still applie[s]"). Given that *Mobile-*

*Sierra* applies here based on the votes of two Commissioners, the question is

whether, based on the entire record, a reasonable Commission could have, in

exercise of broad discretion, applied *Mobile-Sierra* to the remaining twenty

provisions. The answer is yes.

The record justifies applying *Mobile-Sierra* to the relevant twenty parts of

the Agreement. JA1257-60, November 29 Answer at 12-15 (outlining why it was

proper to apply *Mobile-Sierra* to specific provisions). The SEEM Agreement

contains many bilateral provisions that govern key rights and obligations among

the SEEM Members. Those provisions were central to the negotiated terms the

Members agreed on in funding the development and operation of SEEM. JA0937, First Deficiency Resp. at 40 (citing *Texaco Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998)). Those provisions include membership criteria; governance; roles, responsibilities, and scope of the Agent; budgeting and cost allocation; severability; withdrawal; release and liability; equitable relief; reliability obligations; dispute resolution; defaults; confidentiality; public utility status of Members; no reliance on Non-Firm Energy Exchange Transmission Service; no dedication of facilities; amendments; and the agreement for new Members to join. JA0937, *id.* As the SEEM Members explained to the Commission, the "*Mobile-Sierra* protections are now limited to provisions that, if altered, would undermine the assurances that the contracting parties made to each other about the extent of their contractual commitments." JA1260, November 29 Answer at 15.

Applying *Mobile-Sierra* to these particular provisions is crucial to the development and implementation of the SEEM. JA1151, Amendment Filing at 14 (R.237). Commissioners Danly and Christie agreed. JA0072, Christie Statement at ¶ 20 (*Mobile-Sierra* is appropriate because SEEM is "simply a contractual arrangement for utilities in the Southeast to engage in bilateral trading."); JA0097, Danly Statement at ¶ 30 ("[T]o deny [SEEM Members] the protection of the *Mobile-Sierra* presumption would be to make every aspect of this

market construct more expensive and less certain.  Neither of these results can be said to be in the public interest.").

Nor does it matter that additional Members could join the SEEM (indeed, four new entities already have, *see generally* JA1294-1309, Exhibit A Revisions). New rules can still be negotiated and agreed upon when new Members join an existing agreement.  *See Sw. Power Pool, Inc.*, 149 FERC ¶ 61,113, at ¶ 112 (2014); 153 FERC ¶ 61,051 (2015); 155 FERC ¶ 61,168 (2016).  *Mobile-Sierra* makes it harder for third parties or the Commission to impose changes the Members oppose, but does not affect the Members' ability to agree to changes to attract new Members.

In short, the Members are entitled to regulatory certainty as to the contractual commitments they have made, including significant costs they have agreed will be incurred, and costs they have agreed not to incur.  The remaining provisions of the SEEM Agreement are reasonably entitled to *Mobile-Sierra* protection.

### E. Regardless, the Commissioner Statements alone satisfy the APA.

Alternatively, even if this Court applies APA review to the Commissioners' individual statements, it should affirm the 2-2.  Petitioners assert that the

supporting statements filed by Commissioners Christie and Danly "provide no reasoned response" to their points. Br. 28.

To the contrary, both Commissioners made it clear that they understood the arguments against SEEM were really just opposition against anything that is not a full-blown regional transmission organization. JA0060-61, 0069, Christie Statement at ¶¶ 1, 17 ( "The opposition to this proposal stems from one core issue … to force the Southeastern states into [a regional transmission organization]"); JA0089-90, Danly Statement at ¶ 21 & n.44 ("While some may have preferred that the utilities in the Southeast create a [regional transmission organization], that is not the filing the parties submitted."). Yet the Commissioners recognized that Section 205 of the Federal Power Act does not authorize the Commission to reject a reasonable proposal just because an objector prefers a different construct. *See NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 116 (D.C. Cir. 2017) (modifications by the Commission exceed its authority under Section 205 where they result in an "entirely different rate design").

That view properly disposes of many of Petitioner's arguments. It disposes of governance concerns, oversight concerns, and requests to impose a Market Monitor instead of the Market Auditor proposed, at the least.

Commissioners Danly and Christie also addressed Petitioners' concerns about market power.  Br. 35.  Commissioner Danly addressed the need for a new market power analysis, stating that "market-based rate authorities and safeguards are already in place for the existing bilateral market" and that "the filing parties have amply demonstrated how existing and new, additional mechanisms will guard against such concerns, including the establishment of an Administrator and Auditor."  JA0092, Danly Statement at ¶ 22.  Commissioner Danly added that, given the nature of the non-firm transmission, entities must still operate under their existing "tariffs that already impose market power mitigation restrictions."  JA0092-93, Danly Statement at ¶ 23.  Commissioner Christie similarly noted that because SEEM did not propose a new product requiring a new analysis, he would have accepted the proposal without one.  JA0068, Christie Statement at ¶ 14.  Both Commissioners agreed that because SEEM does not create new avenues for market power that are not already addressed by existing mechanisms, a new market power analysis was not required.

Additionally, contrary to Petitioners' claims, Commissioner Danly and Commissioner Christie addressed access to Non-Firm Energy Exchange Transmission Service.  Commissioner Danly noted that formation of a regional transmission organization would provide open access as the Petitioners preferred it,

"[b]ut that decision is not [FERC's] to make[]" and is one that is instead "reserved wholly to the States and their utilities." JA0089-91, Danly Statement at ¶ 21. Commissioner Christie noted the technical infeasibility of allowing trades outside the SEEM Territory. JA0067-68, Christie Statement at ¶ 13; JA0144-47, Tariff Order at ¶¶ 65-71.

At the same time, both Commissioners pointed to the benefits that SEEM will bring to the region. JA0072, Christie Statement at ¶ 21 (SEEM "offers undeniable benefits to consumers both in terms of reliability and lower costs"); JA0066, *id.* at ¶ 10 ("any claim in this record that an RTO would provide 'more' benefits than those offered by the Southeast EEM is purely speculative and unpersuasive."); JA0097, Danly Statement at ¶ 30 ("[D]enial of the Southeast EEM proposal would be to allow unused transmission capacity go unused, thereby denying consumers the 'meaningful' benefits of the filing parties' projection of [$40 to $100 million per year].").

In short, although "tolerably terse," the Commissioner statements on Petitioners' perceived deficiencies were not "intolerably mute." *Hatch v. FERC*, 654 F.2d 825, 834 (D.C. Cir. 1981). They provide solid reasoning to dispose of each of Petitioners' arguments, and could therefore be upheld on this ground alone.

For the reasons set forth here and in the Commission's brief, the petitions for review challenging the approval of the SEEM should be denied.

Dated:  February 1, 2023

Respectfully submitted,

/s/ *Matthew A. Fitzgerald*
Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-4716
*mfitzgerald@mcguirewoods.com*

Noel Symons
Katlyn A. Farrell
Carrie Mobley
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, D.C. 20006
(202) 857-2929
*nsymons@mcguirewoods.com*
*kfarrell@mcguirewoods.com*
*cmobley@mcguirewoods.com*

*Counsel for Intervenors–Respondents*
*SEEM Members*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of the Court of Appeals for the District of Columbia Circuit's July 14, 2022 per curiam order because this brief contains 9,967 words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced 14-point Adobe Caslon Pro font using Microsoft Word.

Dated: February 1, 2023                    _/s/ Matthew A. Fitzgerald_____

*Counsel for Intervenors–Respondents*
*SEEM Members*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2023, the foregoing was filed

electronically with the Clerk of the Court for the United States Court of

Appeals for the District of Columbia Circuit using the appellate CM/ECF

system.  All participants in the case are registered CM/ECF users and the

system will serve them.


Dated:  February 1, 2023                    */s/ Matthew A. Fitzgerald*

                                            *Counsel for Intervenors–Respondents*
                                            *SEEM Members*