# In the United States Court of Appeals for the District of Columbia Circuit

### No. 22-1018

———————

ADVANCED ENERGY ECONOMY, *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

———————

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

Robert M. Kennedy
  Senior Attorney

For Respondent
Federal Energy Regulatory
  Commission
Washington, D.C. 20426

FEBRUARY 2, 2023

# CIRCUIT RULE 28(A)(1) CERTIFICATE

## A.    Parties and Amici

The parties to the underlying agency proceedings and who have appeared before the Court are listed in Petitioners' Rule 28(a)(1) certificate.

## B.    Rulings Under Review

1.    Pursuant to Federal Power Act section 205(g), 16 U.S.C. § 824d(g), the Commission's failure to issue a majority-voted order accepting or rejecting the Southeast Energy Exchange Market proposal before October 12, 2021 is "considered to be an order issued by the Commission accepting the change" for purposes of judicial review;

2.    *Duke Energy Progress, LLC*, Order Accepting Tariff Revisions, 177 FERC ¶ 61,080 (Nov. 8, 2021) (R. 232), JA117;

3.    *Alabama Power Co.*, Order Rejecting Rehearing Requests as Untimely, 177 FERC ¶ 61,178 (Dec. 10, 2021) (R. 247), JA194;

4.    *Alabama Power Co.*, Order Accepting Tariff Revisions, 178 FERC ¶ 61,048 (Jan. 21, 2022) (R. 274), JA203;

5.    *Duke Energy Progress, LLC*, Order Addressing Arguments Raised On Rehearing, 178 FERC ¶ 61,195 (Mar. 24, 2022) (R. 284), JA226; and

6.    *Alabama Power Co.,* Order Addressing Arguments Raised on Rehearing, 178 FERC ¶ 61,196 (Mar. 24, 2022) (R. 285), JA257.

**C.**    **Related Cases**

This case has not previously been before this Court or any other court.  The Third Circuit is considering the scope of review under 16 U.S.C. § 824d(g), which is one of the issues in this case, in *PJM Power Providers Group v. FERC*, Nos. 21-3068, *et al*. (3d Cir.).  That case has been fully briefed and was argued on January 10,  2023.

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney

# TABLE OF CONTENTS

Statement Of The Issues ......................................................................... 1

Statutory And Regulatory Provisions .................................................... 5

Counterstatement Of Jurisdiction ......................................................... 5

Statement Of Facts…… ........................................................................ 5

I.   Statutory And Regulatory Background ....................................... 5

    A.   Federal Power Act ................................................................ 5

    B.   Overview Of The Wholesale Energy Markets .................... 6

        1.   The product ................................................................ 6

        2.   Market designs ........................................................... 7

            a.   Bilateral markets ............................................ 7

            b.   Centralized markets ....................................... 8

II.  The Southeast Energy Exchange Market ................................ 10

    A.   Purpose Of The Market .................................................... 10

    B.   Participants In The Market ............................................... 11

    C.   Monitoring The Market .................................................... 13

    D.   Benefits Of The Market .................................................... 14

III. The Commission Proceedings ................................................. 15

    A.   The Agreement Proceeding ............................................... 17

1. The Agreement goes into effect by
   operation of law ........................................... 17

    a. Christie Statement ........................................ 18

    b. Danly Statement ............................................ 19

    c. Glick Statement ............................................. 21

    d. Clements Statement ..................................... 22

2. The Coalition's untimely requests
   for rehearing ............................................. 24

B. The Tariff Proceeding ...................................... 24

C. The Amendment Proceeding ............................ 25

Summary Of Argument .................................................... 27

Argument ............................................................ 32

I. The Court Lacks Jurisdiction Over
   The Agreement Proceeding ...................................... 32

A. The Commission's Failure To Act Starts The
   Rehearing Clock ............................................ 32

B. The Commission Lacked Statutory Authority
   To Act After October 11, 2021 .......................... 33

C. The Coalition's Efforts To Avoid The Federal Power
   Act's Strict Jurisdictional Requirements Fail ................ 35

1. Rule 2007 cannot extend the
   Commission's statutory authority to act ............... 35

    a. This is consistent with precedent ................. 36

b.     This is consistent with past practice ............. 37

c.     There are no retroactivity concerns ............... 38

2.     There is no "inextricable link" exception ................ 40

II.    If It Proceeds To The Merits, The Court May Review The Entire Record ......................................... 42

A.    Section 824d(g) Prescribes On-The-Merits Review ......... 42

B.    In Assessing An "Order" Under Section 824d(g)(1), The Court May Consider The Entire Record ................... 45

1.     Commissioner statements can anchor judicial review .......................................... 45

2.     The Court may review the entire record ................. 47

III.   The Southeast Energy Exchange Agreement May Reasonably Be Found To Be Just And Reasonable ................. 49

A.    The Southeast Energy Exchange Market Enhances The Existing Bilateral Market For The Benefit Of Consumers .................................................... 49

1.     Builds on existing market structure ....................... 49

2.     Addresses an existing market inefficiency ............. 51

3.     Makes efficient use of transmission capacity ......... 52

4.     Results in substantial consumer benefits ............... 53

B.    The Coalition's Substantive Objections Lacks Merit ...... 54

1.     Governance ............................................. 55

2. Market oversight................................................... 58

3. Benefits.................................................... 61

C. The Coalition's Procedural Objection Lacks Merit.......... 62

D. There Is Legal Support For Applying The
*Mobile-Sierra* Presumption To The Provisions
Enumerated By The Filing Parties.................................. 63

1. Legal background.................................................. 63

2. The current scope of the presumption.................... 64

3. The *Mobile-Sierra* presumption can be applied
to all contracts that are freely-negotiated at
arm's length............................................... 68

4. The Commission may conduct a
provision-by-provision analysis.............................. 69

5. Certain of the enumerated provisions
embody individualized terms ................................ 70

6. The Commission has discretion to apply the
*Mobile-Sierra* presumption to the balance
of the provisions....................................... 71

7. The Coalition's objections lack merit...................... 74

IV. Standard Of Review For Commission Orders........................... 76

V. The Commission Reasonably Approved The Tariff
Amendments Implementing Non-Firm Energy
Exchange Transmission Service............................... 77

A.   The Coalition's Objections To The Participation
     Requirements Lack Merit ............................................... 78

     1.   Geographic requirements ........................................ 79

     2.   Participant agreements .......................................... 80

     3.   Enabling Agreements and toggling ......................... 81

     4.   Monopolistic incentive ........................................... 83

     5.   Burden of proof ...................................................... 84

     6.   Consistency with *pro forma* tariff ........................... 85

B.   The Commission Reasonably Found That The
     Southeast Energy Exchange Market Did Not
     Constitute A "Loose Power Pool" ..................................... 86

     1.   "Tight" and "loose" power pools .............................. 86

     2.   The Southeast Energy Exchange Market
          is not a loose power pool ......................................... 87

          a.   Not discounted service .................................... 87

          b.   Not a special transmission arrangement ...... 88

          c.   No joint planning or coordination ................. 90

          d.   Purpose satisfied ............................................ 92

C.   The Commission Reasonably Waived The
     Joint Tariff Requirement .................................................. 92

D.   The Commission Reasonably Rejected
     The Coalition's Speculation Regarding Cost Shifts ......... 96

    1.    Transmission cost allocation ................................... 96

    2.    Any impacts would be minimal and diffuse ........... 97

    3.    Existing rate designs were not
before the Commission ........................................... 99

VI.    The Court Should Affirm The Amendment Order.................. 100

Conclusion....................................................................... 101

# TABLE OF AUTHORITIES

## COURT CASES:

*Allegheny Def. Project v. FERC,*
    964 F.3d 1 (D.C. Cir. 2020) ............................................ 37, 43, 77

*Atlantic City Elec. Co. v. FERC,*
    295 F.3d 1 (D.C. Cir. 2002) ........................................................ 86

*City of Batavia v. FERC,*
    672 F.2d 64 (D.C. Cir. 1982) ................................................. 36, 37

*City of Bethany v. FERC,*
    727 F.2d 1131 (D.C. Cir. 1984) ............................................. 16, 33

*City of Campbell v. FERC,*
    770 F.2d 1180 (D.C. Cir. 1985) ............................................. 32, 33

*City of Winnfield v. FERC,*
    744 F.2d 871 (D.C. Cir. 1984) ..................................................... 99

*Con. Ed. Co. of N.Y., Inc. v. FERC,*
    45 F.4th 265 (D.C. Cir. 2022) ..................................................... 45

*Elec. Consumers Res. Council v. FERC,*
    407 F.3d 1232 (D.C. Cir. 2005) ................................................... 46

*Emera Maine v. FERC,*
    854 F.3d 662 (D.C. Cir. 2017) ..................................................... 63

*Entergy Servs., Inc. v. FERC,*
    391 F.3d 1240 (D.C. Cir. 2004) ................................................... 67

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................... 45

*Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.,*
  966 F.2d 1471 (D.C. Cir. 1992) ................................................. 45

*FERC v. Elec. Power Supply Ass'n,*
  577 U.S. 260 (2016) .......................................................... 6, 9, 76

*Ind. & Mich. Elec. Co. v. FPC,*
  502 F.2d 336 (D.C. Cir. 1974) ................................................... 36

*Kan. Cities v. FERC,*
  723 F.2d 82 (D.C. Cir. 1983) ................................................. 40, 41

*Md. Pub. Serv. Comm'n v. FERC,*
  632 F.3d 1283 (D.C. Cir. 2011) ................................................. 70

*Mont. Consumer Couns. v. FERC,*
  659 F.3d 910 (9th Cir. 2011) ................................................... 59

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1,*
  554 U.S. 527 (2008) ............................................. 9, 50, 65, 72, 77

*Neustar, Inc. v. FCC,*
  857 F.3d 886 (D.C. Cir. 2017) ................................................... 38

*New England Power Generators Ass'n, Inc. v. FERC,*
  707 F.2d 364 (D.C. Cir. 2013) ................................. 71, 72, 73, 74

*New England Power Generators Ass'n, Inc. v. FERC,*
  879 F.3d 1192 (D.C. Cir. 2018) ............................................. 40, 41

*New York v. EPA,*
  413 F.3d 3 (D.C. Cir. 2005) ................................................... 100

*New York v. FERC,*
  535 U.S. 1 (2001) .............................................................. 9

*North Carolina v. FERC,*
  913 F.3d 148 (D.C. Cir. 2019) ................................................. 77

*NRG Power Mtkg., LLC v. Maine Pub. Utils. Comm'n,*
    558 U.S. 165 (2010) ............................................................ 64, 75

*Old Dominion Elec. Coop. v. FERC,*
    892 F.3d 1223 (D.C. Cir. 2018) .................................................. 35

*Okla. Gas & Elec. Co. v. FERC,*
    827 F.3d 75 (D.C. Cir. 2016) ......................................... 64, 70, 71

*Oregon v. FERC,*
    636 F.3d 1203 (9th Cir. 2011) .................................................... 67

*PPL Wallingford Energy LLC v. FERC,*
    419 F.3d 1194 (D.C. 2005)........................................................ 48

*Process Gas Consumers Grp. v. FERC,*
    866 F.2d 470 (D.C. Cir. 1989) .................................................... 61

*Pub. Citizen, Inc. v. FERC,*
    7 F.4th 1177 (D.C. Cir. 2021)................................................ 13, 50

*Sithe/Indep. Power Partners, L.P. v. FERC,*
    285 F.3d 1 (D.C. Cir. 2002) ....................................................... 89

*St. Luke's Hosp. v. Sebelius,*
    611 F.3d 900 (D.C. Cir. 2010) .................................................... 38

*TransCanada Power Mktg., Ltd. v. FERC,*
    811 F.3d 1 (D.C. Cir. 2015) ......................................................... 6

*Transmission Access Policy Study Grp. v. FERC,*
    225 F.3d 667 (D.C. Cir. 2000) .................................................... 96

*United Airlines, Inc. v. Transp. Sec. Admin,*
    20 F.4th 57 (D.C. Cir. 2021)....................................................... 38

*Wabash Valley Power Ass'n v. FERC,*
    45 F.4th 115 (D.C. Cir. 2022)..................................................... 64

*Westar Energy v. FERC*,
473 F.3d 1239 (D.C. Cir. 2007) .................................................. 93

## **ADMINISTRATIVE CASES:**

*Ala. Power Co.*, 177 FERC ¶ 61,178 (2021) ........................... 24, 32, 34,
35, 36, 37, 39

*Ala. Power Co.*, 178 FERC ¶ 61,048 (2022) ................. 3, 27, 51, 58, 59,
65, 66, 67, 74, 75

*Ala. Power Co.*, 178 FERC ¶ 61,196 (2022) .......... 24, 35, 36, 37, 38, 39

*Ala. Power Co.*, 179 FERC 61,128 (2022) ................................. 3, 67, 75

*Bangor Hydro Elec. Co.*, 144 FERC ¶ 61,031 (2013) ......................... 93

*Devon Power, LLC*, 134 FERC ¶ 61,208 (2011) ...................... 72, 73, 75

*Duke Energy Progress, LLC*,
177 FERC ¶ 61,080 (2021) ........................... 3, 25, 77, 78, 79, 80,
81, 83, 85, 87, 89, 91,
92, 94, 95, 97, 98, 99

*Duke Energy Progress, LLC*,
178 FERC ¶ 61,195 (2022) ................................. 3, 25, 56, 79, 81,
82, 83, 84, 85, 88, 89,
90, 91, 92, 93, 94, 95

*Electronic Tariff Filing*, 130 FERC ¶ 61,047 (2010) .................... 16, 33

*Inquiry Concerning Alternative Power Pooling Institutions
under the Fed. Power Act*,
59 Fed. Reg. 54,851 (Nov. 2, 1994) ........................................... 91

*ISO New England Inc. v. NEPOOL*,
106 FERC ¶ 61,280 (2004) ....................................................... 69

Order No. 888, 61 Fed. Reg. 21,540 (1996)......................... 8, 86, 96, 97

Order No. 888-A, 62 Fed. Reg. 12,274 (1997).................. 86, 87, 88, 89

*PJM Interconnection, L.L.C.*,
    142 FERC ¶ 61,214 (2013) ........................................................ 69

*Policy Statement on Market Monitoring Units*,
    111 FERC ¶ 61,267 (2005) ........................................................ 60

*Pub. Serv. Co. of Colo.*,
    154 FERC ¶ 61,107 (2016) ............................................ 60, 87, 91

*Sw. Power Pool, Inc.*,
    173 FERC ¶ 61,267 (2020) ................................................ 57, 60

*Wolverine Power Supply Coop. Inc.*,
    81 FERC ¶ 61,639 (1998) .......................................................... 91

*Wolverine Power Supply Coop., Inc.*,
    87 FERC ¶ 61,047 (1999)) ........................................................ 87

## COMMISSIONER SECTION 205d(g) STATEMENTS

Statement of Commissioner Christie
    Supporting the Agreement.......................... 18, 19, 49, 51, 52, 53,
                             54, 55, 57, 58, 59, 60, 69

Statement of Commission Danly
    Supporting the Agreement.............. 19, 20, 21, 49, 50, 51, 52, 53,
                             54, 55, 58, 59, 60, 61, 68, 69

Statement of Chairman Glick
    Opposing the Agreement................................................ 21, 22, 54

Statement of Commissioner Clements
    Opposing the Agreement................................................ 22, 23, 24

## STATUTES:

Administrative Procedure Act

    5 U.S.C. § 551(13) ........................................................... 42

    5 U.S.C. § 706(2) ............................................................. 76

Federal Power Act

    16 U.S.C. § 824d(a) ...................................................... 6, 44

    16 U.S.C. § 824d(b) ........................................................... 6

    16 U.S.C. § 824d(c) ........................................................... 6

    16 U.S.C. § 824d(d) ........................................................... 6

    16 U.S.C. § 824d(g)(1) .................................... 2, 17, 18, 24, 33, 34
                                  42, 43, 46, 45, 48, 63

    16 U.S.C. § 824d(g)(2) .................................................. 17, 43, 44

    16 U.S.C. § 824e .............................................................. 57

    16 U.S.C. § 825*l*(a) ................................................ 5, 24, 32, 35, 43

    16 U.S.C. § 825*l*(b) ................................................ 17, 44, 46, 76

Department of Energy Organization Act

    42 U.S.C. § 7171(b) ........................................................ 17

    42 U.S.C. § 7171(e) ...................................................... 17, 42

## REGULATIONS:

    18 C.F.R. § 35.3 .......................................................... 16, 33

    18 C.F.R. § 35.28 ...................................................... 85, 92, 93

    18 C.F.R. § 385.2007 .................................................... 35

## CONGRESSIONAL MATERIALS

164 Cong. Rec. H8227 (Sept. 13, 2018) .............................. 43, 63

S. Rep. No. 115-278 (June 18, 2018) ........................... 43, 46, 63

# GLOSSARY

| | |
|---|---|
| Agreement | Southeast Energy Exchange Market Agreement |
| Agreement Proceeding | Proceeding before the Federal Energy Regulatory Commission regarding the Southeast Energy Exchange Market Agreement in FERC Dkt. Nos. ER21-1111, *et al.* |
| Amendment Order | *Alabama Power Co.*, 178 FERC ¶ 61,048 (2022) (R. 274), JA203 |
| Amendment Proceeding | Proceeding before the Federal Energy Regulatory Commission regarding proposed amendments to the Southeast Energy Exchange Market Agreement in FERC Dkt. No. ER22-476 |
| Amendment Rehearing Order | *Alabama Power Co.*, 179 FERC ¶ 61,128 (2022) (R. 286), JA276 |
| Br. | Petitioners' Corrected Opening Brief |
| Christie Statement | Statement of Commissioner Mark C. Christie in FERC Dkt. Nos. ER21-1111-002, *et al.*, (R. 229), JA60 |
| Clements Statement | Statement of Commissioner Allison Clements in FERC Dkt. Nos. ER21-1111, *et al.*, (R. 228), JA35 |
| Coalition | Petitioners Advanced Energy Economy, *et al.* |
| Commission or FERC | Federal Energy Regulatory Commission |

| | |
|---|---|
| Danly Statement | Statement of Commissioner James P. Danly in FERC Dkt. Nos. ER21-1111, *et al.*, (R. 230), JA76 |
| Glick Statement | Statement of Chairman Richard Glick in FERC Dkt. Nos. ER21-1111, *et al.*, (R. 227), JA25 |
| Harv. Am. Br. | Brief of Amicus Curiae Harvard Electricity Law Initiative |
| Notice | *Alabama Power Co.*, Notice of Filing Taking Effect By Operation Of Law, FERC Dkt. Nos. ER21-1111, *et al.* (Oct. 13, 2021) (R. 226), JA22 |
| Rejection Order | *Alabama Power Co.*, 177 FERC ¶ 61,178 (2021) (R. 247), JA194 |
| Rejection Rehearing Order | *Alabama Power Co.*, 178 FERC ¶ 61,196 (2022) (R. 285), JA257 |
| R. Street Am. Br. | Brief of Amicus Curiae The R Street Institute |
| Tariff Proceeding | Proceeding before the Federal Energy Regulatory Commission regarding open access transmission tariff revisions submitted by certain Members of the Southeast Energy Exchange Market in FERC Dkt. Nos. ER 21-1115, *et al.* |
| Tariff Order | *Duke Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (R. 232), JA117 |
| Tariff Rehearing Order | *Duke Energy Progress, LLC*, 178 FERC ¶ 61,195 (2022) (R. 284), JA226 |

# In the United States Court of Appeals
# for the District of Columbia Circuit

**No. 22-1018**

————————

ADVANCED ENERGY ECONOMY, *ET AL.*,
*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

————————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————————

## STATEMENT OF THE ISSUES

This case concerns the creation of the Southeast Energy Exchange Market – a voluntary electronic trading platform designed to match buyers with sellers to facilitate short-term, intra-hour power sales that will be delivered, free of charge, over otherwise unused transmission capacity. The platform, which began operations in November 2022, is intended to incrementally improve the efficiency of the existing bilateral wholesale market in the Southeast by facilitating short-term power

sales which previously were quite rare.  The improvements are projected to result in customer benefits of more than $40 million per year.  The Southeast Energy Exchange Market became effective through three related proceedings before the Federal Energy Regulatory Commission.

The first involved the Commission's review of the Southeast Energy Exchange Market Agreement, which sets forth the framework for, and rules governing, the new matching platform (the Agreement Proceeding).  A two-two deadlock among the Commissioners prevented the Commission from acting before the Agreement's proposed effective date and, as a result, the filing went into effect by operation of law.  *See Ala. Power Co.*, Notice of Filing Taking Effect By Operation of Law, FERC Docket No. ER21-1111-002 (Oct. 13, 2021) (Notice) (R. 226).

Section 205(g) of the Federal Power Act provides that, in this circumstance, the Commission's failure to act constitutes an "order issued by the Commission accepting the change" for purposes of agency rehearing, which is a prerequisite to judicial review.  16 U.S.C. § 824d(g)(1)(A).  Because Commission inaction is statutorily deemed to be acceptance of the rate filing, this brief defends such acceptance based

on the Commissioner statements and substantial record evidence demonstrating that the Southeast Energy Exchange Market Agreement is just and reasonable and not unduly discriminatory or preferential. (For a detailed discussion of section 824d(g), see *infra* Argument, Part II.)

The second Commission proceeding concerns filings by the transmission-owning parties to the Agreement to update their FERC-jurisdictional tariffs to provide transmission service for transactions on the new platform (the Tariff Proceeding). The Commission accepted these filings via a majority-voted Commission order. *See Duke Energy Progress*, *LLC,* 177 FERC ¶ 61,080 (Nov. 8, 2021) (R. 232), *reh'g denied* 178 FERC ¶ 61,195 (Mar. 24, 2022) (R. 285).

In the third proceeding, the Commission accepted, via a majority-voted order, amendments to the Southeast Energy Exchange Market Agreement that the filing parties had committed to make during the course of the Agreement Proceeding (the Amendment Proceeding). *See Ala. Power Co.*, 178 FERC ¶ 61,048 (Jan. 22, 2022) (R. 274) (Amendment Order), *reh'g denied* 179 FERC ¶ 61,128 (May 19, 2022) (R. 286) (Amendment Rehearing Order).

Petitioners are a large coalition of environmental organizations, trade associations, wind and solar energy advocates, and other organizations (Coalition). Their petition raises the following issues for review:

1. Does the Court have jurisdiction over any claims relating to the Agreement Proceeding where the Coalition did not file its requests for rehearing until 32 days after expiration of the statutory period for Commission action on the Southeast Energy Exchange Market Agreement, where such agency inaction commences the Federal Power Act's 30-day rehearing clock.

2. Assuming jurisdiction, whether the Commissioner statements and substantial record evidence support the conclusion that the Southeast Energy Exchange Market Agreement may reasonably be found to be "just and reasonable" within the meaning of the Federal Power Act.

3. Whether the Commission reasonably found that tariff amendments implementing the transmission service to be used to carry out energy trades facilitated by the Southeast Energy Exchange Market are just and reasonable and not unduly discriminatory or preferential.

## STATUTORY AND REGULATORY PROVISIONS

The pertinent statutes and regulations are contained in the Addendum to this brief.

## COUNTERSTATEMENT OF JURISDICTION

As explained in Part I of the Argument, the Coalition failed to timely seek rehearing of the acceptance of the Southeast Energy Exchange Agreement by operation of law, which is a prerequisite to judicial review. *See* 16 U.S.C. § 825*l*(a). This Court thus lacks jurisdiction to hear any claims arising from the Agreement Proceeding.

In a June 29, 2022 order, the Court referred to the merits panel the motions to dismiss filed by the Commission and Respondent-Intervenor and directed the parties to address this issue in their briefs. *See* ECF Doc. #1952879.

## STATEMENT OF FACTS

## I.   STATUTORY AND REGULATORY BACKGROUND

### A.   The Federal Power Act

Section 201 of the Federal Power Act, 16 U.S.C. §824, gives the Commission exclusive jurisdiction over the rates, terms, and conditions of service for the transmission and sale at wholesale of electric energy

in interstate commerce.  *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 264-66 (2016).

The Federal Power Act permits regulated utilities to set rates unilaterally by tariff, or sellers and buyers may agree on rates by contract.  *See* 16 U.S.C. § 824d(c), (d).  In either event, "[a]ll rates and charges made … by any public utility for or in connection with the transmission or sale of electric energy," and "all rules and regulations affecting or pertaining to such rates and charges," must be "just and reasonable."  *Id*. § 824d(a), (b).

## B.    Overview of Wholesale Energy Markets

### 1.    The product

The fundamental product underlying the wholesale energy markets is the electric energy produced by generators, whose facilities convert fuels such as oil, natural gas, uranium, or the energy inherent in the wind, sunshine, or water, into a flow of electrons.  That flow of electrons is then transmitted over high-voltage power lines.

The electric energy is received by local utilities who in turn distribute that electricity to consumers.  The amount of energy required by end users is called "load," and thus local utilities are sometimes referred to as "load-serving entities."  *See TransCanada Power Mktg.,*

*Ltd. v. FERC*, 811 F.3d 1, 4-5 (D.C. Cir. 2015); *see also* FERC, ENERGY PRIMER: A HANDBOOK OF ENERGY MARKET BASICS 35-36 (Apr. 2020) (Energy Primer).[1]

### 2. Market designs

Electricity markets have retail and wholesale components. Retail markets involve the sale of electricity to consumers and are state-regulated. Wholesale markets involve sales among generators and resellers and are FERC-jurisdictional. In such markets, FERC either authorizes jurisdictional entities to sell at market-based rates or reviews and authorizes cost-based rates. *See* Energy Primer at 35.

### a. Bilateral markets

Traditional wholesale markets – which exist primarily in the Southeast and in the West outside of California – are premised on bilateral transactions among market participants. *Id.* 61. Under this market construct, individual utilities are responsible for the operation of generation and transmission systems, and, typically, for providing power to retail consumers. *Id.* Electric service providers in the

---

[1] The Energy Primer is available at https://www.ferc.gov/media/2020-energy-primer-handbook-energy-market-basics.

Southeast bilateral market include vertically integrated utilities – *i.e.*, utilities that own the generation, transmission, and distribution systems used to serve consumers – federal government-owned providers, state-owned providers, and municipalities.

In bilateral markets, utilities serve their customers through their own generation, or long-term power purchase arrangements, or both. Short-term transactions are less common, but do occur where a purchase of energy can displace more expensive generation. To effectuate these transactions, which generally do not occur at intervals less than one hour, the parties must discover one another, negotiate the terms of the sale, arrange and pay for transmission service across all used transmission systems, and schedule the delivery of energy. *See* Affidavit of A. Melda and L. Bellar (Melda/Bellar Aff.) ¶¶ 13, 34, Attachment B to Southeast Energy Exchange Market Agreement Filing (R. 4) (Agreement Filing), JA409, 417; *see also* Energy Primer at 71.

### b.    Centralized markets

In Order No. 888, 61 Fed. Reg. 21,540 (1996), the Commission required the functional unbundling of wholesale generation and transmission services, and directed utilities to provide open, non-

discriminatory access to their transmission facilities to competing electricity suppliers. *See New York v. FERC*, 535 U.S. 1, 11-13 (2002). Building on that reform, the Commission encouraged transmission providers to establish "Regional Transmission Organizations," which would have operational control over the facilities owned by those providers. *See Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536-37 (2008) (citing Order No. 2000, 65 Fed. Reg. 810, 811-12 (2000)). The Commission also encouraged the management of these Regional Transmission Organizations by "Independent System Operators," not-for-profit entities that operate transmission facilities. *Id*.

Today, there are seven regional transmission organizations or independent system operators in the United States that serve approximately two-thirds of the nation's population. *See* Energy Primer at 61. The centralized markets they operate employ auctions to set a uniform market-clearing price for energy the day before it is needed and establish binding schedules for the production and consumption of that energy. *See, e.g., FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 268 (discussing auction process). A real-time market allows participants to

respond to changes in anticipated supply and demand during the operating day. *See* Energy Primer at 62.

While utilities in the Southeast provide open, non-discriminatory access to their transmission facilities, the Southeast region is not required to, and does not, have a regional transmission organization or independent system operator.

## II.   THE SOUTHEAST ENERGY EXCHANGE MARKET

### A.    Purpose Of The Market

The Southeast Energy Exchange Market – referred to as "SEEM" in the proceedings below – is an automated platform that facilitates intra-hour trades of energy among electric utilities in the Southeast. The platform employs an algorithm to match willing buyers and sellers that are already able to transact bilaterally under existing power sales agreements and regulatory authorizations. The trades take place at 15-minute intervals and are priced on a "split-the-savings" basis, *i.e.*, the midpoint between the seller's offer price and the buyer's bid price. *See* Melda/Bellar Aff. ¶¶ 21, 24-25, JA412-413.

The power is delivered over otherwise unused transmission capacity of participating members free of charge. This no-cost service – dubbed Non-Firm Energy Exchange Transmission Service or "NFEETS"

– eliminates the possibility of multiple transmission charges (*i.e.*, "pancaked" rates) that could otherwise discourage sub-hourly trading. *See id*. ¶ 23, JA412; *see also* Affidavit of S. Pope (Pope Aff.) ¶ 31, Attachment D to Agreement Filing, JA456.

### B.    Participants In The Market

Participation in the Market is voluntary and open to any entity that owns a generation facility or is obligated to serve demand in the Market's footprint, and meets the requirements below.  To buy or sell energy, an entity must join as a "Participant."  This requires among other things, (i) an executed participant agreement setting forth the Market's rules; (ii) arranging to take Non-Firm Energy Exchange Transmission Service from each participating transmission provider; and (iii) entering into bilateral wholesale power sales agreements with at least three other non-affiliated participants, thus establishing potential counterparties for the platform to match.  *See* Affidavit of C. McGeeney and C. Sellers (McGeeney/Sellers Aff.) ¶¶ 17-18, Attachment C to Agreement Filing, JA427.

Parties to the Southeast Energy Exchange Market Agreement, which sets forth the Market's rules, are designated as "Members."

Additional Members – defined as a load serving entity or an association or government unit created to provide energy to a cooperative or government load serving entity in the Market's territory – may join during the annual open season. *Id.* ¶¶ 14-16, JA426-427.

Members share the cost of developing and operating the Market's platform. In addition, they sit on the Membership Board, responsible for all significant decisions, while a revolving group sits on the Operating Committee that oversees the platform's daily functioning. *Id.* ¶¶ 22-25, JA428-429. Members that are transmission providers must amend their tariffs to offer Non-Firm Energy Exchange Transmission Service. *Id.* ¶ 32, JA432. Members that want to participate in the Market as energy buyers or sellers do so on the same terms and conditions as Participants. *Id.* ¶ 17, JA427.

Current Members include all of the various types of electric providers active in the Southeast, *i.e.*, vertically-integrated utilities like Duke Energy, federal entities like Tennessee Valley Authority, state-owned providers like South Carolina Public Service Authority, and municipalities like North Carolina Municipal Power Agency Number 1. The Market's original geographic scope is depicted below.



*See* Melda/Bellar Aff. ¶ 8, JA408.

## C.    Monitoring The Market

In the Southeast, sales of energy by FERC-jurisdictional entities

largely take place under market-based rate authority, subject to any

market-power mitigation measures imposed by the Commission.  *See*

*Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1184-86 (D.C. Cir. 2021)

(discussing Commission's market-based rate program); Energy Primer

at 60-61 (same).  The same is true for sales facilitated by the Southeast

Energy Exchange Market, which simply matches counterparties.  Any

pre-existing limits on an entity's authority to charge market-based

rates, such as price caps, apply to transactions identified by the Market.

*See* Pope Aff. ¶ 69, JA466.

The Market's platform is operated by a third-party Administrator. A third-party Auditor monitors the functionality of the automated platform to confirm that it is operating correctly and in accordance with the rules set forth in the Southeast Energy Exchange Market Agreement. *See* Agreement Filing at 16-17, JA301-302. In addition, on a weekly basis, the Administrator must submit confidential data to the Commission regarding Market transactions. The information is comparable to that submitted by independent system operators in centralized markets and will allow Commission staff to monitor for anomalies, or evidence of the exercise of market power or market manipulation. *See* Amendment Filing at 6-8 (R. 237), JA1143-1145; *see also* Amendment Order PP 31-32, JA218.

### D. Benefits Of The Market

By opening up access to lower cost generation, the Southeast Energy Exchange Market is projected to result in customer benefits of more than $40 million per year. *See* Benefits Analysis by Guidehouse Inc. and Charles River Assocs. (Benefits Analysis) at 6, Attachment E-1 to Agreement Filing, JA501. It is also projected to "allow for better

integration of diverse generation resources, including rapidly growing renewables and will reduce renewable curtailment." *See* Melda/Bellar Aff. ¶ 26, JA413. As more renewable and energy storage facilities are added to the resource mix in the coming years, market-wide savings could exceed $100 million per year. *See* Benefits Analysis at 4, JA499.

## III. THE COMMISSION PROCEEDINGS

On February 12, 2021, Southern Company Services, as agent for Alabama Power, filed the Southeast Energy Exchange Market Agreement with the Commission on behalf of itself and the other prospective Members.[2] The filing was supported by testimony from certain Member organizations explaining the development and operation of the Market, along with analyses from outside experts detailing the economic benefits of the Market and explaining why it will not provide new opportunities for the exercise of market power, and

---

[2] The initial Members of the Southeast Energy Exchange Market were: Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively , Southern Companies); Associated Electric Cooperative, Inc.; Dalton Utilities; Dominion Energy South Carolina; Duke Energy Carolina, LLC; Duke Energy Progress, LLC; Louisville Gas & Electric Company and Kentucky Utilities Company; North Carolina Municipal Power Agency Number 1; PowerSouth Energy Cooperative; North Carolina Electric Membership Corporation; and Tennessee Valley Authority.

how it has been designed to thwart new avenues for market manipulation.  *See* Agreement Filing at 2, JA287.

The parties subsequently responded to two rounds of questions from Commission staff, which were treated as filing amendments and reset the clock for Commission action.  Their last response was filed on August 11, 2021, and specified a requested effective date of October 12, 2021.

Under 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d), unless the Commission orders otherwise, a proposed rate becomes effective 60 days after it is filed.  *See, e.g.*, *City of Bethany v. FERC*, 727 F.2d 1131, 1143 (D.C. Cir. 1984).  Utilities may also propose an effective date that allows for more than the requisite 60-days' notice.  *See* 18 C.F.R. § 35.3. In such circumstance, the proposed effective date "will establish the date on which, by statute, a tariff filing would go into effect by operation of law in the absence of Commission action."  *Elec. Tariff Filing*, 130 FERC ¶ 61,047, P 6 (2010).  Here, the parties' October 12 requested effective date was 62 days after their final amendment.

## A. The Agreement Proceeding

### 1. The Agreement goes into effect by operation of law

In the fall of 2021, the Commission had four sitting Commissioners – enough for a quorum (three is the minimum, 42 U.S.C. § 7171(e)), but one short of the full complement of five. *Id.* § 7171(b)(1). The sitting members split two-two on whether to accept the Agreement. Accordingly, the Commission issued a notice confirming that, "in the absence of Commission action on or before October 11, 2021, the proposed Southeast [Energy Exchange Market] Agreement . . . became effective by operation of law" on October 12, 2021, the requested effective date. Notice, JA22.

Section 205(g), enacted in 2018, provides that, where there is a two-two split regarding a rate filing submitted under section 205, "the failure to issue an order accepting or denying the [rate] change by the Commission shall be considered to be an order issued by the Commission accepting the change." 16 U.S.C. § 824d(g)(1)(A). An aggrieved party may then seek agency rehearing and judicial review of this "inaction order" in the normal course. *Id.* §§ 824d(g)(2), 825*l*(b).

Where a rate filing submitted under section 205 goes into effect

due to a Commission deadlock, Congress directed each Commissioner to prepare "a written statement explaining the views of the Commissioner with respect to" the rate filing. *Id*. § 824d(g)(1)(B).

### a. Christie Statement

Commissioner Christie explained that he voted to accept the Southeast Energy Exchange Market Agreement. *See* Christie Statement (R. 229) at P 4, JA63 (available at https://elibrary.ferc.gov/eLibrary/filedownload?fileid=1c36fc0d-7ab4-c603-96ad-7c9fed100001). He stated that the Market will "increase efficiency, liquidity, transparency, and competition … and better utilize existing capacity in the region." *Id*. P 6, JA64. He stated these improvements will result in "undeniable benefits to consumers both in terms of reliability and lower costs." *Id*. P 21, JA72.

In reaching his conclusion, Commissioner Christie considered the various protests regarding different elements of the proposal. *Id*. P 7, JA64. He stated that many objections to the Southeast Energy Exchange Market emanated from an "agenda of imposing a [Regional Transmission Organization] on the Southeast." *Id*. P 10, JA66. But he stated that whether to adopt a Regional Transmission Organization is a

question for state policy makers, whereas the Commission is simply tasked with judging the proposal before it. *Id*. PP 1, 18, JA61,70.

As to the specific objections, Commissioner Christie stated that the Market's participation requirements are non-discriminatory and necessary to ensure the technical feasibility of the platform. *Id*. P 13, JA67. He further stated that no new market power analyses are required because the Market does not introduce a new product as it simply builds on the existing bilateral construct in the Southeast. *Id*. PP 8, 14, JA64, 68.

### b.  Danly Statement

Commission Danly also voted to accept the Agreement. *See* Danly Statement (R. 230) at P 1, JA76 (available at https://elibrary.ferc.gov/eLibrary/filedownload?fileid=6CE874A1-522F-CB40-9753-7CA053A00001). He stated that it will "enhance the existing bilateral market by creating an automated, region-wide platform that facilitates sub-hourly bilateral transactions using otherwise unused transmission capacity to achieve cost savings throughout the region." *Id*. P 33, JA99. He cited projected savings ranging between $40 million and $100 million. *Id*. P 30, JA97.

Commissioner Danly further stated that the various concerns raised by protestors did not overcome the filing parties' showing that their proposal was just and reasonable and not unduly discriminatory. *Id*. P 34, JA100. For example, the various market oversight components of the proposal will sufficiently guard against the exercise of market power. *Id*. P 22, JA92. Commissioner Danly stated this was particularly true since the Market "purports to be no more than an enhancement to an existing bilateral regime which is obviously permissible." *Id*.

Commissioner Danly determined that the heightened "*Mobile-Sierra*" standard of review – which permits changes only if required by the public interest – could appropriately be applied to future challenges to the Agreement. *Id*. PP 24-30, JA93-97. He explained that Commission precedent, not tested in any court, precluding application of *Mobile-Sierra* protection to generally-applicable contract provisions "violates the principles animating" the doctrine and "deviates from the plain terms of the judicial precedent establishing and reinforcing it." *Id*. P 24, JA93. Commissioner Danly further stated that, because the original proposal had not been formally revised to pare back the *Mobile-*

*Sierra* presumption as proposed by the filing parties during the Agreement Proceeding, "the *Mobile-Sierra* public interest standard of review applies to the *entire* agreement, as requested in the initial submission." *Id.* P 18, JA89.

Commissioner Danly also addressed his colleagues' objections to the proposal, including claims of undue discrimination, and stated that the decision whether to join a Regional Transmission Organization or independent system operator "is reserved wholly to the States and their utilities." *Id.* P 21, JA91.

### c. Glick Statement

Chairman Glick voted against accepting the Agreement. *See* Glick Statement (R. 227) at P 2, JA25 (available at https://elibrary.ferc.gov/eLibrary/filedownload?fileid=43670b25-f764-cf75-b79e-7ca360800001). Although he believed that much of the proposal satisfied the Federal Power Act's just and reasonable standard, Chairman Glick stated that application of the *Mobile-Sierra* presumption to the Agreement violates Commission precedent. *Id.* Under that precedent, he stated "*Mobile-Sierra* does not apply to 'generally applicable' contract provisions," including those that "would

apply to any potential future signatories with limited, if any, room for negotiation." *Id*. P 10, JA28.  Here, entities seeking to become Members "would need to accept the enumerated provisions 'as is,' with limited room for negotiation." *Id*.  He concluded that applying the *Mobile-Sierra* standard to portions of the Agreement would thus "depart from our precedent without justification." *Id*.

### d. Clements Statement

Commissioner Clements voted to reject the Agreement.  *See* Clements Statement (R. 228) at P 2, JA36 (available at https://elibrary.ferc.gov/eLibrary/filedownload?fileid=D803543A-346A-C96C-8659-7CA337300000).  In her view, the Southeast Energy Exchange Market is not simply an enhancement of the existing bilateral market, but rather a mechanism for providing valuable transmission service.  *Id*. PP 5, 10-12, 16-17, JA36, 38, 39, 40-41.  And access to that transmission service is not open, in contravention of the Commission's landmark Order No. 888.  *Id*. P 20 ("It is hard to imagine a more direct and problematic barrier than granting a subset of market participants veto power over whether others may access transmission service, as the Participant Agreement requirement does."), JA42.  Further,

Commissioner Clements stated that the Market's rules and governance are unduly discriminatory and force non-load serving entities into "a Hobson's choice: agree to participate in a market that is controlled in all substantive respects by preferred Members and risk exposure to market flaws" or other abuses, "or forgo access to a valuable transmission service altogether." *Id*. P 33, JA48.

In addition, Commissioner Clements believed that the Agreement establishes a "loose power pool." Under Order No. 888, such arrangements must allow open membership to any market participant, which was not true for the Market. *Id*. PP 27-32, JA46, 48.

Further, in her view, the Market is a "complex multi-lateral optimization engine that replaces the bilateral negotiation of key terms, including price and quantity." *Id*. P 12, JA39. Certain design features "create avenues for manipulation." *Id*. P 48, JA55. For instance, she explained a participant could "toggle off" competitors to deny them access to the Market's transmission service (*id*.), a particular concern given a vertically-integrated utility may be motivated to favor the interests of its shareholders. *Id*. P 19, JA42. Thus additional scrutiny

is warranted, including market power analyses for the new geographic footprint established by the Market. *Id.* P 44, JA53.

### 2. The Coalition's untimely requests for rehearing

The Coalition did not seek rehearing until November 12, 2021, 32 days after the Commission's failure to act by October 11 to prevent the Agreement from becoming effective by operation of law the following day. Because this failure to act is the aggrieving "order" pursuant to 16 U.S.C. § 824d(g), a unanimous Commission dismissed the rehearing requests as untimely in light of the Federal Power Act's 30-day rehearing time limit. *See* 16 U.S.C. § 825*l*(a) (aggrieved parties "may apply for a rehearing within thirty days after the issuance of such order"); *see also Ala. Power Co.*, 177 FERC ¶ 61,178 (2021) (R. 247) (Rejection Order), JA94, *reh'g denied*, 178 FERC ¶ 61,196 (2022) (R. 285) (Rejection Rehearing Order), JA257.

### B. The Tariff Proceeding

In a majority-voted order issued on November 8, 2021, the Commission accepted revisions to the transmission tariffs of the four FERC-jurisdictional, transmission-owning Members of the Southeast Energy Exchange Market (Duke Energy, Louisville Gas and Electric, Alabama Power, and Dominion Energy South Carolina). *See Duke*

*Energy Progress, LLC*, 177 FERC ¶ 61,080 (2021) (R. 232) (Tariff

Order), JA117, *reh'g denied* 178 FERC ¶ 61,195 (2022) (R. 284) (Tariff

Rehearing Order), JA226.

The revisions established Non-Firm Energy Exchange

Transmission Service, the no-charge transmission service that

facilitates sales in the Market. The Commission found that the product

"will utilize otherwise unused transmission capacity," thereby

"promot[ing] more efficient operation" of the relevant transmission

systems, "while at the same time reducing the transactional friction

normally associated with bilateral transactions." Tariff Order P 40,

JA133.

Commissioner Clements dissented. She asserted that Order No.

888 bars incorporating Non-Firm Energy Exchange Transmission

Service into the parties' tariffs because access to that service is not

open. She also argued that the Commission's regulations required the

transmission service to be set forth in a joint tariff. *See* Clements

Dissent PP 4-14, PP 21-24, JA36-40, 43-44.

### C.   The Amendment Proceeding

On November 24, 2021, the Members of the Southeast Energy

Exchange Market filed proposed amendments to the Agreement.  The

amendments reflected changes they had agreed to make in response to

concerns identified by protestors and Commission staff during the

Agreement Proceeding, before the Agreement went into effect by

operation of law.  *See* Amendment Filing at 2, JA1139.

To increase the transparency of the Market, the Members

proposed the weekly submission of confidential market data to the

Commission, and proposed to require the Auditor to publicly disclose

responses to information requests from market participants and state

and federal regulators.  *Id*. 6-12, JA1143-49.  In addition, the Members

proposed to revise the Agreement to limit the more stringent *Mobile-*

*Sierra* application of the just and reasonable standard of review to

future changes to certain specified provisions generally relating to key

rights and obligations negotiated among the Members.  As a result, the

ordinary just and reasonable standard of review would apply to changes

to the balance of the Agreement, including the Market's rules.  *Id*. 14-

15, JA1151-52.

The Commission unanimously approved the amendments, finding

that they "improve the transparency of [the Southeast Energy

Exchange Market] to the public and to the Commission, and … establish safeguards to ensure [the Market] operates as intended. *See* Amendment Order P 31, JA213. The proposed change to the standard of review for future changes to the Agreement "facilitat[es] the Commission's ability to ensure that rates remain just and reasonable and not unduly discriminatory or preferential." *Id*. P 36, JA219.

## SUMMARY OF ARGUMENT

### The Agreement Proceeding

*Lack of Jurisdiction:* The Court lacks jurisdiction over any claims relating to the Agreement Proceeding because the Coalition did not file its requests for rehearing until 32 days after October 11, 2021, the last day prescribed by statute for Commission action on the Southeast Energy Exchange Market Agreement. There is no dispute that the Commission's failure to act starts the 30-day rehearing clock. The Coalition contends, however, that because October 11 was a federal holiday, the Commission could use Rule 2007, its standard time computation regulation, to expand its time to act on the Agreement. But this Court has already held that the Commission lacks authority to

extend the statutory deadline for agency action in response to a Federal Power Act section 205 filing.

*Scope of Review*:  In light of the Coalition's untimely request for agency rehearing, the Court lacks jurisdiction to consider the Agreement Proceeding.  But if the Court examines the merits, the pertinent question is whether there is sufficient evidence in the record to support the agency outcome – acceptance of the filed rate – predetermined by Congress in section 824d(g).  Commissioner statements anchor the Court's consideration of whether the Southeast Energy Exchange Market Agreement could reasonably be found to be just and reasonable.  But the relevant statutory provisions indicate that the entire record may be relied upon to answer that question as well.

*The Agreement:*  The record supports the conclusion that the Agreement could reasonably be found to be just and reasonable.  The matching platform simply facilitates trading under the existing, just and reasonable bilateral market construct in the Southeast.  It addresses a market shortcoming by making economically efficient, intra-hour trades easier to conduct and is conservatively projected to

result in customer savings of more than $40 million per year compared to the current bilateral market.

As to the Coalition's market power concerns, the actual sales of energy will take place under existing market-based rate authorizations and mitigation measures. In addition, there will be weekly data submissions that will further the Commission's ability to monitor market transactions and participant activity.

Finally, there is legal support for applying the *Mobile-Sierra* presumption to those Agreement provisions identified by the filing parties in the Amendment Proceeding. The enumerated provisions primarily affect the Members' relationship among themselves. There is legal support for finding that some of the provisions are automatically subject to *Mobile-Sierra* protection, while others may be granted such protection as a matter of agency discretion.

**The Tariff Proceeding**

***Non-Firm Energy Exchange Transmission Service***: The Commission reasonably accepted tariff revisions establishing Non-Firm Energy Exchange Transmission Service. By making otherwise unused transmission capacity available to transactions facilitated by the

Southeast Energy Exchange Market, this new service will make more efficient use of existing capacity. It will also make possible economically efficient, intra-hour bilateral transactions and thereby confer benefits on consumers.

*Participation Requirements*: The underlying theme to the Coalition's complaints about the Market's participation requirements is that they are tools for "monopolies" to exclude competitors for the benefit of their shareholders. But this theory lacks support. First, the Southeast Energy Exchange Market changes the status quo by facilitating trades when participants can buy energy from others more cheaply than they can generate it themselves. And the Commission reasonably found that the participation requirements were necessary for proper functioning of the Market and not unduly discriminatory. Moreover, many of the Members are governmental entities, not investor-owned utilities, and do not have shareholders.

*Power Pool Requirements*: The Commission reasonably found that unconditional access to the Market for all wholesale market participants was not necessary. That requirement only applies to power pools, the defining characteristic of which is "discounted" or "special"

transmission service. Non-Firm Energy Exchange Transmission Service is neither discounted nor special. Instead, it represents the lowest priority service available and cannot be used as a replacement service for any entity that has reliability obligations.

*Joint-Tariff Waiver*: The Commission also reasonably waived its requirement of a joint-tariff for multi-lateral arrangements. Here, the purpose of the joint-tariff requirement – protection against undue discrimination – is served by having individual tariffs with identical terms.

*Cost Causation*: The Coalition's cost causation concerns are baseless. The cost here is the purchase of firm transmission service, which was caused by an electricity provider's business needs. Any reduction in non-firm transmission revenue credits to offset that cost is not a cost causation matter. In any event, the impact of Non-Firm Energy Exchange Transmission Service is expected to be minimal and diffuse on existing levels of non-firm transmission service.

# ARGUMENT

## I. THE COURT LACKS JURISDICTION OVER THE AGREEMENT PROCEEDING

A timely request for agency rehearing is a prerequisite to judicial review. *See* 16 U.S.C. § 825*l*(a). Here, the Court lacks jurisdiction over any claims arising from the Agreement Proceeding because the Coalition did not file its requests for rehearing until 32 days after the last day for the Commission to act on the Southeast Energy Exchange Market Agreement – the event that starts the Federal Power Act's 30-day rehearing clock. *See* Rejection Order PP 9-10, JA197-198. The fact that the Coalition failed to properly account for an intervening holiday offers no excuse under the strict non-waivable standards of the Act. *See City of Campbell v. FERC*, 770 F.2d 1180, 1183 (D.C. Cir. 1985) ("The 30-day time requirement of this statute is as much a part of the jurisdictional threshold as the mandate to file for a rehearing.").

### A. The Commission's Failure To Act Starts The Rehearing Clock

Section 205(g) of the Federal Power Act states that, in the event of a divided Commission, "the failure to issue an order accepting or denying" the proposed rate filing "shall be considered to be an order issued by the Commission accepting the change for purposes of section

825*l*(a)." 16 U.S.C. § 824d(g)(1)(A). Section 825*l*(a), in turn, establishes that parties "may apply for rehearing within thirty days after the issuance of [an aggrieving] order." *Id.* § 825*l*(a).

Taken together, sections 824d(g) and 825*l*(a) provide that parties "may apply for rehearing within thirty days after" the date of "the failure to issue an order accepting or denying the change by the Commission."

## B. The Commission Lacked Statutory Authority To Act After October 11, 2021

Section 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d), provides the Commission with 60 days to act before a rate takes effect by operation of law. *See, e.g.*, *City of Campbell*, 770 F.2d at 1184-85 (absent Commission action, "a proposed rate becomes effective 60 days after it is filed"); *City of Bethany*, 727 F.2d at 1143. If public utilities propose an effective date that is beyond the Act's 60-day waiting period, that date "will establish the date on which, by statute, a tariff filing would go into effect by operation of law in the absence of Commission action." *Elec. Tariff Filings*, 130 FERC ¶ 61,047 at P 6; *see also* 18 C.F.R. § 35.3 (addressing proposed effective dates). The Commission's statutory authority to act in response to a rate filing thus expires on the

later of (i) the 60th day after a filing with no proposed effective date, or (ii) the day before a proposed effective date. *See* Rejection Order P 11, JA198.

Here, the filing parties requested an effective date of October 12, 2021, which was 62 days after their final amendment. *See* Rejection Order P 4, JA196. The Commission did not issue an order accepting or denying the Agreement by October 11, 2021, and the Agreement became effective as of October 12, 2021.

As the Secretary of the Commission explained in the Notice:

> Pursuant to section 205 of the [Federal Power Act], in the absence of Commission action on or before October 11, 2021, the proposed Southeast EEM Agreement and concurrences thereto became effective by operation of law. Accordingly, the effective date of the proposed tariff sheets is October 12, 2021, as reflected in these tariff sheets.

JA22. The Commission's "failure to issue an order," 16 U.S.C. § 824d(g)(1)(A), thus occurred on October 11, the expiration of the statutory period for the Commission to act prior to the filing taking effect by operation of law.

Once the Agreement became effective, the "filed rate doctrine and the rule against retroactive ratemaking [left] the Commission [with] no discretion … to retroactively change or adjust [the] rate for good cause."

*Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1230 (D.C. Cir. 2018); *see also* Rejection Rehearing Order P 14 (same), JA264.[3]

The 30-day rehearing period established in 16 U.S.C. § 825*l*(a) thus expired on November 10, 2021.  The Coalition's rehearing requests were not filed until November 12, 2021 – two days late – and were therefore untimely.

**C.    The Coalition's Efforts To Avoid The Federal Power Act's Strict Jurisdictional Requirement Fail**

**1.    Rule 2007 cannot extend the Commission's statutory authority to act**

The Coalition attempts to avoid this result by pointing to Commission Rule 2007, which provides that, where the last day of "any time period" falls on a holiday, the period does not end until the next business day.  *See* 18 C.F.R. § 385.2007.  And since October 11, 2021, was Columbus Day, the Coalition asserts that October 12 was actually the last day for Commission action.  Br. 66.  But as the Commission explained, while Rule 2007 can extend the deadlines for filers, it cannot

---

[3] Once a rate goes into effect, the Commission may only alter it "in response to a timely request for rehearing … [or] pursuant to [Federal Power Act] section 206 or a new section 205 filing in a new proceeding." Rejection Order P 12, JA198.

enlarge the statutory time limit for Commission action on rate filings. *See* Rejection Order P 15, JA200.

### a. This is consistent with precedent

This Court has already determined that the Commission lacks authority to extend the statutory deadline for agency action in response to a Federal Power Act section 205 filing. In *Indiana & Michigan Electric Co. v. FPC*, 502 F.2d 336, 341 (D.C. Cir. 1974), the Court found that a Commission regulation imposing a *de facto* 30-day extension of the deadline for Commission action under section 824d(d) "unlawfully extend[ed] the statutory waiting period for utilities." The statutory notice period (then 30 days, now 60) is the "maximum a utility can be compelled to wait from the time it files its rate changes until the date the changes take effect unless the Commission properly exercises its suspension power." *Id*. at 341; *see also* Rejection Rehearing Order P 15, JA265.

The Coalition ignores *Indiana & Michigan Electric* and instead claims that *City of Batavia v. FERC*, 672 F.2d 64 (D.C. Cir. 1982), "held that FERC's time computation rules apply to statutory deadlines." Br. 69. But *Batavia* involved the timeliness of a petition for review (*i.e.*, a

deadline for a filer), not a deadline for Commission action.  *See* 672 F.2d 72-73 (discussing timeliness of petition for review).  *Batavia* says nothing that would call into question the Court's recent admonition that the "Commission has no authority to erase and replace the statutorily prescribed jurisdictional consequences of its inaction."  *Allegheny Def. Project v. FERC*, 964 F.3d 1, 15 (D.C. Cir. 2020) (en banc).

## b.    This is consistent with past practice

The Coalition contends that the Commission has a "longtime position that Rule 2007 applies to the" 60-day waiting period for rate filings.  Br. 68.  Yet the Coalition does not identify a single instance where the Commission applied Rule 2007 to justify the issuance of an order after section 205(d)'s statutory waiting period had run, even though utilities "often seek effective dates for their rates that coincide with the first day of the month (regardless of the day of the week that the first happens to fall on), or the first day of the year even though it is a federal holiday."  Rejection Rehearing Order n.48, JA266; *see also* Rejection Order n.24 (citing examples of early Commission action when waiting period expires on a weekend or holiday), JA199.

In the end, the Coalition is left with a few Commission statements, primarily in the 2003 and 2019 orders amending Rule 2007, indicating that the Rule could, in fact, be applied to time limits on Commission action. *See* Br. 67. But those orders were intended to address emergency situations not present here. *See* Rejection Rehearing Order n.51, JA267. Moreover, "[t]o the extent that … [Rule 2007] may conflict with the statute, … the statute clearly controls." *United Airlines, Inc. v. Transp. Sec. Admin*, 20 F.4th 57, 63 n.3 (D.C. Cir. 2021) (internal quotations omitted); *see also* Rejection Rehearing Order P 17 (same), JA267.

### c.      There are no retroactivity concerns

The Coalition wrongly claims that the Commission's determination of how Rule 2007(a) applies to "orders" arising from Commission inaction as described in 16 U.S.C. § 824d(g) cannot be "retroactively" applied in this case. *See* Br. 68-70. "Within the context of an agency adjudication, the [Commission] generally may lawfully interpret a regulation notwithstanding its retroactive effect." *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 907 (D.C. Cir. 2010); *see also Neustar, Inc. v. FCC*, 857 F.3d 886, 896 (D.C. Cir. 2017) ("a *principle* announced

in adjudication is necessarily retroactive") (internal quotation omitted). None of the factors raised by the Coalition justifies an exception to this rule.

First, contrary to the Coalition's claim (Br. 69), this is a case of first impression: "the Commission has not previously explained in an order the proper calculation of the deadline for rehearing requests following the failure of the Commission to act within the time period prescribed by section 205(d) of the [Federal Power Act]." Rejection Order P 9, JA197.

Second, the Coalition's complaints about a lack of notice are baseless. Br. 70. The Notice stated that the Agreement went into effect by operation of law on October 12 "in the absence of Commission action on or before October 11, 2021." JA22.

Third, the Coalition wrongly claims there is no "statutory interest" in this case. Br. 70. The Commission's interpretation is driven by the dictate in section 205(d), 16 U.S.C. § 824d(d), that, absent Commission action, utilities may only be made to wait 60 days before their proposed rates go into effect. *See, e.g.*, Rejection Order P 12, JA198; Rejection Rehearing Order P 14-15, JA264-65.

Finally, there is no unfairness. The Coalition's inability to challenge the Southeast Energy Exchange Market Agreement is the statutory consequence of their decision to wait until November 12, 2021, to file their rehearing requests, rather than avoiding any question about the applicability of Rule 2007 by filing two days earlier.

## 2.    There is no "inextricable link" exception

The Coalition contends the Court can hear their Agreement Proceeding claims because they are "inextricably linked" to those regarding the Tariff Proceeding. Br. 71. But there is no "inextricable link" exception to the Federal Power Act's timely rehearing requirement. The Coalition relies on language from *Batavia* that "is *dicta* from a footnote; the jurisdictional issue there was resolved on other grounds." *New Eng. Power Generators Ass'n, Inc. v. FERC*, 879 F.3d 1192, 1199 (D.C. Cir. 2018). Moreover, in *Batavia*, the jurisdictional question arose from multiple orders in the same ongoing proceeding. *See* 672 F.2d at 85-86.[4] Here, the Agreement Proceeding

---

[4] The other case cited by the Coalition, *Kansas Cities v. FERC*, 723 F.2d 82, 85-86 (D.C. Cir. 1983), found jurisdiction when a rehearing request timely challenged an order accepting a compliance filing but not an earlier order specifying the relevant legal rule to be used in the agency proceedings. It was unclear to the Court whether the

and the Tariff Proceeding were commenced by different groups of

parties in different Commission dockets and were addressed in separate

proceedings. Permitting the Coalition to pursue their claims under an

"inextricably linked" theory "would render § 313(b)'s [§ 825*l*(b)'s] strict

jurisdictional bar toothless" in any instance where separate

Commission proceedings involve related content. *New Eng. Power*

*Generators*, 879 F.3d at 1199.

Indeed, the Coalition itself has repeatedly asserted that the

Agreement Proceeding and the Tariff Proceeding are distinct. The two

proceedings purportedly injured parties in their group in "distinct

ways." Response to Intervenors' Motion to Dismiss (ECF Doc.

#1948303) at 14. The revisions at issue in the Tariff Proceeding were

"distinct from the Agreement and involved separate Commission

approval." *Id*. 15. "Distinct" regulatory standards were applied in the

two proceedings (*id*. 19), and a ruling in the Tariff Proceeding "would

have no bearing on the lawfulness of the Agreement itself." *Id*. 22.

---

petitioners were "aggrieved" by the earlier order, as is required for
jurisdiction section 825*l*(a). *Id*.; *see also New Eng. Power Generators*,
879 F.3d at 1199 (discussing *Kansas Cities*).

Given these representations, the Coalition cannot now contend that the Agreement Proceeding and Tariff Proceeding are so "inextricably linked" as to excuse failure to comply with the Federal Power Act's strict jurisdictional requirements.

## II. IF IT PROCEEDS TO THE MERITS, THE COURT MAY REVIEW THE ENTIRE RECORD

### A. Section 824d(g) Prescribes On-The-Merits Review

If the Court reaches the merits of the Agreement Proceeding, the question becomes how it should conduct its review. In the typical case, the Court would review written orders "determined by a majority vote of the [Commissioners] present." 42 U.S.C. §7171(e). But this is not the typical case. Where, as here, the Commission deadlocks two-two on a rate filing, Congress has prescribed that such event is agency action accepting the rate filing: "the failure to issue an order accepting or denying the [rate] change by the Commission *shall be considered to be an order issued by the Commission* accepting the change[.]" 16 U.S.C.§ 824d(g)(1)(A) (emphasis added); *see also* 5 U.S.C. § 551(13) (defining "agency action" to include an "order" and "failure to act").

The "inten[t]" of the bill (ultimately codified at section 824d(g)) was "to ensure that FERC and the courts consider the merits of a rate

change and whether such a change is just and reasonable as required by the Federal Power Act."  164 Cong. Rec. H8227 (statement of Rep. Kennedy, chief bill sponsor in the U.S. House of Representatives).  The statutory text reflects this intent.

Under section 824d(g)(1)(A), Commission inaction is deemed to be an order "for purposes of section 825*l*(a) of this title."  Section 825*l*(a), in turn, establishes the prerequisites for challenging a Commission action in court on the merits:  a party must seek agency rehearing and wait 30 days for an agency order on the rehearing application.  *See Allegheny*, 964 F.3d at 4-5 (interpreting the Natural Gas Act analog to § 825*l*).  Since a "purpose[] of section 825*l*(a)" is to permit on-the-merits judicial review of an agency order, section 824d(g)(1)(A)'s incorporation-by-reference of that provision evinces Congress's intent to afford litigants such review.  *See also* S. Rep. 115-278, at 4 (section 824d(g) "require[s] the Commission to compile an adequate administrative record of the [rate] proceeding for a court to review").

Section 824d(g)(2), titled "Appeal," further indicates that, if all jurisdictional prerequisites are satisfied, the court of appeals should conduct a merits review.  In particular, subsection (2) provides that,

where a party seeks rehearing of Commission inaction and a continuing split or lack of quorum prevents the Commission from acting on a rehearing request, "such person may appeal under section 825*l*(b) of this title." 16 U.S.C. § 824d(g)(2). Section 825*l*(b), in turn, provides the Court with "jurisdiction … to affirm, modify, or set aside such order in whole or in part." *Id*. Further, "[t]he findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." *Id*.

Putting it all together, a natural reading of sections 824d(g)(1)-(2) and sections 825*l*(a)-(b) most reasonably results in the following conclusion: a court is (i) empowered to review "an order issued by the Commission accepting the change" (*i.e.*, inaction due to two-two deadlock), and (ii) may "affirm, modify, or set aside such order" if the Commission errs as a matter of law or if a finding that the rate filing is just and reasonable cannot be "supported by substantial evidence." *See* §§ 824d(g)(2), 825*l*(b).

Because section 824d(g) designates Commission inaction as "an order accepting the change," the ultimate question for the Court is whether the rate filing may reasonably be characterized as just and reasonable. *See id*. § 824d(a) (all jurisdictional rates "shall be just and

reasonable"). And because courts apply the Administrative Procedure Act's deferential arbitrary and capricious standard of review in actions brought under section 825*l*(b), that is the most reasonable standard to apply in section 824d(g) matters, as well. *See, e.g.*, *Con. Ed. Co. of N.Y., Inc. v. FERC*, 45 F.4th 265, 277 (D.C. Cir. 2022) (applying 5 U.S.C. § 706(2) on judicial review of an action brought under section 825*l*(b)); *see also id.* at 278 (applying section 825*l*(b)'s "substantial evidence" standard to FERC's factual findings); *Fed. Election Comm'n v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476, 1478 (D.C. Cir. 1992) (deferring to interpretation of regulation set forth in Commissioner statement where agency deadlocked).

## B. In Assessing An "Order" Under Section 824d(g)(1), The Court May Examine The Entire Record

The Coalition agrees that section 824d(g) contemplates on-the-merits review. *See* Br. 27. The parties diverge on *what* should be reviewed.

### 1. Commissioner statements can anchor judicial review

Typically, a court assesses the Commission's rationale set forth in a majority-voted order. Here, however, the "order" on review is, as

Congress prescribed, statutorily-mandated automatic acceptance of a rate filing. *See* 16 U.S.C. § 824d(g)(1). In this circumstance, the statements from Commissioners Christie and Danly supporting the rate filing can anchor the Court's review. But section 824d(g) contemplates that the Court may also look to the entire record to assess whether the Southeast Energy Exchange Market Agreement can reasonably be found to be just and reasonable. This follows from the purpose of section 824d(g), which was to "require the Commission to compile an adequate administrative record of the [rate] proceeding for a court to review" to ensure on-the-merits judicial review. S. Rep. 115-278, at 4.

It also follows from the text of section 824d(g), which deems Commission inaction to be an order accepting the rate filing. The question is thus whether substantial record evidence supports this congressionally-mandated outcome. Under section 825*l*(b) – which is incorporated into section 824d(g) – any facts that would support that conclusion are conclusive if supported by substantial evidence in the record. *See* 16 U.S.C. § 825*l*(b); *see also Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1236 (D.C. Cir. 2005) ("The Commission's factual

findings are conclusive if supported by substantial evidence in the record, 16 U.S.C. § 825*l*(b)").

So while Commissioner statements supply the foundation for the Court's review, the pertinent statutory provisions and legislative history indicate that the reviewing court may look beyond those statements to assess whether there is evidence in the record that would support the conclusion that the Agreement may reasonably be found to be just and reasonable.

## 2.    The Court may review the entire record

The Coalition contends that the Court should confine its review to the four corners of the statements from Commissioners Christie and Danly.  *See* Br. 27, 29-33.  And "as with any agency order," if those statements fail to respond in detail to all objections raised below, the Coalition believes that the Agreement Proceeding must be remanded. *See* Br. 28.  But Congress did not prescribe that Commissioner statements should be the sole focus of judicial review.

This is apparent from the language of section 824d(g).  First, requiring the Commission to supply a reasoned basis for its majority-voted action makes sense because the APA is concerned with

an agency's explanation for *its own* action.  *See, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (APA requires "an agency [to] examine the relevant data and articulate a satisfactory explanation for *its* action" (emphasis added) (cleaned up)).  Here, however, Congress has predetermined the agency outcome (acceptance of the filed rate), thus moderating the salience of the Commission's explanation *for* that outcome.  That makes the Commissioners' statements highly relevant, but not exclusively so.

Second, Congress only asked the Commissioners to express their "views … with respect to the change."  16 U.S.C. § 824(g)(1)(B).  They are not required to set forth a rational connection between the facts found and their conclusions, along with a response to all legitimate objections, as would be the case in a standard, majority-voted order.  *See, e.g., PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (articulating standards for majority-voted FERC orders).

Third, Congress made clear that the statements were only part of the record for judicial review.  They are "added" to the record, not the entirety of it.  16 U.S.C. § 824d(g)(1)(B).

Here, as explained below, there is adequate explanation in the Commissioner statements and evidence in the record to support the conclusion that the Agreement may reasonably be found to be just and reasonable.

## III. THE SOUTHEAST ENERGY EXCHANGE MARKET AGREEMENT MAY REASONABLY BE FOUND TO BE JUST AND REASONABLE

### A. The Southeast Energy Exchange Market Enhances The Existing Bilateral Market For The Benefit Of Consumers

The Southeast Energy Exchange Market Agreement may reasonably be found to be just and reasonable. The Agreement establishes a platform to efficiently identify intra-hour energy sale opportunities and employs otherwise unused transmission capacity to deliver those sales at no cost. These enhancements to the existing bilateral market yield real benefits to consumers.

#### 1. Builds on existing market structure

The platform established under the Agreement is not a new market construct, nor a new vehicle for the sale of energy. It is simply an enhancement of the existing bilateral regime in the Southeast, "which is obviously permissible under the [Federal Power Act]." Danly Statement P 22, JA92; *see also* Christie Statement P 6 (same), JA64;

*Morgan Stanley*, 554 U.S. at 531 ("the FPA also permits utilities to set rates with individual electricity purchasers through bilateral contracts").

The Southeast Energy Exchange Market is a matching service.  It uses an algorithm to pair willing buyers and sellers that are already able to transact with one another under existing sales agreements and regulatory authorizations.  The actual sale of energy between matched entities will thus be accomplished as they always have in the Southeast. *See* Melda/Bellar Aff. ¶ 21, JA412.  Sales involving FERC-jurisdictional entities with market-based rate authority will remain subject to the safeguards in the Commission's market-based rate program (*e.g.*, updated market power analyses, electronic quarterly reports), as well as any existing mitigation measures.  *See* Pope Aff. ¶¶ 69-72, JA466-68; Agreement Filing at 7, 28, JA292, 313; Danly Statement P 22, JA92; *see also Morgan Stanley*, 554 U.S. at 537-38 (discussing safeguards in Commission's market-based rate program); *Public Citizen*, 7 F.4th at 1184-86 (same).

Additional safeguards have been implemented as well.  For example, on a weekly basis, the Administrator will submit confidential

market data to the Commission comparable to that submitted by system operators in centralized markets. *See* Amendment Order P 4, JA204. That information will also be provided to market participants, subject to a certain degree of masking and quarantining to address confidentiality concerns. *Id*. P 9, JA208. The Auditor will ensure that the platform operates in accordance with the Market Rules and will promptly post to the Market's website responses to inquiries from market participants and regulators. *See id*. P 5, JA205. These additional safeguards will enhance transparency and assist the Commission in "its ongoing monitoring and surveillance of market transactions and market participant activity" in connection with transactions facilitated by the Market. *See* Amendment Order P 32 JA218;[5] *see also* Christie Statement P 9 ("monitoring and auditing" proposal makes "for a just and reasonable proposal under section 205"), JA65; Danly Statement P 22 (same), JA92.

## 2. Addresses an existing market inefficiency

Electricity providers seek short-term bilateral transactions to

_____

[5] These modifications were proposed during the course of the Commission's review of the Agreement before it went into effect by operation of law. *See* Amendment Order P 3, JA204.

displace more expensive generation – *i.e.*, they buy electricity when the price is less than the cost to generate, or they sell when the price is greater than the cost to produce and deliver. These economically efficient transactions reduce costs, and a significant portion of the margins from the sales are credited back to consumers. *See* Melda/Bellar Aff. ¶¶ 9-12, JA408-09. But due to a variety of reasons, including geographic constraints and lack of visibility into willing counterparties, intra-hour sales are rare in the Southeast. *See id*. ¶¶ 9, 13, JA408, 409.

The Southeast Energy Exchange Market directly addresses this inefficiency by making use of an automated matching system over a wide geographic region. *See id*. ¶ 24, JA412 The platform established under the Agreement thus "acts to enhance the existing bilateral market … [and] will increase efficiency." Christie Statement P 6, JA64; *see also* Danly Statement P 33 (same), JA99.

### 3. Makes efficient use of transmission capacity

The Market also "more efficiently uses the transmission system in the existing market." Danly Statement P 33, JA99. Sales arranged through the Market will be delivered by Non-Firm Energy Exchange

Transmission Service, a no-cost service that makes use of "transaction capacity that would otherwise be left fallow." *Id*.; *see* Christie Statement P 15 (same), JA68.

There is no opportunity cost associated with this as-available service. "Entities may continue to use the existing transmission system in accordance with the Commission-approved [tariffs] in place today." Danly Statement P 23, JA92. But if there is available capacity, the automated system underlying the Market searches for delivery paths over multiple participating transmission systems, thereby "overcoming transaction costs and information barriers" in the existing market. Pope Aff. ¶ 32, JA454. It will thus "better utilize existing transmission capacity in the region," resulting in substantial benefits for consumers. Christie Statement P 6, JA64.

### 4.    Results in substantial consumer benefits

The record contains qualitative and quantitative analyses of the anticipated benefits of the Southeast Energy Exchange Market. Those analyses demonstrated that the "Market's combination of zero-cost, non-pancaked transmission service and automated 15-minute trading" will arrange beneficial transactions "in ways that are unlikely to occur

today." Pope Aff. ¶ 32, JA456. Consumer savings are expected to amount to $40 million per year versus the status quo. *See* Benefits Analysis at 4, JA499. Market-wide savings increase to over $100 million per year by 2037 assuming higher penetration of renewable and energy storage resources across the region. *Id*.; *see also* Christie Statement P 6 (noting projected benefits), JA64; Glick Statement P 12 (same), JA30. And it is reasonable to expect that the Market will assist the increased penetration of renewable resources. *See* Melda/Bellar Aff. ¶ 32 (explaining why "the Southeast [Energy Exchange Market] is expected to support increased renewables integration in the Southeast"), JA416.

These "undeniable benefits to consumers" establish that the Agreement may reasonably be found to be just and reasonable. Christie Statement P 21, JA72; *see also* Danly Statement P 33 (Agreement offers significant potential benefits with "virtually no downside"), JA100.

## B. The Coalition's Substantive Objections Lack Merit

The Coalition raises a host of objections to the membership, governance, and operational aspects of the Southeast Energy Exchange Market. Commissioners Christie and Danly considered the Coalition's

critique and found that it did not overcome the filing parties' showing that the Agreement was just and reasonable and not unduly discriminatory or preferential.  *See, e.g.,* Christie Statement P 7 ("various protests and comments" that "express concern with different elements and aspects" of the proposal do not overcome the filing parties' showing that it is just and reasonable), JA64; Danly Statement P 34 (protestors' "concerns with various aspects of the" proposal do not establish that filing parties failed to "satisf[y] their burden under FPA section 205"), JA100.  That determination is well-supported by the record.

## 1.    Governance

The Coalition raises multiple objections regarding the governance of the Southeast Energy Exchange Market.  It first claims that the Members have "unfettered discretion over which entities can participate."  Br. 29; *see also* Harv. Am. Br. at 22 (complaining of "second-class participation").  That is incorrect.  Any entity that can physically transact in the existing bilateral markets – *i.e.*, any generator or load-serving entity that is physically connected to a participating transmission provider – is eligible to become a

Participant. *See* McGeeney/Sellers Aff. ¶ 18, JA427. And there is only one class of Participants and one set of market rules, regardless of whether a Participant is also a Member. *See also* Tariff Rehearing Order P 23 ("all participants in the [Market] – including Members and non-Members alike – will be able to access [Non-Firm Energy Exchange Transmission Service] on the same terms and conditions"), JA239.

The Coalition also complains that Members command the voting and decision-making structure in the Market. Br. 29, 54; *see also* Harv. Am. Br. 23 (same). It is true that Members are able to appoint representatives to the Market's Membership Board and Operating Committee which are responsible for significant issues affecting the Market broadly and its day-to-day operations, respectively. *See* McGeeney/Sellers Aff. ¶¶ 14, 22-25, JA426, 428-29.[6] But this follows from the fact that Members are solely responsible for the costs of establishing and maintaining the Market. *Id.* ¶ 26, JA429. There is nothing unduly discriminatory or preferential about Members retaining

---

[6] Additional Members can join during the annual open season if they meet the necessary requirements (*i.e.*, a load-serving entity in the region). *See* McGeeney/Sellers Aff. ¶ 15, JA426.

the right to make decisions about the platform they agree to develop and fund. *See Sw. Power Pool, Inc.* 173 FERC ¶ 61,267, P 66 (2020) ("limiting voting rights to [Western Joint Dispatch Agreement] signatories is reasonable because only WJDA signatories have made a financial commitment to the [Western Energy Imbalance Service] Market"); *see also* Christie Statement P 8 (finding that governance structure meets section 205 standards), JA64-65.

In addition, there are avenues for interested parties to make their voices heard. Parties may comment on or protest any changes to Market rules, which must be filed with the Commission under the Federal Power Act. *See* 16 U.S.C. § 824d(d). Similarly, affected parties can challenge decisions of the Market's governing bodies by filing a complaint under section 206 of the Federal Power Act, 16 U.S.C. § 824e. Participants may also file complaints with the Auditor and, if not satisfied, bring them before the Commission. Amendment Order P 11, JA208. Moreover, there will be annual meetings where stakeholders are able to address issues relating to the Market. *See* Amendment Filing, Attachment B (Agreement) at § 4.4, JA1186.

### 2.    Market Oversight

The Coalition contends that the Southeast Energy Exchange Market Agreement could not be found to be just and reasonable because it was not accompanied by market power studies of sellers operating in that market.  Br. 33-35.  This misperceives the nature of the Market.

It is simply "an enhancement to an existing bilateral regime." Danly Statement P 22, JA92; *see also* Christie Statement PP 6, 8, JA64, 65.  Sales facilitated by the Market's matching algorithm will take place pursuant to jurisdictional-sellers' existing market-based rate authority, which was granted after market power analyses, and any applicable mitigation.  *See* Danly Statement P 22, JA92; *see also* McGeeney/Sellers Aff. ¶ 39, JA437.  The filing parties also submitted expert testimony demonstrating that the Southeast Energy Exchange Market does not create new opportunities for the exercise of market power.  *See*, *e.g.*, Pope Aff. ¶¶ 69-72, JA466-68.

In addition, as noted above (*supra* pp. 13-14), the Administrator and Auditor will assist in ongoing monitoring of the Market and its participants.  *See* Amendment Order PP 8, 22, 32, JA207, 213, 218. This "monitoring and auditing … make[s] for a just and reasonable

proposal under" section 824d.  Christie Statement P 9, JA65; *see also* Danly Statement P 22 ("existing and new, additional mechanisms will guard against [market power] concerns"), JA92; *Mont. Consumer Couns. v. FERC*, 659 F.3d 910, 919 (9th Cir. 2011) ("By screening for market power before authorizing market-based rates, and by continually monitoring sellers for evidence of market power, FERC has adopted a permissible approach to fulfilling its statutory mandate to ensure that rates are just and reasonable.").

The Coalition complains about the "lack of independence" of the Administrator and Auditor.  Br. 30.  But both will be "independent third part[ies]."  *See* Amendment Filing at 21, JA1158; *see also* Amendment Order PP 10, 34, JA208, 219.

The Coalition contends that Commission precedent requires a market power analysis whenever sellers enter a "new relevant geographic market."  Br. 34 (citing *PacifiCorp*, 147 FERC ¶ 61,227 (2014)).  But here, "there is no new product introduced which would require a new market power analysis."  Christie Statement P 14, JA68. Market participants are buying and selling energy under their pre-existing authorities.  And, in terms of geography, the only difference

now is that the Non-Firm Energy Exchange Transmission Service used to carry out trades facilitated by the Market may eliminate some duplicative charges by the transmission facilities that would have been used to carry out pre-Market trades. *See* Danly Statement P 22 (existing safeguards and establishment of Administrator and Auditor eliminate need for quantitative market analyses), JA92.

The Coalition also contends that the Southeast Energy Exchange Market needs a "market monitor," industry parlance for a group of economists and analysts typically employed by independent system operators to screen and investigate anti-competitive behavior and evaluate the performance of those complex markets. *See* Br. 30-31; Harv. Am. Br. 22 (same); *see also Policy Statement on Market Monitoring Units*, 111 FERC ¶ 61,267 (2005) (outlining market monitor functions). But again, the Market simply facilitates bilateral trading that already occurs. Given the Commission's existing tools, and the new monitoring and reporting functions undertaken by the Auditor and Administrator, the absence of provisions for a market monitor does not render the Market unjust and unreasonable. *See* Christie Statement P 9, JA65; Danly Statement PP 21-22, JA88-92; *see also Pub. Serv. Co.*

*of Colo.*, 154 FERC ¶ 61,107 (2016) (accepting an arrangement analogous to the Southeast Energy Exchange Market and not requiring a market monitor).

There is thus ample evidence in the record to support a finding that additional market power studies were not necessary to determine that the Southeast Energy Exchange Market Agreement is just and reasonable. *See, e.g.*, Danly Statement P 22 ("The filing parties have amply demonstrated how existing and new, additional mechanisms will guard against [market power] concerns"), JA92.

### 3. Benefits

The Coalition asserts the Agreement cannot be just and reasonable because it disputes the level of benefits expected to be derived from the Southeast Energy Exchange Market. Br. 31-32. But since a cost-benefit analysis is not required to determine whether a proposal is just and reasonable, any quibbles with such a study are not determinative. *See Sw. Power Pool, Inc.*, 173 FERC ¶ 61,267 at P 30 (finding that SPP's Western Energy Imbalance Service market would deliver significant benefits while rejecting arguments that SPP must quantify those benefits); *see also Process Gas Consumers Grp. v. FERC*,

866 F.2d 470, 476-77 (D.C. Cir. 1989) (Commission need only make a "common-sense assessment" that the costs are consistent with the ratepayers' overall needs and interests).

Moreover, the conclusion from the Coalition's witness was that projected benefits of $40 million to $110 million per year were an "upper bound." *See* Sotkiewicz Aff. ¶ 105, JA819. This hardly establishes that the filing parties' analysis of the Market's benefits was "deeply flawed." Br. 31.[7]

## C. The Coalition's Procedural Objection Lacks Merit

The Coalition complains that the statements of Commissioners Christie and Danly fail to offer a detailed response to all of the purported deficiencies raised in the proceedings below. *See* Br. 28-35. But, as discussed above, section 824d(g) does not require the Commissioners to provide a point-by-point assessment of all the evidence in the record. *See supra* pp. 45-49. It simply requires a

---

[7] The Coalition's objections to the Southeast Energy Exchange Market's participation requirements are identical to those raised in connection with the tariff provisions implementing Non-Firm Energy Exchange Transmission Service. *See* Br. 30-31, 35-37 (counterparty requirements, toggling, monopolistic incentives). They are addressed below in Argument Section V.A.

"statement explaining the views of the Commissioner with respect to the" rate filing.  16 U.S.C. § 824d(g)(1)(B).

Given Congress' intent that a reviewing court consider the *whole* agency record on review, *see* S. Rep. 115-278, at 4; 164 Cong. Rec. H8227, the purported failure of the Christie and Danly statements to respond to all of the many points raised by the Coalition before the agency does not establish that the Agreement cannot reasonably be found to be just and reasonable.

### D.     There Is Legal Support For Applying The *Mobile-Sierra* Presumption To The Provisions Enumerated By The Filing Parties

#### 1.     Legal background

The *Mobile-Sierra* presumption requires the Commission to "presume a contract rate for wholesale energy is just and reasonable" and prohibits the Commission from setting aside that rate unless it finds that the rate "seriously harm[s] the public interest."  *See Emera Maine v. FERC*, 854 F.3d 662, 665 (D.C. Cir. 2017) (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 81 (D.C. Cir. 2014)).  Because "FERC itself must presume just and reasonable a contract rate resulting from fair, arms-length negotiations," the presumption applies regardless of whether the entities challenging the rate are parties or non-parties to

the contract. *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 174-75 (2010).

If the provision at issue reflects "individualized" rates, terms, or conditions that were negotiated freely at arm's length, the Commission will automatically apply the *Mobile-Sierra* presumption. *See Wabash Valley Power Ass'n v. FERC*, 45 F.4th 115, 120 (D.C. Cir. 2022) ("The *Mobile-Sierra* doctrine applies to contractually negotiated rates, not prescriptions of general applicability.") (internal quotations omitted). By contrast, if the rates, terms, or conditions either did not arise from arm's-length negotiations or are "generally applicable," then the presumption does not attach automatically, although the Commission may exercise its discretion to apply the heightened *Mobile-Sierra* standard. *See id.*; *see also Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 80 (D.C. Cir. 2016) ("the Commission certainly is free to exercise its discretion to apply the presumption to terms other than contract rates").

## 2. The current scope of the presumption

In this case, the filing parties initially sought to have the *Mobile-Sierra* presumption apply to the entirety of the Agreement. That came

to pass when the Agreement went into effect by operation of law.  *See*

Amendment Order P 7, JA206.

Subsequently, the filing parties voluntarily proposed to limit the

*Mobile-Sierra* presumption only to certain enumerated provisions

largely relating to the extent of their commitments to each other under

the Agreement.  *Id*.  The ordinary just and reasonable standard would

apply to the balance of the Agreement, including the Market's rules.

*Id.*; *see also* Agreement § 16.9, JA36.[8]  The provisions to which the

*Mobile-Sierra* presumption would continue to apply are:

- Article 1: Definitions (Interest Rate; Investor Owned Utilities; Governmental Utilities; Market Auditor; Material Vendor Contract, Member; Member Net Energy for Load; Net Energy for Load; Operating Costs; Record Date; Sector; Significant Matters; Southeast Energy Exchange Market Administrator; Southeast Energy Exchange Market Agent; Territory), JA1172-77;

- Section 3.2 (Member Criteria), JA1179-80;

- Article 4 (Governance), JA1180-86;

- Sections 6.1 and 6.2 (Appointment of Southeast Energy Exchange Market Agent), JA1189-90;

- Article 7 (Budgeting and Cost Responsibility), JA1191-93;

---

[8] Where the *Mobile-Sierra* presumption applies, a contract provision may be deemed unjust and unreasonable only if it "seriously harms the public interest."  *Morgan Stanley*, 554 U.S. at 530.

- Sections 8.6 and 8.7 (Severability and Non-Jurisdictional Member Withdrawal), JA1194-95;

- Article 9 (Release and Liability; No Fiduciary Duties), JA1195-97;

- Section 10.3 (Equitable Relief), JA1198;

- Section 11.2 (Reliability Obligations), JA1198;

- Article 12 (Dispute Resolution), JA1199-1200;

- Article 14 (Defaults), JA1201;

- Article 15 (Confidentiality), JA1201-02;

- Section 16.1 ("Public Utility" Status of Members); JA1202;

- Section 16.4.1 (No Reliance Interest on Non-Firm Energy Exchange Transmission Service), JA1203;

- Section 16.5 (No Dedication of Facilities), JA1203;

- Section 16.9 (Amendments), JA1204;

- Exhibit B (Form of Joinder Agreement to add new Members), JA1221; and

- Appendix C (Southeast Energy Exchange Market Agent Scope), JA1244.

*See* Amendment Filing at 14-16, JA1151-53.

The Commission approved the change. *See* Amendment Order P 35, JA219. Because the only issue before the Commission was the proposal to limit the scope of the *Mobile-Sierra* presumption, the Commission did not review "anew the application of the *Mobile-Sierra* public interest standard to the provisions of the [Southeast Energy

Exchange Market] Agreement to which it will continue to apply." *Id.*

P 35, JA219; *see also* Amendment Rehearing Order P 17 (same), JA284.

The Coalition challenges the initial application of the *Mobile-Sierra* presumption to the entire Agreement that resulted when the filing went into effect by operation of law. *See* Br. 37 (granting *Mobile-Sierra* protection "to the entire Agreement" was "arbitrary and capricious"). But that question is now moot given the Commission's approval of revisions that limit the presumption to certain enumerated provisions. *See, e.g., Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1245 (D.C. Cir. 2004) (challenges to orders regarding cancelled contract were moot); *Oregon v. FERC*, 636 F.3d 1203, 1206 (9th Cir. 2011) (challenge to FERC approval of LNG facility that will not go forward is moot). The *Mobile-Sierra* presumption applies to this subset of provisions because the Agreement went into effect by operation of law. Accordingly, the Court need not reach the reasonableness of this result if it determines that the Coalition failed to timely seek rehearing in the Agreement Proceeding.

### 3. The *Mobile-Sierra* presumption can be applied to all contracts that are freely-negotiated at arm's length

In ruling that the *Mobile-Sierra* presumption may be applied to either the entire Agreement or the enumerated provisions, the Court could hold that *Mobile-Sierra* protection attaches to any contract that is freely negotiated at arm's length, regardless of whether the relevant terms are individualized or generally-applicable. Commissioner Danly noted the importance of these characteristics, quoting the D.C. Circuit's statement that "FERC did not err in determining that the [*Mobile-Sierra*] doctrine does not extend to anti-competitive measures that were not arrived at through arms-length bargaining. *See* Danly Statement P 27 n.67 (citing *Okla. Gas*, 827 F.3d at 79), JA95. As Commissioner Danly explained, the principle animating the *Mobile-Sierra* doctrine is that contracts serve as a key source of stability and benefit consumers in the long run. *See id.* P 28 (discussing *Morgan Stanley*, 554 U.S. at 551), JA96. "These benefits are conferred by *all* contracts." *Id.* P 29, JA96. The Court could find that denying application of the *Mobile-Sierra* presumption because some terms are generally applicable would "make every aspect of this market construct more expensive and less

certain," which cannot be said to be in the public interest. *Id*. P 30, JA97; *see also* Christie Statement P 20 (concluding that *Mobile-Sierra* presumption is appropriate because Agreement is "simply a contractual arrangement for utilities … to engage in bilateral trading"), JA72.

### 4. The Commission may conduct a provision-by-provision analysis

The Coalition also appears to argue that, because the Agreement contains some generally-applicable provisions, the *Mobile-Sierra* presumption cannot be applied to any provisions at all (whether individualized or generally-applicable). The Court could reject that argument on the basis noted above by Commissioner Danly. Alternatively, the Court could reject that argument on the ground that, when parties seek to apply the *Mobile-Sierra* presumption to only certain parts of an agreement, Commission and court precedent establishes that a provision-by-provision analysis is appropriate. *See ISO New Eng. Inc. v. NEPOOL*, 106 FERC ¶ 61,280, PP 126-131 (2004); *see also PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, PP 184-85 (2013) (finding that it was "neither practical nor necessary" for the Commission to evaluate provisions not at issue and that a provision-by-provision analysis was "an appropriate way to recognize the distinctions

among [the] provisions"); *Okla. Gas*, 827 F.3d at 80 (upholding

Commission's provision-by-provision analysis regarding application of

*Mobile-Sierra* presumption).

> **5.    Certain of the enumerated provisions embody individualized terms**

The Court could determine that a number of enumerated

provisions establish key rights and obligations among Members

regarding cost allocation and other matters.  These include:

- Article 1 (interest rate, method of calculating net energy for load, operating costs, and types of utilities), JA1172-77;

- Article 7 (budgeting and cost allocation among Members), JA1191-93;

- Article 9 (release and liability), JA1195-97;

- Article 12 (dispute resolution procedures that apply to disputes among Members), JA1199-1200;

- Article 14 (defaults of any Member's payment obligations), JA1201;

- Section 10.3 and Article 15 (confidentiality), JA1198, 1201;

- Sections 6.1 and 6.2 and Appendix C (scope of Southeast Energy Exchange Market Agent, whose actions bind Members); Section 8.6 (severability), JA1189-90; 1244, 1184;

- Sections 8.7 and 16.1 (protect the status of non-jurisdictional Members), JA1195, 1202;

- Section 11.2 (Southeast Energy Exchange Market cannot require Members to violate reliability obligations), JA1198; and

- Section 16.9 (limitation on amendments), JA1204.

These provisions primarily affect the contracting parties' relationship among themselves and will not adversely impact third parties. They were "central to the negotiated terms the Members agreed upon in developing" the Southeast Energy Exchange Market. Amendment Filing at 14, JA1151. The Court could find that application of the *Mobile-Sierra* presumption is appropriate as these provisions may reasonably be characterized as "the product of adversarial negotiations between sophisticated parties pursuing independent interests." *Okla. Gas*, 827 F.3d at 79-80.

### 6. The Commission has discretion to apply the *Mobile-Sierra* presumption to the balance of the provisions

Even where provisions may be generally applicable, the Commission has "considerable discretion" to determine that future challenges to them should be subjected to the public interest standard where "the logic of *Mobile-Sierra* still applie[s]." *New Eng. Power Generators Ass'n, v. FERC*, 707 F.2d 364, 371 (D.C. Cir. 2013). That logic includes recognition of the public policy benefits of the doctrine,

such as minimizing the "uncertainties regarding rate stability and contract sanctity [which] can have a chilling effect on investments and a seller's willingness to enter into long-term contracts that …, in turn, can harm customers in the long run." *Morgan Stanley*, 554 U.S. at 551 (quoting Order No. 697, 119 FERC ¶ 61,295, P 6 (2007)).

The Commission exercised this discretion in *Devon Power* where it accepted a settlement with generalized terms governing the restructuring of the New England capacity market. *See* 134 FERC ¶ 61,208, PP 1-2, *order on reh'g*, 137 FERC ¶ 61,073 (2011), *aff'd sub nom. New Eng. Power Generators*, 707 F.3d at 364. The settlement specified that the *Mobile-Sierra* presumption would apply to changes to auction results and transition payments. *See id*. Although the auction results and payments would bind non-parties, the Commission found that the *Mobile-Sierra* presumption was appropriate.

The Commission's decision was influenced by the fact that the auctions were designed to yield "market-disciplined results" that tend to ensure just and reasonable results. *Id*. P 20. There was also a need to ensure stability with transition payments as the region moved to a new market structure. *Id*. PP 21-22. Finally, the Commission found that

"public policy" favored application of the *Mobile-Sierra* presumption where the market design was the "result of extensive negotiations among market participants and it might not have been reached without the inclusion of the 'public interest' standard …." *Id.* P 23.

The Court could find that similar facts exist here. First, the Southeast Energy Exchange Market includes features to assure just and reasonable rates, including an algorithm that matches buyers and sellers to maximize benefits and other design elements that should drive participants towards cost-based bidding. *See* Pope Aff. ¶¶ 46-62, JA459-64. Second, the record establishes that the Market could result in over $40 million per year in benefits for all market participants (not simply Members). *See* Benefits Analysis at 4, JA 499. Third, all of the enumerated provisions were "central" to the parties' negotiation and provide the "contractual certainty" that is "crucial to the development and implementation of the Southeast Energy Exchange Market." Amendment Filing at 14, JA1151. There is thus precedential support and sufficient facts for the Court to find that application of the *Mobile-Sierra* presumption to the enumerated provisions would be a reasonable exercise of the Commission's "considerable discretion." *New Eng. Power*

*Generators*, 707 F.3d at 371.

### 7. The Coalition's objections lack merit

None of the Coalition's objections can establish, as a matter of law, that the *Mobile-Sierra* presumption could not be applied to the enumerated provisions. *See New Eng. Power Generators*, 707 F.3d at 371. ("In challenging FERC's decision … the presumption the State Petitioners must rebut is a daunting one."). First, the Coalition contends that the "rates and rules governing all Market participants" are not subject to negotiation. Br. 39. But that claim has no bearing on the *Mobile-Sierra* issue because any challenges or proposed changes to the Market rules are subject to the ordinary just and reasonable standard. *See* Amendment Order P 7, JA206.

The Coalition also asserts there can be no assurance of justness and reasonableness because the Agreement was negotiated by "'horizontal competitors with a common interest to exclude any future competition.'" Br. 39 (quoting *Okla. Gas*, 827 F.3d at 80); *see also id.* 40-41. But as the Commission explained, "the Members of the Southeast [Energy Exchange Market] currently trade in the bilateral market in the Southeast with numerous counterparties and [came]

together for the express purpose of maximizing the number of potential bilateral transactions." Tariff Rehearing Order P 26, JA240.

The Coalition also notes that the interests of third-party market participants could be affected. Br. 41. The *Mobile-Sierra* doctrine, however, "does not overlook third-party interests; it is framed with a view to their protection." *NRG*, 558 U.S. at 175. It permits the Commission to act on provisions that seriously harm the public interest. *Id.*; *see also Devon Power*, 134 FERC ¶ 61,208 at P 25 ("The 'public interest' standard respects the settled expectations of parties, but still allows the Commission to respond as necessary to the threat of serious harm to the public interest.").

Finally, the Coalition contends that the filing parties only offered a "broad overview" of why the *Mobile-Sierra* presumption was applicable to the enumerated provisions. Br. 43-44. But that complaint is irrelevant now. The *Mobile-Sierra* presumption applies to the enumerated provisions because the Agreement, which extended the presumption to all provisions, went into effect by operation of law. *See* Amendment Order P 35, JA219; Amendment Rehearing Order P 17, JA284-85.

## IV. STANDARD OF REVIEW FOR COMMISSION ORDERS

The Court reviews Commission orders under the Administrative Procedure Act's narrow "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), and the substantial evidence standard set forth in the Federal Power Act's judicial review provision, section 313(b), 16 U.S.C. § 825*l*(b).

Under those standards, the operative question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292. Rather, the Court must uphold the Commission's determination "if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (internal quotations omitted).

"[I]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the [Commission's] regulatory mission." *Md. Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1286 (D.C. Cir. 2011) (cleaned up). As a result, the

Commission receives "great deference" for "its rate decisions." *Morgan Stanley*, 554 U.S. at 532.

The Commission's reasonable interpretation of its regulations and those portions of the Federal Power Act that Congress has charged it with administering through application of its expertise is entitled to deference. *See, e.g., North Carolina v. FERC*, 913 F.3d 148, 150 (D.C. Cir. 2019). Those provisions of the Federal Power Act pertaining to the scope and contours of a court's judicial review of agency action – *e.g.*, sections 205(g) and 313 – are reviewed *de novo. See Allegheny*, 964 F.3d at 11-12.

## V. THE COMMISSION REASONABLY APPROVED THE TARIFF AMENDMENTS IMPLEMENTING NON-FIRM ENERGY EXCHANGE TRANSMISSION SERVICE

In the majority-voted Tariff Order, the Commission reasonably found that the tariff revisions implementing the Non-Firm Energy Exchange Transmission Service that will be used to fulfill trades facilitated by the Market were just and reasonable and not unduly discriminatory. *See* Tariff Order P 40, JA133. The Commission explained that the new service "will promote more efficient operation" of the relevant transmission systems by making use of otherwise unused

capacity. *Id.* It will also encourage economically efficient intra-hour sales by "reducing transactional friction normally associated" with such transactions. *Id.* The Commission further found that pricing the service at $0 per megawatt hour was appropriate. Since the service is available only after all other transmission reservations have been made, there are no opportunity costs and thus no material impact on other customers. *Id.*

## A. The Coalition's Objections To The Participation Requirements Lack Merit

The Coalition raises numerous objections to the Commission's determination that the Southeast Energy Exchange Market's participation requirements did not present an unduly discriminatory barrier to accessing Non-Firm Energy Exchange Transmission Service. Their overarching claim is that the Commission simply "assum[ed]" the revisions were just and reasonable. Br. 45. Not so. As set forth below, each of the challenged requirements was closely examined. While the Coalition contends that all were simply "new mechanisms for the Utilities to exercise market power and unduly discriminate against their competitors" (Br. 46), the Commission reasonably found that they were necessary to ensure the technical feasibility of the Market.

## 1.   Geographic requirements

In order to participate in the Southeast Energy Exchange Market, an entity must either own a generating resource (a "Source") or be obligated to service customers in the region (a "Sink"). A registered generation and delivery point are preexisting requirements of the Southeast bilateral market and necessary for the creation of an "e-Tag," which assigns and tracks the transmission systems used to deliver energy. *See* Tariff Order P 66, JA145. The Commission therefore appropriately concluded that this technical requirement was not an unreasonable barrier to entry. *Id.*

The Coalition's only response is to say that there was no pre-existing geographic limitation because the Market "territory did not exist prior to the filing of the [Southeast Energy Exchange Market] Agreement." Br. 59; *see also id.* 35. True enough, but that is no answer to the fact "that it is not currently technically feasible to allow entities outside the Territory to participate" in the Market because the necessary communications with neighboring transmission systems could not take place "in the less-than-20 minute timeframe" required to effectuate Market transactions. Tariff Order P 66, JA145; *see also*

Tariff Rehearing Order P 23 (geographic limitation is necessary from an operational perspective), JA238.

## 2. Participant agreements

In order to make use of the Market, entities must execute a Participant Agreement, which, among other things, binds the entity to comply with the Market Rules. *See* Tariff Order P 3, JA120; Agreement § 3.3, JA1180. Such agreements are not uncommon and, here, a standard form Participant Agreement "protects against undue discrimination." Tariff Order P 69, JA146.

The Coalition does not take issue with the terms of the Participant Agreement. Instead, it suggests that maybe Members will direct the Agent (the nominal counterparty to the Participant Agreements) not to sign them so as to bar competitors from the Market. *See* Br. 53. The Commission reasonably found this supposition to be "speculative and unsupported." Tariff Order P 69, JA146.

The Coalition's speculation is grounded in the theory that certain Members might try to benefit their own shareholders by barring competitors. *See* Br. 47. Here, however, the Agreement obligates the Agent to countersign Participant Agreements at the direction of the

Operating Committee, which is comprised of representatives from different sectors (investor-owned utilities, cooperatives, and governmental utilities). *See* Tariff Order P 69, JA146. Moreover, "maximizing the number of potential bilateral transactions and thus the benefits" derived from these sub-hourly transactions is the whole point of the Southeast Energy Exchange Market. *Id.* P 68, JA146; *see also* Tariff Rehearing Order P 26, JA240.

### 3. Enabling Agreements and toggling

When the Market matches a buyer and seller, the actual sale takes place pursuant to an Enabling Agreement, which is "widely used in the electric industry, including the Southeast, to define standard contract terms that parties use to enter into bilateral transactions." Tariff Order P 67, JA145; *see also* Agreement, Appendix B (Market Rules) § III.B, JA1230. Participants are required to enter into Enabling Agreements with at least three other unaffiliated counterparties. This requirement – which was proposed in response to questions from Commission staff – guards against collusive bidding behavior by market participants. *See* Pope Aff. ¶¶ 77-82 (explaining origin and purpose of three-counterparty requirement), JA469-70; *see also* Tariff Order P 65

("participation requirements … seek to address concerns regarding the potential for market manipulation"), JA144.

Participants also have the ability to "toggle" on specific counterparty or geographic constraints (provided that at least three eligible counterparties remain) that will cause the algorithm to bypass potential matches with those parties or regions. *See* Agreement Filing at 26-27, JA311-12. This feature permits market participants to, among other things, (i) comply with statutory restrictions on the geographic scope of their activities in the case of the Tennessee Valley Authority, (ii) comply with regional market power restrictions, (iii) avoid exceeding counterparty credit limits, and (iv) avoid trading with a Participant that has not signed an Enabling Agreement. *Id*.

The Coalition complains that the three-counterparty requirement and toggling feature could be used to exclude Coalition members from the Market – that is, Participants might refuse to execute Enabling Agreements or might "toggle on" a counterparty constraint. *See* Br. 15, 30, 31, 35, 47, 52, 53; *see also* R Street Am. Br. at 7. The Commission appropriately found this claim to be "speculative and unsupported." Tariff Rehearing Order P 23, JA238. Again, market participants have

an incentive "to enter into Enabling Agreements with as many potential counterparties as possible," since that maximizes the chance that the Market's algorithm will identify a match for economically efficient sales. Tariff Order P 68, JA146.

### 4. Monopolistic incentive

The Coalition repeatedly suggests that no matter how logical and practical a market design feature may be, it should be viewed as a mechanism to exclude competitors, because the Members of the Southeast Energy Exchange Market are "monopoly utilities" that will exclude competitors to benefit their own interest. *See* Br. 1, 4, 10, 11, 30, 45; *see also* R Street Am. Br. 5; Harv. Am. Br. at 24-25. But again, the Agreement changes the status quo to facilitate transactions where utilities can buy power from others cheaper than they can produce it themselves. *See* Melda/Bellar Aff. ¶¶ 9, 21-25, JA408, 412-13. A diverse group of customer-serving entities came together "for the express purpose of maximizing the number of potential bilateral transactions." Tariff Rehearing Order P 26, JA240. The Market's automated trading platform serves this purpose and fosters competition by making it easier for buyers and sellers to find each other and engage

in economically efficient sub-hourly energy transactions – *i.e.*, transactions where it is cheaper for a utility to buy power from others rather than produce it from its own resources. *Id.*; *see also* Melda/Bellar Aff. ¶ 9 ("short-term purchases are generally made for economic purposes to displace more expensive generation"), JA408. There are thus "increased incentives to trade with counterparties" – trades that reduce consumer costs. Tariff Rehearing Order P 26, JA240.

Moreover, the Members represent a variety of operating structures. In addition to privately-owned utilities, there are government entities like the Tennessee Valley Authority and Santee Cooper, and not-for-profit electric cooperatives, like PowerSouth Energy Cooperative. The suggestion that the Members are a monolith that would all act collusively to exclude competitors to "benefit their shareholders" misses the mark. Br. 47.

### 5. Burden of proof

The Coalition argues that the Commission "required protestors to prove that the Utilities have a subjective intent to take advantage of known opportunities to unduly discriminate." Br. 45-46. That is

incorrect. The Commission held the filing parties to their burden of proof. *See, e.g.*, Tariff Rehearing Order P 23 ("We continue to find that Filing Parties have satisfied their burden under section 205 of the FPA"), JA238. In doing so, the Commission found that the Coalition's speculation regarding potential discriminatory conduct in the Market did not rebut that showing. *See, e.g.*, Tariff Order P 68, JA146.

### 6.    Consistency with *pro forma* tariff

The Commission requires jurisdictional transmission tariffs to be consistent with or superior to the *pro forma* open-access transmission tariff contained in its Order No. 888 rulemaking, which directed utilities to provide open access to their transmission lines in a nondiscriminatory fashion. *See* 18 C.F.R. § 35.28(c)(1); *see also supra* p. 8. The Coalition repackages its complaints regarding the Southeast Energy Exchange Market's participation requirements and alleges that they establish that the tariff revisions fail this consistency requirement. Br. 58-60. But because the revisions were found to be "just and reasonable and not unduly discriminatory or preferential," they "are consistent with or superior to the *pro forma* [Open Access Transmission Tariff]." Tariff Rehearing Order P 23, JA238.

## B. The Commission Reasonably Found That The Southeast Energy Exchange Market Did Not Constitute A "Loose Power Pool"

A "power pool" is a multilateral arrangement among utilities to plan and operate their electric systems. *See* Energy Primer at 38. In Order No. 888, the Commission addressed concerns that power pools unduly discriminate when they reserve preferential transmission access and pricing to a select, closed group of members. To that end, the Commission required public utilities that are members of a power pool to file joint, pool-wide tariffs that contain open, non-discriminatory membership provisions that allow any market participant to join. *See* Order No. 888, 61 Fed. Reg. at 21,594; *see also* Order No. 888-A, 62 Fed. Reg. 12,274, 12,313 (1997).

### 1. "Tight" and "loose" power pools

Power pools can be "tight" or "loose." "Tight power pools are highly integrated pooling arrangements, involving a central dispatch, where utilities extensively coordinate their planning and operations." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 5 (D.C. Cir. 2002). A "loose" power pool is: (1) "any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that [(2)] explicitly or implicitly contains discounted and/or special

transmission arrangements, that is, rates, terms, or conditions."

Order No. 888-A, 62 Fed. Reg. at 12,313.

## 2. The Southeast Energy Exchange Market is not a loose power pool

The Commission reasonably determined that the Southeast

Energy Exchange Market did not constitute a loose power pool. *See*

Tariff Order P 64, JA143.

### a. Not discounted service

First, Non-Firm Energy Exchange Transmission Service is not a

discounted transmission rate. Tariff Order P 64, JA143. The service is

only available if there is unused transmission capacity. It thus "entails

no opportunity cost" (*id*.), and is not a substitute for any transmission

service. *Id* n.110, JA144. Accordingly, it cannot be a discount of any

transmission service. *See Pub. Serv. Co. of Colo*., 154 FERC ¶ 61,107 at

PP 84-85 (finding that the use of a zero-rate transmission product that

relied on otherwise unused transmission capacity did not constitute a

discount).

The Coalition asserts that Non-Firm Energy Exchange

Transmission Service must be a discount because it can eliminate rate

pancaking. Br. 50. But this argument simply highlights an inherent

feature of the new service, not that it is a discounted version of any existing service.

### b. Not a special transmission arrangement

The Commission also reasonably determined that Non-Firm Energy Exchange Transmission Service did not amount to a "special transmission arrangement." *See* Tariff Rehearing Order P 21, JA237. In doing so, the Commission interpreted the word "special" in Order No. 888-A's definition of loose power pools "to connote something favorable," not merely something different. *Id*. While the Coalition contends this interpretation appeared "out of thin air" (Br. 50), in fact it came from the Commission's examination of Order No. 888-A itself.

The precise phrase used in Order No. 888-A – "discounted and/or special transmission arrangements" – suggests that "discounted" and "special" should be read in a similar manner – *i.e.*, "to connote something favorable." Tariff Rehearing Order P 21 (analyzing Order No. 888-A, 62 Fed Reg. at 12,313), JA238. This reading is supported by a broader consideration of Order No. 888-A which, when addressing unduly discriminatory loose power pool terms, stated that the Commission "would consider 'any rates, terms or conditions of

transmission service that *favor* members over non-members to be unduly discriminatory or preferential.'" *Id.* (quoting Order No. 888-A, 62 Fed. Reg. at 12,313), JA238.

Here, two factors establish that Non-Firm Energy Exchange Transmission Service is not favorable to existing transmission services. Initially, it is the first to be curtailed before all other forms of transmission service. *See* Tariff Order P 64, JA143. Second, it does not relieve any entity serving wholesale or retail customers of the reliability obligations imposed upon them by the relevant regulatory authorities. *Id.* Those providers will need to maintain adequate firm transmission service in the amount of their entire projected customer demand. *Id.* n.110, JA144.

The Coalition contends that Non-Firm Energy Exchange Transmission Service is special because it "only incurs 'financial' losses." Br. 51. By this the Coalition means that, under the tariffs, the quantity of power that is inevitably lost any time electricity is transmitted from one place to another will be converted to a monetary figure and charged to the buyer and seller. *See* Tariff Order P 45 (discussing financial losses), JA135; *see generally Sithe/Indep. Power*

*Partners, L.P. v. FERC*, 285 F.3d 1, 2 (D.C. Cir. 2002) (discussing transmission losses). But the Coalition offers no explanation of how this charge renders the Non-Firm Energy Exchange Transmission Service more favorable than other forms of transmission where losses might be settled by other means, such as in-kind contributions.

In short, while Non-Firm Energy Exchange Transmission Service is offered at no charge, it is not favorable to other forms of service because it will not necessarily be there when needed. *See* Tariff Rehearing Order n.67 (because Non-Firm Energy Exchange Transmission Service has the lowest priority of all available services, "it does not meet the definition of 'special' as that term is used in reference to a loose power pool"), JA238.

### c. No joint planning or coordination

Commission precedent highlights joint planning or coordination as key attributes of loose power pools. A loose power pool will be found where participants "work together to establish principles and practices for interconnected operation, review area power supply problems and establish criteria for power supply adequacy, exchange generation and transmission construction plans, and plan coordinated efforts to attain

optimal economy and reliability[.]" *Inquiry Concerning Alternative Power Pooling Institutions under the Fed. Power Act*, 59 Fed. Reg. 54,851, at 54,854 (Nov. 2, 1994); *see also Wolverine Power Supply Coop. Inc.*, 81 FERC ¶ 61,639, 61,355-56 (1998) (finding "no doubt" that an agreement resulted in loose power pool where it provided for, among other things, coordination of operation and planning and construction).

Conversely, the Commission has declined to find that a loose power pool exists where multi-party agreements do not provide for joint resource planning and leave it to the parties to determine how much or little of their resources to make available. *See Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107 at PP 7-9, 85 (agreement providing for zero-dollar non-firm transmission did not amount to a loose power pool where signatories retained autonomy over planning and resource operation).

Here, the Agreement "does not provide for joint planning or coordination." Tariff Order P 64, JA144. And similar to the arrangement in *Public Service Company of Colorado*, each Participant is free "to determine how much or how little energy to buy and/or sell in each interval." *Id.* Moreover, Members have no discretion over whether Non-Firm Energy Exchange Transmission Service is used. They simply

calculate their available capacity pursuant to a posted methodology and submit it on an hourly basis for use as an input into the matching algorithm. *See* Tariff Rehearing Order P 19, JA236.

### d. Purpose satisfied

The Commission also found that "Order No. 888's 'primary goal'" in imposing limitations on pooling arrangements – "ensuring 'comparability regarding transmission services that are offered on a pool-wide basis'" – was satisfied here. Tariff Order P 65 (quoting Order No. 888-A, 62 Fed. Reg. at 12,313), JA144. Non-Firm Energy Exchange Transmission Service will be available to all market participants on non-discriminatory terms. *Id.*

### C. The Commission Reasonably Waived The Joint Tariff Requirement

Commission regulations require transmission providers that enter into a "multi-lateral trading arrangement or agreement that contains transmission rates, terms, or conditions" to file a joint system-wide tariff, even if that agreement does not result in a loose power pool. 18 C.F.R. § 35.28(c)(3). In this case, the Commission found that, although the Market amounted to a multi-lateral trading platform arrangement, it was appropriate to waive the joint tariff requirement. *See* Tariff

Order P 72, JA147.  The Coalition cannot establish that this decision

amounted to an abuse of discretion.  *See Westar Energy v. FERC*, 473

F.3d 1239, 1241 (D.C. Cir. 2007) (waiver decisions reviewed for abuse of

discretion).

The Coalition's primary line of attack is to point out how the facts

of this case differ from two prior cases where the Commission waived

the requirements of 18 C.F.R. § 35.28(c)(3).  *See* Br. 55-56 (discussing

*Bangor Hydro Elec. Co.*, 144 FERC ¶ 61,031 (2013), and *Wolverine*

*Power Supply Coop., Inc.*, 87 FERC ¶ 61,047 (1999)).  But the

Commission's waiver determinations are always specific to the facts of

the case before it.  *See* Tariff Rehearing Order P 30, JA242.  Here, those

facts demonstrate that granting the waiver was not an abuse of

discretion.

First, the purpose of the joint tariff requirement is to ameliorate

the concern that "individual [tariffs] could not cure undue

discrimination 'if those public utilities can continue to trade with a

selective group within a power pool that discriminatorily excludes

others from becoming a member and that provides preferential intra-

pool transmission rights and rates.'"  *Id*. P 28 (quoting Order No. 888,

61 Fed. Reg. at 21,593), JA241. Here, that concern was not present. There are no preferential intra-pool transmission rights. *See supra* pp. 87-92 (discussing finding of no discounted or special transmission service). And the fact that each individual tariff "contains the same rates, terms, and conditions for providing [Non-Firm Energy Exchange Transmission Service]" is "an equally effective measure to protect against any remaining potential for undue discrimination." Tariff Rehearing Order P 28, JA241.

Second, given that all of the participating transmission providers have identical tariff provisions regarding Non-Firm Energy Exchange Transmission Service, "there would be no practical difference" by requiring a joint system-wide tariff. Tariff Order P 73, JA148. The Coalition disputes this conclusion, asserting that a joint tariff would allow anyone to access Non-Firm Energy Exchange Transmission Service, even if they did not satisfy the Market's participation requirements. Br. 57. But Order No. 888-A's broad open membership requirement only applies to loose power pools. Here, the Commission found that the Southeast Energy Exchange Market was not a loose

power pool and that its participation requirements were not unduly discriminatory. *See* Tariff Order PP 64-71, JA143-47.

Third, requiring a joint tariff would be unnecessarily cumbersome. Requiring a joint tariff for Non-Firm Energy Exchange Transmission Service would result in two tariffs for each transmission system (one for regular transmission and one for the residual capacity that can be used to effectuate transactions matched in the Market). *See* Tariff Rehearing Order P 29, JA242.

Fourth, the joint-tariff requirement only applies to jurisdictional entities. Without inclusion of the non-jurisdictional Tennessee Valley Authority, "a joint system-wide [tariff] could jeopardize the expected benefits" of the Southeast Energy Exchange Market. Tariff Order P 73, JA148. The Coalition contends that Tennessee Valley Authority could stay in the Market by voluntarily participating in a joint tariff. Br. 57. But such participation is not certain. And thus requiring a joint tariff would inject this uncertainty "without providing any clear increase in functionality or benefits." Tariff Order P 73 (internal quotations omitted), JA148.

## D. The Commission Reasonably Rejected The Coalition's Speculation Regarding Cost Shifts

The Coalition argues that the use of the Non-Firm Energy Exchange Transmission Service could drive up transmission rates for parties that do not participate in the Market and that any increase would violate cost-causation principles. *See* Br. 60-64.

### 1. Transmission cost allocation

There are two general types of transmission service: firm and non-firm. "Firm service permits customers to demand transmission at any time." *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 730 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002). Firm service can be either "network" (*i.e.*, priority service with access to the entire network) or "point-to-point" (*i.e.*, service between two locales). *See* Energy Primer at 54. "Non-firm" service, as the name implies, "permits the utility to cut service when there is not enough capacity." *Transmission Access Pol'y Study Grp.*, 225 F.3d at 730.

Because a transmission provider must plan for and reserve capacity sufficient for all firm customers, the costs of the transmission system are typically allocated to those customers in the first instance. *See, e.g.*, Order No. 888, 61 Fed. Reg. at 21,574 (noting that reservation

charge paid by firm transmission customers covers all fixed costs associated with the reserved capacity). It is these firm customers that typically "cause" the system costs. Revenue derived from non-firm service is treated as a credit to firm customers to offset these costs. *Id.* at 21,600 ("revenue from non-firm services should continue to be reflected as a revenue credit in the derivation of firm transmission tariff rates"); *see also* Tariff Order P 26, JA127.

## 2. Any impacts would be minimal and diffuse

The Coalition's theory is that some parties currently using non-firm service might switch to Non-Firm Energy Exchange Transmission Service. Since the new service is priced at $0 per megawatt hour, this could reduce non-firm revenues and their associated credits, thereby resulting in a "rate tilt" towards parties that use firm transmission service. Br. 60-61. In the Coalition's view, this could be improper if those entities taking firm point-to-point service do not also participate in, and benefit from, the Market. The Commission appropriately found that this claim "is speculative and unsupported." Tariff Order P 43, JA134.

First, the costs here are the costs of the transmission system. As noted above, those costs are typically "caused by" firm customers for whom sufficient capacity must be reserved.

Second, the record establishes that the affected transmission providers' "revenues from short-term wheeling transactions of the type that could be replaced by Southeast [Energy Exchange Market] transactions are minimal." Melda/Bellar Aff. ¶ 23, JA412. The Commission therefore found that "the anticipated impact" of any switch from existing non-firm service to Non-Firm Energy Exchange Transmission Service "is likely to be minimal." Tariff Order P 43, JA134.

Third, even if this "minimal impact" came to pass, it would be spread among all users of firm service, including those that participate in, and benefit from, the Southeast Energy Exchange Market. *Id.* The Commission therefore reasonably found that "alleged cost shifts" would not alter the conclusion that the tariff revisions are just and reasonable and not unduly discriminatory. *Id.*

### 3. Existing rate designs were not before the Commission

Finally, the Coalition's complaint – that a decrease in non-firm revenues could affect firm customers without any corresponding benefit (Br. 62) – is not specific to Non-Firm Energy Exchange Transmission Service. The same issue would arise with "*any* reduction in non-firm point-to-point transmission service revenues." Tariff Order P 44, JA135. The Coalition's quarrel, therefore, is "with existing rate designs for transmission service," which were not before the Commission in this proceeding as no rate design changes had been proposed. *See* Tariff Rehearing Order P 32, JA243; *see also City of Winnfield v. FERC*, 744 F.2d 871, 877 (D.C. Cir. 1984) ("The statutory obligation of the utility … is not to prove the continued reasonableness of *unchanged* rates or *unchanged* attributes of its rate structure."). The Coalition does not challenge the Commission's holding in this regard.

## VI. THE COURT SHOULD AFFIRM THE AMENDMENT ORDER

The Coalition's brief does not appear to challenge, as arbitrary and capricious or otherwise, any ruling made in the majority-voted Amendment Order, and the Coalition did not petition for review of the Amendment Rehearing Order. The Court should therefore deny the

petition as to the Amendment Proceeding. *See New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (finding that arguments not raised in opening brief are waived).

## CONCLUSION

Those portions of the petition for review relating to the Agreement Proceeding should be dismissed for lack of jurisdiction. The remainder of the petition concerning the Tariff and Amendment Proceedings, and the Agreement Proceeding to the extent not dismissed, should be denied on the merits.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney

Federal Energy Regulatory
    Commission
Washington, D.C.  20426
Tel.: (202) 502-8904
Email: robert.kennedy@ferc.gov

February 2, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation established in the Court's July 14, 2022 order because this brief contains 17,791 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

/s/ Robert M. Kennedy
Robert M. Kennedy
Senior Attorney

Federal Energy Regulatory
   Commission
Washington, D.C. 20426
Tel.: (202) 502-8904
Email: robert.kennedy@ferc.gov

February 2, 2023

# ADDENDUM

## STATUTES
## AND
## REGULATIONS

# TABLE OF CONTENTS

Administrative Procedure Act

    5 U.S.C. § 551 ....................................................................A-1

    5 U.S.C. § 706 ....................................................................A-2

Federal Power Act

    Section 205, 16 U.S.C. § 824d ....................................A-3

    Section 206, 16 U.S.C. § 824e ....................................A-4

    Section 313, 16 U.S.C. § 825*l* ....................................A-7

Department of Energy Organization Act

    42 U.S.C. § 7171 ............................................................A-9

Regulations

    18 C.F.R. § 35.3 ............................................................A-12

    18 C.F.R. § 35.28 ..........................................................A-14

    18 C.F.R. § 385.2007 ..................................................A-27


SUBCHAPTER II—ADMINISTRATIVE PROCEDURE

**Statutory Notes and Related Subsidiaries**

SHORT TITLE

The provisions of this subchapter and chapter 7 of this title were originally enacted by act June 11, 1946, ch. 324, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into this subchapter and chapter 7 hereof.

## § 551. Definitions

For the purpose of this subchapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title—

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;[1]

(2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

(3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency—

(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

(B) withholding of relief;

(C) imposition of penalty or fine;

(D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

(F) requirement, revocation, or suspension of a license; or

(G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency—

(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 381; Pub. L. 94–409, § 4(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 103–272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, § 5(a)(2), Jan. 4, 2011, 124 Stat. 3841.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (1) .............. | 5 U.S.C. 1001(a). | June 11, 1946, ch. 324, § 2(a), 60 Stat. 237. Aug. 8, 1946, ch. 870, § 302, 60 Stat. 918. Aug. 10, 1946, ch. 951, § 601, 60 Stat. 993. Mar. 31, 1947, ch. 30, § 6(a), 61 Stat. 37. June 30, 1947, ch. 163, § 210, 61 Stat. 201. |

---

[1] See References in Text note below.



HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

**Editorial Notes**

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule or provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

# CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.     Congressional review.
802.     Congressional disapproval procedure.
803.     Special rule on statutory, regulatory, and judicial deadlines.
804.     Definitions.
805.     Judicial review.
806.     Applicability; severability.
807.     Exemption for monetary policy.
808.     Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit



State under the laws of which its security issues are regulated by a State commission.

### (g) Guarantee or obligation on part of United States

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

### (h) Filing duplicate reports with the Securities and Exchange Commission

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, § 204, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 850.)

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

## § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

### (a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

### (b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

### (c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

### (d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

### (e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

### (f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years there-

after, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

**§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission**

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided,* That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided,* That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for

---

[1] See References in Text note below.

a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, §206, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 852; amended Pub. L. 100–473, §2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, §1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, §1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision".

Subsec. (e). Pub. L. 109–58, §1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, §2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, §2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, §4, Oct. 6, 1988, 102 Stat. 2300, provided that: "The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however*, That such complaints may be withdrawn and refiled without prejudice."

LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, §3, Oct. 6, 1988, 102 Stat. 2300, provided that: "Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall

be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.]."

STUDY

Pub. L. 100–473, §5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

## §824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, §207, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

## §824g. Ascertainment of cost of property and depreciation

### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, §208, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

**A–6**

VerDate Oct 09 2002   10:23 Oct 12, 2021   Jkt 000000   PO 00000   Frm 01354   Fmt 5800   Sfmt 5800   D:\OLRC\DATA\PRINT\2018SUPP220\OUTPUT\PCC\FOLIOS\USC16.20   PROD

tric energy, however produced, throughout the United States and its possessions, whether or not otherwise subject to the jurisdiction of the Commission, including the generation, transmission, distribution, and sale of electric energy by any agency, authority, or instrumentality of the United States, or of any State or municipality or other political subdivision of a State. It shall, so far as practicable, secure and keep current information regarding the ownership, operation, management, and control of all facilities for such generation, transmission, distribution, and sale; the capacity and output thereof and the relationship between the two; the cost of generation, transmission, and distribution; the rates, charges, and contracts in respect of the sale of electric energy and its service to residential, rural, commercial, and industrial consumers and other purchasers by private and public agencies; and the relation of any or all such facts to the development of navigation, industry, commerce, and the national defense. The Commission shall report to Congress the results of investigations made under authority of this section.

(June 10, 1920, ch. 285, pt. III, § 311, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859.)

TRANSFER OF FUNCTIONS

Federal Power Commission terminated and its functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

Executive and administrative functions of Federal Power Commission, with certain reservations, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 9 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out as a note under section 792 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in title 42 section 7177.

## § 825k. Publication and sale of reports

The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and is authorized to sell at reasonable prices copies of all maps, atlases, and reports as it may from time to time publish. Such reasonable prices may include the cost of compilation, composition, and reproduction. The Commission is also authorized to make such charges as it deems reasonable for special statistical services and other special or periodic services. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Public Printer under such limitations and conditions as the Joint Committee on Print-

ing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Printing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, § 312, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859.)

CODIFICATION

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

TRANSFER OF FUNCTIONS

Federal Power Commission terminated and its functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

Executive and administrative functions of Federal Power Commission, with certain reservations, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 9 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out as a note under section 792 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in title 15 section 717m; title 39 section 3204; title 42 section 7172.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of

this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Judicial review**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amend-ed June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Aug. 28, 1958, Pub. L. 85–791, § 16, 72 Stat. 947.)

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

TRANSFER OF FUNCTIONS

Federal Power Commission terminated and its functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

Executive and administrative functions of Federal Power Commission, with certain reservations, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 9 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out as a note under section 792 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 824k of this title; title 33 section 988; title 42 section 7172.

**§ 825m. Enforcement provisions**

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United



In the administration of any of the functions transferred to, and vested in, the Secretary by this section the Secretary shall take into consideration the requirements of national security.

(Pub. L. 95–91, title III, §307, Aug. 4, 1977, 91 Stat. 581; Pub. L. 115–232, div. A, title VIII, §809(n)(3)(A), Aug. 13, 2018, 132 Stat. 1844.)

AMENDMENTS

2018—Pub. L. 115–232 substituted "chapter 869 of title 10" for "chapter 641 of title 10" in introductory provisions.

EFFECTIVE DATE OF 2018 AMENDMENT

Amendment by Pub. L. 115–232 effective Feb. 1, 2019, with provision for the coordination of amendments and special rule for certain redesignations, see section 800 of Pub. L. 115–232, set out as a note preceding section 3001 of Title 10, Armed Forces.

### § 7156a. Repealed. Pub. L. 105–85, div. C, title XXXIV, § 3403, Nov. 18, 1997, 111 Stat. 2059

Section, Pub. L. 96–137, §2, Dec. 12, 1979, 93 Stat. 1061, related to assignment of naval officers to key management positions within Office of Naval Petroleum and Oil Shale Reserves in Department of Energy and to position of Director.

### § 7157. Transfers from Department of Commerce

There are transferred to, and vested in, the Secretary all functions of the Secretary of Commerce, the Department of Commerce, and officers and components of that Department, as relate to or are utilized by the Office of Energy Programs, but limited to industrial energy conservation programs.

(Pub. L. 95–91, title III, §308, Aug. 4, 1977, 91 Stat. 581.)

### § 7158. Naval reactor and military application programs

The Division of Naval Reactors established pursuant to section 2035 of this title, and responsible for research, design, development, health, and safety matters pertaining to naval nuclear propulsion plants and assigned civilian power reactor programs is transferred to the Department under the Under Secretary for Nuclear Security, and such organizational unit shall be deemed to be an organizational unit established by this chapter.

(Pub. L. 95–91, title III, §309, Aug. 4, 1977, 91 Stat. 581; Pub. L. 106–65, div. C, title XXXII, §3294(c), Oct. 5, 1999, 113 Stat. 970.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

AMENDMENTS

1999—Pub. L. 106–65 struck out subsec. (a) designation before "The Division of Naval Reactors", substituted "Under Secretary for Nuclear Security" for "Assistant Secretary to whom the Secretary has assigned the function listed in section 7133(a)(2)(E) of this title", and struck out subsec. (b) which read as follows: "The Division of Military Application, established by section 2035 of this title, and the functions of the Energy Research and Development Administration with respect to the Military Liaison Committee, established by section 2037 of this title, are transferred to the Department under the Assistant Secretary to whom the Secretary has assigned those functions listed in section 7133(a)(5) of this title, and such organizational units shall be deemed to be organizational units established by this chapter."

EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–65 effective Mar. 1, 2000, see section 3299 of Pub. L. 106–65, set out as an Effective Date note under section 2401 of Title 50, War and National Defense.

TRANSFER OF FUNCTIONS

All national security functions and activities performed immediately before Oct. 5, 1999, by the Office of Naval Reactors transferred to the Administrator for Nuclear Security of the National Nuclear Security Administration of the Department of Energy, and the Deputy Administrator for Naval Reactors of the Administration to be assigned the responsibilities, authorities, and accountability for all functions of the Office of Naval Reactors under Executive Order No. 12344, set out as a note under section 2511 of Title 50, War and National Defense, see sections 2406 and 2481 of Title 50.

Pub. L. 98–525, title XVI, §1634, Oct. 19, 1984, 98 Stat. 2649, which was formerly set out as a note under this section, was renumbered section 4101 of Pub. L. 107–314, the Bob Stump National Defense Authorization Act for Fiscal Year 2003, by Pub. L. 108–136, div. C, title XXXI, §3141(d)(2), Nov. 24, 2003, 117 Stat. 1757, and is set out as a note under section 2511 of Title 50, War and National Defense.

### § 7159. Transfer to Department of Transportation

Notwithstanding section 7151(a) of this title, there are transferred to, and vested in, the Secretary of Transportation all of the functions vested in the Administrator of the Federal Energy Administration by section 6361(b)(1)(B) of this title.

(Pub. L. 95–91, title III, §310, Aug. 4, 1977, 91 Stat. 582.)

SUBCHAPTER IV—FEDERAL ENERGY REGULATORY COMMISSION

### § 7171. Appointment and administration

#### (a) Federal Energy Regulatory Commission; establishment

There is established within the Department an independent regulatory commission to be known as the Federal Energy Regulatory Commission.

#### (b) Composition; term of office; conflict of interest; expiration of terms

(1) The Commission shall be composed of five members appointed by the President, by and with the advice and consent of the Senate. One of the members shall be designated by the President as Chairman. Members shall hold office for a term of 5 years and may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office. Not more than three members of the Commission shall be members of the same political party. Any Commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the re-

mainder of such term. A Commissioner may continue to serve after the expiration of his term until his successor is appointed and has been confirmed and taken the oath of Office, except that such Commissioner shall not serve beyond the end of the session of the Congress in which such term expires. Members of the Commission shall not engage in any other business, vocation, or employment while serving on the Commission.

(2) Notwithstanding the third sentence of paragraph (1), the terms of members first taking office after April 11, 1990, shall expire as follows:

(A) In the case of members appointed to succeed members whose terms expire in 1991, one such member's term shall expire on June 30, 1994, and one such member's term shall expire on June 30, 1995, as designated by the President at the time of appointment.

(B) In the case of members appointed to succeed members whose terms expire in 1992, one such member's term shall expire on June 30, 1996, and one such member's term shall expire on June 30, 1997, as designated by the President at the time of appointment.

(C) In the case of the member appointed to succeed the member whose term expires in 1993, such member's term shall expire on June 30, 1998.

**(c) Duties and responsibilities of Chairman**

The Chairman shall be responsible on behalf of the Commission for the executive and administrative operation of the Commission, including functions of the Commission with respect to (1) the appointment and employment of hearing examiners in accordance with the provisions of title 5, (2) the selection, appointment, and fixing of the compensation of such personnel as he deems necessary, including an executive director, (3) the supervision of personnel employed by or assigned to the Commission, except that each member of the Commission may select and supervise personnel for his personal staff, (4) the distribution of business among personnel and among administrative units of the Commission, and (5) the procurement of services of experts and consultants in accordance with section 3109 of title 5. The Secretary shall provide to the Commission such support and facilities as the Commission determines it needs to carry out its functions.

**(d) Supervision and direction of members, employees, or other personnel of Commission**

In the performance of their functions, the members, employees, or other personnel of the Commission shall not be responsible to or subject to the supervision or direction of any officer, employee, or agent of any other part of the Department.

**(e) Designation of Acting Chairman; quorum; seal**

The Chairman of the Commission may designate any other member of the Commission as Acting Chairman to act in the place and stead of the Chairman during his absence. The Chairman (or the Acting Chairman in the absence of the Chairman) shall preside at all sessions of the Commission and a quorum for the transaction of business shall consist of at least three members present. Each member of the Commission, including the Chairman, shall have one vote. Actions of the Commission shall be determined by a majority vote of the members present. The Commission shall have an official seal which shall be judicially noticed.

**(f) Rules**

The Commission is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions. Until changed by the Commission, any procedural and administrative rules applicable to particular functions over which the Commission has jurisdiction shall continue in effect with respect to such particular functions.

**(g) Powers of Commission**

In carrying out any of its functions, the Commission shall have the powers authorized by the law under which such function is exercised to hold hearings, sign and issue subpenas, administer oaths, examine witnesses, and receive evidence at any place in the United States it may designate. The Commission may, by one or more of its members or by such agents as it may designate, conduct any hearing or other inquiry necessary or appropriate to its functions, except that nothing in this subsection shall be deemed to supersede the provisions of section 556 of title 5 relating to hearing examiners.

**(h) Principal office of Commission**

The principal office of the Commission shall be in or near the District of Columbia, where its general sessions shall be held, but the Commission may sit anywhere in the United States.

**(i) Commission deemed agency; attorney for Commission**

For the purpose of section 552b of title 5, the Commission shall be deemed to be an agency. Except as provided in section 518 of title 28, relating to litigation before the Supreme Court, attorneys designated by the Chairman of the Commission may appear for, and represent the Commission in, any civil action brought in connection with any function carried out by the Commission pursuant to this chapter or as otherwise authorized by law.

**(j) Annual authorization and appropriation request**

In each annual authorization and appropriation request under this chapter, the Secretary shall identify the portion thereof intended for the support of the Commission and include a statement by the Commission (1) showing the amount requested by the Commission in its budgetary presentation to the Secretary and the Office of Management and Budget and (2) an assessment of the budgetary needs of the Commission. Whenever the Commission submits to the Secretary, the President, or the Office of Management and Budget, any legislative recommendation or testimony, or comments on legislation, prepared for submission to Congress, the Commission shall concurrently transmit a copy thereof to the appropriate committees of Congress.

**(k) Addressing insufficient compensation of employees and other personnel of the Commission**

**(1) In general**

Notwithstanding any other provision of law, if the Chairman of the Commission publicly certifies that compensation for a category of employees or other personnel of the Commission is insufficient to retain or attract employees and other personnel to allow the Commission to carry out the functions of the Commission in a timely, efficient, and effective manner, the Chairman may fix the compensation for the category of employees or other personnel without regard to chapter 51 and subchapter III of chapter 53 of title 5, or any other civil service law.

**(2) Certification requirements**

A certification issued under paragraph (1) shall—

(A) apply with respect to a category of employees or other personnel responsible for conducting work of a scientific, technological, engineering, or mathematical nature;

(B) specify a maximum amount of reasonable compensation for the category of employees or other personnel;

(C) be valid for a 5-year period beginning on the date on which the certification is issued;

(D) be no broader than necessary to achieve the objective of retaining or attracting employees and other personnel to allow the Commission to carry out the functions of the Commission in a timely, efficient, and effective manner; and

(E) include an explanation for why the other approaches available to the Chairman for retaining and attracting employees and other personnel are inadequate.

**(3) Renewal**

**(A) In general**

Not later than 90 days before the date of expiration of a certification issued under paragraph (1), the Chairman shall determine whether the certification should be renewed for a subsequent 5-year period.

**(B) Requirement**

If the Chairman determines that a certification should be renewed under subparagraph (A), the Chairman may renew the certification, subject to the certification requirements under paragraph (2) that were applicable to the initial certification.

**(4) New hires**

**(A) In general**

An employee or other personnel that is a member of a category of employees or other personnel that would have been covered by a certification issued under paragraph (1), but was hired during a period in which the certification has expired and has not been renewed under paragraph (3) shall not be eligible for compensation at the level that would have applied to the employee or other personnel if the certification had been in effect

on the date on which the employee or other personnel was hired.

**(B) Compensation of new hires on renewal**

On renewal of a certification under paragraph (3), the Chairman may fix the compensation of the employees or other personnel described in subparagraph (A) at the level established for the category of employees or other personnel in the certification.

**(5) Retention of level of fixed compensation**

A category of employees or other personnel, the compensation of which was fixed by the Chairman in accordance with paragraph (1), may, at the discretion of the Chairman, have the level of fixed compensation for the category of employees or other personnel retained, regardless whether a certification described under that paragraph is in effect with respect to the compensation of the category of employees or other personnel.

**(6) Consultation required**

The Chairman shall consult with the Director of the Office of Personnel Management in implementing this subsection, including in the determination of the amount of compensation with respect to each category of employees or other personnel.

**(7) Experts and consultants**

**(A) In general**

Subject to subparagraph (B), the Chairman may—

(i) obtain the services of experts and consultants in accordance with section 3109 of title 5;

(ii) compensate those experts and consultants for each day (including travel time) at rates not in excess of the rate of pay for level IV of the Executive Schedule under section 5315 of that title; and

(iii) pay to the experts and consultants serving away from the homes or regular places of business of the experts and consultants travel expenses and per diem in lieu of subsistence at rates authorized by sections 5702 and 5703 of that title for persons in Government service employed intermittently.

**(B) Limitations**

The Chairman shall—

(i) to the maximum extent practicable, limit the use of experts and consultants pursuant to subparagraph (A); and

(ii) ensure that the employment contract of each expert and consultant employed pursuant to subparagraph (A) is subject to renewal not less frequently than annually.

(Pub. L. 95–91, title IV, § 401, Aug. 4, 1977, 91 Stat. 582; Pub. L. 101–271, § 2(a), (b), Apr. 11, 1990, 104 Stat. 135; Pub. L. 116–260, div. Z, title XI, § 11004(a), Dec. 27, 2020, 134 Stat. 2612.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (i) and (j), was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification



(d) *Filing date.* The term *filing date* as used herein shall mean the date on which a rate schedule, tariff or service agreement filing is completed by the receipt in the office of the Secretary of all supporting cost and other data required to be filed in compliance with the requirements of this part, unless such rate schedule is rejected as provided in § 35.5. If the material submitted is found to be incomplete, the Director of the Office of Energy Market Regulation will so notify the filing utility within 60 days of the receipt of the submittal.

(e) *Posting* (1) The term posting as used in this part shall mean:

(i) Keeping a copy of every rate schedule, service agreement, or tariff of a public utility as currently on file, or as tendered for filing, with the Commission open and available during regular business hours for public inspection in a convenient form and place at the public utility's principal and district or division offices in the territory served, and/or accessible in electronic format, and

(ii) Serving each purchaser under a rate schedule, service agreement, or tariff either electronically or by mail in accordance with the service regulations in Part 385 of this chapter with a copy of the rate schedule, service agreement, or tariff. Posting shall include, in the event of the filing of increased rates or charges, serving either electronically or by mail in accordance with the service regulations in Part 385 of this chapter each purchaser under a rate schedule, service agreement or tariff proposed to be changed and to each State Commission within whose jurisdiction such purchaser or purchasers distribute and sell electric energy at retail, a copy of the rate schedule, service agreement or tariff showing such increased rates or charges, comparative billing data as required under this part, and, if requested by a purchaser or State Commission, a copy of the supporting data required to be submitted to this Commission under this part. Upon direction of the Secretary, the public utility shall serve copies of rate schedules, service agreements, or tariffs, and supplementary data, upon designated parties other than those specified herein.

(2) Unless it seeks a waiver of electronic service, each customer, State Commission, or other party entitled to service under this paragraph (e) must notify the public utility of the e-mail address to which service should be directed. A customer, State Commission, or other party may seek a waiver of electronic service by filing a waiver request under Part 390 of this chapter providing good cause for its inability to accept electronic service.

(f) *Effective date.* As used herein the *effective date* of a rate schedule, tariff or service agreement shall mean the date on which a rate schedule filed and posted pursuant to the requirements of this part is permitted by the Commission to become effective as a filed rate schedule. The effective date shall be 60 days after the filing date, or such other date as may be specified by the Commission.

(g) *Frequency regulation.* The term *frequency regulation* as used in this part will mean the capability to inject or withdraw real power by resources capable of responding appropriately to a system operator's automatic generation control signal in order to correct for actual or expected Area Control Error needs.

(16 U.S.C. 284(d), 792 *et seq.*; Pub. L. 95–617; Pub. L. 95–91; E.O. 12009, 42 FR 46267)

[Order 271, 28 FR 10573, Oct. 2, 1963, as amended at 28 FR 11404, Oct. 24, 1963; 43 FR 36437, Aug. 17, 1978; 44 FR 16372, Mar. 19, 1979; 44 FR 20077, Apr. 4, 1979; Order 39, 44 FR 46454, Aug. 8, 1979; Order 699, 72 FR 45325, Aug. 14, 2007; Order 701, 72 FR 61054, Oct. 29, 2007; Order 714, 73 FR 57530, Oct. 3, 2008; Order 755, 76 FR 67285, Oct. 31, 2011]

## § 35.3 Notice requirements.

(a)(1) *Rate schedules or tariffs.* All rate schedules or tariffs or any part thereof shall be tendered for filing with the Commission and posted not less than sixty days nor more than one hundred-twenty days prior to the date on which the electric service is to commence and become effective under an initial rate schedule or tariff or the date on which the filing party proposes to make any change in electric service and/or rate, charge, classification, practice, rule, regulation, or contract effective as a change in rate schedule or tariff, except as provided in paragraph (b) of

279

this section, or unless a different period of time is permitted by the Commission. Nothing herein shall be construed as in any way precluding a public utility from entering into agreements which, under this section, may not be filed at the time of execution thereof by reason of the aforementioned sixty to one hundred-twenty day prior filing requirements. The proposed effective date of any rate schedule or tariff filing having a filing date in accordance with § 35.2(d) may be deferred by the public utility making a filing requesting deferral prior to the rate schedule or tariff's acceptance by the Commission.

(2) *Service agreements.* Service agreements that are required to be filed and posted authorizing a customer to take electric service under the terms of a tariff, or any part thereof, shall be tendered for filing with the Commission and posted not more than 30 days after electric service has commenced or such other date as may be specified by the Commission.

(b) *Construction of facilities.* Rate schedules, tariffs or service agreements predicated on the construction of facilities may be tendered for filing and posted no more than one hundred-twenty days prior to the date set by the parties for the contract to go into effect. The Commission, upon request, may permit a rate schedule or service agreement or part thereof to be tendered for filing and posted more than one hundred-twenty days before it is to become effective.

(16 U.S.C. 284(d); Pub. L. 95–617; Pub. L. 95–91; E.O. 12009, 42 FR 46267)

[44 FR 16372, Mar. 19, 1979; 44 FR 20077, Apr. 4, 1979, as amended by Order 714, 73 FR 57531, Oct. 3, 2008]

### § 35.4  Permission to become effective is not approval.

The fact that the Commission permits a rate schedule or tariff, tariff or service agreement or any part thereof or any notice of cancellation to become effective shall not constitute approval by the Commission of such rate schedule or tariff, tariff or service agree-

ment or part thereof or notice of cancellation.

[Order 271, 28 FR 10573, Oct. 2, 1963, as amended by Order 714, 73 FR 57531, 57533, Oct. 3, 2008]

### § 35.5  Rejection of material submitted for filing.

(a) The Secretary, pursuant to the Commission's rules of practice and procedure and delegation of Commission authority, shall reject any material submitted for filing with the Commission which patently fails to substantially comply with the applicable requirements set forth in this part, or the Commission's rules of practice and procedure.

(b) A rate filing that fails to comply with this Part may be rejected by the Director of the Office of Energy Market Regulation pursuant to the authority delegated to the Director in § 375.307(a)(1)(ii) of this chapter.

[Order 271, 28 FR 10573, Oct. 2, 1963, as amended by Order 614, 65 FR 18227, Apr. 7, 2000; Order 699, 72 FR 45325, Aug. 14, 2007; Order 701, 72 FR 61054, Oct. 29, 2007]

### § 35.6  Submission for staff suggestions.

Any public utility may submit a rate schedule, tariff or service agreement or any part thereof or any material relating thereto for the purpose of receiving staff suggestions and comments thereon prior to filing with the Commission.

[Order 271, 28 FR 10573, Oct. 2, 1963, as amended by Order 714, 73 FR 57531, Oct. 3, 2008]

### § 35.7  Electronic filing of tariffs and related materials.

(a) *General rule.* All filings made in proceedings initiated under this part must be made electronically, including tariffs, rate schedules and service agreements, or parts thereof, and material that relates to or bears upon such documents, such as cancellations, amendments, withdrawals, termination, or adoption of tariffs.

(b) *Requirement for signature.* All filings must be signed in compliance with the following:

(1) The signature on a filing constitutes a certification that: the contents are true and correct to the best knowledge and belief of the signer; and



disputed issues whether the customer will market or broker a portion or all of the capacity and energy associated with stranded costs allowed by the Commission.

(iii) If a customer undertakes the brokering option, and the customer's brokering efforts fail to produce a buyer within 60 days of the date of the brokering agreement entered into between the customer and the utility, the customer shall relinquish all rights to broker the released capacity and associated energy and will pay stranded costs as determined by the formula in paragraph (c)(2)(iii) of this section.

(d) *Recovery of retail stranded costs*—1) *General requirement.* A public utility may seek to recover retail stranded costs through rates for retail transmission services only if the state regulatory authority does not have authority under state law to address stranded costs at the time the retail wheeling is required.

(2) *Evidentiary demonstration necessary for retail stranded cost recovery.* A public utility seeking to recover retail stranded costs in accordance with paragraph (d)(1) of this section must demonstrate that:

(i) It incurred costs to provide service to a retail customer that obtains retail wheeling based on a reasonable expectation that the utility would continue to serve the customer; and

(ii) The stranded costs are not more than the customer would have contributed to the utility had the customer remained a retail customer of the utility.

[Order 888–A, 62 FR 12460, Mar. 14, 1997]

### § 35.27  Authority of State commissions.

Nothing in this part—

(a) Shall be construed as preempting or affecting any jurisdiction a State commission or other State authority may have under applicable State and Federal law, or

(b) Limits the authority of a State commission in accordance with State and Federal law to establish

(1) Competitive procedures for the acquisition of electric energy, including demand-side management, purchased at wholesale, or

(2) Non-discriminatory fees for the distribution of such electric energy to retail consumers for purposes established in accordance with State law.

[Order 697, 72 FR 40038, July 20, 2007]

### § 35.28  Non-discriminatory open access transmission tariff.

(a) *Applicability.* This section applies to any public utility that owns, controls or operates facilities used for the transmission of electric energy in interstate commerce and to any non-public utility that seeks voluntary compliance with jurisdictional transmission tariff reciprocity conditions.

(b) *Definitions*—(1) *Requirements service agreement* means a contract or rate schedule under which a public utility provides any portion of a customer's bundled wholesale power requirements.

(2) *Economy energy coordination agreement* means a contract, or service schedule thereunder, that provides for trading of electric energy on an "if, as and when available" basis, but does not require either the seller or the buyer to engage in a particular transaction.

(3) *Non-economy energy coordination agreement* means any non-requirements service agreement, except an economy energy coordination agreement as defined in paragraph (b)(2) of this section.

(4) *Demand response* means a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy.

(5) *Demand response resource* means a resource capable of providing demand response.

(6) *An operating reserve shortage* means a period when the amount of available supply falls short of demand plus the operating reserve requirement.

(7) *Market Monitoring Unit* means the person or entity responsible for carrying out the market monitoring functions that the Commission has ordered Commission-approved independent system operators and regional transmission organizations to perform.

(8) *Market Violation* means a tariff violation, violation of a Commission-approved order, rule or regulation, market manipulation, or inappropriate dispatch that creates substantial concerns regarding unnecessary market inefficiencies.

(9) *Electric storage resource* as used in this section means a resource capable of receiving electric energy from the grid and storing it for later injection of electric energy back to the grid.

(10) *Distributed energy resource* as used in this section means any resource located on the distribution system, any subsystem thereof or behind a customer meter.

(11) *Distributed energy resource aggregator* as used in this section means the entity that aggregates one or more distributed energy resources for purposes of participation in the capacity, energy and/or ancillary service markets of the regional transmission organizations and/or independent system operators.

(c) *Non-discriminatory open access transmission tariffs.* (1) Every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce must have on file with the Commission an open access transmission tariff of general applicability for transmission services, including ancillary services, over such facilities. Such tariff must be the *pro forma* tariff promulgated by the Commission, as amended from time to time, or such other tariff as may be approved by the Commission consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) Subject to the exceptions in paragraphs (c)(1)(ii), (c)(1)(iii), (c)(1)(iv), and (c)(1)(v) of this section, the open access transmission tariff, which tariff must be the *pro forma* tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff, and accompanying rates must be filed no later than 60 days prior to the date on which a public utility would engage in a sale of electric energy at wholesale in interstate commerce or in the transmission of electric energy in interstate commerce.

(ii) If a public utility owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, it must file the revisions to its open access transmission tariff required by Commission rulemaking proceedings promulgating

and amending the *pro forma* tariff, pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(iii) If a public utility owns, controls, or operates transmission facilities used for the transmission of electric energy in interstate commerce, such facilities are jointly owned with a non-public utility, and the joint ownership contract prohibits transmission service over the facilities to third parties, the public utility with respect to access over the public utility's share of the jointly owned facilities must file the revisions to its open access transmission tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(iv) Any public utility whose transmission facilities are under the independent control of a Commission-approved ISO or RTO may satisfy its obligation under paragraph (c)(1) of this section, with respect to such facilities, through the open access transmission tariff filed by the ISO or RTO.

(v) If a public utility obtains a waiver of the tariff requirement pursuant to paragraph (d) of this section, it does not need to file the open access transmission tariff required by this section.

(vi) Any public utility that seeks a deviation from the *pro forma* tariff promulgated by the Commission, as amended from time to time, must demonstrate that the deviation is consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(vii) Each public utility's open access transmission tariff must include the standards incorporated by reference in part 38 of this chapter.

(2) Subject to the exceptions in paragraphs (c)(2)(i) and (c)(3)(iii) of this section, every public utility that owns, controls, or operates facilities used for the transmission of electric energy in

interstate commerce, and that uses those facilities to engage in wholesale sales and/or purchases of electric energy, or unbundled retail sales of electric energy, must take transmission service for such sales and/or purchases under the open access transmission tariff filed pursuant to this section.

(i) For sales of electric energy pursuant to a requirements service agreement executed on or before July 9, 1996, this requirement will not apply unless separately ordered by the Commission. For sales of electric energy pursuant to a bilateral economy energy coordination agreement executed on or before July 9, 1996, this requirement is effective on December 31, 1996. For sales of electric energy pursuant to a bilateral non-economy energy coordination agreement executed on or before July 9, 1996, this requirement will not apply unless separately ordered by the Commission.

(ii) [Reserved]

(3) Every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, and that is a member of a power pool, public utility holding company, or other multi-lateral trading arrangement or agreement that contains transmission rates, terms or conditions, must have on file a joint pool-wide or system-wide open access transmission tariff, which tariff must be the *pro forma* tariff promulgated by the Commission, as amended from time to time, or such other open access transmission tariff as may be approved by the Commission consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) For any power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed after October 11, 2011, this requirement is effective on the date that transactions begin under the arrangement or agreement.

(ii) For any power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed on or be-

fore May 14, 2007, a public utility member of such power pool, public utility holding company or other multi-lateral arrangement or agreement that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce must file the revisions to its joint pool-wide or system-wide open access transmission tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(iii) A public utility member of a power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed on or before July 9, 1996 must take transmission service under a joint pool-wide or system-wide open access transmission tariff filed pursuant to this section for wholesale trades among the pool or system members.

(4) Consistent with paragraph (c)(1) of this section, every Commission-approved ISO or RTO must have on file with the Commission an open access transmission tariff of general applicability for transmission services, including ancillary services, over such facilities. Such tariff must be the *pro forma* tariff promulgated by the Commission, as amended from time to time, or such other tariff as may be approved by the Commission consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) Subject to paragraph (c)(4)(ii) of this section, a Commission-approved ISO or RTO must file the revisions to its open access transmission tariff required by Commission rulemaking proceedings promulgating and amending the *pro forma* tariff pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(ii) If a Commission-approved ISO or RTO can demonstrate that its existing open access transmission tariff is consistent with or superior to the *pro forma* tariff promulgated by the Commission, as amended from time to time, the Commission-approved ISO or RTO may instead set forth such demonstration in its filing pursuant to section 206 in accordance with the procedures set forth in Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(d) *Waivers.* (1) A public utility subject to the requirements of this section and 18 CFR parts 37 (Open Access Same-Time Information System) and 358 (Standards of Conduct for Transmission Providers) may file a request for waiver of all or part of such requirements for good cause shown. Except as provided in paragraph (f) of this section, an application for waiver must be filed no later than 60 days prior to the time the public utility would have to comply with the requirement.

(2) The requirements of this section, 18 CFR parts 37 (Open Access Same-Time Information System) and 358 (Standards of Conduct for Transmission Providers) are waived for any public utility that is or becomes subject to such requirements solely because it owns, controls, or operates Interconnection Customer's Interconnection Facilities, in whole or in part, as that term is defined in the standard generator interconnection procedures and agreements referenced in paragraph (f) of this section, or comparable jurisdictional interconnection facilities that are the subject of interconnection agreements other than the standard generator interconnection procedures and agreements referenced in paragraph (f) of this section, if the entity that owns, operates, or controls such facilities either sells electric energy, or files a statement with the Commission that it commits to comply with and be bound by the obligations and procedures applicable to electric utilities under section 210 of the Federal Power Act.

(i) The waivers referenced in this paragraph (d)(2) shall be deemed to be revoked as of the date the public utility ceases to satisfy the qualifications of this paragraph (d)(2), and may be re-voked by the Commission if the Commission determines that it is in the public interest to do so. After revocation of its waivers, the public utility must comply with the requirements that had been waived within 60 days of revocation.

(ii) Any eligible entity that seeks interconnection or transmission services with respect to the interconnection facilities for which a waiver is in effect pursuant to this paragraph (d)(2) may follow the procedures in sections 210, 211, and 212 of the Federal Power Act, 18 CFR 2.20, and 18 CFR part 36. In any proceeding pursuant to this paragraph (d)(2)(ii):

(A) The Commission will consider it to be in the public interest to grant priority rights to the owner and/or operator of interconnection facilities specified in this paragraph (d)(2) to use capacity thereon when such owner and/or operator can demonstrate that it has specific plans with milestones to use such capacity to interconnect its or its affiliate's future generation projects.

(B) For the first five years after the commercial operation date of the interconnection facilities specified in this paragraph (d)(2), the Commission will apply the rebuttable presumption that the owner and/or operator of such facilities has definitive plans to use the capacity thereon, and it is thus in the public interest to grant priority rights to the owner and/or operator of such facilities to use capacity thereon.

(e) *Non-public utility procedures for tariff reciprocity compliance.* (1) A non-public utility may submit an open access transmission tariff and a request for declaratory order that its voluntary transmission tariff meets the requirements of Commission rulemaking proceedings promulgating and amending the *pro forma* tariff.

(i) Any submittal and request for declaratory order submitted by a non-public utility will be provided an NJ (non-jurisdictional) docket designation.

(ii) If the submittal is found to be an acceptable open access transmission tariff, an applicant in a Federal Power Act (FPA) section 211 or 211A proceeding against the non-public utility shall have the burden of proof to show

why service under the open access transmission tariff is not sufficient and why a section 211 or 211A order should be granted.

(2) A non-public utility may file a request for waiver of all or part of the reciprocity conditions contained in a public utility open access transmission tariff, for good cause shown. An application for waiver may be filed at any time.

(f) *Standard generator interconnection procedures and agreements.* (1) Every public utility that is required to have on file a non-discriminatory open access transmission tariff under this section must amend such tariff by adding the standard interconnection procedures and agreement and the standard small generator interconnection procedures and agreement required by Commission rulemaking proceedings promulgating and amending such interconnection procedures and agreements, or such other interconnection procedures and agreements as may be required by Commission rulemaking proceedings promulgating and amending the standard interconnection procedures and agreement and the standard small generator interconnection procedures and agreement.

(i) Any public utility that seeks a deviation from the standard interconnection procedures and agreement or the standard small generator interconnection procedures and agreement required by Commission rulemaking proceedings promulgating and amending such interconnection procedures and agreements, must demonstrate that the deviation is consistent with the principles set forth in Commission rulemaking proceedings promulgating and amending such interconnection procedures and agreements.

(ii)–(iv) [Reserved]

(2) The non-public utility procedures for tariff reciprocity compliance described in paragraph (e) of this section are applicable to the standard interconnection procedures and agreements.

(3) A public utility subject to the requirements of this paragraph (f) may file a request for waiver of all or part of the requirements of this paragraph (f), for good cause shown.

(g) *Tariffs and operations of Commission-approved independent system operators and regional transmission organizations*—(1) *Demand response and pricing*—(i) *Ancillary services provided by demand response resources.* (A) Every Commission-approved independent system operator or regional transmission organization that operates organized markets based on competitive bidding for energy imbalance, spinning reserves, supplemental reserves, reactive power and voltage control, or regulation and frequency response ancillary services (or its functional equivalent in the Commission-approved independent system operator's or regional transmission organization's tariff) must accept bids from demand response resources in these markets for that product on a basis comparable to any other resources, if the demand response resource meets the necessary technical requirements under the tariff, and submits a bid under the Commission-approved independent system operator's or regional transmission organization's bidding rules at or below the market-clearing price, unless not permitted by the laws or regulations of the relevant electric retail regulatory authority.

(B) Each Commission-approved independent system operator or regional transmission organization must allow providers of a demand response resource to specify the following in their bids:

(*1*) A maximum duration in hours that the demand response resource may be dispatched;

(*2*) A maximum number of times that the demand response resource may be dispatched during a day; and

(*3*) A maximum amount of electric energy reduction that the demand response resource may be required to provide either daily or weekly.

(ii) *Removal of deviation charges.* A Commission-approved independent system operator or regional transmission organization with a tariff that contains a day-ahead and a real-time market may not assess charge to a purchaser of electric energy in its day-ahead market for purchasing less power in the real-time market during a real-time market period for which the Commission-approved independent system operator or regional transmission organization declares an operating reserve shortage or makes a generic request to

reduce load to avoid an operating reserve shortage.

(iii) *Aggregation of retail customers.* Each Commission-approved independent system operator and regional transmission organization must accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, and the customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal year, where the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers. An independent system operator or regional transmission organization must not accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, where the relevant electric retail regulatory authority prohibits such customers' demand response to be bid into organized markets by an aggregator of retail customers, or the customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal year, unless the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers.

(iv) *Price formation during periods of operating reserve shortage.* (A) Each Commission-approved independent system operator and regional transmission organization must modify its market rules to allow the market-clearing price during periods of operating reserve shortage to reach a level that rebalances supply and demand so as to maintain reliability while providing sufficient provisions for mitigating market power. Each Commission-approved independent system operator and regional transmission organization must trigger shortage pricing for any interval in which a shortage of energy or operating reserves is indicated during the pricing of resources for that interval.

(B) A Commission-approved independent system operator or regional transmission organization may phase in this modification of its market rules.

(v) *Demand response compensation in energy markets.* Each Commission-approved independent system operator or regional transmission organization that has a tariff provision permitting demand response resources to participate as a resource in the energy market by reducing consumption of electric energy from their expected levels in response to price signals must:

(A) Pay to those demand response resources the market price for energy for these reductions when these demand response resources have the capability to balance supply and demand and when payment of the market price for energy to these resources is cost-effective as determined by a net benefits test accepted by the Commission;

(B) Allocate the costs associated with demand response compensation proportionally to all entities that purchase from the relevant energy market in the area(s) where the demand response reduces the market price for energy at the time when the demand response resource is committed or dispatched.

(vi) *Settlement intervals.* Each Commission-approved independent system operator and regional transmission organization must settle energy transactions in its real-time markets at the same time interval it dispatches energy, must settle operating reserves transactions in its real-time markets at the same time interval it prices operating reserves, and must settle intertie transactions at the same time interval it schedules intertie transactions.

(2) *Long-term power contracting in organized markets.* Each Commission-approved independent system operator or regional transmission organization must provide a portion of its Web site for market participants to post offers to buy or sell power on a long-term basis.

(3) *Market monitoring policies.* (i) Each Commission-approved independent system operator or regional transmission organization must modify its tariff provisions governing its Market Monitoring Unit to reflect the directives provided in Order No. 719, including the following:

327

(A) Each Commission-approved independent system operator or regional transmission organization must include in its tariff a provision to provide its Market Monitoring Unit access to Commission-approved independent system operator and regional transmission organization market data, resources and personnel to enable the MarketMonitoring Unit to carry out its functions.

(B) The tariff provision must provide the Market Monitoring Unit complete access to the Commission-approved independent system operator's and regional transmission organization's databases of market information.

(C) The tariff provision must provide that any data created by the Market Monitoring Unit, including, but not limited to, reconfiguring of the Commission-approved independent system operator's and regional transmission organization's data, will be kept within the exclusive control of the Market Monitoring Unit.

(D) The Market Monitoring Unit must report to the Commission-approved independent system operator's or regional transmission organization's board of directors, with its management members removed, or to an independent committee of the Commission-approved independent system operator's or regional transmission organization's board of directors. A Commission-approved independent system operator or regional transmission organization that has both an internal Market Monitoring Unit and an external Market Monitoring Unit may permit the internal Market Monitoring Unit to report to management and the external Market Monitoring Unit to report to the Commission-approved independent system operator's or regional transmission organization's board of directors with its management members removed, or to an independent committee of the Commission-approved independent system operator or regional transmission organization board of directors. If the internal market monitor is responsible for carrying out any or all of the core Market Monitoring Unit functions identified in paragraph (g)(3)(ii) of this section, the internal market monitor must report to the independent system operator's or regional transmission organization's board of directors.

(E) A Commission-approved independent system operator or regional transmission organization may not alter the reports generated by the Market Monitoring Unit, or dictate the conclusions reached by the Market Monitoring Unit.

(F) Each Commission-approved independent system operator or regional transmission organization must consolidate the core Market Monitoring Unit provisions into one section of its tariff. Each independent system operator or regional transmission organization must include a mission statement in the introduction to the Market Monitoring Unit provisions that identifies the Market Monitoring Unit's goals, including the protection of consumers and market participants by the identification and reporting of market design flaws and market power abuses.

(ii) *Core Functions of Market Monitoring Unit.* The Market Monitoring Unit must perform the following core functions:

(A) Evaluate existing and proposed market rules, tariff provisions and market design elements and recommend proposed rule and tariff changes to the Commission-approved independent system operator or regional transmission organization, to the Commission's Office of Energy Market Regulation staff and to other interested entities such as state commissions and market participants, provided that:

(*1*) The Market Monitoring Unit is not to effectuate its proposed market design itself, and

(*2*) The Market Monitoring Unit must limit distribution of its identifications and recommendations to the independent system operator or regional transmission organization and to Commission staff in the event it believes broader dissemination could lead to exploitation, with an explanation of why further dissemination should be avoided at that time.

(B) Review and report on the performance of the wholesale markets to the Commission-approved independent system operator or regional transmission organization, the Commission, and other interested entities such as

**Federal Energy Regulatory Commission** § 35.28

state commissions and market participants, on at least a quarterly basis and submit a more comprehensive annual state of the market report. The Market Monitoring Unit may issue additional reports as necessary.

(C) Identify and notify the Commission's Office of Enforcement staff of instances in which a market participant's or the Commission-approved independent system operator's or regional transmission organization's behavior may require investigation, including, but not limited to, suspected Market Violations.

(iii) *Tariff administration and mitigation* (A) A Commission-approved independent system operator or regional transmission organization may not permit its Market Monitoring Unit, whether internal or external, to participate in the administration of the Commission-approved independent system operator's or regional transmission organization's tariff or, except as provided in paragraph (g)(3)(iii)(D) of this section, to conduct prospective mitigation.

(B) A Commission-approved independent system operator or regional transmission organization may permit its Market Monitoring Unit to provide the inputs required for the Commission-approved independent system operator or regional transmission organization to conduct prospective mitigation, including, but not limited to, reference levels, identification of system constraints, and cost calculations.

(C) A Commission-approved independent system operator or regional transmission organization may allow its Market Monitoring Unit to conduct retrospective mitigation.

(D) A Commission-approved independent system operator or regional transmission organization with a hybrid Market Monitoring Unit structure may permit its internal market monitor to conduct prospective and/or retrospective mitigation, in which case it must assign to its external market monitor the responsibility and the tools to monitor the quality and appropriateness of the mitigation.

(E) Each Commission-approved independent system operator or regional transmission organization must identify in its tariff the functions the Mar-

ket Monitoring Unit will perform and the functions the Commission-approved independent system operator or regional transmission organization will perform.

(iv) *Protocols on Market Monitoring Unit referrals to the Commission of suspected violations.* (A) A Market Monitoring Unit is to make a non-public referral to the Commission in all instances where the Market Monitoring Unit has reason to believe that a Market Violation has occurred. While the Market Monitoring Unit need not be able to prove that a Market Violation has occurred, the Market Monitoring Unit is to provide sufficient credible information to warrant further investigation by the Commission. Once the Market Monitoring Unit has obtained sufficient credible information to warrant referral to the Commission, the Market Monitoring Unit is to immediately refer the matter to the Commission and desist from independent action related to the alleged Market Violation. This does not preclude the Market Monitoring Unit from continuing to monitor for any repeated instances of the activity by the same or other entities, which would constitute new Market Violations. The Market Monitoring Unit is to respond to requests from the Commission for any additional information in connection with the alleged Market Violation it has referred.

(B) All referrals to the Commission of alleged Market Violations are to be in writing, whether transmitted electronically, by fax, mail, or courier. The Market Monitoring Unit may alert the Commission orally in advance of the written referral.

(C) The referral is to be addressed to the Commission's Director of the Office of Enforcement, with a copy also directed to both the Director of the Office of Energy Market Regulation and the General Counsel.

(D) The referral is to include, but need not be limited to, the following information.

(*1*) The name[s] of and, if possible, the contact information for, the entity[ies] that allegedly took the action[s] that constituted the alleged Market Violation[s];

(*2*) The date[s] or time period during which the alleged Market Violation[s] occurred and whether the alleged wrongful conduct is ongoing;

(*3*) The specific rule or regulation, and/or tariff provision, that was allegedly violated, or the nature of any inappropriate dispatch that may have occurred;

(*4*) The specific act[s] or conduct that allegedly constituted the Market Violation;

(*5*) The consequences to the market resulting from the acts or conduct, including, if known, an estimate of economic impact on the market;

(*6*) If the Market Monitoring Unit believes that the act[s] or conduct constituted a violation of the anti-manipulation rule of Part 1c, a description of the alleged manipulative effect on market prices, market conditions, or market rules;

(*7*) Any other information the Market Monitoring Unit believes is relevant and may be helpful to the Commission.

(E) Following a referral to the Commission, the Market Monitoring Unit is to continue to notify and inform the Commission of any information that the Market Monitoring Unit learns of that may be related to the referral, but the Market Monitoring Unit is not to undertake any investigative steps regarding the referral except at the express direction of the Commission or Commission Staff.

(v) *Protocols on Market Monitoring Unit Referrals to the Commission of Perceived Market Design Flaws and Recommended Tariff Changes.* (A) A Market Monitoring Unit is to make a referral to the Commission in all instances where the Market Monitoring Unit has reason to believe market design flaws exist that it believes could effectively be remedied by rule or tariff changes. The Market Monitoring Unit must limit distribution of its identifications and recommendations to the independent system operator or regional transmission organization and to the Commission in the event it believes broader dissemination could lead to exploitation, with an explanation of why further dissemination should be avoided at that time.

(B) All referrals to the Commission relating to perceived market design flaws and recommended tariff changes are to be in writing, whether transmitted electronically, by fax, mail, or courier. The Market Monitoring Unit may alert the Commission orally in advance of the written referral.

(C) The referral should be addressed to the Commission's Director of the Office of Energy Market Regulation, with copies directed to both the Director of the Office of Enforcement and the General Counsel.

(D) The referral is to include, but need not be limited to, the following information.

(*1*) A detailed narrative describing the perceived market design flaw[s];

(*2*) The consequences of the perceived market design flaw[s], including, if known, an estimate of economic impact on the market;

(*3*) The rule or tariff change(s) that the Market Monitoring Unit believes could remedy the perceived market design flaw;

(*4*) Any other information the Market Monitoring Unit believes is relevant and may be helpful to the Commission.

(E) Following a referral to the Commission, the Market Monitoring Unit is to continue to notify and inform the Commission of any additional information regarding the perceived market design flaw, its effects on the market, any additional or modified observations concerning the rule or tariff changes that could remedy the perceived design flaw, any recommendations made by the Market Monitoring Unit to the regional transmission organization or independent system operator, stakeholders, market participants or state commissions regarding the perceived design flaw, and any actions taken by the regional transmission organization or independent system operator regarding the perceived design flaw.

(vi) *Market Monitoring Unit ethics standards.* Each Commission-approved independent system operator or regional transmission organization must include in its tariff ethical standards for its Market Monitoring Unit and the employees of its Market Monitoring Unit. At a minimum, the ethics standards must include the following requirements:

(A) The Market Monitoring Unit and its employees must have no material affiliation with any market participant or affiliate.

(B) The Market Monitoring Unit and its employees must not serve as an officer, employee, or partner of a market participant.

(C) The Market Monitoring Unit and its employees must have no material financial interest in any market participant or affiliate with potential exceptions for mutual funds and non-directed investments.

(D) The Market Monitoring Unit and its employees must not engage in any market transactions other than the performance of their duties under the tariff.

(E) The Market Monitoring Unit and its employees must not be compensated, other than by the Commission-approved independent system operator or regional transmission organization that retains or employs it, for any expert witness testimony or other commercial services, either to the Commission-approved independent system operator or regional transmission organization or to any other party, in connection with any legal or regulatory proceeding or commercial transaction relating to the Commission-approved independent system operator or regional transmission organization or to the Commission-approved independent system operator's or regional transmission organization's markets.

(F) The Market Monitoring Unit and its employees may not accept anything of value from a market participant in excess of a *de minimis* amount.

(G) The Market Monitoring Unit and its employees must advise a supervisor in the event they seek employment with a market participant, and must disqualify themselves from participating in any matter that would have an effect on the financial interest of the market participant.

(4) *Electronic delivery of data.* Each Commission-approved regional transmission organization and independent system operator must electronically deliver to the Commission, on an ongoing basis and in a form and manner consistent with its own collection of data and in a form and manner acceptable to the Commission, data related to

the markets that the regional transmission organization or independent system operator administers.

(5) *Offer and bid data.* (i) Unless a Commission-approved independent system operator or regional transmission organization obtains Commission approval for a different period, each Commission-approved independent system operator and regional transmission organization must release its offer and bid data within three months.

(ii) A Commission-approved independent system operator or regional transmission organization must mask the identity of market participants when releasing offer and bid data. The Commission-approved independent system operators and regional transmission organization may propose a time period for eventual unmasking.

(6) *Responsiveness of Commission-approved independent system operators and regional transmission organizations.* Each Commission-approved independent system operator or regional transmission organization must adopt business practices and procedures that achieve Commission-approved independent system operator and regional transmission organization board of directors' responsiveness to customers and other stakeholders and satisfy the following criteria:

(i) *Inclusiveness.* The business practices and procedures must ensure that any customer or other stakeholder affected by the operation of the Commission-approved independent system operator or regional transmission organization, or its representative, is permitted to communicate the customer's or other stakeholder's views to the independent system operator's or regional transmission organization's board of directors;

(ii) *Fairness in balancing diverse interests.* The business practices and procedures must ensure that the interests of customers or other stakeholders are equitably considered, and that deliberation and consideration of Commission-approved independent system operator's and regional transmission organization's issues are not dominated by any single stakeholder category;

(iii) *Representation of minority positions.* The business practices and procedures must ensure that, in instances

where stakeholders are not in total agreement on a particular issue, minority positions are communicated to the Commission-approved independent system operator's and regional transmission organization's board of directors at the same time as majority positions; and

(iv) *Ongoing responsiveness.* The business practices and procedures must provide for stakeholder input into the Commission-approved independent system operator's or regional transmission organization's decisions as well as mechanisms to provide feedback to stakeholders to ensure that information exchange and communication continue over time.

(7) *Compliance filings.* All Commission-approved independent system operators and regional transmission organizations must make a compliance filing with the Commission as described in Order No. 719 under the following schedule:

(i) The compliance filing addressing the accepting of bids from demand response resources in markets for ancillary services on a basis comparable to other resources, removal of deviation charges, aggregation of retail customers, shortage pricing during periods of operating reserve shortage, long-term power contracting in organized markets, Market Monitoring Units, Commission-approved independent system operators' and regional transmission organizations' board of directors' responsiveness, and reporting on the study of the need for further reforms to remove barriers to comparable treatment of demand response resources must be submitted on or before April 28, 2009.

(ii) A public utility that is approved as a regional transmission organization under § 35.34, or that is not approved but begins to operate regional markets for electric energy or ancillary services after December 29, 2008, must comply with Order No. 719 and the provisions of paragraphs (g)(1) through (g)(5) of this section before beginning operations.

(8) *Frequency regulation compensation in ancillary services markets.* Each Commission-approved independent system operator or regional transmission organization that has a tariff that provides for the compensation for frequency regulation service must provide such compensation based on the actual service provided, including a capacity payment that includes the marginal unit's opportunity costs and a payment for performance that reflects the quantity of frequency regulation service provided by a resource when the resource is accurately following the dispatch signal.

(9) *Electric storage resources.* (i) Each Commission-approved independent system operator and regional transmission organization must have tariff provisions providing a participation model for electric storage resources that:

(A) Ensures that a resource using the participation model for electric storage resources in an independent system operator or regional transmission organization market is eligible to provide all capacity, energy, and ancillary services that it is technically capable of providing;

(B) Enables a resource using the participation model for electric storage resources to be dispatched and ensures that such a dispatchable resource can set the wholesale market clearing price as both a wholesale seller and wholesale buyer consistent with rules that govern the conditions under which a resource can set the wholesale price;

(C) Accounts for the physical and operational characteristics of electric storage resources through bidding parameters or other means; and

(D) Establishes a minimum size requirement for resources using the participation model for electric storage resources that does not exceed 100 kW.

(ii) The sale of electric energy from an independent system operator or regional transmission organization market to an electric storage resource that the resource then resells back to that market must be at the wholesale locational marginal price.

(10) *Transparency*—(i) *Uplift reporting.* Each Commission-approved independent system operator or regional transmission organization must post two reports, at minimum, regarding uplift on a publicly accessible portion of its website. First, each Commission-approved independent system operator or regional transmission organization must post uplift, paid in dollars, and categorized by transmission zone, day,

and uplift category. Transmission zone shall be defined as the geographic area that is used for the local allocation of charges. Transmission zones with fewer than four resources may be aggregated with one or more neighboring transmission zones, until each aggregated zone contains at least four resources, and reported collectively. This report shall be posted within 20 calendar days of the end of each month. Second, each Commission-approved independent system operator or regional transmission organization must post the resource name and the total amount of uplift paid in dollars aggregated across the month to each resource that received uplift payments within the calendar month. This report shall be posted within 90 calendar days of the end of each month.

(ii) *Reporting Operator-Initiated Commitments.* Each Commission-approved independent system operator or regional transmission organization must post a report of each operator-initiated commitment listing the size of the commitment, transmission zone, commitment reason, and commitment start time on a publicly accessible portion of its website within 30 calendar days of the end of each month. Transmission zone shall be defined as a geographic area that is used for the local allocation of charges. Commitment reasons shall include, but are not limited to, system-wide capacity, constraint management, and voltage support.

(iii) *Transmission constraint penalty factors.* Each Commission-approved independent system operator or regional transmission organization must include, in its tariff, its transmission constraint penalty factor values; the circumstances, if any, under which the transmission constraint penalty factors can set locational marginal prices; and the procedure, if any, for temporarily changing the transmission constraint penalty factor values. Any procedure for temporarily changing transmission constraint penalty factor values must provide for notice of the change to market participants.

(11) A resource's incremental energy offer must be capped at the higher of $1,000/MWh or that resource's cost-based incremental energy offer. For the

purpose of calculating Locational Marginal Prices, Regional Transmission Organizations and Independent System Operators must cap cost-based incremental energy offers at $2,000/MWh. The actual or expected costs underlying a resource's cost-based incremental energy offer above $1,000/MWh must be verified before that offer can be used for purposes of calculating Locational Marginal Prices. If a resource submits an incremental energy offer above $1,000/MWh and the actual or expected costs underlying that offer cannot be verified before the market clearing process begins, that offer may not be used to calculate Locational Marginal Prices and the resource would be eligible for a make-whole payment if that resource is dispatched and the resource's actual costs are verified after-the-fact. A resource would also be eligible for a make-whole payment if it is dispatched and its verified cost-based incremental energy offer exceeds $2,000/MWh. All resources, regardless of type, are eligible to submit cost-based incremental energy offers in excess of $1,000/MWh.

(12) *Distributed energy resource aggregators.* (i) Each independent system operator and regional transmission organization must have tariff provisions that allow distributed energy resource aggregations to participate directly in the organized wholesale electric markets. Each regional transmission organization and independent system operator must establish distributed energy resource aggregators as a type of market participant. Additionally, each regional transmission organization and independent system operator must allow distributed energy resource aggregators to register distributed energy resource aggregations under one or more participation models in the regional transmission operator's or the independent system operator's tariff that accommodate the physical and operational characteristics of the distributed energy resource aggregation.

(ii) Each regional transmission organization and independent system operator, to accommodate the participation of distributed energy resource aggregations, must establish market rules that address:

(A) Eligibility to participate in the independent system operator or regional transmission organization markets through a distributed energy resource aggregation;

(B) Locational requirements for distributed energy resource aggregations;

(C) Distribution factors and bidding parameters for distributed energy resource aggregations;

(D) Information and data requirements for distributed energy resource aggregations;

(E) Modification to the list of resources in a distributed energy resource aggregation;

(F) Metering and telemetry system requirements for distributed energy resource aggregations;

(G) Coordination between the regional transmission organization or independent system operator, the distributed energy resource aggregator, the distribution utility, and the relevant electric retail regulatory authorities; and

(H) Market participation agreements for distributed energy resource aggregators.

(iii) Each regional transmission organization and independent system operator must establish a minimum size requirement for distributed energy resource aggregations that does not exceed 100 kW.

(iv) Each regional transmission organization and independent system operator must accept bids from a distributed energy resource aggregator if its aggregation includes distributed energy resources that are customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year. An independent system operator or regional transmission organization must not accept bids from a distributed energy resource aggregator if its aggregation includes distributed energy resources that are customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal year, unless the relevant electric retail regulatory authority permits such customers to be bid into RTO/ISO markets by a distributed energy resource aggregator.

[Order 888, 61 FR 21693, May 10, 1996]

Editorial Note: For Federal Register citations affecting § 35.28, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov.*

Effective Date Note: By Order 222–A, 86 FR 16527, Mar. 30, 2021, § 35.28 was amended by revising paragraph (g)(12)(i), effective June 1, 2021. For the convenience of the user, the revised text is set forth as follows:

**§ 35.28 Non-discrimination open access transmission tariff.**

\*      \*      \*      \*      \*

(g) \* \* \*

(12) \* \* \* (i) Each independent system operator and regional transmission organization must have tariff provisions that allow distributed energy resource aggregations to participate directly in the independent system operator or regional transmission organization markets.

\*      \*      \*      \*      \*

**§ 35.29 Treatment of special assessments levied under the Atomic Energy Act of 1954, as amended by Title XI of the Energy Policy Act of 1992.**

The costs that public utilities incur relating to special assessments under the Atomic Energy Act of 1954, as amended by the Energy Policy Act of 1992, are costs that may be reflected in jurisdictional rates. Public utilities seeking to recover the costs incurred relating to special assessments shall comply with the following procedures.

(a) *Fuel adjustment clauses.* In computing the Account 518 cost of nuclear fuel pursuant to § 35.14(a)(6), utilities seeking to recover the costs of special assessments through their fuel adjustment clauses shall:

(1) Deduct any expenses associated with special assessments included in Account 518;

(2) Add to Account 518 one-twelfth of any payments made for special assessments within the 12-month period ending with the current month; and

(3) Deduct from Account 518 one-twelfth of any refunds of payments made for special assessments received within the 12-month period ending with the current month that is received from the Federal government because the public utility has contested a special assessment or overpaid a special assessment.



the filer, or an authorized representative of the filer, maintains a copy of the document bearing an original, physical signature until after such time as all administrative and judicial proceedings in the relevant matter are closed and all deadlines for further administrative or judicial review have passed.

(c) *Electronic signature.* In the case of any document filed in electronic form under the provisions of this Chapter, the typed characters representing the name of a person shall be sufficient to show that such person has signed the document for purposes of this section.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 619, 65 FR 57092, Sept. 21, 2000; Order 653, 70 FR 8724, Feb. 23, 2005]

## § 385.2006 Docket system (Rule 2006).

(a) The Secretary will maintain a system for docketing proceedings.

(b) Any public information in any docket is available for inspection and copying by the public during the office hours of the Commission, to the extent that such availability is consistent with the proper discharge of the Commission's duties and in conformity with part 388 of this chapter.

[Order 226, 47 FR 19022, May 3, 1982; 48 FR 786, Jan. 7, 1983]

## § 385.2007 Time (Rule 2007).

(a) *Computation.* (1) Except as otherwise required by law, any period of time prescribed or allowed by statute or Commission rule or order is computed to exclude the day of the act or event from which the time period begins to run.

(2) The last day of any time period is included in the time period, unless it is a Saturday; Sunday; a day on which the Commission closes due to adverse conditions and does not reopen prior to its official close of business, even though some official duties may continue through telework-ready employees; part-day holiday that affects the Commission; or legal public holiday as designated in section 6103 of title 5, U.S. Code. In each case the period does not end until the close of the Commission business of the next day which is not a Saturday; Sunday; a day on which the Commission closes due to ad-

verse conditions and does not reopen prior to its official close of business even though some official duties may continue through telework-ready employees; part-day holiday that affects the Commission; or legal public holiday.

(b) *Date of issuance of Commission rules or orders.* (1) Any Commission rule or order is deemed issued when the Secretary does the earliest of the following:

(i) Posts a full-text copy in the Division of Public Information;

(ii) Mails or delivers copies of the order to the parties; or

(iii) Makes such copies public.

(2) Any date of issuance specified in a rule or order need not be the date on which the rule or order is adopted by the Commission.

(c) *Effective date of Commission rules or orders.* (1) Unless otherwise ordered by the Commission, rules or orders are effective on the date of issuance.

(2) Any initial or revised initial decision issued by a presiding officer is effective when the initial or revised initial decision is final under Rule 708(d).

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 375, 49 FR 21316, May 21, 1984; Order 376, 49 FR 21707, May 23, 1984; Order 645, 69 FR 2504, Jan. 16, 2004; 84 FR 3983, Feb. 14, 2019]

## § 385.2008 Extensions of time (Rule 2008).

(a) Except as otherwise provided by law, the time by which any person is required or allowed to act under any statute, rule, or order may be extended by the decisional authority for good cause, upon a motion made before the expiration of the period prescribed or previously extended.

(b) If any motion for extension of time is made after the expiration of a specified time period, the decisional authority may permit performance of the act required or allowed, if the movant shows extraordinary circumstances sufficient to justify the failure to act in a timely manner.

## § 385.2009 Notice (Rule 2009).

Unless actual notice is given or unless newspaper notice is given as required by law, notice by the Commission is provided by the Secretary only

1235

A-27

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney