# In the United States Court of Appeals for the District of Columbia Circuit

### No. 22-1018

————

ADVANCED ENERGY ECONOMY, *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————

## SUPPLEMENTAL ADDENDUM OF RESPONDENT FEDERAL ENERGY REGULATORY COMMISSION

————

Matthew R. Christiansen
 General Counsel

Robert H. Solomon
 Solicitor

Robert M. Kennedy
 Senior Attorney

For Respondent
Federal Energy Regulatory
 Commission
Washington, D.C. 20426

FEBRUARY 2, 2023

# TABLE OF CONTENTS

Statement of Commissioner Christie ................................ Supp. Add. 1

Statement of Commissioner Danly ................................ Supp. Add. 16

Statement of Chairman Glick .......................................... Supp. Add. 56

Statement of Commissioner Clements ........................... Supp. Add. 66

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | Docket No. | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-002 |
| Louisville Gas and Electric Company | | ER21-1114-002 |
| Duke Energy Progress, LLC<br>Duke Energy Carolinas, LLC | | ER21-1115-000<br>ER21-1115-001<br>ER21-1115-002 |
| Duke Energy Carolinas, LLC | | ER21-1116-002 |
| Duke Energy Progress, LLC | | ER21-1117-002 |
| Louisville Gas and Electric Company | | ER21-1118-002 |
| Georgia Power Company | | ER21-1119-002 |
| Kentucky Utilities Company | | ER21-1120-002 |
| Mississippi Power Company | | ER21-1121-002 |
| Alabama Power Company | | ER21-1125-000<br>ER21-1125-001<br>ER21-1125-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1128-002 |

STATEMENT OF COMMISSIONER CHRISTIE

(Issued October 20, 2021)

1.     The Southeast Energy Exchange Market (Southeast EEM or SEEM) proposal meets the standard for approval under section 205 of the Federal Power Act (FPA).[1]  The

---

[1] 16 U.S.C. § 824d (2018).

**Supp. Add. 1**

opposition to this proposal stems from one core issue:  the goal of many interest groups to force the Southeastern states into a Regional Transmission Organization (RTO) or at least into a halfway-house to an RTO now, with full submission later.[2]  The decision whether these states should join an RTO, however, is for their own elected policy-makers to make, not this Commission.  All that we are asked to do in this case is determine whether the SEEM proposal meets the section 205 standard.  For the reasons set forth below, it does and I would have voted to approve.

2.     On February 12, 2021, as amended on June 7, 2021[3] and August 11, 2021,[4] Southern Company Services, Inc., as agent for Alabama Power Company, filed the

---

[2] Chairman Glick shares the goal of creating a Southeastern RTO:  "From my perspective, utilities and other stakeholders in this region should be working to establish an RTO/ISO in the Southeast for the benefit of consumers and to promote grid reliability."  Statement of Chairman Glick regarding Southeast EEM at P 1.  Nonetheless, he acknowledges that "I believe that much of the Southeast EEM proposal arguably satisfies the Section 205 standard."  *Id*. at P 2.  Chairman Glick would have voted against the Southeast EEM proposal based on the *Mobile-Sierra* issue.  *Id*. at P 2; *contra infra* at P 20.  Commissioner Clements would use this proceeding to impose RTO-type governance structures on the Southeast EEM.  Statement of Comm'r Clements regarding Southeast EEM at P 41 ("For example, the Filing Parties could remedy these infirmities by: (1) creating the option for non-LSE Participants to become Members if they make the necessary financial commitment, like in the WEIS; and (2) creating a process for non-Member Participants and other *stakeholders, such as states* or consumer groups, to provide complaints and concerns on Southeast EEM proposals, also like in the WEIS." (emphasis added)).  I note that states are not just "stakeholders" but are sovereign authorities which have long exercised regulatory power over the utilities in the Southeast and would be stripped of much of their regulatory authority if the Southeastern states were forced into a federally-regulated RTO.  Being allowed to attend stakeholder meetings and make complaints to RTO management is small consolation to the states for losing much of their regulatory ability to ensure their consumers receive reliable power at the lowest practical cost.  As noted below, *not a single* state utility commission filed in opposition to the SEEM proposal.  *See infra* at P 19.

[3] On May 4, 2021, Commission staff issued a deficiency letter to Filing Parties informing them that the February 12, 2021 Filings were deficient and requesting additional information (May 4 Deficiency Letter).  On June 7, 2021, Filing Parties submitted a response to that letter (June 7 Deficiency Response), amending the February 12, 2021 Filings.

[4] On August 6, 2021, Commission staff issued a deficiency letter to Filing Parties informing them that the February 12, 2021 Filings, as amended in the June 7 Deficiency

Southeast EEM Agreement on behalf of itself and the other prospective Members (collectively, Filing Parties) of the Southeast EEM,[5] pursuant to section 205 of the FPA and section 35.12 of the Commission's regulations.[6] Also on February 12, 2021, as amended on June 7, 2021 and August 11, 2021, seven prospective Southeast EEM Members submitted certificates of concurrence to the Southeast EEM Agreement and four prospective Participating Transmission Providers in the Southeast EEM filed revisions to their respective open access transmission tariffs (OATTs) to incorporate Non-Firm Energy Exchange Transmission Service (NFEETS).[7]

---

Response, were deficient and requesting further information (August 6 Deficiency Letter).  On August 11, 2021, Filing Parties submitted a response to the August 6 Deficiency Letter (August 11 Deficiency Response), further amending the February 12, 2021 Filings.

[5] As of February 12, 2021, the following entities constitute the prospective Members of the Southeast EEM:  Alabama Power Company, Georgia Power Company, and Mississippi Power Company (collectively, Southern Companies); Associated Electric Cooperative, Inc.; Dalton Utilities; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC (collectively, Duke Energy); Louisville Gas and Electric Company and Kentucky Utilities Company (collectively, LG&E/KU); North Carolina Municipal Power Agency Number 1; PowerSouth Energy Cooperative; North Carolina Electric Membership Corporation; and Tennessee Valley Authority  (each a Member and collectively, the Members).  *See, e.g.*, Southern Companies, Docket No. ER21-1111, February 12, 2021 Transmittal (Southeast EEM Transmittal) at 1 and n.1.  In addition, the following entities participated in the creation of the Southeast EEM and, as of February 12, 2021, are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members:  Georgia System Operations Corporation; Georgia Transmission Corporation; Municipal Electric Authority of Georgia; Oglethorpe Power Corporation; and South Carolina Public Service Authority.  *See, e.g.*, *id.*

[6] 18 C.F.R. § 35.12 (2020).

[7] *See* Duke Energy, Tariff Filing, Docket Nos. ER21-1115-000 (filed Feb. 12, 2021), ER21-1115-001 (filed June 7, 2021), and ER21-1115-002 (filed Aug. 11, 2021); LG&E/KU, Tariff Filing, Docket Nos. ER21-1118-000 (filed Feb. 12, 2021), ER21-1118-001 (filed June 8, 2021); ER21-1118-002 (filed Aug. 11, 2021); Southern Companies, Tariff Filing, Docket Nos. ER21-1125-000 (filed Feb. 12, 2021), ER21-1125-001 (filed June 7, 2021), and ER21-1115-002 (filed Aug. 11, 2021); Dominion Energy SC, Tariff Filing, Docket Nos. ER21-1128-000 (file Feb. 12, 2021), ER21-1128-

Docket No. ER21-1111-001, et al.                                                    - 4 -

3.      In the event the Commission does not act on a filing made pursuant to FPA section 205 within the 60-day period established therein "because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum," FPA section 205(g)(1)(B) requires each Commissioner to "add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change."[8] This statement complies with the statute.[9]

4.      In sum, I would have voted to accept the Southeast EEM proposal as a package. As I set forth in greater detail below, the filings unquestionably meet the statutory criteria for acceptance under section 205 and should have been approved by majority vote of this Commission.  In fact, I would have voted to approve the Southeast EEM proposal as a package within the deadline of August 6, 2021 created by the May 4 Deficiency Letter.[10]

* * *

5.      The Southeast EEM proposal facilitates and enhances interaction among entities in the purchase and sale of energy across a 10-state footprint involving 160,000 MW of generating capacity and approximately 640 TWh of load.[11]  The algorithm proposed by the Southeast EEM to be run by an independent administrator, will match 15-minute "split-the-savings" energy exchanges, subject to available transmission.  Moreover, the proposal for the NFEETS transmission service will, subject to availability, provide zero-cost, non-firm transmission by using *otherwise unused* transmission capacity.  NFEETS will also encourage transactions between geographically distant trading partners that may otherwise have been uneconomic.[12]

---

001 (filed June 8, 2021), ER21-1128-002 (filed Aug. 11, 2021).

[8] 16 U.S.C. § 824d.

[9] *Id.*

[10] The Commission does not vote on whether to issue a deficiency letter. Accordingly, no vote of the Commission was taken on whether to issue the August 6 Deficiency Letter – issued on the deadline for an order to be issued for the Southeast EEM proposal or for the proposal to go into effect by operation of law – and which, in my view, sought information that was already in the record or unnecessary to making a decision on the proposal.

[11] *See, e.g.*, Southeast EEM Transmittal at 4.

[12] *See generally* Southeast EEM Transmittal, attach. D, Pope Aff. ¶ 22 (explaining

Docket No. ER21-1111-001, et al.                                                  - 5 -

6.      The proposal acts to enhance the existing bilateral market in the Southeast and benefits the participants.  It will increase efficiency, liquidity, transparency, and competition in the Southeast bilateral market and better utilize existing transmission capacity in the region.  The filing estimates that the benefit will be approximately $40 million in market-wide savings per year relative to the status quo bilateral market.[13] Importantly, benefits of the proposal will flow to consumers.  I would have found that the proposal package meets the standards for the Commission's acceptance of them under FPA section 205 as they are just and reasonable and not unduly discriminatory or preferential.

7.      In reaching this conclusion, I have considered the various protests and comments in these dockets.  Specifically, I have considered that certain protestors and commenters criticize and express concern with different elements and aspects of the Southeast EEM proposal.  I do not agree with them.  Indeed, as set forth below, it is obvious that many of the criticisms and complaints are direct or veiled attacks on this Southeast EEM proposal not because of what it is, but because of what it is not:  an RTO or a halfway-house to an RTO, which is what many of the critics clearly want.[14]

8.      For purposes of this statement, I touch generally on certain of the briefed criticisms.  For example, certain protestors argue that the Southeast EEM will unjustly exclude entities like public interest organizations, independent power producers, and large-scale commercial and industrial customers from becoming Members and engaging in governance[15] and assert that the Southeast EEM's management authority will be

---

that the Southeast EEM matching tool will lead to lower transaction costs by arranging 15-minute trades across a broad geographic area).

        [13] *See, e.g.*, Southeast EEM Transmittal at 11 (citing Southeast EEM Transmittal, attach. E-1); *id*. at 32-33.

        [14] *See infra* at PP 17-18 and n.32.

        [15] *See, e.g.*, Advanced Energy Economy, Advanced Energy Buyers Group, Renewable Energy Buyers Alliance, and Solar Energy Industries Association (collectively "Clean Energy Coalition") March 15, 2021 Comments (Clean Energy Coalition March 15 Comments) at 15-24; Energy Alabama, Sierra Club, South Carolina Coastal Conservation League, GASP, Southern Alliance for Clean Energy, Southface Energy Institute, Inc., Vote Solar, Georgia Interfaith Power and Light, Georgia Conservation Voters, Partnership for Southern Equity, North Carolina Sustainable Energy Association, Sustainable FERC Project, and Natural Resources Defense Council (collectively "PIOs") March 15, 2021 Limited Protest and Comments at 30-32 (PIO's March 15 Limited Protest); Public Citizen March 15, 2021 Protest (Public Citizen March

concentrated only among load serving entities (LSEs) creating a lack of independent governance, imbalanced decision-making and uncompetitive outcomes.[16]  They further allege that the decision-making authority will be in the hands of the three largest utilities and that together these allegations create a lack of independence from the proposed market participants that is unjust, unreasonable, and unduly discriminatory.[17]  I would have found that Southeast EEM is designed to *enhance, not modify*, the existing bilateral nature of energy transactions in the Southeast.  Much of the criticism raised here appears to reflect disappointment that this proposal does not create an RTO.  As I set forth herein, such criticism is misplaced and any expectation that RTO or RTO-esque structures can or should be forced on this region through FERC action has no basis in law or policy.  I therefore would have found these aspects of the Southeast EEM meet section 205 standards and I would have accepted them.

9.      The arguments that the Southeast EEM should be required to have an independent market monitor suffer from the same infirmity.[18]  While I certainly agree that an independent market monitor is essential to oversee more complex and multi-faceted RTO markets, once again, this is *not* a proposal to create a new RTO market nor should FERC force these applicants into an RTO or RTO-type construct.  Thus, the lack of a market monitor in the Southeast EEM not only does not make this proposal unjust and unreasonable, but the request for the imposition of a market monitor in the Southeast EEM again reflects an agenda of forcing these states into an RTO or RTO-type construct, despite the obvious benefits to consumers of the enhancement of the bilateral trading construct that is proposed in the Southeast EEM.  Moreover, the monitoring and auditing

---

15 Protest)at 2-3; Southern Renewable Energy Association (SREA) March 15, 2021 Comments (SREA March 15 Comments) at 3-5; Voltus, Inc. March 15, 2021 Protest (Voltus March 15 Protest) at 3-4.

[16] *See, e.g.*, PIOs March 15 Limited Protest at 31-32; Public Citizen March 15 Protest at 2-3.

[17] *See, e.g.*, Carolinas Clean Energy Business Association (CCEBA) March 15, 2021 Comments (CCEBA March 15 Comments) at 2; Clean Energy Coalition March 15 Comments at 17-20; PIOs March 15 Limited Protest at 28-32, 39; Advanced Energy Economy, Advanced Energy Buyers Group, and the Solar Energy Industries Association (collectively, "Clean Energy Coalition II") June 28, 2021 Response to June 2021 Response to Delinquency Letter (Clean Energy Coalition II June 28 Response to Delinquency Letter) at 5-6.

[18] *See, e.g.*, SREA March 15 Comments at 5; PIOs March 15 Limited Protest at 32-34; Clean Energy Coalition March 15 Comments at 7-8.

proposed in these filings and the combined roles of the Auditor and the Administrator make for a just and reasonable proposal under section 205 that facilitates bilateral trading which already can and does occur in the current market.

10.     Again, related to the same agenda of imposing an RTO on the Southeast, protestors argue that the benefits of the Southeast EEM have been misstated, overstated or unproven.[19]  First, any claim in this record that an RTO would provide "more" benefits than those offered by the Southeast EEM is purely speculative and unpersuasive.  The issue of RTO benefits versus costs and disadvantages, in terms of both reliability and consumer protection, are complex and multi-faceted.  Second, the only proposal before the Commission is the Southeast EEM and under section 205 the Commission's analysis is limited to whether this proposal is just and reasonable and not whether some other proposal is more just or more reasonable.[20]  That said, I would have voted that the proposal meets section 205 standards.

11.     There is also disagreement over the application of the *Mobile-Sierra*[21] public interest presumption as the standard of review.[22]  In response to the May 4 Deficiency Letter, the Filing Parties suggested that they would limit application of the *Mobile-Sierra* presumption to provisions, including:  membership criteria; governance; roles, responsibilities, and scope of the Agent; budgeting and cost allocation; severability; withdrawal; release and liability; equitable relief; reliability obligations; dispute resolution; defaults; confidentiality; public utility status of Members; no reliance on NFEETS; no dedication of facilities; amendments; and the agreement for new Members

---

[19] *See, e.g.*, PIOs March 15 Limited Protest at 42; Clean Energy Coalition March 15 Comments at 8, 27-34; American Forest & Paper Association March 15, 2021 Comments at 13-14.

[20] *See, e.g.*, *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (finding that, when determining whether a proposed rate was "just and reasonable," as required by the FPA, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than the alternative rate designs").

[21] *United Gas Pipe Line Co. v. Mobile Sierra Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956).

[22] *See, e.g.*, Clean Energy Coalition June 28 Delinquency Letter Response at 7-9; Solar Energy Industries Association August 23, 2021 Protest at 3-6.

to join.[23] As set forth more fully below, I would have found application of the *Mobile-Sierra* standard appropriate under the standard itself.

12.      Several protestors raise concerns regarding the (i) public availability and quality of data related to the energy exchange as it relates to the ability to monitor the Southeast EEM for exercises of market power and market manipulation[24] and (ii) the independence and transparency of the Administrator and Auditor roles and the Membership Board's control over those roles.[25]   I would have found, however, that the Southeast EEM proposal strikes a balance between (i) providing the Commission with appropriate information to monitor the Southeast EEM for the exercise of market power and market manipulation and providing the public with sufficient information to understand the Southeast EEM's performance and (ii) protecting confidential and commercially sensitive information.  In addition, under the proposal, the roles and responsibilities of the Administrator and Auditor are set forth clearly and, as I noted above, their combined roles add to a just and reasonable proposal.  As a result, I again would have found the proposal to be just and reasonable and not unduly discriminatory or preferential on these points as well.

13.      A number of protestors claim that a high barrier is created to participation in Southeast EEM by its participation requirements and that those barriers may limit the services Participants can offer or access to NFEETS.[26]   Among the concerns expressed in this regard are the limitation of participation to entities within the territory defined by the Southeast EEM and the three-counterparty rule regarding enabling agreements.  Once again, I would have found the proposal to be just and reasonable and not unduly discriminatory and preferential as to these issues.  For example, as the Filing Parties explain, these requirements are necessary to ensure the technical feasibility of the Southeast EEM.  The Filing Parties note that it is not technically feasible at this time to

---

[23] June 7 Deficiency Response at 40-41.

[24] *See, e.g.*, Voltus March 15 Protest at 5; CCEBA March 15 Comments at 2 (citing Clean Energy Coalition March 15 Comments at 18-22); PIOs March 15 Limited Protest at 36-37.

[25] *See, e.g.*, PIOs March 15 Limited Protest at 37-38, 40-41; Public Citizen March 15 Protest at 3; Clean Energy Coalition March 15 Comments at 24-25; R Street Institute March 15, 2021 Comments at 5.

[26] *See, e.g.*, Voltus March 15 Protest at 4-5; SREA March 15 Comments at 4; Environmental Defense Fund March 15, 2021 Comments at 7-8; PIOs March 15 Limited Protest at 50.

allow entities outside the territory to participate in the Southeast EEM, for example, because "transactions involving the use of transmission outside of the Territory. . . would require the coordination of e-Tags with non-NFEETS providers in the less-than-20 minute timeframe required, which is not possible at this time."[27]  Moreover, as I have noted, this proposal represents an enhancement to a bilateral system in which enabling agreements are not unusual and therefore represent the continued use of an existing mechanism.

14.      Some commenters claim that a lack of a market power analysis of the Southeast EEM is a concern and, for example, makes the Southeast EEM proposal incomplete.[28]  I similarly would have found the proposal just and reasonable as to this point because there is no new product introduced which would require a new market power analysis.

15.      In addition, concerns are expressed over NFEETS, including the potential of undue discrimination to entities with firm transmission rights and that NFEETS acts as a discount to transmission.  Further, some protestors argue that the Southeast EEM creates a loose power pool and therefore must allow open membership to comply with the Commission's open access requirements established in Order Nos. 888 and 888-A.[29]  Again, I would have found the proposal just and reasonable and not unduly discriminatory or preferential.  First, there is no discount to transmission; otherwise unused non-firm transmission is to be used in NFEETS and it is made available only after all other transmission customers make their transmission reservations.[30]  Second, the proposal does not meet the requirements for creating a loose power pool established by Order No. 888-A.[31]

16.      The Commission is obligated to rule on *only the proposal before it*, not some hypothetical version that some may claim would have been better in some ways, in effect, more just and reasonable.  It is a truism that to meet the 205 standard, a proposal does not have to be the best of all conceivable proposals, only good enough to meet the 205

---

[27] Filing Parties March 30 Answer at 44.

[28] *See, e.g.*, Clean Energy Coalition March 15 Comment at 27.

[29] *See, e.g.*, *id.* at 9-14; PIOs March 15 Limited Protest at 6-13; CCEBA March 15 Comments at 2; *see also* Advanced Energy Economy, Advanced Energy Buyers Group, Renewable Energy Buyers Alliance (collectively, Clean Energy Customers) August 23, 2021 Comments at 4-5.

[30] Southeast EEM Transmittal at 24-25.

[31] Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 at 31,235.

standard; the Southeast EEM proposal clearly is and I would have accepted that proposal under section 205 as it meets the applicable legal standard.

17.     As I noted above, much of the opposition to and criticism of the Southeast EEM Agreement follows a common theme:  that the Southeast EEM Agreement falls short of creating a new Southeastern RTO or falls short of laying the foundation that would lead to such a new Southeastern RTO.[32]  Many of the comments or protests to this proposal seek to force RTO-type governance structures and procedures on the SEEM proposal.

_____

[32] *See, e.g.*, PIOs March 15 Limited Protest at 63-64 (encouraging the Commission to engage in a technical conference to determine, *inter alia*, the benefits of RTOs and ISOs over the Southeast EEM and whether instituting the Southeast EEM would "impede or delay" market reform in the Southeast and concluding "The Commission has an opportunity to exercise its authority to establish a foundation for wholesale market reform in the Southeast.  This foundation, instead of being fashioned by the self-interest of the long-time monopoly utilities in the region, would enable the competitive procurement of clean energy and hold down costs for customers in a manner that reflects the views of the many public and private entities that have so much at stake in how the Southeast's electricity system evolves."); Voltus Protest March 15 at 6 ("Part of the question is whether utilities can set up a bilateral trading structure that largely benefits themselves – with only pass through consumer benefits – without even discussing an RTO structure. Given this – and the CLEAN Future Act's proposal that all public utilities place their transmission under the control of an RTO or ISO – Voltus proposes FERC convene a joint conference with the relevant electric retail regulatory authorities (RERRAs) in the involved states to explore the benefits and costs of establishing an RTO/ISO in the Southeastern U.S." (footnote omitted)); SREA March 15 Comments at 2 (SREA "supports the development of an independent organized energy market in the South. While the Southeastern Energy Exchange Market. . .is a step towards better market efficiency, we are concerned that this step will become a stumbling block on the longer journey towards true market reform"); Clean Energy Coalition March 15 Comments at 32-33 ("If only one state in the SEEM footprint were to participate in an RTO, that decision alone is projected to have greater customer benefit than all of the utilities' participation in SEEM is claimed to have.  If the Southeast were to band together to create a new RTO, the potential benefits could total in the hundreds of billions by 2040. The Clean Energy Coalition encourages the SEEM Filing Entities and the Commission to think more ambitiously than the proposal offered in these proceedings, given the tremendous upside to true regional market integration." (footnotes omitted)); Clean Energy Coalition II June 28 Response Delinquency Letter at 4-5 ("Evidence is mounting that a robust and economically efficient competitive regional wholesale market in the Southeast would provide significant benefits to the region, well above the benefits projected by the SEEM Members to be realized through the SEEM Proposal.  In addition

18.     The advocacy by various intervening interest groups for FERC to use this proceeding to impose an RTO or proto-RTO structures misses a key point:  the decision whether to form a new RTO in the states covered by this proposal is a policy decision that is ultimately for *elected policy-makers in those states* to make, *not* for FERC to impose.  If some want to claim that consumers would do better in an RTO than in the state-regulated models prevalent in these Southeastern states – an open question, to say the least – we can certainly have that debate, but it is for another forum.  This proceeding is about one question only:  whether the Southeast EEM proposal meets the section 205 standard.  Answer, as set forth above:  *it does.*

19.     Claims that the Southeast EEM proposal will actually harm consumers are specious – part of the campaign to force these states into an RTO-type structure – particularly in view of data indicating that consumers in the states represented in the Southeast EEM footprint[33] already enjoy average retail rates lower than the national average retail rate under their existing state regulatory frameworks.[34]  Notably, *not a single* state utility commission expressed opposition to this proposal.

––––––––––––––––––––––

to the joint section 209 hearing proposed above, the Commission should convene a technical conference amongst itself, its staff, SEEM members, and stakeholders to facilitate a moderate discussion regarding comprehensive market reform in the Southeast. The Clean Energy Coalition is confident that such a technical conference would reveal that the benefits associated with establishing a true electricity market in the Southeast (be they economic, reliability-based, or environmental) far outweigh the costs.  The Commission should not let this be the end of the matter." (footnotes omitted)); Clean Energy Customers Comments August 23 at 5-6 ("[T]he Commission can, and should, do more to encourage an inclusive conversation about the future of wholesale markets developments in the Southeast.  Now is the time to convene a forum by which stakeholders, including state regulators and policy makers, can begin establishing a collaborative process to consider the costs and benefits of more robust competitive markets in the Southeast.  By broadly soliciting input from stakeholders and establishing a technical conference separate and apart from this docket the Commission can allow consideration of all relevant facts and circumstances, including by stakeholders most impacted.  The Commission has an important role to play in ensuring that this conversation moves forward and can use its convening tools to ensure that the views of states and consumers on the future of the region's wholesale market are heard and considered.").

[33] Southeast EEM Transmittal at 5.

[34] *See* https://www.eia.gov/electricity/state/ .  Information compiled by the Energy Information Administration (EIA), the statistical and analytical agency within the U.S.

20.    The *Mobile-Sierra* issue provides no basis to vote against the Southeast EEM.  A grant of *Mobile-Sierra* status to the provisions remaining after the Filing Parties voluntarily withdrew their request for such status from the *majority* of the Agreement's provisions, as was proffered in response to the May 4 Deficiency Letter,[35] should have been approved.  So, all the provisions, including those withdrawn in the Response to the May 4 Deficiency Letter, will now receive *Mobile-Sierra* protection as requested in the original filings.  While I was prepared to vote on August 6 to approve the filings with the proffered *Mobile-Sierra* withdrawals, I see no reason or basis to differentiate among them at this point.  The real issue here, however, is not hidden in the weeds of legal minutiae over how to interpret our past precedent concerning application of *Mobile-Sierra*, which is muddled at best even before considering the question of how those precedents line up with judicial opinions.  The *Mobile-Sierra* issue does not exist in a hermetically sealed vacuum in this case, and it is unrealistic to pretend that it does.  Refusal to grant any *Mobile-Sierra* protection even to the remaining provisions after the proffered withdrawal – when we could have – empowers those interests opposing the Southeast EEM by making it easier for these opponents to attack and undermine the Southeast EEM in a later section 206 proceeding at this Commission.[36]  The Filing Parties' request for

---

Department of Energy, exists concerning average retail rates in the various states.  I consulted EIA's figures for 2019, the last full year before the pandemic may have had some impact on data.  While I understand that adjustments can be made to the average retail rates published in EIA's reports, I accept the data for what they are, averages both national and state-specific.  The average retail rate for the United States in 2019 was 10.54 cents/kWh.  *Id.*  The 2019 average retail rate for each of the states reflected in the Southeast EEM proposal's footprint is lower.  *See id.*; *see also*, Southeast EEM Transmittal at 5.

[35] *See, e.g.*, June 7 Deficiency Response at 41 (noting that "[m]ost of the Southeast EEM Agreement" would not have been subject to the *Mobile-Sierra* presumption under the June 7 Deficiency Letter Response, including the Market Rules).

[36] Commissioner Clements foresees future section 206 complaints against SEEM, and lists the potential allegations:  "Applying the *Mobile-Sierra* standard would therefore *inappropriately make any future challenge* to the justness and reasonableness of the Southeast EEM Agreement *more difficult.  This is particularly problematic here given the concerns with undue discrimination, governance, market power, and manipulation that the proposal presents*."  Comm'r Clements Southeast EEM Statement at P 7 (emphasis added).  Chairman Glick also raises the prospect of just such future attacks:  "Applying the *Mobile-Sierra* presumption in these circumstances will *make it more difficult for third parties* or even the Commission to *mount legitimate challenges* in the future to the justness and reasonableness of the Southeast EEM."  Chairman Glick Southeast EEM

*Mobile-Sierra* protection against such future attacks on the contractual provisions should have been granted because – once again – this is *not* an RTO, *not* a halfway-house to an RTO, but simply a contractual arrangement for utilities in the Southeast to engage in bilateral trading.

21.    In sum, the Southeast EEM application clearly meets the standard to be approved under section 205 and I would have voted to approve.  It is sad that this proposal, which offers undeniable benefits to consumers both in terms of reliability and lower costs, could not command at least three votes.

22.    Now to turn to a procedural issue.  On October 13, 2021, a Notice was issued in eight of the above-referenced dockets as the Commission could not issue an order due to a 2-to-2 division among the Commissioners.  In that Notice, the filings related directly to Southeast EEM Agreement – but *not* those four related to the OATT revisions which were always part of the Southeast EEM proposal package – were confirmed to have gone into effect by operation of law.

23.    Regardless of legal arguments related to the Notice's exclusion of the four OATT filings from approval by operation of law, as a matter of procedural fairness the OATT revisions could and should have been accepted with a simple order issued by this Commission.  I would have voted for such an order, which I strongly believe would have been appropriate given the way the Southeast EEM proposal has been managed and handled by the Commission.[37]

24.    The Filing Parties stated that the filings across these dockets were made *as a package*.[38]  After changes in the effective date necessitated by two deficiency letters, the Filing Parties selected October 12, 2021 as an effective date for all of the filings.[39]  The

---

Statement at P 11 (emphasis added).

   [37] *See, e.g.*, *supra* at n.10.

   [38] *See* Southern Companies, Docket No. ER21-1125, February 12, 2021 Transmittal at 3 ("The Southeast EEM filings are a package.  Commission action on all filings is necessary so that Southern Companies and other Southeast EEM Members can have the regulatory certainty they need to move forward with any significant additional Southeast EEM financial commitments to bring this enhanced market to fruition for the benefit of customers as quickly as possible."); *see, e.g.*,  Dominion South Carolina, Docket No. ER21-1128, February 12, 2021 Transmittal at 3; Duke Progress & Duke Carolinas, Docket No. ER21-1115, February 12, 2021 Transmittal at 3; LG&E/KU, Docket No. ER21-1118, February 12, 2021 Transmittal at 3.

   [39] Southern Companies, Docket No. ER21-1111, August 11 Deficiency Response

Secretary issued a Combined Notice that reflected that each of the filings was made under section 205(d) and again confirming a 60 day clock.[40]  Southern Companies noted that they followed guidance that the filings needed to be made in multiple dockets[41] and that the OATT revisions should bear a date in eTariff of 12/31/9998 as the transmission revisions should only go into effect at a later date when the service was established under the market structure approved by the Commission.[42]  In sum, the Filing Parties spoke clearly through their filings about their intentions, the reasons the filings were made through multiple dockets, what sources they relied on to make their filings and that these multiple filings were all related and part of the *same* package.

25.     There can be no credible argument that the Filing Parties did not at all times act in good faith as they navigated the Commission rules, protocols and technical requirements for making all of these filings.  This is especially true since neither of the two deficiency letters noted any issue or potential concern with respect to the manner in which the OATT filings were made and given that they were all part of the same package.  It follows that inaction by the Commission on these filings due to a lack of a majority should have resulted in *all* dockets being treated as a *package* by publishing a Notice that the entire package was effective by operation of law or, and preferably, simply issuing the necessary order accepting the OATT filings as of October 12, 2021, the date the rest of the filings went into effect by operation of law.

---

at 9.

[40] February 12, 2021 Combined Notice of Filing #1 and February 12, 2021 Combined Notice of Filing #2 describing each docket as filed under 205(d).

[41] *See* Southeast EEM Transmittal at 3 (defining the Tariff Filings, Concurrence Filings and the Agreement Filings collectively as the Southeast EEM Filings and stating that "eTariff requirements mandate that each of the Southeast EEM Filings have its own docket. . . .")

[42] *See, e.g.*, Southern Companies, Docket No. ER21-1125, February 12, 2021 Transmittal at 12, n.39 (citing Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings at 10 (last updated on Nov. 14, 2016) ("If the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., the date of 12/31/9998 must be used.")).

Docket No. ER21-1111-001, et al.                                    - 15 -

26.     As I stated, regardless of the arguments both legal and equitable, however, there is a readily available cure.  We can and should issue the appropriate technical order accepting the OATT revision filings, and we should do so promptly.  I would have voted for such an order.

_____

Mark C. Christie
Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-002 |
| Louisville Gas and Electric Company | | ER21-1114-002 |
| Duke Energy Progress, LLC | | ER21-1115-000 |
| Duke Energy Carolinas, LLC | | ER21-1115-001 |
| | | ER21-1115-002 |
| Duke Energy Carolinas, LLC | | ER21-1116-002 |
| Duke Energy Progress, LLC | | ER21-1117-002 |
| Louisville Gas and Electric Company | | ER21-1118-002 |
| Georgia Power Company | | ER21-1119-002 |
| Kentucky Utilities Company | | ER21-1120-002 |
| Mississippi Power Company | | ER21-1121-002 |
| Alabama Power Company | | ER21-1125-000 |
| | | ER21-1125-001 |
| | | ER21-1125-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1128-002 |

(Issued October 20, 2021)

STATEMENT OF JAMES P. DANLY

1.    I submit this statement in accordance with section 205(g)(1)(B) of the Federal Power Act (FPA).[1]  I voted to approve the proposal.

_____

[1] 16 U.S.C. § 824d(g)(1)(B).  In October 2018, the America's Water Infrastructure Act became law.  America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, 132 Stat. 3765 (2018).  That Act included provisions from the Fair Ratepayer Accountability,

**Supp. Add. 16**

2.      I provide this statement to explain why the entire Southeast Energy Exchange Market (Southeast EEM) proposal[2] in all twelve root dockets went into effect by operation of law and not merely the subset of dockets included in the Commission's October 13, 2021 Notice.[3]  Excluding those dockets from the notice may create the false impression that the proposed tariff revisions in those dockets did not also go into effect by operation of law.  To the contrary, every filing, in every related docket has now been accepted.[4]  As discussed below, the Commission's deficient notice is just one more in a

---

Transparency, and Efficiency Standards Act (the Fair RATES Act) amending FPA section 205 to treat inaction by the Commission that allows a rate change to take effect as an order for purposes of rehearing and judicial review.  America's Water Infrastructure Act § 3006.

[2] Members of the Southeast EEM are: Alabama Power Company (Alabama Power), Georgia Power Company (Georgia Power), and Mississippi Power Company (Mississippi Power) (collectively, Southern Companies); Associated Electric Cooperative, Inc. (AECI); Dalton Utilities (Dalton); Dominion Energy South Carolina, Inc. (Dominion Energy SC); Duke Energy Carolinas, LLC (DEC) and Duke Energy Progress, LLC (DEP) (together with DEC, Duke); Louisville Gas & Electric Company (LG&E) and Kentucky Utilities Company (KU) (and LG&E and KU Services Company and LG&E and KU Energy LLC, when acting as the agent or representative of LG&E/KU) (collectively, LG&E/KU); North Carolina Municipal Power Agency Number 1 (NCMPA Number 1); Power South Energy Cooperative (PowerSouth); North Carolina Electric Membership Corporation (NCEMC); and Tennessee Valley Authority (TVA) (each a Member and collectively, the Members).  Other entities that have participated in the creation of the Southeast EEM and are in the process of or are contemplating seeking the necessary approvals to execute the Southeast EEM Agreement and become Members: Georgia System Operations Corporation (GSOC); Georgia Transmission Corporation (GTC); Municipal Electric Authority of Georgia (MEAG Power); Oglethorpe Power Corporation (An Electric Membership Corporation) (Oglethorpe); and South Carolina Public Service Authority (Santee Cooper).

[3] October 13, 2021 Notice.  Dockets included were *Ala. Power*, Docket No. ER21-1111-002; *Dominion Energy SC*, Docket No. ER21-1112-002; *LG&E*, Docket No. ER21-1114-002; *DEC*, Docket No. ER21-1116-002; *DEP*, Docket No. ER21-1117-002; *Ga. Power*, Docket No. ER21-1119-002; *KU*, Docket No. ER21-1120-002; *Miss. Power*, Docket No. ER21-1121-002.  Dockets excluded were *Ala. Power*, Docket No. ER21-1125-002, et al.; *Dominion Energy SC*, Docket No. ER21-1128-002, et al.; *Duke*, Docket No. ER21-1115-002, et al.; *LG&E*, Docket No. ER21-1118-002, et al.

[4] *See, e.g.*, *Pub. Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d 757, 776 (D.C. Cir. 1974) (recognizing that an agency's authority runs to it as "an entity apart from its members, and it is its institutional decision—none other—that bear legal

- 2 -

**Supp. Add. 17**

line of improper procedural maneuvers that have unjustifiably delayed the establishment of this market and delayed the issuance of a merits order by half a year.

3.     I also explain why the Southeast EEM proposal is just and reasonable and not unduly discriminatory or preferential and should have been approved in full by the Commission in an order on the merits.

## I.     Southeast EEM Proposal

4.     On February 12, 2021, Southern Company, as agent for Alabama Power, on behalf of itself and other Members of the Southeast EEM, submitted the Southeast EEM Agreement, part of a unified package of proposals to establish a new, voluntary electronic trading platform designed to facilitate bilateral trading in the Southeast, provide access to unused transmission capacity and increase liquidity and competition.[5]  The Southeast EEM Agreement and related filings, including concurrences thereto[6] and related open access transmission tariff (OATT) revisions to establish Non-Firm Energy Exchange Transmission Service,[7] were submitted in twelve related dockets.  As the Southeast EEM Members explained: "The Southeast EEM filings are a package.  Commission action on all filings is necessary so that Southern Companies and other Southeast EEM Members can have the regulatory certainty they need to move forward with any significant additional Southeast EEM financial commitments to bring this enhanced market to fruition for the benefit of customers as quickly as possible."[8]  The Southeast EEM

---

significance."); *see also Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) ("[A]ctions of the Commission shall be determined by a majority vote of the members present." (quoting 42 U.S.C. § 7171(e))).

[5] *See, e.g.*, *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 2.

[6] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal; *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal; *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal; *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal; *Ga. Power*, Docket No. ER21-1119-000 Transmittal; *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal; *Miss. Power*, Docket No. ER21-1121-000 Transmittal.

[7] The four OATT dockets are: *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal; *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal.

[8] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3;

**Supp. Add. 18**

Agreement requires all Members that are transmission service providers amend their tariffs to provide Non-Firm Energy Exchange Transmission Service (NFEETS).[9]  The Members of the Southeast EEM submitted their OATT revisions, in the four dockets excluded from the October 13 Notice, because they signed the Southeast EEM Agreement.[10]  As they noted, the "eTariff requirements mandate that each of the Southeast EEM Filings have its own docket[.]"[11]  The Commission's notices of filing

---

*Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 3; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3.  These are the four OATT dockets.  *See Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5 ("In addition to Southern Companies, Dominion Energy South Carolina, DEC, and LG&E are each filing amendments to their transmission tariffs, some of which are joint OATTs, to add [Non-Firm Energy Exchange Transmission Service] ("Tariff Filings," together with the Agreement Filing and the Concurrence Filings, the "Southeast EEM Filings")."); *see also Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3 (defining the Tariff Filings, Concurrence Filings and the Agreement Filings as the Southeast EEM Filings).

[9] *See* Southeast EEM Agreement, § 3.2.1 ("To be a Member of the Southeast EEM, an entity must be: (i) a Load Serving Entity located in the Territory; (ii) an association, Cooperative or Governmental Utility that is a Load Serving Entity located in the Territory; or (iii) an association, Cooperative or Governmental Utility created for the purpose of providing service that includes Energy to a Cooperative or governmental Load Serving Entity (or the Load Serving Entities being served by an association, Cooperative or Governmental Utility) located in the Territory. *The Tariff of any Member who provides transmission service must contain Non-Firm Energy Exchange Transmission Service provisions for those Energy Exchanges that seek to utilize such Member's transmission system*.") (emphasis added); *see also id.* § 3.1 ("Each Member shall comply with all applicable rules, policies, guidelines, or other standards or requirements set forth in this Agreement and as may otherwise be required by the Membership Board or applicable Law.").

[10] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2; *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 2; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2.

[11] *See, e.g.*, *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3 ("eTariff requirements mandate that each of the Southeast EEM Filings have its own docket"); *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 ("eTariff requirements mandate that each of the Southeast EEM Filings

properly designated all twelve filings as FPA section 205(d) rate filings in accordance with FPA section 205(d) and the related filing codes that were used.[12]  They used the effective date of 12/31/9998[13] as required.[14]  The Southeast EEM proposal was submitted

---

have its own docket").

[12] Filing Code 10 was used for the February 12, 2021 filings, and Filing Code 180 was used for the deficiency responses.  The eTariff Rules Table (as published on April 20, 2018) denotes filings under these codes as having a 60-day statutory deadline with a date range of April 2010 to an inactive date of 12/31/9998.  ETariff Filing Rules Listing (Apr. 20, 2018), available at https://www.ferc.gov/sites/default/files/2020-05/Type%20of%20Filing%20Rules%20Table.pdf.  The Commission routinely accepts filings with a filing party's commitment to submit an informational filing once the commencement of service date is known.

[13] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3, 11-12, 12 n.36, 14 (requesting acceptance of the proposed OATT changes on May 13, 2021 to be effective as of commencement of service and using 12/31/9998 in accordance with the implementation guide); *Dominion Energy SC*, Docket No. ER21-1128-000 February 12, 2021 Transmittal at 3, 11-12, 11 n.36, 14; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3, 12-13, 12 n.39, 15; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3, 12-13, 12 n.38, 15.

[14] *Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings* at 10 (last updated on Nov. 14, 2016), available at https://www.ferc.gov/sites/default/files/2020-05/implementation-guide.pdf ("If the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., *the date of 12/31/9998 must be used*.") (emphasis added).  *See N. Y. Indep. Sys. Operator, Inc.*, Docket No. ER21-892-000 (Mar. 10, 2021) (delegated letter order) (accepting tariff revisions 54 days after filing on January 15, 2021; requesting acceptance within the 60-day statutory period, a waiver of the Commission's 120 days prior notice requirement, and a flexible effective date with tariff sheets filed as effective 12/31/9998); *see also Cal. Indep. Sys. Operator Corp.*, 175 FERC ¶ 61,160 (2021) (accepting tariff revisions 60 days after filing on March 26, 2021, which requested the Commission issue an order by May 25, 2021 and included an effective date of 12/31/9998 as part of the tariff records; accepting the proposed tariff revisions to be effective no later than June 15, 2021 as requested); *Tri-State Generation & Transmission Ass'n, Inc.*, 171 FERC ¶ 61,202 (2020) (accepting protested rate filing 60 days after it was filed with 12/31/9998 for its eTariff effective date); *Gulf Power Co.*, Docket No. ER21-240-000 (Dec. 17, 2020) (delegated letter order) (accepting the Service Agreement for Network Integration Transmission Service under Gulf Power's OATT 49 days after filing on October 29, 2020 requesting an effective date of 12/31/9998).

by the filing parties on February 12, 2021, with a requested acceptance date 90 days after filing, or May 13, 2021, to allow 30 days for comments and 60 days for Commission action.[15]

## II.  **Procedural Issues**

### A.  **Deficiency Letters**

5.     Rather than issue an order on the merits, Commission staff embarked upon a series of procedural maneuvers that significantly delayed approval of the Southeast EEM proposal.  These began with the issuance of a first (and arguably justifiable) deficiency letter.[16]  The original last day for Commission action (LDA)[17] was May 12, 2021.  The First Deficiency Letter was issued on May 4, 2021, just over a week in advance of the deadline.[18]  The filing parties' response to the First Deficiency Letter was filed on June 7, 2021.[19]  That submission reset 60-day statutory clock to August 6, 2021.  In their first deficiency letter response, the filing parties requested "that the Commission accept the

---

[15] *See, e.g., Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3-4 ("The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement to become effective May 13, 2021, 90 days after this filing  . . . .  [W]e respectfully request that the Commission establish a comment period of thirty days . . .  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received.").  See attachment A for similar statements in other dockets.

[16] The first deficiency letter issued on May 4, 2021 requested information related to market power, market manipulation, and market oversight.  May 4, 2021 Deficiency Letter, Docket Nos. ER21-1111-000, ER21-1112-000, ER21-1114-000, ER21-1115-000, ER21-1116-000, ER21-1117-000, ER21-1118-000, ER21-1119-000, ER21-1120-000, ER21-1121-000, ER21-1125-000, ER21-1128-000 (delegated order) (First Deficiency Letter).

[17] The Commission's LDA is an internal control to identify the last date upon which the Commission must act on a filing with a statutory deadline before the filing goes into effect by operation of law.

[18] *See* First Deficiency Letter.

[19] *See Ala. Power*, Docket Nos. ER21-1111-001, et al., First Deficiency Response (June 7-8, 2021).  The deficiency response was filed in certain of the dockets after the 5 p.m. deadline on June 7, 2021, so it is dated June 8, 2021 in those dockets.

- 6 -

**Supp. Add. 21**

Southeast EEM Agreement, *and the related filings in these unconsolidated* dockets . . . to become effective on August 6, 2021."[20]

6.      That deficiency letter was then followed by a second, indisputably frivolous deficiency letter which Commission staff issued on August 6, 2021.[21]  That would have again reset the 60-day statutory clock, this time to October 11, 2021, a federal holiday.  In their second deficiency letter response, the filing parties requested that the "Commission accept the Southeast EEM Agreement, *and the related filings in these unconsolidated dockets . . . to become effective on October 12, 2021.*"[22]

7.      Altogether, those deficiency letters extended by five months the acceptance by operation of law on October 12, 2021 of a filing that was originally submitted on February 12, 2021 with  a requested acceptance date of May 13, 2021.

8.      I am concerned that the Commission staff, who work under the supervision of the Chairman, improperly employed deficiency letters issued under delegated authority to unlawfully toll the time for Commission action.  The First Deficiency Letter requested information related to market power, market manipulation and market oversight.  I concede that this first deficiency letter could be argued to have been a legitimate request for more information, though I do not consider any of the information requested or received to have been necessary to rule on whether the submission satisfied the requirements of FPA section 205.  But even if the first deficiency letter were a legitimate exercise of staff's delegated authority, deficiency letters should not be issued lightly because they work a circumvention of the FPA's clear direction that rate proposals go into effect (or must be affirmatively accepted or rejected) in 60 days.

9.      The Second Deficiency Letter is another matter entirely.  It failed to identify any deficiency or solicit any information that any Commissioner could have required to determine whether the proposal before us is just and reasonable.  As detailed below,

---

[20] First Deficiency Response at 43 (emphasis added).

[21] The second deficiency letter, issued on August 6, 2021, requested information related to Standards of Conduct and affiliate restrictions, access to redacted and confidential information, the Administrator, including information already in the record. August 6, 2021 Deficiency Letter, Docket Nos. ER21-1111-001, ER21-1112-001, ER21-1114-001, ER21-1115-000, ER21-1115-001, ER21-1116-001, ER21-1117-001, ER21-1118-001, ER21-1119-001, ER21-1120-001, ER21-1121-001, ER21-1125-000, ER21-1125-001, ER21-1128-000, ER21-1128-001 (delegated order) (Second Deficiency Letter).

[22] *Ala. Power*, Docket Nos. ER21-1111-002, et al., Second Deficiency Response, at 9 (Aug. 11, 2021) (emphasis added).

**Supp. Add. 22**

review of the record demonstrates—beyond dispute—that the Second Deficiency Letter requested information that *was already in the record*. In reply, the filing parties swiftly submitted responses to the Second Deficiency Letter's three questions three business day after its issuance, on August 11, 2021, five days earlier than the established due date of August 16, 2021. In their response, the filing parties again requested expedited Commission action on or before September 10, 2021; no Commission order issued. The last LDA was October 11, 2021, roughly *five months* later than the original requested effective date.

10.     Requiring filing parties to restate information already in the record can hardly constitute the identification of a deficiency in the parties' filing and if the filing is not deficient, then it must be ruled upon within the statutorily-imposed 60-day time limit. We *know* that the requested information was already available to the Commission. For two of the three questions in the Second Deficiency Letter, the filing parties' response consisted of little more than citations to their original filing and to their First Deficiency Response.[23]  As to the third question, while the filing parties did not simply cite to their earlier submissions (perhaps to avoid the appearance of insolence?), the information sought there was also already in the record. The third question asked that the filing parties "[p]lease clarify whether the Administrator similarly *will not be a Member, Participant, Agent*, or affiliate of those entities."[24]  All[25] of this was already known to the Commission—it was included in the original February 12, 2021 filing in which the filing parties describe the various entities' roles, stating that the "Southeast EEM Administrator" "[w]ill be an independent third party contracted to operate the Southeast EEM; *will not be a Member, Participant, Agent*, or Auditor."[26]  Worst of all, the

---

[23] *See* Second Deficiency Response at 3-7 & nn.4-9 (regarding the response to the first question) (citing First Deficiency Response, Attach. A, Proposed Revisions to Southeast EEM Agreement, Market Rules, §§ VI.D.6, VI.A, VI.D, 2.5, III; *id.* at 7-8 & n.10 (regarding the response to the second question) (citing First Deficiency Response, Attach. A, Proposed Revisions to Southeast EEM Agreement, Participant Agreement, § 6.0).

[24] Second Deficiency Letter at 4 (emphasis added).

[25] While the term "affiliate" was not specifically included in the initial filing, the words "*independent third party*" do appear in describing the Administrator. *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 18 (reflecting that the Southeast EEM Administrator "[w]ill be an independent third party contracted to operate the Southeast EEM; will not be a Member, Participant, Agent, or Auditor.")  A deficiency letter question on this point was not warranted given the lack of ambiguity in the filing parties' initial submission.

[26] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 18

inclusion of this question could not have been an oversight—the Second Deficiency Letter actually *cited the page* at which the filing parties included this information in their transmittal letter.[27]

11.     To the extent to which there was any deficiency at all in this case, it is entirely the Commission's, in particular, its failure to timely act on a complete and well-pleaded section 205 filing.  The issuance of deficiency letters is a practice employed for many years at the direction of many different Chairmen.  I have sparingly directed the issuance of deficiency letters myself.[28]  But the fact that a practice has been employed for years does not make it legal and its abuse can never be acceptable.  As in the case of the Commission's past practice of granting rehearing for the purposes of further consideration (AKA tolling orders) to delay the consideration of section 205 filings, the use of deficiency letters as a tolling mechanism violates the Federal Power Act's clear statutory timeline.  Given the court's sharp rebuke in *Allegheny Defense Project v. FERC* (*Allegheny*), should this new tolling practice ever be challenged, it cannot be expected to withstand judicial scrutiny.  As the court in *Allegheny*[29] noted, "Commissioner Glick has called the process enabled by the Commission's tolling orders 'fundamentally unfair' . . . ."[30]  I agree.

_____

(emphasis added).

[27] Second Deficiency Letter at 4 n.7 (citing Filing Parties February 12 Filing, Transmittal at 16-18).

[28] *See, e.g.*, *PJM Interconnection, L.L.C.*, Docket No. ER21-278-000, Deficiency Letter (2020) (deficiency letter issued on Dec. 22, 2020 regarding an Oct. 30, 2020 filing submitted pursuant to section 205 of the FPA noting that, pending receipt of the information requested to be provided 30 days from the date of the letter, a filing date will to be assigned to the filing).

[29] *Allegheny*, 964 F.3d 1, 9 (D.C. Cir. 2020) (en banc).

[30] *Id.* at 10 (citing *Spire STL Pipeline LLC*, 169 FERC ¶ 61,134 (2019) (*Spire*) (Glick, Comm'r, dissenting at PP 29-30)); *see also Spire*, 169 FERC ¶ 61,134 (Glick, Comm'r, dissenting at P 33) (criticizing "fundamental[] unfair[ness]," recognizing "good government is about more than meeting the absolute minimum of constitutional due process," noting that a "regulatory construct . . . [that] ensures that irreparable harm will occur before any party has access to judicial relief . . . ought to keep every member of [the] Commission up at night," and criticizing "bureaucratic indifference that I find hard to stomach."); *id.* (Glick, Comm'r, dissenting at P 34) ("Alternatively, the Commission could have taken 'the easiest path of all' by simply . . . not issuing its standard tolling

**B.     FPA Section 205(g) Notice**

12.     And now, the latest procedural maneuver: the October 13, 2021 Secretary's Notice.  This notice, issued again by staff under the Chairman's supervision, implies that, following Commission inaction by the statutory deadline of October 11, 2021, only eight of the twelve related dockets had been accepted by operation of law.  The notice simply fails to mention four additional dockets, each of which relate to the tariff changes necessary for the individual utilities to implement the accepted Southeast EEM proposal and provide NFEETs.

13.     Because the Commission *did not issue an order* accepting or denying the Southeast EEM proposal, under FPA section 205(g)(1)(A), such inaction is "considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a)."[31]  The notice is not an order, and has no legal effect on whether a filing has been accepted by operation of law.  Individual Commissioner's statements are no more than opinions and do not have the force of law.  Statements are not institutional decisions and do not reflect a majority vote.  The Commission only speaks through its orders.[32]  Because the entire filing constitutes an integrated package, all twelve dockets went into effect by operation of law.  The Commission's notice is deficient, unlawful, and of no effect because it is the Commission's inaction that triggers parties' rights under the FPA, not the notice.  Since the entire set of twelve dockets has now gone into effect, the filing parties are free to immediately begin implementation of the Southeast EEM proposal.

14.     Chairman Glick acknowledges that "[s]tatutory filings are filings made pursuant to section 205 of the FPA."[33]  Chairman Glick claims that these rate proposals should not be treated like a normal FPA section 205 rate change[34] because the filing parties used an

---

order.") (citation omitted).

[31] 16 U.S.C. § 824d(g)(1)(A).

[32] *See, e.g.*, *Pub. Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d at 776; *see also Pub. Citizen, Inc. v. FERC*, 839 F.3d at 1169.

[33] Glick Statement at P 17 n.20 ("Statutory filings are filings made pursuant to section 205 of the FPA, section 4 of the Natural Gas Act, and section 6 of the Interstate Commerce Act.").

[34] Glick Statement at P 18 ("Here, four of the relevant 12 filings incorporated open-ended proposed effective dates.  As a result, these four filings did not become effective on October 12, 2021, when the Commission failed to act within 61 days of the filing date.").

effective date of 12/31/9998[35] and thus are excluded from the FPA 60-day clock. The effect of this exclusion, if it were lawful, would be to block the tariff revisions required to effectuate the Southeast EEM proposal and thus to prevent the now-accepted proposal from going into effect.

15.     The argument goes as follows: the four dockets at issue, all of which update individual utilities' tariffs in order to establish provisions effectuating the Southeast EEM proposal, were not, in fact, FPA section 205 filings because a Commission staff Implementation Guide required them to use the 12/31/9998 effective date. The staff Implementation Guide provides that "[i]f the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., *the date of 12/31/9998 must be used*."[36] Therefore, the filing parties do not enjoy the benefit of the 60-day time limit for Commission action. This, despite the fact that the filing parties have repeatedly stated that every one of the unconsolidated dockets are part of a single, unified filing and despite the fact that, upon inspection, it is evident that the tariff revisions contemplated in the four excluded dockets are necessary for the Southeast EEM proposal to function. The reason? Because the filing parties entered an effective date of 12/31/9998 on eTariff and despite the fact that this is the *exact entry* that the Commission staff Implementation Guide required them to use.[37]

---

[35] *Cf.* Glick Statement at P 18 ("[F]our of the relevant 12 filings incorporated open-ended proposed effective dates."); Glick Statement at P 18 n.22 ("[T]he open-ended proposed effective date for their OATT filings [was] chosen by the filing parties at their discretion"); *id.* ("The applicants therefore followed the Commission's eTariff rules exactly as expected, given their own request that the OATT revisions take effect at an unknown point after, not coincident with, the Southeast EEM Agreement."). While it is correct to say the filing parties asked for a future effective date for the OATT filings, their transmittal letters clearly evidenced a requested acceptance date of their filings within the statutory 60-day period in both deficiency letter responses.

[36] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12 n.36 (quoting *Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings* at 10 (last updated on Nov. 14, 2016) (emphasis added).

[37] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12 n.36 ("*See Implementation Guide for Electronic Filing of Parts 35, 154, 284, 300, and 341 Tariff Filings* at p. 10 (last updated on Nov. 14, 2016) ('If the effective date is not known at the time of the filing, such as the effective date is contingent on FERC approval, the closing of a plant sale, etc., *the date of 12/31/9998 must be used*.').") (emphasis added).

16.     This cannot be correct.  No precedent is, or to my knowledge can be, cited in support of this theory and that which[38] is cited is inapposite.[39]  Regardless, the FPA governs, not a staff Implementation Guide.  The FPA requires the Commission to act

---

[38] "In order for the Commission and the public to obtain a complete picture of a company's tariff, these various provisions need to be integrated into a single system that will provide information as to the status of tariff provisions, permit the assembly of a complete tariff, and permit tariff related research.  Indeed, for tariffs filed on paper, the Commission has managed these tariffs as a database by keeping tariff books . . . .  The standards we are adopting in this Final Rule merely replace this paper system with a very similar electronic database that will similarly track the tariff submissions and tariff history, but in a form that will make tariff information more widely available over the Internet."  *Electronic Tariff Filings*, Order No. 714, 124 FERC ¶ 61,270, at P 10 (2008), *clarified*, Order No. 714-A, 147 FERC ¶ 61,115 (2014).

Step-by-step instructions explain how one must download and populate the .xml file with the tariff record and use the eTariff Filing Codes for inclusion of metadata.  Then one must zip the .xml file but not the documents.  One submits the .xml file to the FERC Sandbox Electronic Test Site in order to correct any errors received before resubmitting it to the sandbox and "[c]ontinue correcting any errors and resubmitting until no errors are reported."  Fed. Energy Regul. Comm'n, *Electric and MBR Step-by-Step Filing*, https://www.ferc.gov/industries-data/electric/overview/electric-market-based-rates/initial-applications/step-step-guide-filing-your-application-etariff-system (last updated Nov. 19, 2020).  Then, one logs into FERC Online to submit the eFiling including the zip file that contains the .xml file.  Two emails are sent by FERC verifying receipt of the filing.  If errors are identified then one must amend the .xml file and resubmit it.  If one receives warnings, this signals the filing was received but one must double-check that the correct information was submitted as warnings may indicate that what was submitted is different than what FERC normally receives.  *See id.*

[39] Glick Statement at P 17 & nn.18-19.  The cited regulations, 18 C.F.R. §§ 35.7(d) and 385.205(b), and cited orders, *Designation of Electric Rate Schedule Sheets*, Order No. 614, FERC Stats. & Regs. ¶ 31,096, at 31,504 (2000) (cross-referenced at 90 FERC ¶ 61,352); *Electronic Tariff Filings*, Order No. 714, 124 FERC ¶ 61,270 (2008), *clarified*, Order No. 714-A, 147 FERC ¶ 61,115, at P 4 (2014); and, *Pioneer Transmission, LLC*, 169 FERC ¶ 61,265, at P 20 (2019).  Neither the eTariff program nor a staff Implementation Guide can trump the FPA; to do so is unlawful.  The cited case *Ala. Power Co. v. FERC*, 22 F.3d 270, 272-73 (11th Cir. 1994) is inapposite as the sole issue on appeal was whether the FERC may properly decide that when several utilities jointly file their respective rates in a single contract, the 60-day review period begins only when the filing is complete for every utility.  Here, the filings were individually submitted and complete within the last 60-day statutory period.

within 60 days.  We did not, for reasons I have already highlighted.  The staff Implementation Guide, on the other hand, is nothing more than staff's ministerial effort to provide "guidance" (that is why it is called a "Guide") when rate proponents have an unknown future effective date.  The 12/31/9998 date imposed (but really "guided") *by the Commission* via a staff Implementation Guide in such cases obviously is a placeholder date and does not reflect the parties' actual intended effective date.  A good faith reading of neither the Implementation Guide nor the FPA would seriously contemplate empowering the Commission to provide itself up to 7,977 years to act on such a filing.[40] And such a reading of the FPA lacks majority support in any event.

17.     Apart from having no basis in law, this approach gives no effect to filing parties' repeatedly expressed, unambiguous intent for Commission acceptance within the statutory period.[41]  And to the extent to which any proposed solution relies upon a further submission and yet another 60 days to elapse before those filings must be accepted, that would deny the filing parties the very regulatory certainty they require to begin implementation.  Refiling is unnecessary under the FPA, and—given the history of delay

---

[40] Under Chairman Glick's logic, the only way the rate proposal at issue in these four dockets could go into effect by operation of law today would be if the Filing Parties' Neolithic ancestors had filed it circa 6,000 B.C.

[41] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3-4, 12-13, 42, 44; *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2 & n.6, 6-7, 8; *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2 & n.6; 6-7, 8; *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2 & n.6, 6-7; *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2 & n.6, 6-7,8; *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2 & n.6, 6-7, 8; *Ga. Power*, Docket No. ER21-1119-000, February 12, 2021 Transmittal at 3; *Miss. Power*, Docket No. ER21-1121-000, February 12, 2021 Transmittal at 3.

"The Southeast EEM filings are a package." *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3; *see also Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 3 (same); *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3 (same);  *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3 (same).  *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5, 3, 12, 14; *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 2-3, 12, 14; *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2-3, 2 n.7, 13, 15; *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2-3, 2 n.5, 13, 15.

in this proceeding—would be difficult to view as anything but a further cynical attempt to stall the establishment of the Southeast EEM.

18.     All of which is to say, the entire filing package, including every associated docket, has been accepted.  And, since the original version of the proposal that was filed with the Commission has not been superseded, the *Mobile-Sierra* public interest standard of review applies to the *entire* agreement, as requested in the initial submission.[42]  Due to the Commission's failure to issue an order, no compliance filing is triggered as a result of the October 13, 2021 Notice.  Rehearing rights as to the original filing are now perfected, paving the way for judicial review under FPA section 205(g).

## III.     **Substantive Matters**

19.     As to the merits of the case, I would have voted to approve the Southeast EEM proposal in full.

20.     We must first understand what the Southeast EEM proposal is and what it is not. The filing parties clearly state that, "the Southeast EEM is not—and was never intended to be—a top-to-bottom reimagining of the Southeast energy market; rather, it reflects incremental improvement to the existing bilateral market."[43]  This market does not offer joint dispatch, joint operation, or joint planning.  And it is not an energy imbalance market.

21.     While some may have preferred that the utilities in the Southeast create a regional independent system operator (ISO) or regional transmission organization (RTO), that is not the filing the parties submitted.  My colleagues detail a litany of objections[44] to the

---

[42] Second Deficiency Response at 9 ("If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Southeast EEM Members commit to subsequently submit a compliance filing to effectuate the proposed revisions within 30 days of acceptance.").

[43] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 9.

[44] Examples of these include: membership (Clements Statement at PP 3, 8 & n.8, Section III); governance (Clements Statement at PP 3, 7, 33-41); oversight and preference for independent market monitor to address market power and manipulation (Clements Statement at PP 3, 8 & n.8, 33, 42-51; Glick Statement at PP 3, 13, 14); "'black box' algorithm" (Clements Statement at P 5); participation and access requirements (Clements Statement at PP 5, 8 & n.8, 9, 11-12, 16, 17, 19, 21, 40, 48); transparency (Clements Statement at PP 8, 9, 21, 33, 50); undue discrimination (Clements Statement at P 7).  *Cf.* Glick Statement at P 3 ("I believe that the Commission's monitoring capabilities, enforcement authority, and ability to institute an FPA section 206 action provide adequate protections should any Southeast EEM members or participants engage in any

**Supp. Add. 29**

Southeast EEM proposal that, I presume, stem from just such a preference[45] since the establishment of an ISO or RTO would bring with it open access throughout the

_____

conduct that may transgress the FPA or Commission regulations.").

[45] Glick Statement at P 1 ("I believe . . . [RTOs and ISOs] are, by far, the best way to achieve these benefits [i.e., save customers money, enhance reliability, and integrate intermittent resources most efficiently.]. That is also true for the Southeastern United States. From my perspective, utilities and other stakeholders in this region should be working to establish an RTO/ISO in the Southeast for the benefit of consumers and to promote grid reliability. But that is not the proposal presented to us in this docket."); *id.* ("in my opinion there clearly is" a "better option for the region"); *id.* at P 8 ("A centralized and competitive wholesale market in the Southeast, or at least something closer to that model, is a step in the right direction."); *id.* at P 12 ("the best available option . . . in my view is to establish an RTO"); Clements Statement at P 2 (the proposal "fails to abide by the bedrock principles of open access and non-discrimination that were crystallized in the Commission's landmark Order No. 888"); Clements Statement, Section II, at PP 15-25 ("Access to the Southeast EEM is not open, violating Order No. 888"); Clements Statement, Section III.A, at PP 28-32 ("The proposal's membership restrictions violate Order No. 888); Clements Statement, Section III.B, at PP 33-41 (the membership provisions unduly discriminate by creating two unequal classes of market participants (Members and Non-Members) that create an impermissible barrier to transmission access and violate 'the legal and policy cornerstone' of Order No. 888).

- 15 -

**Supp. Add. 30**

Southeast in accordance with Order Nos. 888,[46] 719[47] or 2000.[48]  But that decision is not ours to make.[49]  That choice is reserved wholly to the States and their utilities.[50]

22.    All we need decide here is whether the proposal meets the requirements of FPA section 205.  Whether there might be a better arrangement that could have been requested, is absolutely irrelevant to our analysis.[51]  Arguments that the proposal

---

[46] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,738 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[47] *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719, 125 FERC ¶ 61,071 (2008), *order on reh'g*, Order No. 719-A, 128 FERC ¶ 61,059 (2009), *order on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009).

[48] *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999) (cross-referenced at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)).

[49] *N.C. Waste Awareness & Reduction Network, Inc. v. Duke Energy Carolinas, LLC*, 151 FERC ¶ 61,079, at P 64 (2015) (noting that "[t]he Commission's longstanding policy is that RTO participation is voluntary") (citations omitted)).

[50] *See* Order No. 2000, FERC Stats. & Regs. at 31,213 ("[M]ost states must approve a utility joining an RTO, and several states have required their utilities to turn over their transmission facilities to an independent transmission operator.  Also, states must approve the siting of transmission facilities that are called for in an RTO expansion plan.").

[51]  *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 943 (8th Cir. 2020) (recognizing that the Commission "restricts itself to evaluating the confined proposal" and therefore "need only find the *proposed* rates to be just and reasonable." (citations omitted) (emphasis in original)); *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (stating "[w]hen acting on a public utility's rate filing under section 205, the Commission undertakes 'an essentially passive and reactive role' and restricts itself to

establishes a multilateral construct in violation of the principles of Order No. 888 fail to persuade—this proposal, by its own terms, purports to be no more than an enhancement to an existing bilateral regime which is obviously permissible under the FPA.[52]  While recognizing that market-based rate authorities and safeguards are already in place for the existing bilateral market,[53] my colleague argues that these are insufficient given the new market structure and footprint and argues a need for "quantitative analysis" about the ability "to exercise market power or manipulate the market" and for "safeguards to protect against these abuses."[54]  I disagree.  The filing parties have amply demonstrated how existing and new, additional mechanisms will guard against such concerns, including the establishment of an Administrator and Auditor.

23.     While occupied with cataloguing deficiencies, real or perceived, in the Southeast EEM proposal, we should not lose sight of the fact that Non-Firm Energy Exchange Transmission Service is available *only if* the existing transmission system is not fully employed.  Entities may continue to use the existing transmission system in accordance with the Commission-approved OATTs in place today and may continue to engage in bilateral transactions under Commission-approved market-based tariffs that already

---

evaluating the confined proposal." (quoting *City of Winnfield v. FERC*, 774 F.2d 871, 875-76 (D.C. Cir. 1984)); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (finding that the Commission did not adopt an incorrect legal standard when it did not determine "whether [one] method is more appropriate than a [another] method, but rather whether the [proposed] method is reasonable and adequate.").

[52] The Commission has described the electric power market in the Southeast as follows:  "The Southeast electricity market is a bilateral market . . . and virtually all the physical sales in the Southeast are done bilaterally."  Fed. Energy Regul. Comm'n, *Electric Power Markets*, https://www.ferc.gov/electric-power-markets (last updated July 20, 2021); *see also* Fed. Energy. Regul. Comm'n, Staff Report, Energy Primer: A Handbook of Energy Market Basics 61 (April 2020), https://www.ferc.gov/sites/default/files/2020-06/energy-primer-2020.pdf (explaining that in traditional wholesale electricity markets, which "exist primarily in the Southeast[,] . . . . [u]tilities . . . are frequently vertically integrated . . . [and] [w]holesale physical power trading typically occurs through bilateral transactions.").  Bilateral market wholesale sales of electric energy in interstate commerce and the transmission of electric energy in interstate commerce are subject to the Commission's FPA section 205 authority.  16 U.S.C. §§ 824(a), 824d; *Ala. Power Co.* Docket No. ER17-514-001 (May 17, 2017) (delegated letter order) (accepting Southern Companies' revised market-based rate tariff).

[53] Clements Statement at P 6.

[54] *See, e.g.*, *id.*

impose market power mitigation restrictions. These same OATTs, as revised to provide the Non-Firm Energy Exchange Transmission Service, and the utilities' market-based rate tariffs, will effectuate the Non-Firm Energy Exchange Transmission Service transactions *only* when there is unused transmission capacity.

24.    While some of the opposition may stem from the preference to see RTOs and open access established as widely as possible, one of my colleagues voted against the proposal because he disagrees with the application of the *Mobile-Sierra* standard to protect the Southeast EEM agreements. That is an insufficient basis upon which to cast a vote to reject. The Commission's recent precedent restricting *Mobile-Sierra* protections to only those contracts that bear particular hallmarks is in error. It violates the principles animating the *Mobile-Sierra* doctrine and deviates from the plain terms of the judicial precedent establishing and reinforcing it.

25.    While recognizing that "much of the Southeast EEM proposal arguably satisfies the Section 205 standard"[55] Chairman Glick stated that he "voted no in large part because the filing parties' proposal to apply the *Mobile-Sierra* public interest presumption to the Southeast EEM Agreement violates well-established Commission precedent."[56] In fact, Chairman Glick objects not only to the application of the presumption to the entire agreement, which was what the originally-filed proposal called for, but he objects even to the presumption's application to the smaller subset of enumerated provisions to which the filing parties conditionally agreed in their response to the First Deficiency Letter.[57] In addition to stating that application of the *Mobile-Sierra* presumption would cause

---

[55] Glick Statement at P 2.

[56] *Id.*

[57] First Deficiency Response at 43. Chairman Glick's claim that the filing parties conceded that certain provisions of their agreement did not qualify for the *Mobile-Sierra* presumption is inaccurate. Glick Statement at 10. The parties did not concede that they could not have *Mobile-Sierra* protection for the entire agreement. They agreed under the duress attendant to the delay caused by the first deficiency letter to reduce the scope of the *Mobile-Sierra* protection *if* the Commission were to accept the rest of the proposal in full. They agreed to do so *after* the Commission accepted the proposal. Because the Commission has discretion to apply *Mobile-Sierra* protection, the filing parties could not have conceded the entire agreement was ineligible for *Mobile-Sierra* protection in any event. *See New Eng. Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 370-71 (D.C. Cir. 2013) (holding Commission has considerable discretion to apply *Mobile-Sierra* to non-contract rates).

"considerable risk to the public,"[58] he states that "the *Mobile-Sierra* presumption applies to a contract 'only if the contract has certain characteristics that justify the presumption.'"[59] He explains that it does not apply to generally applicable contractual provisions that bind any potential future signatories and no extraordinary or compelling circumstances apply that warrant application of *Mobile-Sierra* as a matter of agency discretion.[60] I freely acknowledge that Chairman Glick has the weight of Commission precedent on his side. But the Commission's excursion outside the bounds of *Mobile-Sierra* has yet to be addressed squarely by the courts and is based upon an incorrect reading of the case law.

26.     The Commission has repeatedly held that the presumption of *Mobile-Sierra* protection applies only to those contracts that have certain characteristics. The Commission's belief flows from the Supreme Court's statement in *Morgan Stanley*,[61] and quoted in *NRG*,[62] that "[u]nder the *Mobile-Sierra* doctrine, the Federal Energy Regulatory Commission (FERC or Commission) must presume that the rate set out *in a freely negotiated wholesale-energy contract* meets the 'just and reasonable' requirement imposed by law."[63] The Court further held that "[t]he presumption may be overcome only if FERC concludes that the contract seriously harms the public interest."[64]

---

[58] Glick Statement at 11; *see also* Clements Statement at P 7.

[59] Glick Statement at P 9 & n.4 (citing *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 182 (2013)).

[60] Glick Statement at PP 10-11.

[61] *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527 (2008) (*Morgan Stanley*).

[62] *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n*, 558 U.S. 165, 167 (2010) (*NRG*).

[63] *Morgan Stanley*, 554 U.S. at 530 (emphasis added); *accord NRG*, 558 U.S. at 167 (quoting, in part, *Morgan Stanley*, 554 U.S. at 530) (emphasis added).

[64] *Morgan Stanley*, 554 U.S. at 530. *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214; *cf. N.Y. Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,038 (2021) (granting petition for declaratory order that New York Transmission Owners have a federal right of first refusal under New York Independent System Operator, Inc.'s foundational agreements and OATT).

27.     I cannot accept the Commission's apparent reliance on the "freely negotiated" language in *Morgan Stanley* and *NRG*[65] to hold that the presumption applies only to contracts with individualized rates, terms, or conditions, and not to contracts with standard rates, terms, or conditions entered into by multiple counterparties.[66] The Commission has placed more weight on this one statement in *Morgan Stanley* than it can reasonably bear and, in inventing this requirement out of whole cloth, it has abandoned its obligations under the *Mobile-Sierra* doctrine.[67]

---

[65] Glick Statement at P 2 & n.1 (citing *NRG*, 558 U.S. at 174 (quoting *Morgan Stanley*, 554 U.S. at 530)).

[66] In ruling on whether the characteristics necessary to justify a *Mobile-Sierra* presumption are present, the Commission must determine whether the agreement at issue embodies either (1) individualized rates, terms, or conditions that apply only to sophisticated parties who negotiated them freely at arm's length; or (2) rates, terms, or conditions that are generally applicable or that arose in circumstances that do not provide the assurance of justness and reasonableness associated with arm's-length negotiations. Unlike the latter, the former constitute contract rates, terms, or conditions that necessarily qualify for a *Mobile-Sierra* presumption.  *See ISO New Eng. Inc.*, 150 FERC ¶ 61,209, at P 183 (2015) (declining to apply the *Mobile-Sierra* presumption but recognizing that the D.C. Circuit "has determined that the Commission is legally authorized to impose a more rigorous application of the statutory 'just and reasonable' standard of review on future changes to agreements that do not present contract rates."); *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,048, at P 94 (2014) (same); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 185 (permitting the Consolidated Transmission Owner Agreement to be subject to differing standards of review because it could not "be classified in its entirety as containing contract rates or tariff rates" and noting that the differing standards would "recognize the distinctions among its provisions."); *cf N.Y. Indep. Sys. Operator, Inc.*, 162 FERC ¶ 61,107, at PP 143-145 (2018) (approving public interest standard provisions in Non-Incumbent Transmission Owner Agreement in NYISO tariff to conform to NYISO-Transmission Owner Agreement); *ISO New Eng. Inc.* v. *New Eng. Power Pool*, 106 FERC ¶ 61,280, at PP 126-131, *reh'g granted in part, denied in part*, 109 FERC ¶ 61,147, at P 84 (2004) ("We agree that the issues addressed by [section 9.01 (indemnification requirements) and section 9.06 (assumption of liability)] affect primarily the rights and interests of the Filing Parties alone.  Accordingly, we will accept the Filing Parties' proposed Mobile-Sierra provision as it relates to these provisions.").

[67] The D.C. Circuit described the Commission's approach in *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 78-80 (D.C. Cir. 2016).  However, although the court went on to uphold the Commission's determination that the *Mobile-Sierra* presumption does not apply to the right of first refusal provision in the Southwest Power Pool Membership Agreement, the court did not rule on the Commission's approach.  Instead, the court's

- 20 -

**Supp. Add. 35**

28.    It is worth taking a moment to explain why the case law does not reasonably allow the liberties the Commission has taken.  In *Morgan Stanley*, the Court reversed the Ninth Circuit's holding that the *Mobile-Sierra* presumption does not apply to market-based rate contracts not initially approved by the Commission.  In so doing, the Court explained the important public policy benefits of this doctrine:

> The Ninth Circuit's standard would give short shrift to the important role of contracts in the FPA, as reflected in our decision in *Sierra*, and *would threaten to inject more volatility into the electricity market by undermining a key source of stability*.  The FPA recognizes that contract stability ultimately benefits consumers, even if short-term rates for a subset of the public might be high by historical standards—which is why it permits rates to be set by contract and not just by tariff.  As the Commission has recently put it, its "first and foremost duty is to protect consumers from unjust and unreasonable rates; however, . . . *uncertainties regarding rate stability and contract sanctity can have a chilling effect on investments and a seller's willingness to enter into long-term contracts and this, in turn, can harm customers in the long run*."**[68]**

Similarly, in *NRG*, the Court referenced "*the essential role of contracts* as a key factor fostering stability in the electricity market, to the long-run benefit of consumers."**[69]**

29.    These benefits are conferred by *all* contracts, and I see no justification for depriving the parties of *Mobile-Sierra* here.  In addition, fixation upon the phrase "freely negotiated" is unwarranted.  Every contract entered into freely is, to one degree or another, negotiated.  This is true even if the negotiation amounts to no more than an offer and a rejection, implicit or explicit.  This Commission-created doctrine simply has no support in the case law.  We cannot subject the Southeast EEM Agreement to scrutiny on matters not contemplated by the holdings that established the Supreme Court's *Mobile-Sierra* doctrine, and thereby defeat the very purpose of the doctrine: to ensure that—

---

ruling was based on its conclusion that "FERC did not err in determining that the doctrine does not extend to anti-competitive measures that were not arrived at through arms-length bargaining."  *Id*. at 79.

**[68]** *Morgan Stanley*, 554 U.S. at 551 (quoting *Market–Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services by Public Utilities*, Order No. 697, 72 Fed. Reg. 39,904, 119 FERC ¶ 61,295, at P 6 (2007)) (emphasis added).

**[69]** *NRG*, 558 U.S. at 174 (citing *Morgan Stanley*, 554 U.S. at 547-48, 551) (emphasis added).

absent extraordinary circumstances that would justify a public interest finding—contracts can be relied upon.

30.     My colleague asserts that to support *Mobile-Sierra* would be to "undermine our ability to protect consumers under the Southeast EEM."[70]  As I see it, denial of the Southeast EEM proposal would be to allow unused transmission capacity go unused, thereby denying consumers the "meaningful" benefits of the filing parties' projection of "over $100 million per year in market-wide savings by 2037, assuming higher renewable and energy storage penetration, or $40 million per year compared to the current bilateral market under a more conservative estimate."[71]  And to deny the filing parties the protection of the *Mobile-Sierra* presumption would be to make every aspect of this market construct more expensive and less certain.  Neither of these results can be said to be in the public interest.

31.     My colleagues' objections are not properly within the narrow scope of our analysis under FPA section 205.[72]  There is only one question before us: whether the proposed tariff amendments are just and reasonable and not unduly discriminatory or preferential.[73] In reviewing a section 205 filing, the Commission makes a limited determination

---

[70] Glick Statement at P 20.

[71] *Id.* at P 12.

[72] In addition, Commissioner Clements contends that "In past similar circumstances, the Commission has taken the approach of rejecting initial proposals for new market constructs that fail to meet the requirements of section 205, and later approving revised proposals when those shortcomings were later addressed."  Clements Statement at P 3 n.5 (citing *Pub. Serv. Co. of Colo.*, 151 FERC ¶ 61,248 (2015) (*PSCo*); *Sw. Power Pool, Inc.*, 172 FERC ¶ 61,115 (2020) (*SPP*)).  In *PSCo*, the filing entity did not have and was not seeking market-based rate authority, unlike the circumstances here; additionally, the Commission noted that it had accepted other joint dispatch agreements with varying payment structures, including those that split the savings equally among participants, which is the structure presented in the Southeast EEM filing.  *PSCo*, 151 FERC ¶ 61,248 at P 99.  Unlike in *PSCo*, access to non-public information will be restricted.  *Id.* at P 100.  *PSCo* is inapposite.  With respect to *SPP*, the Commission determined the filing was not clear regarding the "use of transmission and the role of the reliability coordinator" and provided guidance on "supply adequacy, marginal losses, and market power."  *SPP*, 172 FERC ¶ 61,115 at P 19.  Here, it is clear that the purpose of the filing is to enhance the existing bilateral mechanism to use *unused* transmission, and existing approvals and safeguards, with enhancements thereto, will apply.

[73] 16 U.S.C. § 824d.

"whether the rates proposed by a utility are reasonable—and [the analysis does not] extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs."[74]  The Commission has authority to accept, reject, or make only "minor deviations" from the filed provisions with the filer's consent.[75]  The Commission is prohibited from requiring an "entirely different rate design" than the one submitted, and it cannot accept "only half of a proposed rate."[76]  According to Chairman Glick, acceptance of only certain of the filings is not a prohibited modification under *NRG*, and he maintains that by expressly requesting that the Commission not consolidate their dockets they "foreclose[ed] the possibility that these filings are part of a single rate for purposes of *NRG*."[77]  I disagree.

32.    Chairman Glick's reading of the Southeast EEM filings ignores other statements in the filings that the Southeast EEM proposal was a package and that regulatory certainty was required to proceed,[78] the explanation of the filing parties that mandatory

---

[74] *Cities of Bethany*, 727 F.2d at 1136 (finding that, when determining whether a proposed rate was "just and reasonable," as required by the FPA, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than the alternative rate designs").

[75] *See W. Res., Inc. v. FERC*, 9 F.3d 1568, 1579 (D.C. Cir. 1993) (*W. Res.*); *City of Winnfield v. FERC*, 744 F.2d. 871, 876.

[76] *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 115 (D.C. Cir. 2017) (quoting *W. Res.*, 9 F.3d at 1578-79).

[77] Glick Statement at P 16 & n.16.

[78] *See, e.g.*, "The Southeast EEM filings are a package.  Commission action on all filings is necessary so that Southern Companies and other Southeast EEM Members can have the regulatory certainty they need to move forward with any significant additional Southeast EEM financial commitments to bring this enhanced market to fruition for the benefit of customers as quickly as possible." *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3; *Dominion Energy SC*, ER21-1128-000, February 12, 2021 Transmittal at 3; *Duke*, ER21-1115-000, February 12, 2021 Transmittal at 3; *LG&E*, ER21-1118-000, February 12, 2021 Transmittal at 3.  These are the four OATT dockets.  *See, e.g.*, *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5 ("In addition to Southern Companies, Dominion Energy South Carolina, DEC, and LG&E are each filing amendments to their transmission tariffs, some of which are joint OATTs, to add Non-Firm Energy Exchange Transmission Service ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filings, the 'Southeast EEM Filings')."); *see also, e.g.*, *Ala. Power*, Docket No., ER21-1111-000, February 12, 2021 Transmittal at 3 (defining the Tariff Filings, Concurrence Filings, and

eTariff procedures required each of the filings to have its own docket but "the issues in the dockets are related . . . [and] use of a single pleading across all dockets will allow all concerned to focus on substance,"[79] and it ignores the Commission's own designation of the dockets as having been filed under FPA section 205(d).[80] It also cannot be squared with *NRG*.

33.     This submission is just and reasonable. The Southeast EEM would enhance the existing bilateral market by creating an automated, region-wide platform that facilitates sub-hourly bilateral transactions using otherwise unused transmission capacity to achieve cost savings throughout the region. It facilitates trades and more efficiently uses the transmission system in the existing market. It does so in reliance upon Commission approvals already granted to the filing parties and is designed in accordance with existing precedent. The provision that prices Non-Firm Energy Exchange Transmission Service at $0/MWh is just and reasonable because the Southeast EEM would make unused transmission capacity available only after all other transmission customers make their transmission reservations.[81] This represents transmission capacity that would otherwise be left fallow. As such, there are no opportunity costs associated with Non-Firm Energy Exchange Transmission Service.[82] In the face of all of the potential benefits that could be

---

the Agreement Filings as the Southeast EEM Filings); *id.* at 4 ("the requested effective date, and the requested date for Commission action . . . will still provide the Commission 60 days to act upon the Southeast EEM Filings").

[79] *See, e.g.*, *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3.

[80] *See, e.g.*, 86 Fed. Reg. 10,264, 10,264-10,265 (Feb. 19, 2021); 86 Fed. Reg. 31,492, 31,493 (June 14, 2021); 86 Fed. Reg. 45,980, 45,980-45,981 (Aug. 17, 2021). *Pioneer*, 169 FERC ¶ 61,265 at P 24 ("Pioneer also had notice that its filing was not a statutory filing made pursuant to section 205(d), as the Commission's Notice of Filing did not indicate that Pioneer made its filing pursuant to section 205(d) or that it had a proposed effective date."); *see also id.* P 24 n.45 ("*Compare* Pioneer's Notice of Filing, at 3 *with* Pacific Gas and Electric Company's Notice of Filing, at 3 in Combined Notice of Filings #1, Docket No. ER18-2119-000, (August 1, 2018), . . . . (Pacific Gas and Electric Company's Notice states that it is a § 205(d) Rate Filing with a proposed effective date while Pioneer's does not). *The Commission adds the § 205(d) Rate Filing and the proposed effective date to those filings with statutory action dates that are properly made through eTariff.*" (emphasis added)).

[81] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 24-25.

[82] *See Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107, at P 84 (2016) (finding that the

realized by the creation of the Southeast EEM, and the fact that there is virtually no downside to its implementation, there is simply no lawful basis upon which to reject this submission.

34.    While protestors raise concerns with various aspects of the Southeast EEM proposal, we should have found that the filing parties have satisfied their burden under FPA section 205, and we should have ruled on the proposal before us and not upon protestors' alternatives.[83]

## IV.    <u>Conclusion</u>

35.    I voted to accept the Southeast EEM proposal and would have done so on August 6, 2021, as just and reasonable.

36.    The Commission will get a second chance to issue a merits order in response to requests for rehearing.  I sincerely hope that wisdom prevails, and that the Southeast EEM proposal is ultimately accepted.

37.    However, should this matter eventually come to the court under FPA section 205(g), the court should remand it back to FERC for an order in the first instance. Failing that, if the court chooses to issue a decision on the merits, it should deny the petitions for review and remand with instructions that every aspect of the filers' submission—in all related dockets—be accepted.

_____

James P. Danly
Commissioner

_____

zero-rate transmission service at issue would otherwise be unused and, therefore, there would be no associated opportunity costs).

[83] *See, e.g.*, *Cities of Bethany*, 727 F.2d at 1136 (finding that, when determining whether a proposed rate was "just and reasonable," as required by the FPA, the Commission properly did not consider "whether a proposed rate schedule is more or less reasonable than the alternative rate designs").

# ATTACHMENT A

## I.     Second Deficiency Response[84]

1.     "Given the limited nature of the second Deficiency Letter and response, the Southeast EEM Members request a shortened comment period of 10 days, or August 23, 2021, and action within 30 days, or September 10. Additionally, the Members request an effective date (as to the Southeast EEM Agreement and concurrence filings) of October 12, 2021, sixty days from the filing of this Response."[85]

2.     "The Southeast EEM Members also respectfully request expedited Commission action on or before September 10, 2021—30 days after the filing date."[86]

3.     "The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement, and the related filings in these unconsolidated dockets, subject to the modifications proposed by the Members in previous filings, to become effective on October 12, 2021. If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Southeast EEM Members commit to subsequently submit a compliance filing to effectuate the proposed revisions within 30 days of acceptance."[87]

## II.     First Deficiency Response[88]

4.     "Because the evidence demonstrates that the Southeast EEM, as proposed to be modified here, will benefit customers, the Southeast EEM Members request that the Commission approve the Southeast EEM as soon as reasonably possible, but no later than August 6, 2021."[89]

5.     "The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement, and the related filings in these unconsolidated dockets,

---

[84] *Ala. Power*, Docket Nos. ER21-1111-002, et al., Second Deficiency Response (Aug. 11, 2021).

[85] Second Deficiency Response at 2

[86] Second Deficiency Response at 8.

[87] Second Deficiency Response at 9.

[88] *Ala. Power*, Docket Nos. ER21-1111-001, et al., First Deficiency Response (June 6, 2021).

[89] First Deficiency Response at 7.

subject to the modifications proposed herein, to become effective on August 6, 2021. If the Commission finds these proposed changes acceptable and otherwise accepts the Southeast EEM Proposal as submitted, the Southeast EEM Members commit to subsequently submit a compliance filing to effectuate the proposed revisions within 30 days of acceptance."[90]

## III.     Initial Filings

### A.     *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal

6.     "Concurrently with this filing, each of the other Commission-jurisdictional Members (together with Southern Companies, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with an open access transmission tariff ('transmission tariff' or OATT') on file with the Commission, including Southern Companies, is filing amendments to its transmission tariff to offer zero-charge transmission service for Southeast Energy Exchange transactions (known as 'Non-Firm Energy Exchange Transmission Service' or 'NFEETS') (collectively, the 'Tariff Filings,' together with the Concurrence Filings and this filing, the 'Southeast EEM Filings')."[91]

7.     "[T]he requested effective date, and the requested date for Commission action . . .  will still provide the Commission 60 days to act upon the Southeast EEM Filings . . . ."[92]

8.     "The Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement to become effective May 13, 2021, 90 days after this filing."[93]

9.     "In order to provide ample time to potential commenters who may wish to provide comments, we respectfully request that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still provide the

---

[90] First Deficiency Response at 43.

[91] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3.

[92] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 4.

[93] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3.

- 2 -

**Supp. Add. 42**

Commission 60 days to act upon the Southeast EEM Filings after comments are received."[94]

10.      "If the Commission accepts the Southeast EEM Filings without material modification or condition within the requested 90 days, the Members anticipate the following schedule to implement the Southeast EEM: May 13, 2021: Proposed effective date of the Southeast EEM Agreement."[95]

11.      "Southern Company and the other Southeast EEM Members respectfully request that the Southeast EEM Agreement become effective on May 13, 2021, 90 days after filing.  This requested effective date is consistent with 18 C.F.R. §§ 35.2(f) and 35.3(a)(1)."[96]

12.      "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[97]

13.      "Southern Company and the Southeast EEM Members respectfully request that the Commission accept the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[98]

---

[94] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 3-4.

[95] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 12-13.

[96] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 42.

[97] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 42.

[98] *Ala. Power*, Docket No. ER21-1111-000, February 12, 2021 Transmittal at 44.

**Supp. Add. 43**

**B.** ***Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal**

14.    "[Dominion Energy SC] respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Southern Company in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[99]

15.    "Each of the other Commission-jurisdictional Members (together with [Dominion Energy SC], the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings').  Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket. There are a total of twelve Southeast EEM Filings."[100]

16.    "In addition, consistent with the request made regarding the Southeast EEM Agreement filing, [Dominion Energy SC] requests a 30-day comment period for this filing, such that comments would be due on March 15, 2021."[101]

17.    ["Dominion Energy SC] respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[102]

18.    "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[103]

---

[99] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2

[100] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2 n.6.

[101] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 2.

[102] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 6.

[103] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021

19.     "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[104]

20.     "[Dominion Energy SC] respectfully requests that the Commission establish a 30-day comment period for this filing and accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[105]

### C.     *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal

21.     "LG&E respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Southern Companies in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[106]

22.     Each of the other Commission-jurisdictional Members (together with LG&E, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings').  Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket.  There are a total of twelve Southeast EEM Filings."[107]

23.     "In order to provide ample time to potential commenters who may wish to provide comments, LG&E respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still

---

Transmittal at 6.

[104] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 7.

[105] *Dominion Energy SC*, Docket No. ER21-1112-000, February 12, 2021 Transmittal at 8.

[106] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2.

[107] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2 n.6.

provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[108]

24.     "LG&E respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[109]

25.     "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[110]

26.     "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[111]

27.     "LG&E respectfully requests that the Commission accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[112]

### D.     *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal

28.     "DEC respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Alabama Power Company in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[113]

29.     "Each of the other Commission-jurisdictional Members (together with DEC, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to

---

[108] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 2.

[109] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 6.

[110] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 7.

[111] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 7.

[112] *LG&E*, Docket No. ER21-1114-000, February 12, 2021 Transmittal at 8.

[113] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2.

- 6 -

**Supp. Add. 46**

its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings'). Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket. There are a total of twelve Southeast EEM Filings."[114]

30.    "In order to provide ample time to potential commenters who may wish to provide comments, DEC respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021. As noted, the requested effective date, and the requested date for Commission action, is in 90 days. Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[115]

31.    "DEC respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[116]

32.    "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[117]

33.    "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[118]

34.    "DEC respectfully request[s] that the Commission accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[119]

---

[114] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2 n.6.

[115] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 2.

[116] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 6.

[117] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 7.

[118] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 7.

[119] *DEC*, Docket No. ER21-1116-000, February 12, 2021 Transmittal at 8.

**Supp. Add. 47**

## E.  *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal

35.    "DEP respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Alabama Power Company in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[120]

36.    "Each of the other Commission-jurisdictional Members (together with DEP, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings').  Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket.  There are a total of twelve Southeast EEM Filings."[121]

37.    "In order to provide ample time to potential commenters who may wish to provide comments, DEP respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[122]

38.    "DEP respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[123]

39.    "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[124]

---

[120] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2.

[121] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2 n.6.

[122] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 2.

[123] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 6.

[124] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 6-7.

**Supp. Add. 48**

40.     "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[125]

41.     "DEP respectfully request[s] that the Commission accept its concurrence to the Southeast EEM Agreement, without modification, to become effective on May 13, 2021."[126]

### F.     *Ga. Power*, Docket No. ER21-1119-000 February 12, 2021 Transmittal

42.     "SCS respectfully requests the Commission make the attached tariff record effective as of May 13, 2021, consistent with the effective date requested in Alabama Power's filing of the Southeast EEM Agreement."[127]

### G.     *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal

43.     "KU respectfully requests an effective date of May 13, 2021 for its concurrence, the same effective date proposed by Southern Companies in the related filing of the Southeast EEM Agreement, and 90 days after the date of this filing."[128]

44.     "Each of the other Commission-jurisdictional Members (together with KU, the 'FERC Jurisdictional Members'), is filing a Certificate of Concurrence (together, the 'Concurrence Filings').  Additionally, each Member that is a transmission service provider with a transmission tariff on file with the Commission, is filing amendments to its transmission tariff to offer zero-cost transmission service for Southeast Energy Exchange transactions (collectively, the 'Tariff Filings').  Each Southeast EEM Filing Filings (collectively, the 'Southeast EEM Filings') will have its own docket.  There are a total of twelve Southeast EEM Filings."[129]

---

[125] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 7.

[126] *DEP*, Docket No. ER21-1117-000, February 12, 2021 Transmittal at 8.

[127] *Ga. Power*, Docket No. ER21-1119-000, February 12, 2021 Transmittal at 2.

[128] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2.

[129] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2 n.6.

**Supp. Add. 49**

45.     "In order to provide ample time to potential commenters who may wish to provide comments, KU respectfully requests that the Commission establish a comment period of thirty days, rather than the usual twenty-one, such that the comment date would be March 15, 2021.  As noted, the requested effective date, and the requested date for Commission action, is in 90 days.  Accordingly, a 30-day period for comments will still provide the Commission 60 days to act upon the Southeast EEM Filings after comments are received."[130]

46.     "KU respectfully requests that this Concurrence become effective on May 13, 2021, 90 days after filing and the same effective date requested in the Southeast EEM Agreement Filing."[131]

47.     "Granting an effective date of May 13, 2021 for this Concurrence Filing will allow it to synchronize with the effective date requested in the Southeast EEM Agreement Filing for a seamless implementation of the Southeast EEM."[132]

48.     "However, to the extent a waiver is needed, good cause exists to grant it, because acceptance of the filing effective May 13, 2021 will permit customers in the Southeast to begin enjoying the benefits of the Southeast EEM at the earliest possible date."[133]

### H.     *Miss. Power*, Docket No. ER21-1121-000 February 12, 2021 Transmittal

49.     "SCS respectfully requests the Commission make the attached tariff record effective as of May 13, 2021, consistent with the effective date requested in Alabama Power's filing of the Southeast EEM Agreement."[134]

---

[130] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 2.

[131] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 6.

[132] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 7.

[133] *KU*, Docket No. ER21-1120-000, February 12, 2021 Transmittal at 7.

[134] *Miss. Power*, Docket No. ER21-1121-000, February 12, 2021 Transmittal at 2.

**Supp. Add. 50**

## I.  *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal

50.  "eTariff requirements mandate that each of the Southeast EEM Filings have its own docket . . . the issues in the dockets are related . . . ."[135]

51.  "In addition to Southern Companies, Dominion Energy South Carolina, DEC, and LG&E are each filing amendments to their transmission tariffs, some of which are joint OATTs, to add NFEETS ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filings, the 'Southeast EEM Filings')."[136]

52.  "Southern Companies request that the Commission issue an order within 90 days, by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Agreement Filing.  Also consistent with that filing, Southern Companies request that the Commission establish a comment period of 30 days in this docket, or March 15, 2021.  The Southeast EEM filings are a package."[137]

53.  "Accordingly, Southern Companies are using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[138]

54.  "Although Southern Companies are requesting a 12/31/9998 effective date, to be updated once the Southeast EEM Commencement Date is known, Southern Companies respectfully request that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast EEM Agreement.  As explained in the Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that include this filing and the Agreement Filing before making significant additional investment in the Southeast EEM."[139]

---

[135] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2-3.

[136] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 2 n.5

[137] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 3.

[138] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12.

[139] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 12.

**Supp. Add. 51**

55.     "Southern Companies ask the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section III above."[140]

### J.     *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal

56.     "eTariff requirements mandate that each of the twelve Southeast EEM Filings have its own docket . . . . the issues in the dockets are related . . . ."[141]

57.     "The Company requests that the Commission issue an order within 90 days, by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Southeast EEM Agreement Filing.  Also consistent with that filing, the Company requests that the Commission establish a comment period of 30 days in this docket, or March 15, 2021.  The Southeast EEM filings are a package."[142]

58.     "Accordingly, the Company is using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[143]

59.     "Although the Company is requesting a 12/31/9998 effective date, the Company respectfully requests that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast EEM Agreement.  As explained in the Southeast EEM Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that include this filing and the Southeast EEM Agreement Filing before making additional investment in the Southeast EEM."[144]

---

[140] *Ala. Power*, Docket No. ER21-1125-000, February 12, 2021 Transmittal at 14.

[141] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 2.

[142] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 3.

[143] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 11.

[144] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 12.

60.    "[T]he Company asks the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section IV above."[145]


### K.    *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal

61.    "eTariff requirements mandate that each of the twelve Southeast EEM Filings have its own docket . . . the issues in the dockets are related . . . ."[146]

62.    "Those twelve filings are Southern Companies' filing of the Southeast EEM Agreement, the seven Concurrence Filings, and the four OATT filings to implement NFEETS, including this one ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filing, the 'Southeast EEM Filings')."[147]

63.    "The Filing Parties request that the Commission issue an order within 90 days of this filing, i.e., by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Agreement Filing.  Also consistent with that filing, the Filing Parties request that the Commission establish a comment period of 30 days in this docket, i.e., March 15, 2021.  The Southeast EEM filings are a package."[148]

64.    "Accordingly, the Filing Parties are using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[149]

65.    "Although the Filing Parties are requesting a 12/31/9998 effective date, to be updated once the Southeast EEM Commencement Date is known, the Filing Parties respectfully request that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast EEM Agreement.  As explained in the Southeast EEM Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that

---

[145] *Dominion Energy SC*, Docket No. ER21-1128-000, February 12, 2021 Transmittal at 14.

[146] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2-3.

[147] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 2 n.7.

[148] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 3.

[149] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 12.

include this filing and the Southeast EEM Agreement Filing before making significant additional investment in the Southeast EEM."[150]

66.    "[T]he Filing Parties ask the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section IV above."[151]

## L.    *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal

67.    "eTariff requirements mandate that each of the twelve Southeast EEM Filings have its own docket . . . the issues in the dockets are related."[152]

68.    "In addition to LG&E/KU, Southern Companies, Dominion Energy South Carolina, DEC are each filing amendments to their transmission tariffs, some of which are joint OATTs to add NFEETS ('Tariff Filings,' together with the Agreement Filing and the Concurrence Filings, the 'Southeast EEM Filings')."[153]

69.    "LG&E/KU request that the Commission issue an order within 90 days, by May 13, 2021, accepting the proposed OATT changes included in this filing, effective as of the dates requested herein.  The requested date for Commission action is the same date requested in the Southeast EEM Agreement Filing.  Also consistent with that filing, LG&E/KU request that the Commission establish a comment period of 30 days in this docket, or March 15, 2021.  The Southeast EEM filings are a package."[154]

70.    "Accordingly, the LG&E/KU are using an open-ended effective date (12/31/9998), consistent with Commission guidelines."[155]

71.    "Although the LG&E/KU are requesting a 12/31/9998 effective date, to be updated once the Southeast EEM Commencement Date is known, the LG&E/KU respectfully request that the Commission act on this filing within 90 days of filing, i.e., no later than May 13, 2021, the same day as the proposed effective date of the Southeast

---

[150] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 13.

[151] *Duke*, Docket No. ER21-1115-000, February 12, 2021 Transmittal at 15.

[152] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2-3.

[153] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 2 n.5.

[154] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 3.

[155] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 12.

EEM Agreement.  As explained in the Southeast EEM Agreement Filing, the Members desire regulatory certainty as to Commission acceptance of the package of filings that include this filing and the Southeast EEM Agreement Filing before making significant additional investment in the Southeast EEM."[156]

72.     "LG&E/KU ask the Commission to issue an order not later than May 13, 2021 that accepts for filing the proposed OATT revisions included herewith with an effective date as discussed in Section IV above."[157]

---

[156] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 13.

[157] *LG&E*, Docket No. ER21-1118-000, February 12, 2021 Transmittal at 15.

**Supp. Add. 55**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Alabama Power Company | Docket Nos. | ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | | ER21-1112-002 |
| Louisville Gas and Electric Company | | ER21-1114-002 |
| Duke Energy Carolinas, LLC | | ER21-1116-002 |
| Duke Energy Progress, LLC | | ER21-1117-002 |
| Georgia Power Company | | ER21-1119-002 |
| Kentucky Utilities Company | | ER21-1120-002 |
| Mississippi Power Company | | ER21-1121-002 |

STATEMENT OF CHAIRMAN GLICK

(Issued October 20, 2021)

1.      Expanding regional electricity markets is one of the single most important steps that the Commission can take to save customers money, enhance reliability, and integrate intermittent resources most efficiently.  I believe regional transmission organizations (RTOs) and independent system operators (ISOs) are, by far, the best way to achieve these benefits.  That is also true for the Southeastern United States.  From my perspective, utilities and other stakeholders in this region should be working to establish an RTO/ISO in the Southeast for the benefit of consumers and to promote grid reliability. But that is not the proposal presented to us in this docket.  Instead, the parties submitted a filing pursuant to section 205 of the Federal Power Act (FPA) proposing to establish the Southeast Energy Exchange Market (Southeast EEM) to facilitate bilateral trading in the Southeast.  And we were called upon to determine whether this proposal is just and reasonable and not unduly discriminatory or preferential, not whether there is a better option for the region—in my opinion, there clearly is.

2.      I believe that much of the Southeast EEM proposal arguably satisfies the Section 205 standard.  However, I voted no in large part because the filing parties' proposal to apply the *Mobile-Sierra* public interest presumption to the Southeast EEM Agreement violates well-established Commission precedent.  When *Mobile-Sierra* applies, the

1

**Supp. Add. 56**

Commission must presume that the relevant agreement meets the statutory just-and-reasonable standard, so the agreement can only be changed if it seriously harms the "public interest," a significantly higher evidentiary hurdle.[1]

3.     That is important here because I share some of Commissioner Clements's concerns over transparency and the potential for the exercise of market power and manipulation in the Southeast EEM. But I believe that the Commission's monitoring capabilities, enforcement authority, and ability to institute an FPA section 206 action provide adequate protections should any Southeast EEM members or participants engage in any conduct that may transgress the FPA or Commission regulations.

4.     That is true, however, only if the Commission's section 206 authority is not hamstrung, for instance, by the improper application of the *Mobile-Sierra* presumption. And because the Southeast EEM proposal would apply *Mobile-Sierra* in a manner inconsistent with our precedent—I voted no. In the balance of this statement, I lay out my "views . . . with respect to the change" submitted by the Southeast EEM parties in the above-captioned dockets, as section 205(g) of the FPA requires when a filing goes into effect by operation of law after a 2-2 vote of the Commission.[2]

*     *     *

5.     Currently, the Southeast region operates as a traditional wholesale electricity market. Trading occurs bilaterally under wholesale power sales contracts. Trades generally occur on an hourly basis as the shortest increment, and usually only amongst entities in the same or directly interconnected balancing authority areas. Parties must use phone or electronic communication tools to negotiate terms of sale, arrange for transmission service, and schedule delivery.

6.     The Southeast EEM represents a step toward modernizing this antiquated approach. The proposal will establish a new automated electronic trading platform designed to facilitate bilateral trading in the Southeast region. The platform will use an algorithm to match willing buyers and sellers for 15-minute transactions, facilitated by a

---

[1] *See NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 174 (2010) ("In unmistakably plain language, *Morgan Stanley* restated *Mobile–Sierra*'s instruction to the Commission: FERC 'must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law. The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest.'") (quoting *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008)).

[2] 16 U.S.C. § 824d(g); Alabama Power Co., *et al.*, Notice, Docket Nos. ER21-1111, *et al.* (issued Oct. 13, 2021) (taking effect by operation of law).

**Supp. Add. 57**

zero-charge transmission service (Non-Firm Energy Exchange Transmission Service or NFEETS) offered by participating transmission providers. Under the Agreement, NFEETS will be available to all participants on the same terms. The Agreement covers a substantial geographic footprint spanning ten states. The founding entities of the Southeast EEM collectively own 160,000 MW of generating capacity and serve approximately 640 TWh of load across ten balancing authority areas and two time zones.[3] According to the filing parties, their proposal will produce approximately $40 million in market-wide savings each year relative to the existing bilateral market; and, assuming increased penetration of renewable resources, those savings are projected at $100 million per year.

7.     To buy or sell energy through the Southeast EEM, an entity must join as a participant. To become a participant, an entity must execute a participant agreement, arrange to take NFEETS from each participating transmission provider, and enter into "Enabling Agreements" with at least three other participants. The 14 entities that executed the Southeast EEM Agreement are designated as members. To become a member, an entity must be a load serving entity located in the Southeast EEM territory or an association or governmental utility created for the purpose of providing energy to a cooperative or governmental load serving entity in the territory. Under the Agreement, members share the costs of developing and operating the Southeast EEM system. Each member will have a seat on the membership board, responsible for all significant decisions, while a revolving group of members will sit on the operating committee, responsible for day-to-day operations.

8.     Considering the history of entrenched resistance to organized markets in the Southeast, the Southeast EEM represents at least a positive step forward. Currently, several large incumbent utilities serve most of the consumers in the Southeast as bundled retail customers. Delivering power across multiple balancing authority areas in the region requires multiple transmission reservations and payment of pancaked transmission rates. A centralized and competitive wholesale market in the Southeast, or at least something closer to that model, is a step in the right direction.

9.     But finding a proposal just and reasonable and not unduly discriminatory or preferential under Section 205 of the FPA requires that it be more than just a step in the right direction. The filing parties initially proposed to apply *Mobile-Sierra* to the entire Southeast EEM Agreement and later narrowed that to a smaller subset of "enumerated provisions." I cannot support this part of the proposal because I believe that application of the *Mobile-Sierra* presumption here violates Commission precedent. Under that well-

---

[3] Alabama Power Company, Tariff Filing, Docket No. ER21-1111-000, at 4 (filed Feb. 12, 2021) (Southeast EEM Transmittal).

**Supp. Add. 58**

settled precedent, the *Mobile-Sierra* presumption applies to a contract "only if the contract has certain characteristics that justify the presumption."[4]

10.     The Southeast EEM Agreement fails this test.  We have consistently held that *Mobile-Sierra* does not apply to "generally applicable" contractual provisions, including those that bind not just the parties to the contract but also would apply to any potential future signatories with limited, if any, room for negotiation.[5]  The filing parties have already conceded that the *Mobile-Sierra* presumption should not apply to the entire Agreement:  when they narrowed their proposal to apply *Mobile-Sierra* to just the enumerated provisions, they acknowledged that "certain portions of the Southeast EEM Agreement . . . may be perceived as being generally applicable in nature."[6]  Our prior holdings require that we reject the imposition of *Mobile-Sierra* on even the enumerated provisions of the Southeast EEM Agreement.  Entities that may later seek to join the Southeast EEM would need to accept the enumerated provisions "as is," with limited room for negotiation.  New signatories thus would be placed in a position "that differs fundamentally from that of parties who are able to negotiate freely like buyers and sellers entering into a typical power sales contract that would be entitled to a *Mobile-Sierra* presumption."[7]  And the Southeast EEM filing parties have not shown "extraordinary" or "compelling" circumstances that, under Commission precedent, would merit application of *Mobile-Sierra* here as a matter of agency discretion.[8]  For these reasons, applying the

---

[4] *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 182 (2013).

[5] *See, e.g.*, *Arizona Pub. Serv. Co.*, 148 FERC ¶ 61,012, at P 4 (2014) (contrasting settlement rates that apply only to parties to the settlement with another settlement involving generally applicable rate schedules that apply to any entity for open access service); *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 187 (2013) (stating that the Commission's conclusion that right of first refusal provisions at issue created generally applicable requirements was "bolstered by the fact that any new PJM Transmission Owner would have to accept these provisions as-is, with limited room for negotiation"); *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185 (2015); *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,137, at P 9 (2013).  Commissioner Danly concedes that my position "has the weight of Commission precedent" on my side.  Comm'r Danly Statement at P 25.  And while he cites broad statements in Supreme Court cases on *Mobile-Sierra* extolling the public policy benefits of contractual stability *as a general matter*, he offers no case—indeed, there is none—that contradicts either my position against applying *Mobile-Sierra* under the circumstances of this proceeding or the extensive Commission precedent on which I rely.

[6] *See* June 7 Deficiency Response at 40.

[7] *ISO New England Inc.*, 150 FERC ¶ 61,209, at P 185.

[8] *See, e.g.*, *High Island Offshore Sys., LLC*, 135 FERC ¶ 61,105, at PP 23-25

4

**Supp. Add. 59**

*Mobile-Sierra* public interest presumption to at least the enumerated provisions of the Southeast EEM Agreement departs from our precedent without justification.[9]  I am disappointed that a majority of the Commission did not reach this conclusion.

11.     We must always tread cautiously when determining whether a *presumption* that an agreement satisfies the statutory "just and reasonable" standard is applicable.  Had the Commission been able to reach agreement on the *Mobile-Sierra* issue discussed above, I believe that our existing statutory protections against undue discrimination would have been sufficient to address protestors' concerns about the Southeast EEM and to protect consumers and market participants in the region.  Applying the *Mobile-Sierra* presumption in these circumstances will make it more difficult for third parties or even the Commission to mount legitimate challenges in the future to the justness and reasonableness of the Southeast EEM.  Put simply, there is no need (and no basis) to apply the *Mobile-Sierra* presumption here—and there is considerable risk to the public in doing so.

12.     Aside from my disagreement on the *Mobile-Sierra* issue, I was willing to support the Southeast EEM proposal—as modified by the filing parties' June 7 and August 11 responses[10] to Commission deficiency letters—because I believe the modified proposal otherwise meets the "just and reasonable" standard of section 205 of the Federal Power Act.  Our role here is to decide only whether the proposal before us meets that standard— not whether the filing parties have chosen the best available option, which in my view is to establish an RTO.[11]  The Southeast EEM filing parties have proposed essentially a

_____

(2011); *Devon Power,* 137 FERC ¶ 61,073, at P 37 (2011).

   [9] The *Mobile-Sierra* question is not "weeds of legal minutiae."  Comm'r Christie Statement at P 20.  The doctrine, which has been repeatedly addressed by the U.S. Supreme Court, establishes the standard for Commission modifications to the agreements at issue here, implicating both our statutory authority and our duty to protect consumers. *See NRG Power Mktg.*, 558 U.S. at 172 (noting origins of the doctrine in Supreme Court decisions from 1956).

   [10] *See, e.g.*, June 7 Deficiency Response at 17-18 (committing to providing additional transaction data in response to concerns about opportunities for market manipulation under the Southeast EEM Agreement); August 11 Deficiency Response at 3-4 (committing to additional restrictions on sharing of non-public market information received through the Southeast EEM).

   [11] *See, e.g.*, *PJM Interconnection, L.L.C.*, 170 FERC ¶ 61,243, at P 57 (2020) (citing *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007); *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984); *Cal. Indep. Sys. Operator Corp.*, 128 FERC ¶ 61,282, at P 31 (2009)).

**Supp. Add. 60**

matching platform for bilateral transactions. The intent of this platform, as these parties have stated, is to augment the existing bilateral nature of energy transactions in the region. And the stated benefits of this platform, though unverified, appear to be meaningful: The filing parties project over $100 million per year in market-wide savings by 2037 assuming higher renewable and energy storage penetration across the region, or $40 million per year relative to the current bilateral market under a more conservative estimate.

13.     For customers to realize such benefits, however, market outcomes must be the product of genuine competition, not market manipulation. For this reason, I share the concern of many that the Southeast EEM Agreement may present opportunities for the participants to engage in manipulation.[12] The Southeast EEM parties made commitments, in their responses to deficiency letters, to provide additional transparency safeguards.[13] While the original filings, not those subsequent responses, go into effect by operation of law, I urge the parties to stand by their additional commitments on transparency.

14.     Indeed, without those commitments embodied in the filing parties' responses to the deficiency letters, the Southeast EEM may be unjust and unreasonable under section 206 of the Federal Power Act. These added safeguards are necessary to protect consumers and market participants from anticompetitive conduct. For example, the filing parties' commitment to providing extensive transaction data on a weekly basis will enable the Commission to be aware of any abusive conduct. The filing parties also offered critical transparency measures to protect market participants and consumers: by publicly posting, with appropriate confidentiality limitations, any information requests from regulators and the Southeast EEM Auditor's responses to such requests. Beyond what the parties have offered, the Commission has the tools—and stands ready—to investigate any potential fraudulent or manipulative conduct and take any corrective action as needed, including imposing civil penalties. As I have often stated, guarding against market manipulation remains one of the core obligations vested in this agency by Congress. I intend for the Commission to continue to remain vigilant on this front.

15.     I believe the parties' Southeast EEM proposal, while admittedly not perfect, is a positive first step on the road to regionalization. The better outcome here, in my view, is for markets like the Southeast to move toward organized wholesale electricity markets. RTOs and ISOs have led to significant benefits for consumers across the country, including more efficient coordination and dispatch of generation, enhanced reliability,

---

[12] *See, e.g.*, Comments of Advanced Energy Economy, *et al.*, at 23-24 (Mar. 15, 2021); Protest of Public Interest Organizations, at 24-26 (Mar. 15, 2021).

[13] June 7 Deficiency Response at 17-19; Filing Parties July 14 Answer at 8-15.

**Supp. Add. 61**

and more effective integration of renewable resources.[14]  As the generation mix transforms rapidly before our eyes,[15] the benefits of organized wholesale markets will continue to accrue in the future—particularly when it comes to both meeting our nation's critical need to rapidly integrate massive amounts of new renewable resources at relatively low costs and minimizing disruptions to energy markets from extreme weather events.

16.    Finally, both Commissioners Danly and Christie raise objections to the omission of the parties' open access transmission tariff filings from the Secretary's October 13, 2021 notice of the filings that went into effect by operation of law effective October 12, 2021.  In their view, all twelve dockets related to the Southeast EEM proposal should have gone into effect by operation of law, rather than only the eight that were included in the notice.  Their preferred result would unsettle established Commission precedent and introduce significant uncertainty into Commission proceedings.[16]

17.    In enacting the FPA, "Congress did not set forth any filing procedures.  Rather, it expressly authorized the FERC to prescribe rules and regulations pertaining to rate filings and to designate the form of such filings."[17]  Under that authority, the Commission has

---

[14] *See, e.g.*, *Pac. Gas & Elec. Co.*, 168 FERC ¶ 61,038 (2019) (Glick, Comm'r, concurring at P 4); *Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285, 1999 WL 33505505, at *37-38 (2000).

[15] *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 176 FERC ¶ 61,024 (2021) (Glick, Chairman, and Clements, Comm'r, concurring at P 4).

[16] Separately, Commissioner Danly calls for a remand based on his suggestion that the Commission has "accept[ed]" only "half of a proposed rate" in violation of the D.C. Circuit's *NRG Power Marketing* decision.  Comm'r Danly Statement at P 31 & n.76.  But *NRG* is inapt.  *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 115 (D.C. Cir. 2017).  There, the court held that the Commission could not "suggest *modifications* that result in an 'entirely different rate design' than the utility's original proposal or the utility's prior rate scheme."  *Id*. (emphasis added).  Here, the Commission, as a result of a 2-2 split, has merely let filings go into effect on their proposed effective date, as required by section 205 of the FPA.  It has not "modified" a rate in any respect.  Moreover, Commissioner Danly's theory is undercut by the filing parties themselves, who expressly asked the Commission not to consolidate their filings, foreclosing the possibility that these filings are part of a single rate for the purposes of *NRG*.  Southeast EEM Members, Answer, Docket Nos. ER21-1111, at 54 (filed Mar. 30, 2021) ("Notwithstanding the common nexus of facts, the filings are by different entities who retain their individual Section 205 rights.").

[17] *Ala. Power Co. v. FERC*, 22 F.3d 270, 272-73 (11th Cir. 1994) (citing 16 U.S.C.

adopted regulations, by notice-and-comment rulemaking, regarding the electronic filing of tariffs, including the rules governing the use of proposed effective dates. Pursuant to these regulations, only filings with statutory action dates become effective in the absence of Commission action.[18]  And it is longstanding Commission practice even before the emergence of electronic tariff filing—again, codified through notice-and-comment rulemaking—to determine the effective dates of section 205 filings based on the effective dates proposed by the filing parties in their tariff sheets.[19]  Since the advent of the Commission's eTariff filing system in 2010, parties have relied on those rules when filing nearly 1,200 statutory filings with open-ended effective dates.[20]

18.    Here, four of the relevant 12 filings incorporated open-ended proposed effective dates.[21]  As a result, these four filings did not become effective on October 12, 2021,

---

§ 824d(c)).

[18] 18 C.F.R. § 35.7(d) ("Only filings filed and designated as filings with statutory action dates in accordance with these electronic filing requirements and formats will be considered to have statutory action dates."); *see also* 18 C.F.R. § 385.205(b) (filings without statutory action dates "will not become effective should the Commission not act by the requested action date"); Electronic Tariff Filings, Order No. 714-A, 147 FERC ¶ 61,115, at P 4 (2014) ("The regulations now will provide explicitly that only tariff filings properly filed as and designated as statutory filings according to the Commission's eTariff requirements will be considered to have statutory action dates, and that tariff filings not properly filed and designated as statutory filings will not become effective in the absence of Commission action."); *Pioneer Transmission, LLC*, 169 FERC ¶ 61,265, at P 20 (2019) ("Any filer who desires to have its section 205 filing subject to the statutory clock must follow the prescribed eTariff filing format.").

[19] *See Designation of Electric Rate Schedule Sheets*, Order No. 614, FERC Stats. & Regs. ¶ 31,096, at 31,504 (2000) ("It is thus incumbent upon utilities to unambiguously identify their proposed changes in a manner conforming to the Commission's regulations including properly formatting and designating their proposed tariff sheets. . . . It is not the function of this Commission to speculate on the nature of an applicant's filing (for example, what a utility intends as the effective date) nor is it our function to, on our own, perfect a utility's application.").

[20] Statutory filings are filings made pursuant to section 205 of the FPA, section 4 of the Natural Gas Act, and section 6 of the Interstate Commerce Act.

[21] *See* Alabama Power Co., Transmittal, Docket No. ER21-1125, at 12 & n.36 (filed Feb. 12, 2021) ("While the Southeast EEM Commencement Date is anticipated to occur sometime in the first quarter of 2022, *the exact date is unknown at this time*.  The Southeast EEM Commencement Date will be determined by the Members in accordance with the provisions of Section 4.1.9(a)(v) of the Southeast EEM Agreement.

when the Commission failed to act within 61 days of the filing date. Despite Commissioner Christie's statements to the contrary, the record shows that the applicants understood these rules,[22] expressly sought an open-ended effective date,[23] and opposed consolidation.[24] As the filing parties also recognized, their use of an open-ended effective date requires action by the Commission in the form of a waiver of agency regulations.[25] The Secretary's October 13 notice fully complies with the statute as well as with the Commission's regulations and precedent, and is consistent with the filing

---

*Accordingly, Southern Companies are using an open-ended effective date (12/31/9998), consistent with Commission guidelines.*") (emphases added).

[22] Commissioner Christie implies that the applicants might have been confused by the Commission's eTariff rules, but he also concedes that the applicants intended that "the transmission revisions should only go into effect *at a later date* when the service was established under the market structure approved by the Commission," and he cites applicants' own statement that they used a 12/31/9998 effective date for that reason. Comm'r Christie Statement at P 24 (emphasis added). The applicants therefore followed the Commission's eTariff rules exactly as expected, given their own request that the OATT revisions take effect at an unknown point after, not coincident with, the Southeast EEM Agreement. Commissioner Christie's criticism of Commission staff for not raising such eTariff issues in the deficiency letters is unfounded. Those letters sought additional information in light of deficiencies in the filings—but the open-ended proposed effective date for their OATT filings, chosen by the filing parties at their discretion, was not a deficiency.

[23] Alabama Power Co., Transmittal, Docket No. ER21-1125, at 12 (filed Feb. 12, 2021) ("An effective date prior to the Southeast EEM Commencement Date would be inconsistent with current non-Southeast EEM operations and illogical because NFEETS can be taken only in conjunction with Energy Exchanges. . . . Southern Companies respectfully *request* that the Commission act on this filing within 90 days of filing.") (emphasis added); Duke Energy Carolinas, LLC and Duke Energy Progress, LLC, Transmittal, Docket No. ER21-1115, at 12-13 (filed Feb. 12, 2021) (same); Dominion Energy South Carolina, Inc., Transmittal, Docket No. ER21-1128, at 11-12 (filed Feb. 12, 2021) (same); Louisville Gas & Elec. Co., Transmittal Letter, Docket No. ER21-1118, at 12-13 (filed Feb. 12, 2021) (same).

[24] Southeast EEM Members, Answer, Docket Nos. ER21-1111, at 54 (filed Mar. 30, 2021).

[25] *See, e.g.,* Alabama Power Co., Transmittal, Docket No. ER21-1125, at 12 (filed Feb. 12, 2021) ("In addition, because the requested effective date may be more than 120 days after the date these OATT revisions are filed with the Commission, Southern Companies seek waiver of Section 35.3(a)(1) of the Commission's regulations.").

**Supp. Add. 64**

parties' discretionary choice to include effective dates on some—but not all—of their submissions.

19.     Still, there remains an easy solution for the filing parties:  In the event that the Commission has not acted on their filings, when they know the implementation date for the Southeast EEM, they can establish an effective date by submitting an amended filing with the proposed date on which their OATTs will become effective; in the absence of Commission action, this filing will go into effect on the later of their proposed effective date or 61 days from the date of filing.[26]

\*     \*     \*

20.     Under FPA section 205, our role is to evaluate whether the proposal before us is just and reasonable and not unduly discriminatory or preferential.  As described above, while on balance I believe the proposal comes close to meeting that standard, I cannot support application of the *Mobile-Sierra* presumption in these circumstances.  To do so would run contrary to Commission precedent and undermine our ability to protect consumers under the Southeast EEM.

_____

Richard Glick
Chairman

---

[26] *Notice of Procedures for Making Statutory Filings when Authorization for New or Revised Tariff Provisions is Not Required*, Docket No. RM01-5, at 5 (June 3, 2020) (the effective date on which a public utility filing goes into effect in the absence of Commission action is "the later of either the 61st day after the date of filing or the earliest of the proposed tariff record effective dates that is after the 61st day").

**Supp. Add. 65**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| Alabama Power Company | Docket Nos.  ER21-1111-002 |
| Dominion Energy South Carolina, Inc. | ER21-1112-002 |
| Louisville Gas and Electric Company | ER21-1114-002 |
| Duke Energy Carolinas, LLC | ER21-1116-002 |
| Duke Energy Progress, LLC | ER21-1117-002 |
| Georgia Power Company | ER21-1119-002 |
| Kentucky Utilities Company | ER21-1120-002 |
| Mississippi Power Company | ER21-1121-002 |

STATEMENT OF COMMISSIONER CLEMENTS

(Issued October 20, 2021)

1.     The proposed Southeast Energy Exchange Market (Southeast EEM) Agreement, filed in this proceeding pursuant to section 205 of the Federal Power Act (FPA),[1] by Southern Company Services, Inc. as agent for Alabama Power Company, and on behalf of itself and the other prospective Members, went into effect by operation of law because the Commissioners are divided two against two as to the lawfulness of the market.  That means that the Commission did not determine whether the proposed market is just and reasonable and not unduly discriminatory or preferential.  When this happens, section 205(g) of the FPA[2] requires each Commissioner to issue a "written statement explaining the views of the Commissioner with respect to the change[s]."[3]

2.     While I am an ardent supporter of market formation across the electricity sector as a means of harnessing competition to ensure better outcomes for customers, market formation cannot be blessed at the expense of compromising the Commission's bedrock principles of ensuring open access to non-discriminatory rates and service, and applying adequate protections to markets to ensure just and reasonable rates.  The cost and reliability benefits that all sorts of organized market structures have provided to customers, utilities, and regions—whether from tight power pools, RTOs, the more recent Western imbalance markets, or other constructs—are clear and compelling.  While I appreciate the efforts of the Filing Parties in this proceeding toward increasing the

---

[1] 16 U.S.C. § 824(d).

[2] *Id.* § 824d(g).

[3] *Id.*

**Supp. Add. 66**

Docket No. ER21-1111-002, *et al.*                                        - 2 -

efficiency of the existing Southeastern bilateral markets, I would have voted against the Southeast EEM as proposed by the Filing Parties. I believe the Southeast EEM, as proposed by the Filing Parties, fails to abide by the bedrock principles of open access and non-discrimination that were crystallized in the Commission's landmark Order No. 888, and fails to ensure just and reasonable rates.

3.    To be very clear, my lack of support for the instant proposal is not because I would prefer a different market structure or that I fail to appreciate the parameters of the legal inquiry that Section 205 prescribes. I am cognizant of Section 205's requirements that we not let perfect be the enemy of the good and that we can only review the proposal in front of us.[4] But legal insufficiency must foreclose Commission approval. In my view, the Southeast EEM, as proposed, contains infirmities that compel the Commission to find that the Filing Parties have not satisfied their legal burden. That is not to say that the Southeast EEM, or a similar market structure, has no path to legal sufficiency. Rather, as I discuss below, my concerns with this market could be addressed with some discrete changes to the membership and governance provisions, as well as a superior approach to market power and manipulation concerns.[5]

4.    The Filing Parties' proposal rests on two legally and factually flawed contentions: first, that the Southeast EEM is nothing more than an enhancement to the existing bilateral markets that currently exist in the Southeastern United States; and second, that no new evidence, analysis, or safeguards are required to reach the conclusion that there exists no opportunity for market power or manipulation across the proposal's exchange platform.

5.    As I describe in more detail below, the proposed Southeast EEM is far from the existing bilateral market regime. The Southeast EEM is a multilateral market, with a unique (and large) footprint, designed to allocate limited rights to a new, desirable

---

[4] *See, e.g.*, *PJM Interconnection, L.L.C.*, Docket No. ER21-2582-000, Statement of Chairman Glick and Comm'r Clements, Oct. 19, 2021, at P 32 ("Under section 205, a utility does not need to show that the existing tariff is unjust and unreasonable, nor must it demonstrate that its proposal is the best option. Rather it must show only that its proposed tariff is just and reasonable [and not unduly discriminatory].") (citing *Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017); *PJM Interconnection, L.L.C.*, 170 FERC ¶ 61,243, at P 57 (2020); *City of Winfield v. FERC*, 744 F.2d 871, 874-75 (D.C. Cir. 1984)).

[5] In past similar circumstances, the Commission has taken the approach of rejecting initial proposals for new market constructs that fail to meet the requirements of section 205, and later approving revised proposals when those shortcomings were later addressed. *See, e.g.*, *Pub. Serv. Co. of Colorado*, 151 FERC ¶ 61,248 (2015); *Sw. Power Pool, Inc.*, 172 FERC ¶ 61,115 (2020).

transmission product and match electric power supply and demand offers across a suite of potential exchange matches using a complex "black box" algorithm.[6]  The transmission product and matching service are accessible only to Southeast EEM market Participants that sign and obtain countersigned participation agreements and acquiesce to the platform's governing rules, which are controlled by a coterie of preferred Members. None of these characteristics are features of a bilateral market.

6.      I am concerned that the Southeast EEM may expose Participants to unjust and unreasonable rates.  The Filing Parties proposed the Southeast EEM with neither any quantitative analysis demonstrating an inability by Participants to exercise market power or manipulate the market, nor adequate safeguards to protect against these abuses on a going-forward basis.  It is insufficient to rely on Participants' existing market-based rate authorities given the new market structure and new market footprint of the Southeast EEM.  Yet the Filing Parties suggest that despite these clear differences, the Commission should rely on analysis conducted for the existing bilateral market, and safeguards put in place for a bilateral, not multi-lateral market structure.

7.      I also agree with Chairman Glick's conclusion that applying the *Mobile-Sierra* standard to the generally applicable Southeast EEM Agreement provisions, even the "enumerated provisions" identified in the response to the First Deficiency Letter, would violate Commission precedent.  As he ably explains, the Southeast EEM provisions are tariff rates for which *Mobile-Sierra* protection does not lie.[7]  Applying the *Mobile-Sierra* standard would therefore inappropriately make any future challenge to the justness and reasonableness of the Southeast EEM Agreement more difficult.  This is particularly problematic here given the concerns with undue discrimination, governance, market power, and manipulation that the proposal presents.

8.      While Filing Parties made some relevant additional commitments to provide data in response to the Commission's May 4, 2021 deficiency letter,[8] they still wave off most

---

[6] The Territory will span 10 states, feature 160,000 MW of generating capacity, and serve about 640 TWh of load.  Transmittal Letter at 4.

[7] Chairman Glick Statement at PP 9-10.

[8] Among other things, the Filing Parties committed to: provide Order No. 760-style data to the Commission; require the Administrator, Auditor, and Participants to respond to inquiries from the Commission and other regulators; post reports, analysis, and Participant complaints on the Southeast EEM website; post the network map and information on binding transmission paths and the marginal value of transmission constraints; and make transparency improvements (*e.g.* making Membership Board meeting minutes public and allowing non-Members to observe Membership Board meetings).  While this would have provided more transparency than the tariff provisions that have gone into effect by operation of law, these concessions do not eliminate the

of protestors' concerns about the Southeast EEM's barriers to participation, restrictions on membership, preferential structure for load-serving entity Members, lack of transparency or oversight, and potential for the exercises of market power and manipulation. These concerns, however, constitute legal grounds on which the Commission should have rejected the current proposal. To be clear, there is no insurmountable barrier to the formation of a market like the Southeast EEM. In fact, straightforward revisions to the platform's participation and membership rules, and common approaches to protection against the exercise of market power and manipulation would cure most, if not all, of the statutory violations that impair the current proposal.

9.      By failing to reject the Southeast EEM as proposed, despite its demonstrable flaws, the Commission compromises its fundamental principles of transparency, oversight and fair and open market access. Failing to apply these principles to this market is dangerous not only because of the discriminatory and unjust rate impacts it may impart in the region, but because it may inhibit the Commission's ability to ensure that other organized markets, existing or forthcoming, are just and reasonable and not unduly discriminatory. Failing to reject the instant proposal is likely to invite future attacks on the Commission's fundamental market design safeguards in existing and future markets across the country.

## I.      The Southeast EEM is a multi-lateral market construct

10.     First, it is necessary to understand what the Southeast EEM is and is not. The Filing Parties take the position that the Southeast EEM is merely an enhancement of the bilateral markets that currently exist in the Southeastern United States. They argue that the introduction of the Southeast EEM algorithm, which will automatically match buyers and sellers for Energy Exchanges, and NFEETS, a zero-cost transmission product, are merely improvements on the existing bilateral structure.[9] This position requires an insurmountable strain on logic that lacks any compelling rationale.

11.     Bilateral electric power supply transactions involve two known parties engaging in a negotiated exchange of electricity and related services. They involve the parties participating in a back-and-forth regarding terms of the sale including the price, quantity, transmission path, tenor, performance expectations, and other terms and conditions. While market data may influence agreed-upon prices or other terms, any given bilateral transaction is defined by the four corners of the deal struck by the engaging parties.

---

impermissible barriers to access, cure the unduly discriminatory membership and participation structure, or remedy the failure to carry out market power analysis or provide for an independent market monitor whose institutional role is to independently protect the Southeast EEM from manipulation or the exercise of market power.

[9] Transmittal Letter at 9-11.

Bilateral transaction prices are not influenced in real-time by various other bid and buy offer levels, nor are they optimized across a set of various buyer and seller matches. Bilateral electric power supply transactions are not automatically combined with transmission service and do not require access to a participant-only transmission product. Bilateral transactions do not involve a members committee, an administrator, an auditor, or satisfaction of a set of participation requirements as a condition to execution.

12.     While the Southeast EEM relies on bilaterally arranged enabling agreements, the structure hinges upon a complex multi-lateral optimization engine that replaces the bilateral negotiation of key terms, including price and quantity.  This engine, operated by the Southeast EEM Administrator, is responsible for (1) selecting which transactions should be consummated from among many potential buy and sell offers from many participants in order to optimize dispatch over the Southeast EEM footprint, and (2) allocating the NFEETS, which is an exclusive transmission service reserved for participants in the Southeast EEM, in order to consummate those transactions.[10]  The multi-lateral engine is so complex that the Filing Parties assert that simply providing a "mathematical statement of the optimization problem solved by the Algorithm (*i.e.*, the software platform implementing the Southeast EEM)" would be a "significant undertaking and possibly an additional material Southeast EEM Member expense in addition to the planned cost of hiring a software vendor."[11]  Necessarily, the Southeast EEM also has its own set of rules, a governance structure, and participation requirements, each of which further distinguish it from traditional bilateral markets.

13.     My colleagues disagree with this assessment, but offer no rationale whatsoever regarding how these plainly multi-lateral market features represent a mere immaterial "enhancement" to the bilateral market and do not transform it into a multi-lateral construct.  Rather than engage with these arguments on the merits, their positions amount to credulously accepting the Filing Parties' assertions that the market will be bilateral in nature without examining the ample evidence to the contrary.[12]

---

[10] The existence of NFEETS is in itself an important distinction between the Southeast EEM and traditional bilateral markets.  In true bilateral transactions arranging and paying for transmission is a part of effectuating any trade.  NFEETS, which is only obtainable by joining the Southeast EEM, is factored into the market's optimization.

[11] Response to First Deficiency Letter at 38.

[12] *See* Comm'r Danly Statement at P 20 ("The filing parties clearly state that, 'the Southeast EEM is not—and was never intended to be—a top-to-bottom reimagining of the Southeast energy market; rather it reflects incremental improvement to the existing bilateral market.'") (quoting Transmittal Letter at 9); Comm'r Christie Statement at PP 6, 8 (stating in conclusory fashion that the proposal enhances rather than modifies the existing bilateral market).  While Commissioner Danly observes that "[t]his market does

14.    But closing our eyes, clicking our heels three times, and wishing "the Southeast will remain a purely bilateral market" will not make that so.  Given its features, the Southeast EEM is clearly more than an enhancement of the status quo.  It is an entirely new market construct, with its own set of rules and a unique footprint.  As such, it is the Commission's obligation to go beyond taking the Filing Parties' word for it and to review the Southeast EEM proposal to ensure that it meets basic principles of non-discrimination and protects against the exercise of market power and manipulation.

## II.    Access to the Southeast EEM is not open, violating Order No. 888

15.    Order No. 888 compels open "access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce,"[13] and requires public utilities to "remove preferential transmission access and pricing provisions from agreements governing their transactions."[14]  The Southeast EEM contravenes these bedrock requirements by restricting access to NFEETS.

16.    In order to join and obtain the ability to access NFEETS, a prospective Participant is required: (1) to obtain the countersignature of the Southeast EEM Agent at the direction of the Operating Committee, a body controlled entirely by Members,[15] and (2) to execute Enabling Agreements with at least three other Participants.  These provisions give Southeast EEM Members and existing Participants leverage they may use to block market access to transmission service.[16]  In addition, to participate, an entity must be registered as a Source or Sink within the Southeast EEM footprint.

---

not offer joint dispatch, joint operation, or joint planning," these are arguments that the Southeast EEM is an RTO, not a rebuttal to any of the logic I have set forth regarding why the Southeast EEM platform is multi-lateral, not bilateral.  Comm'r Danly Statement at P 20.

[13] Order No. 888, 61 Fed. Reg. 21,540, 21,541 (1996).

[14] *Id.*

[15] *See* Southeast EEM Agreement § 5.1 (describing Operating Committee membership).

[16] Southeast EEM Market Rules § III.B.3.  A prospective Participant must also (3) own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink; and (4) arrange to take NFEETS from each Participating Transmission Provider, either through execution of a service agreement under the Participating Transmission Provider's tariff or by otherwise making arrangements for such service.

17.     While the Filing Parties argue that Members and Participants have economic incentives to execute participation and enabling agreements, they neglect that Members and Participants also have economic incentives to block access, and the reality is that the proposal erects substantial barriers to participation.  Although the Filing Parties observe that "enabling agreements are used today in the Southeast bilateral market "to facilitate regular bilateral energy transactions"[17] this fact is beside the point.  While transmission service is not governed by enabling agreements in the existing bilateral market, the question the Commission must ask here is whether these requirements serve as an unduly discriminatory barrier to entry to Southeast EEM and the NFEETS *transmission service* it provides.  Order No. 888 establishes a firm requirement of open access, not a demonstration that economic incentives *might* create conditions where utilities choose of their own accord to permit open competition.[18]

18.     As protestors persuasively argue, the Three Counterparty Rule and Participant Agreement requirements may prevent a prospective Participant from accessing the market because current Participants may "collude to exclude prospective Participants by refusing to enter into Enabling Agreements," or the Operating Committee could direct the Agent to block access by declining to sign the Participant Agreement with a given counterparty.[19]  The Filing Parties contend that the Commission need not worry about such abuse of the Three Counterparty Rule and Participant Agreement because the benefits of the Southeast EEM "will be at their greatest with eligible counterparties maximized," arguing that if they had incentive to block market access for any individual prospective participant they would not have proposed the Southeast EEM at all.[20]  To accept this simplistic logic is naïve.

19.     While it is true that retail customer benefits would be maximized if Participants entered into as many matches as possible, incentives for load serving entity shareholder

---

[17] Response to First Deficiency Letter at 19-20.

[18] *See* Order No. 888, 61 Fed. Reg. at 21,541 ("The legal and policy cornerstone of these rules is to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce.").  Order No. 888 targets denials of open access "whether they are blatant or subtle," and also targets "the *potential* for future denials of access."  *Id.* at 21,550 (emphasis added).

[19] The proposal appears not to contain any provision requiring the Agent to not unreasonably withhold its signature, in contrast to other market arrangements. *See, e.g.*, Public Service Company of Colorado, Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43.

[20] Filing Parties March 30 Answer at 37.

profits do not neatly align with retail customer benefits in the Southeast EEM as proposed. Indeed, while some Members may indirectly have an incentive to lower costs, many of the Filing Parties earn more return on equity by spending more capital. Shareholder profits for Southeast EEM Members may go up if they retain a larger market share by blocking access for competitors and thereby increase the megawatt-hours served by generation owned by Members.[21]

20.     Even if it does not choose to block access outright, the Southeast EEM Operating Committee could seek to use Participant Agreements as an opportunity to exercise leverage over prospective Participants.[22] The Commission's regulations require that a market-based rate seller demonstrate that "the seller cannot erect any barriers to entry against potential competitors."[23] It is hard to imagine a more direct and problematic barrier than granting a subset of market participants veto power over whether others may access transmission service, as the Participant Agreement requirement does.[24] While it is common for organized markets to require some sort of participation agreement, such

---

[21] Monopoly regulation of vertically integrated, investor-owned utilities exists because of the structural misalignment of economic incentives that fail to ensure the maximization of consumer benefits. Here, protections are necessary not as a speculative assumption of bad faith on the part of Filing Parties, but as part of the Commission's statutory obligation. In no situation can one simply assume that monopoly entities will work to adequately protect customers without regulation to require it.

[22] Contrary to the Filing Parties' response, such abuse is perfectly consistent with a broader desire by the Filing Parties to utilize the Southeast EEM construct. While seeking to deliver consumer savings facilitated by the Southeast EEM, the Filing Parties may nevertheless seek to administer the platform in a manner that locks out certain competitors who they determine might pose a threat to their market positions, or who they can secure concessions from in other market contexts by exerting leverage in agreeing to permit access to SEEM. *See* March 30 Answer at 36 ("If utilities in the Southeast were driven, when it came to consideration of the Southeast EEM, by the idea that 'competition and the availability of lower cost suppliers erodes the potential profits that come from a monopoly's main source of revenue: building additional generation,' . . . there would be no Southeast EEM proposal.").

[23] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3 (D.C. Cir. Aug. 6, 2021) (citing 18 C.F.R. § 35.37 (2020)).

[24] *See* PIOs March 24 Protest at 13 ("[B]y exercising unmitigated authority over who is permitted to execute Enabling Agreements and become a SEEM Participant, the Applicants cement their control over the transmission system and all but guarantee that competitors will be provided inferior transmission service.").

agreements should have clear application procedures and must not allow for other participants to reject the agreement without cause.[25]

21.     Further, by failing to act, the Commission approves a market construct by which prospective Participants do not have adequate means of detecting or seeking redress regarding abuse in restricting market access.  Prospective Participants appear not to have a right to bring complaints to the Auditor (with such complaints limited to Participants).[26] And while prospective Participants could in theory bring a complaint directly to the Commission, the absence of market transparency provides them with scant ability to gather the evidence that would be necessary to support such a complaint.  Further, several Southeast EEM Members are unregulated transmitting utilities, over whom the Commission likely would not have jurisdiction for such a complaint.  The upshot is that to the extent that abuse occurs, the Commission may never find out.  Something as fundamental as open access to transmission services must not rely on speculation. Rather, a basic tenet of Order No. 888 is that transmission providers must file tariff terms that provide open access without giving themselves an opportunity to exercise discretion to block access.[27]

---

[25] Such barriers to transmission access were the express focus of Order 888.  Order No. 888, 61 Fed. Reg. at 21,541-42.  *See, e.g.*, Public Service Company of Colorado, Transmission and Service Agreements Tariff, Joint Dispatch Trans Svc, Section 43 (an example of an agreement with clearer application features that do not permit unjustified rejection).

[26] Transmittal Letter at 31 ("The Auditor may also receive complaints from Participants, which it will refer to the Membership Board and investigate at the Membership Board's discretion.").  Further, even if prospective Participants did have a right to bring complaints to the Auditor, complaints to the Auditor about undue discrimination via the Enabling Agreements are submitted to the Membership Board, which can choose not to act and to not submit such complaints to the Commission.

[27] Order No. 888, 61 Fed. Reg. at 21, 552 ("We conclude that functional unbundling of wholesale services is necessary to implement non-discriminatory open access transmission and that corporate unbundling should not now be required.  As we explained in the NOPR, functional unbundling means three things:  (1) a public utility must take transmission services (including ancillary services) for all of its new wholesale sales and purchases of energy under the same tariff of general applicability as do others; (2) a public utility must state separate rates for wholesale generation, transmission, and ancillary services; (3) a public utility must rely on the same electronic information network that its transmission customers rely on to obtain information about its transmission system when buying or selling power.").

22.    The proposal further restricts participation by requiring Participants to own or otherwise control a Source within the Territory and/or be contractually obligated to serve a Sink within the Territory.[28]  Public Interest Organizations (PIOs) assert that this restriction will exclude "an estimated 65 trading partners that border the SEEM territory . . . because they do not have resources located in the territory."[29]  Excluding these trading partners from the Southeast EEM closes their access to a valuable transmission service offered by each Transmission Owner, and is demonstrably more restrictive than the required Open Access Transmission Tariffs (OATTs) of the participating jurisdictional Transmission Owners.  As PIOs explain, the Commission's "open access rules require that transmission service is offered under each public utility's OATT to all transmission customers in a comparable, non-discriminatory manner, including existing trading partners."[30]

23.    The Filing Parties rationalize the proposed geographic restriction as permissible because it "is not currently technically feasible to allow entities outside the Territory to participate in the Southeast SEEM because 'transactions involving the use of transmission outside of the Territory . . . would require the coordination of e-Tags with non-NFEETS providers in the less-than-20 minute timeframe required, which is not possible at this time.'"[31]

24.    This reasoning is circular: open access is not technically feasible because the Filing Parties have not designed the market in a manner that facilitates a workable solution, and have not invested in the software or other analytical capabilities necessary to facilitate access under their chosen design.  Permitting transmission providers to evade open access requirements via their own market design choices and investment decisions would fundamentally undermine open access.  Filing Parties have done nothing to demonstrate why, in the abstract, e-Tags for external resources could not be coordinated on the timeframe necessary, or why another solution, such as requiring external resources to secure firm service to the border of the Southeast EEM Territory, is not feasible.  Rather, they have designed the market and chosen a scope of work for the relevant vendors that accomplishes coordination for their own purposes without facilitating access for competitors outside the Territory.  Such undue exclusion is not permitted by Order No. 888.[32]

---

[28] Transmittal Letter at 16.

[29] PIOs July 29 Answer at 10-11.

[30] *Id.* at 11.

[31] Filing Parties March 30 Answer at 44.

[32] Order No. 888, 61 Fed. Reg. at 21,594 ("[M]embership provision[s] must allow

25.    The basic unavoidable fact is that NFEETS is transmission service, and thus must be provided by each of the Southeast EEM Members on an open and non-discriminatory basis.  That NFEETS is last priority service does not change this analysis,[33] nor does it make a whit of difference that NFEETS will technically be accessed via the relevant Southeast EEM Member's OATT.  While the service will technically be administered via the OATT, it can only be accessed by Southeast EEM participants, pursuant to the discriminatory terms set forth in the Southeast EEM Agreement and other relevant documents.  None of my colleagues reckons with how the proposal's blatant barriers to open access—manifested by the participation agreement provisions, Three Counterparty Rule, and source/sink requirements—pass muster under Order No. 888.[34]

## III.    Southeast EEM's membership structure, market rules and governance are unduly discriminatory

26.    Beyond violating Order No. 888 by providing for unlawful barriers to accessing NFEETS, the Southeast EEM proposal also unlawfully limits access to transmission service via its restrictive membership provisions, and by forcing prospective non-Member Participants into a choice between either (i) agreeing to a set of discriminatory rules that may only be amended or otherwise influenced by a small cohort of Members in

---

any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location.").

[33] Were it material that "NFEETS service is available *only if* the existing transmission system is not fully employed," as Commissioner Danly suggests, then non-firm service could likewise skirt the basic requirements of Order No. 888.  Comm'r Danly Statement at P 23 (emphasis in original).  Nothing in that order suggests or has been understood to apply only to firm service.

[34] For example, Commissioner Christie asserts that the Three Counterparty Rule and source/sink requirements are "necessary to ensure technical feasibility," and repeats his conclusion that "this proposal represents an enhancement to a bilateral system in which enabling agreements are not unusual," but does not address the obvious distinction that, unlike in this existing bilateral market, such requirements *in this context* inhibit open access to transmission service.  Comm'r Christie Statement at P 13.  The Filing Parties suggest that open membership requirements do not apply because the Southeast EEM will not establish a loose power pool.  *See* Filing Parties March 30 Answer at 9.  While I disagree with this conclusion, it is irrelevant with regard to the barriers to *participation* imposed by the participation agreement provisions, Three Counterparty Rule, and source/sink requirements.  Such barriers implicate Order No. 888's requirement that transmission providers provide open access to transmission service; requirements for loose power pools are layered on top of this floor set for all jurisdictional transmission providers.

order to access NFEETS and the Southeast EEM's matching service, or (ii) forgoing service altogether.

27.      A key defect of the Southeast EEM is that, except for one narrow exception, an entity must be an LSE in the Southeast EEM footprint to be a Member.[35]  This restrictive provision, standing alone, violates the express terms of Order No. 888.  But even if such Membership restrictions were permissible, as discussed below, they constitute an impermissible barrier to transmission service when considered together with the combination of features in the proposal that discriminate in favor of Members.

## A.      The proposal's membership restrictions violate Order No. 888

28.      The proposed restrictions on membership for the Southeast EEM violate Order No. 888, which requires open, non-discriminatory membership for "'loose' power pools" or "other coordination arrangements."[36]  Contrary to the conclusion of my colleagues, the proposed arrangement constitutes a loose power pool, for which Order No. 888 requires "open, non-discriminatory membership provisions" and mandates modification of "any provisions that are unduly discriminatory or preferential."[37]  Order No. 888 specifically requires open membership for loose power pools to extend beyond transmission owning utilities: "membership provision[s] must allow any bulk power market participant to join, regardless of the type of entity, affiliation, or geographic location."[38]

29.      The Southeast EEM fits comfortably within Order No. 888-A's definition for loose power pools, which is "(1) any multi-lateral arrangement, other than a tight power pool or a holding company arrangement, that (2) explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions."[39]  NFEETS is a "discounted and/or special transmission arrangement" because it provides a service not otherwise available under relevant Participants' OATTs: $0/MWh transmission service with no associated Schedule 1 or Schedule 2 ancillary service charges, and financial losses only.  While Filing Parties contend that NFEETS is

---

[35] A Member must either be "(1) an LSE located in the Territory; (2) an association, Cooperative, or Governmental Entity that is an LSE located in the Territory; or (3) an association, Cooperative, or Governmental Utility created for the purpose of providing Energy to a Cooperative or Governmental LSEs."  Transmittal Letter at 13.

[36] Order No. 888, 61 Fed. Reg. at 21, 593.

[37] *Id.* at 21,594.

[38] *Id.*

[39] Order No. 888-A, 62 Fed. Reg. 12,274, 12,313 (1997).

Docket No. ER21-1111-002, *et al.*                                          - 13 -

not a discounted service because it relies on otherwise unused capacity, providing service at zero cost is not something typically done by the relevant transmission providers, who generally charge for non-firm service.[40]

30.     The Commission's recent decision in *PSCo* fails to support a finding that the Southeast EEM will not establish a loose power pool. *PSCO* merely stated in conclusory fashion that the arrangement at issue was not a loose power pool, without justifying that conclusion.[41] Further, *PSCo*'s conclusion ran counter to Order No. 888's express terms, despite the fact that *PSCo* was an order on a proceeding contested by a single party, not a rulemaking that would be required to reverse Order No. 888. In addition, *PSCo* addressed circumstances that entailed a far simpler arrangement across only a single balancing authority, and was inconsistent with the Commission's prior conclusion in *Wolverine Power Supply*, where the Commission explained that Order No. 888, "in seeking to eliminate undue discrimination in pooling arrangements, . . . defined pooling arrangements in the broadest terms possible."[42]

31.     While NFEETS schedules transmission on infrastructure that would otherwise go unused, *PSCo* fails to address the fact that the service is discounted insofar as NFEETS does not include any ancillary service charges and does not entail any charges for operating the platform to arrange service. Moreover, *PSCo* never considered whether such service was "special."[43] Here, in addition to the special terms described above, the elimination of rate pancaking across the broad Southeastern EEM service territory is a demonstrably special service delivered by NFEETS, sparing Participants from the multiplicity of charges that could otherwise be incurred in the existing bilateral markets. Further, in a significant distinction from *PSCo*, this case entails a complex multi-lateral optimization engine that *coordinates* the apportionment of the zero-cost transmission service among a wide array of participating entities across at least several balancing authority areas.

32.     Even if the Southeast EEM were not classified as a loose power pool, the same need for non-discriminatory membership provisions applies in order to avoid triggering

---

[40] *See* PIOs April 12 Answer at 3-5 (citing Filing Parties March 30 Answer at 8-9).

[41] *PSCo*, 154 FERC ¶ 61,107, at P 85 (2016) ("PSCo is not proposing the establishment of a loose power pool and as such the requirements cited to are not required of the arrangement proposed by PSCo.").

[42] *Wolverine Power Supply*, 85 FERC ¶ 61,099, 61,355 (1998).

[43] *PSCo*, 154 FERC ¶ 61,107, at P 84 (2016) ("Therefore, Joint Dispatch Transmission Service does not represent a discount of non-firm transmission service, and does not serve as a substitute for that service.").

the FPA's bar on undue discrimination.  Indeed, in speaking more broadly about "power pools *or other coordination arrangements*," or "certain bilateral arrangements that allow preferential transmission pricing or access," Order No. 888 states that "[t]he filing of open access tariffs by the public utility members . . . is not enough to cure undue discrimination in transmission if those public utilities can continue to trade with a selective group within a power pool that discriminatorily excludes others from becoming a member and that provides preferential intra-pool transmission rights and rates."[44]  The Filing Parties' proposal violates this requirement because it establishes a select group of Members with exclusive transmission-related rights: namely, the ability to participate in controlling and overseeing the platform for administering service across a footprint comprised of many different transmission owners.[45]  The heart of the proposal's deficiency in this regard stems from the Southeast EEM's exclusion of non-LSEs from the opportunity to fund the platform in exchange for Membership rights.

> **B.    Further, the proposal's membership restrictions act in conjunction with its asymmetric market and governance structure to provide discriminatory access to transmission service**

33.    Beyond directly violating Order No. 888's requirements for loose power pools or other coordination arrangements, the Southeast EEM's restrictive membership provisions act in concert with other aspects of the Southeast EEM proposal to violate the FPA's prohibition on undue discrimination by creating two unequal classes of market participants.  The proposal gives preferential treatment to the small coterie of Members, granting them operational control of the complex and important market platform that allocates transmission service, as well as unique auditing and oversight abilities not shared with other Participants, and exclusive control over all meaningful governance decisions.[46]  Non-Member Participants, on the other hand, face a Hobson's choice: agree to participate in a market that is controlled in all substantive respects by preferred Members and risk exposure to market flaws, potential exercises of market power, or other abuses that may not be detected due to skewed and inadequate oversight, transparency and fair governance; or forgo access to a valuable transmission service altogether.  Taken, together, these provisions amount to an impermissible barrier to transmission access and thereby violate "the legal and policy cornerstone" of Order No. 888.[47]

---

[44] Order No. 888, 61 Fed. Reg. at 21,594 (emphasis added).

[45] These preferential rights include Members' ability to effectively control the Southeast EEM Agent, Administrator, and Auditor, and to dictate the Southeast EEM's governance.

[46] Transmittal Letter at 21-23.

[47] Order No. 888, 61 Fed. Reg. at 21,541.

Prospective Participants confirm that these discriminatory features may cause them to choose not to participate in the Southeast EEM.[48]

34.    Member control over operations is provided via their exclusive ability to participate in both the Southeast EEM Membership Board and Operating Committee, which are vested with near total control over the structure and operation of the market. The Membership Board will have sole responsibility and input into the operation and oversight of the Southeast EEM platform, including the hiring and firing of the Administrator, who operates the platform.[49]  The Membership Board also chooses the Auditor, who oversees the platform, and determines how often, if ever, the Auditor performs its function.[50]  Together, the Auditor and Administrator are responsible for ensuring that the Southeast EEM's multi-lateral optimization platform functions as intended.

35.    Allowing operational control and oversight to be conducted by a small sub-class of Participants is particularly troubling in the context of the Southeast EEM proposal because of the extreme complexity of the optimization platform.  Given the platform's complexity, it is unsurprising that Members provided a mechanism for themselves to ensure that it functions as intended.  The Auditor is to "monitor the functionality of the Southeast EEM System to ensure that it is operating correctly and in accordance with the Market Rules outlined in the Southeast EEM Agreement."[51]  But in providing the

---

[48] *See* Clean Energy Coalition March 15 Comments at 22 ("Without more transparency that offers some assurance of fairness and proper market function, independent sellers and buyers of power may severely limit their participation in SEEM.").  While Order No. 888's open access requirement does not speak directly to terms and conditions by which transmission service is accessed, it stands to reason that conditioning access on acceding to undesirable terms and conditions must at some point constitute an impermissible bar to access.  A large monetary fee imposed only on non-Members, for example, would clearly constitute undue discrimination.  Here, as confirmed by the Clean Energy Coalition's declaration that its members are hesitant to participate in the Southeast EEM, the discriminatory administration, oversight, and governance provisions acting in concert rise to the level of a clear barrier to participation that can reasonably be expected to inhibit non-Members' access to transmission services.

[49] The Administrator will oversee and operating the Southeast EEM System and submit e-Tags to reserve and schedule NFEETS.  Transmittal Letter at 17.

[50] Transmittal Letter at 17; Operations Affidavit at P 52.

[51] Transmittal Letter at 17.

Members alone with control over the Auditor's actions, the proposal gives non-Member Participants no such assurance.

36.    The proposal also vests Members alone with power to meaningfully weigh in on any potential changes to the Market Rules, providing no meaningful opportunity for non-Members, including other Southeast EEM market participants, states, or customers, to have a voice.  While the Filing Parties propose to provide limited opportunities for non-Member engagement, such as an "Annual Meeting of Participants and Stakeholders,"[52] these opportunities equate to no more than a chance to provide a perspective.  The proposal does not include any requirements for or process by which these perspectives will be incorporated or acted upon.  These opportunities fail to provide non-Member Participants with any real ability or leverage to shape decisions, or to participate in market administration and oversight.

37.    The Filing Parties rationalize this blatantly preferential treatment with a theory that superior rights for Members are appropriate because the Members financed the Southeast EEM platform.[53]  This argument neglects the fact that non-LSE Participants are not offered the opportunity to become Members or otherwise participate in the funding of the platform.  The exclusive opportunity to fund a market platform that organizes market activity and allocates transmission service across several utilities' footprints, and enjoy special rights granted in exchange for that funding, is unduly discriminatory because no reason has been given why LSEs alone should enjoy this right in exchange for preferential terms and conditions.  Although the Filing Parties reference the recently accepted governance structure of SPP WEIS' market as support,[54] such reliance is inappropriate for three reasons: (1) although representation on WEIS' WMEC is similarly exclusive to WEIS Participants, there are no restrictions on who can become a WEIS Participant; (2) there are meaningful avenues for non-WEIS Participants to provide input on WEIS decisions (*i.e.*, through the WEIS Revision Request Process); and (3) the WMEC is overseen by the independent SPP Board of Directors, with any decisions by WMEC appealable up to the SPP Board of Directors.

38.    The Commission has on prior occasions disapproved of transmission service arrangements that give preference to a certain class of Members, even where that preference is less marked than the combination of factors present here.  For example, in evaluating the "governance rules for the Management Committee and the Regional Reliability Committee" of the Mid-Continent Area Power Pool, the Commission determined that the rules "do not satisfy Order No. 888" because they provided for

---

[52] Southeast EEM Agreement § 4.4.

[53] Filing Parties March 30 Answer at 37.

[54] *Id.*

"voting on the basis of Electric Revenues, which . . . gives too much influence to the vertically integrated utility members that own the transmission system."[55]  Similarly, the D.C. Circuit upheld a Commission order rejecting the membership criteria of a loose power pooling arrangement that provided for two classes of Participants, with one class enjoying substantially better rights to govern the pool's market rules and control operation of the pool.[56]  In that case, the relevant filing parties had proposed an arrangement that included "Participants," who enjoyed full membership rights, and "Associate Participants," who were entitled only to "representation on certain pool committees and participation in pool planning functions."[57]  The Commission found this distinction "discriminatory on its face under sections 205 and 206 of [the Federal Power Act]", and its determination was specifically approved by the D.C. Circuit.[58]  While the names of the two classes diverge, the difference between Participants and Associate Participants in many respects mirrors the Southeast EEM proposal's distinction of rights between Member Participants and non-Member Participants.

39.     Commissioners Danly and Christie dismiss these discriminatory features of the Southeast EEM, suggesting that they would only be problematic if the Southeast EEM were an RTO.  In doing so, they ignore the fact that, together, the preference for Members built into the Southeast EEM agreement, these features are a clear barrier to access for prospective non-Member Participants.  My colleagues fail to set forth any theory for why forcing potential Participants to choose between accepting these discriminatory market rules or forgoing access to this valuable transmission service is not a violation of Order No. 888 and the underlying requirement of the FPA that service not be unduly discriminatory.

40.     Allowing the Southeast EEM to go into effect with the existing governance structure and market participation requirements may have a significant effect on the Southeast energy market.  For one, it will decrease volume and liquidity of non-firm point-to-point service within or across the Southeast EEM territory,[59] making it more difficult and expensive for anyone who continues to engage bilaterally in the Southeast

---

[55] *Mid-Continent Area Power Pool*, 87 FERC ¶ 61,075 at 61,317 (1999), *petitions for review denied*, *Alliant Energy Corp. v. FERC*, 253 F.3d 748 (D.C. Cir. 2001).

[56] *See Central Iowa Power Cooperative v. FERC*, 606 F.2d 1156, 1170 (D.C. Cir. 1979).

[57] *Id.*

[58] *Id.* at 1170, 1171.

[59] Filing Parties predict this effect, citing it in their benefits analysis.  *See* Transmittal Letter at 36-37 (citing Benefits Analysis at 8, 19).

EEM footprint.  The Filing Parties acknowledge this potential cost impact on non-Participants.[60]  The FPA does not permit requiring non-Participants to subsidize benefits for Participants, especially for Participants with valid concerns that joining the Southeast EEM may subject them to discriminatory treatment.

41.      There are clear and straightforward solutions here, which would not derail the Filing Parties goal of an efficient Southeast EEM platform.  For example, the Filing Parties could remedy these infirmities by: (1) creating the option for non-LSE Participants to become Members if they make the necessary financial commitment, like in the WEIS; and (2) creating a process for non-Member Participants, states and other stakeholders, such as consumer groups, to provide complaints and concerns on Southeast EEM proposals, also like in the WEIS.

## IV.    Southeast EEM's lack of adequate market protections may result in unjust and unreasonable rates

42.      I am also concerned that the Southeast EEM, as proposed, could result in unjust and unreasonable rates.  The Filing Parties failed to provide sufficient analysis demonstrating a lack of potential by Southeast EEM Participants for the exercise of market power or manipulation of the market, or adequate safeguards to protect against these potential abuses on a going forward basis.

43.      The Filing Parties dismiss market power concerns raised by protestors and argue that no market power analysis or other market power protection is needed for the Southeast EEM because the core functioning of the Southeast bilateral market is not being changed by the Southeast EEM and the market presents no new opportunities for the exercise of market power.[61]  In other words, the Filing Parties propose to rely on the jurisdictional Southeast EEM Participants' existing market-based rate authorities as proof that Participants in the Southeast EEM will not be able to exercise market power.  This reliance depends on the false premise that the Southeast EEM is nothing more than an enhancement on the existing bilateral markets in the Southeast.[62]  Such cursory analysis

---

[60] See Pope Aff. ¶ 67.  The Filing Parties justify the potential increase in transmission service costs to native load customers as permissible because native load customers may receive greater benefits via the relevant utilities' participation in the Southeast EEM.  *Id.*  But this argument neglects that *non*-native load customers can likewise expect increased transmission service costs and will receive *no* corresponding benefits where they are not Participants in the Southeast EEM.

[61] *See* Filing Parties March 30 Answer at 29; Response to First Deficiency Letter at 2.

[62] *See supra* at PP 10-12.

violates the Commission's duty to ensure that participants in the Southeast EEM "either lack, or have adequately mitigated, any horizontal or vertical market power."[63]

44.     First, as discussed above, the Southeast EEM is a new market footprint. To the extent that the Commission has granted jurisdictional Southeast EEM Participants the authority to transact in the Southeast, it has done so based on the results of market power analyses of each Participant's ability to exercise market power in the balancing authority areas in which they own generation and transmission assets. Those analyses assume that each balancing authority is essentially its own unique market, and require a number of inputs that are specific to the market being studied.[64]  Given its expanded footprint, voluntary nature, and introduction of NFEETS, all of these inputs would necessarily be different for the Southeast EEM.

45.     Furthermore, traditional market power analyses assume that all uncommitted capacity located within the market footprint is available to compete. However, given the participation requirements, and the voluntary nature of the market, it is unclear who will participate in the market and how many resources they will make available. The Filing Parties admit that they do not know the level of participation in the Southeast EEM.[65]  If participation levels are lower than the Filing Parties anticipate, it is very possible that Participants the Commission found to not have market power as studied in individual balancing authority areas could have the ability to exercise market power in the Southeast EEM.

46.     The failure to provide market-specific market power analyses contradicts the Commission's decisions in the Western EIM. In *PacifiCorp*, the Commission found that the EIM will be a new relevant geographic market for market power purposes, and required PacifiCorp (and all subsequent market members) to study the EIM when joining, as well as study it as part of their triennial market power updates.[66]  This helped ensure

---

[63] *Public Citizen v. FERC*, No. 20-1156, 2021 WL 3438374, at *3.

[64] For example, the amount of generation located in the balancing authority area, the average amount of load, the number of potential competitors, and the amount of potential competing transfers that can be imported from neighboring balancing authority areas.

[65] In the first Deficiency Letter, Commission staff inquired about the number of companies that are expected to participate in the Southeast EEM, as well as their expected supply and demand offers. The Filing Parties declined to offer any specifics, instead arguing that "forward looking estimates . . . are difficult to make with any precision or certainty" and they expect "that the market will attract robust participation." *See* Response to First Deficiency Letter at 13-14.

[66] *PacifiCorp*, 147 FERC ¶ 61,227, at P 206 (2014) ("[B]ecause the EIM will be a

that PacifiCorp, which had market-based rate authority in all balancing areas that comprised the EIM at the time it joined the market, would not be able to exercise market power.

47.     Without a market power analysis that looks specifically at the Southeast EEM, the Commission is flying blind.  The risk of market power abuse created by the Southeast EEM going into effect without adequate market power analysis is exacerbated by the fact that the market has no independent market monitor.  Other organized market proposals recently approved by the Commission, like the WEIS and EIM, include independent market monitors that work to prevent the exercise of market power, by constantly analyzing the market and enforcing market power mitigation measures when they detect that conditions are such that a market participant will be able to exercise market power – even when those participants have received authorization to transact at market-based rates.  The Commission relied on the presence of the market monitors in approving the design of the Western EIM and SPP's WEIS.[67]  While the Commission is equipped to

_____

new relevant geographic market for market power purposes, PacifiCorp is required to make a market-based rate change of status filing within nine months of the launch of the EIM market so that the Commission can assess whether PacifiCorp has market power in the EIM.").

[67] *See e.g.*, *Cal. Indep. Sys. Operator Corp.*, 147 FERC ¶ 61,231, at P 226 (2014) ("With regard to Neighboring Systems' request that market power analyses be performed on an ongoing basis and that the Department of Market Monitoring publish quarterly reports on the performance of the EIM, we note that CAISO has proposed that the Department of Market Monitoring will monitor markets administered by CAISO, which include the EIM.  In addition, CAISO's tariff requires the Department of Market Monitoring to report on wholesale market trends on a quarterly basis."); *Sw. Power Pool, Inc.,* 173 FERC ¶ 61,267, at P 81 (2020) ("Instead, SPP and the SPP MMU will evaluate the mitigation thresholds over time, and SPP will file with the Commission to implement changes as needed.  We find that this approach is just and reasonable and addresses the Commission's concern in the July Order regarding automatic increases of mitigation thresholds."); *id*. at P 83 ("Furthermore, the SPP MMU is obligated to recommend frequently constrained areas prior to the start of the WEIS Market"); *id.* at P 99 ("In addition, to the extent that market participants are consistently short due to physical withholding, they face potential referral to the Commission's Office of Enforcement if the SPP MMU suspects physical withholding behavior based on credible evidence."). SPP's market monitor also completed a Market Power Study several months prior to Commission approval of the proposed WEIS market, found that a single supplier could possess structural market power at the system level, and recommended that the SPP develop a system-wide market power mitigation measure.  *Id.* at P 69.

provide some *ex post* monitoring of the Southeast EEM, that is not a replacement for active monitoring that will prevent the exercise of market power.

48.     I am also concerned that the Southeast EEM's design will create avenues for manipulation.  The Southeast EEM permits Participants to "select Counterparty Specific Constraints for any reason."[68]  Given this lack of any need for justification,[69] as well as the absence of market monitoring, such "toggling" presents a risk of abuse.  The Filing Parties argue that such toggling "is just a manifestation of a decision that any market participant can make today."[70]  This argument neglects the fact that that the risk is materially different in the Southeast EEM context.  Under the proposal, actions by one participant not only impact that participant and its counterparties, but also automatically flow through the multi-lateral algorithm, impacting other potential buyers and sellers at the same time.  Prices of various transactions that emerge from the algorithm depend upon the multi-lateral landscape of bids, not just on that party's own conduct.  Further, the Filing Parties glaze over the fact that the Southeast EEM is a mechanism to allocate finite transmission rights.  The ability to toggle off competitors, or entire balancing authority areas, creates the opportunity for participating Southeast EEM Members to secure NFEETS transmission rights for themselves while denying their competitors access.[71]  The bilateral market, by contrast, subjects all bilateral transactions to equal transmission opportunities.

49.     Using the Three Eligible Counterparty Rule[72] as a safeguard against collusive schemes is a recognition that such schemes may occur.  There has been no demonstration

---

[68] Transmittal Letter at 25.

[69] While Filing Parties explain that Counterparty Specific Constraints can be used to allow Participants to comply with limits on their market-based rate authority ("toggling off" in regions where they are not permitted to market-based sales), nothing obligates them to use Counterparty Specific Constraints only for this purpose, and they need not give any justification for imposing constraints.  *Id.*

[70] Filing Parties March 30 Answer at 33.

[71] The Filing Parties list 180 counterparties to existing enabling agreements as evidence that they are widely used in the Southeast.  However, these agreements have never been used as a gating mechanism for participation in a multilateral market construct.  Prospective Southeast EEM Participants must enter into enabling agreements with existing Southeast EEM Participants to gain entry into the market.

[72] The Three Eligible Counterparty Rule is "the requirement that all Participants have 'toggled on' at least three unaffiliated potential counterparties each time they bid or offer."  Transmittal Letter at 40.

that this requirement will act as an effective safeguard to prevent such schemes. The Filing Parties state that the number of required counterparties renders it difficult for Participants to engage in anticompetitive conduct,[73] but do not provide any analysis, evidence, or rationale why three is the right number to protect the integrity of the market. This amounts to acknowledgment that anticompetitive conduct is a valid concern, without any demonstration that such concern has been properly mitigated.

50.     The Southeast EEM algorithm's complexity and lack of transparency expose the market to manipulation, particularly in the absence of a market monitor to observe its operation and investigate anomalies. The Commission's enforcement docket is full of examples of market participants using superior knowledge of, and experience with, vulnerabilities in optimization algorithms or other features of complex markets to manipulate prices or collect unjustified payments.[74] That the algorithm is too complex for Filing Parties even to describe in a mathematical formula evinces a high risk of design flaws for manipulators to exploit.

51.     The lack of analysis specific to Southeast EEM's unique characteristics, demonstrating that Participants will not be able to exercise market power, as well as the unchecked potential avenues for manipulation, means that Filing Parties have failed to demonstrate that rates in the Southeast EEM will be just and reasonable. Like earlier concerns about undue discrimination, these issues are not insurmountable. The Filing Parties could easily address these deficiencies by submitting a Southeast EEM-specific market power analysis and by closing some of these potential avenues for manipulation (e.g. instituting protections to avoid toggling off abuse). Of course, adding an independent market monitor would also go a long way to address both the market power and market manipulation concerns. These are legitimate issues with straightforward solutions that the Commission could have provided as guidance to Filing Parties in a rejection order.

---

[73] Transmittal Letter at 41.

[74] *See, e.g., Vitol Inc. and Federico Corteggiano*, 169 FERC ¶ 61,0170 (2019) (order assessing penalties for market manipulation where knowledgeable market participants used feature of CAISO's marginal cost of congestion formula to manipulate physical energy prices for benefit of participants' related financial positions); *Coaltrain Energy, L.P.,* 155 FERC ¶ 61,204 (2016) (market participants manipulate market by placing economically meaningless 'Up to Congestion' bids at nodes with small or no price spreads for sole purpose of collecting unjustified marginal loss surplus allocation credits, rather than for legitimate arbitrage purposes); *City Power Marketing, LLC,* 152 FERC ¶ 61,012 (2015) (manipulative 'Up to Congestion' bids); *Houlian Chen,* 151 FERC ¶ 61,179 (2015) (manipulative 'Up to Congestion' bids).

Document Accession #: 20211020-4003     Filed Date: 10/20/2021

## V.     **Conclusion:  Creation of this market puts non-Members at a permanent disadvantage in the Southeast**

52.     The Commission's responsibility under section 205 of the FPA is to evaluate proposals to determine whether they will result in just and reasonable rates that are not unduly discriminatory or preferential.  As my colleagues have emphasized, the Filing Parties have not put forth an RTO proposal, so in the context of this proceeding it is not the Commission's role to evaluate whether an RTO would deliver greater benefits than the proposal before us.  By the same token, we cannot dismiss a failure of this proposal to abide by the Commission's bedrock principles necessary to guarantee just and reasonable and non-discriminatory rates simply because opponents of the proposal may prefer an RTO.  We have an obligation under the Administrative Procedure Act to articulate a "rational connection between the facts found and the choice made."[75]  (Here, the choice being to allow the tariff to go into effect by operation of law via split vote.)  My colleagues' failure to explain why they would have rejected protestors' detailed arguments that the proposal imposes unduly discriminatory barriers to transmission access and fails to safeguard the market against just and reasonable rates violates this obligation.[76]

53.     Engaging on the merits of the actual filing under consideration, it is clear that the Southeast EEM proposal, whether accepted by operation of law or with the commitments offered in the response to the first deficiency letter, fails to meet the standard set forth in section 205.  I therefore cannot support the market platform as proposed.

54.     A well-designed Southeast EEM has the potential to provide valuable benefits to the Southeast energy markets.  An order rejecting the proposal could easily have set the stage for a future proposal complying with the FPA's requirements, thereby providing a pathway for the promise of benefits to bear fruit.  It is disappointing that, perhaps in search of near-term incremental cost savings, the Commission has compromised its fundamental responsibilities to guarantee non-discriminatory service and safeguard the market from abuse.  Allowing this tariff to go into effect by operation of law puts at risk the Commission's long-running and largely unified commitment to steadily expanding

---

[75] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)).

[76] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) ("It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'") (quoting *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)).

Docket No. ER21-1111-002, *et al*.                                              - 24 -

non-discriminatory open access, a legal tradition exemplified by one of the Commission's proudest actions, Order No. 888.


_____

Allison Clements
Commissioner

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2023, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney